UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-40976<br><br>(Joint Administration Requested)<br><br>Hearing Date:  TBD[2]<br>Hearing Time:  TBD<br>Hearing Location:  TBD |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO MAINTAIN AND ADMINISTER
THEIR CUSTOMER PROGRAMS AND HONOR CERTAIN PREPETITION
OBLIGATIONS RELATED THERETO AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

**Relief Requested**[3]

1.    The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "Proposed Orders")[4], (a) authorizing the Debtors to maintain and administer their Customer Programs and honor certain prepetition obligations to customers in the ordinary course of business and (b) granting related relief.  In

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]   The Debtors will file a notice stating the date, time, and location of the first day hearing once this information becomes available.

[3]   Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[4]   Copies of the Proposed Orders will be made available on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

addition, the Debtors request that the Court schedule a final hearing to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

5. 23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[5] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome. The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic health reports. Further, through its Lemonaid Health telehealth platform, the Company operates as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

---

[5] Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

2

6. On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7. The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated at this time.

8. A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[6]

## The Debtors' Customer Programs

9. The Debtors offer a suite of products and services designed to help customers access, understand, and benefit from their genetic information, from one-time genetic testing kits to healthcare subscription services and a telehealth platform. The Debtors' customer-centric approach has helped millions of customers worldwide achieve access to personalized information about their genetic health risks, ancestry, traits, and medical care.

10. In the ordinary course of business, the Debtors provide certain incentives, discounts, promotions, and accommodations, and administer certain related programs, to attract

---

[6] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

3

customers and maintain positive customer relationships (collectively, the "Customer Programs"). The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brands. Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to allow the Debtors to compete within their markets and maximize value.

11. By this motion, the Debtors seek authority to (a) honor any prepetition obligations related to their Customer Programs and (b) continue to honor the Customer Programs in the ordinary course of business, subject to certain modifications described in this motion, on a postpetition basis without disruption. The Debtors' material Customer Programs and estimates of the Debtors' prepetition obligations thereunder are described below.

**A.    Subscriptions**

12. In the ordinary course of business, the Debtors sell one-time ancestry and genetic test kits and also offer various subscriptions to customers. The Debtors primarily have three types of subscriptions: the 23andMe+ Premium subscription, the 23andMe+ Total Health subscription, and various condition-specific and medication subscriptions offered through their Lemonaid Health telehealth platform (collectively, the "Subscriptions"). As of the Petition Date, approximately 700,000 customers have active Subscriptions.

13. *23andMe+ Premium*. The Debtors offer an annual membership providing customers with access to personalized health data and recommendations. Through the 23andMe+ Premium subscription, customers can receive personalized health recommendations for lifestyle changes and clinical screenings based on genetic and non-genetic data. The Debtors offer customers personalized and holistic insights around certain common cancers, enabling customers to assess their risk profiles and take preventative or mitigative action. Likewise, subscribers can

4

receive Pharmacogenetics reports, which enables customers, in conjunction with their doctors, to understand how their DNA interacts with certain medications.

14. *23andMe+Total Health*. Subscribers to the Debtors' Total Health platform are entitled to a suite of features. The Debtors employ exome sequencing (a genetic test that sequences the protein-coding regions of a person's genes) to analyze customers' DNA and detect disease-causing variants and high impact genes associated with certain health conditions. Regular blood testing provides subscribers with biannual analyses of key blood biomarkers to provide customers with a more comprehensive understanding of their health. Finally, subscribers can work with expert clinicians who are trained in genetics-informed preventative care and health action plans. Subscribers are entitled to unlimited messaging with these clinicians, as well as an in-depth consultation tailored to their testing results.

15. *Lemonaid Health*. The Debtors' Lemonaid Health telehealth platform operates as a national online doctor's office that provides medical care and pharmacy fulfillment services. In connection with this platform, the Debtors offer memberships relating to the treatment of specific conditions and providing access to certain medicine. Specific memberships, such as those relating to mental health, insomnia, and weight loss, include access to clinician consults and necessary blood labs. The Debtors also offer memberships providing access to, and facilitating the delivery of, medication and treatments for a wide range of medical conditions. Subscriptions are offered on a monthly basis, as well as on prepaid quarterly and annual bases.

16. Customers with Subscriptions are charged in advance at the time of initial purchase and then, if not cancelled, at the time of renewal (for a monthly, quarterly, or annual period). Thus, at any given time, the Debtors have obligations to their customers, which may include shipment for testing for which they have paid, providing ongoing access to the services associated with their

5

Subscriptions, and providing refunds and replacement testing kits or similar offerings under certain circumstances. The Debtors estimate that, as of the Petition Date, they have approximately $666,811, plus other non-cash obligations, owing on account of Subscriptions.

### B. Retail Partners

17. The Debtors sell their genetic testing services to customers via their websites, as well as through third-party online retail partners (the "Retail Partners"). Typically, a Retail Partner who sells directly to the end-user receives between 10-30% of the total purchase price as compensation, remitting the balance to the Debtors. The Debtors generate approximately 21% of their revenue through indirect sales of services through the Retail Partners. As of the Petition Date, the Debtors estimate they owe no more than approximately $470,000 in outstanding prepetition obligations to Retail Partners.

### C. Promotional Offers and Third-Party Vendors

18. Through their websites and through certain third-party vendors, the Debtors occasionally offer sales promotions on their products and services (collectively, the "Promotions") to potential and existing customers. These promotional offers provide discounts to customers, including "price reductions," "friends and family" referral bonuses, and "percentage off" price reductions upon consenting to go-forward communications. Additionally, the Debtors occasionally offer discounted health "add-on" services to customers with Subscriptions. The Debtors believe the Promotions encourage overall sales, improve customer relationships, and generate repeat customers. Because the Promotions enable customers to receive discounts and may not be redeemed for any other value, they do not represent a cash liability for the Debtors.

**D.     Refund and Exchange Program**

19.     To accommodate customer needs, the Debtors maintain certain refund and exchange policies.  These refund and exchange policies are critical to maintaining the goodwill of the Debtors' consumer base as they allow the Debtors to protect consumer confidence and ensure customer satisfaction.

20.     In the ordinary course of business, the Debtors may process refunds to their customers under certain circumstances (the "Refund Policy").  Generally, refunds are provided to customers (a) upon notice from a customer who failed to cancel a Subscription but would like to do so within 24 hours following the renewal date, (b) if the Debtors' laboratory cannot analyze a customer's DNA after the customer provides two saliva samples,[7] (c) within 30 days of purchase, so long as the customer has not yet shipped its saliva sample to the Debtors' laboratory, or (d) under other circumstances as determined by the Debtors in their business judgment.

21.     Typically, the Debtors offer customers a refund of the full purchase price of the renewed Subscription or testing kit cost (excluding shipping and handling costs), credited to the original form of payment.  Additionally, upon request, the Debtors occasionally extend a price adjustment if the Debtors reduce the original price of an item within seven days of the customer's original product purchase date.  If the refund cannot be processed to the customer's original form of payment, the Debtors offer a refund in the form of gift cards issued by Tango Card, Inc. ("Tango"), a third-party vendor offering gift cards from a variety of online retailers.  The Debtors do not issue these gift cards directly, but instead pay Tango the cost of each gift card issued.

---

[7]   It is not always known why a sample "fails" and cannot be analyzed.  Due to biological variability, some customers may lack enough concentration of DNA in their saliva for the Debtors' technology to process.

7

22. Additionally, the Debtors offer replacement health testing kits or similar materials to customers, free of charge, if the original test kit or similar materials are damaged, expired, lost in the mail, yield an inconclusive result, or cannot be processed (the "Replacement Kit Policy" and, together with the Refund Policy, the "Refund and Exchange Program"). Once the Debtors are made aware of obligations under the Refund and Exchange Program, they pay such amounts as soon as reasonably practicable. Therefore, the Debtors are not aware of any incurred but unpaid obligations under the Refund and Exchange Program outside of the other Customer Programs' obligations set forth in this motion. However, out of an abundance of caution, the Debtors seek authorization to continue honoring their obligations on account of the Refund and Exchange Program, if any, including payments to Tango, resulting from prepetition transactions on a postpetition basis consistent with historical practices.

23. Given the Debtors' liquidity position and their fiduciary obligations to maximize value for stakeholders, the Debtors also seek authority to make reasonable modifications to the Refund Policy (the "Refund Policy Modifications"), as described below and as may be reasonably modified in the Debtors' business judgment. For customers located in the United States that purchase the Debtors' testing kit without a Subscription, the Debtors seek to modify their Refund Policy such that the customer will be entitled to a refund upon request within 24 hours of purchase, so long as the customer has not yet shipped its saliva sample to the Debtors' laboratory. For the avoidance of doubt, the Refund Policy Modifications do not apply to prepetition sales and will not impact the ability of customers whose DNA cannot be processed by the Debtors' laboratory after the customer provides two saliva samples to receive a refund. The Debtors believe the foregoing Refund Policy Modifications are necessary to maximize value to all stakeholders.

8

24. To ensure customers receive notice of the Refund Policy Modifications, the Debtors will clearly indicate the terms of their modified Refund Policy by updating the return and refund policy and the Terms of Service on their website to reflect the Refund Policy Modifications (the "Noticing Procedures"). Based on the foregoing, the Debtors submit that the Noticing Procedures are reasonable and provide customers with notice of the Refund Policy Modifications.

## Basis for Relief

**A. Continuing to Honor the Customer Programs in the Ordinary Course Is Warranted Under Sections 105(a) and 363 of the Bankruptcy Code and Is in the Best Interests of the Debtors' Estates**

25. The Debtors seek authority to honor and satisfy any claims based on Customer Programs, whether incurred prepetition or postpetition, in the ordinary course of business. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In doing so, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.[8]

---

[8] Because the Debtors engage in transactions related to the Customer Programs on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe such transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and thus do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course transactions in connection with the Debtors' Customer Programs is integral to ensuring the Debtors' ability to operate their business as debtors in possession and maximize the value of their estates.

9

26. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 499.

27. Section 105(a) of the Bankruptcy Code and the "doctrine of necessity" permit the bankruptcy court to exercise its broad grant of equitable powers to authorize the payment of prepetition obligations when "such payments are necessary to the continued operation of the Debtor." *See, e.g.*, *In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) (citing *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (holding that debtors may pay prepetition claims that are essential to continued operation of business)); *Bird* v. *Crown Convenience* (*In re NWFX, Inc.*), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that equitable principles govern . . ."); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) (explaining that courts have long justified the payment of certain pre-petition creditors under the "doctrine of necessity" when "payment of those claims was necessary to keep the debtor in business," and "was necessary to effectuate a successful reorganization . . .").

28. The above-referenced sections of the Bankruptcy Code empower the Court to authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims of certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re CoServ, L.L.C.*,

10

273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

29. Here, authorizing the Debtors to continue to administer the Customer Programs without interruption, including payment prepetition claims arising thereunder, during the pendency of the chapter 11 cases is critical to preserve the value of the Debtors' estates. The Debtors' customers are crucial to their business, and any interruption to the Debtors' relationships with their customers would have substantially negative consequences on the value of the Debtors' business. The commencement of the Debtors' chapter 11 cases may create apprehension on the part of certain current or potential customers about their continuing or commencing business with the Debtors. Any curtailment of the Debtors' ability to continue the Customer Programs, and the resulting negative public perception from the Debtors' inability to do so, may enable the Debtors' competitors to take advantage of the Debtors' reorganization proceedings, causing substantial harm to the Debtors' business, their estates, and their stakeholders. The Debtors therefore seek to ensure their customers of the Debtors' commitment to continued productive relationships. The Debtors further believe that the substantial benefit conferred on the Debtors' estates—and ultimately their creditors—by the Customer Programs' enhancement of the Debtors' going-concern business value warrants authorizing the Debtors to honor such Customer Programs.

**B.    The Refund Policy Modifications are Appropriate**

30. The Debtors submit that, in order to maximize value for all stakeholders, the Debtors should be able to modify their Customer Programs. The proposed Refund Policy Modifications provide the Debtors with finality and enhanced financial flexibility, while simultaneously affording customers the opportunity to request a refund.

11

31. Certain states may have laws and regulations governing a company's return and refund requirements (the "Applicable Laws"). While the Debtors intend to comply with the Applicable Laws in modifying the Refund Policy, they have not thoroughly analyzed all of the strict requirements under the Applicable Laws in connection with their preparation for chapter 11. To eliminate the time, delay, and expense associated with the administrative procedures necessary to strictly comply with the Applicable Laws, the Debtors' proposed Refund Policy Modifications streamline the administrative burdens on their estates and simultaneously provide adequate protection to the broad and varied interests of consumers. Bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See, e.g.*, *In re Shenago Grp., Inc.*, 186 B.R. 623, 628 (Bankr. W.D.Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997); *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1353 (9th Cir. 1994) (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety").[9]

---

[9] Bankruptcy courts in this and other jurisdictions often grant similar relief in authorizing debtors to conduct store closing sales without strict compliance with applicable state and local laws. *See, e.g.*, *Final Order (I) Authorizing the Debtors to Assume the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief*, ¶ 12, *In re Party City Holdco Inc.*, Case No. 24-90621 (ARP) (Bankr. S.D. Tex. Jan. 21, 2025) ("[T]he Debtors and the Consultant shall be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Store Closing Sales in accordance with the terms of this Final Order and the Store Closing Procedures without the necessity of further showing compliance with any such Liquidation Sale Laws."); *Order Authorizing Debtor to Enter Into and Perform Under Agency Agreement, To Conduct Store-Closing Sale, and to Abandon Unsold Assets*, ¶ 12, *In re Bakers Footwear Group, Inc.*, Case No. 12-49658-705 (Bankr. E.D. Mo. Nov. 8, 2012) ("Compliance with any and all bulk sales laws, to the extent applicable to the Sale, is hereby waived.").

12

32.     Under the circumstances of these cases, enforcing the strict requirements of the Applicable Laws as applied to the Debtors' modified Refund Policy would undermine the fundamental purpose of the Bankruptcy Code by placing constraints on the Debtors' ability to maximize estate assets for the benefits of creditors.  Accordingly, the Refund Policy Modifications are necessary and appropriate, while also being narrowly tailored to facilitate the successful resolution of these chapter 11 cases.  With the exception of the limited waivers and accommodations requested herein, the Debtors will comply with all Applicable Laws pertaining to the Refund Policy.

33.     For the foregoing reasons, the Debtors submit that the circumstances of these chapter 11 cases warrant granting the requested relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted. Likewise, the Debtors submit that the Noticing Procedures provide customers with sufficient notice of the proposed Refund Policy Modifications.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue their Customer Programs and honor prepetition commitments related thereto in the ordinary course of business on a postpetition basis. In addition, the Debtors respectfully request authority to replace, implement, modify, and/or terminate one or more of the Customer Programs, in each case, as the Debtors deem appropriate in their business judgment and in the ordinary course of business, without further Court order.

**Processing of Checks and Electronic Funds Transfers Should Be Authorized**

34.     The Debtors have sufficient funds to pay any amounts related to the Customer Programs in the ordinary course of business.  In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize the Debtors' banks and other financial institutions (the "Banks") to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this motion, without regard to whether any checks or transfers were issued before

13

or after the Petition Date; (b) provide that all Banks may rely on the Debtors' representations with respect to whether any check or transfer issued or made by the Debtors before the Petition Date should be honored pursuant to this motion (such banks and other financial institutions having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this motion are dishonored or rejected by the Banks.

## Immediate Relief Is Necessary

35.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm."  For the reasons discussed herein and in the First Day Declaration, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts.  The relief requested herein is necessary for the Debtors to operate their business in the ordinary course and preserve the value of their estates for the benefit of stakeholders.  Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

36.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this motion is necessary for the Debtors to operate their business without interruption and to preserve value for

14

their estates through these chapter 11 cases. Accordingly, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

37. Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

15

**Notice**

38.     The Debtors will provide notice of this motion to the following parties: (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable; (e) the United States Attorney's Office for the Eastern District of Missouri; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Federal Trade Commission; (i) the state attorneys general in all 50 states; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Notice of this motion and any order entered hereon will be served in accordance with rule 9013-3(A)(1) of the Local Rules. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

39.     A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov/, and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders and grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 24, 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:   (314) 854-8600
Facsimile:   (314) 854-8660
Email:   thr@carmodymacdonald.com
   nrw@carmodymacdonald.com
   jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:   (212) 373-3000
Facsimile:   (212) 757-3990
Email:   pbasta@paulweiss.com
   chopkins@paulweiss.com
   jchoi@paulweiss.com
   ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*