## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |
| | Hearing Date:  TBD[2]<br>Hearing Time:  TBD<br>Hearing Location:  TBD |

**DEBTORS' MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) PAY CERTAIN PREPETITION EMPLOYEE WAGES
AND BENEFITS AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS
AND PAY RELATED OBLIGATIONS AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

### Relief Requested[3]

1.      The Debtors seek entry of an interim order (the "Interim Order") and a final order

(the "Final Order" and, together with the Interim Order, the "Proposed Orders")[4] (a) authorizing

the Debtors to (i) pay certain prepetition wages and benefits and (ii) continue employee benefits

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]     The Debtors will file a notice stating the date, time, and location of the first day hearing once this information becomes available.

[3]     Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[4]     Copies of the Proposed Orders will be made available on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

programs in the ordinary course of their business, including payment of certain prepetition obligations related thereto, and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing to consider approval of this motion on a final basis.

### Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 363(c), 507, and 541(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### Background

5.      23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[5] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome. The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic health reports. Further, through its Lemonaid Health telehealth platform, the Company operates

---

[5]      Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

6.      On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated at this time.

8.      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[6]

### The Debtors' Workforce

9.      The Debtors' workforce primarily comprises four types of workers:  (a) employees directly employed by the Debtors; (b) medical professionals employed by affiliated non-Debtor professional medical entities; (c) independent contractors; and (d) temporary staff.

    a.      *Debtor Employees*:  As of the Petition Date, the Debtors directly employ approximately 271 full- and part-time employees (the "Debtor Employees").

---

[6]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

b.     *PMC Professionals*:  As described in the First Day Declaration, the Debtors partner with physicians and other medical professionals to offer their customers access to medical care through the Debtors' Lemonaid Health platform.  Through these partnerships, the Debtors contract with affiliated non-Debtor professional medical corporations ("PMCs") that in turn employ or contract with medical professionals who provide services to the Debtors' customers.  The PMC structure is necessary to comply with state laws that prohibit corporate ownership of medical practices.  Under these arrangements, the Debtors have exclusive responsibility for the provision of all non-medical services required for the day-to-day operation and management of the PMCs, including payment of the medical professionals' salaries and employee benefits.  Specifically, the Debtors are responsible for the salaries of, but do not directly employ, 15 physicians, nurse practitioners, and registered nurses (collectively, the "PMC Professionals" and together with the Debtor Employees, the "Employees").

c.     *Independent Contractors*:  The Debtors additionally directly contract with several independent contractors (the "Independent Contractors").  The Independent Contractors fulfill a variety of roles across the Debtors' business and fulfill duties similar to the Employee job functions.  As of the Petition Date, there are approximately 50 Independent Contractors in the Debtors' workforce.

d.     *Temporary Staff*:  The Debtors occasionally further supplement their workforce by retaining temporary workers who are sourced from various staffing agencies (collectively, the "Staffing Agencies") to fulfill ordinary course duties on a short- or long-term basis, including to service the Debtors' customer care call center (the "Temporary Staff" and, collectively with the Employees and the Independent Contractors, the "Workers").  As of the Petition Date, the Debtors retain approximately 150 Temporary Staff.

10.     The Workers perform a wide range of functions critical to the Debtors' operations and the administration of these chapter 11 cases.  In many instances, the Workers include personnel who are intimately familiar with the Debtors' business, processes, and systems, possess unique skills and experience, and/or have developed relationships with customers and vendors that are essential to the Debtors' business.  These individuals are not easily replaced.  Without access to the services of the Workers, the Debtors' ability to conduct operations and the administration of their estates will be substantially impaired.

11.     The vast majority of the Workers rely on their compensation and benefits, as applicable, to pay their daily living expenses and support their families.  These Workers will be subject to severe financial constraints if the Debtors are not permitted to continue paying their compensation and providing health and other benefits during the pendency of these chapter 11 cases, as applicable.  Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate due to the facts and circumstances of these chapter 11 cases.

## Compensation and Benefits

12.     To minimize the personal hardship the Debtors' Workers could suffer if certain prepetition obligations are not paid when due, and to maintain stability in the Debtors' workforce during the administration of these chapter 11 cases, the Debtors seek authority to pay and honor any prepetition amounts owed relating to, among other things, wages, salaries, other compensation, payroll processing services, federal and state withholding taxes and other amounts withheld (including garnishments, Workers' share of insurance premiums, flexible and health savings account contributions, 401(k) contributions, and taxes), reimbursable expenses, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, ordinary course non-insider bonus programs, retirement and savings plans, and other benefits that the Debtors have historically provided in the ordinary course, all as more fully described herein (collectively, the "Compensation and Benefits").  In addition, the Debtors are seeking to pay all costs incidental to the Compensation and Benefits whether arising prepetition or postpetition.

13.     Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their prepetition Compensation and Benefits programs in the ordinary course of business.  Out of an abundance of caution, the Debtors request the right to modify, change, and discontinue any of their Compensation and Benefits and to implement new programs, policies, and benefits in

5

the ordinary course of business during these chapter 11 cases and without the need for further Court approval.

14.     The Debtors estimate that they owe prepetition amounts on account of the Compensation and Benefits in approximately the following amounts:

| Prepetition Compensation and Benefits Obligations | Interim Amount | Final Amount |
|---|---|---|
| **Compensation** | | |
| Unpaid Wages | $1,657,000 | $1,657,000 |
| Unpaid Temporary Staff Compensation | $2,202,000 | $2,202,000 |
| Unpaid Independent Contractor Compensation | $411,000 | $411,000 |
| Reimbursable Expenses | $36,000 | $36,000 |
| Unpaid Withholding Obligations | $947,000 | $947,000 |
| Unpaid Payroll Processing Fees | $31,000 | $31,000 |
| **Benefits** | | |
| Unpaid Health Benefit Plan Amounts | $302,000 | $302,000 |
| COBRA Benefits | $608,000 | $912,000 |
| Unpaid 401(k) Fees and Unpaid Matching Contributions | $309,000 | $809,000 |
| Additional Benefits Programs | $44,000 | $44,000 |
| **Total** | **$6,547,000** | **$7,351,000** |

15.     As of the Petition Date, the Debtors do not believe that there are any Workers that are owed prepetition Compensation and Benefits in excess of $15,150, the priority expense compensation and benefit cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

A.     **Compensation**

1.     **Unpaid Wages**

16.     In the ordinary course of business, the Debtors incur payroll obligations for wages, salaries, and other compensation owed to their Employees (the "Employee Wages").  Employees are generally paid on a bi-monthly basis on the 15th and the last day of the month via direct deposit, wire transfer, or checks, on either a salaried or hourly basis.  Approximately 261 Employees are

6

salaried, exempt employees and 25 Employees are paid hourly. In 2024, the Debtors paid approximately $82,913,000 in aggregate on account of Employee Wages, net of withholding obligations. None of the Employees are represented by a union or employed pursuant to a collective bargaining agreement.

17.     Because the majority of Employees are paid in arrears, certain Employees will be owed accrued and unpaid Employee Wages as of the Petition Date. Employee Wages also may be due and owing as of the Petition Date because of, among other things: (a) potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and (b) the delay between the date when certain payroll checks are issued and the date on which such checks are presented to the Employee's bank for payment. As of the Petition Date, the Debtors estimate that they owe approximately $1,657,000 on account of unpaid Employee Wages earned by Employees within 180 days prior to the Petition Date (the "Unpaid Wages").

### 2. Unpaid Temporary Staff Compensation

18.     The Debtors make payments to Staffing Agencies and the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services important to the Debtors' operations following the receipt of an invoice for services rendered. In 2024, the Debtors paid approximately $6,983,000 on account of Temporary Staff Compensation, including fees that the Debtors remit to Staffing Agencies in exchange for the services they provide with respect to the Temporary Staff. The Debtors believe the authority to continue paying the Temporary Staff Compensation is critical to minimize disruption of the Debtors' business operations. As of the Petition Date, the Debtors estimate that Temporary Staff and Staffing Agencies are owed approximately $2,202,000 on account of services rendered prior to the Petition Date (collectively, the "Unpaid Temporary Staff Compensation").

### 3. Independent Contractor Compensation

19.     The Debtors rely on Independent Contractors in the ordinary course of their business.  In 2024, the Debtors utilized the services of approximately 50 Independent Contractors. Typically, the Independent Contractors submit invoices for their work (the "Independent Contractor Compensation") and the Debtors pay such invoices in accordance with the terms of the agreements governing each respective Independent Contractor's engagement.

20.     In 2024, the Debtors paid approximately $1,276,000 on account of Independent Contractor Compensation.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued and unpaid Independent Contractor Compensation is approximately $411,000 (the "Unpaid Independent Contractor Compensation").

### 4. Director Compensation

21.     Debtor 23andMe Holding Co. maintains a board of directors (the "Board") consisting of four non-Employee directors and the Debtors' former Chief Executive Officer (each in such capacity, a "Director").  Three of the non-Employee Directors were appointed to the Board in October 2024 and their compensation consists of (a) a one-time cash payment that was paid on or around October 28, 2024 and (b) a monthly cash retainer.  The fourth non-Employee Director was appointed to the Board in March 2025 and his compensation consists of (a) a one-time cash payment that was paid prior to the Petition Date and (b) a monthly cash retainer beginning on or around September 2025.  The former Chief Executive Officer does not receive compensation for her service as a Director.  As of the Petition Date, the Debtors do not believe they owe any outstanding obligations to any non-Employee Director.

### 5.  Non-Insider Employee Incentive Programs[7]

22.    The Debtors maintain various incentive programs to drive performance among many of their Employees (the "Non-Insider Employee Incentive Programs").  To qualify for the Non-Insider Employee Incentive Programs, Employees must be actively employed on the date of payment thereunder.  Awards under the Non-Insider Employee Incentive Programs are subject to the oversight of the Board's compensation committee.

23.    The Debtors believe that the Non-Insider Employee Incentive Programs have been critical to maintaining Employee morale and loyalty.  Uncertainty about the continuation of such Non-Insider Employee Incentive Programs may create instability in the Debtors' workforce by causing current Employees to seek other employment, or cause potential employees to avoid joining the Debtors, thereby undermining the Debtors' ability to restructure.  Moreover, the Debtors believe the Non-Insider Employee Incentive Programs are integral to the Debtors' business operations and align participating Employees' interests with those of the Debtors generally by linking payments under the Non-Insider Employee Incentive Programs to the Debtors' financial and operational performance.

### i.    Debtor Employee Incentive Program

24.    In the ordinary course of business, the Debtors offer the Debtor Employees an annual incentive program to maximize the Debtor Employees' performance for the benefit of the Debtors' business (the "Debtor Employee Incentive Program").  All of the Debtor Employees are eligible to receive awards under the Debtor Employee Incentive Program, which can be granted in either cash or restricted stock units ("RSUs").  Historically, awards granted under the Debtor

---

[7]    The relief sought under this motion with respect to the Non-Insider Programs (as defined below) does not include the payment of any obligation to any "Insider" (as the term is defined in section 101(31) of the Bankruptcy Code). The Debtors may seek separate authority with respect to any "insider," if necessary, and reserve all rights with respect to the "insider" status of any Employee.

Employee Incentive Program have always been granted in the form of RSUs, which vest upon issuance, and are allocated to each Debtor Employee on a case-by-case basis based on their role and seniority. As of the Petition Date, the Debtors do not believe that there are any prepetition amounts due and owing on account of the Debtor Employee Incentive Program. Out of an abundance of caution, however, the Debtors request to pay prepetition amounts on account of the Debtor Employee Incentive Program and to continue the program on a postpetition basis in the ordinary course of business, including with respect to the issuance of RSUs or their cash equivalents.

### ii.   Cash-Based Incentive Programs

25.     The PMC Professionals do not participate in the Debtor Employee Incentive Program, but are instead eligible to receive annual cash incentive payments for achieving certain performance metrics that are established by the Debtors' management by reference to clinical error rate, process adherence, and patient satisfaction (the "Annual PMC Cash Bonus Program").[8] The Debtors typically make the payouts under the Annual PMC Cash Bonus Program in May following the close of the preceding fiscal year ending in March. In 2024, the Debtors paid approximately $427,000 in cash to eligible PMC Professionals under the Annual PMC Cash Bonus Program. Awards under the Annual PMC Cash Bonus Program accrue at the end of each fiscal year.

26.     Additionally, from time to time and in the ordinary course of business, the Debtors award the Debtor Employees for performing above and beyond expectations through a discretionary cash-based bonus program (the "SPOT Bonus Program" and, together with the Annual PMC Cash Bonus Program, the "Cash-Based Incentive Programs"). Under the SPOT Bonus Program, Debtor Employees can nominate other Debtor Employees to receive a one-time

---

[8]   For the avoidance of doubt, such performance metrics do not include any financial metrics.

cash bonus in recognition of their exceptional contribution to the Debtors' business.  Debtor Employees submit nominations to the eligible employee's supervisor via Workday, a cloud-based human resources platform.  Awards under the SPOT Bonus Program are divided into tiers based on the Debtor Employee's specific contribution and generally range from $100 to $10,000. Additionally, awards under the SPOT Bonus Program are dependent upon department budgets, granted at the discretion of the Debtor Employee's supervisor, and limited to a maximum of two awards per individual per year, with the exception of the lowest bonus tier.  In 2024, the Debtors paid approximately $275,000 in cash to eligible Debtor Employees under the SPOT Bonus Program.

27.     As of the Petition Date, the Debtors do not believe that there are any prepetition amounts due and owing on account of the Cash-Based Incentive Programs.  However, given the importance of the Cash-Based Incentive Programs for Employee morale and retention, the Debtors seek authority, out of an abundance of caution, to pay prepetition amounts on account of the Cash-Based Incentive Programs and to continue the Cash-Based Incentive Programs on a postpetition basis in the ordinary course of business.

### 6.  Non-Insider Retention Bonus Program

28.     Prior to the Petition Date, the Debtors implemented a cash-based retention award program for its non-insider Employees (the "Non-Insider Retention Bonus Program").  Under the Non-Insider Retention Bonus Program, the Debtors reserved funds in the amount of $1,000,000 to be allocated as retention-based cash awards for their non-insider Employees who are critical to the Debtors' business.  Awards under the Non-Insider Retention Bonus Program are granted at the discretion of the Special Committee.  Each Employee's receipt of an award is subject to such Employee's continued employment with the Debtors through the earlier of December 31, 2025, and the date of the Debtors' emergence from bankruptcy following the effective date of a plan of

reorganization approved by the Court. Under the Non-Insider Retention Bonus Program, an Employee who receives an award and resigns voluntarily without good reason or is terminated by the Debtors for cause prior to the end of the retention period will be required to repay the retention amounts.

29.     As of the Petition Date, there are no prepetition amounts due and owing under the Non-Insider Retention Bonus Program. The Debtors seek authority to continue the Non-Insider Retention Bonus Program on a postpetition basis in the ordinary course of business. For the avoidance of doubt, the relief sought with respect to the Non-Insider Retention Bonus Program does not include payment of any obligations to any insider, and the Debtors will not make any non-ordinary course incentive or bonus payments to any insiders without further order of the Court.

### 7.  Non-Insider Severance Program

30.     The Debtors do not maintain a formal severance policy in the ordinary course of business. However, the Debtors have on occasion implemented temporary, discretionary severance programs for the benefit of certain non-insider Employees in connection with recent reductions in force or other terminations (the "Non-Insider Severance Programs" and, collectively with the Non-Insider Employee Incentive Programs and the Non-Insider Retention Bonus Program, the "Non-Insider Programs"). Under the Non-Insider Severance Programs, upon termination and at the Debtors' discretion, eligible non-insider Employees typically received a lump sum payment based on the Employee's length of employment, position, and/or other factors considered at the discretion of the Debtors (collectively, the "Severance Obligations"). Payments made on account of the Severance Obligations were typically provided in exchange for entry into release and confidentiality agreements, pursuant to which Employees typically released any and all claims against the Debtors and agreed to not disclose confidential information.

31.     As of the Petition Date, the Debtors do not believe that they owe any amounts to non-insider former Employees on account of Severance Obligations.  The Debtors believe that honoring Severance Obligations on a go-forward basis is critical to maintaining Employee morale and loyalty.  Accordingly, in the event that Severance Obligations arise after the Petition Date, the Debtors seek authority to make such payments to non-insider Employees in the ordinary course consistent with the Debtors' historical practice under the Non-Insider Severance Programs.  For avoidance of doubt, the relief sought with respect to Severance Obligations will not include payment of any obligations to any insider.

**B.     Reimbursable Expenses**

32.     Prior to the Petition Date, the Debtors directly or indirectly reimbursed, or provided a stiped to, eligible Employees and Independent Contractors, as applicable, for certain expenses incurred in the scope of their employment on behalf of the Debtors (the "Reimbursable Expenses").  The Reimbursable Expenses are incurred in the ordinary course of the Debtors' business operations and include expenses related to business travel (*e.g.*, airfare, in-flight Wi-Fi, luggage fees, car rentals, ground transportation, lodging, meals, and laundry service), mobile phone data and internet usage, work-from-home equipment costs, and other business-related expenses paid directly by the Debtors' Employees and Independent Contractors, as applicable.[9] Eligible Employees and Independent Contractors, as applicable, request reimbursement by submitting an expense report to the Debtors directly or through SAP Concur, a third-party expense

---

[9]     The Reimbursable Expenses discussed herein exclude expenses incurred by certain of the Employees through a corporate-issued credit card, which the Debtors seek authority to pay pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of Cash Management System, (B) Maintenance of Bank Accounts and Business Forms, (C) Performance of Intercompany Transactions, and (D) Certain Prepetition Obligations to be Honored; (II) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors; (III) Waiving Strict Compliance with 11 U.S.C. § 345(b) and Certain Operating Guidelines, as Applicable, and (IV) Granting Related Relief*, filed substantially contemporaneously herewith.

reporting application.   Once the Debtors have verified that a request relates to allowable Reimbursable Expenses, they reimburse the eligible Employee or Independent Contractor for the submitted expenses.[10]

33.     In 2024, the Debtors paid approximately $30,000 per month on account of Reimbursable Expenses.   As of the Petition Date, the Debtors estimate that they owe approximately $36,000 on account of Reimbursable Expenses.  The Debtors' Employees and Independent Contractors incur Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that such expenses would be reimbursed by the Debtors. Accordingly, the Debtors' inability to reimburse such workers for Reimbursable Expenses could impose hardship on those workers who have incurred obligations for the Debtors' benefit.   To avoid harming such Employees and Independent Contractors and to protect against the risk that these workers become personally liable for such expenses, the Debtors request authority to pay outstanding Reimbursable Expenses and to continue to pay the Reimbursable Expenses in the ordinary course of business on a postpetition basis.

**C.     Other Expenses**

34.     The Debtors offer Employees who work 20 hours a week or more reimbursement and/or payment assistance for other special expenses, such as pre-approved Sign-On Expenses (as defined below), tuition expenses, student loan payments, and family planning expenses (collectively, the "Other Expenses").  In 2024, the Debtors paid Employees approximately $41,000 per month on account of the Other Expenses.  As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid Other Expenses, but seek authority, out of an abundance of

---

[10]    Independent Contractors are only eligible to be reimbursed for travel-related expenses.

caution, to pay prepetition amounts in connection with the Other Expenses, if necessary, and to continue the programs associated with the Other Expenses in the ordinary course of business.

### 1. Sign-On Expenses

35.     In their discretion, the Debtors may from time to time offer one-time sign-on bonuses to certain new Employees and reimbursement for relocation expenses (the "Sign-On Expenses").  In 2024, the Debtors paid or reimbursed approximately $330,000 on account of Sign-On Expenses.  As of the Petition Date, the Debtors do not believe that there are any accrued and unpaid amounts outstanding in connection with Sign-On Expenses.

### 2. Tuition Reimbursement and Student Loan Assistance Programs

36.     To encourage the education and career development of their Employees, the Debtors reimburse eligible Employees up to $2,300 per calendar year for college-level coursework that is related to the Debtors' business, subject to such Employee (a) completing at least six months of employment prior to enrollment in the course and (b) receiving a letter grade of a "B" or better in the course, passing the course, or receiving a certificate of completion of the course.  The Debtors also assist Employees who are the primary borrower of a student loan by making a monthly $75 contribution directly to the Employee's student loan servicer through Gradifi, a provider of workplace education solutions, subject to a lifetime maximum contribution of $5,000 (collectively, the "Tuition and Student Loan Programs").   In 2024, the Debtors paid or reimbursed approximately $77,000 on account of the Tuition and Student Loan Programs.

### 3. Family Planning Program

37.     In the ordinary course of business, the Debtors reimburse eligible Employees for certain expenses incurred in connection with fertility, surrogacy, and adoption services (the "Family Planning Services").  The Debtors offer eligible Employees a lifetime reimbursement of up to $20,000 for each of the Family Planning Services through Navia (the "Family Planning

Program"). In 2024, the Debtors paid or reimbursed approximately $138,000 on account of the Family Planning Program.

### D. Payment Withholding and Processing

#### 1. Deductions and Payroll Taxes

38.     During each payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including garnishments, child support, and similar deductions as required by law. The Debtors also deduct other pretax and after tax deductions payable pursuant to certain employee benefit plans discussed herein, such as an Employee's share of healthcare benefits and insurance premiums, contributions under voluntary benefit programs, 401(k) retirement plan contributions, and other miscellaneous deductions (collectively, the "Deductions"). The Debtors forward the Deductions to the appropriate third-party recipients.

39.     In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (together with the Employee Payroll Taxes, the "Payroll Taxes" and collectively with the Deductions and FSA/HSA Withheld Amounts (as defined below), the "Withholding Obligations"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time the Employees' payroll checks are disbursed.

40.     In 2024, the Debtors paid approximately $5,880,000 per month on account of Withholding Obligations. As of the Petition Date, the Debtors estimate that they owe

approximately $947,000 on account of the Withholding Obligations (the "Unpaid Withholding Obligations").

### 2. Payroll Processing

41.     The Debtors contract with Automatic Data Processing (the "Payroll Processor") to process and administer the Debtors' payrolls.  For each payroll period, the Payroll Processor may process direct deposit transfers or wire transfers or administer payroll checks to Employees from disbursement accounts funded by the Debtors.  In addition, the Payroll Processor may serve as the Debtors' federal W-2 tax form processing vendor and/or administer certain of the Debtors' federal, state, and local payroll tax filings.  The Payroll Processor is integral to the Debtors' payroll process and facilitates the Debtors' accurate payment of compensation based on time worked, performance, and incentives earned.

42.     In 2024, the Debtors paid approximately $310,000 in the aggregate on account of payroll processing services, time and attendance systems, benefits administration, recruiting services, and related tools.  As of the Petition Date, the Debtors estimate that they owe approximately $31,000 to the Payroll Processor for payroll processing services (the "Unpaid Payroll Processing Fees").

### E.  Employee Benefits Programs

43.     The Debtors offer their Employees who work an average of 20 hours or more per week the ability to participate in several health and welfare insurance and benefits programs (including, among other programs, medical and dental plans, vision, flexible benefits plans, life insurance, and disability plans) and retirement plans (collectively, the "Employee Benefits Programs").

44.     The Employee Benefits Programs confer substantial benefits to eligible Employees who rely on the Employee Benefits Programs for their physical and financial well-being.  Failure

17

to continue the Employee Benefits Programs could cause Employees to experience severe hardship.

### 1. Health Benefit Plans

45.     The Debtors offer eligible Employees the opportunity to participate in various health benefit plans, including medical and dental plans (collectively, the "Health Benefit Plans").

    a.    *Healthcare Plans*.  The Debtors provide healthcare plans (the "Healthcare Plans") for medical coverage, which are administered by Kaiser Permanente ("Kaiser"), Blue Cross Blue Shield ("Blue Shield"), Aetna, and Hawaii Medical Service Association ("HMSA").  The type of Healthcare Plan in which an Employee can enroll in depends on such Employee's residence and role.  Depending on the provider, Employees have the option to enroll in a traditional health maintenance organization (HMO) plan, a high deductible plan, a preferred provider organization (PPO) plan, or a managed care plan.  The Healthcare Plans provide coverage for, among other things, physician and ancillary care, inpatient or outpatient care, preventative care, and prescription drug services.  On average, the Debtors pay approximately 80% of the Healthcare Plan premiums and Employees pay the remaining approximately 20%.  Spouses, children, and other specified dependents are eligible dependents under the Healthcare Plans.  The annual cost to the Debtors of the Healthcare Plans is approximately $9,389,000. As of the Petition Date, the Debtors estimate that they owe approximately $171,000 on account of the Healthcare Plans.

    b.    FSAs and HSAs.  The Debtors offer eligible Employees the ability to contribute a portion of their pretax compensation to certain flexible spending accounts to cover eligible expenses for healthcare and dependent care, including day care expenses (each, an "FSA").  The FSAs are administered by Navia.  The Debtors also provide Employees who choose to participate in a high deductible healthcare plan with the opportunity to contribute to a health savings account to voluntarily set aside pretax funds to pay for eligible health and welfare expenses ("HSAs").  The HSAs are administered by Fidelity.  For the 2025 calendar year, each eligible Employee can contribute up to $6,550 to an HSA depending on such Employee's age and whether their Healthcare Plan coverage includes spouses and/or dependents, and up to $5,000 per year for each FSA depending on the specific account.  In addition to the Employees' contributions, the Debtors contribute approximately $20,000 in the aggregate each month to Employees' HSAs.  The Debtors do not contribute to Employees' FSAs.  The Debtors withhold approximately $1,016,000 in the aggregate per year from Employees' compensation on account of Employees' contributions to HSA and FSAs (the "FSA/HSA Withheld Amounts").  Additionally, the Debtors pay a quarterly administration fee of

18

approximately $15,000 to Fidelity and Navia on account of the FSAs and HSAs. As of the Petition Date, the Debtors estimate that they owe approximately $12,000 on account of unpaid HSA contributions. The Debtors believe that approximately $2,000 remains outstanding on account of unpaid FSA and HSA fees.

c.   <u>Dental Plan</u>.   The Debtors offer eligible Employees the option of participating in a dental plan (the "<u>Dental Plan</u>") administered by Delta Dental. The Debtors and Employees each pay for approximately 80% and 20% of Dental Plan premiums, respectively. The annual cost to the Debtors of the Dental Plan is approximately $764,000. As of the Petition Date, the Debtors estimate that they owe approximately $110,000 on account of the Dental Plan.

d.   <u>Vision Plan</u>.   The Debtors offer eligible Employees the option of participating in a vision plan (the "<u>Vision Plan</u>") administered by Delta Dental in partnership with VSP Vision Care. The Debtors and Employees each pay for approximately 80% and 20% of Vision Plan premiums, respectively. The annual cost to the Debtors of the Vision Plan is approximately $77,000. As of the Petition Date, the Debtors estimate that they owe approximately $2,000 on account of the Vision Plan.

e.   <u>Life Insurance and Related Coverage</u>.   The Debtors provide eligible Employees with (i) voluntary life insurance (at a rate calculated based on the Employee's age, and a benefit of up to $500,000), which includes optional supplemental spouse/domestic partner and child life products offered on a voluntary, Employee-paid basis and accidental death and dismemberment coverage, (ii) voluntary accident, critical illness, and hospital insurance, and (iii) group term life insurance, which includes accidental death and dismemberment insurance (as a rate of one times the Employee's base salary up to a maximum of $500,000) (collectively, the "<u>Life Insurance and Related Coverage</u>"), which are administered by Unum Insurance. The annual cost of the Life Insurance and Related Coverage to the Debtors is approximately $76,000. As of the Petition Date, the Debtors estimate they owe approximately $2,000 on account of unpaid amounts related to the Life Insurance and Related Coverage.

f.   <u>Disability Benefits</u>.   The Debtors provide basic short- and long-term disability benefits to eligible Employees through Unum Insurance (the "<u>Disability Benefits Program</u>"). Under the short-term disability program, eligible Employees are entitled to receive the lesser of 60 percent of their base weekly salary and $3,750 per week, for a period of up to 24 weeks. After 24 weeks, eligible Employees are entitled to continue receiving 60% of base monthly earnings up to $15,000 per month. The annual cost to the Debtors of the Disability Benefits Program is approximately $301,000. As of the Petition Date, the Debtors estimate that

19

they owe approximately $3,000 on account of the Disability Benefits Program.

46.     In the aggregate, the Debtors estimate that they owe approximately $302,000 on account of the Health Benefit Plans (the "Unpaid Health Benefit Plan Amounts"), including claim reimbursement payments and administrative fees owed to Kaiser, Blue Shield, HMSA, and Aetna.

**2.  Workers Compensation**

47.     Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtors.  The Debtors maintain a workers' compensation benefits program administered by The Travelers Companies, Inc. (the "Workers Compensation Program").  The annual premium under the Workers Compensation Policy is approximately $57,000, which is paid by the Debtors on an annual basis.

48.     As of the Petition Date, the Debtors do not maintain reserves on account of the Workers' Compensation Program.  The Debtors must continue the claims assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program, without regard to whether such liabilities were outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements. The inability to do so may result in adverse legal consequences that could disrupt their chapter 11 process.  Accordingly, the Debtors seek authority to pay prepetition amounts owed with respect to the Workers' Compensation Program, and to continue the Workers' Compensation Program in the ordinary course on a postpetition basis.

**3.  COBRA Benefits**

49.     The Debtors provide certain benefits to eligible Employees after their termination, retirement, or disability leave, including benefits provided under the Consolidated Omnibus

Budget Reconciliation Act of 1985 ("COBRA"). Navia is the third-party COBRA administrator for the Debtors. In November 2024 and February 2025, the Debtors implemented reductions in force (the "RIFs") resulting in an over 40% headcount reduction, which included the discontinuance of their therapeutics business. Pursuant to the RIFs, the Debtors offered all impacted Employees a 100% subsidy for up to three months of COBRA coverage following their last date of employment, which for many affected employees occurred in either January or February 2025. As of the Petition Date, the Debtors estimate that they owe approximately $912,000 in accrued and unpaid COBRA coverage.

### 4. 401(k) Plan

50.     The Debtors offer eligible Employees the opportunity to participate in a retirement savings plan (the "401(k) Plan"), administered by Fidelity, that generally provides automatic pretax salary deductions of compensation up to limits set by the Internal Revenue Code. Each participating Employee's 401(k) Plan contributions are deducted automatically from each paycheck. The vast majority of Employees participate in the 401(k) Plan. The Debtors withhold approximately $8,830,000 per year from Employees' compensation on account of Employees' 401(k) contributions to the 401(k) Plan. The Debtors pay Fidelity approximately $25,000 in administrative fees per year for administering the 401(k) Plan. As of the Petition Date, the Debtors owe Fidelity approximately $59,000 in administrative fees related to the 401(k) Plan (the "Unpaid 401(k) Fees").

51.     The Debtors also provide certain annual matching contributions for the 401(k) Plan (the "401(k) Matching Contributions"). The Debtors match 100% of Employees' contributions up to 2% of eligible compensation and the 401(k) Matching Contributions are 100 percent vested at the time of payment. In 2024, the Debtors contributed approximately $2,341,000 in 401(k) Matching Contributions. As of the Petition Date, the Debtors estimate that they owe

21

approximately $750,000 in accrued and unpaid 401(k) Matching Contributions (the "Unpaid Matching Contributions").

52.     Many eligible Employees' retirement savings consist solely of their 401(k) Plan, and many eligible Employees choose to participate in the 401(k) Plan because of the 401(k) Matching Contributions.  Thus, the Debtors believe that continuing the 401(k) Plan and the 401(k) Matching Contributions is essential to maintaining Employee morale.

### 5.  Employee Referral Program

53.     In the ordinary course of business, the Debtors provide cash payments to eligible Debtor Employees who refer job applicants who are subsequently hired and remain employed with the Debtors (the "Employee Referral Program").  The referral payment is $1,000 per successful referral.  The Debtors do not believe any amounts are outstanding under the Employee Referral Program as of the Petition Date.

### 6.  Paid Leave Benefits

54.     The Debtors offer several paid and flexible time-off benefits for their Employees. When an Employee elects to use paid time-off benefits (collectively, "Paid Leave Benefits"), the applicable Employee is generally paid at their applicable regular hourly or salary rate.

55.     Specifically, the Debtors offer their (a) salaried Debtor Employees a flexible time off policy (the "FTO Policy")[11] that allows such employees to take unlimited time off for circumstances including vacation, caring for children, school activities, medical/dental appointments, personal business, or emergencies, (b) hourly Debtor Employees a paid time-off policy that provides a total of up to 27 days of paid time-off per year depending on the applicable

---

[11]  Debtor Employees who qualify for the FTO Policy accrue separate sick time at a rate of one hour for every 30 hours worked for up to 72 hours.  Such employees also receive an additional 80 hours of sick leave for COVID-related sick time off.

Debtor Employee's role and tenure, and (c) PMC Professionals a paid time-off policy that provides a total of five weeks of paid time-off per year with separate sick leave.

56.     The Debtors also offer their Employees, as applicable, additional other forms of paid and unpaid time-off, many of which are required by law, including: Company and floating holidays, time off for bereavement, jury or court attendance, time spent voting or volunteering, military service, medical leaves, family and parental leave, domestic abuse leaves, and other personal leaves. These other forms of paid and unpaid time off do not involve incremental cash outlays beyond standard payroll obligations.

57.     As of the Petition Date, the Debtors estimate there are approximately $66,000 of accrued but unpaid amounts on account of Paid Leave Benefits under the policies for hourly Debtor Employees and PMC Professionals. The Debtors believe that the (a) continuation of the Paid Leave Benefits in accordance with prior practice is essential to maintaining morale during the Debtors' reorganization and (b) payment of Paid Leave Benefits obligations postpetition will not create any material increase in cash flow requirements beyond the Debtors' typical payroll obligations. Accordingly, the Debtors are only seeking authority to continue to honor obligations on account of Paid Leave Benefits, including to cash out accrued benefits at termination, if or when such amounts come due in the ordinary course of business on a postpetition basis, to the extent required by applicable law and consistent with past practice.

### 7.  Additional Benefit Programs

58.     In addition to the foregoing, the Debtors offer Employees the opportunity to participate in a range of general, ancillary benefits, including, among other things: (a) commuter benefits, under which Employees receive a subsidy from the Debtors for utilizing public transportation and/or have the opportunity to set aside pretax earnings for expenses incurred relating to public transportation and/or parking fees; (b) mental health benefits whereby

Employees may seek counseling sessions; (c) health and wellness programs, including access to the Debtors' genetic testing products; (d) back-up adult and child care benefits; and (e) pet insurance through Nationwide and United Pet Care (collectively, the "Additional Benefit Programs").

59.     As of the Petition Date, approximately $44,000 is accrued and outstanding under the Additional Benefit Programs.

### Basis for Relief

**A.      Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations**

**1.   Certain of the Compensation and Benefits Are Entitled to Priority Treatment**

60.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits to priority treatment.  As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan.  *See* U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including sick leave pay earned by an individual, and (b) contributions to an employee benefit plan).  Thus, granting the relief sought herein should only affect the timing of payments to Employees, and should not have any material negative impact on recoveries for general unsecured creditors.

**2.   Payment of Certain Compensation and Benefits Is Required by Law**

61.     The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' wages. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. *See* 11 U.S.C. § 541(b)(1).  Further, federal and state laws require the Debtors to withhold certain

tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because such obligations may not be property of the Debtors' estates, the Debtors request authorization to transmit any Withholding Obligations to the proper parties in the ordinary course of business.

62. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

**B.     The Bankruptcy Code Permits the Court to Authorize the Debtors to Pay Prepetition Compensation and Benefits Where Such Payments Are Necessary to Protect and Preserve the Estate**

63. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business' going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."). In doing so, these courts

acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.[12]

64.     Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 499.

65.     Section 105(a) of the Bankruptcy Code and the "doctrine of necessity" permit the bankruptcy court to exercise its broad grant of equitable powers to authorize the payment of prepetition obligations when "such payments are necessary to the continued operation of the Debtor." *See, e.g.*, *In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) (citing *In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (Bankr. D. Del. 1999) (holding that debtors may pay prepetition claims that are essential to continued operation of business)); *Bird* v. *Crown Convenience* (*In re NWFX, Inc.*), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy, however, is that equitable principles govern . . ."); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546 (Bankr. W.D. Mo. 2001) (explaining that courts have long justified the payment of certain pre-petition creditors under the "doctrine of necessity" when "payment of those claims

---

[12]   Because the Debtors engage in transactions related to the Compensation and Benefits programs on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe such transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and thus do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course transactions in connection with the Debtors' the Compensation and Benefits programs is integral to ensuring the Debtors' ability to operate their business as debtors in possession and maximize the value of their estates.

was necessary to keep the debtor in business," and "was necessary to effectuate a successful reorganization . . .").

66.     The above-referenced sections of the Bankruptcy Code empower the Court to authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims of certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re CoServ, L.L.C.*, 273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

67.     Here, the Debtors' payment of the Compensation and Benefits is necessary to their continued and uninterrupted operations during these chapter 11 cases.  The majority of the Debtors' workforce rely exclusively on the Compensation and Benefits to satisfy their daily living expenses.  Consequently, the Debtors' Workers will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Compensation and Benefits, as applicable.  Additionally, continuing ordinary course benefits will help maintain workforce morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

68.     The Debtors' ability to continue providing the Compensation and Benefits is necessary to their continued and interrupted operations during these chapter 11 cases.  Absent the relief requested herein, the Debtors believe that their Workers may seek alternative employment opportunities, which would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and, likely, diminishing stakeholder confidence in the Debtors' ability to

successfully reorganize.  The loss of valuable Workers and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their business operations.  Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, continuing to provide the Compensation and Benefits in the ordinary course.

69.    The Debtors submit that the circumstances of these chapter 11 cases warrant granting the requested relief, and that doing so is in the best interests of the Debtors, their estates, their creditors, and their stakeholders, and therefore should be granted.  Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue providing the Compensation and Benefits and pay prepetition claims related thereto on the terms set forth in the Proposed Orders.

### a.   The Non-Insider Programs Are Reasonable and a Sound Exercise of the Debtors' Business Judgment

70.    The Debtors further request that they be allowed to continue the Non-Insider Programs in the ordinary course of business.  The Debtors submit that the Non-Insider Programs should be reviewed under section 363(c)(1) of the Bankruptcy Code rather than section 503(c) of the Bankruptcy Code because they are simply preexisting programs that the Debtors have maintained in the ordinary course and seek to continue on a postpetition basis, and no insiders are part of such programs.  *See, e.g., In re Dana Corp.*, 358 B.R. 567, 581 (Bankr. S.D.N.Y. 2006); *In re Glob. Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007).

71.    The Debtors submit that continuing to maintain the Non-Insider Programs for non-insiders is a sound exercise of their business judgment and in the best interests of the estates.  Importantly, these programs are material components of the Debtors' overall Compensation and Benefits package and are intended to incentivize employees in the ordinary course of the Debtors'

operations.  The Debtors utilize the Non-Insider Programs to drive eligible employees to attain superior performance goals.  The Debtors believe that it is necessary to continue these programs for non-insiders on a postpetition basis to incentivize performance that exceeds expectations and to avoid the risk of losing their most critical Employees.  Accordingly, the Debtors respectfully request that the Court authorize, but not direct, the Debtors to continue the Non-Insider Programs in the ordinary course of business, including payment of prepetition obligations related thereto, if any.

72.    However, out of an abundance of caution, the Debtors further submit that the Non-Insider Programs comply with the requirements of section 503(c) of the Bankruptcy Code.  The standard for determining if the Non-Insider Programs do not run afoul of section 503(c)(3) of the Bankruptcy Code's requirement that such contemplated payments be justified by the facts and circumstances of the case is essentially the same business judgment standard articulated under section 363(b) of the Bankruptcy Code.  *See In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).").  Section 503(c)(3) of the Bankruptcy Code generally prohibits certain transfers made to officers, managers, consultants, and others that are not justified by the facts and circumstances of the case. 11 U.S.C. § 503(c)(3).

73.    Here, the business justification supporting the Non-Insider Programs is clear—the Debtors require the key, non-insider Employees' specific knowledge and skill sets to preserve and maximize stakeholder value.  The Non-Insider Programs Employees are intimately familiar with the Debtors' operations, and many have skills that are unique and difficult to replace.  Without the Non-Insider Programs, the Debtors risk the departure of many of their most crucial Employees.

Such departures would likely cause a substantial disruption to the efficiency and future growth of the Debtors' operations, reducing profits and revenues to the detriment of all parties in interest. Moreover, it is the Debtors' reasonable belief that the cost of the Non-Insider Programs is less than the cost of recruiting and training replacement Employees to oversee the Debtors' business and operations. Retaining Employees through the Non-Insider Programs will accordingly maintain stability and allow the Debtors to focus their efforts on reorganizing as effectively as possible. Overall, the Debtors believe that the Non-Insider Programs are vital to retaining Employees and protecting the enterprise value associated therewith.

74.     Because implementing and continuing the Non-Insider Programs will motivate the Debtors' Employees to the benefit of all parties in interest, the Non-Insider Programs reflect a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these chapter 11 cases. *See, e.g., In re Glob. Home Prods., LLC*, 369 B.R. at 784 ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *In re Mesa Air Grp., Inc.*, 2010 WL 3810899, at *4 (Bankr. S.D.N.Y. Sept. 24, 2010) (holding that bonus payments are "'justified by the facts and circumstances of the case' under section 503(c)(3) [where] they are within the 'sound business judgment' of the Debtors" (citation omitted)). Accordingly, to the extent necessary, the Non-Insider Programs satisfy section 503(c) of the Bankruptcy Code.

**b.  The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims**

75.     Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]

30

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." 11 U.S.C. § 362(d)(1).

76. The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their claims under the Workers' Compensation Program (the "Workers' Compensation Claims") in the appropriate judicial or administrative forum. The Debtors believe that cause exists to modify the automatic stay because staying the Workers' Compensation Claims could have a detrimental effect on Employee financial well-being and morale and lead to the departure of certain Employees who are critical at this juncture. In addition, as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Debtors' Workers' Compensation Program to proceed.

### Processing of Checks and Electronic Funds Transfers Should Be Authorized

77. In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize the Debtors' banks and other financial institutions (the "Banks") to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all Banks may rely on the Debtors' representations with respect to whether any check or transfer issued made by the Debtors before the Petition Date should be honored pursuant to this motion (such banks and other financial institutions having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this motion are dishonored or rejected by the Banks.

### Immediate Relief Is Necessary

78.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after

the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable

harm."  For the reasons discussed herein and in the First Day Declaration, the Debtors believe an

immediate and orderly transition into chapter 11 is critical to the viability of their operations and

that any delay in granting the relief requested could hinder the Debtors' operations and cause

irreparable harm.  Failure to obtain the requested relief during the first 21 days of these chapter 11

cases would severely disrupt the Debtors' operations at this critical juncture and imperil the

Debtors' restructuring efforts.  The relief requested herein is necessary for the Debtors to operate

their business in the ordinary course and preserve the value of their estates for the benefit of

stakeholders.  Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been

satisfied.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

79.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or

lease of property (other than cash collateral) is stayed for 14 days after the order is entered."  Fed.

R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this motion is

necessary for the Debtors to operate their business without interruption and to preserve value for

their estates through these chapter 11 cases.  Accordingly, the Debtors request that the Court enter

an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and

that the Debtors have established cause to exclude such relief from the 14-day stay period under

Bankruptcy Rule 6004(h).

### Reservation of Rights

80.     Nothing contained herein or any actions taken pursuant to such relief requested is

intended to be or should be construed as:  (a) an admission as to the amount of, basis for, or validity

of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

81.     The Debtors will provide notice of this motion to the following parties:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable; (e) the United States Attorney's Office for the Eastern District of

Missouri; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Federal Trade Commission; (i) the state attorneys general in all 50 states; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). Notice of this motion and any order entered hereon will be served in accordance with rule 9013-3(A)(1) of the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Rules"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

82.    A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov/ and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders

and grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 24, 2025                    Respectfully submitted,
St. Louis, Missouri

                                         **Carmody MacDonald P.C.**
                                         */s/ Thomas H. Riske*
                                         Thomas H. Riske #61838MO
                                         Nathan R. Wallace #74890MO
                                         Jackson J. Gilkey #73716MO
                                         120 S. Central Avenue, Suite 1800
                                         St. Louis, Missouri 63105
                                         Telephone:     (314) 854-8600
                                         Facsimile:     (314) 854-8660
                                         Email:         thr@carmodymacdonald.com
                                                        nrw@carmodymacdonald.com
                                                        jjg@carmodymacdonald.com

                                         - and -

                                         **PAUL, WEISS, RIFKIND, WHARTON &**
                                         **GARRISON LLP**
                                         Paul M. Basta (*pro hac vice* pending)
                                         Christopher Hopkins (*pro hac vice* pending)
                                         Jessica I. Choi (*pro hac vice* pending)
                                         Grace C. Hotz (*pro hac vice* pending)
                                         1285 Avenue of the Americas
                                         New York, New York 10019
                                         Telephone:     (212) 373-3000
                                         Facsimile:     (212) 757-3990
                                         Email:         pbasta@paulweiss.com
                                                        chopkins@paulweiss.com
                                                        jchoi@paulweiss.com
                                                        ghotz@paulweiss.com

                                         *Proposed Counsel to the Debtors and Debtors in*
                                         *Possession*