**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |
| | Hearing Date:  TBD[2]<br>Hearing Time:  TBD<br>Hearing Location:  TBD |

**DEBTORS' MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING (A) CONTINUED USE OF CASH
MANAGEMENT SYSTEM, (B) MAINTENANCE OF BANK
ACCOUNTS AND BUSINESS FORMS, (C) PERFORMANCE
OF INTERCOMPANY TRANSACTIONS, AND (D) CERTAIN
PREPETITION OBLIGATIONS TO BE HONORED; (II) GRANTING
ADMINISTRATIVE EXPENSE PRIORITY STATUS TO POSTPETITION
INTERCOMPANY CLAIMS AGAINST THE DEBTORS; (III) WAIVING
STRICT COMPLIANCE WITH 11 U.S.C. § 345(B) AND CERTAIN OPERATING
GUIDELINES, AS APPLICABLE; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
      proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address
      for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]   The Debtors will file a notice stating the date, time, and location of the first day hearing once this information
      becomes available.

**Relief Requested**[3]

1.     The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "Proposed Orders")[4] (a) authorizing the Debtors to (i) continue using their existing Cash Management System, (ii) maintain the Bank Accounts and Business Forms, (iii) perform Intercompany Transactions, and (iv) honor certain prepetition obligations related to the Cash Management System; (b) granting administrative expense priority status to postpetition Intercompany Claims against the Debtors; (c) waiving strict compliance with section 345(b) of the Bankruptcy Code and certain operating guidelines related to the Bank Accounts, to the extent applicable; and (d) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing to consider approval of this motion on a final basis.

**Jurisdiction and Venue**

2.     The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3]     Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[4]     Copies of the Proposed Orders will be made available on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

4.      The bases for the relief requested herein are sections 105, 345, 363, and 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

5.      23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[5] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome.  The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic health reports.  Further, through its Lemonaid Health telehealth platform, the Company operates as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

6.      On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated at this time.

8.      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* (the "First Day

---

[5]    Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[6]

## The Cash Management System

**A.    Overview**

9.    As of the Petition Date, the Debtors have approximately $37 million of unrestricted cash (the "Unrestricted Cash"). The Debtors intend to use the Unrestricted Cash to fund their operations in the ordinary course of business and the costs of these chapter 11 cases in accordance with the cash flow forecast attached as **Exhibit A** to this motion (as may be modified, amended, extended, and updated from time to time, the "Budget"). Accordingly, the Debtors are not seeking approval of a cash collateral or debtor in possession financing order at the outset of these cases. Instead, the Debtors seek authorization to continue using their historical Cash Management System (as defined below) in the ordinary course of business, subject to certain modifications implemented shortly before the Petition Date and as otherwise described in this motion.

10.    The Debtors' continued use of their Cash Management System is critical to the uninterrupted operation of their business and their seamless transition to operating as debtors in possession in these chapter 11 cases. Absent approval of the requested relief, the Debtors will be unable to efficiently fund operations and the administrative costs of these cases, to the detriment of all stakeholders.

**B.    The Cash Management System**

11.    In the ordinary course of business, the Debtors maintain an integrated cash management system to efficiently collect, transfer, and disburse funds generated from their

---

[6]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

operations, and to facilitate cash monitoring, forecasting, and reporting (the "Cash Management System"). The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined below). The Debtors' treasury department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.

12.     The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner. Indeed, large businesses use integrated systems to help control funds, ensure cash availability for each entity within the cash management system, and reduce administrative expenses by facilitating the movement of funds among multiple corporate entities.

## C.     Bank Accounts and Flow of Funds

### i.     Flow of Funds

13.     The Debtors' cash generally moves through the Cash Management System as illustrated in the diagram of the Cash Management System attached hereto as **Exhibit B**. The following is a summary overview of the material cash receipts and disbursements within the Cash Management System:

      a.     *Receipts*

          i.     The Debtors' primary source of income consists of cash receipts derived from (A) payments received from customers purchasing the Debtors' products and services (including through payment processors), (B) payments received from third-party online retail partners that sell the Debtors' products and subsequently remit the proceeds to the Debtors, (C) payments received from research and collaboration partners (including royalties), and (D) other miscellaneous receipts.

          ii.     The Debtors' cash receipts enter the Cash Management System via credit and debit card processing, check, wire, or automated clearing house ("ACH") transfer.

    iii.  The Debtors collect all of their receipts into the Operating Account and the Processor Account (each as defined below). Thereafter, the cash proceeds are generally swept into the Debtors' main Concentration Account (as defined below).

  b.  *Disbursements*

    i.  Funds are transferred from the Concentration Account to the Operating Account and various Disbursement Accounts (as defined below) on an as-needed basis. The Debtors also pay debit and credit card processing fees and issue refunds through the Processor Account.

    ii.  The Debtors' cash disbursements generally include (A) third-party vendor and contractor expenses, (B) employee and payroll obligations, (C) software costs, (D) domestic and foreign taxes, (E) licensing and regulatory fees, (F) research and development costs, (G) credit and debit card processing fees, and (H) corporate overhead and other expenses in the ordinary course of business.

### ii. Bank Accounts

14. The Cash Management System comprises a total of ten bank accounts maintained with JPMorgan Chase Bank, N.A. ("JPM" or the "Bank"), each of which is identified on **Exhibit C** attached to this motion (collectively, the "Bank Accounts"). Nine of the ten Bank Accounts are maintained by the Debtors, while one is maintained by a non-Debtor affiliate. JPMorgan Chase Bank, N.A., where all Bank Accounts are maintained, is an authorized bank depository ("Authorized Depository") under the *Chapter 11 Guidelines for Debtors-in-Possession* (the "U.S. Trustee Guidelines") published by the Office of the United States Trustee for Region 13 (the "U.S. Trustee").

15. The Bank Accounts are described in more detail in the following table:[7]

---

[7] These descriptions and categories of Bank Accounts are for illustrative purposes only. A single Bank Account may fall into more than one of the categories described above.

| Bank Account | Description of Bank Account |
|---|---|
| ***Concentration Account*** | |
| **Concentration Account**<br><br>Account ending 9657 | 23andMe, Inc. maintains one main concentration account (the "<u>Concentration Account</u>") that collects funds that are regularly swept from the Debtors' zero-balance accounts, including the Processor Account, the Operating Account, the Payroll Accounts (as defined below), the Medical Licensing Account (as defined below), and the Pharmacy Licensing Account (as defined below). From time to time, excess funds from the Collateral Account (as defined below) and, historically, funds from the Investment Account (as defined below) are also transferred to the Concentration Account.<br><br>Funds held in the Concentration Account are used to make disbursements to other accounts, including the Operating Account, the Collateral Account, the Payroll Accounts, the Medical Licensing Account, the Pharmacy Licensing Account, and, historically, the Investment Account. |
| ***Collection Accounts*** | |
| **Operating Account**<br><br>Account ending 2026 | 23andMe, Inc. maintains a checking and operating account that receives funds from sales of the Debtors' test kits through third-party online retailers (the "<u>Operating Account</u>"). The Operating Account is also used as a disbursement account to pay certain of the Debtors' accounts payable via ACH, wire transfers, and checks, and to fund the Canadian Tax Account (as defined below).<br><br>The Operating Account is a "zero-balance" account that maintains no cash balance at the end of each day. The Debtors fund the Operating Account with cash from the Concentration Account, most commonly through automated transfers to restore the Operating Account's balance to $0.00 when it has a negative balance at the end of a given day. If the Operating Account has a positive balance at the end of a day, the balance is automatically swept into the Concentration Account. |
| **Processor Account**<br><br>Account ending 9689 | 23andMe, Inc. maintains a collection account that receives funds from credit card sales, debit card sales, online payment processors, and other direct customer payments from the Debtors' online sales (the "<u>Processor Account</u>"). The Processor Account is also used to pay associated processing fees on account of credit card sales, debit card sales, and customer refunds.<br><br>The Processor Account is a "zero-balance" account that maintains no cash balance at the end of each day. Funds in the Processor Account are automatically transferred to the Concentration Account at the end of each day. |
| ***Disbursement Accounts*** | |
| **Payroll Accounts**<br><br>Accounts ending 9928, 9629 | 23andMe, Inc. and non-Debtor affiliate LMND Medical Group, Inc., A Professional Corporation ("<u>LMND CA</u>") each maintain a zero-balance disbursement account that is funded by the Concentration Account and used to fund payroll and benefits for the Debtors' workforce and professionals employed by the PMCs (as defined below) (together, the "<u>Payroll Accounts</u>").[8]<br><br>The Payroll Accounts are zero-balance accounts that maintain no balance at the end of each day. The Debtors fund the Payroll Accounts with cash from the Concentration Account, most commonly through automated transfers to restore the Payroll Accounts' balances to $0.00 when they have a negative balance at the |

---

[8]    As described in the First Day Declaration, the Debtors have exclusive contractual arrangements with the PMCs (the "<u>PMC MSAs</u>") requiring them to provide business, administrative, and non-clinical services to the PMCs, including payment of payroll and benefits for the PMCs' professional employees, in exchange for a fixed fee and the PMCs' professionals providing services to patients through the Debtors' telehealth platform, Lemonaid Health.

| Bank Account | Description of Bank Account |
|---|---|
|  | end of a given day.  If either Payroll Account has a positive balance at the end of a day, the balance is automatically swept into the Concentration Account. |
| **Medical Licensing Account**<br><br>Account ending 9280 | 23andMe, Inc. maintains a disbursement account used to pay licensing and regulatory fees associated with the medical services provided by physicians and related professionals through Lemonaid Health (the "Medical Licensing Account").[9]<br><br>The Medical Licensing Account is a "zero-balance" account that maintains no cash balance at the end of each day.  The Debtors fund the Medical Licensing Account with cash from the Concentration Account, most commonly through automated transfers to restore the Medical Licensing Account's balance to $0.00 when it has a negative balance at the end of a given day.  If the Medical Licensing Account has a positive balance at the end of a day, the balance is automatically swept into the Concentration Account. |
| **Pharmacy Licensing Account**<br><br>Account ending 7920 | Lemonaid Pharmacy Holdings Inc. maintains a bank account used to pay licensing fees necessary for the Debtors' pharmacy business (the "Pharmacy Licensing Account").  Under applicable law, pharmacy-related licenses and other fees must be paid by a pharmacy benefit manager (here, Lemonaid Pharmacy Holdings Inc.).<br><br>The Pharmacy Licensing Account is a "zero-balance" account that maintains no cash balance at the end of each day.  The Debtors fund the Pharmacy Licensing Account with cash from the Concentration Account, most commonly through automated transfers to restore the Pharmacy Licensing Account's balance to $0.00 when it has a negative balance at the end of a given day.  If the Pharmacy Licensing Account has a positive balance at the end of a day, the balance is automatically swept into the Concentration Account. |
| **Canadian Tax Account**<br><br>Account ending 1413 | 23andMe, Inc. maintains a disbursement account that is manually funded by the Operating Account and used to pay the Debtors' taxes owing in Canada (the "Canadian Tax Account" and, collectively with the Payroll Accounts, the Medical Licensing Account, and the Pharmacy Licensing Account, the "Disbursement Accounts").  Under applicable law, the bank account used to pay Canadian taxes cannot be a zero-balance account. |
| *Other Accounts* |  |
| **Collateral Account**<br><br>Account ending 1733 | 23andMe, Inc. maintains an account for the purposes of holding restricted cash that serves as collateral under the Debtors' Corporate Card Program (as defined below), certain real property leases, and agreements with certain payment processors (the "Collateral Account"), in each case as required under the applicable operating agreements.  The funds in the Collateral Account are restricted (excluded from the Company's Unrestricted Cash) and subject to an exclusive first-priority lien in favor of JPM under that certain Assignment of Deposits, dated as of March 11, 2019 (the "Assignment of Deposits").<br><br>The Debtors fund the Collateral Account with funds from the Concentration Account on an as-needed basis.  Upon termination or expiration of, or otherwise in accordance with, the applicable operating agreements, the Debtors transfer any excess funds from the Collateral Account to the Concentration Account. |
| **Investment Account**<br><br>Account ending 6833 | 23andMe, Inc. maintains a money market investment account (the "Investment Account") that is manually funded by the Concentration Account.  Historically, the Debtors have conducted weekly cash flow forecasts and manually transferred funds from (a) the Investment Account into the Concentration Account in order to |

---

[9]    The Debtors are contractually obligated to pay such fees under the PMC MSAs.

| Bank Account | Description of Bank Account |
|---|---|
| | maintain a specified minimum balance in the Concentration Account and (b) the Concentration Account into the Investment Account if the Concentration Account has a balance in excess of such specified minimum balance. |
| | The Investment Account is currently dormant and does not hold any cash.  The Debtors currently do not anticipate utilizing the Investment Account to engage in any investment activity during the pendency of these chapter 11 cases. |

16.    In addition to the accounts described above, as of the Petition Date, the Debtors initiated the process of opening three new accounts with JPM to (a) hold proposed adequate assurance deposits for the benefit of the Debtors' utility providers throughout the course of these chapter 11 cases (the "Adequate Assurance Account"),[10] (b) hold certain employee-related obligations that the Debtors seek to pay under the Wages Motion (the "Wages Account"),[11] and (c) establish the Administrative Expense Account (as defined below).

**ii.    Bank Fees**

17.    In the ordinary course of business, the Bank charges, and the Debtors pay, honor, or allow the deduction from the appropriate Bank Accounts, certain service charges, and other fees, costs, and expenses (collectively, the "Bank Fees").  The Bank Fees are paid by the Debtors on a monthly basis.  In 2024, the Debtors estimate that they paid approximately $3,244 in Bank Fees on average each month.  As of the Petition Date, the Debtors estimate that there are approximately $3,500 in outstanding Bank Fees, all of which will come due within 30 days after the Petition Date.

---

[10]    The adequate assurance deposits are described further in the *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief*, filed substantially contemporaneously herewith.

[11]    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Employee Wages and Benefits and (B) Continue Employee Benefits Programs and Pay Related Obligations and (II) Granting Related Relief* (the "Wages Motion").

### iii.    Corporate Cards

18.    In the ordinary course of business, the Debtors provide certain of their employees corporate credit cards (the "Corporate Cards" and, such program, the "Corporate Card Program") for authorized business expenses, including travel, conferences, marketing materials, subscriptions, office supplies, software costs, and other ordinary course items.  The Corporate Card Program is provided pursuant to the Commercial Card Classic Application & Agreement, dated as of December 2, 2014 (as amended, supplemented, restated, or replaced from time to time, the "Corporate Card Agreement"), by and between 23andMe, Inc. and JPM.  The Corporate Card balances are paid directly from the Operating Account.  As of the Petition Date, the Debtors maintain approximately 35 Corporate Cards.

19.    The Corporate Card Program is an integral part of the Debtors' Cash Management System.  Employees' continued use of the Corporate Cards for procurement of qualifying expenses is essential to the continued operation of the Debtors' businesses.  On average, in the 12 months prior to the Petition Date, the Debtors spend on the Corporate Cards was approximately $100,000 per month.  The Debtors, with the assistance of their advisors, will continue to accurately track the balances incurred on the Corporate Cards throughout these chapter 11 cases.

20.    As of the Petition Date, the Debtors estimate that they owe approximately $10,000 on account of the Corporate Card Program.  Continued use of the Corporate Card Program is necessary to ensure the uninterrupted operation of the Debtors' business.  Accordingly, the Debtors seek authority to pay any amounts due and owing, whether related to the prepetition or postpetition period, under the Corporate Card Program and to continue this program in the ordinary course of business on a postpetition basis.

**D.      Modification to the Cash Management System**

21.      The Debtors seek to modify the Cash Management System by opening and dedicating a new, segregated Bank Account to fund certain administrative expenses during these chapter 11 cases (the "<u>Administrative Expense Account</u>"), primarily Bankruptcy Fees, U.S. Trustee Fees, and Professional Fees (each as defined below).  The Debtors seek authority to operate the Administrative Expense Account pursuant to the procedures set forth below (the "<u>Administrative Expense Procedures</u>"), which will ensure that the Debtors' maintain sufficient Unrestricted Cash to fund these chapter 11 cases for the benefit of all stakeholders:

| Administrative Expense Procedures | |
|---|---|
| **Covered Administrative Expenses** | The funds on deposit in the Administrative Expense Account shall not be available to general creditors of the Debtors' estates and may only be used to fund categories of fees and expenses set forth below in the ordinary course and subject to any applicable Court approvals, except as otherwise ordered by the Court:<br><br>• all fees required to be paid to the Clerk of the Court under section 1930(a) of title 28 of the United States Code plus applicable interest at the statutory rate (the "<u>Bankruptcy Fees</u>");<br><br>• all fees required to be paid to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus applicable interest at the statutory rate (the "<u>U.S. Trustee Fees</u>"); and<br><br>• all fees (including success or transaction fees) and expenses incurred during the chapter 11 cases by (a) persons or firms retained by the Debtors (the "<u>Debtor Professionals</u>") and (b) persons or firms retained by any official creditors committee pursuant to section 328 or 1102 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>" and, all fees and expenses incurred by such Professional Persons, the "<u>Professional Fees</u>).<br><br>All Bankruptcy Fees, U.S. Trustee Fees, and Professional Fees shall be paid from the Administrative Expense Account in accordance with and subject to any applicable Court orders. |
| **Weekly Funding Amount** | As soon as practicable following entry of the Interim Order and on a weekly basis thereafter, the Debtors shall fund the Administrative Expense Account with the aggregate amount of Bankruptcy Fees, U.S. Trustee Fees, and Professional Fees for such week as set forth in the Budget (the "<u>Weekly Funding Amount</u>"). |
| **Weekly Reporting** | Starting on the second week after the Petition Date, each Professional Person shall provide the Debtors on weekly basis by no later than 5:00 p.m. (prevailing Central Time) on Monday of each week (the "<u>Weekly Reporting Date</u>") a good faith estimate of the aggregate amount of actual accrued and unpaid fees and expenses incurred by |

11

| Administrative Expense Procedures | |
|---|---|
| | such Professional Person through such Weekly Reporting Date (each, a "Professional Fee Estimate"). |
| | The Professional Fee Estimates shall be submitted to the Debtors' advisors by electronic mail to: nbakke@alvarezandmarsal.com; fzepeda@alvarezandmarsal.com; and matt.yoon@alvarezandmarsal.com. |
| Adjustments to the Weekly Funding Amount | Following each Weekly Reporting Date, the Debtor Professionals shall calculate an amount (the "Weekly Variance Amount") equal to the difference between (a) the aggregate amount of all accrued and unpaid Professional Fees as reported in the Professional Fee Estimates and (b) the Weekly Funding Amount, in each case as of the applicable Weekly Reporting Date.  If the Weekly Variance Amount is a positive number, the Debtors shall transfer cash in an amount equal to the Weekly Variance Amount to the Administrative Expense Account. |
| Subsequent Transactions | The Administrative Expense Account and these Administrative Expense Procedures may be modified or replaced in their entirety by a customary "carve out" or similar construct in connection with the approval of any debtor in possession financing subsequently approved in these chapter 11 cases. |

22.     The Administrative Expense Procedures are intended to perform a similar function as a customary "carve out" in a cash collateral or debtor in possession financing order.  The Debtors submit that approval of the Administrative Expense Procedures is in the best interests of the Debtors' estates and all parties in interest, and ensure the Debtors maintain sufficient cash on account to fund the amounts necessary to appropriately administer these chapter 11 cases.

**E.      Compliance of the Bank Accounts with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines**

23.     Section 345(b) of the Bankruptcy Code requires that a debtor's bank post a bond unless a debtor's funds are "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."  11 U.S.C. § 345(b).  In addition, the U.S. Trustee Guidelines generally require that, among other things, chapter 11 debtors deposit all estate funds in an account with an Authorized Depository that agrees to comply with the requirements of the U.S. Trustee.

24.     Here, the Debtors maintain the Bank Accounts at JPMorgan Chase Bank, N.A., an Authorized Depository in the Eastern District of Missouri that is insured by the Federal Deposit

Insurance Company (the "FDIC").  If any of these Bank Accounts maintains cash balances that exceed the FDIC insurance limit, the Bank, pursuant to the uniform depository agreement entered into with the U.S. Trustee as a condition to become an Authorized Depository, has agreed to maintain sufficient collateral for such excess deposit amounts by either posting a surety bond in a form acceptable to and from a company approved by the U.S. Trustee in accordance with section 345(b)(1) of the Bankruptcy Code or depositing securities in accordance with section 345(b)(2) of the Bankruptcy Code.  Thus, the Debtors have satisfied the requirement under section 345(b) of the Bankruptcy Code with respect to these Bank Accounts.

25.     Additionally, the Debtors maintain the Investment Account at the Bank.  While the Bank is an Authorized Depository, funds invested in the Investment Account are not FDIC insured. However, funds in the Investment Account are invested in a money market fund that invests exclusively in high-quality, short-term securities issued or guaranteed by the U.S. government or by U.S. government agencies and instrumentalities, including U.S. Treasury repurchase agreements, U.S. government agency repurchase agreements, U.S. Treasury debt, and U.S. government agency debt.  Prior to the Petition Date, the Debtors liquidated all investments in the Investment Account and transferred all cash held in the Investment Account to the Concentration Account.  The Debtors intend to keep the Investment Account open during the pendency of the chapter 11 cases, but currently do not intend to utilize the Investment Account for any investment activities during that time. Instead, Debtors expect that the Investment Account will remain dormant for the pendency of the cases.

26.     The Debtors respectfully request that the Court authorize the Bank to continue to maintain, service, and administer the Investment Account as an account of the Debtors as debtors in possession, without interruption and in the ordinary course of business.  Requiring the Debtors

to formally close the Investment Account would place a needless administrative burden on the Debtors and impose unnecessary costs on the Debtors' estates, especially considering that the Debtors may plan to re-use the Investment Account after they emerge from these chapter 11 cases. Given that all funds in the Investment Account have been transferred to the Concentration Account, a non-investment Bank Account at JPM (an Authorized Depository), allowing the Investment Account to stay open poses no risk to the safety of the Debtors' cash. Therefore, to the extent applicable, the Debtors request that the Court waive the U.S. Trustee Guidelines and the requirements of section 345(b) of the Bankruptcy Code with respect to the Investment Account.

**F.     The Business Forms**

27.     In the ordinary course of business, the Debtors use a variety of checks, correspondence, and business forms (collectively, the "Business Forms"). Because the Business Forms were established and used prepetition, they do not reference the Debtors' current status as debtors in possession. Rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines, the Debtors request that the Court authorize their continued use of all Business Forms (including, without limitation, letterhead, purchase orders, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. This will minimize expenses to the Debtors' estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases. Upon depletion of the Debtors' check stock, the Debtors will obtain new check stock bearing the designation "Debtor In Possession."

**G.     Intercompany Transactions**

28.     The Debtors conduct various business transactions with each other and with certain of their non-Debtor affiliates in the ordinary course of business (the "Intercompany Transactions"

and, each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "Intercompany Claim"), including moving cash within the Cash Management System between different Debtors and their non-Debtor affiliates.[12]  As a result, there may be Intercompany Claims owing among the Debtors or their non-Debtor affiliates at any given time, including outstanding prepetition Intercompany Claims.  With the help of the Cash Management System and the Debtors' treasury and accounting personnel, the Debtors are able to track and account for each Intercompany Transaction and the resulting Intercompany Claims.  The Intercompany Transactions are generally intended to reduce administrative costs and ensure the orderly and efficient operation of the Debtors' enterprise.

29.    The primary type of Intercompany Transactions among the Debtors and their non-Debtor affiliates is payments the Debtors make and receive pursuant to the PMC MSAs. Specifically, the Debtors' affiliated professional medical corporations (the "PMCs") owe annual payments to the Debtors pursuant to the terms of the PMC MSAs, under which the Debtors provide management and administrative services to the PMCs to ensure efficient operation of their business.[13]  The PMCs' professional employees (physicians and nurse practitioners) also provide medical services to patients through the Debtors' telehealth platform, Lemonaid Health.  As part of their obligations under the PMC MSAs, the Debtors are responsible for all non-clinical aspects of the PMCs, including payment of licensing fees, employee payroll and benefits, and other

---

[12]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses.

[13]    The contractual arrangements between the Debtors and the PMCs are described in greater detail in the First Day Declaration and the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Honor and Incur Obligations Related to Non-Debtor Professional Medical Corporations and (II) Granting Related Relief*, filed substantially contemporaneously herewith.

operational expenses.  The Debtors make these payments to either (a) the PMCs, through transfers from the Concentration Account to the applicable Payroll Account or (b) third-party vendors.  The Debtors may also collect and deposit the PMCs' accounts receivable into Debtor Bank Accounts, so long as the funds remain in the PMCs' names through accrual on the PMCs' accounting records.

30.    The Intercompany Transactions ensure the efficient and smooth functioning and operations of the Debtors' businesses, as certain of the Debtors are better suited or contractually obligated to perform certain functions to the business on behalf of the Debtors and their non-Debtor affiliates.  If the Debtors were required to cease the Intercompany Transactions, their operations would be disrupted, resulting in possible degradation of value to the detriment of their estates and creditors.  Additionally, the Debtors respectfully request authority to grant administrative expense status pursuant to section 503(b) of the Bankruptcy Code to any Intercompany Claims against any Debtor that arise after the Petition Date.  If such postpetition Intercompany Transactions are accorded administrative priority status, each Debtor contributing funds to, or utilizing the funds of, another Debtor will continue to receive credit, or bear ultimate repayment responsibility, for such funds, as applicable.

## **Basis for Relief**

**A.    Maintaining the Existing Cash Management System Is Important to the Debtors' Operations and Chapter 11 Efforts**

31.    The Debtors' request for authority to continue using the Cash Management System, subject to the modifications to utilize the Administrative Expense Account, is consistent with section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1). Section 363(c)(1) is intended to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business.  *See, e.g.*, *Habinger, Inc.* v. *Metro. Cosmetic*

16

*& Reconstructive Surgical Clinic, P.A.*, 124 B.R. 784, 786 (D. Minn. 1990) (citing *U.S. ex rel.*

*Harrison* v. *Estate of Deutscher*, 115 B.R. 592, 598 (Bankr. M.D. Tenn. 1990). Included within

the purview of section 363(c) is a debtor's ability to continue the routine transactions necessitated

by its cash management system. *See Amdura Nat'l Distrib. Co.* v. *Amdura Corp., Inc. (In re*

*Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996). Nevertheless, the Debtors file this motion

out of an abundance of caution, to the extent any aspect of the Cash Management System could be

considered as outside the ordinary course of business for purposes of section 363(c) of the

Bankruptcy Code.

32. The Debtors submit that maintaining the existing Cash Management System,

including the payment of Bank Fees, maintenance of the Corporate Card Program, and the

Administrative Expense Procedures is in the best interests of the Debtors' estates and all parties in

interest and, therefore, should be approved. As described herein, any disruption to the Cash

Management System would have an immediate adverse impact on the Debtors' business and would

impair the Debtors' ability to continue operating in the ordinary course and successfully administer

these chapter 11 cases. It would be time consuming, difficult, and costly for the Debtors to

establish an entirely new system of accounts and a new cash management system. The attendant

delays from revising cash management procedures, redirecting receipts, and implementing new

payment protocols would create unnecessary pressure on the Debtors while they work to meet the

other administrative obligations imposed by chapter 11 of the Bankruptcy Code. In addition,

preserving a "business as usual" atmosphere and avoiding the unnecessary and costly distractions

that would inevitably be associated with any substantial disruption in the Cash Management

System will facilitate the Debtors' efforts in this regard.

33.     An integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *rev'd on other grounds*, 997 F.2d 1039 (3d Cir. 1993); *see also Southmark Corp.* v. *Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets"). The requirement to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Off. Comm. of Unsecured Creditors* v. *Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 997 F.2d 1039, 1061 (3d Cir. 1993).

34.     Moreover, approval of the Administrative Expense Procedures and the postpetition funding of the Administrative Expense Account thereunder should be authorized as an exercise of the Debtors' sound business judgment under section 363(b) of the Bankruptcy Code. Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts approve such transactions using the "business judgment" standard. *See, e.g.*, *Meyers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is a legitimate business justification). The business judgment rule has a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *See Seidl* v. *Am. Century Cos.*, 799 F.3d 983, 990 (8th Cir. 2015) (internal citations omitted). Thus, the business judgment test "is not an onerous one" and may be satisfied "as long as [the proposed action] appears to enhance [the] debtor's estate." *See Crystalin, L.L.C.* v. *Selma Props. (In re Crystalin,*

*L.L.C.)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) (emphasis in original)).

35.     The business judgment standard is clearly met here because the relief requested will ensure that the Debtors (a) can cover essential fees and expenses incurred in connection with these chapter 11 cases and (b) retain sufficient liquidity to bring these cases to a successful conclusion, notwithstanding the outcome of the proposed marketing and sale process.  Courts routinely grant similar relief as part of customary "carve out" or similar constructs in connection with the approval of debtor in possession financing.  Moreover, in at least one case, the Bankruptcy Court for the Southern District of Texas approved similar administrative expense procedures where the debtors did not seek approval of the use of cash collateral or debtor in possession financing at the outset of the cases.[14]

36.     The Court may also exercise its equitable powers to grant the relief requested herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Continuing the Cash Management System without interruption is important to the success of these chapter 11 cases, and it is within the Court's equitable power under section 105(a) to approve its continued use.  For these reasons, the Debtors believe that they should be permitted to continue using the Cash Management System as described herein.

37.     The Debtors submit that the circumstances of these chapter 11 cases warrant granting the relief requested herein, and that doing so is in the best interests of the Debtors, their

---

[14]     *See Final Order (I) Authorizing Use of the Debtors' Existing Cash Management System; (II) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers; (III) Authorizing Continued Use and Satisfaction of Intercompany Transactions; (IV) Authorizing the Debtors' Use of Existing Bank Accounts and Existing Business Forms; (V) Granting Adequate Protection; and (VI) Granting Related Relief*, ¶¶ 12-13, *In re Diamond Offshore Drilling, Inc.*, Case No. 20-32307 (DRJ) (Bankr. S.D. Tex. June 29, 2020).

estates, their creditors, and their stakeholders, and therefore should be granted. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to continue maintaining their Cash Management System and pay prepetition claims arising thereunder (as applicable), pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

**B.     The Court Should Authorize the Debtors to Maintain Existing Bank Accounts and Continue Using Their Existing Business Forms**

38.     The U.S. Trustee Guidelines require debtors in possession to, among other things: (a) close all existing bank accounts and open new debtor in possession accounts with certain financial institutions designed as authorized depositories by the U.S. Trustee; and (b) obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, and to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

39.     Enforcement of the U.S. Trustee Guidelines during these chapter 11 cases would severely disrupt the Debtors' ordinary financial operations, including disrupting the Debtors' ability to efficiently obtain revenues. Accordingly, the Debtors respectfully request that the Court allow them to operate each Bank Account as it was maintained in the ordinary course of business before the Petition Date as described herein.

40.     In addition, the Debtors have concurrently filed several motions seeking authority to pay prepetition obligations in the ordinary course of business. If the Debtors were required to open new accounts, they would likely be unable to timely implement the critical relief sought in those motions. The Debtors have the ability to monitor disbursements from the Bank Accounts to ensure that only those prepetition obligations expressly approved by the Court are paid.

41.     In the ordinary course of their business, the Debtors use a variety of checks and business forms.  To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they be authorized to continue using their existing Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  If the Debtors need to purchase new check stock during the pendency of these chapter 11 cases, such check stock will include a legend referring to the Debtors as "Debtor in Possession" or "DIP" and the lead case number.  In addition, within 15 days of the entry of the proposed Interim Order, the Debtors will cause any electronically produced checks to reflect "Debtor in Possession" or "DIP" and the lead case number.

42.     The Debtors submit that parties in interest will not be prejudiced if the Debtors are authorized to continue using their existing Business Forms.  The Debtors will be sending a notice of commencement of these chapter 11 cases to creditors in accordance with the Creditor Matrix Motion[15] filed substantially contemporaneously herewith.  Parties doing business with the Debtors will likely be aware of the Debtors' status as debtors in possession; thus, the Debtors submit that changing Business Forms immediately is unnecessary and unduly burdensome in the context of these chapter 11 cases.

---

[15]  The *Debtors' Motion for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs, (II) Extending the Time to Schedule the Meeting of Creditors, (III) Waiving the Requirement to File Equity Lists and Provide Notice to Equity Security Holders, (IV) Authorizing the Debtors to File (A) A Consolidated List of Counsel Representing Cyber Security Incident Claimants and (B) A Consolidated List of Other Unsecured Creditors of the Debtors, (V) Authorizing the Debtors to Prepare a Consolidated and Redacted List of Creditors in Lieu of Submitting Separate and Reformatted Creditor Matrices for Each Debtor, (VI) Approving the Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases, and (VII) Granting Related Relief* (the "Creditor Matrix Motion"), filed substantially contemporaneously herewith.

**C.      Cause Exists to Permit Continued Performance of Intercompany Transactions, and
Certain Postpetition Intercompany Claims Should Be Given Administrative Expense
Priority**

43.      As described above, the Debtors enter into certain Intercompany Transactions with

one another in the ordinary course of business.  If the Intercompany Transactions are discontinued,

shared services provided by and among the Debtors, as well as services between the Debtors and

certain non-Debtor affiliates, would be disrupted.  Accordingly, the Debtors believe that the

continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and

their creditors, and seek authority to continue such Intercompany Transactions in the ordinary

course of business.

44.      The continuation of the Intercompany Transactions will not prejudice the Debtors'

estates or their creditors.  Furthermore, the Debtors maintain strict records of all transfers of cash

and can ascertain, trace, and account for all such transfers, including any Intercompany

Transactions.   Accordingly, the Debtors believe that continuation of the Intercompany

Transactions is in the best interests of the Debtors' estates and creditors.

45.      Because the Debtors engage in Intercompany Transactions on a regular basis and

such transactions are common among similar enterprises, the Debtors believe the Intercompany

Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the

Bankruptcy Code and, therefore, do not require the Court's approval.  Yet, precisely because of

their routine nature, the continuation of such transactions is integral to the Debtors' ability to

operate their business efficiently and successfully emerge from chapter 11.  Accordingly, out of

an abundance of caution, the Debtors are seeking express authority to engage Intercompany

Transactions on a postpetition basis.

46.      The Debtors further request that pursuant to section 503(b)(1) of the Bankruptcy

Code, any Intercompany Claims against the Debtors on account of the Intercompany Transactions

be accorded administrative expense priority status.[16]  If all Intercompany Claims against the Debtors are accorded administrative expense priority status, each entity will continue to bear ultimate payment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions will jeopardize the recoveries available to each Debtor's respective creditors.  Furthermore, granting administrative expense priority status to Intercompany Claims against the Debtors will prevent unnecessary disruptions to the Debtors' business operations.

**D.    Authority to Honor Certain Prepetition Bank Fees Should Be Granted**

47.    The Debtors submit that payment of the prepetition Bank Fees is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent unnecessary disruptions to the Cash Management System and ensure that the Debtors' receipt of funds is not delayed.  Payment of prepetition Bank Fees will not prejudice any parties in interest.  Indeed, because the Bank likely has setoff rights for the Bank Fees, payment of prepetition Bank Fees should not alter the rights of unsecured creditors in these chapter 11 cases.  Accordingly, the Debtors request authority to pay any outstanding prepetition Bank Fees to maintain the Cash Management System.

**E.    Continuation of the Corporate Card Program Is Warranted**

48.    The Corporate Card Program is essential to the Debtors' operations.  The Corporate Card Program allows the Debtors' employees to charge business-related expenses to the Debtors, thereby allowing the employees to conduct business more efficiently.  Continuing the Corporate Card Program and satisfying the prepetition and postpetition amounts outstanding thereunder will help minimize any adverse effect of the commencement of these chapter 11 cases on the Debtors'

---

[16]    Notwithstanding the administrative expense status requested for the Intercompany Transactions, all Debtors reserve their rights to dispute any Intercompany Transaction (or payment made on account of an Intercompany Transaction) on any ground, including the methodology for calculation of such transaction or payment, and to claw back or avoid such transactions and/or payments.

businesses.  Accordingly, the Debtors request authority to continue the Corporate Card Program in the ordinary course of business, including making ordinary course modifications thereto, and to pay any outstanding obligations, whether arising prepetition or postpetition.

**F.     The Court Should Waive Strict Compliance with Section 345(b) of the Bankruptcy Code, as Applicable**

49.     Section 345(a) of the Bankruptcy Code authorizes a debtor in possession to make deposits or investments of estate money in a manner "as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  11 U.S.C. § 345(a).  If a deposit or investment is not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that a debtor must require that the entity with which the deposit or investment is made obtain a bond in favor of the United States that is secured by the undertaking of an adequate corporate surety or deposit securities of the kind specified in 31 U.S.C. § 9303, unless the court "for cause" orders otherwise.  *See* 11 U.S.C. § 345(b).[17]

50.     As discussed above, funds invested in the Investment Account held at the Bank are not FDIC insured.  As noted above, however, the Investment Account funds are invested in a money market fund that invests exclusively in high-quality, short-term securities issued or guaranteed by the U.S. government or by U.S. government agencies and instrumentalities such as U.S. Treasury and U.S. government agency debt.  The Debtors submit that such investments are

---

[17]    Strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in a case such as this, be inconsistent with section 345(a) of the Bankruptcy Code, which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause."  140 Cong. Rec. H. 10,767 (Oct. 4, 1994), 1994 WL 54773.

in compliance with the requirements of section 345(b) because they are backed by the U.S. government and therefore the full faith and credit of the United States. Nevertheless, prior to the Petition Date, the Debtors liquidated all investments in the Investment Account and transferred all cash held in the Investment Account to the Concentration Account. The Debtors expect that the Investment Account will remain dormant and will not be utilized by the Debtors for any investment activities for the pendency of the cases. Given that the Investment Account no longer holds any cash of the Debtors, allowing the Investment Account to stay open poses no risk to the safety of the Debtors' cash. Requiring the Debtors to formally close the Investment Account would place a needless administrative burden on the Debtors and impose unnecessary costs on the Debtors' estates, especially considering that the Debtors plan to re-use the Investment Account after they emerge from these chapter 11 cases. Thus, to the extent applicable, cause exists to waive the U.S. Trustee Guidelines and the requirements of section 345 with respect to the Investment Account and to allow the Debtors to continue to maintain all Bank Accounts in the ordinary course of business.

**G.    The Court Should Authorize the Bank to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business**

51.    In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize the Debtors' Bank to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that the Bank may rely on the Debtors' representations with respect to whether any check or transfer issued made by the Debtors before the Petition Date should be honored pursuant to this motion (the Bank having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the

Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this motion are dishonored or rejected by the Bank.

**Immediate Relief Is Necessary**

52.　Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm." For the reasons discussed herein and in the First Day Declaration, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts. The relief requested herein is necessary for the Debtors to operate their business in the ordinary course and preserve the value of their estates for the benefit of stakeholders. Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied.

**Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

53.　Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates through these chapter 11 cases. Accordingly, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

54.     Except as expressly set forth herein, nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

**Notice**

55.     The Debtors will provide notice of this motion to the following parties:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the

30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable; (e) the Bank; (f) the United States Attorney's Office for the Eastern District of Missouri; (g) the Internal Revenue Service; (h) the Securities and Exchange Commission; (i) the Federal Trade Commission; (j) the state attorneys general in all 50 states; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this motion and any order entered hereon will be served in accordance with rule 9013-3(A)(1) of the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Rules").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

56.     A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov/ and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders and grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 24, 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:     (314) 854-8600
Facsimile:      (314) 854-8660
Email:            thr@carmodymacdonald.com
                     nrw@carmodymacdonald.com
                     jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:     (212) 373-3000
Facsimile:      (212) 757-3990
Email:            pbasta@paulweiss.com
                     chopkins@paulweiss.com
                     jchoi@paulweiss.com
                     ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Exhibit A**

**Budget**

**Postpetition Weekly Cash Flow Forecast**

*($ in 000s)*

| | M/E: | Mar-25 | Apr-25 | Apr-25 | Apr-25 | Apr-25 | Apr-25 | May-25 | May-25 | May-25 | May-25 | Jun-25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/E: | 3/28/25 | 4/4/25 | 4/11/25 | 4/18/25 | 4/25/25 | 5/2/25 | 5/9/25 | 5/16/25 | 5/23/25 | 5/30/25 | 6/6/25 | |
| **Net Cash Flow** | | | | | | | | | | | | | |
| **Receipts:** | | | | | | | | | | | | | |
| (+) Credit Card & Third-Party Kit Sales | $ | 1,659 | $ 2,635 | $ 1,419 | $ 1,945 | $ 1,419 | $ 2,914 | $ 2,140 | $ 1,846 | $ 1,309 | $ 1,806 | $ 1,727 | $ 20,819 |
| **Operating Disbursements:** | | | | | | | | | | | | | |
| (-) Payroll & Benefits | | (3,307) | (697) | (97) | (3,197) | (67) | (3,197) | (97) | (3,197) | (67) | (3,197) | (97) | **(17,213)** |
| (-) Rent | | (25) | - | - | - | - | (25) | - | - | - | (25) | - | **(75)** |
| (-) Insurance | | - | - | - | - | - | - | - | - | - | (500) | - | **(500)** |
| (-) IT/Software | | (235) | (220) | (440) | (440) | (440) | (440) | (354) | (354) | (354) | (354) | (438) | **(4,071)** |
| (-) Ordinary Course Professionals | | (225) | (52) | (244) | (244) | (244) | (444) | (337) | (337) | (337) | (537) | (225) | **(3,225)** |
| (-) Other Operations | | (1,192) | (1,174) | (1,174) | (1,174) | (1,174) | (1,174) | (1,175) | (1,175) | (1,175) | (1,175) | (1,052) | **(12,813)** |
| **Total Operating Disbursements** | | (4,983) | (2,143) | (1,955) | (5,055) | (1,925) | (5,280) | (1,963) | (5,063) | (1,933) | (5,788) | (1,812) | **(37,898)** |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | |
| (-) Restructuring Professional Fees[1] | | (1,238) | (1,443) | (1,443) | (1,943) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,406) | **(16,133)** |
| (-) DIP Interest | | - | - | - | - | - | - | - | - | - | - | - | **-** |
| (-) DIP Fees[1] | | (800) | - | - | - | - | - | - | - | - | - | - | **(800)** |
| **Total Non-Operating Disbursements** | | (2,038) | (1,443) | (1,443) | (1,943) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,406) | **(16,933)** |
| **Net Cash Flow** | $ | **(5,361)** | $ (951) | $ (1,979) | $ (5,053) | $ (1,949) | $ (3,809) | $ (1,266) | $ (4,660) | $ (2,067) | $ (5,425) | $ (1,491) | $ **(34,011)** |
| **Cash & Liquidity** | | | | | | | | | | | | | |
| **Beginning Unrestricted Cash** | $ | 37,062 | $ 31,700 | $ 30,749 | $ 28,770 | $ 23,718 | $ 21,769 | $ 17,960 | $ 16,694 | $ 12,034 | $ 9,966 | $ 4,542 | $ 37,062 |
| (+/-) Net Cash Flow | | (5,361) | (951) | (1,979) | (5,053) | (1,949) | (3,809) | (1,266) | (4,660) | (2,067) | (5,425) | (1,491) | **(34,011)** |
| (+/-) DIP Draw / Repayment | | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Ending Unrestricted Cash** | $ | **31,700** | $ 30,749 | $ 28,770 | $ 23,718 | $ 21,769 | $ 17,960 | $ 16,694 | $ 12,034 | $ 9,966 | $ 4,542 | $ 3,051 | $ **3,051** |
| (+) Restricted Cash | | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | $ 14,988 |
| **Total Cash Balance** | $ | **46,689** | $ 45,737 | $ 43,758 | $ 38,706 | $ 36,757 | $ 32,948 | $ 31,682 | $ 27,022 | $ 24,955 | $ 19,530 | $ 18,039 | $ **18,039** |

[1] Forecast assumes no DIP draws, related interest or exit fees

## <u>Exhibit B</u>

**Diagram of Cash Management System**



# 23andMe
# Simplified Cash Management Schematic

[1] PMC entities are not owned directly or indirectly by 23andMe. PMC entities are affiliate entities of Lemonaid Heath and are owned by third-parties.

**<u>Exhibit C</u>**

**List of Bank Accounts**

| Account Holder | Bank | Account Number (Last 4 Digits) | Account Designation | Approximate Balance of the Petition Date[1] |
|---|---|---|---|---|
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 1413 | Disbursement Account (Canadian Tax Account) | CAD $35,126.03 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 1733 | Collateral Account | $14,988,136.00 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 2026 | Operating Account | $0.00 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 6833 | Investment Account | $0.00 |
| Lemonaid Pharmacy Holdings Inc. | JPMorgan Chase Bank, N.A. | 7920 | Disbursement Account (Pharmacy Licensing Account) | $0.00 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 9280 | Disbursement Account (Medical Licensing Account) | $0.00 |
| LMND Medical Group, Inc., A Professional Corporation (non-Debtor) | JPMorgan Chase Bank, N.A. | 9629 | Disbursement Account (Payroll Account) | $0.00 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 9657 | Concentration Account | $37,037,257.67 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 9689 | Processor Account | $0.00 |
| 23andMe, Inc. | JPMorgan Chase Bank, N.A. | 9928 | Disbursement Account (Payroll Account) | $0.00 |

---

[1]   Other than the Investment Account, accounts with $0.00 balances are "zero-balance" accounts as described in the motion and on diagram of the Cash Management System attached as **Exhibit B** to the motion.