### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |
| | Hearing Date:  TBD[2] |
| | Hearing Time:  TBD |
| | Hearing Location:  TBD |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY PREPETITION CLAIMS OF (A) CERTAIN CRITICAL VENDORS, (B) LIEN CLAIMANTS, (C) 503(B)(9) CLAIMANTS, AND (D) FOREIGN VENDORS, (II) GRANTING ADMINISTRATIVE EXPENSE PRIORITY TO AND AUTHORIZING THE PAYMENT OF CERTAIN OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

### Relief Requested[3]

1.      The Debtors seek entry of an interim order (the "Interim Order") and a final order (the "Final Order" and, together with the Interim Order, the "Proposed Orders")[4], (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition claims

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]  The Debtors will file a notice stating the date, time, and location of the first day hearing once this information becomes available.

[3]  Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[4]  Copies of the Proposed Orders will be made available on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

held by certain (i) Critical Vendors, (ii) Lien Claimants, (iii) 503(b)(9) Claimants, and (iv) Foreign Vendors (collectively, the "Vendor Claimants"), (b) granting administrative expense priority status to certain Outstanding Orders and authorizing the payment of such obligations in the ordinary course of business, and (c) granting related relief. In addition, the Debtors request that the Court schedule a final hearing to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri (the "Local Rules"). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a), 363(b), and 503(b)(9) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

5. 23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[5] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome. The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic

---

[5]    Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

health reports.  Further, through its Lemonaid Health telehealth platform, the Company operates as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

6.      On March 23, 2025, (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated at this time.

8.      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[6]

### Overview of Debtors' Vendors

9.      A critical component of the Debtors' operations is the manufacture, supply, distribution, and processing of their saliva collection kits (the "Saliva Collection Kits"), which provides the means for collecting and analyzing genetic information and other related services for the Debtors' customers.  The Debtors do not have in-house manufacturing capabilities and instead

---

[6]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration.

rely on third-party suppliers, which the Debtors have qualified in accordance with their quality control system, to provide services and materials (including the Debtors' Saliva Collection Kits, bead chips, reagents, or other materials and equipment used in the Debtors' laboratory operations) that are essential to the Debtors' business.

10.     As discussed above, the Debtors also operate a telehealth business through their "Lemonaid Health" platform.  When medications are prescribed by Lemonaid Health's affiliated healthcare professionals, patients can use Lemonaid Health's online pharmacy for fulfillment of their medications.  Lemonaid Health's pharmacy is licensed in all 50 U.S. states and the District of Columbia.  The Debtors rely on multiple third-party suppliers for the fulfillment of their pharmaceutical orders.

11.     The Vendor Claimants support nearly every aspect of the Debtors' business, including by:  (a) manufacturing and supplying the Saliva Collection Kits and other laboratory materials and equipment; (b) shipping the Saliva Collection Kits to and from customers; (c) processing and analyzing the saliva samples provided by customers through the Saliva Collection Kits; (d) fulfilling pharmaceutical orders that are submitted through the Debtors' Lemonaid Health's online pharmacy; (e) advertising and marketing the Debtors' products and services; (f) providing customer support in each geographic region where the Debtors' products and services are made available; and (g) servicing the Debtors' obligations to provide management and administrative services to various non-Debtor affiliated entities pursuant to the terms of certain management and service agreements.  If these Vendor Claimants refuse to continue doing business with the Debtors on account of outstanding prepetition amounts, replacing them would cause significant delays in the Debtors' ability to provide their services and also cause irreparable, and potentially irreversible, damage to the Debtors' business and their estates.

4

12.     Accordingly, it is essential that the Debtors maintain their ability to honor prepetition payment obligations to the Vendor Claimants (the "Vendor Obligations") to prevent any unexpected or inopportune interruption to the Debtors' operations during these chapter 11 cases.  The goods and services that the Vendor Claimants provide are vital to the Debtors' business and any loss of access to, or delay in the delivery of, such goods and services would materially harm the Debtors' business and operations.  Authorization to pay the Vendor Claimants in the ordinary course of business is necessary to minimize the risk of any material disruption to the Debtors' operations and allow for a seamless transition through these chapter 11 cases for the benefit of all parties in interest.

13.     In determining which vendors to designate as Vendor Claimants, the Debtors and their advisors undertook a comprehensive process to ensure that, among other criteria, only vendors that provide goods or services necessary to preserve the value of the estates are designated as Vendor Claimants.  It is only these Vendor Claimants whom the Debtors request to pay pursuant to the Proposed Orders.

14.     As part of this process, the Debtors first generated a master "accounts payable" schedule of various vendors with balances outstanding as of the Petition Date (excluding the vendors which were analyzed in connection with the other first day motions, such as utility providers or insurance brokers).  Thereafter, the Debtors and their advisors determined whether each vendor fell under one or more of the following categories:  (a) such vendor met certain criteria, described below in paragraph 16, that led the Debtors to denote such vendor as a critical vendor (the "Critical Vendors," and the claims of such Critical Vendors, the "Critical Vendor Claims"); (b) such vendor was a Shipper or Warehouseman (each as defined below) with potential warehouse liens (the "Lien Claimants," and the claims of such Lien

Claimants, the "Lien Claims"); (c) such vendor provided goods which were received by the Debtors within the 20 days prior to the Petition Date (the "503(b)(9) Claimants," and the claims of such 503(b)(9) Claimants, the "503(b)(9) Claims"); and (d) foreign services providers (the "Foreign Vendors," and the claims of such Foreign Vendors, the "Foreign Vendor Claims"). It is such vendors that fall into one or more of the foregoing categories for which the Debtors seek authority, but not direction, to pay pursuant to the Proposed Orders.

15.     The following table summarizes the Vendor Obligations, the amounts of Vendor Obligations the Debtors expect to become due within 30 days of the Petition Date, and the Debtors' estimate of the Vendor Obligations accrued as of the Petition Date.

| Category | Estimated Amount Due or Due to Be Paid Within 30 Days (Interim Order) | Estimated Amount Due to Be Paid after Entry of the Final Order[7] |
|---|---|---|
| Critical Vendors | $5,360,000 | $5,360,000 |
| Lien Claimants | $99,000 | $99,000 |
| 503(b)(9) Claimants | $44,000 | $44,000 |
| Foreign Vendors | $310,000 | $320,000 |
| **Total Amounts** | **$5,813,000** | **$5,823,000** |

## I.     Critical Vendor Claims

16.     With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting with the Debtors' management and reviewing contracts and supply agreements, to identify certain critical business relationships and

---

[7]     The amounts listed in this column include amounts approved under the Interim Order.

suppliers of goods and services—the loss of which would immediately and irreparably harm their business. In this process, the Debtors considered a variety of factors, including:

- whether certain specifications prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether a vendor is a sole-source supplier or service provider;

- whether the services provided by the vendor are so vital, or the vendor's operations are so commingled with the Debtors' business, that even the briefest disruption would cause significant harm to the Debtors' operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating and meeting customer demands while transitioning business thereto;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis; and

- whether the business relationship between the Debtors and the supplier is governed by an enforceable contract.

17. Through this analysis, the Debtors identified the certain vendors (the "Critical Vendors" and, the claims of such Critical Vendors, the "Critical Vendor Claims") that supply products and services that are essential to the Debtors' go-forward operations. Maintaining relationships with the Critical Vendors throughout the pendency of these chapter 11 cases is critical to the Debtors' ability to preserve and maximize value for the benefit of their estates.

18. A substantial portion of the Critical Vendor Claims are associated with services provided by third-party marketing vendors. As discussed in the First Day Declaration, the majority of the Debtors' revenues are derived from sales of their Personal Genome Service® ("PGS")

7

offerings, including the Saliva Collection Kits and related services and memberships.  The Debtors

rely heavily on third-party marketing vendors to market and advertise the Debtors' PGS offerings,

and thus, such vendors are essential to driving the Company's top-line revenues.  If the Debtors

cease payments to these Critical Vendors, there is substantial risk of an immediate disruption in

their marketing services, which may materially impact the Debtors' ability to generate revenue

and sustain operations.

19.     Other Critical Vendor Claims are associated with goods and services provided by

third-party manufacturing, laboratory testing, inventory, software, IT, and other vendors.  Notably,

the Debtors currently rely on a sole supplier to manufacture their Saliva Collection Kits.  Moreover,

two of the Critical Vendors provide laboratory testing services that require certification under the

Certified Laboratory Improvement Amendments of 1988 ("CLIA").[8]  Vendors that provide testing

services for the Debtors would require similar CLIA certifications as well as appropriate state

licenses and validation that their services comply with the Federal Drug Administration's

regulations and expectations.  Thus, the process for replacing such Critical Vendors can take

several months and would cause significant disruption to the Debtors' business.

20.     The Debtors' selection process balanced the need to ensure that these

chapter 11 cases do not disrupt their operations or negatively impact their operations and

customers, thereby maximizing value for the Debtors' stakeholders, with the need to preserve

estate resources and provide equitable treatment to holders of prepetition claims.  Paying targeted

prepetition claims of these Critical Vendors benefits the Debtors' estates, both monetarily and

---

[8]    The CLIA regulations establish quality standard for laboratory testing performed on specimens from humans,
such as blood, bodily fluid, and saliva.  *See* 42 U.S.C. § 263(a).

8

operationally, by preserving liquidity and enabling the Debtors to operate effectively during these chapter 11 cases.

21.    As of the Petition Date, the Debtors estimate that approximately $5,360,000 in Critical Vendor Claims are outstanding, approximately all of which is expected to become due prior to a final hearing on this motion.

## II.    The Lien Claimants (Shippers and Warehousemen)

22.    In operating their business, the Debtors use and make payments to shippers, common carriers, and distributors (collectively, the "Shippers") to ship, transport, and otherwise facilitate the movement of inventory, supplies, merchandise, tools, equipment, components, materials, and other items (collectively, the "Goods"), some of which are stored at third-party warehouses (the "Warehousemen").  The services provided by the Shippers and Warehousemen are critical to the Debtors' day-to-day operations.  If certain of the Goods in transit are not timely delivered, the Debtors' business operations would be impaired, precluding or frustrating them from providing expected services to customers, including the sharing of critical genetic data and health reports and the provision of medical care, laboratory testing, and pharmacy fulfillment services.

23.    Because of the commencement of these chapter 11 cases, certain Shippers and Warehousemen who hold Goods for delivery to or from the Debtors may refuse to release the Goods pending receipt of payment for their prepetition services.  Under some state laws, a Shipper or Warehouseman may have a lien on the Goods in its possession to secure charges or expenses incurred for the transportation or storage of Goods.[9]  Additionally, pursuant to section 363(e) of

---

[9]    For example, section 7-209 of the Uniform Commercial Code provides, in pertinent part, that "[a] warehouse has a lien against the bailor on the goods covered by a warehouse receipt or storage agreement or on the proceeds thereof in its possession for charges for storage or transportation, including demurrage and terminal charges, insurance, labor, or other charges, present or future, in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to the law."  U.C.C. § 7-209(a) (2012).

the Bankruptcy Code, the Shippers and Warehousemen, as bailees, may be entitled to adequate protection as holders of possessory liens. As discussed above, because of the Debtors' continuous and immediate need for timely supply of key Goods and other items, any delay in shipments could disrupt the Debtors' operations and could harm the Debtors' sales process and restructuring efforts. It is thus imperative that the Debtors be authorized to pay the Lien Claims on the terms set forth in the Proposed Orders, whether they arose prior to or after the Petition Date, if the Debtors determine in their business judgment that doing so is necessary to ensure the uninterrupted shipment and delivery of Goods.

24.    As of the Petition Date, the Debtors estimate that they owe approximately $99,000 to the Lien Claims, approximately all of which is expected to become due prior to the final hearing on this motion.

### III.    The 503(b)(9) Claimants

25.    The Debtors have identified certain claims that may be entitled to priority status under section 503(b)(9) of the Bankruptcy Code because they are undisputed obligations for goods received from various 503(b)(9) Claimants by the Debtors in the ordinary course of business in the 20 days prior to the Petition Date. Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term executory contracts. Rather, the Debtors obtain goods or other materials from such claimants on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its 503(b)(9) Claims or demand payment in cash on delivery. Such refusal or prejudicial trade terms could negatively affect the Debtors' estates as the Debtors' business are dependent on the steady flow of goods and materials through their supply chain. Even if the 503(b)(9) Claimants were not entitled to priority status under the Bankruptcy Code, the Debtors would still seek to pay most, if not all, of their

claims in the ordinary course as a Critical Vendor given their importance to the Debtors and their business.

26.     As of the Petition Date, the Debtors estimate that approximately $44,000 is owed on account of 503(b)(9) Claims, approximately all of which is expected to become due prior to the final hearing on this motion.

**IV.    The Foreign Vendors**

27.     The continued operation of the Debtors' business also entails transacting with certain Foreign Vendors.  The Debtors' products and services are accessible in a number of countries and territories located outside the U.S.  Given the global nature of their enterprise, in the ordinary course of their business, the Debtors transact with Foreign Vendors who provide critical services, such as customer support in geographic areas where the Debtors' products and services are marketed.  Thus, the Foreign Vendors supply services that are critical to the success of the Debtors' ongoing operations.

28.     There is a significant risk that nonpayment of prepetition claims could cause a Foreign Vendor to stop providing services to the Debtors on a timely basis following the Petition Date or sever its business relationship with the Debtors completely.  Short of severing relations with the Debtors, nonpayment of prepetition claims could cause Foreign Vendors to take other precipitous actions, including refusing to continue to provide critical services to the Debtors or seeking to impose onerous payment terms.  As with any company, receiving services in a timely and cost-effective manner is critical to the Debtors' business—the Debtors cannot afford delays of this nature or the increased costs associated therewith.

29.     Further, if the Foreign Vendor Claims are not paid, the Foreign Vendors may take action against the Debtors despite the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Although the automatic stay is not, by its terms, limited in its geographical

scope, as a practical matter, the ability to enforce its provisions may be limited to creditors that are subject to the jurisdiction of the United States bankruptcy courts. Certain Foreign Vendors may lack minimum contacts with the United States and, thus, may not be subject to the jurisdiction of the Court. Many of the Foreign Vendors have significant, long-standing relationships with the Debtors and either cannot be replaced given their specialized role in the Debtors' business or cannot be replaced without significant delay and cost.

30.     Payment of the Foreign Vendor Claims is essential to avoid disruption of the Debtors' operations during these chapter 11 cases. The Debtors' estimated amount of Foreign Vendor Claims pales in comparison to the potential damage to the Debtors' business if the Debtors' operations were to experience significant disruption in the continued provision of goods and materials by the Foreign Vendors. The Debtors, their estates, and their stakeholders will ultimately benefit from the Debtors' payments to the Foreign Vendors.

31.     As of the Petition Date, the Debtors estimate that approximately $320,000 is owed on account of Foreign Vendor Claims, approximately $310,000 of which is expected to become due prior to the final hearing on this motion.

**V.     Trade Terms Conditions**

32.     Subject to the Court's approval, the Debtors intend to pay the Vendor Obligations only to the extent necessary to preserve the value of their estates. To that end, in return for paying the Vendor Obligations either in full or in part, the Debtors propose that the Debtors be authorized to require Vendor Claimants to provide specified trade terms for the postpetition procurement of goods and services from the Vendor Claimants. Specifically, the Debtors seek authorization to condition payment of Vendor Obligations upon each Vendor Claimant's agreement to (a) continue or recommence supplying goods and services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as

favorable to the Debtors as those in place during the 12 months prior to the Petition Date, or on other terms satisfactory to the Debtors (the "Customary Trade Terms") and (b) agree that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these chapter 11 cases. The Debtors also seek authorization, but not direction, to require certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms, the form of which is attached to each of the Interim Order and the Final Order as **Exhibit A** (the "Trade Agreement"). The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms conditions to payment be made in writing, either by use of the Trade Agreement or other form of written agreement (including electronic mail).

33.     In addition, the Debtors request that if a payee, after receiving a payment under an order approving this motion, ceases to provide Customary Trade Terms, then (a) such payment may be deemed to be an improper postpetition transfer on account of a prepetition claim, and therefore, immediately recoverable by the Debtors in cash upon request; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by this motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## VI.   Outstanding Orders

34.     Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods which will not be delivered until after the Petition Date

(collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, including obligating the Debtors to re-order goods that were ordered prior to the Petition Date, and given that goods delivered after the Petition Date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) authorizing, but not directing, the Debtors to satisfy, in the Debtors' sole election, certain obligations arising from the acceptance of goods subject to Outstanding Orders in the ordinary course of business, and (b) granting administrative expense priority under section 503(b) of the Bankruptcy Code to such undisputed obligations.

### **Basis for Relief**

I.    **Payment of the Vendor Obligations as Provided Herein Is a Sound Exercise of the Debtors' Business Judgment and Is Necessary to Protect and Preserve the Estates**

35.    Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value.  *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept.").  In doing so, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

36.    Section 363(b) of the Bankruptcy Code permits a debtor, subject to court approval, to pay prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere*

14

*Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *In re CoServ, L.L.C.*, 273 B.R. at 499. The business judgment rule is highly deferential to debtors and may be satisfied "'as long as the proposed action appears to enhance the debtor's estate.'" *In re Crystalin, LLC*, 293 B.R. 455, 463--64 (B.A.P. 8th Cir. 2003) (*quoting In re Food Barn Stores, Inc.*), 107 F.3d 558, 566 n.16 (8th Cir. 1997)); *see also In re Farmland Indus. Inc.*, 294 B.R. 903, 913 (Bankr. W.D. Mo. 2003) ("Under the business judgment standard, the question is whether the [proposed action] is in the Debtors' best economic interests, based on the best business judgment in those circumstances.").

37.     Section 105(a) of the Bankruptcy Code and the "doctrine of necessity" permit the bankruptcy court to exercise its broad grant of equitable powers to authorize the payment of prepetition obligations when such payment is "essential to the continued operation" of the debtor's business. 11 U.S.C. §105(a); *see also In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor"); *In re Payless Cashways, Inc.*, 268 B.R. 543, 546–47 (Bankr. W.D. Mo. 2001) (authorizing payment of critical prepetition suppliers' claims when such suppliers agree to provide postpetition trade credit).

38.     The above-referenced sections of the Bankruptcy Code empower the Court to authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here. *See, e.g.*, *In re Just for Feet*, 242 B.R. at 826 (finding that payment of prepetition claims of certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re CoServ, L.L.C.*,

15

273 B.R. at 497 ("[I]t is only logical that the bankruptcy court be able to use [s]ection 105(a) of the [Bankruptcy] Code to authorize satisfaction of the pre-petition claim in aid of preservation or enhancement of the estate.").

39.     Here, for the reasons outlined herein and in the First Day Declaration, the Debtors submit that retaining their ability to pay the Vendor Obligations as described herein is necessary to their continued and uninterrupted operations during these chapter 11 cases.  As the foregoing authority provides, where the ability to promptly pay prepetition claims is necessary to prevent disruption to the Debtors' business operations, courts are empowered to authorize such payments. Further, the satisfaction of the Vendor Obligations will enable the Debtors to preserve the value of their estates and safeguard the confidence and goodwill of their service and goods providers. Without the requested relief, which is based on the careful exercise of the Debtors' business judgment, the Debtors' efforts to maximize the value of these estates will be jeopardized. Moreover, the relief requested in this motion contemplates the payment of Vendor Obligations of those Vendor Claimants who agree to provide postpetition services to the Debtors on Customary Trade Terms when requested by the Debtors, and, the Debtors submit, is therefore consistent with, and appropriate under, sections 105 and 363 of the Bankruptcy Code.

40.     As detailed above, unanticipated disruptions to the Debtors' ability to operate their business would result in substantial and irreparable harm to the Debtors and would severely impair the Debtors' efforts to preserve and maximize the value of their estates during these chapter 11 cases.  It is, therefore, critical that the Debtors receive necessary materials, goods, and services without interruption in order to preserve the Debtors' go-forward business and maximize the value of the Debtors' assets to be sold through the sale process described in the First Day

Declaration and pursuant to the bidding and sale procedures motion filed contemporaneously herewith.

41.     If the Vendor Claimants stop supplying services or goods to the Debtors, the Debtors' business would be adversely affected as a result for the reasons outlined herein.  In light of the foregoing, the Debtors submit that payment of the Vendor Obligations is in the best interests of their estates and creditors.  If the relief sought in this motion is not granted, the Vendor Claimants may attempt to assert their considerable leverage and deny the Debtors essential services or goods going forward.  Based on these circumstances, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.

## II.     Failure to Make Timely Payment of the Lien Claims Would Threaten the Debtors' Ability to Operate and May Subject the Debtors' Assets to the Perfection of Liens

42.     As noted above, certain Lien Claimants may be entitled under applicable non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.[10]  As a result, the Debtors anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent a valid lien,

---

[10]   *See* 11 U.S.C. § 546(b)(1) (providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

to the extent certain Lien Claimants have possession of the Debtors' essential parts and equipment, mere possession or retention would disrupt the Debtors' operations.

43.     Furthermore, paying the Lien Claimants should not impair unsecured creditor recoveries in these chapter 11 cases.  For example, in instances where the amount owed to Lien Claimants is less than the value of the materials or equipment held by the Warehousemen, such Warehousemen are fully-secured creditors of the Debtors' estates.  In such instances, payment now only provides such parties with what they might be entitled to receive under a chapter 11 plan, only without any interest costs that might otherwise accrue during these chapter 11 cases. Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into chapter 11 and the ultimate delivery and sale of the Debtors' products to their customers.

### III.   Payment of Foreign Vendor Claims Is Necessary to Ensure Continuation of Debtors' Operations

44.     Payment of the prepetition claims of the Debtors' Foreign Creditors is essential to the Debtors' reorganization.  As stated, the limitations of the enforceability of the automatic stay, the potential risk of Foreign Creditors' exercising remedial rights and the critical nature of services provided by the Foreign Vendors justify the requested relief in this motion.  Absent a continued, uninterrupted supply of services from Foreign Vendors, the Debtors' overall ability to operate their business will be jeopardized.  Simply stated, payment of the Foreign Vendor Claims as proposed will assure the orderly operation of the Debtors' business and avoid costly disruptions and the significant loss of value and irreparable harm arising therefrom.  Further, the Foreign Vendors may take actions to collect debts outside the United States.  The Debtors have concluded that if they do not pay the Foreign Vendor Claims, the potential value destruction will be well in excess of amounts that the Debtors seek authorization to pay.

**IV.      The Court Should Authorize, But Not Direct, the Payment of 503(b)(9) Claims**

45.      Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." These claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.

46.      Moreover, the Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe that they may be able to pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21–23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval."). The timing of such payments also lies squarely within the Court's discretion. *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

47.      The Debtors' ongoing ability to obtain materials and products as provided herein is key to their reorganization and necessary to preserve the value of their estates. Absent the payment of some 503(b)(9) Claims at the outset of these chapter 11 cases—which may merely accelerate the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to materials and products necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

48.     Instead of satisfying all 503(b)(9) Claims after confirmation of a chapter 11 plan (at which time such payments may be too late to benefit the Debtors' estates), the Debtors seek authority to pay certain of these claims, while such payments can still induce 503(b)(9) Claimants to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.  Failure to honor these claims in may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process.  Such vendors could accelerate or eliminate favorable trade terms.  The payment of certain 503(b)(9) Claims is in the best interests of the Debtors' estates because favorable trade terms will prevent foreseeable disruptions to the Debtors' operations, and the Court's time and resources will not be burdened with numerous motions from individual vendors requesting payment on account of their administrative priority expense claims.  Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

## V.     The Court Should Authorize, But Not Direct, the Payment of Claims in Respect of Outstanding Orders

49.     Pursuant to section 503(b) of the Bankruptcy Code, most obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are administrative expense priority claims because they benefit the estate postpetition.  *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).  Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not provide the suppliers with any greater priority than they would otherwise have if the relief requested herein were not granted, and will not prejudice any other party in interest.

50.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide the suppliers with assurance of such administrative priority.  Any disruption to the continuous and timely flow of goods to the Debtors could result in substantial delays in the Debtors' operations, which could lead to dissatisfied customers and reduced sales.  Accordingly, the Debtors submit that the Court authorize, but not direct the Debtors to, in the Debtors' sole election, satisfy certain obligations arising from the acceptance of goods subject to Outstanding Orders in the ordinary course of business and grant administrative expense priority under section 503(b) of the Bankruptcy Code to such undisputed obligations.

**Processing of Checks and Electronic Funds Transfers Should Be Authorized**

51.     In connection with the foregoing, the Debtors respectfully request that the Court (a) authorize the Debtors' banks and other financial institutions (the "Banks") to receive, process, honor, and pay all checks and transfers issued by the Debtors in accordance with this motion, without regard to whether any checks or transfers were issued before or after the Petition Date; (b) provide that all Banks may rely on the Debtors' representations with respect to whether any check or transfer issued or made by the Debtors before the Petition Date should be honored pursuant to this motion (such banks and other financial institutions having no liability to any party for relying on such representations by the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or transfers to the extent any checks or transfers that are issued and authorized to be paid in accordance with this motion are dishonored or rejected by the Banks.

**Immediate Relief Is Necessary**

52.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm."  For the reasons discussed herein and in the First Day Declaration, the Debtors believe an

immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.   Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts.   The relief requested herein is necessary for the Debtors to operate their business in the ordinary course and preserve the value of their estates for the benefit of stakeholders.  Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

53.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h).   As described above, the relief that the Debtors seek in this motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates through these chapter 11 cases.  Accordingly, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

54.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by

this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

55.      The Debtors will provide notice of this motion to the following parties:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable; (e) the United States Attorney's Office for the Eastern District of Missouri; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Federal Trade Commission; (i) the state attorneys general in all 50 states; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this motion and any order entered hereon will be served in accordance with rule 9013-3(A)(1) of

the Local Rules.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

56.     A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov/ and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders

and grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 24, 2025                          Respectfully submitted,
St. Louis, Missouri

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:     (314) 854-8600
Facsimile:     (314) 854-8660
Email:         thr@carmodymacdonald.com
               nrw@carmodymacdonald.com
               jjg@carmodymacdonald.com

                                               - and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:     (212) 373-3000
Facsimile:     (212) 757-3990
Email:         pbasta@paulweiss.com
               chopkins@paulweiss.com
               jchoi@paulweiss.com
               ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in
Possession*