## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |
|  | Hearing Date: TBD[2] |
|  | Hearing Time: TBD |
|  | Hearing Location: TBD |

**DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER AUTHORIZING (A) ENTRY INTO AND PERFORMANCE UNDER THE BINDING DIP TERM SHEET, INCLUDING PAYMENT OF THE COMMITMENT FEE AND WORK FEE THEREUNDER, AND (B) GRANTING RELATED RELIEF AND (II) AN ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, GRANT LIENS, AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (B) MODIFYING THE AUTOMATIC STAY, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:

### Relief Requested[3]

1.     The Debtors seek entry of an order (the "Approval Order") at the first day hearing in these chapter 11 cases (a) authorizing the Debtors' entry into, and performance under, that certain binding term sheet by and between the Debtors and JMB Capital Partners Lending, LLC ("JMB" and, together with its permitted designees and/or assignees, the "DIP Lender"), dated as

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]     The Debtors will file a notice stating the date, time, and location of the first day hearing once this information becomes available.

[3]     Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

of March 23, 2025, substantially in the form attached hereto as **Exhibit A** (the "DIP Term Sheet"), pursuant to which, and subject to the satisfaction of certain conditions, the DIP Lender has committed to provide up to $35 million in DIP Loans pursuant to a non-amortizing priming superpriority senior secured term loan facility (the "DIP Facility") and (b) granting related relief.

2.      Additionally, the Debtors seek entry of a final order (the "DIP Order" and, together with the Approval Order, "Proposed Orders")[4] granting the following relief:[5]

- ***DIP Facility***:  Authorizing the Debtors to obtain postpetition financing (the "DIP Financing") pursuant to a $35 million DIP Facility, subject to the terms and conditions of the DIP Term Sheet, the DIP Credit Agreement, and the related security and ancillary documents (collectively, the "DIP Documents" and, all obligations arising thereunder, the "DIP Obligations"), of which (a) up to $10 million (the "Initial Draw Amount") will be available upon entry of the DIP Order and (b) the remaining up to $25 million (the "Final Amount") will be available upon the Court's entry of an order on or before May 7, 2025, authorizing and approving a stalking horse purchase agreement that (i) is executed, effective, and binding on all parties thereto and (ii) either (A) is approved by the DIP Lender in its reasonable discretion or (B)(1) would generate sufficient cash proceeds sufficient for the payment in full of the DIP Obligations upon closing of a sale, (2) closes on or before June 30, 2025, and (3) requires, pursuant to a Court order, the payment in full of the DIP Obligations (an "Acceptable Stalking Horse Agreement"), in each case, subject to satisfaction of all other applicable conditions precedent as set forth in the DIP Documents;

- ***Superpriority Claims and DIP Liens***:  Granting DIP Liens on the DIP Collateral to secure the DIP Obligations with the relative priorities set forth in the DIP Order subject to the terms set forth in the DIP Documents and the DIP Order;

- ***Automatic Stay***: Modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and conditions of the DIP Order subject to the terms set forth in the DIP Documents and the DIP Order;

---

[4]     Copies of the Proposed Orders will be made available on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors will make a copy of the DIP Order and a form of credit agreement related to the DIP Facility (the "DIP Credit Agreement") available no later than ten days prior to the objection deadline for final approval of this motion.

[5]     The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.

2

- **_Final Hearing_**:  Scheduling a final hearing (the "<u>Final Hearing</u>") to consider approval of the DIP Facility pursuant to a proposed DIP Order, as set forth in this motion and the DIP Documents; and

- **_Related Relief_**:  Granting certain related relief.

3.      In support of this motion, the Debtors submit the (a) _Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions_ (the "<u>First Day Declaration</u>") and (b) _Declaration of Andrew Swift in Support of Debtors' Motion for Entry of (I) An Order (A) Authorizing Entry Into and Performance Under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and the Work Fee Thereunder, and (B) Granting Related Relief and (II) An Order (A) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, And Provide Superpriority Administrative Expense Claims, (B) Modifying the Automatic Stay, and (C) Granting Related Relief_ (the "<u>Swift Declaration</u>" and, together with the First Day Declaration, the "<u>Declarations</u>").  Each of the Declarations is incorporated herein by reference.

### Jurisdiction and Venue

4.      The United States Bankruptcy Court for the Eastern District of Missouri (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 _et seq._ (the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Rules"), and the Court's *Chapter 11 Guidelines for Cash Collateral and Financing Orders* (the "Local Guidelines").

### Background

7.      23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[6] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome.  The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic health reports.  Further, through its Lemonaid Health telehealth platform, the Company operates as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

8.      On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated at this time.

10.      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the First Day

---

[6]      Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

Declaration, filed substantially contemporaneously herewith and incorporated herein by reference.[7]

## Concise Statement Pursuant to Bankruptcy Rule 4001

11. In accordance with Bankruptcy Rules 4001(c) and 4001(d), the following is a concise statement and summary of the proposed material terms of the DIP Facility as provided in the DIP Documents.[8]

| DIP Facility | |
|---|---|
| **DIP Facility**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 3 (*Type and Amount of the DIP Facility*) | A non-amortizing priming superpriority senior secured term loan facility subject to the terms and conditions set forth in the DIP Term Sheet, consisting of new money term loans in an aggregate principal amount not to exceed $35 million. |
| **Borrowers**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 1 (*Borrowers and Guarantors*) | All of the Debtors in these chapter 11 cases. |
| **Guarantors**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 1 (*Borrowers and Guarantors*) | All of the Borrowers and each Borrower's respective subsidiaries and affiliates. |
| **DIP Lender**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 2 (*DIP Lender*) | JMB Capital Partners Lending, LLC and/or its designees or its assignees; *provided* that JMB will not designate or assign (a) any of its rights as DIP Lender under the DIP Term Sheet or the DIP Documents or (b) DIP Loans to any insider (as defined under the Bankruptcy Code) of the Debtors without the Debtors' prior written consent in their sole discretion. |
| **Term**<br><br>**Bankruptcy Rule 4001(c)(1)(B)** | The earliest of (a) September 30, 2025, (b) the effective date of any chapter 11 plan with respect to the Borrowers, (c) the consummation of any sale or other disposition of all or |

---

[7] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the DIP Term Sheet or the First Day Declaration, as applicable.

[8] This summary is intended only to assist the Court by reference to the DIP Term Sheet and is qualified in its entirety by the terms of the DIP Term Sheet, as may be modified by the Proposed Orders. Capitalized terms used in this statement but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet.

| DIP Facility | |
|---|---|
| DIP Term Sheet § 7 (*Maturity and Termination*) | substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code, (d) the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default in accordance with the DIP Documents, (e) dismissal of any chapter 11 case or conversion of any chapter 11 case into a case under chapter 7 of the Bankruptcy Code; and (f) April 25, 2025 (or such later date as agreed to by the DIP Lender), unless the DIP Order has been entered by the Court on or prior to such date. |
| **Material Conditions to Closing and Borrowing**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet §§ 15-16 (*Conditions Precedent to Initial Draw; Conditions Precedent to Availability of Other Draws; Milestones*) | The DIP Facility includes customary conditions of borrowing, the satisfaction of which are a condition precedent to the obligations of the DIP Lender to make DIP Loans. |
| **Fees and Expenses**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>Approval Order ¶¶ 5-7<br><br>DIP Term Sheet §§ 9 (*Commitment Fee, Work Fee, Exit Fee, and Other Fees*), 22 (*DIP Order*), 26 (*Indemnification and Reimbursement of Expenses*) | <u>Commitment Fee</u>: a cash fee equal to 2.0% of the total amount of DIP Commitments. The Commitment Fee shall be (a) fully earned, non-refundable, and allowed upon entry of the Approval Order and (b) paid in cash promptly after the Court's entry of the Approval Order, but in no event later than the date that is two business days after the entry of the Approval Order.<br><br><u>Work Fee</u>: $100,000, which shall be (a) fully earned, non-refundable, and allowed upon entry of the Approval Order and (b) paid in cash promptly after the Court's entry of the Approval Order, but in no event later than the date that is two business days after the entry of the Approval Order.<br><br><u>Exit Fee</u>: an exit fee equal to 4.0% of the DIP Commitments as follows: (a) following entry of the DIP Order, 4.0% of the Initial Draw Amount (*i.e.*, $10,000,000) and (b) following the Court's approval and the execution and delivery of an Acceptable Stalking Horse Purchase Agreement, 4.0% of the total remaining amount of the DIP Commitments (*i.e.*, $25,000,000), which, in each case, shall be fully earned, non-refundable, and allowed upon the Court's entry of the DIP Order. The Exit Fee shall be due and payable in cash upon the earliest of (i) the DIP Termination Date (including, for the avoidance of doubt, the occurrence of the Maturity Date), (ii) Payment in Full of the DIP Obligations, and (iii) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations.<br><br><u>Expenses</u>: subject to the DIP Documents and entry of the DIP Order, all reasonable and documented out-of-pocket |

| DIP Facility | |
|---|---|
| | accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender incurred in connection with the DIP Facility and the chapter 11 cases, which shall be paid on a current basis within ten days after the Debtors' receipt of a summary invoice for any such fees, costs, disbursements, and expenses. |
| **Interest Rate**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 8 (*Interest Rate*) | 14.0% per annum, payable in cash on the first day of each month in arrears. |
| **DIP Liens**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))**<br><br>DIP Term Sheet § 12 (*Security*) | The DIP Facility will be secured by liens on (a) substantially all assets and property of the Debtors, whether now owned or existing or hereafter acquired, created, or arising and wherever located, (b) avoidance actions (other than the Specified Insider Claims), (c) the proceeds thereof, and (d) the proceeds of the Specified Insider Claims (in each case, subject to the Permitted Senior Lien, Permitted Prior Liens, and the Carve-Out). |
| **Modification of Non-Bankruptcy Law Relating to Perfection of Liens on Estate Property**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(vii))**<br><br>DIP Term Sheet § 13 (*Priority and Security*) | The DIP Liens described shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the DIP Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements. or other agreements. |
| **Superpriority Administrative Claims**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(i))**<br><br>DIP Term Sheet §§ 13 (*Priority and Security*), 14 (*DIP Order*) | The DIP Obligations shall constitute allowed superpriority administrative claims with priority over any and all administrative expenses and unsecured claims, including, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code. |
| **Limitations on the DIP Lenders' Obligations to Fund Activities of the Debtors**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 10 (*Use of Proceeds*) | Notwithstanding any other provision of the DIP Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral, or any portion of the Carve-Out may be used directly or indirectly by any Debtor, any official committee appointed in these chapter 11 cases, or any trustee or examiner appointed in these chapter 11 case or any successor cases, including any chapter 7 cases, or any other person, party or entity: (a) in connection with the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or |

| **DIP Facility** |
| --- |

|  | other proceeding (i) against the DIP Lender, or its predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens, or DIP Claims; or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the DIP Order, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; (b) to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Order, each in accordance with the DIP Documents and the DIP Order, as applicable; provided, however, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Order and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder; (c) to seek to modify any of the rights and remedies granted to the DIP Lender under the DIP Order (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted, if any, pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or in parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Order have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| --- | --- |
| **Events of Default**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 25 (*Events of Default*) | Usual and customary events of defaults for facilities of this type and purpose, including, among others:<br>• Any action by any Debtor to challenge the rights and remedies of the DIP Lender;<br>• Cancellation or termination of an Acceptable Stalking Horse Purchase Agreement without the DIP Lender's consent;<br>• Failure to comply with milestones;<br>• Nonpayment of obligations;<br>• Covenant defaults;<br>• Breaches of representations and warranties; and |

| DIP Facility | |
|---|---|
| | • The occurrence of certain adverse actions or consequences in the chapter 11 cases. |
| **Covenants**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet §§ 19, 20 (*Affirmative Covenants*; *Negative Covenants*) | <u>Affirmative Covenants</u>: Usual and customary for facilities of this type.<br><br><u>Negative Covenants</u>: Usual and customary for facilities of this type; *provided* that the DIP Documents will permit, among other things, (a) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale(s), subject to Court approval and provided that such sale(s), in the aggregate, provide for the Payment in Full of the DIP Obligations; (b) the ability to reject or modify contracts; (c) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (d) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (e) adequate protection in accordance with the Budget and acceptable to the DIP Lender in its sole discretion. |
| **Reporting**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 21 (*DIP Budget/Variance Reporting*) | The DIP Facility requires compliance with certain periodic reporting covenants, including monthly and cumulative variance reporting for cash receipts and cash disbursements. |
| **Use of Proceeds and Cash Collateral**<br><br>**(Bankruptcy Rule 4001(c)(1)(B))**<br><br>DIP Term Sheet § 10 (*Use of Proceeds*) | The proceeds of the DIP Facility shall be available to finance: (a) working capital and general corporate purposes of the Borrowers, subject to the Budget and Permitted Variance, (b) professional fees and expenses of the Debtors' estates in administering the chapter 11 cases, (c) fees and expenses payable under the DIP Facility, and (d) interest and other amounts payable under the DIP Facility. |
| **Milestones**<br><br>DIP Term Sheet § 16 (*Conditions Precedent to Initial Draw; Conditions Precedent to Availability of Other Draws; Milestones*) | As a condition to the Debtors making any Other Draw (*i.e.*, any Draw under the DIP Facility in excess of $10,000,000), on or before May 7, 2025, the Court shall have entered an order authorizing and approving an Acceptable Stalking Horse Agreement.<br><br>The DIP Documents shall contain certain other milestones relating to the chapter 11 cases. |
| **Release or Waiver of any Claim**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(viii))**<br><br>DIP Term Sheet § 27 (*Release*) | The DIP Order shall include a customary release of the DIP Lender in its capacity as such with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| **Indemnification** | The DIP Documents shall contain customary indemnification |

| DIP Facility | |
|---|---|
| **(Bankruptcy Rule 4001(c)(1)(B)(ix))**<br><br>DIP Term Sheet § 26 (*Indemnification and Reimbursement of Expenses*) | provisions for the benefit of the DIP Lender and its related parties, subject to customary exceptions including the bad faith, gross negligence, or willful misconduct of the relevant indemnitee. |
| **Waiver/Modification of the Automatic Stay**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(iv))**<br><br>DIP Term Sheet §§ 14 (*Remedies*), 28 (*Waivers*) | The DIP Order will provide a waiver of section 362 of the Bankruptcy Code providing that, upon the DIP Termination Date, the DIP Lender shall be entitled to immediate payment of all DIP Obligations under the DIP Facility and to enforce the remedies provided for under the DIP Documents or under applicable law, without further notice, motion, or application to, hearing before, or order from, the Court.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Order and the Debtors' right to seek an emergency hearing before the Court with respect to the exercise of remedies by the DIP Lender. |
| **Section 506(c) and 552(b) Waiver**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(x))**<br><br>DIP Term Sheet §§ 22 (*DIP Order*), 26 (*Waivers*) | The DIP Order shall approve the Debtors' waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise. |
| **Liens on Avoidance Proceeds**<br><br>**(Bankruptcy Rule 4001(c)(1)(B)(xi))**<br><br>DIP Term Sheet § 12 (*Security*) | The DIP Collateral includes liens on (a) any actions under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable nonbankruptcy law and (b) the proceeds thereof; *provided*, *however* that the DIP Collateral (i) shall not include the Specified Insider Claims but (ii) shall include the proceeds of the Specified Insider Claims. |

## **Significant Provisions under the Local Guidelines**

12.     The Debtors expect that the DIP Order will contain certain of the provisions (the "Significant Provisions") identified in the Local Guidelines as set forth below.  The Debtors believe that each Significant Provision is justifiable because the DIP Lender would not have provided the DIP Facility without such provision and the DIP Facility, taken as a whole, is fair and reasonable to the Debtors (particularly in the context of these chapter 11 cases) and is the best financing option available.  Moreover, since the Debtors seek approval of the DIP Facility

on regular (not expedited) notice, parties in interest have sufficient notice of, and an opportunity

to object to, such Significant Provisions.

| Provision | Status |
|---|---|
| **Cross-Collateralization** | The DIP Order will not contemplate cross-collateralization. |
| **Provisions Seeking to Bind the Estate or Other Parties in Interest With Respect to Validity, Perfection or Amount of a Secured Creditor's Prepetition Lien or Release or Waiver of Claims Against a Secured Creditor** | The DIP Order shall include a customary release of the DIP Lender in its capacity as such with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| **506(c) Waiver** | The DIP Order shall approve the Debtors' waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise. |
| **Liens on Proceeds of Avoidance Actions** | The DIP Collateral includes liens on (a) any actions under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable nonbankruptcy law and (b) the proceeds thereof; *provided*, *however* that the DIP Collateral (i) shall not include the Specified Insider Claims but (ii) shall include the proceeds of the Specified Insider Claims. |
| **Roll-Up** | The DIP Order will not contemplate a roll-up. |
| **Carve-Out** | The DIP Documents and DIP Order contemplate a Carve Out for (i) fees required to be paid to the Clerk of the Court and the Office of the United States Trustee for the Eastern District of Missouri, (b) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, (c) to the extent allowed, all unpaid expenses and fees incurred by Professional Persons prior to the delivery of a Carve-Out Trigger Notice, and (d) allowed professional fees of Professional Persons in an aggregate amount not to exceed $3,500,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice. |
| **Non-Consensual Priming Liens** | The DIP Order will not contemplate non-consensual priming liens in respect of the Permitted Senior Lien and the Permitted Prior Lien. |
| **552(b)(1) Waiver** | The DIP Order will not contemplate a waiver of all rights under section 552(b) of the Bankruptcy Code. |

| Provision | Status |
|---|---|
| **Waiver/Modification of the Automatic Stay** | The DIP Order will provide a waiver of section 362 of the Bankruptcy Code providing that, upon the DIP Termination Date, the DIP Lender shall be entitled to immediate payment of all DIP Obligations under the DIP Facility and to enforce the remedies provided for under the DIP Documents or under applicable law, without further notice, motion, or application to, hearing before, or order from, the Court.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Order and the Debtors' right to seek an emergency hearing before the Court with respect to the exercise of remedies by the DIP Lender. |
| **Credit Bid** | The DIP Order will provide the DIP Lender with the right to credit bid up to and including the full amount of the DIP Obligations for the DIP Collateral. |

13.     The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating the Debtors' goal of effectuating a value-maximizing sale for all or substantially all of their assets (the "Sale Transaction") during these chapter 11 cases.  In light of the foregoing, the Significant Provisions are appropriate under the facts and circumstances of these chapter 11 cases and should be approved.

**The Debtors' Need for the DIP Facility and Development of the Budget**

14.     The Debtors require access to liquidity during these chapter 11 cases to stabilize the business, continue operating in the ordinary course, effectuate an efficient and expeditious Sale Transaction, and distribute any remaining proceeds and assets to their stakeholders.  Prior to the Petition Date, the Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to fund the administration of these chapter 11 cases.  In undertaking this analysis, the Debtors and their advisors considered the Debtors' near-term projected financial performance, including demand for the Debtors' products and services and the cost of supplying such products and services, along with their current liquidity position.

15.     As part of the Debtors' financial review and analysis, the Debtors, with the assistance of their financial advisor, Alvarez & Marsal North America, LLC, developed an initial cash flow forecast, a copy of which is attached as **Exhibit B** hereto (the "Budget").[9]  The Budget incorporates several factors and reasonable assumptions, including the Company's substantial working capital requirements, the effect of filing for chapter 11 on the Debtors' operations, material cash disbursements, vendor relationships and required payments, cash flows from the Debtors' ongoing operations, and the cost of necessary goods and materials.  Furthermore, the Budget includes all of the expenditures that the Debtors seek authority to pay under various "first day" pleadings, if approved by the Court.

16.     The Debtors intend to use cash on hand to fund working capital, capital expenditures, and other general corporate purposes.  The Debtors' current liquidity alone, however, is likely insufficient to fund the costs associated with the Debtors' operations, the Sale Transaction, and distribution of remaining cash and estate assets to stakeholders during these chapter 11 cases.  Therefore, the Debtors, with the assistance of their advisors, have determined that the additional postpetition financing provided by the DIP Facility is necessary.  The DIP Facility will provide liquidity to support the Debtors' continued operations and fulfill commitments to its valued customers, employees, and vendors during the chapter 11 cases, while maintaining momentum on its sale process with a goal of maximizing value for the benefit of all stakeholders.  Importantly, the Debtors submit that the incremental liquidity provided by the DIP Facility will help ensure that the Debtors' customers, vendors, and other key stakeholders—as well as potential bidders in the Debtors' proposed sale process—understand there will be sufficient liquidity to bridge the Debtors through one or more value-maximizing sale transactions

---

[9]     The Debtors expect to file a revised Budget prior to the Final Hearing to account for any expected draws under the DIP Facility.

pursuant to the proposed sale process.  Accordingly, the Debtors have demonstrated a need to access the DIP Facility following entry of the DIP Order and throughout the pendency of these chapter 11 cases thereafter and that entry into the DIP Facility is a sound exercise of the Debtors' business judgment.

**Alternative Sources of Financing Are Not Available on Better Terms**

17.     As explained in the Swift Declaration and First Day Declaration, over the past several months, the Debtors, with the assistance of Moelis & Company, LLC ("Moelis") and at the direction of the Special Committee, have made significant efforts to secure financing necessary to address the Debtors' liquidity need.

18.     In furtherance of the Prepetition Marketing Process, the Debtors prepared a confidential information memorandum with extensive information on the Company Assets, populated a data room containing significant diligence documentation (the "Data Room"), and began outreach to potential buyers and financing parties.  On January 28, 2025, the Special Committee issued a press release announcing that it had undertaken a process to explore strategic alternatives, including among other alternatives, a possible sale of the Company, business combination, sale of all or part of the Company's assets, licensing of assets, restructuring, or other strategic action,[10] which resulted in additional inbound interest from third parties.

19.     The Debtors and/or Moelis engaged with 103 potential counterparties, including 51 potential strategic investors and 52 potential financial investors (the "Contact Parties"), to evaluate a potential purchase of all or part of the Company's assets or an alternative potential investment in the Debtors.  These efforts resulted in 90 introductory calls and the execution of 42 confidentiality agreements with the applicable counterparty receiving access to a comprehensive

---

[10]     *See* 23andMe Holding Co. press release dated January 28, 2025 (https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-announces-exploration-strategic).

Data Room. Beginning January 30, 2025, and continuing throughout the Prepetition Marketing Process, Moelis distributed the confidential information memorandum and a preliminary financial model to Contact Parties that had executed a confidentiality agreement.

20.     As part of the Prepetition Marketing Process, certain parties indicated interest in providing debtor-in-possession financing if the Debtors decided to pursue an in-court process. After evaluation of such potential proposals with the Special Committee, the Debtors, with Moelis' assistance, engaged in further discussions with such parties, which resulted in the Debtors' receipt of three written indications of interest in providing a DIP facility (the "Initial DIP Interest Parties"). The Initial DIP Interest Parties included both new, third-party capital providers as well as the Debtors' former Chief Executive Officer, co-founder, controlling stockholder, and member of the Debtors' board of directors (the "Former CEO").

21.     Of the three indications of interest received, the Special Committee, with the assistance of its advisors, determined that only the proposals provided by the DIP Lender (the "DIP Lender Proposal") and the Former CEO (the "Former CEO Proposal" and, together with the DIP Lender Proposal, the "Proposals") were potentially actionable. Accordingly, with the authorization of the Special Committee, the Debtors engaged in arm's-length and good faith negotiations with the counterparties to the Proposals (the "Counterparties") in the week leading up to the Petition Date.

22.     As part of these negotiations, the Debtors' advisors had multiple discussions and exchanged various drafts of terms sheets and other documentation outlining the material terms of each Proposal with the Counterparties' advisors. Throughout the process, the Debtors' advisors provided regular updates to, and had various substantive discussions with, the Special Committee. As a result of these efforts, the Special Committee determined that accepting DIP

15

Lender Proposal was in the best interests of the Debtors, including with respect to the Former CEO Proposal. Specifically, the key terms of the DIP Lender's Proposal, including the size of the facility, maturity, cost of capital, conditions to funding, and affirmative and negative covenants, are comparable to or better than those in the Former CEO Proposal taken as a whole.

23.     Entry into the DIP Term Sheet provides a crucial first step for the Debtors to receive funding to allow them to conduct a sale process on a timeline that should encourage a robust bidding and auction process in an effort to ultimately allow the Debtors to maximize value for the benefit of the Debtors' stakeholders. If the Debtors are not authorized to enter into the DIP Term Sheet and, ultimately, the other DIP Documents, the Debtors risk lacking sufficient liquidity to both bridge through closing of one or more value-maximizing sales in the proposed sales process and deploy sufficient resources to maintain the value of the Debtors' business during the pendency of that process to the detriment of all stakeholders.

24.     Accordingly, the DIP Facility represents the best available option to enhance the Debtors' liquidity position and facilitate a successful sale process and exit from chapter 11.

### Basis for Relief

## I.     The Debtors Should Be Authorized To Enter Into the DIP Term Sheet and Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

25.     The Debtors satisfy the requirements for relief under sections 363 and 364 of the Bankruptcy Code. Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor in possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts routinely grant a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *Grp. of Institutional Investors* v. *Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re*

*Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. Apr. 17, 2003) ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio Aug 30, 1983). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co.* v. *Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

26.     Moreover, section 364 of the Bankruptcy Code permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative status and liens on its property.   Specifically, section 364(c) of the Bankruptcy Code provides that the court may approve financing, "with priority over any or all administrative expenses . . .." 11 U.S.C. § 364(c).

27.     Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating their requests to incur postpetition credit.   *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 [Docket No. 21] (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Latam Airlines Grp. S.A.*, 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment . . . so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in interest").

28.     In determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Facility, this Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc*., 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York explained that "non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting postpetition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms" due to the importance of those terms.  *Id.*

29.     Here, given all the facts and circumstances present in these chapter 11 cases, the Debtors have amply satisfied the necessary conditions under sections 363 and 364(c) of the Bankruptcy Code for authority to enter into DIP Term Sheet and the DIP Facility and, upon entry of the Approval Order, pay the Commitment Fee and the Work Fee contemplated thereunder. The Debtors exercised proper business judgment in securing the DIP Facility on terms that are fair, reasonable, and the best available to them under the circumstances and in the current market.  For all the reasons discussed further below, the Debtors respectfully submit that the Court should grant the Debtors' request to enter into the DIP Facility pursuant to sections 363 and 364(c) of the Bankruptcy Code.

**A.     The Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter the DIP Term Sheet and DIP Facility**

30.     Based on the facts and circumstances of these chapter 11 cases, entry into the DIP Term Sheet and DIP Facility represent a proper exercise of the Debtors' business judgment.  As

noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity") (citing *Aronson* v. *Lewis*, 473 A.2d 805, 812 (Del. 1984)); *In re Garrett Motion Inc.*, No. 20-12212 (Bankr. S.D.N.Y. Oct. 23, 2020) (approving postpetition financing as "a sound and prudent exercise of the Debtors' business judgment"); *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. July 28, 2009) (noting "decisions in [the Second Circuit] emphasizing that [bankruptcy courts] should not substitute [their] business judgment for that of the Debtors'") (citations omitted), *aff'd* 421 B.R. 620 (S.D.N.Y. 2009); *Richmond Leasing Co.* v. *Capital Bank N.A.*, 762 F.2d at 1311 ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.").

31.     Specifically, when evaluating whether a debtor's decision to obtain postpetition financing was an exercise of sound business judgment, courts need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Dura Auto. Sys., Inc.*, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. Apr. 3, 2006)).  When evaluating whether a debtor's decision to enter into postpetition financing was an exercise of sound business judgment, bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and the market for financing more generally.  *See, e.g., In re Farmland Indus., Inc.*, 294 B.R. at 886; *Unsecured Creditors' Comm. Mobil Oil Corp.* v. *First Nat'l Bank & Trust Co.* (*In re Ellingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986)

(recognizing a debtor may have to enter into a "'hard' bargain" to acquire funds for its reorganization). Moreover, courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "'as long as the proposed action appears to enhance the debtor's estate.'" *Crystalin, LLC* v. *Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (quoting *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997) (emphasis original, internal alterations and quotations omitted)).

32.     Prevailing market conditions are also highly relevant to a court's evaluation of a debtor's business judgment regarding their postpetition financing. *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co*., Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past).

33.     Accordingly, the Debtors submit that entry into the DIP Term Sheet and the DIP Facility should be approved as a sound exercise of their business judgment. The Debtors have successfully negotiated financing that provides sufficient liquidity, market pricing, reasonable covenants, and facilitates the Debtors' path towards consummating one or more value-maximizing Sale Transactions. The proposed DIP Financing is also the result of vigorous negotiations with the DIP Lender supported by experienced, professional advisors and, as set forth in the Swift Declaration, is on terms that are fair and reasonable based on the circumstances of these chapter 11 cases. On this record, the Debtors submit that the relief requested herein is a sound exercise of the Debtors' business judgment and should be approved.

**B.** **The Debtors Meet the Conditions Necessary Under Sections 364(c) and 364(d) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

34.     The Debtors propose to obtain financing under the DIP Facility by providing superpriority claims and liens pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code. The Debtors propose to provide the DIP Lender with liens on and security interests in all of the DIP Collateral.  The DIP Collateral includes all of the assets and property of the Debtors, the avoidance actions (other than the Specified Insider Claims), the proceeds thereof, and the proceeds of the Specified Insider Claims (in each case, subject to the Permitted Senior Lien, the Permitted Prior Liens, and the Carve-Out).

35.     In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts act in their "informed discretion." *In re Ames Dep't Stores*, 115 B.R. at 37.  Courts perform a qualitative analysis and consider factors including whether (a) the debtor made a reasonable effort to find financing with better terms, (b) the financing is necessary to preserve assets of the estate, and (c) the terms of the credit agreement are fair, reasonable, and adequate given the circumstances of the debtor and proposed lender.  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016).

**C.** **The Debtors Are Unable to Obtain Financing on More Favorable Terms Than the DIP Facility**

36.     Debtors must demonstrate that they made a reasonable effort to find alternative financing before a bankruptcy court will order superpriority liens.  *In re Latam Airlines Grp. S.A.*, at *26.  However, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* (quoting *Bray* v. *Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)); *In re Pearl-Phil GMT (Far East) Ltd.* v. *Caldor Corp.*, 266 B.R. 575, 584−85 (S.D.N.Y.

2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense); *see also In re Ames Dep't Stores, Inc*., 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after discussing possible postpetition financing with four lenders; *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. May 9, 1996). Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. Sept. 12, 1988), *aff'd sub nom*. *Anchor Sav. Bank FSB* v. *Sky Valley, Inc*., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

37.     Here, the Debtors do not believe that comparable alternative sources of financing are reasonably available. As discussed above, the Debtors, with the assistance of their advisors, solicited financing proposals from potential new, third-party capital providers and conducted arm's-length negotiations with certain of the Contact Parties. Swift Decl. ¶¶ 8-14. Through these negotiations, the Debtors improved the economic and other terms of the DIP Facility, which is the best financing proposal reasonably available under the circumstances. *Id.* ¶¶ 14, 18. In sum, the DIP Facility represents the Debtors' best available postpetition financing option.

### D.     The DIP Facility Is Necessary to Preserve the Value of the Debtors' Estates

38.     The Debtors have a fiduciary duty to protect and maximize their estates' assets. *See In re Mushroom Transp. Co*., 382 F.3d 325, 339 (3d Cir. 2004). The Debtors seek access to the DIP Facility consistent with that duty. Without access to the DIP Facility, the Debtors may not have sufficient liquidity to both bridge through closing of one or more value-maximizing sales in the proposed sale process and deploy sufficient resources to maintain the value of the Debtors' estates during the pendency of that process to the detriment of all stakeholders. Swift

Decl. ¶ 22.   Accordingly, the circumstances of the chapter 11 cases necessitate postpetition financing under section 364(c) of the Bankruptcy Code.

### E.   The Terms of the DIP Facility Are Fair, Reasonable, and Adequate under the Circumstances

39.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. at 886.  The appropriateness of a proposed financing facility should also be considered in light of current market conditions.  *See In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of the DIP] reasonable here and now.").

40.    Here, the terms of the DIP Facility are fair, appropriate, reasonable, adequate under the circumstances, and in the best interests of the Debtors, their estates, and their creditors. As noted above, the terms of the DIP Facility were actively negotiated by the Debtors' advisors (overseen by the Special Committee), and ultimately approved by the Special Committee.  Under the current circumstances, the pricing, fees, and other economics provided for in the DIP Facility, taken as a whole, are reasonable and in the Debtors' best interests, particularly in light of the absence of any other more favorable alternatives.  *See* Swift Decl. ¶¶ 23-24.

### F.   The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)

41.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

42.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors can obtain postpetition financing at this time. As described in the Swift Declaration, the negotiations of the terms of the DIP Facility with the DIP Lender were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Documents are reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Documents. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender thus is entitled to all of the protections afforded by that section.

## II.    The Scope of the Carve-Out is Appropriate

43.     The DIP Term Sheet subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out.  Such Carve-Outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee appointed can reimburse their professionals in certain circumstances following an event of default under the terms of the debtor's postpetition financing. *See Ames Dep't Stores*, 115 B.R. at 41.  None of the DIP Documents nor the DIP Facility directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases. *See id.* at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such

protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the U.S. Trustee's fees and professional fees of the Debtors and any statutory committee notwithstanding the grant of priming liens and superpriority claims. The Debtors expect that, upon entry of the DIP Order, the Carve-Out will replace or modify the administrative expense procedures set forth in the Debtors' Cash Management Motion.[11]

### III. The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lender Under the DIP Term Sheet

44. In consideration for their commitment to provide the DIP Facility, the Debtors have agreed, subject to Court approval, to provide the DIP Lender with (a) a $100,000 Work Fee, (b) a Commitment Fee of 2.00% of the total amount of DIP Commitments, (c) an Exit Fee of 4.0% of the total amount of DIP Commitments, which shall only apply to $10 million of the DIP Commitments until the Debtors gain access to the full amount of the DIP Facility under the terms of the DIP Term Sheet (after which the Exit Fee will apply to the full amount of the DIP Commitments), and (d) reimbursement of reasonable and documented out-of-pocket fees, costs, disbursements, and expenses. The Debtors seek approval of the Commitment Fee and the Work Fee through entry of the Approval Order, and submit that the Court should approve such fees as a reasonable exercise of the Debtors' business judgment. The Debtors only seek approval of the Exit Fee and reimbursement of the DIP Lender's fees and expenses upon entry of the DIP Order.

---

[11]   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of Cash Management System, (B) Maintenance of Bank Accounts and Business Forms, (C) Performance of Intercompany Transactions, and (D) Certain Prepetition Obligations to be Honored; (II) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors; (III) Waiving Strict Compliance with 11 U.S.C. § 345(b) and Certain Operating Guidelines, as Applicable; and (IV) Granting Related Relief* (the "Cash Management Motion"), filed substantially contemporaneously herewith.

45. In light of the substantial amount of capital that the DIP Lender has committed to provide to ensure an efficient and value-maximizing chapter 11 process, the Debtors, in consultation with their advisors, believe that the consideration being provided to the DIP Lender, taken as a whole, in exchange for providing such commitment, is reasonable under the circumstances and necessary to obtain the DIP Facility. The Debtors do not believe they could obtain a financing commitment similar to that reflected in the DIP Term Sheet on better terms. As set forth more fully in the Swift Declaration, the terms and conditions of the DIP Facility result from a competitive market process undertaken by the Debtors and their investment banker and arms'-length negotiations among the parties. Accordingly, the Debtors submit that their decision to perform their obligations under the DIP Term Sheet is in the best interests of their estates and should be approved.

## IV. The Automatic Stay Should Be Modified on a Limited Basis

46. The Debtors anticipate that the DIP Order will contemplate modification of the automatic stay to (a) permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Order and the DIP Documents and (b) permit the DIP Lender to exercise rights and remedies under certain circumstances. The Debtors believe that these provisions are required for the Debtors' to obtain the DIP Financing as provided in the DIP Order. In the Debtors' business judgment, the stay modifications are reasonable and fair under the circumstances of these chapter 11 cases.

## Immediate Relief Is Necessary

47. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm." For the reasons discussed herein and in the First Day Declaration and the Swift Declaration, the Debtors believe an immediate and orderly transition into chapter 11 is

26

critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Failure to obtain the requested relief under the Approval Order during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts.  Specifically, the DIP Term Sheet provides for its automatic termination if the Approval Order is not entered by the Court within seven days after the Petition Date.  The relief requested under the Approval Order is necessary for the Debtors to operate their business in the ordinary course and preserve the value of their estates for the benefit of stakeholders.  Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied.

### **Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

48.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates through these chapter 11 cases.  Accordingly, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### **Notice**

49.     The Debtors will provide notice of this motion to the following parties:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) JMB and its counsel; (e) the United States Attorney's Office

for the Eastern District of Missouri; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Federal Trade Commission; (i) the state attorneys general in all 50 states; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-3(A)(1).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

50.     A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov/ and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Orders

and grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 24, 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:     (314) 854-8600
Facsimile:     (314) 854-8660
Email:     thr@carmodymacdonald.com
          nrw@carmodymacdonald.com
          jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:     (212) 373-3000
Facsimile:     (212) 757-3990
Email:     pbasta@paulweiss.com
          chopkins@paulweiss.com
          jchoi@paulweiss.com
          ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

**<u>Exhibit A</u>**

**DIP Term Sheet**

*EXECUTION VERSION*

**March 23, 2025**

**23andMe Holding Co. *et al.***
**$35,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, the "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the DIP Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Approval Order with respect to the DIP Facility (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein and entry of the DIP Order. Capitalized terms used but not defined in this Term Sheet shall have the meanings given to such terms in the applicable DIP Documents. In the event of any conflict between this Term Sheet and the terms of the DIP Order, the terms of the DIP Order shall govern.**

**This Term Sheet is a binding and enforceable agreement, subject to entry of the Approval Order with respect to the Debtors, with respect to the subject matter contained herein, including an agreement to negotiate in good faith the DIP Documents by the parties hereto in a manner consistent with this Term Sheet, it being acknowledged and agreed that the funding or availability of the DIP Facility is subject to the applicable conditions precedent set forth hereto and in the Term Sheet.**

**This Term Sheet and all commitments and undertakings shall terminate if the board of directors or board of managers, as applicable, of any Borrower determines, in good faith based upon advice of outside legal counsel, that proceeding with this Term Sheet or taking any action (or refraining from taking any action) in relation thereto, would be inconsistent with the exercise of its fiduciary duties under applicable law.**

| 1. | ***Borrowers and Guarantors*** | • 23andMe Holding Co., 23andMe Inc., Lemonaid Health Inc., and 23andMe Pharmacy Holdings, Inc. (collectively with all other direct and indirect affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases, the "**Borrowers**", and each a "**Borrower**"). |
|---|---|---|
| | | • All obligations under the DIP Facility will be unconditionally guaranteed by each Borrower and each Borrower's respective subsidiaries and affiliates (collectively, the "**Loan Parties**" and each a "**Loan Party**"). |
| | | • The Borrowers are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**", and the Borrowers and their applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**") on or around March 23, 2025 (such date, the "**Petition Date**"). |
| | | • For the purposes of this Term Sheet, 23andMe Holding Co. (i) is hereby designated and appointed by each Loan Party as its authorized |

|   |   |   |
|---|---|---|
|   |   | representative and agent to act on its behalf (the "**Borrower Representative**") and (ii) accepts such appointment as the Borrower Representative. |
| 2. | *DIP Lender* | • JMB Capital Partners Lending, LLC ("**JMB**") and/or its designees or its assignees; <u>provided</u> that JMB will not designate or assign (a) any of its rights as DIP Lender under this Term Sheet or the DIP Documents or (b) DIP Loans to any insider of the Debtors (as defined under the Bankruptcy Code) without the Debtors' prior written consent in its sole discretion. |
| 3. | *Type and Amount of the DIP Facility* | • A non-amortizing priming super-priority senior secured term loan facility in an aggregate principal amount not to exceed $35,000,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**").

• The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed.

• Any Initial Draw shall be funded to the Debtors, through the DIP Bank Account (as defined below), to be used in accordance with the Budget.

• Subsequent DIP Loan proceeds to be funded into a new segregated Bank Account to be opened and designated by a Borrower (the "**DIP Bank Account**") and the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 30 days after the entry of the DIP Order subject to a 30-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the DIP Order. |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the DIP Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of DIP Loans up to $10,000,000 (the "**Initial Draw Amount**") and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 below immediately upon entry of the DIP Order (the "**Initial Draws**", the date of such first Initial Draw shall be referred to herein as the "**Closing Date**"). The closing of definitive DIP Documents shall occur as soon after the entry of the DIP Order as reasonably possible, but in any event no later than two (2) business days thereafter. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the DIP Order and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**", and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |

| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, and availability under the DIP Commitments, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (as defined below). |
| --- | --- | --- |
| | | • Each Draw shall be made (in an aggregate minimum amount of $2,000,000 (and multiples thereof) upon three (3) business days' written notice, up to the aggregate amount of the available undrawn DIP Commitments at any time prior to three (3) business days before the DIP Termination Date (as defined below); <u>provided</u> that the first Initial Draw shall be in the amount up to the Initial Draw Amount in accordance with the terms of the DIP Documents, and funded within three (3) business days following after the DIP Lender's receipt of a customary borrowing notice following entry of the DIP Order. |
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of: |
| | |     i.    September 30, 2025; |
| | |     ii.    the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
| | |     iii.    the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; |
| | |     iv.    the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and in the DIP Documents) in accordance with the DIP Documents; |
| | |     v.    dismissal of any Chapter 11 Case or conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code; and |
| | |     vi.    April 25, 2025 (or such later date as agreed to by the DIP Lender), unless the DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow under the DIP Facility and shall terminate the DIP Commitments and any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents. |
| | | • For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the Maturity Date under the DIP Documents. |

---

[1] For purposes hereof, the term "**Payment in Full**" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

| 8. | *Interest Rate* | • The DIP Loans shall bear interest at a per annum rate equal to 14.0% payable in cash on the first day of each month in arrears (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2.0%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | *Commitment Fee, Work Fee, Exit Fee, and Other Fees* | • **Commitment Fee.** The Borrowers shall pay to the DIP Lender a commitment fee equal to 2.0% of the total amount of the DIP Commitments (the "**Commitment Fee**"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of an order, in form and substance satisfactory to the DIP Lender in its reasonable discretion, authorizing and approving on a final basis, among other things, this Term Sheet, the Work Fee (as defined below), and the Commitment Fee (the "**Approval Order**"), and shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Approval Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Approval Order. |
| | | • **Work Fee.** The Borrowers shall pay to the DIP Lender a work fee in the amount of $100,000 (the "**Work Fee**"), which Work Fee shall be fully earned, non-refundable, and allowed upon entry of the Approval Order. The Work Fee shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Approval Order, but in no event shall the Work Fee be paid later than the date that is two (2) business days after the entry of the Approval Order. |
| | | • If the Approval Order is not entered by the Bankruptcy Court within seven (7) days after the Petition Date, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. The payment of the Commitment Fee and the Work Fee shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Approval Order. |
| | | • **Exit Fee.** The Borrowers shall pay to the DIP Lender an exit fee equal to 4.0% of the DIP Commitments as follows: (i) following entry of the DIP Order, 4.0% of the Initial Draw Amount; and (ii) following the Bankruptcy Court's approval and the execution and delivery of an Acceptable Stalking Horse Purchase Agreement, 4.0% of the remaining amount of the DIP Commitments (*i.e.*, $25,000,000), which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the DIP Order (the "**Exit Fee**"). The Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date (including, for the avoidance of doubt, the occurrence of the Maturity Date), (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be |

|   |   |   |
|---|---|---|
|   |   | payable until the DIP Obligations have been accelerated by the DIP Lender. |
|   |   | • The Commitment Fee and the Work Fee shall be approved on a final basis by the Bankruptcy Court as part of the Approval Order, and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the DIP Order. If such fees are not approved on a final basis by the Bankruptcy Court and paid as set forth herein, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. |
| 10. | *Use of Proceeds* | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget and 20.0% permitted variances as set forth below:<br><br> i. working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable if such subsidiaries are Loan Parties under the DIP Documents;<br><br> ii. professional fees and expenses of the Debtors' estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable;<br><br> iii. fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and<br><br> iv. interest and other amounts payable under the DIP Facility.<br><br>• Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in any Chapter 11 Case, or any trustee or examiner appointed in any Chapter 11 Case or any successor cases, including any chapter 7 cases, or any other person, party or entity (each of the following, a "**Restricted Use**"):<br><br> i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding:<br><br>  a. against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), or DIP Claims (as defined below); or<br><br>  b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted |

under the DIP Order, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise;

ii.    to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Order, each in accordance with the DIP Documents and the DIP Order, as applicable; <u>provided</u>, <u>however</u>, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Order and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder;

iii.    to seek to modify any of the rights and remedies granted to the DIP Lender under the DIP Order (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or

iv.    to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted, if any, pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Order have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender.

| 11. | *Voluntary Prepayments* | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts equal to the lesser of (a) $2,000,000 of principal and (b) the amount necessary to constitute Payment in Full of the outstanding DIP Obligations. |
|---|---|---|
| 12. | *Security* | • As security for the DIP Obligations, subject to the Carve-Out, the Permitted Senior Lien and Permitted Prior Liens (each as defined in **Schedule 1** hereto), and effective upon entry of the DIP Order, each Loan Party shall grant to the DIP Lender (a) a priming first lien on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that are subject to valid and perfected security interests in favor of third parties as of the Petition Date, (b) a first lien security interest on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that were unencumbered as of the Petition Date, and (c) a junior priority security interest on all of such Loan Parties' right, title and interest in, to and under all the Loan Parties' assets that were subject to the Permitted Senior Lien and Permitted Prior Liens, in each case, |

6

including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): all assets and property of such Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to section 1(c) or section 1(d) of the Lanham Act (15 U.S.C. §1051 et seq.)), all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York), all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof, and all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof; provided, however, that the DIP Collateral (i) shall not include claims and causes of action against current or former directors, officers and employees of any Debtor, including, without limitation, any claim for or relating to a breach of fiduciary duty by any such director or officer, (such claims and causes of action, the "**Specified Insider Claims**") but (ii) shall include the proceeds of the Specified Insider Claims (the "**Specified Insider Claims Proceeds**").

- Negative pledge on all assets of the Loan Parties subject to permitted liens, if any, under the DIP Documents.

- In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, and deposit account control agreements) requested by DIP Lender.

| 13. | *Priority and Security* | - Subject to the Carve-Out, the Permitted Senior Lien and Permitted Prior Liens, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees |

|    |    | and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to, as applicable, (i) a priming lien, (ii) a senior secured lien, (iii) junior secured liens, and (iv) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior or junior priority, as applicable, over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**"). |
|----|----|----|
|    |    | • Subject to the Carve-Out, the Permitted Senior Lien and Permitted Prior Liens, all DIP Obligations in respect of the DIP Facility shall be: |
|    |    |     i.  pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); and |
|    |    |     ii.  secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all unencumbered assets of the Loan Parties that are not subject to a valid and perfected lien on the Petition Date; |
|    |    |     iii.  secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by an automatically perfected junior security interest lien on all assets of each Loan Party that is subject to the Permitted Senior Lien and Permitted Prior Liens; and |
|    |    |     iv.  secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by an automatically perfected priming first-priority lien on all assets of each Loan Party that are subject to valid and perfected security interests in favor of third parties as of the Petition Date. |
|    |    | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the DIP Order. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the DIP Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, which shall include, without limitation, the right to: |
|    |    |     i.  declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; |

| | | |
|---|---|---|
| | | ii. declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; |
| | | iii. charge interest at the default rate under the DIP Documents; |
| | | iv. declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the DIP Order); or |
| | | v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law. |
| | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Order and the Loan Parties' right to seek an emergency hearing before the Bankruptcy Court with respect to the exercise of remedies by the DIP Lender. |
| 15. | *Conditions Precedent to Initial Draw* | • Entry of the DIP Order on or before April 25, 2025, and no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the DIP Order; |
| | | • The Approval Order shall have been entered and shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner; |
| | | • Delivery of the Initial Budget acceptable to the DIP Lender in its discretion (not to be unreasonably withheld); |
| | | • All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet (including the Commitment Fee and the Work Fee), the DIP Documents, or the DIP Order shall have been paid in accordance with the Term Sheet or the applicable DIP Documents (provided that the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (other than the Work Fee) shall be paid out of the proceeds of the Initial Draw); |
| | | • The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |
| | | • No Material Adverse Effect (as defined below) shall have occurred and be continuing; |
| | | • The Debtors shall be in compliance in all material respects with the DIP Order; |
| | | • No Event of Default shall have occurred and be continuing under this Term Sheet or the DIP Documents; and |

| | | |
|---|---|---|
| | | • The Borrowers shall have delivered to the DIP Lender a customary borrowing notice in form and substance reasonably satisfactory to the DIP Lender. |
| 16. | ***Conditions Precedent to Availability of Other Draws; Milestones*** | • The DIP Order, or any material provision thereof, shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the DIP Lender's prior written consent in its reasonable discretion. |
| | | • In addition, the DIP Documents shall contain conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation: |
| | |     i.   execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance mutually acceptable to the Loan Parties and the DIP Lender; |
| | |     ii.   delivery of any Budget subsequent to the Initial Budget, acceptable to the DIP Lender in its sole discretion; |
| | |     iii.   no trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party or any Loan Party's business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than a Loan Party exercising control over its assets; |
| | |     iv.   the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |
| | |     v.   the Borrowers shall have delivered to the DIP Lender a customary borrowing notice in accordance with the DIP Documents; |
| | |     vi.   the Debtors shall be in compliance in all respects with the DIP Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; |
| | |     vii.   no default or event of default shall have occurred and be continuing under the DIP Documents; |
| | |     viii.   no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the DIP Order; |
| | |     ix.   since the Petition Date, other than the commencement of the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could |

reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**") in each case, not otherwise known by the DIP Lender or its counsel as of the date of execution of this Term Sheet;

    x.    the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured;

    xi.    all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due;

    xii.    the Debtors shall have (a) entered into and delivered a fully executed and binding Acceptable Stalking Horse Purchase Agreement and (b) satisfied any other applicable Milestones; and

    xiii.    a granting to the DIP Lender of DIP Claims and DIP Liens to secure all DIP Obligations pursuant to the applicable provisions in sections 364(c) and 364(d) of the Bankruptcy Code.

- The DIP Documents shall contain certain milestones (the "**Milestones**") relating to the Chapter 11 Cases, which may be extended by the DIP Lender in its reasonable discretion, including the following:

    i.    as a condition to the Debtors making any Other Draw, on or before May 7, 2025, the Bankruptcy Court shall have entered an order (in form and substance reasonably satisfactory to the DIP Lender) authorizing and approving an "**Acceptable Stalking Horse Purchase Agreement**," which means a stalking horse purchase agreement for all or substantially all of the Debtors' assets(s) that (a) is executed, effective, and binding on all parties thereto and (b) either (x) is approved by the DIP Lender in its reasonable discretion or (y) (1) would generate cash proceeds sufficient for the Payment in Full of the DIP Obligations (pursuant to a signed commitment acceptable to the DIP Lender in its reasonable discretion to lend from a recognized lender or another source of funding acceptable to the DIP Lender in its reasonable discretion) upon the closing date of such sale, (2) closes on or before June 30, 2025, and (3) requires, pursuant to an order of the

|  |  | Bankruptcy Court, the Payment in Full of the DIP Obligations as set forth in clause (1). |
|---|---|---|
| 17. | *Documentation* | • Definitive financing documentation with respect to the DIP Loans, including, without limitation, this Term Sheet, the DIP Order, any DIP Loan agreement and all definitive guaranty, collateral, security and other credit documentation, any security agreement, and any documents executed pursuant hereto or thereto (the "**DIP Documents**") shall be mutually agreed upon by the Loan Parties and the DIP Lender in accordance with the Documentation Principles. For the avoidance of doubt, DIP Documents (other than this Term Sheet) shall be documented prior to entry of the DIP Order. |
| 18. | *Representations and Warranties* | • Subject to the Documentation Principles, the DIP Documents shall contain representations and warranties with respect to the Loan Parties as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender and the Loan Parties, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes, title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility.<br><br>• Each Loan Party represents and warrants that none of its assets and properties are subject to any liens, security interests or encumbrances as of the Petition Date and no liens, security interests or encumbrances will be created on or after the Petition Date except, in each case, for liens set forth on **Schedule 1** hereto. |
| 19. | *Affirmative Covenants* | • Subject to the Documentation Principles, the DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. |
| 20. | *Negative Covenants* | • Subject to the Documentation Principles, the DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties; <u>provided</u> that the DIP Documents will permit, among other things: (i) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for and require the Payment in Full of the DIP Obligations; (ii) the ability to reject or modify contracts; (iii) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (iv) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (v) provide for adequate protection in accordance with the Budget and acceptable to the DIP Lender in its sole discretion. |

| 21. | *DIP Budget / Variance Reporting* | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the DIP Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). The Budget shall permit the Borrowers to reserve cash in an amount to be agreed among the Borrowers and the DIP Lender for purposes of paying certain employee, tax, and other specified obligations or liabilities (including administrative expenses such as bankruptcy fees, U.S. Trustee fees and professional fees) and prosecuting any Estate Claims (the "**Cash Reserve**").<br><br>• The Budget shall be updated and provided to the DIP Lender on the fifth Wednesday following the prior Budget's approval and every fifth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its sole discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within five (5) business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender in its sole discretion. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five (5) business day period, such Updated Budget shall become effective as the Budget.<br><br>• On a weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating cash flow for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative four-week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Disbursement Variance (as defined below) solely with respect to net operating cash flow that exceeds 20.0% shall be material and shall constitute and Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably satisfactory to the DIP Lender). For the avoidance of doubt, net operating disbursements shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases.<br><br>• For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating disbursements" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" for such period as set forth in the Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative |

| | | budgeted amount for such period (the "**Net Operating Disbursement Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 20.0% for budget variances with respect to the Net Operating Disbursement Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, and the Loan Parties, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Disbursement Variance calculation. |
|---|---|---|
| 22. | ***DIP Order*** | • The order approving the DIP Facility, which shall be in form and substance reasonably satisfactory to the DIP Lender (the "**DIP Order**"), shall, among other things, authorize and approve, in each case on a final basis: |
| | |     i.    the DIP Facility; |
| | |     ii.    the making of the DIP Loans in accordance with the DIP Documents; |
| | |     iii.    the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral; |
| | |     iv.    the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described in Section 26 of this Term Sheet (provided that the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (other than the Work Fee) shall be paid out of the proceeds of the Initial Draw); |
| | |     v.    the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the DIP Order; and |
| | |     vi.    the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | ***Documentation Principles*** | • The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance reasonably acceptable to the Borrower and the DIP Lender, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the DIP Order, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) be mutually agreed between the Loan Parties and the DIP Lender, (b) the DIP Order, and (c) as applicable, and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as reasonably |

| | | determined by the Loan Parties and the DIP Lender (the foregoing, collectively, the "**Documentation Principles**"). |
|---|---|---|
| 24. | *Carve-Out* | • The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject and subordinated to the claims covered by the Cash Reserve and to the Carve-Out (as defined below). |
| | | • As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained to the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Official Committee of Unsecured Creditors (the "**Committee**"), if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Approved Budget and any other limits imposed by the amount set forth in the DIP Order; and (iv) allowed professional fees of Professional Persons in an aggregate amount not to exceed $3,500,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clauses (i) through (ii) but less any retainers held by such Professional Persons, the "**Carve-Out Cap**"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds. |
| | | • Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Loan Parties shall be required to deposit into a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") cash (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to difference between the Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors. The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expense of the Professional Person that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in |

| | | |
|---|---|---|
| | | full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. The DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Accounts, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Accounts and all allowed Professional Fees have been paid in full pursuant to a final order of the Bankruptcy Court. |
| | | • For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. |
| | | • The Carve-Out shall not include, apply to or be available for any party in connection with any Restricted Use. |
| | | • The DIP Order shall provide that the foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw. |
| 25. | *Events of Default* | • Subject to the Documentation Principles, the DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor-in-possession financing facilities of this type, including, without limitation: |
| | |     i.   payment, non-compliance with covenants set forth in the DIP Documents, judgements in excess of specified amounts, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature; |
| | |     ii.   the entry of the DIP Order shall have not occurred on or before April 25, 2025, or the DIP Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered; |
| | |     iii.   the failure of the Loan Parties to comply with any of the Milestones; |
| | |     iv.   an Acceptable Stalking Horse Purchase Agreement is cancelled, terminated, amended, modified, or supplemented without the DIP Lender's consent; |
| | |     v.   the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | |     vi.   non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Order; |
| | |     vii.   the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy |

Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment;

viii.    the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $500,000;

ix.    the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents;

x.    any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

xi.    entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations;

xii.    the making of any material payments in respect of prepetition obligations other than (a) as permitted by the DIP Order, (b) as permitted by any order of the Bankruptcy Court in a form reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender;

xiii.    entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

xiv.    any Loan Party shall, directly or indirectly, seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or DIP Claims, or (c) contest any material provision of any DIP Document;

17

| | | |
|---|---|---|
| | | xv.    any Debtor files a Plan that is not in form and substance reasonably satisfactory to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender in its reasonable discretion to lend from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender in its reasonable discretion sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations; |
| | | xvi.    any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have an adverse effect on the DIP Collateral without the prior written consent of the DIP Lender in its sole discretion; |
| | | xvii.    any Debtor files a motion for the approval of a sale of the DIP Collateral or any portion thereof, pursuant to section 363 of the Bankruptcy Code or otherwise, which proposed sale (including, for the avoidance of doubt, any order approving such sale) is not acceptable to the DIP Lender in its reasonable discretion; or |
| | | xviii.    the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in this Term Sheet or the applicable DIP Documents. |
| 26. | *Indemnification and Reimbursement of Expenses* | •   The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties (the "***Indemnitees***"), including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof, except to the extent the relevant Indemnities are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, gross negligence or willful misconduct of the relevant Indemnitee. The Loan Parties' indemnification obligations shall be contingent on the occurrence of the Closing Date. |
| | | •   Subject to the DIP Documents and entry of the DIP Order, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the reasonable and documented fees and expenses of Norton Rose Fulbright US LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis within ten (10) days after the Debtors' receipt of a summary invoice for any such fees, costs, disbursements, and expenses. |

| 27. | *Release* | • The DIP Order shall include a customary release of the DIP Lender in its capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
|-----|-----------|---------|
| 28. | *Waivers* | • The DIP Order shall include terms and conditions customary for final DIP financing orders and shall be acceptable to the DIP Lender in its reasonable discretion, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
| 29. | ***DIP Lender Representations*** | • By executing this Term Sheet, the DIP Lender hereby represents and warrants to the Debtors that:<br>   i.   neither the DIP Lender nor any of its predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors are insiders (as such term is defined under the Bankruptcy Code) of the Debtors;<br>   ii.   the DIP Lender has not engaged in any collusion with respect to any bids or the 363 sale process and further agrees not to engage in any collusion with respect to the bids, the auction, or the 363 sale process. |
| 30. | ***Governing Law*** | • New York (and to the extent applicable, the Bankruptcy Code). |

## Schedule 1

**A. Existing Liens:**

(a) U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20203423599 in respect of specific equipment of 23ANDMe, Inc.

(b) U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20226984510 in respect of specific equipment of 23ANDMe, Inc.

(c) U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20231390144 in respect of specific equipment of 23ANDMe, Inc.

(d) U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20233366308 in respect of specific equipment of 23ANDMe, Inc.

(e) Smith Drug Company, a Division of JM Smith Corporation, filed UCC-1 Financing Statement (Missouri) 20220803002707723 in respect of specific property and all proceeds from the sale or transfer of such property of LPRXONE LLC.

(f) Cardinal Health 110 LLC, filed UCC-1 Financing Statement (Missouri) 202011090001399655 in respect of all business assets and personal property of Lemonaid Community Pharmacy, Inc.

**B. Other Defined Terms**: For purposes of this Term Sheet,

"**Permitted Prior Liens**" means the following liens, in an aggregate amount not to exceed $250,000:

(a) the "Existing Liens" set forth on this **Schedule 1**;

(b) statutory or common law liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business for amounts not overdue; or

(c) liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment.

"**Permitted Senior Lien**" means the security interest in and right of set-off granted to JPMorgan Chase Bank, N.A. (the "**Bank**") in all of 23andme, Inc.'s right, title and interest in and to all deposits, and any renewals thereof, additions thereto and substitutions therefor, in the collateral account ending in x1733 held at the Bank and designated under that certain Assignment of Deposits, dated as of March 11, 2019 as between 23andme, Inc. and Bank, together with all monies, proceeds, interest or sums credited from time to time thereto or due or to become due thereon or therefrom.

## **<u>Exhibit B</u>**

**Budget**

**Postpetition Weekly Cash Flow Forecast**

*($ in 000s)*

| | M/E | Mar-25 | Apr-25 | Apr-25 | Apr-25 | Apr-25 | Apr-25 | May-25 | May-25 | May-25 | May-25 | Jun-25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/E | 3/28/25 | 4/4/25 | 4/11/25 | 4/18/25 | 4/25/25 | 5/2/25 | 5/9/25 | 5/16/25 | 5/23/25 | 5/30/25 | 6/6/25 | Total |
| **Net Cash Flow** | | | | | | | | | | | | | |
| **Receipts:** | | | | | | | | | | | | | |
| (+) Credit Card & Third-Party Kit Sales | $ | 1,659 | $ 2,635 | $ 1,419 | $ 1,945 | $ 1,419 | $ 2,914 | $ 2,140 | $ 1,846 | $ 1,309 | $ 1,806 | $ 1,727 | $ 20,819 |
| **Operating Disbursements:** | | | | | | | | | | | | | |
| (-) Payroll & Benefits | | (3,307) | (697) | (97) | (3,197) | (67) | (3,197) | (97) | (3,197) | (67) | (3,197) | (97) | **(17,213)** |
| (-) Rent | | (25) | - | - | - | - | (25) | - | - | - | (25) | - | **(75)** |
| (-) Insurance | | - | - | - | - | - | - | - | - | - | (500) | - | **(500)** |
| (-) IT/Software | | (235) | (220) | (440) | (440) | (440) | (440) | (354) | (354) | (354) | (354) | (438) | **(4,071)** |
| (-) Ordinary Course Professionals | | (225) | (52) | (244) | (244) | (244) | (444) | (337) | (337) | (337) | (537) | (225) | **(3,225)** |
| (-) Other Operations | | (1,192) | (1,174) | (1,174) | (1,174) | (1,174) | (1,174) | (1,175) | (1,175) | (1,175) | (1,175) | (1,052) | **(12,813)** |
| **Total Operating Disbursements** | | (4,983) | (2,143) | (1,955) | (5,055) | (1,925) | (5,280) | (1,963) | (5,063) | (1,933) | (5,788) | (1,812) | **(37,898)** |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | |
| (-) Restructuring Professional Fees[1] | | (1,238) | (1,443) | (1,443) | (1,943) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,406) | **(16,133)** |
| (-) DIP Interest | | - | - | - | - | - | - | - | - | - | - | - | **-** |
| (-) DIP Fees[1] | | (800) | - | - | - | - | - | - | - | - | - | - | **(800)** |
| **Total Non-Operating Disbursements** | | (2,038) | (1,443) | (1,443) | (1,943) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,443) | (1,406) | **(16,933)** |
| **Net Cash Flow** | $ | **(5,361)** | $ **(951)** | $ **(1,979)** | $ **(5,053)** | $ **(1,949)** | $ **(3,809)** | $ **(1,266)** | $ **(4,660)** | $ **(2,067)** | $ **(5,425)** | $ **(1,491)** | $ **(34,011)** |
| **Cash & Liquidity** | | | | | | | | | | | | | |
| **Beginning Unrestricted Cash** | $ | **37,062** | $ **31,700** | $ **30,749** | $ **28,770** | $ **23,718** | $ **21,769** | $ **17,960** | $ **16,694** | $ **12,034** | $ **9,966** | $ **4,542** | $ **37,062** |
| (+/-) Net Cash Flow | | (5,361) | (951) | (1,979) | (5,053) | (1,949) | (3,809) | (1,266) | (4,660) | (2,067) | (5,425) | (1,491) | **(34,011)** |
| (+/-) DIP Draw / Repayment | | - | - | - | - | - | - | - | - | - | - | - | **-** |
| **Ending Unrestricted Cash** | $ | **31,700** | $ **30,749** | $ **28,770** | $ **23,718** | $ **21,769** | $ **17,960** | $ **16,694** | $ **12,034** | $ **9,966** | $ **4,542** | $ **3,051** | $ **3,051** |
| (+) Restricted Cash | | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | 14,988 | $ **14,988** |
| **Total Cash Balance** | $ | **46,689** | $ **45,737** | $ **43,758** | $ **38,706** | $ **36,757** | $ **32,948** | $ **31,682** | $ **27,022** | $ **24,955** | $ **19,530** | $ **18,039** | $ **18,039** |

[1] Forecast assumes no DIP draws, related interest or exit fees