## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |
| | Hearing Date: TBD[2] |
| | Hearing Time: TBD |
| | Hearing Location: TBD |

**DEBTORS' MOTION FOR ENTRY
OF AN ORDER (I) APPROVING BIDDING
PROCEDURES FOR THE SALE OF THE DEBTORS'
ASSETS, (II) SCHEDULING CERTAIN DATES AND DEADLINES
WITH RESPECT THERETO, (III) APPROVING THE FORM AND
MANNER OF THE NOTICE THEREOF, (IV) APPROVING PROCEDURES
REGARDING ENTRY INTO STALKING HORSE AGREEMENT(S), IF ANY,
(V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI) AUTHORIZING
THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, INTERESTS, AND ENCUMBRANCES, (VII) APPROVING
PROCEDURES FOR THE SALE, TRANSFER, OR ABANDONMENT
OF DE MINIMIS ASSETS, AND (VIII) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

**Relief Requested**[3]

1.       The Debtors seek entry of an order (the "Proposed Order"):[4]

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]    The Debtors will file a notice stating the date, time, and location of the first day hearing once this information becomes available.

[3]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[4]    Copies of the Proposed Order will be made available on the website of the Debtors' proposed claims and noticing

(a) approving the bidding procedures (the "Bidding Procedures") in substantially the form attached as **Exhibit 1** hereto to govern the sale of all or substantially all of the Debtors' assets (the "Company Assets") or some combination thereof, pursuant to section 363 of the Bankruptcy Code;

(b) scheduling (i) an auction in connection with the Sale (the "Auction"), (ii) a hearing date in connection with approval of the Sale (the "Sale Hearing"), and (iii) the objection deadline for the Sale Hearing;

(c) approving the form and manner of notice of the Auction and Sale Hearing, substantially in the form attached as **Exhibit 2** hereto (the "Sale Notice");

(d) authorizing the Debtors, in their reasonable business judgment, to: (i) select one or more bidders to act as stalking horse bidders (each, a "Stalking Horse Bidder" and each such bid, a "Stalking Horse Bid") and enter into a purchase agreement or other executable document with each such Stalking Horse Bidder (each such agreement, a "Stalking Horse Agreement"); and (ii) provide certain bid protections in connection therewith, subject, in each case, to notice and an opportunity to object;

(e) approving procedures (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases (each, a "Contract") in connection with the Sale and approving the form, manner, and notice thereof, attached as **Exhibit 3** hereto (the "Cure Notice"); and

(f) approving procedures for (i) the sale or transfer, in any individual transaction or series of related transactions, of certain Company Assets with an aggregate purchase price equal to or less than $2,000,000 (collectively, the "De Minimis Assets" and, such sale or transfer, a "De Minimis Asset Sale"), and the form and manner of notice contemplated thereby, attached as **Exhibit 4** hereto (the "De Minimis Asset Sale Procedures") and (ii) the abandonment of certain other de minimis assets (the "Abandonment Procedures"), and the form and manner of notice contemplated thereby, attached as **Exhibit 5** hereto; and

(g) granting related relief.

2.    If the Debtors determine to pursue consummation of a Sale in accordance with the Bidding Procedures, the Debtors will seek entry of one or more orders (each, a "Sale Order") at the Sale Hearing.  The Debtors will make a copy of the proposed form of the Sale Order(s)

---

agent at https://restructuring.ra.kroll.com/23andMe.

available on the website of their claims and noticing agent in advance of the Sale Hearing.  The

Debtors anticipate that the Sale Order(s) will provide for, among other things:

> (a)  the sale of the applicable Company Assets to the Successful Bidder(s) on the terms substantially set forth in the Successful Bid(s), including the sale of the Company Assets free and clear of liens, claims, interests, and other encumbrances;
>
> (b)  the assumption and assignment of certain Contracts of the Debtors in connection therewith; and
>
> (c)  related relief.

3.     In support of this motion, the Debtors submit the *Declaration of Andrew Swift in Support of Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* (the "Swift Declaration"), attached hereto as **Exhibit 6**.

### Jurisdiction and Venue

4.     The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 363, 365, and 554(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Court's *Chapter 11 Guidelines for Sales and Sale Procedures Motions* (the "Local Guidelines").

## Background

### A.      General Overview

7.      23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[5] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome.  The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic health reports.  Further, through its Lemonaid Health telehealth platform, the Company operates as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

8.      On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

9.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) substantially contemporaneously herewith.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated at this time.

---

[5]    Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

10.     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed substantially contemporaneously herewith and incorporated herein by reference.[6]

**B.      The Sale Process**

11.     As described in the First Day Declaration, the Debtors commenced these chapter 11 cases to effectuate a value-maximizing sale of substantially all or a portion of their assets following an extensive prepetition marketing process that did not result in a transaction capable of being implemented within the Debtors' current liquidity runway.   Specifically, in March 2024, as described in further detail in the First Day Declaration, the Special Committee engaged Wells Fargo Securities, LLC ("Wells Fargo") as its independent financial advisor to assist the Special Committee in evaluating a potential strategic transaction for the Company.   Shortly thereafter, Wells Fargo, at the discretion of the Special Committee, contacted 15 potential counterparties to assess potential third-party interest in the Company (the "Initial Outreach").   As a result of the Initial Outreach, one party signed a confidentiality agreement with the Company to facilitate further discussion.   However, the Initial Outreach did not result in an out-of-court transaction and in October 2024, Wells Fargo terminated its engagement letter with the Special Committee.

12.     Following the Initial Outreach, the Special Committee selected Moelis & Company LLC ("Moelis")[7] to aid in its evaluation of strategic alternatives for the Company.   In January

---

[6]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration or the Bidding Procedures, as applicable.

[7]     In March 2025, Moelis's engagement was subsequently modified to account for its role as investment banker to both the Special Committee and the Debtors in connection with these chapter 11 cases.

2025, at the direction of the Special Committee, Moelis began (a) soliciting potential third-party interest in the acquisition of the Company for all or a portion of the Company Assets or business segments, as well as potential financing sources for new financing for the Company (the "Prepetition Marketing Process"), and (b) working with the Special Committee and the Debtors[8] to assist in the preparation of materials for the Prepetition Marketing Process.  As part of this process, the Debtors dedicated substantial time and effort to conduct outreach to strategic and financial investors and, in consultation with Moelis, determined which parties to contact based on the parties' involvement in the healthcare sector, potential capacity to consummate a transaction, and industry knowledge and experience (among other criteria).  Ultimately, the Debtors, with the assistance of Moelis and under the direction of the Special Committee, prepared a confidential information memorandum with extensive information on the Company Assets, populated a data room (the "Data Room") containing significant diligence documentation, and began outreach to potential buyers and financing parties.  On January 28, 2025, the Special Committee issued a press release announcing that it had undertaken a process to explore strategic alternatives, including, among other alternatives, a possible sale of the Company, business combination, sale of all or part of the Company's assets, licensing of assets, restructuring, or other strategic action,[9] which resulted in additional inbound interest from third parties.

13.    Overall, as part of the Prepetition Marketing Process, the Debtors under the direction of the Special Committee and its advisors, contacted 103 potential counterparties (which included the 15 counterparties contacted by Wells Fargo), including 51 potential strategic investors

---

[8]    At all relevant times, the Debtors conducted the Prepetition Marketing Process under the authority of the Special Committee, and references to the "Debtors" in this section, where applicable, should be interpreted to mean that the Debtors took such action subject to the Special Committee's direction and oversight.

[9]    *See* 23andMe Holding Co. press release dated January 28, 2025 (https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-announces-exploration-strategic).

and 52 potential financial investors / financing counterparties (the "Contact Parties"), to evaluate a potential purchase of all or part of the Company Assets or an alternative potential investment in the Debtors. These efforts resulted in 90 introductory calls and the execution of 42 confidentiality agreements with the Company, with the applicable counterparties receiving access to the Data Room. Starting on January 30, 2025 and continuing throughout the Prepetition Marketing Process, Moelis distributed the confidential information memorandum and a preliminary financial model to Contact Parties that signed confidentiality agreements with the Company. In the aggregate, the Debtors, with the assistance of Moelis, published over 180 diligence documents to the Data Room throughout the Prepetition Marketing Process, covering financial, operational, legal and other key items, and facilitated diligence calls among members of the Debtors' management team, certain Contact Parties, and the Special Committee's and/or the Debtors' advisors.

14.     In early February 2025, Moelis distributed a formal process letter requesting that the Initial Contact Parties remaining in the process submit initial indications of interest no later than February 20, 2025 (the "Initial IOI Deadline"). The process letter provided to the Contact Parties included optionality for the Contact Parties to present indications of interest for the Company's equity or on a cash-free, debt-free basis for all or part of the Company, or the terms of a financing. In connection with the Initial IOI Deadline, Moelis, on behalf of the Special Committee, received multiple preliminary non-binding indications of interest from certain Contact Parties with various structures. Subsequent to the Initial IOI Deadline, Moelis continued to engage in discussions with certain Contact Parties about a potential transaction involving the Company, and received preliminary non-binding indications of interest from a few additional Contact Parties with respect to potential financing or asset acquisition transactions. Only one of the non-binding indications of interest received in the Prepetition Marketing Process provided for an out-of-court

acquisition for 100% of the equity of the Company and, ultimately, none of the indications of interest resulted in an out-of-court transaction. Despite the overall outcome of the Prepetition Marketing Process, Moelis' outreach and the receipt of several proposals reflect strong prospects for a robust in-court sale process and competitive Auction.

15.     To preserve the value of the Debtors' estates and offer the Debtors a chance to increase the ultimate value provided by the monetization and disposition of the Company Assets, the Debtors propose to implement the Bidding Procedures attached as **Exhibit 1** to this motion. The Bidding Procedures establish deadlines by which potential bidders must submit binding bids for the Company Assets and outline the procedures for an Auction process designed to encourage active participation and obtain the highest or otherwise best possible offer for the Company Assets. If any Initial Contact Parties or any other potential interested parties reach out to the Debtors and/or their advisors or any additional potential interested parties are otherwise identified by the Debtors and their advisors, Moelis will coordinate execution of confidentiality agreements with such parties (to the extent not previously executed), and facilitate such parties' diligence of the Company Assets over the coming days and weeks in accordance with the Bidding Procedures.

16.     The Bidding Procedures provide substantial flexibility with respect to the structure of any Sale transaction. Furthermore, while the Debtors have not selected a stalking horse to serve as a committed buyer of some or all of the Company Assets, the Bidding Procedures provide the Debtors with the ability to do so and grant reasonable bid protections prior to the Sale Hearing after notice and an opportunity to object. The Debtors will consider all viable options in accordance with the Bidding Procedures before determining if selling any Company Assets will, in their business judgment, maximize value for the estates. Any delay to the sale timeline would hinder the Debtors' efforts to maximize value.

17.     In light of the foregoing, the Debtors have determined that effectuating a sale process for the Company Assets pursuant to the Bidding Procedures is in the best interests of the Debtors' estates, will establish the highest and best value for the Company Assets under the circumstances of these cases, provide interested bidders with sufficient opportunity to participate, and ensure parties in interest receive appropriate notice and opportunity to object with respect to any proposed sale transaction.

## The Bidding Procedures

**A.     Bidding Procedures**

18.     The Debtors believe the proposed Bidding Procedures will provide the Debtors sufficient time to conduct a fulsome, value-maximizing marketing process that will continue the outreach to both strategic and financial parties, particularly in light of the Debtors' prepetition and ongoing marketing efforts.   Furthermore, the Debtors believe that potential bidders will have appropriate notice and time to conduct thorough due diligence to submit binding bids in advance of the May 7, 2025 bid deadline (the "Bid Deadline").   The Bidding Procedures are designed to encourage all prospective bidders to put their best bid forward and create a path towards the highest or otherwise best available recoveries to the Debtors' stakeholders.

19.     The following chart summarizes material provisions of the Bidding Procedures and discloses certain information in accordance with the Local Guidelines:[10]

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **Provisions Governing Qualification of Bidders** | **Potential Bidder Requirements.** To participate in the bidding process, all parties must deliver the following to the Debtors (unless waived by the Debtors in their reasonable business judgment): (a) an executed confidentiality agreement on terms acceptable to the Debtors, if not already executed; (b) a statement of what portion of the Company Assets that the Potential Bidder intends to acquire; (c) sufficient information, as determined by |

---

[10]   The following summary is provided for convenience purposes only.   To the extent any of the terms described below are inconsistent with the Bidding Procedures, the Bidding Procedures control in all respects.   Capitalized terms used in the summary chart below but not otherwise defined in this motion shall have the meanings ascribed to such terms in the Bidding Procedures.

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

| | |
|---|---|
| Local Guidelines 3(a)(i) | the Debtors and their advisors, demonstrating that the interested party (i) has the financial wherewithal to consummate the Sale and (ii) intends to access the Data Room for a purpose consistent with the Bidding Procedures; and (d) any other evidence the Debtors may reasonably request to evaluate the party's fitness to participate in the bidding process or ability to timely acquire the Company Assets. |
| | **Due Diligence Requirements.** Only Potential Bidders shall be eligible to receive due diligence information and access to the Data Room and to receive additional non-public information regarding the Debtors. The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder. |
| | **Qualified Bidder Requirements.** A Potential Bidder who satisfies the following requirements (unless waived by the Debtors in their reasonable business judgment) may be deemed a Qualified Bidder: (a) the Potential Bidder has demonstrated the financial capability to consummate the applicable Sale (as determined by the Debtors in consultation with any Committee); (b) the Potential Bidder's Bid is a Qualified Bid; and (c) the Debtors have determined, in consultation with any Committee, that the Potential Bidder should be considered a Qualified Bidder. |
| **Provisions Governing Qualified Bids** <br><br> Local Guidelines 3(a)(ii) | **IOI Deadline.** The IOI Deadline for any party interested in purchasing the Company Assets to submit a non-binding Indication of Interest, as may be extended without notice or hearing by the Debtors, is April 13, 2025, at 4:00 p.m. (prevailing Central Time). Note that submitting an Indication of Interest by the IOI Deadline does not obligate the submitting party to submit a formal bid or to participate in the sale process and does not exempt the submitting party from also having to submit a Qualified Bid by the Bid Deadline to participate in the Auction. |
| | **Bid Deadline.** The Bid Deadline to submit a Qualified Bid to acquire the Company Assets, as may be extended without notice or hearing by the Debtors, is May 7, 2025, 2025, at 4:00 p.m. (prevailing Central Time). |
| | **Stalking Horse.** Any Stalking Horse Bid shall be deemed a Qualified Bid. |
| | **Qualified Bid Requirements**. A Bid by a Potential Bidder that is submitted in writing by the Bid Deadline and satisfies each of the following requirements, as determined by the Debtors in their reasonable business judgment, in consultation with any statutory committee appointed in these chapter 11 cases, shall constitute a Qualified Bid: |
| | <u>Documentation</u>. Each Bid must be accompanied by (a) an executed Purchase Agreement, based either on (i) the form asset purchase agreement that the Debtors will make available in the Data Room no later than ten days prior to the Bid Deadline or (ii) the Stalking Horse Agreement if there is a Stalking Horse Bidder, in each case, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the proposed Sale, (b) a redline of such Purchase Agreement marked to reflect any amendments and modifications from the form purchase agreement or Stalking Horse Agreement, as applicable, which amendments and modifications may not be materially more burdensome or otherwise inconsistent with these Bidding Procedures and (c) a copy of the execution version of the Purchase Agreement in Microsoft Word or similar software. Each such Purchase Agreement must provide for payment in cash at closing of the Bid Protections to the Stalking Horse Bidder, if any. |
| | <u>Purchase Price</u>. Each Bid must clearly (a) set forth the Purchase Price, (b) identify separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities, and (c) indicate the allocation of the |

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
| --- |

Purchase Price among the applicable Company Assets. The Purchase Price should be a single point value in U.S. Dollars for the applicable Company Assets on a cash-free, debt-free basis. Any Bid for substantially all of the Company Assets must also include a statement as to whether the Bid is conditioned on purchasing all Company Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more Company Assets. The Debtors reserve the right to ask any Qualified Bidder to allocate the value ascribed to the Bid for any particular Company Asset and to inquire about any significant assumptions on which such valuations are based.

Deposit. Each Bid must be accompanied by a cash deposit in the amount equal to ten percent of the aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors.

Terms; Specify Acquired Assets and Assumed Liabilities. Each Bid must identify the Company Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale

Committed Financing. If a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors (in consultation with any Committee) that demonstrates that the Qualified Bidder has: (a) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (b) adequate working capital financing or resources to finance going concern operations for the applicable Company Assets and the proposed transactions. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with any Committee.

Contingencies; No Financing or Diligence Outs. A Bid shall not be conditioned on obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence.

Identity. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors.

Adequate Assurance of Future Performance. Each Bid must (a) reasonably identify any executory contracts and unexpired leases of the Debtors to be assumed or assumed and assigned in connection with the Sale, (b) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder, and (c) demonstrate, in the Debtors' reasonable business judgment, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

Binding and Irrevocable. A Qualified Bidder's Bid for the applicable Company Assets shall be irrevocable unless and until the Debtors notify such Qualified Bidder that such Bid has not been approved as a Successful Bid or a Backup Bid at the Sale Hearing

| MATERIAL TERMS OF THE BIDDING PROCEDURES |
|---|

|  | Backup Bid.  Each Bid shall provide that the Qualified Bidder will serve as a Backup Bidder if the Qualified Bidder's Bid is the next highest or best bid with respect to the applicable Company Assets.
Expenses; Disclaimer of Fees.  Each Bid (other than the Stalking Horse Bid(s), if any (solely to the extent set forth in the Stalking Horse Agreement(s)) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation.
Authorization.  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to submit the Bid and consummate the proposed transaction; *provided* that, if the bidder is an entity specially formed for the purpose of effectuating the proposed transaction, then the bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the submission of thee Bid and consummation of the proposed transaction by the parent company or sponsor of such bidder.
Employee Obligations.  Each Bid must indicate whether the Qualified Bidder intends to hire all employees of the Debtors.  If the Qualified Bidder does not intend to hire all employees of the Debtors, the Qualified Bidder must include a description of the Qualified Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are employed primarily in connection with the applicable Company Assets, and a description of any contemplated incentive plan, if applicable.
As-Is, Where-Is.   Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Company Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or such assets in making its Bid; and (c) did not and will not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Company Assets or the completeness of any information provided in connection therewith or at an Auction, except those expressly stated in the Qualified Bidder's Purchase Agreement.
Acknowledgement of Compliance with Bidding Procedures, Bankruptcy Code, and Non-Bankruptcy Law.  Each Bid must acknowledge that it has complied, and will continue to comply, in all respects with the Bidding Procedures (including, after the conclusion of any Auction, not to submit a Bid or seek to reopen the Auction), the Bankruptcy Code, and any other applicable law.
Privacy Policies.  The Qualified Bidder must comply in all respects with the Debtors' consumer privacy practices, which do not restrict the transfer of personally identifiable information of the Debtors' customers in connection with a bankruptcy, merger, acquisition, reorganization, or sale of assets, and each Bid must contain a statement acknowledging such compliance.
No Collusion.  The Qualified Bidder must (a) acknowledge in writing that it has not engaged in any collusion with respect to any Bids or the Sale and (b) agree not to engage in any collusion with respect to the Bids, the Auction, or the Sale.
Confidentiality.  By submitting a Bid, each Qualified Bidder agrees to treat such Bid (including any modifications thereto, subsequent Bids, or Overbids) and any related information thereto as confidential and shall not publicly disclose such information without the written consent of the Debtors until the earlier of (i) the date that is one |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | year following the Bid Deadline and (ii) entry of an order by the Court requiring such disclosure. |
| | Government Approvals and Time Frame for Closing.  Each Bid must (a) include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; and (b) set forth an estimated timeframe for (i) obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale and (ii) the Qualified Bidder's expected date of closing the Sale, which must be reasonably likely to be consummated, if selected, within a timeframe acceptable to the Debtors, in consultation with any Committee. |
| | Consent to Jurisdiction.  By submitting a Bid, each Qualified Bidder agrees to submit to the jurisdiction of the Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, if any, the construction and enforcement of the Bidding Procedures, the Sale documents, and the closing, as applicable. |
| | **Non-Qualifying Bid.** The Debtors expressly reserve the right to notify a Potential Bidder that its Bid is a Non-Qualifying Bid and permit such Potential Bidder to revise or supplement a Non-Qualifying Bid to make it a Qualified Bid. |
| **Provisions Providing Bid Protections to "Stalking Horse" or Initial Bidder**<br><br>Local Guidelines 3(a)(iii) | **Bid Protections.** The Debtors are authorized, but not obligated, in an exercise of their business judgment and in consultation with any Committee, to (a) select one or more Qualified Bidders to act as Stalking Horse Bidders; (b) enter into a Stalking Horse Agreement with reach Stalking Horse Bidder so selected; and (c) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, provide a Breakup Fee and Expense Reimbursement not to exceed three percent of the purchase price in the aggregate. No later than two business days after entry into a Stalking Horse Agreement, the Debtors shall file a Stalking Horse Notice and proposed form of order with the Court with information on the Stalking Horse Bid as described in the Bidding Procedures.  If there are no objections to the Stalking Horse Notice within five days of filing with the Court, the Debtors may submit an order to the Court that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse Agreement, without the need for further hearing. |
| | **Minimum Overbid Increment.** The Debtors shall evaluate all Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, in consultation with any Committee, the highest or otherwise best Qualified Bid(s) for the applicable Company Assets being sold at the Auction (the "Baseline Bid(s)").  Any Overbid(s) for the Company Assets shall provide for total consideration with a value that exceeds the value of the consideration under any Baseline Bid(s) by an incremental amount that is not less than an amount to be announced at or before the commencement of the Auction (as applicable, the "Minimum Overbid Increment"), and successive Overbids shall be higher than the Prevailing Highest Bid by at least the Minimum Overbid Increment.  The Debtors reserve the right to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction. |
| | **Backup Bidder.** The next-highest or otherwise second-best Bid for the applicable Company Assets, as determined by the Debtors in the exercise of their reasonable business judgment (in consultation with any Committee) (the "Backup Bid"), shall be required to serve as a Backup Bidder for such assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.  The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be |

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| | announced by the Debtors at the conclusion of the Auction, if any, at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid open and irrevocable until the closing of the transaction with the applicable Successful Bidder. If the Successful Bid is not consummated, the Debtors may file a notice with the Court designating the applicable Backup Bidder, if any, as the applicable Successful Bidder, and such Backup Bidder, if any, shall be deemed the Successful Bidder for all purposes. |
| | **Modification of Bidding Procedures.** The Debtors reserve their rights to modify the Bidding Procedures, in their reasonable business judgment, in any manner that will best promote the goals of the bidding process at or prior to the Auction. |
| | **Bidding Deadline.** The Debtors reserve the right to reschedule or waive the IOI Deadline, Bid Deadline, and related marketing process deadlines and hearing dates in their sole discretion. |
| | **Modification of Auction.** The Debtors explicitly reserve the right, in their business judgment and after consultation with the Committee, to exercise their discretion in conducting the Auction. |
| **Provisions Governing the Auction**<br><br>Local Guidelines 3(b) | **Date.** The Auction, if necessary, will take place on **May 14, 2025, at 9:00 a.m. (prevailing Central Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019, or by remote video, or such other date, time, and/or location as selected by the Debtors in consultation with the Committee. If the Auction is rescheduled, the Debtors will file a notice with the Court disclosing the new date, time, and/or location, as applicable |
| | **Transcription.** The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, including the Baseline Bid(s), all applicable Overbids, and the Successful Bid. |
| | **Participation.** Only (a) Qualified Bidders and their legal and financial advisors and (b) the members of and advisors to any Committee shall be entitled to attend the Auction. |
| | **No Collusion.** Each Qualified Bidder participating in the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding and the Auction, (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder or Backup Bidder, and (c) it agrees to serve as the Backup Bidder if its Qualified Bid is the next highest or otherwise best bid after the Successful Bid. |

20.     The Bidding Procedures also provide for the right to credit bid within the meaning of section 363(k) of the Bankruptcy Code. At the Auction (if any), any Qualified Bidder that has a valid and perfected lien on any Company Assets (a "Secured Creditor") to be sold shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Creditor's undisputed claims (a "Credit Bid"), to the extent permitted under section 363(k) of the Bankruptcy Code. The Bidding Procedures require any Secured Creditor that intends to participate in an Auction with a Bid that includes a Credit Bid to provide

14

the Debtors with advance notice and, if requested, supporting documentation of its liens, claims, and encumbered assets prior to the Auction.

21.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and, as noted, preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**B.     Proposed Sale Schedule**

22.     The Debtors are seeking approval of the Bidding Procedures and a schedule governing the Sale to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids.  The Debtors will use the time both before and following entry of the Proposed Order to continue to actively market the Company Assets.  Subject to the Court's availability, the key dates and deadlines the Debtors seek to establish pursuant to the Proposed Order are as follows (all times referenced below refer to prevailing Central Time and are subject to the Court's availability):[11]

| Action | Description | Deadline |
|---|---|---|
| Non-Binding Indication of Interest Deadline ("IOI Deadline") | The deadline by which any party interested in purchasing the Company Assets must submit a non-binding indication of interest. | April 13, 2025 at 4:00 p.m. (prevailing Central Time)<br><br>Petition Date + 21 days |
| Stalking Horse Deadline | The deadline by which the Debtors may choose one or more Stalking Horse Bidder(s). | April 25, 2025<br><br>Petition Date + 33 days |
| Stalking Horse Notice Deadline | The deadline by which the Debtors must file a Stalking Horse Notice. | Within two business days after entry into a Stalking Horse Agreement |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | May 7, 2025 at 4:00 p.m.<br><br>Petition Date + 45 days |
| Determination of Qualified Bids | The deadline by which the Debtors will determine which Bids are Qualified Bids and notify each | May 9, 2025 |

---

[11]    The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures and the Proposed Order, as applicable.

| Action | Description | Deadline |
|--------|-------------|----------|
| | Potential bidder in writing whether such Potential bidder is a Qualified Bidder. | Bid Deadline + 2 business days |
| Auction (if necessary) | The date and time of the Auction, which will be held at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019. | May 14, 2025 at 9:00 a.m.<br><br>Petition Date + 52 days |
| Notice of Successful Bidder | Within two business days following closing of the Auction, the Debtors will file on the docket a notice identifying the Successful Bidder, identifying the applicable Successful Bidder, Company Assets, and key terms of the agreement. | Within two business days following closing of the Auction (if any) |
| Deadline to File and Serve Cure Notices | The deadline by which the Debtors must file and serve Cure Notices to counterparties to Contracts to be assumed and assigned in connection with the Sale(s). | May 19, 2025 (seven days before the Sale Objection Deadline) |
| Sale Objection Deadline; Cure/Assignment Objection Deadline | The deadline by which objections to the Successful Bidder(s) and Sale(s), if any, or to the assumption and assignment of any Contracts in connection with the Sale(s) must be filed with the Court. | May 26, 2025 at 4:00 p.m.<br><br>Petition Date + 64 days (seven days before the Sale Hearing) |
| Sale Hearing | The hearing, if any, before the Court to consider approval of the Successful Bid(s), pursuant to which the Debtors and the Successful Bidder(s) consummate the Sale(s). | June 2, 2025<br><br>Petition Date + 71 days |

## C.    Sale Notice

23.    As soon as reasonably practicable, but no later than three business days after entry of the Proposed Order, the Debtors (or their agents) will serve the Sale Notice, substantially in the form attached hereto as **Exhibit 2**, by first-class mail, electronic mail, or overnight delivery upon: (a) all entities known to have expressed a *bona fide* interest in a transaction with respect to the Company Assets; (b) all entities known to have asserted any lien, claim, or encumbrance in or upon any assets comprising the Company Assets; (c) known counterparties to any Contract that could potentially be assumed and assigned to a Successful Bidder; (d) the Office of the United States Trustee for the Eastern District Of Missouri; (e) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (f) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date;

16

(g) the Internal Revenue Service; (h) individual claimants who have initiated or filed arbitration claims against the Debtors; (i) the Securities and Exchange Commission; (j) the Federal Trade Commission; (k) the United States Attorney's Office for the Eastern District of Missouri; (l) the state attorneys general in all 50 states; (m) counsel to any official committee appointed in these cases; (n) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable; and (o) all persons and entities that have filed a request for service of filings in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

24.     In addition, within five business days after entry of the Proposed Order (or as soon thereafter as reasonably practicable), the Debtors will (a) publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in *The Wall Street Journal* to provide notice to any other potential interested parties and (b) post the Sale Notice, the Proposed Order (as entered), and the Bidding Procedures on the website of the Debtors' proposed claims and noticing agent.

25.     The Debtors submit that the Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the proposed sale, including the date, time, and place of the Auction (if one is held), the Bidding Procedures, and the dates and deadlines related thereto.  Accordingly, the Debtors request that the form and manner of the Sale Notice be approved and that the Court determine that no other or further notice of the Auction is required.

**D.     Assumption and Assignment of the Contracts and Cure Notice**

26.     The Debtors seek approval of the Assumption and Assignment Procedures set forth in the Proposed Order to govern the assumption and assignment of the Debtors' Contracts in connection with the Sale.  The Assumption and Assignment Procedures will notify the Non-Debtor Counterparties (as defined below) of the potential assumption and assignment of their Contracts and the Debtors' calculation of any Cure Amount (as defined below).

17

27.     The Debtors are also seeking approval of the Cure Notice, substantially in the form attached hereto as **Exhibit 3**, which they propose to file and serve on each non-Debtor counterparty (each, a "Non-Debtor Counterparty") to a Contract related to any of the Company Assets that may be assumed or assumed and assigned, no later than seven days in advance of the Cure/Assignment Objection Deadline (as defined below) (the "Cure Notice Service Date").  The Cure Notice will:

(a)     identify the applicable Contract(s) that may be assumed and assigned in connection with the Sale, including the name of the Non-Debtor Counterparty to each such Contract(s);

(b)     state the cure amount(s), if any, that the Debtors believe are necessary to assume such Contract(s) pursuant to section 365 of the Bankruptcy Code (the "Cure Amount");

(c)     include a statement that the assumption and assignment of such Contract(s) is neither required nor guaranteed;

(d)     inform the Non-Debtor Counterparty of the deadline by which any Non-Debtor Counterparty must file an objection to the proposed assumption, assignment, cure, and/or adequate assurance and the procedures relating thereto   (a "Cure/Assignment Objection"),   which Cure/Assignment Objections must:  (i) be in writing; (ii) state with specificity the nature of such objection, including the amount of the Cure Amount in dispute; and (iii) be filed with the Court no later than **4:00 p.m. (prevailing Central Time) on May 26, 2025** (the "Cure/Assignment Objection Deadline"); and

(e)     state the date of the Sale Hearing and note the possibility of adjournment.

28.     If the Debtors at any time after the Cure Notice Service Date (a) identify additional Contracts that may be assumed and assigned to the Successful Bidder, (b) remove any Contracts from the list attached to the Cure Notice, and/or (c) modify the previously stated Cure Amount associated with any Contract that requires modification, the Debtors will promptly file with this Court and serve a supplemental Cure Notice (a "Supplemental Cure Notice") on each Non-Debtor Counterparty affected by the Supplemental Cure Notice.  Each Supplemental Cure Notice shall include the same information with respect to the Contracts in the Supplemental Cure Notice as would have been included in the Cure Notice.  Any Non-Debtor Counterparty that receives a

Supplemental Cure Notice may file an objection (a "Supplemental Cure/Assignment Objection") to the proposed assumption and assignment of the applicable Contract or the proposed Cure Amount, if any. All Supplemental Cure/Assignment Objections must: (a) be in writing; (b) state with specificity the nature of such objection, including the amount of the Cure Amount in dispute; and (c) be filed with the Court and properly served on the Notice Parties so as to be received no later than the date that is the later of (i) the Cure/Assignment Objection Deadline and (ii) seven days following the date of service of such Supplemental Cure Notice, which date will be set forth in the Supplemental Cure Notice (the "Supplemental Cure/Assignment Objection Deadline").

29.     If a Non-Debtor Counterparty files a Cure/Assignment Objection or a Supplemental Cure/Assignment Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such objection will be resolved at the Sale Hearing, an expedited hearing sought by the Debtors (a "Supplemental Cure/Assignment Hearing"), or such later date as determined by the Court. If any Cure/Assignment Objection or Supplemental Cure/Assignment Objection cannot be resolved by the parties, the Contract may be conditionally assumed and assigned, subject to the consent of the Successful Bidder in connection with a Sale, pending a resolution of the Cure/Assignment Objection or Supplemental Cure/Assignment Objection after notice and a hearing. If a Cure/Assignment Objection or Supplemental Cure/Assignment Objection is not satisfactorily resolved, the Successful Bidder or the Debtors, as applicable, may determine that such Contract should be rejected and not assumed and assigned, in which case the Successful Bidder or the Debtors, as applicable, will not be responsible for any Cure Amounts in respect of such Contract.

30.     If a Non-Debtor Counterparty does not file and serve a Cure/Assignment Objection or Supplemental Cure/Assignment Objection in a manner that is consistent with the requirements

set forth above, and absent a subsequent order of the Court establishing an alternative Cure Amount, (a) the Cure Amount, if any, set forth in the Cure Notice or Supplemental Cure Notice, as applicable, shall be controlling, notwithstanding anything to the contrary in any Contract or any other document, and (b) the Non-Debtor Counterparty will be deemed to have consented to the assumption and assignment, as applicable, of the Contract and the Cure Amount, if any, and will be forever barred from objecting to the assumption and assignment of such Contract and rights thereunder, including the Cure Amount, if any, and from asserting any other claims related to such Contract against the Debtors or the Successful Bidder, or the property of any of them.

31.     Any objections to the Successful Bidder's proposed form of adequate assurance of future performance must be filed by the Cure/Assignment Objection Deadline or Supplemental Cure/Assignment Objection Deadline, as applicable, and such objections will be resolved at the Sale Hearing, Supplemental Cure/Assignment Hearing, or such later date as determined by the Court, as applicable.  The Debtors may, with the consent of the Successful Bidder, adjourn the resolution of any such objection to a later hearing.  For the avoidance of doubt, the inclusion of a Contract on the Cure Notice or Supplemental Cure Notice shall not obligate the Debtors to assume and assign any such Contract or obligate the Successful Bidder to take assignment of any such Contract.  The Successful Bidder shall determine whether to take assignment of any Contracts pursuant to the terms of the applicable purchase agreement.

**The De Minimis Asset Sale Procedures and Abandonment Procedures**

32.     The Debtors have anticipate that, throughout these chapter 11 cases, they will determine that certain of their assets are burdensome, no longer used or necessary for the Debtors' operations, or otherwise cannot be monetized for material value.  Such assets may include, among other things, inventory, equipment, office furniture, fixtures, or other assets.  Moreover, as described in the First Day Declaration, in November 2024, the Debtors ceased operation of their

therapeutics division as part of a broader restructuring to focus on their core consumer business. Since that time, the Debtors have been engaged in negotiations to sell their remaining therapeutics assets and associated intellectual property to third parties. The Debtors anticipate that certain of these negotiations may culminate in agreements to sell the remaining therapeutics assets while these chapter 11 cases are pending.

33.     Accordingly, the Debtors are seeking authority to sell, transfer, or abandon these assets when appropriate, pursuant to the procedures described below. Given the relatively small monetary value of the De Minimis Assets relative to the magnitude of the Debtors' overall operations, the Debtors believe it would be an inefficient use of resources to seek this Court's approval each time the Debtors have an opportunity to sell, transfer, or abandon such assets. Thus, the Debtors respectfully request that the Court enter the Proposed Order authorizing the Debtors to sell, transfer, or abandon the De Minimis Assets, without further hearing or order of the Court, subject to the procedures set forth in this motion.

**A.      The De Minimis Asset Sale Procedures**

34.     The Debtors propose to engage in De Minimis Asset Sales to individual buyers or groups of related buyers (each, a "De Minimis Asset Purchaser") for the highest or otherwise best offer received, taking into consideration the circumstances of each such sale or transfer, under the following De Minimis Asset Sale Procedures:

> (a)    Debtors' Authorization. The Debtors are authorized to consummate a De Minimis Asset Sale without further order of the Court if (a) the aggregate transaction value, as calculated within the Debtors' reasonable discretion, is less than or equal to $2,000,000 and (b) the Debtors determine in the reasonable exercise of their business judgment that such sale or transfer is in the best interest of their estates, subject only to the noticing procedures set forth herein;

> (b)    Free and Clear Sale of a De Minimis Asset. Any De Minimis Asset Sale shall be, without need for any action by any party, final, fully authorized by the Court, and free and clear of all liens, claims, and encumbrances, with

21

such liens, claims, and encumbrances attaching only to the proceeds of such De Minimis Asset Sale, if any, with the same validity, extent, and priority that attached to the applicable De Minimis Asset immediately prior to such De Minimis Asset Sale;

(c)   <u>De Minimis Asset Sale Notice</u>.     At least ten days prior to closing such sale or effectuating such transfer, the Debtors shall file on the Court's docket and serve written notice of each De Minimis Asset Sale (the "<u>De Minimis Asset Sale Notice</u>"), substantially in the form attached hereto as **Exhibit 4**.   The content of the De Minimis Asset Sale Notice shall consist of (i) identification of the De Minimis Assets being sold or transferred, (ii) identification of the De Minimis Asset Purchaser and their relationship (if any) to the Debtors, (iii) the purchase price of the De Minimis Asset, (iv) the significant terms of the De Minimis Asset Sale, if any, including, but not limited to, any payments to be made by the Debtors on account of commission fees to agents, brokers, auctioneers, and liquidators, if any, (v) identification of any parties known to the Debtors as holding liens on the property being sold and a statement indicating whether the holders of such liens have consented to the sale; and (vi) the date and time within which objections must be filed and served on the Debtors (as set forth below).   If any Contract is to be assumed and assigned in connection with such De Minimis Asset Sale, such contract will be subject to the Assumption and Assignment Procedures herein;

(d)   <u>De Minimis Asset Sale Notice Parties</u>. In accordance with the above, the Debtors shall cause the De Minimis Asset Sale Notice to be served, by email, if available, or overnight delivery on (i) counsel to any official committee appointed in these chapter 11 cases; (ii) the Office of the United States Trustee for the Eastern District Of Missouri; (iii) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iv) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (v) all entities known to have asserted any lien, claim, or encumbrance in or upon the applicable De Minimis Asset(s); (vi) any party known by the Debtors to have a *bona fide* interest in such De Minimis Asset(s); and (vii) those parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>De Minimis Notice Parties</u>");

(e)   <u>Objection Procedures</u>. Parties objecting to a De Minimis Asset Sale Notice must file and serve a written objection so that such objection is filed with the Court and is actually received by counsel to the Debtors no later than ten days after the date on which the Debtors serve the relevant De Minimis Asset Sale Notice;

(f)   <u>No Objection Timely Filed</u>. If no written objections to a De Minimis Asset Sale are timely filed with the Court, then the Debtors are authorized to immediately consummate such De Minimis Asset Sale; *provided* that in the

event a De Minimis Asset Purchaser requests an order of the Court approving the assumption and assignment of a Contract concerning or related to such De Minimis Asset, the Debtors shall be permitted to obtain such order through the filing of a declaration pursuant to 28 U.S.C. § 1746;

(g)     Unresolved Timely Objection.  If a timely objection is filed and not withdrawn or resolved, the Debtors may file a notice of hearing to consider the unresolved objection.  If such objection is overruled or withdrawn, or if the sale of such property is specifically approved by further order of the Court, the Debtors are authorized to immediately consummate such transaction;

(h)     Good Faith Purchaser.  Good faith purchasers of assets pursuant to these De Minimis Asset Sale Procedures shall be entitled to the protections of section 363(m) of the Bankruptcy Code; and

(i)     Modifications to or Recission of a De Minimis Asset Sale Notice.  The Debtors reserve the right (exercisable in their sole discretion) to remove any De Minimis Asset from a De Minimis Asset Sale Notice or rescind any De Minimis Asset Sale at any time prior to the consummation thereof.

## B.     The Abandonment Procedures

35.     The Debtors intend to take all commercially reasonable steps to sell personal property that is not needed in their operations.  In certain cases, however, the costs associated with the sale of such property may exceed the proceeds that would be generated from such sales. Accordingly, the Debtors seek authority to abandon such property pursuant to the following Abandonment Procedures where, in the exercise of their reasonable business judgment, the Debtors determine that the cost of selling such property outweighs any potential recovery from its sale:

(a)     Debtors' Authorization.  The Debtors are authorized to abandon any property without further order of the Court if the Debtors determine in the reasonable exercise of their business judgment that such sale or transfer is in the best interest of their estates, subject only to the noticing procedures set forth herein;

(b)     Abandonment Notice.  At least ten days prior to abandoning such property, the Debtors shall file on the Court's docket and serve written notice of such abandonment (the "Abandonment Notice"), substantially in the form attached hereto as **Exhibit 5**.  The content of the Abandonment

23

Notice shall consist of (i) identification of the property being abandoned and its location; (ii) a summary of the reasons for abandoning such property; (iii) the entity to whom the property is proposed to be abandoned, if any; and (iv) the date and time within which objections must be filed and served on the Debtors (as set forth below);

(c)     <u>Abandonment Notice Parties</u>.  In accordance with the above, the Debtors shall cause the Abandonment Notice to be served, by email, if available, or overnight delivery on (i) counsel to any official committee appointed in these chapter 11 cases; (ii) the Office of the United States Trustee for the Eastern District Of Missouri; (iii) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (iv) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (v) all entities known to have asserted any lien, claim, or encumbrance in or upon the property being abandoned; (vi) any party known by the Debtors to have a *bona fide* interest in the property being abandoned; (vii) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable, and (viii) those parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Abandonment Notice Parties</u>");

(j)     <u>Objection Procedures</u>.  Parties objecting to an Abandonment Notice must file and serve a written objection so that such objection is filed with the Court and is actually received by counsel to the Debtors no later than ten days after the date on which the Debtors serve the relevant Abandonment Notice;

(k)     <u>No Objection Timely Filed</u>.  If no written objections to an Abandonment Notice are timely filed with the Court, then the Debtors are authorized to immediately abandon the relevant property;

(l)     <u>Unresolved Timely Objection</u>.  If a timely objection is filed and not withdrawn or resolved, the Debtors may file a notice of hearing to consider the unresolved objection.  If such objection is overruled or withdrawn, or if the sale of such property is specifically approved by further order of the Court, the Debtors are authorized to immediately abandon the relevant property; and

(m)     <u>Modifications to or Recission of an Abandonment Notice</u>.  The Debtors reserve the right (exercisable in their sole discretion) to remove any property from an Abandonment Notice or rescind any abandonment at any time prior to the consummation thereof.

24

**Basis for Relief**

A.    **The De Minimis Asset Sale Procedures and the Bidding Procedures Are Fair, Designed to Maximize the Value Received by the Debtors' Estates, and Consistent with the Debtors' Reasonable Business Judgment**

36.    Section 363 of the Bankruptcy Code provides that "[t]he [debtor-in-possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1).  Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under [Section 363], courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.") (*quoting In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *see also Fulton State Bank* v. *Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification.'") (internal citations omitted); *see also Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (explaining that courts usually defer to the trustee's "legitimate business justification" with respect to section 363 of the Bankruptcy Code); *see also In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business judgment test when analyzing transactions under § 363(b)(1).").

37.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, 2017 Bankr. LEXIS 4506, at *12 (Bankr. D. Del. Sept. 7, 2017) ("The relief requested in the Sale Motion . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate, and its creditors."); *In re Integrated Res. Inc.*,

25

147 B.R. 650, 659 (S.D.N.Y. 1992) ('"[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").

38.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. *See*, *e.g.*, *In re Integrated Res. Inc.*, 147 B.R. at 659 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets"); *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Wintz* v. *American Freightways, Inc. (In re Wintz Companies)*, 219 F.3d 807, 812-813 (8th Cir. 2000) (sale procedure providing for competitive bidding calculated to maximize value to the estate was deemed valid).

39.     The Debtors have carefully evaluated a number of qualitative and quantitative factors in designing a process that they believe will maximize the value of their estates, produce maximum recoveries, and result in a successful restructuring of their estates.  This process includes approval of the Bidding Procedures, which are fair, designed to facilitate orderly yet competitive bidding to maximize the value of the Debtors' estates, and to elicit the highest or otherwise best offers available for all or substantially all of the Debtors' assets.  In particular, the Bidding Procedures contemplate an open auction process with minimum barriers to entry and provide

potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

40.     Further, the Bidding Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the Sale.  Moreover, having the option to enter into a Stalking Horse Agreement with a Stalking Horse Bidder ensures that the Debtors retain flexibility to set a minimum purchase price for the Company Assets that will be tested by the marketplace.  As such, the Debtors and creditors of the Debtors' estates can be assured that, taking into account the financial condition of the market and the economy, the consideration obtained will be fair and reasonable.

41.     In addition, over the course of these chapter 11 cases, the Debtors may identify De Minimis Assets that are sellable only at values that do not justify the additional administrative cost and expense associated with maintaining such assets or conducting a formal auction process. Moreover, in certain circumstances, the Debtors may have a limited window of time in which they may enter into or take advantage of opportunities to sell such De Minimis Assets and the delay associated with waiting to sell the assets at the Auction, if any, could eliminate or substantially diminish the assets' economic value.  The De Minimis Asset Sale Procedures will allow the Debtors to monetize such assets fairly and efficiently with appropriate notice given to key parties in interest and without unnecessarily burdening the Debtors' estates with costs that undermine the Debtors' efforts to maximize value for the benefit of all stakeholders.

42.     In connection with the sale of De Minimis Assets pursuant to the De Minimis Asset Sale Procedures, the Debtors will have to make a determination that such a sale is a reasonable exercise of their business judgment and that it would be in the best interests of their estates. Further, the Debtors have a clear business justification for implementing the De Minimis Asset

Sale Procedures because implementing a process to sell or transfer the De Minimis Assets will provide the Debtors with necessary flexibility during these chapter 11 cases. Moreover, parties with an interest in the De Minimis Assets are fully protected by the opportunity to object to any proposed sale and to attend a hearing, if desired. The De Minimis Asset Sale Procedures thus do not prejudice any party in interest while providing meaningful potential benefits to the Debtors' estates and their creditors.

43.     For the foregoing reasons, the Debtors respectfully submit that (a) the Bidding Procedures will encourage competitive bidding and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings and (b) the De Minimis Asset Sale Procedures will maximize the value of the Debtors' estate by avoiding any unnecessary cost and delay associated with the sale of any De Minimis Assets. Accordingly the Debtors believe that the Bidding Procedures and the De Minimis Asset Sale Procedures should be approved.

**B.     The Bid Protections Have a Sound Business Purpose and Should Be Approved**

44.     The Debtors are also seeking authority to designate one or more Stalking Horse Bidders and offer certain protections (the "Bid Protections") in connection therewith consisting of a Breakup Fee and Expense Reimbursement, in an aggregate amount not to exceed three percent of the Stalking Horse Bidder's purchase price. Debtors customarily utilize a stalking horse bidder, an initial bidder "whose due diligence and research serve to encourage future bidders, and whose bid sets a floor for subsequent bidding," to maximize the value of estate assets at auction. *See In re Interforum Holding LLC*, 2011 WL 2671254, at *1 n.1 (E.D. Wis. July 7, 2011) (stalking horse bidders and offers "establish a framework for competitive bidding and facilitat[ing] a realization of that value"). The offering of Bid Protections to induce stalking horse bidders to provide these benefits has become an established and important practice in chapter 11 cases. "Break-up fees are

28

important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *In re Integrated Res. Inc.*, 147 B.R. at 659–60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also In re Integrated Res. Inc.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"). Moreover, courts in this circuit have stated that "bid procedures should provide a vehicle to enhance the bid." *In re President Casinos, Inc*., 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (citing *In re Food Barn Stores, Inc*., 107 F.3d 558, (8th Cir. 1997) (discussing bid protections)).

45.     As discussed above, courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling estate assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale."). With respect to the granting of bid protections, courts have held that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Reliant Energy Channelview LP* v. *Kelson Channelview LLC* (*In re Reliant Energy Channelview LP*), 594 F.3d 200, 206 (3d Cir. 2010) (citing

*Calpine Corp.* v. *O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527 (3d Cir.1999)).

46.     Therefore, courts in this and other jurisdictions have ruled that bid protections must meet the standard set forth in the administrative expense provisions of Bankruptcy Code section 503(b), which is generally satisfied if such bid protections provide some benefit to the debtor's estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3rd Cir. 2018); *In re Tama Beef Packing, Inc*., 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) ("We . . . hold that the determination of whether break-up fees or expenses are allowable under section 503(b)(1)(A) will be made in reference to general administrative expense jurisprudence."); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533. Benefits to the debtor's estate may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" and where the availability of the breakup fees and expenses "were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely . . . increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* at 537. The Bid Protections contemplated herein may be necessary to induce parties to act as Stalking Horse Bidders.

47.     Notably, the flexibility to offer Bid Protections is a critical component of the Debtors' ability to potentially obtain the commitment of one or more Stalking Horse Bidders. To qualify as a Stalking Horse Bidder, a bidder will need to have expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, despite the fact that its Bid will be subject not only to Court approval but also to overbidding by third parties at the Auction. Any Bid Protections offered to a Stalking Horse Bidder will have been negotiated in good faith and at arm's length. As a result, by

preserving the flexibility to offer Bid Protections, the Debtors ensure that their estates can realize the benefit of a transaction with a Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction.

48.     Additionally, a Stalking Horse Bid would ensure the continuation of the Debtors' business subject to such Stalking Horse Bid as a going concern and establish a substantial "baseline" for a thorough, postpetition auction.  Such Stalking Horse Bid may further contemplate the employment of some or all of the Debtors' employees, provide for the satisfaction of some or substantially all accrued trade obligations as they become payable post-Sale in the ordinary course of business, or contemplate the assumption of some or substantially all of the Debtors' executory contracts and unexpired leases.  In consideration of the foregoing, the Debtors submit that the Court should authorize the Debtors to offer Bid Protections pursuant to sections 503(b), 507(a)(2), and 507(b).

**C.     The Form, Manner, and Extent of Notice of This Motion and the Proposed Sales, Transfers, or Abandonments Are Appropriate and Adequate Under the Circumstances**

49.     The Debtors will serve the Sale Notice, Cure Notice, De Minimis Asset Sale Notice, and Abandonment Notice in accordance with the Proposed Order.  The notice of the proposed Sale to be provided by the Debtors as set forth herein sufficiently describe the process through which the Debtors seek to sell the Company Assets pursuant to the Bidding Procedures.  Moreover, the De Minimis Asset Sale Notice and the Abandonment Notice sufficiently describe the assets to be sold, transferred, or abandoned, as applicable, while providing parties with notice and an opportunity to object to any proposed disposition.

50.     Several sections of the Bankruptcy Code and Bankruptcy Rules dictate the sufficiency of notice and adequacy of service.  As discussed below, the content and manner of service of this motion and the related notices satisfy all such requirements:

i. <u>Sale Notice, De Minimis Asset Sale Notice, and Abandonment Notice</u> – Section 363 of the Bankruptcy Code provides that a "trustee after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." Under section 102(1) of the Bankruptcy Code, the phrase "after notice and a hearing" means "notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances." 11 U.S.C. § 102(1)(A). As set forth above, creditors will be provided notice of the salient details regarding this motion, the Sale Hearing, and any proposed disposition of assets through service of this motion, the Sale Notice, the De Minimis Asset Sale Notice, and the Abandonment Notice, as applicable, each as described herein. Accordingly, notice is sufficient under section 363 of the Bankruptcy Code.

ii. <u>Bankruptcy Rule 2002</u> – Bankruptcy Rule 2002 requires 21 days' notice of the proposed sale of property other than in the ordinary course of business. In addition, Bankruptcy Rule 2002 provides that notice of a sale shall include: (a) the time and place of any public sale; (b) the terms and conditions of any private sale; (c) a general description of the property; (d) the time to file objections; and (e) for a proposed sale or lease of personally identifiable information under Bankruptcy Code section 363(b)(1), a statement whether the sale is consistent with any policy that prohibits transferring the information. *See* Fed. R. Bankr. P. 2002(c)(1). As set forth above, the notice of this motion and the proposed Sale that has been and will be provided by the Debtors satisfies each of these requirements.

With respect to sales and transfers of De Minimis Assets, however, the notice and hearing requirements contained in section 363(b)(1) of the Bankruptcy Code are satisfied if appropriate notice and an opportunity for a hearing are provided in light of the particular circumstances. *See* 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" to mean such notice and an opportunity for a hearing "as [are] appropriate in the particular circumstances"). Accordingly, courts are authorized to shorten the 21-day notice period generally applicable to asset sales, or direct another method of giving notice, upon a showing of "cause." *See* Fed. R. Bankr. P. 2002(a)(2). Moreover, courts are authorized to limit notice of asset sales outside of the ordinary course of a debtor's business, even without a prior showing of cause, to any official committee appointed under section 1102 of the Bankruptcy Code and any creditor or equity holder requesting notice. *See* Fed. R. Bankr. P. 2002(i). Bankruptcy courts are guided by fundamental notions of procedural due process when determining whether notice is appropriate under the circumstances.

Requiring 21-days' notice and a hearing before each sale of De Minimis Assets would impose unnecessary costs and administrative burdens that may undermine or eliminate the economic benefits of the underlying de minimis transactions, and in some instances, may hinder the Debtors' ability

to take advantage of sale opportunities that are available only for a limited time. The Debtors, therefore, propose to streamline the process and shorten the applicable notice periods as described herein to maximize the net value realized from sales of De Minimis Assets. The De Minimis Asset Sale Procedures provide all interested parties ample notice and an opportunity to object. Because the De Minimis Asset Sale Procedures are reasonably calculated to provide interested parties notice, an opportunity to object and, if necessary, a hearing, the proposed procedures satisfy applicable due process standards.

iii. <u>Bankruptcy Rules 6004 and 6006</u> – Bankruptcy Rule 6004 requires that notice of sales of property out of the ordinary course of business complies with Bankruptcy Rule 2002. As set forth above, the Debtors have complied with Bankruptcy Rule 2002 or seek authority to shorten notice thereunder for cause. Bankruptcy Rule 6006 requires notice of a motion to assume and assign an executory contract or unexpired lease to be served on the non-Debtor counterparty to such contract or lease, as well as on other parties in interest as the Court may direct. The Sale Notice and the Cure Notice have been or will be served on the Non-Debtor Counterparties to any assigned contracts, thereby satisfying this requirement.

iv. <u>Procedural Due Process</u> – The notices of this motion, the Sale, any De Minimis Asset Sale, and any abandonment of property that are being provided as described herein, including the notice being provided by publication as described herein and the Proposed Order, are "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. *See Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Parties in interest have been and should be found to have been afforded adequate notice of this motion, the proposed Sale, the Bidding Procedures, any De Minimis Asset Sale, and any abandonment of property, and the other relief requested herein.

51.     The Debtors submit that the notice they intend to provide as outlined above with respect to the proposed Sale, the Bidding Procedures, the Bid Protections, any De Minimis Asset Sale, any abandonment of property, and the Cure Amounts, as applicable, is reasonable and appropriate and constitutes good and adequate notice of the Sale, transfer, or abandonment of the Company Assets and the procedures and proceedings related thereto and therefore should be approved by this Court.

**D.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved**

52.     To facilitate and effectuate the Sale, the Debtors are seeking approval of the Assumption and Assignment Procedures.  Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Courts use the business judgment standard to determine whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease.  *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (stating that the assumption or rejection of a lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Glob. Holdings, Inc*., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject an executory contract is governed by the "business judgment" standard).   The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp.* v. *West Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, *Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).   A more exacting scrutiny would harm the estate through increased costs and further, "would slow the administration of a debtor's estate, . . . interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."  *Richmond Leasing Co.* v. *Cap. Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11.  Pursuant to section 105(a) of the Bankruptcy Code, a court may issue orders or decrees that help preserve or protect the value of a debtor's assets.  *See, e.g.*, *In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets

out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

53.     The assumption and assignment of executory contracts and unexpired leases, as designated by the Successful Bidder, is crucial to the Debtors' ability to obtain the best value in connection with a Sale and falls well within the reasonable exercise of the Debtors' business judgment.  Pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default that is required to be cured, including compensating or providing adequate assurance of prompt compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).  Once an executory contract is assumed, the trustee or debtor in possession may elect to assign it.  *See L.R.S.C. Co.* v. *Rickel Home Ctrs., Inc. (In re Rickel Home Ctrs., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate").  Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract or unexpired lease . . . only if the trustee assumes such contract or lease . . . and adequate assurance of future performance . . . is provided . . . ." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. Dec. 30, 1988).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.

54.     The Debtors respectfully submit that the Assumption and Assignment Procedures are appropriate and reasonably tailored to provide Non-Debtor Counterparties with adequate notice of the potential assumption and assignment of their contracts and leases, as well as proposed Cure

Amounts, if any.  Non-Debtor Counterparties will have the opportunity to object to the Cure

Amounts listed in the Cure Notice or Supplemental Cure Notice, as applicable, or to the

assumption and assignment of their Contracts on other grounds, including concerns regarding

inadequate assurance of future performance.  The Assumption and Assignment Procedures further

provide that, in the event an objection is not resolved, the Court will determine the disputed issues.

Accordingly, the Debtors submit that implementation of the Assumption and Assignment

Procedures is appropriate under the facts and circumstances of these chapter 11 cases and the

proposed Sale.

55.     For the foregoing reasons, the Debtors submit that the assumption and assignment

of the Debtors' contracts and leases to the Successful Bidder should be approved as an exercise of

the Debtors' sound business judgment.

**E.      The Sale and Any De Minimis Asset Sale Should Be Approved as Exercises of Sound Business Judgment**

56.     As described above, Section 363 of the Bankruptcy Code provides, in relevant part,

"[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 does not specify

a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of

property of the estate, courts routinely authorize a sale of a debtor's assets if such sale is based

upon the sound business judgment of the debtor.  *See, e.g., In re Channel One Comm., Inc.*, 117

B.R. 493, 496 (Bankr. E.D. Mo. Aug. 9, 1990) (citing *Comm. of Equity Sec. Holders* v. *Lionel*

*Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re The Landing*, 156 B.R. 246,

249 (Bankr. E.D. Mo. July 1, 1993) (citing *In re George Walsh Chevrolet*, 118 B.R. 99, 102

(Bankr. E.D. Mo. Aug. 21, 1990)); *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir.

1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141,

143 (2d Cir. 1992); *Stephen Indus., Inc.* v. *McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. Aug. 31, 2010).

57.    The business judgment rule shields a debtor's decisions from judicial second-guessing.  Once a debtor articulates a valid business justification, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. Aug. 31, 1995) (internal citations omitted); *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at *40 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *see also Comm. of Asbestos-Related Litigants and/or Creditors* v. *Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. May 5, 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

58.    Courts typically consider the following factors in determining whether a sale of a debtor's assets satisfies this standard: "(1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith."  *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *In re George Walsh Chevrolet*, 118 B.R. at 102; *In re The Landing*, 156 B.R. at 249.

(a)    **A Sound Business Purpose Exists for the Sale and the Sale Price Is Fair**

59.    Here, a sound business purpose exists for the Sale because the Debtors believe that the Sale will maximize the value of the Company Assets, exposing them to the market as part of a

competitive, arms'-length process. It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market. *See Bank of Am. Nat 'I Trust & Sav. Ass'n.* v. *203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, 2001 WL 1820326, *4 (Bankr. D. Del. Apr. 2, 2001) ("[I]t is worth noting that a [section] 363(b) sale transaction does not require an auction procedure. The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). Consequently, the ultimately Successful Bid, after being subject to a "market check" in the form of the Sale process and Auction (if any), will constitute, in the Debtors' business judgment, the highest or otherwise best offer for the Company Assets and will provide a greater recovery for their estates than any known or practicably available alternative. Also, because any sale of the Company Assets will likely contemplate the assumption of certain of the Debtors' executory contracts and unexpired leases, it will result in payment in full for some of the Debtors' creditors.

60.    As noted above, prior to the Bid Deadline, Moelis will continue to market the Company Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting previously solicited parties, continuing to provide interested parties with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the purchase price will, conclusively, be deemed fair value.

61.    Thus, the Debtors submit that the Successful Bid(s) will constitute the highest or otherwise best offer(s) for the Company Assets and will provide a greater recovery for the Debtors'

estates than would be provided by any other available alternative.  As such, the Debtors'
determination to sell the Company Assets through an Auction process and subsequently to enter
into a Purchase Agreement with the Successful Bidder(s) will be a valid and sound exercise of the
Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support
these conclusions, as well as a showing to support the fairness of the sale price.  Therefore, the
Debtors request that the Court make a finding that the proposed sale of the Company Assets is a
proper exercise of the Debtors' business judgment and is rightly authorized.

62.     Moreover, in connection with the sale of De Minimis Assets pursuant to the De
Minimis Asset Sale Procedures, the Debtors will have to make a determination that such a sale is
a reasonable exercise of their business judgement and that it would be in the best interests of their
estates.  Further, the Debtors have a clear business justification for implementing the De Minimis
Asset Sale Procedures because implementing a process to sell or transfer the De Minimis Assets
will provide the Debtors with necessary flexibility during these chapter 11 cases.  Parties with an
interest in the De Minimis Assets are fully protected by the opportunity to object to any proposed
sale and to attend a hearing, if desired.  Accordingly, the De Minimis Asset Sale Procedures do
not prejudice any party in interest while providing meaningful potential benefits to the Debtors'
estates and their creditors.

      (b)     **Adequate and Reasonable Notice of the Auction, Sale, Any De Minimis Asset
Sale, and Abandonment of Assets Will Be Provided**

63.     The Sale Notice, the Cure Notice, any Supplemental Cure Notice, De Minimis
Asset Sale Notice, and Abandonment Notice:  (a) inform parties in interest of the deadlines for
objecting to the Sale or the assumption and assignment of any executory contracts and unexpired
leases in connection with any Sale; (b) otherwis includes all information relevant to parties
interested in or affected by the Sale, De Minimis Asset Sale, or abandonment of property, as

applicable; and (c) with respect to the Sale Notice, Cure Notice, and any Supplemental Cure Notice, will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing.  Significantly, the form and manner of the notices will have been approved by this Court pursuant to the Proposed Order after notice and a hearing before it is served on parties in interest.

      (c)    **The Sale and Any De Minimis Asset Sale Has Been Proposed in Good Faith Without Collusion, and the Successful Bidder or Purchaser Is a "Good Faith Purchaser"**

64.     The Debtors request that the Court find the Successful Bidder and any purchaser of De Minimis Assets is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of Company Assets.  Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

65.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that  a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *Tempo Tech. Corp.* v. *CIBC Wood Gundy Ventures (In re Temtechco, Inc.)*, 1998 WL

887256, at *28 (D. Del. 1998); *In re Congoleum Corp.*, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007); *U.S.* v. *Whitney Design, Inc. (In re Whitney Design, Inc.)*, 2011 WL 13254299, at *2 (E.D. Mo. Jan. 11, 2011) (noting that the purpose of section 363(m) is to protect third-party purchasers in good faith and "by providing reliability and finality, § 363 enhances the value of the debtor's assets sold in bankruptcy").

66.    The Debtors submit that the Successful Bidder(s) and any purchaser of De Minimis Assets will be "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code.[12]  Any Sale will be the result of a robust, intensive postpetition sale process designed to elicit the highest or otherwise best offer for the sale of the Company Assets, through which all parties will be represented by counsel and all negotiations will be conducted on an arm's-length, good faith basis.  With respect to potential bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  Moreover, the Debtors submit that any agreement that results in a sale pursuant to the De Minimis Asset Sale Procedures will be an arm's-length transaction entitled to the protections of section 363(m).  Accordingly, the Debtors believe that the Successful Bidder(s), any purchaser of De Minimis Assets, and any purchase agreement associated in connection therewith should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

---

[12]    The Debtors believe that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code will be appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the Successful Bidder or Backup Bidder, if any, any entity whose good faith under section 363(m) of the Bankruptcy Code can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of section 363(m) of the Bankruptcy Code has been satisfied.

F.     **The Sale and Any De Minimis Asset Sale Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code**

67.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) of the Bankruptcy Code is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens, and encumbrances. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. Aug. 20, 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *The Mutual Life Inc. Co. of New York* v. *Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 857–858 (Bankr. W.D. Mo. 1984) (same); *Citicorp Homeowners Servs., Inc.* v. *Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

68.     The Debtors submit that, if any interest in the Company Assets will not be an assumed liability or permitted encumbrance, any such interest in the Company Assets satisfies or will satisfy at least one of the five conditions of section 363(f) of the Bankruptcy Code.  Moreover, any such interest in the Company Assets will be adequately protected by either being paid in full at the Sale closing or attaching to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.

69.     It is also appropriate to sell the Company Assets free and clear of successor liability relating to the Debtors' business.  Such limitations on successor liability ensure that the Successful Bidder or purchaser of De Minimis Assets is protected from any claims or lawsuits premised on

the theory that such party is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business.  *See, e.g., Cibulka* v. *Trans World Airlines, Inc.*, 92 F. App'x 366, 368 (8th Cir. 2004) (citing *In re Trans World Airlines, Inc.*, 322 F.3d 283, 28890 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585-86 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133, at *4 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. Sept. 18, 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

70.    The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts.  Accordingly, the Debtors request authority to convey the Company Assets to the Successful Bidder, if any, free and clear of all encumbrances, with any such encumbrances to attach to the proceeds of the Sale, and that any party with a lien on the De Minimis Assets sold or transferred shall have a corresponding security interest in the proceeds of such sale or transfer.

**G.    The Proposed Abandonment Procedures Satisfy Section 554 of the Bankruptcy Code**

71.    The Debtors respectfully submit that the proposed Abandonment Procedures represent the exercise of sound business judgment, are fair and appropriate, and balance the need

for an expeditious reduction of burdensome costs to the Debtors' estates with the provision of advance notice of proposed dispositions of property. The proposed Abandonment Procedures satisfy the requirements of section 554 of the Bankruptcy Code, which provides that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a). Courts generally give great deference to a debtor in possession's decision to abandon property. *See, e.g.*, *In re Vel Rey Props., Inc.*, 174 B.R. 859, 867 (Bankr. D.D.C. 1994) ("Clearly, the court should give deference to the trustee's judgment in such matters."). Unless certain property is harmful to the public, once a debtor has shown that it is burdensome or of inconsequential value to the estate, a court should approve the abandonment. *See id.*

72. The Debtors will take reasonable steps to sell De Minimis Assets not needed in their operations for the benefit of their estates. The costs associated with sales of certain De Minimis Assets, however, may exceed any possible proceeds thereof. The inability to consummate a commercially reasonable sale of De Minimis Assets would indicate that these assets have no meaningful monetary value to the Debtors' estates. Further, the costs of storing and maintaining such De Minimis Assets may burden the Debtors' estates and weigh in favor of deserting such assets. Accordingly, the Debtors contend that, in such circumstances, the abandonment of De Minimis Assets pursuant to the De Minimis Asset Abandonment Procedures is in the best interest of the Debtors' estates.

**Immediate Relief Is Necessary**

73. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case if "relief is needed to avoid immediate and irreparable harm." For the reasons discussed herein and in the First Day Declaration, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and

that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Failure to obtain the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring efforts. The relief requested herein is necessary for the Debtors to operate their business in the ordinary course and preserve the value of their estates for the benefit of stakeholders. Accordingly, the Debtors respectfully submit that Bankruptcy Rule 6003 has been satisfied.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

74.   Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in this motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates through these chapter 11 cases. Accordingly, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14 day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

75.   Except as expressly set forth herein, nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is

45

an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## Notice

76.    The Debtors will provide notice of this motion to the following parties:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) the agent/lender under any proposed postpetition financing facility and its counsel, if applicable; (e) the United States Attorney's Office for the Eastern District of Missouri; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Federal Trade Commission; (i) the state attorneys general in all 50 states; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  Notice of this motion and any order entered hereon will be served in accordance with rule 9013-3(A)(1) of

the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri (the "Local Rules"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

77.     A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov and (b) the website maintained by the Debtors' proposed claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order and grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 24, 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
/s/ Thomas H. Riske
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:      (314) 854-8600
Facsimile:      (314) 854-8660
Email:          thr@carmodymacdonald.com
                nrw@carmodymacdonald.com
                jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:      (212) 373-3000
Facsimile:      (212) 757-3990
Email:          pbasta@paulweiss.com
                chopkins@paulweiss.com
                jchoi@paulweiss.com
                ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit 1</u>**

**Bidding Procedures**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |
| | Related Docket Nos. __ & __ |

## BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On March 23, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Court").

On [_____], 2025, the Court entered that certain *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order"), which approved, among other things, (a) the following procedures (the "Bidding Procedures") pursuant to which the Debtors are authorized to solicit and pursue a sale (a "Sale") of all or any portion of the Debtors' assets (the "Company Assets") under section 363 of the Bankruptcy Code, (b) the scheduling of a hearing to approve the Sale of the Company Assets, or a portion thereof, free and clear of any liens, claims, and encumbrances under section 363 of the Bankruptcy Code, and (c) procedures in connection with the assumption and assignment of any executory contracts or unexpired leases (each, a "Contract") the Debtors seek to have assumed and assigned in connection with a Sale. ***All interested bidders should carefully read the Bidding Procedures Order and these Bidding Procedures in their entirety.***[2]

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and*

> **Copies of the Bidding Procedures Order or other documents related thereto are available upon request to Kroll Restructuring Administration LLC by calling (888) 367-7556 (U.S. and Canada) or (646) 891-5055 (International) or visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/23andMe.**
>
> **All due diligence requests must be directed to Moelis & Company LLC at Project_Chrome_2025_EXT@Moelis.com.**

## I.    OVERVIEW

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing process and, if necessary, an auction (an "Auction") for a Sale of the Company Assets.

The Debtors will consider bids (each, a "Bid") for the purchase of all or any portion of the Company Assets to the person or entity making the most value maximizing Bid through the process outlined in these Bidding Procedures.

The Debtors reserve the right to modify these Bidding Procedures, including to extend the deadlines and modify the requirements set forth herein or impose additional terms and conditions at any time, if they determine, in their reasonable business judgment, that doing so will best promote the goals of the bidding process, including during an Auction.

## II.    KEY SALE PROCESS DATES

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing bids for the Company Assets.  The Debtors shall assist interested parties in conducting their respective due diligence investigations and shall accept Bids until **May 7, 2025, at 4:00 p.m. (prevailing Central Time)** (the "Bid Deadline").  The other key dates for the marketing process are as follows:[3]

| Action | Description | Deadline |
|---|---|---|
| Non-Binding Indication of Interest Deadline ("IOI Deadline") | The deadline by which any party interested in purchasing the Company Assets must submit a non-binding indication of interest. | April 13, 2025 at 4:00 p.m. (prevailing Central Time)<br><br>Petition Date + 21 days |
| Stalking Horse Deadline | The deadline by which the Debtors may choose one or more Stalking Horse Bidder(s). | April 25, 2025<br><br>Petition Date + 33 days |
| Stalking Horse Notice Deadline | The deadline by which the Debtors must file a Stalking Horse Notice. | Within two business days after entry into a Stalking Horse Agreement |

_____

*Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. ___], as applicable.

[3]    These dates are subject to extension or adjournment as provided for herein.

| Action | Description | Deadline |
|---|---|---|
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | May 7, 2025 at 4:00 p.m. (prevailing Central Time)<br><br>Petition Date + 45 days |
| Determination of Qualified Bids | The deadline by which the Debtors will determine which Bids are Qualified Bids and notify each Potential bidder in writing whether such Potential bidder is a Qualified Bidder. | May 9, 2025<br><br>Bid Deadline + 2 business days |
| Auction (if necessary) | The date and time of the Auction, which will be held at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019. | May 14, 2025 at 9:00 a.m.<br><br>Petition Date + 52 days |
| Notice of Successful Bidder | Within two business days following closing of the Auction, the Debtors will file on the docket a notice identifying the Successful Bidder, identifying the applicable Successful Bidder, Company Assets, and key terms of the agreement. | Within two business days following closing of the Auction (if any) |
| Deadline to File and Serve Cure Notices | The deadline by which the Debtors must file and serve Cure Notices to counterparties to Contracts to be assumed and assigned in connection with the Sale(s). | May 19, 2025 (seven days before the Sale Objection Deadline) |
| Sale Objection Deadline; Cure/Assignment Objection Deadline | The deadline by which objections to the Successful Bidder(s) and Sale(s), if any, or to the assumption and assignment of any Contracts in connection with the Sale(s) must be filed with the Court. | May 26, 2025 at 4:00 p.m Petition Date + 64 days (seven days before the Sale Hearing) |
| Sale Hearing | The hearing, if any, before the Court to consider approval of the Successful Bid(s), pursuant to which the Debtors and the Successful Bidder(s) consummate the Sale(s). | June 2, 2025]<br><br>Petition Date + 71 days |

## III.   PUBLIC ANNOUNCEMENT OF AUCTION

Within three business days after entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable), the Debtors shall serve on the Sale Notice Parties a notice of the Auction and Sale (the "Sale Notice"). In addition, within five business days after entry of the Bidding Procedures Order (or as soon thereafter as reasonably practicable), the Debtors shall (a) publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in *The Wall Street Journal* to provide notice to any other potential interested parties and (b) post the Sale Notice, the Bidding Procedures Order (as entered), and the Bidding Procedures on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

## IV.    **BIDDING PROCESS**

### A.  **Submissions to the Debtors.**

These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction, thereby competing to make the highest or otherwise best offer for any combination of the Company Assets.  The Debtors, in consultation with their advisors and any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"), will consider any Bid for all or any portion of the Company Assets including, among other possibilities, multiple Bids from multiple bidders (including multiple Bids submitted by the same bidder).

### B.  **Stalking Horse Bidder and Bid Protections.**

At any time until April 25, 2025, the Debtors are authorized, but not obligated, in an exercise of their business judgment and in consultation with any Committee, to:  (i) select one or more Qualified Bidders to act as Stalking Horse Bidders; (ii) enter into a Stalking Horse Agreement with each Stalking Horse Bidder so selected; and (iii) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, (a) provide a breakup fee (the "Breakup Fee") and (b) agree to reimburse the reasonable and documented out of pocket fees and expenses (the "Expense Reimbursement" and, together with the Breakup Fee, the "Bid Protections"), not to exceed three percent of the purchase price with respect to the foregoing clauses (a) and (b) in the aggregate.

No later than two business days after entry into a Stalking Horse Agreement, the Debtors shall file a notice and proposed form of order with the Court that (i) sets forth the identity of the Stalking Horse Bidder (and if the Stalking Horse Bidder is a newly formed entity, then the Stalking Horse Bidder's parent company or sponsor); (ii) sets forth the amount of the Stalking Horse Bid and what portion (if any) is cash; (iii) states whether the Stalking Horse Bidder has any connections to the Debtors other than those that arise from the Stalking Horse Bid; (iv) specifies any proposed Bid Protections (including the amount and calculation thereof); (v) attaches the Stalking Horse Agreement, including all exhibits, schedules, and attachments thereto; (vi) specifies the Company Assets included in the Stalking Horse Bid and (vii) sets forth the deadline to object to the Stalking Horse Bidder designation and any Bid Protections (the "Stalking Horse Notice").

If there are no objections to the Stalking Horse Notice within five days of filing with the Court (the "Notice Period"), the Debtors may submit an order to the Court that authorizes the Debtors to designate a Stalking Horse Bidder and to enter into a Stalking Horse Agreement, without the need for a further hearing.  If a party files an objection to the Stalking Horse Notice, the Court shall hold a hearing after the expiration of the Notice Period and as soon thereafter as the Court is available.

Upon entry of the order approving the designation of a Stalking Horse Bidder and Stalking Horse Agreement, the Debtors are authorized to incur and pay the Bid Protections to the Stalking Horse Bidder(s) in accordance with the terms of such order and the Stalking Horse Agreement. After designating the Stalking Horse Bidders, if any, and designating other Qualified Bidders, if any, the Debtors may then hold an Auction for the applicable Company Assets.

**C.  Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (a "Potential Bidder") must deliver the following to the Debtors (unless waived by the Debtors in their reasonable business judgment):

      i.      an executed confidentiality agreement on terms acceptable to the Debtors (a "Confidentiality Agreement"), if not already executed;

      ii.      a statement of what portion of the Company Assets that the Potential Bidder intends to acquire;

      iii.      sufficient information, as determined by the Debtors and their advisors, demonstrating that the interested party (a) has the financial wherewithal to consummate the Sale and (b) intends to access the Data Room (as defined below) for a purpose consistent with these Bidding Procedures; and

      iv.      any other evidence the Debtors may reasonably request to evaluate the person's or entity's fitness to participate in the bidding process or ability to timely acquire the Company Assets.

**D.  Non-Binding Indications of Interest.**

Any party interested in purchasing the Company Assets shall submit a non-binding indication of interest (an "Indication of Interest") on or before April 13, 2025, at 4:00 p.m. (prevailing Central Time) (as may be extended without notice or hearing by the Debtors, the "IOI Deadline").  The Indication of Interest should (i) identify whether the party is interested in acquiring all or substantially all of the assets, (ii) set forth a proposed purchase price for the proposed transaction, including by identifying separately any cash and non-cash components of the proposed transaction consideration, which non-cash components shall be limited only to assumption of liabilities and/or credit bids, and (iii) identify any proposed conditions to closing the transaction.

Indications of Interest should be submitted to the Debtors by the IOI Deadline.  Note that submitting an Indication of Interest by the IOI Deadline does not obligate the submitting party to submit a formal bid or to participate in the sale process and does not exempt the submitting party from also having to submit a Qualified Bid by the Bid Deadline to participate in the Auction, each as defined below.

All Indications of Interest must be received via email so as to be **actually received** by the IOI Deadline—on or before **4:00 p.m. (prevailing Central Time) on April 13, 2025, 2025** by:

      a.      Debtors' Counsel.  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Paul Basta (pbasta@paulweiss.com);                    Christopher              Hopkins

(chopkins@paulweiss.com); Jessica I. Choi (jchoi@paulweiss.com); and Grace C. Hotz (ghotz@paulweiss.com).

b. <u>Debtors' Co-Counsel</u>. Carmody MacDonald P.C., 120 S. Central Avenue, Suite 1800 St. Louis, Missouri 63105, Attn: Thomas H. Riske (thr@carmodymacdonald.com); Nathan R. Wallace (nrw@carmodymacdonald.com); and Jackson J. Gilkey (jjg@carmodymacdonald.com).

c. <u>Debtors' Investment Banker</u>. Moelis & Company LLC, 399 Park Ave., 4th Floor, New York, New York 10022 at Project_Chrome_2025_EXT@Moelis.com.

The Debtors shall provide the Committee with copies of all Indications of Interest received by the Debtors; *provided* that the Committee agrees to treat such Indications of Interest and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the potential bidder.

**E. Due Diligence.**

Only Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room (the "<u>Data Room</u>") and to receive additional non-public information regarding the Debtors. **Only Potential Bidders that enter into a Confidentiality Agreement with the Debtors will be permitted to conduct any due diligence that includes confidential information.** The Debtors will use commercially reasonable efforts to provide due diligence information to any such Potential Bidder, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request, and the Debtors shall post confidential information concerning the Company Assets to the Data Room which will be made available to Potential Bidders. Unless extended by the Debtors in their reasonable business judgment, each Potential Bidder's due diligence period will end on the applicable Bid Deadline, after which the Debtors shall have no obligation to furnish any due diligence information.

The Debtors need not furnish any confidential information relating to the Company Assets, liabilities of the Debtors, or any Sale to any person or entity except to a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent provided in the applicable Confidentiality Agreement and requested by such Potential Bidder. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Debtors may decline to provide (or elect to withdraw access to) due diligence information to any Potential Bidder who, at such time and in the Debtors' reasonable business judgment, has not established (or there is otherwise a reasonable basis to doubt) that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale. If a Potential Bidder no longer intends in good faith to, or lacks the capacity to, consummate a Sale, such Potential Bidder shall promptly notify the Debtors through email notice.

The Debtors also reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Potential Bidder, including a Potential Bidder the Debtors determine is (or is affiliated with) a competitor or supplier of the

Debtors, or is otherwise an entity to which the disclosure of sensitive or competitive information, in the Debtors' reasonable business judgment, may risk unduly placing the Debtors at a competitive disadvantage or subject them to regulatory scrutiny. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any entity that is not determined to be a Potential Bidder.

*All due diligence requests are to be sent to the Debtors through email notice.*

1.     <u>Communications with Potential Bidders</u>.

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive communications related to Bids or the Sale between or amongst Potential Bidders shall be conducted exclusively through the Debtors and the Debtors' advisors. Communications between and amongst Potential Bidders or the Committee and Potential Bidders is expressly prohibited unless the Debtors expressly consent in writing to such communication; *provided* that, if such consent is given, a representative of the Debtors shall be present for or party to any such communications (unless otherwise agreed by the Debtors in their sole discretion).

2.     <u>Due Diligence of Potential Bidders</u>.

Each Potential Bidder shall comply with any reasonable requests of the Debtors or their advisors for additional information or due diligence access regarding qualification as a Potential Bidder or Qualified Bidder, the terms of the Potential Bidder's Bid, or the ability of the Potential Bidder to acquire the applicable Company Assets. Failure by a Potential Bidder to comply with such reasonable requests may be a basis for the Debtors to determine that such bidder is no longer a Potential Bidder or that any bid made by such Potential Bidder is not a Qualified Bid (a "<u>Non-Qualifying Bid</u>").

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct its advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or otherwise in connection with these chapter 11 cases, in each case in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable confidentiality agreement, the Debtors and the Debtors' advisors may disclose confidential information: (a) with the prior written consent of such Potential Bidder; (b) to the applicable Potential Bidder; (c) in accordance with these Bidding Procedures; and (d) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular Potential Bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

*The Debtors encourage all Potential Bidders interested in participating in these marketing processes to promptly notify the Debtors and their advisors of such interest. Such Potential Bidders should describe, in as much specificity and as soon as practically feasible, the*

*scope of Company Assets that are envisioned to be encompassed by any Bid that such Potential Bidders expect to submit.*

**F. Qualified Bidders.**

1.        A "<u>Qualified Bidder</u>" is a Potential Bidder who satisfies the following requirements (unless waived by the Debtors in their reasonable business judgment): (a) the Potential Bidder has demonstrated the financial capability to consummate the applicable Sale (as determined by the Debtors in consultation with any Committee); (b) the Potential Bidder's Bid is a Qualified Bid; and (c) the Debtors have determined, in consultation with any Committee, the Potential Bidder should be considered a Qualified Bidder.  Within two business days after the Bid Deadline, the Debtors' advisors will notify each Potential Bidder whether such Potential Bidder is a Qualified Bidder.  Any Stalking Horse Bidder shall be deemed a Qualified Bidder for all purposes under these Bidding Procedures.

2.        If any Potential Bidder is determined by the Debtors, in consultation with any Committee, not to be a Qualified Bidder, the Debtors will refund such Potential Bidder's Deposit, if any, and all accumulated interest thereon, if any, within five business days of the Bid Deadline.

3.        For the avoidance of doubt, the Debtors expressly reserve the right to notify a Potential Bidder that its Bid is a Non-Qualifying Bid and permit such Potential Bidder to revise or supplement a Non-Qualifying Bid to make it a Qualified Bid.

4.        Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, if any, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder.  Without the determination by, and written consent of, the Debtors in their sole discretion (in consultation with any Committee), a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that, for the avoidance of doubt, any Qualified Bid may be improved at the Auction, if any, as set forth herein.  Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures, and the Debtors expressly reserve the right to request additional diligence information and assurances necessary to assess and ensure continued compliance (including additional information, assurances, or commitments regarding the applicable Qualified Bidder's financial capability to consummate the transactions contemplated by such improved Qualified Bid).

**G. Bid Requirements.**

A Bid by a Potential Bidder that is submitted in writing by the Bid Deadline and satisfies each of the following requirements (the "<u>Bid Requirements</u>"), as determined by the Debtors in their reasonable business judgment, in consultation with any Committee, shall constitute a "<u>Qualified Bid</u>."  Any Stalking Horse Bid shall be deemed a Qualified Bid for all purposes under these Bidding Procedures and at all times.  The Debtors shall provide the Committee with copies of all Bids received by the Debtors; *provided* that the Committee agrees to treat such Bids and any

related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder.

1.    <u>Documentation</u>.  Each Bid must be accompanied by (a) an executed purchase agreement (a "<u>Purchase Agreement</u>"), based either on (i) the form asset purchase agreement that the Debtors will make available in the Data Room no later than ten days prior to the Bid Deadline or (ii) the Stalking Horse Agreement if there is a Stalking Horse Bidder, in each case, including the exhibits, schedules, and ancillary agreements related thereto and any other related material documents integral to such Bid pursuant to which the Potential Bidder proposes to effectuate the proposed Sale, (b) a redline of such Purchase Agreement marked to reflect any amendments and modifications from the form purchase agreement or Stalking Horse Agreement, as applicable, which amendments and modifications may not be materially more burdensome or otherwise inconsistent with these Bidding Procedures, and (c) a copy of the execution version of the Purchase Agreement in Microsoft Word or similar software (the "<u>Qualified Bid Document</u>").  Each such Purchase Agreement must provide for payment in cash at closing of the Bid Protections to the Stalking Horse Bidder, if any.

2.    <u>Purchase Price</u>.  Each Bid must clearly (a) set forth the consideration to be provided for the applicable Company Assets (the "<u>Purchase Price</u>"), (b) identify separately any cash and non-cash components, which non-cash components shall be limited only to credit-bids and assumed liabilities, and (c) indicate the allocation of the Purchase Price among the applicable Company Assets.  The Purchase Price should be a single point value in U.S. Dollars for the applicable Company Assets on a cash-free, debt-free basis.  Any Bid for substantially all of the Company Assets must also include a statement as to whether the Bid is conditioned on purchasing all Company Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more Company Assets.  The Debtors reserve the right to ask any Qualified Bidder to allocate the value ascribed to the Bid for any particular Company Asset and to inquire about any significant assumptions on which such valuations are based.

3.    <u>Deposit</u>.  Each Bid must be accompanied by a cash deposit in the amount equal to ten percent of the aggregate Purchase Price of the Bid, to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

4.    <u>Terms; Specify Acquired Assets and Assumed Liabilities</u>.  Each Bid must identify the Company Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the Sale.

5.    <u>Committed Financing</u>.  If a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include unconditional committed financing from a reputable financing institution, documented to the satisfaction of the Debtors (in consultation with any Committee), that demonstrates that the Qualified Bidder has:  (a) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (b) adequate working capital financing or resources to finance going concern operations for the applicable Company Assets and the proposed transactions.  Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements,

9

diligence, or credit committee approvals, and shall have covenants and conditions reasonably acceptable to the Debtors, in consultation with any Committee.

6. <u>Contingencies; No Financing or Diligence Outs</u>. A Bid shall not be conditioned on obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence.

7. <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid and the complete terms of any such participation. Each Bid must also fully disclose whether any current or former officer, director, or equity holder of the Debtors, or any entity affiliated with any current or former officer, director, or equity holder of the Debtors, will be bidding or otherwise participating in connection with such Bid, including any employment or compensation arrangements being negotiated or agreed to between the Qualified Bidder and any employee of the Debtors. Under no circumstances shall any undisclosed insiders, principals, equity holders, or financial backers of the Debtors be associated with any Bid (including any Overbid (as defined below) at the Auction. Each Bid must also include contact information for the specific persons and counsel whom the Debtors' advisors should contact regarding such Bid. All information disclosed pursuant to this paragraph shall be made available by the Debtors to the Committee, if any, promptly upon the Debtors' receipt thereof but in any event no later than one business day following the Bid Deadline.

8. <u>Adequate Assurance of Future Performance</u>. Each Bid must (a) reasonably identify any executory contracts and unexpired leases of the Debtors to be assumed or assumed and assigned in connection with the Sale, (b) provide for the payment of all cure costs related to such executory contracts and unexpired leases by the Qualified Bidder, and (c) demonstrate, in the Debtors' reasonable business judgment, that the Qualified Bidder can provide adequate assurance of future performance under all such executory contracts and unexpired leases.

9. <u>Binding and Irrevocable</u>. A Qualified Bidder's Bid for the applicable Company Assets shall be irrevocable unless and until the Debtors notify such Qualified Bidder that such Bid has not been approved as a Successful Bid or a Backup Bid (each as defined below) at the Sale Hearing.

10. <u>Backup Bid</u>. Each Bid shall provide that the Qualified Bidder will serve as a Backup Bidder if the Qualified Bidder's Bid is the next highest or best bid with respect to the applicable Company Assets.

11. <u>Expenses; Disclaimer of Fees</u>. Each Bid (other than the Stalking Horse Bid(s), if any (solely to the extent set forth in the Stalking Horse Agreement(s)) must disclaim any right to receive a fee analogous to a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidders, if any, and, in that case, solely to the extent set forth in the Stalking Horse Agreement(s)) will be permitted to request at any time, whether as part of an Auction, if any, or otherwise, a breakup fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

12.     <u>Authorization</u>.  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to submit the Bid and consummate the proposed transaction; *provided* that, if the bidder is an entity specially formed for the purpose of effectuating the proposed transaction, then the bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the submission of the Bid and consummation of the proposed transaction by the parent company or sponsor of such bidder.

13.     <u>Employee Obligations</u>.  Each Bid must indicate whether the Qualified Bidder intends to hire all employees of the Debtors.  If the Qualified Bidder does not intend to hire all employees of the Debtors, the Qualified Bidder must include a description of the Qualified Bidder's intentions with respect to the relevant members of the Debtors' current management team and other employees who are employed primarily in connection with the applicable Company Assets, and a description of any contemplated incentive plan, if applicable.

14.     <u>As-Is, Where-Is</u>.  Each Bid must include a written acknowledgment and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Company Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or such assets in making its Bid; and (c) did not and will not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the applicable Company Assets or the completeness of any information provided in connection therewith or at an Auction, except those expressly stated in the Qualified Bidder's Purchase Agreement.

15.     <u>Acknowledgment of Compliance with Bidding Procedures, Bankruptcy Code, and Non-Bankruptcy Law</u>.  Each Bid must acknowledge that it has complied, and will continue to comply, in all respects with these Bidding Procedures (including, after the conclusion of any Auction, not to submit a Bid or seek to reopen the Auction), the Bankruptcy Code, and any applicable law.

16.     <u>Privacy Policies</u>.  The Qualified Bidder must comply in all respects with the Debtors' consumer privacy practices, which do not restrict the transfer of personally identifiable information of the Debtors' customers in connection with a bankruptcy, merger, acquisition, reorganization, or sale of assets, and each Bid must contain a statement acknowledging such compliance.

17.     <u>No Collusion</u>.  The Qualified Bidder must (a) acknowledge in writing that it has not engaged in any collusion with respect to any Bids or the Sale and (b) agree not to engage in any collusion with respect to the Bids, the Auction, or the Sale.

18.     <u>Confidentiality</u>.  By submitting a Bid, each Qualified Bidder agrees to treat such Bid (including any modifications, subsequent Bids, or Overbids) and any related information thereto as confidential and shall not publicly disclose such information without the written consent of the Debtors until the earlier of (a) the date that is one year following the Bid Deadline and (b) entry of an order by the Court requiring such disclosure.

19.    <u>Government Approvals and Time Frame for Closing</u>.  Each Bid must (a) include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; and (b) set forth an estimated timeframe for (i) obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale and (ii) the Qualified Bidder's expected date of closing the Sale, which must be reasonably likely to be consummated, if selected, within a timeframe acceptable to the Debtors, in consultation with any Committee.

20.    <u>Consent to Jurisdiction</u>.  By submitting a Bid, each Qualified Bidder agrees, and shall be deemed to have agreed, to submit to the jurisdiction of the Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing, as applicable.

21.    <u>Bid Deadlines</u>.  Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** by the Bid Deadline—on or before **4:00 p.m. (prevailing Central Time) on May 7, 2025, 2025** by:

      a.    <u>Debtors' Counsel</u>.  Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Paul Basta (pbasta@paulweiss.com); Christopher Hopkins (chopkins@paulweiss.com); Jessica I. Choi (jchoi@paulweiss.com); and Grace C. Hotz (ghotz@paulweiss.com).

      b.    <u>Debtors' Co-Counsel</u>. Carmody MacDonald P.C., 120 S. Central Avenue, Suite 1800 St. Louis, Missouri 63105, Attn: Thomas H. Riske (thr@carmodymacdonald.com); Nathan R. Wallace (nrw@carmodymacdonald.com); and Jackson J. Gilkey (jjg@carmodymacdonald.com).

      c.    <u>Debtors' Investment Banker</u>.  Moelis & Company LLC, 399 Park Ave., 4th Floor, New York, New York 10022 at Project_Chrome_2025_EXT@Moelis.com.

*provided*, *however*, that the Debtors reserve the right to reschedule or waive the Bid Deadline and related marketing process deadlines and hearing dates in their sole discretion.

## H.  Right to Credit Bid.

At the Auction, if any, any Qualified Bidder who has a valid and perfected lien on any assets of the Debtors' estates (a "<u>Secured Creditor</u>") shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Creditor's undisputed claims (a "<u>Credit Bid</u>"), to the extent permitted under section 363(k) of the Bankruptcy Code, as it relates to the Company Assets; *provided*, *however*, that any Secured Creditor that intends to participate in the Auction with a Bid that includes a Credit Bid shall, as a condition to

such participation, (a) notify the Debtors at least two business days prior to the applicable Bid Deadline that it intends to submit a Credit Bid and (b) provide all documentation requested by the Debtors to establish the lien, claims, and encumbered assets that will be the subject of the Secured Creditor's potential Credit Bid.

**I.  Evaluation of Qualified Bids.**

The Debtors shall evaluate all Qualified Bids and identify the Qualified Bid that is, in the Debtors' judgment, in consultation with any Committee, the highest or otherwise best Qualified Bid(s) for the applicable Company Assets being sold at the Auction (the "Baseline Bid(s)"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid(s) to each Qualified Bidder at or prior the Auction.

When determining the highest or otherwise best Qualified Bid(s) and selecting the Baseline Bid(s) and the Successful Bid(s), as compared to other Qualified Bids, the Debtors may consider the following factors in addition to any other factors that the Debtors deem appropriate (collectively, the "Bid Assessment Criteria"):

1.  the number, type, and nature of any changes to the form of Purchase Agreement or Stalking Horse Agreement, if any, requested by the Qualified Bidder, including the type and amount of assets sought and obligations to be assumed in the Qualified Bid;

2.  the amount and nature of the total consideration, including the assumption of liabilities;

3.  the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof;

4.  the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents;

5.  any regulatory requirements applicable to the Sale;

6.  the tax consequences of such Qualified Bid;

7.  the impact on employees, including the number of employees proposed to be transferred;

8.  the assumption of liabilities, including obligations under contracts and leases;

9.  the cure amounts to be paid; and

10.  the terms and conditions of a transition services agreement.

**J.  No Qualified Bids.**

If (a) the Debtors have entered into one or more Stalking Horse Agreements, such Stalking Horse Agreements have been approved pursuant to the Bidding Procedures Order, and no Qualified Bids other than the Stalking Horse Bids are received in accordance with these Bidding Procedures or (b) only one Qualified Bid is received, then the Debtors may cancel the Auction.  In such scenarios, the Debtors, in their reasonable business judgment, in consultation with any Committee, may designate the Stalking Horse Bid(s) or the only Qualified Bid as the Successful Bid for such Company Assets and pursue entry of the orders approving a Sale of the Company Assets to the Stalking Horse Bidder(s) (pursuant to the Stalking Horse Agreement(s)) or to the Qualified Bidder.

If the Auction is cancelled, the Debtors shall promptly file a notice of cancellation of the Auction and designation of the Stalking Horse Bid or only Qualified Bid as the Successful Bid with the Court.

**K.  Auction.**

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Company Assets or portion of Company Assets by the Bid Deadline, the Debtors shall conduct an Auction to determine the Successful Bidder (and Backup Bidder, as applicable) in their business judgment with respect to such Company Assets or portion of Company Assets in accordance with the procedures set forth herein.

The Auction, if necessary, shall take place on **May 14, 2025 at 9:00 a.m. (prevailing Central Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019, or by remote video, or such other date, time, and/or location as selected by the Debtors in consultation with the Committee.  If the Auction is rescheduled, the Debtors will file a notice with the Court disclosing the new date, time, and/or location, as applicable.

1.      The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the material terms of the Baseline Bid(s) for the Company Assets.  The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, including the Baseline Bid(s), all applicable Overbids, and the Successful Bid.

Only (a) Qualified Bidders and their legal and financial advisors and (b) the members of and advisors to any Committee shall be entitled to attend the Auction.  The Qualified Bidders shall appear at the Auction for which they are Qualified Bidders in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction.

The Debtors explicitly reserve the right, in their business judgment and after consultation with the Committee, to exercise their discretion in conducting the Auction, including determining

whether to adjourn the Auction to facilitate separate discussions between any Qualified Bidders and the Debtors, as applicable.

    2.    <u>Terms of Overbids</u>.

"<u>Overbid</u>" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid(s). Each applicable Overbid must comply with the following conditions:

    a.  **Minimum Overbid Increment.** The Overbid(s) for the Company Assets shall provide for total consideration with a value that exceeds the value of the consideration under the Baseline Bid(s) by an incremental amount that is not less than an amount to be announced at or before the commencement of the Auction (as applicable, the "<u>Minimum Overbid Increment</u>"), and successive Overbids shall be higher than the Prevailing Highest Bid (as defined below) by at least the Minimum Overbid Increment. The Debtors reserve the right to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Baseline Bid or Prevailing Highest Bid may include: (i) cash; (ii) assumption of liability, which shall be ascribed a value by the Debtors, in determining whether the Minimum Overbid Increment has been met; and (iii) in the case of a Bid by a Secured Creditor, a credit bid on a Secured Creditor's collateral of up to the full amount of such Secured Creditor's allowed secured claim pursuant to section 363(k) of the Bankruptcy Code.

    b.  **Conclusion of Each Overbid Round.** Upon the solicitation of each round of applicable Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Debtors.

    c.  **Overbid Alterations.** An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid so long as, after giving effect to the same, the terms of the Overbid are no less favorable to the Debtors' estates than any prior Bid or Overbid of such Qualified Bidder, as determined in the Debtors' reasonable business judgment after consultation with the Committee, and shall otherwise comply with the terms of these Bidding Procedures.

    d.  **Announcing Highest Bid.** Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified in the applicable Overbid round an Overbid (or combination of Overbids) as being higher or otherwise better than in the Overbid round, the Baseline Bid plus the Minimum Overbid Increment, or in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest

Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

3.   <u>Consideration of Overbids</u>.

The Debtors reserve the right, in their reasonable business judgment and after consultation with the Committee, to adjourn the Auction one or more times to, among other things: (a) facilitate discussions between and amongst the Debtors, the Qualified Bidders, and any Committee, as appropriate; (b) allow Qualified Bidders to consider how they wish to proceed; and (c) provide Qualified Bidders the opportunity to provide the Debtors and the Committee with such additional evidence as the Debtors, in their reasonable business judgment after consultation with the Committee, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Overbid amount.

4.   <u>Closing the Auction</u>.

The Auction shall continue until there is one Bid (or a combination of Bids) for the Company Assets to be sold at the Auction that the Debtors determine, in their reasonable business judgment and after consultation with the Committee, to be the highest or otherwise best Bid (or Bids) for the Company Assets.  Such Bid(s) shall be declared the "<u>Successful Bid(s)</u>" and such Qualified Bidder(s), the "<u>Successful Bidder(s)</u>," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

The Successful Bidder shall, within one business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Successful Bid.  The Successful Bid may not be assigned to any party without the consent of the Debtors after consulting with the Committee.

As soon as reasonably practicable after closing the Auction, and in any event not less than two business days following closing of the Auction, the Debtors shall cause a notice of Successful Bid and Successful Bidder to be filed with the Court, identifying the Successful Bidder, the Company Assets to be purchased in the Sale, and the key terms of the agreement.

If any Qualified Bid is modified before, during, or after an Auction, the Debtors reserve the right to require that such Qualified Bidder adjust its deposit so that it equals ten percent of the aggregate cash portion of the Purchase Price.

The Debtors shall not consider any Bids or Overbids submitted after the conclusion of the Auction, if any, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

5.     No Collusion; Good-Faith *Bona Fide* Offer**.**

Each Qualified Bidder participating in the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding and the Auction, (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder or Backup Bidder, and (c) it agrees to serve as the Backup Bidder if its Qualified Bid is the next highest or otherwise best bid after the Successful Bid.

**L.  Backup Bidder.**

The next-highest or otherwise second-best Bid for the applicable Company Assets, as determined by the Debtors in the exercise of their reasonable business judgment (in consultation with any Committee) (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder") for such assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction, if any, at the same time the Debtors announce the identity of the Successful Bidder.  The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder.  The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder.

The Backup Bidder shall, within one business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of the Backup Bid.  The Backup Bid may not be assigned to any party without the consent of the Debtors.

All Qualified Bids (other than the Successful Bid(s) and the Backup Bid(s)) shall be deemed rejected by the Debtors on and as of the date of approval of the Successful Bid and Backup Bid by the Court.

**M. Reservation of Rights.**

The Debtors reserve their rights to modify these Bidding Procedures, in their reasonable business judgment and after consultation with the Committee, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the Sale of the Company Assets, including:  (1) extending the deadlines set forth in these Bidding Procedures; (2) adjourning the Auction, including at the Auction, and/or the Sale Hearing, including in open court, with the notice described herein; (3) modifying the Bidding Procedures and/or adding procedural rules or methods of bidding that are reasonably necessary or advisable under the circumstances for conducting the Auction; (4) canceling the Auction; (5) waiving or imposing additional terms and conditions set forth herein with respect to Potential Bidders; and (6) rejecting any or all Bids.

17

**N. Approval of Sale Transactions.**

A hearing to consider the approval of a Sale to the Successful Bidder and the approval of the corresponding Backup Bid, if any (the "Sale Hearing"), will take place before the Honorable [●] at the Court, 111 South 10th St., 4th Floor, St. Louis, Missouri, 63102 on **June 2, 2025 at _:__ a.m./p.m. (prevailing Central Time)** (unless adjourned or canceled in accordance with these Bidding Procedures).

**The Sale Hearing may be adjourned or continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such adjournment or continuance will be required to be provided to any party (including any Stalking Horse Bidder).**

At the Sale Hearing, the Debtors, in consultation with their advisors, shall present the Successful Bid and any Backup Bid to the Court for approval. The Sale Order submitted at the Sale Hearing shall provide that: (1) if the Successful Bid is not consummated, the Debtors may file a notice with the Court designating the applicable Backup Bidder, if any, as the applicable Successful Bidder, and such Backup Bidder, if any, shall be deemed the Successful Bidder for all purposes; and (2) the Debtors will be authorized, but not required, to consummate all transactions contemplated by the applicable Backup Bid, once so designated as the Successful Bid, without further order of the Court or notice to any party.

**O. Return of Deposits.**

The Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court; *provided*, *however*, the Deposit of any Successful Bidder (including any Backup Bidder that becomes a Successful Bidder) may be forfeited to the Debtors or credited toward the Purchase Price set forth in the Successful Bid, in either case as set forth in these Bidding Procedures. The Deposit of any Qualified Bidder that is neither a Successful Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five business days after the Sale Hearing. The Deposit of the Backup Bidder, if any, shall be returned to such Backup Bidder no later than three business days after the closing of the Sale with the Successful Bidder. Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder (or Backup Bidder, as applicable) timely closes on its transaction, its Deposit shall be credited towards the applicable purchase price. If the Successful Bidder (or Backup Bidder, if applicable) fails to consummate a sale transaction because of a breach or failure to perform on the part of the Successful Bidder (or Backup Bidder, if applicable), the Debtors will not have any obligation to return the Deposit deposited by the Successful Bidder (or Backup Bidder, if applicable), and such Deposit shall irrevocably become property of the Debtors as partial compensation for the damages caused to the Debtors and their estates as a result of such breach or failure to perform without prejudice to any claims, rights, or remedies of the Debtors or their estates for additional damages.

**P.  Fiduciary Out.**

Nothing in these Bidding Procedures or any document filed with or entered by the Court in connection therewith shall restrain the board of directors, board of managers, or such similar governing body (including any special committee thereof) of any of the Debtors from taking any action or refraining from taking any action to the extent that such board of directors, board of managers, or such similar governing body (including any special committee thereof) determines, based on the written advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, the Bidding Procedures Order, or any document filed with or entered by the Court in connection therewith, through the date of the Auction (if held), nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, managers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Company Assets (each, an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternative Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

**<u>Exhibit 2</u>**

**Sale Notice**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |
| | Related Docket Nos. __ & __ |

### NOTICE OF AUCTION FOR THE SALE OF THE DEBTORS' ASSETS

**PLEASE TAKE NOTICE** that, on **[●]**, the United States Bankruptcy Court for the Eastern District of Missouri (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. __] (the "Bidding Procedures Order"),[2] authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to conduct an auction (the "Auction"), if any, to select the party or parties to purchase all or substantially all of the Debtors' assets (the "Company Assets" and, such transaction, the "Sale"). The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 1, the "Bidding Procedures"). ***All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.***

**PLEASE TAKE FURTHER NOTICE** that the **Bid Deadline is May 7, 2025, at 4:00 p.m. (prevailing Central Time)** and that any person or entity who wishes to participate in the Auction, if any, must comply with the participation requirements, bid requirements, and other requirements set forth in the Bidding Procedures.

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]   Capitalized terms used but not defined have the meanings ascribed to them in the Bidding Procedures Order, the Bidding Procedures, or the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. __] (the "Motion"), as applicable.

**PLEASE TAKE FURTHER NOTICE** that (a) the Bidding Procedures Order recognizes that the Debtors have not disclosed any policies prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtors, (b) any person or entity who wishes to participate in the Auction must comply in all respects with the Debtors' consumer privacy practices, which do not restrict the transfer of personally identifiable information of the Debtors' customers in connection with a bankruptcy, merger, acquisition, reorganization, or sale of assets, and (c) each Bid must contain a statement acknowledging such compliance, among other requirements.

**PLEASE TAKE FURTHER NOTICE** that the Debtors, if necessary, intend to conduct the Auction, if any, at which they will consider proposals submitted to them and their advisors, by and pursuant to the Bidding Procedures as set forth in the Bidding Procedures Order, on **May 14, 2025 at 9:00 a.m. (prevailing Central Time)** at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, or by remote video, or such other date and time location as selected by the Debtors in consultation with any Committee and timely communicated to all entities entitled to attend the Auction.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right to modify the Bidding Procedures, in their reasonable business judgment in accordance with the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that **June 2, 2025 at [●] [a.m./p.m.] (prevailing Central Time),** or as soon thereafter as the Debtors may be heard, shall be the date and time for the hearing at which the Bankruptcy Court will consider approval of the Sale **(**the "Sale Hearing"**).**

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Sale (the "Sale Objections") shall be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Procedure for the Eastern District of Missouri, set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estate or properties, the basis for the objection, and the specific grounds therefore, and be filed and served upon the following so that such objections are received by **May 26, 2025 at 4:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline") by: (a) counsel for the Debtors, (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn. Christopher Hopkins (chopkins@paulweiss.com); Jessica Choi (jchoi@paulweiss.com); and Grace C. Hotz (ghotz@paulweiss.com)), and (ii) Carmody MacDonald P.C., 120 S. Central Avenue, Suite 1800 St. Louis, Missouri 63105 (Attn: Thomas H. Riske (thr@carmodymacdonald.com); Nathan R. Wallace (nrw@carmodymacdonald.com); and Jackson J. Gilkey (jjg@carmodymacdonald.com)); (b) the Office of the United States Trustee for the Eastern District of Missouri, 111 South 10th Street, Suite 6.353, St. Louis, Missouri 63102 (Attn: Carole Ryczek (Carole.Ryczek@usdoj.gov) and Paul A. Randolph Paul.A.Randolph@usdoj.gov)); and (c) the Sale Notice Parties (as defined in the Motion).

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the full terms and conditions of the Motion, the Bidding Procedures Order, and the Bidding Procedures, and the Debtors urge parties in interest to review such documents in their entirety. Copies of the Motion, the Stalking Horse Agreement(s), if any, the Bidding Procedures, and the Bidding Procedures Order, in addition to any related documents that may be filed, may be obtained by accessing (a) the website of the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, at

https://restructuring.ra.kroll.com/23andMe, for no charge, or (b) the Court's internet site: https://www.moeb.uscourts.gov/, for a fee, through an account obtained from the PACER website at http://pacer.psc.uscourts.gov.

### CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY THAT FAILS TO TIMELY FILE AND SERVE AN OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE COMPANY ASSETS OF THE DEBTORS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS AFFECTED THEREUNDER.**

Dated: [●]
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:    (314) 854-8600
Facsimile:    (314) 854-8660
Email:        thr@carmodymacdonald.com
              nrw@carmodymacdonald.com
              jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:    (212) 373-3000
Facsimile:    (212) 757-3990
Email:        pbasta@paulweiss.com
              chopkins@paulweiss.com
              jchoi@paulweiss.com
              ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

4

**<u>Exhibit 3</u>**

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |
| | Related Docket Nos. __ & __ |

**NOTICE OF (I) POTENTIAL ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (II) PROPOSED CURE AMOUNTS**

 **You are receiving this notice (this "<u>Notice</u>") because you may be a counterparty to a contract or lease with one or more of the Debtors (as defined below) as set forth on <u>Appendix A</u> hereto.  Please read this notice carefully as your rights may be affected by the transactions described herein.**[2]

 **PLEASE TAKE NOTICE OF THE FOLLOWING**:

 1.  On [●] 2025, the United States Bankruptcy Court for the Eastern District of Missouri (the "<u>Court</u>") entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No.  __] (the "<u>Bidding Procedures Order</u>"),[3] authorizing the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") to conduct an auction (the "<u>Auction</u>"), if any, to select the party or parties to purchase all or substantially all of the Debtors' assets (the "<u>Company Assets</u>" and, such transaction, the "<u>Sale</u>").  The Auction will be governed by the bidding procedures approved pursuant to the Bidding Procedures Order (attached to the Bidding Procedures Order as Exhibit 1, the "<u>Bidding Procedures</u>").

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]  This Notice is being sent to counterparties to contracts and leases that may be executory contracts and unexpired leases.  This notice is not an admission by the Debtors that any such contract or lease is executory or unexpired.

[3]  Capitalized terms used but not defined have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

2.       Pursuant to the Bidding Procedures Order, the Debtors **may** assume and assign to the Successful Bidder the executory contract(s) or unexpired lease(s) listed on **Appendix A** attached hereto (each, a "Contract") to which you are a counterparty.  The Debtors have conducted a review of their books and records and have determined that the cure amounts required to be paid pursuant to Bankruptcy Code section 365(b) in respect of such Contract(s) (the "Cure Amount") are as set forth on **Appendix A** attached hereto.  **If you disagree with the proposed Cure Amount, object to the proposed assumption and assignment of the Contract(s) to the Successful Bidder, or object to the Successful Bidder's ability to provide adequate assurance of future performance with respect to any Contract(s), you must file an objection (a "Cure/Assignment Objection") stating with specificity the nature of your objection, with the Court no later than 4:00 p.m. (prevailing Central Time) on May 26, 2025 (the "Cure/Assignment Objection Deadline").**

3.       If no objection to (a) the Cure Amount, (b) the proposed assumption and assignment of any Contract, or (c) adequate assurance of the Successful Bidder's ability to perform is filed by the Cure/Assignment Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Amount as determined by the Debtors is correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Amount under the proposed assigned Contract, and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance.

4.       Any objection to the proposed assumption and assignment of a Contract or related Cure Amount in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

5.       Notwithstanding anything herein, the mere listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Contracts are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Contract as either rejected or assumed in connection with the Sale.

6.       Nothing herein (a) alters in any way the prepetition nature of any Contract or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Contract, (b) creates a postpetition contract or agreement, or (c) elevates to administrative expense priority any claims of a counterparty to any Contract against the Debtors that may arise under such Contract.

7.       This notice is subject to the full terms and conditions of the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict, and the Debtors urge parties in interest to review such documents in their entirety.  Copies of the Stalking Horse Agreement(s), if any, the Bidding Procedures, and the Bidding Procedures Order, in addition to

any related documents that have been or may be filed, may be obtained by accessing (a) the website of the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe for no charge, or (b) the Court's internet site: https://www.moeb.uscourts.gov/, for a fee, through an account obtained from the PACER website at http://pacer.psc.uscourts.gov.  The documents also may be obtained from the Debtors' claims and notice agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

[*Remainder of Page Intentionally Left Blank*]

Dated: [●], 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:     (314) 854-8600
Facsimile:     (314) 854-8660
Email:          thr@carmodymacdonald.com
                nrw@carmodymacdonald.com
                jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:     (212) 373-3000
Facsimile:     (212) 757-3990
Email:          pbasta@paulweiss.com
                chopkins@paulweiss.com
                jchoi@paulweiss.com
                ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

9

APPENDIX A TO CURE NOTICE

| Counterparty Name | Contract/Lease | Cure Amount |
| --- | --- | --- |

## **Exhibit 4**

**De Minimis Asset Sale Notice**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |
| | Related Docket Nos. __ & __ |

**NOTICE OF DE MINIMIS ASSET SALE**

On [●], 2025, the United States Bankruptcy Court for the Eastern District of Missouri (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] attached hereto as Exhibit A, by which the Court approved procedures by which the Debtors are authorized to sell or transfer certain assets with an aggregate purchase price equal to or less than $2,000,000 (the "De Minimis Assets").

**PLEASE TAKE NOTICE** that, pursuant to the Bidding Procedures Order, the Debtors propose to sell the De Minimis Assets as set forth and described on Exhibit B attached hereto (the "De Minimis Sale Assets"). Exhibit B identifies, for each De Minimis Sale Asset: (a) the De Minimis Sale Assets and their location, (b) the De Minimis Asset Purchaser its relationship, if any, to the Debtors, (c) the purchase price and other material economic terms and conditions of the sale, (d) the identity of any party asserting a lien, claim, interest, or encumbrance on any De Minimis Sale Asset, any such lien, claim, interest, or encumbrance attaching to the proceeds of the sale described in Exhibit B, and (e) other relevant information.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed sale of any De Minimis Sale Assets (each, an "Objection") must be filed and served so that such objection is filed with the Court and **actually received** by **4:00 p.m. (prevailing Central Time) on _____** (the "De Minimis Sale Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that, absent a timely filed objection to this De Minimis Asset Sale Notice, the Debtors are authorized to immediately consummate the De Minimis Asset Sale described in Exhibit B without further notice, hearing, or order of this Court.

**PLEASE TAKE FURTHER NOTICE** that, if you object to the De Minimis Asset Sale, the Debtors may not consummate the De Minimis Asset Sale unless you withdraw the objection, you resolve the objection with the Debtors, this Court specifically approves the De Minimis Asset Sale by further order, or your objection is overruled.

**PLEASE TAKE FURTHER NOTICE** that, if you object to the De Minimis Asset Sale, and you do not withdraw your objection or resolve your objection with the Debtors, the Debtors shall file a notice of hearing to contest your objection with the Court.

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE ON OR BEFORE THE DE MINIMIS SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE DISPOSITION OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN SUCH OTHER AGREEMENT WITH THE DE MINIMIS ASSET PURCHASER.**

PLEASE TAKE FURTHER NOTICE that copies of the Bidding Procedures Order, as well as all related exhibits, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retained in these chapter 11 cases) by calling (888) 367-7556 (U.S. and Canada) or (646) 891-5055 (International); (b) by visiting the website maintained in these chapter 11 cases at https://restructuring.ra.kroll.com/23andMe; or (c) for a fee via PACER by visiting http://pacer.psc.uscourts.gov.

Dated: [●], 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:    (314) 854-8600
Facsimile:    (314) 854-8660
Email:        thr@carmodymacdonald.com
              nrw@carmodymacdonald.com
              jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:    (212) 373-3000
Facsimile:    (212) 757-3990
Email:        pbasta@paulweiss.com
              chopkins@paulweiss.com
              jchoi@paulweiss.com
              ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

## **Exhibit A**

**Bidding Procedures Order**

## Exhibit B

**De Minimis Asset Sale List**

| De Minimis Asset(s) | Encumbrances on De Minimis Asset(s) | De Minimis Asset Purchaser | Relationship of De Minimis Asset Purchaser to Debtors (if any) | Price | Conditions of De Minimis Asset Sale | Sale Effective Date | Identity of any Party Asserting Encumbrance on De Minimis Asset(s) |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

**Exhibit 5**

**Abandonment Notice**

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |
| | Related Docket Nos. __ & __ |

### NOTICE OF ABANDONMENT OF ASSETS

On [●], 2025, the United States Bankruptcy Court for the Eastern District of Missouri (the "Court") entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"),[2] attached hereto as Exhibit A, by which the Court approved procedures by which the Debtors are authorized to abandon certain of their assets.

**PLEASE TAKE NOTICE** that, pursuant to the Bidding Procedures Order, the Debtors have determined, in the reasonable exercise of their business judgment, to abandon the property set forth and described on Exhibit B attached hereto (the "Abandoned Assets"). Exhibit B identifies, for each De Minimis Sale Asset: (a) the Abandoned Assets and their location, (b) a summary of the reasons for abandoning such property, and (c) the entity to whom the Abandoned Assets are proposed to be abandoned, if any.

**PLEASE TAKE FURTHER NOTICE** that any objection to the proposed abandonment of any Abandoned Assets  (each, an "Objection") must be filed and served so that such objection

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. [●]] (the "Motion").

is filed with the Court and **actually received** by **4:00 p.m. (prevailing Central Time) on** _____ (the "Abandonment Objection Deadline").

      **PLEASE TAKE FURTHER NOTICE** that, absent a timely filed objection to this Abandonment Notice, the Debtors are authorized to immediately abandon the Abandoned Assets described in Exhibit B without further notice, hearing, or order of this Court.

      **PLEASE TAKE FURTHER NOTICE** that, if you object to the abandonment of the Abandoned Assets, the Debtors may not abandon such assets unless you withdraw the objection, you resolve the objection with the Debtors, the Court specifically approves the abandonment by further order, or your objection is overruled.

      **PLEASE TAKE FURTHER NOTICE** that, if you object to the Abandonment Sale, and you do not withdraw your objection or resolve your objection with the Debtors, the Debtors shall file a notice of hearing to contest your objection with the Court.

### CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

      **ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE ABANDONMENT ON OR BEFORE THE ABANDONMENT OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE ABANDONMENT.**

      PLEASE TAKE FURTHER NOTICE that copies of the Bidding Procedures Order, as well as all related exhibits, are available: (a) upon request to Kroll Restructuring Administration LLC (the claims, noticing, and solicitation agent retained in these chapter 11 cases) by calling (888) 367-7556 (U.S. and Canada) or (646) 891-5055 (International); (b) by visiting the website maintained in these chapter 11 cases at https://restructuring.ra.kroll.com/23andMe; or (c) for a fee via PACER by visiting http://pacer.psc.uscourts.gov.

Dated: [●], 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:    (314) 854-8600
Facsimile:    (314) 854-8660
Email:        thr@carmodymacdonald.com
              nrw@carmodymacdonald.com
              jjg@carmodymacdonald.com

- and -


**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:    (212) 373-3000
Facsimile:    (212) 757-3990
Email:        pbasta@paulweiss.com
              chopkins@paulweiss.com
              jchoi@paulweiss.com
              ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

3

**<u>Exhibit A</u>**

**Bidding Procedures Order**

## Exhibit B

**Abandoned Assets**

| Abandoned Assets | Location of Abandoned Assets | Reasons for Abandonment | Entity to Whom the Abandoned Assets is Proposed to be Abandoned |
|---|---|---|---|
| | | | |

**<u>Exhibit 6</u>**

**Swift Declaration**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ANDREW SWIFT IN**
**SUPPORT OF DEBTORS' BIDDING PROCEDURES MOTION**

I, Andrew Swift, hereby declare under penalty of perjury:

1.      I am a Managing Director at Moelis & Company LLC ("Moelis") an investment banking firm with principal offices located at 399 Park Avenue, New York, New York 10022. Moelis is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases.  I submit this declaration (the "Declaration") in support of the Debtors' Bidding Procedures Motion.[2]

2.      Although Moelis is expected to be compensated for its work as the Debtors' proposed investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all of the facts set forth in this

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]    The *Debtors' Motion for Entry of An Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* (the "Bidding Procedures Motion"), filed contemporaneously herewith.  Capitalized terms used herein but not otherwise defined shall share the meanings ascribed to such terms in the Bidding Procedures Motion or the Bidding Procedures, as applicable.

Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by Moelis professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years, and I am authorized to submit this Declaration.

## Professional Qualifications

3.      I have more than 12 years of investment banking experience.  I have led engagement teams in complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities.  In particular, I have provided services to debtors and other constituencies in numerous restructurings, including: *In re Blink Holdings, Inc., et al.*, No 24-11686 (JKS) (Bankr. D. Del. 2024); *In re Invitae Corp., et al.*, No 24-11362 (MBK) (Bankr. D.N.J. 2023); *In re Diamond Sports Group LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. 2023); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. 2023); *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. 2023); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. 2019); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. 2018); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. 2016); and *In re Trinity Coal Corporation*, No. 13-50364 (TNW) (Bankr. E.D. Ky. 2013).

4.      I have been with Moelis since 2012.  I hold a Bachelor of Arts in history from the University of Michigan.  I am authorized to execute this declaration on behalf of Moelis.

## The Retention of Moelis

5.      Since its engagement, Moelis has rendered investment banking advisory services to the Special Committee (as defined below) in connection with its evaluation of financing and strategic alternatives.  Additionally, Moelis has worked with the Debtors' management and other

professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

### The Potential Sale Transaction

6.     As set forth in greater detail in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Pleadings* filed substantially contemporaneously herewith (the "First Day Declaration"), the Debtors commenced these chapter 11 cases with the goal of continuing their prepetition marketing efforts to sell all or a portion of their assets (the "Company Assets") through a court-overseen sale (the "Sale") and auction process (the "Auction").   In connection therewith, the Debtors propose to pursue the Sale in accordance with the Bidding Procedures.

### The Debtors' Marketing Process

7.     Prior to Moelis' involvement, I understand from the Debtors' advisors that in March 2024, the Special Committee of the Board of Directors of Debtor 23andMe Holding Co. (the "Special Committee") engaged Wells Fargo Securities, LLC ("Wells Fargo") as its independent financial advisor to assist the Special Committee in evaluating a potential strategic transaction for the Company.   I understand that as part of this process, Wells Fargo, at the discretion of the Special Committee, contacted 15 potential counterparties to assess potential third-party interest in the Company.   I also understand that such efforts did not result in an out-of-court transaction (the "Initial Outreach").

8.     Following the Initial Outreach, the Special Committee was repopulated in November 2024 with three new independent and disinterested directors, and shortly thereafter, the Special Committee selected Moelis to aid in its evaluation of strategic alternatives for the

Company.[3]  In January 2025, at the direction of the Special Committee, Moelis began (a) soliciting potential third-party interest in the acquisition of the Debtors for all or a portion of the Company's Assets or the Company's business segments, as well as potential financing sources for new financing for the Debtors (the "Prepetition Marketing Process"), and (b) working with the Special Committee and the Debtors to assist in the preparation of materials for the Prepetition Marketing Process.  As part of this process, the Debtors dedicated substantial time and effort to conduct outreach to strategic and financial investors and, in consultation with Moelis, determined which parties to contact based on the parties' involvement in the healthcare sector, potential capacity to consummate a transaction, and industry knowledge and experience (among other criteria).  In furtherance of the Prepetition Marketing Process, the Debtors, under the direction of the Special Committee and with Moelis' assistance, prepared a confidential information memorandum with extensive information on the Company Assets, populated a data room containing significant diligence documentation (the "Data Room"), and began outreach to potential buyers and financing parties.  On January 28, 2025, the Special Committee issued a press release announcing that it had undertaken a process to explore strategic alternatives, including among other alternatives, a possible sale of the Company, business combination, sale of all or part of the Company Assets, licensing of assets, restructuring, or other strategic action,[4] which resulted in additional inbound interest from third parties.

9.      The Debtors, under the direction of the Special Committee and its advisors, engaged with 103 potential counterparties (including all 15 counterparties who I understand were

---

[3]    In March 2025, Moelis's engagement was subsequently modified to account for its role as investment banker to both the Special Committee and the Debtors in connection with these chapter 11 cases.

[4]    *See* 23andMe Holding Co. press release dated January 28, 2025 (https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-announces-exploration-strategic).

contacted by Wells Fargo), including 51 potential strategic investors and 52 potential financial investors / financing counterparties (the "Contact Parties"), to evaluate a potential purchase of all or part of the Company Assets or an alternative potential investment in the Company. These efforts resulted in 90 introductory calls and the execution of 42 confidentiality agreements with the applicable counterparties receiving access to a comprehensive Data Room. Beginning January 30, 2025, and continuing throughout the Prepetition Marketing Process, Moelis distributed the confidential information memorandum and a preliminary financial model to the Contact Parties that had executed a confidentiality agreement. In the aggregate, the Debtors, with the assistance of Moelis, published over 180 diligence documents to the Data Room throughout the Prepetition Marketing Process covering financial, operational, legal, and other key items, and facilitated several diligence calls among the Debtors' management team, certain Contact Parties, and the Special Committee's and/or the Debtors' advisors.

10. In early February 2025, Moelis distributed a formal process letter requesting that the Contact Parties remaining in the process submit initial indications of interest no later than February 20, 2025 (the "Initial IOI Deadline"). The process letter provided to the Contact Parties included optionality for the Contact Parties to present indications of interest for the Company's equity or on a cash-free, debt-free basis for all or part of the Debtors, or the terms of a financing. In connection with the Initial IOI Deadline, Moelis, on behalf of the Special Committee, received multiple preliminary non-binding indications of interest from Contact Parties with various structures. Subsequent to the Initial IOI Deadline, Moelis continued to engage in discussions with Contact Parties about a potential transaction involving the Company, and received preliminary non-binding indications of interest from a few additional Contact Parties with respect to potential financing or asset acquisition transactions. None of the non-binding indications of interest

received in the Prepetition Marketing Process, other than an indication of interest from the Debtors' former Chief Executive Officer, co-founder, controlling stockholder and Chair of the Debtors' board of directors, provided for an out-of-court acquisition for 100% of the equity of the Company. Ultimately the Special Committee determined that the indications of interest received during the Prepetition Marketing Process were either (a) preliminary in nature and not currently actionable, (b) not actionable on an out-of-court basis, or (c) otherwise not in the best interest of the Debtors and their stakeholders. In addition, given the Debtors' financial condition and liquidity position, among other relevant factors, the Special Committee determined that it was in the best interests of the Debtors' stakeholders to pivot to an in-court sale process.

11.    The Debtors intend to continue the Prepetition Marketing Process on a postpetition basis to solicit binding bids and "market test" the interest they have received to attempt to consummate a Sale for the highest or otherwise best possible bid in an effort to maximize value. The marketing process will continue during these cases so that the Debtors can determine whether to seek approval of one or more Stalking Horse Bidders, host an Auction (if necessary), and solicit the highest or otherwise best possible bid for a Sale. I believe that Moelis' outreach and the receipt of several proposals under the Prepetition Marketing Process will maximize the likelihood of a robust in-court sale process and competitive Auction. The Debtors, with Moelis' assistance, are prepared to work closely with interested parties to explore and address potential transaction structures, diligence questions, timing, and process considerations. If any additional Contact Parties or any other potential interested parties reach out to the Debtors and/or their advisors or any additional potential interested parties are otherwise identified by the Debtors and their advisors, Moelis will coordinate execution of confidentiality agreements with such parties (to the

6

extent not previously executed), and facilitate such parties' diligence of the Company Assets over the coming days and weeks in accordance with the Bidding Procedures.

**The Bidding Procedures and Related Timeline**

12.     Prior to the Petition Date, the Debtors and their advisors worked diligently to develop the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids in a fair, accessible, and expeditious manner.  The Bidding Procedures are designed to implement a process allowing the Debtors to attempt to maximize the value of the Debtors' estates and resulting recoveries for their stakeholders.

13.     In my view, the Bidding Procedures establish a fair, transparent, and robust process to market test the value of the Company Assets and provide for an efficient timeline that is appropriate in light of the circumstances of the Debtors' chapter 11 cases.  I believe the market exposure resulting from the Prepetition Marketing Process and the postpetition marketing process contemplated by the Bidding Procedures are the best means currently available for the Debtors to seek to establish a fair and reasonable value for the Company Assets.  The timeline set forth in the Bidding Procedures was calculated to balance the need to provide adequate notice to parties in interest and potential bidders while enabling the Debtors to run a robust but efficient postpetition marketing and sale process in light of the Debtors' limited cash resources and ongoing cash burn.

14.     I believe that the key dates and deadlines the Debtors seek to establish pursuant to the Bidding Procedures allow for a clear and open process for the solicitation, receipt, and evaluation of Bids on a timeline that should enable the Debtors to consummate a Sale efficiently, while also affording potential bidders a reasonable opportunity to conduct due diligence, submit Bids to acquire the Company Assets, and participate in any Auction (if necessary):

7

| Action | Description | Deadline |
|---|---|---|
| Non-Binding Indication of Interest Deadline | The deadline for bidders to submit a non-binding indication of interest to the Debtors | April 13, 2025 Petition Date + 21 days |
| Stalking Horse Deadline | The deadline by which the Debtors may choose one or more Stalking Horse Bidder(s). | April 25, 2025 Petition Date + 33 days |
| Stalking Horse Notice Deadline | The deadline by which the Debtors must file a Stalking Horse Notice. | Within two business days after entry into a Stalking Horse Agreement |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | May 7, 2025 at 4:00 p.m. Petition Date + 45 days |
| Determination of Qualified Bids | The deadline by which the Debtors will determine which Bids are Qualified Bids and notify each potential bidder in writing whether such potential bidder is a Qualified Bidder. | May 9, 2025 Bid Deadline + 2 business days |
| Auction (if necessary) | The date and time of the Auction, which will be held at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019. | May 14, 2025 at 9:00 a.m. (Prevailing Central Time) Petition Date + 52 days |
| Notice of Successful Bidder | Within two business days following closing of the Auction, the Debtors will file on the docket a notice identifying the Successful Bidder, identifying the applicable Successful Bidder, Company Assets, and key terms of the agreement. | Within two business days following closing of the Auction (if any) |
| Deadline to File and Serve Cure Notices | The deadline by which the Debtors must file and serve Cure Notices to counterparties to Contracts to be assumed and assigned in connection with the Sale(s). | May 19, 2025 (seven days before the Sale Objection Deadline) |
| Sale Objection Deadline; Cure/Assignment Objection Deadline | The deadline by which objections to the Successful Bidder(s) and Sale(s), if any, or to the assumption and assignment of any Contracts in connection with the Sale(s) must be filed with the Court. | May 26, 2025 at 4:00 p.m. Petition Date + 64 days (seven days before the Sale Hearing) |
| Sale Hearing | The hearing, if any, before the Court to consider approval of the Successful Bid(s), pursuant to which the Debtors and the Successful Bidder(s) consummate the Sale(s). | June 2, 2025 Petition Date + 71 days |

15.     The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging potential bidders to submit competitive, value-maximizing bids for the Company Assets.   For example, the Bidding Procedures provide an opportunity for potential bidders to serve as a Stalking Horse Bidder and obtain Bid Protections, which I believe creates incentives that will further drive a competitive

process.   Moreover, I believe the Bidding Procedures will allow the Debtors to conduct the postpetition marketing process and the Auction, if held, in an efficient, fair, and open fashion that will attract Qualified Bidders with a demonstrated ability to close the Sale.  In addition, I believe the Bidding Procedures will foster an open marketing process with minimal barriers to entry, and the timeline contemplated therein affords potential bidders an appropriate opportunity to conduct the due diligence necessary to submit a Qualified Bid.

16.     I was involved in designing the Bidding Procedures, which I believe are generally consistent with procedures previously approved in cases of similar size and complexity.   The Bidding Procedures establish, among other things:[5]

- the requirements Potential Bidders must satisfy to access due diligence materials;

- the deadlines and requirements for submitting Qualified Bids and the methods and criteria by which such Bids are deemed to be timely "Qualified Bids" sufficient to trigger an Auction, if any;

- the manner in which Qualified Bids will be evaluated by the Debtors to determine the Baseline Bid for the Auction, if any;

- the conditions under which the Auction, if any, will take place, as well as the procedures for conducting the Auction; and

- various other matters relating to the Sale, including the designation of any Backup Bid, the return of any Deposits, and certain reservations of rights.

17.     In my opinion, the Bidding Procedures appropriately preserve the Debtors' ability to consider all Qualified Bids made at or prior to the Bid Deadline and likewise preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to seek to maximize the value of the Debtors' estates.

---

[5]     The summary that follows is provided solely for purposes of convenience.  In the event of any inconsistency with the Bidding Procedures, the Bidding Procedures shall govern in all respects.

### The Use of a Stalking Horse and the Bid Protections

18.     The Bidding Procedures and Proposed Order provide the Debtors with flexibility to select a Stalking Horse Bidder and provide Bid Protections on market terms in the form of a break-up fee and/or an expense reimbursement, subject to notice and an opportunity to object.  If the Debtors enter into a Stalking Horse Agreement, such Stalking Horse Bid will, for the benefit of the Debtors' estates, establish a floor for further bidding that may increase the consideration received in exchange for the Company Assets.  I believe that the ability to provide Bid Protections contemplated by the Bidding Procedures will facilitate the Debtors' efforts to induce potential bidders to become a Stalking Horse Bidder.  Accordingly, I believe that the ability to designate a Stalking Horse Bidder and provide such Stalking Horse Bidder with Bid Protections will further the Debtors' efforts to maximize the value of the Debtors' estates and, accordingly, represent a valid and sound exercise of the Debtors' business judgment.

19.     The Bid Protections identified in the Bidding Procedures Motion are, in my view and based on my experience, customary, reasonable, and in line with bid protections that stalking horse bidders typically require in comparable situations based on comparisons that I have reviewed alongside others on the Moelis team.  If the Debtors seek to appoint a Stalking Horse Bidder, it will be done on notice to parties in interest in these chapter 11 cases and an opportunity to object. I believe that allowance of the Bid Protections will account for a critical component of any Stalking Horse Bidder's commitment.  Any Stalking Horse Bidder will have expended, and will continue to expend, significant time and resources negotiating, drafting, and otherwise conducting the due diligence required by the Sale, despite the fact that any Stalking Horse Agreement (and related Bid Protections) will remain subject to potential Overbids by other bidders throughout the Sale process. Accordingly, I believe that the ability to designate a Stalking Horse Bidder and provide Bid Protections as set forth in the Proposed Order and Bidding Procedures represents a valid and sound

exercise of the Debtors' business judgment, and that the Court should approve such relief in conjunction with the Bidding Procedures.

## **Conclusion**

20.     Accordingly, for all of the foregoing reasons, I believe that the Bidding Procedures: (a) are designed to encourage robust bidding for the Company Assets; (b) are generally consistent with procedures previously approved in cases of similar size and complexity; and (c) appropriately suit the circumstances of these chapter 11 cases.  Given the details regarding the Debtors' Sale process described above—and my experience as a restructuring professional and involvement in other similar sale processes—I believe the Bidding Procedures are appropriate and that the Court should approve the Bidding Procedures.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 24, 2025

By:   /s/ Andrew Swift
Andrew Swift
Managing Director
Moelis & Company LLC