**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF MATTHEW KVARDA**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Matthew Kvarda, do hereby declare, under penalty of perjury, the following to the best of my information, knowledge, and belief:

1.      I am the Chief Restructuring Officer of 23andMe Holding Co., a Delaware corporation (collectively with its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases, the "Debtors" and, the Debtors with their non-Debtor affiliates,[2] "23andMe" or the "Company").

**Introduction**

2.      23andMe is a leading human genetics and telehealth company with a mission to help people access, understand and benefit from the human genome. The Company pioneered direct-to-consumer genetic testing through its saliva collection kits, providing customers with access to unique, personalized information about their ancestry, genetic traits and health risks through its Personal Genome Service® ("PGS") offerings. Through its collection of genetic information, 23andMe has developed one of the world's largest crowdsourced platforms for

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA, 94102.

[2]   Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

genetic research comprised of data from over 15 million customers. The scale of 23andMe's growing database of genetic information has enabled the Company to make over 100 health and carrier status reports available to its customers in the United States. Moreover, 23andMe is the *only* company to have Food & Drug Administration ("FDA") authorization, clearance or an exemption from premarket notification for all of the carrier status, genetic health risk, cancer predisposition and pharmacogenetics reports that it offers to its customers. Additionally, insights from the Company's expansive genetic database have promoted opportunities for the identification and validation of candidates for new drug development, which are primarily advanced through the Company's collaborations with universities, research institutions and pharmaceutical companies.

3.      The Company also operates a telehealth platform ("Lemonaid" or "Lemonaid Health") that provides customers access to personalized healthcare services and affordable, online medical care through licensed healthcare professionals. Patients can also use Lemonaid Health's online pharmacy for fulfillment when medications are prescribed by Lemonaid Health's affiliated healthcare professionals. Lemonaid Health allows the Company to further its mission of enabling people to use their genetic health information to live healthier lives, particularly as it relates to customers who choose to integrate their 23andMe genetic information with Lemonaid's telehealth services.

4.      Despite the revolutionary nature of the Company's business and its positive impacts on the lives of millions of its customers, the Company has not been immune to challenges arising from external market conditions and other developments. Over the last three years, rising inflation has increased the Company's operating expenses while downward trends in discretionary consumer spending negatively impacted sales of 23andMe's products and services. Additionally, over the past few years, consumer interest and demand for genetic testing kits declined. At the

same time, competition in the genetic ancestry testing space and consumer price sensitivity put downward pressure on the average sales price of the Company's saliva collection kits and other PGS offerings.  The Company has focused on increasing the value proposition to customers through enhanced products and features, but the often "one-time" nature of sales involving the Company's saliva collection kits resulted in a shrinking customer base and declining topline revenues.

5.      The telehealth space has also become increasingly crowded and requires substantial marketing investment to differentiate among peers who provide similar offerings. However, the Company's liquidity constraints limited its ability to invest in Lemonaid Health and thus, hindered the growth of this business.  Moreover, the Company's business model of using its PGS revenues to fund its now-discontinued Therapeutics business proved unsustainable, with the consumer-facing divisions not generating enough recurring revenue to cover the high costs of research and development ("R&D").

6.      The confluence of these factors has imposed severe liquidity pressures on the Company.  In addition, in October 2023, the Company identified and disclosed a data breach (the "Cyber Security Incident"), which resulted in numerous actions being filed or threatened against the Company in United States ("U.S.") federal and state courts, Canada and the United Kingdom ("U.K."), as well as the initiation of various domestic and foreign governmental investigations.

7.      In light of these challenges, Ms. Anne Wojcicki, the Company's then Chief Executive Officer, co-founder, controlling stockholder and Chair of the board of directors of 23andMe Holding Co. (the "Board"), communicated to the Board that she was exploring the possibility of taking the Company private.  In March 2024, the Board formed a special committee

of independent and disinterested directors (the "<u>Special Committee</u>") to review and evaluate strategic alternatives that might be available to the Company, including any proposal from Ms. Wojcicki. However, this initial process did not present any actionable transaction alternatives for the Company. In September 2024, the then-serving independent directors of the Board, including the then-serving members of the Special Committee, resigned.

8.     In October 2024, three new independent and disinterested directors were appointed to the Board as well as to the Special Committee, with the authority to review and evaluate strategic alternatives that might be available to the Company. In November 2024, under the supervision of the repopulated Special Committee, the Company implemented cost-cutting measures to improve its financial condition and restructured its operations, including by reducing headcount and shutting down its Therapeutics division (described below) in order to focus on the long-term success of its core consumer business and research partnerships. Although these efforts helped streamline the business and generate cost savings, the Company determined that it would still require additional capital, either in the form of outside financing or a sale of all or a portion of its assets, to address the Company's deteriorating liquidity position. To that end, in January 2025, under the authority of the Special Committee and with the assistance of its investment banker, Moelis & Company LLC ("<u>Moelis</u>"), the Company expanded its efforts to explore and evaluate potential third-party interest in a sale of the Company or all or a portion of its assets.

9.     Despite receiving multiple indications of interest—including proposals from Ms. Wojcicki—the Special Committee determined that the proposals either were (a) preliminary in nature and not currently actionable, (b) not actionable on an out-of-court basis or (c) otherwise not in the best interest of the Company and its stakeholders. Accordingly, the Company determined that, given its limited cash position and operating cash burn, as well as the

uncertainty surrounding the scope and extent of liabilities arising from the Cyber Security Incident, commencing these cases to stabilize the business and monetize its assets on a "free and clear" basis through a chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code, provided the best path to maximize value for the benefit of the Company's stakeholders.

10.     To ensure the Debtors' ability to run an efficient and expeditious sale process and continue operations in the ordinary course, the Debtors have secured a commitment from JMB Capital Partners Lending, LLC to provide a debtor-in-possession financing facility of up to $35 million (the "DIP Facility").  The DIP Facility will provide liquidity to support the Debtors' continued operations and fulfill commitments to its valued customers, employees, and vendors during the chapter 11 cases, while maintaining momentum on its sale process with a goal of maximizing value for the benefit of all stakeholders.  As further described below, the Debtors will fund these chapter 11 cases with unrestricted cash on hand until approval of the DIP Facility on a final basis at the second day hearing.

11.     In commencing these cases, the Company intends to (a) continue the Prepetition Marketing Process (as defined below) through a fair, robust, and transparent marketing process to maximize the value of the Company's assets through one or more sale transactions, (b) utilize the chapter 11 "toolkit" to preserve and maximize the value of its assets for the benefit of all stakeholders, and (c) move these cases forward as efficiently and expeditiously as possible to maximize distributions to stakeholders through a confirmed chapter 11 plan following the conclusion of the marketing process.

### Background and Qualifications

12.     I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M").  I received my Bachelor of Arts from the University of California at San Diego and a Masters in Business Administration from the University of California at Los Angeles.  I am also a

Certified Insolvency and Restructuring Advisor. I have over 30 years of distressed company advisory experience, and my primary areas of focus include formulating and evaluating strategic business plans and developing cash and liquidity forecasting and monitoring programs.

13.    I have advised clients in numerous complex chapter 11 cases, including Revlon, Inc., Penn Virginia Corp., Oakwood Homes Corporation, Denbury Resources Inc., Las Vegas Monorail Company, People's Choice Home Loan, Inc., and 155 East Tropicana LLC, a/k/a Hooters Hotel and Casino, among others. I previously served as the Chief Restructuring Officer during the chapter 11 cases of People's Choice Home Loan, Inc. and have also served as Chief Restructuring Officer in non-public situations. I have also served as interim Chief Financial Officer of distressed and non-distressed companies in both in-court chapter 11 proceedings and out-of-court restructurings, including Revlon, Inc., TEAM, Inc., and Jacuzzi Brands Corp. I have substantial knowledge and experience advising large companies and assisting financially distressed organizations with stabilizing their financial condition, developing business plans, and assessing restructuring alternatives.

14.    In addition, I, along with my team at A&M, are intimately familiar with the Debtors' businesses, financial affairs, and capital structure. Since A&M's initial engagement by the Company on January 28, 2025, my team and I have worked closely with the Debtors' management and other professionals in assisting with the myriad requirements of these chapter 11 cases. Consequently, in my capacity as Chief Restructuring Officer, I have developed significant relevant experience and expertise regarding the Debtors, their operations, day-to-day business affairs, books and records and the unique circumstances leading to the commencement of these cases.

15.     I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in gaining an understanding of the Company, its capital structure, the circumstances that led to the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases"), the Company's plans to emerge from chapter 11, and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "First Day Motions").    I am authorized by the Debtors to submit this Declaration.    If called as a witness, I could and would testify competently to the facts set forth in this Declaration.

16.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the Debtors' senior management, and information provided to me by the Debtors' professional advisors, including:    (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and Carmody MacDonald P.C., as restructuring co-counsel to the Debtors; (ii) Goodwin Procter LLP ("Goodwin Procter"), as counsel to the Special Committee; (iii) Moelis, as investment banker to the Debtors and the Special Committee; and (iv) A&M, as financial advisor to the Debtors.

17.     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief with the United States Bankruptcy Court for the Eastern District of Missouri (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the Chapter 11 Cases.    The Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.    The Debtors intend to operate their business and manage their properties as debtors in possession during the pendency of the Chapter 11 Cases.    No trustee or examiner has

been appointed in the Chapter 11 Cases. As of the date hereof, no statutory committees have been appointed at this time.

18. **Part I** of this Declaration describes the Debtors' business, including their history, organizational structure, business operations, and prepetition capital structure. **Part II** describes the events and circumstances leading to the commencement of these Chapter 11 Cases, including the Debtors' prepetition marketing processes. Finally, **Part III** sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

## I.    General Background

### A.    The Debtors' History

19. In 2006, Ms. Wojcicki co-founded the Company with Linda Avey and Paul Cusenza under the name 23andMe, Inc., as the first direct-to-consumer genetic testing company. Today, 23andMe is a leading direct-to-consumer genetic testing company, having built one of the world's largest crowdsourced platform for genetic research, with data from over 15 million customers, and is the first company of its kind to offer reports authorized by the FDA on genetic health risks, carrier status, and pharmacogenetics. By providing direct access to their genetic information, personalized reports, actionable insights and digital access to affordable healthcare professionals through the Company's telehealth platform, the Company empowers its customers to not only understand their genetic information but also to optimize their health leveraging insights from such information.

20. In June 2021, the Company's predecessor, VG Acquisition Corp. ("VGAC"), a special purpose acquisition company sponsored by Sir Richard Branson's Virgin Group, and Chrome Merger Sub, Inc. ("Merger Sub"), a wholly-owned direct subsidiary of VGAC, consummated a merger with 23andMe, Inc. (the "Merger"), whereby MergerSub merged with and into 23andMe, Inc., with 23andMe, Inc. being the surviving corporation and a wholly-

owned subsidiary of VGAC.  Upon the closing of the Merger, VGAC changed its name to 23andMe Holding Co., and Class A Common stock and public warrants of the Company began trading on the Nasdaq Global Select Market under the ticker symbols "ME" and "MEUSW," respectively, starting on June 17, 2021.

21.    Through the Merger, 23andMe raised approximately $592 million in gross proceeds to fuel growth and expansion in the Company's PGS and Therapeutics businesses.[3] 23andMe also invested in R&D to support these two businesses, with the goal of expanding and utilizing the Company's unique  database of genetic and phenotypic information to identify drug targets and help accelerate personalized healthcare at scale.

22.    In November 2021, 23andMe acquired Lemonaid Health, Inc., an on-demand platform providing access to medical care and pharmacy services online, offering telemedicine, lab and pharmacy fulfillment services to patients in all 50 states and the District of Columbia, at a purchase price of $400 million consisting of cash ($88.6 million) and the Company's Class A common stock.[4]  The addition of Lemonaid's telehealth services to the Company's consumer business enabled the Company to provide  healthcare to individuals in an affordable and accessible way, while presenting the opportunity to offer personalized healthcare, based on a patient's wellness, choices and genetics.

**B.    The Debtors' Organizational Structure**

23.    A summary chart (the "Organizational Chart") depicting the Debtors' current corporate structure is reflected below:

---

[3]    As of the date hereof, the Company has ceased operations of its Therapeutics division.

[4]    *See* 23andMe Holding Co., Form 8-K, at 2 (Nov. 1, 2021) (SEC).



24.    Lemonaid Health, Inc. has extensive contractual relationships with four non-Debtor professional medical corporations ("PMCs") that are 100% owned by licensed medical providers in four jurisdictions (California, New Jersey, Kansas and Texas).    Specifically, Lemonaid Health, Inc. has entered into a management services agreement ("MSA") with each PMC pursuant to which certain of the Debtors provide business, administrative and non-clinical services to the PMC in exchange for a fixed fee.[5]  Professional clinicians employed by the PMCs also provide medical services to patients via the Debtors' Lemonaid Health telehealth platform.

---

[5]    While Lemonaid Health, Inc. is the Debtor-counterparty to the MSAs, the services contemplated therein are also furnished by Debtor 23andMe, Inc. pursuant to an MSA subcontracting agreement between Debtors 23andMe, Inc. and Lemonaid Health, Inc.

### C.    The Debtors' Business

25.    The Debtors operate three businesses (each, a "Business Line"): (i) Personal Genome Service®, (ii) Telehealth and (iii) Research Services.  Each Business Line is supported by the Company's dynamic health data engine, allowing the Company to run hundreds of billions of association tests per year to identify potential associations between particular genes and health conditions.

### i.    Personal Genome Service®

26.    The Debtors' PGS offerings provide customers with a broad suite of genetic reports, including information on customers' genetic ancestral origins, personal genetic health risks, chances of passing on certain rare carrier conditions to their children, and how genetics can impact their response to certain medications.  By providing customers with direct access to their genetic disease risks and likelihoods, the Company empowers them to make better-informed decisions about their health and seek opportunities to take preventative action against disease.

27.    All PGS offerings require a customer to provide a saliva sample through the Company's saliva collection kit.  The saliva sample, which contains DNA from the cells in the customer's mouth, is sent to the Company's third-party laboratory services provider for DNA extraction and analysis.  Once the DNA has been extracted and processed in accordance with the Company's custom genotyping process, the resulting genetic data is then sent to the Company for purposes of analyzing and interpreting the customer's ancestry, traits and genetic health risks.



28.    In the U.S., Canada, and the U.K., the Company offers two PGS offerings: the Ancestry Service and Health + Ancestry Service.  The Ancestry Service is 23andMe's base service and provides customers information about their genetic ancestral origins and how genetics may influence over 30 traits, such as physical features, sense perceptions, reactions to external stimuli and other traits.  The service also includes a tool that enables customers who opt in to connect with genetic relatives who are also customers of the Company.

29.    The Company's Health + Ancestry Service builds upon its Ancestry Service to also provide reports relating to a customer's health predispositions (including certain cancers and other genetic health risks such as late-onset Alzheimer's disease), carrier status (including for cystic fibrosis, sickle cell anemia and hereditary hearing loss), and wellness (including for deep sleep, lactose intolerance and genetic weight).  Ancestry Service customers can upgrade to the Health + Ancestry Service for a fee.  These PGS offerings provide customers with updates on their genetic health and ancestry reports as well as access to new product features and ability to connect with genetic relatives.

30.     The Company also offers two membership services:  23andMe+ Premium and 23andMe+ Total Health.  The 23andMe+ Premium service is an annual membership that provides customers with exclusive reports and features not available in the basic Health +Ancestry Service.  This membership is an add-on to the Company's Health + Ancestry Service.  23andMe+ Premium provides customers with additional health reports, including multiple FDA-authorized pharmacogenetics reports and personalized risk score reports based on 23andMe's research.  These new risk scores can help customers understand certain genetic health predispositions, such as atrial fibrillation, coronary artery disease, high LDL cholesterol, hypertension and migraines, and provide them with information on preventing and managing these conditions.

31.     The 23andMe+ Premium membership also provides customers with advanced ancestry-related features, such as enhanced tools and filters for finding genetic relatives and historical matches.  In 2023, the Company added additional features to the 23andMe+ Premium membership with the introduction of 23andMe Health Action Plan and 23andMe Health Tracks.  These personalized action plans are part of 23andMe's broader effort to help its customers take action based on their genetic insights and other data.  Over time, the Company plans to continue to add more dynamic recommendation content and intuitive ways to track phenotypic inputs, with the ultimate goal of helping customers improve their health span.  The 23andMe+ Premium membership enhances customer engagement as members receive new content with discoveries about themselves throughout the membership period and meaningful and customized information to help them lead healthier lives.

32.     In November 2023, the Company launched 23andMe+ Total Health ("Total Health"), 23andMe's most comprehensive membership providing access to third-party independent clinicians practicing genetics-informed care with a focus on early risk detection and

13

preventative actions.  The Company's Total Health service combines membership and telehealth offerings with the addition of next generation sequencing covering 200x more hereditary disease-causing variants than the Company's personal genome service reports (50,000+ hereditary disease-causing variants in Total Health exome sequencing compared to 250 health-related variants in Company's genotyping carrier status and genetic health risk reports).  Total Health also includes blood testing and access to genetics-based clinical care.  As of fiscal year ended March 31, 2024, the Company's membership services (23andMe+ Premium and 23andMe+ Total Health) had a total of approximately 550,000 members.

33.     The majority of the Company's revenues are derived from the PGS Business Line, with revenue from PGS representing approximately 76% of total revenues for fiscal year ended March 31, 2024.

ii.    **Lemonaid Telehealth**



*The Company offers direct access to care with Lemonaid Health Telehealth Services, with a growing menu of options.*

34.     23andMe's Lemonaid telehealth platform powers the Company's telehealth capabilities.  Through the Lemonaid telehealth platform, the Company offers medical visits, prescriptions and memberships relating to the treatment of specific conditions and provides access

to certain medicine.  Specific memberships, such as those relating to mental health, insomnia, and weight loss, include access to clinician consults and necessary blood labs.  The Company also offers medical visits, prescriptions and memberships providing access to, and facilitating the delivery of, medication and treatments for a wide range of medical conditions.  Subscriptions are offered on a monthly basis, as well as on a prepaid quarterly or annual basis.  If a prescription is warranted, the patient can access 23andMe's pharmacy services for delivery.  The Company's pharmacy offers non-controlled medications for treatment of certain acute and chronic conditions. Lemonaid telehealth services are only available in the U.S. as of the Petition Date.

35.     Because many states limit the ownership of medical practices to licensed professionals and prohibit corporate ownership of medical practices, 23andMe offers medical services through affiliated PMCs that are owned by a licensed medical provider in the applicable jurisdiction.  All of the physicians and nurse practitioners who provide medical services to the Company's customers are employees of the PMCs.  Lemonaid Health, Inc. is party to an MSA with each PMC pursuant to which the Company provides business, administrative and non-clinical services to the PMC in exchange for a fixed fee and the PMC professional employees' ability to access patients through the Lemonaid telehealth platform.  These services include information technology, billing, insurance, tax, accounting and other administrative services, but do not include any clinical, diagnostic or treatment decisions, which are made solely by licensed practitioners based on evidence-based guidelines and clinical protocols.  The MSAs are exclusive arrangements, and the PMCs were established specifically to provide medical services through the Lemonaid telehealth platform.

36.     23andMe's customers may choose to fill prescriptions provided to them by the Company's affiliated healthcare professionals by using the Company's pharmacy services.

Debtor LPRXOne LLC, a mail order pharmacy based in St. Louis, Missouri, offers patients delivery of prescriptions throughout the U.S.  The Company's pharmacy services (and more generally all of Lemonaid Health's services) are provided on a self-pay basis and are not covered by third-party payors.  The Company also provides a small number of compounded medications that are fulfilled by a third-party service provider that is not affiliated with the Company.  23andMe manages its affiliated pharmacy under MSAs pursuant to which the Company provides all administrative services as well as licensed pharmacists, support staff and infrastructure.  The Company's MSAs with its affiliated pharmacy are exclusive arrangements, and the affiliated pharmacy was established specifically to provide prescription medications when patients choose to use the Company's platform to fill prescriptions written by 23andMe's affiliated healthcare professionals.

37.     As of fiscal year ended March 31, 2024, the Company's revenues from the Lemonaid telehealth Business Line comprised approximately 16% of the Company's total revenues.

### iii.    Research Services



38.    23andMe customers have the opportunity to participate in the Company's research programs, and more than 80% of 23andMe's customer base who are genotyped and eligible for research (the "<u>Consenting Customers</u>") have chosen to do so. Consenting Customers agree to allow the Company to use their genotypic data as well as phenotypic data the customers provide to 23andMe concerning their health, physical characteristics, family origins, lifestyle, and other habits.[6]  This has enabled the Company to unlock more than 5.5 billion unique phenotypic data points, making 23andMe's database one of the largest of its kind for research purposes in the world. The Company analyzes these data using machine learning and other analytic techniques in order to discover new biological insights. The Company's analyses may highlight new

---

[6]    Genotypic data is information about the genetic makeup of each individual human being. Phenotypic data is information that Consenting Customers report to the Company, including through their responses to the Company's online surveys, about their traits, conditions, diseases and other observable characteristics.

connections between human populations, identify genetic and non-genetic factors that predict disease risk or drug response, or reveal the biological pathways underlying disease. These insights may then be used to develop new features for customers to enhance their health, wellness, and medical care, including, for those customers who choose this option, care accessed through the Company's Lemonaid telehealth platform.

39.     Through its Research Services Business Line, 23andMe uses its vast database of genetic and phenotypic information to discover insights into the genetic origins of disease and to identify and validate targets for drug development. These services are performed under agreements with universities, research institutions, and pharmaceutical companies. For example, in July 2018, the Company entered into a five-year exclusive collaboration agreement (the "Original GSK Agreement") with an affiliate of GlaxoSmithKline ("GSK") to leverage 23andMe's genetic insights to validate, rapidly progress development, and commercialize useful new drugs. As of July 2023, the exclusivity period under the Original GSK Agreement terminated, enabling the Company to pursue new target discovery collaborations with other parties that can leverage 23andMe's extensive database and research capabilities. In October 2023, the Company entered into an amendment to the Original GSK Agreement (the "2023 GSK Amendment") to provide GSK with a non-exclusive license to certain new, de-identified, aggregated data from 23andMe's database (the "New Data"), as well as access to certain of the Company's research services with respect to such New Data.

40.     In addition, 23andMe offers services to pharmaceutical and biotechnology companies that leverage the Company's engaged research participants. Specifically, the Company supports recruitment of clinical trials with genetically defined recruitment criteria, as well as

promoting awareness of diseases with a significant genetic risk factor through the creation of sponsored health reports, cascade testing, and confirmatory testing.

41.     Furthermore, until November 2024, the Company operated its Therapeutics business, which sought to directly leverage the scale of 23andMe's genetic insights to identify potential targets and develop novel therapies for certain diseases.  Although the Company ultimately decided to cease its Therapeutics division as part of a broader restructuring to focus on its core consumer business, the promise shown by the Company's clinical and preclinical stage pipeline demonstrated the potential to license or otherwise monetize 23andMe's extensive database to discover new drugs.

42.     As of fiscal year ended March 31, 2024, the Company's revenues from its Research Business Line comprised approximately 8% of the Company's total revenues, a substantial portion of which comprise revenues generated from the 2023 GSK Amendment.

### D.    Manufacture, Supply and Laboratory Testing

43.     For its saliva collection kits and other products associated with its PGS Business Line, the Company does not have in-house manufacturing or laboratory testing capabilities and does not plan to develop such capacity in the foreseeable future.  23andMe has a quality system that is in compliance with 21 C.F.R. Part 820 and International Organization for Standardization 13485 for the regulated activities that are performed by the Company.  23andMe relies on third-party suppliers and laboratories, which have been qualified in accordance with the Company's quality system, to provide materials (such as 23andMe's saliva collection kits, bead chips, reagents or other materials and equipment used in its laboratory operations) and testing services.  Currently, the Company relies on a sole supplier to manufacture its saliva collection kits. Any changes in the design of certain materials which the Company relies on, such as 23andMe's bead chip or its saliva collection kit, may require additional authorization or clearance from the

FDA. Any laboratories utilized by the Company in connection with testing services would be required to obtain appropriate Clinical Laboratory Improvement Amendments of 1988 ("CLIA")[7] certification and state licensure (if required), including the validation of 23andMe's testing services in accordance with FDA and CLIA regulations and expectations.

E.   **Employees**

44.   As of the Petition Date, 23andMe directly employs approximately 286 individuals, of which 261 are compensated on a salaried, exempt basis and 25 are paid on an hourly basis (collectively, the "Employees"). All Employees are based in the U.S. Pursuant to the MSAs with the PMCs, the Debtors have exclusive responsibility for the payment of the PMCs' medical professionals' salaries and employee benefits (such professionals, the "PMC Professionals"). Moreover, 23andMe supplements its workforce by contracting with independent contractors (the "Contractors") and retaining temporary workers (together with the Contractors, PMC Professionals, and the Employees, the "Workforce") to support the organization. 23andMe's Workforce performs a wide variety of scientific, corporate, and administrative functions, including, among other things: (a) research and development; (b) sales, marketing and commercial strategy; (c) finance, accounting, legal, and human resources functions; (d) accounting, billing, and revenue collection services; (e) technology support and IT services; (f) business analysis and managerial support services; and (g) solely with respect to the PMC Professionals, provision of medical services to patients through the Debtors' telehealth platform.

F.   **Intellectual Property**

45.   Since inception, 23andMe has built an extensive patent estate (as summarized below) and intellectual property remains a critical part of the Company's mission.

---

[7]   The CLIA regulations establish quality standard for laboratory testing performed on specimens from humans, such as blood, bodily fluid, and saliva. *See* 42 U.S.C. § 263(a).

i.    **Consumer (PGS) Patent Estate**

46.    The Company's PGS patent estate consists of 127 granted U.S. patents, which include 106 utility and 21 design patents that cover technologies that include graphical user interfaces, aspects of algorithms for processing genetic data, computer implemented inventions, bioinformatics, and genotyping.  Included in these are patents that relate to the following PGS offerings: (i) 15 design and 67 utility patents relate to the Ancestry Service, (ii) 17 design and 67 utility patents relate to the Health + Ancestry Service, and (iii) 19 utility patents relate to the 23andMe+ Premium service.

47.    The PGS patent estate also includes 45 pending patent applications, which include one design application, 31 U.S. utility applications, two Patent Cooperation Treaty ("PCT") applications, five Canadian patent applications, and six European patent applications. Included in these are applications that relate to the following PGS services: (i) one design and 23 U.S. utility applications, six European patent applications, five Canadian patent applications, and one PCT application relate to the Ancestry Service, (ii) one design, 23 U.S. utility applications, six European patent applications, five Canadian patent applications, and one PCT application relate to the Health + Ancestry Service, and (iii) six U.S. utility applications, one European patent application, and one Canadian patent application relate to the 23andMe+ Premium service.

48.    The Company's PGS patent portfolio has expected expiration dates ranging from about 2027 to about 2044.

ii.    **Therapeutics Patent Estate**

49.    The Company also holds certain patents in connection with its Therapeutics business comprising four granted U.S. patents, one granted Nigerian patent and one South African patent that cover key areas of the Company's past therapeutic development candidates.  The therapeutics patent estate also includes 54 pending U.S. utility and foreign utility patent

applications, which include nine U.S. utility applications and 45 foreign utility patent applications, covering key areas of the Company's past therapeutic development candidates. These applications include those in the following jurisdictions: the PCT, Argentina, Taiwan, Australia, Brazil, Canada, Chile, China, Colombia, Costa Rica, Eurasia, Europe, Hong Kong, India, Indonesia, Israel, Iran, Japan, South Korea, Malaysia, Mexico, New Zealand, Nigeria, Peru, Philippines, Singapore, Thailand, Ukraine, Vietnam and South Africa. The subject matter of the therapeutics patent portfolio relates to immuno-oncology, inflammatory disease and other therapeutic areas. The Company's therapeutics patent portfolio has expected expiration dates ranging from about 2039 to about 2044.

50.     On November 8, 2024, the Company announced that it will cease substantially all operations in its Therapeutics business segment. Starting in late 2024, the Company engaged in discussions with potential third parties regarding the sale and/or license of its therapeutics assets and associated intellectual property. In March 2025, the Company entered into an agreement with a third party for the sale of one of its therapeutics assets, which sale is expected to close shortly after the Petition Date, as well as an exclusive worldwide licensing agreement with another third party with respect to a different therapeutics asset. Discussions relating to the sale and/or license of other therapeutics assets remain ongoing as of the Petition Date.

### G.     Government Regulation

51.     23andMe's genetic health risk, carrier status, and pharmacogenetic reports are subject to regulatory oversight by the FDA under provisions of the Federal Food, Drug, and Cosmetic Act and regulations thereunder, including regulations governing the development, marketing, labeling, promotion, manufacturing, distribution, and export of diagnostic products.

52.    The third-party laboratories that the Company contracts with to perform the laboratory portions of its service are subject to oversight by the Centers for Medicare and Medicaid Services pursuant to the CLIA, as well as agencies in various states, including New York.

53.    The Company is subject to many other federal, state and foreign laws, including anti-fraud and abuse, anti-kickback and patient privacy.  Failure to comply with applicable requirements can lead to sanctions, including withdrawal of products from the market, recalls, refusal to authorize government contracts, product seizures, exclusion from participation in federal and state healthcare programs, civil money penalties, injunctions, and criminal prosecution.

54.    The Company is engaged in ongoing privacy compliance and oversight efforts, including in connection with the requirements of numerous local, state, federal and international laws, rules, and regulations relating to the privacy and security of directly or indirectly identifiable personal information (collectively, "Data Protection Laws").  Such Data Protection Laws regulate the collection, storage, sharing, use, disclosure, processing, transferring, and protection of personal information, including genetic information, and evolve frequently in scope and enforcement.

55.    In the U.S., some of the notable Data Protection Laws that the Company is subject to include the California Consumer Privacy Act, as amended by the California Privacy Rights Act (collectively, the "CCPA"), the California Genetic Information Privacy Act, California Confidentiality of Medical Information Act, Section 5 of the Federal Trade Commission Act ("FTC Act"), the Telephone Consumer Protection Act of 1991 and, in the event of a data breach, various data breach laws across the 50 states.  The Company is also subject to at least ten state genetics privacy laws.

56.     Outside of the U.S., numerous countries have their own Data Protection Laws, including, but not limited to, the Canadian Personal Information Protection and Electronic Documents Act ("PIPEDA") and the EU General Data Protection Regulation ("EU GDPR"), now also enacted in the U.K. ("UK GDPR").

57.     Data Protection Laws are enforced by the FTC, government authorities and agencies, including state attorneys general and national or state data protection authorities.  Non-compliance with such Data Protection Laws may result in monetary liabilities and other remedial consequences, including the fines, civil litigation or regulatory orders that impacting the Company's use of personal information on a go-forward basis.

**H.     The Debtors' Capital Structure**

58.     As of the Petition Date, the Debtors have no funded debt obligations.  The Debtors have unsecured claims outstanding as of the Petition Date, a substantial portion of which comprise claims arising from the Cyber Security Incident (discussed in further detail below) and ordinary course trade claims.

59.     Debtor 23andMe Holding Co. is a publicly traded company and its shares trade on the National Association of Security Dealers Automated Quotations ("NASDAQ") Capital Market under the ticker ME.  23andMe Holding Co. has two classes of common stock: (i) the Class A common stock is publicly traded on the NASDAQ (the "Class A Common Stock") and (ii) the Class B common stock is not listed on any stock exchange nor traded on any public market (the "Class B Common Stock").  The rights of the holders of Class A Common Stock and Class B Common Stock are identical, except that holders of Class A Common Stock are entitled to one vote per share and holders of Class B Common Stock are entitled to ten votes per share. Each share of Class B Common Stock is convertible into one share of Class A Common Stock any time at the option of the holder and is automatically converted into one share of Class A Common

Stock upon transfer (except for certain permitted transfers).  As of the Petition Date, 23andMe Holding Co. has approximately 20,340,344 shares of Class A common stock and 7,099,035 shares of Class B common stock issued and outstanding.

## II.    Events Leading to Chapter 11

### A.    Adverse Market Conditions and Liquidity Constraints

60.    Although 23andMe's business has generated revenues in excess of $200 million per year over the last five years, the Company has not yet recognized any net profits since its inception.  Nevertheless, the Company has historically been able to operate and fund its operations primarily through issuances of equity, sales of its PGS offerings and Lemonaid telehealth services, as well as research partnerships.

61.    Macroeconomic headwinds and other market conditions constrained the Company's ability to access capital markets following the Merger, leading to significant liquidity constraints.  In addition, rising inflation coming out of the COVID-19 pandemic combined with the Federal Reserve's efforts to combat inflation through interest rate increases created macroeconomic conditions that adversely impacted the economy.  These factors led to increased costs of operating 23andMe's business, including vendor, supplier, freight and delivery costs, causing significant financial strain due to the Company's reliance on outsourced manufacturing and distribution capabilities as part of its business model.

62.    Moreover, the market for personal genetics products and services has experienced a recent overall decline, suggesting that consumers may choose to forego tests and services like those offered by 23andMe, leading to decreases in the Company's revenues (as well as those of the Company's direct competitors) in the PGS Business Line, which generates most of the Company's revenue.  The Company's consumer segment also faced increased competition in both the ancestry testing and telehealth industries at the same time the Company's revenue growth

slowed.  To compete in these increasingly competitive spaces, the Company lowered pricing to retain consumer demand.

63.    Investment in the Company's drug discovery programs at historical levels proved unsustainable in light of these challenges and the Company's dwindling cash position.  The decision to shut down its Therapeutics division and refocus the Company's resources on the consumer and telehealth segments streamlined operations and enabled the Company to right-size its cost structure.  Despite these efforts, however, the Company remains cash flow negative.  The negative press driven by the Cyber Security Incident, as described below, further dampened consumer demand.

### B.    Cyber Security Incident and Related Litigation

#### i.    Background

64.    On October 1, 2023, a threat actor posted online a claim to have 23andMe users' profile information. Upon learning of the incident, the Company immediately commenced an investigation and engaged third-party incident response experts to assist in determining the extent of any unauthorized activity. Based on its investigation, the Company determined the threat actor was able to access a very small percentage (0.1%) of user accounts in instances where usernames and passwords that were used on the Company website were the same as those used on other websites that had been previously compromised or were otherwise available (the "Credential Stuffed Accounts"). The information accessed by the threat actor in the Credential Stuffed Accounts varied by user account, and generally included ancestry information, and, for a subset of those accounts, health-related information based upon the user's genetics. Using this access to the Credential Stuffed Accounts, the threat actor accessed files containing information that users consented  to share when either opting in to 23andMe's DNA Relatives feature or the Connections

Feature..[8]  The Company determined that as a result of the Cyber Security Incident, the threat actor accessed, without authorization, personal information relating to approximately seven million customers.

### ii.   Litigation, Arbitration and Regulatory Investigations

#### (a)   Multi-District Litigation

65.   After the Company's announcement of the Cyber Security Incident, over 40 putative class action lawsuits were filed against 23andMe asserting claims for various common law torts and various statutory claims—including several that allege an entitlement to statutory damages under certain states' laws arising from the alleged unauthorized disclosure of genetic information.  On December 21, 2023, 23andMe filed a Motion to Transfer Actions to the Northern District of California Pursuant to 18 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings with the Judicial Panel on Multidistrict Litigation ("JPML"), MDL No. 3098 (the "Cyber Class Action").   On April 11, 2024, the JPML centralized the Litigation before the Honorable Edward M. Chen of the Northern District of California (the "MDL Court").   On June 5, 2024, the court in the Class Action Litigation appointed interim co-lead class counsel ("Class Counsel"), authorizing them to pursue the Class Action Litigation on behalf of the class action plaintiffs, and to engage in appropriate settlement negotiations on behalf of the plaintiffs and the putative class members.   On June 26, 2024, Plaintiffs in the Cyber Class Action filed their consolidated class action complaint against 23andMe, asserting various common law and statutory claims.

---

[8]   23andMe's "DNA Relatives" feature allows customers to find and connect with their genetic relatives, while the "Family Tree" feature automatically predicts a family tree based on the DNA shared by a customer with its relatives in 23andMe.  23andMe's "Connections" feature allows users to share information with another 23andMe user. Connections are established based on mutual agreement of the users—one user sends a Connection invitation and the other user accepts it to initiate the sharing of data between the users.

### (b)    State Court Litigation

66.    As of the Petition Date, nine actions have been filed against 23andMe in California state courts alleging similar causes of action asserted in the Cyber Class Action (the "State Court Actions").  Prior to the Petition Date, all state actions were stayed through May 22, 2025.  The vast majority plaintiffs in the State Court Actions are represented by one law firm (Potter Handy, LLP).

### (c)    Arbitration

67.    After 23andMe's announcement of the Cyber Security Incident, approximately 35,000 claimants in the U.S. asserted or threatened arbitration claims against the Company (collectively, the "Arbitration Claimants").  The vast majority of the Arbitration Claimants are represented by six independent law firms.  Some of the arbitrations have been filed with Judicial Arbitration and Mediation Services ("JAMS").

### (d)    Foreign Actions

68.    As of the Petition Date, two class actions have been filed in Canadian courts (one in Ontario and another in British Columbia).  Prior to the Petition Date, counsel to plaintiffs in the Ontario action ("Ontario Counsel") confirmed they had entered into a cooperation agreement with counsel to plaintiffs in the British Columbia action ("BC Counsel") pursuant to which both Ontario Counsel and BC Counsel agreed to coordinate the sequencing and timing of motions and other litigation-related events in their respective class actions.  At the last case management conference on December 13, 2024, the Canadian court scheduled a five-day hearing on various motions to be heard the week of June 16, 2025.

69.    One firm in the U.K. has also asserted a pre-arbitration demand, seeking damages on behalf of 3,720 customers in the U.K. who were allegedly impacted by the Cyber Security Incident.

(e)    **Regulatory Actions**

70.    In March 2024, the Federal Trade Commission ("<u>FTC</u>") served a civil investigative demand ("<u>CID</u>") seeking information related to, among other things, the Cyber Security Incident.  As of the Petition Date, 23andMe continues to respond to the FTC's demands on a rolling basis.

71.    In addition, a Multi-State Attorneys General investigation seeking information about the Cyber Security Incident has been brought by the U.S. state attorneys general or appropriate representatives of the States or Commonwealths of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming and the District of Columbia (collectively, the "<u>Attorneys General</u>").

72.    Outside of the U.S., 12 foreign regulators have inquired about the Cyber Security Incident, including a joint investigation initiated in June 2024 by Canada and the U.K.  In connection with their joint investigation, the Canadian and U.K. data protection regulators have submitted multiple information requests and conducted three interviews of employees at the Company with knowledge regarding or relating to the Cyber Security Incident.  All other inquiries and/or investigations involving foreign regulators have either been resolved or have gone dormant in the course of the last several months leading up to the Petition Date.

iii.    **Mediation and Settlement**

73.    The MDL parties entered into mediation before Mr. Randall Wulff, who presided over three mediation sessions taking place in January, March and June 2024.  The arm's-

length negotiation from the June mediation session resulted in Mr. Wulff's proposal for resolution of the Cyber Class Action litigation claims against 23andMe. In July 2024, the MDL parties accepted Mr. Wulff's proposal and informed the MDL Court that parties had reached an agreement in principle on the terms of a consensual settlement framework.

74. The MDL parties executed a confidential settlement term sheet on July 29, 2024, which contemplated an aggregate cash payment by the Company of $30.0 million to settle all claims brought on behalf of all U.S. persons whose personal information was impacted by the Cyber Security Incident. In addition, the Company agreed to document various business practice initiatives relating to cybersecurity and provide customers with the option to enroll in a privacy and monitoring service for three years. These terms were ultimately memorialized into and agreed upon as part of a settlement agreement (the "Class Action Settlement Agreement"). On September 12, 2024, plaintiffs filed a motion asking the MDL Court for preliminary approval of the Class Action Settlement Agreement, and the motion was considered at a court hearing on October 29, 2024. On October 29, 2024, the Court deferred the motion and asked the parties to provide additional information by November 12, 2024.

75. On December 4, 2024, the MDL Court granted preliminary conditional approval of the Class Action Settlement Agreement to resolve all claims by U.S. customers (who do not opt out) arising out of the Cyber Security Incident. The Court's order was conditioned upon the parties' acceptance of certain modifications to the Class Action Settlement Agreement, including the exclusion from the settlement class customers who have chosen to exercise their right to arbitrate, whether by making a demand for arbitration or by filing a formal complaint with an arbitral forum. Following the December 4, 2024 order, the Company engaged in discussions with the Cyber Class Action plaintiffs, as well as U.S. state court and arbitral claimants, regarding

a potential settlement that would resolve all claims by U.S. customers, including those who choose to exercise their arbitration rights.

76.    In December 2024, the Company retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") to assist the Company in settling the various lawsuits and claims arising from the Cyber Security Incident.  In January and February 2025, the Company engaged in settlement discussions with plaintiffs in State Court Actions represented by Potter Handy LLP (the "Settling State Court Plaintiffs"), as well as with Arbitration Claimants represented by three independent law firms (Labaton Keller Sucharow LLP, Levi & Korsinsky LLP and Milberg Coleman Bryson Phillips Grossman PLLC) (the "Settling Arbitration Claimants").  The Company entered into a binding term sheet with the Settling Arbitration Claimants on  February 13, 2025, and a binding term sheet with the Settling State Court Plaintiffs on February 18, 2025.  On March 21, 2025, the Company executed settlement agreements with both the Settling State Court Plaintiffs and Settling Arbitration Claimants.

77.    The cumulative effects of 23andMe's business performance, the Company's negative cash flows, and pending litigation and claims arising from the Cyber Security Incident proved to make it difficult, if not impossible, for the Company to access or attract equity or debt financing on an out-of-court basis on actionable terms, effectively limiting the Company's runway to find a solution to its existing cash-on-hand.

C.    **23andMe's Operational Restructuring Efforts**

78.    In an effort to address its worsening liquidity situation, under the supervision of the repopulated Special Committee, the Company implemented cost-cutting measures to improve its financial condition and preserve liquidity.  In November 2024, the Company announced that it would discontinue further development of all its Therapeutics programs and wind-down ongoing clinical trials for drugs in the Company's clinical and

31

preclinical stage pipeline.  In the same month, the Company also reduced its overall headcount by approximately 200 employees, representing roughly 40% of the Company's workforce at the time, in an effort to substantially reduce operating expenses and realize cost savings.  These efforts sought to restructure and strategically align the Company's workforce and organization with its current strategy of focusing on the long-term success of the Company's core consumer business and research partnerships.  In January 2025, the Company implemented further cost-cutting measures, including additional reductions in operating expenses and entering into negotiations with certain of its landlords to reduce (or terminate) rent expenses under the Company's long-term real estate leases.

### D.    Initial Prepetition Marketing Efforts

79.    The Company's business performance, liquidity position, and challenges in accessing the capital markets were all adversely affected by the Cyber Security Incident and ensuing litigation. These factors, coupled with Ms. Wojcicki's expression of her intent to consider making an offer to acquire the outstanding equity of the Company held by unaffiliated public stockholders, led the Board to initiate a process under the control of disinterested and independent directors to assess strategic alternatives for the Company.  Specifically, in March 2024, the Board formed and delegated to the Special Committee the Board's power and authority to, among other things, review and evaluate potential strategic transactions with potential acquirors, including Ms. Wojcicki, and the Company's other strategic alternatives (any such transaction or alternative, a "Potential Transaction"), as well as maintaining the status quo as a standalone company.  The Board determined to establish the Special Committee because Ms. Wojcicki and her affiliates,[9] as

---

[9]    Ms. Wojcicki and her affiliates owned, as of such date, approximately 49% of the total voting power of the Company's outstanding voting securities.

potential acquirors, could have an interest in a Potential Transaction that was different from, or in addition to, the interests of the Company's stockholders generally.

80.     Accordingly, since March 2024, the Board has relied on the Special Committee consisting of disinterested and independent directors to ensure that the Company's evaluation and review of strategic alternatives, including any Potential Transaction, whether with Ms. Wojcicki or with a third party, was thorough, fair, and free of potential conflict.

81.     Shortly after its formation, the Special Committee engaged Wells Fargo Securities, LLC ("Wells Fargo") as its independent financial advisor and Dechert LLP as its independent legal advisor to assist the Special Committee in evaluating a potential strategic transaction for the Company, including any proposal from Ms. Wojcicki.

82.     In April 2024, Ms. Wojcicki publicly announced that she was considering making a proposal to "acquire the [Company] in a potential go-private transaction."[10]   Ms. Wojcicki also announced that she was working with advisors and intended to begin speaking to potential partners and financing sources.  Ms. Wojcicki stated that any proposal by her would be conditioned irrevocably upon the approval of the Special Committee and a majority of the unaffiliated shareholders of the Company.  Ms. Wojcicki also indicated that she wished to maintain control of the Company and, therefore, would not support an alternative transaction.  As required by the Securities Exchange Act of 1934, as amended, Ms. Wojcicki disclosed the foregoing through an amendment to the report on Schedule 13D previously filed with the Securities and Exchange Commission ("SEC") by Ms. Wojcicki and certain of her affiliates (the "Schedule 13D").[11]

---

[10]   *See* Schedule 13D (Amendment No. 1) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 6 (Apr. 17, 2024) (SEC).

[11]   *See id.*

83.     Three months later, on July 29, 2024, Ms. Wojcicki submitted a non-binding indication of interest to the Special Committee to acquire all of the Company's outstanding shares of common stock not owned by Ms. Wojcicki and her affiliates (or any other stockholders that might be invited to "roll-over" their current equity shares) for $0.40 per share (the "July 29 Proposal").[12]   The July 29 Proposal remained subject to confirmatory due diligence, among other conditions, and did not include committed financing.[13]

84.     On August 2, 2024, the Special Committee rejected Ms. Wojcicki's July 29 Proposal on the basis that, among other things, the offer did not provide a premium to the closing price of the Company's publicly traded common stock as of July 31, 2024, it lacked committed financing, and it was conditional in nature.  The Special Committee requested that Ms. Wojcicki withdraw her stated intent to oppose any alternative transaction so that the Special Committee could fully assess whether there was interest from third parties in a transaction that would maximize value for all stockholders.[14]

85.     Shortly thereafter, in August 2024, Wells Fargo, at the direction of the Special Committee, contacted 15 potential counterparties to assess potential third-party interest in the Company (the "Initial Outreach"), assuming Ms. Wojcicki were to withdraw her stated intent not to support a transaction with a third party.  As a result of the Initial Outreach, one party signed a confidentiality agreement with the Company to facilitate further discussion.

---

[12]   Ms. Wojcicki's offer of $0.40 per share was proposed prior to the Company's 1-for-20 reverse stock split that was completed on October 16, 2024 in order for the Company to regain compliance with the minimum bid price requirement of the Nasdaq Global Market.  Ms. Wojcicki's July 29 Proposal equated to $8.00 per share calculated on a pro forma basis for the reverse stock split.

[13]   *See* Schedule 13D (Amendment No. 2) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 6 (July 31, 2024) (SEC).

[14]   *See* 23andMe Holding Co., Form 8-K, at 4 (Aug. 2, 2024) (SEC).

86.     In early September 2024, in response to requests from the Special Committee, Ms. Wojcicki notified the members of the Special Committee that she would be open to considering third-party takeover proposals for the Company and updated the disclosure in her Schedule 13D to reflect the same.[15] Ms. Wojcicki also continued to evaluate a potential go-private transaction involving the Company.[16]

87.     Shortly thereafter, the independent directors of the Board resigned.  In a public letter to Ms. Wojcicki, the independent directors noted that they believed that they had not received an actionable proposal from Ms. Wojcicki and would not receive one.[17]  The letter further explained that, given their divergence in views from Ms. Wojcicki, the independent directors' resignation would be "in the best interests of the Company's shareholders."[18]  Following such resignations, Ms. Wojcicki remained the sole director of the Company.

88.     In late September 2024, Ms. Wojcicki updated her prior statement in her Schedule 13D, indicating that she remained committed to completing an acquisition of the Company but would not consider third-party takeover proposals for the Company.[19]  In October 2024, Wells Fargo terminated its engagement letter with the Special Committee.

89.     On October 28, 2024 , the Board increased its size from one member to four members and appointed three new independent directors.  On November 2, 2024, the Special Committee was also repopulated with these three new independent and disinterested directors, who

---

[15] *See* Schedule 13D (Amendment No. 3) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 4 (Sept. 11, 2024) (SEC).

[16] *See id*.

[17] *See* 23andMe Holding Co., Form 8-K, at 4 (Sept. 18, 2024) (SEC).

[18] *See id*.

[19] *See* Schedule 13D (Amendment No. 5) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 4 (Sept. 30, 2024) (SEC).

still serve on the Special Committee as of the Petition Date.[20]  Shortly thereafter, the Special Committee selected Moelis, as its independent investment banker,[21] and Goodwin Procter, as its independent legal advisor, to aid in its evaluation of strategic alternatives for the Company, including a Potential Transaction.

90.     In January 2025, Paul, Weiss was authorized by the Special Committee to begin chapter 11 contingency planning in light of the Company's deteriorating liquidity position. In the same month, the Company also retained A&M, as financial advisor, to assist with the chapter 11 contingency planning.

### E.     Expanded Prepetition Marketing Process

91.     Beginning in January 2025, as set forth in greater detail in the *Declaration of Andrew Swift in Support of Debtors' Motion for Entry of An Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* filed contemporaneously herewith, Moelis, at the direction of the Special Committee, began soliciting potential third-party interest in the acquisition of the

---

[20]   As described below, on March 21, 2025, Mr. Thomas Walper was appointed to the Board and the Special Committee as an additional independent and disinterested director. As of the Petition Date, the Special Committee consists of Mark Jensen, Andre Fernandez, Jim Frankola and Thomas Walper.

[21]   In March 2025, Moelis's engagement was subsequently modified to account for its role as investment banker to both the Special Committee and the Company in connection with these Chapter 11 Cases.

Company for all or a portion of the Company's assets or business segments, as well as potential financing sources for new financing for the Company.

92.     As part of this process (the "Prepetition Marketing Process"), the Debtors,[22] with the assistance of Moelis, prepared a confidential information memorandum with extensive information on the Company's assets, and populated a data room (the "Data Room") containing significant diligence documentation.

93.     On January 28, 2025, the Special Committee issued a press release announcing that it had undertaken a process to explore strategic alternatives, including, among other alternatives, a possible sale of the Company, business combination, sale of all or part of the Company's assets, licensing of assets, restructuring, or other strategic action,[23] which resulted in additional inbound interest from third parties.  Shortly thereafter, in response to a request from the Special Committee, Ms. Wojcicki updated her prior statement in her Schedule 13D to indicate her willingness to consider third-party takeover proposals for the Company or other strategic alternatives that may be in the best interests of the Company.[24]

94.     Overall, as part of the Prepetition Marketing Process, the Debtors, under the direction of the Special Committee and its advisors, engaged with 103 potential counterparties, including 51 potential strategic investors and 52 potential financial investors / financing counterparties (collectively, the "Contact Parties").  These efforts resulted in 90 introductory calls and the execution of approximately 42 confidentiality agreements with the Company.

---

[22]   At all relevant times, the Debtors conducted the Prepetition Marketing Process under the authority of the Special Committee, and references to the "Debtors" in this section, where applicable, should be interpreted to mean that the Debtors took such action subject to the Special Committee's direction and oversight.

[23]   *See* 23andMe Holding Co. press release dated January 28, 2025 (https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-announces-exploration-strategic).

[24]   *See* Schedule 13D (Amendment No. 8) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 5 (Jan. 31, 2025) (SEC).

95.     Starting on January 30, 2025, and continuing throughout the Prepetition Marketing Process, Moelis distributed the confidential information memorandum and a preliminary financial model to Contact Parties that signed confidentiality agreements with the Company and provided such parties with access to the Data Room.  In the aggregate, the Debtors, with the assistance of Moelis, published over 180 diligence documents to the Data Room throughout the Prepetition Marketing Process, covering financial, operational, legal and other key items, and facilitated diligence calls among members of the Debtors' management team, certain Contact Parties, and the Special Committee's and/or the Debtors' advisors.

96.     In early February 2025, Moelis distributed a formal process letter requesting that the Contact Parties remaining in the process submit initial indications of interest no later than February 20, 2025 (the "Initial IOI Deadline").  The process letter provided to the Contact Parties included optionality for the Contact Parties to present indications of interest for the Company's equity or on a cash-free, debt-free basis for all or part of the Company, or the terms of a financing. Moelis also informed Ms. Wojcicki and her advisors of the Initial IOI deadline.  In connection with the Initial IOI Deadline, Moelis, on behalf of the Special Committee, received multiple preliminary non-binding indications of interest from Contact Parties with various structures, and a joint indication of interest from Ms. Wojcicki and New Mountain Capital L.L.C. ("New Mountain") seeking to acquire all of the Company's outstanding shares of common stock not owned by Ms. Wojcicki or her affiliates (or any other stockholders that might be invited to "roll-over" their current equity shares) at a price of $2.53 per share (the "February 20 Proposal").[25] Subsequent to the Initial IOI Deadline, Moelis continued to engage in discussions with Contact

---

[25]  *See* Schedule 13D (Amendment No. 9) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 4 (Feb. 21, 2025) (SEC).

Parties about a potential transaction involving the Company, and received preliminary non-binding indications of interest from a few additional Contact Parties with respect to potential financing or asset acquisition transactions.  None of the non-binding indications of interest received in the Prepetition Marketing Process, other than the indication of interest from Ms. Wojcicki and New Mountain, provided for an out-of-court acquisition for 100% of the equity of the Company.

97.     On March 3, 2025, Ms. Wojcicki filed an amendment to her Schedule 13D,[26] disclosing that Ms. Wojcicki had been informed that New Mountain was no longer interested in participating in a potential acquisition of the Company as described in the February 20 Proposal but that Ms. Wojcicki remained committed to completing an acquisition of the Company.  The amendment to Schedule 13D also included a copy of a non-binding proposal to acquire all of the Company's outstanding shares of common stock not owned by Ms. Wojcicki or her affiliates (or any other shareholders that might be invited to "roll-over" their current equity shares) for $0.41 per share, which Ms. Wojcicki had delivered to the Special Committee on March 2, 2025 (the "March 2 Proposal").  The March 2 Proposal also indicated that Ms. Wojcicki would be willing to provide $30 million of unsecured financing for the Company's operations through the closing of the potential transaction, subject to various conditions set forth in a term sheet provided with the March 2 Proposal.  Shortly thereafter, the Special Committee issued a press release indicating that it had reviewed the March 2 Proposal in consultation with its financial and legal advisors, and had determined to reject the proposal.[27]

---

[26]  *See* Schedule 13D (Amendment No. 10) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 4 (Mar. 3, 2025) (SEC).

[27]  *See* 23andMe Holding Co. press release dated March 3, 2025 (https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-rejects-acquisition-proposal-ceo-anne).

98.     On March 6, 2025, Ms. Wojcicki delivered a revised non-binding proposal to the Special Committee for upfront cash consideration of $0.41 per share and three contingent value rights representing the potential to receive an additional $2.53 per share in the aggregate if specified revenue milestones were achieved by the Company in fiscal years 2026, 2027 and 2028 (the "March 6 Proposal").[28]  As part of the March 6 Proposal, Ms. Wojcicki continued to indicate that she was willing to provide $30 million of unsecured financing, subject to various conditions, to the Company to finance its operations through the closing of the potential transaction. Thereafter, on March 10, 2025 and in response to certain requests of the Special Committee, Ms. Wojcicki submitted an updated non-binding proposal that further referenced a proposed commitment to provide $20 million of additional capital to fund the operations of the Company (the "March 10 Proposal").[29]  After the Special Committee endeavored to negotiate with Ms. Wojcicki, she notified the Special Committee that the March 10 Proposal was her best and final offer.  After consultation with its advisors, the Special Committee determined that the March 10 Proposal, which reflected Ms. Wojcicki's best and final offer, should be rejected.

99.     The Special Committee determined that the indications of interest received during the Prepetition Marketing Process, including Ms. Wojcicki's proposals, were either (a) preliminary in nature and not currently actionable, (b) not actionable on an out-of-court basis or (c) otherwise not in the best interest of the Company and its stakeholders.  In addition, given the Debtors' financial condition and liquidity position, the uncertainty surrounding the scope and extent of liabilities arising from the Cyber Security Incident and other relevant factors, the Special

---

[28]   In the March 6 Proposal, Ms. Wojcicki also noted that she and her advisors had "ran an exhaustive process to identify new financing, contacting over 100 potential providers of public and private equity as well as debt financing."  *See* Schedule 13D (Amendment No. 11) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 4 (Mar. 10, 2025) (SEC).

[29]   *See* Schedule 13D (Amendment No. 12) of ABeeC 2.0, LLC, ANNE WOJCICKI REVOCABLE TRUST U/A/D 9/2/09, AS AMENDED AND RESTATED, and Anne Wojcicki, at 4 (Mar. 11, 2025) (SEC).

Committee determined that it was in the best interests of the Debtors' stakeholders to pivot to an in-court sales process and leverage the ability to sell assets free and clear through a chapter 11 plan or pursuant to section 363 of the Bankruptcy Code, to maximize value for the benefit of the Debtors' stakeholders.

100.    Given the prospect of an imminent chapter 11 filing, the Company took certain steps to further modify and enhance its independent governance framework.  On March 7, 2025, the Board authorized resolutions that expanded the Special Committee's delegation of authority to include *all* matters related to a potential restructuring of the Company, including the authority to direct the Company to file for chapter 11 proceedings.  On March 16, 2025, the Special Committee authorized resolutions directing certain specified counsel to the Special Committee and to the Company to conduct a special review of the Company's governance, financial transactions, and business operations to assess the potential viability of legal claims that may be brought by various parties against any third party or any of the Company's directors, officers, managers, members, equity holders, principals, employees, and any other individual that is an insider of the Company (the "Investigation").  On March 21, 2025, the Special Committee authorized resolutions that approved (a) the filing of these Chapter 11 Cases, (b)  the filing of the Bidding Procedures Motion and engaging in a marketing process in accordance with the procedures contemplated therein, and (c) the retention of the Professionals.

101.    On the same day, Ms. Wojcicki, by mutual agreement between Ms. Wojcicki and the Special Committee, tendered her resignation as an officer of the Company to the Board, with such resignation effective at 5:00 p.m., Eastern Time, on March 23, 2025.  Ms. Wojcicki also stepped down as Chair of the Board (while continuing to serve as a director on the Board) and further resigned as director and/or officer, as appropriate, from various other Company

subsidiaries.[30]  Also on the same day, the Board authorized resolutions (a) appointing Mr. Mark Jensen as the Chairman of the Board, (b) appointing Mr. Joseph Selsavage as Interim Chief Executive Officer and Interim President, effective upon Ms. Wojcicki's resignation, (c) appointing me as the Chief Restructuring Officer of the Company, subject to and effective upon the filing of these Chapter 11 Cases, (d) expanding the size of the Board from four to five directors, and (e) appointing Mr. Walper as an additional independent director and appointing him to the Special Committee, in each case, effective upon the filing of these Chapter 11 Cases.  On March 23, 2025, the Special Committee (x) authorized resolutions designating and empowering Mr. Walper to exercise all of the power and authority of the Special Committee with respect to the Investigation, effective upon the filing of these Chapter 11 Cases and (y) approved specific guidelines governing, among other things, communications between Ms. Wojcicki and the Company's management, subject to appropriate oversight by the Special Committee and senior members of the Company's management team.

### F.  Proposed Debtor-in-Possession Financing

102.  As described in the *Declaration of Andrew Swift in Support of Debtors' Motion for Entry of (I) An Order (A) Authorizing Entry into and Performance Under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and the Work Fee Thereunder, and (B) Granting Related Relief and (II) An Order (A) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, and Provide Superpriority Administrative Expense Claims, (B) Modifying the Automatic Stay and (C) Granting Related Relief* (the "DIP Declaration"), filed contemporaneously herewith, certain parties involved in the Prepetition Marketing Process

---

[30]    These subsidiaries include: (i) 23andMe, Inc. (director and officer), Lemonaid Health, Inc. (director and officer), 23andMe Pharmacy Holdings, Inc. (officer) and Lemonaid Pharmacy Holdings, Inc (officer).

expressed interest in providing debtor-in-possession financing if the Debtors decided to pursue an in-court process. After evaluation of such potential proposals with the Special Committee, the Company, with Moelis' assistance, engaged in further discussions with such parties, which resulted in the Company's receipt of three written indications of interest in providing a DIP facility (the "Initial DIP Interest Parties"). The Initial DIP Interest Parties included both new, third-party capital providers as well as Ms. Wojcicki.

103.    Of the three indications of interest received, the Special Committee, with the assistance of its advisors, determined that only the proposals provided by JMB Capital Partners Lending, LLC (the "DIP Lender" and, such proposal, the "DIP Lender Proposal") and Ms. Wojcicki (the "Former CEO Proposal" and, together with the DIP Lender Proposal, the "Proposals") were potentially actionable. Accordingly, with the authorization of the Special Committee, the Debtors engaged in arm's-length and good faith negotiations with the counterparties to the Proposals (the "Counterparties") in the week leading up to the Petition Date.

104.    After engaging in multiple discussions and exchanging various drafts of term sheets and other documentation outlining the material terms of each Proposal with the Counterparties' advisors, the Special Committee determined that accepting the DIP Lender Proposal was in the best interests of the Debtors, including with respect to the Former CEO Proposal. On March 23, 2025, the Special Committee authorized the Company's advisors to move forward with documenting the DIP Lender Proposal. Shortly thereafter, the Company and the DIP Lender executed a binding term sheet (the "DIP Term Sheet"), under which it committed to provide the DIP Facility subject to certain terms and conditions set forth therein and as more fully detailed in the *Debtors' Motion for Entry of (I) An Order (A) Authorizing (A) Entry Into and Performance Under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and the Work Fee*

*Thereunder, and (B) Granting Related Relief and (II) An Order (A) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, and Provide Superpriority Administrative Expense Claims, (B) Modifying the Automatic Stay and (C) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith.

105.    As discussed in the DIP Motion, the DIP Term Sheet does not contemplate any funding at the outset of these Chapter 11 Cases.  Instead, the Debtors seek Court approval of an Approval Order (as defined in the DIP Motion), which would authorize them to enter into the DIP Term Sheet and pay the DIP Lender (a) a fully earned, non-refundable $100,000 work fee (the "Work Fee") for reimbursement of the DIP Lender's fees and expenses provided in connection with the DIP Facility, the preparation of the DIP Facility definitive documentation, and the other transactions contemplated by the DIP Term Sheet, and (b) a $700,000 fully earned, non-refundable cash fee equal to 2.00% of the total amount of the DIP Commitments (as defined in the DIP Motion) (the "Commitment Fee"), in each case, paid in cash no later than two business days after the entry of the Approval Order (as defined in the DIP Motion).

106.    Additionally, the Debtors seek entry of the DIP Order (as defined in the DIP Motion) at the second day hearing.  Upon entry of the DIP Order, the DIP Facility would allow the Debtors to (a) immediately access up to $10 million and (b) access the remaining $25 million upon the Court's approval of an Acceptable Stalking Horse Agreement no later than May 7, 2025, that either (i) is acceptable to the DIP Lender in its reasonable discretion or (ii) would repay, or generate sufficient cash proceeds to repay, the DIP Obligations.  The DIP Facility has an approximate six-month term[31] and customary covenants and terms for a facility of its size.

---

[31]    The DIP Facility shall be due and payable on the earliest of September 30, 2025 and certain other events, including (i) April 25, 2025 unless the DIP Order has been entered by the Court, (ii) the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; (iii) the date of the acceleration of loans issued pursuant to the DIP Facility and the termination of the DIP

107.    Access to the DIP Facility will instill much needed confidence in parties

that are critical to the success of these Chapter 11 Cases, including the Company's employees,

vendors and customers.  Based on my familiarity with the Company's operations and extensive

discussions with the Company's management team and advisors, I believe the DIP Facility should

provide the Company with sufficient liquidity to make it through the key sale process dates

described below.

### G.    Commencement of the Chapter 11 Cases

108.    In the absence of a viable out-of-court transaction and a shortening liquidity

runway, the Company determined to commence these cases to protect and seek to maximize the

value of the Debtors' assets for the benefit of all stakeholders.  Specifically, the Debtors intend to

use the tools provided by the Bankruptcy Code—including the breathing spell provided by the

automatic stay, the ability to reject burdensome contracts, the ability to sell assets free and clear of

prepetition liabilities and the ability to resolve all claims arising from the Cyber Security Incident

through a centralized claims resolution process—to preserve and seek to maximize value for the

benefit of the Debtors' estates and stakeholders.

109.    With the foundation for a successful marketing process in place and several

proposals indicative of a competitive auction in hand, the Debtors will utilize these Chapter 11

Cases to expand upon their Prepetition Marketing Process through a court-overseen sale and

auction process pursuant to their proposed bidding procedures, which are designed to maximize

value for all stakeholders.  If the Debtors' proposed bidding procedures are approved, such

procedures will allow the Debtors to (a) determine if any potential purchaser(s) should be

---

Commitments following the occurrence and during the continuation of an Event of Default (as defined in the DIP Term Sheet); (iv) the effective date of any chapter 11 plan with respect to the Company, and (v) dismissal of the Chapter 11 Cases or conversion into a case under chapter 7 of the Bankruptcy Code.

designated as a stalking horse bidder for some or all of the Debtors' assets, (b) host an auction, if necessary, and (c) obtain the highest or otherwise best possible bid for a sale of all or substantially all of the Debtors' assets, among other things.

110. To that end, contemporaneously herewith, the Debtors have filed the *Motion for Entry of An Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* (the "Bidding Procedures Motion"), which will request this Court's approval of bidding procedures for bids on one or more potential sales of their assets.

111. The proposed bidding procedures contemplate a sale process timeline that will allow the Debtors to move through these Chapter 11 Cases as quickly and efficiently as possible, while providing sufficient time to maximize the value of any transaction from the parties already active in the process and affording additional interested parties reasonable time to submit bids. A chart summarizing key dates and deadlines the Debtors seek to establish pursuant to the proposed bidding procedures is set forth below:

| Action | Description | Deadline |
|---|---|---|
| Non-Binding Indication of Interest Deadline | The deadline by which any party interested in purchasing the Company Assets must submit a non-binding indication of interest. | April 13, 2025 at 4:00 p.m. (prevailing Central Time) Petition Date + 21 days |
| Stalking Horse Deadline | The deadline by which the Debtors may choose one or more Stalking Horse Bidder(s). | April 27, 2025 Petition Date + 35 days |

| Action | Description | Deadline |
|---|---|---|
| Stalking Horse Notice Deadline | The deadline by which the Debtors must file a Stalking Horse Notice. | Within two business days after entry into a Stalking Horse Agreement |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | May 7, 2025<br><br>Petition Date + 45 days |
| Determination of Qualified Bids | The deadline by which the Debtors will determine which Bids are Qualified Bids and notify each potential bidder in writing whether such potential bidder is a Qualified Bidder. | May 9, 2025<br><br>Bid Deadline + 2 business days |
| Auction (if necessary) | The date and time of the Auction, which will be held at the offices of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York, 10019. | May 14, 2025 at 9:00 a.m.<br><br>Petition Date + 52 days |
| Notice of Successful Bidder | Within two business days following closing of the Auction, the Debtors will file on the docket a notice identifying the Successful Bidder, identifying the applicable Successful Bidder, Company Assets, and key terms of the agreement. | Within two business days following closing of the Auction (if any) |
| Deadline to File and Serve Cure Notices | The deadline by which the Debtors must file and serve Cure Notices to counterparties to Contracts to be assumed and assigned in connection with the Sale(s). | May 19, 2025 (seven days before the Sale Objection Deadline) |
| Sale Objection Deadline; Cure/Assignment Objection Deadline | The deadline by which objections to the Successful Bidder(s) and Sale(s), if any, or to the assumption and assignment of any Contracts in connection with the Sale(s) must be filed with the Court. | May 26, 2025<br><br>Petition Date + 64 days (seven days before the Sale Hearing) |
| Sale Hearing | The hearing, if any, before the Court to consider approval of the Successful Bid(s), pursuant to which the Debtors and the Successful Bidder(s) consummate the Sale(s). | June 2, 2025<br><br>Petition Date + 71 days |

112.    Importantly, in furtherance of the Company's ongoing commitment to protect the privacy and security of its customers' personal information, the proposed bidding procedures contemplate full compliance with the Company's existing consumer privacy practices, which do not restrict the transfer of personally identifiable information of the Debtors' customers in connection with a bankruptcy, merger, acquisition, reorganization or sale of assets. Specifically, the proposed bidding procedures will require any person or entity who wishes to participate in the Auction to comply, in all respects, with the Debtors' existing consumer privacy practices and will

require an affirmative statement as part of any bid acknowledgment of such compliance.  To the extent circumstances arise where any deviation from the Company's consumer privacy practices is warranted and/or necessary, the Debtors will implement any such change in accordance with applicable law(s), with adequate notice to applicable parties, and/or with necessary relief from this Court, as appropriate.

113.    In addition to seeking authority to implement procedures to govern the sale, bidding, and auction process for all or substantially all of the Company's assets, the Bidding Procedures Motion requests approval of procedures to govern the sale or abandonment of certain of the Company's assets that are of de minimis value (the "De Minimis Asset Procedures").  As mentioned previously, the Company intends to sell substantially all of their assets through a Court overseen sale process in accordance with the proposed Bidding Procedures.  However, the Company may identify assets (a) that are sellable only at values that do not justify the additional administrative cost and expense associated with maintaining such assets or conducting a formal auction process or (b) where the costs associated with the sale or maintenance of such assets may exceed any possible proceeds thereof.  The De Minimis Asset Sale Procedures will allow the Company flexibility to either monetize or abandon such assets, in each case, fairly and efficiently with appropriate notice given to key parties in interest and without unnecessarily burdening the Company's estates with unnecessary costs and delay.

## III.    First Day Motions[32]

114.    As a result of my first-hand knowledge, and review of various materials, and information, and discussions with members of the Debtors' management and advisors, I have

---

[32]    Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions, as applicable.

formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while working to maximize the value of their assets for the benefit of all stakeholders, and (c) the immediate and irreparable harm to which the Debtors will be exposed upon the commencement of these Chapter 11 Cases unless the limited relief requested in the First Day Motions is granted without delay.

115.    As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their advisors, to ensure that the Debtors' immediate operational needs are met so that the Debtors can continue their business in the ordinary course, and that the Debtors suffer no immediate and irreparable harm at the outset of these Chapter 11 Cases.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewed the pleadings related thereto.  At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor in possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases.  It is my opinion that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Motions is not granted.

## A.     Administrative Motions

   i.   *Debtors' Motion for Entry of an Order (I) Directing the Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion")

116.    Through the Joint Administration Motion, the Debtors request entry of an order directing the joint administration of these Chapter 11 Cases, and respectfully request that the

Clerk of the Court maintain one file and one docket for all of these Chapter 11 Cases and that the

cases be administered under a consolidated case caption as set forth below:

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA, 94102.

117.   I understand that many, if not all, of the motions, applications, hearings, and

orders that will arise in these Chapter 11 Cases will jointly affect all of the Debtors.  The joint

administration of the Debtors' respective estates will permit counsel for all parties in interest to

include all of these Chapter 11 Cases in a single caption and will enable parties in interest of all of

the Chapter 11 Cases to stay apprised of the various matters before the court.

118.   In addition, I believe that it would be far more practical and expedient for

the administration of the Chapter 11 Cases if the Court were to authorize their joint administration,

which will reduce costs and facilitate the administrative process by avoiding the need for

duplicative notices, applications, and orders.  It is my understanding that no prejudice will befall

any party by the joint administration of the Debtors' cases, as the relief sought therein is solely

procedural, and not intended to affect substantive rights.  Thus, in order to optimally and

economically administer these Chapter 11 Cases, the Debtors submit that such cases should be

jointly administered under the case number assigned to 23andMe Holding Co.  In light of the foregoing, the Debtors respectfully request that the Joint Administration Motion be granted.

      ii.   *Debtors' Motion for Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* (the "<u>Case Management Motion</u>")

119.    Through the Case Management Motion, the Debtors request authority to implement certain notice, case management, and administrative procedures (the "<u>Procedures</u>") in connection with the Chapter 11 Cases.  The Procedures, among other things, (a) establish requirements for the filing and service of Court filings, (b) delineate standards for notices of hearing and agendas, (c) articulate mandatory guidelines for the scheduling of hearings and objection deadlines, (d) limit matters that are required to be heard by the Court, and (e) authorize the Debtors to (i) schedule, in cooperation with the Court, periodic omnibus hearing dates, (ii) serve documents by email on certain parties in interest, (iii) establish a case information website to provide interested parties with access to certain documents filed in these Chapter 11 Cases, and (iv) use a claims and noticing agent to maintain and distribute documents.

120.    It is my belief that implementing the Procedures will maximize the efficiency and orderliness of the administration of the Chapter 11 Cases and reduce the costs associated with traditional case management procedures.  I also believe that granting the relief requested will limit the administrative burdens and costs associated with preparing for hearings and serving and mailing documents.  In addition, the Procedures will assist the Debtors and their personnel and professionals in organizing and prioritizing the numerous tasks attendant to these cases.  I understand that the Debtors estimate that implementing the Procedures will yield significant savings to these estates and will also avoid unnecessary costs and delays.  In light of the foregoing, the Debtors respectfully request that the Case Management Motion be approved.

      iii.    *Debtors' Motion for Entry of an Order (I) Extending the Time to File Schedules and Statements; (II) Extending the Time to Schedule the Meeting of Creditors; (III) Waiving the Requirements to File Equity Lists and Provide Notice to Equity Security Holders; (IV) Authorizing the Debtors to File (A) A Consolidated List of Counsel Representing Cyber Security Incident Claimants and (B) A Consolidated List of Other Unsecured Creditors of the Debtors, (V) Authorizing the Debtors to Prepare a Consolidated and Redacted List of Creditors in Lieu of Submitting Separate and Reformatted Creditor Matrices for Each Debtor; (VI) Approving the Form and Manner of Notifying Creditors of the Commencement of these Chapter 11 Cases; and (VII) Granting Related Relief* (the "Creditors Matrix Motion")*

121.    Through the Creditors Matrix Motion, the Debtors seek entry of an order (a) extending the 14-day period to file schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements") by an additional 22 days; (b) authorizing the Office of the United States Trustee for the Eastern District of Missouri (the "U.S. Trustee") to schedule the meeting of creditors after the 40-day deadline imposed by Bankruptcy Rule 2003(a); (c) waiving the requirements to file a list of equity security holders (the "Equity List") and to give notice of the order for relief to all equity security holders for 23andMe Holding Co.; (d) authorizing the Debtors to file a consolidated list of counsel representing Cyber Security Incident Claimants (as defined below); (e) authorizing the Debtors to file a consolidated list of other unsecured creditors of the Debtors; (f) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting separate and reformatted creditor matrices for each Debtor and (ii) redact or withhold certain confidential information of customers and personal information of individuals; (g) mail initial notices through Kroll Restructuring Administration LLC (the "Claims and Noticing Agent"); and (g) granting related relief.

122.    I believe that good cause exists for granting an extension of the time to file the Schedules and Statements. To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to claims, assets, leases, and contracts from each Debtor entity. Given the size and complexity of the Debtors' business and

financial affairs, this information is voluminous and collecting it will require an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term.  Accordingly, the 22-day extension the Debtors seek pursuant to the Creditors Matrix Motion is warranted because focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will maintain the stability of the Debtors' business operations and facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

123.    I understand that, pursuant to Bankruptcy Rule 1007(d), a chapter 11 debtor must file with its voluntary petition a list setting forth the names, addresses and claim amounts of the creditors, excluding insiders, that hold the twenty largest unsecured claims in the debtor's case (the "Top 20 List").  I also understand that one of the primary purposes of filing a list of a debtor's largest unsecured creditors is to facilitate the U.S. Trustee's evaluation of the types and amounts of unsecured claims asserted against a debtor so that the U.S. Trustee can make an informed decision when identifying potential candidates to serve on an official committee of unsecured creditors, if one is appointed.

124.    As discussed herein, numerous actions and claims have been filed or asserted against the Debtors as a result of the Cyber Security Incident.  Attempting to designate certain individual Cyber Security Incident Claimants as holding the "largest" unsecured claims for purposes of a Top 20 List would be arbitrary because the vast majority of pending claims are disputed, contingent, and/or unliquidated and therefore would be difficult to value.  I have been informed that, for this reason, debtors in mass tort cases regularly (a) list law firms representing plaintiffs who have filed or asserted claims against such debtors as part of a separate, standalone

list in lieu of listing individual claimants or plaintiffs as part of the Top 20 List and (b) implement certain procedures to provide notice to such claimants and their counsel. Accordingly, the Debtors believe, and I agree, that it would be appropriate to (x) provide a consolidated list of all of the law firms representing Cyber Security Incident Claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date (the "Cyber Security Incident Counsel List"), in lieu of listing individual Cyber Security Incident Claimants on a Top 20 List and (y) notice such claimants in the manner provided therein. I believe that, in both cases, doing so would facilitate the U.S. Trustee's appointment of any official creditors' committee to the extent one should be appointed and avoid any unnecessary costs to the Debtors' estate.

125.    In addition to the Cyber Security Incident Counsel List, to provide the U.S. Trustee with a clearer picture of the Debtors' creditor constituency, the Debtors have prepared a consolidated list of their thirty largest general unsecured creditors (the "Top 30 List"), excluding any Cyber Security Incident claimants, as opposed to a Top 20 List for each Debtor. Because the Debtors do not have any funded indebtedness and thus, the Debtors' significant unsecured creditors are captured on the Top 30 List, the Debtors will provide the U.S. Trustee with a sufficiently clear picture of the Debtors' unsecured creditor constituency. In addition, because a large number of creditors may be shared amongst the Debtors, the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service in these Chapter 11 Cases.

126.    Moreover, I understand that the Creditor Matrix Procedures instruct debtors to follow specific formatting requirements for electronically filed creditor matrices. The Debtors, working together with Kroll and A&M, have already prepared a single, consolidated list of all of the Debtors' creditors (the "Creditor Matrix") in electronic format. I believe that permitting the Debtors to maintain the Creditor Matrix, in lieu of filing individual and reformatted creditor

matrices for each Debtor, is warranted in these Chapter 11 Cases to ease the administrative burden of preparing individual creditor matrices for each Debtor and to avoid unnecessary cost, delay, and an increased risk of error. I believe that the Creditor Matrix will be sufficient to allow Kroll to provide notice to all creditors and other parties in interest during the Chapter 11 Cases.

127. I believe that redaction of the names, home and email addresses of natural persons is appropriate in these cases because (a) such information may be subject to data protection laws regulating the collection, storage, sharing, use, disclosure, processing, transferring and protection of personal information, including but not limited to the CCPA, Section 5 of the FTC Act, the UK GDPR, and the EU GDPR, and (b) disclosure risks violating such regulations and other similar laws, exposing the Debtors to potential civil liability and significant financial penalties. Accordingly, it is my belief that the Debtors have a duty to their customers and other stakeholders to maintain the confidentiality of their personal information and redaction of such information is warranted.

128. Finally, the Debtors also seek a waiver of certain of the requirements to file a list of, and to provide notice directly to, equity security holders as to Debtor 23andMe Holding Co. 23andMe Holding Co. is a publicly traded company with approximately 27.4 million shares of common stock. Accordingly, I believe that preparing and submitting an Equity List with the last known addresses for each such equity security holder and sending notices to all such parties with respect to 23andMe Holding Co. will be expensive and time consuming.

129. In light of the foregoing, the Debtors respectfully request that the Creditor Matrix Motion be granted.

## B. Operations-Related Motions Requesting Immediate Relief

> i. *Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services; (II) Deeming Utility Companies to Have Adequate Assurance of Future Payment; (III) Establishing Procedures for Determining Adequate Assurance of Payment; and (IV) Granting Related Relief* (the "Utilities Motion")

130. Through the Utilities Motion, to ensure continued provision of utility services (the "Utility Services") to the Debtors in the ordinary course of operation of their businesses, the Debtors seek entry of interim and final orders (a) prohibiting the Debtors' utility service providers (collectively, the "Utility Companies") from altering, refusing, or discontinuing utility services on account of unpaid prepetition invoices, (b) deeming the Utility Companies to have adequate assurance of future performance, (c) establishing procedures for determining additional adequate assurance of future payment and authorizing the Debtors to provide adequate assurance of future payment to the Debtors' Utility Companies, and (d) granting related relief. The Debtors expect their available cash and cash made available under any postpetition financing agreements will be more than sufficient to pay for the Debtors' postpetition use. Nonetheless, the Debtors propose establishing a segregated account into which the Debtors will deposit a sum equal to approximately 50% of the Debtors' estimated aggregate utility expenses for one month and, additionally, have proposed standard procedures to address any request made by the Utility Companies for additional adequate assurance.

131. Any disruption of the Debtors' Utility Services would cause substantial and irreparable harm to the Debtors' business operations, their estates, and their ability to preserve and maximize value through these Chapter 11 Cases. For the foregoing reasons, I believe that the relief requested in the Utilities Motion is in the best interest of the Debtors, their estates, and their creditors, and should therefore be approved.

  ii. *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion")

  132. Through the Taxes Motion, the Debtors request entry of interim and final orders (a) authorizing the Debtors to remit or pay (or use tax credits or other attributes to offset or otherwise satisfy) certain taxes and fees (the "Taxes and Fees") due and owing to various federal, state, local, foreign, and other applicable authorities (the "Authorities") that arose prior to the Petition Date (including any Assessment determined by Audit or otherwise determined to be owed for periods prior to the Petition Date), and (b) granting related relief, all as more fully set forth in the Taxes Motion.

  133. The Debtors pay and remit, as applicable, Taxes and Fees on a periodic basis, typically remitting them monthly, quarterly, annually, or on other terms to the Authorities, depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  Taxes and Fees typically (but not exclusively) are remitted and paid by the Debtors through checks and electronic transfers that are processed through their banks and other financial institutions or service providers.  From time to time, the Debtors also receive tax credits for overpayments or refunds in respect of Taxes or Fees.  The Debtors use these credits in the ordinary course of business to offset against future Taxes or Fees, or for other general corporate purposes, or have the amount of such credits refunded to the Debtors.

  134. The Debtors estimate that no more than approximately \$481,700 in Taxes and Fees have accrued as of the Petition Date or otherwise relate to the prepetition period and will become due and owing to Authorities after the Petition Date, of which approximately \$110,150 will become due to Authorities on or before the date on which a hearing is scheduled to consider approval of this motion on a final basis.

135.    I believe the Debtors' timely payment of the Taxes and Fees is necessary to prevent the adverse consequences that likely would result from a failure to remit the payments, including, but not limited to, causing Authorities to assert liens or seek to lift the automatic stay, impose civil and/or criminal penalties, or modify, suspend, or revoke licenses that are necessary to the Debtors' continued operations.  Such actions could materially disrupt the Debtors' day-to-day operations and impose significant costs on the Debtors' estates.  Failure to satisfy certain of the prepetition Taxes or Fees may jeopardize the Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.  I also believe that if certain Taxes and Fees remain unpaid, the Authorities may seek to recover such amounts directly from the Debtors' directors, officers, or employees, thereby distracting such key personnel from the administration of the Chapter 11 Cases.  Significant disruptions to the Debtors' operations of these types threaten to irreparably impair the Debtors' efforts in the Chapter 11 Cases.

136.    Moreover,  I believe that the Court should authorize the payment of Taxes and Fees because (a) certain of the Taxes and Fees may not constitute property of the Debtors' estates, (b) certain of the Taxes and Fees are or may be priority claims.  Absent payment of these amounts, the Debtors may face serious disruptions and distractions during the administration of the Chapter 11 Cases, thus hindering the Debtors' efforts to maximize estate value through these restructuring proceedings.

137.    Specifically, I understand from counsel that certain Taxes or Fees are collected or withheld by the Debtors on behalf of the applicable Authorities are held in trust by the Debtors.  Because the Debtors may not have an equitable interest in funds held on account of such "trust fund" taxes, the Debtors should be permitted to pay those funds to the Authorities as they become due.  I also understand from counsel that claims for certain of the Taxes and Fees are or

may be priority claims entitled to payment before general unsecured claims pursuant to section 507(a)(8) of the Bankruptcy Code.  Therefore, payment of certain Taxes and Fees at this time only affects the timing of the payment for the amounts at issue and will not unduly prejudice the rights and recoveries of junior creditors.  Payment of such Taxes and Fees will likely give Authorities no more than that to which they otherwise would be entitled under a chapter 11 plan of reorganization and will save the Debtors the potential interest expense, legal expense, penalties, and other fees that might otherwise accrue on Taxes and Fees during these Chapter 11 Cases.

138.    I also believe that some of these Authorities may initiate audits, attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies if the Debtors fail to pay the Taxes and Fees promptly.  Such actions would further divert attention and resources from the process of administering these Chapter 11 Cases and harm the Debtors' estates.

139.    For the foregoing reasons, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and their creditors, and should therefore be approved.

iii.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of Cash Management System, (B) Maintenance of Bank Accounts and Business Forms, (C) Performance of Intercompany Transactions, and (D) Certain Prepetition Obligations to be Honored; (II) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors; (III) Waiving Strict Compliance with 11 U.S.C. § 345(b) and Certain Operating Guidelines, as Applicable; and (IV) Granting Related Relief* (the "Cash Management Motion")

140.    Through the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) continue using their existing cash management system and honoring prepetition obligations related thereto, (b) maintain their existing business forms and books and records, and (c) continue certain intercompany transactions, and granting

administrative expense priority to the intercompany claims.  As described in detail in the Cash Management Motion, the Debtors maintain an integrated cash management system in the ordinary course of their operations.  To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these Chapter 11 Cases, it is vital that the Debtors be permitted to maintain their cash management system and be authorized to, *inter alia*, pay any outstanding bank fees owed in relation to their cash management system, continue utilizing their corporate credit cards, maintain their existing business forms, and continue engaging in ordinary course intercompany transactions.  The Debtors believe that each of their bank accounts complies with section 345(b) of the Bankruptcy Code because it is maintained at a bank that is (a) an authorized depository in accordance with the U.S. Trustee Guidelines and/or (b) insured by the Federal Deposit Insurance Company.

141.    If the Debtors are required to alter the way in which they collect and disburse cash throughout the cash management system, I believe that their operations would experience severe disruptions, which ultimately would frustrate the Debtors' ability to effectuate a restructuring and/or sale transaction and maximize the value of their estates for the benefit of all stakeholders.  It is, therefore, critical that the Debtors be able to continue to utilize their existing cash management system to consolidate management of cash and centrally coordinate transfers of funds to efficiently and effectively operate their business.  Accordingly, the Debtors request that the relief requested in the Cash Management Motion be approved.

iv.    *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Continue Prepetition Insurance Policies and Pay All Prepetition Obligations in Respect Thereof and (II) Granting Related Relief (the "*Insurance Motion*")*

142.    Through the Insurance Motion, the Debtors request entry of an interim and final order (a) authorizing the Debtors to (i) continue to maintain and administer their prepetition insurance program and revise, extend, renew, supplement, or change policies thereunder, as

needed, and (ii) pay or honor obligations arising under or in connection with their insurance

program, including prepetition obligations arising in the ordinary course of business, if any, and

(b) granting related relief.

143.    In the ordinary course of the Debtors' business and as more fully described

in the Insurance Motion, the Debtors maintain a comprehensive insurance program comprised of

approximately 34 insurance policies that are administered by various third-party insurance carriers.

These programs provide coverage for, among other things, losses related to the Debtors' property,

automobiles, crime, cargo and stock throughput, cyber and technology liability, directors' and

officers' liability, employers' liability, medical malpractice, workers' compensation, and various

other property-related and general liabilities.  In many instances, insurance coverage is required

by the various regulations, laws, and contracts that govern the Debtors' commercial activities.  The

Debtors do not believe that they owe any prepetition amounts to any broker or insurance carrier

on account of insurance premiums, retentions, deductibles, or broker fees.  Out of an abundance

of caution, however, the Debtors seek the authority to honor any amounts owed on account of the

foregoing, including any prepetition amounts, in the ordinary course of business .

144.    I believe that maintaining the Debtors' insurance program, including paying

any premium payments, retentions, deductibles, and broker fees, is a crucial ordinary course of

business transaction, and essential to the preservation of the value of the Debtors' business,

properties, and assets in these Chapter 11 Cases.  Additionally, in many instances the maintenance

of these insurance programs is required by statute or regulation.  Furthermore, it is my

understanding that, under the Operating Guidelines for Chapter 11 Cases issued by the United

States Trustee for Region 13, the Debtors are obligated to maintain certain insurance coverage

during these Chapter 11 Cases, and such coverage is provided by certain of the policies included

in the insurance program. Consequently, authority to pay any prepetition obligations related to the insurance program—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided—is imperative.

145.    For the foregoing reasons, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and should therefore be approved.

v.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Prepetition Employee Wages and Benefits and (B) Continue Employee Benefits Programs and Pay Related Obligations and (II) Granting Related Relief* (the "Wages Motion")

146.    Through the Wages Motion, the Debtors seek authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, other compensation, payroll processing services, federal and state withholding taxes and other amounts withheld (including garnishments, Workers' share of insurance premiums, flexible and health savings account contributions, 401(k) contributions, and taxes), reimbursable expenses, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, ordinary course non-insider bonus, non-insider retention programs, retirement and savings plans, and other benefits that the Debtors have historically provided in the ordinary course, all as more fully described in the Wages Motion (collectively, the "Compensation and Benefits").

147.    As discussed herein, the Debtors employ, in the aggregate, hundreds of full-time and part-time employees, temporary workers, and independent contractors (collectively, the "Workers"). In most cases, the Debtors' Workers rely on the Compensation and Benefits provided or funded by the Debtors to continue to pay their daily living expenses, and will be

exposed to significant financial difficulties if the Debtors are not permitted to pay these obligations. I believe that if the Debtors are unable to honor all such obligations, morale and loyalty will be jeopardized at a time when the support of these individuals is crucial.

148.    Moreover, a stable workforce is critical to the uninterrupted continuation of the Debtors' business and the preservation and maximization of the value of the Debtors' estates during these Chapter 11 Cases. Any significant number of departures or deterioration in morale among the Debtors' Workers at this time will immediately and substantially adversely impact the Debtors' efforts in chapter 11 and result in immediate and irreparable harm to the Debtors' estates and creditors. There is a real, immediate risk that if the Debtors are not authorized to continue to honor their obligations to these parties in the ordinary course, the Debtors' Workers would no longer support and maintain the operations of the Debtors, thereby crippling them. In addition, absent the relief requested by the Wages Motion, many of the Debtors' Workers would undoubtedly suffer hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain Workers to meet their own personal financial obligations.

149.    Accordingly, I strongly believe that the relief requested in the Wages Motion is essential to the continued operation of the Debtors' business and will enable the Debtors to operate during the Chapter 11 Cases without disruption, thereby maximizing value for the Debtors' estates, creditors, and other stakeholders. Additionally, I am advised by counsel that the Debtors do not seek to compensate any Workers on behalf of prepetition obligations in an amount that exceeds the statutory priority cap of $15,150 and the Debtors will not make any payments to insiders that would violate the Bankruptcy Code. For these reasons, I believe that the Wages Motion is in the best interests of the Debtors, their estates, and creditors, and, therefore, should be approved.

     vi.   *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "Customer Programs Motion")

150.    Through the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their customer programs and honor certain prepetition obligations to customers in the ordinary course of business and (b) granting related relief.

151.    In the ordinary course of business and as more fully described in the Customer Programs Motion, the Debtors provide certain incentives, discounts, promotions, and accommodations, and administer certain related programs, to attract customers and maintain positive customer relationships (collectively, the "Customer Programs"). The Debtors' Customer Programs include various subscription offerings, relationships with third-party online retail partners, promotional offers, the issuance of gift cards through a third-party vendor, and a refund and exchange program. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' businesses and the value of their brands. I believe that maintaining the goodwill of the Debtors' customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases and is necessary to allow the Debtors to compete within their markets and maximize value.

152.    Through the Customer Programs Motion, the Debtors seek authority to (a) honor any prepetition obligations related to their Customer Programs and (b) out of an abundance of caution, continue to honor the Customer Programs in the ordinary course of business on a postpetition basis without disruption. I believe that satisfaction of prepetition obligations relating to the Customer Programs, and the continuation of the Customer Programs in the ordinary course of business on a postpetition basis, is necessary to the Debtors' continued and uninterrupted

operations during these Chapter 11 Cases. Continuing to administer the Customer Programs without interruption during the pendency of these Chapter 11 Cases will help preserve value and customer goodwill during these Chapter 11 Cases, and make the Debtors' business more attractive to prospective purchasers. In addition, I believe that providing the Debtors authority to replace, implement, modify, and/or terminate one or more of the Customer Programs, in each case as the Debtors deem appropriate and in their business judgment, is also appropriate.

153. For the foregoing reasons, I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors, their estates, their creditors, and all parties in interest, and, therefore, should be approved.

*vii. Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Certain Critical Vendors, (B) Lien Claimants, (C) 503(B)(9) Claimants, and (IV) Foreign Vendors, (II) Granting Administrative Expense Priority to and Authorizing the Payment of Certain Outstanding Orders, and (II) Granting Related Relief (the "Critical Vendors Motion")*

154. Through the Critical Vendors Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition claims held by certain (i) Critical Vendors, (ii) Lien Claimants, (iii) 503(b)(9) Claimants and (iv) Foreign Vendors (each as defined below and, collectively, the "Vendor Claimants"), collectively, in an amount not to exceed $5,813,000 on an interim basis and $5,823,000 on a final basis (b) granting administrative expense priority status to certain Outstanding Orders (as defined below) and authorizing the payment of such obligations in the ordinary course of business, and (c) granting related relief, all as more fully set forth in the Critical Vendors Motion.

155. To effectuate their business model and ensure the uninterrupted provision of goods and services to their customers, the Debtors rely on strong relationships with the Vendor

Claimants.  Any disruption in the provision of the critical supplies, materials and services the Debtors source from their vendors would have far-reaching and adverse economic and operational consequences on the Debtors' business.

156.    A critical component of the Debtors' operations is the manufacture, supply, distribution and processing of their saliva collection kits (the "Saliva Collection Kits"), which provides the means for collecting and analyzing genetic information and other related services for the Debtors' customers.  The Debtors do not have in-house manufacturing capabilities and instead rely on third-party suppliers, which the Debtors have qualified in accordance with their quality control system, to provide services and materials (including the Debtors' Saliva Collection Kits, bead chips, arrays, reagents or other materials and equipment used in the Debtors' laboratory operations) that are essential to the Debtors' business.

157.    The Debtors also operate a telehealth business through their "Lemonaid Health" platform, which operates as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.  When medications are prescribed by Lemonaid Health's affiliated healthcare professionals, patients can use Lemonaid Health's online pharmacy for fulfillment of their medications.  Lemonaid Health's pharmacy is licensed in all 50 U.S. states and the District of Columbia.  The Debtors rely on multiple third-party suppliers for the fulfillment of their pharmaceutical orders.

158.    The Vendor Claimants support nearly every aspect of the Debtors' business, including by:  (a) manufacturing and supplying the Saliva Collection Kits and other laboratory materials and equipment; (b) shipping the Saliva Collection Kits to and from customers; (c) processing and analyzing the saliva samples provided by customers through the Saliva Collection Kits; (d) fulfilling pharmaceutical orders that are submitted through the Debtors'

Lemonaid Health's online pharmacy; (e) advertising and marketing the Debtors' products and services; (f) providing customer support in each geographic region where the Debtors' products and services are made available; and (g) servicing the Debtors' obligations to provide management and administrative services to various non-Debtor affiliated entities pursuant to the terms of certain management and service agreements. If these Vendor Claimants refuse to continue doing business with the Debtors on account of outstanding prepetition amounts, replacing them would cause significant delays in the Debtors' ability to provide their services and also cause irreparable, and potentially irreversible, damage to the Debtors' business and their estates.

159.    In determining which vendors to designate as Vendor Claimants, the Debtors and their advisors undertook a comprehensive process to ensure that, among other criteria, only vendors that provide goods or services necessary to preserve the value of the estates were designated as Vendor Claimants. As part of this process, the Debtors generated a master "accounts payable" schedule of various vendors with balances outstanding as of the Petition Date (excluding the vendors which were analyzed in connection with the other first day motions, such as utility providers or insurance brokers). Thereafter, the Debtors and their advisors determined whether each vendor fell under one or more of the following categories: (a) such vendor met certain criteria that led the Debtors to denote such vendor as a critical vendor (the "Critical Vendors"); (b) such vendor was a Shipper or Warehouseman with potential warehouse liens (the "Lien Claimants"); (c) such vendor provided goods which were received by the Debtors within the 20 days prior to the Petition Date (the "503(b)(9) Claimants") and (d) foreign services providers (the "Foreign Vendors"). It is only these Vendor Claimants whom the Debtors request to pay.

160.    Subject to the Court's approval, the Debtors intend to pay the Vendor Obligations as set forth in the Critical Vendors Motion. To that end, in return for paying the

Vendor Obligations either in full or in part, the Debtors propose that the Debtors be authorized to require Vendor Claimants to provide specified trade terms for the postpetition procurement of goods and services from the Vendor Claimants.  Specifically, the Debtors seek authorization to condition payment of Vendor Obligations upon each Vendor Claimant's agreement to continue (a) continue or recommence supplying goods and services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and other terms) at least as favorable to the Debtors as those in place during the 12 months prior to the Petition Date, or on other terms satisfactory to the Debtors (the "Customary Trade Terms") and (b) agree that they shall not be permitted to cancel any contract, agreement, or arrangement pursuant to which they provide such goods and/or services to the Debtors during the course of these Chapter 11 Cases.  The Debtors also seek authorization, but not direction, to require certain Trade Claimants to enter into a contractual agreement evidencing such Customary Trade Terms, the form of which is attached to each of the Interim Order and the Final Order as Exhibit A (the "Trade Agreement").  The Debtors reserve the right to require, at their discretion, that the Customary Trade Terms conditions to payment be made in writing, either by use of the Trade Agreement or other form of written agreement (including electronic mail).

161.    Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods which will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations, including obligating the Debtors to re-order goods that were ordered prior to the

Petition Date, and given that goods delivered after the Petition date are afforded administrative expense priority under section 503(b) of the Bankruptcy Code, the Debtors seek an order (a) authorizing, but not directing, the Debtors to satisfy, in the Debtors' sole election, certain obligations arising from the acceptance of goods subject to Outstanding Orders in the ordinary course of business, and (b) granting administrative expense priority under section 503(b) of the Bankruptcy Code to such undisputed obligations.

162.     For the foregoing reasons, I believe the relief requested in the Critical Vendors Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and will enable the Debtors to continue to effectively operate their businesses during these Chapter 11 Cases, and should therefore be approved.

viii.   *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock of 23andMe Holding Co. Against Debtors and (II) Granting Related Relief* (the "NOL Procedures Motion")

163.     Through the NOL Procedures Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to establish notification and hearing procedures (the "NOL Procedures") to protect the potential value of net operating losses ("NOLs") and certain other tax attributes (collectively, the "Tax Attributes") of the Debtors for U.S. federal income tax purposes in connection with the reorganization of the Debtors.  The NOL Procedures include separate procedures applicable to the beneficial ownership (including direct and indirect ownership) of 23andMe Holding Co.'s common stock (the "Common Stock") and any options or similar rights to acquire such interests, as well as to any claim of a worthlessness deduction under sections 382 and 383 of the Internal Revenue Code of 1986, as amended ("IRC") by a substantial shareholder with respect to any beneficial ownership of Common Stock.

164.    The Debtors possess certain Tax Attributes, including, as of the end of their 2024 tax year, federal NOL carryovers in the amount of approximately $1,100,000,000 and a federal tax asset basis (other than cash) of approximately $74 million.  I understand that the Tax Attributes may be of significant value to the Debtors and their estates because the Debtors can generally carry forward their Tax Attributes to offset their future taxable income, thereby reducing their future aggregate tax obligations.  I further understand that such Tax Attributes may generally be utilized by the Debtors to offset any taxable income generated by transactions consummated during these Chapter 11 Cases (including with respect to any taxable disposition of some or all of the Debtor's assets).  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

165.    I understand that implementation of the NOL Procedures is necessary and appropriate to enforce the automatic stay and, critically, to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  I am advised that under sections 382 and 383 of the IRC, certain transfers of, or declarations of worthlessness with respect to, Beneficial Ownership of Common Stock prior to the consummation of a chapter 11 plan could limit the Debtors' ability to use the Tax Attributes.  By establishing the NOL Procedures for monitoring certain transfers of, and the claiming of worthless stock deduction with respect to, beneficial ownership of 23andMe Holding Co.'s Common Stock, I believe that the Debtors can preserve their ability to seek the necessary relief if it appears that any such action may impair the Debtors' ability to utilize their Tax Attributes.  Moreover, the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.

166.     Importantly, I understand that the NOL Procedures do not bar all transfers of, or declarations of worthlessness with respect to, Beneficial Ownership of Common Stock.  The Debtors seek to establish procedures only to monitor the types of transactions that would pose a serious risk under the ownership change test pursuant to sections 382 and 383 of the IRC and to preserve the Debtors' ability to seek substantive relief if it appears that a proposed transfer or declaration of worthlessness could jeopardize the Debtors' utilization of the Tax Attributes. Because of the Tax Attributes' importance to the Debtors' restructuring, and thus all parties in interest, the benefits of implementing the Procedures outweigh subjecting a limited number of transfers to the NOL Procedures.  Accordingly, I believe the relief requested in the NOL Procedures Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

ix.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors  to Honor and Incur Obligations Related to Non-Debtor Professional Medical Corporations and (II) Granting Related Relief]* (the "<u>PMC Motion</u>")

167.     Through the PMC Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to honor, pay, or otherwise satisfy obligations incurred in relation to the non-Debtor PMCs.  As described herein and in the PMC Motion, the Debtors provide management and administrative services to the PMCs that in turn provide medical services to patients through the Debtors' telehealth platform.  The Debtors' relationships with the PMCs and the PMC Physicians are governed by contracts, the PMC MSAs, and structured to ensure compliance with applicable laws limiting the ownership of medical practices to licensed physicians.  The PMC-related obligations are contractual obligations of the Debtors under the MSAs.

168.     Under the PMC MSAs, the Debtors have various obligations and incur certain costs owed to or on behalf of the PMCs that they seek authority to pay under the PMC Motion in the ordinary course of business.  The Debtors are seeking authority to pay certain of

these costs pursuant to the Taxes Motion, Insurance Motion, Vendors Motion, and Wages Motion, as applicable, and request authority to utilize their existing cash management system to account for any such costs.  However, if not authorized by the relief requested in those motions, the Debtors seek authority to pay accrued and outstanding costs under the PMC MSAs and to continue to pay all operating costs under the PMC MSAs as they become due.

169.    The Debtors' continued operation of their telehealth business is dependent on their ability to provide management and administrative services to the PMCs, including payment of the obligations under the PMC MSAs.  I believe that the inability to maintain the existing relationships with the PMCs would greatly inhibit the Debtors' ability to support the PMCs and related professionals in providing high-quality care to their patients.  Even short-term interruptions to the Debtors' performance under the PMC MSAs could cause the PMCs to end their relationships with the Debtors, which could threaten the Debtors' ability to continue operating their business.  Accordingly, I believe the relief requested in the PMC Motion is in the best interests of the Debtors' estates and will enable the Debtors to effectively operate their business during these Chapter 11 Cases.

C.    **Finance and Sale Related Motion**

i.    *The DIP Motion*

170.    The factual predicates for the DIP Motion are set forth *supra* paragraphs 102-107.

    ii.    *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* (the "<u>Bidding Procedures Motion</u>")

171.    The factual predicates for the Bidding Procedures Motion are set forth *supra* paragraphs 91-101 and 108-113.

### D.    Retention of Professionals

172.    The Debtors will separately be seeking authority to retain and employ various professionals in these Chapter 11 Cases. The Debtors will be seeking the retention of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP as co-counsel, (ii) Carmody MacDonald P.C. as co-counsel, (iii) Moelis & Company LLC as investment banker, (iv) Alvarez & Marsal North America, LLC as financial advisor, (v) Kroll Restructuring Administration LLC as claims and noticing agent and administrative advisor, (vi) Goodwin Procter as counsel to the Special Committee and (vii) Lewis Rice LLC as counsel to the Special Committee.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 24, 2025

/s/  *Matthew Kvarda*
Matthew Kvarda
Chief Restructuring Officer