**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF ANDREW SWIFT IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE BINDING DIP TERM SHEET, INCLUDING PAYMENT OF THE COMMITMENT FEE AND THE WORK FEE THEREUNDER, AND (B) GRANTING RELATED RELIEF AND (II) AN ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, GRANT LIENS, AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (B) MODIFYING THE AUTOMATIC STAY, AND (C) GRANTING RELATED RELIEF**

I, Andrew Swift, hereby declare under penalty of perjury:[2]

1.      I am a Managing Director at Moelis & Company LLC ("Moelis") an investment banking firm with principal offices located at 399 Park Avenue, New York, New York 10022. Moelis is the proposed investment banker for the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases.   I submit this declaration (the "Declaration") in support of the Debtors' DIP Motion.

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]      Capitalized terms used but not defined in this declaration shall have the meanings ascribed to them in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") or the *Debtors' Motion for Entry of an Order (I) Authorizing (A) Entry Into and Performance Under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and the Work Fee Thereunder, and (B) The Debtors to Obtain Postpetition Financing, Grant Liens, and Provide Superpriority Administrative Expense Claims, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith and incorporated herein by reference.

2.      Although Moelis is expected to be compensated for its work as the Debtors' proposed investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by Moelis professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years, and I am authorized to submit this Declaration.

### Professional Qualifications

3.      I have more than 12 years of investment banking experience.  I have led engagement teams in complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities.  In particular, I have provided services to debtors and other constituencies in numerous restructurings, including: *In re Blink Holdings, Inc., et al.*, No 24-11686 (JKS) (Bankr. D. Del. 2024); *In re Invitae Corp., et al.*, No 24-11362 (MBK) (Bankr. D.N.J. 2023); *In re Diamond Sports Group LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. 2023); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. 2023); *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. 2023); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. 2019); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del. 2018); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. 2016); and *In re Trinity Coal Corporation*, No. 13-50364 (TNW) (Bankr. E.D. Ky. 2013).

4.      I have been with Moelis since 2012.  I hold a Bachelor of Arts in history from the University of Michigan.  I am authorized to execute this declaration on behalf of Moelis.

2

**The Retention of Moelis**

5.       Moelis has been engaged as investment banker to the Special Committee of the Board of Directors of Debtor 23andMe Holding Co. (the "Special Committee") since January 2025.[3]  Since being engaged, Moelis has rendered investment banking advisory services to the Special Committee in connection with the Special Committee's evaluation of financing and strategic alternatives.  Additionally, Moelis has worked with the Debtors' management and other professionals retained by the Debtors, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

**The Debtors' Efforts to Secure Financing**

6.       Over the past several months the Debtors, with the assistance of Moelis and at the direction of the Special Committee, have made significant efforts to secure financing necessary to address the Debtors' liquidity need.

7.       Following Moelis' engagement, Moelis began working closely with the Special Committee and the Debtors to assist in a financing for the Debtors or a sale of the assets of the Company (the "Company Assets") on (a) an equity basis or (b) a cash-free, debt-free basis for all or parts of the Debtors' assets (the "Prepetition Marketing Process").  Moelis also began working with the Special Committee and the Debtors to assist in the preparation of materials for the Prepetition Marketing Process.  As part of this process, the Debtors dedicated substantial time and effort to conducting outreach to strategic investors, financial investors, and financing counterparties, and, in consultation with Moelis, determined which parties to contact based on the parties' involvement in the healthcare sector, potential capacity to consummate a transaction,

---

[3]       Moelis's engagement was subsequently modified to account for its role as investment banker to both the Special Committee and the Company.

and industry knowledge and experience (among other criteria).  In furtherance of the Prepetition

Marketing Process, the Debtors, under the direction of the Special Committee and with Moelis'

assistance, prepared a confidential information memorandum with extensive information on the

Company Assets, populated a data room containing significant diligence documentation (the

"Data Room"), and began outreach to potential buyers and financing parties.  On January 28,

2025, the Special Committee issued a press release announcing that the Special Committee had

undertaken a process to explore strategic alternatives, including among other alternatives, a

possible sale of the Company, business combination, sale of all or part of the Company's assets,

licensing of assets, restructuring, or other strategic action,[4] which resulted in additional inbound

interest from third parties.

8.      The Debtors, under the direction of the Special Committee and its advisors,

engaged with 103 potential counterparties (including all 15 counterparties who I understand were

contacted by Wells Fargo Securities, LLC, the Special Committee's investment banker prior to

Moelis' engagement), including 51 potential strategic investors and 52 potential financial

investors/financing counterparties (the "Contact Parties"), to evaluate a potential purchase of all

or part of the Company Assets or an alternative potential investment in the Debtors.  Many of the

Contact Parties had the capability to provide debtor-in-possession financing or specialized in

these types of debtor-in-possession financings.

9.      These efforts resulted in 90 introductory calls and the execution of 42

confidentiality agreements with the applicable counterparties receiving access to a

comprehensive Data Room.  Beginning January 30, 2025, and continuing throughout the

---

[4]    *See* 23andMe Holding Co. press release dated January 28, 2025 (https://investors.23andme.com/news-releases/news-release-details/23andme-special-committee-announces-exploration-strategic).

Prepetition Marketing Process, Moelis distributed the confidential information memorandum and a preliminary financial model to the Contact Parties that had executed a confidentiality agreement. In the aggregate, the Debtors, with the assistance of Moelis, published over 180 diligence documents to the Data Room throughout the Prepetition Marketing Process covering financial, operational, legal, and other key items, and facilitated several diligence calls among the Debtors' management team, certain Contact Parties, and the Special Committee's and/or the Debtors' advisors.

10.     In early February 2025, Moelis distributed a formal process letter requesting that the Contact Parties remaining in the process submit initial indications of interest no later than February 20, 2025 (the "Initial IOI Deadline"). The process letter provided to the Contact Parties included optionality for the Contact Parties to present indications of interest on an equity or a cash-free, debt-free basis for all or part of the Company or the terms of a financing. In connection with the Initial IOI Deadline, Moelis, on behalf of the Special Committee, received multiple preliminary non-binding indications of interest from the Contact Parties with various structures. Subsequent to the Initial IOI Deadline, Moelis continued to engage in discussions with Contact Parties about a potential transaction involving the Company, and received preliminary non-binding indications of interest from a few additional Contact Parties with respect to potential financing or asset acquisition transactions.

11.     None of the non-binding indications of interest received in the Prepetition Marketing Process, other than an indication of interest from the Debtors' former Chief Executive Officer, co-founder, controlling stockholder and member of the Debtors' board of directors (the

"Former CEO"),[5] provided for an out-of-court acquisition for 100% of the Company's equity. Ultimately, the Special Committee determined that the indications of interest received during the Prepetition Marketing Process were either (a) preliminary in nature and not currently actionable, (b) not actionable on an out-of-court basis, or (c) otherwise not in the best interest of the Company and its stakeholders. In addition, given the Debtors' financial condition and liquidity position, among other relevant factors, the Special Committee determined that it was in the best interests of the Debtors' stakeholders to pivot to an in-court sales process.

12.     As part of Moelis' Prepetition Marketing Process, certain parties indicated interest in providing debtor-in-possession financing if the Debtors decided to pursue an in-court process. After evaluation of such potential proposals with the Special Committee, the Debtors, with Moelis' assistance, engaged in further discussions with such parties, which resulted in the Debtors' receipt of three written indications of interest in providing a DIP facility (the "Initial DIP Interest Parties"). The Initial DIP Interest Parties included both new, third-party capital providers as well as the Former CEO.

13.     Of the three indications of interest received, the Special Committee, with the assistance of its advisors, determined that only the proposals provided by the DIP Lender (the "DIP Lender Proposal") and the Former CEO (the "Former CEO Proposal" and, together with the DIP Lender Proposal, the "Proposals") were potentially actionable. Accordingly, with the authorization of the Special Committee, the Debtors engaged in arm's-length and good faith negotiations with the counterparties to the Proposals (the "Counterparties") in the week leading up to the Petition Date.

---

[5]     As of the Petition Date, the Former CEO remains a member of the board of directors of 23andMe Holding Co.

14.     As part of these negotiations, the Debtors' advisors had multiple discussions and exchanged various drafts of terms sheets and other documentation outlining the material terms of each Proposal with the Counterparties' advisors.  Throughout the process, the Debtors' advisors provided regular updates to, and had various substantive discussions with, the Special Committee.  As a result of these efforts, the Special Committee determined that accepting the DIP Lender Proposal was in the best interests of the Debtors, including with respect to the Former CEO Proposal.

15.     Specifically, the key terms of the DIP Lender's Proposal, including the size of the facility, maturity, cost of capital, conditions to funding, and affirmative and negative covenants, were comparable to or better than those in the Former CEO Proposal.  Accordingly, the Special Committee authorized the Debtors' advisors to proceed with finalizing the terms of the DIP Lender Proposal.  Prior to the Petition Date, the Debtors' advisors negotiated the terms of the DIP Term Sheet, the DIP Motion, and the Approval Order with the DIP Lender's advisors.  I understand that the Debtors expect to negotiate and finalize the other DIP Documents, including the DIP Credit Agreement and the DIP Order, and make them available to parties in interest at least ten days prior to the DIP Order objection deadline.

16.     On March 23, 2025, following the Special Committee's authorization, the Debtors and the DIP Lender executed the DIP Term Sheet, which provides JMB's commitment to provide a $35 million DIP Facility (subject to certain terms and conditions).  The DIP Term Sheet does not contemplate any funding at the outset of these chapter 11 cases.  Instead, the Debtors seek Court approval of the Approval Order, which would authorize them to enter into the DIP Term Sheet and pay the DIP Lender (a) a fully earned, non-refundable $100,000 work fee (the "Work Fee") for reimbursement of the DIP Lender's fees and expenses provided in

connection with the DIP Facility, the preparation of the DIP Facility definitive documentation, and the other transactions contemplated by the DIP Term Sheet, and (b) a fully earned, non-refundable cash fee equal to 2.00% of the total amount of the DIP Commitments (the "Commitment Fee"), in each case, paid in cash no later than two business days after the entry of the Approval Order.

17.     Additionally, the Debtors seek entry of the DIP Order at the second day hearing. Upon entry of the DIP Order, the DIP Facility would allow the Debtors to (a) immediately access up to $10 million and (b) access the remaining $25 million upon the Court's approval of an Acceptable Stalking Horse Agreement no later than May 7, 2025, that either (i) is acceptable to the DIP Lender in its reasonable discretion or (ii) would repay, or generate sufficient cash proceeds to repay, the DIP Obligations.

18.     The Debtors' Prepetition Marketing Process ultimately culminated in the DIP Facility on terms that the Debtors believe will be sufficient to fund the Debtors' chapter 11 cases as documented by the DIP Term Sheet through closing of one or more sales effectuated in accordance with the proposed sale process in these chapter 11 cases.  Based on the negotiations held with the Counterparties and their advisors and the outcome of the Prepetition Marketing Process, I do not believe that any potential financing parties would be willing to enter into a financing agreement with the Debtors on an unsecured basis or on terms more favorable than the DIP Lender Proposal.  Moreover, the DIP Facility is designed to allow the Debtors to run an efficient and expeditious sale process and distribute any proceeds and remaining assets to their stakeholders, while providing confidence to potential buyers, customers, vendors, and employees of the Debtors' continued ability to operate in the ordinary course.

**The DIP Facility**

**A.    The Debtors' Entry Into the DIP Term Sheet and the DIP Facility Are Reasonable and Appropriate Under the Circumstances and in the Best Interests of the Debtors' Estates**

19.    I believe that the Debtors' entry into the DIP Term Sheet and the DIP Facility is reasonable and appropriate.  As discussed above, the Debtors and their advisors expended significant efforts in negotiating the DIP Facility.  These negotiations were conducted in good faith and at arm's length.  During these negotiations, the Debtors were represented by experienced bankers, financial advisors, and restructuring counsel.  I believe that the proposed DIP Financing is the best financing proposal reasonably available under the circumstances to address the Debtors' liquidity needs at a reasonable cost, while also providing the Debtors with a stable platform on which to conduct their proposed sale process and distribute value to their stakeholders.

20.    Additionally, I believe that incurrence of the Commitment Fee and Work Fee was necessary under the circumstances to enable the Debtors to obtain the DIP Lender's commitment to provide the DIP Financing.  During negotiations, the DIP Lender made clear that it was not willing to provide the DIP Financing absent the Debtors' execution of the DIP Term Sheet and payment of such fees upon entry and pursuant to the terms of the Approval Order.  Moreover, through the Debtors' negotiations with the DIP Lender, the economic and other terms of the DIP Facility improved to the benefit of the Debtors, including the terms of the Exit Fee.

**B.    The DIP Facility Is the Best Available Postpetition Financing Option for the Debtors**

21.    The Debtors negotiated the DIP Facility with the DIP Lender following the conclusion of an extensive marketing process for all or substantially all of the Debtors' assets that did not result in a transaction that would resolve the Debtors' liquidity challenges.  Entry

into the DIP Term Sheet provides a crucial first step for the Debtors to receive funding to allow them to conduct a sale process on a timeline that should encourage a robust bidding and auction process in an effort to ultimately allow the Debtors to distribute value to their stakeholders.  I believe that if the Debtors are not authorized to enter into the DIP Term Sheet and, ultimately, the other DIP Documents, the Debtors may not have sufficient liquidity to both bridge through closing of one or more value-maximizing sales in the proposed sales process and deploy sufficient resources to maintain the value of the Debtors' estates during the pendency of that process to the detriment of all stakeholders.

22.     Based on the facts above, my experience in raising DIP financing, current market conditions, the Debtors' circumstances, and my participation in, and supervision of, the negotiations around the DIP Facility, I believe that (a) there are no identified alternative sources of financing currently available on both better and more executable terms than the DIP Facility, (b) no actionable unsecured financing was identified for the Debtors under the circumstances in the amount required to adequately fund these cases, (c) the terms of the DIP Facility are fair and reasonable under circumstances, and (d) therefore, the DIP Facility represents the best option currently available to address the Debtors' liquidity needs and create a possible pathway towards a successful sale process and exit from chapter 11.  Accordingly, it is my belief that the Debtors' entry into the DIP Term Sheet should be approved.  Absent the Debtors receiving financing through the DIP Facility, the Debtors may not have sufficient liquidity to fund their operations and their chapter 11 proceedings.

C.    **The DIP Facility Contains Reasonable Terms and Conditions under the Circumstances**

23.    The DIP Lender has committed to provide a substantial amount of capital designed to ensure the Debtors have sufficient liquidity to fund their sale process and distribute proceeds and remaining assets to their stakeholders during these chapter 11 cases.  In light of those commitments, the circumstances of these cases, and my experience as a restructuring professional, I believe the pricing and fees under the DIP Term Sheet have been negotiated in good faith at arm's length between the Debtors and the DIP Lender and are reasonable under the circumstances.

24.    As described above, in consideration for the DIP Lender's commitment to provide the DIP Facility, the Debtors have agreed, subject to Court approval, to pay the 2.00% Commitment Fee and the $100,000 Work Fee on the terms set forth in the DIP Term Sheet. Moreover, the Debtors have agreed to a 4.00% exit fee, which shall only apply to up to $10 million of the DIP Loans until the Debtors gain access to the full amount of the DIP Facility under the terms of the DIP Term Sheet (after which the Exit Fee will apply to the full amount of the DIP Loans).  The Debtors seek approval of the Commitment Fee and the Work Fee through the Approval Order, and approval of the Exit Fee only upon entry of  the DIP Order.

25.    The DIP Term Sheet also contains certain milestones that the Debtors must meet during the chapter 11 cases related to their sale process.  The milestones were negotiated by the DIP Lender as a condition to executing the DIP Term Sheet and should provide the Debtors with adequate time to conduct the sale process on a timeline designed to facilitate a value-maximizing transaction.  Accordingly, I believe that agreeing to include these milestones in the DIP Facility is reasonable and in the Debtors' best interests.

11

## **Conclusion**

26.     It is my professional opinion that (a) the proposed DIP Facility is the best option currently available to address the Debtors' liquidity needs while seeking to preserve value for all stakeholders, (b) the Debtors' entry into the DIP Term Sheet and the payment of the Commitment Fee and the Work Fee thereunder are necessary to obtain the DIP Lender's agreement to provide DIP Financing, and (c) the relief requested in the DIP Motion is in the best interests of the Debtors and their estates.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

March 24, 2025                          */s/ Andrew Swift*
                                         Andrew Swift
                                         Managing Director
                                         Moelis & Company LLC