# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

In re:

**23ANDME HOLDING CO.,** *et al.*,[1]

Debtors.

Case No. 25-40976-357
Chapter 11

(Jointly Administered)

Hearing Date: March 26, 2025
Hearing Time: 12:00 p.m.

Related Doc. 28

---

## ORDER (I) AUTHORIZING ENTRY INTO AND PERFORMANCE UNDER THE BINDING DIP TERM SHEET, INCLUDING PAYMENT OF THE COMMITMENT FEE AND THE WORK FEE THEREUNDER, AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order") (a) authorizing entry into and performance under the binding DIP Term Sheet, including payment of the Commitment Fee and the Work Fee thereunder, and (b) granting related relief, all as more fully set forth in the Motion; and upon consideration of the First Day Declaration and the Swift Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri; and this Court having found that this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court having found that venue of this proceeding and the Motion in

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]   Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED IN PART as set forth herein.

2.      The Debtors are authorized to enter into and perform under the DIP Term Sheet attached to this Order as **Exhibit A** and the prior execution thereof is hereby ratified, approved, and authorized.  The Debtors are authorized to comply with the terms of the DIP Term Sheet and take any and all actions necessary to implement the terms thereof.

3.      The DIP Term Sheet and the terms and provisions included therein are valid, binding, and enforceable against the DIP Lender and the Debtors in accordance with their terms.

4.      The DIP Term Sheet and any related agreements, documents, or instruments may be modified, amended, supplemented, or waived by the parties thereto in accordance with terms thereof, in each case without any other or further notice to or order of the Court.

5.      The Debtors are authorized and directed to pay the DIP Lender a cash fee equal to 2.00% of the total amount of DIP Commitments (the "Commitment Fee") promptly, but in no event later than the date that is two business days after entry of this Order.

6.      The Debtors are authorized and directed to pay the DIP Lender a work fee in the amount of $100,000 (the "Work Fee") for reimbursement of the DIP Lender's fees and expenses provided in connection with the DIP Facility, the preparation of the DIP Facility definitive documentation, and the other transactions contemplated by the DIP Term Sheet promptly, but in no event later than the date that is two business days after entry of this Order.

7.      The Commitment Fee and the Work Fee are (a) non-refundable shall not be avoidable, whether under Chapter 5 of the Bankruptcy Code, state law, or otherwise, and (b) actual, necessary costs and expenses of preserving the Debtors' estates and shall be treated as allowed administrative expenses of the Debtors under section 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

8.      The Debtors shall make copies of the proposed forms of the DIP Order and the DIP Credit Agreement available on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe no later than ten days prior to the objection deadline for final approval of the Motion.  The DIP Lender shall use best efforts to negotiate and finalize such documents with the Debtors by such date.

9.      Entry of this Order does not constitute final approval of any terms of the DIP Term Sheet (other than the Commitment Fee and the Work Fee), and all parties' rights to object to such terms are preserved.

10.     This order shall be binding upon and inure to the benefit of the Debtors and their successors, including any trustee or other estate representative appointed in the chapter 11 cases, or upon dismissal of the chapter 11 cases or conversion to a case under chapter 7 of the Bankruptcy Code.

11.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

12.     Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

13.     Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Order are immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

15.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

16.     No later than two business days after the date of this Order, the Debtors shall serve on the Notice Parties (a) a copy of this Order and (b) a notice scheduling a hearing on the remaining relief requested in the Motion, on April 22, 2025, at 1:30 p.m. (prevailing Central Time), and shall file a certificate of service no later than 24 hours after service.  If no objections to entry of the DIP Order on the Motion are timely received, the Court may enter the DIP Order without need for the final hearing.

Dated:  March 26, 2025
St. Louis, Missouri
cjs

Brian C. Walsh
United States Bankruptcy Judge

**Order Prepared By:**

**Carmody MacDonald P.C.**
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:    (314) 854-8600
Facsimile:    (314) 854-8660
Email:        thr@carmodymacdonald.com
              nrw@carmodymacdonald.com
              jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (*pro hac vice* pending)
Christopher Hopkins (*pro hac vice* pending)
Jessica I. Choi (*pro hac vice* pending)
Grace C. Hotz (*pro hac vice* pending)
1285 Avenue of the Americas
New York, New York 10019
Telephone:    (212) 373-3000
Facsimile:    (212) 757-3990
Email:        pbasta@paulweiss.com
              chopkins@paulweiss.com
              jchoi@paulweiss.com
              ghotz@paulweiss.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

**<u>Exhibit A</u>**

**DIP Term Sheet**

*EXECUTION VERSION*

**March 23, 2025**

**23andMe Holding Co.** *et al.*
**$35,000,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, the "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the DIP Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Approval Order with respect to the DIP Facility (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein and entry of the DIP Order. Capitalized terms used but not defined in this Term Sheet shall have the meanings given to such terms in the applicable DIP Documents. In the event of any conflict between this Term Sheet and the terms of the DIP Order, the terms of the DIP Order shall govern.**

**This Term Sheet is a binding and enforceable agreement, subject to entry of the Approval Order with respect to the Debtors, with respect to the subject matter contained herein, including an agreement to negotiate in good faith the DIP Documents by the parties hereto in a manner consistent with this Term Sheet, it being acknowledged and agreed that the funding or availability of the DIP Facility is subject to the applicable conditions precedent set forth hereto and in the Term Sheet.**

**This Term Sheet and all commitments and undertakings shall terminate if the board of directors or board of managers, as applicable, of any Borrower determines, in good faith based upon advice of outside legal counsel, that proceeding with this Term Sheet or taking any action (or refraining from taking any action) in relation thereto, would be inconsistent with the exercise of its fiduciary duties under applicable law.**

| 1. | ***Borrowers and Guarantors*** | • 23andMe Holding Co., 23andMe Inc., Lemonaid Health Inc., and 23andMe Pharmacy Holdings, Inc. (collectively with all other direct and indirect affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases, the "**Borrowers**", and each a "**Borrower**"). |
|  |  | • All obligations under the DIP Facility will be unconditionally guaranteed by each Borrower and each Borrower's respective subsidiaries and affiliates (collectively, the "**Loan Parties**" and each a "**Loan Party**"). |
|  |  | • The Borrowers are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**", and the Borrowers and their applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the Eastern District of Missouri (the "**Bankruptcy Court**") on or around March 23, 2025 (such date, the "**Petition Date**"). |
|  |  | • For the purposes of this Term Sheet, 23andMe Holding Co. (i) is hereby designated and appointed by each Loan Party as its authorized |

| | | |
|---|---|---|
| | | representative and agent to act on its behalf (the "**Borrower Representative**") and (ii) accepts such appointment as the Borrower Representative. |
| 2. | *DIP Lender* | • JMB Capital Partners Lending, LLC ("**JMB**") and/or its designees or its assignees; <u>provided</u> that JMB will not designate or assign (a) any of its rights as DIP Lender under this Term Sheet or the DIP Documents or (b) DIP Loans to any insider of the Debtors (as defined under the Bankruptcy Code) without the Debtors' prior written consent in its sole discretion. |
| 3. | *Type and Amount of the DIP Facility* | • A non-amortizing priming super-priority senior secured term loan facility in an aggregate principal amount not to exceed $35,000,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**"). |
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |
| | | • Any Initial Draw shall be funded to the Debtors, through the DIP Bank Account (as defined below), to be used in accordance with the Budget. |
| | | • Subsequent DIP Loan proceeds to be funded into a new segregated Bank Account to be opened and designated by a Borrower (the "**DIP Bank Account**") and the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 30 days after the entry of the DIP Order subject to a 30-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the DIP Order. |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the DIP Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of DIP Loans up to $10,000,000 (the "**Initial Draw Amount**") and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 below immediately upon entry of the DIP Order (the "**Initial Draws**", the date of such first Initial Draw shall be referred to herein as the "**Closing Date**"). The closing of definitive DIP Documents shall occur as soon after the entry of the DIP Order as reasonably possible, but in any event no later than two (2) business days thereafter. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the DIP Order and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**", and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |

| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, and availability under the DIP Commitments, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (as defined below).<br><br>• Each Draw shall be made (in an aggregate minimum amount of $2,000,000 (and multiples thereof) upon three (3) business days' written notice, up to the aggregate amount of the available undrawn DIP Commitments at any time prior to three (3) business days before the DIP Termination Date (as defined below); <u>provided</u> that the first Initial Draw shall be in the amount up to the Initial Draw Amount in accordance with the terms of the DIP Documents, and funded within three (3) business days following after the DIP Lender's receipt of a customary borrowing notice following entry of the DIP Order. |
|---|---|---|
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of:<br><br>    i.    September 30, 2025;<br><br>    ii.    the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**");<br><br>    iii.    the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code;<br><br>    iv.    the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and in the DIP Documents) in accordance with the DIP Documents;<br><br>    v.    dismissal of any Chapter 11 Case or conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code; and<br><br>    vi.    April 25, 2025 (or such later date as agreed to by the DIP Lender), unless the DIP Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**").<br><br>• The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow under the DIP Facility and shall terminate the DIP Commitments and any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.<br><br>• For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the Maturity Date under the DIP Documents. |

---

[1] For purposes hereof, the term "**Payment in Full**" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

| 8. | *Interest Rate* | • The DIP Loans shall bear interest at a per annum rate equal to 14.0% payable in cash on the first day of each month in arrears (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2.0%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | *Commitment Fee, Work Fee, Exit Fee, and Other Fees* | • **Commitment Fee.** The Borrowers shall pay to the DIP Lender a commitment fee equal to 2.0% of the total amount of the DIP Commitments (the "**Commitment Fee**"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of an order, in form and substance satisfactory to the DIP Lender in its reasonable discretion, authorizing and approving on a final basis, among other things, this Term Sheet, the Work Fee (as defined below), and the Commitment Fee (the "**Approval Order**"), and shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Approval Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Approval Order. |
| | | • **Work Fee.** The Borrowers shall pay to the DIP Lender a work fee in the amount of $100,000 (the "**Work Fee**"), which Work Fee shall be fully earned, non-refundable, and allowed upon entry of the Approval Order. The Work Fee shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Approval Order, but in no event shall the Work Fee be paid later than the date that is two (2) business days after the entry of the Approval Order. |
| | | • If the Approval Order is not entered by the Bankruptcy Court within seven (7) days after the Petition Date, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. The payment of the Commitment Fee and the Work Fee shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Approval Order. |
| | | • **Exit Fee.** The Borrowers shall pay to the DIP Lender an exit fee equal to 4.0% of the DIP Commitments as follows: (i) following entry of the DIP Order, 4.0% of the Initial Draw Amount; and (ii) following the Bankruptcy Court's approval and the execution and delivery of an Acceptable Stalking Horse Purchase Agreement, 4.0% of the remaining amount of the DIP Commitments (*i.e.*, $25,000,000), which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the DIP Order (the "**Exit Fee**"). The Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date (including, for the avoidance of doubt, the occurrence of the Maturity Date), (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be |

4

| | | |
|---|---|---|
| | | payable until the DIP Obligations have been accelerated by the DIP Lender. |
| | | • The Commitment Fee and the Work Fee shall be approved on a final basis by the Bankruptcy Court as part of the Approval Order, and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the DIP Order.  If such fees are not approved on a final basis by the Bankruptcy Court and paid as set forth herein, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. |
| 10. | *Use of Proceeds* | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget and 20.0% permitted variances as set forth below: |
| | |    i. working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable if such subsidiaries are Loan Parties under the DIP Documents; |
| | |    ii. professional fees and expenses of the Debtors' estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable; |
| | |    iii. fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and |
| | |    iv. interest and other amounts payable under the DIP Facility. |
| | | • Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in any Chapter 11 Case, or any trustee or examiner appointed in any Chapter 11 Case or any successor cases, including any chapter 7 cases, or any other person, party or entity (each of the following, a "**Restricted Use**"): |
| | |    i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding: |
| | |       a. against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), or DIP Claims (as defined below); or |
| | |       b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted |

| | | |
|---|---|---|
| | | under the DIP Order, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; |
| | | ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Order, each in accordance with the DIP Documents and the DIP Order, as applicable; *provided*, *however*, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Order and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder; |
| | | iii. to seek to modify any of the rights and remedies granted to the DIP Lender under the DIP Order (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or |
| | | iv. to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted, if any, pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Order have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 11. | ***Voluntary Prepayments*** | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts equal to the lesser of (a) $2,000,000 of principal and (b) the amount necessary to constitute Payment in Full of the outstanding DIP Obligations. |
| 12. | ***Security*** | • As security for the DIP Obligations, subject to the Carve-Out, the Permitted Senior Lien and Permitted Prior Liens (each as defined in **Schedule 1** hereto), and effective upon entry of the DIP Order, each Loan Party shall grant to the DIP Lender (a) a priming first lien on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that are subject to valid and perfected security interests in favor of third parties as of the Petition Date, (b) a first lien security interest on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that were unencumbered as of the Petition Date, and (c) a junior priority security interest on all of such Loan Parties' right, title and interest in, to and under all the Loan Parties' assets that were subject to the Permitted Senior Lien and Permitted Prior Liens, in each case, |

| | | including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): all assets and property of such Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to section 1(c) or section 1(d) of the Lanham Act (15 U.S.C. §1051 et seq.)), all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York), all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof, and all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof; provided, however, that the DIP Collateral (i) shall not include claims and causes of action against current or former directors, officers and employees of any Debtor, including, without limitation, any claim for or relating to a breach of fiduciary duty by any such director or officer, (such claims and causes of action, the "**Specified Insider Claims**") but (ii) shall include the proceeds of the Specified Insider Claims (the "**Specified Insider Claims Proceeds**").<br><br>• Negative pledge on all assets of the Loan Parties subject to permitted liens, if any, under the DIP Documents.<br><br>• In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, and deposit account control agreements) requested by DIP Lender. |
| 13. | *Priority and Security* | • Subject to the Carve-Out, the Permitted Senior Lien and Permitted Prior Liens, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees |

|  |  | and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to, as applicable, (i) a priming lien, (ii) a senior secured lien, (iii) junior secured liens, and (iv) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior or junior priority, as applicable, over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**").<br><br>• Subject to the Carve-Out, the Permitted Senior Lien and Permitted Prior Liens, all DIP Obligations in respect of the DIP Facility shall be:<br><br>   i.   pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); and<br><br>   ii.   secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all unencumbered assets of the Loan Parties that are not subject to a valid and perfected lien on the Petition Date;<br><br>   iii.   secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by an automatically perfected junior security interest lien on all assets of each Loan Party that is subject to the Permitted Senior Lien and Permitted Prior Liens; and<br><br>   iv.   secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by an automatically perfected priming first-priority lien on all assets of each Loan Party that are subject to valid and perfected security interests in favor of third parties as of the Petition Date.<br><br>• The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the DIP Order.  The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the DIP Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, which shall include, without limitation, the right to:<br><br>   i.   declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; |

| | | |
|---|---|---|
| | | ii.    declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; |
| | | iii.    charge interest at the default rate under the DIP Documents; |
| | | iv.    declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the DIP Order); or |
| | | v.    take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law. |
| | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Order and the Loan Parties' right to seek an emergency hearing before the Bankruptcy Court with respect to the exercise of remedies by the DIP Lender. |
| 15. | ***Conditions Precedent to Initial Draw*** | • Entry of the DIP Order on or before April 25, 2025, and no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the DIP Order; <br><br>• The Approval Order shall have been entered and shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner; <br><br>• Delivery of the Initial Budget acceptable to the DIP Lender in its discretion (not to be unreasonably withheld); <br><br>• All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet (including the Commitment Fee and the Work Fee), the DIP Documents, or the DIP Order shall have been paid in accordance with the Term Sheet or the applicable DIP Documents (<u>provided</u> that the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (other than the Work Fee) shall be paid out of the proceeds of the Initial Draw); <br><br>• The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); <br><br>• No Material Adverse Effect (as defined below) shall have occurred and be continuing; <br><br>• The Debtors shall be in compliance in all material respects with the DIP Order; <br><br>• No Event of Default shall have occurred and be continuing under this Term Sheet or the DIP Documents; and |

|  |  | • The Borrowers shall have delivered to the DIP Lender a customary borrowing notice in form and substance reasonably satisfactory to the DIP Lender. |
|---|---|---|
| 16. | *Conditions Precedent to Availability of Other Draws; Milestones* | • The DIP Order, or any material provision thereof, shall not have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the DIP Lender's prior written consent in its reasonable discretion. |

• In addition, the DIP Documents shall contain conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:

  i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance mutually acceptable to the Loan Parties and the DIP Lender;

  ii. delivery of any Budget subsequent to the Initial Budget, acceptable to the DIP Lender in its sole discretion;

  iii. no trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party or any Loan Party's business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than a Loan Party exercising control over its assets;

  iv. the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);

  v. the Borrowers shall have delivered to the DIP Lender a customary borrowing notice in accordance with the DIP Documents;

  vi. the Debtors shall be in compliance in all respects with the DIP Order and the Loan Parties shall be in compliance in all respects with the DIP Documents;

  vii. no default or event of default shall have occurred and be continuing under the DIP Documents;

  viii. no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the DIP Order;

  ix. since the Petition Date, other than the commencement of the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could

10

reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**") in each case, not otherwise known by the DIP Lender or its counsel as of the date of execution of this Term Sheet;

x.   the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured;

xi.   all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due;

xii.   the Debtors shall have (a) entered into and delivered a fully executed and binding Acceptable Stalking Horse Purchase Agreement and (b) satisfied any other applicable Milestones; and

xiii.   a granting to the DIP Lender of DIP Claims and DIP Liens to secure all DIP Obligations pursuant to the applicable provisions in sections 364(c) and 364(d) of the Bankruptcy Code.

- The DIP Documents shall contain certain milestones (the "**Milestones**") relating to the Chapter 11 Cases, which may be extended by the DIP Lender in its reasonable discretion, including the following:

    i.   as a condition to the Debtors making any Other Draw, on or before May 7, 2025, the Bankruptcy Court shall have entered an order (in form and substance reasonably satisfactory to the DIP Lender) authorizing and approving an "**Acceptable Stalking Horse Purchase Agreement**," which means a stalking horse purchase agreement for all or substantially all of the Debtors' assets(s) that (a) is executed, effective, and binding on all parties thereto and (b) either (x) is approved by the DIP Lender in its reasonable discretion or (y) (1) would generate cash proceeds sufficient for the Payment in Full of the DIP Obligations (pursuant to a signed commitment acceptable to the DIP Lender in its reasonable discretion to lend from a recognized lender or another source of funding acceptable to the DIP Lender in its reasonable discretion) upon the closing date of such sale, (2) closes on or before June 30, 2025, and (3) requires, pursuant to an order of the

| | | |
|---|---|---|
| | | Bankruptcy Court, the Payment in Full of the DIP Obligations as set forth in clause (1). |
| 17. | *Documentation* | • Definitive financing documentation with respect to the DIP Loans, including, without limitation, this Term Sheet, the DIP Order, any DIP Loan agreement and all definitive guaranty, collateral, security and other credit documentation, any security agreement, and any documents executed pursuant hereto or thereto (the "**DIP Documents**") shall be mutually agreed upon by the Loan Parties and the DIP Lender in accordance with the Documentation Principles. For the avoidance of doubt, DIP Documents (other than this Term Sheet) shall be documented prior to entry of the DIP Order. |
| 18. | *Representations and Warranties* | • Subject to the Documentation Principles, the DIP Documents shall contain representations and warranties with respect to the Loan Parties as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender and the Loan Parties, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes, title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility.<br><br>• Each Loan Party represents and warrants that none of its assets and properties are subject to any liens, security interests or encumbrances as of the Petition Date and no liens, security interests or encumbrances will be created on or after the Petition Date except, in each case, for liens set forth on **Schedule 1** hereto. |
| 19. | *Affirmative Covenants* | • Subject to the Documentation Principles, the DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. |
| 20. | *Negative Covenants* | • Subject to the Documentation Principles, the DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties; underlined provided that the DIP Documents will permit, among other things: (i) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for and require the Payment in Full of the DIP Obligations; (ii) the ability to reject or modify contracts; (iii) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (iv) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (v) provide for adequate protection in accordance with the Budget and acceptable to the DIP Lender in its sole discretion. |

12

| 21. | *DIP Budget / Variance Reporting* | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the DIP Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). The Budget shall permit the Borrowers to reserve cash in an amount to be agreed among the Borrowers and the DIP Lender for purposes of paying certain employee, tax, and other specified obligations or liabilities (including administrative expenses such as bankruptcy fees, U.S. Trustee fees and professional fees) and prosecuting any Estate Claims (the "**Cash Reserve**"). |
| --- | --- | --- |
| | | • The Budget shall be updated and provided to the DIP Lender on the fifth Wednesday following the prior Budget's approval and every fifth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its sole discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within five (5) business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender in its sole discretion. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five (5) business day period, such Updated Budget shall become effective as the Budget. |
| | | • On a weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating cash flow for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative four-week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Disbursement Variance (as defined below) solely with respect to net operating cash flow that exceeds 20.0% shall be material and shall constitute and Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably satisfactory to the DIP Lender). For the avoidance of doubt, net operating disbursements shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases. |
| | | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating disbursements" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" for such period as set forth in the Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative |

| | | |
|---|---|---|
| | | budgeted amount for such period (the "**Net Operating Disbursement Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 20.0% for budget variances with respect to the Net Operating Disbursement Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, and the Loan Parties, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Disbursement Variance calculation. |
| 22. | ***DIP Order*** | • The order approving the DIP Facility, which shall be in form and substance reasonably satisfactory to the DIP Lender (the "**DIP Order**"), shall, among other things, authorize and approve, in each case on a final basis:<br><br>   i.   the DIP Facility;<br><br>   ii.   the making of the DIP Loans in accordance with the DIP Documents;<br><br>   iii.   the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;<br><br>   iv.   the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described in Section 26 of this Term Sheet (<u>provided</u> that the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (other than the Work Fee) shall be paid out of the proceeds of the Initial Draw);<br><br>   v.   the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the DIP Order; and<br><br>   vi.   the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | ***Documentation Principles*** | • The DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement, negotiated in good faith, in form and substance reasonably acceptable to the Borrower and the DIP Lender, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the DIP Order, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) be mutually agreed between the Loan Parties and the DIP Lender, (b) the DIP Order, and (c) as applicable, and other legal documentation or instruments as are, in each case, usual and customary for debtor-in-possession financings of this type and/or reasonably necessary to effectuate the financing contemplated hereby, as reasonably |

14

| | | |
|---|---|---|
| | | determined by the Loan Parties and the DIP Lender (the foregoing, collectively, the "**Documentation Principles**"). |
| 24. | *Carve-Out* | • The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject and subordinated to the claims covered by the Cash Reserve and to the Carve-Out (as defined below). |
| | | • As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Official Committee of Unsecured Creditors (the "**Committee**"), if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Approved Budget and any other limits imposed by the amount set forth in the DIP Order; and (iv) allowed professional fees of Professional Persons in an aggregate amount not to exceed $3,500,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clauses (i) through (ii) but less any retainers held by such Professional Persons, the "**Carve-Out Cap**"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds. |
| | | • Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Loan Parties shall be required to deposit into a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") cash (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to difference between the Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors. The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expense of the Professional Person that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in |

15

| | | |
|---|---|---|
| | | full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.  The DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Accounts, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Accounts and all allowed Professional Fees have been paid in full pursuant to a final order of the Bankruptcy Court. |
| | | • For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. |
| | | • The Carve-Out shall not include, apply to or be available for any party in connection with any Restricted Use. |
| | | • The DIP Order shall provide that the foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw. |
| 25. | *Events of Default* | • Subject to the Documentation Principles, the DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor-in-possession financing facilities of this type, including, without limitation:<br><br>i.  payment, non-compliance with covenants set forth in the DIP Documents, judgements in excess of specified amounts, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature;<br><br>ii.  the entry of the DIP Order shall have not occurred on or before April 25, 2025, or the DIP Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered;<br><br>iii.  the failure of the Loan Parties to comply with any of the Milestones;<br><br>iv.  an Acceptable Stalking Horse Purchase Agreement is cancelled, terminated, amended, modified, or supplemented without the DIP Lender's consent;<br><br>v.  the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;<br><br>vi.  non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Order;<br><br>vii.  the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy |

Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment;

viii.   the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties to which the fair market value of which exceeds $500,000;

ix.   the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents;

x.   any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

xi.   entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations;

xii.   the making of any material payments in respect of prepetition obligations other than (a) as permitted by the DIP Order, (b) as permitted by any order of the Bankruptcy Court in a form reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender;

xiii.   entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code;

xiv.   any Loan Party shall, directly or indirectly, seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or DIP Claims, or (c) contest any material provision of any DIP Document;

| | | |
|---|---|---|
| | | xv.  any Debtor files a Plan that is not in form and substance reasonably satisfactory to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender in its reasonable discretion to lend from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender in its reasonable discretion sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations; |
| | | xvi.  any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have an adverse effect on the DIP Collateral without the prior written consent of the DIP Lender in its sole discretion; |
| | | xvii.  any Debtor files a motion for the approval of a sale of the DIP Collateral or any portion thereof, pursuant to section 363 of the Bankruptcy Code or otherwise, which proposed sale (including, for the avoidance of doubt, any order approving such sale) is not acceptable to the DIP Lender in its reasonable discretion; or |
| | | xviii.  the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in this Term Sheet or the applicable DIP Documents. |
| 26. | *Indemnification and Reimbursement of Expenses* | • The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties (the "*Indemnitees*"), including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof, except to the extent the relevant Indemnities are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, gross negligence or willful misconduct of the relevant Indemnitee.  The Loan Parties' indemnification obligations shall be contingent on the occurrence of the Closing Date.<br><br>• Subject to the DIP Documents and entry of the DIP Order, all reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the reasonable and documented fees and expenses of Norton Rose Fulbright US LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis within ten (10) days after the Debtors' receipt of a summary invoice for any such fees, costs, disbursements, and expenses. |

| 27. | *Release* | • The DIP Order shall include a customary release of the DIP Lender in its capacity as such, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
|---|---|---|
| 28. | *Waivers* | • The DIP Order shall include terms and conditions customary for final DIP financing orders and shall be acceptable to the DIP Lender in its reasonable discretion, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
| 29. | *DIP Lender Representations* | • By executing this Term Sheet, the DIP Lender hereby represents and warrants to the Debtors that:<br>  i. neither the DIP Lender nor any of its predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors are insiders (as such term is defined under the Bankruptcy Code) of the Debtors;<br>  ii. the DIP Lender has not engaged in any collusion with respect to any bids or the 363 sale process and further agrees not to engage in any collusion with respect to the bids, the auction, or the 363 sale process. |
| 30. | *Governing Law* | • New York (and to the extent applicable, the Bankruptcy Code). |

19

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

23ANDME HOLDING CO., as Borrower and Borrower Representative, for and on behalf of itself and the Loan Parties

By: *Joe Selsavage*

Name:  Joe Selsavage

Title:   Chief Financial and Accounting Officer

[*Signature Page to Term Sheet*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

23ANDME HOLDING CO., as Borrower and Borrower Representative, for and on behalf of itself and the Loan Parties

By: *Joe Selsavage*
Name:  Joe Selsavage
Title:   Chief Financial and Accounting Officer

[*Signature Page to Term Sheet*]

## Schedule 1

**A. Existing Liens:**

(a)  U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20203423599 in respect of specific equipment of 23ANDMe, Inc.

(b)  U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20226984510 in respect of specific equipment of 23ANDMe, Inc.

(c)  U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20231390144 in respect of specific equipment of 23ANDMe, Inc.

(d)  U.S. Bank Equipment Finance, filed UCC-1 Financing Statement (Delaware) 20233366308 in respect of specific equipment of 23ANDMe, Inc.

(e)  Smith Drug Company, a Division of JM Smith Corporation, filed UCC-1 Financing Statement (Missouri) 20220803002707723 in respect of specific property and all proceeds from the sale or transfer of such property of LPRXONE LLC.

(f)  Cardinal Health 110 LLC, filed UCC-1 Financing Statement (Missouri) 202011090001399655 in respect of all business assets and personal property of Lemonaid Community Pharmacy, Inc.

**B. Other Defined Terms**: For purposes of this Term Sheet,

"**Permitted Prior Liens**" means the following liens, in an aggregate amount not to exceed $250,000:

(a)  the "Existing Liens" set forth on this **Schedule 1**;

(b)  statutory or common law liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business for amounts not overdue; or

(c)  liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment.

"**Permitted Senior Lien**" means the security interest in and right of set-off granted to JPMorgan Chase Bank, N.A. (the "**Bank**") in all of 23andme, Inc.'s right, title and interest in and to all deposits, and any renewals thereof, additions thereto and substitutions therefor, in the collateral account ending in x1733 held at the Bank and designated under that certain Assignment of Deposits, dated as of March 11, 2019 as between 23andme, Inc. and Bank, together with all monies, proceeds, interest or sums credited from time to time thereto or due or to become due thereon or therefrom.

United States Bankruptcy Court

Eastern District of Missouri

In re:                                                                                          Case No. 25-40976-bcw

23andMe Holding Co.                                                                Chapter 11

    Debtor

# CERTIFICATE OF NOTICE

| District/off: 0865-4 | User: admin | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Mar 27, 2025 | Form ID: pdfo2 | Total Noticed: 4 |

The following symbols are used throughout this certificate:

**Symbol**    **Definition**

+    Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Mar 29, 2025:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| aty | + | Christopher Hopkins, 1285 Avenue of the Americas, New York, NY 10019-6031 |
| aty | + | Grace C Hotz, 1285 Avenue of the Americas, New York, NY 10019-6031 |
| aty | + | Jessica I Choi, 1285 Avenue of the Americas, New York, NY 10019-6031 |
| aty | + | Paul M. Basta, Paul, Weiss, Rifkind, Wharton & Garrison, 1285 Avenue of the Americas, New York, NY 10019-6031 |

TOTAL: 4

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Mar 29, 2025        Signature:          /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on March 26, 2025 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Carole J. Ryczek | on behalf of U.S. Trustee Office of US Trustee carole.ryczek@usdoj.gov |
| David L. Going | on behalf of Interested Party TTAM 2.0 LLC dgoing@armstrongteasdale.com, jscharf@armstrongteasdale.com |
| Erin M. Edelman | on behalf of Interested Party TTAM 2.0 LLC eedelman@armstrongteasdale.com |
| Heather M Crockett | on behalf of Interested Party State of Indiana heather.crockett@atg.in.gov  marie.baker@atg.in.gov |
| Joseph Richard Schlotzhauer | |

District/off: 0865-4                          User: admin                                    Page 2 of 2
Date Rcvd: Mar 27, 2025                        Form ID: pdfo2                             Total Noticed: 4

on behalf of U.S. Trustee Office of US Trustee joseph.schlotzhauer@usdoj.gov

Joshua M Watts

    on behalf of Interested Party JMB Capital Partners Lending  LLC josh.watts@nortonrosefulbright.com

Joshua Michael Jones

    on behalf of Interested Party United States of America joshua.m.jones@usdoj.gov
    rebecca.ferguson@usdoj.gov;peggy.dryden@usdoj.gov;caseview.ecf@usdoj.gov;usamoe.crimdock@usdoj.gov;usamoe.civldock
    @usdoj.gov

Lawrence E. Parres

    on behalf of Debtor 23andMe Holding Co. lparres@lewisrice.com  larry-parres-3537@ecf.pacerpro.com

Nathan R Wallace

    on behalf of Debtor 23andMe Holding Co. nrw@carmodymacdonald.com
    kxd@carmodymacdonald.com;ala@carmodymacdonald.com

Office of US Trustee

    USTPRegion13.SL.ECF@USDOJ.gov

Robert E Eggmann, III

    on behalf of Debtor 23andMe Holding Co. ree@carmodymacdonald.com
    thr@carmodymacdonald.com;ala@carmodymacdonald.com;kxd@carmodymacdonald.com

Thomas H Riske

    on behalf of Debtor 23andMe Holding Co. thr@carmodymacdonald.com
    kxd@carmodymacdonald.com;ala@carmodymacdonald.com


TOTAL: 12