UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 25-40976<br><br>(Jointly Administered)<br><br>**Response Deadline:** April 29, 2025<br>**Hearing Date:**   April 29, 2025<br>**Hearing Time:**   1:30p.m. (CST)<br>**Hearing Location:** Courtroom 5 North |

**MOTION FOR ORDER APPOINTING A CONSUMER PRIVACY OMBUDSMAN
UNDER 11 U.S.C. §§ 105(a), 332, AND 363(b)(1) AND NOTICE OF HEARING**

**WARNING: THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE BY APRIL 29, 2025. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. THE DATE IS SET OUT ABOVE. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

   The State of Texas, acting by and through the Office of the Texas Attorney General ("Texas"), hereby files this Motion for Order Appointing a Consumer Privacy Ombudsman ("CPO") under 11 U.S.C. §§ 105(a), 332, and 363(b)(1) (the "Motion").[2] In support of the Motion, Texas respectfully, states as follows:

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2] References to the "Bankruptcy Code" or "Section" shall mean Title 11 of the United States Code and the specific sections referenced thereunder.

1

I.  INTRODUCTION

23andMe Holding Co. and its debtor affiliates (hereinafter, the "Debtors" or "23andMe") seek to sell unspecified assets that may include the extraordinarily sensitive genetic data of adults and children—a category of personally identifiable information ("PII") that is biologically immutable, inherently familial, uniquely identifying, and governed by a framework of state, federal, and international privacy laws.[3]  The assets to be sold may also include health information related to the Debtors' telehealth platform, "Lemonaid Health," which provides personalized healthcare services and an online pharmacy.  At least three Texas data privacy laws govern the Debtors' sale of PII, including a genetic data privacy law that provides individuals with an exclusive property right in and control over their genetic data restricting transfers without an individual's **separate express consent**.  In addition to complying with state law, section 363(b)(1) triggers the appointment of a CPO for sales involving PII if the Debtors' "in connection with offering a product or service[,] disclose to an individual a policy prohibiting the transfer of" PII **unless** the sale is consistent with the Debtors' policy.[4]

The need for heightened protection in this case is not hypothetical, and the importance of safeguarding such highly sensitive PII cannot be overstated.  Genetic data is fundamentally distinct from other forms of PII.  It reveals not only traits about an individual, but also predispositions to disease and health disorders, ancestry, and sensitive attributes that extend to biological relatives and descendants, even those who do not participate in genetic testing services.  Its misuse or mishandling carries serious risk: a single data point can implicate multiple individuals, it may reveal familial connections not yet known or made public, and can be used for discriminatory and improper purposes.[5]  Unlike an email address or password, it cannot be "reset."

---

[3] See Norman-Bloodsaw v. Lawrence Berkeley Lab., 135 F.3d 1260, 1269 (9th Cir.) ("One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health or genetic make-up." (citing Doe v. City of N.Y., 15 F.3d 264, 267 (2nd Cir.)).
[4] 11 U.S.C. § 363(b)(1)(A) (emphasis supplied).
[5] Congress passed legislation to prohibit employers and insurance companies from using genetic information for discriminatory purposes. See Genetic Information Nondiscrimination Act (GINA), Pub. L. No. 110–233, 122 STAT. 881-

2

Despite these issues, the Debtors have not filed or identified which "policy" or "policies" purportedly apply to their proposed sale of PII.[6] Instead, their filings vaguely reference "privacy practices," which, the Debtors claim, "do not restrict the transfer of" PII.[7] The distinction is material: "policy," the term used in section 363(b)(1), refers to formal representations to consumers that often form the basis of expectations, obligations, and regulatory compliance; "practices," by contrast, are operational non-binding behaviors that may not be disclosed or even documented and, regardless of the language in the Debtors' "privacy practices" or any policies, any proposed sale must comply with applicable nonbankruptcy law regarding the transfer of genetic data.[8]

Moreover, multiple policies may be applicable to the Debtors' customer database based on when customers began or ceased using services over the course of the company's nearly 20-year history. An informal search of the Debtors' website history produced twenty-two (22) updates to their "Privacy Statement" between 2007 and 2025 with nearly all versions including restrictions on the company's sale of PII to third parties absent explicit consent; the Debtors have not demonstrated whether customers have consented to any such policies or the sale of their PII.[9]

The need for oversight is further underscored by the Debtors suffering a prior data breach and numerous Texas consumers having reported, up until the filing of this Motion, difficulty accessing their accounts and deleting their data raising questions about the Debtors' ability to honor consumers'

---

83 (2008) (codified at 42 U.S.C. §§ 2000ff-2000ff-11).

[6] The Debtors' recently filed motion at Docket No. 169 indicates, for the first time, their belief that their recent March 14, 2025 Privacy Statement and unidentified and undated "terms of service" govern the sale.

[7] See *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), if any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [D.E. 30] (the "Bid Procedures Motion"), ¶ 12 ("The Qualified Bidder must comply in all respects with the Debtors' **consumer privacy practices**, which do not restrict the transfer of personally identifiable information of the Debtors' customers in connection with a bankruptcy, merger, acquisition, reorganization, or sale of assets . . . ." (emphasis supplied); see also *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* [D.E. 32] (the "First Day Declaration"), ¶ 112 (referring to "existing consumer privacy practices.").

[8] See 28 U.S.C. § 959(b) (requiring debtors-in-possession to comply with nonbankruptcy law).

[9] 23andMe, Privacy Statement (Nov. 7, 2011-March 14, 2025), https://www.23andme.com/legal/privacy/; archived at: https://web.archive.org/web/20250000000000*/https:/www.23andme.com/legal/privacy (last visited on April 7, 2025).

3

rights to delete, adhere to its "practices," or securely transfer this highly sensitive PII. Given the numerous state, federal, and international laws governing the sale of PII, the applicability of twenty-two (22) or more versions of the Debtors' policies, and because this case presents an unprecedented situation at the intersection of bankruptcy law, consumer data rights, and the ethical use of genetic information, Texas contends that the appointment of a neutral third-party CPO to assist the Court in consideration of the sale of PII is not only appropriate and in the best interest of consumers and creditors, but mandatory under the Bankruptcy Code prior to any sale transaction involving PII.

## II. JURISDICTION AND VENUE

1. The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) and the Court has the authority to enter a final order with respect to the Motion.

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the requested relief are sections 105(a), 332, and 363(b)(1) of the Bankruptcy Code, rules 6004(g), 7004, 9006(d), and 9014 of the Federal Rules of Bankruptcy Procedure (the Bankruptcy Rules"), and this Court's Local Rules of Bankruptcy Procedure (the "Local Rules").

## III. RELEVANT BACKGROUND

4. Founded in 2006, 23andMe provides genetic testing directly to consumers, which includes collection of a consumer's biological sample, conducting DNA genotyping, and providing "personalized genetic reports on everything from ancestry composition to traits to genetic health risks."[10] 23andMe also provides Exome Sequencing to "detect 50,000+ hereditary disease-causing

---

[10] See First Day Declaration, ¶¶ 19, 27; 23andMe, Frequently asked questions, https://www.23andme.com (last visited April 2, 2025).

4

variants."[11] As a result of its products and services, according to the Debtors, the company has amassed data from over fifteen (15) million customers.[12]

5. In October 2023, 23andMe suffered a data breach which, they believe, impacted approximately seven (7) million consumers thus prompting various federal, state, and international investigations, including an investigation by Texas into the company's state law violations.[13]

6. On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are jointly administered, and the Debtors' are operating their business as debtors-in-possession pursuant to sections 1107(a) and 1108.[14]

7. On March 24, 2025, the Debtors filed their Bid Procedures Motion seeking authority to begin a section 363 sale process to sell substantially all or a portion of their unspecified assets on an abbreviated timeline.[15] The Debtors have not filed copies of any of their policies alleged to govern the sale of PII.[16] They have also not disclosed, on the docket, the "privacy practices" they refer to in their First Day Declaration and Bid Procedures Motion.

8. The deadline to file schedules has been extended to April 28, 2025, and the First Meeting of Creditors is scheduled to be held on May 5, 2025.[17]

9. On March 28, 2025, the Court entered an Order on the Bid Procedures Motion that currently provides for a bid deadline of May 7, 2025, an auction on May 14, 2025, if necessary, the filing of a notice identifying sale assets and key terms by May 16, 2025, and a sale hearing on June 17, 2025.[18]

10. On April 3, 2025, the United States Trustee appointed an official committee of

---

[11] 23andMe, Frequently asked questions.
[12] First Day Declaration, ¶ 19.
[13] See First Day Declaration, ¶¶ 6, 64.
[14] Docket Nos. 1, 105.
[15] Docket No. 30.
[16] See supra, n.5.
[17] Docket Nos. 132, 157.
[18] Docket No. 125.

unsecured creditors pursuant to section 1102.[19]

## IV. LEGAL STANDARDS, AUTHORITY, AND ARGUMENT IN SUPPORT

11. Although the Bid Procedures Motion is unclear regarding the assets being sold or the sale terms, the Debtors proposed sale likely includes the sale of PII such as its customer database, customer records, other books and records, health information, research information, and non-genetic and genetic PII. Debtors' counsel was contacted informally regarding clarity as to the proposed sale, including the specific assets being offered for sale, but no substantive response has been provided.

12. A CPO is required prior to approval of the sale of PII, because the Debtors have not established that the sale of PII is permitted by or consistent with their policies, including whether customers provided "explicit consent" to the sale.

13. Section 363(b)(1) provides that:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of [PII] about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease [PII] to any person unless –
> (A) such sale or lease is consistent with such policy; or
> (B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or lease—
> (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
> (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.[20]

### A. The Debtors Have Not Met the Conditions in Section 363(b)(1)(A).

14. Section 363(b)(1) mandates the appointment of a CPO if the Debtors, "in connection with offering a product or service[,] disclose to an individual a policy prohibiting the transfer of" PII *unless* the sale is consistent with the Debtors' policy.[21] Here, the relevant policies for review include

---

[19] Docket No. 159.
[20] 11 U.S.C. § 363(b)(1)(A), (B).
[21] 11 U.S.C. § 363(b)(1)(A) (emphasis added).

6

not only the Debtors' policy in place on the Petition Date but, also, the policy in place at the time a consumer's PII was submitted or collected.[22]

15. According to the Debtors, their fifteen (15)+ million customer database includes many one-time users.[23] Consequently, different or multiple policies may be in effect as to the Debtors' customers on the Petition Date depending on when a customer began or ceased using the Debtors' services, if they consented to any policies at the time their data was collected or submitted, and whether they consented to any subsequent policies. Despite references to "privacy practices," the Debtors have not identified any of their applicable policies related to the transfer of PII or established customer consent.[24]

16. Based on a review of the Debtors' website history, the Debtors posted at least twenty-two (22) updates to their "Privacy Statement" from November 2007 through March 14, 2025.[25] Many versions did not include any reference to sales in the context of "bankruptcy" or "reorganization," and the eighteen (18) updates from November 2007 through October 3, 2023 contain a restriction on the release and/or sale of PII to third parties absent "explicit consent."[26] At least one such version assures consumers, "[a]s a reminder, we do not sell information, and we will not use your Genetic Information for marketing or personalized advertising without your explicit consent,"[27] while others declare, in the company's "core privacy principles," "we will not sell, lease, or rent your individual-level information (i.e., information about a single individual's genotypes, diseases or other traits/characteristics) to any third-party or to a third-party for research purposes without your explicit consent."[28]

---

[22] See In re Gateway Learning Corp., FTC Docket No. 042-0347, 2004 WL 2618647, at *5 (F.T.C. Sept. 10, 2004) (holding that, because the privacy policy had changed from the time the customer signed up with the company and there was no affirmative opt-in for the new policy, the company had to honor the previous policy).
[23] First Day Declaration, ¶ 4.
[24] See supra, n.5.
[25] 23andMe, Privacy Statement (Nov. 7, 2011-March 14, 2025), https://www.23andme.com/legal/privacy/; archived at: https://web.archive.org/web/20250000000000*/https://www.23andme.com/legal/privacy (last visited on April 7, 2025).
[26] Id.
[27] Id. at 23andMe, Privacy Statement (June 8, 2022).
[28] Id. at 23andMe, Privacy Statement (Dec. 7, 2015 and Sept. 29, 2016).

17. Further, the Debtors boast on their website that they "**provide robust controls** that give you options when it comes to your genetic data."[29] Their current "Privacy Statement" affords consumers the right to access and download, correct, and delete personal information and their 23andMe accounts.[30]

18. Although the Debtors represent to consumers that they can download and delete their data at any time, Texas has received complaints indicating consumers are unable to log into their accounts to access or delete their genetic data and/or request the destruction of their biological sample.[31] These consumers complain they are unable to reach the Debtors' customer service for assistance and have not received a response from the company. Other consumers submitted deletion requests but have not received confirmation that their requests were honored. Texas contacted Debtors' counsel regarding consumer account deletion issues asking for information as to steps that were taken or will be taken to address the continued issues, but no further detail has been provided besides a representation that the company is working to respond to customer inquiries and deletion requests. Notwithstanding the Debtors' representations, consumers are left unable to access their accounts or delete their genetic data.

19. As part of its current version of "core privacy values," the Debtors emphasize their security practices stating, "[y]our genetic information deserves the highest level of security, because without security, you can't have privacy" and "23andMe employs software, hardware, and physical security measures to protect your data."[32] While representing to consumers that "[y]ou can be assured that your genetic data **will not be shared** with employers, insurance companies, or public databases without your explicit consent[,]"[33] consumers' personal and genetic information was made available

---

[29] 23andMe, Your privacy comes first, https://www.23andme.com/privacy/ (last visited April 3, 2025) (emphasis in original).
[30] 23andMe, Privacy Statement (March 14, 2025), https://www.23andme.com/legal/privacy/full-version/ (last visited April 8, 2025).
[31] 23and Me, Your privacy comes first ("At any time you have the ability to download your raw data, as well as delete your 23andMe account if you are no longer interested in participating in our Services.").
[32] Id.
[33] Id. (emphasis in original).

8

on a dark web database after the Debtors' data breach.[34] Additionally, in the course of its investigation, Texas found serious issues with the Debtors' data security procedures.[35]

20. Accordingly, the Debtors have not met the conditions in section 363(b)(1)(A), because their policies restrict the transfer of PII and they have not demonstrated that their proposed sale is consistent with their policies, including whether customers provided "explicit consent." They also do not appear to be following their own practices and representations that customers can access and delete their records, and have not disclosed the steps that have or will be taken to ensure no further data breaches occur. As such, the appointment of a CPO is required, appropriate, and necessary.

**B.  A CPO is Required and the Sale of PII Must Comply with Nonbankruptcy Law.**

21. Once a debtor has failed to meet the conditions set forth in section 363(b)(1)(A), section 363(b)(1)(B) requires the appointment of a CPO pursuant to section 332.[36] The CPO's review of a proposed sale includes advising the Court on whether the sale complies with or violates applicable nonbankruptcy law.

22. Section 363(b)(1)(B) provides, in relevant part, that:

> the trustee may not sell or lease [PII] to any person unless . . . after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale . . . (i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and (ii) finding that no showing was made that such sale or lease would violate applicable nonbankruptcy law.[37]

23. Section 332(b) provides the guidelines for a CPO's review:

> The consumer privacy ombudsman may appear and be heard . . . and shall provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of [PII] under section 363(b)(1)(B). Such information may include presentation of–
> (1) the debtor's privacy policy;
> (2) the potential losses or gains of privacy to consumers if such sale

---

[34] Letter from Bill Cassidy, M.D., Ranking Member Senate Comm. on Health, Educ., Labor & Pensions to Anne Wojcicki Chief Executive Officer of 23andMe, Inc. (Oct. 20, 2023), https://www.help.senate.gov/imo/media/doc/cassidy_letter_on_23andme_data_leak.pdf.
[35] Texas conducted its investigation pursuant to the Texas Deceptive Trade Practices—Consumer Protection Act, Tex. Bus. & Com. Code § 17.41 et seq. and Texas state privacy laws.
[36] 11 U.S.C. § 363(b)(1).
[37] 11 U.S.C. § 363(b)(1)(B).

9

or such lease is approved by the court;
(3) the potential costs or benefits to consumers if such sale or such lease is approved by the court;
(4) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.[38]

24. Unlike the sale of other PII, such as names, addresses, credit card information, and customer lists, the sale of genetic information and material, including saliva, genetic testing and identification results, and research affects not only the consumers who entrusted this highly sensitive information to the Debtors, but their parents, children, and other family members who share their DNA. Such information must be safeguarded to prevent harm, treated with extreme care and monitored by a disinterested professional who can advise the Court as to the attendant risks and benefits, including the protection of data and the prospective purchaser's privacy policies and history of compliance.

25. Because the Debtors are governed by a variety of state and federal laws related to PII and genetic data, it is imperative that a CPO's review of the Debtors' sale processes and proposed transactions include analyses of all versions of the Debtors' privacy policies, compliance with applicable nonbankruptcy law, and ensuring all protections are in place regarding PII and other sensitive health and genetic information.[39]

(i.) *The Sale Parties Must Comply with the Texas Direct-to-Consumer Genetic Testing Act.*

26. As a company offering genetic testing products or services directly to consumers in the State of Texas, 23andMe and any buyer(s) of the company's genetic testing line, genetic data, and/or biological samples (the "Sale Parties") are required to comply with the Texas Direct-to-

---

[38] Id. § 332(b).
[39] Several other states have enacted privacy laws concerning genetic data and genetic material. See e.g., Ala. Code §§ 8-43-1 to 8-43-6; Alaska Stat. Ann. §§ 18.13.010 to 18.13.100; Ariz. Rev. Stat. §§ 44-8001 to 44-8004; Cal. Civ. Code §§ 56.18 to 56.186; Del. Code Ann. tit. 16, §§ 1201 to 12078; Fla. Stat. Ann. §§ 760.40, 817.5655; Ga. Code Ann. § 33-54-1 to 33-54-8; Ky. Rev. Stat. Ann. § 311.705; Mass. Gen. Laws Ann. ch. 111, § 70G; Md. Code Ann., Com. Law §§ 14-4401 to 14-4408; Minn. Stat. Ann. § 325F.995; Mo. Rev. Stat. § 375.1309; Mont. Code. Ann. § 30-23-101 to 30-23-106; Neb. Rev. Stat. Ann. §§ 87-901 to 87-904; N.J. Stat. Ann. § 10:5-45; N.M. Stat. Ann. §§ 24-21-1 -- 24-21-7; Nev. Rev. Stat. Ann. § 629.171; N.Y. Civ. Rights Law § 79-l; Or. Rev. Stat. Ann. §§ 192.531 to 192.550; Tenn. Code Ann. §§ 47-18-4901 to 47-18-4906; Utah Code Ann. § 13-60-101 to 13-60-106; Va. Code Ann. §§ 59.1-593 to 59.1-602; Wash. Rev. Code §§ 19.373.005 to 19.373.900; and Wyo. Stat. Ann. §§ 35-32-101 to 35-32-105.

Consumer Genetic Testing Act (the "DTC Genetic Testing Act").[40]

27. Under the DTC Genetic Testing Act, individual Texas residents have an exclusive property right in, and right to exercise exclusive control over, (1) their biological sample and (2) genetic data (i.e., the results of genetic testing or analysis conducted on their DNA), "including the collection, use, retention, maintenance, disclosure, or destruction of the sample or results."[41] The Sale Parties must "provide a process for an individual to access their genetic data, delete their account and/or genetic data, and destroy or require the destruction of their biological sample," and "develop, implement, and maintain a comprehensive security program to protect an individual's genetic data against unauthorized access, use, or disclosure."[42] Other requirements include providing public notice of basic information about the company's collection, use, or disclosure of genetic data.[43]

28. The DTC Genetic Testing Act also requires that the Debtors obtain an individual's **separate express consent to**: (a) transfer or disclose the individual's genetic data to any person other than the company's vendors and service providers; (b) use genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; or (c) retain the biological sample following completion of the initial testing service.[44] Specifically, the Debtors must obtain a **separate** "affirmative response to a clear and meaningful notice regarding the collection, use, or disclosure of genetic data . . . ."[45] Absent written consent, the Debtors are also prohibited from disclosing an individual's genetic data to an entity that offers health insurance, life insurance, or long-

---

[40] Codified primarily in Texas Business & Commerce Code § 503A.001 et seq.
[41] See id. §§ 503A.003 ("Biological sample means a material part of the human body, or a discharge or derivative part of the body, including tissue, blood, urine, or saliva that is known to contain DNA." Id. § 503A.001(1). "Genetic data means any data, regardless of format, concerning an individual's genetic characteristics. The term includes: (i) raw sequence data derived from sequencing all or a portion of an individual's extracted DNA; (ii) genotypic and phenotypic information obtained from analyzing an individual's raw sequence data; and (iii) health information regarding the health conditions that an individual self-reports to a company and that the company (a) uses for scientific research or product development; (b) analyzes in connection with the individual's raw sequence data; and (c) does not include deidentified data." Id. § 503A.001(6). "Deidentified data means data not reasonably linked to and that cannot reasonably be used to infer information about an identifiable individual." Id. § 503A.001(2). "DNA means deoxyribonucleic acid." Id. § 503A.001(4).
[42] Id. §§ 503A.005(a)(1), (c).
[43] Id. § 503A.005(a)(2), (b).
[44] Id. § 503A.006(a)(1).
[45] Id. § 503A.001(5) (defining "express consent").

11

term care insurance or an individual's employer.[46]

        (ii.)        *The Sale Parties Must Comply with the Texas Data Privacy and Security Act.*

29.      The Sale Parties are also subject to the Texas Data Privacy and Security Act (the "TDPSA"), which regulates the collection, use, processing, and treatment of consumers' personal data and provides consumers with certain rights regarding their data.[47] The TDPSA also requires companies to make certain disclosures in their Privacy Notice.[48]

30.      Companies subject to the TDPSA are required to establish, implement, and maintain reasonable administrative, technical, and physical data security practices to protect the confidentiality, integrity, and accessibility of personal data.[49] Personal data includes sensitive data and specifically, genetic data.[50] Subject companies may not process the sensitive data of a consumer without obtaining the consumer's consent.[51]

31.      Under the TDPSA, consumers have the right to: (a) confirm whether their personal data is processed; (b) correct inaccuracies in their personal data; (c) delete their personal data; (d) obtain a copy of their personal data previously provided; and (e) opt out of targeted advertising, the sale of personal data, and profiling in furtherance of a decision that produces a legal or similarly significant effect concerning the consumer.[52]

32.      The Sale Parties' collection, use, and processing of consumers' genetic data requires compliance with the TDPSA's notice and disclosure requirements, data security safeguards, consumer data privacy rights, and allow consumers to exercise their data privacy rights.

---

[46] Id. § 503A.007.
[47] Codified primarily in Texas Business & Commerce Code § 541.001 et seq.
[48] Id. § 541.102.
[49] Id. § 541.101(a)(2).
[50] Id. § 541.001(19), (29)(B).
[51] Id. § 541.101(b)(4). Consent "means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer." Id. § 541.001(6). Consent "does not include (A) acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; (B) hovering over, muting, pausing, or closing a given piece of content; or (C) agreement obtained through the use of dark patterns." Id.
[52] See id. §§ 541.001(28)(E) and 541.051(b).

(iii.)   *The Sale Parties Must Comply with the Texas Identity Theft Enforcement and Protection Act.*

33.     The Sale Parties are also subject to the Texas Identity Theft Enforcement and Protection Act ("ITEPA").[53] ITEPA creates legal protections for certain information and data breach notification and reporting requirements.

34.     Companies that collect or maintain "Sensitive Personal Information" have a business duty to implement and maintain reasonable safeguards to protect it from unlawful use or disclosure.[54] The genetic data the Debtors possess is Sensitive Personal Information, and ITEPA requires the Sale Parties to comply with the business duty to protect this data.[55]

35.     In the event of a data breach, ITEPA requires companies to timely notify affected consumers and, if involving 250 or more Texas residents, to report the breach to the Office of the Texas Attorney General.[56] The Sale Parties must also comply with these requirements and have in place an appropriate Data Breach Response and Notification Plan in the event of the unlawful disclosure of the genetic data such as the data breach the Debtors' encountered in October 2023.

C.      **The Facts and Circumstances of this Case Warrant the Appointment of CPO.**

36.     Section 105(a) provides that:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.[57]

37.     "Even if a sale will comply with the Debtors' privacy policy, bankruptcy courts have the discretion 'to order the appointment of officers or professionals at the expense of the estate when the court feels that it could benefit from the additional information or assistance that a neutral third

---

[53] Codified primarily in Texas Business & Commerce Code § 521.001 et seq.
[54] Id. § 521.052(a).
[55] See id. § 521.002(a)(2)(B)(i) (defining "Sensitive Personal Information").
[56] Id. § 521.053.
[57] 11 U.S.C. § 105(a).

13

party might provide.'"[58]

38. As the Debtors have acknowledged, they are governed by "the requirements of numerous local, state, federal and international laws, rules, and regulations relating to the privacy and security" of PII.[59] The Debtors have also previously suffered a data breach compromising genetic information, and Texas customers continue to face issues and delays in the process of account deletion.

39. Given the significant amount and sensitive nature of customer PII that could be included in a sale, the numerous applicable laws restricting the Debtors' sale, and the various versions of the Debtors' policies that may be applicable to the customer database, appointing a neutral CPO early in the sale process will ensure adequate protection of customer PII.

## V.    RESERVATION OF RIGHTS

40. Texas reserves the right to supplement this Motion or to raise additional arguments or objections to the Debtors' proposed sale as necessary and appropriate.

## VI.    NOTICE

41. This Motion, and notice thereof, will be served in accordance with this Court's *Interim Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* [D.E. 131], Bankruptcy Rule 2002, and Local Rule 9013-3, as applicable.

## VII.    PRAYER

42. WHEREFORE, Texas respectfully requests that the Court direct the United States Trustee to appoint a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code and enter any other and further relief to which the Court finds just and appropriate.

*[Remainder of page left intentionally blank.  Signature page follows.]*

---

[58] In re Celsius Network LLC, No. 22-10964(MG), 2022 WL 14193879, at *7 (Bankr. S.D.N.Y. Oct. 24, 2022).
[59] First Day Declaration, ¶ 54.

Dated: April 9, 2025

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**RACHEL R. OBALDO**
Chief for Bankruptcy & Collections Division

*/s/ Roma N. Desai*
**LAYLA D. MILLIGAN**
Texas State Bar No. 24026015
**ROMA N. DESAI**
Texas State Bar No.  24095553
**STEPHANIE EBERHARDT**
Texas State Bar No. 24084728
Assistant Attorneys General
Office of the Texas Attorney General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov
stephanie.eberhardt@oag.texas.gov

ATTORNEYS FOR THE STATE OF TEXAS

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was filed electronically on the 9th day of April 2025, with the United States Bankruptcy Court, and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

/s/ Roma N. Desai
**ROMA N. DESAI**
Assistant Attorney General