## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 25-40976-357 |
| | ) | Jointly Administered |
| 23ANDME HOLDING CO., et al., | ) | |
| | ) | Hon. Brian C. Walsh |
| | ) | U.S. Bankruptcy Judge |
| Debtors. | ) | |
| | ) | Hearing Date:        April 29, 2025 |
| | ) | Hearing Time:        1:30 p.m. |
| _____ | ) | Hearing Location: |
| | ) | Thomas F. Eagleton U.S. Courthouse |
| JERRY L. JENSEN, | ) | 111 S. 10th Street |
| Acting United States Trustee, | ) | Courtroom 5 North |
| Movant, | ) | St. Louis, MO 63102 |
| | ) | |
| v. | ) | Response Due:        April 29, 2025 |
| | ) | |
| 23ANDME HOLDING CO., et al., | ) | |
| | ) | |
| Respondents. | ) | |

## UNITED STATES TRUSTEE'S (I) MOTION FOR APPOINTMENT OF CONSUMER PRIVACY OMBUDSMAN OR, IN THE ALTERNATIVE, APPOINTMENT OF AN EXAMINER AND (II) OBJECTION TO DEBTORS' MOTION FOR APPOINTMENT OF INDEPENDENT CUSTOMER DATA REPRESENTATIVE

COMES NOW, Acting United States Trustee, Jerry L. Jensen (the "United States Trustee"), and moves this Court for an order directing the United States Trustee to appoint a Consumer Privacy Ombudsman ("CPO") pursuant to 11 U.S.C. §§ 332 and 363(b)(1) and Fed. R. Bankr. P. 6004(g) in connection with the proposed sale or transfer of customer information by 23andMe Holding Co., and with its

affiliated debtor entities (collectively, the "Debtors" or "23andMe"), or, in the

alternative, for an order directing the appointment of an examiner under 11 U.S.C.

§ 1104(c); and objects to the Debtors' Motion for entry of an order appointing an

"Independent Customer Data Representative" (the "CDR Motion") (Doc. 169).

## INTRODUCTION

These chapter 11 cases present unique circumstances that will require the Court

to balance the Debtors' need to maximize the value of their estate against the privacy

interests of their customers. Among the Debtors' most valuable assets are databases

containing genetic, health, and personal information for more than 15.5 million

individual customers. These records include some of the most private and sensitive

personal information imaginable, and as the Debtors' prior experience with a large-

scale privacy breach unfortunately demonstrates, many individuals may face untold

and irreparable harms if that information is again breached, misdirected, or misused.

Among other risks, the misuse of genetic data poses substantial risk of "synthetic

identity theft" (criminals' use of stolen personally identifiable information, including

genetic data, to create false identities) and, in some circumstances, risks to the national

security of the United States.

Because the personal genetic information of the Debtors' customers is likely to

be included in any proposed sale of the Debtors' assets, the Court will be faced with

difficult questions about *whether* that data can be sold at all consistent with the

Debtors' privacy policies in effect on the petition date with respect to *each* of its 15.5 million customers, other applicable nonbankruptcy laws and regulations, and the public interest. And if that data can be sold, the Court must consider what privacy guardrails should be imposed consistent with those applicable laws and privacy policies. This undertaking requires the expertise of an independent and neutral privacy professional whose loyalties lie to the estate, its individual customers, and stakeholders as a whole.

The goals of protecting consumer privacy and maximizing estate value, however, are not necessarily incompatible. The more confidence that consumers have in the safety and security of their personal data during a sale process and after, the more data the Debtors will be able to sell (assuming it can be sold). The United States Trustee's appointment of a neutral, third-party privacy professional could reassure individuals about the safety and security of their data, resulting in fewer account deletions—a "win-win" for all stakeholders.

The Court should direct the United States Trustee to appoint a CPO under section 332 of the Bankruptcy Code, a provision enacted by Congress to address the very public policy concerns here. In the alternative, if the Court determines that the statutory requirements for appointment of a CPO are not satisfied or exercises its discretion not to direct the appointment of a CPO, the United States Trustee requests that the Court order the appointment of an examiner under section 1104(c)(1) of the Bankruptcy Code as in the "interests of creditors, any equity security holders, and

3

other interests of the estate" to investigate and to report on the privacy issues implicated by the Debtors' proposed sale of assets.

Although the Debtors have not consented to the appointment of a CPO or an examiner, they acknowledge the need for oversight of their privacy practices and any sale of customer data through their own motion for the appointment of a non-statutory "Independent Customer Data Representative" (the "CDR"). Although the relief sought by the Debtors and the United States Trustee may seem superficially similar, there are critical differences between the two motions. Most importantly, the Debtors seek the right to handpick their own CDR, in contrast to the independent appointment process for the CPOs and examiners mandated by the Bankruptcy Code. Furthermore, the role of the Debtors' proposed CDR would be far narrower than that of a CPO or examiner. In particular, under the Debtors' proposed CDR protocol, the CDR's investigation would apparently be limited to analyzing a proposed sale against the baseline of the Debtors' current privacy policy. Unlike a CPO or examiner, the CDR would not consider broader questions of whether that sale complies with applicable nonbankruptcy law, public policy, or whether the Debtors' previous, more restrictive privacy policies may still be "in effect" regarding certain customers, especially those who have not used the Debtors' services in years or agreed to updated terms.

Given the paramount importance of privacy and data security issues in this case, there is no reason for the Court to bypass the privacy and oversight provisions

4

set forth in the Bankruptcy Code for these exact circumstances. The Court should direct the appointment of a CPO in accordance with sections 332 and 363 or an examiner under section 1104, and it should deny the Debtors' motion for the appointment of a non-statutory CDR.

## BACKGROUND

### I.    The Debtors' Business Involves the Collection of Extensive Customer Data.

The Debtors operate a consumer-facing genetic testing, telehealth services, and biomedical research business. 23andMe collects, analyzes, and stores extensive amounts of personally identifiable and sensitive genetic information from millions of customers. This information gathering process is initiated when a customer submits an at-home saliva kit to the Debtors for laboratory analysis.[1] 23andMe then provides the customer with reports related to ancestry, health risks, and genetic traits. Through this business model, 23andMe has amassed one of the largest private databases of human genetic data (in addition to other customer information), encompassing the profiles of more than 15.5 million individuals.[2]

Beyond direct-to-consumer services, 23andMe monetizes its data through research partnerships with pharmaceutical companies and research institutions to support drug development and biomedical research. According to the Debtors, more

---

[1] Kvarda Declaration, Doc. 32, at ¶ 27.
[2] *Id.* at ¶ 19.

than 80% of their customers, or about 12.9 million people, have consented to the use of their data in biomedical research.[3]

## II.    The Scope and Scale of Personal Customer Data Held by the Debtors is Immense.

The Debtors have disclosed that, as part of their businesses, they maintain a broad collection of sensitive personal information about their customers, including:

- customer names, addresses, emails, phone numbers, dates of birth, and payment information;

- genetic information, including raw genotype data and accompanying reports;

- laboratory values and other information derived from saliva samples submitted by users;

- self-reported user information, including health history, ethnicity, family medical background, and lifestyle traits;

- customer biometric information used to verify customer identity;

- user-generated content posted to or through 23andMe; and

- internet tracking and usage analytics collected from users via cookies and other tracking devices.[4]

---

[3] *Id.* at ¶ 38.
[4] https://www.23andme.com/legal/privacy/full-version/ (last updated March 14, 2025).

Unlike other types of personally identifiable information, genetic data is biologically unique, permanent, and unalterable. Even when anonymized, genetic information can be re-identified using external databases, such as public genealogy websites or data obtained through prior breaches.[5] "With the emergence of large genomic databases, de-identified genetic data for research and business purposes can be linked to individuals using genomic software and public information, creating a significant re-identification risk."[6]

As the Debtors' own recent history illustrates, genetic information is especially vulnerable to sophisticated cyber threats. In October 2023, the Debtors were the subject of a cyber-attack that led to the unauthorized accessing of the personal and genetic information of approximately seven million customers, which has resulted in numerous litigated and regulatory actions against the Debtors, and which was one of the events precipitating these chapter 11 cases.[7]

## III.   The Debtors' Privacy Policies Provide for Limited Protection of Consumer Data.

The Debtors maintain a privacy policy that they disclose to their customers through a Privacy Statement and Medical Record Privacy Notice that can be accessed

---

[5] *See* Zachary Shapiro, *Big Data, Genetics, and Re-Identification,* BILL OF HEALTH (Apr. 7, 2025), https://petrieflom.law.harvard.edu/2015/09/24/big-data-genetics-and-re-identification/.

[6] https://news.bloomberglaw.com/us-law-week/23andme-bankruptcy-puts-spotlight-on-genetic-privacy-compliance (Apr. 4, 2025).

[7] Kvarda Declaration, Doc. 32, at ¶¶ 64-77.

7

through 23andMe's website (the "Privacy Statement").[8] Among other terms, the

current Privacy Statement represents that 23andMe will not voluntarily share

customer information with "public databases, insurance companies or employers, or

law enforcement, absent a valid court order, subpoena, or search warrant."[9] The

current Privacy Statement further represents that disclosures to third parties require

specific authorization and explicit consent.[10]

     The Debtors further assure users "[y]ou are in control of your data," meaning

"you decide how your information is used and for what purposes."[11] This includes the

ability to delete their information and biological samples. According to the current

Privacy Statement, customers retain the right to delete their data from 23andMe's

platform "at any time."[12] 23andMe provides an automated process for users to request

the deletion of their personal information and biological samples.[13]

     Under some circumstances, the Debtors may retain customer data, even of

customers who delete their accounts.[14] For example, under "Retention of

Information," 23andMe represents it retains "customer genetic information, date of

---

[8] https://www.23andme.com/legal/privacy/full-version/ (last updated March 14, 2025).

[9] *Id.*

[10] *Id.*

[11] https://www.23andme.com/privacy/ (last accessed April 10, 2025).

[12] *Id.*

[13] https://customercare.23andme.com/hc/en-us/articles/212170688-Requesting-23andMe-Account-Closure (last accessed April 7, 2025).

[14] https://www.23andme.com/legal/privacy/full-version/ (last updated March 14, 2025).

birth, and sex as required for compliance with applicable legal obligations, including

the federal Clinical Laboratory Improvement Amendments of 1988 (CLIA), California

Business and Professions Code Section 1265 and College of American Pathologists

(CAP) accreditation requirements, **even if you chose to delete your account**."[15]

(emphasis added).

In June 2022, the Debtors amended the Privacy Statement to permit the

transfer of personal information in bankruptcy.[16] Specifically, the Privacy Statement,

under the heading "Data Sharing," provides:

> **Commonly owned entities, affiliates and change of ownership**: If
> we are involved in a bankruptcy, merger, acquisition, reorganization,
> or sale of assets, your Personal Information may be accessed, sold or
> transferred as part of that transaction and this Privacy Statement will
> apply to your Personal Information as transferred to the new entity.
> We may also disclose Personal Information about you to our
> corporate affiliates to help operate our services and our affiliates'
> services.[17]

Prior to the June 2022 amendment, the Privacy Statement did not mention

bankruptcy.[18]

Notably, the authorization for data sharing under the Privacy Statement

appears to be limited to internal reorganizations or transactions in which the Debtors

---

[15] *Id.*

[16] David Siffert, *If 23andMe Goes Bankrupt, What Happens to All Our Data?,* 203 N.Y.L.J. 4 (Jan. 4, 2025).

[17] https://www.23andme.com/legal/privacy/full-version/ (last updated March 14, 2025).

[18] Siffert, *supra* note 16.

are sold as a going concern; the Privacy Statement does not address or authorize transfers in which the Debtors' customer data is sold as a separate asset. In addition, it is unclear whether the June 2022 version (or any version thereafter) of the Privacy Statement applies to all or merely to some of the Debtors' customers. The Debtors' disclosures do not explain the procedures, if any, under which customers were required to assent to changes in their privacy policies, and it may be possible that some inactive customers (who have not logged on to 23andMe's website or otherwise interacted with the Debtors since 2022 or earlier) may remain subject to older versions of the Privacy Statement, which do not include the bankruptcy language added in June 2022.

Apart from the terms of the Privacy Statement, the Debtors' collection and maintenance of customer data is subject to numerous state, federal, and international laws and regulations, including the California Consumer Privacy Act, the federal Confidentiality of Medical Information Act, and at least ten state genetics privacy laws.[19]

## IV.    The Debtors Filed Chapter 11 Cases in Response to Lower Customer Demand, Increased Competition, and a 2023 Data Breach.

On March 23, 2025, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. As causes for the filings, the Debtors cite increased operational costs, declining consumer demand for genetic testing, and

---

[19] Kvarda Declaration, Doc. 32, at ¶¶ 54-55.

increased competition in the genetic testing and telehealth industries.[20] 23andMe also cited litigation and regulatory costs resulting from a significant data breach in October 2023, compromising the personal information of approximately seven million customers.[21]

According to their filings, the Debtors seek to pursue an expedited sale of substantially all their assets.[22] The Debtors have stated that any potential buyer must agree to comply with 23andMe's existing privacy policy and applicable laws. Specifically, the Debtors' proposed bid procedures require prospective bidders to "comply in all respects with the Debtors' consumer privacy practices" and make a statement "acknowledging such compliance."[23] At the first day hearings on March 26, 2025, the Debtors represented that the bankruptcy filing and related relief do not change how the Debtors store, manage, or collect customer data and that the Debtors remain committed to its customers and to being transparent about how their data is managed and treated in the bankruptcy.

## V.  The Debtors' Bidding Procedures Require a Purchaser of Customer Data to Comply with the Debtors' Current Privacy Policy.

On March 28, 2025, the Court entered an order approving bidding procedures for a proposed sale of the Debtors' assets (the "Bidding Procedures").[24] Under the

---

[20] *Id.* at ¶¶ 4-5.
[21] *Id.* at ¶¶ 7, 64.
[22] *E.g.*, Bidding Procedures Motion, Doc. 30, at ¶¶ 15-16
[23] *Id.* at 12; Bidding Procedures at 11.
[24] Doc. 125, Exhibit 1.

Bidding Procedures, the Debtors may consider bids for "all or any portion of" their assets, including their repository of the personal and genetic customer information.[25] The Bidding Procedures further state that that prospective bidders must "comply in all respects with the Debtors' consumer privacy practices" and make a statement "acknowledging such compliance."[26]

But the Debtors' alleged commitment to future compliance with their Privacy Statement—either by them or any purchaser—is not unequivocal. Despite repeated statements that the bid procedures will require any purchaser to abide by the Debtors' "consumer privacy practices," the Debtors gave themselves "an out": "To the extent circumstances arise where any deviation from the Company's consumer privacy practices is warranted and/or necessary, the Debtors will implement any such change in accordance with applicable law(s), with adequate notice to applicable parties, and/or with necessary relief from this Court, as appropriate."[27]

## VI.   The Debtors Filed a CDR Motion.

On April 7, 2025, the Debtors filed the CDR Motion, which seeks authorization for the estate to retain a CDR pursuant to a "CDR Protocol" set forth in that motion.[28] The CDR Motion characterizes the proposed CDR as an alternative to the CPO, which the Debtors assert is not warranted because the Privacy Statement

---

[25] *Id.* at 2.
[26] *Id.* at 11.
[27] Kvarda Declaration, Doc. 32, at ¶ 112.
[28] CDR Motion, Doc. 169, at ¶¶ 16-21.

"in effect" on the petition date allegedly authorizes the sale of the Debtors' customer data, as well as based on the Debtors' assurances that they will require asset purchasers to comply with their existing privacy policies.[29]

Under the Debtors' proposed CDR Protocol, the CDR will be charged with reviewing the Debtors' existing policies, cybersecurity infrastructure, and "other relevant information."[30] The CDR's findings will be reflected in a report that will opine on the reasonableness of any proposed sale "after balancing … the interests of the Debtors' customers with respect to the treatment of management of Customer Data against the Debtors' fiduciary obligation to maximize the value of their respective estates."[31]

## ARGUMENT

### I.    Appointment of a CPO is Required under 11 U.S.C. § 332.

#### A.    Because the Proposed Sale May Result in the Transfer of Sensitive Personal Information in a Manner Not Authorized by the Privacy Statement, Appointment of a CPO is Mandatory.

A debtor in bankruptcy may generally sell, with court approval, property of the estate outside the ordinary course of business.[32] But if that property includes "personally identifiable information about individuals," the Bankruptcy Code imposes

---

[29] *Id.* at ¶ 12.
[30] *Id.* at ¶ 17.
[31] *Id.* at ¶ 19.
[32] *See* 11 U.S.C. § 363(b)(1).

13

additional requirements in certain circumstances before any such sale or transfer can be approved. If the debtor maintained a privacy policy that restricted the sale of personally identifiable information, or if the privacy policy failed to disclose that the debtor may sell or transfer that information, the Court must appoint a CPO under section 332 of the Bankruptcy Code to assist the Court in its consideration of the sale motion (unless it separately finds that the sale is consistent with the privacy policy).[33] In addition, as part of its section 363 hearing, the Court must also consider whether such sale "would violate applicable nonbankruptcy law."[34]

In turn, section 332 of the Bankruptcy Code provides that the bankruptcy court "shall order" the United States Trustee to appoint a CPO in any case in which a hearing is required under section 363(b)(1)(B).[35] Such a CPO must be disinterested and must be appointed no later than seven days before the sale hearing.[36] Once appointed, the CPO has the duty to "provide . . . information to assist the court" on privacy issues, including on the terms of the debtor's privacy policy and the potential harms to consumers that might result from the sale.[37]

---

[33] *See* 11 U.S.C. § 363(b)(1)(A), (B).
[34] 11 U.S.C. § 363(b)(1)(B)(ii).
[35] *See* 11 U.S.C. § 332(a).
[36] *Id.* In most cases, a privacy ombudsman needs far more than seven days to complete the necessary work, and that will be particularly true here given the scope and nature of the personal data Debtors maintain.
[37] *See* 11 U.S.C. § 332(b).

In this case, the customer lists and biographical data collected by the Debtors are "personally identifiable information" (also sometimes referred to as "PII") within the meaning of the Bankruptcy Code.[38] In addition, although not explicitly addressed in the Bankruptcy Code, the genetic data maintained by the Debtors also falls within the definition of "personally identifiable information" because genetic data can be "re-identified."[39] "[P]ersonally identifiable information" includes information "that, if disclosed, will result in … identifying such individual physically or electronically."[40] It is no surprise that the Code does not expressly address genetic and biometric data because direct-to-consumer genetic testing did not exist in 2005, when Congress added section 332 to the Code.[41] But there can be little doubt that the definition of PII is broad enough to encompass genetic data that is itself a form of identification. "Even just the identity theft risks become serious, as more and more sources resort to biometric forms of identification . . . ."[42]

Because a sale of the Debtors' assets (or a stand-alone sale of the Debtors' customer databases) will involve protected personally identifiable information, a hearing under section 363(b)(1)(B) (and therefore also the appointment of a CPO under section 332) is mandatory unless the Court finds that the sale is fully authorized

---

[38] *See* 11 U.S.C. § 101(41A).

[39] *See supra* at 7.

[40] *See* 11 U.S.C. § 101(41A)(B)(ii)

[41] 23andMe was the first company to offer the service after the company was founded in 2006. Kvarda Declaration, Doc. 32, at ¶ 19.

[42] Siffert, *supra* note 16.

by the Debtors' privacy policy. But the record of this case is insufficient for the Court to make any such finding, for at least two reasons. <u>First</u>, bids for the Debtors' assets have not yet been received, and it unclear whether those assets will eventually be sold as a going concern or piecemeal (in which case the "change of ownership" provisions of the Privacy Statement may not apply).

     <u>Second</u>, the revised terms of the Privacy Statement are likely unenforceable as to customers who submitted their data to 23andMe before June 2022, particularly those customers who never affirmatively assented to the revised terms of that document:

> The Federal Trade Commission ("FTC") has made it clear that a debtor's privacy policy on the petition date is not the only privacy policy that matters. There are circumstances in which the personal information collected by the debtor may be subject to representations in prior privacy policies. For example, if a consumer has submitted personal information pursuant to a privacy policy that either prohibits its sale or fails to disclose that such information may be sold or transferred, the consumer's information may not be sold unless the consumer has consented to any subsequent change in the privacy policy to permit such a sale. If the consumer has not consented to any subsequent change in the privacy policy, the consumer's personal information may continue to be governed by the privacy policy in place at the time his or her personal information was submitted or collected.[43]

Moreover, for similar reasons, prior privacy policies—that did not disclose the possibility of customer data being sold in a bankruptcy—may be the policy in effect on the petition date with respect to certain customers' data:

---

[43] Michael St. Patrick Baxter, *The Sale of Personally Identifiable Information in Bankruptcy*, 27 AM. BANKR. INST. L. REV. 1, 2 (2019) (footnotes omitted).

16

The text of the Bankruptcy Code supports the relevance of a debtor's prior privacy policy to the sale of PII. The requirement for the appointment of a consumer privacy ombudsman turns on whether the privacy policy "in effect on the date of the commencement of the case" prohibits the transfer of PII. The privacy policy "in effect on the date of the commencement of the case" does not necessarily refer to the debtor's privacy policy in place on the petition date. Instead, it refers to the privacy policy that applies to-—or to use the statutory language, is "in effect" with respect to-—the particular PII in question. If, for the reasons discussed above, the debtor's PII is governed by more than one privacy policy, the appointment of a consumer privacy ombudsman is required if any applicable privacy policy—even if it is a prior privacy policy—prohibits the transfer of the PII in question. This can be so even if the debtor's privacy policy on the petition date permits the sale of PII. For consumers whose personal information was collected under an earlier, more restrictive privacy policy, and who did not consent to any subsequent privacy policy, the sale of their PII may violate the privacy policy applicable to their PII "in effect on the date of the commencement of the case."[44]

The Debtors, however, wholly ignore the possibility that there may have been multiple privacy policies in effect on the petition date for different "buckets" of consumers and simply assume that only the June 2022 policy applies. A CPO should be appointed to investigate and to report on which customers were subject to which privacy policy on the petition date and thus whether they consented to the sale of their personal data.

---

[44] *Id.* at 12.

**B.    In the Alternative, the Court Should Exercise Its Discretion to Appoint a Section 332 CPO.**

Even if the Court determines that the facts of this case do not trigger the mandatory CPO appointment under section 332, "the Court has discretion to appoint an ombudsman if it believes a neutral third party would be helpful, even if a sale will comply with the Debtors' privacy policy."[45]

Here, the circumstances weigh strongly in favor of the discretionary appointment of a CPO even if the Court determines that such appointment is not mandatory. The personal information at issue is not simply "garden variety" customer lists and financial information. Rather, it includes the most personal and sensitive of information—millions of individuals' health, family, and genetic data.

Misuse of genetic data presents unique security concerns, including risks of discrimination based on genetic predispositions[46] and "synthetic identity fraud, where criminals exploit genetic information to create false identities or impersonate relatives for financial gain."[47] Misuse of genetic data also poses national security risks: "If

---

[45] *In re Celsius Network LLC*, No. 22-10964, 2022 Bankr. LEXIS 3023 at *22-23 (Bankr. S.D.N.Y. Oct. 24, 2022) (citing 3 Collier on Bankruptcy ¶ 332.02 (16th ed. 2022)) (court can "order the appointment of officers or professionals at the expense of the estate when the court feels that it could benefit from the additional information or assistance that a **neutral** third party might provide") (emphasis added).

[46] Although the Genetic Information Nondiscrimination Act of 2008, 42 U.S.C. § 2000ff et seq. ("GINA"), makes discrimination in employment or health insurance based on genetic information illegal, the risk of illegal discrimination remains.

[47] https://news.bloomberglaw.com/us-law-week/23andme-bankruptcy-puts-spotlight-on-genetic-privacy-compliance (Apr. 4, 2025).

hostile foreign governments obtain Americans' genetic and medical data, they could develop biological weapons targeting the population or food supply, and gain significant strategic and economic power over the US."[48] Because some of this genetic information has already been wrongfully disseminated through a data breach involving the Debtors, there is an even more compelling public interest in ensuring customer confidence through independent oversight of the Debtors' data practices in connection with any proposed sale.

In addition, determining the legality of any such proposed sale will involve not only analyzing the Debtors' current and past privacy policies, but it may also require analyzing dozens or more state, federal, and international regulatory schemes. Given the aggressive and accelerated sale schedule proposed by the Debtors, even as rightly extended by the Court, the Court will benefit from the insight of a neutral subject matter expert who can provide objective analysis of these groundbreaking and unprecedented (in a bankruptcy court at least) privacy matters. "Even though speed is generally prioritized in bankruptcies, the congressional purpose to prioritize privacy should not be sacrificed as a result."[49]

---

[48] *Id.*

[49] Note, *Data Privacy in Bankruptcy: The Consumer Privacy Ombudsman*, 138 HARV. L. REV. 1451, 1457-58 (Mar. 2025) (footnote omitted).

## II.   In the Alternative, the Court Should Appoint an Examiner under 11 U.S.C. § 1104(c)(1) as in the Interests of the Debtors' Estates, Creditors, and Equity Security Holders.

If this Court declines to order the appointment of a CPO, it nevertheless should exercise its discretion and order the appointment of an examiner under section 1104(c)(1) because the appointment would be in the interests of the Debtors' estates, their creditors, and equity security holders for the same reasons discussed in I.B. *supra*. The overwhelming majority of creditors are its seven million customers whose data was compromised in the 2023 cyber-attack. These customers, along with those whose data was not compromised but whose data remains in the Debtors' control, have a strong interest in ensuring that their most personal and private data remains secure during and after any sale (assuming they have consented to that sale).

The appointment of an examiner has been held to be particularly appropriate when the subject matter of the investigation involves a complex area of law that may be beyond the bankruptcy court's expertise.[50] Examiners can also offer "valuable perspective" in a "case with many competing interests at stake," and the need for specialized "expertise" constitutes "cause" for the appointment of an examiner.[51] Given the unique complexities of safeguarding genetic data and the multiple laws that

---

[50] *See In re Michigan BioDiesel, LLC*, 466 B.R. 413, 421 (Bankr. W.D. Mich. 2011) (appointing examiner and noting that the court would "appreciate an examiner's independent advice on these complex issues of federal tax and energy policy").
[51] *First American Health Care of Georgia, Inc. v. U.S. Department of Health and Human Services*, 208 B.R. 992, 995 (Bankr. S.D. Ga. 1996).

apply, this case fits the complex profile weighing in favor of appointing an examiner focused on data privacy.

Moreover, the Debtors have not been transparent about prior privacy policies that may still have been "in effect" on the petition date for multiple customers and specifically have failed to disclose how many of their customers have not logged in to their 23andMe accounts since June 2022, when the privacy policy first contemplated allowing the sale of personal data in bankruptcy. That lack of transparency also requires a neutral third party to investigate which privacy policies apply to which customer's data and present to the Court, the United States Trustee, and all interested parties a report that the Debtors' customers can understand.

An examiner (or a CPO) may also benefit creditors and the public by analyzing cybersecurity issues and identifying potential cybersecurity vulnerabilities in the Debtors' customer data—as other examiners have previously done in other chapter 11 cases involving sensitive personal information.[52] Indeed, an objective, unbiased, and public evaluation of the Debtors' cybersecurity practices may be essential to restoring public consumer confidence in the Debtors' business model.

Finally, genuinely enforcing data privacy and cyber-security safeguards may also be a value maximizing proposition for the Debtors, their estates, and equity security

---

[52] *See, e.g.*, *In re Celsius Network LLC*, Case No. 22-10964, ECF No. 1948 (Bankr. S.D.N.Y. Jan. 27, 2023) (Consumer Privacy Ombudsman First Report to the Court).

21

holders. Customer data is inherently valuable.[53] Here, the customer data is valuable beyond the ordinary case involving, for example, customer lists and contact information. One of Debtors' most significant assets is the genetic data available for research purposes and thus potential monetization through its partnerships with other businesses and institutions: "the promise shown by the Company's clinical and preclinical stage pipeline demonstrated the potential to license or otherwise monetize 23andMe's extensive database to discover new drugs."[54] But if consumers lose further confidence in the security of their data, they may delete their accounts and their data, further diminishing the value of the Debtors' assets. Indeed, news reports suggest that 23andMe customer requests to delete their data or close their accounts surged in the wake of the bankruptcy filing:

> According to data from online traffic analysis company Similarweb, on March 24, the day of the bankruptcy announcement, 23andMe received 1.5 million visits to its website, a 526% increase from one day prior. According to Similarweb, 376,000 visits were made to help pages specifically related to deleting data, and 30,000 were made to the customer care page for account closure. The next day, that figure rose to 1.7 million visits, and traffic to the delete data help page about 480,000.[55]

---

[53] *See* Cassandra M. Porter, *Confessions of a Consumer Privacy Ombudsman*, Landslide, July/Aug. 2017, at 30 ("Critically, customer data is often among a debtor's most valuable assets.") (quoted in Note, *Data Privacy in Bankruptcy: The Consumer Privacy Ombudsman*, 138 HARV. L. REV. 1451, 1460 n.86 (Mar. 2025)).

[54] Kvarda Declaration, Doc. 32, at ¶ 41.

[55] https://www.cnbc.com/2025/03/30/23andme-bankruptcy-selling-deleting-dna-genetic-testing.html, (Mar. 30, 2025).

Maximizing the value of any section 363 sale requires complete consumer confidence in the security of their data that can only be assured by an independent neutral like an examiner (or CPO). Thus, it is in the collective interest of all stakeholders to appoint an examiner to investigate and to report on privacy issues should the Court decline to appoint a CPO.

### III. The Debtors Should Not Be Allowed to Short Circuit the Code's Requirements for a Neutral and Independent Privacy Fiduciary.

Because there are strong grounds for the appointment of either a CPO or an examiner under the Bankruptcy Code, the Court should reject the Debtors' proposal to retain a CDR (who would be appointed by, and beholden to, the Debtors) in lieu of a statutory fiduciary. Although debtors often take proactive steps to avoid the appointment of a CPO, including by submitting their own reports prepared by debtor-retained privacy experts or by including "boilerplate language about consumer data in sales motions,"[56] a debtor-controlled and debtor-retained privacy expert is precisely what Congress sought to avoid when it added section 332 to the Code:

> Congress intended for the ombudsman to be the one checking any privacy issues precisely because Congress was distrustful of debtors who were abusing the process and selling data in violation of their privacy policies. While some of the debtor actions do help alleviate the concern for potential abuse by promoting consumer-protective language, **these actions only give the illusion that the debtor is looking out for consumer privacy. An ombudsman hired by the debtor for this purpose is not a neutral party like a court-appointed [sic] ombudsman.** A debtor-hired ombudsman's job is to convince the court

---

[56] Note, *Data Privacy in Bankruptcy: The Consumer Privacy Ombudsman*, 138 HARV. L. REV. 1451, 1456 (Mar. 2025).

23

that there are no privacy concerns to worry about in the sale. A court-appointed ombudsman would not be concerned with tailoring their report to a debtor's interests because they are not hired by that debtor.[57]

The Debtors purport to take privacy seriously, "given the importance of protecting Customer Data, the need for any Sale to close as soon as possible after the Sale Hearing, and the privacy and security-related concerns raised by various stakeholders, regulators, and other parties in interest in these chapter 11 cases."[58] But the Debtors' proposed CDR lacks some of the most critical features of a CPO or examiner—neutrality and independence. That is, the United States Trustee, as the neutral and independent watchdog of the bankruptcy system, appoints CPOs (and examiners). One must question why the Debtors go to such great lengths to avoid a neutral and independent appointment. The answer is surely as explained above: a Debtor-appointed privacy professional owes its duties to the Debtors, and its job is to convince the Court that the sale presents no privacy concerns and, instead, comports with law and the Debtors' privacy policies. A United States Trustee-appointed privacy ombudsman's or examiner's duties run to those whose PII and privacy interests are at stake—the Debtors' customers.

The Court should reject the Debtors' CDR proposal for another reason. The Code provides for two types of professionals to investigate and to report publicly to the Court their findings—ombudsmen (sections 332 and 333) and examiners (section

---

[57] *Id.* at 1456–57 (footnote omitted) (emphasis added).
[58] CDR Motion, ¶ 25.

1104). That is it. Although section 363 authorizes a debtor to retain consultants and personnel outside the ordinary course of business, it should not be used to evade the Code's express provisions governing CPOs and examiners, which explicitly place the discretion of whom to appoint with the United States Trustee to ensure their neutrality and independence.

Lastly, the scope of the proposed CDR investigation and report differs materially from the type of investigation that would be performed by either a CPO or an examiner. While the CDR will be charged with balancing the interests of customers against the interests of the Debtors, a CPO's investigation is focused on the separate question of the "costs and benefits <u>to consumers</u>," separate and apart from the interests of the Debtors.[59] A CPO is also charged with examining the Debtors' privacy policies[60] and the legality of any proposed sale under nonbankruptcy law,[61] matters which appear to be outside the proposed scope of the CDR investigation.[62] Although proposing coordination with "Key Stakeholders," the Debtors give themselves discretion to determine who "Key Stakeholders" are and what access to grant such Key Stakeholders, not to mention the United States Trustee and the Creditors' Committee, to the CDR.[63]

---

[59] 11 U.S.C. § 332(b)(2) (emphasis added).
[60] 11 U.S.C. § 332(b)(1).
[61] 11 U.S.C. § 363(b)(1)(B)(ii).
[62] *See* Debtors' CDR Motion, Doc. 169 at ¶¶ 17-20.
[63] *Id.* at ¶ 20.

Although the Debtors assert that the appointment of a CPO is not warranted, this assertion is based entirely on their self-interested belief that any sale of personal information is already authorized by the Privacy Statement—but as explained above, it is far from certain that this is true, particularly in the absence of an independent investigation of, and report on, the Debtors' privacy practices. But even if the Debtors' characterization of their privacy policies were correct, the Court retains the discretion to appoint a CPO or an examiner in the interests of creditors—and as the Debtors' request for a CDR acknowledges, there is ample cause for such an appointment. Finally, if the Court has concerns over the potential costs of a CPO or examiner, it may set a budget in connection with its appointment order, and there is neither evidence nor reason why a CPO or examiner would necessarily impose a greater cost to the estates than the Debtors' proposed CDR.

## CONCLUSION

The appointment of a CPO or examiner is not a procedural formality in this case—it is a necessary measure to safeguard the rights and expectations of millions of individuals whose highly sensitive and permanent personal and genetic data now stands to be sold. The Debtors' non-statutory alternative of a CDR is not an adequate substitute for a CPO or examiner, and appointment of a CDR would serve no purpose except to undermine the Bankruptcy Code's comprehensive scheme for the protection of privacy interests through an independent CPO or examiner and to allow

the Debtors to evade the rigorous and required scrutiny of privacy issues before they may sell the most personal and private data of millions of customers.

WHEREFORE, the United States Trustee respectfully requests that the Court enter an order directing the appointment of a Consumer Privacy Ombudsman under 11 U.S.C. §§ 332 and 363(b)(1), or, in the alternative, directing the appointment of an examiner under 11 U.S.C. § 1104(c), denying the Debtors' motion for appointment of a CDR, and for such other relief as the Court deems just and proper.

Respectfully submitted,

JERRY L. JENSEN
Acting United States Trustee

PAUL A. RANDOLPH
Assistant United States Trustee

By: */s/ Carole J. Ryczek*
Carole J. Ryczek, E.D. MO #6195873IL
Joseph R. Schlotzhauer, E.D. MO #62138
111 S. 10th Street
Suite 6.353
St. Louis, MO 63102
PH: (314) 539-2982
FAX: (314) 539-2990
Email: carole.ryczek@usdoj.gov
joseph.schlotzhauer@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was filed electronically on April 10, 2025, with the United States Bankruptcy Court and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

I further certify that a true and correct copy of the foregoing document was served on April 10, 2025, on the parties listed in and by the method set forth on the Master Service List attached at Exhibit A.

/s/ Margaret Slaughter
Paralegal Specialist
Office of the United States Trustee