# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| 23ANDMEHOLDING CO., *et al.*, | § | Case No. 25-40976 |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |
| The State of Arizona, ex rel. Kristin K. Mayes, the Attorney General; Office of the Attorney General, State of Colorado; State of Connecticut; District of Columbia, Office of the Attorney General; State of Florida, Office of the Attorney General, Department of Legal Affairs; Office of the Illinois Attorney General; The Commonwealth of Kentucky, ex rel. Russell Coleman, Attorney General; State of Louisiana; State of Maine; Michigan Attorney General, *ex rel.* the People of the State of Michigan; State of Minnesota, by its Attorney General, Keith Ellison; New Hampshire Office of the Attorney General, Consumer Protection Division; New Mexico Department of Justice; New York State Attorney General's Office; State of North Carolina; Ohio Attorney General; The State of Oregon, by and through its Attorney General Dan Rayfield; The State of South Carolina ex rel. Alan Wilson, in his official capacity as Attorney General of the State of South Carolina; State of Utah, Office of the Utah Attorney General; State of Vermont; Commonwealth of Virginia, *ex rel.* Jason S. Miyares, Attorney General; Washington Attorney General Nick Brown; Office of the West Virginia Attorney General; State of Wisconsin | § § § § § § § § § § § § § § § § § § § § § § § § § § § | Hon. Brian C. Walsh U.S. Bankruptcy Judge  **Response Deadline:**  April 29, 2025 **Hearing Date:**  April 29, 2025 **Hearing Time:**  1:30 p.m. (CST) **Hearing Location:** Thomas F. Eagleton U.S. Courthouse 111 S. 10th Street Courtroom 5 North St. Louis, MO 63102 |
| Movants, | § | |
| v. | § | |
| | § | |
| 23ANDME HOLDING CO., *et al.*,[1] | § | |
| Respondents. | | |

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

---

**MOTION FOR THE APPOINTMENT OF A CONSUMER PRIVACY
OMBUDSMAN AND A SECURITY EXAMINER PURSUANT TO 11 U.S.C.
SECTIONS 105(a), 332, 363(b)(1) AND FEDERAL RULE OF BANKRUPTCY
PROCEDURE 6004(G) AND NOTICE OF HEARING**

**WARNING: THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT
THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING
PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO
THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE BY APRIL
29, 2025. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE
GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE
GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION
AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.
THE DATE IS SET OUT ABOVE. UNLESS THE PARTIES AGREE OTHERWISE, THE
COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE
MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

COMES NOW, The State of Arizona, ex rel. Kristin K. Mayes, the Attorney General;

Office of the Attorney General, State of Connecticut; District of Columbia, Office of the

Attorney General; State of Florida, Office of the Attorney General, Department of Legal Affairs;

Office of the Illinois Attorney General; State of Louisiana; State of Maine; Michigan Attorney

General, *ex rel.* the People of the State of Michigan; New Hampshire Office of the Attorney

General, Consumer Protection Division; New Mexico Department of Justice; New York State

Attorney General's Office; State of North Carolina; Ohio Attorney General; The State of South

Carolina *ex rel.* Alan Wilson, in his official capacity as Attorney General of the State of South

Carolina; State of Utah, Office of the Utah Attorney General; State of Vermont; Commonwealth

of Virginia, *ex rel.* Jason S. Miyares, Attorney General; Washington Attorney General Nick

Brown; Office of the West Virginia Attorney General; State of Wisconsin[2] by and through

---

[2] Hereinafter, the "States" or "NAAG Client States" and together with the State of Colorado, Commonwealth of

Abigail R. Ryan, Bankruptcy Counsel, National Association of Attorneys General, and by the State of Colorado, by and through Senior Assistant Attorney General, Robert Padjen; by The Commonwealth of Kentucky, ex rel. Russell Coleman, Attorney General, by and through Assistant Attorney General, Christopher D. Hunt; by the State of Minnesota, by its Attorney General, Keith Ellison; and by the State of Oregon, by and through Senior Assistant Attorney General, Justin D. Leonard, and files this *Motion for the Appointment of a Consumer Privacy Ombudsman and a Security Examiner pursuant to 11 U.S.C. Sections 105(a), 332, 363(b)(1) and Federal Rule of Bankruptcy Procedure 6004(g)*,[3] and respectfully shows this Court the following:

## I.     OVERVIEW

This is a watershed moment in bankruptcy—a moment when legal regulations have not kept pace with science, leaving millions of Americans dependent upon the protections and safeguards only this Court can enforce. Bankruptcy courts regularly oversee sales that include personally identifiable information,[4] such as credit card numbers, email addresses, and phone numbers.[5] Congress has determined that such PII requires special care and has established a special provision in the Bankruptcy Code to protect it. However, such PII can be decoupled from the person's identity; while inconvenient, addresses, phone numbers, and credit cards can be changed.[6]

---

Kentucky, State of Minnesota, and the State of Oregon, by and through its Attorney General Dan Rayfield, "the States."

[3] Hereinafter, "Motion" or "States' Motion."

[4] Hereinafter, "PII" or "personally identifiable information."

[5] *See e.g.*, *In re GMC*, 2009 Bankr. LEXIS 5565, *32 (Bankr. S.D.N.Y. 2009), *In re JK Harris & Co., LLC*, 475 B.R. 470, 472 (Bankr. D.S.C. 2012), *In re Golfsmith Int'l Holdings*, 16-12033, 2016 Bankr. LEXIS 4749 at *25 (Bankr. D. Del. Nov. 2, 2016), and *In re Celsius Network, LLC*, 2022 Bankr. LEXIS 3023 at *22-23 (October 24, 2022).

[6] The States do not intend to diminish the problems—sometimes life-altering problems---that the misuse of such information can cause. The States have, in other bankruptcy cases, moved for an ombudsman to protect this type of

---

In this unprecedented case, the information this Debtor seeks to sell[7] is the person's
immutable <u>genetic identity</u>: their genome. That information becomes exponentially more
powerful – and more sensitive – when linked with that person's <u>PII</u>, and for all those who
entrusted the Debtors for medical care, their <u>medical and pharmaceutical records</u>. Coupled
together, the magnitude of the data within this Debtor's control is unprecedented – both in terms
of the sheer amount, as well as its sensitivity: the fact is that an individual's genetic identity is
immutable. The States are concerned not only about the protection of each and every consumer,
but also every person who shares DNA with each consumer – along with their respective future
generations. Each of these current and future people are intimately tied to this data, and most
have no awareness that it has been entrusted with this Debtor, under the oversight of this
bankruptcy court.

The Debtors are now seeking the Court's permission to auction off to the highest bidder
millions[8] of Americans' Genetic Materials,[9] Genetic Data,[10] medical records containing
individualized diagnoses and treatments based upon a consumer's Genetic Data, and other
personally identifiable information with which the Debtors have been entrusted. The States urge
the Court to rely on an independent ombudsman – someone who has the capability to address not

---

data in other sales. *See e.g. In re* ToySmart, Case No. 00-13995, Bankr. Mass. at docket nos. 62 (Texas's obj to
sale), 81 (New York's objection to sale), 83 (Commonwealth of Massachusetts's Memo in Support of dkt. 62), 86
(New York's Memorandum) and docket no 313 (50 States assenting to the complete destruction of Toysmart's PII);
and *In re Radio Shack*, Case No. 15-10197, Bankr. Dist. Delaware at docket no. 1393 (Texas's Objection to Sale
which was joined or supported by thirty-six States) docket no. 1822 (Second objection by the State of Texas to sale
of PII), docket no. 1831 (The State of Oregon, by and through its Attorney General Dan Rayfield 's joinder to
Texas's objection), docket no. 1851 (Objection and Joinder filed by the Commonwealth of Pennsylvania), docket
no. 1852 (Joinder by the State of Tennessee).

[7] Despite the States' request for more information, the Debtors have not specifically articulated what exactly is being
sold; however, due to the nature of the businesses, sensitive genetic materials and/or data may be part of the sale.

[8] *See* docket no. 32 at paras. 2-3, 19. Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First
Day Motions. Hereinafter, "Kvarda Declaration," stating that the Debtors have over 15 million customers. How
many million Americans are part of the 15 million consumers is not know at this time.

[9] "Genetic Materials" are actual, physical samples of genetic material sent in by consumers, typically spit samples.

[10] "Genetic Data" means personalized reports made based upon an individual's Genetic Materials or data derived or
interpreted from the analysis of Genetic Materials.

---

only the typical consumer privacy issues, but also the security of the genomic and medical

records as well as the physical human material that has been entrusted with the Debtor.

The Debtors have repeatedly assured the States and the Court that it recognizes the

significance of the intimate records and material with which they have been entrusted and will

protect it through this process. However, good intention will not protect this data. The Court

surely recognizes the competing pressures inherent in any bankruptcy sale process, coupled with

the sensitivity of this particular data within a patchwork of state and federal regulations.

Compounding these concerns, the States – and their citizens who have been calling and writing

them with pleas for help – do not trust the Debtor's existing security, for good reason. The States

attorneys general have been investigating the Debtors' massive 2023 data breach, impacting

almost seven million consumers. It resulted in the targeted sales on the dark web of data of at

least one million individuals with Ashkenazi Jewish heritage, as well as hundreds of thousands

of individuals with Chinese ancestry. Unfortunately, the Debtors have failed to remedy the

States' concerns, this data is not sufficiently secure at present, and a Consumer Privacy

Ombudsman and Security Examiner is necessary.

The States urge the careful selection of an independent, proactive, and knowledgeable

ombuds for this extraordinary case. A standard pro forma analysis with a boilerplate report will

not suffice with this unique data set and its far-reaching impact – beyond the Debtors' consumers

themselves, including their extended families and future generations.  As now-Bankruptcy Judge

Christopher G. Bradley warned in his aptly-titled law review article "Privacy Theater in the

Bankruptcy Courts," the consumer privacy ombudsman system too often results in a "myth of

oversight" with ombuds submitting almost standardized reports with little original analysis.[11]

The States hope to provide input in the selection process, to ensure a robust and meaningful

review, analysis, and reporting – something that will guide the Court in its analysis of any

potential sale while also providing transparency to the general public regarding the security of

this data.

 Therefore, the States request independent oversight of the data and its security through a

special consumer ombudsman and security examiner who is appointed by and accountable to this

Court – someone who is selected independently of the Debtor and with input from the States.

## II.   JURISDICTION AND VENUE

1.   The United States Bankruptcy Court for the Eastern District of Missouri[12] has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local

Rules of the United States District Court for the Eastern District of Missouri. This matter is a

core proceeding within the meaning of 28 U.S.C. § 157(b) and the Court has the authority to

enter a final order with respect to the States' Motion.

2.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.   The relief requested herein is based upon sections 105(a), 332, and 363(b)(1) of

the Bankruptcy Code; rules 6004(g), 7004, 9006(d); and 9014 of the Federal Rules of

Bankruptcy Procedure, and this Court's Local Rules of Bankruptcy Procedure.

---

[11] Christopher G. Bradley, *Privacy Theater in the Bankruptcy Courts*, 74 Hastings Law J. 607, 645-55 (2023). After
analyzing and assessing the work of 33 consumer privacy ombuds appointed in 141 bankruptcy cases from 2005 to
mid-2020, then-Law Professor Bradley warns that the current consumer privacy ombudsman regime far too often
projects what scholars have called "a myth of oversight." (In October 2023, the 5th Circuit Court of Appeals
appointed now-Judge Bradley as a Bankruptcy Judge for the Western District of Texas.)
[12] Hereinafter, the "Court."

### III.    BACKGROUND FACTS

4.      23andMe is a California-based[13] biotechnology company that specializes in the collection and monetization of human genetic data. 23andMe collects this data from consumers through the sale of at-home genetic tests, that can be used to determine ancestry information, lineal descent, and the presence of risk factors for certain diseases.[14] 23andMe also sells the genetic information of consumers to pharmaceutical companies and has used this data for pharmaceutical research and development.[15] 23andMe also has a telehealth arm, Lemonaid, that offers remote healthcare services and prescription drugs through pharmacy subsidiaries.[16]

5.      23andMe collects and maintains a vast amount of sensitive personal information about consumers. 23andMe solicits "profile information" from consumers, inviting them to input their names, birthdays, and locations.[17] 23andMe also solicits "family tree" information, asking users to input information about their relatives, who may or may not be 23andMe users.[18] Through their Lemonaid telehealth subsidiary, 23andMe collects personal health information and creates medical records.[19] Because Lemonaid does not take insurance or transmit health information for payment, it does not perform any transactions that are covered by HIPAA.[20]  As a result, the medical records collected and maintained by 23andMe are not subject to HIPAA's protections.[21]

6.      Most importantly, 23andMe collects and analyzes biological samples in order to

---

[13] Dkt. No. 1 the Petition for 23andMe Holding Co. at number 4.
[14] Dkt. No. 32 at paras. 26-32.
[15] Dkt. No. 32 at paras. 38-41.
[16] Dkt. No. 32 at paras. 34-35.
[17] *See* https://customercare.23andme.com/hc/en-us/articles/360004944654-What-s-In-Your-Account-Settings
[18] *See* https://customercare.23andme.com/hc/en-us/articles/360036068393-The-23andMe-Family-Tree-Feature
[19] *See* https://www.lemonaidhealth.com/legals/privacy-policy
[20] *See* Dkt. No. 32 at para. 36.
[21] 45 CFR 160.103; *See* definitions of Covered Entity and Transaction.

sequence a person's entire genome.[22] This record of a human's entire raw genetic code is then kept as a .csv file linked to the user's profile. 23andMe has collected this information about more than 15 million people.[23] 23andMe analyzes this raw genetic information to provide insights about an individual's ancestry, including the likely regions of origin of their forebears.[24] 23andMe also analyzes their customers' genomes to determine the presence of genetic risk factors for diseases, deriving and retaining another trove of highly sensitive health information[25] that is unprotected by HIPAA, but protected through a host and variety of state laws.

7.      On October 6, 2023, 23andMe published a press release stating that "customer profile information" shared through their "DNA Relatives" feature had been compiled and exposed by a threat actor using 23andMe accounts without authorization.[26] This resulted in the compilation and exposure of individuals' usernames, passwords, locations, genetic ancestry information, and in some cases, health data and raw genotype data.[27] According to 23andMe, the breach impacted over 6.4 million consumers nationwide.[28] Troublingly, the threat actor posted data on the dark web, targeting account holders with specific genetic heritage.[29]

8.      23andMe alleged the data was exposed as the result of a "credential stuffing" attack, whereby the threat actors utilized email and password information already available from unrelated past breaches to access 23andMe accounts.[30] Once the threat actor had this access,

---

[22] Dkt. No. 32 at paras. 26-32.
[23] Dkt. No. 32 at paras. 2-3, 19.
[24] Dkt. No. 32 at para. 26, 28. 31.
[25] Dkt. No. 32 at paras. 28-30.
[26] 23andMe's October 6, 2023, notice entitled "Addressing Data Security Concerns --- Action Plan" at https://blog.23andme.com/articles/addressing-data-security-concerns
[27] *23andMe confirms hackers stole ancestry data on 6.9 million users*, TechCrunch (Dec. 4, 2023) at https://techcrunch.com/2023/12/04/23andme-confirms-hackers-stole-ancestry-data-on-6-9-million-users/
[28] *Id*.
[29] *Id*.
[30] 23andMe's October 6, 2023, notice entitled "Addressing Data Security Concerns --- Action Plan" at https://blog.23andme.com/articles/addressing-data-security-concerns

---

23andMe claimed that they were able to compile customer profile information based on user opt-ins for their "DNA Relatives" feature.[31] Reports also indicated that the threat actor was selling individual 23andMe user profiles that included raw, unedited genetic data.[32] 23andMe later admitted that the threat actor had begun breaking into user accounts beginning in April 2023, and maintained this access for five months, ostensibly undetected.[33]

9.      In the spring of 2024, Connecticut and Indiana organized a multistate investigation into the 23andMe breach, with 44 states participating.  Throughout 2024, the multistate collected documents and information through civil investigative demands. In September and October 2024, Indiana took sworn statements on behalf of the multistate from current and former 23andMe employees.  Based on the findings of its investigation, the multistate proposed settlement terms in early 2025, and to date there is no resolution of this investigation.

10.     On March 23, 2025, 23andMe Holding Co. and eleven affiliated debtors filed bankruptcy, and on March 24, 2025, the Debtors filed its *Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry Into Stalking Horse Agreement(s), if any, (V)Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims,*

---

[31] *Id.*

[32] *23andMe User Data Stolen in Targeted Attack on Ashkenazi Jews,* WIRED (Oct. 6, 2023), at https://www.wired.com/story/23andme-credential-stuffing-data-stolen/

[33] *23andMe admits it didn't detect cyberattacks for months*, TechCrunch (Jan. 25, 2024), at https://techcrunch.com/2024/01/25/23andme-admits-itdidnt-detect-cyberattacks-for-months/

*Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or*

*Abandonment of De Minimis Assets, and (VIII) Granting Related Relief*[34] in which, among other

things, the Debtors seek approval from this Court to auction off the Debtors' assets.

11.    The States have requested, among other things, that the Debtors provide the States

with a list of assets being sold, but, to date, that list has not been produced. It is assumed that the

Debtors' assets include the Genetic Materials, Genetic Data, and other personally identifiable

information of millions of Americans.

## IV.    ARGUMENT

A.  *The Debtors' Privacy Policy Violates State Laws, and, as such, a Consumer Privacy Ombudsman is Required.*

12.    Due to the illegality of the Debtors' privacy policy, the Debtors cannot sell any

personally identifiable information and other data covered by Debtors' privacy policy[35] outside

of the ordinary course of business without the appointment of a Consumer Privacy Ombudsman

under 11 U.S.C. § 363(b)(1)(B) and 11 U.S.C. § 332.

13.    It is axiomatic to say that company policies cannot violate state law, and 28

U.S.C. § 959(b) makes this axiom applicable to debtors in bankruptcy by requiring debtors to

operate in accordance with state laws. If a debtor's policy violates state or federal laws, the mere

act of filing bankruptcy does not relieve the debtor of its obligations to comply with applicable

non-bankruptcy laws.

14.    In the instant case, Debtors argue that under 11 U.S.C. § 363, the Debtors'

privacy policy in place at the time of the bankruptcy filings[36] allows for the proposed sale,

---

[34] Dkt. No. 30. Hereinafter "Debtors' Motion" or "Bidding Procedures Motion."
[35] Due to the bankruptcy code's definition of "Personally Identifiable Information," it is questionable as to whether genetic materials (spit samples) would fall within this definition. The States reserve the right to fully brief this issue.
[36] *See* EX A - 23andMe's March 14, 2025, privacy policy. Also available at
https://www.23andme.com/legal/privacy/full-version/

notwithstanding the fact that the privacy policy does not comport with applicable state laws.  In particular, a privacy policy allowing for sale or transfer of different types of Genetic Materials, Genetic Data, and other personally identifiable information in the event of a bankruptcy violates several state genetic laws, privacy laws, and other laws, and, therefore, is illegal.

15.     Many states have privacy laws covering Genetic Materials and Genetic Data,[37] and some of these laws are specific as to transfer, use, and consent. For instance, some states require that consumers give consent before the disclosure, transfer or sale of the consumers' genetic data to a third party, with some states requiring that this express consent be separate from any other consents previously provided.[38] Other states grant their citizens exclusive ownership rights over their own Genetic Materials and Genetic Data, which raises the question of whether some of the DNA materials and data belong to the Debtors at all.[39]

16.     Other state laws make it a crime to sell this type of information without express consent. Under Florida law it is a second-degree felony to sell or transfer another person's DNA sample without the person's express consent to the sale. Specifically, Section 817.5655(5) of the Florida Statutes states: "It is unlawful for a person to willfully, and without express consent, sell or otherwise transfer another person's DNA sample or results of another person's DNA analysis

---

[37] See e.g. ALA. CODE §§ 8-43-1 to 8-43-6; ALASKA STAT. ANN. §§ 18.13.010 to 18.13.100; ARIZ. REV. STAT. §§ 44-8001 to 44-8004; CAL. CIV. CODE §§ 56.18 to 56.186; Colorado Privacy Act, Colo. Rev. Stat. §§ 6-1-1301 to 1313; 4 CCR 904-3; DEL. CODE ANN. TIT. 16, §§ 1201 to 12078; FLA. STAT. ANN. §§ 760.40, 817.5655; GA. CODE ANN. § 33-54-1 to 33-54-8; KY. REV. STAT. ANN. § 311.705; MASS. GEN. LAWS ANN. CH. 111, § 70G; MD. CODE ANN., COM. LAW §§ 14-4401 to 14-4408; MINN. STAT. ANN. § 325F.995; MO. REV. STAT. § 375.1309; MONT. CODE. ANN. § 30-23-101 to 30-23-106; NEB. REV. STAT. ANN. §§ 87-901 to 87-904; N.H. Rev.Stat.Ann. 141:H-1, et. seq.; N.J. STAT. ANN. § 10:5-45; N.M. STAT. ANN. §§ 24-21-1 -– 24-21-7; NEV. REV. STAT. ANN. § 629.171; N.Y. CIV. RIGHTS LAW § 79-l; OR. REV. STAT. ANN. §§ 192.531 to 192.550; TENN. CODE ANN. §§ 47-18-4901 to 47-18-4906; UTAH CODE ANN. § 13-60-101 to 13-60-106; VA. CODE ANN. §§ 59.1-593 to 59.1-602; WASH. REV. CODE §§ 19.373.005 to 19.373.900; and WYO. STAT. ANN. §§ 35-32-101 to 35-32-105.

[38] See e.g. Ariz. Rev. Stat § 44-8002(A)(2)(b)(i), Colorado Privacy Act, Colo. Rev. Stat. § 6-1-1308(7); 4 CCR 904-3, Rules 6.10; 7.02-7.05, Fla. Stat. § 817.5655(5) (2024), N.H.Rev.Stat.Ann. 141-H:2, III, ORS § 192.539(1), Tex. Bus. & Comm. Code § 503A.001(5), Utah Code § 13-60-104(1)(c)(i)-(ii), Wash. Rev. Code Ann. § 19.373.070 (2024).

[39] See Alaska Stat. § 18.13.010(a)(2), Fla. Stat. § 760.40(1)(c) (2024), Tex. Bus. & Comm. Code § 503A.003.

to a third party, *regardless* of whether the DNA sample was originally collected, retained, or analyzed with express consent. A person who violates this subsection commits a felony of the second degree. . ..." (emphasis added). Under Florida law, a second-degree felony is punishable by a term of imprisonment not exceeding fifteen years and/or a fine of up to $10,000.[40]

17.    Arizona's Genetic Information Privacy Act, among other things, protects the genetic data of the deceased. Specifically, Arizona law requires that, following the death of a person who had genetic testing performed, the release of the testing information is limited to the deceased's next of kin.[41]

18.    A Consumer Privacy Ombudsman may review the Debtors' policies, the applicable states' laws, and any other relevant information and make recommendations as to the sale of the Debtors' assets for this Court's consideration.

19.    With the Ombudsman's report as guidance, the Court can only approve the sale after "giving due consideration to the facts, circumstances, and conditions of such sale . . . *and* finding that no showing was made that such sale. . . would violate applicable nonbankruptcy law."[42]

20.    Even if the Debtors' privacy policy were sufficient, the Court may still appoint a Consumer Privacy Ombudsman pursuant to 11 U.S.C. § 105(a), which authorizes the Court to "issues any order, process, or judgment that is necessary or appropriate" to administer the bankruptcy case.

21.    For example, in *In re Celsius*, despite the fact that the debtors' privacy policies provided for the sale, the Court appointed a Consumer Privacy Ombudsman to protect the

---

[40] Fla. Stat. §§775.082(d) and 775.083(1)(b) (2024).
[41] Ariz. Rev. Stat §§ 44-8002(6), 12-2802(F), and 12-2294(D).
[42] 11 U.S.C. §363(b).

consumers' personally identifiable information the debtors were seeking to sell.[43]

22.    In so doing, the Court recognized that "[e]ven if a sale will comply with the Debtors' privacy policy, bankruptcy courts have the discretion 'to order the appointment of officers or professionals at the expense of the estate when the court feels that it could benefit from the additional information or assistance that a neutral third party might provide.' "[44]

B. *Because the Debtors' Privacy Policy and Terms of Service are Vague and Ambiguous as to the Ownership of Genetic Information, a Consumer Privacy Ombudsman Must be Appointed.*

23.    The Debtors' privacy policy[45] and terms of service[46] create confusion as to ownership of Genetic Materials and Genetic Data, and, as such, whether this information is or is not property of the Debtors' estate that can be sold.[47]

24.    Under the privacy policy that the Debtors allege allow them to sell consumers' Personal Information, the term "Personal Information" is defined as follows:

> When we say **Personal Information**, we use this as a general term to refer to the different data categories we describe in this section that either personally identify you or are about you. Your Personal Information can be either
>
> - **Individual-level Information:** information about a single individual, such as their genotypes, diseases or other traits or characteristics.
> - **De-identified Information:** information that has been stripped of identifying data, such as name and contact information, so that an individual cannot reasonably be identified.

25.    Under this definition,[48] Personal Information includes the information derived from the sample submitted by consumers.

---

[43] *See In re Celsius Network, LLC*, 2022 Bankr. LEXIS 3023 at *22-23 (October 24, 2022).
[44] *Id*. at *23.
[45] https://www.23andme.com/legal/privacy/full-version/
[46] EX B – 23andMe's March 14, 2025, Terms of Service. Also available at https://www.23andme.com/legal/terms-of-service/full-version/
[47] The Texas Attorney General's Motion to Appoint a Consumer Privacy Ombudsman describes other serious issues with the Debtors' privacy policy, and, as such, they will not be repeated here but are incorporated by reference. *See* Dkt. No. 181.
[48] https://www.23andme.com/legal/privacy/full-version/

26.    The terms of use, however, state that "any information derived from your sample *remains your information*, subject to rights we retain as set forth in these Terms."[49]

27.    Nowhere in the terms of use does it state that Personal Information or information derived from a sample, can be sold.[50]

28.    Due to this apparent contradiction in the privacy policy and the terms of use, the appointment of a Consumer Privacy Ombudsman is mandatory,[51] necessary, and appropriate to assist in determining who owns the genetic information.[52]

---

[49] https://www.23andme.com/legal/terms-of-service/full-version/ (emphasis added), Section 2 Using the Services.
[50] https://www.23andme.com/legal/terms-of-service/full-version/
[51] *See* 11 U.S.C. §§ 363(b)(1) and 332.
[52] This contradiction might also be a violation of the States' Unfair Deceptive Acts/Practices statutes, which have varying equitable remedies that an Ombudsman can consider when making recommendations. *See* Unfair Trade Practices Act, Alaska Stat. 45.50.471, et seq.; Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, et seq.; Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq.; Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, et seq.; California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.; California False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.; Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 et seq.; Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b, et seq.; Consumer Protection Procedures Act, D.C. Code §§ 28-3901, et seq.; Consumer Fraud Act, 6 Del. C. §§ 2511 et seq.; Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, §501.201 et seq., Florida Statutes; Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390 through 408; Uniform Deceptive Trade Practice Act, Haw. Rev. Stat. ch. 481A and Haw. Rev. Stat. § 480-2; Iowa Consumer Fraud Act, Iowa Code § 714.16; Idaho Consumer Protection Act, Idaho Code §§ 48-601, et seq.; Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.; Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5 et seq.; Kansas Consumer Protection Act, K.S.A §§ 50-623 et seq.; Kentucky Consumer Protection Act, KRS §§ 367.110-367.300, 367.990; Unfair Trade Practices and Consumer Protection Law, La. R.S. §§ 51:1401, et seq.; Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, et seq.; Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A, et seq.; Michigan Consumer Protection Act, MCL 445.901 et seq.; Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43 .48; Consumer Fraud Act, Minn. Stat. §§ 325F.68-.694; Mo. Rev. Stat. §§ 407.010, et seq.; Mississippi Consumer Protection Act, Miss. Code §§ 75-24-1, et seq.; Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-101 et seq.; North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, et seq.; Unlawful Sales or Advertising Practices, N.D.C.C. §§ 51-15-01 et seq.; Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 et seq.; New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann § 358-A:1, et seq.; New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.; New Mexico Unfair Practices Act, NMSA 1978, §§ 57-12-1 et seq.; Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903 et seq.; Executive Law 63(12), General Business Law 349/350; Ohio Consumer Sales Practices Act, R.C. § 1345.01, et seq.; Oklahoma Consumer Protection Act, 15 O.S. Section 751, et seq.; Oregon Unlawful Trade Practices Act, ORS 646.605, et seq.; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, et seq.; Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1, et seq.; South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.; SDCL Chapter 37-24; Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. §§ 47-18-101 to-135; Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 17.63; Utah Consumer Sales Practices Act Utah Code §§ 13-11-1, et. seq.; Virginia Consumer Protection Act, Virginia Code §§ 59.1-196 through 59.1-207; Vermont Consumer Protection Act, 9 V.S.A. §§ 2451

---

C. *The Debtors' Current Privacy Policy should not Apply to All Consumers.*

29.     As discussed in the United States Trustee's Motion to Appoint[53] and the State of Texas's Motion to Appoint,[54] the Debtors' privacy policy at the time of filing should not apply to all consumers.

30.     Prior to June 8, 2022,[55] the Debtor's privacy policy did not contain language allowing for the sale of consumers' information in bankruptcy. Specifically, the February 3, 2022,[56] version of 23andMe's privacy statement regarding business transactions read as follows:

f.  **Business transactions**

In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement.

31.     It is unclear how many times the Debtor has changed the privacy policy, but what is clear is that any consumers that bought a 23andMe kit prior to June 8, 2022, they were not subject to the language regarding selling consumers' personal information in a bankruptcy.

32.     As admitted by the Debtors, consumers generally buy this product only once,[57] and, as such, it is unclear as to how the Debtors updated consumers as to these changes in the privacy policy.

---

et seq.; Washington Consumer Protection Act, RCW 19.86.010 et seq.; Wis. Stat. § 100.18(1); W. Va. Code §§ 46A-1-101, et seq.; and Wyoming Consumer Protection Act, W.S. §§ 40-12-101 et seq.
[53] Dkt. No. 195 "*United States Trustee's (I) Motion for Appointment of Consumer Privacy Ombudsman or, in the Alternative, Appointment of an Examiner and (II) Objection to Debtors' Motion for Appointment of Independent Customer Data Representative*" is incorporated by reference herein.
[54] Dkt. No. 181 "*Motion for Order Appointing a Consumer Privacy Ombudsman Under 11 U.S.C. §§ 105(a), 332, and 363(b)(1) and Notice of Hearing.*"
[55] https://web.archive.org/web/20220610073436/https://www.23andme.com/about/privacy/ (First inclusion of the bankruptcy language in the privacy policy that is dated June 8, 2022.).
[56] EX C – 23andMe's Feb. 3, 2022, privacy policy. Also available at https://web.archive.org/web/20220301024852/https://www.23andme.com/about/privacy/
[57] Dkt. No. 31-32 at para. 4 stating: ". . . the often 'one-time' nature of sales involving the Company's saliva collection kits resulted in a shrinking customer base and declining topline revenues."

33.     This Court should appoint a Consumer Privacy Ombudsman to review the Debtors' prior privacy policies and determine to whom the current policy might apply. To not do so would set a bad precedent, that would allow future debtors to change their privacy policies on the eve of bankruptcy with no notice to consumers.[58]

D.  *Lemonaid Health, Inc.'s Privacy Policy does not Clearly Disclose the Sale of Personally Identifiable Information through Bankruptcy to Third Parties Unrelated to the Debtors, and a Consumer Privacy Ombudsman Must be Appointed.*

34.     Lemonaid Health, Inc. has a different privacy policy from Debtors 23andMe, and this privacy policy fails to properly inform consumers about a bankruptcy sale of their PII to an unrelated third party, and, as such, the appointment of a Consumer Privacy Ombudsman is mandatory.[59]

35.     Pursuant to 11 U.S.C. § 363(b)(1), a Consumer Privacy Ombudsman must be appointed because Lemonaid Health, Inc.'s privacy policy at the time of filing did not clearly disclose to consumers that their personally identifiable information could be sold in a bankruptcy proceeding to third parties that are not related to the Debtor.[60]

36.     As of March 14, 2025, Lemonaid Health's privacy policy provided in pertinent part:

- **Business Transfers.** We may disclose your Personal Information with other business entities in connection with the sale, assignment, merger or other transfer of all or a portion of Lemonaid's business to such business entity. This Privacy Policy will apply to your Personal Information as transferred to the new entity.

---

[58] *The Sale of Personally Identifiable Information in Bankruptcy*, 27 Am. Bankr. Inst. L. Rev. 1, 10 (Winter 2019), available at at https://www.abi.org/member-resources/law-review/the-sale-of-personally-identifiable-information-in-bankruptcy
[59] *See* 11 U.S.C. §§ 363(b)(1) and 332.
[60] EX D - Lemonaid Health, Inc.'s March 14, 2025, privacy policy also available at https://www.lemonaidhealth.com/legals/privacy-policy

---

37.     As seen above, Lemonaid Health's privacy policy has no mention of a bankruptcy sale, and it does not clearly state that the "business entities" could be unrelated to the Lemonaid Health, Inc. as Debtor. In fact, sales, assignments, and mergers commonly occur between related companies.

38.     Due to the lack of clarity as to the sale of PII through bankruptcy to a third party not related to the Debtor, Lemonaid Health, a Consumer Privacy Ombudsman must be appointed.

39.     Further, to date, no privacy policy for Debtors Lemonaid Community Pharmacy, Inc. and Lemonaid Pharmacy Holdings have been found or disclosed. However, a reading of Lemonaid Health, Inc.'s privacy policy seems to indicate that Lemonaid Health's privacy policy may apply to these other Debtors.

40.     Specifically, Lemonaid Health's privacy policy states in pertinent part:[61]

> This Privacy Policy applies to Lemonaid Health, Inc., LMND Medical Group, Inc., a California Professional Corporation, LMND Medical Group, a Professional Association based in Kansas, LMND Medical Group, a Professional Corporation based in New Jersey, and LMND Medical Group, a Professional Association based in Texas (together, "Lemonaid"), products and services, including www.lemonaidhealth.com and any other websites, pages, features or content we own or operate, or that links to this Privacy Policy (collectively, the "Services"). When you use these Services, this Privacy Policy applies to your use.

41.     Because this privacy policy states that it applies to ". . .products and services, including www.lemonaidhealth.com and any other websites, pages, features or content we own

---

[61] EX D. Also available at https://www.lemonaidhealth.com/legals/privacy-policy

or operate, or that links to this Privacy Policy. . . ,"[62] and because the Lemonaid pharmacy

services are part and parcel to the website www.lemonaidhealth.com, it seems that this privacy

policy applies to Debtors Lemonaid Community Pharmacy, Inc. and Lemonaid Pharmacy

Holdings.

42.    To the extent that Lemonaid Health, Inc.'s privacy policy also applies to Debtors,

Lemonaid Community Pharmacy, Inc. and Lemonaid Pharmacy Holdings, Inc. or other Debtors,

the States raise this same objection and seek the appointment of a Consumer Privacy

Ombudsman for those Debtors as well.

E.  *Due to the Highly Sensitive Genetic Information held by the Debtors, and Because of the*
    *Unresolved Data Breach Investigation and Ongoing Security Concerns, a Security*
    *Examiner should be Appointed*.

43.    As discussed above, in October 2023, the Debtors disclosed that a serious data

breach occurred, resulting in the personally identifiable information and genetic information of

almost 7 million consumers being accessed and over 1 million consumers' information being put

up for sale on the dark web.

44.    Since that time, the States have been investigating the Debtors, and based upon

information disclosed in the investigation, the States learned of certain security deficiencies that

contributed to the October 2023, data breach.

45.    While the States have presented a proposed settlement to the Debtors that includes

terms requiring certain enhancements to security protections and processes, to date, this

settlement has not been finalized, and the States have not received adequate assurances that such

enhanced security measures have been implemented.  Further, given the financial condition of

23andMe any purported improvements in security may suffer due to lack of resources.  A robust

---

[62] EX D. Also available at https://www.lemonaidhealth.com/legals/privacy-policy

cybersecurity program requires strong governance, well trained personnel, and a host of technical, administrative, and physical controls, all of which are expenditures.

46.     While a Consumer Privacy Ombudsman would report on and make recommendations as to privacy policies and practices, compliance with applicable laws, and the terms of potential sale of data, a Security Examiner would report on and make recommendations as to reasonable data security measures commensurate with risk and employment of controls to enable 23andMe to meet its commitments to keep the data safe and secure, which it previously failed to do prior to the breach.

47.     The Security Examiner appointed would be able to review not only reasonable data security standards and practices, but report on compliance with applicable state laws that include reasonable data security or reporting of data breaches.[63]

---

[63] *See e.g.* Alaska Stat. 45.48.010, et seq.; Data Breach Notification Act of 2018, Ala. Code § 8-38-1, et seq.; Arkansas Personal Information Protection Act, Ark. Code Ann. § 4-110-101, et seq.; Ariz. Rev. Stat. §§ 18-551 and 18-552; Cal. Civ. Code §§ 1798.81.5, 1798.82; Colorado Consumer Data Protection Laws, Colo. Rev. Stat. §§ 6-1-713, 6-1-713.5, and 6-1-716; Breach of Security, Conn. Gen. Stat. § 36a- 701b; Safeguarding of Personal Information, Conn. Gen. Stat. § 42-471; District of Columbia Consumer Security Breach Notification Act, D.C. Code §§ 28-3851, et seq.; Delaware Data Breach Notification Law, 6 Del. C. § 12B-100 et seq.; Florida Information Protection Act, Section 501.171, Florida Statutes; Georgia Personal Identity Protection Act, O.C.G.A § 10-1-910 through 915; Haw. Rev. Stat. ch. 487J and Haw. Rev. Stat. ch. 487N; Personal Information Security Breach Protection Act, Iowa Code Chapter 715C; Idaho Code, Title 28, Chapter 51, , §28-51-103 et seq.; Illinois Personal Information Protection Act, 815 ILCS 530/1 et seq.; Disclosure of Security Breach Act, Ind. Code §§ 24-4.9 et seq.; Security Breach Notification Act, K.S.A. §§ 50- 7a01, et seq.; The Wayne Owen Act, K.S.A. § 50-6,139b; KRS 365.732; Database Security Breach Notification Law, La. R.S. §§ 51:3071, et seq.; Mass. Gen. Laws ch. 93H; 201 Code Mass. Regs. 17.00 et seq.; Maryland Personal Information Protection Act, Md. Code Ann., Com. Law §§ 14-3501, et seq.; Maine Notice of Risk to Personal Data Act, 10 M.R.S.A. §§ 1346, et seq.; Identity Theft Protection Act, MCL 445.61, et seq.; Minnesota Data Breach Notification Statute, Minn. Stat. § 325E.61 and Minnesota Health Records Act, Minn. Stat. § 144.291-144.34; Mo. Rev. Stat. § 407.1500; Miss. Code Ann. § 75-24-29; Mont. Code Ann. §§ 30-14-1701 et seq.; Identity Theft Protection Act, N.C.G.S. §§ 75- 60, et seq.; Notice of Security Breach for Personal Information N.D.C.C. §§ 51-30-01 et seq.; Financial Data Protection and Consumer Notification of Data Security Breach Act of 2006, Neb. Rev. Stat. § 87-801 et seq.; N.H. Rev. Stat. Ann § 359-C: 19-21; New Jersey Identity Theft Prevention Act, N.J.S.A. 56:8-161 to -166; Data Breach Notifications Act, NMSA 1978, Sections 57-12C-1 et seq.; Nev. Rev. Stat. §§ 603A.010-603A.290; General Business Law 899-aa and 899-bb; R.C. §§ 1349.19 to 1349.192; Oklahoma Security Breach Notification Act, 24 O.S. Section 161, et seq.; Oregon Consumer Information Protection Act, ORS 646A.600, et seq.; Breach of Personal Information Notification Act, 73 P.S. §§ 2301, et seq.; Rhode Island Identity Theft Protection Act R.I. Gen. Laws §§ 11-49.3-1, et seq.; South Carolina Data Breach Notification Law, S.C. Code Ann. § 39-1-90; SDCL Chapter 22-40; Tennessee Identify Theft Deterrence Act of 1999, Tenn. Code Ann. §§ 47-18-2101 to -2111;  Identity Theft Enforcement and Protection Act, Tex. Bus. &

---

48.     As such, the States request that this Court appoint a Security Examiner to review the Debtors' security measures currently in place, review the security measures utilized by any potential purchasers, and submit a report to this Court for consideration of informational safety in the event any sale occurs.

## V.     <u>RESERVATION OF RIGHTS</u>

49.     The States reserve the right to supplement this Motion or to raise additional arguments or objections to the Debtors' proposed sale. The States reserve the right to file a separate reply to the Debtors' *Motion for Entry of an Order (I) Appointing an Independent Customer Data Representative and (II) Granting Related Relief.*[64]

## VI.     <u>NOTICE</u>

50.     As required by docket 131 the *Interim Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief*, notice is hereby given that copies of the proposed order granting the relief requested herein will be made available on the website of the Debtors' claims and noticing agent at

https://restructuring.ra.kroll.com/23andMe.

(*Remainder of Page Intentionally Left Blank*)

---

Com. Code Ann. § 521.001 - 521.152; Utah Protection of Personal Information Act, Utah Code §§ 13-44-101, et seq.; Virginia Breach of Personal Information Notification Law, Virginia Code § 18.2-186.6; 9 V.S.A §§ 2430, 2431, and 2435; Washington Data Breach Notification Law, RCW 19.255.005 et seq.; Wis. Stat. § 134.98; W. Va. Code §§ 46A-2A-101 et seq.; and W.S. §§ 40-12-501 *et seq.* (Note – some States combine data breach statutes and PII act, but others do not.).

[64] Dkt. No. 169.

## VII.    <u>PRAYER</u>

WHEREFORE, the States respectfully request that the Court direct the United States

Trustee to appoint a Consumer Privacy Ombudsman pursuant to section 332 of the Bankruptcy

Code, appoint a Security Examiner pursuant to 11 U.S.C. § 105(a), and enter any further relief to

which the Court finds is just.


Dated: April 15, 2025


*(Remainder of the Page Intentionally Left Blank
Signature Page Follows)*

---

RESPECTFULLY SUBMITTED,

**FOR MOVANT NAAG CLIENT STATES**

*/s/ ABIGAIL R. RYAN*
ABIGAIL R. RYAN, BANKRUPTCY COUNSEL
NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
1850 M Street NW, 12th Floor
Washington, DC 20036
Telephone: (202) 326-6000, Ext. 258
Email: aryan@naag.org
COUNSEL FOR:

THE STATE OF ARIZONA, EX REL. KRISTIN K. MAYES,
THE ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL, STATE OF
CONNECTICUT

DISTRICT OF COLUMBIA, OFFICE OF THE ATTORNEY
GENERAL

STATE OF FLORIDA, OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF LEGAL AFFAIRS

OFFICE OF THE ILLINOIS ATTORNEY GENERAL

STATE OF LOUISIANA

STATE OF MAINE

MICHIGAN ATTORNEY GENERAL, *EX REL.* THE PEOPLE
OF THE STATE OF MICHIGAN

NEW HAMPSHIRE OFFICE OF THE ATTORNEY GENERAL,
CONSUMER PROTECTION DIVISION

NEW MEXICO DEPARTMENT OF JUSTICE

NEW YORK STATE ATTORNEY GENERAL'S OFFICE

STATE OF NORTH CAROLINA

OHIO ATTORNEY GENERAL

THE STATE OF SOUTH CAROLINA EX REL. ALAN
WILSON

STATE OF UTAH, OFFICE OF THE UTAH ATTORNEY
GENERAL

STATE OF VERMONT

COMMONWEALTH OF VIRGINIA, EX REL. JASON S.
MIYARES, ATTORNEY GENERAL

WASHINGTON ATTORNEY GENERAL NICK BROWN

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL

STATE OF WISCONSIN

**FOR MOVANT STATE OF COLORADO**

*/s/ ROBERT PADJEN*
ROBERT PADJEN, NO. 14678CO
SENIOR ASSISTANT ATTORNEY GENERAL COLORADO
DEPARTMENT OF LAW
RALPH L. CARR COLORADO JUDICIAL CENTER
1300 Broadway, 8th Floor
Denver, Colorado 80203
Direct dial: 720-508-6346
E-mail: robert.padjen@coag.gov

**FOR MOVANT THE COMMONWEALTH OF KENTUCKY, EX
REL. RUSSELL COLEMAN, ATTORNEY GENERAL**

*/s/ CHRISTOPHER D. HUNT*
CHRISTOPHER D. HUNT (KY BAR NO. 91775)
ASSISTANT ATTORNEY GENERAL
KENTUCKY OFFICE OF THE ATTORNEY GENERAL
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: (502) 696-5691
ChrisD.Hunt@ky.gov

**FOR MOVANT STATE OF MINNESOTA
KEITH ELLISON
ATTORNEY GENERAL OF MINNESOTA**

*/s/ DALILA Z. JORDAN*
DALILA Z. JORDAN, ATTORNEY REG # 0403120
ASSISTANT ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION
445 Minnesota Street, Suite 600
Saint Paul, Minnesota 55101
Telephone: (651) 300-7640
Email: Dalila.Jordan@ag.state.mn.us
COUNSEL FOR THE STATE OF MINNESOTA

**FOR MOVANT STATE OF OREGON
DAN RAYFIELD ATTORNEY GENERAL OF OREGON**

*/s/ JUSTIN D. LEONARD*
JUSTIN D. LEONARD, E.D. MO. D.C. # 033736OR
SENIOR ASSISTANT ATTORNEY GENERAL
OREGON DEPARTMENT OF JUSTICE
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4400
Email: Justin.Leonard@doj.oregon.gov

COUNSEL FOR THE STATE OF OREGON

---

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing document was filed electronically on April 15, 2025, with the United States Bankruptcy Court and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

I further certify that a true and correct copy of the foregoing document was served via email on April 15, 2025, on the parties listed in the Master Service List attached at Exhibit E and on April 16, 2025, a true and correct copy of the foregoing was served via United States Mail on those parties listed in the Master Service List that did not have an email address and are not a Movant herein.

*/s/Abigail R. Ryan*
Abigail R. Ryan

---