# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,[1]<br><br>                Debtors.<br><br>23ANDME HOLDING CO., *et al.*,<br><br>                Movant,<br><br>v.<br><br>THE STATE OF TEXAS,<br><br>                Respondent. | Chapter 11<br><br>Case No. 25-40976<br><br>(Jointly Administered)<br><br>Docket No.      169<br>Responses Due:  April 23, 2025[2]<br>Hearing Date:    April 29, 2025<br>Hearing Time:    1:30 p.m. CDT<br>Hearing Location:  Thomas F. Eagleton<br>U.S. Courthouse<br>111 S. 10th Street<br>Courtroom 5 North<br>St. Louis, MO 63102 |

**THE STATE OF TEXAS' OBJECTION TO DEBTORS' CDR MOTION
AND JOINDER IN UNITED STATES TRUSTEE'S OBJECTION**

The State of Texas, acting by and through the Office of the Texas Attorney General ("Texas"), hereby files this objection and joins in ("Joinder") the United States Trustee's Objection [Docket No. 195] (the "UST's Objection") to the *Debtors' Motion for Entry of an Order (I) Appointing an Independent Customer Data Representative and (II) Granting Related Relief* [Docket No. 169] (the "CDR Motion").[3]  In support of this Joinder, Texas respectfully, states as follows:

## I.    PRELIMINARY STATEMENT

Congress explicitly provided for the appointment of a consumer privacy ombudsman ("CPO") in the Bankruptcy Code as a tailored statutory mechanism to ensure customer rights and interests are

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.
[2] The response deadline for Texas was extended to April 23, 2025 with the consent of the Debtors.
[3] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the CDR Motion or Texas's *Motion for Order Appointing a Consumer Privacy Ombudsman under 11 U.S.C. §§ 105(a), 332, and 363(b)(1)* [Docket No. 181] (the "Texas CPO Motion").

1

adequately protected and considered when bankruptcy courts evaluate sales involving customers' sensitive information.[4]   As discussed in the Texas CPO Motion, the appointment of a CPO is both required and appropriate here, because this case involves distinctly sensitive consumer information and exceptional circumstances presenting unique and significant privacy implications.[5] Although the Debtors conceded that privacy concerns necessitate the appointment of a third party professional, their proposal for a self-selected CDR lacks the critical independence and accountability necessary in this case and effectively circumvents and nullifies the safeguards intended by Congress; the CDR is compensated by and reports directly to the Debtors under broad confidentiality and exculpation provisions, is limited in their scope of review, and is designed to prioritize value maximization over rigorous consumer data protection.  By contrast, sections 332 and 363(b)(1) mandate the appointment of a neutral consumer privacy ombudsman to provide a comprehensive analysis directly to the Court and all stakeholders ensuring transparent oversight in evaluating the privacy laws and concerns implicated by the transfer of sensitive consumer data balanced against estate value.

## II.      OBJECTION AND AUTHORITY IN SUPPORT

1. Section 332 provides the statutory framework of a CPO's duties and analysis:

   The CPO . . . shall provide to the Court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of [PII] under section 363(b)(1)(B).  Such information may include presentation of –
   (1) the debtor's privacy policy;
   (2) the potential loss or gains of privacy to consumers if such sale or such lease is approved by the court;
   (3) the potential costs or benefits to consumers if such sale or such lease is approved by the court; and
   (4) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.[6]

2. While the Debtors' initiative to appoint a CDR reflects an awareness of the privacy

---

[4] See 151 Cong. Rec. 2899, 2957-58 (Feb. 28, 2005) (statement of Sen. Leahy) ("Our bipartisan provision permits bankruptcy courts to honor the privacy policies of business debtors. It creates a consumer privacy ombudsman to protect personal privacy in bankruptcy proceedings. . . . We wanted to prevent future cases like Toysmart.com. Once somebody tells you we are going to keep your kids' information confidential, it will be.").
[5] The Texas CPO Motion is incorporated herein fully by reference.
[6] 11 U.S.C. § 332(b).

2

concerns posed by their potential sale of PII, their proposed structure raises significant issues regarding independency and transparency and appears designed to facilitate the sale process rather than to provide an unbiased assessment of privacy implications.

3. A CPO's role already encompasses everything the Debtors envision for their CDR while also providing the independence, transparency, and statutory authority that their CDR lacks and is essential to meaningful oversight. There is no legal or practical need to create a new role when sections 332 and 363 already provide a clear mechanism for comprehensive oversight.

| Feature | Customer Data Representative (CDR) | Consumer Privacy Ombudsman (CPO) |
|---|---|---|
| Appointment & Independence | - Selected and compensated by Debtors[7]<br>- Nominally 'independent,' but functions as a consultant[8] | - Appointed by the U.S. Trustee under 11 U.S.C. § 332<br>- Statutorily disinterested and neutral |
| Scope & Duties | - Limited to confirming accuracy of Debtors' current policies, cybersecurity, and data infrastructure[9]<br>- Regularly advises Debtors[10] | - Broad mandate to review all applicable privacy policies, compliance with privacy laws, and the full range of consumer privacy implications |
| Access | - Access to stakeholders controlled by Debtors[11]<br>- "Reasonable access" undefined, potentially limiting engagement with regulators[12] | - No restrictions on consultation<br>- May engage freely with regulators, consumer advocates, or other stakeholders as necessary |
| Reporting and Transparency | - Limited transparency surrounding key findings due to confidentiality provisions[13]<br>- Debtors receive a draft 7 days in advance of filing[14] | - Transparent reporting directly to Court<br>- Independent, publicly filed report not subject to Debtor review, and only PII itself is protected. |
| Legal Framework & Authority | - Non-statutory, ad hoc role created at Debtors' discretion to assist them[15] | - Mandated by statute under 11 U.S.C. §§ 332 and 363(b)(1) to assist the Court, not the Debtors. |
| Purchaser Review | - Unclear if purchaser privacy policies are independently reviewed or analyzed for compliance[16] | - Authorized to evaluate whether proposed purchasers' privacy policies comply with applicable laws and consumer expectations |

---

[7] CDR Motion, ¶¶ 13-14.
[8] Id. at ¶¶ 16-21.
[9] Id. at ¶ 17.
[10] Id. at ¶¶ 18-19 ("The Customer Data Representative will regularly consult with the Debtors solely as to . . . .").
[11] Id. at ¶ 20.
[12] Id.
[13] Id. at ¶ 21.
[14] Id. at ¶ 19.
[15] Id. at ¶ 13.
[16] Id. at ¶ 18.

4. As noted by both Texas and the United States Trustee in their CPO motions, multiple policies prior to the March 14th policy may be applicable to the Debtors' customer database requiring a comprehensive analysis. The Debtors' proposal, however, focuses on current privacy policies, neglecting the evolution and variations of such policies over time and failing to consider that privacy law dictates the policy "in effect" is the one in place at the time the consumer's PII was submitted or collected absent demonstrated consent to different treatment.[17]

5. In cases similar to this one where many policies are implicated, the CPO's analysis included consideration of prior policies and privacy representations for the very same reasons at issue here.[18]

6. A narrow interpretation of section 363(b)(1) limited solely to the Debtors' current policies would also contradict its legislative intent and risk making the CPO requirement meaningless, as it would permit debtors to sidestep statutory oversight by amending their privacy policies just before commencing bankruptcy proceedings.[19]

7. As the CPO in General Motors Corp. noted:

> "[A]ccepted 'privacy' law directs that the relevant privacy policy is the one in place on the date that the information is collected. The Privacy Ombudsman believes public policy considerations dictate that he should follow generally accepted privacy law here. Otherwise, GM (and future debtors) could simply change their privacy policy upon filling for bankruptcy, which would seem to frustrate the purpose of the 2005 Bankruptcy Act.[20]

---

[17] See In re Gateway Learning Corp., FTC Docket No. 042-0347, 2004 WL 2618647, at *5 (F.T.C. Sept. 10, 2004) (holding that, because the privacy policy had changed from the time the customer signed up with the company and there was no affirmative opt-in for the new policy, the company had to honor the previous policy).

[18] See In re General Motors Corp., No. 09-50026-mg (Bankr. S.D.N.Y. July 1, 2009) [Docket No. 2873, p. 22-24]; In re Borders Group, Inc., no. 11-10614 (MG) (Bankr. S.D.N.Y. Sept. 21, 2011) [Docket No. 1830, p 20-24]; see also In re Quirky, Inc., No. 15-12596 (MG) (Bankr. S.D.N.Y. Oct. 7 and 27, 2015) [Docket Nos. 80, 136] (UST objected to sale procedures and requested appointment of CPO because debtors' prior policies restricted sale of PII and debtor did not provide information regarding consumer consent to updated policies. The debtor ultimately agreed to exclude PII of customers subject to the prior restrictive policies.)

[19] Michael St. Patrick Baxter, The Sale of Personally Identifiable Information in Bankruptcy, 27 Am. Bankr. Inst. L. Rev. 1, 10 (2019) ("But, if the only privacy policy that matters is the privacy policy in place on the petition date, and, if that policy discloses (or at least does not prohibit) the possible sale of PII, such a sale would arguably be consistent with the debtor's privacy policy, and the Bankruptcy Code would not require the appointment of a consumer privacy ombudsman.") (footnotes omitted).

[20] No. 09-50026-mg [Docket No. 2873, p. 22-23] (internal citations omitted).

4

8.      Furthermore, the three cases cited by the Debtors to support their argument that a CPO is unnecessary are distinguishable from this case.[21]  In both <u>Sports Auth. Holdings, Inc.</u>,[22] and <u>Gordmans Stores, Inc.</u>,[23] neither a motion to appoint a CPO nor an objection to the proposed sale procedures based on the absence of a CPO was filed.  Additionally, in <u>Sports Auth. Holdings, Inc.</u>, the debtors explicitly represented to the bankruptcy court that a CPO was not required because "pursuant to the Closing Store Agreement, the Liquidation Consultant will not be purchasing any assets from the Debtors, much less personally identifiable information from the Debtors (*e.g.*, customer lists)."[24]

9.      In <u>Bed Bath Beyond Inc.</u>, the debtors' argument against the appointment of a CPO was based on a factual record supported by detailed evidence and disclosures that the Debtors have neither offered nor substantiated here.[25]  In support of their statements, the <u>Bed Bath Beyond Inc.</u> debtors attached a declaration of a data privacy attorney who had served as a CPO in several other bankruptcies.[26]  The declaration listed fifteen (15) iterations of the debtors' privacy policy since 1999, detailed how each iteration allowed for the sharing of PII, and demonstrated customer consent to such policies.[27]  It is only in light of these facts that the bankruptcy court's finding not to appoint a CPO can be fully understood.

10.     Here, Texas, the United States Trustee, and several other states have filed motions specifically requesting the appointment of a CPO and objecting to the absence of a CPO.[28]  Additionally, this case involves many single-use consumers rather than repeated consumers that consented or opted-in to policy changes.[29]  Significantly, there have been at least twenty-two (22)

---

[21] CDR Motion, ¶ 24.
[22] No. 16-10527 (Bankr. D. Del. July 19, 2016) [Docket No. 2552].
[23] No. 17-80304 (Bankr. D. Neb. Apr. 10, 2017) [Docket No. 334].
[24] No. 16-10527 (Bankr. D. Del. March 2, 2016) [Docket No. 15, ¶ 57].
[25] No. 23-13359 (Bankr. D. N.J.) [Docket No. 29, ¶¶ 64-65], [Docket No. 1314, p. 171-79].
[26] <u>Id.</u> at Docket No. 1314, p. 171–79.
[27] <u>Id.</u> at p. 177–87.
[28] <u>See</u> Docket Nos. 181, 195, 239, 244, 246, 248, 254, 282, and 284.
[29] Absent consent by the consumer to any changed material terms, the privacy policy at the time the data was collected applies.  <u>See</u> <u>Gateway Learning Corp.</u>, <u>supra</u> n.17.

5

iterations of the Debtors' privacy policy in its 20-year history. However, there is no analysis in this Court's record regarding the changes to the sharing of PII in each iteration, consumer consent, or the rights Debtors reserved to change the privacy policy without further agreement by the consumer.[30]

11. Accordingly, and for the reasons discussed in the Texas CPO Motion and the UST's Objection, Texas contends that a CPO is not only necessary, but also required in this case.

### III. RESERVATION OF RIGHTS

12. Texas reserves the right to supplement this Joinder or to raise additional arguments or objections to the Debtors' CDR Motion or proposed sale as necessary and appropriate.

### IV. CONCLUSION

13. WHEREFORE, Texas requests that the Court deny the CDR Motion, direct the United States Trustee to appoint a consumer privacy ombudsman pursuant to sections 105, 332, and 363(b)(1), and enter any other and further relief to which the Court finds just and appropriate.

*[Remainder of page left intentionally blank. Signature page follows.]*

---

[30] See In re 1Health.io Inc., FTC Docket No. 192-3170, 2023 WL 4146159, at *4 (F.T.C. June 16, 2023) (alleging that the company published revised privacy policies that applied to all of its customers, including past customers, that attempted to "significantly expand the types of third parties with whom, and the purposes for which, [the company] may share consumers' personal information" without obtaining customers' consent).

Dated: April 23, 2025

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**RACHEL R. OBALDO**
Chief for Bankruptcy & Collections Division

*/s/ Roma N. Desai*
**LAYLA D. MILLIGAN**
Texas State Bar No. 24026015
**ROMA N. DESAI**
Texas Bar No. 24095553
**STEPHANIE EBERHARDT**
Texas Bar No. 24084728
Assistant Attorneys General
Office of the Texas Attorney General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov
stephanie.eberhardt@oag.texas.gov

ATTORNEYS FOR THE STATE OF TEXAS

## CERTIFICATE OF SERVICE

    I certify that a true and correct copy of the foregoing document was filed electronically on the 23rd day of April 2025, with the United States Bankruptcy Court, and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

                                            */s/ Roma N. Desai*
                                            **ROMA N. DESAI**
                                            Assistant Attorney General