# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,[1]<br><br>Debtors. | Case No. 25-40976-357<br>Chapter 11<br><br>(Jointly Administered)<br><br>Hearing Date: April 22, 2025<br>Hearing Time: 1:30 p.m.<br><br>Related Docs. 28 & 81 |

## FINAL ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, GRANT LIENS, PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND USE CASH COLLATERAL, (B) MODIFYING THE AUTOMATIC STAY, AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (together with all exhibits hereto, this "Final Order" and, together with the Approval Order, the "DIP Orders") that, among other things:

i. authorizes the Debtors, jointly and severally, to obtain a non-amortizing priming super-priority senior secured postpetition credit facility ("DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $35,000,000 of which, upon entry of this Final Order and subject to the terms and conditions set forth herein and in the DIP Credit Agreement (as defined below), (a) up to $10 million (the "Interim Amount") will be available upon entry of the Final Order and (b) the remaining up to $25 million (the "Final Amount") will be available upon the Court's entry of an order on or before May 7, 2025, authorizing and approving a stalking horse purchase agreement that (i) is executed, effective, and binding on all parties thereto and (ii) either (A) is approved by the DIP Lender (as defined below) in its reasonable discretion or (B)(1) would generate cash proceeds (as evidenced by financing sources reasonably acceptable to the DIP Lender) sufficient for the Payment in Full[3] of the DIP Obligations upon closing of

---

[1] The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are:  23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these Chapter 11 Cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the applicable DIP Documents (as defined below).

[3] The term "Payment in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement

a sale (the "Stalking Horse Sale"), (2) closes on or before June 30, 2025, and (3) requires, pursuant to a Court order, the Payment in Full of the DIP Obligations (an "Acceptable Stalking Horse Agreement"), in each case, subject to the terms and conditions set forth in this Final Order and the *Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement* among the Debtors, as Borrowers, and JMB Capital Partners Lending, LLC or its permitted designees or assignees, as Lender (the "DIP Lender"), which shall be substantially in the form attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral, or related documents and agreements, including the DIP Orders, each as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");

ii.   approves the terms of the DIP Credit Agreement and the other DIP Documents, and authorizes the Debtors to execute, deliver, and perform under the DIP Documents;

iii.   authorizes the Debtors, on a final basis, to incur and guarantee the DIP Loans and, and all other obligations due or payable to or for the benefit of the DIP Lender under the DIP Documents (including all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, premiums, the Commitment Fee and the Work Fee previously approved on a final basis pursuant to the Approval Order, the Exit Fee, and any other fees payable pursuant to the DIP Documents) (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.   authorizes and directs the Debtors, on a final basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Documents and this Final Order to (a) fund the postpetition working capital needs of the Debtors; (b) pay fees, costs, and expenses of the DIP Facility on the terms and conditions described in this Final Order and the DIP Documents; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Documents, the Approved Budget (as defined below), and this Final Order;

v.   authorizes and approves, on a final basis, the Debtors' grant to the DIP Lender of valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out (as defined below), the Permitted Senior Lien (as defined in the DIP Credit Agreement), and the Permitted Prior Liens (as defined in the DIP Credit Agreement), as applicable, and (b) liens in the DIP Collateral (as defined below), including all property constituting "cash collateral," as defined in section 361(a) of the Bankruptcy Code ("Cash Collateral")[4] pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the

---

obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

[4]   For the avoidance of doubt, Cash Collateral shall not include the security deposit of CoreWeave, Inc. in the amount of $224,636.52, pursuant to the Sublease dated August 15, 2024, between CoreWeave, Inc., and 23andMe, Inc; provided, that the DIP Lender shall have a lien on the Debtors' residual interest in such funds, if any.

Bankruptcy Code, to secure all DIP Obligations, subject only to the Carve-Out, the Permitted Senior Lien, and the Permitted Prior Liens;

vi.     authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Final Order and the DIP Documents;

vii.    authorizes, as applicable, payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Documents;

viii.   subject to the terms hereof, waives (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

ix.     modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Documents and this Final Order, and authorizes the DIP Lender to deliver any notices and exercise rights and remedies, as contemplated in this Final Order and the DIP Documents; and

x.      waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

This Court, upon consideration of the relief requested in the Motion and the exhibits attached thereto, the First Day Declaration, the Swift Declaration, the DIP Credit Agreement, the other available DIP Documents, and the other pleadings filed with this Court; and this Court having considered the evidence submitted and arguments made at the hearing held on March 26, 2025 (the "Interim Hearing"), and having entered the Approval Order on March 26, 2025; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri; and this Court having found that this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and

opportunity for the Interim Hearing and a final hearing on the Motion (the "<u>Final Hearing</u>"), were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at the Interim Hearing and the Final Hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing and Final Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL, AND THE EVIDENCE SUBMITTED DURING THE INTERIM HEARING AND FINAL HEARING, INCLUDING THE FIRST DAY DECLARATION AND THE SWIFT DECLARATION:** [5]

a. **Petition Date**. Commencing on March 23, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

b. **Debtors in Possession**. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

c. **Jurisdiction and Venue**. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court

---

[5] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

for the Eastern District of Missouri.  This matter is a core proceeding within the meaning of 28

U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

     d.    **Notice**.  Proper, timely, adequate, and sufficient notice of the Motion, the Interim

Hearing, and the Final Hearing on the Motion has been provided in accordance with the Approval

Order, Bankruptcy Code, Bankruptcy Rules and Local Rules, and no other or further notice is

required to enter this Final Order.

     e.    **Approval Order**.  On March 26, 2025, the Court entered the Approval Order,

pursuant to which the Court, *inter alia*, (i) authorized the Debtors' entry into, and performance

under the DIP Term Sheet, and (ii) authorized and directed, on a final basis, the Debtors to pay to

the DIP Lender the Commitment Fee and the Work Fee.  As set forth in the Approval Order, the

Commitment Fee and the Work Fee are non-refundable, shall not be avoidable, whether under

Chapter 5 of the Bankruptcy Code, state law, or otherwise, and actual, necessary costs and

expenses of preserving the Debtors' estates and shall be treated as allowed administrative expenses

of the Debtors under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.

     f.    **Committee Formation**.  On April 3, 2025, the Office of the United States Trustee

for the Eastern District of Missouri (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Committee") in these Chapter 11 Cases pursuant to section 1102 of the

Bankruptcy Code (Doc. 159].

     g.    **No Credit Available on More Favorable Terms**.  Given their current financial

condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11

Cases as demonstrated at the Interim Hearing and the Final Hearing the Debtors are unable to

obtain financing from sources other than the DIP Lender on terms more favorable than the DIP

Facility.  The Debtors are unable to procure sufficient financing in the form of unsecured credit

allowable as an administrative expense. The Debtors are also unable to obtain sufficient secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims, in each case subject and subordinate to the Carve-Out, the Permitted Senior Lien, and the Permitted Prior Liens, as set forth herein and in the DIP Documents.

h.   **Good Faith**.  Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including the use of Cash Collateral) under the DIP Facility, as provided by the DIP Documents, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and payments as set forth in this Final Order and the other DIP Documents, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, are integral, critical, and essential components of the DIP Facility provided by the DIP Lender; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and all terms, conditions, and relief set forth in and otherwise approved by this Final Order shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

i.   **Good Cause**.  Good cause has been shown for the entry of this Final Order, and the entry of this Final Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The relief requested in the Motion is fair and reasonable and in the best

interest of the Debtors and their estates, and essential for the continued operation of the Debtors'

business and the preservation of the value of the Debtors' assets.

       j.    **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors do

not have sufficient and reliable sources of working capital to continue to operate their business in

the ordinary course without the financing requested in the Motion.  The financing provided

pursuant to this Final Order and the DIP Documents and the authority to use Cash Collateral

granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses

incurred in connection with the Chapter 11 Cases; (ii) fund any obligations benefiting from the

Carve-Out; (iii) continue the orderly continuation of the operation of their business for the benefit

of all their stakeholders; (iv) maintain business relationships with customers, vendors, and

suppliers; (v) make payroll for their employees; and (vi) satisfy other working capital and

operational needs.

       k.    **Willingness to Provide Financing**.  The DIP Lender has committed to provide

financing to the Debtors subject to:  (i) entry of the DIP Orders; (ii) approval of the terms and

conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Documents;

(iii) satisfaction of the closing conditions set forth in the DIP Credit Agreement; and (iv) findings

by this Court that the DIP Lender is extending credit to the Debtors pursuant to this Final Order

and the DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims,

security interests and liens and other protections granted pursuant to this Final Order and the DIP

Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

       l.    **DIP Budget**.  The Debtors have prepared and delivered to the DIP Lender and its

advisors an initial budget, a copy of which is attached to this Final Order as **Exhibit 2** (together

with any additional line-item or other detail and supplements as may be provided pursuant to the

terms of the DIP Documents, the "Initial DIP Budget").  The Initial DIP Budget reflects, among other things, for the 13-week period commencing on or around the week of entry of this Final Order, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement or the other DIP Documents, and such modified, amended, extended and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, in consultation with the Committee, shall modify, replace, supplement, or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Credit Agreement) shall constitute, without duplication, an "Approved Budget").  The Approved Budget for purposes of this Final Order is attached hereto as **Exhibit 2**.  The Approved Budget has been prepared by the Debtors, their management and their advisors, and the Debtors believe that the Approved Budget is reasonable under the circumstances.  The DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject only to Permitted Variances) and the terms of this Final Order and the DIP Documents in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for in this Final Order.

m.  **Use of Cash Collateral and Proceeds of DIP Facility**.  As a condition to the Debtors' entry into the DIP Credit Agreement and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Final Order, the DIP Documents, and the Approved Budget (subject

to Permitted Variances). Except as otherwise set forth in this Final Order, all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral; provided, however, that, the DIP Lender's Cash Collateral shall not include any cash deposited in any Deposit Escrow Account except cash that the Debtors are entitled to retain under a bidding procedures order or any other final order of the Court.

n.      **Section 506(c) and Marshaling**. As material inducement to the DIP Lender's agreement that the DIP Liens and DIP Superpriority Claims shall be subject to payment of the Carve-Out, the Permitted Senior Lien, and the Permitted Prior Liens, the DIP Lender is entitled to (i) except as otherwise provided in paragraph 31(b) of this Final Order, a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

o.      **Requisite Authority**. Upon entry of this Final Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Credit Agreement and the other DIP Documents to which it is a party and to perform its obligations thereunder.

p.      **Immediate Entry**. Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules. Consummation of the DIP Facility and the permitted use of DIP Collateral in accordance with this

Final Order and the DIP Documents, are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted**.  The relief sought in the Motion is GRANTED on a final basis as set forth herein.  Entry into the DIP Credit Agreement and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in each case, on a final basis and subject to the terms and conditions set forth in this Final Order and in the DIP Documents, including the Approved Budget (subject to Permitted Variances).  All objections to the Motion and this Final Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled on the merits.

2.      **Authorization of the DIP Facility**.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Credit Agreement and the other DIP Documents, and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the other DIP Documents, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Documents, and the creation, perfection, and continuation (as applicable) of the DIP Liens described in and provided for by this Final Order and the DIP Documents.  Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with this Final Order and the other DIP Documents, as such amounts become due and owing, without further Court approval (except as otherwise

provided herein or in the other DIP Documents), including the Exit Fee,[6] as well as any reasonable and documented fees and expenses of counsel to the DIP Lender (subject to paragraph 26 of this Final Order), in each case as set forth herein and in the DIP Credit Agreement, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Final Order and the other DIP Documents.  Upon execution and delivery, the DIP Credit Agreement and, as applicable, the other DIP Documents, shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms.  All provisions of the DIP Credit Agreement are incorporated herein and approved in their entirety. Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Credit Agreement and the other DIP Documents without further order of this Court.

3.     **DIP Obligations**.  This Final Order and, upon execution and delivery thereof, the other DIP Documents shall constitute and evidence the validity and binding effect of the DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto (the "Successors"), including any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing  (collectively, the "Successor Cases").[7]  The DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due in accordance with the DIP Documents, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under this Final Order and

---

[6]     As set forth in paragraph e above, the Commitment Fee and the Work Fee were deemed fully earned and allowed on a final basis upon entry of the Approval Order and paid in full in cash.

[7]     For the avoidance of doubt, the term Successors as used herein shall not include any buyer of the Debtors' assets pursuant to an order of the Court.

the other DIP Documents, and (b) the payment and performance of all covenants, duties, agreements, obligations, and liabilities of the Debtors to the DIP Lender under this Final Order and the other DIP Documents.  The Debtors and their Successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Documents and the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Credit Agreement) or as otherwise set forth in the DIP Documents.  No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4.     **Authorization to Borrow**.  The Debtors are hereby authorized to execute, deliver, enter into, and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Credit Agreement and the other DIP Documents and to take such other and further acts as may be necessary, appropriate, or desirable in connection therewith.  The Debtors are authorized to borrow up to the aggregate amount of the Commitments (as defined in the DIP Credit Agreement), and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Documents, and the DIP Obligations are hereby approved on a final basis (as and when such amounts become earned, due, and payable in accordance with the DIP Documents) without the need to seek further Court approval.  The

borrowing of DIP Loans under this Final Order and the other DIP Documents shall permanently decrease the Commitments and, once repaid, the DIP Loans incurred may not be re-borrowed.

5.    **DIP Collateral**.  The term "<u>DIP Collateral</u>" means, collectively, each Debtor's right, title, and interest in, to and under all of such Debtor's personal property and other assets, in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before or after the Petition Date, and wherever located, including, without limitation, the following:  (a) all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Debtor in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties,[8] all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to section 1(c) or section 1(d) of the Lanham Act (15 U.S.C. §1051 *et seq.*)), all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents, and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State

---

[8]    No liens granted pursuant to this Final Order or the DIP Facility shall attach to any lease rejected pursuant to an order of the Court in the chapter 11 cases.

of New York), and (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; provided, however, that the DIP Collateral (i) shall not include (a) all Avoidance Actions that are not Specified Insider[9] Claims (as defined below) or proceeds of Avoidance Actions that are not Specified Insider Claims,[10] (b) claims and causes of action against current or former directors, officers, and employees of any Debtor, or any other Insider of the Debtor, including, without limitation, any Avoidance Actions and claims and causes of action for or relating to a breach of fiduciary duty by any such director, officer, employee, or Insider (such claims and causes of action, the "Specified Insider Claims"), or (c) the security deposit of CoreWeave, Inc. in the amount of $224,636.52, pursuant to the Sublease dated August 15, 2024 between CoreWeave, Inc. and 23andMe Inc.; provided, that the DIP Lender shall have a lien on the Debtors' residual interest in such funds, if any, but (ii) shall include the proceeds of the Specified Insider Claims.  Nothing in this Final Order shall confer standing on, or otherwise authorize, the DIP Lender to pursue or control the pursuit of any estate cause of action, including, without limitation, any Specified Insider Claim, but, until the DIP Obligations are Paid in Full, the DIP Lender's right to file a motion for standing to pursue any Specified Insider Claim (and any party in interest's right to oppose any such motion) is expressly reserved.

6.     **Disposition of DIP Collateral**.  Except as set forth in the DIP Credit Agreement, it shall be deemed an Event of Default under the DIP Credit Agreement and the other DIP

---

[9]   The term "Insider" shall have the meaning ascribed to it in section 101(31) of the Bankruptcy Code and includes, for the avoidance of doubt, Anne Wojcicki.

[10]   The term "Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

Documents if the Debtors sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents, without the prior written consent of the DIP Lender, which consent shall not unreasonably be withheld or delayed, or further order of the Court. Subject to terms of the DIP Credit Agreement, including Section 2.3(d)(1) thereof, 100% of any net cash proceeds of any sale of DIP Collateral outside of the ordinary course of business shall (including the Stalking Horse Sale), subject to the satisfaction of the Carve-Out and the lien priorities set forth herein and in the DIP Documents, be used to immediately satisfy the DIP Obligations.

7.    **DIP Liens**.  To secure the DIP Obligations, immediately upon and effective as of entry of this Final Order, the DIP Lender is hereby granted on a final basis continuing, effective, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral (the "<u>DIP Liens</u>") as follows, in each case subject to the Carve-Out, the Permitted Prior Liens, and the Permitted Senior Lien:

a.    **Liens Priming Any Prepetition Liens**.  Pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected first-priority senior priming liens and security interests in all DIP Collateral, regardless of where located and subject only to the Carve-Out, the Permitted Senior Lien, and the Permitted Prior Liens, which senior priming liens and security interests in favor of the DIP Lender shall be senior to any Prepetition Liens;[11]

---

[11]    The term "<u>Prepetition Liens</u>" means any valid, enforceable, and non-avoidable liens on and security interests in the DIP Collateral that were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

b. **Liens on Unencumbered Property**. Pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected first-priority liens on and security interests in all DIP Collateral that is not otherwise subject to any valid, enforceable, non-avoidable and perfected lien on or security interest as of the Petition Date or a valid, enforceable, non-avoidable lien or security interest in existence as of the Petition Date and perfected subsequent to the Petition Date as permitted under section 546(b) of the Bankruptcy Code, subject only to the Carve-Out;

c. **Liens Junior to Permitted Prior Liens and the Permitted Senior Lien**. Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable, and automatically and fully perfected junior liens on and security interests in all DIP Collateral that is subject to Permitted Prior Liens and the Permitted Senior Lien.

Other than as set forth herein or in the other DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, and shall be valid and enforceable against any trustee appointed in the chapter 11 cases or any Successor Case, upon the conversion of any of Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case. The DIP Liens shall not be subject to sections 510(c), 549, or 550 of the Bankruptcy Code. To the extent applicable non-bankruptcy law does not permit the DIP Liens to attach directly to any DIP Collateral, the DIP Liens shall be legal, binding, continuing, allowed, enforceable, non-avoidable, properly authorized, and automatically valid, fully and properly perfected and effective priming security

interests in and liens on any proceeds from any sale or other disposition of such DIP Collateral and such proceeds shall constitute DIP Collateral.

8.    **DIP Superpriority Claims**.  Subject to and subordinate to only the Carve-Out the Permitted Senior Lien, and the Permitted Prior Liens, effective immediately upon entry of this Final Order, the DIP Lender is hereby granted on a final basis, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate in the Chapter 11 Cases and any Successor Case (without the need to file any proof of claim) for all DIP Obligations (collectively, the "DIP Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.  The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property and assets of the Debtors and their estates and all proceeds thereof, excluding only the Carve-Out; subject, however, only to the senior lien rights of a stalking horse purchaser and such stalking horse bid protections as may be approved by the Bankruptcy Court.

9.    **No Obligation to Extend Credit**.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Documents unless (a) all of the conditions precedent and other terms under this Final Order and the other DIP Documents have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Credit

Agreement or the other DIP Documents (including this Final Order) has occurred and is continuing, or would occur if any such loan or advance is made.

10.    **Use of DIP Facility Proceeds**.  The Debtors shall be permitted to use loans, extensions of credit, and any other financial accommodations available under the DIP Facility only for the purposes specifically set forth in this Final Order and the other DIP Documents.

11.    **No Monitoring Obligation**.  The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Final Order and the other DIP Documents, including the Approved Budget (subject to the Permitted Variances).

12.    **Authorization to Use Cash Collateral**.  Subject to the terms and conditions of this Final Order and the other DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral in accordance with the terms and conditions of this Final Order and other DIP Documents.

13.    **Modification of DIP Documents**.  The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Documents, any modifications of the DIP Documents without further notice, motion or application to, order of or hearing before, this Court.

14.    **DIP Facility Reporting**.  Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Documents and in accordance with the Approved Budget (subject to the Permitted Variances).  The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Documents.  The Debtors shall deliver a copy of all reporting delivered to the DIP Lender

under the DIP Documents to the advisors to the Committee concurrently with their delivery of such reporting to the DIP Lender.

15. **Perfection of DIP Liens**.  This Final Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein and herein, including the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted in this Final Order.  Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, deposit account control agreements, mortgages, notices of liens, and other similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens.  The DIP Lender may, in its respective sole discretion, file an electronic copy or photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.  For the avoidance of doubt, any deposit account control agreements contemplated by the DIP Credit Agreement shall automatically supersede any preexisting deposit account control agreements, without the necessity of any further action, including by the Debtors or the DIP Lender.  Upon the request of the DIP Lender, each Debtor, without any further consent of any party, is authorized to

take, execute, deliver, and file any such instruments contemplated by the DIP Credit Agreement to enable the DIP Lender to further validate, perfect, preserve, and enforce the DIP Liens.

16.     **Modification of Automatic Stay**.   The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors and the DIP Lender to accomplish the transactions contemplated by this Final Order and the other DIP Documents.

17.     **Proceeds of Subsequent Financing**.   If any of the Debtors, any trustee, any examiner, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Documents or otherwise at any time prior to the Payment in Full of the DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Credit Agreement) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve-Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender to be distributed in accordance with this Final Order and the other DIP Documents; provided, however, that nothing contained herein or the DIP Documents shall preclude the Debtors from seeking to refinance the DIP Facility.

18.     **Payments Held in Trust**.   Except as expressly permitted in this Final Order, the DIP Credit Agreement, or otherwise ordered by this Court, including in respect of the Carve-Out, the Permitted Senior Lien, and the Permitted Prior Liens, in the event that any person or entity other than the Debtors receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to the Payment in Full of the DIP Obligations under the DIP Documents, and termination of the DIP Facility in accordance

with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with this Final Order or the applicable DIP Documents.

19.     **Maintenance of DIP Collateral**.  Until the Payment in Full of the DIP Obligations, the Debtors shall:  (a) insure the DIP Collateral as required under the DIP Documents and applicable law; and (b) maintain the cash-management system consistent with the terms and conditions of the Cash Management Order (as defined in the DIP Credit Agreement) and the DIP Documents.

20.     **Right to Credit Bid**.  Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a reorganization plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a Chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle; provided, that (i) the DIP Lender will not designate or assign any of its rights under the DIP Documents or DIP Loans to any Insider of the Debtors without either (a) the Debtors' and the Committee's prior written consent in their sole discretion or (b) a Court order approving such designation or assignment, (ii) the designation or assignment of any rights under

the DIP Documents or the DIP Loans shall not entitle any Insider or any affiliate of an Insider to credit bid or to designate or control the right to credit bid any portion of the DIP Obligations absent a further order of this Court, and (iii) the designation or assignment of any rights under the DIP Documents or the DIP Loans shall not entitle any Insider, or any affiliate of an Insider, to be a Consultation Party (as defined in the order approving bid procedures entered at Docket No. 125 in the Chapter 11 Cases) absent a further order of this Court.

21.     **Effect of DIP Termination.**

a.     **Exercise of Remedies**.  Upon the occurrence and during the continuation of an Event of Default that has not been waived in writing by the DIP Lender, without further notice to, hearing of, application to, or order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time:  (i) deliver a written notice (which may be via email) to counsel for the Debtors, the U.S. Trustee, and counsel for any Committee (the "Remedies Notice") declaring the occurrence of an Event of Default (such date, the "DIP Termination Declaration Date") and deliver a Carve-Out Trigger Notice; (ii) declare the termination, reduction, or restriction of the Commitments, to the extent any such Commitments remain outstanding, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (iii) declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) charge default interest at the default rate set forth in the DIP Credit Agreement; and

(v) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (subject to the Carve-Out).

b. **Waiting Period Procedures**. The Debtors or the Committee may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) business days following the DIP Termination Declaration Date (such period, including as such period may be tolled, the "Waiting Period") for the purpose of contesting whether, in fact, an Event of Default has occurred and is continuing. If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Debtors or the Committee may only raise the issue of whether an Event of Default has occurred or is continuing. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including Cash Collateral) in accordance with the terms of this Final Order, the other DIP Documents, and the Approved Budget, solely to pay any expenses which are necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default. For the avoidance of doubt, neither the Debtors, the Committee, nor any other party in interest may challenge the occurrence of the Maturity Date if it occurs as a result of the occurrence of September 30, 2025 (or such later outside date as set forth in any amendment to the DIP Credit Agreement).

c. **Cash Reserve**. Notwithstanding anything to the contrary in this Final Order (including this paragraph 21) and the DIP Documents, the DIP Lender hereby

agrees that, upon the occurrence of the DIP Termination Declaration Date, an aggregate amount of $2.5 million in Cash Collateral shall be reserved and restricted (the "Cash Reserve") for purposes of (i) paying costs associated with (a) employee-related obligations, including wages, benefits, severance and termination costs, or other amounts that are or will become due to the Debtors' employees during the pendency of these Chapter 11 Cases (collectively, the "Employee Obligations") and (b) tax-related obligations, including sales and use tax obligations (the "Tax Obligations"), and (ii) prosecuting any Estate Claims (the claims thereunder, the "Cash Reserve Claims"), in each case, subject to the Approved Budget. The Cash Reserve (i) may be funded from the proceeds of the DIP Facility in accordance with the Approved Budget and (ii) shall only be used by the Debtors to pay accrued, unpaid, and undisputed liabilities relating to the Employee Obligations and the Tax Obligations and fund costs associated with prosecuting Estate Claims, in each case, in accordance with the Approved Budget. The DIP Lender further agrees to irrevocably release any DIP Liens in respect of the Cash Reserve to the extent such funds are used to satisfy Employee Obligations, Tax Obligations, or other Cash Reserve Claims. Any funds remaining after all Cash Reserve Claims have been satisfied in full shall be released from the Cash Reserve and unrestricted (subject only to the DIP Documents and the Approved Budget).

d. **Rights and Remedies Following Termination Date**. Following a DIP Termination Declaration Date and unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights

and remedies in accordance with this Final Order, the other DIP Documents, and applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with the DIP Documents, this Final Order, and applicable law.

22.    **No Waiver by Failure to Seek Relief**.  The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Final Order, the other DIP Documents, applicable law, or otherwise.  The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the other DIP Documents, or applicable law shall not constitute a waiver of any of its respective rights.  Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Final Order or the other DIP Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender.  No consents required hereunder by the DIP Lender shall be implied, including by any inaction or acquiescence by the DIP Lender.

23.    **Carve-Out**.

a.    **Priority of Carve-Out**.  The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to the Carve-Out.  The Carve-Out shall be senior to all other claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Final Order.

b.    **Carve-Out**.  The term "Carve-Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee

under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to sections 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") or the Committee, if any, pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Approved Budget and any other limits imposed by the terms of this Final Order; and (iv) allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,500,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap" and, together with the amounts set forth in clauses (i) through (ii) but less any retainers held by such Professional Persons, the "Carve-Out Cap"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.

c. **Carve-Out Account**. As soon as reasonably practicable following the entry of this

Final Order, and each week thereafter, the Debtors shall transfer cash on hand or cash proceeds from the DIP Facility (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to the amount of fees and expenses reflected in the Approved Budget for each Professional Person for such week into a segregated account not subject to control of the DIP Lender (the "Carve-Out Account").   Upon entry of this Final Order, the Carve-Out Account shall automatically replace the segregated "Administrative Expense Account" established and funded pursuant to the Interim Cash Management Order, and the funds in the "Administrative Expense Account" shall be deemed to be funds in the Carve-Out Account for purposes of this Final Order.[12]  The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full.  The amounts in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Persons that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid.  The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.  Until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been

---

[12]    The term "Interim Cash Management Order" means the *Interim Order (I) Authorizing (A) Continued Use of Cash Management System, (B) Maintenance of Bank Accounts and Business Forms, (C) Performance of Intercompany Transactions, and (D) Certain Prepetition Obligations to be Honored; (II) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors; and (III) Granting Related Relief* [Docket No. 80] entered by the Court on March 26, 2025.

funded into the applicable Carve-Out Account and all allowed Professional Fees (as defined in the DIP Credit Agreement) have been paid in full pursuant to a final order of the Court; provided, in no way shall the Carve-Out, the Carve-Out Account, or any Approved Budget be construed as a cap or limitation on the amount of the allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).  Notwithstanding anything contained herein to the contrary, funds transferred to the Carve-Out Account (i) shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to obligations arising under the Carve-Out, and (ii) shall not be subject to any liens or claims granted to the DIP Lender or any other creditors and shall not constitute DIP Collateral; provided, however, that, until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the Carve-Out Account and all allowed fees of Professional Persons have been paid in full pursuant to a final order of the Court.  All funds in the Carve-Out Account shall be used to pay all obligations set forth in the definition of Carve-Out until such obligations are paid in full.  The DIP Lender shall not sweep or foreclose upon any cash on hand or subsequent cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve-

Out as required hereunder.

d. **Carve-Out Trigger Notice**.  For purposes of this Final Order, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under and as such terms are defined in the DIP Credit Agreement, stating that the Post-Carve-Out Trigger Notice Cap has been invoked (the "Trigger Date").  The Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date, excluding cash held in the Cash Reserve except that portion (a) reserved for the prosecution of any Estate Claims and (b) remaining after satisfaction of the Cash Reserve Claims in accordance with the terms of this Final Order, to transfer to the Carve-Out Account an amount of cash equal to the remaining unfunded portion of the Carve-Out (less any retainers held by Professional Persons).  Any Carve-Out Trigger Notice shall be deemed a consent by the DIP Lender to authorize the Debtors to deposit Cash Collateral or proceeds of the DIP Facility into the Carve-Out Account in an amount equal to the unfunded portion of the sum of the Post-Carve-Out Trigger Notice Cap and any budgeted amounts reflected in the Approved Budget through the date of the Carve-Out Trigger Notice that have not already been deposited in the Carve-Out Account.

e. **Carve-Out Draw**.  Subject to exhaustion of the Commitments and the applicable terms of the DIP Documents, the Debtors shall be permitted to draw on the DIP

Facility in the amount of any remaining unfunded portions of the Carve-Out, notwithstanding any default, Event of Default, or the occurrence of a Trigger Date.

f. **Payment of Allowed Professional Fees Prior to the Trigger Date**. Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any allowed Professional Fees shall not reduce the Carve-Out.

g. **Initial Advance**. The foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Advance (as defined in the DIP Credit Agreement).

h. **Restricted Use**. The Carve-Out shall not include, apply to, or be available for any party in connection with any Restricted Use (as defined in the DIP Credit Agreement).

24. **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**. The DIP Lender shall not be obligated, liable, or in any way responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order, the other DIP Documents, or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses. Notwithstanding anything contained herein

to the contrary, neither the Carve-Out or the Approved Budget shall constitute a cap or limitation on the amount of Professional Fees that may be allowed by the Court and due and payable by the Debtors.

25.    **Approval of DIP Fees**.  In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses, and other amounts payable under the DIP Documents as such become due, including the Commitment Fee and the Work Fee (which were deemed fully earned and allowed on a final basis upon entry of the Approval Order and paid in full in cash), the Exit Fee, and the reasonable and documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees").  The Commitment Fee and the Work Fee and the approval thereof in the Approval Order are hereby ratified and adopted in full and such amounts shall continue to be deemed allowed, fully earned, and non-refundable; provided that, upon entry of this Final Order, the DIP Fees other than the Commitment Fee and the Work Fee shall be payable in accordance with the terms of the DIP Credit Agreement and any other applicable DIP Documents.  The DIP Fees shall be part of the DIP Obligations.

26.    **DIP Lender's Professionals' Fees**.  Professionals for the DIP Lender, Norton Rose Fulbright US LLP (the "DIP Lender's Professionals"), shall provide, by electronic mail to counsel to the Debtors and Committee, summary copies of any invoices for reasonable and documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender and the DIP Lender's Professionals incurred in connection with the DIP Facility (which such invoices shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, the attorney work product

doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (i) a summary of the work performed during the relevant compensation period; (ii) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (iii) the total fee amount being requested. The Debtors shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (as defined below) other than the Disputed Invoiced Fees (as defined below). Any objections raised by the Debtors or the Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten days' prior written notice by the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, on or about the closing date of the Stalking Horse Sale (or, as applicable, the closing date of another transaction that constitutes an Acceptable Sale or an Acceptable Plan, the Debtors shall pay reasonable and documented fees and expenses of the DIP Lender's Professionals incurred prior to such date following advance receipt of an invoice by the Debtors and the Committee, without the need to otherwise first deliver a copy of its invoice as provided for herein. No DIP Lender's Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

27.    **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in

respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith, or willful misconduct of the relevant Indemnitee (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents).  Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the DIP Documents or (b) to the extent arising out of any loss, claim, damage, liability, or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee.  The Debtors' indemnification obligations in this paragraph 27 shall be contingent on the occurrence of the Initial Advance and shall not apply to any designee or assignee of any DIP Obligation that is an Insider absent further order of this Court.  The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Case, following dismissal of any of the Chapter 11 Cases or any Successor Case, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

28.    **Proofs of Claim**.  The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Case, this Final Order was deemed to constitute a timely filed proof of claim, and the entry of this Final Order shall be deemed to constitute a timely and valid amendment of such proof of claim.  Any order entered by this Court in relation to the establishment of a bar date (a "Bar Date Order") for any claim (including administrative claims) in the Chapter 11 Cases or Successor Case shall not apply to the DIP Lender.  Notwithstanding the foregoing, (i) the DIP Lender may, in its sole discretion, file (and amend or supplement) one or more proofs of claim (including master or aggregate proofs of claim) in the Chapter 11 Cases for any claim allowed herein or that the DIP Lender otherwise has or may have in respect of the Debtors, and

(ii) this paragraph shall not apply to any designee or assignee of any DIP Obligation that is an Insider absent further order of this Court.

29.    **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve-Out, and Other Funds**.  Except as otherwise permitted in the DIP Documents (including the DIP Orders) and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, the Carve-Out, or the Cash Reserve may not be used, directly or indirectly, by any of the Debtors, the Committee, any other official or unofficial committee, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Case) or any other person or entity (or to pay any professional fees, disbursements, costs, or expenses incurred in connection therewith) in connection with any Restricted Use, including, without limitation, (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) except as permitted by the DIP Documents or order of this Court, using or seeking to use Cash Collateral or any insurance proceeds constituting DIP Collateral without the permission of the DIP Lender; (c) except as permitted by the DIP Documents or order of this Court, selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Lender (not to be unreasonably withheld), unless the Debtors have drawn the Final Amount and such sale or disposition will generate cash proceeds sufficient for (and such cash proceeds are used for) the Payment in Full of the DIP Obligations; (d) seeking to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders or the DIP Documents, as applicable, including seeking to use Cash Collateral or DIP Collateral on a contested basis; (e) the investigation, initiation, or prosecution of any claims, causes of action adversary proceedings, litigation, challenge, objection or other proceeding against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the

foregoing in respect of the DIP Obligations, DIP Liens or DIP Superpriority Claims; (f) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including Cash Collateral) or any other claims held by or on behalf of the DIP Lender; (g) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (h) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations; or (i) any other prohibited or otherwise restricted use of proceeds as set forth in the DIP Documents. For the avoidance of doubt, the Committee's efforts to review, negotiate and/or object to the entry of this Final Order shall not constitute a Restricted Use under the DIP Documents or this Final Order.

30.    **Releases**.  Upon entry of this Final Order, the Debtors, on their own behalf and on behalf of their estates, forever and irrevocably:  (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such (each a "Released Party"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Documents; and (b) waive, discharge and release any and all defenses (including offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations; provided, however, that nothing contained herein shall (i) release any claims against

a Released Party for liabilities that a court of competent jurisdiction determines results from the bad faith, fraud, gross negligence or willful misconduct of such Released Party, (ii) release the DIP Lender from its commitments and obligations hereunder and under the DIP Documents, or (iii) release any Insider from any claim or cause of action whatsoever.

31.    **Waivers**.

a.    **Limitation on Charging on Expenses**.  No costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b.    **No Marshaling**.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Final Order and the other DIP Documents; provided, however, that prior to seeking payment of any DIP Obligations (including, without limitation, any DIP Superpriority Claims) from the proceeds of Specified Insider Claims, the DIP Lender shall first satisfy the DIP Obligations from all other DIP Collateral and shall only avail itself of proceeds of Specified Insider Claims if the DIP Obligations are unable to be Paid in Full from such other DIP Collateral.

32.    **No Lender Liability**.  In determining to make any loan or accommodation of any kind (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations

of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans. Furthermore, nothing in this Final Order or the other DIP Documents shall impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code). This paragraph 32 shall not apply to any designee or assignee of any DIP Obligation that is an Insider absent further order of this Court.

33.     **Limitation of Liability**.  Nothing in this Final Order, the other DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.  This paragraph 33 shall not apply to any designee or assignee of any DIP Obligation that is an Insider absent further order of this Court.

34.     **No Third-Party Beneficiaries**.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35.     **Insurance Proceeds and Policies**.  The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral until the Payment in Full of the DIP Obligations (notwithstanding anything to the contrary in the DIP Documents); provided, however, the Debtors shall not be required to name any designee or assignee of any DIP Obligation that is an Insider as an additional insured or loss payee on any insurance policy absent further order of this Court.

36.     **Chubb Reservation of Rights**. For the avoidance of doubt, (i) the Debtors shall not grant to any other party any liens and/or security interests in any insurance policy issued by Federal Insurance Company and/or any of its U.S.-based affiliates (collectively, together with each of their successors, and solely in their roles as insurers, "Chubb"); (ii) the proceeds of any insurance policy issued by Chubb shall only be considered to be DIP Collateral to the extent such proceeds are paid to the Debtors (as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy; provided, however, that to the extent any claim with respect to the DIP Collateral arises that is covered by any insurance policies issued by Chubb, the Debtors or DIP Lender (if designated as an additional insured party under any such insurance policy in accordance with the terms and conditions thereof) may pursue such claim in accordance with the terms of such insurance policies; and (iii) nothing, including the DIP Documents, alters or modifies the terms and conditions of any insurance policies issued by Chubb and/or any agreements related thereto.  If the Debtors recover any insurance proceeds under such insurance policies, they are hereby authorized to turn over to the DIP Lender any such insurance proceeds (each, a "Proceeds Turnover"), provided, however, that Chubb shall have no duty to effectuate a Proceeds Turnover or liability related to a Proceeds Turnover.

37.    **No Waivers or Modifications of Final Order**.  The Debtors have agreed not to and shall not seek any modification or extension of this Final Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

38.    **Binding Effect of this Final Order**.  Immediately upon entry of this Final Order by this Court, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective Successors and assigns, including any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any Successor Case; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including Cash Collateral) by or extend any financing to any Chapter 7 trustee, Chapter 11 trustee or similar responsible person appointed for the Debtors' estates.

39.    **Discharge**.  Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Payment in Full of the DIP Obligations has occurred, on or before the effective date of such confirmed plan.

40.    **Survival**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any Chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Case; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Case.

The terms and provisions of this Final Order, including the claims, liens, security interests and other protections granted to the DIP Lender, the Carve-Out, or otherwise approved or set forth in this Final Order and the other DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Case, or following dismissal of any of the Chapter 11 Cases or any Successor Case, and shall maintain their priority as provided by this Final Order until, in respect of the DIP Facility, the Payment in Full of the DIP Obligations, pursuant to this Final Order and the other DIP Documents (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

41.    **Necessary Actions**.  The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Final Order and the other DIP Documents.

42.    **Enforceability**.  This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

43.    **Final Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of this Final Order and the other DIP Documents, the terms and provisions of this Final Order shall govern and control to the extent of such conflict or inconsistency.

44.    **Headings**.  All paragraph headings used in this Final Order are for ease of reference only and shall not affect the construction or interpretation hereof.

45.    **Retention of Jurisdiction**.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Documents or this Final Order.

46.    **Miscellaneous**.

a.    Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

b.    All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

c.    No later than two business days after the date of this Final Order, the Debtors shall serve on the Notice Parties a copy of the Final Order and shall file a certificate of service no later than 24 hours after service.

Dated:  April 23, 2025
St. Louis, Missouri
cjs

_Brian C Walsh_
Brian C. Walsh
United States Bankruptcy Judge

Order prepared by:

**CARMODY MACDONALD P.C.**

Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 854-8600
Facsimile: (314) 854-8660
Email: thr@carmodymacdonald.com
      nrw@carmodymacdonald.com
      jjg@carmodymacdonald.com

    - and -

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**
Paul M. Basta (*pro hac vice* granted)
Christopher Hopkins (*pro hac vice*
granted)
Jessica I. Choi (*pro hac vice* granted)
Grace C. Hotz (*pro hac vice* granted)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
chopkins@paulweiss.com
jchoi@paulweiss.com
ghotz@paulweiss.com

*Counsel to the Debtors and Debtors in*
*Possession*

## **Exhibit 1**

**DIP Credit Agreement**

*PROPOSED EXECUTION VERSION*

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT


by and among


23ANDME HOLDING CO.,

THE OTHER BORROWERS PARTY HERETO

and

JMB CAPITAL PARTNERS LENDING, LLC
as Lender


Dated as of April [•], 2025

## TABLE OF CONTENTS

**Page**

1.   DEFINITIONS AND CONSTRUCTION. ........................................................2
   1.1   **Definitions** ....................................................................................2
   1.2   **Accounting Terms** ........................................................................16
   1.3   **UCC** ...............................................................................................16
   1.4   **Construction** .................................................................................17
   1.5   **Schedules and Exhibits** ................................................................17
   1.6   **Timing of Payment or Performance** ............................................17

2.   LOAN AND TERMS OF PAYMENT. ........................................................17
   2.1   **Agreement to Lend; Delayed Draw; Security Documents; and Loan Documents.** ....................................................................................17
   2.2   **Borrowing Procedures** ..................................................................18
   2.3   **Payments; Reductions of the Commitments; Prepayments.** .........19
   2.4   **Interest Rates and Rates, Payments and Calculations.** ...............20
   2.5   **Crediting Payments; Clearance Charge** .......................................21
   2.6   **Designated Account** ......................................................................21
   2.7   **Statements of Obligations** ............................................................21
   2.8   **Fees.** ...............................................................................................22
   2.9   **Borrower Representative; Assumptions** .......................................22

3.   CONDITIONS; TERM OF AGREEMENT. ................................................22
   3.1   **Conditions Precedent to the Effective Date** .................................22
   3.2   **Conditions Precedent to All Advances** ........................................23
   3.3   **Conditions Precedent to of the Advance of the Interim Amount** ....25
   3.4   **Maturity** .......................................................................................26
   3.5   **Effect of Maturity** ........................................................................26

4.   REPRESENTATIONS AND WARRANTIES. .............................................26
   4.1   **Due Organization and Qualification** ...........................................27
   4.2   **Due Authorization** ........................................................................27
   4.3   **Binding Obligations** .....................................................................27
   4.4   **Title to Properties** ........................................................................27
   4.5   **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims.** ...27

| | 4.6 | **Litigation** | 27 |
| | 4.7 | **Fraudulent Transfer** | 28 |
| | 4.8 | **Reserved.** | 28 |
| | 4.9 | **Payment of Taxes** | 28 |
| | 4.10 | **Approved Budget** | 28 |
| | 4.11 | **Site Leases** | 28 |
| | 4.12 | **Permits** | 29 |
| | 4.13 | **No Other Representations** | 29 |
| | 4.14 | **Full Disclosure** | 29 |
| 5. | | AFFIRMATIVE COVENANTS. | 29 |
| | 5.1 | **Notice of Certain Events** | 29 |
| | 5.2 | **Reporting; Budget; Conference Calls.** | 30 |
| | 5.3 | **Existence** | 30 |
| | 5.4 | **Maintenance of Properties; Permits** | 31 |
| | 5.5 | **Taxes** | 31 |
| | 5.6 | **Insurance** | 31 |
| | 5.7 | **Inspection** | 32 |
| | 5.8 | **Environmental** | 32 |
| | 5.9 | **Compliance with Laws** | 32 |
| | 5.10 | **Disclosure Updates** | 33 |
| | 5.11 | **Further Assurances** | 33 |
| | 5.12 | **Approved Budget** | 33 |
| | 5.13 | **Carve-Out Account** | 33 |
| | 5.14 | **Deposit Account Control Agreements** | 33 |
| | 5.15 | **Material Contracts; Sale Offers** | 34 |
| | 5.16 | **Supplement to Commercial Torts Schedule** | 34 |
| 6. | | NEGATIVE COVENANTS. | 34 |
| | 6.1 | **Indebtedness** | 34 |
| | 6.2 | **Liens** | 35 |
| | 6.3 | **Restrictions on Fundamental Changes** | 36 |
| | 6.4 | **Disposal of Assets** | 36 |
| | 6.5 | **Change Name** | 36 |
| | 6.6 | **Nature of Business** | 36 |

6.7 **Material Leases or Contracts; Amendments**..................................36

6.8 **Change of Control**..................................36

6.9 **Accounting Methods**..................................36

6.10 **Transactions with Affiliates**..................................36

6.11 **Use of Advances**..................................37

6.12 **Limitation on Capital Expenditures**..................................37

6.13 **Chapter 11 Cases**..................................37

6.14 **Certain Transactions**..................................37

6.15 **Acquisitions, Loans, or Investments**..................................37

6.16 **Payments on Indebtedness**..................................38

6.17 **Distributions or Redemptions**..................................38

6.18 **Formation of Subsidiaries**..................................38

7. EVENTS OF DEFAULT..................................39

7.1 **Event of Default**..................................39

7.2 **Rights and Remedies**..................................42

7.3 **Application of Proceeds upon Event of Default**..................................43

7.4 **Remedies Cumulative**..................................43

7.5 **Acknowledgment**..................................43

8. COLLATERAL SECURITY..................................43

8.1 **Grant of Security Interest in the Collateral; Superpriority Claims**..................................43

8.2 **Representations and Warranties in Connection with Security Interest**..................................44

8.3 **Superpriority Nature of Obligations and Liens**..................................44

8.4 **Power of Attorney**..................................44

8.5 **Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral**..................................45

8.6 **Filing of Financing Statements**..................................45

8.7 **No Discharge; Survival of Claims**..................................45

9. WAIVERS; INDEMNIFICATION..................................45

9.1 **Demand; Protest; etc**..................................45

9.2 **Lender's Liability for Collateral**..................................46

9.3 **Indemnification**..................................46

10.     NOTICES.................................................................................................................46

11.     CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. .......................................48

12.     AMENDMENTS; WAIVERS; SUCCESSORS.........................................................49

     12.1   **Amendments and Waivers**.........................................................................49

     12.2   **No Waivers; Cumulative Remedies**.........................................................49

     12.3   **Successors**...............................................................................................49

13.     GENERAL PROVISIONS. ....................................................................................49

     13.1   **Effectiveness**............................................................................................49

     13.2   **Section Headings**.....................................................................................49

     13.3   **Interpretation**...........................................................................................49

     13.4   **Severability of Provisions**........................................................................49

     13.5   **Debtor-Creditor Relationship**..................................................................49

     13.6   **Counterparts; Electronic Execution** ........................................................50

     13.7   **Revival and Reinstatement of Obligations** .............................................50

     13.8   **Lender Expenses**.....................................................................................50

     13.9   **Integration**...............................................................................................50

14.     JOINT AND SEVERAL OBLIGATIONS.................................................................50

15.     ADDITIONAL BORROWERS..................................................................................51

16.     TREATMENT OF CERTAIN INFORMATION. .........................................................51

17.     LENDER REPRESENTATIONS.............................................................................51

     17.1   **No Insider**................................................................................................51

     17.2   **No Collusion**............................................................................................51

Exhibits

Exhibit A – Form of Compliance Certificate
Exhibit B – Approved Budget
Exhibit C – Reporting Requirements
Exhibit D – Form of Borrowing Notice
Exhibit E – Copy of Approval Order and Term Sheet

Schedules

Schedule A-1 – Authorized Persons
Schedule A-2 – Payment Account
Schedule D-1 – Designated Account and Designated Account Bank
Schedule 4.1(a) – Organizational Chart
Schedule 4.5 – Borrowers, Equity Ownership and Uniform Commercial Code Filing Information
Schedule 4.6 – Litigation and Commercial Tort Claims
Schedule 4.9 – Taxes
Schedule 4.11(b) – Site Leases and Site Lease Defaults
Schedule 4.12 – Maintenance of Properties; Permits

## SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of April [•], 2025 (the "Effective Date"), by and among 23andMe Holding Co., a Delaware corporation ("Holdings"), the other borrowers signatory hereto (together with Holdings, collectively, jointly and severally, the "Borrowers"), and JMB Capital Partners Lending, LLC, a California limited liability company, as lender (together with its successors and assigns, the "Lender").

**WHEREAS,** on March 23, 2025 (the "Petition Date"), Borrowers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Missouri, Eastern Division (the "Bankruptcy Court"), which are being jointly administered under the lead Case No. 25-40976 filed by Holdings (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases");

**WHEREAS,** Borrowers remain in possession of their respective businesses and manage their respective properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS,** Borrowers have requested that Lender provide a non-amortizing, priming, super-priority senior secured term loan facility to Borrowers in a total aggregate principal amount of up to thirty-five million Dollars ($35,000,000) (the "Facility") pursuant to Sections 105, 363, 364(c), and 364(d) of the Bankruptcy Code, consisting of (a) an initial tranche of ten million Dollars ($10,000,000) of term loans made available to the Borrowers upon entry of the Final Order (as defined below) (the "Interim Term Loan") and (b) a tranche of twenty-five million Dollars ($25,000,000) of delayed draw term loans subject to compliance with the terms, conditions, and covenants described in this Agreement and the Final Order (the "Delayed Draw Term Loan," and collectively with the Interim Term Loan, the "Loans");

**WHEREAS,** Lender has indicated its willingness to fund the Loans to Borrowers on the terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 363, 364(c), and 364(d) of the Bankruptcy Code, so long as all of the Obligations are (a) secured by priming first priority senior secured Liens on the Collateral granted by the Borrowers as provided herein and in the other Loan Documents and (b) given superpriority status as provided in the Final Order;

**WHEREAS,** each Borrower has agreed (a) to grant to Lender, among other things, (i) a fully perfected first-priority senior priming lien on and security interest in all its assets, subject to the Carve-Out, the Permitted Senior Lien (as defined below), and Permitted Prior Liens (as defined below) and (ii) other relief in accordance with and as more fully set forth in the Final Order, and (b) that Lender shall have Superpriority Claims in the Chapter 11 Cases for the repayment of the Obligations pursuant to the Final Order; and

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1.    DEFINITIONS AND CONSTRUCTION.

1.1    **Definitions.**    As used in this Agreement, the following terms shall have the meanings set forth below:

"23andMe" means 23andMe, Inc., a Delaware corporation.

"Acceptable Plan" means a plan of reorganization or liquidation, in form and substance reasonably satisfactory to Lender, for any or all of the Chapter 11 Cases that is either (a) approved by Lender before same is filed with the Bankruptcy Court, or (b) provides for (i) the indefeasible payment in full in cash, through sources acceptable to Lender in its reasonable discretion, of the Obligations, in exchange for full discharge thereof, on or prior to the effective date of such plan as a condition to the effectiveness thereof, and (ii) releases and indemnification for Lender to the maximum extent permitted by applicable law.

"Acceptable Sale" means a Sale of all or a material portion of Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, in accordance with a Sale Order, where either (a) the Sale, by itself or with one or more related transactions, (i) provides for the indefeasible payment in full in cash of the Obligations; (ii) the purchaser has demonstrated that it has (A) cash or cash equivalents in the amount of the purchase price set forth in any purchase agreement or other applicable transaction document(s), (B) a signed commitment, acceptable to Lender in its reasonable discretion, to lend from a recognized lender in the amount of such purchase price, or (C) a combination thereof, necessary to consummate any purchase agreement or other applicable transaction document(s); and (iii) the closing of the Sale shall occur on or prior to the Maturity Date; or (b) Lender provides its prior written consent to such Sale before same is approved by the Bankruptcy Court.

"Acceptable Stalking Horse Agreement" means a stalking horse purchase agreement for all or a material portion of the Borrowers' assets(s) that (a) is executed, effective, and binding on all parties thereto and (b) either (x) is approved by Lender in its reasonable discretion or (y) (1) would generate cash proceeds sufficient for the payment in full of the Obligations (pursuant to a signed commitment acceptable to Lender in its reasonable discretion to lend from a recognized lender or another source of funding acceptable to Lender in its reasonable discretion) upon the closing date of such sale, (2) closes on or before June 30, 2025, and (3) requires, pursuant to a Sale Order, the payment in full of the Obligations.

"Additional Documents" has the meaning set forth in Section 5.11.

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Effective Date) of ten percent (10%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person.  For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with")

shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Approval Order" means the *Interim Order (I) Authorizing Entry into and Performance Under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and the Work Fee Thereunder, and (II) Granting Related Relief* [Docket No. 81] entered by the Bankruptcy Court on March 26, 2025. For the Parties' convenience, a true and correct copy of the Approval Order is attached hereto as Exhibit E.

"Approved Budget" means an (a) the initial budget, prepared by Borrowers, for a 13-week period commencing on the Petition Date that sets forth in reasonable detail all of Borrowers' projected (i) Cash Receipts, (ii) Cash Operating Disbursements, and (iii) non-operating bankruptcy-related cash disbursements on a weekly basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance acceptable to Lender, and is attached hereto as Exhibit B and (b) an amended or otherwise modified budget adopted with the written consent of Lender in its reasonable discretion; provided that the total amount of Loans provided pursuant to such amended Approved Budget shall not exceed the total amount of the Commitments authorized by the Final Order; provided, further, that the Approved Budget shall include the Cash Reserve (as defined in the Final Order).

"Authorized Person" means any of the individuals identified on Schedule A-1, which may be updated from time to time by written notice from Borrowers to Lender.

"Avoidance Actions" means any and all avoidance, recovery, subordination, derivative, or other claims, actions or remedies that may be brought by or on behalf of one or more of the Borrowers or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under Sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar, related, or comparable state or federal statutes or common law, including fraudulent transfer laws, or under other applicable law.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Borrowing Notice" has the meaning set forth in Section 2.2.

"Borrowers" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve-Out" has the meaning set forth in the Final Order.

"Carve-Out Account" has the meaning set forth in the Final Order.

"Carve-Out Advance" has the meaning set forth in Section 2.1(b).

"Carve-Out Cap" has the meaning set forth in the Final Order.

"Carve-Out Trigger Notice" has the meaning set forth in the Final Order.

"Cash Collateral" has the meaning set forth in the Final Order.

"Cash Management Order" means the *Final Order (I) Authorizing (A) Continued Use of Cash Management System, (B) Maintenance of Bank Accounts and Business Forms, (C) Performance of Intercompany Transactions, and (D) Certain Prepetition Obligations to be Honored; (II) Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtors; (III) Waiving Strict Compliance With 11 U.S.C. § 345(B) and Certain Operating Guidelines, as Applicable; and (IV) Granting Related Relief* [Docket No. [•]] entered by the Bankruptcy Court on April 22, 2025.

"Cash Operating Disbursements" means cash operating disbursements of Borrowers.

"Cash Receipts" means the cash receipts of Borrowers.

"Cash Reserve" has the meaning set forth in the Final Order.

"Change of Control" means except with respect to the consummation of an Acceptable Plan or an Acceptable Sale, the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (i) the beneficial ownership, directly or indirectly, of 50% or more of the voting equity interests of Holdings or (ii) all or substantially all of the assets of the Borrowers, taken as a whole, except as permitted in this Agreement.

"Chapter 11 Case" and "Chapter 11 Cases" have the meanings set forth in the recitals to this Agreement.

"Chief Restructuring Officer" or "CRO" means Matthew Kvarda, Managing Director of Alvarez and Marsal North America, LLC, in his capacity as chief restructuring officer of Holdings and the other debtors and debtors in possession in the Chapter 11 Cases or any replacement agreed to Lender (such agreement not to be unreasonably withheld, conditioned or delayed).

"Collateral" means, collectively, each Borrower's right, title, and interest in, to and under all of such Borrower's personal property and other assets, in each case, whether now owned or existing or hereafter acquired, created or arising, whether arising before or after the Petition Date, and wherever located, including, without limitation, the following:  (a) all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by such Borrower in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to section 1(c) or section 1(d) of the Lanham Act (15 U.S.C. §1051 *et seq.*)), all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), together with all books and records relating to the foregoing, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York), (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of Collateral and any proceeds thereof, and (b) all Avoidance Actions; provided, however, that the "Collateral" (i) shall not include the Specified Insider Claims but (ii) shall include the proceeds of Specified Insider Claims; provided, further, that the "Collateral" shall not include any cash deposited in the Deposit Escrow Account except cash that Borrowers are entitled to retain under a bidding procedures order or any other final order of the Bankruptcy Court.

"Commitment Fee" means the fee equal to two percent (2.00%) of the principal amount of the Commitments, which fee was fully earned and non-refundable, and approved on a final basis, upon entry of the Approval Order and indefeasibly paid in full in cash by the applicable Debtors pursuant thereto.

"Commitments" means the commitments of Lender (including the Interim Term Loan Commitment and the Delayed Draw Term Loan Commitment) to fund the Loans hereunder.  The aggregate amount of Lender's Commitments is the principal amount of up to thirty-five million Dollars ($35,000,000), subject to the terms of this Agreement, the Final Order, and the other Loan Documents.

"Committee" means the statutory committee of unsecured creditors appointed by the United States Trustee in relation to the Chapter 11 Cases, if any.

"Compliance Certificate" means a certificate substantially in the form of Exhibit A delivered by the Authorized Person of Borrowers to Lender.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"<u>Debtor</u>" or "<u>Debtors</u>" means, as applicable, each debtor, or all debtors, in the Chapter 11 Cases in their respective capacity as a debtor and debtor in possession.

"<u>Default</u>" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" has the meaning set forth in <u>Section 2.4(b)</u>.

"<u>Delayed Draw Term Loan</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Delayed Draw Term Loan Commitment</u>" means the commitment of Lender to fund Advances under the Delayed Draw Term Loan in an aggregate principal amount of twenty-five million Dollars ($25,000,000), subject to the terms of this Agreement, the Final Order, and the other Loan Documents.

"<u>Deposit Account Control Agreement</u>" means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to Borrowers and Lender that (a) is entered into among Lender, the financial institution or other person at which such Deposit Account is maintained, and such Borrower maintaining such Deposit Account, and (b) is effective for Lender to obtain "control" (within the meaning of Articles 8 and 9 of the UCC) of such Deposit Account.

"<u>Deposit Escrow Account</u>" means any escrow account established in connection with a purchase agreement entered into between Borrowers and any potential purchaser of all or substantially all of Borrowers' assets pursuant to a bidding procedures order of the Bankruptcy Court.

"<u>Designated Account</u>" means the Deposit Account of Borrowers at the Designated Account Bank identified on <u>Schedule D-1</u>, which shall be an account existing within Borrowers' cash-management system as of the Petition Date.

"<u>Designated Account Bank</u>" has the meaning set forth in <u>Schedule D-1</u>.

"<u>DIP Orders</u>" means the Approval Order and the Final Order, each as applicable.

"<u>DIP Termination Declaration Date</u>" has the meaning set forth in the Final Order.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Effective Date</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Environmental Action</u>" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial, or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral, (b) from adjoining properties or businesses of any real properties that constitute Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by Borrowers.

"Environmental Law" means any applicable federal, state, provincial, foreign, or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, in each case, to the extent binding on Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs, and expenses (including all reasonable fees, disbursements, and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Event of Default" has the meaning set forth in Section 8.1.

"Exit Fee" means the fee equal to the sum of, without duplication, (a) following entry of the Final Order, four percent (4.00%) of the Interim Amount, and (b) following the Bankruptcy Court's approval and the execution and delivery of an Acceptable Stalking Horse Purchase Agreement, four percent (4.00%) of the Delayed Draw Term Loan Commitment, which with respect to (a) the Exit Fee related to the Interim Amount shall be fully earned, non-refundable, and allowed upon the entry of the Final Order and (b) the Exit Fee related to the Delayed Draw Term Loan Commitment shall be fully earned, non-refundable, and allowed upon entry of the Final Order and Bankruptcy Court approval and the execution and delivery of an Acceptable Stalking Horse Purchase Agreement.

"Facility" has the meaning set forth in the recitals to this Agreement.

"Fees" means all fees due to Lender under this Agreement, any Loan Document, or the DIP Orders, including, but not limited to, the Commitment Fee, the Work Fee, and the Exit Fee.

"Final Order" means a final order of the Bankruptcy Court authorizing and approving Borrowers' entry into this Agreement and the other Loan Documents and with such modifications as are necessary to convert the Term Sheet into a financing order, in form and substance reasonably satisfactory to Lender on a final basis and entered at or following a final hearing.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity,

reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity," (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the Ordinary Course of Business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above.  For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning set forth in Section 10.3.

"Indemnified Person" has the meaning set forth in Section 10.3.

"Information" has the meaning set forth in Section 16.

"Initial Advance" means the funding of the first Advance under this Agreement (*i.e.*, the Interim Term Loan or the applicable portion of the Interim Amount).

"Interim Amount" means ten million Dollars ($10,000,000), which will be made available to be drawn by Borrowers pursuant to the terms and conditions of the this Agreement and the Final Order.

"Interim Term Loan" has the meaning set forth in the recitals to this Agreement.

"Interim Term Loan Commitment" means the commitment of Lender to fund an Advance under the Interim Term Loan in an aggregate principal amount of ten million Dollars ($10,000,000), subject to the terms of this Agreement, the Final Order, and the other Loan Documents.

"JPM" means JPMorgan Chase Bank, N.A.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lender Expenses" means all of its reasonable and documented out-of-pocket costs and expenses (a) incurred in connection with the development, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, the administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of Norton Rose Fulbright LLP, as counsel to Lender (plus one firm of local counsel to the Lender per material jurisdiction as may be reasonably necessary) and (b) incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in clause (b) (including all such reasonable costs and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning Borrowers (including the Chapter 11 Cases) or in exercising rights or remedies under the Loan Documents), including the documented fees and disbursements of Norton Rose Fulbright LLP, as counsel to Lender and, if necessary, a single firm of local counsel per material jurisdiction Lender as may reasonably be necessary.

"Lender Related Person" means Lender, together with its officers, directors, employees, attorneys, representatives, and agents.

"Lender's Liens" means the Liens granted by Borrowers in and to the Collateral in favor of Lender.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" means the loan accounts maintained by Lender in the name of Borrowers in which shall be recorded the date and amount of each Loan made by Lender and the amount of each payment in respect thereof.

"Loan Documents" means this Agreement, DIP Orders, the Additional Documents, and any other notes, account control agreements, financing statements, or security agreements executed by Borrowers in connection with this Agreement in favor of Lender, any other agreement entered into, now or in the future, by Borrowers and Lender in connection with this Agreement and designated a Loan Document, and all amendments, modifications, renewals, substitutions, and replacements of any of the foregoing; provided that, for the avoidance of doubt, all Loan Documents shall be in form and substance reasonably satisfactory to Borrowers and Lender.

"Loans" has the meaning set forth in the recitals to this Agreement.

"<u>Material Adverse Change</u>" means (a) a material adverse effect on the business, operations, properties, assets, performance, or financial condition of the Borrowers taken as a whole; (b) a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to Lender; or (c) a material adverse effect on the ability of the Borrowers to perform their obligations under any Loan Documents, in each case, excluding (i) any matters publicly disclosed prior to the Petition Date, (ii) any matters known by Lender or its counsel as of the date of the execution of the Term Sheet and (iii) any matters related to or arising from the commencement of the Chapter 11 Cases.

"<u>Material Contract</u>" means each contract or agreement to which any Borrower is party as to which the breach, nonperformance, cancellation, termination, loss, expiration, or failure to renew by any party thereto that has resulted in, or would reasonably be expected to result in, a Material Adverse Change.

"<u>Maturity Date</u>" means the earliest of (a) September 30, 2025; (b) the effective date of any chapter 11 plan with respect to the Borrowers; (c) the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; (d) the date of the acceleration of the Loans and the termination of the Commitments following the occurrence and during the continuation of an Event of Default in accordance with this Agreement; and (e) dismissal of any Chapter 11 Case or conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code.

"<u>Motion</u>" means the *Debtors' Motion for Entry of (I) an Order Authorizing (A) Entry Into and Performance Under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and Work Fee Thereunder, and (B) Granting Related Relief and (II) an Order (A) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, and Provide Superpriority Administrative Expense Claims, (B) Modifying the Automatic Stay, and (C) Granting Related Relief* [Docket No. 28] filed on March 24, 2025 in the Chapter 11 Cases.

"<u>Net Cash Proceeds</u>" means with respect to any sale or disposition of the Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, and (b) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction.

"<u>Net Operating Disbursement Variance</u>" means the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Approved Budget) for such period to "net operating cash flow" for such period as set forth in the Approved Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period.

"<u>Obligations</u>" means all loans, including, without limitation, the Loans, the Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), obligations

(including indemnification obligations), Fees (including the Commitment Fee, the Work Fee, and the Exit Fee), Lender Expenses, premiums, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute, or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants, and duties of any kind and description owing by Borrowers to Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments, or agreements described in clause (i) of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, of Borrowers to Lender under the Loan Documents and the Final Order, and including all interest not paid when due and all other expenses or other amounts that Borrowers are required to pay or reimburse by the Loan Documents, by law, or otherwise in connection with the Loan Documents including, without limitation, in connection with the collection or enforcement of or preservation of rights of Lender under the Loan Documents.

"Ordinary Course" and "Ordinary Course of Business" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith except as such conduct has been changed resulting from the filing of the Chapter 11 Cases.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation; (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership; (c) for any limited liability company, the operating agreement or limited liability company agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company; and (d) any agreement between a Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of such Borrower.

"Payment Account" means the Deposit Account of Lender identified on Schedule A-2, or otherwise identified to the Borrowers in writing by Lender.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization, or approval issued by a Governmental Authority.

"Permitted Indebtedness" has the meaning set forth in Section 6.1.

"Permitted Liens" means:

(a)     all Liens created by the Loan Documents and the Final Order (including the Carve-Out);

(b)     Liens for taxes that are not delinquent or thereafter payable and that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with generally accepted accounting principles as in effect from time to time and any other taxes to the extent not required to be paid not required to be paid pursuant to Section 5.5;

(c)      statutory or common law liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other like liens imposed by law or pursuant to customary reservations or retentions of title arising in the Ordinary Course of Business;

(d)(i)   pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by the Employee Retirement Income Security Act of 1974, and (ii) pledges and deposits of cash securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Borrower;

(e)      liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment;

(f)      non-exclusive licenses and sublicenses of intellectual property and other assets entered into in the Ordinary Course of Business that does not materially interfere with the ordinary conduct of the business of the Borrowers, individually, or taken as a whole;

(g)      normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions incurred in connection with the maintenance of such deposits in the Ordinary Course of Business in connection with the issuance or repayment of indebtedness;

(h)      any zoning or similar law or right reserved to or vested in any governmental authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrowers, individually, or taken as a whole;

(i)      Liens securing Indebtedness incurred pursuant to Section 6.01(h); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds thereof and (ii) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets and the proceeds thereof) other than the assets subject to, or acquired, constructed, repaired or improved with the proceeds of such Indebtedness; provided that, in each case, individual financings provided by one lender may be cross collateralized to other financings provided by such lender or its Affiliates;

(j)      any other interest or title (and any encumbrances on such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or subleases (other than capitalized leases) or licenses or sublicenses, in each case entered into by a Borrower in the Ordinary Course of Business;

(k)      Permitted Prior Liens; and

(l)      Permitted Senior Lien.

"Permitted Prior Liens" means the following liens, in an aggregate amount, taken together, not to exceed $250,000:

(a)      the "Existing Liens" set forth on <u>Schedule 1</u> to the Term Sheet;

(b)      statutory or common law liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business for amounts not overdue; or

(c)      liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment.

"<u>Permitted Protest</u>" means the right of any Borrower to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, <u>provided</u>, that (a) a reserve with respect to such obligation is established on such Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower in good faith, and (c) Lender is satisfied in its reasonable discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens.

"<u>Permitted Senior Lien</u>" means the security interest in and right of set-off granted to JPM in all of 23andMe's right, title and interest in and to all deposits, and any renewals thereof, additions thereto and substitutions therefor, in the collateral account ending in x1733 held at JPM and designated under that certain Assignment of Deposits, dated as of March 11, 2019 as between 23andMe and JPM, together with all monies, proceeds, interest or sums credited from time to time thereto or due or to become due thereon or therefrom.

"<u>Permitted Transfers</u>" means (a) dispositions of inventory and other assets in the Ordinary Course of Business, (b) sale of worn-out or obsolete Equipment that is, in the reasonable judgment of Borrowers, no longer economically practicable to maintain or useful in the Ordinary Course of Business, (c) dispositions of accounts receivable in connection with the collection or compromise thereof, (d) non-exclusive licenses and sublicenses of intellectual property and other assets entered into in the Ordinary Course of Business, (e) the sale or disposition of cash equivalents for fair market value and in a manner that is not otherwise prohibited by this Agreement or the Loan Documents, (f) the abandonment, transfer, cancellation or lapse of immaterial intellectual property that is, no longer economically practicable to maintain or useful in the Ordinary Course of Business, (g) dispositions among Borrowers and (h) any other dispositions set forth in the Approved Budget.

"<u>Permitted Variance</u>" means a Net Operating Disbursement Variance of no more than twenty percent (20.00%), which variance shall be tested on a four (4) week cumulative basis, as opposed to a line-by-line, basis; <u>provided</u> that, for the avoidance of doubt, the calculation of any aforementioned Permitted Variance shall exclude any disbursements in connection with professional fees of Borrowers, fees of the U.S. Trustee, Lender Expenses, interest, Fees, all direct costs and budgeted professional fees associated with the Chapter 11 Cases and any other amounts payable hereunder or any Loan Document.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Post-Carve Out Trigger Notice Cap" has the meaning set forth in the Final Order

"Professional Fees" means all unpaid fees and expenses incurred by persons or firms retained by (a) the Borrowers pursuant to Sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; or (b) the Committee pursuant to Sections 328 or 1103 of the Bankruptcy Code; provided that, to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Remedies Notice" has the meaning set forth in the Final Order.

"Required Lien Priority" means, with respect to any Lien on the Collateral in favor of Lender, the priority set forth in the Final Order.

"Restricted Use" means the use of Loans, Collateral, or the proceeds of the foregoing:

(a) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding:

(i) against Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the Obligations, Lender's Liens, or Superpriority Claims; or

(ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Obligations and/or the liens, claims, rights, or security interests granted under the Final Order, the Loan Documents, including, in each case, without limitation, for lender liability or pursuant to Section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise;

(b) to prevent, hinder, or otherwise delay Lender's enforcement or realization on the Obligations, the Collateral, and the liens, claims, and rights granted to such parties under the Final Order, each in accordance with the Loan Documents and the Final Order, as applicable; provided, however, that this shall not apply to a challenge to whether an Event of Default has occurred or is continuing in accordance with the Final Order and/or the propriety of Lender's termination and/or acceleration of the Obligations or calculation of the amounts owed thereunder;

(c) to seek to modify any of the rights and remedies granted to Lender under the Final Order (other than with the consents contemplated thereunder), or the Loan Documents, as applicable; or

(d) to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted, if any, pursuant to the Loan Documents) or security interests in the Collateral or any portion thereof that are senior to, or on parity with, the Lender's Liens, Superiority Claims, unless permitted under the Loan Documents or unless all Obligations and claims granted to Lender under the Final Order have been refinanced with Lender's consent or paid in full in cash or otherwise agreed to in writing by Lender.

"Sale" means one or more sale(s) or transaction(s) that, when taken together, result in the sale of all or substantially all of the assets of any Borrower or any other Borrower to any party, including Lender or any of its Affiliates, pursuant to an Acceptable Sale or pursuant to an Acceptable Plan.

"Sale Order" means each order or proposed order approving an Acceptable Sale or any other sale of a Borrower's assets pursuant to Section 363 of the Bankruptcy Code or otherwise, which order shall be in form and substance satisfactory to Lender.

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Security Documents" means (a) all UCC financing statements, or amendments or continuations thereof, and (b) all other security agreements, Deposit Account Control Agreements, documents or filings in connection with the perfection of the Liens granted or pledged pursuant to the terms of this Agreement, any other Loan Document or the Final Order, as same may be amended, modified, restated or supplemented from time to time.

"Site Lease" means a lease pursuant to which each location operated by a Borrower or a Subsidiary of a Borrower has been leased to such Person.

"Specified Insider Claims" has the meaning set forth in the Final Order.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claims" means the "DIP Superpriority Claims" as that term is defined in the Final Order.

"Term Sheet" means that certain term sheet, together with the exhibits and schedules thereto, attached as Exhibit A to the Approval Order.  For the Parties' convenience, a true and correct copy of the Term Sheet is attached hereto as Exhibit E.

"Trigger Date" has the meaning set forth in the Final Order.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided, that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection, or non-perfection or priority.

"United States" means the United States of America.

"Variance Report" has the meaning set forth in Section 5.2(c).

"Waiting Period" has the meaning set forth in the Final Order.

"Work Fee" means the fee in the amount of $100,000, which fee was fully earned and non-refundable, and approved on a final basis, upon entry of the Approval Order and such fee was indefeasibly paid in full in cash by the applicable Debtors pursuant thereto.

1.2    **Accounting Terms.**  All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided that, if Borrowers notify Lender that Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrowers that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Lender and Borrowers hereby agree that they will negotiate, in good faith, amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective.  When used herein, the term "financial statements" shall include the notes and schedules thereto.  Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean Borrowers on a consolidated basis, unless the context clearly requires otherwise.

1.3    **UCC.**  Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4    **Construction.**  Unless the context of this Agreement or the Loan Documents clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except as otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or the Loan Documents refer to this Agreement or such other Loan Document, as the case may be, as a whole, and not to any particular provision of this Agreement or such other Loan Document, as the case may be.  Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full (or any correlative phrase) of the Obligations shall mean the irrevocable and indefeasible payment in full in cash of all Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all Commitments shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.  Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns.  Any requirement of a writing contained herein or in any Loan Document shall be satisfied by the transmission of a Record.

1.5    **Schedules and Exhibits**.  All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.6    **Timing of Payment or Performance.**  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

2.    **LOAN AND TERMS OF PAYMENT.**

2.1    **Agreement to Lend; Delayed Draw; Security Documents; and Loan Documents.**

(a)    Subject to the terms and conditions of the Final Order, this Agreement, and the satisfaction or waiver of the conditions precedent in Sections 3.1, 3.2 and 3.3, as applicable, Lender agrees to fund under the Loans (each, an "Advance" and collectively, the "Advances") to the Borrower Representative in the aggregate amount up to (i) following entry of the Final Order, the Interim Term Loan Commitment (the funding of which, for the avoidance of doubt, shall only be subject to conditions precedent in Section 3.3), and (ii) following the Bankruptcy Court's approval and the execution and delivery of an Acceptable Stalking Horse Purchase Agreement, the Delayed Draw Term Loan Commitment; provided that in no event shall the outstanding Loans

exceed the Commitments. Each Advance shall be made in an aggregate minimum amount of $2,000,000 (and multiples of $500,000 in excess thereof) upon three (3) business days' written notice (or such lesser notice as agreed by Lender in its sole discretion), up to the aggregate amount of the undrawn Commitments at any time prior to three (3) business days before the Maturity Date.

(b)    Notwithstanding clause (a) above, so long as there is availability under the Delayed Draw Term Loan Commitment, the Borrower Representative shall be permitted to request one or more Advances (or portions thereof), and Lender shall fund any such Advance (or portion thereof) (each, a "Carve-Out Advance"), in an aggregate amount of up to the Carve-Out Cap, less any amounts maintained in the Carve-Out Account, all in accordance with the Final Order. Any Carve-Out Trigger Notice shall be deemed a consent by Lender to the Borrowers depositing Cash Collateral or proceeds of the Carve-Out Advances into such account in an amount not to exceed the Carve-Out Cap less the existing balance in such account, if any; provided, however, that notwithstanding Lender's agreement to fund any Carve-Out Advance in accordance with the terms of this Agreement and the Final Order, nothing herein shall create any obligation on the part of Lender to satisfy any allowed Professional Fees, which allowed Professional Fees shall remain the sole obligation of the Borrowers, and the Lender shall not be obligated to lend more than the Commitments.

(c)    Each Advance (other than a Carve-Out Advance) hereunder is subject to the satisfaction or waiver of the conditions precedent the Final Order and in Sections 3.1, 3.2 and 3.3, as applicable. Each Advance shall permanently decrease the Commitments, and any Loans, or portion thereof, that are repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(d)    The Loans shall be secured by the Collateral as set forth in this Agreement, the Final Order, and the other Loan Documents.

(e)    Borrowers promise to indefeasibly pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full in cash (including, as applicable, the Commitment Fee and the Exit Fee) on or before the Maturity Date.

2.2    **Borrowing Procedures**. Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Borrowing Notice attached hereto as Exhibit D (each such written request, a "Borrowing Notice") executed by an Authorized Person of the Borrower Representative, accompanied by a Compliance Certificate, and delivered to Lender no later than three (3) Business Days prior to the requested funding date in the case of each Advance (or such shorter period as Lender may permit in its sole discretion), but in no event later than three (3) Business Days before the Maturity Date; provided that, (a) the Borrower Representative shall submit such requests only after entry of the Final Order, and (b) the aggregate amount of all such Advances, including any Carve-Out Advance, shall not exceed the Commitments. Upon satisfaction or waiver by Lender (in its sole discretion) of the conditions precedent set forth herein, Lender shall fund the Advance to the Borrower Representative on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

2.3    **Payments; Reductions of the Commitments; Prepayments.**

(a)    **Payments by Borrowers.**  Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Payment Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Prevailing Eastern time) on the dates set forth in this Section 2.3.  Any payment received by Lender later than 4:00 p.m. (Prevailing Eastern time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)    **Application of Payments and Proceeds.**  Subject to Section 7.3, all payments remitted to Lender and all proceeds of the Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i)    first, to pay any Lender Expenses (including reasonable and documented cost or expense reimbursements, such as reasonable and documented attorneys' fees) then owed to Lender or any Lender Related Person in accordance with the Final Order, or indemnities then due to Lender under the Loan Documents, until indefeasibly paid in full in cash;

(ii)    second, to pay any Fees then due to Lender under the Loan Documents until indefeasibly paid in full in cash;

(iii)    third, to pay interest due in respect of the Loans until indefeasibly paid in full in cash;

(iv)    fourth, to pay the principal of all Loans until indefeasibly paid in full in cash;

(v)    fifth, to pay any other Obligations until indefeasibly paid in full in cash; and

(vi)    sixth, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.3(b) and any other provision contained in any Loan Document (except for the Final Order), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(b) shall control and govern. Notwithstanding the foregoing, to the extent there is any conflict between any provisions of the Final Order and this Agreement or any Loan Document, the Final Order shall control and govern.

(c)    **Optional Prepayments.**  Upon notice to Lender, Borrowers may prepay any Loan, in whole or in part, at any time without premium or penalty; provided, that (i) the aggregate principal amount being prepaid shall be an amount not less than two million Dollars ($2,000,000) (and multiples of $500,000 in excess thereof) unless such lower amount being prepaid represents the balance outstanding under this Agreement; (ii) such prepayment includes the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such

voluntary prepayment, and (iii) any such prepayments under this <u>Section 2.3(c)</u> shall be applied in the order set forth in <u>Section 2.3(b)</u>.

      (d)    **Mandatory Prepayments.**

      (i)    **Dispositions.**  To the extent an Advance has been made hereunder, and subject to the Final Order and any applicable Sale Order, within two (2) Business Days of the date of receipt by any Borrower or any of its Subsidiaries of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of Collateral (other than the disposition of Collateral in the Ordinary Course), such Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, <u>plus</u> the accrued interest as applied to the amount of such prepayment.  Nothing contained in this <u>Section 2.3(d)(i)</u> shall permit Borrowers to sell any Collateral other than in accordance with <u>Section 6.4</u>.  In no event shall any amount paid to Lender under this <u>Section 2.3(d)(i)</u> exceed the outstanding amount of the Obligations.

      (ii)    **Indebtedness.**  To the extent an Advance has been made hereunder, within two (2) Business Days of the date on which any Borrower or any of its Subsidiaries receives proceeds of any Indebtedness (other than Permitted Indebtedness), Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness <u>plus</u> the accrued interest as applied to the principal amount of such prepayment.  The provisions of this <u>Section 2.3(d)(ii)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

2.4    <u>**Interest Rates and Rates, Payments and Calculations.**</u>

      (a)    **Interest Rate.**  Except as provided in <u>Section 2.4(b)</u>, all Advances shall bear interest on the Daily Balance thereof at a rate equal to fourteen percent (14.0%) per annum. For the purpose of calculating interest, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

      (b)    **Default Rate.**  Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.0%) <u>plus</u> the then applicable interest rate (the "<u>Default Rate</u>") upon notice from Lender of its election to impose interest at the Default Rate.  Any such notice may impose interest at the Default Rate retroactively to the date of the occurrence of the related Event of Default. For the purpose of calculating interest under this <u>Section 2.4(b)</u>, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

      (c)    **Payment.**  Except to the extent provided to the contrary herein or as provided for in the Final Order, interest, all Fees payable hereunder or under any of the other Loan

Documents, and all costs, expenses, and Lender Expenses payable hereunder or under any of the other Loan Document shall be due and payable in cash, in arrears, on the first (1st) day of each month at any time that Obligations or the Loans are outstanding and shall be paid to the Payment Account.  Borrowers hereby agree that Lender has all rights of setoff and bankers' lien provided by applicable law on account of any accounts maintained at Lender.  Subject to the Final Order and without affecting Borrowers' continuing obligation to pay all Obligations hereunder when due, in the event that any amounts are due hereunder and remain unpaid when due (with any such failure constituting an Event of Default hereunder), Borrowers shall be deemed to have made a request for an Advance in such amount and Lender shall charge the Loan Account in an amount equal to the aggregate principal amount of such Advance and thereafter such Advance shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations (including the Default Rate) until the indefeasible payment in full in cash of all Obligations.

(d)    **Computation.**  All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)    **Intent to Limit Charges to Maximum Lawful Rate.**  In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  Borrowers and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.5    **Crediting Payments; Clearance Charge**.  The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Payment Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. (Prevailing Eastern time).  If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. (Prevailing Eastern time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

2.6    **Designated Account.**  Borrowers hereby agree to maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

2.7    **Statements of Obligations**.  Lender shall maintain true, correct, and complete electronic or written records evidencing the Indebtedness and other Obligations owed by

Borrowers to Lender, in which Lender will record in the Loan Account (a) the amount of all Advances made under this Agreement, (b) the amount of any principal or interest due and payable or to become due and payable from Borrowers to Lender under this Agreement, and (c) all amounts received by Lender under this Agreement from Borrowers.

2.8    **Fees**.

(a)    **Commitment Fee and Work Fee.**  Following the entry of the Approval Order, Borrowers paid to Lender the Commitment Fee and the Work Fee in full in cash.

(b)    **Exit Fee.**  The Exit Fee shall be due and payable upon the earliest of (i) the Maturity Date, (ii) payment in full of the Loans, and (iii) on a *pro rata* basis for any voluntary prepayment of the Loans; provided, however, that, if the Maturity Date has occurred solely as a result of the occurrence and continuation of an Event of Default under this Agreement or any other Loan Document, then the Exit Fee shall not be payable until the Obligations have been accelerated by the Lender.

Except as otherwise expressly set forth herein, in the Final Order, or in any of the other Loan Documents, the Fees payable to Lender under this Agreement, the DIP Orders, or any of the other Loan Documents shall not be subject to proration and shall be non-refundable and non-avoidable obligations of the Borrowers and shall be paid by Borrowers in full in cash, or deducted from the applicable Advance, as the case may be.

2.9    **Borrower Representative; Assumptions**.  As of the Effective Date, Holdings (a) is hereby designated and appointed by each Borrower as its representative and agent on its behalf (the "Borrower Representative") and (b) accepts such appointment as the Borrower Representative, in each case, for the purposes of issuing Borrowing Notices, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants, but without relieving any other Borrower of its joint and several obligations to pay and perform the Obligations) on behalf of any Borrower or the Borrowers under the Loan Documents. Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative as a notice or communication from all Borrowers.  Each warranty, covenant, agreement and undertaking made on behalf of a Borrower by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

3.    **CONDITIONS; TERM OF AGREEMENT.**

3.1    **Conditions Precedent to the Effective Date**.  The effectiveness of this Agreement and the agreements of Lender hereunder shall be subject to the satisfaction of the conditions set forth below (unless waived in writing by Lender in its sole discretion):

(a)    The parties shall have executed and delivered this Agreement and all other documents required by Lender as a condition to the Effective Date and in connection with the

transactions contemplated by this Agreement and shall be in form and substance satisfactory to Lender.

(b)    Lender shall have received evidence satisfactory to Lender that all Uniform Commercial Code financing statements necessary, or, in the opinion of the Lender, desirable to provide Lender with a valid, perfected priming security interest in the Collateral pledged by the Borrowers have been filed or will be filed by Lender promptly upon the Effective Date.

(c)    The Bankruptcy Court shall have entered the Final Order not later than April 25, 2025, in form and substance satisfactory to Lender in its reasonable discretion and no order shall have been entered reversing, amending, staying, vacating, terminating or otherwise modifying the Final Order or any material provision thereof in any manner without Lender's prior written consent.  Borrowers and Lender shall be entitled to rely in good faith upon the Final Order and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(d)    [Reserved.]

(e)    Lender shall have received from Borrowers an Approved Budget, acceptable to Lender in its sole discretion, attached hereto as <u>Exhibit B</u>.

(f)    [Reserved].

(g)    Each Borrower shall be a debtor and debtor in possession in the Chapter 11 Cases.

(h)    All accrued and unpaid Lender Expenses for which invoices have been presented (and such invoices shall contain information only to the extent required by Paragraph 26 of the Final Order), required to be paid on or before the Effective Date, if any, shall have been paid.

(i)    The following statements shall be true and correct: (i) the representations and warranties of the Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Effective Date, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would immediately result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

3.2    <u>**Conditions Precedent to All Advances.**</u>  In addition to the conditions set forth in <u>Section 3.1</u> above, subject to <u>Section 2.1(c)</u>, Lender shall not be required to fund any Loans or fund any Advances (other than the Advance of the Interim Amount, which shall be governed by <u>Section 3.3</u>) unless and until all of the conditions set forth below shall have been satisfied or waived in writing by Lender in its sole discretion; <u>provided</u> that clauses <u>(a)</u> and <u>(b)(i)</u> and <u>(ii)</u> below must

be satisfied as determined by Lender in its sole discretion for any Advances to be made under any circumstances:

(a)    No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the DIP Orders or any provision thereof; provided that any amendment or modification of the DIP Orders approved by Lender shall not preclude satisfaction of this condition.

(b)    (i) No trustee, examiner, or receiver shall have been appointed or designated with respect to the Borrowers' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Borrowers exercising control over their assets, and (ii) no Person other than the Borrowers shall have been granted control over the Collateral by the Bankruptcy Court in any Chapter 11 Case.

(c)    The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such Advance, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(d)    No Default or Event of Default under any of the Loan Documents (including a default or the occurrence of the DIP Termination Declaration Date under the Final Order) shall have occurred and be continuing on the date of such Advance, nor shall either result from the making thereof.

(e)    No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against Borrowers or Lender.

(f)    No action, proceeding, investigation, regulation, or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain, or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents; provided that any objection to a Sale made by a Governmental Agency shall not preclude the satisfaction of this condition unless such objection is sustained or otherwise resolved in a manner adverse to Lender's rights under the DIP Orders.

(g)    The Borrowers shall be in compliance in all material respects with the Loan Documents (including the DIP Orders).

(h)    Lender shall have received a fully executed and delivered Borrowing Notice and Compliance Certificate from Borrowers in accordance with Section 2.2.

(i)    Lender shall have received in advance, or will receive from the proceeds of such Advance, (i) all Fees required to be paid upon or before the date of any such Advance, and

(ii) all Lender Expenses (including the fees and expenses of legal counsel) for which invoices have been presented before any such Advance, subject in all respects to the Final Order. All such amounts shall be reflected in the funding instructions annexed to the relevant Borrowing Notice delivered in accordance with Section 2.2.

(j)    Since the Petition Date, there shall not have occurred any event, condition, circumstance or contingency that, individually or in the aggregate, that has resulted in, or would reasonably be expected to result in, a Material Adverse Change.

(k)    The Bankruptcy Court shall have entered an order authorizing and approving an Acceptable Stalking Horse Agreement on or before May 7, 2025.

(l)    Lender shall have received from the Borrowers an updated Approved Budget (acceptable to Lender in its sole discretion) to the extent required to be delivered by Section 5.2(b) on or before the making of such Advance, which such updated Approved Budget shall be subject to Section 5.2(b) and the Final Order.

3.3    **Conditions Precedent to of the Advance of the Interim Amount.**  In addition to the conditions set forth in Section 3.1 above, subject to Section 2.1(c), Lender shall not be required to fund any Loans or fund any Advances in respect of the Interim Amount unless and until all of the conditions set forth below shall have been satisfied or waived in writing by Lender in its sole discretion:

(a)    No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the DIP Orders or any provision thereof provided that any amendment or modification of the DIP Orders approved by Lender shall not preclude satisfaction of this condition.

(b)    The representations and warranties of Borrowers contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such Advance, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(c)    No Default or Event of Default under any of the Loan Documents (including any default or the occurrence of the DIP Termination Declaration Date under the Final Order) shall have occurred and be continuing on the date of such Advance, nor shall either result from the making thereof.

(d)    The Borrowers shall be in compliance in all material respects with the Loan Documents (including the DIP Orders).

(e)    Lender shall have received a fully executed and delivered Borrowing Notice and Compliance Certificate from Borrowers in accordance with Section 2.2.

(f)    Lender shall have received in advance, or will receive from the proceeds of such Advance, (i) all Fees required to be paid upon or before the date of any such Advance, and

(ii) all Lender Expenses (including the fees and expenses of legal counsel) for which invoices have been presented before any such Advance, subject in all respects to the Final Order.  All such amounts shall be reflected in the funding instructions annexed to the relevant Borrowing Notice delivered in accordance with Section 2.2.

(g)   Since the Petition Date, there shall not have occurred any event, condition, circumstance or contingency that, individual or in the aggregate, that has resulted in, or would reasonably be expected to result in, a Material Adverse Change.

3.4   **Maturity.**  This Agreement shall continue in full force and effect until the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification).  All Obligations including, without limitation, the outstanding unpaid principal balance and all accrued and unpaid interest and all Fees (including, without limitation, the Exit Fee) on the Advances shall be due and payable on the Maturity Date.

3.5   **Effect of Maturity.**  On the Maturity Date the obligation of the Lender to provide any additional credit or other accommodations under the Loan Documents shall automatically terminate and all Obligations (other than continuing Obligations with respect to indemnification) shall immediately become due and payable without notice or demand.  No termination of the obligations of Lender (other than payment in full in cash of the Obligations and termination of the Commitments) shall relieve or discharge any Borrower of its duties, obligations, or covenants hereunder or under any Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations (other than continuing Obligations with respect to indemnification) have been indefeasibly paid in full in cash and the Commitments has been terminated.  When all of the Obligations (other than continuing Obligations with respect to indemnification) have been indefeasibly paid in full in cash in immediately available funds and Lender has no further obligation hereunder to fund further Advances, Lender will, at the Borrowers' expense, execute and deliver any payoff letters, termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are necessary to evidence and confirm the repayment in full of the Obligations (other than continuing Obligations with respect to indemnification) and to release, as of record, Lender's Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

4.   **REPRESENTATIONS AND WARRANTIES.**[1]

In order to induce Lender to enter into this Agreement, each Borrower hereby makes the following representations and warranties to Lender.  Each Borrower hereby further represents that such representations and warranties shall be true, correct, and complete, in all respects, as of the Effective Date, and shall be true, correct, and complete, in all respects, as of the date of the making of each Advance (or other extension of credit) made thereafter, as though made on and as of the date of such Advance (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive

---

[1] NTD: Section 4 remains subject to Company review.

the execution and delivery of this Agreement until all Obligations have been indefeasibly paid in full in cash:

4.1 **Due Organization and Qualification.** Such Borrower (a) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (b) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified has resulted in, or would reasonably be expected to result in, a Material Adverse Change, and (c) subject to the Bankruptcy Court's entry of the DIP Orders, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby. Schedule 4.1(a) sets forth an organizational chart showing the complete and accurate ownership structure of the Borrowers as of the Effective Date.

4.2 **Due Authorization.** Subject to the Bankruptcy Court's entry of the Final Order, the execution, delivery, and performance by such Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Borrower and, with respect to such Borrower.

4.3 **Binding Obligations.** Each Loan Document has been duly executed and delivered by each Borrower that is a party thereto and, subject to the entry of the DIP Orders, as applicable, is the legally valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.4 **Title to Properties.** Borrowers have (a) good, sufficient, and legal title to, and (b) good and marketable title to (in the case of personal property), all of Borrowers' right, interest, and title in the Collateral, subject to Permitted Liens.

4.5 **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims.**

(a) The name (within the meaning of Section 9-503 of the UCC), jurisdiction of organization, type of entity, direct equity owner and, to the extent required to be set forth in a financing statement under the UCC, organizational identification number (if any) of such Borrower is as set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).

(b) A primary mailing address of such Borrower is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Borrower to Lender).

4.6 **Litigation.** Other than the Chapter 11 Cases and except as stayed by the filing of the Chapter 11 Cases, there are no actions, suits, proceedings, claims, or disputes pending or, to the actual knowledge of such Borrower, threatened in writing, at law, in equity, in arbitration, or before any Governmental Authority, by or against such Borrower or against any of its properties

or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to such Borrower seeking authorization to enter into the Loan Documents and incur the Obligations under this Agreement), or (b) except as set forth on Schedule 4.6, either individually or in the aggregate, has resulted in, or would reasonably be expected to result in, a Material Adverse Change.  As of the Effective Date, but subject to any supplements as contemplated by Section 5.16, Schedule 4.6 sets forth all of the commercial tort claims any Borrower has against another Person known to any Borrower as of the Petition Date.

4.7    **Fraudulent Transfer.** No transfer of property is being made by such Borrower and no obligation is being incurred by such Borrower in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Borrower.

4.8    **Reserved.**

4.9    **Payment of Taxes.** Except as provided on Schedule 4.9, or as would not, individually or in the aggregate, result in, or would not reasonably be expected to result in, a Material Adverse Change and subject to the terms of the Final Order and any required approval by the Bankruptcy Court, all United States federal, state, and other material tax returns and reports of the Borrowers required to be filed by the Borrowers with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees, and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest.

4.10    **Approved Budget.** Attached to this Agreement as Exhibit B is a true and complete copy of the Approved Budget as of the Effective Date.  The Approved Budget may be amended or otherwise modified from time to time in accordance with the procedures set forth in Section 5.2(b) of this Agreement; provided that, the total amount of Loans provided pursuant to the Approved Budget shall not exceed the total amount of the Commitments.

4.11    **Site Leases.**

(a)    Except as would not, individually or in the agreement, result in, or would not reasonably be expected to result in, a Material Adverse Change, each location maintained by a Borrower or a Subsidiary of a Borrower, including but not limited to all buildings and other improvements comprising any real property, is (i) in good condition and repair and well maintained, ordinary wear and tear and casualty or condemnation events excepted; (ii) equipped and operational in all respects for purposes of the business operated therein in the Ordinary Course of such Borrower or Subsidiary of a Borrower; (iii) to each Borrower's knowledge, free from structural defects; and (iv) to each Borrower's knowledge, in compliance in all respects with all applicable regulations relating to public safety.

(b)    Each Site Lease is in full force and effect and the applicable Borrower or Subsidiary is the sole owner of the entire leasehold interest thereunder, and such Person's interest in such Site Lease has not been assigned, transferred, subleased, mortgaged, hypothecated or otherwise encumbered, except for the Liens expressly permitted by Section 6.2.  As of the

Effective Date, to each Borrower's knowledge, no event has occurred and no condition exists that, with the giving of notice or the lapse of time or both, would constitute a Material Adverse Change by any Borrower or any of its respective Subsidiaries under any Site Lease, except as set forth on Schedule 4.11(b).

4.12    **Permits.**  Except as set forth on Schedule 4.12, such Borrower has all Permits required for the operation of its business and for the execution, delivery, and performance by, and enforcement against, such Borrower of each Loan Document.  Except as set forth in Schedule 4.12, such Borrower is not in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition, or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case results in, or would reasonably be expected to result in, a Material Adverse Change.

4.13    **No Other Representations.**  Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), no Borrower or any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of a Borrower including, without limitation, any representation or warranty as to the accuracy or completeness of any information, documents, or material delivered to Lender or made available to Lender.  Lender hereby acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Lender has relied solely upon its own investigation and the express representations and warranties of the Borrowers set forth in this Article 4 (including the related portions of the Schedules) and (b) no Borrower or any other Person has made any representation or warranty except as expressly set forth in this Article 4 (including the related portions of the Schedules).

4.14    **Full Disclosure.**  The representations, warranties and other written statements made by any Borrower to Lender in connection with this Agreement and the other Loan Documents, taken as a whole, do not contain any untrue statement of a material fact, or omit to state any material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which they were made.

## 5.    AFFIRMATIVE COVENANTS.

Each Borrower hereby covenants and agrees that, until termination of the Commitments and indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), it shall comply with each of the following, as applicable:

5.1    **Notice of Certain Events.**  The Borrowers shall deliver to Lender (a) promptly, but in any event within five (5) Business Days, upon becoming aware of any Default or Event of Default, notice of such Default or Event of Default; (b) promptly upon becoming aware of any litigation threatened in writing against any Borrower or filed (other than any adversary proceeding or other pleading filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases), in each case which has resulted in, or would reasonably be expected to result in, a Material Adverse Change, notice of such litigation or event; and (c) at the time a Borrowing Notice is furnished to Lender in connection with any requested Advance, a Compliance Certificate.  In addition, the Borrowers hereby agree to maintain a system of

accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

5.2    **Reporting; Budget; Conference Calls.**

(a)    The Borrowers shall comply with the agreements, requirements, covenants, and undertakings applicable to it set forth in Exhibit C, in accordance with the terms thereof.

(b)    The Borrowers will, on Wednesdays, commencing on [•] [•], 2025, and every five (5) weeks thereafter, or more frequently at the reasonable discretion of both the Borrowers and Lender, prepare and deliver to Lender a supplement to the initial Approved Budget (or the previously supplemented Approved Budget) updating or extending the period covered by the initial Approved Budget (or the previously supplemented Approved Budget) so that it covers at least a 13-week period from the date of such initial Approved Budget or supplemental Approved Budget, as applicable, which supplemental Approved Budget shall be subject to Lender's approval in its sole discretion and without further order of the Bankruptcy Court.  To the extent Lender provides written notice rejecting the updates (or any amendments) within five (5) Business Days after the delivery by the Borrowers of any such update or amendment, the then existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as an update or amendment is approved by Lender in its sole discretion.  In the event Lender does not provide written notice of its rejection of the supplemental Approved Budget within such five (5) Business Day period, such supplemental Approved Budget shall become effective as the Approved Budget.

(c)    On a weekly basis after the delivery of the first supplemental Approved Budget, the Borrowers shall deliver to Lender a variance report for the four (4) week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "Budget Variance"), between actual net operating disbursements for such period to projected net operating disbursements for such period as set forth in the Budget on a cumulative four (4) week rolling basis (each a "Measuring Period") and explaining in reasonable detail all material variances, it being understood that any Net Operating Disbursement Variance solely with respect to net operating disbursements that exceeds twenty percent (20.00%) shall be material and shall constitute an Event of Default under the Loan Documents (each such report, a "Variance Report," which shall be in a form reasonably satisfactory to Lender). For the avoidance of doubt, net operating disbursements shall not include any disbursements in connection with professional fees of Borrowers, fees of the U.S. Trustee, Lender Expenses, interest, Fees, all direct costs and budgeted professional fees associated with the Chapter 11 Cases and any other amounts payable hereunder or any Loan Document.

(d)    The Borrowers shall participate in a conference call occurring every week, if requested by Lender, commencing on the first week following the Effective Date regarding the Approved Budget, the Chapter 11 Cases and other financial matters.

5.3    **Existence.**  At all times, each Borrower shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to be in good standing or maintain any such rights and franchises, or licenses and permits would not result in, or would not reasonably be expected to result in, a Material Adverse Change.

5.4    **Maintenance of Properties; Permits.**   The Borrowers shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, with ordinary wear, tear, and casualty excepted, to the extent permitted by the Approved Budget and the Permitted Variance, (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless (i) such provisions are the subject of a Permitted Protest, (ii) such lease is a Site Lease that is rejected in the exercise of the Borrowers' reasonable judgment or (iii) compliance is not permitted or contemplated by the Approved Budget or is otherwise excused by the provisions of the Bankruptcy Code or an order of the Bankruptcy Court; and (c) maintain, comply with, and keep in full force and effect its Permits with respect to the Collateral pledged by it, except where failure to so comply would not result in, or would not reasonably be expected to result in, a Material Adverse Change.   Such Borrower shall comply with and maintain, all Permits required for the operation of its business, except where failure to so comply would not result in, or would not reasonably be expected to result in, a Material Adverse Change.

5.5    **Taxes.**   Except to the extent such payment is excused by, or is otherwise prohibited by, the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, the Borrowers shall, and shall cause each Subsidiary to pay in full or discharge all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency (giving effect to any extension period), except to the extent that any such assessments and taxes shall be paid pursuant to a Sale Order or the Approved Budget or that are subject to a Permitted Protest.

5.6    **Insurance.**  At the Borrowers' sole costs and expense, the Borrowers shall maintain insurance with respect to the Collateral in which the Borrowers have any right, interest, or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with the Borrowers' insurance policies in effect on the Petition Date.  The Borrowers shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against larceny, embezzlement, and criminal misappropriation, consistent with the Borrowers' insurance policies in effect on the Petition Date.  All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located. The Borrowers shall use their commercially reasonable efforts to cause, within thirty (30) days following the Effective Date, all property insurance policies covering the Collateral to be made payable to the Lender, in case of loss, pursuant to a standard lender loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Lender may reasonably require to fully protect the Lender's interest in the Collateral and any payments to be made under such policies.  The Borrowers shall use their commercially reasonable efforts to cause, within thirty (30) days following the Effective Date, all certificates of property and general liability insurance are to be delivered to the Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of the Lender and shall provide for not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation.  If the Borrowers fail to maintain the insurance required by this Section 5.6, the Lender may arrange for such insurance, but at the Borrowers' sole cost and expense and without any responsibility on the Lender's part for obtaining the insurance, the

solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. The Borrowers shall give the Lender prompt notice of any loss covered by their casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt, and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise, or settlement of any claims under any such insurance policies.

5.7 **Inspection**. Borrowers shall permit Lender and each of its duly authorized representatives or agents, to visit any of its properties and inspect any of its Collateral or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times during regular business hours and intervals as Lender may require, in each case other than information subject to confidentiality obligations and/or attorney client or other privilege, underlined provided, that all such visits and inspections shall be made in accordance with the standard safety, visit, and inspection procedures of the Borrowers and their tenants, as applicable, and no such visit or inspection shall unreasonably interfere with the normal business operation of the Borrowers and their tenants, and provided, further that absent the existence of a Default or Event of Default, Lender shall provide Borrowers with reasonable prior notice before any such inspections.

5.8 **Environmental**. The Borrowers shall:

(a) Keep the Collateral owned or operated by it free of any Environmental Liens.

(b) Comply with all applicable Environmental Laws, except where the failure to so comply has not resulted in, or would not reasonably be expected to result in, a Material Adverse Change.

(c) Promptly notify Lender of any release of which any Borrower has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by such Borrower that results in, or would reasonably be expected to result in, a Material Adverse Change.

(d) Promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following: (i) written notice that an Environmental Lien has been filed against any of the Collateral, (ii) commencement of any Environmental Action or written notice that an Environmental Action will be filed against such Borrower, and (iii) written notice of a violation, citation, or other administrative order from a Governmental Authority concerning violations or alleged violations of Environmental Laws, which seeks to impose liability therefor or otherwise results in, or would reasonably be expected to result in, a Material Adverse Change.

5.9 **Compliance with Laws**. Each Borrower shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws,

rules, regulations, and orders the non-compliance with which, individually, has not resulted in, or would not reasonably be expected to result in, a Material Adverse Change.

5.10    **Disclosure Updates.** The Borrowers shall promptly, but in any event within five (5) Business Days after obtaining actual knowledge thereof, notify Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about the Borrowers' industry) furnished (after giving effect to any supplements thereto and when taken as a whole) to Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not materially misleading in light of the circumstances in which made.  Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

5.11    **Further Assurances.** The Borrowers shall use commercially reasonably efforts to execute and/or deliver to Lender any and all Security Documents, financing statements, fixture filings, endorsements of certificates of title, mortgages, deeds of trust, trademark filings, copyright filings, and all other instruments or other documents (collectively, the "Additional Documents") that Lender or its counsel may reasonably request in form and substance reasonably satisfactory to Lender, to more fully evidence, confirm, validate, create, perfect, continue, preserve, or enforce Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), in each case, promptly, and in no later than thirty (30) days (subject to an automatic 30-day extension if the Borrowers are using commercial reasonable efforts to execute and deliver the applicable Additional Documents), following the request of Lender or its counsel at any time after the Effective Date.

5.12    **Approved Budget.** The Borrowers shall comply with the Approved Budget (as updated and supplemented, subject to Lender's consent as set forth in Section 5.2 and the Final Order, in accordance with this Agreement and the Final Order), subject to the Permitted Variances.

5.13    **Carve-Out Account.** The Borrowers shall deposit and hold in a segregated account the amounts necessary to (a) fund the Carve-Out Account to pay such then unpaid allowed Professional Fees prior to any and all other claims and, as applicable and (b) satisfy the Carve-Out.  The Carve-Out Account shall be funded by the Borrowers in accordance with this Agreement, the Final Order, and as set forth in the Approved Budget.

5.14    **Deposit Account Control Agreements.** The Borrowers shall use commercially reasonable efforts to cause each relevant financial institution or other person at which each Deposit Account that constitutes Collateral (other than the Deposit Escrow Account) is maintained to, enter into a Deposit Account Control Agreement with respect to such Deposit Account, in each case, promptly, and in no later than thirty (30) days (subject to an automatic 30-day extension if Borrowers are using commercial reasonable efforts to obtain the relevant Deposit Account Control Agreements), following the request of Lender at any time after the Effective Date.

5.15    **Material Contracts; Sale Offers.** Other than defaults existing as of the Effective Date which have already been disclosed to Lender or events of public knowledge in the Chapter 11 Cases, any Borrower shall deliver to Lender (a) promptly (but in any event within five (5) Business Days) of a Borrower becoming aware of any default (other than the filing of the Chapter 11 Cases) or other material breach under any Material Contract to which any Borrower is a party, notice of such defaults or breaches, and (b) subject to any bidding procedures entered into by the Bankruptcy Court, prompt notification of any written offer to purchase all or substantially all of the assets of any Borrower or a segment thereof, or to purchase all or substantially all of the equity interests of any Borrower, or otherwise explore or enter into a transaction to acquire a material portion of the assets or equity of the Borrowers outside the Ordinary Course of Business.

5.16    **Supplement to Commercial Torts Schedule.**  Not later than May 15, 2025 (or such later date as agreed by Lender in its reasonable discretion), Borrowers shall deliver to Lender an updated Schedule 4.6 with respect to the commercial tort claims any Borrower has against another Person known to any Borrower as of the Petition, which schedule shall be attached hereto and supplement Schedule 4.6 as delivered on the Effective Date.

## 6.    NEGATIVE COVENANTS.

Each Borrower hereby covenants and agrees that, until termination of the Commitments and the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), such Borrower will not do any of the following without the prior written consent of Lender:

6.1    **Indebtedness.** Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral, except for the following ("Permitted Indebtedness"):

(a)    Indebtedness evidenced by this Agreement and the Loan Documents (including the Carve-Out);

(b)    Indebtedness outstanding as of the Petition Date;

(c)    unsecured obligations (contingent or otherwise) of any Borrower or any of its Subsidiaries existing or arising under any swap contract, provided, that (i) such obligations are (or were) entered into by such Person in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view," and (ii) such swap contract is not for speculative purposes;

(d)    obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs, and other cash management and similar arrangements incurred in the Ordinary Course of Business;

(e)      unsecured Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the Ordinary Course of Business;

(f)      unsecured Indebtedness incurred by any Borrower or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts, or similar instruments issued or created in the Ordinary Course of Business, including in respect of workers compensation claims, health, disability, or other employee benefits or property, casualty, or liability insurance or self-insurance, or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(g)      Indebtedness in respect of surety bonds, performance bonds and other similar obligations incurred in the Ordinary Course of Business;

(h)      Indebtedness incurred to finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of any fixed or capital assets, including real property, as a lessee under Capital Leases and any Indebtedness assumed in connection with the acquisition of any such assets; provided that such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement; provided that aggregate principal amount of all such Indebtedness shall not exceed $250,000 (or such greater amount approved in writing by the Lender in its sole discretion) at any time outstanding;

(i)      Indebtedness representing deferred compensation or similar arrangements to current, future or former officers, directors, employees, members of management, or consultants of the Borrowers in the Ordinary Course of Business consistent with past practice;

(j)      Indebtedness representing any Taxes to the extent such Taxes are permitted to not be paid or discharged at such time in accordance with Section 5.05;

(k)      Other Indebtedness permitted by the Approved Budget (including any Permitted Variance);

(l)      Indebtedness permitted by the Final Order;

(m)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (l) above; or

(n)      guarantees with respect to Indebtedness permitted under this Section 6.1.

6.2      **Liens.**

(a)      Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens; or

(b)　　Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien that is equal to or superior to the priority of any Liens granted by this Agreement or the Final Order to or in favor of the Lender on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for the Permitted Senior Lien, Permitted Prior Liens, and the Carve-Out.

6.3　　**Restrictions on Fundamental Changes.**  Except in connection with an Acceptable Plan or Acceptable Sale approved by the Bankruptcy Court or otherwise with the prior written consent of Lender, no Borrower shall:

(a)　　enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests;

(b)　　liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution); or

(c)　　suspend or close its business, or a substantial portion of its business.

6.4　　**Disposal of Assets.** Except in connection with an Acceptable Plan or Acceptable Sale, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral pledged by the Borrowers, other than Permitted Transfers.

6.5　　**Change Name.** Except in connection with an Acceptable Plan or Acceptable Sale, change any Borrower's name, state of organization, or organizational identity.

6.6　　**Nature of Business.**  Make any change in the nature of any Borrower's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; underlined provided, that the foregoing shall not prevent any Borrower from (a) engaging in any business that is reasonably related or ancillary to its business, or (b) complying with any requirement of the Bankruptcy Code.

6.7　　**Material Leases or Contracts; Amendments.**　Except in connection with an Acceptable Plan or Acceptable Sale, amend, alter, change, or modify (a) the material terms of any material lease or contract in connection with the Collateral except in a manner that does not result in, or would not reasonably be expected to result in, a Material Adverse Change, or (b) any of its Organizational Documents in a manner that is adverse to Lender.

6.8　　**Change of Control.** Except in connection with an Acceptable Plan or Acceptable Sale, cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9　　**Accounting Methods.** Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10　　**Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Borrower, except for transactions (a) that are in the Ordinary Course of Business of such Borrower, (b) otherwise approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to Lender, (c) pursuant to

arrangements or agreements in effect on the Petition Date, or (d) permitted pursuant to the Approved Budget (including any Permitted Variance).

6.11    **Use of Advances.** Use the proceeds of the Advances for any purpose other than to fund payments, subject in all respects to the Approved Budget and the Permitted Variances, related to the: (a) working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Borrowers; (b) professional fees and expenses of administering the Chapter 11 Cases (including fees and expenses incurred prior to the Effective Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable; (c) fees and expenses payable under this Agreement, including, without limitation, the Commitment Fee, the Work Fee, the Exit Fee, and legal fees and expenses of the Lender (including fees and expenses incurred prior to the Effective Date); and (d) interest and other amounts payable under this Agreement.

6.12    **Limitation on Capital Expenditures.** Except permitted by the Approved Budget (including any Permitted Variance), make or incur any Capital Expenditure.

6.13    **Chapter 11 Cases.** Directly or indirectly, seek, consent, or suffer to exist, without the prior written consent of the Lender, (a) any modification, stay, vacation, or amendment to the DIP Orders, (b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind set forth in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority of any claim of Lender in respect to the Collateral or otherwise, other than those permitted by the Final Order (including the Carve-Out, the Permitted Senior Lien, and Permitted Prior Liens), and (c) any Lien on the Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than as required under a purchase agreement with respect to the good faith deposit thereunder, the Permitted Senior Lien, Permitted Prior Liens, and the Carve-Out.

6.14    **Certain Transactions.** Propose or support any chapter 11 plan, or any Sale of all or a material portion of such Borrower's assets, which proposal, plan, or sale is not an Acceptable Plan or an Acceptable Sale, as applicable; <u>provided</u> that this <u>Section 6.14</u> shall not prohibit Permitted Transfers.

6.15    **Acquisitions, Loans, or Investments.** Make any material acquisition, advance, loan or any other investment of any kind or nature except for the following:

(a)    acquisitions of, and advances made in connection with, inventory, equipment, goods or services in the Ordinary Course of Business;

(b)    intercompany loans and advances in the Ordinary Course of Business or consistent with past practice;

(c)    investments in negotiable instruments deposited or to be deposited for collection in the Ordinary Course of Business;

(d)       investments received in settlement of amounts due to any Borrower effected in the Ordinary Course of Business or owing to any Borrower as a result of Insolvency Proceedings involving an account debtor or upon the foreclosure or enforcement of any Lien in favor of a Borrower;

(e)       investments in Equity Interests, obligations or securities received in settlement of debts created in the Ordinary Course of Business and owing to any Borrower or in satisfaction of judgments or pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of a debtor;

(f)       investments in receivables owing to any Borrower created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as any Borrower deems reasonable under the circumstances;

(g)       investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the Ordinary Course of Business consistent with past practice;

(h)       guarantees of operating leases or of other obligations that do not constitute Indebtedness, in each case, in the Ordinary Course of Business;

(i)       investments in swap contracts of the type permitted Section 6.01(c);

(j)       defined contribution pension scheme, unfunded pension fund, phantom equity, cash-settled equity-based awards and other employee benefit plan obligations and liabilities to the extent that they are permitted to remain unfunded under applicable laws;

(k)       investments in any captive insurance subsidiary not to exceed the minimum amount of capitalization required pursuant to regulatory capital requirements; and

(l)       other investments permitted by the Approved Budget (including any Permitted Variance).

6.16   **Payments on Indebtedness.** Other than with respect to the Obligations or pursuant to the Approved Budget (including any Permitted Variance), make any payment with respect to any Indebtedness.

6.17   **Distributions or Redemptions.** Pay any dividends or distributions on, or make any redemptions of, any equity interest of any Borrower; provided that the foregoing shall not prevent any whole-owned Subsidiary (other than Holdings) from making any distribution to its direct parent.

6.18   **Formation of Subsidiaries.** Except in connection with an Acceptable Plan or Acceptable Sale, form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Effective Date, without the prior written consent of Lender in its sole discretion.

7.      **EVENTS OF DEFAULT.**

7.1      **Event of Default**. Any one or more of the following events shall constitute an event of default upon giving any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a)      [reserved];

(b)      solely to the extent Lender has funded any portion of the Delayed Draw Term Loan Commitment, the Acceptable Stalking Horse Agreement that satisfied the condition precedent in Section 3.2(k) hereof is withdrawn, cancelled, terminated, amended, modified, or supplemented in a manner adverse to Lender without Lender's consent, in its sole discretion;

(c)      any Borrower shall fail to pay when due and payable, any principal (including, without limitation, pursuant to Section 2.3(d)), interest, or any Fees, Lender Expenses, or any other Obligations under this Agreement or any other Loan Document;

(d)      any Borrower shall fail to comply with its obligations under (i) Sections 5.1, 5.2(c), 5.3, 5.4, 5.8, 6, and/or 8, or (ii) Sections 5.2(a) and/or 5.2(b), and in the case of this clause (ii), such failure or breach shall continue for five (5) days after the earlier to occur of (x) the date on which such failure to comply or breach is known to any officer (including the Chief Restructuring Officer) of such Borrower and (y) the date on which Lender shall have notified such Borrower or its applicable representative of such failure;

(e)      other than as set forth in any other sub-section of this Section 7.1, any Borrower shall fail to perform, or otherwise breach, any of its covenants or obligations contained in this Agreement, which failure or breach shall continue for thirty (30) days after the earlier to occur of (i) the date on which such failure to comply is known to any officer of such Borrower, and (ii) the date on which the Lender shall have notified such Borrower or its applicable representative of such failure; provided, however, that such thirty (30) day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such thirty (30) day period;

(f)      any representation or warranty made by any Borrower in this Agreement or in any agreement, certificate, instrument, financial statement, or other statement delivered to Lender pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made and such inaccuracy is adverse to the Lender;

(g)      except upon Lender's prior written request or with Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of Lender), any Borrower shall file a motion with the Bankruptcy Court or any other court of competent jurisdiction seeking an order (or such order is otherwise entered), that by its terms modifies, reverses, revokes, stays, rescinds, vacates, or amends the DIP Orders (or any material provision thereof), this Agreement, any other Loan Documents, or the relief or transactions otherwise contemplated in the foregoing Loan Documents (or, in each case, purports to effect any of the foregoing);

(h)      [reserved];

(i)        without the prior written consent of Lender, any Borrower shall file, or the Bankruptcy Court shall otherwise order, grant, confirm, or approve (including any approval on an interim or conditional basis), as applicable, (i) any motion seeking approval of a sale of all or a material portion of such Borrower's assets (including any amendment, modification or supplement to such sale) that is not an Acceptable Sale; or (ii) any chapter 11 plan or related disclosure statement (including any amendment, modification or supplement to such plan or disclosure statement), that is not an Acceptable Plan;

(j)        except with respect to the Carve-Out, any Borrower shall file any motion or application, or the Bankruptcy Court allows or approves the motion or application of any other Person (which order is not stayed, vacated or withdrawn five (5) calendar days from entry thereof), which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens, and security interests granted to Lender under the Final Order, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Final Order;

(k)        one or more final non-appealable judgments (and the same shall have not been vacated, discharged, dismissed, stayed or bonded within forty five (45) consecutive calendar days) and orders for the payment of money exceeding $500,000 in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying party has not denied coverage thereof) shall be rendered against any Borrower, shall be subject to immediate collection and remain unsatisfied and shall result in a judgment lien or claim having priority over or ranking in parity with the Lender's Liens or claims or rights (subject to the Carve-Out) under the Loan Documents];

(l)        any damage to, or loss, theft or destruction of, any Collateral having a value in excess of $1,500,000 in the aggregate, unless such Collateral is insured in amounts acceptable to Lender, the insurance company has been notified of the occurrence of such event and has not denied coverage thereof and the claim has been settled within 75 days (or such longer time as Lender may agree) of the occurrence of such event;

(m)        the occurrence of any default or event of default under the Final Order and the continuance thereof after any applicable grace or cure period provided in the Final Order, if any, or granted by order of the Bankruptcy Court;

(n)        the entry of an order that is not stayed, vacated, or withdrawn three (3) calendar days appointing a trustee or an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of Lender in its sole discretion;

(o)        the entry of an order that is not stayed, vacated, or withdrawn three (3) calendar days which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor or party in interest, other than Lender (other than any creditor or party in interest having a Lien on specific equipment that is

senior to Lender), to realize upon, or to exercise any right or remedy with respect to, any of the Collateral with a value in excess of $500,000;

(p)      the entry of an order that is not stayed, vacated, or withdrawn three (3) calendar days (i) surcharging any of the Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code or applicable law; (ii) allowing any administrative expense claim having priority over or ranking in parity with Lender's claims or rights (subject to the Carve-Out) under the Loan Documents; or (iii) otherwise adversely impacting Lender's Liens and priority in the Collateral, as set forth in Section 8 of this Agreement and the Final Order;

(q)      the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the dismissal of any Chapter 11 Case or any subsequent case under chapter 7 of the Bankruptcy Code, either voluntarily or involuntarily, and the Obligations are not indefeasibly paid in full in cash at the time of such conversion or dismissal unless the order converting or dismissing the Chapter 11 Cases is stayed, vacated or withdrawn within three (3) days from entry thereof;

(r)      the DIP Orders, or any material provision thereof, (i) cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court or (ii) are modified, reversed, revoked, remanded, stayed, rescinded, vacated, or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(s)      any Borrower brings any action, or otherwise supports such action, to (i) challenge the rights and remedies of Lender under this Agreement or any other Loan Document in the Chapter 11 Cases or acts in a manner inconsistent with the Loan Documents or (ii) avoid or require disgorgement by Lender of any amounts received in respect of the Obligations;

(t)      any Borrower shall seek, or the Bankruptcy Court shall enter, an order authorizing any Borrower to obtain financing from a Person other than Lender pursuant to Section 364(d) of the Bankruptcy Code, unless (i) Lender consents in writing to such financing, or (ii) Lender is indefeasibly paid in full in cash in connection with such financing;

(u)      any Borrower shall make any material payments in respect of prepetition obligations other than (i) as permitted by the Final Order, (ii) as permitted by any "first day" or "second day" orders satisfactory to Lender (and Lender acknowledges that all orders entered by the Bankruptcy Court as of the Effective Date are satisfactory to it), (iii) as permitted by any other order of the Bankruptcy Court satisfactory to Lender, (iv) as permitted under this Agreement or any other Loan Documents in accordance with the Approved Budget (subject to Permitted Variance), or (v) as otherwise agreed to by Lender in writing before such payment is made;

(v)      the entry of an order by the Bankruptcy Court that is not stayed, vacated, or withdrawn three (3) calendar days terminating or modifying the exclusive right of any Borrower to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of Lender;

(w)    any Borrower shall seek, or support any other person's motion, to (i) disallow in whole or in part the Obligations, (ii) challenge the validity and enforceability of Lender's Liens, or (iii) contest any material provision of this Agreement or any Loan Document;

(x)    the entry of an order  that is not stayed, vacated, or withdrawn three (3) calendar days granting the relief sought in a motion which seeks to prosecute or settle a claim or controversy on account of, or that is part of, the Collateral (including, without limitation, any commercial tort claims held by any Borrower or its estate), without the prior written consent of Lender; or

(y)    the occurrence of a Change of Control.

7.2    **Rights and Remedies.**

Subject to the terms of the Final Order (including, as applicable, Borrowers' rights with respect to the Remedies Notice and the Waiting Period), upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court of competent jurisdiction or the initiation of any further proceeding with Borrowers, in addition to taking any other action or exercising any other rights or remedies (including, without limitation, with respect to the Liens in favor of the Lender) provided for hereunder or under any Loan Document (including the DIP Orders) or by the UCC or any other applicable law, Lender may do any one or more of the following:

(i)    declare the Obligations, whether evidenced by this Agreement or by any Loan Document, are due and payable, and the Commitments are terminated, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, further notice, or other requirements of any kind, all of which are hereby expressly waived by Borrowers;

(ii)    terminate, restrict, or reduce Borrowers' ability to use Cash Collateral as provided by the Final Order;

(iii)    charge interest at the Default Rate;

(iv)    obtain and liquidate the Collateral, it being understood and agreed that (1) if notice of disposition of the Collateral is required by law, ten (10) days prior written notice by Lender to Borrowers designating the time and place of any public sale or the time after which any private sale or other intended disposition of the Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and Borrowers hereby waive any other notice, (2) Lender may bid for and purchase the Collateral at any public sale and (3) Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v)    exercise all voting and consensual rights and powers on account of any pledged securities;

(vi)     require Borrowers to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(vii)    take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(viii)   exercise any of its other rights and remedies under the Loan Documents, any rights granted under the Final Order, and applicable law.

For the avoidance of doubt, the Lender shall not be entitled to exercise any rights or remedies under this Agreement or any other Loan Documents with respect to Specified Insider Claims.

7.3     **Application of Proceeds upon Event of Default.**  Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (a) <u>first</u>, to fund the Carve-Out (to the extent not fully funded by Borrowers at such time); (b) <u>second</u>, to the Lender Expenses consisting of reasonable and documented attorneys' fees and all reasonable and documented expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes, and other expenses) incurred by Lender in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (c) <u>third</u>, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Exit Fee); (d) <u>fourth</u>, to the discharge of any accrued but unpaid interest on the Obligations; (e) <u>fifth</u>, to the outstanding principal balance of any Obligations; and (f) <u>sixth</u>, to pay any remaining surplus to Borrowers.

7.4     **Remedies Cumulative.** The rights and remedies of Lender under this Agreement, the Loan Documents, and all other agreements shall be cumulative.  Lender shall have all rights and remedies not inconsistent herewith or with the Final Order, as provided under the UCC, by law, or in equity.  No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver.  No delay by Lender shall constitute a waiver, election, or acquiescence by it.

7.5     **Acknowledgment.**  Notwithstanding anything herein to the contrary, Lender acknowledges and agrees that in no event shall an "event of default" or "default" under any Site Lease (if any) or any other Indebtedness of Borrowers (other than the Indebtedness evidenced by this Agreement and the Loan Documents), cause a Default or Event of Default hereunder, or cause a breach of any covenant described in <u>Section 5</u> or <u>Section 6</u> of this Agreement.

8.      **COLLATERAL SECURITY.**

8.1     **Grant of Security Interest in the Collateral; Superpriority Claims.**

(a)     Subject to the terms and conditions of, and entry of, the Final Order, to secure the payment and performance of the Obligations, each Borrower hereby (i) grants, collaterally pledges, and assigns to Lender the liens set forth in the Final Order, including a fully perfected first-priority senior priming lien on and security interest in all of each Borrower's right, title and interest in and to the Collateral (subject to the Carve-Out, the Permitted Senior Lien, and

Permitted Prior Liens), and (ii) grants to Lender Superpriority Claims in the Chapter 11 Cases for the repayment of the Obligations.

(b)    In the event any of the Collateral is transferred to any Borrower, such transfer shall be subject in all respects to Lender's Liens.

(c)    Nothing herein shall be construed to impair the ability of Lender to object on any grounds to the fees, expenses, reimbursement, or compensation described in the definition of the term Carve-Out in the Final Order.

8.2    **Representations and Warranties in Connection with Security Interest.** Each Borrower represents and warrants to the Lender as follows, that subject to the entry of the Final Order:

(a)    The Borrowers have full right and power to grant to the Lender a perfected, security interest and Lien, in accordance with the Required Lien Priority, on Borrowers' respective interests in the Collateral pursuant to this Agreement and the other Loan Documents;

(b)    Upon the execution and delivery of this Agreement, the Lender will have valid and automatically perfected Liens and security interests in the Collateral granted by the applicable Borrower, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, other than restrictions or Liens expressly permitted by Section 6.2; provided that, notwithstanding the automatic perfection and priority of Lender's Liens under the Final Order, Lender may, in its sole discretion, file any financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, in respect of the Collateral and the Liens granted hereunder (including, without limitation, as contemplated in Section 8.6);

(c)    As of the Effective Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Borrower is on file in any public office except those on behalf of the Lender, other than the filings in respect of Liens expressly permitted by Section 6.2; and

(d)    As of the Effective Date, such Borrower is not party or otherwise subject to any agreement, document or instrument that conflicts with this Section 8.2.

8.3    **Superpriority Nature of Obligations and Liens.** The Liens and Superpriority Claims referred to in Section 8.1 shall have the priority afforded to such Liens and Superpriority Claims in the Final Order.

8.4    **Power of Attorney.**  Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for each Borrower (without requiring Lender to act as such) with full power of substitution to, do the following (which appointment is irrevocable and coupled with an interest): subject to the Final Order, (a) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is or they or are obligated to give Lender under any of the Loan Documents; (b) do such other and further lawful acts and deeds in the name of such Person that Lender may deem necessary or desirable to perfect Lender's security interest or lien in any Collateral or (c) after the occurrence of an Event of Default

which is continuing, (i) enforce an Account, (ii) exercise any voting or consensual rights with respect to the pledged securities, (iii) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral (which, for the avoidance of doubt, shall not include any Specified Insider Claims), (iv) notify, or to require any Borrower to notify, account debtors to make payment directly to Lender, (v) make, settle and adjust claims in respect of Collateral under policies of insurance, indorsing the name of such Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; provided that, nothing herein contained shall be construed as requiring or obligating Lender to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, or (vi) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral (which, for the avoidance of doubt, shall not include any Specified Insider Claims). Notwithstanding the foregoing, the foregoing power of attorney is a right and not an obligation of Lender and neither Lender nor its officers, directors, employees or agents shall be responsible to any Borrower for failure to exercise any of the foregoing rights.

8.5    **Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral.** Lender shall have the right, but not the obligation, to perform on Borrowers' behalf, any or all of Borrowers' obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account, and at the sole risk of such Borrower.

8.6    **Filing of Financing Statements.** Each Borrower irrevocably authorizes the Lender without notice to such Borrower to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Lender's security interest in the Collateral, in all jurisdictions in which the Lender believes in its sole opinion that such filing is appropriate. Each Borrower also irrevocably authorizes the Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law.

8.7    **No Discharge; Survival of Claims.** Pursuant to Section 1141(d)(4) of the Bankruptcy Code, each Borrower hereby waives any discharge of the Obligations with respect to any chapter 11 plan that is not an Acceptable Plan.

9.    **WAIVERS; INDEMNIFICATION.**

9.1    **Demand; Protest; etc.** To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Borrower hereby waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Borrower may in any way be liable.

9.2     **Lender's Liability for Collateral.** As long as Lender complies with its obligations, if any, under the UCC, Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person.  All risk of loss, damage, or destruction of the Collateral shall be borne by Borrowers, except any thereof resulting from the gross negligence, bad faith, fraud, or willful misconduct of Lender or its representatives or agents as finally determined by the Bankruptcy Court or other court of competent jurisdiction.

9.3     **Indemnification.** Borrowers shall pay, indemnify, defend, and hold any Lender Related Person (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) for any losses, claims, damages, liabilities, expenses, penalties, fines, actions, judgement, and disbursements of any kind or nature whatsoever (including reasonable and documented out of pocket fees and disbursements of attorneys, experts, consultants, and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against imposed upon, or incurred by any of them (a) in connection with, as a result of, or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of Borrowers' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities, or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities").  The foregoing to the contrary notwithstanding, Borrowers shall have no obligation to any Indemnified Person under this Section 9.3 with respect to any Indemnified Liability that the Bankruptcy Court or other court of competent jurisdiction finally determines to have resulted from the bad faith, fraud, gross negligence, or willful misconduct of such Indemnified Person.  This provision shall survive the termination of this Agreement and the repayment of the Obligations.  If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Borrower was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Borrower with respect thereto. **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON EXCEPT FOR ANY ACT OR OMISSION THAT CONSTITUTES BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON.**

10.     **NOTICES.**

All notices or demands relating to this Agreement or any Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid,

return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith).  In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Borrowers:

23andMe Holding Co.
870 Market Street, Room 415,
San Francisco, CA 94102
Attention: Legal
Email: Legal@23andme.com

with a copy to (which shall not constitute notice):

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Attn:  Christopher Hopkins
Grace Hotz
Jessica Choi
Email:  chopkins@paulweiss.com
ghotz@paulweiss.com
jchoi@paulweiss.com

If to the Lender:

JMB Capital Partners Lending, LLC
205 S. Martel Avenue
Los Angeles, CA 90036
Attn:  Vikas Tandon
Telephone:  310-286-2929
Email: vikas@jmbcapital.com

with a copy to (which shall not constitute notice):

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Attn: Robert M. Hirsh, Esq.
Kristian W. Gluck, Esq.
Jamie Copeland, Esq.
E-mail: robert.hirsh@nortonrosefulbright.com
kristian.gluck@nortonrosefulbright.com
james.copeland@nortonrosefulbright.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party.  All notices or demands sent in

accordance with this Section 10, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function.

11.    **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a)    THE VALIDITY OF THIS AGREEMENT AND THE LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN THE LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT.  BORROWERS AND LENDER HEREBY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 11(B); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASES REMAINS PENDING.

(c)    **BORROWERS AND LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWERS AND LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. BORROWERS AND LENDER EACH WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

## 12.    AMENDMENTS; WAIVERS; SUCCESSORS.

12.1    **Amendments and Waivers.** No amendment, waiver, or other modification of any provision of this Agreement or any Loan Document, and no consent with respect to any departure therefrom, shall be effective unless the same shall be in writing and signed by Lender and Borrowers that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

12.2    **No Waivers; Cumulative Remedies.** No failure by Lender to exercise any right, remedy, or option under this Agreement or any Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by Borrowers of any provision of this Agreement. Lender's rights under this Agreement and the Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

12.3    **Successors.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, that no Borrower may assign this Agreement or any rights or duties hereunder without Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release such Borrower from its Obligations. Any assignment by such Borrower which is not explicitly permitted hereunder shall be void *ab initio*. Lender may not assign this Agreement or any Loan Document or any rights or obligations of Lender hereunder or thereunder (including any Loans) to an insider (as such term is defined under the Bankruptcy Code) of the Borrowers or any third party that is not an Affiliate of Lender except, in each case, with the Borrower Representative's prior written consent in its sole discretion.

## 13.    GENERAL PROVISIONS.

13.1    **Effectiveness.** This Agreement shall be binding and deemed effective when executed by Borrowers and Lender.

13.2    **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

13.3    **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or Borrowers, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

13.4    **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

13.5    **Debtor-Creditor Relationship.** The relationship between Lender, on the one hand, and Borrowers, on the other hand, is solely that of creditor and debtor, as applicable. Lender has

not (and shall not be deemed to have) any fiduciary relationship or duty to Borrowers arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Borrowers, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

13.6    **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

13.7    **Revival and Reinstatement of Obligations.** If the incurrence or payment of the Obligations by Borrowers or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable, documented, and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

13.8    **Lender Expenses.** Subject to the applicable provisions of the Final Order, if any, Borrowers hereby agree to pay any and all Lender Expenses promptly after written demand therefor by Lender and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

13.9    **Integration.** This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**14.    JOINT AND SEVERAL OBLIGATIONS.**

IN ADDITION TO, AND WITHOUT LIMITING ANY TERM OR PROVISION OF, THIS AGREEMENT, ALL OBLIGATIONS HEREUNDER AND UNDER THE LOAN DOCUMENTS OF EACH BORROWER IS JOINT AND SEVERAL.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGATIONS OF EACH BORROWER SHALL NOT BE AFFECTED BY (A) THE FAILURE OF LENDER TO ASSERT ANY CLAIM OR DEMAND OR TO ENFORCE OR EXERCISE ANY RIGHT OR REMEDY AGAINST ANY OTHER BORROWER UNDER THE PROVISIONS OF THIS AGREEMENT,

ANY OTHER LOAN DOCUMENT OR OTHERWISE, (B) ANY RESCISSION, WAIVER, AMENDMENT OR MODIFICATION OF, OR ANY RELEASE FROM ANY OF THE TERMS OR PROVISIONS OF, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR (C) THE FAILURE TO PERFECT ANY SECURITY INTEREST IN, OR THE RELEASE OF, ANY OF THE COLLATERAL OR OTHER SECURITY HELD BY LENDER.

**15.     ADDITIONAL BORROWERS.**

In the event a Borrower is added to this Agreement as required hereunder, all references herein to Borrowers shall also apply to any such additional Borrower, including, without limitation and to the extent applicable, the granting of a security interest in the Collateral and all representations, warranties, covenants and other obligations of Borrowers hereunder.

**16.     TREATMENT OF CERTAIN INFORMATION.**

Lender agrees to comply with any existing confidentiality agreement between the Lender and Borrowers as of the date of this Agreement and agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all non-public information regarding any Borrower or any of its Subsidiaries pursuant to this Agreement which (a) is clearly identified by such Person as being confidential at the time the same is delivered to Lender or (b) constitutes any financial statement, financial projections or forecasts, budget, compliance certificate, audit report, management letter or accountants' certification delivered hereunder ("Information"); provided, however, that nothing herein shall limit the disclosure of any such Information (i) to any Lender Related Person as need to know such Information, (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, (iii) to auditors or accountants, and any analogous counterpart thereof, (iv) in connection with any litigation to which Lender is a party arising from or related to this Agreement or the Loan Documents, (v) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Agreement, (B) becomes available to Lender on a confidential basis from a source other than any Borrower or any of its Subsidiaries, so long as such source is not known by Lender to be bound by obligations of confidentiality with respect to such Information, or (C) was available to Lender on a non-confidential basis prior its disclosure to Lender by any Borrower or any of its Subsidiaries, or any of their advisors, and (vi) to the extent that any Borrower shall have consented to such disclosure in writing.

**17.     LENDER REPRESENTATIONS.**

17.1     **No Insider.** Neither the Lender nor any of its predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors are insiders (as such term is defined under the Bankruptcy Code) of the Borrowers.

17.2     **No Collusion.** The Lender has not engaged in any collusion with respect to any bids or the 363 sale process and will not engage in any collusion with respect to the bids, the auction, or the 363 sale process.

[Signature pages follow]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWERS:**

**23ANDME HOLDING CO.**

By: _____

Name: _____

Title: _____

**[add other Borrowers]**

By: _____

Name: _____

Title: _____

**<u>LENDER</u>:**

**JMB CAPITAL PARTNERS LENDING, LLC**


By: _____

Name: _____

Title: _____

## EXHIBIT A

### Form of Compliance Certificate

Date: _____, 202[ ]

This Compliance Certificate (this "Certificate") is given to JMB Capital Partners Lending, LLC, a California limited liability company (together with its successors and assigns, "Lender"), by 23andMe Holding Co., a Delaware corporation (the "Borrower Representative"), for itself and on behalf of the other Borrowers party to that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement dated as of April [•], 2025 (as the same has been amended, restated, amended and restated, supplemented, or otherwise modified from time to time through the date hereof, the "Loan Agreement"), by and among the Borrower Representative, the other Borrowers from time to time party thereto and Lender.  Capitalized terms used in this Certificate without definition shall have the same meanings herein as they have in the Loan Agreement.  This Certificate constitutes a Loan Document.

The Borrower Representative, for itself and on behalf of each of the other Borrowers, hereby certifies that:

(a)     The representations and warranties of each Borrower contained in the Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of this Certificate, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(b)     No Default or Event of Default shall have occurred and be continuing on the date of this Certificate, nor shall either result from the making of the Advance requested in connection with this Certificate;

(c)     The DIP Orders remain in full force and effect on the date hereof and has not been, from the time of the entry of such order, modified or amended (unless otherwise approved by Lender), reversed, stayed, or subject to a motion for re-argument or reconsideration, or appealed; and

(d)     No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the Loans has been issued and remains in force by any Governmental Authority against any Borrower.

**IN WITNESS WHEREOF**, the Borrower Representative has caused this Certificate to be executed as of the date first written above.

**23ANDME HOLDING CO.**

By: _____

Name: _____

Title: _____

## **EXHIBIT B**

### **Approved Budget**

See attached.

## <u>EXHIBIT C</u>

**Reporting Requirements**

(a)    **Financial Reports**.  Borrowers shall furnish to Lender, which, subject to the following sentence, shall be in a form satisfactory to Lender, as soon as available and in any event within 35 days after the end of each calendar month or, in the case of the last calendar month of each fiscal quarter, 45 days after the end of such calendar month:

(i)    unaudited consolidated financial statements for such calendar month or quarter, as applicable, of Borrowers consisting of a balance sheet, and related statements of income and cash flows, all of which shall be certified on behalf of Borrowers by an Authorized Person as being in compliance with this <u>paragraph (a)</u>; and

(ii)    solely with respect to the last month of each fiscal quarter, a management report signed by an Authorized Person of Borrowers, describing in reasonable detail Borrowers' operations and financial condition for such quarter.

Delivery of the monthly operating reports required to be filed in the Chapter 11 Cases as and when required thereunder shall satisfy the requirement of this clause (a).

All financial statements shall be prepared, and shall be complete and correct in all material respects, and fairly presenting in all material respects, in each case in accordance with GAAP, consistently applied, the financial position and results of operations of Borrowers on a consolidated basis, in each case, subject to the absence of footnote disclosure and may be subject to normal year-end adjustments.

(b)    **Other Materials**.  Borrowers shall furnish to Lender as soon as available and in any event within five (5) Business Days after the preparation, receipt, or issuance thereof or request therefor by Lender, (A) copies of any reports and management control letters provided by Borrowers' independent accountants and (B) such additional information, documents, statements, and other materials as Lender may reasonably request from time to time and which is reasonably capable of being obtained, produced, or generated by Borrowers; <u>provided</u>, that in no event shall Borrowers be required to provide any information, documents, statements, and other materials that is subject to attorney-client or other privilege or that consists of attorney work product.

(c)    **Notices**.  Each Borrower for itself, promptly, and in any event within five (5) Business Days after such Borrower or any Authorized Person thereof obtains knowledge thereof, shall notify Lender in writing of:

(i)    other than in connection with the Chapter 11 Cases, any pending or threatened (in writing) action, suit, proceeding, or investigation involving any Borrower or any of its Subsidiaries, or any such Person's property to the extent the amount in controversy exceeds $500,000 the aggregate or any injunctive relief is sought;

(ii)    other than in connection with the Chapter 11 Cases, (A) the receipt of any notice or request from any Governmental Authority regarding any liability or claim

equal to or exceeding $500,000 in the aggregate or (B) any material action taken or threatened to be taken by any Governmental Authority (or any notice of any of the foregoing);

(iii)    any notice regarding termination by the lessor of any lease of material real property (other than any such termination resulting from the scheduled expiration thereof, pursuant to the agreed upon terms in effect on the date of this Agreement) or of any senior officer, or the loss or termination (other than any such termination resulting from the scheduled expiration thereof, pursuant to the agreed upon terms in effect on the date of this Agreement) of any Material Contract to which any Borrower or its assets are bound; and

(iv)    the filing, recording, or assessment of any federal, state, local, or foreign tax Lien against any Collateral (other than real estate taxes and municipal charges related to Collateral consisting of real property).

(d)    **Updates**.  Borrowers shall furnish to Lender revisions to the schedules to any Loan Document to the extent necessary or appropriate (as determined by Borrowers in the good faith exercise of its business judgment); provided, that delivery or receipt thereof by Lender shall not constitute a waiver by Lender or a cure of any Default or Event of Default resulting therefrom.

(e)    **Material Adverse Change**.  Promptly upon an Authorized Person of Borrowers obtaining knowledge of any development or event pertaining to Borrowers that has resulted in, or would reasonably be expected to result in a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this Exhibit C, a certificate signed by an Authorized Person of Borrowers setting forth the details of such development or event and stating what action Borrowers has taken or proposes to take with respect thereto; provided, that in no event shall Borrowers be subject to provide any detail or action-related decision that is subject to attorney-client or other privilege or that consists of attorney work product.

(f)    **Management Letters**.  Promptly after the receipt thereof by Borrowers, copies of any management letters and any reports as to material inadequacies in accounting controls (including reports as to the absence of any such inadequacies) submitted to Borrowers by its independent accountants in connection with any audit of Borrowers made by such accountants.

## EXHIBIT D

**Form of Borrowing Notice**


JMB Capital Partners Lending, LLC and/or its designees or its assignees,
as DIP Lender (as defined in the Final Order referred to below)
205 South Martel Avenue
Los Angeles, California 90036

Ladies and Gentlemen:

The undersigned, 23andMe Holding Co. (the "Borrower Representative"; and together with its affiliated debtors, as debtors in possession, in the chapter 11 case no. 25-40976 (the "Chapter 11 Cases"), collectively, the "Borrowers"), refers to (a) that certain *Final Order (I) Authorizing (A) Postpetition Financing and (B) the Use of Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; and (III) Modifying the Automatic Stay* (the "Final Order") and (b) the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement dated as of April [•], 2025 (as the same has been amended, restated, amended and restated, supplemented, or otherwise modified from time to time through the date hereof, the "Loan Agreement") between Borrowers and JMB Capital Partners Lending, LLC, a California limited liability company (together with its successors and assigns, "Lender"). Capitalized terms used herein without definition shall have the respective meanings ascribed to such terms in the Final Order or, if not defined therein, the Loan Agreement. This Borrowing Notice constitutes a Loan Document.

In accordance with the Final Order and the Loan Agreement, the undersigned hereby gives you notice of its request for an Advance in the amount of [•] Million Dollars ($[•]) to be funded on [•], 202[•] by wire transfer of immediately available funds to the account of the Borrower Representative set forth on Annex A hereto. The Borrower Representative, for itself and on behalf of the other Borrowers, acknowledges and agrees that the requested Advance shall be funded net of the unpaid fees and expenses of Norton Rose Fulbright US LLP, counsel to the Lender (the "Netted Amounts" and the excess of the principal amount of the requested Advance and Netted Amounts, the "Net Proceeds"). For the avoidance of doubt, the funding of the Net Proceeds shall constitute the full funding of the requested Advance.

The Borrower Representative, for itself and on behalf of the other Borrowers, hereby represent and warrant to Lender that: (i) as of the date of this Borrowing Notice, the sum of the outstanding principal of the Loans under the Loan Agreement (after giving effect to the Advance requested to be made on such date pursuant to this Borrowing Notice) plus the amount requested in any outstanding but unfunded Borrowing Notice does not violate Section 2.1 of the Loan Agreement or any other Loan Document; and (ii) Borrowers are in compliance with the conditions precedent set forth in Sections 3.1, 3.2 or 3.3, as applicable, of the Loan Agreement.

[SIGNATURE PAGE FOLLOWS]

**<u>BORROWER REPRESENTATIVE</u>:**

**23ANDME HOLDING CO.**

By: _____

Name: _____

Title: _____

# EXHIBIT E

**Copy of Approval Order and Term Sheet**

## **Exhibit 2**

**Budget**

**Updated DIP Forecast**

*($ in 000s)*

| | M/E: | Apr-25 | Apr-25 | Apr-25 | Apr-25 | May-25 | May-25 | May-25 | May-25 | Jun-25 | Jun-25 | Jun-25 | Jun-25 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | W/E: | 4/11/25 | 4/18/25 | 4/25/25 | 5/2/25 | 5/9/25 | 5/16/25 | 5/23/25 | 5/30/25 | 6/6/25 | 6/13/25 | 6/20/25 | 6/27/25 | Total |
| **Net Cash Flow** | | | | | | | | | | | | | | |
| **Receipts:** | | | | | | | | | | | | | | |
| (+) Receipts | $ | 910 | 1,251 | 912 | 1,873 | 1,376 | 1,187 | 841 | 1,161 | 1,110 | 1,637 | 1,174 | - | $ 13,433 |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| (-) Payroll & Benefits | | (157) | (4,401) | (67) | (3,197) | (155) | (3,302) | (67) | (3,302) | (97) | (3,302) | (67) | (3,302) | (21,412) |
| (-) Rent | | (1) | (11) | - | (25) | - | - | - | (25) | - | - | - | - | (62) |
| (-) Insurance | | - | (588) | - | - | - | - | - | - | - | - | - | (500) | (1,088) |
| (-) IT/Software | | (37) | (1,243) | (440) | (440) | (354) | (354) | (354) | (354) | (438) | (438) | - | (100) | (4,991) |
| (-) Ordinary Course Professionals | | - | (1,315) | (441) | (441) | (512) | (512) | (512) | (512) | (395) | (395) | (395) | (395) | (5,825) |
| (-) Other Operations | | (375) | (2,934) | (994) | (1,144) | (917) | (917) | (917) | (917) | (662) | (662) | (693) | (25) | (11,157) |
| **Total Operating Disbursements** | $ | (570) | (10,492) | (1,942) | (5,247) | (1,938) | (5,085) | (1,850) | (5,110) | (1,592) | (4,797) | (1,593) | (4,322) | (44,536) |
| **Non-Operating Disbursements:** | | | | | | | | | | | | | | |
| (-) Restructuring Professional Fees [1] | | (1,147) | (2,478) | (1,630) | (2,130) | (1,694) | (1,694) | (1,694) | (1,694) | (1,544) | (1,544) | (1,544) | (1,544) | (20,335) |
| (-) DIP Interest | | - | - | - | - | - | - | - | (28) | - | - | (101) | - | (128) |
| (-) DIP Fees | | - | - | - | - | - | - | - | - | - | - | (1,400) | - | (1,400) |
| **Total Operating Disbursements** | $ | (1,147) | (2,478) | (1,630) | (2,130) | (1,694) | (1,694) | (1,694) | (1,721) | (1,544) | (1,544) | (3,045) | (1,544) | (21,863) |
| **Net Cash Flow** | $ | (807) | (11,719) | (2,660) | (5,504) | (2,256) | (5,592) | (2,702) | (5,670) | (2,025) | (4,703) | (3,464) | (5,866) | (52,967) |
| **Cash & Liquidity** | | | | | | | | | | | | | | |
| **Beginning Unrestricted Cash** | $ | 35,087 | 34,280 | 22,561 | 19,901 | 14,398 | 12,142 | 6,550 | 11,848 | 6,178 | 6,153 | 6,450 | 7,986 | $ 35,087 |
| (+/-) Net Cash Flow | | (807) | (11,719) | (2,660) | (5,504) | (2,256) | (5,592) | (2,702) | (5,670) | (2,025) | (4,703) | (3,464) | (5,866) | (52,967) |
| (+/-) Initial DIP Draw | | - | - | - | - | - | - | 8,000 | - | 2,000 | - | - | - | 10,000 |
| (+/-) Subsequent DIP Draw | | - | - | - | - | - | - | - | - | - | - | 5,000 | 5,000 | 10,000 |
| **Ending Unrestricted Cash** | $ | 34,280 | 22,561 | 19,901 | 14,398 | 12,142 | 6,550 | 11,848 | 6,178 | 6,153 | 6,450 | 7,986 | 2,120 | $ 2,120 |
| (+) Restricted Cash | | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 | 13,046 |
| **Total Cash Balance** | $ | 47,326 | 35,607 | 32,947 | 27,443 | 25,188 | 19,596 | 24,894 | 19,224 | 19,198 | 19,496 | 21,032 | 15,166 | $ 15,166 |

[1] Excludes Moelis sale and restructuring fee