## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976-357 |
| Debtors. | (Jointly Administered) |
|  | Objection Deadline:  June 3, 2025[2] |
|  | Hearing Date: June 3, 2025 |
|  | Hearing Time: 1:30 p.m. (Central Time) |
|  | Hearing Location:  Courtroom 5 North |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING PROCEDURES FOR THE SUBMISSION OF FINAL PROPOSALS FROM THE BACKUP BIDDER AND SUCCESSFUL BIDDER AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

respectfully state as follows in support of this motion:

### Relief Requested[3]

1.    The Debtors seek entry of an order (the "<u>Proposed Order</u>")[4] (a) establishing

---

[1]    The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are:  23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]    The Debtors have been notified by certain key parties in interest that June 3 coincides with the Shavuot holiday, which in turn will make it difficult for certain key advisors to attend the hearing in person.  The Debtors have reached out to the Court and other key parties in interest about whether adjourning the hearing to June 4 is possible to alleviate any potential conflicts for such parties.  If June 4 does not work for the Court and key parties in interest, the Debtors are prepared to proceed at the scheduled June 3 omnibus hearing.

[3]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[4]    A copy of the Proposed Order will be made available on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

procedures (the "Final Proposal Procedures") for the submission of best and final transaction proposals (the "Final Proposals") from the Successful Bidder and Backup Bidder for a sale of all or substantially all of the Debtors' Assets or some combination thereof and (b) granting related relief.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri (the "Local Rules").  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105, 363, 503(b), 507(a)(2), and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and the Bidding Procedures Order.

## Background

5.     23andMe Holding Co. (collectively with its Debtor subsidiaries and non-Debtor affiliates,[5] the "Company") is a leading human genetics and telehealth company with a mission to help people access, understand, and benefit from the human genome.  The Company pioneered direct access to genetic information as the only company with multiple FDA clearances for genetic health reports.  Further, through its Lemonaid Health telehealth platform, the Company operates

---

[5]     Non-Debtor affiliates exclude any controlling shareholder of 23andMe Holding Co.

as a national online doctor's office that provides medical care, pharmacy fulfillment, and laboratory testing services.

6.     On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7.     The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These cases are being jointly administered pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  On April 3, 2025, the Office of the United States Trustee for the Eastern District of Missouri appointed an official committee of unsecured creditors (the "Committee").

8.     A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 32] (the "First Day Declaration").[6]

9.     On March 24, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. 30] (the "Bidding Procedures and

---

[6]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration or the Bidding Procedures (as defined below), as applicable.

3

Sale Motion").

10. On March 28, 2025, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VII) Granting Related Relief* [Docket No. 125] (the "Bidding Procedures Order") approving procedures by which the Debtors were authorized to conduct an auction (the "Auction" and, such procedures, the "Bidding Procedures") for the sale of all or substantially all of their assets (each, an "Asset") or some combination thereof (the "Sale Transaction").

11. From May 14, 2025, through May 16, 2025, pursuant to the Bidding Procedures, the Debtors conducted the Auction with respect to their Assets. At the conclusion of the Auction, the Debtors, in consultation with their advisors and the Consultation Parties and in their business judgment, selected Regeneron Pharmaceuticals, Inc. ("Regeneron") as the Successful Bidder and TTAM Research Institute ("TTAM" and, together with Regeneron, the "Bidders") as the Backup Bidder.

12. On May 17, 2025, the Debtors and Regeneron entered into that certain Asset Purchase Agreement, dated as of May 17, 2025, by and among 23andMe Holding Co., the other Debtors party thereto, and Regeneron (as amended, modified, or supplemented from time to time, the "Regeneron APA"), which, among other things, (a) provides the Debtors a right to terminate the Regeneron APA if they determine that proceeding with the transactions contemplated by the Regeneron APA or failing to terminate the Regeneron APA would be inconsistent with their

fiduciary duties (the "Fiduciary Out") and (b) preserves the Debtors' right to pursue any transaction or restructuring strategy that, in the Debtors' business judgment, will maximize the value of their estates notwithstanding any other provision in the Regeneron APA or other document related to the transactions contemplated by the Regeneron APA.

13.     Following the Debtors' and Regeneron's entry into the Regeneron APA, on May 17, 2025, TTAM's advisors circulated a letter to the Debtors' advisors setting forth the terms of a revised proposal from TTAM to acquire substantially all of the Debtors' Assets at a higher purchase price than contemplated under the Regeneron APA (the "May 17 Proposal").

14.     On May 19, 2025, the Debtors (a) filed the *Notice of Successful Bidder and Backup Bidder With Respect to the Auction of the Debtors' Assets* [Docket No. 420] (the "Notice") identifying Regeneron as the Successful Bidder and TTAM as the Backup Bidder at the Auction, and (b) circulated a letter to TTAM's advisors in response to the May 17 Proposal.

15.     On May 21, 2025, TTAM's advisors circulated a second letter to the Debtors' advisors setting forth the terms of a further revised proposal from TTAM for substantially all of the Debtors' Assets at a higher purchase price than contemplated in the May 17 Proposal (the "May 21 Proposal" and, together with the May 17 Proposal, the "TTAM Post-Auction Proposals") that included additional evidence of financial wherewithal that TTAM did not provide before the conclusion of the Auction.

16.     On May 27, 2025, TTAM filed the *TTAM Parties' Motion for Leave to File Under Seal Preliminary Objection to the Sale Motion* [Docket No. 480] and the *TTAM Parties' Motion for Entry of an Order (I) Shortening the Objection Period and, if Necessary, Scheduling an Expedited In Camera Hearing on the TTAM Parties' Motion for Leave to File Under Seal Preliminary Objection to the Sale Motion; (II) Setting A Scheduling Conference with Respect to*

*the Sale Hearing* [Docket No. 481] (together, the "TTAM Pleadings") requesting, among other things, (a) Court approval to file a "preliminary" objection to the Debtors' Bidding Procedures and Sale Motion and the Auction process (the "TTAM Preliminary Objection") under seal and (b) a scheduling conference to address discovery procedures, briefing schedules, and related deadlines, among other things.

17.    On May 29, 2025, (a) the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File Under Seal Their Opposition to the TTAM Parties' Motion for a Scheduling Conference and Response to the TTAM Parties' Preliminary Objection and (II) Granting Related Relief* [Docket No. 522], and the *Debtors' Opposition to the TTAM Parties' Motion for a Scheduling Conference* [Docket No. 525] (the "Response" and, together with the TTAM Pleadings, the "Sale Motion Pleadings") requesting, among other things, that the Court (a) deny TTAM's request for a scheduling conference, and (b) grant the Debtors' request to file their Response under seal.   Additionally, (a) the Debtors' Consumer Privacy Ombudsman filed the *Consumer Privacy Ombudsman's Notice of Response in Compliance with the Court's Order on May 28, 2025* [Docket No. 517] (the "CPO Notice") informing the Court that, among other things, as a result of the current state of the Sale Transaction, he may be unable to file his final report (the "Final Report") by the deadline prescribed by the *Joint Stipulation and Agreed Order Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman* [Docket No. 346] absent additional time and/or an increased budget to allow the Consumer Privacy Ombudsman to utilize his advisors to facilitate the submission of a timely report and (b) the Committee and Regeneron filed responses to the TTAM Pleadings.  *See* Docket Nos. 520 and 521.

18.    On May 31, 2025, TTAM's advisors circulated a third letter to the Debtors' advisors (the "May 31 Letter") (a) requesting, among other things, that the Debtors reconsider

seeking Court approval to implement the Final Proposal Procedures as communicated to TTAM's advisors on May 30, 2025, and (b) offering to materially increase TTAM's good faith deposit currently held in escrow pursuant to the Bidding Procedures to serve as a "synthetic backup bid" if, and only if, the Debtors (i) agree to an alternative best and final proposal framework where no Bidder receives a "last look," or (ii) exercise the Fiduciary Out and declare TTAM the Successful Bidder by June 3, 2025 (the "Deposit Proposal").  In the May 31 Letter, TTAM states that the Deposit Proposal would ensure the Debtors' estates would not be worse off than they would have been if the Debtors had moved forward with Regeneron's winning bid of $256 million in a scenario where the Debtors exercise the Fiduciary Out, declare TTAM as the Successful Bidder, and TTAM breaches its Asset Purchase Agreement.

## Final Proposal Procedures

19.     The Debtors filed these chapter 11 cases with a deteriorating liquidity position and a focus on completing a value-maximizing Sale Transaction as quickly as possible while balancing the need to conduct a robust postpetition sale process.  In under two months, the Debtors are well on their way towards achieving that goal.  Significantly, on May 14-16, 2025, the Debtors conducted a three-day, competitive Auction in accordance with the Bidding Procedures that culminated in the announcement of a $256 million winning bid from Regeneron, a Fortune 500 Company with a balance sheet of over $37 billion in assets and a track record of successfully managing data privacy concerns.  The Debtors selected TTAM as the Backup Bidder with a bid of $146 million.

20.     The vigorous competition at the Auction resulted from extensive and careful consideration by the Debtors' four-member special committee of disinterested and independent directors (the "Special Committee").  At all times, the Special Committee worked carefully in accordance with their fiduciary duties and goal of maximizing value for stakeholders and the

7

Debtors' estates.  And the outcome of the Auction speaks for itself: the Debtors announced a successful bid of $256 million from Regeneron just weeks after the Special Committee rejected a prepetition bid of $40 million to take the Company private from its then-CEO, founder, and controlling shareholder, Anne Wojcicki.

21.     Following the Auction and execution of the Regeneron APA, the Debtors received the TTAM Post-Auction Proposals to acquire the Debtors' Assets at a purchase price higher than the one contemplated under the Regeneron APA.  Given the negotiated Fiduciary Out in the Regeneron APA, the Special Committee evaluated these proposals in good faith and engaged in dialogue with TTAM, Regeneron, their respective advisors, and other stakeholders.  The Debtors, at all times during the Auction and evaluation of the TTAM Post-Auction Proposals, have been guided by two overarching goals—*first*, to, consistent with their fiduciary obligations, obtain and seek approval of the most value-maximizing transaction for the benefit of their estates; and *second*, to close the Sale Transaction as expeditiously as possible to preserve liquidity and facilitate distributions of the proceeds to their stakeholders.

22.     Based on the arguments set forth in the TTAM Pleadings, TTAM Preliminary Objection, and related responses, the Debtors believe there is a significant risk that they will be subject to litigation regarding the current state of the Sale Transaction absent a framework that allows TTAM and Regeneron an opportunity to submit additional bids for the Debtors' Assets. The Debtors believe the arguments set forth in the TTAM Pleadings and TTAM Preliminary Objection are baseless, but entering into litigation at this time would cause unnecessary cost and delay at a critical moment for these chapter 11 cases.  However, Regeneron, as the Successful Bidder following the Auction conducted in accordance with the Bidding Procedures Order, has informed the Debtors that it believes TTAM is prohibited from making post-Auction proposals to

the Debtors under the terms of the Bidding Procedures Order.  Regeneron has also informed the Debtors that it believes filing a motion seeking approval of a revised bidding framework without Regeneron's consent will trigger termination rights for Regeneron under the Regeneron APA, and would otherwise depart from the Bidding Procedures Order in ways that Regeneron would challenge.

23.     Specifically, Regeneron has indicated that, among other provisions, the Debtors filing a motion seeking approval of a revised bidding framework without Regeneron's consent (a) violates the Debtors' obligations under the Regeneron APA to use "good-faith reasonable efforts to take, or cause to be taken, all actions necessary, proper or advisable to satisfy all of the conditions [to closing]" and (b) would allow Regeneron to terminate the Regeneron APA given the agreement's termination right if Regeneron "is not the Successful Bidder or Backup Bidder at the Auction."  *See* Regeneron APA §§ 7.2; 10.1(f)(i).  Moreover, Regeneron has stated that the TTAM Post-Auction Proposals violate the Bidding Procedures, given such procedures (a) require each Bid to "acknowledge that it has complied, and will continue to comply, in all respects with these Bidding Procedures (including, after the conclusion of any Auction, not to submit a Bid or seek to reopen the Auction)" and (b) prohibit the Debtors from "consider[ing] any Bids or Overbids submitted after the conclusion of the Auction, if any, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid."  *See* Bidding Procedures §§ G(15); K(4).[7]

24.     Regardless of the merits of Regeneron's position regarding the Debtors' potential actions (which, for the avoidance of doubt, the Debtors dispute) and the purported invalidity of the

---

[7]    Importantly, the Bidding Procedures also reserve the Debtors' "rights to modify the Bidding Procedures, in their reasonable business judgment and after consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process."  *See id.* § M.

TTAM Post-Auction Proposals, disputes between the Debtors and Regeneron, including disputes that could call into question the Debtors' ability to effectuate the transaction with Regeneron announced after the Auction, would destabilize the Debtors' business, impact the Debtors' ability to conduct a value-maximizing sale process, and put stakeholders at risk of losing the $256 million of sale proceeds provided under the Regeneron APA.

25.    Moreover, while the Debtors view TTAM's Deposit Proposal and willingness to put a greater deposit into escrow as a constructive step forward, the solution proposed by TTAM only partially resolves the Debtors' concerns regarding the value that would be lost to the Debtors' estates in the form of a backup bidder if the Debtors exercise the Fiduciary Out to select TTAM as the Successful Bidder.  The Deposit Proposal only provides the Debtors with a "synthetic backup bid" in the event TTAM breaches their Asset Purchase Agreement.  However, there are numerous risks to closing the Sale Transaction under both the Regeneron APA and TTAM's Asset Purchase Agreement other than breach of the applicable agreement by TTAM or Regeneron.  For example, the Consumer Privacy Ombudsmen and interested regulatory authorities are currently evaluating the proposed transactions with TTAM and Regeneron and have yet to weigh-in on the respective merits of those transactions.  That feedback, once received, will enable the Debtors make a more informed decision as to which of the competing proposals is highest and best for the benefit of all stakeholders.  Accordingly, it is vital for the Debtors to maintain a backup bid in all such circumstances absent a sufficiently value-maximizing alternative proposal.

26.    Consequently, absent a comprehensive solution, the Debtors currently face expensive and value-destructive litigation regardless of their course of action to the detriment of all stakeholders.  Accordingly, following receipt of the TTAM Post-Auction Proposals and after discussions among the Debtors, the Special Committee, and the Debtors' advisors, the Debtors

engaged both Regeneron and TTAM in an active dialogue regarding a framework for soliciting and evaluating further proposals for a sale of the Debtors' Assets. Informed by those discussions, the Final Proposal Procedures provide an alternative path forward that is consistent with the Debtors' obligation to create a competitive bidding framework that maximizes value, preserves the benefits of the current Successful Bid and Backup Bid, and seeks to avoid unnecessary litigation.

27.   Specifically, the Final Proposal Procedures are as follows:

A. The Bidders' respective current bids shall be (i) Regeneron's existing Successful Bid of $256 million as disclosed in the Notice (the "Current Regeneron Bid") and (ii) TTAM's May 21 Proposal (the "Current TTAM Bid" and, together with the Current Regeneron Bid, the "Current Bids"). For the avoidance of doubt, the Current Bids are binding on each respective Bidder and irrevocable, subject to (i) the Bidding Procedures and these Final Proposal Procedures and (ii) solely with respect to the Current Regeneron Bid, the terms of the Regeneron APA;

B. TTAM shall have until June 11, 2025, at 5:00 p.m. Central Time (the "TTAM Best and Final Deadline") to submit a "best and final" proposal (a "Final Proposal") to the Debtors, which shall be shared with the Consultation Parties and Regeneron in accordance with subsection F of these Final Proposal Procedures; *provided*, that if TTAM does not submit a "best and final proposal," then the Current TTAM Bid shall be deemed TTAM's Final Proposal;

C. Regeneron shall have until June 12, 2025, at 5:00 p.m. Central Time (the "Regeneron Best and Final Deadline" and, together with the TTAM Best and Final Deadline, the "Best and Final Deadlines") to submit a Final Proposal; *provided*, that Regeneron's Final Proposal must include a purchase price Overbid that is at least $5 million greater than the purchase price proposed by TTAM in its Final Proposal (the "Incremental Bid Amount")[8];

D. Only the Bidders shall be permitted to propose a Final Proposal. Other than the Final Proposals contemplated by paragraphs 27.B and 27.C above, any proposal

---

[8]   For the avoidance of doubt, Regeneron's Overbid must conform to the terms agreed to by the Debtors and Regeneron at the Auction with respect to Regeneron's Overbids, which require Regeneron to submit an Overbid of at least the Incremental Bid Amount plus an additional $5 million. Under the terms of the Regeneron APA and TTAM's Asset Purchase Agreement, TTAM agreed to assume certain unpaid postpetition accounts payable at the time of closing that the Debtors estimate to be $5 million. The Regeneron APA does not contemplate the assumption of such liabilities, but Regeneron agreed to increase its cash purchase price by $5 million to offset the net value differential.

submitted by a Bidder, or by any third-party (including any joint bid submitted by a third-party together with a Bidder), shall be deemed invalid and incapable of acceptance by the Debtors;

E.   Each Final Proposal may include an increased purchase price, any requested or proposed amendments to the latest version of each Bidder's Asset Purchase Agreement, and related transaction documents pertaining to such Final Proposal; *provided*, that the Bidders shall not be permitted to revise the definition of "Acquired Assets" in the latest versions of each Bidder's Asset Purchase Agreement.   Each Final Proposal shall be binding and irrevocable and must be accompanied by (i) an executed Asset Purchase Agreement, (ii) a redline of such Asset Purchase Agreement marked to reflect any amendments and modifications from the prior draft shared or executed, as applicable, with the Debtors, and (iii) a copy of the execution version of the Asset Purchase Agreement in Microsoft Word or similar software;

F.   Each Bidder's Final Proposal (if any) will be kept confidential by the Debtors; *provided,* that the Debtors will share any Final Proposal with the Consultation Parties and the other Bidder; *provided*, *further*, that such parties agree to treat such Final Proposals and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the Bidder who submitted the applicable Final Proposal;

G.   Any Final Proposal must include (the following, collectively, the "<u>Financial Documentation</u>") (i) sufficient detail supporting Regeneron's and the TTAM Parties' (as defined in the TTAM Pleadings), as applicable, financial wherewithal to fund that portion of the purchase price (if any) that is greater than the purchase price contemplated by the applicable Bidder's Current Bid, (such greater amount, the "<u>Incremental Purchase Price</u>") in cash and/or cash equivalents[9] currently owned by Regeneron or the TTAM Parties, as applicable, and (ii) confirmation that the portion of the purchase price corresponding to the purchase price under such Bidder's Current Bid remains fully backed by cash and/or cash equivalents currently owned by Regeneron or the TTAM Parties, as applicable. The Final Documentation must include a reasonably detailed description of (a) any permissions required for Regeneron or the TTAM Parties, as applicable, to access any accounts submitted as Financial Documentation and (b) all liabilities that may reduce the availability of any funding submitted as Financial Documentation, as applicable.   The Debtors shall determine the sufficiency of any Financial Documentation in their sole discretion. The Debtors reserve the right to request additional Financial Documentation from Regeneron or the TTAM Parties, as applicable, at any time;

H.   No later than 11:59 p.m. Central Time on June 13, 2025 (the "<u>Final Determination Time</u>"), the Debtors will file a notice (the "<u>Winning Bidder</u>

---

[9]   For the avoidance of doubt, the Debtors will not consider financial wherewithal to support the Incremental Purchase Price in the form of non-cash assets, including equity investments.

Notice") disclosing which Bidder submitted the highest and best proposal (such proposal, the "<u>Winning Bid</u>" and, such Bidder, the "<u>Winning Bidder</u>"). The Winning Bidder Notice will (i) include a summary of the material terms of the Winning Bid and (ii) attach a copy of the Asset Purchase Agreement applicable to such Winning Bid;

I. Neither Bidder is required to submit a Final Proposal; *provided,* that:

(i) the Current Regeneron Bid shall remain in full force and effect regardless of whether Regeneron submits a Final Proposal on or before the Regeneron Best and Final Deadline, and Regeneron shall remain the Successful Bidder, unless and until (a) Regeneron is declared the Winning Bidder or (b) (1) TTAM is declared the Winning Bidder and (2) the Debtors obtain entry of the TTAM Authorization Order (as defined below) at the Sale Hearing or Regeneron provides the Regeneron Consent (as defined below);

(ii) if Regeneron does not submit a Final Proposal on or before the Regeneron Best and Final Deadline and if the Debtors select TTAM as the Winning Bidder, TTAM shall not be deemed the Successful Bidder unless and until the earlier of (a) the Court entering an order authorizing the Debtors to exercise their Fiduciary Out under the Regeneron APA at the Sale Hearing (the "<u>TTAM Authorization Order</u>") and (b) Regeneron agreeing in writing that the Debtors are authorized to exercise their Fiduciary Out under the Regeneron APA (the "<u>Regeneron Consent</u>");

(iii) if TTAM is not the Winning Bidder, TTAM's backup bid of $146 million as disclosed in the Notice will remain in full force and effect;

(iv) if TTAM is the Winning Bidder, (a) its Winning Bid shall be the greater of the amount set forth in (1) the Current TTAM Bid (inclusive of all agreed enhancements to such proposal subsequently agreed to between TTAM and the Debtors) and (2) its Final Proposal; and

(v) if TTAM is the Winning Bidder and following the earlier of the Court's entry of the TTAM Authorization Order and the Debtors' receipt of the Regeneron Consent, (a) Regeneron shall become the Backup Bidder under the Bidding Procedures at a purchase price of $151 million, and (b) the Debtors shall pay Regeneron a $10 million Breakup Fee (the "<u>Regeneron Breakup Fee</u>"),[10] which shall be due upon, and shall be

---

[10] Although TTAM has indicated it objects to the Regeneron Breakup Fee on the grounds that it is prohibited by the Bidding Procedures, the Debtors seek approval of the Regeneron Breakup Fee pursuant to this motion and these Final Proposal Procedures, and not under the terms of the Bidding Procedures. Accordingly, the terms of the Bidding Procedures—which, in any event, the Debtors may modify in their business judgment—are inapplicable to and do not govern the Regeneron Breakup Fee. Moreover, the TTAM Asset Purchase Agreement contains a

paid concurrently with, closing of the Sale Transaction with TTAM, as consideration for (1) Regeneron's agreement to serve as the Successful Bidder in the event TTAM is selected as the Winning Bidder until the Court's entry of the TTAM Authorization Order or Regeneron's agreement to provide the Regeneron Consent, as applicable, (2) the time, effort, and resources invested by Regeneron to consummate the Sale Transaction under the Regeneron APA, including in particular from the conclusion of the Auction to the Best and Final Deadlines, and (3) Regeneron's agreement to serve as the Backup Bidder at a purchase price of $151 million notwithstanding the Bidding Procedures.

J.  Each Bidder is expressly permitted to submit a Final Proposal in accordance with the terms of the Proposed Order notwithstanding anything to the contrary in the Bidding Procedures or any Bidder's Asset Purchase Agreement related to such Bidder's Current Bid;

K.  Regardless of whether a Bidder submits a Final Proposal on or before the Best and Final Deadlines, as applicable, each Bidder is prohibited from making any alternative or revised proposal for the Debtors' Assets after the applicable Best and Final Deadline (any such proposal, an "Untimely Proposal"), and the Debtors are prohibited from seeking approval of any Untimely Proposal, or any proposal from any party that is not a Bidder, regardless of whether the Debtors may determine in their business judgment that such Untimely Proposal or other proposal may otherwise constitute a highest and best bid. The Court will not consider for approval at the Sale Hearing any Untimely Proposal or alternative proposal from any party that is not a Bidder;

L.  The deadline for parties in interest to object to the Sale Transaction and the Sale Order shall continue to be June 10, 2025 (the "Sale Objection Deadline"), in accordance with (and unless extended pursuant to) the Bidding Procedures Order. The Sale Objection Deadline applies to objections to approval of either or both of the Current Bids, as modified by any Final Proposal; *provided* that the rights of parties in interest, including the Bidders, to object to the Debtors' determination of the highest and best bid (including the exercise of the Fiduciary Out under the Regeneron APA) following the Final Proposal Deadline are preserved and may be made, including in writing as appropriate, at any time up to and including the Sale Hearing, subject in all respects to the terms of the Final Proposal Procedures; and

M.  Nothing in these Final Proposal Procedures shall modify or affect Regeneron's designation as the Successful Bidder at the Auction. Notwithstanding these Final Proposal Procedures or this motion, the Auction has concluded and nothing in these Final Proposal Procedures or motion is or shall be construed as

---

"fiduciary out" provision which contemplates a fee payable to TTAM if the Debtors exercise their right to terminate the TTAM Asset Purchase Agreement pursuant to this provision.

reopening the Auction.

28.      TTAM has notified the Debtors it objects to any subsequent proposal process where Regeneron receives a "last look" after TTAM has submitted its Final Proposal as provided in the Final Proposal Procedures.  To be clear, the Debtors would also prefer utilizing a "best and final" process without either Bidder having a "last look," but implementing that process here is not without risk.  If Regeneron litigated whether TTAM is prohibited from submitting post-Auction proposals and wins, the Debtors will lose the ability to bring *any* incremental value into the estates.  If the Debtors proceed with seeking approval of a best and final proposal process without a "last look" on a nonconsensual basis with respect to Regeneron, Regeneron would litigate whether TTAM is permitted to provide any proposal to the Debtors after the Auction concluded and whether it has a valid termination right under the Regeneron APA as discussed in more detail above.  Although the Debtors believe they would prevail in such litigation, it would nonetheless introduce risk into this process that could destroy stakeholder value.  Under these circumstances, the Special Committee exercised its business judgment to determine that the Final Proposal Procedures as contemplated herein are the best available means to mitigate these risks and maximize value for the estates given the competing positions of the Bidders.

29.      Accordingly, the Debtors are seeking approval of the Final Proposal Procedures in the sound exercise of their business judgment as the best available framework under the circumstances.  The Final Proposal Procedures benefit the Debtors' estates in several important ways:

- *First,* the Debtors have secured an agreement from Regeneron to serve as a backup bidder at a purchase price of $151 million—which is consistent with what a Regeneron Backup Bid would have been set at had Regeneron not been named the Successful Bidder at the Auction—if TTAM is declared the Winning Bidder following the conclusion of the Final

Proposal Procedures;

- *Second*, it allows the Debtors to obtain the value-maximizing benefits of a final round of proposals from Regeneron and TTAM free of potential litigation from Regeneron that (a) TTAM is not permitted to submit any revised proposal to the Debtors after the conclusion of the Auction and (b) the Debtors filing a motion or otherwise seeking to reopen competitive bidding in any way gives rise to a termination right under the Regeneron APA;

- *Third*, the Final Proposal Procedures provide all parties in interest, including the Debtors and their stakeholders, the benefit of finality going into the Sale Hearing; and

- *Fourth*, the Debtors believe it moots the pending litigation from TTAM pursuant to which TTAM is seeking to retain the opportunity to submit a revised proposal to the Debtors notwithstanding the valid and appropriate conclusion of the Auction on May 16, 2025.

## **Basis for Relief**

**A.    The Final Proposal Procedures are Fair, Designed to Maximize the Value Received by the Debtors' Estates, and Consistent with the Debtors' Reasonable Business Judgment**

30.    Section 363 of the Bankruptcy Code provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets under section 363 of the Bankruptcy Code.  *See, e.g.*, *Myers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (explaining that courts usually defer to the trustee's "legitimate business justification" with respect to section 363 of the Bankruptcy Code); *see also In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 356 (Bankr. E.D. Va. 2016) ("Courts apply the deferential business

judgment test when analyzing transactions under § 363(b)(1).").

31.     The business judgment rule shields a debtor's decisions from judicial second-guessing.  Once a debtor articulates a valid business justification, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. Aug. 31, 1995) (internal citations omitted); *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at *40 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *see also Comm. of Asbestos-Related Litigants and/or Creditors* v. *Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. May 5, 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").

32.     In addition, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Adams Res. Expl. Corp.*, 2017 Bankr. LEXIS 4506, at *12 (Bankr. D. Del. Sept. 7, 2017) ("The relief requested in the [motion] . . . is a necessary and appropriate step toward enabling the Debtor to maximize the value of its bankruptcy estate, and it is in the best interests of the Debtor, its estate, and its creditors."); *In re Integrated Res. Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the [Debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  To that end, courts uniformly

recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate. *See, e.g.*, *Four B. Corp.* v. *Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564–65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *Wintz* v. *American Freightways, Inc. (In re Wintz Companies)*, 219 F.3d 807, 812-813 (8th Cir. 2000) (sale procedure providing for competitive bidding calculated to maximize value to the estate was deemed valid).

33.     Moreover, Courts routinely recognize that a debtor's fiduciary obligations require it to consider and evaluate ***all*** proposals that could maximize value for the estate, even after the debtor has agreed to consummate a transaction with a counterparty, especially where the debtor has a "fiduciary out." *See, e.g.*, *In re Glob. Crossing Ltd.*, 295 B.R. 726, 745–46 (Bankr. S.D.N.Y. 2003) (explaining it was "fully consistent" with the debtor's fiduciary duties that it evaluated alternative proposals after entering into a purchase agreement containing a "fiduciary out" with a buyer, noting that "[i]f this Court were to believe, for half a second, that the Debtors had spurned a better offer to the detriment of their fiduciary duties, this Court would not hesitate to invoke its powers."); *In re Metaldyne Corp.*, 409 B.R. 661, 669 (Bankr. S.D.N.Y. 2009) ("Once another bidder entered the fray with a potentially higher and better offer, the Debtors *had to* consider the offer; failure to do so would have been a breach of their duties to the estate and its creditors.") (emphasis in original); *In re Innkeepers USA Tr.*, 448 B.R. 131, 148 (Bankr. S.D.N.Y. 2011) (discussing that a "fiduciary out" clause which "trumps every other provision in the controlling documents" means that "if a competing bidder submits a bid that reflects a higher return to . . . the Debtor[s] . . . the Debtors can and should exercise their fiduciary duty to give it their full consideration."). Here, the TTAM Post-Auction Proposals suggest that there exists unexplored potential increased value to the estate; in light of this, the Debtors' fiduciary obligations require

them to consider such proposals and design a process that, subject to the Court's approval, in their reasonable business judgment, would maximize value to the estate.

34.    Moreover, section 105(a) of the Bankruptcy Code allows the Court to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code. *See* 11 U.S.C. § 105(a).

35.    Here, a sound business purpose exists for the Debtors to implement the Final Proposal Procedures because the procedures will maximize value for the Debtors' estates by, among other things, allowing the Debtors to continue to evaluate proposals for the sale of their Assets to TTAM or Regeneron while providing finality to the sale process.  Despite the conclusion of a competitive three-day Auction process and the selection of a $256 million winning bid, TTAM has submitted revised proposals at a materially higher purchase price than its final bid at the Auction.  However, given the benefits of the Regeneron APA and the risks of litigation surrounding the sale and Auction process, it is imperative that any process for the Debtors to continue to consider additional sale proposals (a) be conducted within the current Court-approved timeline for approval of the Sale Transaction, (b) ensure that the Bidders are provided a fair opportunity to submit Final Proposals for the Debtors' Assets, and (c) preserve the existing benefits of the Successful Bid and Backup Bid, including maintaining access to a backup bid.

36.    Indeed, the deadlines for approval of the Sale Transaction are fast-approaching— the Sale Hearing is scheduled for June 17, 2025, and the Consumer Privacy Ombudsman is required to submit his Final Report with the Court by June 10, 2025.  Moreover, as reflected by the Sale Motion Pleadings and the CPO Notice, absent the relief requested herein, there is a significant risk that (a) parties in interest will continue to litigate the outcome of the Auction

process and (b) the CPO's ability to complete his Final Report by the applicable deadline could be complicated by the need to analyze changing proposals submitted by two separate bidders.

37.     The Final Proposal Procedures were designed (a) at all times under the supervision of the Special Committee, with the advice of the Debtors' advisors, and after careful consideration of a number of quantitative and qualitative factors relating to the results of the Auction, the additional proposals received after the Auction, and the current state of the Sale Transaction, and (b) to facilitate continued fair, yet competitive, bidding to maximize the value of the Debtors' estates, elicit the highest or otherwise best offers available for the Debtors' Assets, and bring the Sale Transaction to an orderly and final conclusion.

38.     For the foregoing reasons, the Debtors respectfully submit that implementing the Final Proposal Procedures as outlined herein is a sound exercise of their business judgment and fiduciary obligations, and is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these cases.  Importantly, implementing the Final Proposal Procedures will (a) best situate the Debtors to consider the Final Proposals in an exercise of their business judgment and fiduciary obligations to maximize the value of their estates, (b) avoid any unnecessary cost and delay to the current sale timeline, (c) afford each Bidder a fair and reasonable opportunity to submit revised proposals, (d) preserve the benefits of the Regeneron APA while avoiding disputes as to whether it could be terminated if the Debtors take certain steps; and (e) provide finality to an already protracted sale process.

**B.      The Regeneron Breakup Fee Has a Sound Business Purpose and Should Be Approved**

39.     As discussed above, the Debtors are requesting authority to grant Regeneron the Regeneron Breakup Fee in the event the Debtors select TTAM as the Winning Bidder and the Court enters the TTAM Authorization Order or Regeneron provides the Regeneron Consent. Doing so is a reasonable and a sound exercise of their business judgment because the Regeneron

Breakup Fee acts as consideration for (a) Regeneron's agreement to continue to serve as the Successful Bidder until the Court enters the TTAM Authorization Order, or Regeneron provides the Regeneron Consent, in the event the Debtors select TTAM as the Winning Bidder, (b) the cost and expense Regeneron has invested in consummating the Sale Transaction under the Regeneron APA, in particular after the Auction, and (c) Regeneron's consent to the Final Proposal Procedures in lieu of litigating whether (i) TTAM is permitted to submit any alternative proposal to the Debtors and (ii) the Debtors are permitted to establish procedures for subsequent rounds of bidding among Qualified Bidders without violating the terms or restrictions of the Regeneron APA, in each case, after Regeneron had been declared the Successful Bidder following the Auction.

40.    In this regard, Regeneron is effectively acting as a "stalking horse bidder," whose Successful Bid "sets a floor for subsequent bidding," under the Final Proposal Procedures. *See In re Interforum Holding LLC*, 2011 WL 2671254, at *1 n.1 (E.D. Wis. July 7, 2011) (stalking horse bidders and offers "establish a framework for competitive bidding and facilitat[ing] a realization of that value"). The offering of breakup fees (and other similar bid protections) to induce stalking horse bidders to provide benefits similar to those Regeneron has provided the Debtors has become an established and important practice in chapter 11 cases. "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *In re Integrated Res. Inc.*, 147 B.R. at 659–60 (emphasis in original).

41.    As discussed above, courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling estate assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use,

21

sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.").  With respect to the granting of bid protections, including breakup fees, courts have held that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision."  *Reliant Energy Channelview LP* v. *Kelson Channelview LLC* (*In re Reliant Energy Channelview LP*), 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp.* v. *O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527 (3d Cir.1999)).

42.     Therefore, courts in this and other jurisdictions have ruled that bid protections must meet the standard set forth in the administrative expense provisions of Bankruptcy Code section 503(b), which is generally satisfied if such bid protections provide some benefit to the debtor's estate.  *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3rd Cir. 2018); *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) ("We . . . hold that the determination of whether break-up fees or expenses are allowable under section 503(b)(1)(A) will be made in reference to general administrative expense jurisprudence."); *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 533.  Benefits to the debtor's estate may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" and where the availability of the breakup fees and expenses "were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely . . . increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.* at 537.

43.     Here, the Regeneron Breakup Fee is a critical component of Regeneron's

commitment to consent to the Final Proposal Procedures, including not to seek to terminate the Regeneron APA, not to object to TTAM's submission of post-Auction bids, and to serve as a Backup Bidder at $151 million if TTAM ultimately has the Winning Bid. These aspects of the Final Proposal Procedures are vital to the Debtors' ability to pursue the most value-maximizing sale while preserving the status quo of having a backup bid to ensure value to the estates. Regeneron has also expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale Transaction, despite the fact that its bid will be subject not only to Court approval, but also to overbidding by TTAM after the Auction concluded. As a result, by agreeing to the Regeneron Breakup Fee, the Debtors ensured that their estates would have the benefit of the best transaction without the potential risks of pursuing an alternative transaction after the Auction.

44.     In consideration of the foregoing, the Debtors submit that the Court should authorize the Debtors to grant Regeneron the Regeneron Breakup Fee pursuant to sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.

## **Reservation of Rights**

45.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as (other than with respect to the Regeneron Breakup Fee): (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, assign, or reject any agreement, contract, or lease pursuant to section 365 of the

23

Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order (other than with respect to the Regeneron Breakup Fee) is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

### Notice

46.     The Debtors will provide notice of this motion to the following parties:  (a) the Office of the United States Trustee for the Eastern District of Missouri; (b) counsel to the Committee; (c) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (d) counsel to the lender under the Debtors' postpetition financing facility; (e) the United States Attorney's Office for the Eastern District of Missouri; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the Federal Trade Commission; (i) the state attorneys general in all 50 states; (j) counsel to the Bidders; (k) the Consumer Privacy Ombudsman and counsel thereto; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").   Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-3(A)(1). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

47.     A copy of this motion is available on (a) PACER at https://pacer.uscourts.gov/ and (b) the website maintained by the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC, at https://restructuring.ra.kroll.com/23andMe.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order and grant such other relief as the Court deems appropriate under the circumstances.

Dated: May 31, 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:    (314) 854-8600
Facsimile:    (314) 854-8660
Email:        thr@carmodymacdonald.com
              nrw@carmodymacdonald.com
              jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Jessica I. Choi (admitted *pro hac vice*)
Grace C. Hotz (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:    (212) 373-3000
Facsimile:    (212) 757-3990
Email:        pbasta@paulweiss.com
              chopkins@paulweiss.com
              jchoi@paulweiss.com
              ghotz@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*