**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |

**MOTION FOR ENTRY OF AN ORDER DIRECTING
THE APPOINTMENT OF AN OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS PURSUANT TO 11 U.S.C. § 1102**

The holders of Class A common stock of 23andMe Holding Co. ("**23andMe**" and, together with its debtor affiliates, the "**Debtors**") identified on **Schedule 1** annexed hereto (collectively, the "**Moving Shareholders**"), who collectively hold 6,805,766 shares (or approximately 33.5%) of the issued and outstanding Class A common stock of 23andMe, by and through their undersigned counsel, respectfully submit this Motion requesting entry of an Order, substantially in the form attached hereto as **Exhibit A**, directing the appointment an Official Committee of Equity Security Holders (the "**Official Equity Committee**") in these cases.  In support of this Motion, the Moving Shareholders state as follows:

**PRELIMINARY STATEMENT**

1.      The Moving Shareholders have diligently pursued official representation in these cases since their inception based on their conviction that, given firm prepetition indicia of value

---

[1]     The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are: 23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these Chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

and the relatively limited pool of liabilities, significant value would flow to 23andMe's shareholders. The Moving Shareholders first requested the appointment of an Official Equity Committee on March 31, 2025. The Debtors opposed this request, arguing mainly that the outcome of their nascent post-petition sale process and, thus, the value that may be available to equity, was unknown (and unknowable) at that time. The United States Trustee declined the initial equity committee request. Although the Moving Shareholders disagreed with this decision, they respected it, recognizing that all parties would benefit from more concrete information respecting the Debtors' equity value as the auction process developed over the ensuing weeks.

2.      The auction process has now sufficiently matured. As the Debtors state, "the outcome of the Auction speaks for itself." (Dkt. No. 574, ¶ 20). That process has thus far yielded a remarkably high bid from Regeneron Pharmaceuticals, Inc. ("**Regeneron**") that provides for a gross purchase price of $256 million (plus cure amounts)—a binding, irrevocable bid that will easily clear the Debtors' modest claims pool and extend deep into equity. (*Notice of Successful and Backup Bidders with Respect to the Auction of the Debtors' Assets* [Dkt. No. 420]). There is no longer any reasonable doubt that 23andMe's shareholders have a substantial value entitlement in these cases.

3.      And, that's not all. Bidding continues. Post-auction, the "back-up bidder" (referred to herein as "**TTAM**"), led by the Debtors' former CEO, co-founder, controlling stockholder, and board chair, Ms. Anne Wojcicki, has apparently submitted a meaningfully higher topping bid, accompanied by evidence of financial wherewithal to close and a large cash deposit. According to TTAM, the Debtors have resisted their efforts to overbid Regeneron, and only when faced with the threat of expensive, lengthy (and potentially embarrassing) litigation, did the Debtors pivot and announce their proposal for a new "best and final" round of bidding.

4.     The recent dispute with TTAM, and the Debtors' and Creditors Committee's evident hostility towards TTAM's efforts to top Regeneron, illustrates why an Official Equity Committee is needed.  Bankruptcy requires an adversary process of "checks and balances" to function properly.  These cases desperately require an effective fiduciary counterweight to the Debtors, one that advocates exclusively for the interests of the "fulcrum" security (i.e., equity).  The Creditors Committee cannot serve this vital function.  Faced with serious allegations that the Debtors were disabling TTAM's efforts to top Regeneron's bid (which would assuredly pay creditors in full), the Creditors Committee's feeble response and emphasis on "maintaining the current sale schedule" (Dkt. No. 520, ¶ 4) suggests a committee laser-focused on closing the "bird in hand"—not ensuring that the value of the Debtors' assets is maximized for **all** stakeholders.

5.     Based on the public submissions, it appears that TTAM's unrelenting pursuit of its topping bid forced the Debtors to course correct and propose an unusual (and perhaps controversial) "best and final" bid process.  But, shareholders should not have had to rely on a zealous bidder to ensure that the Debtors get top dollar for their assets.  Moreover, the Debtors' hastily prepared "best and final" procedures raise serious questions as to whether this is, in fact, the best means of maximizing the Debtors' value.  Now is the time to appoint an Official Equity Committee.  Decisions are being made that will directly and materially impact equity recoveries.  Shareholders deserve a fiduciary seat at the negotiating table to ensure that the final sale transaction and ultimate case resolution (including the Chapter 11 plan) maximizes value for equity holders.  The pertinent factors overwhelmingly favor the appointment of an Official Equity Committee.

6.     **First**, the Debtors appear to be massively solvent.  The Debtors' asset value—at least $256 million (plus cures) and rising—is more than enough to satisfy the relatively paltry claims pool and deliver meaningful value to equity.  The Debtors entered bankruptcy with an

atypically small liability stack.  There is no funded debt.  No ABL facility.  No term loan.  No bond debt.  Other typical liabilities are absent.  There is no collective bargaining agreement.  No pension obligations.  No sprawling lease portfolio.  Instead, the overwhelming majority of the Debtors' claim pool relates to alleged claims arising from the "Cyber Security Incident" (discussed below).  Most of these claims were settled prepetition for $37.5 million total, and insurance appears likely to cover a large chunk of that.  Prepetition trade claims are modest (e.g., about $7 million is listed in the Debtors' schedules), and post-petition "critical" trade payments (up to $5.82 million) may significantly reduce these amounts.  Post-petition DIP loan obligations top out at $35 million, and actual borrowings may be substantially less.  Other categories of theoretical, potential claims (discussed below) appear highly unlikely to overwhelm the sizeable sale proceeds and render these estates "hopelessly insolvent."   Market data confirms this.   Since the announcement of the Regeneron bid, 23andMe's share price has surged, closing at $3.76 per share on June 2nd on robust trading activity, and the company's market capitalization has soared to over **$100 million** (far beyond "option" value).

7.      The Debtors and Creditors Committee will attempt to move the goalposts (as they did in their responses to the Moving Shareholders' renewed request to appoint an Official Equity Committee post-auction).  Although the Debtors now have binding bids of enormous value, they will suggest that there is still uncertainty in the sale outcome—i.e., the cash is not yet in the door and recoveries for equity holders have not yet been fixed to the penny.  But, this is not the pertinent standard.  Bankruptcy jurisprudence asks, instead, whether the debtor is so "hopelessly insolvent" that there is not a foreseeable path forward that leads to a positive outcome for equity.  There is plainly such a path here.  The "straw man" standard urged by the Debtors and Creditors Committee is not the law, would render the appointment of an Official Equity Committee a virtual

4

impossibility, and would effectively write Section 1102(a)(2) as it relates to equity committees out of the Bankruptcy Code.  Put another way, if this case does not warrant appointment of an Official Equity Committee, then what case could?

8.    **Second**, shareholders do not have an adequate voice.  The Debtors will point to the Special Committee, but that is not the representation demanded under the jurisprudence. Shareholders did not appoint the Special Committee and have never had a vote on its composition. Despite the Moving Shareholders being organized since the very outset of these cases, the Special Committee and its advisors have not once contacted or corresponded with the Moving Shareholders, or solicited their input.  Meanwhile, the Special Committee is making decisions that have enormous (and adverse) economic consequences for shareholders.  One unfortunate and distressing example is the Debtors' recent announcement to voluntarily deregister 23andMe's stock (i.e., "go dark") on June 6, 2025.[2]  This drastic decision is unnecessary at this time and will likely severely damage shareholder liquidity.  Moreover, it seems to disregard potentially value-maximizing restructuring options, such as retention of stockholder equity interests under a Chapter 11 plan, reorganization around the remaining business assets (and litigation claims) post-sale, and preservation of the Debtors' significant and valuable tax attributes (e.g., $1.1 billion in federal NOL carryovers).  A similar structure was utilized by the Official Equity Committee in <u>Lordstown Motor Corp.</u> to maximize value for equity holders.  *See* Case No. 23-10831, Bankr. D. Del. (MFW).

9.    The Debtors' blithe response, in its correspondence with the United States Trustee, that the Moving Shareholders can simply participate as an "ad hoc" committee and litigate for

---

[2]    23andMe Announces Intent to Voluntarily Delist from Nasdaq and Deregister with the SEC, dated May 27, 2025, available at: https://investors.23andme.com/news-releases/news-release-details/23andme-announces-intent-voluntarily-delist-nasdaq-and.  A copy of the press release is attached hereto as **Exhibit B**.

reimbursement of fees and expenses under Section 503(b) (which the Debtors will assuredly oppose) underscores how detached the company is from its shareholder base. The Moving Shareholders consist of individual investors, family offices, and other retail holders. They are not large hedge funds, private equity firms, Wall Street houses, or other deep-pocketed institutions. They don't live in mansions or own airplanes. They have a real value entitlement, and they are entitled to protect that value against the powerful professional machinery installed by the Debtors.

10.     The Official Creditors Committee—which owes fiduciary duties only to unsecured creditors—is no solution, either. Given the numerous indicators of solvency, the Creditors Committee is essentially a competing stakeholder representative to equity. Shareholders cannot rely on the Creditors Committee to protect their interests, particularly as it relates to negotiation of a Chapter 11 plan.

11.     **Third**, the Debtors' cases are sufficiently complex to warrant appointment of an Official Equity Committee. Here, the complexity lies not in the capital structure, but rather in completing the auction process and negotiating a Chapter 11 plan. The Debtors have a complex corporate structure and enormous tax attributes, which will require careful analysis to ensure a Chapter 11 plan is structured in a way that maximizes value for equity. Potential complexities in the claim resolution process (including from creditors improperly seeking to exploit the Debtors' solvency to enhance their recoveries beyond their legal entitlements) further supports appointment of an Official Equity Committee.

12.     **Finally**, the benefit of ensuring that shareholders have a fiduciary voice far outweighs the cost. Plan negotiations should commence promptly. Although there will be complexities that the parties will need to work through, the Moving Shareholders submit that plan negotiations can proceed expeditiously and that a plan can be filed without any significant delay

in the case.  The Official Equity Committee will have a keen incentive to expeditiously conclude these cases, as a prolonged plan process would likely dilute shareholder recoveries.

## JURISDICTION, VENUE, STATUTORY PREDICATES

13.     The United States Bankruptcy Court for the Eastern District of Missouri (this "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This Motion is a core proceeding within the meaning of 28 U.S.C. § 157(b).  Venue for this Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is 11 U.S.C. § 1102(a)(2).

## PERTINENT BACKGROUND

**A.      General Case Background.**

14.     On March 23, 2025 (the "**Petition Date**"), the Debtors each filed a voluntary petition for Chapter 11 relief commencing these Chapter 11 cases (the "**Chapter 11 Cases**").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

15.     The Chapter 11 Cases have been consolidated for procedural purposes only and are jointly administered under the above-captioned case number. (*Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related* [Dkt. No. 105]).

16.     On April 3, 2025, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**") in these Chapter 11 Cases.  (*Notice of Appointment of Official Unsecured Creditors' Committee* [Dkt. No. 159]).

**B.      The Debtors' Business And Assets.**

17.     The Debtors entered bankruptcy with a highly-valuable asset portfolio.  The Debtors' business assets include their genetic database, an extensive patent estate covering both their consumer genetic platform and various therapeutics, collaboration agreements with industry-

7

leading partners, and their Lemonaid telehealth platform.  (*Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* [Dkt. No. 32] (the "**Kvarda Decl.**"), ¶¶ 25-42, 45-50).

18.    The Debtors also entered bankruptcy with significant balance sheet cash, including $37 million of unrestricted cash and a further $15 million of "restricted" cash.  (*Debtors' Motion for Entry of (I) an Order Authorizing (A) Entry into and Performance under the Binding DIP Term Sheet, Including Payment of the Commitment Fee and Work Fee Thereunder, and (B) Granting Related Relief and (II) and Order (A) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, and Provide Superpriority Administrative Expense Claims, (B) Modifying the Automatic Stay, and (C) Granting Related Relief* [Dkt. No. 28], Ex. B (the "**Original Cash Flow Forecast**")).

19.    The estates also include claims against (among others) the Debtors' directors and officers relating to (among other things) the Cyber Security Incident (discussed below), for which D&O insurance coverage is likely available.

**C.**    **The Debtors' Liabilities.**

20.    Unlike most large bankruptcy cases, the Debtors entered bankruptcy without a cent of funded debt (secured or unsecured).  (Kvarda Decl. ¶ 58).  The "substantial portion" of the Debtors' prepetition claims pool is, instead, comprised of claims arising from the "Cyber Security Incident" and "ordinary trade claims." (Kvarda Decl. ¶ 58).

**i.**    **Cyber Security Incident Claims.**

21.    The "Cyber Security Incident" refers to a threat actor's unauthorized access to the personal information of approximately 7 million customers and potential liability arising therefrom.  (Kvarda Decl. ¶ 64).

22.     According to the Debtors, "given that [they] do not have any funded indebtedness, the Cyber Security Incident Claims are likely to comprise the substantial majority of claims that will be asserted against the Debtors."  (*Debtors' Omnibus Reply in Support of Entry of an Order (I) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof and (II) Granting Related Relief* [Dkt. No. 339], ¶ 4).

23.     The "Cyber Security Incident" resulted in the following litigation commenced against the Debtors: (i) over forty putative class action lawsuits that were subsequently centralized in the Norther District of California before Judge Edward M. Chen, MDL No. 3098 (the "**MDL Action**"); (ii) nine actions filed in California state court (the "**State Court Actions**"); (iii) asserted or threatened arbitration claims from approximately 35,000 claimants (the "**Arbitration Actions**"); and (iv) two class actions filed in Canadian courts in Ontario and British Columbia (the "**Canadian Actions**").  (Kvarda Decl. ¶¶ 65-68).

24.     In the MDL Action, the MDL Court appointed co-lead counsel and authorized the filing of a consolidated class action complaint, which was filed in June 2024.  (Kvarda Decl. ¶ 65). Prior thereto, the parties in the MDL Action entered into mediation before Mr. Randall Wulff. (Kvarda Decl. ¶ 73).  Mr. Wulff proposed a complete resolution of the MDL Action, which the MDL parties accepted.  Under the settlement, the Debtors would make an aggregate cash payment of $30 million to resolve all claims brought on behalf of all U.S. persons whose personal information was impacted by the Cyber Security Incident.  (Kvarda Decl. ¶ 74).  The settlement was conditionally approved by the MDL Court in December 2024, subject to including an opt-out mechanic for individuals who choose to exercise their arbitration rights. (Kvarda Decl. ¶ 75).

25.     Thereafter, the Debtors engaged in settlement discussions with the parties to the State Court Actions and Arbitration Actions.  Those actions, too, were settled prior to the

bankruptcy filing for what appears to be approximately $7.5 million in the aggregate, bringing the total amount due, according to the Debtors, under the various prepetition settlements to $37.5 million. (*See* Letter from Christopher J. Hopkins, dated April 3, 2025 ("**Debtor April 3 Letter**"), attached hereto as **Exhibit C**).

26.    The Debtors are covered under a $25 million cyber insurance policy, which is available to satisfy amounts due under the foregoing settlements. As of April 2025, the Debtors assert that $16 million in coverage was available under these policies, which would leave an alleged "shortfall" of approximately $21.5 million with respect to the Cyber Security Incident settlements. (*See* Debtor April 3 Letter).

27.    The two Canadian Class Actions are in their infancy and are presently stayed. Plaintiffs' counsel in those actions have entered into cooperation agreements to coordinate efforts. (Kvarda Decl. ¶ 68). It is unclear if the Canadian plaintiffs will even pursue claims in these Chapter 11 Cases, as they state that they "continue to be in discussion to determine the appropriate route to channel the claims against 23andMe," and claim to reserve purported rights as to this Court's jurisdiction over their alleged claims. (*See Declaration of Eli Karp in Opposition to the Debtors' Motion for Entry of an Order (A) (I) Enforcing the Automatic Stay or (II) in the Alternative, Extending the Automatic Stay; and (B) Enjoining the Continued Prosecution of the Canadian Proceedings* [Dkt. No. 559-2]).

   **ii.    Trade Claims.**

28.    The Debtors' schedules identify a grand total across all Debtors of $7.15 million in known (although disputed) prepetition claims. (*See* Case No. 25-40975 [Dkt. No. 9], Schedule E/F (listed claims of $1,126.96, plus purportedly undetermined claims); Case No. 25-40976 [Dkt. No. 335], Schedule E/F (no listed claims); Case No. 25-40977 [Dkt. No. 9], Schedule E/F (listed

claims of $7,025,841.57, plus purportedly undetermined claims); Case No. 25-40978 [Dkt. No. 9], Schedule E/F (no listed claim); Case No. 25-40979 [Dkt. No. 9], Schedule E/F (listed claims of $500.00); Case No. 25-40980 [Dkt. No. 9], Schedule E/F (listed claims of $124,104.61, plus purportedly undetermined claims); Case No. 25-40981 [Dkt. No. 9], Schedule E/F (no listed claim); Case No. 25-40982 [Dkt. No. 9], Schedule E/F (no listed claim); Case No. 25-40983 [Dkt. No. 9], Schedule E/F (no listed claim); Case No. 25-40984 [Dkt. No. 9], Schedule E/F (no listed claim); Case No. 25-40985 [Dkt. No. 9], Schedule E/F (no listed claim); Case No. 25-40986 [Dkt. No. 9], Schedule E/F (no listed claim)).

29.    The Debtors obtained authority to pay up to $5.82 million for certain prepetition "critical" trade claims, and the Debtors note that certain of the foregoing scheduled claims may be (and presumptively have been) satisfied through such "critical" trade payments.  (*See Final Order (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Certain Critical Vendors, (B) Lien Claimants, (C) 503(B)(9) Claimants, and (D) Foreign Vendors, (II) Granting Administrative Expense Priority to and Authorizing the Payment of Outstanding Orders, and (III) Granting Related Relief* [Dkt. No. 301]).

30.    The Debtors assert that other prepetition claims (e.g., employee wages, taxes) will similarly be satisfied in full in the ordinary course during these cases.  (*See Final Order (I) Authorizing the Debtors to (A) Pay Certain Prepetition Employee Wages and Benefits and (B) Continue Employee Benefits Programs and Pay Related Obligations and (II) Granting Related Relief* [Dkt. No. 304]; *Final Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* [Dkt. No. 303]).

### iii.    **DIP Financing Obligations.**

31.    The Debtors are authorized to borrow up to a maximum aggregate amount of $35 million in post-petition DIP financing.  (*Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing, Granting Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral, (B) Modifying the Automatic Stay, and (C) Granting Related Relief* [Dkt. No. 313] (the "**Final DIP Order**")).

32.    It's unclear how much of the DIP loan will need to be drawn, and thus repaid, during these cases.  The Debtors entered bankruptcy with $37 million in unrestricted cash (and an additional approximately $15 million in "restricted cash").  The Debtors' original cash flow forecast (filed on March 24th) did not project any DIP loan borrowings through the first week of June, based in part on projected cash receipts of $20.8 million over the same period.  (*See* Original Cash Flow Forecast).  A revised cash flow forecast filed with the Final DIP Order (on April 23rd) projected $10 million in DIP draws through the first week of June, and an additional $10 million in DIP draws through the end of June.  (*See* Final DIP Order, Ex. 2).

33.    The projected liquidity need appears to stem, in part, from revised downward projections in cash receipts (e.g., $13.4 million through the 12-week period ended June 12, 2025). Based on the Debtors' monthly operating reports [Dkt. Nos. 358, 549], actual receipts appear to have been stronger than the revised projections (and consistent with the original cash flow forecast), e.g., actual post-petition receipts through April 30, 2025 of $11,441 as compared to originally forecasted receipts for the post-petition period ended May 2, 2025 of $11,991.[3]  All of

---

[3]    An apples-to-apples comparison is not possible given the different measuring periods in the cash flow forecasts and the monthly operating reports, and the lack of actuals for prior periods in the revised cash flow forecast.  The Debtors began the forecast period under the revised cash flow forecast with more cash ($35 million) than originally forecasted ($30.7 million), and it is unclear if this is the result of an uptick in business, increased realization, the timing of receipts, delaying disbursements, or other reasons.

this is to say that projected DIP loan borrowings will not be an impediment to an equity recovery, and there may be less of an actual borrowing need than the revised forecast projects.

    **iv.**    **Other Potential Liabilities.**

34.    The Moving Shareholders anticipate that the Debtors and Creditors Committee will allude to other potential liabilities against the estates.

35.    "Threatened" UK Litigation.  The Debtors have hinted at "threatened or initiated" actions in the U.K.  The Kvarda Declaration makes one passing reference (at ¶ 69) that one law firm in the U.K. has "asserted a pre-arbitration demand" seeking damages on behalf of certain U.K. customers.  There is no information respecting the substance or legitimacy of such potential claims, in either the Debtors' bankruptcy submissions or, notably, in their SEC filings.  Securities law obligates 23andMe, as a public company, to disclose material litigation risks and, if it failed to do so, stockholders may have meritorious claims sounding in securities fraud.  *See, e.g., In re Facebook, Inc. Sec. Litig.*, 87 F.4th 924 (9th Cir. 2023).

36.    Regulatory Investigations.  The Debtors mention that foreign and domestic regulators have commenced investigations, and that these may eventually result in claims, including, they say, a "proposed £4.59 million fine."  But, the Kvarda Declaration does not mention any fine as a liability (or even projected liability).  Rather, it states that the Debtors have been complying with these investigations, and that apart from certain informational requests and interviews, "all other inquiries and/or investigations involving foreign regulators have either been resolved or have gone dormant."  (Kvarda Decl. ¶¶ 70-72)

37.    "Pixel" Litigation.  The Debtors and Creditors Committee have alluded to potential claims arising from "pixel" litigation against "certain of the Debtors."  Only two Debtors are defendants in that "pixel" action: Lemonaid Health Inc. and LMND Medical Group, Inc., d/b/a

Lemonaid Health.  Those entities do not appear to be part of the Regeneron bid, and may ultimately be wound down.  (*See Notice Of Successful And Backup Bidders With Respect To The Auction Of The Debtors' Assets* [Docket No. 420]; Press Release, 23andMe, *Regeneron, A Leading U.S. Biotechnology Company, to Acquire 23andMe in Court-Supervised Sale* (May 19, 2025), available at https://investors.23andme.com/news-releases/news-release-details/regeneron-leading-us-biotechnology-company-acquire-23andme-court ("The agreement does not include the purchase of the Company's Lemonaid Health subsidiary, which the Company plans to wind down in an orderly manner, subject to and in accordance with the agreement.").  Speculative claims at those subsidiaries should not materially impact recoveries to 23andMe's equity holders.

38.    Potential Rejection Damages.  The proposed sale process has not yet concluded, and schedules of contracts to be assumed and assigned under the winning bid have not been finalized.  There may be unsecured claims resulting from lease rejections, as is the case in almost every Chapter 11 case.  And, as in most Chapter 11 cases, the Debtors will likely have defenses, including mitigation, to such claims, if any are brought.  The actual amount of such claims (certain of which, if proven, would be subject to additional limitations under the Bankruptcy Code) is far from being determined—and Official Committees are frequently involved in negotiations over such claims.

**D.    The Auction Process Results; Call For "Best and Final" Bids.**

39.    Prior to their bankruptcy filing, the Debtors ran a marketing process to sell their business.  (Kvarda Decl. ¶¶ 79-101).  That process attracted multiple proposals from Ms. Wojcicki, one of which (submitted just prior to the bankruptcy) contemplated acquiring all outstanding shares not otherwise owned by Ms. Wojcicki for $0.41/share in cash, plus additional contingent consideration up to $2.53/share.  (Kvarda Decl. ¶¶ 97-98).

14

40.    Post-petition, the Debtors continued their marketing efforts.  In accordance with the Bidding Procedures Order [Dkt. No. 12], the Debtors conducted an auction (May 14 – May 16).  That auction yielded an initial "successful bid" submitted by Regeneron that provides for a top-line purchase price of $256 million plus cure amounts (as set forth in the applicable cure schedules).  (*Notice of Successful and Backup Bidders with Respect to the Auction of the Debtors' Assets* [Dkt. No. 420]).  A bid submitted by Ms. Wojcicki's TTAM Research Institute that provides for the payment of $146 million plus cure amounts (as set forth in the applicable cure schedules) and assumption of certain liabilities was designated as the "back-up bid."  *Id*.

41.    However, bidding continued (and continues) post-auction.  Ms. Wojcicki and back-up bidder TTAM have submitted multiple increased bids for the Debtors' assets, including a May 21 proposal that appears to meaningfully exceed Regeneron's $256 million (plus cure amounts) bid.  (*See TTAM Parties' Preliminary Objection to the Sale Motion* [Dkt. No. 573], ¶ 4).  Although shareholders and the public are in the dark as to the precise economic terms of this proposal, it was reportedly accompanied by proof of financial wherewithal to close.

42.    The TTAM topping bid has compelled the Debtors to seek approval of a supplemental "best and final" auction process.  (*Debtors' Motion for Entry of an Order (I) Establishing Procedures for the Submission of Final Proposals from the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [Dkt. No. 574]).

43.    Pursuant to this unconventional process, TTAM must submit a "best and final" bid on June 11, 2025, and Regeneron must submit a "best and final" bid by June 12, 2025.  Notably, the Debtors state that Regeneron's "best and final" bid must be at least $5 million higher than TTAM's best and final proposal (which could be TTAM's May 21 proposal), implying that Regeneron's $256 million (plus cure amounts) is no longer the "highest and best" bid for the assets.

E.    **The Market's Response To The Auction**.

44.    Post-auction, the market has recognized the significant equity value in 23andMe. The current market capitalization of 23andMe's stock is over **$100 million**.    Since the announcement of Regeneron's bid, 23andMe's share price has more than quadrupled, closing at $3.76 per share on June 2nd (from $0.90 per share before the auction results were announced).    A few days after the bankruptcy filing (March 26th), 23andMe's share price fell to a closing low of $0.53 per share.    Since then, the value of 23andMe's stock has increased over 7x.

45.    The company's stock market capitalization is substantially in excess of so-called "option value," *i.e.*, where the stock of most Chapter 11 debtors typically trade.    *See* Gregory A. Horowitz, "Market Pricing in Solvency Valuation and Testing," in *Contested Valuation in Corporate Bankruptcy*, at ¶ 4.4.03[3] (Lexis/Nexis 2011).    Option value is **pennies** per share. 23andMe's stock, in juxtaposition, is trading at **dollars** per share.



46.     This market data is based on robust trading activity.  It is not propped up by isolated, outlier trades.   Trading volume since the announcement of the Regeneron bid (May 19th) has averaged over 980,000 shares per day.  Removing trading data for May 19th and May 20th (which saw increased trading activity of 3.94 million and 1.78 million shares, respectively), recent trading volume has still averaged close to 500,000 shares per day.



## F.    <u>Moving Shareholders' Prompt Requests to Appoint an Official Equity Committee</u>.

47.     Given the abundant (and now confirmed) evidence of equity value in these cases, the Moving Shareholders quickly organized and, on March 31, 2025, submitted a request to the Office of the United States Trustee to appoint an Official Equity Committee.  (*See* Letter from Robert J. Stark, dated March 31, 2025, attached hereto as **<u>Exhibit D</u>**).  The Debtors opposed this request, in large measure because, according to the Debtors, the Moving Shareholders could "not demonstrate a substantial likelihood of meaningful distributions to equity holders at [that] stage of the cases" (i.e., before the auction process revealed the Debtors' value).  (*See* Debtor April 3

Letter).  In a subsequent correspondence, the Moving Shareholders explained how the Debtors were misconstruing the applicable legal standard and why the factors applicable to the appointment of an Official Equity Committee weighed in favor of such appointment.  (*See* Letter from Robert J. Stark, dated April 9, 2025, attached hereto as **Exhibit E**).  However, the United States Trustee declined the Moving Shareholders' request.

48.     On May 16, 2025, the Moving Shareholders renewed their request based on recent statements from the Debtors about the status of bids received and the expectation of a robust auction.  (*See* Letter from Robert J. Stark, dated May 16, 2025, attached hereto as **Exhibit F**).  The Moving Shareholders supplemented this correspondence on May 19, 2025, after the initial auction results were announced.  (*See* Letter from Robert J. Stark, dated May 19, 2025, attached hereto as **Exhibit G**).  The Debtors and Creditors Committee opposed the renewed request, contending that shareholder recoveries were still unknown because the sale had not yet closed, and the claims pool was not yet fixed.  The parties also argued that shareholders were already adequately represented in the case.  (*See* Letter from Christopher J. Hopkins, dated May 23, 2025, attached hereto as **Exhibit H**; Letter from Eric R. Wilson, dated May 23, 2025, attached hereto as **Exhibit I**).  The United States Trustee ultimately denied the Moving Shareholders' renewed request.  (*See* Letter from Paul A. Randolph, dated May 30, 2025, attached hereto as **Exhibit J**).

## LEGAL ARGUMENT

49.     Bankruptcy Code Section 1102(a)(2) provides that, on request of a party in interest, the Court may direct the appointment of an Official Equity Committee.  11 U.S.C. § 1102(a)(2).  When determining whether to direct such appointment, Courts consider the following factors:

> (i)     whether the debtors are likely to prove solvent;
>
> (ii)    whether equity is adequately represented by the stakeholders already at the table;

(iii)    the complexity of the debtor's case; and

(iv)    the likely cost to the debtor's estates of an equity committee.

*See In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (citing *In re Williams Commc'ns Grp., Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002)); *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 68 B.R. 155 (S.D.N.Y. 1986), *appeal dismissed*, 824 F.2d 176 (2d Cir. 1987); *In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Wang Laboratories, Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992); *In re Oneida Ltd.*, Case No. 06–10489, 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006).

50.    These factors, individually and collectively, weigh heavily in favor of appointment of an Official Equity Committee in these Chapter 11 Cases.

## A.    <u>The Debtors Are Likely Massively Solvent.</u>

51.    The debtor's potential solvency is often the most important factor in determining whether to appoint an official equity committee.  *See, e.g., National R.V. Holdings*, 390 B.R. 690, 696 (Bankr. C.D. Cal. 2008); *In re Ampex Corp.*, No. 08-11094, 2008 WL2051128, at *1, (Bankr. S.D.N.Y. 2008).

52.    This standard asks "whether Debtors are likely to prove insolvent."  *Pilgrim's Pride*, 407 B.R. at 216.  Variations in the jurisprudence ask whether the debtors "appear to be hopelessly insolvent," *Williams Commc'ns*, 281 B.R. at 220-21, or whether "there is a substantial likelihood that [shareholders] will receive a meaningful distribution in the case," *In re Spansion, Inc.*, 421 B.R. 151, 156 (Bankr. D. Del. 2009); *see also Wang Labs*, 149 B.R. at 3 (bankruptcy court appointed committee even though debtor was operating "at a loss" because debtor was not "hopelessly" insolvent).

53.    In other words, the standard is **not** whether the Debtor **is** adjudicated to be solvent at the time of the request.  Rather, the inquiry is forward-looking, focusing on what seems "likely" based on the available data.

54.    The standard is not a rigid formulation.  The Court, instead, is tasked with making a "practical conclusion, based upon a confluence of factors."  *Williams Commc'ns*, 281 B.R. at 221; *Wang Labs*, 149 B.R. at 3 ("[Insolvency] is not a simple matter of statutory construction where the Court can rest with citation to the balance sheet test of 11 U.S.C. § 101(32).").  Analyzing the "confluence of factors," this prong overwhelmingly favors appointment of an Official Equity Committee.

### i.    The Debtors' Substantial Asset Value.

55.    First (and foremost), the auction process has already yielded a binding bid from Regeneron (a Fortune 500 company) for a $256 million purchase price (plus cure costs), easily clearing the Debtors' claims pool and extending well into equity.  And, the final sale price is likely to increase.  TTAM appears to have already topped Regeneron's bid, and the Debtors are presently seeking approval of a process to solicit additional bids.

56.    Second, available market data confirms that equity is well in the money.  The current market capitalization of 23andMe's stock is over $100 million.  Since the announcement of Regeneron's bid, 23andMe's share price has more than quadrupled, closing at $3.76 per share on June 2nd (from $0.90 per share before the auction results were announced).  *In re Iridium Operating LLC*, 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("[T]he public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed … from an advocate's point of view.").  Indeed, 23andMe's share price has increased nearly 7x since the early days of the bankruptcy case.

57. Third, this market data is based on robust trading activity (despite the stock trading OTC). It is not propped up by isolated, outlier trades.

58. Fourth, the successful auction outcome is not at all surprising. As the Shareholders explained in their prior Letters advocating for an Official Equity Committee, the Debtors have numerous (clearly) valuable assets, and multiple prepetition proposals for the company provided for a recovery to equity holders.

### ii. **The Debtors' Relatively Modest Liabilities.**

59. Contrasted against the Debtors' abundant equity value is their conspicuously limited claims pool. As noted, the Debtors entered bankruptcy without any prepetition funded debt. (Kvarda Decl. ¶ 58). The "substantial portion" of their claims pool is comprised of claims arising from the "Cyber Security Incident." Claims in the MDL Action, State Court Actions, and Arbitration Actions were settled prepetition for $37.5 million total, with insurance likely to cover a significant portion of this amount. The prepetition trade claims pool is limited, and post-petition "critical" vendor payments will likely satisfy a large portion of these claims. Under the Final DIP Order, post-petition financing will not exceed $35 million, and the Debtors' actual borrowing need appears to be significantly below that. The grab bag of other theoretical, potential claims described above appears highly unlikely to surpass the value to be realized through the auction process.

### B. **Equity Is Not Adequately Represented By Stakeholders Already At The Table.**

60. The bankruptcy process functions properly when the parties with an economic interest in the Debtors' affairs have an officially-mandated, fiduciary seat at the table when issues critical to those interests are being negotiated. Here, the overwhelming weight of evidence indicates that the "fulcrum" economic interest is equity. An Official Equity Committee should be appointed to enable shareholders to participate fully and actively in the completion of the sale

process, negotiation of a Chapter 11 plan, and other matters bearing on the interests of shareholders.

61.     The Special Committee cannot serve this function. 23andMe's shareholders have never had their say in the appointment of the Special Committee.  Rather, the current iteration of the Special Committee was appointed without any shareholder input.  And, the lack of shareholder input continues.  Despite the Moving Shareholders organizing and submitting their initial letter in late March 2025, in the over two months since then, not a single representative of the Special Committee, their advisors, the Debtors, or their advisors have solicited any input from the Moving Shareholders.  Had they done so, perhaps the Moving Shareholders could have dissuaded the Debtors and Special Committee from taking certain actions that are value-deteriorative to 23andMe's shareholders, including the announced decision to voluntarily deregister with the SEC (i.e., "go dark" with no further public reporting), which will adversely impact shareholder liquidity.

62.     Moreover, the jurisprudence recognizes that management has conflicting/multifaceted responsibilities and pressures that, despite best intentions, may prompt it to make strategic case decisions that do not further equity's interests.  As explained by Judge Lynn in *Pilgrim's Pride*: "[T]he reorganization process is not so simple that it ensures shareholders are adequately represented by even equity-owning management.  The principal concern of Debtors and their managers … must be preservation of the Debtors' going concern value and their successful emergence from chapter 11.  That will occur through confirmation of a plan of reorganization.  Confirmation of a plan, in turn, is heavily dependent upon Debtors reaching an accord with the [Official Creditors Committee] and the Banks." 407 B.R. at 218 (citations omitted).  Here, issues potentially impacting equity recoveries (e.g., the filing of a class proof of

claim, alleged rejection damages claims) should be informed by the views of an Official Equity Committee.

63.     The Creditors Committee is no solution, either.  The law recognizes that creditor fiduciaries are not equity fiduciaries.  The Creditors Committee has a fiduciary duty to maximize returns for unsecured creditors.   But, once solvency is shown, the Creditors Committee's incentives are no longer focused on maximizing the value of the estate.  *See, e.g., Pilgrim's Pride*, 407 B.R. at 218 ("[I]t is hardly likely that the UCC or the Banks will be disposed to value Debtors so liberally that equity may be sure to receive its due.").

64.     In such circumstances (as is the case here), an Official Equity Committee is particularly necessary to ensure that Chapter 11's adversary process functions properly.  That process depends on a zealous official committee to serve as a robust counterbalance to the debtors. If there is reason to suspect that the Creditors Committee cannot provide "the usual checks and balances" in the Chapter 11 case (because, e.g., there is very little unsecured debt in the case), the appointment of an Official Equity Committee becomes even more of an imperative.  *See In re Oneida Ltd.*, 2006 WL 1288576, at *3 (Bankr. S.D.N.Y. Mary 4, 2006) (Official Equity Committee warranted because, among other things, "all general unsecured claims (if any) will be paid in full under the Debtors' plan, making the [Official Creditors] Committee the least likely party in interest to challenge the status quo. The Court finds no indication that the creditors committee or its counsel are failing to act properly under the circumstances, but the usual checks and balances are not present.").

65.     Given the Debtors' solvency, the Creditors Committee is essentially a competing stakeholder representative to equity.  Shareholders cannot rely on the committee to protect their

interests.  Without official representation, the ability of equity holders to effectively participate in these Chapter 11 Cases and the plan process will be severely hampered.

## C.   **These Chapter 11 Cases Are Sufficiently Complex.**

66.    The case law recognizes that appointment of an Official Equity Committee "is more appropriate where the complexities of the case make it more difficult for another—[e.g.,] management—to protect equity interests as well as those of creditors." *Pilgrim's Pride*, 407 B.R. at 220.  This factor weighs in favor of an Official Equity Committee.  First, resolution of the sale process and the Debtors' proposed "pivot" to an atypical "best and final" procedure presents complexities favoring appointment of an Official Equity Committee.  Second, although the Debtors do not have a complicated capital structure, they do have a complex corporate structure, consisting of twelve individual Debtors operating a variety of unconnected businesses, some of which operate internationally, and each involving various types of regulatory oversight.  Third, the Debtors' substantial tax attributes—including $1.1 billion in federal NOL carryovers and a federal tax asset basis (other than cash) of approximately $74 million—and potential restructuring options around such valuable assets present a further complexity that could materially impact equity recoveries. (*Debtors Motion for Entry of Interim and Final Orders (I) Establishing Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness with Respect to Common Stock of 23andMe Holding Co. against Debtors and (II) Granting Related Relief* [Dkt. No. 6], ¶ 10).

## D.   **The Cost Of An Equity Committee Is Justified And Subject To Controls To Prevent Inefficiency.**

67.    Courts have made it clear that the administrative costs of a statutory equity committee alone must not bar its appointment.  *See, e.g., In re Enron Corp.*, 279 B.R. 671, 694 (Bankr. S.D.N.Y. 2002) ("Added cost alone does not justify the denial of appointment of an

additional committee where it is warranted" (citing *In re Hills Stores*, 137 B.R. 4, 8 (Bankr. S.D.N.Y. 1992)); *In re McLean Indus.*, 70 B.R. 852, 860 (Bankr. S.D.N.Y. 1987) ("Cost alone cannot, and should not, deprive public debt and security holders of representation." (citing *In re Beker Indus. Corp.*, 55 B.R. 945, 951 (Bankr. S.D.N.Y. 1985)))).

68.     Courts "employ a balancing test to weigh the cost of any equity committee" against the need for "adequate representation." *Williams Commc'ns*, 281 B.R. at 220 (citing *Wang*, 149 B.R. at 3).  In a case where creditors expect to be repaid in full, equity holders have arguably the strongest incentive to keep costs low so as not to diminish their recoveries.  An Official Equity Committee will ensure that the scope of the engagement will be tailored to the circumstances and that any fees will be necessary and based on the prevailing market for such services.  Moreover, given that incentive, establishing an Official Equity Committee at this critical juncture will provide additional oversight of other parties' costs to ensure the efficiency of the proceedings.  The anticipated cost of the professionals is small when compared to the value of the equity to be preserved for shareholders.  The Bankruptcy Code also contains adequate means for controlling costs.  Fees and expenses of the Official Equity Committee will be subject to review and, if appropriate, objection by other parties in interest.  The Court will also have the final say over the Official Equity Committee's fee requests.

**E.     Given That This Case Is Maturing,
        An Official Equity Committee Should Be Appointed Now.**

69.     These Chapter 11 Cases commenced on March 23, 2025.  We are almost 2 ½ months in.  Since its filing, these cases have progressed significantly.  The auction process has matured and should reach its conclusion soon.  Chapter 11 plan negotiations should commence in earnest shortly.  Given these circumstances, in order for equity to be adequately represented, an Official Equity Committee must be appointed as soon as possible.

70.     The jurisprudence does not require waiting for the case to essentially end before deciding whether to allow equity to have a voice in the Chapter 11 process.  Official Equity Committees are routinely appointed in bankruptcy cases where, as here, circumstances warrant, and they can provide significant input in the case's ultimate outcome.  *See, e.g., In re Lordstown Motors Corp.*, No. 23-10831 (Bankr. D. Del.); *In re Washington Prime Grp.*, 21-31948 (Bankr. S.D. Tex.);*In re ADPT DFW Holdings LLC* (a/k/a Adeptus Health), No. 17-31432 (Bankr. N.D. Tex.); *In re Azure Midstream Partners, LP*, No. 17-30461 (Bankr. S.D. Tex.); *In re Tidewater Inc.*, No. 17-11132 (Bankr. D. Del.); *In re BPS US Holdings Inc*. (a/k/a Performance Sports Group), No. 16-12373 (Bankr. D. Del.); *In re IMX Acquisition Corp.*, No. 16-12238 (Bankr. D. Del.); *In re The Dolan Company*, No. 14-10614 (Bankr. D. Del.); *In re KIT Digital, Inc.*, No. 13-11298 (Bankr. S.D.N.Y.); *In re Overseas Shipholding Grp.*, No. 12-20000 (Bankr. D. Del.); *In re Pilgrims' Pride Corp.*, No. 08-45664 (Bankr. N.D. Tex.); *In re Oneida Ltd.*, No. 06-10489 (Bankr. S.D.N.Y.); *In re Riverstone Networks, Inc.*, No. 06-10110 (Bankr. D. Del.); *In re Global Power Equipment Grp.*, No. 06-11045 (Bankr. D. Del.); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex.); *In re Comdisco Ventures, Inc.*, No. 01-24795 (Bankr. N.D. Ill.); *In re Mercury Finance Co.*, 98-20763 (Bankr. N.D. Ill.); *In re A.H. Robins Co.*, No. 85-2183 (Bankr. E.D. Va.).

*[Remainder of page intentionally left blank.]*

**WHEREFORE**, based on the foregoing, the Moving Shareholders request that the

Court order the appointment of an Official Equity Committee to assure adequate representation of

23andMe's equity holders, and that the Moving Shareholders have such other and further relief to

which they may justly be entitled.

Dated: June 3, 2025
      St. Louis, MO                          Respectfully submitted,

                                        **DESAI LAW FIRM LLC**

                                        By: */s/ Spencer P. Desai*

                                        Spencer P. Desai #39877
                                        13321 North Outer Forty Rd., Suite 300
                                        St. Louis, MO 63017
                                        Telephone: (314) 666-9781
                                        Email: spd@desailawfirmllc.com

                                        -and-

                                        **BROWN RUDNICK LLP**
                                        Robert J. Stark (*pro hac vice* forthcoming)
                                        Bennett S. Silverberg (*pro hac vice* forthcoming)
                                        Andrew M. Carty (*pro hac vice* forthcoming)
                                        Alexander F. Kasnetz (*pro hac vice* forthcoming)
                                        Seven Times Square
                                        New York, NY 10036
                                        Telephone: (212) 209-4800
                                        Email: rstark@brownrudnick.com
                                             bsilverberg@brownrudnick.com
                                           acarty@brownrudnick.com
                                           akasnetz@brownrudnick.com

                                        Shari I. Dwoskin (*pro hac vice* forthcoming)
                                        One Financial Center
                                        Boston, MA 02111
                                        Telephone: (617) 856-8200
                                        Email: sdwoskin@brownrudnick.com

                                        *Counsel to the Moving Shareholders*

**SCHEDULE 1**

| Name | Address | Common Equity (in shares) | Other Disclosable Economic Interests |
|---|---|---:|---|
| Kevin Barnes | 4030 S. Whitehorse Rd, #408 Malvern, PA 19432 | 50,000 | N/A |
| Camac Fund, LP | 317 West Avenue, #113197, SMB# 35983 Stamford, CT 06911 | 857,360 | N/A |
| Group Hearn, LLC | 555 S Ocean Blvd, Apt 5 Boca Raton FL 33432 | 406,925 | N/A |
| Justin Hilgart | RR3 box 3818 San Juan, PR 00926 | 50,000 | N/A |
| Victor Mankovsky | 360 Estate Point Road Toms River, NJ 08753 | 5,000 | N/A |
| Shay Capital LLC | 280 Park Avenue 5th Floor New York, NY 10017 | 620,090 | N/A |
| Ray of Hope Development LLC | 360 Estate Point Road Toms River, NJ 08753 | 5,500 | N/A |
| Ray of Hope Development LLC 2 | 360 Estate Point Road Toms River, NJ 08753 | 232,147 | N/A |
| Charles Viscito | 5702 NW 48th CT Coral Springs, FL 33067 | 38,309 | N/A |
| Patrick Conlin | 3131 Campus Drive Suite 100 Plymouth, MN 55441 | 30,600 | N/A |
| Milestone Vimba Fund L.P. | 3131 Campus Drive Suite 100 Plymouth, MN 55441 | 725,000 | N/A |
| Alexander Keoleian | 6901 Stoneridge Drive North Richland Hills, TX 76182 | 79,000 | N/A |
| Richard A. Magides | 03/12 Leedon Residences 10 Leedon Heights Singapore 266217 | 3,132,593 | N/A |
| Zentree Investments Pte Ltd | 15-01. 18 Robinson 18 Robinson road Singapore 048547 | 566,643 | N/A |
| Austin Viny | 392 Lorimer Street, Apt 1 Brooklyn, NY 11206 | 6,599 | N/A |
| **Total:** | | **6,805,766** | |