**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Case No. 25-40976 |
| | ) | |
| 23andMe Holding Co., *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**STATEMENT OF REGENERON WITH RESPECT TO THE DEBTORS' MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR THE SUBMISSION OF FINAL PROPOSALS FROM THE BACKUP BIDDER AND SUCCESSFUL BIDDER**

Regeneron Pharmaceuticals, Inc. ("Regeneron"), the Successful Bidder under this Court's Bidding Procedures, respectfully submits the following statement in response to the *Debtors' Motion for Entry of an Order (A) Scheduling an Expedited Hearing on the Debtors' Motion for Entry of an Order (I) Establishing Procedures for the Submission of Final Proposals from the Backup Bidder and Successful Bidder and (II) Granting Related Relief and (B) Granting Related Relief* [Dkt. 575] (the "Final Proposals Motion").[2]

---

[1] The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are: 23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595). The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2] To the extent possible in the limited time available, this statement also addresses certain points in the *Objection of TTAM Parties to Debtors' Motion for Entry of an Order (A) Scheduling an Expedited Hearing on the Debtors' Motion for Entry of an Order (I) Establishing Procedures for the Submission of Final Proposals from the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [Dkt. 601] (the "Wojcicki Parties Objection" or "Objection").

## INTRODUCTION

1.	Regeneron is a leading American biotechnology company, founded by a team of renowned physician-scientists, that has for nearly 40 years had the mission of developing and producing therapeutics that treat numerous serious ailments.

2.	Regeneron participated in good faith in the auction for the Debtors' assets. It followed all the rules. And it won the auction fair and square.

3.	Since the auction ended, Regeneron has been subject to remarkably unfair treatment. Despite auction rules that unambiguously prohibit bids after the auction, and that likewise prohibit bidders from seeking to reopen the auction, TTAM—a vehicle controlled by the Debtors' former CEO, which participated at every stage of the auction—has submitted a flurry of new bids and has pressed non-stop to reopen the auction. Although TTAM argues that the Debtors made poor decisions at the auction, instead of seeking judicial relief, TTAM has apparently concluded that "it's better to ask for forgiveness than for permission." Every day since the auction, TTAM has violated the Court-approved bidding procedures and, as a result, this Court's order mandating compliance with those procedures.

4.	The Debtors, for their part, have also violated the Bidding Procedures, including the requirement that they "shall not consider any Bids or Overbids submitted after the conclusion of the Auction." It is no answer to say that the APA has a "fiduciary out." If the Debtors wanted to exercise their "fiduciary out," they could have informed the Court of their intent to do so and sought appropriate relief. Instead, the Debtors have allowed their former CEO to bid after the auction, in violation of the rules, while at the same time *not* exercising their "fiduciary out" vis-à-vis Regeneron, such that (according to the Debtors) Regeneron is still bound to its APA.

5.	The Eighth Circuit has recognized that "[f]inality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, for devotion to

- 2 -

those principles encourages fervent bidding and ensures that interested parties will sincerely extend their best and highest offers at the auction itself." *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564 (8th Cir. 1997) (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir. 1983)). Here, the Debtors offered finality to Regeneron to induce Regeneron to bid for the Debtors' assets. But instead of respecting the rules that induced "fervent bidding" at the auction, the Debtors have allowed their former CEO to disrupt the process that all bidders agreed to respect.

6. Regeneron's goal is to complete the purchase of the Debtors' assets without further acrimony or litigation. Although Regeneron believes that it would be entitled to terminate its APA if it wished to do so, and that there would be clear grounds to require TTAM to comply with the bid procedures and have any of its post-auction proposals disregarded, rather than litigating those issues, Regeneron has agreed to move forward on the specific terms set forth in the Final Proposals Motion. As discussed below and in the Final Proposals Motion, the limited protections being provided to Regeneron are well-justified and within the Debtors' business judgment to provide. Regeneron, accordingly, supports the compromise set forth in the Final Proposals Motion. In the event that the Court does not approve the motion, Regeneron submits that the only appropriate alternative is to enforce the Bidding Procedures Order, prevent TTAM from continuing to violate the Court's directives, and declare the result of the Auction final.

**STATEMENT AND RESPONSE**

7. Prior to 23andMe's bankruptcy, Regeneron had no business relationship with the Debtors. When the Debtors initiated a process to sell their assets pursuant to the Bidding Procedures and Bidding Procedures Order,[3] Regeneron expressed its interest in participating.

---

[3] *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the*

Regeneron believed that, with its resources and expertise, the 23andMe sale presented an opportunity to build upon 23andMe's existing customer genetic business and to facilitate Regeneron's own leading scientific research and drug development efforts.

8. In assessing whether 23andMe presented an attractive acquisition, Regeneron reviewed and relied on the procedures governing 23andMe's sale. Clear rules regarding the potential sale—including in particular meaningful guarantees of finality—are crucial for any bidder in deciding whether to invest substantial time and resources into pursuing an acquisition. In this case, those concerns were addressed through the Bidding Procedures and the Bidding Procedures Order.

9. The Bidding Procedures provided for the finality that Regeneron needed. Under those procedures, every participating bidder had to agree, "*after the conclusion of any Auction, not to submit a Bid or seek to reopen the Auction.*" Bidding Procedures at IV.G.15. The Bidding Procedures state as well that "[t]he Debtors *shall not consider any Bids or Overbids submitted after the conclusion of the Auction*, if any, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid." Bidding Procedures ¶ IV.K.4. And the Bidding Procedures' "Fiduciary Out" provision specifically provides that the Debtors' have the ability to consider "Alternate Proposals," but *only* "through the date of the Auction." Bidding Procedures ¶ IV.P. Finally, the Bidding Procedures Order *mandated* compliance with the Bidding Procedures: "Any party desiring to bid for all, substantially all, or a portion of the Company Assets *shall comply* with the Bidding Procedures and this Order."

---

*Notice Thereof, (IV) Approving Procedures Regarding Entry Into Stalking Horse Agreement(s), if Any (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VII) Granting Related Relief* [Dkt. No. 125] (the "<u>Bidding Procedures Order</u>").

- 4 -

Bidding Procedures Order ¶ 4.

10. These assurances of finality were especially important in the circumstances presented, where Regeneron expected that it would be bidding against an entity controlled by 23andMe's controlling stockholder and former CEO—who, on no fewer than four occasions before the petition date, attempted to buy 23andMe. In that context, Ms. Wojcicki had stated publicly that she would not support proposals that would require her to forfeit control (and thus refused to entertain outside bids), while simultaneously making offers to other shareholders that were at or below the existing stock price. *See* Kvarda Decl. [Dkt. 32] ¶¶ 82, 84, 88. In September 2024, *every independent director* of 23andMe resigned, explaining to Ms. Wojcicki that "[a]fter months of work, we have yet to receive from you a fully financed, fully diligenced, actionable proposal that is in the best interests of the non-affiliated shareholders .... That we have not seen any notable progress over the last 5 months leads us to believe no such proposal is forthcoming …. it is also clear that we differ on the strategic direction for the Company going forward. Because of that difference and because of your concentrated voting power, we believe that it is in the best interests of the Company's shareholders that we resign from the Board rather than have a protracted and distracting difference of view with you as to the direction of the Company."[4] In February-March 2025, after first partnering with New Mountain Capital L.L.C. before that arrangement fell through, Ms. Wojcicki made various offers to take the company private, decreasing in value from $2.53/share to $0.41/share plus contingent consideration, all of which the Special Committee determined to be "either (a) preliminary in nature and not currently actionable, (b) not actionable on an out-of-court basis or (c) otherwise not in the best interest of the Company and its stakeholders." Kvarda Decl. ¶ 99.

---

[4] 23andMe Holding Co., Form 8-K, at 4 (Sept. 18, 2024) (SEC) (cited in Kvarda Decl. ¶ 87).

11. In short, and given that history, no bidder would ever voluntarily participate in an auction in which the Wojcicki Parties, who led the company into this proceeding, could use the auction process as a vehicle for price discovery, with a one-way option to reopen the process—and to bid again—after the auction concludes.

12. Regeneron participated in the Auction in good faith and in compliance with the Bidding Procedures. No one has alleged otherwise. It prevailed at the Auction, outbidding the Wojcicki Parties, and the Auction ended. Under the crystal clear rules of the Auction, the Wojcicki Parties were required to stop bidding and not to seek to reopen the Auction, and the Debtors were not permitted to consider post-Auction bids.

13. After Regeneron was declared the Successful Bidder, Regeneron set out to prepare to close the acquisition. A nearly 60-person team has been working, at Regeneron's substantial expense, to be ready to close upon entry of the Sale Order. On the understanding that *the Auction is over*, Regeneron has worked intensely with the Debtors and their business team on a complex integration process. Regeneron has also worked with the Consumer Privacy Ombudsman and is preparing to work with regulators, among others, to assure all interested stakeholders that 23andMe will be in safe hands and will not face the data breach issues that plagued it in the past.

14. Nonetheless, starting the day the Auction closed, the Wojcicki Parties have repeatedly violated both the Bidding Procedures and the Bidding Procedures Order. The day after the Auction, the Wojcicki Parties submitted a revised proposal, in direct violation of the rules. Final Procedures Motion ¶ 14. On May 21, the Wojcicki Parties submitted another revised proposal, including new financial resources. *Id.* ¶ 15. The Wojcicki Parties have not only raised their bid—they also appear, post-auction, to have sought to generate interest from

- 6 -

third parties and open the process further still. *TTAM Parties' Preliminary Objection to the Sale Motion* [Dkt. No. 573] at 5-6. The Wojcicki Parties could have attempted to obtain those financial commitments or engaged with this unidentified third party prior to the Auction; instead they have apparently waited until *after* the Auction was closed and they lost.

15. In their 26-page Objection, the Wojcicki Parties make no serious effort to dispute that they have repeatedly violated the Bidding Procedures, and thus have repeatedly violated a Court order. They argue that the bid procedures could potentially be amended, and that the Debtors made improper decisions at the auction, but those are close to *non sequiturs*. The simple fact is that the Wojcicki Parties' post-Auction bids, and their efforts to reopen the Auction, violate the Bidding Procedures and the Bidding Procedures Order. Complaints about the auction, or a desire to amend the procedures, do not justify violations of the existing procedures and the Court's order.

16. The Eighth Circuit has made clear that, in the context of a bankruptcy auction, "important notions of finality and regularity in judicial auctions are appeased if the court acts consistently with the rules by which the particular sale is conducted and in compliance with the bidders' reasonable expectations. *In re Food Barn Stores, Inc.*, 107 F.3d 558, 565 (8th Cir. 1997); *see also In re Farmland Indus., Inc.*, 289 B.R. 122, 126 (8th Cir. B.A.P. 2003) ("Finality and regularity are important because they encourage interested parties to sincerely extend their best and highest offers."). Consistent with that principle, the Eighth Circuit has warned against allowing a buyer to "bide[] its time during the auction, taking an opportunity to survey the landscape of the sale, only later to submit an upset bid at the lowest possible price." *Food Barn Stores, Inc.*, 107 F.3d at 566.[5] The *Food Barn* court approved a late-submitted bid where, unlike

---

[5] *See also In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 629 (1st Cir. 1975) ("It might not only be

- 7 -

here, the auction was "marked by a lack of applicable rules and guidelines" and the late bidder "obeyed what it perceived to be the rules of the sale." *Id.* at 566. Here, the rules of the auction were clear and formal, the Debtors exercised their business judgment to declare the winner at the end of that formal process, and now the Wojcicki Parties are doing exactly what they agreed not to do before entering the Auction.[6]

17. The Wojcicki Parties should not be permitted to leverage their disregard of the Bidding Procedures and Bidding Procedures Order to their advantage. Instead, Regeneron believes the right result would be for the Court enforce the Bidding Procedures Order and bar the Wojcicki Parties' late bids and attempts to reopen the auction. At the same time, recognizing the difficult position in which the Wojcicki Parties have sought to place the Debtors' Special Committee, Regeneron has engaged with the Special Committee and sought to find a compromise that would avoid litigation and keep the process on track for a near-term closing – even though this may mean that there may be additional bidding for the Debtors' assets.

18. The result of that engagement is the Final Procedures Motion. Under the process set forth in this motion, Regeneron will not at this time terminate its APA or otherwise object to submission of a best and final bid by the Wojcicki Parties. Regeneron has also agreed to provide a backup bid if the Wojcicki Parties prevail in this second auction and then fail to consummate a transaction. The Debtors in turn have agreed to provide Regeneron with a $10 million break-up

---

thought improper for a bankruptcy court to proceed in an irregular fashion merely to gain a few extra dollars in one case, but in the long run such a practice would be penny wise and pound foolish. Creditors in general would suffer if unpredictability discouraged bidders altogether.").

[6] *See also* Emergency Status Conference Tr., *In re Instant Brand Acquisitions Holding Inc.*, Case No. 23-bk-90716 [ECF No. 596] (Bankr. S.D. Tex. Sep. 26, 2023) at 38-41 (refusing to entertain late topping bid once auction was closed, as it didn't matter "what the price increase [wa]s" relative to the importance of "protecting the integrity of [the] process").

fee, on account of its role as an effective stalking horse, and have also agreed to a "last look," which accounts for the fact that the Debtors are permitting an additional bid from TTAM after the auction closed. This compromise is in substance a settlement under Federal Rule of Bankruptcy Procedure 9019(a).

19. The Wojcicki Parties put forward various objections to the proposed compromise. Although Regeneron will defer to the Debtors to explain why they believe the final procedures maximize value, and why they have exercised their business judgment to propose those procedures, Regeneron responds briefly below to certain objections.

### A.  The bid protections are reasonable.

20. The Debtors and Regeneron have agreed that Regeneron is entitled to a $10 million break-up fee should the Debtors not select Regeneron as the winning bidder. The Debtors have presented evidence that the break-up fee is within a customary and reasonable range. Swift Decl. [Dkt. 592] at ¶ 9. The $10 million break-up fee is especially justified in this unusual context, where Regeneron's $256 million bid is not only effectively a stalking-horse bid—now that TTAM would be permitted to submit an additional bid, while Regeneron remains committed—but where the bid has been converted into a stalking-horse bid only *after* Regeneron prevailed in the Auction, such that Regeneron's *final*, *winning* bid is now being used to try to generate a higher bid. Moreover, the $10 million break-up fee is inclusive of Regeneron's expenses incurred in reliance on having been designated the Successful Bidder. *Id.*

21. The Debtors and Regeneron have agreed that, after a best and final offer is received from the Wojcicki Parties, Regeneron will be entitled to top that offer, and that whichever final bid is superior at that point shall be the winning bid. This, too, is a well-accepted protection for buyers in merger transactions. Indeed, the Eighth Circuit has approved

inclusion of a "last look" provision in bidding procedures as a protection that an initial winning bidder could use if an objector sought to submit a topping bid at the end of the auction. *In re Wintz Cos.*, 219 F.3d 807, 812-13 (8th Cir. 2000).

22. But the Court need not take Regeneron's word for it. The Wojcicki Parties' *own APA* provided for similar protections, including both a break-up fee and a "last look." TTAM APA § 10.2 ("In the event of the termination of this Agreement … Sellers shall, jointly and severally, promptly pay to Purchaser an aggregate amount equal to five million dollars"); *id*. §§ 7.19(b)-(c) ("Sellers must give to Purchaser (i) written notice of such desire to terminate this Agreement and the materially final terms of the proposed Alternative Transaction and (ii) an opportunity either to propose revisions to the terms of this Agreement to match such Alternative Transaction proposal or make another proposal that is higher or otherwise better than such Alternative Transaction"). The Wojcicki Parties cannot be heard to complain that the provisions of the kind they proposed to protect themselves are unfair when granted to a non-insider third party that *already won the Auction* and is now being subjected to an additional round of bidding.

**B.    Regeneron would have strong arguments for termination.**

23. Regeneron signed an Asset Purchase Agreement with the Debtors contemplating that the Debtors would seek to close the transaction on the terms that the parties had negotiated. In furtherance of that objective, Regeneron negotiated for numerous provisions that were meant to ensure that the Debtors would pursue Regeneron's deal, not some other deal—and that if they did pursue some other deal, that Regeneron would not be compelled to keep its offer open.

24. Regeneron's APA contains numerous covenants and provisions that would be breached by the Debtors reopening the bidding process (without Regeneron's consent) after having accepted Regeneron's bid, including Sections 7.2, 10.1(f)(i), 10.1(f)(iv), 11.2(a), and

11.2(d), among others.

25. The Wojcicki Parties' principal request—that the Auction be reopened—would immediately cause a termination event under the Regeneron APA (assuming that reopening the Auction is even possible under the Bidding Procedures). The Regeneron APA provides that if Regeneron "is not the Successful Bidder or Backup Bidder at the Auction," then Regeneron can terminate. § 10.1(f)(i). Upon reopening of the Auction, that is precisely the state Regeneron would find itself in: it would be neither the Successful Bidder or the Backup Bidder, which are designations that can be made only at the *conclusion* of the Auction. Bidding Procedures ¶ IV.L.

26. The Wojcicki Parties also are fundamentally confused about Regeneron's argument under Section 7.2 of the Regeneron APA, a provision that requires the Debtors to use their best efforts to cause the Sale Order approving the sale to Regeneron to be entered. The Wojcicki Parties claim that because the Regeneron APA contains fiduciary reservations—in particular the reservation of the right to modify the Bidding Procedures or exercise their Fiduciary Out—that means that Regeneron can never terminate if the Debtors' avail themselves of those rights. But that argument does not cohere. The Debtors' arguable freedom to take actions under their fiduciary reservations is not freedom from the *consequences* that would result from not complying with Section 7.2. Any action by the Debtors to pursue an alternative transaction in lieu of the Regeneron APA would violate Section 7.2 (and permit Regeneron to terminate its own obligations) even if arguably permissible under the fiduciary out.[7]

---

[7] Similarly, the fact that the Debtors' obligations under the Regeneron APA are not binding on them or the Court because the Court has not approved the Debtors' entry into the Regeneron APA under § 363(b) is totally beside the point. Objection ¶ 43. It is of course an accurate statement of bankruptcy law that a Debtor is not bound to an agreement outside the ordinary course of business absent court approval. But the relevant question here is whether *Regeneron* can be bound to an agreement under circumstances where Regeneron has a valid termination right, not whether the Debtors can be bound and made liable for damages for breaching that

27.     To be sure, Section 7.2 of the Regeneron APA is not the only section that would be violated by the Debtors choosing to reopen the Auction.  The many other provisions that would be implicated include Section 11.2(a), which requires the Debtors to "use Reasonable Efforts to obtain entry by the Bankruptcy Court of the Sale Order" approving the successful Regeneron bid, § 11.2(a), and Section 11.2(d), which requires the Debtors not to seek any relief from the Bankruptcy Court with respect to the sale process that is unacceptable to Regeneron in its discretion, § 11.2(d).  Taking further bids on the condition that those bids were higher and better than the bid reflected in the Regeneron APA would also inevitably cause a termination event under Section 10.1(f)(iv), which requires that the Bankruptcy Court not have entered an order denying approval of the "Sale"—the "Sale" being a defined term referring to the specific transaction contemplated by the Regeneron APA.

28.     In short, even if the Debtors were permitted to reopen the Auction and its result based on their "fiduciary out," there would be no basis to force Regeneron to continue to be bound to its APA while the Debtors take actions directly contrary to that agreement and to Regeneron's prejudice.

**C.      Regeneron could not be compelled to be the backup bidder.**

29.     The Wojcicki Parties' argument that Regeneron can be forced to be the Backup Bidder is totally meritless.  Their position appears to be that, by virtue of having bid in an Auction that it *won*, if the Debtors "reopen" that Auction after it has closed (a procedure which is nowhere contemplated in the Bidding Procedures), and effectively commence a new Auction that Regeneron does not consent to, Regeneron can still be *forced* to be the Backup Bidder by virtue of Bids submitted during the previous Auction.  That is patently absurd.  Among other things,

---

agreement.  *Contra* Obj. ¶ 43.

- 12 -

Regeneron has materially changed its position after the Auction, including incurring substantial expenses in reliance on having been designated the Successful Bidder. Further, there is only one Backup Bid under the Bidding Procedures—namely, the bid announced as such by the Debtors at the conclusion of the Auction. Bidding Procedures § IV.L. That bid belongs to TTAM.

30. In any case, the Regeneron APA contains a merger clause expressly providing that the APA represents the entire agreement between Regeneron and the Debtors and supersedes all prior agreements, § 12.5, and provides that upon termination of the Regeneron APA, that Agreement is void and that neither party shall have any liability to the other, § 10.2. Those provisions further confirm the parties' intent that if Regeneron was no longer the Successful Bidder, it would have no further obligations to the Debtors, including to serve as a Backup Bidder.[8]

* * *

31. While Regeneron appreciates the Special Committee's approach in trying to find a consensual solution in the face of the Wojcicki Parties' non-compliant conduct, the bankruptcy system cannot tolerate insider parties ignoring Court-approved bidding procedures when they are unhappy with the results. Regeneron, a good-faith third-party bidder that followed the auction rules, is exactly the type of bidder that the bankruptcy system should be *encouraging* to

---

[8] The Wojcicki Parties also challenge the Debtors decision to "freeze" the eventual Backup Bid at $151 million. Obj. ¶ 35. This assertion ignores the fact that the Debtors applied this cap, which was an important tool the Debtors utilized to maximize value at the Auction, equally to TTAM and Regeneron. Without that cap, Regeneron would not have bid further in light of its concerns regarding (i) the viability of TTAM's bid structure (specifically, Ms. Wojcicki utilizing a California nonprofit public benefit corporation funded by a nonprofit private foundation as an acquisition vehicle to acquire a for-profit business) and TTAM's affiliation with an insider who could benefit (as a stockholder) from pushing up Regeneron's bid even where TTAM could not close or could ultimately be prevented from closing.

- 13 -

participate in auction processes. Because of Regeneron's participation, the bidding process was supercharged, taking the auction from a $50 million starting bid to over $256 million, an extraordinarily result for the company's stakeholders. Had Regeneron not participated, the Wojcicki Parties presumably would have won the Auction at a *much lower* bid.

33. Future participants reading about this saga will have to think twice. They might ask: Why participate in a bankruptcy auction at all, rather than wait and see what happens at the auction and then perhaps overbid afterwards, like Ms. Wojcicki? Why participate in an auction at all when the Debtors' insiders can ignore the rules and bid whenever they please? Regeneron would never have participated in this Auction had it known that winning the Auction would just result in a further takeover attempt from the Wojcicki Parties, resulting in a further bidding process.

33. For the reasons set forth above, and based on the compromises set forth in the Final Procedures Motion, Regeneron will not object to the requested relief. In the alternative, if the Court does not approve that compromise, Regeneron believes that this Court should bar the Wojcicki Parties from violating the Bidding Procedures and Bidding Procedures Order, declare the Auction final, and set the Regeneron APA for a hearing on June 17. Regeneron otherwise reserves all rights.

| | |
|---|---|
| Dated:  June 4, 2025 | */s/ Emil A. Kleinhaus*<br>Elaine Golin (admitted *pro hac vice*)<br>Emil A. Kleinhaus (admitted *pro hac vice*)<br>Michael S. Benn (admitted *pro hac vice*)<br>Michael H. Cassel (admitted *pro hac vice*)<br>WACHTELL, LIPTON, ROSEN & KATZ<br>51 West 52nd Street<br>New York, New York  10019<br>Telephone:  (212) 403-1000<br>Facsimile:   (212) 403-2000<br>Email:         EPGolin@wlrk.com<br>                    EAKleinhaus@wlrk.com<br>                    MSBenn@wlrk.com<br>                    MHCassel@wlrk.com<br><br>-and-<br><br>Stephen B. Sutton, MO 25109<br>Benjamin C. Struby, MO 56711<br>LATHROP GPM LLP<br>2345 Grand Blvd.<br>Suite 2200<br>Kansas City, MO  64108<br>Telephone:  (816) 292-2000<br>Email:         steve.sutton@lathropgpm.com<br>                    benjamin.struby@lathropgpm.com<br><br>*Counsel for Regeneron Pharmaceuticals, Inc.* |

## CERTIFICATE OF SERVICE

The undersigned certifies that on June 4, 2025, a true and correct copy of the foregoing document was filed with the Clerk of the United States Bankruptcy Court for the Eastern District of Missouri and was served on the parties registered to receive electronic notice via the Court's CM/ECF System.

/s/ Benjamin C. Struby
An Attorney for Regeneron
Pharmaceuticals, Inc.

- 15 -