## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## ST. LOUIS DIVISION

|  |  |
|---|---|
| | § |
| | §  Chapter 11 |
| | §  Case No. 25-40976-357 |
| | § |
| | §  (Jointly Administered) |
| 23ANDME HOLDING CO., *et al.*,[1] | § |
| | § |
| | §  **Response Deadline**: June 17, 2025 |
| | §  **Hearing Date**: June 17, 2025 |
| Debtors. | §  **Hearing Time**: 9:00 AM CT |
| | §  **Hearing Location**: |
| | §  Thomas F. Eagleton U.S. Courthouse |
| | §  111 S. 10th Street |
| | §  Courtroom 5 North |
| | §  St. Louis, MO 63102 |
| | § |
| | §  **Relates to Docket Nos. 30, 125, & 420** |

## THE STATES' OBJECTION TO THE DEBTORS' PROPOSED SALE OF CUSTOMERS' ASSETS
### (*Relates to Docket Nos. 30, 125, & 420*)

COMES NOW, The State of Arizona, *ex rel*. Kristin K. Mayes, the Attorney General;

Office of the Attorney General, State of Connecticut; District of Columbia, Office of the Attorney

General; State of Florida, Office of the Attorney General, Department of Legal Affairs; Office of

the Illinois Attorney General; The State of Kansas, *ex rel*. Kris Kobach; State of Louisiana; State of

Maine; Michigan Attorney General, *ex rel*. the People of the State of Michigan; New Hampshire

Office of the Attorney General, Consumer Protection Division; New Mexico Department of

Justice; New York State Attorney General's Office; State of North Carolina; State of Oklahoma;

The State of South Carolina *ex rel*. Alan Wilson; The Attorney General for the State of South

Dakota; State of Utah, Office of the Utah Attorney General; State of Vermont; Commonwealth of

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is:  870 Market Street, Room 415, San Francisco, CA 94102.

Virginia, *ex rel.* Jason S. Miyares, Attorney General; The State of Washington; Office of the West Virginia Attorney General, and The State of Wisconsin, by and through Abigail R. Ryan, Bankruptcy Counsel, National Association of Attorneys General; by the State of Colorado, by and through Senior Assistant Attorney General, Robert Padjen; by The Commonwealth of Kentucky, ex rel. Russell Coleman, Attorney General, by and through Assistant Attorney General, Christopher D. Hunt; by the State of Minnesota, by its Attorney General, Keith Ellison; by the State of Missouri, Andrew Bailey, Attorney General; by the State of Oregon *ex rel.* Dan Rayfield, Oregon Attorney General, by and through Senior Assistant Attorney General, Justin D. Leonard; and by the Commonwealth of Pennsylvania, Office of the Attorney General, David W. Sunday, Jr., Attorney General and files this *Objection to the Debtors' Proposed Sale of Customers' Assets*,[2] and would respectfully show this Court the following:

## I.       JURISDICTION AND VENUE

1.       The United States Bankruptcy Court for the Eastern District of Missouri[3] has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and the Court has the authority to enter a final order with respect to the States' Motion.

2.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.       PROCEDURAL BACKGROUND

3.       23andMe is a California-based[4] biotechnology company that specializes in the collection and monetization of human genetic data. 23andMe collects this data from consumers through the sale of at-home genetic tests, that can be used to determine ancestry information, lineal

---

[2] Hereinafter, "Objection" or "States' Objection."
[3] Hereinafter, the "Court."
[4] Dkt. No. 1 the Petition for 23andMe Holding Co. at number 4.

descent, and the presence of risk factors for certain diseases.[5] 23andMe also sells the genetic information of consumers to pharmaceutical companies and has used this data for pharmaceutical research and development.[6] 23andMe also has a telehealth arm, Lemonaid, that offers remote healthcare services and prescription drugs through pharmacy subsidiaries.[7]

4.  23andMe collects and maintains a vast amount of sensitive personal information about consumers:

a.  23andMe obtains "**Profile Data**" from consumers, including their name, date of birth, birth sex, current gender, relationship labels (whether they identify themselves as male or female), and contact information.[8]

b.  23andMe also solicits "**Family Tree Data**" by asking users to input information about their relatives, who may or may not be 23andMe users.[9]

c.  23andMe also collects and links additional forms of "**Phenotype Data**" – each individual customer's personal data and health information as collected through initial and supplemental surveys, research participation, and uploaded medical records.[10] Phenotype data represents the observable characteristics of an individual – the physical expression of that individual's genes (aka genotype).

5.  Most significantly, 23andMe collects and analyzes biological samples from consumers in order to sequence their genome for the consumer, creating "**Genotype Data**."[11] This record of a human's raw genetic code is then kept as a .csv file linked to the user's profile.

---

[5] Dkt. No. 32 at paras. 26-32.
[6] Dkt. No. 32 at paras. 38-41.
[7] Dkt. No. 32 at paras. 34-35.
[8] *See* https://customercare.23andme.com/hc/en-us/articles/360004944654-What-s-In-Your-Account-Settings
[9] *See* https://customercare.23andme.com/hc/en-us/articles/360036068393-The-23andMe-Family-Tree-Feature
[10] *See* https://customercare.23andme.com/hc/en-us/articles/212873367-Updating-Your-Personal-Information-with-23andMe-Name-Sex-Date-of-Birth
[11] Dkt. No. 32 at paras. 26-32.

23andMe has collected Genotype Data from more than 15 million people.[12] 23andMe analyzes this raw genetic information to provide insights about an individual's ancestry, including the likely regions of origin of their forebears.[13] 23andMe also analyzes their customers' genomes to determine the presence of genetic risk factors for diseases.

6.      23andMe has biological samples and genetic information for over 15 million consumers.[14] According to the Debtors' APA Section 5.1(v)(iii), as of May 3, 2025, the business held the following Customer Data:

(A) 5,316,155 research-consented and individual data-sharing consented genotyped customers with at least one (1) health survey completed and who have completed 23andMe's main health survey and health profile),

(B) 5,866,360 research-consented and biobank-consented genotyped customers with at least one (1) health survey completed and who have completed 23andMe's main health survey and health profile),

(C) 4,661,755 research-consented, biobank-consented and individual datasharing consented genotyped customers with at least one (1) health survey completed who have completed 23andMe's main health survey and health profile),

(D) 8,860,556 research-consented and biobank-consented genotyped customers; and

(E) 10,397,824 biobank-consented customers.[15]

7.      In 2023, almost 7 million consumers' personally identifiable information was subject to a serious data breach, and the multistate investigation into that breach has not been resolved.

---

[12] Dkt. No. 32 at paras. 2-3, 19.
[13] Dkt. No. 32 at para. 26, 28, and 31.
[14] Dkt. No. 32 at paras. 2-3, 19.
[15] Dkt. No. 420 at page 56.

8.      On March 23, 2025, 23andMe Holding Co. and eleven affiliated debtors[16] filed bankruptcy, and on March 24, 2025, the Debtors filed its *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), if any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief.*[17] The Court entered an order approving the Procedures Motion on March 28, 2025.[18]

9.      On May 19, 2025, the Debtors posted their Notice of the successful bidders, which set the objection deadline for June 10, 2025, and identified Regeneron[19] as the successful bidder and TTAM Research Institute, a California nonprofit public benefit corporation[20] as the backup bidder.[21]

10.     As set forth in their proposed agreements, the bidders now seek to purchase (a) customers' biological material (*i.e.,* their spit); (b) their Genotype Data (*i.e.,* their DNA code, which may include their entire genome); and (c) their personal information, including Profile Data (including their name, date of birth, birth sex, their reported gender, and contact information), Family Tree Data, and Phenotype Data (altogether "**Genotype and Phenotype Data**"), which is more generically defined by the Debtors as "**Customer Data**."

---

[16] Hereinafter, "the Debtors."
[17] Dkt. No. 30; hereinafter, "Procedures Motion."
[18] Dkt. No. 125.
[19] Hereinafter, "Regeneron," "Purchaser," or "Buyer."
[20] Hereinafter, "TTAM," "Purchaser," or "Buyer."
[21] Hereinafter Regeneron and TTAM will collectively be referred to as "Purchasers" or "Buyers."

11.     In reality, this "Customer Data" comprises an unprecedented compilation of highly sensitive and immutable personal data of consumers: a human being's permanent and everlasting genetic identity (their genome) coupled with their phenotype data – how their genome is manifest physically and mentally – together with sensitive personal information, including the individual's birth sex and gender, their family tree, and contact information.

12.     Virtually all of this "Customer Data" is immutable. ***If stolen or misused, it cannot be changed or replaced***. Furthermore, this data is exclusively personal and unique in representing that customer's identity – something that no other human being who ever existed or will exist in the future (absent abuse of currently illegal cloning technologies) will match.

13.     In addition, this exclusively personal data carries with it significant, sensitive information about others who share DNA and/or familial relationships. For example, this data can be used to identify and track those who are related to the 23andMe consumer – including future generations yet unborn. In other words, the magnitude of the data in this proposed sale stretches far beyond the 23andMe consumers, impacting those who have no awareness of the sale as well as human beings who do not even exist yet.

14.     Perhaps most incredible of these characteristics, a customer's genome is effectively eternal when preserved in this form. It could remain in existence in corporate hands and subject to use (ranging from research to cloning) long after future generations of 23andMe's consumer have passed away.

15.     The States have filed an adversary proceeding complaint against 23andMe pursuant to FRBP 7001(b) & (i), seeking declaratory judgment under 28 U.S.C. § 2201 regarding the validity and extent of the Debtors' interest in each customers' genetic material and related data – including whether the Debtors have the right to sell and transfer it to any buyer without first obtaining express and informed consent from each customer.

### III.    OBJECTIONS

A.    *Pursuant to State's Laws, the Debtors Lack Sufficient Rights to and Interest in the Customers' Data Under Absent Disclosure of the Transaction and Express Informed Consent by Each Consumer.*

16.    The Debtors have no right to sell their customers' genetic identities to the highest bidder, unless the Debtors first obtain express informed consent to the proposed transaction/transfer by each consumer impacted.

17.    Under applicable bankruptcy law, it is a "…fundamental bankruptcy principle that the estate succeeds to whatever property the debtor possessed outside of bankruptcy[,]"[22] and while federal bankruptcy law defines what is property of the bankruptcy estate; it is state law that defines the extent of the estate's interest in the property.[23]

18.    Property of the estate is defined as the debtor's legal or equitable interest in property at the commencement of the estate: "To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate."[24]

19.    Section 541(c)(1) does not change this fundamental principle. Section 541(c)(1) "governs what is property of the estate; it does not address what a [debtor] is allowed to do with that property."[25]  In other words, any limitations on transfer of property prepetition, remain intact once the bankruptcy is filed.

20.    Likewise, as recognized by the Eighth Circuit, 11 U.S.C. § 363 does not expand the Debtors' interest in property. Section 363(b)(1) is an enabling statute that gives debtors "the authority to sell or dispose of property if the debtors would have had the same right under state

---

[22] *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 193 B.R. 722, 729 (D.N.J. 1996), *aff'd*, 124 F.3d 487 (3d Cir. 1997).
[23] *See Stellwagen v. Clum*, 245 U.S. 605, 613 (1918); *Butner v. United States*, 440 U.S. 48, 54 (1979).
[24] *In re Sanders*, 969 F.2d 591, 593 (7th Cir. 1992) (citing *In re Balay*, 113 B.R. 429, 445 (Bankr. N.D. Ill. 1990) (quoting 4 Collier on Bankruptcy P 541.06 (15th ed. 1989)).
[25] *In re Paul*, 355 B.R. 64, 67 (Bankr. N.D. IL 2001); *See In re Crossman*, 259 B.R. 301 (Bankr. N.D. Ill. 2001).

law."[26] Section 363(f)(1) only allows the sale of property if nonbankruptcy law would permit the sale.[27]

21.    Finally, 28 U.S.C. § 959(b) requires that debtors operate in accordance with state law, including the statutory and common law rights of consumers.

### Express, Informed Consent is Required

22.    The States are not objectively opposed to any sale. Rather, the States contend that express, informed consent by each customer is necessary before any transfer of that customer's data can take place. There are a number of independent reasons why consent is necessary.

23.    First, the States contend that human beings have inherent common law rights of ownership or control[28] in (a) their biological material (*i.e.,* their spit);[29] (b) their Genotype Data (*i.e.,* their DNA code, which may include their entire genome); and (c) their personal information, including Profile Data (including their name, date of birth, birth sex, their reported gender, and contact information), Family Tree Data, and Phenotype Data.[30]

24.    Indeed, 23andMe currently recognizes these inherent common law rights, assuring all customers, wherever they live, that their data belongs to them and that they will remain in control of their data – including the right to delete all of it at any time.[31] Based on customers'

---

[26] *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir. 1987); *See In re Paul*, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001).

[27] 11 U.S.C. § 363(f).

[28] Courts are still grappling with how to describe and account for such rights, including through the legal lenses of property, privacy, confidentiality, dignity, comparative justice, family cohesion, bioethics, and philosophy, among others. *See, e.g.,* Natalie Ram, DNA by the Entirety, 115 Colum. L. Rev. 873, 892–93 (2015) (arguing that the developing common law rights of ownership, privacy, and control in genetic data should factor in the rights of family members).

[29] *See, e.g., Echt v. Superior Court*, 20 Cal. Rptr. 2d 275, 281 (Ct. App. 1993) (holding that a sperm donor has an interest in his stored semen not "governed by the general law of personal property" but that it was "an interest, in the nature of ownership, to the extent that he had decision making authority as to the sperm within the scope of the policy set by law").

[30] Certainly, an individual's interest in these items is not absolute and remains subject to various exceptions as recognized in common law and statutes, including for governmental purposes such as law enforcement, determination of paternity, and screening of newborns as required by state or federal law.

[31] Debtor may contend that this right of deletion confers sufficient control, by essentially providing an "opt-out" to consumers. However, this is not sufficient. Consumers are not necessarily aware of the continued current use of their data, the risks of its continued existence and how it may impact family members, or that they even have the option of

---

inherent rights, the States contend that the Debtors lack sufficient rights to control and transfer a customer's biological material and their Genotype and Phenotype Data to a third party – unless and until the customer has provided express, informed, affirmative consent to the proposed sale and transfer.

25.    Beyond these general principles, some states have specific statutes that codify these common law rights. For example, specific criminal statutes[32] and genetic data privacy statutes[33] require express, informed, affirmative consent from consumers prior to the sale or transfer of genetic data.[34]

---

deletion. Further, customers may not be aware that the Debtors are auctioning off their data to the highest bidder, since they did not receive a copy of the sale notice -- despite their significant interest in the underlying asset. Furthermore, if the court approves a sale, the buyer will adopt all prior policies – but these policies, including the right of deletion, could change thereafter, and the Court and the customers would have no say in this removal of this "opt-out" right that many customers may have had no awareness that they even held.

[32] For example, Florida's "Protecting DNA Privacy Act" requires "express consent" to sell or otherwise transfer another person's DNA sample or the results of another person's DNA analysis to a third party, regardless of whether the DNA sample was originally collected, retained or analyzed with express consent. Violations are subject to criminal prosecution, up to a second-degree felony. Fla. Stat. §§ 817.5655(5); 775.082(d); 775.083(1)(b) (2024).

[33] *See, e.g.,* Alaska Stat. § 18.13.010(a)(2); Ariz. Rev. Stat § 44-8002(A)(2)(b)(i); Colorado Privacy Act, Colo. Rev. Stat. § 6-1-1308(7) & 4 CCR 904-3, Rules 6.10 7.02-7.05; Fla. Stat. § 817.5655(5) (2024); N.H. Rev.Stat.Ann. 141-H:2, III; Tex. Bus. & Comm. Code § 503A.001(5); Utah Code § 13-60-104(1)(c)(i)-(ii); Wash. Rev. Code Ann. § 19.373.070 (2024).

[34] *See* **Exhibit A** for a list of states' laws; however, for example, in Texas, the Texas Direct-to-Consumer Genetic Testing Act specifically regulates companies like 23andMe and provides consumers with certain rights and protections over their biological samples and genetic data. *See* Tex. Bus. & Com. Code §§ 503A.001-.008. Under the Act, Texans have an exclusive property right in, and right to exercise exclusive control over, their biological sample and genetic data. *Id*. § 503A.003. Therefore, Debtors must obtain Texans' *separate* express consent to (a) transfer or disclose the individual's genetic data to any person other than the company's vendors and service providers; (b) use genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; or (c) retain the biological sample following completion of the initial testing service. *Id*. § 503A.006(a)(1). Consent requires a separate "affirmative response to a clear and meaningful notice regarding the collection, use, or disclosure of genetic data for a specific purpose." *Id*. § 503A.001(5). The consumer's original click-through acceptance of 23andMe's Terms of Service and Privacy Statement upon signing up for services would not meet the *separate* express consent requirement as defined by the DTC Genetic Testing Act. (The Texas Data Privacy and Security Act would also prohibit transfer absent informed consent as to a particular transfer to a particular buyer. *See* Tex. Bus. & Com. Code § 541).

Arizona law similarly requires direct-to-consumer genetic testing companies to obtain separate express consent from the consumer for the specific purpose of transferring or disclosing the consumer's genetic data to a buyer. Ariz. Rev. Stat. §§ 44-8001(5), 44-8002(A)(2)(b)(i). Furthermore, under Arizona law, the genetic testing information of a deceased consumer cannot be transferred based on a consent provided by the consumer while still alive. *See* Ariz. Rev. Stat § 12-2082(F). Rather, it can *only* be released to the deceased consumer's last healthcare decisionmaker and the personal representative of the consumer's estate or next of kin. Ariz. Rev. Stat § 12-2294(D).

Also, Minnesota's Genetic Information Privacy Act forbids the sale or transfer of genetic information without the consumer's express consent. The law specifies that a direct-to-consumer genetic testing company must obtain "separate express consent" before each transfer or disclosure of the consumer's genetic data or biological sample to any person other than the company's vendor and service providers. Minn. Stat. §325F.995, subd. 2(a)(2)(ii). Under

---

26.    Besides customers' inherent rights to control their bodily fluids, genes, and phenotype data, and the additional statutory protections in some states, customers have a reasonable expectation of privacy and control based on the representations the Debtors have made to them. For example, the main 23andMe "Privacy" webpage assures customers that their DNA and health insights, entrusted with 23andMe, will be protected. The page begins in huge, approx. 48-pt font, "Your privacy comes first." Then, in its first bullet point "assurance," the Privacy page explains that "You can be assured that your genetic data **will not be shared** with employers, insurance companies, or public databases without your explicit consent."[35] Based on such representations, customers have a reasonable expectation that their genetic data would not be auctioned off and shared with the highest bidder without their "explicit consent" – using the Debtors' term.

27.    Besides customers' reasonable expectations based on Debtors' assurances in their general marketing materials, Debtors' privacy policies and terms of use are contractual and binding on the Debtors. The Debtors contend that each customer's "click-through" acceptance of 23andMe's Terms of Service and Privacy Statement upon their initial sign-up provides 23andMe with sufficient rights to sell the customer's biological material and Genetic and Phenotype Data in the proposed sale. This contention is based on a statement tucked away in the middle of their privacy policy that allows for the sale of customers' data in the context of a bankruptcy case (notwithstanding contrary representations elsewhere). However, this bankruptcy provision was added on June 8, 2022, and it would not be applicable to customers who signed up before then.

28.    The States contend that the Debtors must obtain express consent for the sale from all customers who signed up for the service prior to June 8, 2022, because until this date, the

---

Minnesota's law, express consent means "a consumer's affirmative written response to a clear, meaningful, and prominent written notice," which may be presented and captured electronically. *Id.* § 325F.995, subd. 1(f).
[35]  https://www.23andme.com/privacy/ (emphasis in the original).

company assured its clients in its Privacy Policy that "**23andMe will not sell, lease, or rent your individual-level information to a third party for research purposes without your explicit consent**." This contractual provision evolved slightly over time, from the very first Privacy Policy in 2007 through the March 22, 2022, version (which is the last version before June 8, 2022). However, the substance is essentially the same – <u>no sale without the customer's explicit consent</u>.

29.     As explained by the Federal Trade Commission, when a privacy policy changes from the time the customer signed up with the company and there was no affirmative opt-in for the new policy, the company had to honor the previous policy – *i.e.,* the original policy that the customer purportedly reviewed and agreed to. *In re Gateway Learning Corp.*, FTC Docket No. 042-0347, 2004 WL 2618647, at *5 (F.T.C. Sept. 10, 2004). Accordingly, under its own privacy policy terms and regardless of the state law requirements described above, the Debtors are contractually obligated to obtain express consent for the sale from all customers who signed up for the service prior to June 8, 2022.

30.     These issues, and others, have also been raised by the States in an adversary proceeding, acting pursuant to statutory authority to enforce data privacy and consumer protection laws on behalf of their citizens. The States request a declaratory judgment in that action to ensure that the Debtors and Buyer are complying with the applicable states' laws. The States object to any sale unless the Debtors and Buyer agree to ensure that each customer is informed of the transaction and consents prior to the transfer of their personal data.

### *The Debtors' Proposed Transactions Contemplate Consent*

31.     While the Debtors and Buyers will argue that no consent is needed because that is the economically rational position, the APAs actually include a consent procedure in Section 7.3, to ensure that the transaction is not stymied by the Court's determination that express, informed consent is necessary. Of course, this Section requires the Debtors to challenge the States, to try to

avoid the need for express consent obligations.[36] However, under this provision, the Buyers must follow through with the transaction, even if express consent is required by the Court and even when consent is not obtained.

32.     Section 7.3 of the APAs demonstrate that Debtors and Buyers understand their consent obligations here, yet they are hoping that the States do not object and, if they do, such requirements might be rendered unenforceable by the Bankruptcy Court. However, as in the States' filings, the Bankruptcy Court – while powerful in many ways – has no ability to override state law in such respects.

B.     *The Debtors Cannot Avoid Their Legal Obligations to Customers Simply by Labeling this Sale and Transfer of Customer Data as a "Change of Ownership" that "Shall Not Constitute a Sale, Transfer or Disclosure of Customer Data"*

33.     You can paint a horse and call it a zebra, but it is still a horse. Likewise, the Debtors can label the sale and transfer of its customer data a "change of ownership," yet it is still a transfer. Accordingly, the Debtors and Purchasers must comply with the respective states' laws prohibiting the sale, transfer, or disclosure of genetic data.

34.     The Debtors are seeking court approval to sell and transfer their most valuable assets – customers' biological material, genetic data, and phenotype data under 11 U.S.C. § 363(f), with all of the benefits Section 363(f) affords. However, at the same time, the Debtors (and the proposed buyers) have agreed that the Customer Data being purchased "***shall not constitute a sale, transfer or disclosure of Customer Data*** and shall solely constitute a change in ownership."[37]

35.     In the Debtors' view, there is no sale, transfer, or disclosure taking place – simply because they say so. According to Debtors' logic, if there is no sale or transfer or disclosure of

---

[36] Dkt. No. 420 at Section 7.3 ("…Reasonable Efforts shall include appropriate filings by Sellers in the Bankruptcy Court seeking a determination that the Bankruptcy Code renders unenforceable the consent requirement in question.").
[37] Dkt. No. 420 at Section 4.4 (emphasis added).

customer data, then there is no violation of customers' rights and interest here – and no need to obtain express, informed consent to the transfer from their customers.

36.    A sale of assets necessarily means the assets will be sold and transferred to a new owner. That is what Debtors propose to do here. For example, in the Debtors' proposed General Assignment (APA Exhibit B), each Debtor "hereby sells, assigns, transfers, conveys, sets over, and delivers to Purchaser to have and to hold forever, all of Seller's right, title, and interest in the Acquired Assets."[38]

37.    Just because the new owner retains the website and agrees to follow the Debtors' same privacy policies and terms of use does not magically transform this sale into a "change in ownership." The Customer Data – the core asset of the company – is being <u>sold, transferred, and disclosed</u> here, even if the Asset Purchase Agreement says otherwise.

38.    A "change in ownership" without a sale and transfer of the Customer Data is legally possible. The Debtors are corporations, and their shareholders are the owners. Through the purchase of the Debtors' stock, the proposed buyers could effectuate a change in ownership outside of bankruptcy – arguably without causing a sale, transfer, or disclosure of the assets. However, that is a very different transaction. After the change in ownership, 23andMe would remain in control of its Customer Data. However, it would also remain responsible for the damages that resulted from the 2023 cybersecurity incident, which presumably necessitated this bankruptcy filing. In this transaction, the proposed buyers presumably want only the assets themselves, cleansed of liens and other liabilities. The proposed buyers do not want to take on 23andMe's obligations – only its assets.

---

[38] Dkt. No. 420 at page 91. See also the Intellectual Property Assignment Agreement (APA Exhibit C) and the Asset Allocation Schedule (APA Schedule 3.3), each demonstrating that this is indeed a transfer of assets.

39.     The Debtors have proposed a sale and transfer under 11 U.S.C. § 363(f). The Debtors can only effectuate a 363 sale by demonstrating that they have the right to sell, transfer, and disclose their customers' data. Simply saying the transaction is not a sale, transfer, or disclosure is not sufficient. They must honor their customers' rights under state law, including obtaining express, informed consent from their customers.

C.      *The Debtors Cannot Apply the Protections under 11 U.S.C. § 363 to the "Customer Data" by Including the Definition of "Customer Data" within the Definition of "Industry Data"*

40.     The Debtors' definition of "Industry Data" not only specifically incorporates their definition of "Customer Data," but is virtually the exact wording as their definition as "Customer Data."

| **Industry Data** | **Customer Data** |
|---|---|
| "all *customer data* and all biological samples of the Business that are biobanked or otherwise in the possession of Sellers, including genetic data, processed genetic data, analyses of raw genotyped data, phenotype data, ancestry, surveys, user generated or reported data, linked medical records or other linked health data, account information and biological samples (saliva and blood samples) of the Business (collectively, the '**Industry Data**')"[39] | "'**Customer Data**' means all genetic data, processed genetic data, analyses of raw genotyped data, phenotype data, ancestry, user-generated or reported data, linked medical records or other linked health data, account information and biological samples (saliva and blood samples), including, for the avoidance of doubt, such material or data containing Personal Information of customers of the Business at the Closing Date."[40] |

41.     By referencing and incorporating the definition of "Customer Data" in the definition of "Industry Data," it appears that the Debtors and Purchasers seek to make the protections of 11 U.S.C. § 363(f) apply to the Customer Data. (This is notwithstanding their "magic language" of Section 7.11 of the Asset Purchase Agreement regarding the "Customer Data" not being sold, transferred, or disclosed.).

---

[39] Dkt. 420 at PDF page 12.
[40] Dkt. 420 at PDF page 18.

42.    The sale language in the APA refers to Industry Data, rather than Customer Data. Specifically, Article V, Section 5.1(v)(iv) states in part:

> (iv) The Acquired Assets delivered at the Closing *shall include the Industry Data*. At the Closing, the Industry Data *shall transfer to Purchaser or a Designated Purchaser, free and clear of all Liens, other than Permitted Encumbrances*. At the Closing, Purchaser or Designated Purchaser shall have good and marketable title to and the right to use, and shall be free to use in substantially the same manner in which Sellers use prior to the Closing, the Industry Data, after giving effect to Section 7.11. . . .

43.    As such, the Debtors are seeking to bootstrap the "Customer Data," which the Debtors and Purchasers state is "not a sale or transfer," into the protections of 363 by including the definition of "Customer Data" into "Industry Data." Unfortunately for Debtors, a horse is a horse – regardless of how you paint it or what you call it.

D.    *Use of the Equitable Powers Granted by 11 U.S.C. § 105(a) Must be Consistent with the Bankruptcy Code and State Laws*

44.    Bankruptcy Courts enjoy equitable powers provided under 11 U.S.C. § 105(a) to carry out the terms of the Bankruptcy Code.[41] However, these powers are not unlimited, and they should not be abused as proposed by Debtors' to override individual consumers' most personal rights to control their Genotype and Phenotype Data.

45.    As recognized by the United States Supreme Court:

> It is hornbook law that §105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." 2 Collier on Bankruptcy ¶105.01[2], p. 105-6 (16th ed. 2013). Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere.[42]

46.    "The Eighth Circuit has similarly and repeatedly held that a bankruptcy court's 'broad equitable powers may only be exercised in a manner which is consistent with the provisions

---

[41] *In re Easton*, 882 F.2d 312, 315 (8th Cir. 1989).
[42] *Law v. Siegel*, 571 U.S. 415, 421, 134 S. Ct. 1188, 1194-95 (2014).

of the Code[,]'"[43] and the Court's equity powers found in 11 U.S.C. § 105(a) "cannot be applied to circumvent unequivocal provisions of substantive law, including relevant state law that is not expressly superseded by the Bankruptcy Code."[44]

47.     Even when applying state law in a bankruptcy case has a negative effect on the case, courts have recognized that the "text and spirit of the bankruptcy provision[s] have not been held to preempt state laws limiting the alienability or present liquidation value of the assets, even though those limitations may undermine the expeditious liquidation of the bankruptcy estate."[45]

48.     The Debtors may request that this Court use 11 U.S.C. § 105(a) to approve the sale of its assets. The States object to any request by the Debtors to apply the Court's equitable powers to override customers' rights under state law to control their genetic material.

E.     *To the Extent TTAM Intends to Remain a Nonprofit Organization, TTAM Should Agree That It Will Remain Subject to All State Privacy and Cybersecurity Laws Just Like 23andMe and Other Corporate Entities, Notwithstanding Any State Statutory Exceptions for Nonprofit Organizations.*

49.     TTAM's APA raises special concerns because it purports to be a tax-exempt nonprofit. As such, TTAM would be able to evade some of the regulatory scrutiny that 23andMe faced prior to the bankruptcy filing. Many states with comprehensive data protection laws have

---

[43] *Official Comm. of Unsecured Creditors v. Archdiocese of Saint Paul & Minneapolis*, 562 B.R. 755, 761 (D. Minn. 2016) (citing *Johnson v. First Nat'l Bank of Montevideo, Minn.*, 719 F.2d 270, 273 (8th Cir. 1983*); in re Miller*, 16 F.3d 240, 244 (8th Cir. 1994) ("stating a bankruptcy court's powers under § 105 are limited in that 'such powers must be exercised consistent with the provisions of the Bankruptcy Code'"); *In re Easton*, 882 F.2d 312, 315 (8th Cir. 1989) ("same")).

[44] *In re Brick Hearth Pizza, Inc.*, 302 B.R. 877, 881 (Bankr. D. Minn. 2003) (citing *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 198, 108 S.Ct. 963, 964, 99 L. Ed. 2d 169 (1988); *In re Easton,* 882 F.2d 312, 314 (8th Cir. 1989); *In re NWFX, Inc.,* 864 F.2d 593, 595 (8th Cir. 1989); *Johnson v. First Nat'l Bank of Montevideo,* 719 F.2d 270, 273 (8th Cir. 1983)).

[45] *In re United Healthcare Sys.*, CIVIL ACTION NO. 97-1159 (NHP), 1997 U.S. Dist. LEXIS 5090, at *28-32 (D.N.J. Mar. 26, 1997) (citing *Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 193 Bankr. 722, 729 (D.N.J. 1996) (holding that trustee lacked power to assign tort claims which were non-transferable under state law)).

entity-level exemptions for non-profits, which are typically defined as tax exempt.[46]  To the extent that TTAM would indeed qualify as a non-profit, consumers would actually be at greater risk.

50.     If TTAM's intent was not to evade privacy laws, but to provide a public service, the States would expect TTAM to agree that it would remain subject to all state privacy and cybersecurity laws and regulations notwithstanding its nonprofit status. Otherwise, the States object to TTAM's apparent effort to evade regulatory scrutiny.

F.     *The APAs and/or Sale Order Require Clarifications: Removing "Government" and "Governmental and Regulatory Authorities" in the Definition of "Persons" and Clarifying the Court's Jurisdiction Applies Only to the APA Parties.*

51.     The Debtors' APAs define "Person" as "any natural person, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, government, Governmental or Regulatory Authority, or any other entity whatsoever." The States object to the inclusion of "Government" and "Governmental and Regulatory Authorities" being included in this definition, as the Bankruptcy Code specifically exempts most governmental units from the definition of "person," and provides a more specific definition applicable to governmental units. Some provisions of the sales documents applicable to "Persons" as defined by the Debtors may not be applicable to the government due to state and or federal laws. Therefore, the States request that "Government" and "Governmental and Regulatory Authorities" be deleted from the Debtors' definition of "Person," and instead use the Bankruptcy Code's definition of "Governmental Unit" under 11 U.S.C. section 101(27) in all sales documents and orders.

---

[46]  As one example, Virginia Code § 59.1-575 defines "nonprofit organization" as "any corporation organized under the Virginia Nonstock Corporation Act (§ 13.1-801 et seq.) or any organization exempt from taxation under § 501(c)(3), 501(c)(6), or 501(c)(12) of the Internal Revenue Code, any political organization, any organization exempt from taxation under § 501(c)(4) of the Internal Revenue Code that is identified in § 52-41, and any subsidiary or affiliate of entities organized pursuant to Chapter 9.1 (§ 56-231.15 et seq.) of Title 56."

52.    Additionally, Section 12.2 confers exclusive jurisdiction on the Bankruptcy Court as to sale issues, including "to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, and breach or default hereunder, or the transactions contemplated hereby."

53.    The States request that the Sale Order clarify that this language only applies to the APA parties and does not apply to regulatory actions by adding the following language in any order approving any sale and/or transfer of the Debtors' assets:

> *Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order provided, however, that the Buyer shall not assume any liability to a Governmental Unit for penalties for days of violation prior to closing of the sale. Nothing in this Order or the Asset Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.*

## IV.    APPLICATION AND RESERVATIONS

54.    This objection applies to both the Bidder and Backup Bidders' Asset Purchase Agreements, as the terms are substantially similar.

55.    The States reserve the right to supplement or amend this objection.

## V.    NOTICE

56.    As required by docket 131 – the *Interim Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief* -- notice is hereby given that copies of the proposed order granting the relief requested herein will be made available on the website of the Debtors' claims and noticing agent at

https://restructuring.ra.kroll.com/23andMe.

## VI.    <u>**PRAYER**</u>

WHEREFORE, the States respectfully request that the Court sustain their objections and enter any further relief to which the Court finds is just.

Date: June 9, 2025,

*(Remainder of Page Intentionally Left Blank---Signature Page Follows)*

Respectfully Submitted,

/s/ ABIGAIL R. RYAN
ABIGAIL R. RYAN
BANKRUPTCY COUNSEL
NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
1850 M Street NW, 12th Floor
Washington, DC 20036
Telephone: (202) 326-6000, Ext. 258
Email: aryan@naag.org
**COUNSEL FOR THE FOLLOWING NAAG CLIENT STATES:**

THE STATE OF ARIZONA, *EX REL.* KRISTIN K. MAYES, THE ATTORNEY GENERAL

STATE OF CONNECTICUT

DISTRICT OF COLUMBIA, OFFICE OF THE ATTORNEY GENERAL

STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS

OFFICE OF THE ILLINOIS ATTORNEY GENERAL

THE STATE OF KANSAS, *EX REL.* KRIS KOBACH

STATE OF LOUISIANA

STATE OF MAINE

MICHIGAN ATTORNEY GENERAL, *EX REL.* THE PEOPLE OF THE STATE OF MICHIGAN

NEW HAMPSHIRE OFFICE OF THE ATTORNEY GENERAL, CONSUMER PROTECTION DIVISION

NEW MEXICO DEPARTMENT OF JUSTICE

NEW YORK STATE ATTORNEY GENERAL'S OFFICE

STATE OF NORTH CAROLINA

STATE OF OKLAHOMA

THE STATE OF SOUTH CAROLINA *EX REL.* ALAN WILSON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF SOUTH CAROLINA

THE ATTORNEY GENERAL FOR THE STATE OF SOUTH DAKOTA

STATE OF UTAH, OFFICE OF THE UTAH ATTORNEY GENERAL

STATE OF VERMONT

THE COMMONWEALTH OF VIRGINIA, *EX REL.* JASON S. MIYARES, ATTORNEY GENERAL

THE STATE OF WASHINGTON

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL

THE STATE OF WISCONSIN

**FOR THE STATE OF COLORADO**

/s/ ROBERT PADJEN
ROBERT PADJEN, No. 14678CO
SENIOR ASSISTANT ATTORNEY GENERAL
COLORADO DEPARTMENT OF LAW
RALPH L. CARR COLORADO JUDICIAL CENTER
1300 Broadway, 8th Floor
Denver, Colorado 80203
Direct dial: 720-508-6346
E-mail: robert.padjen@coag.gov

**FOR THE COMMONWEALTH OF KENTUCKY, EX REL. RUSSELL COLEMAN, ATTORNEY GENERAL**

/s/ CHRISTOPHER D. HUNT
CHRISTOPHER D. HUNT (KY BAR No. 91775)
ASSISTANT ATTORNEY GENERAL
KENTUCKY OFFICE OF THE ATTORNEY GENERAL
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: (502) 696-5691
*ChrisD.Hunt@ky.gov*

**FOR THE STATE OF MINNESOTA**
**KEITH ELLISON ATTORNEY GENERAL OF MINNESOTA**

/s/ DALILA Z. JORDAN
DALILA Z. JORDAN, ATTORNEY REG # 0403120
ASSISTANT ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION
445 Minnesota Street, Suite 600
Saint Paul, Minnesota 55101
Telephone: (651) 300-7640
Email: Dalila.Jordan@ag.state.mn.us

COUNSEL FOR THE STATE OF MINNESOTA

FOR THE STATE OF MISSOURI
ANDREW BAILEY, ATTORNEY GENERAL

BY: */s/ CALEB LEWIS*
Caleb M. Lewis, Mo. Bar #61894
   Assistant Attorney General
Michael Schwalbert, Mo. Bar #63119
   Assistant Attorney General
Alison Esbeck, Mo. Bar. #58501
   Assistant Attorney General
Zachary Elam, Mo. Bar #76935
   Assistant Attorney General

Missouri Attorney General's Office
815 Olive Street Suite 200
St. Louis, MO 63101
(314) 340-7883
FAX: (314) 340-7981
Caleb.Lewis@ago.mo.gov
Michael.Schwalbert@ago.mo.gov
Alison.Esbeck@ago.mo.gov
Zachary.Elam@ago.mo.gov
*ATTORNEYS FOR THE OFFICE OF THE
MISSOURI ATTORNEY GENERAL*

FOR THE STATE OF OREGON, DAN RAYFIELD
ATTORNEY GENERAL OF OREGON

*/s/ JUSTIN D. LEONARD*
JUSTIN D. LEONARD, E.D. MO. D.C. # 033736OR
SENIOR ASSISTANT ATTORNEY GENERAL
OREGON DEPARTMENT OF JUSTICE
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4400
Email: Justin.Leonard@doj.oregon.gov

FOR THE COMMONWEALTH OF
PENNSYLVANIA
OFFICE OF THE ATTORNEY GENERAL,
DAVID W. SUNDAY, JR., ATTORNEY
GENERAL

By: */s/Lauren A. Michaels*
Lauren A. Michaels
Deputy Attorney General
Pa I.D. No. 320686
Melissa L. Van Eck
Chief Deputy Attorney General Financial
Enforcement Section
Commonwealth Of Pennsylvania
Office Of Attorney General
1251 Waterfront Place
Mezzanine Level
Pittsburgh, Pa 15222
Tel: (412) 235-9072
E-mail: lmichaels@attorneygeneral.gov

---

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2025, a true and correct copy of the foregoing document

was electronically filed and served upon all those who receive electronic notification.


  /s/ *Abigail R. Ryan*
Abigail R. Ryan
Bankruptcy Counsel
National Association of Attorneys General