**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 |
| Debtors. | (Jointly Administered) |
| | Docket Nos.   30, 125, 420, 574, 657, 668 |
| | Hearing Date: June 17, 2025 |
| | Hearing Time: 9:00 a.m. CDT |
| | Hearing Location: Thomas F. Eagleton U.S. Courthouse 111 S. 10th Street Courtroom 5 North St. Louis, MO 63102 |

**THE STATE OF TEXAS' OBJECTION TO DEBTORS'**
**SALE TRANSACTION AND PROPOSED SALE ORDER**

The State of Texas, acting by and through the Office of the Texas Attorney General ("Texas"), hereby files this objection (the "Objection") to the Debtors' sale of all or substantially all of their assets (the "Proposed Sale") to either Regeneron Pharmaceuticals, Inc. ("Regeneron") or TTAM Research Institute ("TTAM"), as currently contemplated in the May 17, 2025 Asset Purchase Agreement with Regeneron (the "Regeneron APA") and the May 16, 2025 Asset Purchase Agreement with TTAM (the "TTAM APA, and together with the Regeneron APA, the "APAs").[2]  In support of this Objection, Texas respectfully states as follows:[3]

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.
[2] D.E. 420, Ex. A, B.
[3] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Debtors' Proposed Sale related pleadings appearing at D.E. 30, 125, 420, 574, 657, or 668.  Unless otherwise noted, references to the

## I.        PRELIMINARY STATEMENT

*"Why should I need a prescription to spit into a vial and get my DNA read? Why can't I get my own blood drawn without a doctor's permission?* **It's my blood***."*[4]
*-Anne Wojcicki*

Citizens have a basic, inherent right to their genetic data and biomaterials. Just as genes are distinct to each individual, each individual has a right of basic ownership and control over their genetic material, data, and information gleaned from the collection and use of that data. The State of Texas has been at the forefront of the protection of the genetic material, data, and information, as well as other sensitive personal information, through the passage of laws and regulations regarding who owns genetic data, who can sell, transfer, or disclose that data, and what types of businesses may access this highly sensitive and personal information. The protection of this data is imperative, especially considering the risks associated with intentional or inadvertent disclosure of this most personal of information. Once the genetic data is disclosed, there is no going back – individuals cannot request replacement DNA strands for themselves, their children, grandchildren, grandparents, and the ancestors who preceded them. It should not be sold, transferred, or disclosed without their permission.

Considering the proposed sale of assets contemplated in the current bankruptcy case, the first of its kind, the State of Texas files this objection to not only preserve the rule of law and regulatory interests, but to protect Texas consumers from unauthorized sale, transfer, or disclosure of genetic data and materials by the Debtors to third party purchasers.

---

"Bankruptcy Code" or "Section" shall mean Title 11 of the United States Code and the specific sections referenced thereunder.
[4] <u>Married to the Google Billionaire</u>, by Leah McGrath Goodman, Marie Claire, May 10, 2010 (emphasis added).

## II.      RELEVANT BACKGROUND

A.      **General Background**

1.      Founded in 2006, 23andMe provides genetic testing directly to consumers, which includes collection of a consumer's biological sample, conducting DNA genotyping, and providing "personalized genetic reports on everything from ancestry composition to traits to genetic health risks."[5] 23andMe also provides Exome Sequencing to "detect 50,000+ hereditary disease-causing variants."[6] As a result of its products and services, according to the Debtors, the company has amassed data from over fifteen (15) million customers.[7]

2.      In October 2023, 23andMe suffered a data breach which, they believe, impacted approximately seven (7) million consumers, thus prompting various federal, state, and international investigations, including an investigation by Texas into the company's state law violations.[8]

3.      On March 23, 2025, 23andMe Holding Co., along with eleven (11) affiliated debtors, filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code, case no. 25-40976, pending before the U.S. Bankruptcy Court, Eastern Division of Missouri.

4.      On March 28, 2025, an Order (I) Approving Bidding Procedures for the Sale of the Debtors Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry Into Stalking Horse Agreement(s), if any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimus Assets, and (VII) Granting Related Relief was entered

---

[5] See D.E. 32, First Day Declaration, ¶¶ 19, 27; 23andMe, Frequently asked questions, https://www.23andme.com (last visited April 2, 2025).
[6] See 23andMe, Frequently asked questions.
[7] See D.E. 32, First Day Declaration, ¶ 19.
[8] See D.E. 32, First Day Declaration, ¶¶ 6, 64.

by the Court .[9]

5.      A Notice of Successful and Backup Bidders with Respect to the Auction of Debtors' Assets was filed on May 19, 2025, indicating bids by two third parties.[10]

6.      A hearing to approve the sale of the Debtors' assets, including genetic data, material, information, and personally identifiable information, is scheduled to take place on June 17, 2025, at 9:00 a.m. (CST).

**B.      The Highly Sensitive Data Included in the Sale**

7.      23andMe collects and maintains a significant amount of sensitive personal information about Texas consumers, including, but not limited to:

    a.      "**Profile Data**" from consumers, including their name, date of birth, birth sex, current gender, relationship labels (whether they identify themselves as male or female), and contact information.[11]

    b.      "**Family Tree Data,**" obtained by asking users to input information about their relatives, who may or may not be 23andMe users.[12]

    c.      "**Phenotype Data**" – each individual customer's personal data and health information as collected through initial and supplemental surveys, research participation, and uploaded medical records.[13] Phenotype data represents the observable characteristics of an individual – the physical expression of that individual's genes (their genotype).

8.      Importantly, 23andMe collects and analyzes biological samples from consumers and sequences their genome for the consumer, creating "Genetic Data."[14] This data, consisting of a human's raw genetic code, is then kept as a .csv file linked to the user's profile. 23andMe has collected Genetic Data from more than 15 million people.[15] 23andMe analyzes this raw genetic

---

[9] D.E. 125 (the "Bid Procedures Order").

[10] D.E. 420.

[11] See https://customercare.23andme.com/hc/en-us/articles/360004944654-What-s-In-Your-Account-Settings.

[12] See https://customercare.23andme.com/hc/en-us/articles/360036068393-The-23andMe-Family-Tree-Feature.

[13] See https://customercare.23andme.com/hc/en-us/articles/212873367-Updating-Your-Personal-Information-with-23andMe-Name-Sex-Date-of-Birth.

[14] D.E. 32, ¶¶ 26–32.

[15] D.E. 32, ¶¶ 2–3, 19.

information to provide insights about an individual's ancestry, including the likely regions of origin of their forebears.[16] 23andMe also analyzes their customers' genomes to determine the presence of genetic risk factors for diseases. Additionally, 23andMe potentially holds, through its Lemonaid Health telehealth platform, medical information, including medications and other health information of Texas consumers.[17]

9.      23andMe holds—and is proposing to sell to a third-party—an unprecedented compilation of highly sensitive and immutable personal data, including a human being's immutable genetic identity (their genome). Each individual's information is conjoined with their phenotype data (how their genome has manifested itself physically/mentally) and other sensitive personal information, including the individual's family tree and contact information.

10.     Virtually all of this personal information is immutable. If stolen or misused, it cannot be changed or replaced. Furthermore, this data is exclusively personal and unique, representing that customer's identity and not the identity of any other human being.

11.     In addition, this exclusively personal data also carries with it significant, sensitive information about others who share DNA and/or familial relationships. For example, this data can be used to identify and track those who are related to the 23andMe consumer—including deceased ancestors and future generations yet unborn. In other words, the magnitude of the data in this proposed sale stretches far beyond the 23andMe consumers, impacting those who have no awareness of the sale as well as humans who no longer exist and do not exist yet. Protection of Texas customers and their control of the data in question in this sale is of the utmost importance to the State of Texas.

---

[16] D.E. 32, ¶¶ 26, 28. 31.
[17] D.E. 32, ¶ 3.

### III.        OBJECTION AND AUTHORITY IN SUPPORT

**A.        The Issue of Property of the Estate Must be Determined Prior to Sale.**

12.        While federal bankruptcy law defines what is property of the bankruptcy estate, it is state law that defines the extent of the estate's interest in the property.[18]  The issue of whether the Debtors have a property interest in such data under Texas law must be determined prior to any sale of the data.[19]

13.        Section 541(a) provides that the estate is comprised of all legal or equitable interests of the debtor in property, wherever located, as of the date the case is commenced except those excluded by subsections (b), (c), and (d).[20]  Subsection (b) provides that a pure fiduciary power over another's property never brings that property into the estate: "[p]roperty of the estate does not include… any power that the debtor may exercise solely for the benefit of an entity other than the debtor."[21]  Subsection (c) preserves enforceable non-bankruptcy transfer restrictions; "section 541(c)(1)(A) does not invalidate the restrictions . . . .  Rather, it ensures that the debtor's interest . . ., including transfer restrictions imposed upon the debtor not otherwise precluded by law, becomes property of the estate."[22]  Subsection (d) prevents "equitable" rights from coming into the estate when the debtor only holds legal title: "Property in which the debtor holds . . . only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title . . . but not . . . any equitable interest . . . that the debtor does not hold."[23]

14.        As the Supreme Court noted, "[t]he legislative history indicates that Congress

---

[18] See Stellwagen v. Clum, 245 U.S. 605, 613 (1918); Butner v. United States, 440 U.S. 48, 54 (1979).
[19] See In re Clark, 266 B.R. 163, 171 (B.A.P. 9th 2001) (holding that the threshold question of whether property is property of the estate "must first be decided" prior to any sale); see also 11 U.S.C. § 363(p).
[20] 11 U.S.C. § 541(a)(1).
[21] Id. at § 541(b)(1).
[22] See In re Dean, 174 B.R. 787, 790 (Bankr. E.D. Ark. 1994); In re Paul, 355 B.R. 64, 67 (Bankr. N.D. IL 2001) (while section 541(c) "governs what is property of the estate; it does not address what a [debtor] is allowed to do with that property."); In re Crossman, 259 B.R. 301 (Bankr. N.D. Ill. 2001).
[23] 11 U.S.C. § 541(d).

intended to exclude from the estate property of others in which the debtor had some minor interest such as a lien or bare legal title."[24]  Section 541(a)(1)'s definition does not enlarge a debtor's substantive property rights "against others beyond those existing at the commencement of the case."[25]

### (1)    Any Interest the Debtors Have in Texas Customers' Highly Sensitive Data is Subject to Customers' Property, Ownership, and Control Rights under Texas Law.

15.    In the current case, Texas law provides Texas customers exclusive property, ownership, and control rights in and over their biological samples, genetic and personal data, and the results or analysis thereof (the "Highly Sensitive Data"), as well as privacy rights in the Highly Sensitive data.[26]  As such, the Debtors cannot claim ownership in and sell this data as proposed without first obtaining separate, express consent of Texas customers.

### (a)    Texas Direct-to-Consumer Genetic Testing Act

16.    Under Texas' Direct-to-Consumer Genetic Testing Act (the "DTC Genetic Testing Act"),[27] individual Texas residents have exclusive ownership and control over their Highly Sensitive Data:

> Sec. 503A.003. EXCLUSIVE PROPERTY RIGHT IN DNA; CONFIDENTIALITY. An individual has a property right in, and retains the right to exercise exclusive control over the individual's biological sample that is provided to or used by a direct-to-consumer genetic testing company and the results of genetic testing or analysis conducted on the individual's DNA by a direct-to-consumer genetic testing company, including to the collection, use, retention, maintenance, disclosure, or

---

[24] United States v. Whiting Pools, Inc., 462 U.S. 198, 204 n.8 (1983).

[25] See In re N.S. Garrott & Sons, 772 F.2d 462, 465-467 (8th Cir. 1985) ("the estate cannot acquire greater interests than those which the debtors had . . . ."); see also In re Schauer, 62 B.R. 526, 530 (Bankr. D. Minn. 1986) ("The trustee and the estate succeed only to the title and rights in property which the debtor had; the mere commencement of a bankruptcy case does not vest the trustee with property rights which the debtor could not himself wield.").

[26] See Tex. Bus. & Com. Code § 503A.003. The Texas Legislature passed the DTC Genetic Testing Act to provide Texans with genetic data privacy protections because "private genetic testing companies such as Ancestry and 23andMe fall in a regulatory gray area." S. Comm. on Bus & Com., Bill Analysis, Tex. H.B. 2545, 88th Leg., R.S. (2023). This law "reaffirm[s] that [Texans] are [to] always [be] informed and have complete control of when and how their genetic data will be shared . . . ." Id.

[27] Codified primarily in Texas Business & Commerce Code § 503A.001 et seq.

destruction of the sample or results. The results of the genetic testing of an individual's DNA are confidential and may not be disclosed to another person without the individual's express consent.[28]

17.     The DTC Genetic Testing Act also contains certain restrictions or conditions on the direct-to-consumer genetic testing company's possession of this data.  The company must obtain an individual's **separate express consent** before: (a) the transfer or disclosure of the individual's genetic data to any person other than the company's vendors and service providers; (b) the use of genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; or (c) the retention of any biological sample provided following completion of the initial testing service.[29]  The company is also prohibited from disclosing an individual's genetic data to an entity that offers health insurance, life insurance, or long-term care insurance or an individual's employer absent written consent.[30]

18.     Specifically, the company must obtain a separate "affirmative response to a clear and meaningful notice regarding the collection, use, or disclosure of genetic data for a specific purpose."[31]

### (b)     Texas Data Privacy and Security Act

19.     Texas' Data Privacy and Security Act (the "TDPSA") also regulates, restricts, or conditions the collection, use, processing, and treatment of consumers' personal data and provides

---

[28] See id. § 503A.003 ("Biological sample means a material part of the human body, or a discharge or derivative part of the body, including tissue, blood, urine, or saliva that is known to contain DNA." Id. § 503A.001(1).  "Genetic data means any data, regardless of format, concerning an individual's genetic characteristics.  The term includes: (i) raw sequence data derived from sequencing all or a portion of an individual's extracted DNA; (ii) genotypic and phenotypic information obtained from analyzing an individual's raw sequence data; and (iii) health information regarding the health conditions that an individual self-reports to a company and that the company (a) uses for scientific research or product development; (b) analyzes in connection with the individual's raw sequence data; and (c) does not include deidentified data." Id. § 503A.001(6).  "Deidentified data means data not reasonably linked to and that cannot reasonably be used to infer information about an identifiable individual."  Id. § 503A.001(2). "DNA means deoxyribonucleic acid." Id. § 503A.001(4).
[29] Id. § 503A.006(a)(1).
[30] Id. § 503A.007(b).
[31] Id. § 503A.001(5) (defining "express consent").

consumers with certain rights regarding their data.[32]  Personal data includes sensitive data such as genetic data, personal data revealing racial or ethnic origin, mental or physical health diagnosis, and personal data collected from a known child.[33]

20.    Subject companies may not process the sensitive data of a consumer <u>before</u> obtaining the consumer's consent.[34]  "Process" or "Processing" includes the disclosure of sensitive data such as a Texan's genetic data and health diagnosis.[35]

21.    Consent under the TDPSA "means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer."[36] A consumer's consent is <u>not</u> obtained through the "acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; hovering over, muting, pausing, or closing a given piece of content; or agreement obtained through the use of dark patterns."[37]

22.    A consumer's click-through acceptance of the Debtors' terms of service and/or privacy policies upon signing up for services does not meet the consent requirements as defined by the DTC Genetic Testing Act or the TDPSA.

23.    Although Texas law expressly grants individuals full property, ownership, and control rights in and over their Highly Sensitive Data, the Debtors have not shown that they hold any interest in that data beyond mere possession.[38]  Even if the Debtors possess more than a

---

[32] Codified primarily in Texas Business & Commerce Code § 541.001 <u>et seq.</u>
[33] <u>Id</u>. § 541.001(19), (29).
[34] <u>Id</u>. § 541.101(b)(4).
[35] <u>Id</u>. §§ 541.001(22) (defining "process" to include disclosure), 541.001(29) (defining "sensitive data").
[36] <u>Id</u>. § 541.001(6).
[37] <u>Id</u>.
[38] Neither the Petition nor the Debtors' schedules list the Highly Sensitive Data, the Regeneron APA carves out "Industry Data" from the "Acquired Assets' definition covering "all of the properties, rights, title, interests and other tangible and intangible assets that the [Debtors] own or possess," and the TTAM APA does not specifically include "Personal Information" in the definition of "Acquired Assets," but then refers to it as an Acquired Asset under section 4.4.  <u>See</u> D.E. 420, pp. 12, 109-111, and 140.

minimal possessory interest, such interest remains subject to the limitations and conditions imposed by Texas law.

**(2)    Debtors Have No Ownership Interest in Deleted Customer Data.**

24.    Just prior to and following the filing of the bankruptcy petition, Debtors communicated to former and current customers the right to delete their data and genetic materials, assuring customers that the data would be deleted upon request. It is unknown how many Texas customers have, to date, requested data and account deletion from Debtors, as Debtors have failed to provide this information to state regulators. Further, it is unknown what process the Debtors have undertaken to (1) timely process the deletion requests, (2) delete data for each customer, (3) track the data that has been deleted to confirm deletion, or (4) confirm that the data has been deleted, despite requests for this information by Texas and other state regulators.

25.    Despite the repeated assurances of the Debtors, Texas posits that Debtors have no ownership interest in, and no ability transfer, sell, disclose, or otherwise change ownership of data that has been deleted, or has a pending deletion request.

**B.    Section 363 Does Not Authorize Approval of the Proposed Sale.**

26.    The Proposed Sale of the Highly Sensitive Data under both APAs violates nonbankruptcy law and the Debtors' contractual obligations to customers and does not meet the conditions of section 363(f).  Accordingly, the Debtors are not authorized under section 363 to use or sell the Highly Sensitive Data free and clear of customers' property and ownerships rights or interests, as provided in the Proposed Sale, unless and until they first obtain the separate express consent of customers prior to consummation of the sale.  Texas contends that this consent requirement can be accomplished by implementing a customer opt-in procedure, as further discussed and proposed herein.

27.    Section 363(b)(1) provides that:

The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of [PII] about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease [PII] to any person unless –
(A)    such sale or lease is consistent with such policy; or
(B)    after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or lease—
(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.[39]

28.    Section 363(f) authorizes a trustee or debtor-in-possession to sell property "free and clear of any interest in such property of an entity other than the estate," but only if one of the following prerequisites are met:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2) such entity consents;
(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4) such interest is in bona fide dispute; or
such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[40]

**(1)    The Proposed Sale is Not Consistent with the Debtors' Privacy Policies as Required under Section 363(b)(1)(A).**

29.    The Proposed Sale does not comply with the Debtors' Privacy Policies, and as such, the sale cannot be approved pursuant to section 363(b)(1)(A). Based on a review of the Debtors' website history, the Debtors posted at least twenty-two (22) updates to their "Privacy Statement"

---

[39] 11 U.S.C. § 363(b)(1)(A), (B).
[40] 11 U.S.C. § 363(f)(1)–(5).

from November 2007 through March 14, 2025. [41] Many versions did not include any reference to sales in the context of "bankruptcy" or "reorganization," and the eighteen (18) updates from November 2007 through October 3, 2023 contain a restriction on the release and/or sale of the Highly Sensitive Data to third parties absent "explicit consent." [42] At least one such version assures consumers, "[a]s a reminder, we do not sell information, and we will not use your Genetic Information for marketing or personalized advertising without your explicit consent," [43] while others declare, in the company's "core privacy principles," "we will not sell, lease, or rent your individual-level information (i.e., information about a single individual's genotypes, diseases or other traits/characteristics) to any third-party or to a third-party for research purposes without your explicit consent." [44]

30.     Because Debtors have provided assurances to its customers, many of whom are customers who may have purchased one 23andMe genetic testing kit and would be subject to the Privacy Statement in effect at the time, the Debtors cannot and have not shown that the Proposed Sale complies with applicable privacy policies.

**(2)     The Proposed Sale Violates Nonbankruptcy Law and Cannot be Approved under Section 363(b)(1)(B).**

31.     The Proposed Sale cannot be approved pursuant to section 363(b)(1)(B), as the Proposed Sale violates Texas law. The Proposed Sale seeks authority, without the prior separate express consent of consumers, to: (a) transfer or disclose customers' genetic data to any person other than the company's vendors and service providers; (b) use customers' genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; and

---

[41] 23andMe, Privacy Statement (Nov. 7, 2011-March 14, 2025), https://www.23andme.com/legal/privacy/; archived at: https://web.archive.org/web/20250000000000*/https://www.23andme.com/legal/privacy (last visited on April 7, 2025).
[42] Id.
[43] Id. at 23andMe, Privacy Statement (June 8, 2022).
[44] Id. at 23andMe, Privacy Statement (Dec. 7, 2015 and Sept. 29, 2016).

(c) process the sensitive data of a consumer.

32.     However, as noted above, restrictions or conditions on the Debtors' interests that are not otherwise precluded by law become property of the estate, and the Debtors' rights are not enlarged against others beyond those existing at the commencement of the case.[45]  Here, Texas law restricts or conditions the Debtors' interests in the Highly Sensitive Data on obtaining prior separate express consent, and the laws are not invalidated by any provision of the Bankruptcy Code.  These restrictions are not tied to the Debtors' insolvency, existed pre-bankruptcy filing, and excepting only the Debtors' vendors or service providers, are triggered in any context involving the Debtors': (a) transfer or disclosure of customers' genetic data; (b) use of customers' genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; and (c) processing of customer's sensitive data.[46]  Regeneron and TTAM are not the Debtors' vendors or service providers.  Accordingly, the Proposed Sale violates nonbankruptcy law and is not permitted under Texas law absent the Debtors obtaining customers' prior separate express consent.

---

[45] See In re N.S. Garrott & Sons, 772 F.2d at 465–67 (noting that "the estate cannot acquire greater interests than those which the debtors had . . . ."); see also In re Schauer, 62 B.R. at 530 ("The trustee and the estate succeed only to the title and rights in property which the debtor had; the mere commencement of a bankruptcy case does not vest the trustee with property rights which the debtor could not himself wield."); see also State of Missouri v. U.S. Bankruptcy Court of the Eastern District of Arkansas, 647 F.2 768, 770 (8th Cir. 1981) ("Although we hold that the bankruptcy court has preliminary jurisdiction over the property, we emphasize that the bankruptcy court must administer the debtors' limited interest consistent with the ownership rights of holders of documents of title under Missouri law…"); see also In re Kramer, No. 19-12014-R, 2022 Bankr. LEXIS 330, at *12 (Bankr. N.D. Ok. Feb. 8, 2022) (holding that the "Trustee's proposed sale and transfer of the economic benefits of the estate's interest" in property was subject to all contractual provisions as construed by state law because the trustee only succeeds to the title and rights the debtor had in the property prior to bankruptcy); see also In re Sanders, 969 F.2d 591, 593 (7th Cir. 1992) ("[A] bankruptcy trustee succeeds only to the title and rights in property that the debtor had at the time she filed the bankruptcy petition. Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest. Further, a trustee takes the property subject to the same restrictions that existed at the commencement of the case. To the extent an interest is limited in the hands of a debtor, it is equally limited as property of the estate." (internal citations omitted)).

[46] Cf. 11 U.S.C. § 363(l) (providing that "the trustee may use, sell, or lease property…notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor,…and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in the such property").

      **(3)     The Proposed Sale Does Not Meet the Conditions in § 363(f).**

33.     The parties seek authority of the Proposed Sale free and clear of customers' property and ownership rights and interest, but do not meet any of the prerequisites contained in section 363(f).

34.     As discussed above, in III.B(2), Texas law does not permit the Proposed Sale absent the Debtors obtaining customers' prior separate express consent, which the Debtors have not obtained and do not provide for in the Proposed Sale.[47]  The customers' interest is not a lien, and because Texas law explicitly provides consumers with exclusive property, ownership, and control rights, the only interest in dispute is that of the Debtors.  Also, customers' property and ownership rights and interests at issue here are not the type of interests that are reducible to a claim for which the Debtors can compel customers to accept a portion of the proceeds of the Proposed Sale in satisfaction of their interests.[48]

      **(4)     Section 363 Does Not Authorize the Debtors' "Change in Ownership."**

35.     The Bid Procedures Order and Bidding Procedures authorized the Debtors to solicit and purse a sale under section 363.[49]  To undermine customers' property rights and interests and

---

[47] Consent under the DTC Genetic Testing Act, requires a separate "affirmative response to a clear and meaningful notice regarding the collection, use, or disclosure of genetic data for a specific purpose." Tex. Bus. & Com. Code § 503A.001(5). Consent under the TDPSA "means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer," but does not include "acceptance of a general or broad terms of use or similar document . . . ." Id. § 541.001(6). Bankruptcy courts have similarly determined "consent" means an affirmative act. See generally, In re Roberts, 249 B.R. 152, 155 (Bankr. W.D. Mich. 2000) (The terms "consents" and "fails to object" are not synonymous. "When a person consents to a particular action, that person has equivocally manifested his or her affirmation of the proposed action through some discernable statement or act. In contrast, when a person fails to object to a proposed action, that person's affirmation can only be deduced from the lack of any statement or act which would suggest a contrary position . . . . '[C]onsent' obligates the trustee to approach the lienholder and secure the lienholder's assent if the trustee wishes to sell the property free and clear of the lien."); see also In re DeCelis, 349 B.R. 465, 469 (Bankr. E.D. Va. 2006) ("If consent in section 363(f)(2) was intended to include silence, Congress "knew how to say so . . . [i]t did not.").

[48] See Trans World Airlines, Inc. v. Knox-Schillinger (In re TWA), 322 F.3d 283, 291 (3rd Cir. 2003) (finding that EEOC discrimination claims "are reducible to, and can be satisfied by, monetary awards even if the relief sought is injunctive in nature" and thus fell under the exception in § 363(f)(5)); see also In re Kellstorm Indus., Inc., 282 B.R. 787, 794 (Bankr. D. Del. 2022) ("Any interest in property that can be reduced to a money satisfaction constitutes a claim for purposes of section 363(f)(5).").

[49] D.E. 125.

14

specifically circumvent state law, however, the parties simultaneously include and carve-out the Highly Sensitive Data from the definition of "Acquired Assets" in the APAs, and frame the transaction regarding Highly Sensitive Data as a mere "change in ownership" that "shall not constitute a sale, transfer, or disclosure:"

**Regeneron APA:**[50]

§ 1.1 - "Acquired Assets" means all of the properties, rights, title, interests and other tangible and intangible assets that Sellers own or possess (other than, except in the case of <u>clause (b)</u> below . . .and that are related to or used or held for use by such Seller in connection with the conduct of the Business as the same shall exist on the Closing Date, and shall include: . . . (b) all customer data and all biological samples of the Business that are biobanked or otherwise in the possession of Sellers, including genetic data, processed genetic data, analyses of raw genotyped data, phenotype data, ancestry, surveys, user-generated or reported data, linked medical records or other linked health data, account information and biological samples (saliva and blood samples) of the Business (collectively, the "Industry Data").

§ 1.1 – "Customer Data" means all genetic data, processed genetic data, analyses of raw genotyped data, phenotype data, ancestry, user-generated or reported data, linked medical records or other linked health data, account information and biological samples (saliva and blood samples), including, for the avoidance of doubt, such material or data containing Personal Information of customers of the Business at the Closing Date. [51]

§ 4.4 – <u>Change in Ownership.</u>  Sellers and Purchasers acknowledge and agree that the change of ownership of Customer Data included in the Acquired Assets from Sellers to Purchaser pursuant to this Agreement shall not constitute a sale, transfer or disclosure of Customer Data and shall solely constitute a change in ownership of such Acquired Assets, and shall be made for the sole purpose of enabling Purchaser to continue operating the Business subject to <u>Section 7.11</u>.

**TTAM APA:**[52]

§ 1.1 – "Acquired Assets" means all of the properties, rights, title, interests and other tangible and intangible assets the Sellers own or possess . . . as the same shall exist on the Closing Date . . . .

§ 4.4 – <u>Change in Ownership.</u>  Sellers and Purchaser acknowledge and agree that the

---

[50] D.E. 420, pp. 12, 39.
[51] The terms "Industry Data" and "Customer Data" are defined in similar, but distinguishingly different ways.  <u>Id.</u> at pp. 12, 18.  The Debtors indicated this was a drafting error but, as noted below in III.E., the differing definitions and references in various provisions of the APA raise concerns as to the true meaning of Regeneron's "commitments" regarding the Highly Sensitive Data in § 7.11.
[52] D.E. 420, pp. 109, 140.

change of ownership of Personal Information included in the Acquired Assets from Sellers to Purchaser pursuant to this Agreement shall not constitute a sale, transfer or disclosure of Personal Information and shall solely constitute a change in ownership of such Acquired Assets, and shall be made for the sole purpose of enabling Purchaser to continue operating the Acquired Assets <u>subject to Section 7.12</u>.[53]

36.     Curiously, though, approval of the transaction that is "not a sale, transfer, or disclosure" carries all the same benefits only afforded to sales under section 363.[54]  Despite the parties' labels, there can be no reasonable dispute that the transactions contemplated under either APA will result in, at minimum, "disclosure" of the Highly Sensitive Data to persons that are not the Debtors' vendors or service providers, including Regeneron or TTAM.   There are no exemptions for "change in control," "acquisitions," "equity transfers," "stock purchases," or any other terminology the parties concoct to try and avoid the requirements under Texas law.[55]   The substance of the APAs also reflect a functional disclosure and transfer of control over the Highly Sensitive Data to a new, separate legal entity:

| Regeneron Pharmaceuticals, Inc. APA D.E. 420 | TTAM Research Institute APA D.E. 420 |
|---|---|
| Sec. 2.1 "Seller will **sell**, **transfer**, **convey**, **assign**, **deliver** and set over to Purchaser or a Designated Purchaser, and Purchaser or a Designated Purchaser will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under, the **Acquired Assets**, free and clear of all Liens and Interests (other than Permitted Encumbrances), pursuant to Section 363 of the Bankruptcy Code." | Sec. 2.1 "Seller will **sell**, **transfer**, **convey**, **assign**, **deliver** and set over to Purchaser (or the applicable Designated Purchaser(s)), and Purchaser (or the applicable Designated Purchaser(s)) will purchase and accept, all of the right, title, benefit and interest of such Seller in, to and under, the **Acquired Assets**, free and clear of all Liens and Interests (other than Permitted Encumbrances and Assumed Liabilities), pursuant to Sections 105, 363(f), 365 and/or 1123(b)(4) of the Bankruptcy Code, as applicable." |

---

[53] While the term "Personal Information" has a precise definition, it is not listed as one of the specified "Acquired Assets," presumably falling under the "including (but not limited to)" clause. underline{Id.} at p. 126.

[54] underline{See, e.g.}, Regeneron APA, §§ 1.1, 2.1, 2.4, 2.6, 4.2, 5.1, 11.2, and 11.5; TTAM APA, §§ 1.1, 2.1, 2.4, 4.2, 5.1, 7.13, 7.22, 11.5, and 11.9; D.E. 420, ¶¶ F, N, Q, 10, 12, 14, 21, and 25.

[55] The DTC Genetic Testing Act prohibits transfer or disclosure of genetic data to unrelated third parties, for use for a purpose other than the primary purpose, and retention of the biological sample without separate express consent. Tex. Bus. & Com. Code § 503A.003(1). The TDPSA prohibits the disclosure of sensitive data without the consumer's consent and consent does not include acceptance to general terms of use or other document. <u>Id.</u> §§ 541.101(b)(4), 541.001(6) (defining "consent"), 541.001(22) (defining "process" to include "disclosure").

| | |
|---|---|
| Sec. 4.1 "All documents **delivered** and all transactions consummated at the Closing will be deemed for all purposes to have been **delivered** and consummated effective as of the Effective Time. | Sec. 3.3(b) "The parties agree that the **purchase and sale of the Acquired Assets pursuant to this Agreement** shall be treated for U.S. federal, state and local income tax purposes as the purchase and sale of the Acquired Assets in a taxable transaction governed by Section 1001 of the Code." |
| Sec. 4.2 "Seller will **deliver** . . . any physical **Acquired Assets** within the control or possession of such Seller or its Affiliates, it being understood that the delivery required hereunder shall be deemed satisfied if such **assets are made available to the Purchaser** for collection[.]" | Sec. 4.1 "All documents **delivered** and all transactions consummated at the Closing will be deemed for all purposes to have been **delivered** and consummated effective as of the Effective Time." |
| Sec. 5.1(m)(viii) "Sellers have complied in all material aspects with applicable Privacy Requirements in relation to **the transfer of Personal Information to third parties**." | Sec. 4.2 "Seller will **deliver** . . . any physical **Acquired Assets** of such Seller or its Affiliates, it being understood that the delivery required hereunder shall be deemed satisfied if such **assets are made available to the Purchaser for collection**" |
| Sec. 5.1(m)(ix) "any **transfer of Personal Information** by Sellers to Purchaser in connection with the execution or delivery or performance of this Agreement or any Related Agreements will comply with all applicable Privacy Requirements and Sellers are not required to provide notice to obtain consent from any relevant individual prior to effectuating such transfer." | Sec. 5.1(l)(iv) "**Sellers have the right to transfer** to the Purchaser, and, giving effect to Section 7.12 and subject to applicable Law, upon Closing the **Purchaser will have the right to** continue to **collect**, **use** and otherwise **process**, all **Personal Information** included in the Acquired Assets in the same manner as in the conduct of the Business prior to Closing, without undue restriction or delay and without breach of Privacy Requirements, in all material respect." |
| Sec. 5.1(m)(xi) "Following the Closing, **Purchaser** and/or the Designated Purchaser shall be **permitted to use the samples and Personal Information included in the Industry Data** to the same extent Sellers were permitted to use such Personal Information prior to the Closing, after giving effect to Section 7.11." | Sec. 5.1(s)(v) "**None of the Acquired Assets constitutes** stock, partnership interests or any **other equity interest** in any Person for U.S. federal income Tax purposes." |
| Sec. 5.1(r)(vi) "**None of the Acquired Assets constitutes** stock, partnership interests or any **other equity interest** in any Person for U.S. federal income Tax purposes." | Sec. 5.2(j) "**Purchaser is acquiring the Acquired Assets** for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Purchaser has no present intention of selling, granting |

17

| | any participation in, or otherwise distributing the same." |
|---|---|
| Sec. 5.1(v)(iv) "The Acquired Assets **delivered** at the Closing shall include the Industry Data. At the Closing, the **Industry Data shall transfer** to Purchaser or a Designated Purchaser, free and clear of all Liens, other than Permitted Encumbrances." | Sec. 11.5 "The **transfer of the Acquired Assets shall vest Purchaser** (or the applicable Designated Purchaser(s)) with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities) pursuant to Sections 105, 363(f), 365 and/or 1123(b)(4) of the Bankruptcy Code].]" |
| Sec 5.2(i) "**Purchaser is acquiring the Acquired Assets** for investment for Purchaser's own account, not as a nominee or agent, and not with a view to the resale, and Purchaser has no present intention of selling or otherwise distributing the same." | |
| Sec. 11.5 "The **transfer of the Acquired Assets shall vest Purchaser** with all right, title, and interest of Sellers in the Acquired Assets free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances) pursuant to Section 363 of the Bankruptcy Code[.]" | |

37.     However, if, as the Debtors contend, the Highly Sensitive Data transaction is *not* a sale or transfer, then the Court should deny the relief requested because neither section 363 nor the Bid Procedures Order authorize a "change in ownership," and the parties should not be permitted to disclaim a sale while seeking sale approval and all the benefits attendant to a sale under section 363.

**C.    Section 363 Does Not Preempt State Law.**

38.     "Federal law may preempt state law" in three ways; first, in enacting the federal law, Congress may explicitly define the extent to which it intends to preempt state law. Second, even in the absence of express preemptive language, Congress may indicate an intent to occupy

an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government. Finally, if Congress has not displaced state regulation entirely, it may nonetheless preempt state law to the extent that the state law actually conflicts with federal law. Such a conflict arises when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[56]

39.    "[U]nder section 363(f), sales of estate property free and clear of interests are permitted, *inter alia*, to the extent applicable nonbankruptcy law so permits."[57] Here, section 363(b)(1) specifically recognizes that the sale of personally identifiable information cannot "violate applicable nonbankruptcy law."[58] This is a clear recognition that Congress did not intend to displace state regulation entirely.[59] Quite the contrary, Congress made clear that any sale of personally identifiable information, which includes the genetic data at issue in this sale, must comply with "applicable nonbankruptcy law."[60] Therefore, the only way preemption could occur is if there is a conflict between Texas law and the Bankruptcy Code.

40.    In order for the Court to conclude that the Bankruptcy Code preempts state law, "the court must conclude that an actual conflict exists between a specific provision of the Bankruptcy Code" and the state statute.[61] "Simply making a reorganization more difficult for a particular debtor, however, does not rise to the level of 'stand[ing] as an obstacle to the accomplishment of the full purposes and objectives of Congress.'"[62] Additionally, numerous cases

---

[56] *See* <u>Mich. Canners & Freezers Ass'n v. Agric. Marketing & Bargaining Bd.</u>, 467 U.S. 461, 469 (1984) (internal citations omitted).

[57] *See* <u>In re Drexel Burnham Lambert Grp., Inc.</u>, 120 B.R. 724, 735–36 (Bankr. S.D.N.Y. 1990).

[58] 11 U.S.C. § 363(b)(1)(B)(ii).

[59] *See* <u>Mich. Canners & Freezers Ass'n</u>, 467 U.S. at 469.

[60] 11 U.S.C. § 363(b)(1)(B)(ii).

[61] *See* <u>P.K.R. Convalescent Ctrs., Inc. v. Commonwealth of Va., Dep't of Med. Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.)</u>, 189 B.R. 90, 93 (Bankr. E.D. Va. 1995).

[62] *See* <u>In re Baker & Drake, Inc.</u>, 35 F.3d 1348, 1354 (9th Cir. 1994) (quoting <u>Schneidewind v. ANR Pipeline Co.</u>, 485 U.S. 293, 300 (1988)).

have held that section 363 does not invalidate state law restrictions on the transfer of interests.[63]
This is true because the trustee or the debtor-in-possession "takes only those rights that the debtor
had under state law."[64] It is an elementary rule of bankruptcy that the estate only succeeds to the
title and rights in the property that the debtor possessed.[65] As a result, a state law restraining the
transfer of an interest is not preempted by federal law.[66]

41.     There is no conflict between section 363 and Texas law. Texas is simply asking
that this section 363 sale comply with Texas property and privacy laws in connection with the sale,
transfer, or disclosure of genetic data, and that law requires express, separate, affirmative consent
of Texas consumers prior to consummation of the sale of that property.

**D.     The Proposed Sale to TTAM Involves Insiders, and as such, Requires Additional
Scrutiny.**

42.     The former CEO of the Debtors is Anne Wojcicki, who is currently serving on the
Board of Directors for Debtors.[67] Anne Wojcicki has appeared in this case, and is directly involved
in the operations of TTAM, one of the potential purchasers of the assets of Debtors. Anne Wojcicki
attempted to purchase assets of the Debtors pre-petition, and through TTAM, continues those

---

[63] See, e.g., In re Schauer, 835 F.2d 1222, 1225 (8th Cir. 1987) (holding that a state law requiring consent in order to
transfer patron margin certificates did not conflict with § 363 and thus the trustee could not transfer or assign the
certificates absent approval as required by state law); In re Paul, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001) (holding that
the trustee could not sell under § 363 the right to receive annuity payments without authorization of the state court as
required by state law); In re Borne Chemical Co., 54 B.R. 126, 132 (Bankr. N.J. 1984) (holding that "just as the sale
of licenses and certificates may be conditioned on compliance with federal or state requirements, the sale of real estate
should be subject to federal or state regulatory provisions" and that the state environmental statute did "not conflict
with the Bankruptcy Code"); Milk Indus. Regulatory Office of the Commonwealth of P.R. v. Rosa Dairy Farm, Inc.
(In re Rosa Dairy Farm, Inc.), 622 B.R. 806, 816 (B.A.P. 1st 2020) (holding that the regulatory law did not conflict
with the Bankruptcy Code and therefore was not preempted, thus requiring the debtor to comply with both the
regulatory law and the Bankruptcy Code); In re Baker & Drake, Inc., 35 F.3d 1348, 1354 (9th Cir. 1994) (holding
that a Nevada statute requiring that drivers for tax companies be employees of the companies rather than independent
contractors did not conflict with the Bankruptcy Code and therefore was not preempted).
[64] See In re Schauer, 835 F.2d 1225.
[65] Id. (quoting In re Klayer, 20 B.R. 270, 272 (Bankr. W.D. Ky. 1981)).
[66] Id.
[67] D.E. 32, ¶¶ 7.

efforts now.[68]

43.      An "insider" includes a person or entity that has a "sufficiently close relationship to the debtor that its conduct is made subject to closer scrutiny than those dealing at arm's length with debtor."[69] While engaging in insider transactions does not constitute a per se violation of fiduciary obligations, the fiduciary must prove that the transaction is inherently fair, carries the earmarks of an arm's length bargain, and was entered into in good faith.[70]

44.      Because of the involvement by Anne Wojcicki in one of the possible transactions at issue, the Court should closely consider the terms of the sale and APA in question, and determine whether the Proposed Sale complies with the higher standards required for an insider transaction.

**E.    Texas Further Objects to Specific Provisions of Both APAs and the Proposed Order.**

45.      Beyond the issues already addressed, the APAs and Proposed Order include provisions that are ambiguous or otherwise problematic:

**Regeneron APA:**

| D.E. 420 Page Number | APA Section/Term: | Issue/Objection: |
|---|---|---|
| 12-13 | 1.1 "Acquired Assets" | May include data of customers who requested data and account deletion from Debtors. |
| 13 | 1.1. "Acquired Assets" (j) | May include transfer of governmental licenses, permits, registrations, authorizations or approval, or discontinuation of obligations without requiring separate governmental approval or consent. |

---

[68] D.E. 32, ¶¶ 9, 82, 83–88; D.E. 420, pp. 127 (defining "Purchaser Affiliates" to include, inter alia, Anne Wojcicki, Anne Wojcicki Revocable Trust U/A/D/ 9/2/09, as Amended and Restated, and The Anne Wojcicki Foundation).
[69] See Eide v. Nat'l City Cap. Corp. (In re Riverside World Inc.), 366 B.R. 34, 43 (Bankr. N.D. Iowa 2007) (citing In re Controlled Power Corp. of Ohio, 351 B.R. 470, 475 (Bankr. N.D. Ohio 2006)).
[70] See Lange v. Schropp (In re Brook Valley IV, J.V.), 347 B.R. 662, 675 (B.A.P. 8th Cir. 2006); see also In re Apex Oil Co., 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988) (quoting In re Andy Frain Servs, Inc., 798 F.2d 1113, 1125 (7th Cir. 1986)).

| 15 | 1.1. "Assumed Liabilities" (d) | - Includes obligation to complete kits that have already been purchased without customer consent to a new company doing so.<br>- Unclear if customers will be made aware of change in who they are transacting with and who they should contact regarding questions, concerns, or issues. |
|---|---|---|
| 12, 18 | 1.1. "Customer Data," "Industry Data," | "Customer Data" and "Industry Data" overlap, but "Customer Data" includes "Personal Information." "Customer Data" is not included in the definition of Acquired Assets, but 4.4 does include it.<br>Definition of "Personal Information" doesn't include biological samples or genetic data<br>Definition of "Privacy Laws" does not include Texas laws relating to biological samples or genetic data. |
| 27, 28, 67 | 1.1 "Personal Information" and "Privacy Laws" and 7.11-Data Privacy and Security | Section 7.11 includes certain of Regeneron's commitments regarding Privacy Laws and Personal Information, but biological samples and genetic data are excluded from the definition of both "Personal Information" and "Privacy Laws," and this section does not seem to require any compliance with Texas's genetic data laws. |
| 67 | 7.11 - Data Privacy and Security | - The applicable policies, statements, terms of service, and notices should not be limited to those in place on the effective date of the APA and should include those in place at the time a consumer's biological sample or other information was submitted.<br>- Permits change of purpose without compliance with genetic data laws. |
| 78 | 12.2 - Governing Law | Disregards potential conflict of laws issues. |
| 81 | 12.7 - No Assignment; Binding Effect | Allows for a different, unknown purchaser, to be substituted without notice to anyone besides the Debtors and after the sale objection deadline and Sale Hearing. |
| 83 | 12.16 - No Liability; Release | Broad releases that include Avoidance Actions. |

**TTAM APA:**

| D.E. 420 Page Number | APA Section/Term: | Issue/Objection: |
|---|---|---|
| 109–111 | 1.1 "Acquired Assets" | May include data of customers who requested data and account deletion from Debtors. |
| 110 | 1.1. "Acquired Assets" (k) | May include transfer of governmental licenses, permits, registrations, authorizations or approval, or discontinuation of obligations without requiring separate governmental approval or consent. |
| 113 | 1.1. "Assumed Liabilities" (h) | - Includes obligation to complete kits that have already been purchased without customer consent to a new company doing so.<br>- Unclear if customers will be made aware of change in who they are transacting with and who they should contact regarding questions, concerns, or issues. |
| 109–111, 116, 126, 128 | 1.1. "Acquired Assets," "Company Genetic Database," "Personal Information," and "Seller Data" | -May include the data of customers who have closed or deleted their accounts or have requested the Debtors to do so.<br>-23andMe has neither verified which accounts have been deleted or closed nor have they set forth what happened to the data associated with those accounts.<br>-There are no terms in the TTAM APA that explicitly carve out deleted customer accounts and associated data from the Acquired Assets. |
| 126, 167 | 1.1 "Personal Information" and "Privacy Laws" and 7.12 - "Data Privacy" | Section 7.12 includes certain of TTAM's commitments regarding Privacy Laws and Personal Information, but this section does not seem to require any compliance with Texas's genetic data laws. |

| 167 | 7.12 - Data Privacy | - The applicable policies, statements, terms of service, and notices should not be limited to those in place on the effective date of the APA and should include those in place at the time a consumer's biological sample or other information was submitted.<br>- Permits change of purpose without compliance with genetic data laws. |
| 183–184 | 12.2 - Governing Law | Disregards potential conflict of laws issues |
| 133–134 | 2.7 – Designated Purchaser | -Allows for the Purchaser to designate any Affiliate, which could include an insider as discussed above, to acquire the assets with merely three business days' notice prior to closing.<br>-Allows insufficient time for any party to potentially oppose any such transfer or assumption to a "Designated Purchaser." |
| 146, 168, 180 | 5.1(l) – Data Privacy, 7.13 – Successor Liability, and 11.5 – Free and Clear | Broad releases that include insiders and/or board members that may still need to be litigated in relation to the 2023 data breach. |

## **Proposed Order Dated 5/28/25 - D.E. 420:**

| Section | Text | Objection |
|---|---|---|
| Findings of Fact, Section N., pp. 10–11. and Order of the Court, paragraph 25, p. 30. | N. **Successor or Other Derivative Liability**. With respect to any claims against, or other liabilities or obligations of, the Debtors, the **Purchaser is not, and will not (a) be a mere continuation or substantial continuation or alter ego of any of the Debtors, their respective estates, or any registered enterprise of the Debtors, (b) be a successor or the designated successor-in-interest of any of the Debtors,** (c) except to the express extent set forth in the Sale Transaction Documents, agree to assume any liabilities of any of the Debtors or (d) have merged with or assumed the interests of the Debtors. . . . | Directly contradicts Section 4.4 of the APA; Cannot be both a "transfer in ownership" that is not a sale, transfer or disclosure of the Highly Sensitive Data, while also not being a "mere continuation" of the Debtors. |
| Order of the Court, Paragraph 12 and 11., pp. 19–20. | 12. **Free and Clear**. On the Closing Date, except as otherwise expressly set forth in the Sale Transaction Documents… **all Acquired Assets shall be transferred to or vest in the Purchaser free and clear of all liens** (as defined in section 101(37) Bankruptcy Code), **claims** (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), **charges, interests, or other encumbrance**s… | State of Texas objects to waiver of state regulatory interests. |

F.    **Compliance with Texas Law is Not Unduly Burdensome.**

49.    Texas law requires, and general privacy concerns related to the protection of personally identifiable information dictate, that Texas consumers should be provided an opt-in option to allow their Highly Sensitive Data to be sold to the proposed Purchaser. This opt-in option is not overly burdensome and reduces the risk of disclosure of Highly Sensitive Data without the consumers' consent. Opt-in disclosure policies provide a stronger protection for consumer privacy rights than opt-out practices do.[71] Additionally, because the Debtors' have successfully notified former and current customers of the Notice of Bar Date by email,[72] a similar email message seeking separate express consent should not be at a substantial cost to the administration of the bankruptcy estate, nor take an undue amount of time to obtain.

47.    Said email message to Texas customers should include information that notifies Texas customers of their ability to opt in to the transaction once approved by the Court, with language suggested as follows:

> By Order of the United States Bankruptcy Court for the Eastern District of Missouri, all of the assets of 23andMe, including any biological sample you submitted, genetic data generated from the results and analysis of genetic testing, sensitive personal information that you as a customer have provided to 23andMe, medical records associated with Lemonaid Health, and other personally identifiable information, will be transferred to a [New York Corporation, Regeneron Pharmaceuticals, Inc./California nonprofit public benefit corporation, TTAM Research Institute] conditioned on your express consent by clicking the key below to affirmatively opt-into this transfer.

> If you do not opt-in by [insert date], then your biological sample, all of your genetic data, sensitive personal information, and your complete file will be destroyed by 23andMe. The decision to opt-in is an important one that should be carefully considered.

---

[71] See, e.g., U.S. West, Inc. v. FCC, 182 F.3d 1224 (10th Cir. 1999) (overturning a former FCC order creating an opt-in disclosure requirement because the less-restrictive opt-out requirement would be more appropriate under the circumstances).

[72] D.E. 349.

> Background: On March 23, 2025, [23andMe], of which you are a customer, filed Chapter 11 bankruptcy in the United States Bankruptcy Court for the Eastern District of Missouri, (23andMe Holding Co., *et al.*, Case No. 25-40976). Information regarding the bankruptcy case can be found at: https://restructuring.ra.kroll.com/23andMe.

48.     Texas has asserted that separate express consent is necessary to transfer, sell, or disclose data throughout the underlying bankruptcy case.[73] Should the Debtors and proposed Purchasers pose a concern based on a perceived change of the value of the Assets due to this opt-in consent requirement, the parties may choose to renegotiate the sale price. The cost to affected consumers outweighs the potential value to the bankruptcy estate, especially in light of the nature of the assets being transferred—extraordinarily sensitive genetic data, health and medical information, and other highly sensitive personally identifiable information, that once disclosed, cannot be changed.

## G.     Regulatory Protective Language in the Final Sale Order is Appropriate.

49.     Texas seeks to ensure that all applicable laws and regulations are followed in connection with the Sale. Specifically, Texas wants to preserve: (a) Texas's police and regulatory powers that any entity would be subject to as the owner or operator of property after the effective date of the Sale; (b) any liability to Texas under police and regulatory statutes or regulations that any entity would be subject to as owner or operator of property after the effective date of the Sale, including regulations on the transfer of any licenses; (c) any liability to Texas on the part of any person other than the Debtors; and (d) any causes of action Texas may have under applicable non-bankruptcy law, including all rights, claims and defenses to setoff and recoupment.

---

[73] D.E. 181, pp. 26–32.

50.    Accordingly, Texas respectfully requests that the following language be included in any order approving the Sale:

> Nothing in this Order or related documents, including any agreement related to the sale of the purchased assets, shall release, nullify, discharge, bar, impair, enjoin, or otherwise preclude or affect: (i) any liability to any governmental unit as defined in 11 U.S.C. § 101(27) ("Governmental Unit") that is not a "claim" as defined in 11 U.S.C. § 101(5) ("Claim"); (ii) any Claim of a Governmental Unit arising on or after the date hereof; (iii) any liability to a Governmental Unit under police and regulatory statutes or regulations that any entity would be subject to as the owner, agent, lessor, lessee, permittee, controller, or operator of property or rights to property that such entity owns, operates, licenses, or leases on or after the date hereof; or (iv) any liability to a Governmental Unit on behalf of any non-Debtor.  Nor shall anything in this Order release the Debtors from any Claim against the estate based on any pre-Closing actions nor enjoin, limit, or bar a Governmental Unit from asserting, exercising, or enforcing, outside this Court, any liability described in the preceding sentence or any police and regulatory powers.

> Further, nothing in this Order or related documents, including any agreement related to the sale of the purchased assets, authorizes the assumption, sale, transfer or assignment of any governmental (i) license, (ii) permit, (iii) registration, (iv) authorization or (v) approval, or the discontinuation of any obligation thereunder (collectively, "Governmental Interests"), without compliance with all applicable legal requirements and approvals under police or regulatory law.  Nothing in this Order shall: (i) be interpreted to require any Governmental Unit to approve or otherwise consent to the assumption, sale, assignment or transfer of any Governmental Interests; (ii) relieve any entity from any obligation to address or comply with information requests or inquiries from any Governmental Unit; (iii) affect any setoff or recoupment rights of any Governmental Unit; or (iv) divest any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

## IV.    RESERVATION OF RIGHTS

51.    Texas reserves the right to supplement this Objection or to raise additional arguments or objections to the Sale as necessary and appropriate.

## V.   <u>CONCLUSION</u>

52.     While expeditious consideration of the sale of property is not unusual in bankruptcy proceedings, the sale, transfer, and disclosure of the most sensitive of data must comply with applicable law, including state law that directly provides customers with a property interest in their data. As such, Texas requests the Court deny the Motion for Sale as proposed, and in the alternative, require the Debtors and/or any approved Purchaser to obtain express, separate, affirmative consent to the sale from Texas customers prior to the sale closing.

*[Remainder of page left intentionally blank.  Signature page follows.]*

Dated: June 10, 2025

Respectfully submitted,

**KEN PAXTON**
Attorney General

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**RACHEL R. OBALDO**
Chief for Bankruptcy & Collections Division

*/s/ Layla D. Milligan*
LAYLA D. MILLIGAN
Texas State Bar No. 24026015
ROMA N. DESAI
Texas State Bar No. 24095553
STEPHANIE EBERHARDT
Texas State Bar No. 24084728
Assistant Attorneys General
Office of the Texas Attorney General
Bankruptcy & Collections Division
P. O. Box 12548
Austin, Texas 78711-2548
P: (512) 463-2173/F: (512) 936-1409
layla.milligan@oag.texas.gov
roma.desai@oag.texas.gov
stephanie.eberhardt@oag.texas.gov

ATTORNEYS FOR THE STATE OF TEXAS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was filed electronically on the 10th day of June 2025, with the United States Bankruptcy Court, and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List and via email transmission on the following parties:

*Counsel for the Debtors*
Christopher Hopkins (chopkins@paulweiss.com)
Jessica Choi (jchoi@paulweiss.com)
Grace C. Hotz (ghotz@paulweiss.com)
Thomas H. Riske (thr@carmodymacdonald.com)
Nathan R. Wallace (nrw@carmodymacdonald.com)
Jackson J. Gilkey (jjg@carmodymacdonald.com)

*Office of the United States Trustee for the Eastern District of Missouri*
Joseph R. Schlotzhauer (joseph.schlotzhauer@usdoj.gov)
Paul A. Randolph (Paul.A.Randolph@usdoj.gov)

*Counsel for Potential Purchasers*
Elaine Golin (EPGolin@wlrk.com)
Emil A. Kleinhaus (EAKleinhaus@wlrk.com)
Michael S. Benn (MSBenn@wlrk.com)
Victor Goldfeld (VGoldfeld@wlrk.com)
Michael H. Casse (MHCassel@wlrk.com)
David M. Unseth (david.unseth@bclplaw.com)
Joseph O. Larkin (joseph.larkin@skadden.com)
Susheel Kirpalani (susheelkirpalani@quinnemanuel.com)
Daniel Holzman (danielholzman@quinnemanuel.com)
Kenneth Hershey (kenhershey@quinnemanuel.com)
Emma McCabe (emmamccabe@quinnemanuel.com)

*/s/ Layla D. Milligan*
Layla D. Milligan
Assistant Attorney General