# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: ) | **Case No. 25-40976-357** |
| **23ANDME HOLDING CO.,** *et al.*, ) | |
| | **Chapter 11** |
| Debtors. ) | **Jointly Administered** |
| ) | **Related to Docs. 527, 574, and 575** |
| ) | |
| ) | |
| ) | |

## <u>REPORT OF CONSUMER PRIVACY OMBUDSMAN</u>

June 11, 2025

Neil M. Richards, Esq.
Koch Distinguished Professor in Law
Director, Cordell Institute for Policy in
Medicine & Law
Washington University
Consumer Privacy Ombudsman

One Brookings Drive
MSC 1120-250-258
St. Louis, MO 63130-4899
Telephone: (314) 935-4794
nrichards@wustl.edu

# Report of Consumer Privacy Ombudsman in the 23andMe Bankruptcy Case

## TABLE OF CONTENTS

I.   Introduction .................................................................................................................. 1

   a.   Background on the CPO Role ................................................................................ 1

   b.   The CPO's Assignment ........................................................................................ 3

   c.   The CPO's Method ............................................................................................... 5

   d.   Summary of Legal Conclusions ........................................................................... 7

   e.   Summary of Recommended Privacy Safeguards ................................................. 8

   f.   Comparison of the Bidders ................................................................................ 11

II.   Factual Background ................................................................................................... 12

   a.   23andMe's Founding and Business Model ........................................................ 13

   b.   Trends Across 23andMe Account Holders ........................................................ 18

   c.   Personal Data Held by 23andMe ....................................................................... 19

   d.   Consents ............................................................................................................. 20

   e.   The 2023 Data Breach ....................................................................................... 22

   f.   The Company's Existing Data Security Program .............................................. 23

   g.   The Current Bankruptcy Proceeding ................................................................. 24

   h.   Proposed Purchasers ......................................................................................... 25

III.   23andMe's Privacy Representations, Terms of Service, and Privacy Statements ............... 28

   a.   The Company's Privacy Representations ........................................................... 29

   b.   The Company's Terms of Service ...................................................................... 30

   c.   The Company's Privacy Statement .................................................................... 32

   d.   Whether the Proposed Sale is Consistent with Company's Privacy Policies .................. 36

   e.   Lemonaid Health ............................................................................................... 41

IV.   Consumer Privacy in Genetic Data .......................................................................... 41

   a.   The Heightened Sensitivity of Genetic Data .................................................... 42

   b.   The Practical Limits of Notice and Choice Frameworks ................................... 46

V.   Costs and Benefits Associated with the Potential Sale or Transfer ........................... 52

   a.   Potential Losses or Gains to Privacy if Such Sale is Approved by the Court ................. 52

   b.    Potential Costs or Benefits to Consumers if Such Sale is Approved by the Court........... 54

VI.   Applicable Legal Background ........................................................................................ 60

   a.    Federal Laws ............................................................................................................ 60

   b.    State Laws ................................................................................................................ 72

   c.    International Laws .................................................................................................... 88

VII.  Whether the Proposed Sale Would Violate Applicable Non-Bankruptcy Law ................... 93

   a.    Genetic Privacy Laws .............................................................................................. 93

   b.    FTC Act/UDAP ..................................................................................................... 100

   c.    State Comprehensive Privacy Laws...................................................................... 102

   d.    State Consumer Health Data Laws ....................................................................... 103

   e.    Other Considerations ............................................................................................. 103

VIII.Recommendations of the CPO ..................................................................................... 105

IX.   Differences Between the Bidders................................................................................... 113

X.    Conclusion .................................................................................................................... 116

## I.    Introduction

Neil Richards, the Consumer Privacy Ombudsman ("CPO") appointed in this case pursuant to Bankruptcy Code section 332(a),[1] submits this examination report ("Report") to assist the Court in its consideration of the facts, circumstances, and conditions of the proposed sale of personally identifiable information of customers of 23andMe Holding Co. and eleven affiliated debtors (collectively, "23andMe," the "Debtors," or the "Company").

Under section 332(b) of the Bankruptcy Code, the CPO is required to "provide the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of personally identifiable information under section 363(b)(1)(B)."[2] This includes: (a) 23andMe's privacy policy;[3] (b) the potential losses or gains of privacy to consumers if the sale is approved by the court; (c) the potential costs or benefits to consumers if the sale is approved by the court; and (d) the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.[4]

### a.    Background on the CPO Role

The CPO mechanism was created by Congress as a result of the controversial *Toysmart* bankruptcy case. Toysmart.com was an early "dot-com" business that sold nonviolent children's toys over the Internet. When Toysmart went bankrupt in 2000, it sought to sell its assets, including data about the children for whom toys had been purchased, notwithstanding a privacy policy stating that information collected from customers would not be shared with third parties.

---

[1] 11 U.S.C. § 332(a).
[2] 11 U.S.C. § 332(b).
[3] For reasons discussed below, 23andMe's privacy policies are spread across multiple documents and representations, but 23andMe does have a "Privacy Statement" that contains many of these commitments and policies. *See Privacy Statement*, 23andMe, https://www.23andme.com/legal/privacy/full-version/ (last modified Mar. 14, 2025).
[4] *See* 11 U.S.C. § 332(b).

On July 10, 2000, the Federal Trade Commission ("FTC") sued under Section 5 of the FTC Act to prevent the sale in bankruptcy of the data.[5]  The litigation produced a settlement under which Toysmart was prohibited from selling its customer data except to a "qualified buyer" that (1) "concentrates its business" in the same market and purchased the "Goodwill" of the business and not merely its customer data; (2) expressly agreed to treat the customer data "in accordance with the terms of the Privacy Statement and [to] be responsible for any violation by it following the date of purchase"; (3) would not change the privacy policy without prior notice; and (4) would provide affirmative "opt-in" consent before any new policy or policy term would apply to already-collected data.[6]  Toysmart also promised to destroy customer data if a qualified buyer was not found within a year.  Subsequent to the settlement, several state attorneys general objected to the proposed sale as violating state unfair and deceptive practices laws, and as a consequence, the data was destroyed the next year.[7]  It is also worth noting that the *Toysmart* decision by the FTC was a 3-2 decision, in which two of the three Commissioners would have wanted even greater protection for customer data in bankruptcy.

Following the *Toysmart* case, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), which amended the Bankruptcy Code to permit the

---

[5] Press Release, Federal Trade Commission, *FTC Sues Failed Website, Toysmart.com, for Deceptively Offering for Sale Personal Information of Website Visitors* (July 10, 2000), https://www.ftc.gov/news-events/news/press-releases/2000/07/ftc-sues-failed-website-toysmartcom-deceptively-offering-sale-personal-information-website-visitors.

[6] Press Release, Federal Trade Commission, *FTC Announces Settlement With Bankrupt Website, Toysmart.com, Regarding Alleged Privacy Policy Violations* (July 21, 2000), https://www.ftc.gov/news-events/news/press-releases/2000/07/ftc-announces-settlement-bankrupt-website-toysmartcom-regarding-alleged-privacy-policy-violations#N_1; Stipulation and Order Establishing Conditions on Sale of Customer Information, *In re Toysmart, LLC*, No. 00-13995-CJK (Bankr. E.D. Mass. July 21, 2000), https://www.ftc.gov/sites/default/files/documents/cases/toysmarttbankruptcy.1.htm.

[7] Associated Press, *Technology Briefing: E-Commerce; Toysmart Database to Be Destroyed*, N.Y. Times, Jan. 10, 2001, https://www.nytimes.com/2001/01/10/business/technology-briefing-e-commerce-toysmart-database-to-be-destroyed.html. *See generally* Laura N. Coordes, *Unmasking the Consumer Privacy Ombudsman*, 82 Mont. L. Rev. 17, 23 (2021).

2

appointment of a CPO in cases in which personal data was sought to be sold as an asset in bankruptcy.  While CPOs have been appointed in a number of cases following the BAPCPA amendments, the mechanism has been sharply criticized in the academic literature as frequently producing only "privacy theater," in which there was an illusion of protection that was undermined by both the realities of bankruptcy practice, as well as structural defects in the selection of CPOs and the ways in which they have produced prior reports.[8]  This literature, which is well-researched, rigorous, and persuasive, identifies a number of such defects, including (1) the existence of a regular cohort of professional CPOs who might not have the correct incentives to conduct a thorough investigation and articulation of consumer interests; (2) that CPOs are often under-resourced; and (3) that CPO reports are often rushed given the time pressures of bankruptcy practice.  In preparing this Report, the CPO has been mindful of these criticisms and has sought to avoid them in order to present a thorough examination and Report that is helpful to the Court by fulfilling its charge to the CPO in the Joint Order and Stipulation.

### b.  The CPO's Assignment

In this case, the Court has specifically appointed the CPO to "conduct an examination and present a report to the Court pursuant to 11 U.S.C. §§ 332 and 363(b) to assist the court in its consideration of the facts, circumstances, and conditions of any and all proposed … sale(s) under the Bidding Procedures, which shall include, but is not limited to: (a) whether such sale or lease is consistent with the Debtors' privacy policies in effect or applicable to any persons or customers as of the Petition Date; (b) whether such sale or lease would not violate applicable

---

[8] *See, e.g.*, *Data Privacy in Bankruptcy: The Consumer Privacy Ombudsman*, 138 Harv. L. Rev. 1451 (2025); Christopher G. Bradley, *Privacy Theater in the Bankruptcy Courts*, 74 Hastings L.J. 607 (2023); Christopher G. Bradley, *Privacy for Sale: The Law of Transactions in Consumers' Private Data*, 40 Yale J. on Regul. 127 (2023); Laura N. Coordes, *Unmasking the Consumer Privacy Ombudsman*, 82 Mont. L. Rev. 17, 23 (2021).

nonbankruptcy law; (c) the potential losses or gains of privacy to consumers if such sale or lease

is approved by the court; (d) the potential costs or benefits to consumers if such sale or lease is

approved by the court; (e) the cybersecurity program and security controls utilized by any

potential purchaser; (f) any alternatives or changes required or warranted under federal or state

laws or regulations that would mitigate potential privacy losses or potential costs to consumers;

and (g) the Debtors' existing cybersecurity program and security controls for the purposes of

evaluating any of the items set forth in clauses (a) through (f) of this paragraph."[9]  "In

connection with the CPO's assessment of which of the Debtors' privacy policies were in effect

as of the Petition Date, the CPO shall review the historical changes to the Debtors' privacy

policies and the effect of those changes, if any, on the applicability of the current policy to

current and past customers, as well as any and all potential purchasers' policies regarding

privacy and cybersecurity related to PII, including genetic data, research, and materials, and

potential purchasers' compliance with applicable state and federal laws related thereto."[10]

This Report contains the recommendations of the CPO pursuant to his examination of the

issues charged by the Court pursuant to the Bankruptcy Code in the Joint Stipulation and Order

dated April 29, 2025.

Part of the CPO's role in this specific proceeding is to analyze the consequences of the

Company's potential sale to one of the two entities that are actively bidding as part of this

bankruptcy proceeding—Regeneron Pharmaceuticals, Inc. ("Regeneron") and TTAM Research

Institute ("TTAM") (collectively, the "Bidders").  Due to developments in the proceedings

---

[9] Joint Stipulation and Agreed Order Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman, ¶ 3, *In re 23andMe Holding Co.*, No. 25-40976-357 (Bankr. E.D. Mo. Apr. 29, 2025), Dkt. 346.
[10] *Id.*

involving the Debtors and each of these companies, the CPO's examination and analysis necessarily involved both of these companies rather than (as is typical) a single identified winning bidder.

Another variable that the CPO took into consideration for this Report is the Company's role as the owner of Lemonaid Health, Inc. ("Lemonaid Health"). The Company purchased Lemonaid Health in 2021 for $400 million.[11] It is a telehealth service that, based on its own privacy policy[12] (that is distinct from 23andMe's Privacy Statement), processes user data and other categories of personal information in the ordinary course of business. The CPO evaluated the potential sale and transfer of Lemonaid Health (in addition to the Company's core offerings involving genetic data), particularly because it is the CPO's understanding that Lemonaid Health would be included as part of the sale if TTAM were the winning bidder.[13]

### c. The CPO's Method

The CPO was appointed by the Court on May 6, 2025, and proceeded directly to retain counsel and begin his examination by reaching out to counsel for the Debtors and counsel for the Committee of Unsecured Creditors ("Committee"). Counsel for the Debtors provided a secure cloud folder in which materials relevant to the CPO's examination could be accessed. Working with counsel for Debtors, the CPO also sought and obtained meetings as soon as practicable with both Bidders.

---

[11] Press Release, 23and Me, *23andMe Agrees to Acquire Lemonaid Health* (Oct. 22, 2021), https://investors.23andme.com/news-releases/news-release-details/23andme-agrees-acquire-lemonaid-health.
[12] *Privacy Policy*, Lemonaid Health (last modified Mar. 14, 2025), https://www.lemonaidhealth.com/legals/privacy-policy.
[13] It is the CPO's understanding (based on information provided by Debtors' counsel on June 9, 2025) that, if Regeneron were to be the winning bidder, the Debtors would seek a separate buyer for Lemonaid Health. In the event that Lemonaid Health could not be sold, the asset would be winded down, and Lemonaid Health's data would likely be destroyed (subject to applicable legal retention requirements).

The CPO's examination was conducted on the basis of interviews with stakeholders, written questions given to such stakeholders, and additional written submissions that stakeholders provided.  In addition to meeting with the Committee, the CPO also met with representatives of subsets of the creditors, including counsel for both class action claimants and arbitration claimant customers of 23andMe who are pursuing relief as a result of the 2023 23andMe data breach.  The CPO also met with and/or considered written submissions from regulators, including the multistate group of state attorneys general ("AGs"), the California Attorney General's Office, the United States Senate Judiciary Committee, the FTC, and the Office of the Information and Privacy Commissioners of both Alberta and Québec (Canada).

Finally, the CPO received and carefully considered letters and written correspondence from concerned members of the public.  Most notably and helpfully, the CPO received a letter from a number of eminent legal scholars with expertise in bioethics, privacy, and health law (this letter is available at Appendix J).  The CPO also received written correspondence from the Global BioData Trust, "a nonprofit initiative formed in response to the 23andMe bankruptcy proceedings to advocate for the ethical stewardship of genetic and biometric data" (this correspondence is available at Appendix K).  Additionally, the CPO received emails from several 23andMe consumers, sharing concerns about their genetic data being included in 23andMe's asset sale and the difficulties experienced while trying to delete their own account, as well as the accounts of deceased relatives.  On the whole, all stakeholders were cooperative, though the complexity of the examination and the Debtors' insistence on an accelerated sale schedule meant that not all written submissions from the Debtors were received by the CPO from counsel for the Debtors within a week of the deadline for submission of this Report.

### d.  Summary of Legal Conclusions

Having concluded the assigned examination and analysis of both (1) the likely effect of applicable non-bankruptcy law on the proposed transaction and (2) the consistency of the Company's privacy policies to the proposed transaction, the CPO concludes as follows as to whether the proposed sale or transfer is consistent with Debtors' privacy policies and/or violates applicable non-bankruptcy laws:

**Compliance with the Debtors' privacy policies.** The CPO interprets "the Debtors' privacy policies" broadly, to include not just the many versions and revisions of the 23andMe Privacy Statement and 23andMe's Terms of Service, but also the frequent representations and promises 23andMe made about privacy, most of which were far more visible (and thus likely to be understood by consumers) than technical language about change in control deep in the Privacy Statement.  Based upon his examination, the CPO cannot conclude with certainty that the sale of the Company's data in bankruptcy is otherwise consistent with its privacy policies, particularly for those customers who created their accounts before the 23andMe Privacy Statement was amended in June 2022 to expressly note the potential for a sale of customer data in bankruptcy.

**Compliance with applicable non-bankruptcy laws.** Based on: (1) the repeated, clear promises made by the Company on whether it would "sell" customer information; and (2) the plausible claim that the sale or transfer of the Company's genetic information data assets would constitute a disclosure, transfer, or sale of such information under the genetic privacy laws of many states, the CPO cannot conclude that applicable non-bankruptcy law would not be violated as a result of the sale of the Company and its assets to either bidder under this bankruptcy proceeding, unless the Company has obtained appropriate consent from customers (in a manner

7

that complied with applicable state laws) prior to the winning bidder obtaining control of customer genetic data.

### e.  Summary of Recommended Privacy Safeguards

Regardless of whether the sale or transfer of the Company's data assets is permitted under current applicable non-bankruptcy laws (which, as noted earlier, the CPO cannot conclude is the case), the Court should consider requiring certain best practices for either bidder due to the inherent sensitivity of the underlying data "in order to mitigate potential privacy losses or potential costs to consumers."[14]  Based upon the examination of the facts and law relevant to the CPO's assignment, his experience, and with the assistance of counsel, the CPO recommends as follows, given the serious privacy and security risks present in this matter, the complex web of at least a hundred federal, state, and international privacy and security laws implicating the data at issue, and the consistent strong privacy and security promises made by the Debtors over the historical course of their business:

**Consent Safeguards.** Putting aside the issue of whether consent is legally required, as a best practice and privacy safeguard, the optimal solution from a consumer privacy perspective would be to mandate the Company to obtain separate, affirmative consent from its customers in order to sell their data to either bidder.  An alternative solution would be to mandate that the winning bidder obtain separate, affirmative consent from customers prior to using customers' data (this consent could be obtained the next time a user logs into their account, through a mandated outreach by email to solicit such consent).  In either scenario, the Company or the winning bidder would be prohibited from using dark patterns to solicit consent and would be

---

[14] 11 U.S.C. § 332(b)(4).

required to delete a customer's data if they did not provide their affirmative consent within a reasonable time period.

**Posthumous Use Safeguards.** With respect to the inevitability of posthumous genetic data, the best practice from a consumer privacy standpoint for the Company or any successor in interest to the data to take would proceed in three steps.  First, any holder of the sensitive genetic data moving forward should put in place clear procedures by which the next of kin of a deceased customer can take control of the account and delete the data if desired upon proof of death (perhaps by the executor of the estate presenting a valid state death certificate). Second, when customers have not logged into their accounts for a specified period (perhaps three years), the Company should email those account holders to see if they are able to respond. If the account holders do not respond within six months, the Company should presume those customers to be deceased and delete the accounts.  Third, the Company should clarify in its privacy policies and research consents that its consents do not extend beyond the death of an account holder unless an account holder manifests after informed consent (including notice of the consequences to living and unborn relatives) a separate, clear intention to donate the body of their data to science.

**Guarantee of Data Loyalty.** An additional important safeguard from a consumer privacy perspective would be to require the winning bidder to make an important substantive promise not to use Company customer data in a way that is inconsistent with the best interests of the data subject.  Such a safeguard would have the advantage, by ensuring loyal uses of personal information, of both avoiding privacy harm and supporting company trust.  Such a requirement could serve as a supplement to or possibly a replacement for individual affirmative consent in some instances, should the Court determine that such consent is either (a) not practical in the totality of the circumstances in this Chapter 11 case or (b) not legally required in those

9

jurisdictions that do not have a genetic privacy law mandating appropriate consent for the sale, transfer, or disclosure of genetic data.

**Actual Notice.** Another alternative but—to be clear—*significantly less protective safeguard* from a consumer privacy perspective would be to provide meaningful, actual notice to all 23andMe customers.  Ideally, such notice would be provided by the Company prior to the sale of consumers' data, providing consumers the opportunity to delete their data before it is transferred to the successful bidder.  This notice should be provided to consumers both through the application and web interfaces, as well as through individualized email and postal mail notice of the transfer.  Alternatively, the winning bidder should be required to provide meaningful, actual notice to all 23andMe customers via email and provide consumers with an opportunity to delete their data.  The CPO offers this option in the spirit of completeness but notes that this is likely to be a highly ineffective form of notice in practice.

**Publicly Available Privacy and Security Commitments.** In addition, the winning bidder should publicly commit to adhere to certain privacy and security standards with regard to the personal information they obtain from their acquisition of the Company's assets.  This type of public commitment would be akin to the requirements that are in consent decrees that companies regularly agree to with the FTC or state AGs as part of settlement orders and would create increased transparency around the winning bidder's safeguards for the acquired data.

**Future Bankruptcy Issues.** In order to avoid the level of complexity, uncertainty, and expense that the privacy and security issues in this matter have produced, the winning bidder should be required to make a binding commitment that, in the case of any future bankruptcy, it would acquire separate, explicit, informed, and easily revocable individual consent before it would seek to sell or transfer customer genomic data.

**Government Access Issues.** Because consumer genomic data of the sort held by 23andMe is of great interest to law enforcement in the prosecution of crimes, the CPO recommends that the winning bidder commit in its Privacy Statement and consumer-facing representations to litigate any law enforcement requests for customer genetic data to the greatest extent possible under the law, such as, for example, demanding the presentation of a valid search warrant.

### f.   Comparison of the Bidders

In terms of comparing the Bidders, the potential sale of the Company to either bidder creates unique challenges that the Debtors should evaluate carefully as part of their consideration of the winning bidder.

With respect to Regeneron, the Debtors should consider that the entity has never operated a direct-to-consumer ("DTC") genetic testing company and that it may not have the experience in dealing with issues that are unique in that regard (for example, handling mass volumes of data subject requests).  Additionally, Regeneron has indicated that it plans on relying on previously obtained permissions from Company customers with regard to its future uses of customer data. However, at the time of providing such consent, 23andMe customers did not anticipate that a completely different entity (with different objectives) would be relying on their consent for data processing, which creates a concern as to whether such use is consistent with consumers' reasonable privacy expectations.

With respect to TTAM – while certain individuals associated with TTAM (especially the co-founder and former chief executive officer of 23andMe, Anne Wojcicki, who is leading the TTAM effort) have experience operating 23andMe in the past (and thus do not pose the same concerns from an experience or customer expectations perspective), there are other challenges

associated with TTAM's bid.  For one, many of the individuals associated with TTAM were associated with the Company during the 2023 data breach, which led to the potential compromise of the personal (including genetic) information of approximately 7 million customers.[15]  Additionally, there are concerns associated with TTAM's role as a nonprofit because it potentially puts the Company outside of the scope of many data protection laws from an enforcement perspective, potentially creating a privacy and security enforcement and accountability vacuum.  Finally, TTAM's bid also includes Lemonade Health, which creates additional complications related to the evolving legal landscape for personal health records and the sensitivity with health data in general.  The CPO is generally concerned about these issues though cannot properly assess TTAM's purchase of Lemonaid Health without knowing who would purchase the entity in the event Regeneron was declared the winning bidder (as Regeneron's bid does not include Lemonaid Health).

## II.    Factual Background

This case, like *Toysmart*, presents novel and important questions at the intersection of privacy law and bankruptcy law.  Like *Toysmart*, it is likely to be highly precedential, because it involves the bankruptcy of another pioneering technology company using highly sensitive data, though this case involves at its core the consumer genetic data collected by 23andMe—a type of data that is (as explained below in Section IV) significantly more sensitive than that involved in *Toysmart*.

---

[15] *Credential Stuffing Incident: What Happened?*, 23andMe, (Dec. 5, 2023), https://blog.23andme.com/articles/addressing-data-security-concerns.

### a.  23andMe's Founding and Business Model

23andMe was founded in 2006 by Linda Avey, Paul Cusenza, and Anne Wojcicki.[16]  In 2021, 23andMe merged with Virgin Group's VG Acquisition Corp. to become a publicly traded company.[17]  Wojcicki was CEO of 23andMe until the Company filed for bankruptcy in March 2025.[18]

According to the Company, 23andMe was created with the mission to "help[] individuals understand their own genetic information using recent advances in DNA analysis technologies and web-based interactive tools."[19]  23andMe provides genetic reports to consumers through a DTC genetic testing kit, which the company calls a "saliva collection kit."[20] Consumers can purchase saliva collection kits directly from 23andMe or through authorized retailers (e.g., Amazon and Walmart).[21]  Consumers are instructed to spit into the "saliva collection tube," "register" the tube using a barcode provided by the Company, and mail the tube back to the Company's third-party laboratory for processing.[22]  Through this service provider,[23] the Company arranges for the sequencing of a portion of the customer's genome, which is then used

---

[16] 23andMe Media Center, *Fact Sheet*,
https://web.archive.org/web/20130119085732/http://mediacenter.23andme.com/fact-sheet/.
[17] Press Release, 23andMe, *23andMe to Merge with Virgin Group's VG Acquisition Corp. to Become Publicly-Traded Company set to Revolutionize Personalized Healthcare and Therapeutic Development through Human Genetics* (Feb. 4, 2021), https://investors.23andme.com/news-releases/news-release-details/23andme-merge-virgin-groups-vg-acquisition-corp-become-publicly.
[18] Ashley Capoot, *23andMe Files for Bankruptcy, Anne Wojcicki Steps Down as CEO*, CNBC (Mar. 24, 2025), https://www.cnbc.com/2025/03/24/23andme-files-for-bankruptcy-anne-wojcicki-steps-down-as-ceo.html.
[19] *Fact Sheet,* 23andMe Media Center,
https://web.archive.org/web/20130119085732/http://mediacenter.23andme.com/fact-sheet/.
[20] 23andMe, *How it Works*, https://www.23andme.com/howitworks.
[21] *Where to buy 23andMe DNA Test Kit?,* 23andMe, https://customercare.23andme.com/hc/en-us/articles/115014501108-Where-to-Buy-23andMe-DNA-Test-Kit.
[22] 23andMe, *How it Works*, *supra* n.20.
[23] *What Happens to My DNA Sample at the Lab?*, 23andMe, https://customercare.23andme.com/hc/en-us/articles/202904590-What-Happens-to-My-DNA-Sample-at-the-Lab.

to provide personalized genomic and health services available through the Company's web site and mobile app.[24]

The Company publicly claims to have around 15 million customers worldwide[25] (though this number does not necessarily account for the number of deletions the Company has had since its bankruptcy announcement). While 23andMe is a Delaware corporation[26] with corporate headquarters in San Francisco,[27] the Company has customers in Canada, Great Britian, Australia, Netherlands, France, Sweden, Denmark, Ireland, and Spain.[28] In a press release from January of this year, the Company stated that "[a]pproximately 84[%] of the Company's 15 million customers have opted in to participate in 23andMe's Research program."[29]

23andMe's services can be most helpfully divided into four categories: (1) ancestry services that allow customers to trace their genetic ancestry;[30] (2) health services providing detailed reports regarding a customer's genetic markers for various potential health issues;[31] (3) medical research that links consumers' genetic data to consumers' answers to online survey questions;[32] and (4) Lemonaid Health, which provides consumers with telemedicine services.[33]

---

[24] *How it Works*, 23andMe, *supra* n.2020.

[25] *23andME for Healthcare Professionals*, 23andMe, https://medical.23andme.com/.

[26] 23andMe Holding Co. Form 10-K for fiscal year ended March 31, 2024, https://www.sec.gov/ix?doc=/Archives/edgar/data/1804591/000180459124000038/me-20240331.htm.

[27] *Id.*

[28] Memorandum from Gretchen Ramos & John Carlin to Professor Neil Richards & Ryan Durrie, *In re 23andMe Holding Co. – Responses to CPO Questions (Set 1)*, at 2 (May 23, 2025) [hereinafter Responses to CPO Questions (Set 1)].

[29] Press Release, 23andMe, *23andMe Launches Discover23 to Help Accelerate Large-Scale Genetics Research for Biopharma Collaborators, Powered by Lifebit's Trusted Technology*, (Jan. 8, 2025), https://investors.23andme.com/news-releases/news-release-details/23andme-launches-discover23-help-accelerate-large-scale-genetics.

[30] *Health + Ancestry Service*, 23andMe, https://www.23andme.com/dna-health-ancestry/.

[31] *23andMe+ Total Health*, 23andMe, https://www.23andme.com/total-health/.

[32] *Becoming Part of Something Bigger*, 23andMe, https://www.23andme.com/research/.

[33] Press Release, 23andMe, *23andMe Agrees to Acquire Lemonaid Health* (Oct. 22, 2021), https://investors.23andme.com/news-releases/news-release-details/23andme-agrees-acquire-lemonaid-health.

### i. Ancestry

According to the Company, 23andMe's "ancestry service" is the "best DNA kit with the most comprehensive ancestry breakdown."[34]  The Company advertises that its ancestry-specific kit enables consumers to "[d]iscover where in the world your DNA is from across 4000+ regions —in some cases, down to the county level."[35]  Furthermore, the Company claims that the kit's ancestry detail report provides consumers with "population-specific reports that offer a granular view of your ancestry background, plus curated content on the history, food and popular travel destinations connected to your DNA ancestry."[36]  According to the Company, 23andMe's kit allows consumers to "trace [their] path back thousands of years" with an ancestry timeline that goes back more than eight generations.[37]

23andMe also advertises its "ancestry services" as a means to "find your people" and "open your world."[38]  According to the Company, consumers can use its DNA Relative Finder feature to "find your matches," "[c]ompare ancestries and traits," and "[m]esssage relatives directly to better understand your family connection."[39]  Furthermore, the Company claims to automatically build consumers' family trees based on consumers' DNA relationships.[40]  Finally, the Company provides consumers with a "share and compare" feature, allegedly allowing consumers to "[c]ompare your DNA ancestry results with family and friends to uncover similarities and differences."[41]

---

[34] *Ancestry Service*, 23andMe, https://www.23andme.com/dna-ancestry/.
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*
[41] *Id.*

### ii. Personal Health

As part of its services, 23andMe offers "Total Health," a "longevity platform" that is asserttedly built with "exome sequencing, blood biomarker analysis, and expert clinician oversight."[42]  According to the Company, the Total Health platform equips consumers with "the tools to age with health, productivity, and grace."[43]  More specifically, the Company claims to offer consumers "clinician-ordered sequencing and clinical interpretations of 100+ high impact genes associated with 55+ health conditions that, if detected early, may have effective preventive measures and clinical interventions."[44]  Furthermore, the Company offers biannual "biological age" monitoring, which, according to the Company, allows consumers to track "the condition of major body systems and organs" and "take steps to potentially slow down or reverse [the] course [of aging]."[45]

Additionally, 23andMe's "Premium Membership" asserttedly provides consumers with "[p]ersonalized insights for prevention and better health over time."[46]  According to the Company, the membership's "Health Action Plan" provides consumers with "personalized recommendations based on genetic and non-genetic data" and "actionable recommendations for lifestyle changes [and] clinical screenings including blood work."[47]  Furthermore, the Company claims to offer a variety of "premium reports" that indicate consumers' likelihood, based on their genetics, for high blood pressure, atrial fibrillation, coronary artery disease, breast cancer, prostate cancer, and colorectal cancer.[48]

---

[42] *23andMe+ Total Health*, 23andMe, https://www.23andme.com/total-health/.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *23andMe+ Premium*, 23andMe, https://www.23andme.com/membership/.
[47] *Id.*
[48] *Id.*

### iii. Medical Research

According to the Company, many of its premium health reports and features "are developed by 23andMe scientists using data and insights gathered from thousands of customers who have consented to participate in [the Company's] research."[49]  Advertising its medical research as an "opportunity to make a difference by participating in a new kind of research," 23andMe assertedly allows scientists to connect consumers' answers to online survey questions with consumers' genetic data.[50]  According to the Company, 23andMe has received "four grants from the U.S. National Institutes of Health" and has "identified hundreds of new genetic associations."[51]

To participate in the Company's medical research, consumers must consent to sharing their research information, which the Company defines as genetic information, self-reported information (e.g., age, ethnicity, etc.), genetic reports and surveys, and microbe data.[52]

According to the Company, customers' "registration information is stripped from their genetic data so they cannot reasonably be identified" and "registration information, such as [consumer's] name and contact information" is not included in the Company's research database.[53]  Furthermore, the Company states that it "stores personal information that researchers do need for analysis (like date of birth) in a separate database from the genetic data, and they are only linked by a randomly assigned research ID."[54]  According to the Company's Research Participation and Consent webpage, consumers can revoke their consent "at any time" and, upon

---

[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Research Participation and Consent,* 23andMe, https://customercare.23andme.com/hc/en-us/articles/212195708-Research-Participation-and-Consent.
[53] Responses to CPO Questions (Set 1), at 6-7.
[54] *Id.*

revocation, consumers' data "will not be included in studies that start more than 30 days after [customers] opt out."[55]

### iv.  Lemonaid Health

23andMe acquired Lemonaid Health, an online, on-demand medical care and pharmacy services platform, in 2021.[56]  In a press release, Wojcicki stated that "Lemonaid Health's telemedicine platform and digital pharmacy will enable us to bring better healthcare to individuals in an affordable and accessible way, and ultimately empower people to take better control of their health."[57]  According to the Company, Lemonaid Health "leverages clinical algorithms to augment its experienced medical providers' knowledge base" and serves patients in all 50 states.[58]

### b.  Trends Across 23andMe Account Holders

According to counsel for the Debtors, millions of 23andMe consumers have not logged into their accounts at all since June 9, 2022 (importantly, 23andMe's Privacy Statement was updated to include the word "bankruptcy" on June 8, 2022).  23andMe account deletions spiked (relative to past deletion rates) after the 2023 data breach was reported in the press, and they spiked again by a larger amount after the Company declared bankruptcy earlier this year.  According to press reports that are consistent with Company evidence reviewed as part of the CPO's examination, around two million 23andMe customers have submitted a data deletion request to the Company since the 2023 data breach, a very large increase compared to the

---

[55] *Research Participation and Consent, supra* n.52.
[56] Press Release, 23andMe, *23andMe Announces the Closing of its Acquisition of Lemonaid Health* (Nov. 1, 2021), https://investors.23andme.com/news-releases/news-release-details/23andme-announces-closing-its-acquisition-lemonaid-health.
[57] *Id*.
[58] *Id.*

baseline deletion rate in recent years that represents about one-sixth of all 23andMe customers.[59]

On the day of the Company's bankruptcy filing, 23andMe's website traffic surged 526% as

customers rushed to delete their data.[60]

### c. Personal Data Held by 23andMe

By any measure or standard, 23andMe holds a vast amount of extraordinarily sensitive

data regarding its customers. It would not be hyperbole to conclude that this is one of the

most—if not the most—sensitive collections of data about identified people ever sought to be

discharged in bankruptcy, a conclusion buttressed by the extraordinary level of media, public,

regulator, and lawmaker attention focused on the disposition of the personal data under this

proceeding.

23andMe defines the categories of what it describes as "personal information" that it

retains about customers in its Privacy Statement, available online on the Company's website.[61]

These data categories include genetic information (information regarding a customer's genotype

(e.g., the As, Ts, Cs, and Gs at particular locations in their DNA)), sample information (e.g.,

saliva samples), and self-reported information (including information about disease history and

family history, self-reported biometric information, and payment information (e.g., credit card

information)).

23andMe distinguishes between these categories of personal information and what it

describes as "Aggregate Information" that it does not consider to be personal information. This

---

[59] Marianne Kolbasuk McGee, *Sale of 23andMe: On the Hot Seat of Congress, States*, Bank Info Security (June 10, 2025), https://www.bankinfosecurity.com/sale-23andme-on-heat-seat-congress-states-a-28645.

[60] Kevin Williams, *23andMe Bankruptcy: With America's DNA Put on Sale, Market Panic Gets a New Twist*, CNBC (Mar. 30, 2025), https://www.cnbc.com/2025/03/30/23andme-bankruptcy-selling-deleting-dna-genetic-testing.html.

[61] *Privacy Statement, supra* n.3.

information is described as information that does not contain information about, nor can it reasonably be linked to, a specific individual. Aggregate Information, as defined by 23andMe, is information about a group of people, such as an analysis or evaluation of a group. Aggregate Information describes the group as a whole in such a way that no specific individual may be reasonably identified. For example, the number of 23andMe customers with a specific variant or health condition is Aggregate Information from 23andMe's perspective.[62]

23andMe also provides a definition of "de-identified information" in its Privacy Statement, which also describes the Company's uses of such information. "De-identified information" is defined as information that has been stripped of identifying data, such as name and contact information, so that an individual cannot reasonably be identified.[63] According to the Privacy Statement, if a consumer chooses to consent to the Company's "main research consent,"[64] 23andMe may use de-identified "genetic information"[65] and/or "self-reported information"[66] for research.[67] Subject to this consent, 23andMe may also use de-identified individual-level genetic information and self-reported information internally at 23andMe for research purposes.[68]

### d. Consents

Consent plays an important role in the Company's overall data flow. As part of account creation, a new customer must signify that they have read and agreed to the Company's Terms of Service and Privacy Statement[69] (although the Company does not verify that customers have

---

[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.*
[69] Responses to CPO Questions (Set 1), at 18-19.

actually read these lengthy documents; it merely relies on the fact that customers have checked a box saying that they have as a required element of account creation). As part of this "consent flow," customers must consent to the Company's processing of sensitive data if they want to use the services.[70]  Additional consents are obtained for additional use cases such as research,[71] biobanking,[72] and individual data sharing.[73]  Unlike with the Privacy Statement and Terms of Service, every customer is required to browse through every additional consent form before making a choice at the bottom of the screen.[74]  Nearly all of the consent forms in the initial "consent flow" sign-up have a hyperlink to the Company's Privacy Statement and Terms of Service, and some contain these hyperlinks in several places.[75]  The Company has mechanisms in place for customers to withdraw consent.[76]

Notably, none of the three use case-specific consent forms indicate what will happen to an individual's data after death.  Further, the biobanking consent in particular states that unless a customer withdraws their biobanking consent or closes the account, their permission to keep their samples at the 23andMe biobank never expires, and 23andMe may continue to store and analyze their samples.[77]  While the research consent form indicates that a customer's participation in 23andMe research could be terminated without their consent in the event of a transfer of ownership of 23andMe, the form does not speak to whether a customer's participation in research could continue without their consent in the event of a transfer of ownership.[78]

---

[70] *Id.*
[71] *Research Consent Document*, 23andMe, https://www.23andme.com/about/consent/.
[72] *Biobanking Consent Document*, 23andMe, https://www.23andme.com/about/biobanking/.
[73] *Individual Data Sharing Consent*, 23andMe, https://www.23andme.com/about/individual-data-consent/.
[74] Responses to CPO Questions (Set 1), at 20.
[75] *Id.*
[76] *Id.* at 17.
[77] *Biobanking Consent Document*, *supra* n.72.
[78] *Research Consent Document*, *supra* n.71.

### e. The 2023 Data Breach

Around April 2023, 23andMe had a data breach that lasted approximately five months and affected over 6.9 million customers.[79]  According to the Company, a threat actor gained unauthorized access to consumer's accounts through the process of "credential stuffing," using compromised usernames and password combinations from other breaches, to log into 23andMe accounts that had the same combinations.[80]  As a result, the threat actor was able to access information shared within the compromised accounts, including "DNA Relatives profiles connected to these compromised accounts, which consist of information that a customer chooses to make available to their genetic relatives when they opt in to participate in 23andMe's DNA Relatives feature."[81]  According to the Company, access to a DNA Relatives profile can include access to a consumer's profile name, date of birth, ancestry reports and matching DNA segments, percentage of DNA shared with matching profiles, and family tree.[82]  According to the Company, the threat actor accessed 14,000 user accounts through credential stuffing and had access to an additional 6.9 million profiles through 23andMe's DNA Relatives and Family Tree features.[83]

In September 2024, 23andMe agreed to pay $30 million and provide three years of security monitoring in a federal class action lawsuit stemming from the data breach.[84]  In a court filing, the Company called the settlement "fair, adequate and reasonable."[85]  In addition to the

---

[79] Jonathan Stempel, *23andMe Settles Data Breach Lawsuit for $30 Million*, Reuters (Sept. 13, 2024), https://www.reuters.com/technology/cybersecurity/23andme-settles-data-breach-lawsuit-30-million-2024-09-13/.
[80] *Credential Stuffing Incident: What happened?*, 23andMe, (Dec. 5, 2023), https://blog.23andme.com/articles/addressing-data-security-concerns.
[81] *Id.*
[82] *DNA Relatives Privacy & Display Settings*, 23andMe, https://customercare.23andme.com/hc/en-us/articles/212170838-DNA-Relatives-Privacy-Display-Settings.
[83] *Credential Stuffing Incident: What Happened?, supra* n.80.
[84] Stempel, *23andMe Settles Data Breach Lawsuit for $30 Million, supra* n.79.
[85] *Id.*

class action lawsuit, at least 5,000 customers have sought to arbitrate their claims against the Company.[86]  At the present time, neither the class action settlement nor the arbitration proceedings have been finalized.

###### f.   The Company's Existing Data Security Program

The Company has several policies and procedures addressing data security issues specifically.[87]  The Company has also received various ISO certifications and undergone extensive audits by an independent third party.[88]  According to the Company, its "Information Security Management System" is designed to identify, assess, prioritize, and mitigate risks across the Company, enhance resilience, and support the achievement of the Company's security objectives.[89]  The Company's position is that it has security measures in place for authentication, encryption, data segregation, and least privilege access.[90]  According to the Company, access to its service combines token-based, multi-factor authentication and strict least-privileged authorization controls.[91]  The Company has a process for assessing the cybersecurity controls of new third-party vendors.[92]  The Company undergoes third-party security assessments at least annually and conducts periodic security assessments internally.[93]  The Company's cybersecurity team is responsible for managing the day-to-day cybersecurity strategy of the organization, which includes oversight over cybersecurity tools and controls to protect company assets.[94]

---

[86] *Id.*

[87] Memorandum from Gretchen Ramos & John P. Carlin to Professor Neil Richards, *In re 23andMe Holding Co. – Debtors' Memorandum to CPO*, at 26 (June 1, 2025) [hereinafter Debtors' Memorandum to CPO].

[88] *The 23andMe Privacy Team Answers 10 Common Questions*, 23andMe (Dec. 6, 2021), https://blog.23andme.com/articles/privacy-questions-answered.

[89] Form 10-K, *supra* n.26.

[90] *The 23andMe Privacy Team Answers 10 Common Questions*, *supra* n.88.

[91] *Id.*

[92] Form 10-K, *supra* n.26.

[93] Responses to CPO Questions (Set 1), at 25.

[94] Form 10-K, *supra* n.26.

In addition to these policies and procedures, the Company has employed "various employees to oversee its compliance with applicable data protection laws."[95] All Company employees are required to complete security training as new hires, annually, and at any other times designated by its chief security officer.[96] There are specific training obligations related to the handling of genetic information.[97]

The Company made notable updates to its security policies and procedures after the 2023 data breach, including by requiring multi-factor authentication for all customers (both new and existing).[98] The Company also hired a new chief security officer in 2024.[99]

### g. The Current Bankruptcy Proceeding

On March 28, 2025, upon motion of the Debtors, the Court issued an order detailing bidding procedures for the sale of assets at issue in these bankruptcy proceedings. On May 6, 2025, following an order from the Court, the United States Trustee appointed Neil M. Richards as CPO in the Debtors' Chapter 11 cases.

On May 14, 2025, following an auction of their assets, the Debtors selected Regeneron as the "Successful Bidder" and TTAM as the "Backup Bidder." On May 17, 2025, the Debtors and Regeneron entered into an Asset Purchase Agreement ("APA"). TTAM responded by circulating (on May 17 and May 21, 2025) revised proposals to acquire the Debtors' assets at a higher purchase price than contemplated under the Regeneron APA.

---

[95] Responses to CPO Questions (Set 1), at 8.
[96] *Id*.
[97] *Id*.
[98] *Enhanced Customer Security at 23andMe with 2-Step Verification*, 23andMe (Nov. 6, 2023), https://blog.23andme.com/articles/enhanced-customer-security-at-23andme-with-2-step-verification.
[99] *Biography of Frank Russo*, 23andMe, https://investors.23andme.com/management/frank-russo (last visited May 23, 2025).

On June 6, 2025, upon motion of the Debtors, the Court established procedures for the submission of final proposals from Regeneron and TTAM.  Pursuant to these procedures, the Debtors will file a notice disclosing which bidder submitted the winning proposal no later than the date that is two business days after the later of (a) the sale objection deadline or (b) the public filing of the CPO's report.

### h.  Proposed Purchasers

#### i.  Regeneron

Founded in 2013, Regeneron is a biotechnology company that invents, develops, and commercializes medicines for people with serious diseases.[100]  Regeneron uses DNA for research and, according to its president, has developed treatments to prevent blindness, asthma, several forms of cancer, Ebola, and COVID-19.[101]  Over the last decade, Regeneron has worked with collaborators to develop what it describes as one of the world's largest genetic databases.[102]  According to the Company, at the Regeneron Genetics Center, the company leverages the power of human genetics and innovative technologies to build datasets, "sequence exomes," and "make meaningful associations between genes and diseases."[103]

### 1.  Regeneron's Cybersecurity Program and Controls

According to Regeneron, its cybersecurity program consists of policies and procedures aimed at prioritizing the confidentiality, integrity, and availability of data.[104]  The security program involves layering multiple security measures, and the comprehensive security

---

[100] *About Regeneron*, https://www.regeneron.com/about/our-company.
[101] Michael Levenson, *23andMe to Be Bought by Biotech Company for $256 Million*, N.Y. Times (May 19, 2025), https://www.nytimes.com/topic/subject/dna.
[102] Memorandum from Regeneron Pharmaceuticals, Inc., *In re 23andMe Bankruptcy: List of Privacy Questions for the Successful Bidder*.
[103] *Genetics to Therapeutics, Designed for All*, Regeneron, https://www.regeneron.com/science/genetics-center.
[104] Memorandum from Regeneron Pharmaceuticals, Inc., *In re 23andMe Bankruptcy: List of Privacy Questions for the Successful Bidder*, at 10.

framework is, according to Regeneron, designed using industry-leading standards.[105]  Some of the policies and procedures of the program include encryption technologies, secure backup solutions, anti-malware protection, access controls, network and endpoint security, and physical security.[106]  The physical security protections include secure remote access, vulnerability management, and a 24/7 system for monitoring and logging.[107]  All Regeneron employees are required to complete online training courses on security on a recurring basis.[108]  Employees are required to use complex passwords and employ other means to limit compromised passwords.[109]

Regeneron asserts that it regularly assesses risks from cybersecurity threats, monitors its information system for potential vulnerabilities, and tests those systems pursuant to its cybersecurity policies, processes, and practices, which are integrated into Regeneron's overall risk management program.[110]  According to Regeneron, it also has a dedicated incident response team.[111]  Regeneron also evaluates the security practices of its vendors and partners to ensure that they align with the company's security standards and expectations.[112]

### ii.  TTAM

According to its website, TTAM, which appears to be an acronym for "[T]wenty-[T]hree [A]nd [M]e" is "a nonprofit medical research organization dedicated to helping scientists and non-scientists join together to unravel the mysteries of DNA - the code of life."[113]  After Anne

---

[105] *Id.*
[106] *Id.*
[107] *Id.* at 10-11.
[108] *Id.* at 9.
[109] *Id.* at 10.
[110] Regeneron Pharmaceuticals, Inc., Annual Report (Form 10-K) for the fiscal year ended Dec. 31, 2024, at 67 (Feb. 5, 2025).
[111] *Id.* at 11.
[112] *Id.*
[113] *About TTAM Research Institute*, https://ttamresearchinstitute.org/.

Wojcicki resigned as the Company's CEO in March, she formed TTAM to place a bid to acquire the Company.[114]

### 1. TTAM's Cybersecurity Program and Controls

TTAM has indicated that a majority of its cybersecurity programming will be adopted or adapted from 23andMe's current cybersecurity framework.[115]  TTAM will use the Company's internal data protection policies and procedures as a guiding infrastructure for continuing to expand its privacy protections and will work with a cybersecurity firm to strengthen its cybersecurity infrastructure.[116]  TTAM is committed to building out privacy- and security-by-design on an ongoing basis, specifically by embedding privacy and security resources, controls, and best practices in product and development teams.[117]  TTAM anticipates maintaining the Company's existing workforce relating to privacy compliance, information security, and data governance.[118]  However, in their discussion with the CPO, TTAM stated that it anticipated that additional resources will be necessary to rebuild (at least in part) the Company's former information security and privacy teams.[119]  TTAM is considering engaging a third-party information security team to conduct a security risk assessment and provide recommendations on TTAM's security practices and controls post-acquisition to ensure TTAM's security practices are

---

[114] Alexandra Trenayne-Pengelly, *23andMe Bankruptcy Saga: Founder Anne Wojcicki Makes Last-Minute Bid for DNA Data*, Observer (June 5, 2025), https://observer.com/2025/06/23andme-former-ceo-anne-wojcicki-bid-dna-data/.

[115] *See In re 23andMe Bankruptcy*: Responses to Privacy Questions from the Consumer Privacy Ombudsman TTAM, at 2, 4 (stating that "TTAM is committed to maintain [*sic*] the Company's privacy and security policies and standards, as well as strengthening them in certain areas" and that "TTAM's leadership is uniquely situated, given its relationship with [the] Company and having played a large role in creating the Company's privacy program, to integrate the Company's existing data security practices into TTAM's own infrastructure and processes".

[116] *In re 23andMe Bankruptcy*: Responses to Privacy Questions from the Consumer Privacy Ombudsman, at 3.

[117] *Id.*

[118] *Id.* at 4.

[119] *Id.*

sufficiently robust.[120]  According to TTAM, it also plans to "ensure regular tabletop exercises, run by external and independent third parties, to ensure it is preparing over time as new threats evolve."[121]

### III.    23andMe's Privacy Representations, Terms of Service, and Privacy Statements

23andMe has made privacy a central part of its branding and commitments to its consumers.  23andMe's Privacy Statement itself opens with the strong claim "Privacy is in our DNA,"[122] which suggests that privacy is at the very core of its business, down to the smallest detail.  The listings and advertising around their products also makes statements regarding 23andMe's privacy policies and practices, reassuring customers that they are in control of the use of their data at 23andMe.[123]  Privacy is listed as a separate section on 23andMe's website.[124]  It is also relevant (for purposes of this bankruptcy proceeding) that the Company's Terms of Service also make privacy representations and discuss what happens to customers' data in the event of a change of control.  Given the importance of these representations (all of which, from the CPO's perspective, constitute the Company's "privacy policies," as they are made available to consumers), this section of the Report analyzes these documents in detail.  At the end of this section, the CPO addresses the question (asked by the Court) of whether the proposed sale or transfer is consistent with the Company's privacy policies.

---

[120] *Id.*
[121] *Id.*
[122] *Privacy Statement*, *supra* n.3.
[123] 23andMe, https://www.23andme.com/ (last visited June 11, 2025).
[124] *Your Privacy Comes First*, 23andMe, https://www.23andme.com/privacy/ (last visited June 10, 2025).

### a. The Company's Privacy Representations

In its customer-facing materials, 23andMe consistently and strongly asserts the ability of its customers to maintain control of their personal information.  These claims include statements on various product listings including:

- "[k]now that you are in control of your DNA";[125]

- "[d]iscovery should never come at the expense of privacy";[126] and

- "[y]our data is encrypted, protected, and under your control."[127]

Each listing is also accompanied by a statement that they are "Subject to 23andMe's Terms of Service at 23andm.com/tos and Privacy Statement at 23andMe.com/about/privacy."[128]

The Company makes further privacy representations by email when a customer purchases a DNA test kit from 23andMe.  In the first of these messages, the company states that "YOU are in control of your DNA and your data."[129]  Underneath an opt-in button, the message then states, "You opt in to sharing your information—not the other way around."[130] The third email of the series reads:

> Explore your DNA with confidence knowing that: **You are in control of your data**. From the moment you register your kit and set up your private account, you decide how your information is shared and with whom it is shared.[131]

---

[125] Product Detail Page for 23and Me Ancestry Service, AMAZON, https://www.amazon.com/23andMe-DNA-Test-Ancestral-Opt/dp/B01LZ5K87Z/ (last visited May 23, 2025); Product Detail Page for 23and Me Health + Ancestry Service, WALMART, https://www.walmart.com/ip/23andMe-Health-Ancestry-Service-DNA-Test-before-You-Buy-See-Important-Test-Info-below/678846605 (last visited May 23, 2025).

[126] *23andMe Ancestry Service - DNA Test Kit*, *supra* n.34; *23andMe Health + Ancestry Service – DNA Test*, *supra* n.30.

[127] *23andMe Ancestry Service - DNA Test Kit*, *supra* n.34; *23andMe Health + Ancestry Service – DNA Test*, *supra* n.30.

[128] *23andMe Ancestry Service - DNA Test Kit*, *supra* n.34; *23andMe Health + Ancestry Service – DNA Test*, *supra* n.30.

[129] *Privacy and Data Protection Messaging*, at 2, 23andMe (2025).

[130] *Id.*

[131] *Id.* at 3.

This message then goes on to point customers to the website for additional information, including the Company's FAQs.[132]  On the 23andMe website, the FAQ titled "Will the Information I Provide Be Shared With Third Parties" states that 23andMe does share information with "[c]ommonly owned entities, affiliates, and change of ownership", without a reference to bankruptcy specifically.[133]  However, on the Privacy page of the website, clicking a small "Read our Privacy Statement" link takes the user to a page entitled "What you should know about privacy at 23andMe."  If a user then clicks the index tab entitled "Data sharing," and then another button titled "Commonly owned entities, affiliates and change of ownership," and then the "Read more" button, the following information is provided: "[i]f we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction …."[134]

### b.  The Company's Terms of Service

Like many (if not most) companies, 23andMe make its Terms of Service publicly available on its website.  The current Terms of Service, dated March 14, 2025, were in effect as of the Petition Date.  This document is attached to this Report as Appendix A.  Customers are required to consent to 23andMe's Terms of Service in order to use 23andMe's services.[135]  The Terms of Service govern a customer's "use and access to 23andMe's products, software, services, and website[.]"[136]  Additionally, the Terms of Service provide that a customer's use of

---

[132] *Id.*

[133] *Will the Information I Provide Be Shared With Third Parties?*, 23andMe, https://customercare.23andme.com/hc/en-us/articles/202907870-Will-the-Information-I-Provide-Be-Shared-With-Third-Parties (last visited June 10, 2025).

[134] *Data Sharing*, 23andMe, https://www.23andme.com/legal/privacy/#data-sharing (last visited June 10, 2025).

[135] *Terms of Service,* 23andMe (last modified Mar. 14, 2025), https://www.23andme.com/legal/terms-of-service/full-version/.

[136] *Id.*

23andMe's services are governed by 23andMe's Privacy Statement.[137]  They also state that

"[a]ny information derived from your sample remains your information, subject to rights we

retain as set forth in these Terms."[138]

As described in 23andMe's memorandum ("memo") to the CPO, the process for creating

a 23andMe account includes the following steps:

> Customers provide this consent when registering their 23andMe kit before
> sending their saliva for processing …. [,] checking a box confirming, "I have read
> and agree to the Terms of Service and the Privacy Statement." Customers can
> access and review the Privacy Statement by clicking on the words "Privacy
> Statement" when creating an account to register a kit, which links to the text of
> the Privacy Statement. The next page customers are directed to after creating an
> account contains multiple links to Debtor's Privacy Statement and Terms of
> Service, and summarizes certain "[h]ighlights" and "[i]mportant [p]oints" from
> these policies. To proceed from this page, customers must click "Accept and
> Continue" after being informed that doing so indicates that they "accept the
> Terms of Service and acknowledge the Privacy Policy."[139]

It is important to note (again), however, that customers are not required to read or

understand these lengthy documents in order to create an account.  As detailed below in

Section IV.b, the fact that consumers do not read terms of service and privacy policies is

well-known, and the notion that they do is referred to by one academic study as "The

Biggest Lie on the Internet."[140]  It is notable that even though it has designed its interface

to make customers check a box to signify that they have read the Terms of Service or

Privacy Statement, 23andMe does not track whether its customers have ever read these

documents.[141]

---

[137] *Id.*
[138] *Id.*
[139] Debtors' Memorandum to CPO, at 18-19 (footnotes omitted).
[140] *See* Jonathan A. Obar & Anne Oeldorf-Hirsch, *The Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of Service Policies of Social Networking Services*, 23 Info. Comm'n & Soc. 128 (July 2018), https://doi.org/10.1080/1369118X.2018.1486870.
[141] Responses to CPO Questions (Set 1), at 20.

### c.  The Company's Privacy Statement

23andMe also makes its Privacy Statement publicly available on its website.  The current version of 23andMe's Privacy Statement is dated March 14, 2025 and was in effect at the time 23andMe filed for bankruptcy.  It is attached to this Report as Appendix B.  From November of 2007 through the current version, 23andMe's Privacy Statement has been revised or updated twenty-two separate times—a rate of more than once per year.  The Privacy Statement "applies to all websites owned and operated by 23andMe, Inc., including www.23andme.com, and any other websites, pages, features, or content we own or operate, and to your use of the 23andMe mobile app and any related Services."[142] (Notably, Lemonaid Health has its own privacy policy on its website.)

After they complete account registration, customers can access the Privacy Statement by clicking the "Privacy Statement" link, one of dozens of small links in the persistent footer of the website.  On the mobile app, a customer can access the Privacy Statement by clicking on the account symbol in the upper right-hand corner, which opens a "Settings" screen.  If the customer navigates to the "Legal" section of the Settings screen, they will be presented with a link to the Privacy Statement.[143]

23andMe makes privacy a distinctive point in its communications with customers, as described above.  This is also true when presenting its Privacy Statement.  Before showing the Privacy Statement in full, or specific terms, the Privacy page on 23andMe's website shows a bold blue statement in large font size that "Your privacy comes first."  On either side of this statement are stylized DNA double helix graphics into which padlocks (presumably connoting

---

[142] *Privacy Statement*, *supra* n.3.
[143] Debtors' Memorandum to CPO, at 19.

privacy and security commitments) have been introduced.  Beneath that banner are seven high-level bullet points in boxes that highlight what are presumably the most customer-salient elements of privacy at 23andMe.  Each such bullet has a sentence, of which certain (presumably, the most important) words are presented in bold, blue type, promising that "your genetic data will not be shared"; that "your individual data has never been released to law enforcement"; that "[w]e provide robust controls … when it comes to your genetic data"; that "each choice you make is an informed choice"; that when it comes to security there is the "strength of [our] security program"; that "[a]ll your sensitive information is encrypted"; and that the Company has "enabled app-based 2-step verification."



        In between a larger font promising that "You are free to change your consents at any time" and "You are in control of your data" is the smallest font on the page, which states "Read

our Privacy Statement."  Clicking that link leads to the Privacy Statement, a document currently comprising approximately 3,306 words and broken into seven different pages accessible by tabs on the left of the page.  Clicking the fifth of those tabs, entitled "Data sharing," leads a customer to the portion of the page dealing with changes of ownership, and, at least since 2022, provides the customer with information that their data may be sold or transferred as part of a bankruptcy proceeding.  This section undertook significant changes over time, with the full list of language changes provided in the chart attached as Appendix C.  The key change in the policies was the inclusion of "bankruptcy" to the possible change of control transactions covered by the Privacy Statement starting on June 8, 2022.[144]  Prior to this date, there was no reference to the term "bankruptcy" as part of the change in control language.

The change in this language is summarized here.  From June 8, 2022 through the present, the change in control language reads:

> If [23andMe] are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, [customer's] Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to [customer's] Personal Information as transferred to the new entity. [23andMe] may also disclose Personal Information about [customer] to [23andMe's] corporate affiliates to help operate our services and our affiliates' services.[145]

However, at present, unless a customer sees that they can click a relatively small hyperlink on the top right of the page titled "Full Privacy Statement," this information is presented in the third of four boxes, and initially displays only the words up to "this Privacy Statement will apply to your[.]"[146]  In order to read the full statement, a person would have to click again on a "Read More" button to read the full statement, including the part starting with

---

[144] 23andMe CPO Report, Appendix C, Chart of Change in Control Language.
[145] *Data Sharing*, 23andMe, *supra* n.134.
[146] *Id.*

the words "Personal Information as transferred to the new entity."  From the main 23andMe

webpage, this represents the fourth click a customer has to make in order to get to the relevant

language.

> From June 24, 2010 until June 7, 2022, the change in control language read:
>
> In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, [customer's] Personal Information will likely be among the assets transferred. In such a case, [customer's] information would remain subject to the promises made in any pre-existing Privacy Statement.[147]
>
> From November 11, 2007 through June 23, 2010, the change in control language read:
>
> In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, [customer's] personal information and non-personal information will likely be among the assets transferred. [Customer] will be notified in advance via email and prominent notice on [23andMe's] website of any such change in ownership or control of your personal information. [23andMe] will require an acquiring company or merger agreement to uphold the material terms of this privacy statement, including honoring requests for account deletion.[148]

It is important to reiterate that, even if a customer were to navigate to the correct section

of the Privacy Statement, the 23andMe Privacy Statement did not actually mention sale in

bankruptcy until June 8, 2022.  When this change was made almost exactly three years ago,

customers were not notified by email of this change, as 23andMe did not consider the changes to

the Privacy Policy as a whole to be material.[149]  Instead, 23andMe provided notification by the

addition of the word "updated" next to "Privacy Statement" on the website home page footer.[150]

In addition to its Privacy Statement and Terms of Service, 23andMe has additional

specific privacy notices for various jurisdictions.  These include a Privacy Notice for U.S. State

---

[147] Debtors' Memorandum to CPO, at 20.
[148] *Id.*
[149] *Id.* at 20-21.
[150] *Id.* at 20.

Residents (the "State-Specific Notice")[151] and an EEA, UK, and Switzerland Privacy Notice (the

"EU Notice").[152]  Each of these notices is hyperlinked within the Privacy Statement.[153]  The

State-Specific Notice is a list of the rights afforded residents of the specific states covered,

including customer rights such as to know if 23andMe sell or share data to or with third parties

and the right to opt out of such sale or sharing, the right to delete customer data, and the right to

access and receive an overview of any data held by 23andMe.

The EU Notice describes 23andMe's mechanisms for compliance with privacy rights

available to individuals located in the Covered European States and provides disclosures

covering international data transfers, the legal bases for processing PII, and how residents of the

Covered European States may exercise their rights under the applicable privacy laws.

In total, these documents represent a daunting read for consumers.  Putting to one side the

fact that there have been many changes to these documents and their terms over time, the current

Privacy Statement is 3,306 words, the Terms of Service is 1,634 words, the EU Notice is 1,238

words, and the State-Specific Notice is 3,203 words, representing a total of 9,381 words.

### d.  Whether the Proposed Sale is Consistent with Company's Privacy Policies

One of the questions asked of the CPO in the Joint Order and Stipulation is to analyze

"whether such sale or lease is consistent with the Debtors' privacy policies in effect, or

applicable to any persons or customers as of the Petition Date."[154]  Consistent with the academic

---

[151] *Privacy Notice for U.S. State Residents*, 23andMe (last modified Mar. 15, 2024),
https://www.23andme.com/legal/us-privacy/. The states included in the notice are California, Washington,
Colorado, Virginia, Utah, and Connecticut.
[152] *EEA, UK and Switzerland Privacy Notice*, 23andMe (last modified Apr. 17, 2025),
https://www.23andme.com/legal/eu-privacy-notice/. This applies to the European Economic Area (inclusive of the
European Union), United Kingdom, and Switzerland (collectively, the "Covered European States").
[153] *Privacy Statement*, *supra* n.3.
[154] Joint Stipulation and Agreed Order Directing the United States Trustee to Appoint a Consumer Privacy
Ombudsman, *supra* n.9, at 6.

literature on how consumers reasonably understand privacy terms, the CPO interprets "the Debtor's privacy policies" broadly, to include the full sweep of privacy representations and promises that the Company has made to its customers.[155]  This includes not just the many versions and revisions of the "privacy policy" split among at least four documents—the 23andMe Privacy Statement (22 versions), the 23andMe Terms of Service (21 versions), the 23andMe EU Notice, and the 23andMe State-Specific Notice—but also the frequent representations and promises 23andMe made about privacy, most of which were far more visible (and thus likely seen and understood by consumers) than technical language about asset transfers deep in the Privacy Statement.  This reflects the consistent conclusions of the relevant academic literature that consumer-facing privacy statements should be judged as consumers actually encounter them, and not on the basis of individual, often technical sentences pulled out and analyzed as a trained lawyer would read them.[156]  Such an approach has been used in at least one CPO report in the past and is consistent with avoiding the critique in the academic literature that the CPO review mechanism can become little more than a rubber stamp if not done with an awareness of the broader understandings of privacy law.[157]  Moreover, the CPO has been provided evidence that a meaningful number of 23andMe do not regularly log in to their accounts and are thus highly unlikely to be aware of changes to the Privacy Statement that they

---

[155] This is also how regulators perceive their jurisdiction when interpreting their laws. *See e.g.*, *Privacy and Security Enforcement*, FTC, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement ("When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce.").

[156] Section IV.a-b below.

[157] *See, e.g.*, Bradley, *Privacy Theater in the Bankruptcy Courts*, *supra* n.8, at 646.

were not affirmatively notified of, particularly subtle ones like the addition of a single word like "bankruptcy."[158]

As elaborated upon earlier, the Company's customer-directed communications and customer-facing representations are replete with promises about both the importance with which it treats privacy and how it tells customers that it puts them in control with revocable choices about "your data."  While it is true that there has always been technical legal language in the fine print of the actual Privacy Statement that data could be transferred under a change in ownership, this document has been changed twenty-two different times since 2007, and it was only after June 8, 2022 that the word "bankruptcy" was added.  Before June 8, 2022, no consumer—no matter how hard they looked—would have been able to find a statement in 23andMe's Privacy Statement that a bankruptcy might result in the sale or transfer of their data.  This is, again, in contrast to the many clear, bold, and large statements about the importance of privacy and the control customers are provided regarding their data.

Today, the bankruptcy language can be found, but it is neither easy nor intuitive to do so. It takes either four correct clicks among many through a complex interface to find and read the full relevant sentence, or three clicks and then scrolling through a dense document of 3,306 words to find the specific bankruptcy language towards the end of that document.  As explained below, the interdisciplinary academic literature on privacy makes clear that the burdens placed on consumers to understand privacy policies are substantial, and that consumers simply do not have the time or cognitive bandwidth to read—much less comprehend—the vast amounts of privacy policies that they are subjected to, and that consumer comprehension of privacy policies

---

[158] *See id.* at 625-26.

is affected by a number of well-documented pathologies.  In sum, and in the context of this case, the CPO concludes that it is highly unlikely that a typical 23andMe customer acting reasonably knew or understood what they were agreeing to in the Privacy Statement with respect to the sale of data in bankruptcy, particularly in the context of the many general promises of far greater salience regarding the importance of privacy.

With respect to 23andMe customers who created their accounts and had their genomes sequenced prior to June 8, 2022, insufficient notice was provided to consumers to make them reasonably aware of the change in the Privacy Statement regarding potential bankruptcy sale of genetic data.  As noted above, the Privacy Statements before that date did not mention that sensitive customer data (including potentially their biospecimens and/or genomes) could be sold or transferred in bankruptcy.  And when the word "bankruptcy" was added to the June 8, 2022 Privacy Statement, the Company did not adequately notify its customers of the change except through a banner in the interface about an "updated" Privacy Statement.[159]  As noted below, the interdisciplinary academic literature on privacy has made clear that consumer comprehension of changes to privacy policies is even lower than their comprehension of the ones they struggle to read when signing up for new services.  This problem seems particularly acute in the context of 23andMe, because unlike, for example, social media companies in which significant proportions of users may log in on a weekly or daily basis to see updated content, the frequency with which 23andMe customers log in (and thereby might encounter updates through the website or app) can be very low.  In their response dated June 9, 2025 to questions posed by the CPO, counsel for the Company explained that while there are 18 million customers currently registered with the

---

[159] *Privacy Statement*, *supra* n.3.

Company, nearly one-third of those customers have not logged in during the last three years.[160] Indeed, more than half of 23andMe's customers have averaged one or fewer logins over the past three years since the addition of the word "bankruptcy" to the relevant provision of the Privacy Statement. Coincidentally, this three-year period almost exactly coincides with the date of the June 8, 2022 update to mention bankruptcy.  These facts suggest two conclusions.  First, about one-third of 23andMe customers received essentially no notice of change in the Privacy Statement's fine print to specify that a sale in bankruptcy was possible, and in general most 23andMe customers log in very rarely, meaning that changes to the privacy policies are even less likely to inform 23andMe customers than the typical digital consumer.

Finally, as has been observed by the Texas Attorney General, the eighteen updates to the Company's Privacy Statement from November 2007 through October 3, 2023 contained "a restriction on the release and/or sale of the Highly Sensitive Data to third parties absent 'explicit consent.'"[161]  Such language included, for example, statements that "we do not sell information, and we will not use your Genetic Information for marketing or personalized advertising without your explicit consent," as well as that "we will not sell, lease, or rent your individual-level information (i.e., information about a single individual's genotypes, diseases or other traits/characteristics) to any third party or to a third party for research purposes without your explicit consent."[162]

In the opinion of the CPO, such disclosures do not clearly disclose to a reasonable consumer the possibility that their customer data (including potentially their biospecimens or

---

[160] Email from Counsel for Debtors to CPO (June 9, 2025).
[161] The State of Texas' Objection to Debtors Sale Transaction and Proposed Sale Order, at 12, *In re 23andMe Holding Co.*, No. 25-40976-357 (Bankr. E.D. Mo. June 10, 2025), Dkt. 703.
[162] *Id.*

genomes) could be sold or transferred to another company in bankruptcy.  Based upon this

examination, the CPO cannot conclude with certainty that the sale of the Company's data in

bankruptcy is otherwise consistent with its privacy policies, particularly for those customers who

created their accounts before the 23andMe Privacy Statement was amended in 2022 to add

language in the fine print stating the potential for a sale of customer data in bankruptcy.

### e.  Lemonaid Health

There are similar issues pertaining to whether the disclosure of the Company's assets

would be consistent with representations made to Company customers regarding Lemonaid

Health, specifically.  For example, the privacy policy available on Lemonaid Health's website

states, in relation to customers' data, that "It's your data, you're in control" and that "[w]e

believe you should be in control of your Personal Information."[163]  Notably, like 23andMe's

policy prior to 2022, Lemonaid Health's privacy policy (specifically the section on "Business

Transfers") does not explicitly mention that a customer's data may be sold or transferred as part

of a bankruptcy proceeding.[164]

## IV.    Consumer Privacy in Genetic Data

When it comes to understanding consumer privacy interests in genetic data, it is essential

to keep in mind two important and highly supported findings of the interdisciplinary literature in

privacy.  The first of these findings is that genetic privacy is perhaps the most sensitive data

about humans that exists, which means it requires special safeguards before it can be processed

or shared.  The second of these findings is that consumers (both actual and reasonable

consumers) do not read privacy policies the way that lawyers from large law firms do – they do

---

[163] *Lemonaid Privacy Policy*, Lemonaid Health (Mar. 14, 2025), https://www.lemonaidhealth.com/legals/privacy-policy.
[164] *Id.*

not have limitless resources of time, attention, and professional training such that they can parse the often vague and dense fine print the way that lawyers do.  Instead, they consider corporate privacy representations in their totality, including broad, high-level promises about putting privacy first and putting them in control.  Consumers typically do not read or understand dense and vague privacy policies and terms of service, a fact that is well-known by companies as well as professional scholars of privacy and technology issues.

### a.   The Heightened Sensitivity of Genetic Data

Genetic data of the sort at issue in this case is "sensitive data."  This is, as the leading study on the subject explains, personal data that is likely to lead to serious harm if disclosed, breached, or misused.[165]  Simply put, the law tends to require heightened protections for sensitive data, such as higher levels of data security, presumptions against disclosure, or heightened consent requirements before it can be used, shared, or sold.[166]

Genetic data is unquestionably sensitive data,[167] as the leading study on sensitive data also illustrates by using genetic data as its paradigmatic example.  Like the broader sensitive category of health data of which it is a subset, genetic data is a kind of data that potentially exposes people to a variety of harms.  For example, the legislative history of the 2008 Genetic Information Nondiscrimination Act suggests that Congress was concerned that "discrimination based on a person's genetic identity is just as unacceptable as discrimination on the basis of race or religion."[168]  The law was also based upon the idea that "[a] person's unique genetic code

---

[165] Paul Ohm, *Sensitive Information*, 88 S. Calif. L. Rev. 1125 (2015).
[166] *See, e.g.*, Colo. Rev. Stat. Ann. § 6-1-1308(7) (requiring that controllers obtain consumer consent before processing sensitive data); GDPR Art. 9 (outlining requirements related to processing of "special categories of personal data").
[167] *See* Ohm, *Sensitive Information, supra* n.165, at 1126.
[168] 154 Cong. Rec. S3363-01 (Apr. 24, 2008) (statement of Rep. Kennedy).

contains the most personal aspects of their identity," and was passed due to Americans' "legitimate fears about how this deeply private information will be used."[169]  The CPO notes that, in the aftermath of the 2023 23andMe data breach, media reports suggested that hackers had posted an initial data sample on the dark web, boasting that they had data on a million people of Ashkenazi Jewish heritage.[170]  Moreover, the Pentagon has warned service members not to use DTC genetic testing companies like 23andMe because of the risk that it "could expose personal and genetic information, and potentially create unintended security consequences and increased risk to the joint force and mission."[171]

The heightened sensitivity of genetic data has also been recognized both by its frequent appearance in statutory and scholarly lists of sensitive data, as well as numerous special legal protections that single out genetic data for special, additional protection.[172]  This Report examines many of these laws and regulations in Section VI.

But genetic data is not ordinary sensitive data.  Genetic data is a special kind of data that makes it arguably *the most sensitive personal data that exists*.  Genetic data possesses characteristics other kinds of sensitive data (like location data, data about sexual or political characteristics, financial data, communications data, etc.) do not.  These other kinds of sensitive data offer revealing information about people.  Genetic data is not just data about people—*it is*

---

[169] *Id.* at S3363.
[170] *23andMe User Data Stolen in Targeted Attack on Ashkenazi Jews*, Wired (Oct. 6, 2023), https://www.wired.com/story/23andme-credentialstuffing-data-stolen/.
[171] Heather Murphy & Mihir Zaveri, *Pentagon Warns Military Personnel Against At-Home DNA Tests*, N.Y. Times, (Dec. 24, 2019), https://www.nytimes.com/2019/12/24/us/military-dna-tests.html.
[172] *See, e.g.*, Sara Gerke et al., *Bankruptcy, Genetic Information, and Privacy—Selling Personal Information*, 392 New Eng. J. Med. 937, 937 (Mar. 6, 2025); Ohm, *supra* n.165, at 1151-53.

*people*.  Our genome is our unique individual source code.  It cannot be changed, and thus it is immutable.[173]

Our genetic data is also highly revealing about us, which is why it is so eagerly sought by others, including hackers and law enforcement.  The federal Genetic Information Nondiscrimination Act prohibits discrimination through the use of genetic information in health insurance and employment (though its scope is largely limited to those contexts).[174]  Businesses in other contexts could seek to use genetic information in order to discriminate based on what genetic information shows about a person.[175]

Genetic data also cannot be deidentified, except in the technical sense.  Given the unique nature of a person's genetic code, there is always a risk of reidentification even if names and other identifying information is removed, because one's unique DNA does not change.[176]  The Illinois Supreme Court, citing the Illinois General Assembly's passage of the Biometric Information Privacy Act (Act),[177] noted:

> Biometrics are unlike other unique identifiers that are used to access finances or other sensitive information. For example, social security numbers, when compromised, can be changed. Biometrics, however, are biologically unique to the individual; therefore, once compromised, the individual has no recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric-facilitated transactions.[178]

---

[173] *See* Natalie Ram, *Investigative Genetic Genealogy and the Problem of Familial Forensic Identification*, at 216, in Consumer Genetic Technologies: Ethical and Legal Considerations (I. Glenn Cohen, Nita Farahany, Henry T. Greely & Carmel Shachar, eds.) (Cambridge Univ. Press 2021); *see also* Natalie Ram, *DNA by the Entirety*, 115 Colum. L. Rev. 873, 903 (2015).

[174] Genetic Information Nondiscrimination Act of 2008, Pub. L. No. 110-233, 122 Stat. 881.

[175] Jarrod O. Anderson, Anna C. Lewis & Anya E. Prince, *The Problems with Patchwork: State Approaches to Regulating Insurer Use of Genetic Information*, 22 DePaul J. Health Care L. 1 (2021).

[176] Kayte Spector-Bagdady, *"The Google of Healthcare": Enabling the Privatization of Genetic Bio/Databanking*, 26 Ann. Epidemiol. 515 (2016).

[177] 740 ILCS 14/1 et seq. (West 2016).

[178] 740 ILCS 14/5(c) (West 2016); *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186 (Ill. Jan. 25, 2019).

While not exactly the same, there are similarities between biometric and genetic data, particularly given their relationship to the human body and their immutable nature. As AI and other scientific techniques advance, the information that could potentially be revealed about people through their DNA will expand—a fact identified by lawmakers who have enacted protections for genetic and other forms of biometric data.

Genetic data is also special in that, unlike other forms of sensitive data such as location or even ordinary health data, one person's consent has direct and permanent ramifications for others. The nature of genetic data means that a database of multiple millions of people makes hundreds of millions, if not billions, of people indirectly identifiable.[179] A person who shares their genetic data with another is also sharing a significant fraction of the genetic data of their mother, father, siblings, and children, and of other blood relatives to a lesser degree.[180] This can include information about ancestry, susceptibility to disease, and other factors. And as genetic science advances rapidly, it may permit other, as-yet unknown inferences about the data subjects. To make this point explicit, any consents exercised in the context of customers of the Debtors also share data about those customers' blood relatives, who will have no ability to participate in that consent.

Finally, a number of state AGs have argued that 23andMe's customers have "inherent common law rights of ownership or control" in the various forms of personal information collected by the Company, including their biological material, genotype data, family tree data, phenotype data, and other forms of personal information.[181] These rights are not merely

---

[179] Natalie Ram, *Investigative Genetic Genealogy and the Problem of Familial Forensic Identification*, at 219, in Consumer Genetic Technologies: Ethical and Legal Considerations (I. Glenn Cohen, Nita Farahany, Henry T. Greely & Carmel Shachar, eds.) (Cambridge Univ. Press 2021).
[180] Ram, *DNA By The Entirety*, *supra* n.173.
[181] *See* State AG Complaint, ¶ 22(A).

theoretical.  For example, Alaska law provides that "a DNA sample and the results of a DNA analysis performed on the sample are the exclusive property of the person sampled or analyzed,"[182] while Texas law similarly bestows a property right on individuals for "the individual's biological sample that is provided to or used by a DTC genetic testing company and the results of genetic testing or analysis conducted on the individual's DNA by a DTC genetic testing company."[183]  Most tellingly, 23andMe customers' property interests in their genetic data have been recognized by 23andMe itself, as evidenced by the Company's repeated assurances to customers that they ultimately control and retain ownership in "their" data they provide to the Company.[184]

### b.  The Practical Limits of Notice and Choice Frameworks

The default mechanism by which U.S. privacy law has regulated personal information in recent decades is by a mechanism typically called "notice and choice," under which companies purportedly give notice of their privacy practices in a privacy policy and then consumers get to exercise choices over how their information is to be processed.  Based upon the CPO's expertise and experience in privacy law and practice, the CPO believes that five propositions from the academic literature are of central relevance to this matter in terms of contextualizing the privacy issues fairly and in a way that is sensitive to the critical consumer interests in this matter.

First, an overwhelming weight of interdisciplinary privacy scholarship stretching back over two decades shows that relying on "notice and choice" models that purport to put

---

[182] Alaska Stat. Ann. § 18.13.010(a)(2).
[183] Tex. Bus. & Com. Code Ann. § 503A.003; *see also* The State of Texas' Objection to Debtors Sale Transaction and Proposed Sale Order, at 7, *supra* n.161 ("Texas law provides Texas customers exclusive property, ownership, and control rights in and over their biological samples, genetic and personal data, and the results or analysis thereof.… As such, the Debtors cannot claim ownership in and sell this data as proposed without first obtaining separate, express consent of Texas customers.").
[184] *See* Section III.a above; *see also* State AG Complaint, ¶ 22(B) n.20.

46

consumers in control of how their data is processed is likely to be ineffective or otherwise misleading.  Privacy policies, terms of service, and data use policies are rarely effective at actually informing consumers about how their data is being processed, particularly when what is being described are complex new technologies, complex legal terms, and/or complex potential consequences.[185]  Scholars, including the CPO, have further explained how lengthy, dense, and vague privacy policies and other documents disempower consumers.[186]  Effectively informing consumers about data practices requires, at a minimum, vivid or "visceral" notices that consumers actually see and read.

---

[185] *See, e.g.*, Daniel J. Solove, *Privacy Self-Management and the Consent Dilemma*, 126 Harv. L. Rev. 1880, 1880-81 (2013) ("empirical and social science research demonstrates that there are severe cognitive problems that … impair individuals' ability to make informed, rational choices about the costs and benefits of consenting to the collection, use, and disclosure of their personal data"); Daniel J. Solove, *Murky Consent*, 104 B.U. L. Rev. 593, 602 (2024) ("[t]he notice-and-choice approach has been savaged in academic literature. Hardly anyone reads privacy notices, those who try to read them struggle to understand them, the statements in privacy notices are often vague and ambiguous, and the effort to read privacy notices does not scale because there are too many to read"); Daniel J. Solove & Woodrow Hartzog, *Kafka in the Age of AI and the Futility of Privacy As Control*, 104 B.U. L. Rev. 1021 (2024); Meg Leta Jones & Jenny Lee, *Comparing Consent to Cookies: A Case for Protecting Non-Use*, 53 Cornell Int'l L.J. 97, 124-27 (2020); Robert H. Sloan & Richard Warner, *Beyond Notice and Choice: Privacy, Norms, and Consent*, 14 J. High Tech. L. 370, 371 (2014); Daniel Susser, *Notice After Notice-and-Consent: Why Privacy Disclosures Are Valuable Even if Consent Frameworks Aren't*, 9 J. Info. Pol'y 37, 38 (2019); Gordon Hull, *Successful Failure: What Foucault Can Teach Us About Privacy Self-management in a World of Facebook and Big Data*, 17 Ethics Inf. Tech. 89 (2015); Helen Nissenbaum, *A Contextual Approach to Privacy Online*, 140 Daedalus 32, 34 (2011); Allyson W. Haynes, *Online Privacy Policies: Contracting Away Control Over Personal Information?*, 111 Penn. St. L. Rev. 587, 588 (2007); Aleecia M. McDonald & Lorrie Faith Cranor, *The Cost of Reading Privacy Policies*, 4 I/ S: J. L. Pol'y Info. Soc'y 543 (2009); Omri Ben-Shahar & Carl E. Schneider, The Failure of Mandated Disclosure (2014); *250,000 Words of App Terms and Conditions*, Norwegian Consumer Council (May 24, 2016), http:// www. forbrukerradet.no/side/250000-words-of-app-terms-and-conditions; Joel R. Reidenberg et al., *Disagreeable Privacy Policies: Mismatches Between Meaning and Users' Understanding*, 30 Berkeley Tech. L. J. 39 (2015); Joel R. Reidenberg et al., *Privacy Harms and the Effectiveness of the Notice and Choice Framework*, 11 I/S: J. L. Pol'y Info. Soc'y 485, 487-88 (2015); Finn Brunton & Helen Nissenbaum, Obfuscation: A User's Guide for Privacy and Protest 30-31(2015); Ignacio Cofone, The Privacy Fallacy: Harm and Power in the Information Economy 46-66 (2024); Ari Ezra Waldman, Industry Unbound: The Inside Story of Privacy, Data, and Corporate Power (2021); Ari Ezra Waldman, Advanced Introduction to U.S. Data Privacy Law 5 (2023); Paul M. Schwartz, *Privacy and Democracy in Cyberspace*, 52 Vand. L. Rev. 1609, 1661-62 (1999).

[186] *See, e.g.*, Neil Richards, Why Privacy Matters 27-28, 90-100 (2021); Neil Richards, *Four Privacy Myths*, in A World Without Privacy? (Austin Sarat ed. 2015); Neil Richards & Woodrow Hartzog, *Taking Trust Seriously in Privacy Law*, 19 Stan. Tech. L. Rev. 431 (2016); Neil Richards & Woodrow Hartzog, *Privacy's Trust Gap: A Review*, 126 Yale L. J. 1180 (2017); Neil Richards & Woodrow Hartzog, *The Pathologies of Digital Consent*, 96 Wash. U. L. Rev. 1461 (2019); Woodrow Hartzog & Neil Richards, *Privacy's Constitutional Moment and the Limits of Data Protection*, 61 B.C. L. Rev. 1687 (2020); Nicole Ozer, *Golden State Sword: The History And Future Of California's Constitutional Right To Privacy To Defend And Promote Rights, Justice, And Democracy In The Modern Digital Age*, 39 Berk. Tech. L.J. 963, 1046-49 (2024).

Second, the literature has established that few, if any, consumers of digital services read those dense and vague privacy policies.  Part of this story is cognitive (actual consumers are not the perfectly rational creatures companies assume them to be), and part of it is practical (there are simply not enough hours in the day (or year) for them to achieve meaningful informed consent to information practices by reading privacy policies.).  The classic study here found that, if American consumers were to read all the relevant privacy notices they encountered in a year, it would take 76 working days of non-stop reading to do so.[187]  Other studies reach similar conclusions—i.e., that the burden of reading and understanding the intricacies of privacy policies represents a practical impossibility if the goal is for consumers to actually comprehend what they are agreeing to.[188]  As one recent study found, consumers are frequently disempowered and feel that they have no control, so they click "I agree" out of despair.[189]  In sum, the claim that consumers do—or can—meaningfully read and understand the terms of service and privacy policies is (as one experimental study memorably called it) "the biggest lie on the Internet"[190] and that this finding was the case both for initial signups to tech companies and for when privacy policies changed for existing users.[191]

Third, the scholarly literature has demonstrated the power that design gives to influence consumer choices, particularly when married to the insights of behavioral economics and personal data.  This includes the power to set defaults as well as the power to design the choice

---

[187] Aleecia M. McDonald & Lorrie Faith Cranor, *The Cost of Reading Privacy Policies*, 4 I/S: J.L. & Pol'y For Info. Soc'y 543, 565 (2008).

[188] *E.g.*, Obar & Oeldorf-Hirsch, supra n.140; Ben-Shahar & Schneider, *supra* n.185; 250,000 Words of App Terms and Conditions, *supra* n.185.

[189] *See, e.g.,* Joseph Turow et al. *Americans Can't Consent to Companies' Use of Their Data*, Annenberg School for Communication, U. Penn. (2023); Neil Richards, Why Privacy Matters 95-100 (2021).

[190] Obar & Oeldorf-Hirsch, *supra* n.140.

[191] *Id.* at 140.

architecture of interfaces.  The behavioral science literature on "choice architecture" has

demonstrated that while we often think that our choices are free and voluntary, a whole host of

factors affect the "choice architecture" within which people actually make decisions.[192]

Moreover, the power to set up both defaults and choice architecture gives designers substantial

power to influence consumer choices—or, to use the popular term, to "nudge" them.[193]  Put

simply, default settings matter, and companies have considerable power to influence the choices

they decide to give to consumers through making certain choices "like larger or more colorful

buttons" more likely to be pressed.  As one recent study explains, "[w]hile Big Tech and the

Supreme Court alike agree that the privacy of personal digital devices is important, the reality is

that a host of digital design choices or seemingly slight social pressures can result in people

agreeing to privacy policies or intrusions into their digital devices that would normally be

considered unreasonable."[194]  The study concludes that "[b]ehavioral manipulations resulting

from digital design choices strongly undercut the notion that a legal formula of notice and

consent is adequate to protect privacy in the digital domain."[195]  Another study drawing on the

work of academic computer scientists explains that designers have a toolkit full of tricks that

they can use to nudge, manipulate, and subvert user attention, intentions, and preferences,

including coercion, confusion, restricting functionality, among others.  Perhaps most relevant to

this matter are the concepts of "distraction," defined as "[a]ttracting the user's attention away

from their current task by exploiting perception," and "obfuscation," defined as "[h]iding desired

---

[192] Richard Thaler & Cass R. Sunstein, Nudge: Improving Decisions About Health, Wealth, And Happiness 6 (2008) (coining the phrase).
[193] *See id. See also* Richard H. Thaler, *The Power of Nudges, for Good and Bad*, N.Y. Times (Oct. 31, 2015), https://www.nytimes.com/2015/11/01/upshot/the-power-of-nudges-for-good-and-bad.html.
[194] Aileen Nielsen, *Tech Has an Attention Problem*, UC Berkeley Center for Long-Term Cybersecurity, 10 (2021).
[195] *Id*. n.12.

information and interface elements."[196]  Other recent scholarship has termed these kinds of

manipulative design choices "dark patterns"—interfaces that "confuse users, make it difficult for

users to express their preferences or satisfy their objectives, or manipulate users into taking

actions that are inconsistent with their preferences or well-being."[197]  Such tactics can both be

very effective and take a variety of forms.[198]  One researcher explained how firms can use the

power of design, supplemented by both the insights of behavioral economics and data to engage

in manipulation through default-setting: "Researchers and others have realized that people's

biases lead them to give up more personal information than they would absent the manipulation.

A simple example is defaults: if consumers must opt out of data collection instead of opt in, more

data will end up being collected as consumers hold to the status quo."[199]  Other scholars provide

further experimental and other evidence of the power of design over consumer privacy choices,

concluding that it is nearly impossible for consumer self-help and privacy choices to overcome

the power of dark patterns and manipulative design.[200]  One recent experimental study concludes

that "substantial numbers of consumers are unable to resist the manipulative effects of dark

patterns even when they are instructed to do so and understand their objective. … This evidence

suggests that even when consumers are trying to protect their privacy, the kinds of dark patterns

---

[196] Woodrow Hartzog, *Privacy's Blueprint* 148 (2018) (drawing on Gregory Conti and Edward Sobiesk, *Malicious Interface Design: Exploiting the User*, paper presented at WWW 2010: The 19th International World Wide Web Conference, Raleigh, NC, April 26-30 (2010), http://www.rumint.org/gregconti/publications/201004_malchi.pdf).
[197] Jamie Luguri & Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns*, 13 J. Legal Anal. 43 (2021); Matthew Kugler et al., *Can Consumers Protect Themselves Against Privacy Dark Patterns?* 23 U.N.H. L. Rev. (forthcoming 2025) (adopting the same definition), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5084827.
[198] Luguri & Strahilevitz, *supra* n.197, at 47. *See also Bringing Dark Patterns to Light* 15, FTC Staff Report (2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf.
[199] Ryan Calo, *Digital Market Manipulation*, 82 Geo. Wash. L. Rev. 995, 1013 (2014).
[200] Alessandro Acquisti & Jens Grossklags, *What Can Behavioral Economics Teach Us About Privacy?*, in Digital Privacy: Theory, Technologies, and Practices 363, 363-79 (2008). *See generally* Hartzog, Privacy's Blueprint, *supra* n.196 (collecting studies).

they regularly encounter online can confuse, manipulate, or pester them into surrendering private information and privacy rights."[201]  In sum, it is possible for firms wielding the power of design through default-setting and choice architecture to exert substantial influence over the actual choices made by consumers that they are purportedly putting "in control" of their digital choices. Put simply, defaults matter, and so does design.

Fourth, to the extent that privacy policies, data use policies, terms of use, and other related documents change after a consumer has started using a platform or online service, changes to those policies are even less likely to be salient to a consumer's attention.  As two social scientists who have examined this problem in the context of facial recognition conclude, "[o]nce people are using a platform, they are likely simply to agree to updated terms of service without closely inspecting them or thinking about them in order to continue to participate in their online networks."[202]  Other experimental work has reached a similar conclusion.[203]

Fifth, and finally, privacy compliance programs focused upon notions of "putting consumers in control" and "data subject access rights" have also been highly criticized by the academic literature.  In particular, the scholarly consensus is that many privacy compliance programs, grounded as they are in notice and choice models and corporate-friendly definitions of privacy, offer little in terms of meaningful protection to consumers against privacy risks.  Given this review of the scholarly literature, it should not be surprising to find that scholars have also been critical of corporate privacy compliance programs that have attempted to use notice and

---

[201] Kugler et al., *supra* n.197, at 6 (adopting the same definition), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2838449.
[202] Mark Andrejevich & Neil Selwyn, Facial Recognition 71 (2022).
[203] E.g., Obar & Oeldorf-Hirsch, *supra* n.140.

choice and control models as the building blocks with which to manage privacy risk, manipulation risk, and trust risk.

Accordingly, when technology firms assert that they are putting consumers in "control" of their data and privacy, that control must be viewed against a backdrop of engineered choices powered by design, firm-favorable default-settings, and the deployment of personal data that nudges a consumer's choice architecture in the direction of "authorizing" more data sharing with the platform. Moreover, there is substantial reason to doubt the efficacy and comprehensiveness of corporate privacy compliance programs that purport to put consumers in control of their data. All of this background informs the CPO's recommendations in this matter.

## V.    Costs and Benefits Associated with the Potential Sale or Transfer

### a.    Potential Losses or Gains to Privacy if Such Sale is Approved by the Court

Privacy is relational. When it comes to consumer interests in privacy, what matters most is not just the data, but also the vulnerabilities created when data is shared in a relationship. Thus, the people or entities that data is shared with matter a great deal. To use one example familiar to lawyers, if an attorney were to transfer their clients to a different firm without the clients' consent, this would create new risks for those clients that were not necessarily consented to in the first place—even if professional ethics rules were to continue to apply to the new lawyer.

In their letter to the CPO dated June 1, 2025, counsel for the Debtors argued that "[a]s structured, there is no loss of privacy to the Debtors' customers as a result of this transaction because the Buyer agrees to (a) use the customer data for the same purposes as they were previously, (b) comply with applicable privacy law in relation to any further use of the customer data, (c) allow customers to continue to exercise their privacy rights in relation to their data,

including their deletion rights; (d) employ appropriate information security controls to protect the customer data; and (e) notify all customers of the sale once approved."[204]  The CPO does not agree with such conclusory analysis.

As has already been noted, with respect to privacy, particularly when we are talking about sensitive data, *whom* we share what information with is often of fundamental importance. We might tell things to our lawyer, our doctor, or our friend that we would not tell a different person, even if they were a lawyer, a doctor, or our friend.  Similarly, when it comes to data security, whom we entrust sensitive information to matters a great deal, because different people or entities exercise different levels of care. In this proceeding, this is a meaningful difference, because no matter which bidder is ultimately successful, a new entity will be owning 23andMe and controlling its customers' genetic and other sensitive data.  This would certainly be the case if Regeneron acquires the data, but it would also be true if TTAM acquires it, even though the principal of TTAM is the 23andMe founder and former CEO.  The new owning entity also has the potential to change the privacy statement and terms of service that customers are subject to and either not obtain consent for such changes (by claiming that they are immaterial) or "nudge" customers to consent (using the tools outlined earlier).

Counsel for the Debtors argue that because "the Buyer is stepping into the Debtors' shoes," and "will not engage in processing activities that differ from the Debtors'" it follows that the buyer "is not properly considered a third party vis-à-vis the Debtors."[205]  As the CPO elaborates upon in Section VII.a, he is not convinced by this reading of the law.

---

[204] Debtors' Memorandum to CPO, at 49.
[205] *Id.* at 7.

Moreover, it bears repeating that this matter involves genetic and genomic data—perhaps the most sensitive data about us and the most revealing about our biology. And a person's genetic data does not just reveal information about themselves, but about all of their genetic relatives, including distant and unborn ones. As detailed below in Section VI, over a hundred state and federal statutes are implicated by the transfer and storage of genetic data, including a number of laws specifically focused on this category of data. This means that, when it comes to the transfer of genetic data, the privacy stakes are always high, and meaningful safeguards—including substantive ones that transcend technical language in largely unread privacy policies—are essential.

### b. Potential Costs or Benefits to Consumers if Such Sale is Approved by the Court

#### i. Costs

##### 1. 23andMe Customers with Inactive Accounts

As described in Section II(b), many 23andMe customers are inactive and/or sign in to their accounts infrequently. This may be because they believe they have received the benefit of the services with the initial reports they received and see no need to check in further, it could be because they have lost their login credentials, but for some of these customers it is inevitably because they have died. For a customer base of over 15 million customers that spans almost twenty years, it is inevitable (at an actuarial level) that many 23andMe account holders are no longer alive. Because the Company has been operating since approximately 2007, such deceased customers may not have provided consent to the Company's Privacy Statement after the June 2022 change that incorporated the word "bankruptcy" into the updated document. Such people might not have known their data would be transferred via bankruptcy and might not have been willing to accept such a transfer. Additionally, even deceased customers who agreed to the

54

current privacy policies might not have been willing to have their data owned by a new third

party.  These customers should be considered in determining what privacy protections and

affirmative consents may be placed on any transaction including 23andMe's genomic data.

Moreover, since 23andMe customers will inevitably continue to die over time, such customers

should be considered by any future acquirer of the Company's genetic data.  While the CPO's

understanding that under the current terms of the transaction, any buyer would have to follow the

existing Privacy Statement and Terms of Service which does help mitigate some of the privacy

concerns for customers in general, deceased and inactive customers would not have the same

opportunity to object or determine whether they wish their data to be owned or used for research

by the new buyer.  Accordingly, in order to avoid privacy harm to deceased customers

(potentially in perpetuity) safeguards are necessary to address both customers who have already

died as well as customers who will inevitably die in the future without deleting their accounts.

### 2.  23andMe Customers with Pseudonymous Accounts

While the CPO does not have exact numbers on how many users fall in this category, it is

his understanding that there are some 23andMe users that use fake names and temporary emails

to essentially create pseudonymous accounts on the service (with the intention being that they

want to learn more about their ancestry without putting their sensitive personal information at

risk.  These users may be at a similar risk as users who have inactive accounts or are deceased

because they may also not be aware of what is happening to their genetic data as a result of this

bankruptcy proceeding.

### 3.  Relatives of 23andMe Customers

As described in Section IV(a), DNA and genetic data are unique for many reasons.  Not

only is such data immutable and deeply personal, it also directly affects relatives of the

customers.  Relatives of customers might not want the information about them from their

relatives DNA to be transferred to a new third party but currently have no way of "opting out" of

such a transfer.  This is particularly acute for people who either do not know that a relative has

used 23andMe's services, or whose participating relative is deceased.  These customers should

also be considered in determining what privacy protections and affirmative consents may be

placed on any transaction including 23andMe's genomic data.

### ii.  Benefits

#### 1.  Active Account Holders

In their memo to the CPO,[206] 23andMe stated that should this transaction not be

approved, it is likely that 23andMe would commence a Chapter 7 bankruptcy liquidation.  Under

this contingency, the Company argues this would discontinue all 23andMe's services, including

the reporting and ancestry information made available to its customers.  These products are used

and relied upon by millions of consumers who would lose the ability to continue to access the

products and services they purchased, and should they wish to receive comparable information,

they would be forced to open themselves up to new privacy concerns with a third party to receive

comparable services.[207]  23andMe provides consumers personalized information about ancestry,

genetic traits, and health risks.  Per their memo to the CPO, 23andMe states that a "2019 survey

found that over 75% of 23andMe customers reported taking positive health actions after learning

about their genetic traits and health profile through 23andMe."[208]

In the CPO's opinion, the fact that a meaningful proportion of users do not regularly log

into their accounts, coupled with the Company's financial struggles, suggest that the Company's

---

[206] Debtors' Memorandum to CPO, at 48-49.
[207] Id.
[208] Id. at 44.

claims in this regard should be taken with a grain of salt (though the continued benefit to 23andMe customers who continue to use its services regularly are certainly a consumer benefit that should be part of the calculus). With respect to the potential of a Chapter 7 liquidation, the CPO notes that any potential Chapter 7 sale would potentially implicate even more serious privacy issues that could warrant even greater safeguards than are envisioned by this Report. Such a sale should be subject to additional heightened scrutiny by the Court.

Additionally, 23andMe noted in their memo to the CPO that in two 2023 studies: 1) participants in health research observed a meaningfully lower percentage of users that opted in compared to users that opted out, despite there being no difference in the subject of consent, and 2) a study showing "[w]hen given an explicit option to Opt-In, users seldom chose to do so," finding that only 11.76% of users chose to opt-in when presented with the option.[209] Using this assumed response rate, potentially a massive number of customers would need to be followed up with again and again until they receive a response under affirmative consent. Additionally, 23andMe states that under applicable law, they cannot delete a customer's data without verifying that customer's identity, and they would want to make sure customers have the opportunity to download any health reports and various other information 23andMe provided prior to the deletion flow.[210]

The CPO notes that these studies are consistent with the academic literature discussed above that show the power of defaults and choice architecture. These conclusions cut both ways, however, suggesting that consumers who do not want their genetic data transferred in bankruptcy

---

[209] Memorandum from Gretchen Ramos & John P. Carlin to Professor Neil Richards, *In re 23andMe Holding Co. – Debtors' Supplemental Memorandum*, at 21-22 (June 6, 2025).
[210] *Id.* at 22.

would struggle to take the affirmative step to delete their account, assuming that they even knew that it was happening.  The friction involved means that either an opt-in or an opt-out choice would not directly track consumer preferences.  Given this problem, however, a few factors suggest that requiring affirmative consumer choice would be the preferable choice here as a best practice (to the extent that it were not already required by law).  First, the Company has made numerous promises about the importance of privacy (including the importance of not sharing data), that customers continue to own their data at bottom, and the importance of putting those customers in control.  Giving consumers an actual choice is more consistent with these promises than relying on the highly criticized notice and choice opt-out system discussed above.  Second, the heightened sensitivity of genetic data is such that meaningful safeguards are necessary, and that a thumb should be placed on the scale of privacy protection where there is any doubt.  Third, as already discussed, there is the empirical fact that a significant number of 23andMe users have already actively chosen to delete their data after both the 2023 data breach and after the announcement of 23andMe's bankruptcy.  It could perhaps be asserted that these high numbers suggest that the notice and choice system of privacy opt-outs is working.  However, such a conclusion would be contrary to the overwhelming weight of scholarly evidence (including the studies proffered by the Company here) that it is very difficult for consumers to (a) understand their rights and (b) act on them.  In light of these studies, the CPO concludes that the best interpretation of the high number of customer data deletion requests is not evidence that the notice and choice system is working but rather that consumers are exercising these choices despite the difficulties associated with this process. In other words, the enormous consumer concern about genetic privacy and security is producing a measurable effect but, given the challenges of an opt-out system, the actual number of customers who would want to delete their

data if given a meaningful choice could be much higher.  The best way to resolve this puzzle would be to give those customers an actual choice and see what they do in exercising the control rights that the Company has promised.

## 2.  Research

As noted above, if this transaction were not approved, it is possible that 23andMe would enter a Chapter 7 bankruptcy liquidation.  In that case, customers and society more generally might lose the benefit of the genetic research that 23andMe is conducting with consented customers.  Furthermore, according to the Company, over 80 percent of 23andMe customers have consented to share their genetic data with universities, research institutes, and pharmaceutical companies engaged in critical research into the genetic origin of diseases. According to the Company, the data provided by these customers has led to the publication of 293 research papers since 2010 and improved the scientific community's ability to identify and validate targets for life-changing drug development.[211]  Additionally, it is unlikely that a similarly broad database of genomic information is readily available for use by researchers.[212] While this research database is a significant scientific benefit to society writ large, that is true only so long as the persons whose information comprise the database have consented fully to all use of their genetic data.

## 3.  Data breach plaintiffs

As described in Section II.e, 23andMe experienced a data breach in 2023, and was sued by a class of affected customers.  If the transaction is not approved, then these customers would

---

[211] *Since 2010, 23andMe has published 293 papers*, 23andMe, https://www.23andme.com/publications/ (last visited June 11, 2025).
[212] *A New Era for Human Genetic Data in Drug Development*, 23and Me, https://blog.23andme.com/articles/a-new-era-for-human-genetic-data-in-drug-development.

not receive any monetary compensation for the harms they suffered from that breach. While some such affected customers may be comfortable with an outcome where the genetic information if destroyed or no longer available generally, it would potentially frustrate public policy goals of enforcement mechanisms such as these class action suits to frustrate recovery to the affected customers. The CPO notes therefore that to the extent that compensation for injuries sustained in a data breach are privacy injuries, there are privacy interests (though perhaps ones that are qualitatively different) on both sides of the ledger here.

## VI.    Applicable Legal Background

As we detail in this section, because of the nature of the Company's business and its global presence, there are hundreds of privacy, security, and genetic data-specific laws that apply to the Company's core business operations. These include laws regulating unfair or deceptive acts or practices in every state and at the federal level, at least 19 U.S. state comprehensive privacy laws, at least 23 laws specifically regulating genetic (or related) data, and international data protection laws in every country where the Company has customers. These are relevant to both the question of whether applicable non-bankruptcy laws are potentially violated as a result of the sale or transfer in this bankruptcy proceeding (which is addressed in Section VII), as well as the CPO's overall recommendations (which are outlined in Section VIII).

### a.  Federal Laws

#### i.  Federal Trade Commission

The FTC has jurisdiction over most for-profit organizations and individuals doing business in the United States, other than those in the telecommunications, financial, and transportation industries, which are primarily regulated by other federal agencies.[213]

---

[213] *See* 15 U.S.C. § 45(a).

In contrast, the scope of the FTC's jurisdiction over nonprofit entities is an open issue. The Supreme Court has held that the FTC can enforce the FTC Act against certain organizations that claim nonprofit tax status when those entities are "organized on behalf of for-profit members" and engage in activities that confer "far more than *de minimis* or merely presumed economic benefits" on its members.[214]  Meanwhile, in determining whether an entity is organized for profit and thus within its jurisdiction, the FTC applies a two-part test.  In *College Football Ass'n*, the Commission stated that "[t]he not-for profit jurisdictional exemption under Section 4 [of the FTC Act] requires both that there be [1] an adequate nexus between an organization's activities and its alleged public purposes and [2] that its net proceeds be properly devoted to recognized public, rather than private, interests."[215]  An entity that fails to satisfy these two prongs would, according to the FTC, fall within the Commission's enforcement jurisdiction.[216]  However, courts have more aggressively policed the boundaries of the FTC's jurisdiction over nonprofits, with one district court recently concluding, for example, that "Congress chose only to vest the FTC with authority to pursue claims against an entity organized to carry on business for its 'own' profit or the profit of its 'members,'" thus rejecting an argument that the FTC be "allowed to pursue claims against nonprofits that operate for the benefit of non-member insiders, related businesses, and officers."[217]

In terms of potential FTC implications, most relevant for the Company in relation to its core business offerings and its potential sale are Section 5 of the FTC Act and the Health Breach Notification Rule ("HBNR").

---

[214] *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 767-68 (1999).
[215] *In re College Football Ass'n*, 117 F.T.C. 971, 998 (1994).
[216] *See* Non-Compete Clause Rule, 89 Fed. Reg. 38342, 38357-58 (2024); *see also id.* at 38449 (rejecting a proposal to exempt nonprofits from the FTC's ban on noncompete agreements).
[217] *Fed. Trade Comm'n v. Grand Canyon Educ., Inc.*, 745 F. Supp. 3d 803, 824 (D. Ariz. 2024).

1. **Section 5**

The FTC Act was established to regulate questionable business practices and protect consumers.  Section 5 of the FTC Act ("Section 5") prohibits unfair or deceptive acts and practices in commerce, which can include consumer privacy violations and engaging in improper data collection, use, and disclosure practices.[218]  Section 5 is also routinely applied to penalize organizations that do not have reasonable data security practices.  As such, the FTC can bring enforcement actions for Section 5 violations.  Notably, practices inconsistent with FTC guidance also have the potential to result in corrective action by the Commission under Section 5 if the Commission finds those practices to be unfair or deceptive after an investigation.

The FTC uses a three-part test to determine whether an act or practice is deceptive:

- The representation, omission, or practice must mislead or be likely to mislead the consumer.

- The consumer's interpretation of the representation, omission, or practice must be reasonable under the circumstances.

- The misleading representation, omission, or practice must be material.[219]

In assessing whether an entity acted in a deceptive manner, the FTC will often analyze the entity's public statements, including through its privacy policy, advertisements, and other public-facing documents.  For example, in a recent enforcement action involving Vitagene, the FTC alleged that Vitagene engaged in deceptive practices by claiming it would honor consumer

---

[218] *See* 15 U.S.C. § 45.
[219] *See* James C. Miller III, Chairman, *FTC Policy Statement on Deception*, to John D. Dingell, Chairman, Committee on Energy and Commerce (Oct. 14, 1983), https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf.

data deletion requests without having the necessary inventory to operationalize these requests and by misrepresenting that it exceeded industry-standard security practices.[220]

In the present case, there have been similar complaints made regarding the Company's deletion practices. While the Company claims "[w]e make it easy to exercise your rights to know, correct, and delete your Personal Information,"[221] customers have allegedly had difficulties accessing their accounts, deleting their genetic data, and requesting the destruction of their biological samples.[222] While some customers have resorted to contacting the Company's customer service, the consumers either "have not received a response from the [C]ompany" or "have not received confirmation that their [deletion] requests were honored."[223]

FTC Chair Andrew Ferguson has identified potential concerns associated with the Company's sale as they pertain to the privacy promises made by the Company to its customers. In a letter dated March 31, 2025 (and available as Appendix D), Chair Ferguson highlighted that the Company collects and holds sensitive, immutable, identifiable personal information about millions of American consumers and cited to some of the Company's statements regarding how it will keep this information private and secure.[224] The letter reiterated the Company's position that the data protections promised to consumers would continue even if the data was sold or

---

[220] Consent Order and Decision, at 21, *In re 1Health.IO Inc.*, FTC File No. 1923170, https://www.ftc.gov/system/files/ftc_gov/pdf/decision_and_order.pdf (last visited June 11, 2025).
[221] *Privacy Notice for U.S. State Residents*, 23andMe (last modified Mar. 15, 2024), https://www.23andme.com/legal/us-privacy/.
[222] *See* Motion for Order Appointing a Consumer Privacy Ombudsman Under 11 U.S.C. §§ 105(a), 332, and 363(b)(1) and Notice of Hearing ¶ 18, at 8, *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. Apr. 9, 2025), Dkt. 181 [hereinafter Texas's Motion for Order Appointing a Consumer Privacy Ombudsman].
[223] *See id.*
[224] *See* Letter from Andrew N. Ferguson, Chairman, FTC, to Jerry Jensen, Acting U.S. Trustee, Paul A. Randolph, Assistant U.S. Trustee, Carole J. Ryczek, Trial Attorney, Joseph Schlotzhauer, Trial Attorney, Office of the U.S. Trustee (Mar. 31, 2025) [hereinafter Ferguson letter], https://www.ftc.gov/system/files/ftc_gov/pdf/23andme-letter-ferguson.pdf.

transferred in a bankruptcy proceeding.[225]  After highlighting the Company's various promises throughout the letter, Chair Ferguson concluded by stating that "these types of promises to consumers must be kept," so the Company remains responsible for adhering to any privacy or security-specific representations that consumers relied upon when providing the Company with their sensitive data.  The CPO's interpretation of this letter is that the FTC is highly concerned with potential deceptive claims made by the Company in relation to its privacy practices should a future buyer fail to adhere to these practices.

The FTC can also bring enforcement actions under the "unfairness" prong of Section 5. In determining whether an act or practice is unfair, the FTC requires that the act or practice "cause[] or [be] likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."[226]  In determining whether an act or practice is unfair, the FTC "may consider established public policies," but "[s]uch public policy considerations may not serve as a primary basis for [a determination of unfairness]."[227]  The FTC has historically relied on the unfairness test in the context of enforcement actions involving companies' misuse of consumer data and, in recent years, has adopted an increasingly broad view of what constitutes unfairness in this sphere, sweeping in such practices as inadequate cybersecurity controls and unnecessary retention of customer data.

The unfairness prong of Section 5 may also be relevant to the potential sale of the Company and its data assets.  For example, the FTC could determine that the disclosure of the

---

[225] *Id.* at 2.
[226] 15 U.S.C. § 45(n).
[227] *Id.*

Company's genetic data assets to a third party without customer consent is potentially unfair, as it has for the disclosure of other sensitive data in other contexts.[228]  Additionally, if the future buyer of the Company modifies the privacy policy in a way the FTC deems "unfair," this could also lead to a potential FTC enforcement action.[229]

## 2. Health Breach Notification Rule

The Health Breach Notification Rule[230] applies to vendors of personal health records[231] ("PHR") (e.g., fitness tracker applications), PHR-related entities (e.g., online applications that interact with PHRs), and third-party service providers (e.g., data storage provider).  The Rule outlines the notification requirements these entities must undertake following a breach of unsecured identifiable health information.

In April 2024, the FTC issued a final rule that expanded the scope of the HBNR to apply to health applications and similar technologies.[232]  The new rule also contains specific references to genetic information.  For example, the new rule defines "health care services or supplies" as "any online service such as a website, mobile application, or internet-connected device that provides mechanisms to track diseases, health conditions, diagnoses or diagnostic testing,

---

[228] *See* Complaint for Permanent Injunction, Civil Penalties, and Other Relief ¶¶ 107-109, at 24-25, *United States v. GoodRX Holdings, Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 1, 2023), Dkt. 1, https://www.ftc.gov/system/files/ftc_gov/pdf/goodrx_complaint_for_permanent_injunction_civil_penalties_and_other_relief.pdf (alleging that "GoodRx has collected and disclosed users' personal health information […] without users' knowledge, and without providing users notice or obtaining users' affirmative express consent. GoodRx's actions have caused or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. Therefore, GoodRx's acts or practices […] constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a), (n).").

[229] *See* Consent Order and Decision, *In re 1Health.IO Inc.*, FTC File No. 1923170, https://www.ftc.gov/system/files/ftc_gov/pdf/decision_and_order.pdf (last visited June 11, 2025).

[230] *See* 16 C.F.R. § 318.

[231] The Rule defines a "personal health record" as an "electronic record of PHR identifiable health information on an individual that can be drawn from multiple sources and that is managed, shared, and controlled by or primarily for the individual." Health Breach Notification Rule, 89 Fed. Reg. 47028, 47029 (May 30, 2024).

[232] *Id.*

treatment, medications, vital signs, symptoms, bodily functions, fitness, fertility, sexual health, sleep, mental health, genetic information, diet, or that provides other health-related services or tools."[233]

Based on the Company's representations regarding Lemonaid Health and our understanding of Lemonaid Health's business operations, Lemonaid Health is likely subject to the HBNR because it maintains personal health records in order to connect consumers with high risks for certain medical conditions with specialists.[234]  Accordingly, Lemonaid Health would likely be subject to the requirements outlined in HBNR.

### 3.  Consent Decree

FTC investigations often culminate in a consent decree between the FTC and the investigated company.  A consent decree is an agreement between the FTC and a company that resolves the relevant legal dispute, typically without requiring admission of guilt or liability on the part of the company.  These documents usually consist of a description of the company's remedy and compliance obligations.[235]

In the data privacy and security context, consent decrees commonly require companies (including major technology companies)[236] to implement privacy or information security programs.  Though the specific requirements of such programs vary from order to order, they generally include similar provisions.  The FTC's October 2024 consent decree and order with Marriott International, Inc., and its subsidiary Starwood Hotels & Resorts Worldwide LLC,

---

[233] *Id.* at 47062.
[234] *Our Story*, Lemonaid Health, https://www.lemonaidhealth.com/our-story (last visited June 11, 2025).
[235] *See* 16 C.F.R. § 2.32 (describing additional requirements of consent orders).
[236] *See, e.g.,* Agreement Containing Consent Order, *In re Facebook, Inc*., FTC File No. 092 3184, https://www.ftc.gov/sites/default/files/documents/cases/2011/11/111129facebookagree.pdf (Facebook, comprehensive privacy program); Agreement Containing Consent Order, *In re Google Inc*., FTC File No. 1023136, https://www.ftc.gov/sites/default/files/documents/cases/2011/03/110330googlebuzzagreeorder.pdf (Google, comprehensive privacy program).

reached in the aftermath of a series of data breaches impacting more than 344 million customers, offers a recent example.[237]  That consent order required Marriott and Starwood to implement an information security program, and specifically required the companies to, among other things:[238]

- Document the information security program and provide regular updates on the program to the company's board of directors or a senior officer within the company;

- Designate a specific employee to oversee the program;

- Conduct regular risk assessments regarding potential risks to the security, confidentiality, or integrity of personal information;

- Implement specific technical safeguards, including, but not limited to: implementation of role-appropriate personnel training; development of an incident response plan; implementation of logging and monitoring procedures; implementation of data access control procedures; development of configuration standards to harden systems and devices; implementation of multi-factor authentication; use of encryption where appropriate; compilation of asset inventories; and implementation of vulnerability and patch management procedures; and

- Conduct third-party assessments of their implementation of the program;

---

[237] *See* Press Release, Federal Trade Commission, *FTC Takes Action Against Marriott and Starwood Over Multiple Data Breaches* (Oct. 9, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/10/ftc-takes-action-against-marriott-starwood-over-multiple-data-breaches; Agreement Containing Consent Order, *In re Marriott Int'l, Inc.*, FTC File No. 1923022, https://www.ftc.gov/system/files/ftc_gov/pdf/1923022marriottacco.pdf (last visited June 11, 2025).
[238] *See* Decision, at 4-15, *In re Marriott Int'l, Inc.*, FTC File No. 1923022, https://www.ftc.gov/system/files/ftc_gov/pdf/1923022marriottacco.pdf (last visited June 11, 2025).

## ii. Common Rule

Clinical trials, and any other federal research involving human subjects, have been governed by a multiagency "Common Rule" since 1991.[239]  That rule was substantially revised in 2018.  The rule establishes the core procedures for human research subject protections, which include obtaining informed consent and review by an Institutional Review Board ("IRB"), as well as particular protections for vulnerable groups like children and pregnant women.[240]  The amendments added disclosure and explanation requirements to the informed consent process, allowed researchers to seek broad consent for both current research and future research using the same data or biospecimens provided they disclose certain facts, clarified the scope of research exempt from the Common Rule, streamlined the IRB process for cooperative research, and clarified the IRB's authority to monitor ongoing review of research.

The Common Rule applies to human subject research that is funded or conducted by an agency governed by the Common Rule.[241]  Even though the Company uses customer information for health-related research and undergoes IRB review, based on the Company's representations,[242] our understanding of the Company's business operations is that this research is not funded or conducted by an agency governed by the Common Rule.  Therefore, the

---

[239] *See* 45 C.F.R. § 46.

[240] *See* 28 C.F.R. §§ 46.101-46.124.

[241] For a list of Common Rule departments and agencies, see *Common Rule Departments and Agencies*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/ohrp/education-and-outreach/revised-common-rule/common-rule-departments-agencies/index.html (last visited June 11, 2025).

[242] *See* Responses to CPO Questions (Set 1), at 6 (stating that "Besides limited AI use cases, 23andMe uses de-identified customer information for health-related research. 23andMe Research aims to make and support scientific discoveries about genetics and other factors behind diseases and traits, including for drug development or the development of new treatments of chronic and serious illness. To do this, the Company conducts its own research and supports the work of other researchers around the world by collaborating and publishing their findings in scientific journals. Results of 23andMe research may be used to help develop new ways to diagnose and treat disease, or new reports and features for the 23andMe product or services."); *see also 23andMe Improves Research Consent Process*, 23andMe Blog (June 24, 2010), https://blog.23andme.com/articles/23andme-improves-research-consent-process.

Company may not be subject to the Common Rule.  However, the Company may be brought within the scope of the Rule based on its contractual commitments regarding how customer data will be handled in regard to health-related research.  For example, as the Company undergoes IRB review, it may be required to meet Common Rule requirements.  Additionally, the Company may be subject to future liability for failure to comply with its own representations regarding how it handles customer data related to this type of research or for misrepresentations regarding customer data and this type of research.

### iii.  Genetic Information Nondiscrimination Act

There are some specific protections for genetic and health data at the federal level that are not necessarily applicable to the Company's ordinary business operations but were included in the CPO's analysis for completeness.  One such law is the Genetic Information Nondiscrimination Act of 2008 ("GINA").[243]  Broadly speaking, GINA protects individuals from discrimination on the basis of genetic information in the areas of health insurance coverage and employment.  Title I of GINA prohibits genetic discrimination in health insurance coverage, including adjusting premiums on the basis of genetic information and collecting genetic information for underwriting purposes or prior to an individual's enrollment in a health insurance plan.  Title II, meanwhile, prohibits genetic discrimination in the employment context, including in hiring, compensation, and terms, conditions, and privileges of employment.  Title II also prohibits employers from acquiring employee genetic information (as well as genetic information of family members), subject to specified exceptions, and places confidentiality limits on genetic information that employers can permissibly collect.

---

[243] *See* Genetic Information Nondiscrimination Act of 2008, Pub. L. No. 110-233, 122 Stat. 881.

While GINA is potentially relevant to the Company in its role as an employer, it does not generally apply to the Company's core business offerings, and the CPO does not have any reason to believe that it would be relevant to the sale or transfer of the Company or its data assets. The CPO has analyzed GINA as part of this Report in order to understand the overall concerns regulators and legislatures have regarding genetic data, and the law and its history have helped inform his recommendations.

### iv. HIPAA

The Health Insurance Portability and Accountability Act ("HIPAA") establishes a framework of rules governing how specific "covered entities" and their "business associates" secure, transmit, and protect "individually identifiable health information." Under HIPAA, a "covered entity" is a health plan,[244] health care clearinghouse,[245] or a health care provider[246] who transmits "any health information in electronic form in connection with a transaction covered by HIPAA"[247]—i.e., a transaction that involves the provision or receipt of health insurance. A business associate is a person who receives, maintains, or transmits protected health information ("PHI") on behalf of a covered entity.[248]

---

[244] A "health plan" is defined as "an individual or group plan that provides, or pays the cost of, medical care (as defined in section 2791(a)(2) of the PHS Act, 42 U.S.C. 300gg-91(a)(2))." 45 C.F.R. § 160.103.

[245] A "health care clearinghouse" is defined as "a public or private entity, including a billing service, repricing company, community health management information system or community health information system, and 'value-added' networks and switches, that does either of the following functions: (1) Processes or facilitates the processing of health information received from another entity in a nonstandard format or containing nonstandard data content into standard data elements or a standard transaction. (2) Receives a standard transaction from another entity and processes or facilitates the processing of health information into nonstandard format or nonstandard data content for the receiving entity." *Id.*

[246] A "health care provider" is defined as a "a provider of services (as defined in section 1861(u) of the Act, 42 U.S.C. 1395x(u)), a provider of medical or health services (as defined in section 1861(s) of the Act, 42 U.S.C. 1395x(s)), and any other person or organization who furnishes, bills, or is paid for health care in the normal course of business." *Id.*

[247] *Id.*

[248] *Id.*

Based on the Company's representations[249] and our understanding of the Company's operations, in the ordinary course of business, the Company is not a health plan, health care clearinghouse, or a health care provider that engages in transactions covered by HIPAA. Therefore, the Company is not a "covered entity." Additionally, based on the Company's representations and our understanding of the Company's operations, the Company does not receive, maintain, or transmit PHI on behalf of a covered entity; therefore, the Company is not a "business associate." Since the Company is neither a "covered entity" nor a "business associate" as those terms are defined by HIPAA, the Company is likely not currently subject to HIPAA.[250]

For related reasons, Lemonaid Health is also not a covered entity. While Lemonaid Health portrays itself as a "national online doctor's office,"[251] Lemonaid Health does not engage in transactions covered by HIPAA. Furthermore, while Lemonaid Health stores consumers' medical health records, the health data within these records is provided directly by consumers and is neither transmitted, received, or maintained on behalf of a covered entity. As such, Lemonaid Health is neither a covered entity nor business associate and is not currently subject to HIPAA.

---

[249] According to responses provided by the Company on May 23, 2025: "23andMe is not a 'health plan' because it is not an individual or group plan that provides, or pays the cost of, medical care (as defined in section 2791(2) of the Public Health Services Act, 42 U.S.C. § 300gg91(a)). … 23andMe is not a 'health care clearinghouse' because it does not '[p]rocesses or facilitates the processing of health information received from another entity in a nonstandard format or containing nonstandard data content into standard data elements or a standard transaction' nor '[r]eceives a standard transaction from another entity and processes or facilitates the processing of health information into nonstandard format or nonstandard data content for the receiving entity.' … While 23andMe does not concede that it is a 'health care provider' as defined by HIPAA, 23andMe does not 'transmit[] any health information in electronic form in connection with a transaction covered by [HIPAA]' because it does not engage in any of the transactions described above." Responses to CPO Questions (Set 1) ¶ 17, at 11-12.

[250] Note that our analysis here specifically focuses on the Company's core business offerings. The Company may, for example, be a covered entity in relation to a health insurance plan it offers its employees. Because it is not relevant for the Company's core offerings as they pertain to consumers, the CPO did not evaluate the Company's practices in this regard specifically.

[251] *Our Story*, Lemonaid Health, https://www.lemonaidhealth.com/our-story (last visited June 11, 2025).

Similar to GINA, while not directly applicable to the Company or Lemonaid Health's operations, the CPO has taken the requirements of this legal framework into consideration as part of his recommendations.

### b.  State Laws

#### i.  Genetic Privacy Laws

A number of states have passed laws that create specific data processing obligations for genetic data, DNA information, and human biospecimen data, all of which are especially relevant for the Company given the nature of its business.  The exact requirements under these laws vary but they generally include obligations regarding consumer transparency (such as through appropriate privacy policies); consent requirements for the transfer, sale, or disclosure of genetic data; and data subject rights for consumers.  There are some exemptions under these state laws that limit their applicability, including for certain regulated clinical research activities, de-identified data, and information that is otherwise regulated by HIPAA.

In recent years, in response to the increasing popularity of DTC genetic testing companies (like 23andMe), newer bills specifically dealing with the protection of genetic information have surged through state legislatures.  Utah's,[252] Arizona's,[253] and California's[254] laws impose meaningful notice and consent obligations on these DTC genetic testing companies as well as a requirement to honor consumer rights to access and delete their genetic data.  As an example, California's Genetic Information Privacy Act ("GIPA") specifically requires DTC genetic testing companies to obtain a consumer's "separate and express consent" for the "transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a

---

[252] S.B. 227, 2021 Gen. Sess. (Utah 2021) (codified at Utah Code § 13-58-101 *et seq.*).
[253] H.B. 2069, 55th Leg., 1st Reg. Sess. (Ariz. 2021) (codified at Ariz. Rev. Stat. § 44-7921 *et seq.*).
[254] S.B. 41, 2021-2022 Reg. Sess. (Cal. 2021) (codified at Cal. Civ. Code § 56.18 *et seq.*).

service provider."[255]  Additionally, a company's request for consent to transfers or disclosures must include "the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed."[256]  These new laws also contain data security obligations related to the companies' handling of genetic data. For example, Utah's law requires that DTC genetic testing companies "develop, implement, and maintain a comprehensive security program to protect a consumer's genetic data against unauthorized access, use, or disclosure."[257]  Notably, Florida's law[258] imposes criminal penalties for violations, while Arizona's law offers protections for deceased individuals' genetic data.[259]

Some states' genetic privacy laws exempt from their consent requirements disclosures of genetic data to service providers.[260]  Many states do not define "service provider" (or the equivalent term) in the context of their genetic privacy laws.[261]  However, some states do offer such a definition.  For example, GIPA requires that DTC genetic testing companies obtain a consumer's express consent for "[e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party *other than to a service provider*."[262]  The California law does not define "third party,"[263] but *does* define "service provider" as a legal entity "that is involved

---

[255] Cal. Civ. Code § 56.181(a)(2). *See also id.* § 56.18(b)(6) (Defining "express consent" as "a consumer's affirmative authorization to grant permission in response to a clear, meaningful, and prominent notice regarding the collection, use, maintenance, or disclosure of genetic data for a specific purpose. The nature of the data collection, use, maintenance, or disclosure shall be conveyed in clear and prominent terms in such a manner that an ordinary consumer would notice and understand it. Express consent cannot be inferred from inaction. Agreement obtained through use of dark patterns does not constitute consent.).
[256] Cal. Civ. Code § 56.181(2)(D).
[257] Utah Code Ann. § 13-60-104(1)(e). *See also* Ariz. Rev. Stat. Ann. § 44-8002(A)(4); Cal. Civ. Code § 56.181(d)(1).
[258] Fla. Stat. Ann. § 760.40.
[259] *See* Ariz. Rev. Stat. Ann. § 44-8002(A)(6); Ariz. Rev. Stat. Ann. § 12-2802(F).
[260] *See, e.g.*, Utah Code Ann. § 13-60-104(1)(c)(i)(A); Md. Code Ann., Com. Law § 14-4404(2).
[261] *See, e.g.*, Ky. Rev. Stat. Ann. § 311.705; Ariz. Rev. Stat. Ann. § 44-8001; Neb. Rev. Stat. Ann. § 87-902.
[262] Cal. Civ. Code § 56.181(a)(2)(D) (emphasis added).
[263] *See generally* Cal. Civ. Code § 56.18.

73

in the collection, transportation, and analysis of the consumer's biological sample or extracted genetic material on behalf of the DTC genetic testing company."[264]  The statute further provides that "[t]he contract between the company and the service provider shall prohibit the service provider from retaining, using, or disclosing the [genetic data] for any purpose other than for the specific purpose of performing the services specified in the contract for the business."[265]  Other states adopt different definitions.  For example, Virginia defines "service provider" as an entity "that is involved in (i) the collection, transportation, and analysis of the consumer's biological sample or extracted genetic material (a) on behalf of the DTC genetic testing company or (b) on behalf of any other company that collects, uses, maintains, or discloses genetic data collected or derived from a DTC genetic testing product or service or directly provided by a consumer or (ii) the delivery of the results of the analysis of the biological sample or genetic material."[266]  As another example, Alabama defines a "contractor" simply as "[a] person that contracts with a genetic testing company to provide a service necessary to the genetic testing company's consumer products or services which requires possession of a consumer's biological sample or genetic data, including laboratory facilities for genetic testing."[267]

Additionally, a handful of state laws specifically protect consumers' DNA samples.[268] For example, Arkansas defines biometric data to include DNA and recently passed the Children and Teen's Online Privacy Protection Act (H.B. 1717), which includes protections for minors'

---

[264] Cal. Civ. Code § 56.18(b)(10).
[265] Cal. Civ. Code § 56.18(b)(10). *See also* Mont. Code Ann. § 30-23-102(10) (defining a "processor" as "a person that processes genetic data on behalf of an entity pursuant to a contract between the entity and the processor that prohibits the processor from retaining, using, or disclosing the genetic data, or any information regarding the identity of the consumer, including whether that consumer has solicited or received genetic testing, as applicable, for any purpose other than for the specific purpose of performing the services specified in the contract").
[266] Va. Code Ann. § 59.1-593.
[267] Ala. Code § 8-43-2.
[268] *See* Ark. Code § 4-110-103(7)(E)(ii)(f); H.B. 1717, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) (effective July 1, 2026); Or. Rev. Stat. § 192.539(1); Va. Code §§ 59.1-593–602.

DNA.[269]  Furthermore, Oregon prohibits the disclosure of the identity of an individual who had a DNA test performed, unless there is consent or another limited exception.[270]  Notably, Oregon's law applies regardless of the source of the DNA or the manner in which the DNA is obtained.[271]  Finally, Virginia requires DTC genetic testing companies to provide consumers with a mechanism to revoke consent and destroy the DNA sample within 30 days.[272]

In a motion signed on by twenty-four state attorneys general regarding the sale of the Company (the "NAAG Motion," available at Appendix E), regulators focused on the need for informed consent before the Company sells or transfers consumers' genetic material.[273]  The NAAG Motion asserted that some state genetic privacy laws would require the Company to obtain consumers' consent before disclosing, transferring, or selling their genetic data to a third party.[274]  Moreover, the motion asserted that some state laws go so far as to require the Company to obtain consumer consent that is separate and distinct from previously obtained consent before selling, disclosing, or transferring consumer's genetic material.[275]  Furthermore, some states, like California, require the Company to include the name of the third party in consent requests sent to consumers.[276]

---

[269] Ark. Code § 4-110-103(7)(E)(ii)(f); H.B. 1717, 95th Gen. Assemb., Reg. Sess. (Ark. 2025) (effective July 1, 2026).
[270] *See* Or. Rev. Stat. § 192.539(1).
[271] *See id.*
[272] *See* Va. Code § 59.1-596.
[273] *See* NAAG's Motion for the Appointment of a Consumer Privacy Ombudsman ¶ 15, at 11, *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. Apr. 15, 2025), Dkt. 239 [hereinafter NAAG Motion].
[274] *See id.*
[275] *See id.*; *see also* Texas's Motion for Order Appointing a Consumer Privacy Ombudsman ¶ 28, at 11.
[276] *See* California's Motion for the Appointment of a Consumer Privacy Ombudsman ¶ 11, at 4, *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. Apr. 15, 2025), Dkt. 244.

Additionally, the NAAG Motion asserted that some state laws grant consumers exclusive ownership over their genetic data[277] and raised the question of "whether some of the DNA materials and data belong to the [Company] at all."[278]  The unique property interest in one's own genetic material appears to be further underscored by Arizona's genetic privacy law, which limits the disclosure of a deceased consumer's genetic material to the deceased's next of kin,[279] and Alaska and Florida's criminal laws, which make it a crime to sell or transfer an individual's genetic information without their consent.[280]

In a letter from California Attorney General Rob Bonta ("the California AG Letter," available at Appendix G), Bonta portrayed Regeneron's press release as "an attempt to strategically avoid application of various state laws that are triggered by transfers or disclosures of genetic information (e.g., GIPA)" and depicted the APA's "Change in Ownership" provision as "an attempt to disclaim that any assets are being sold or transferred," likely due to the fact that "the proposed sale of genetic data would trigger various applicable state laws.[281]  If GIPA applies to Regeneron's purchase of the Company's assets, like AG Bonta asserts,[282] the Company cannot transfer California consumers' genetic data and biological samples without

---

[277] *See* NAAG Motion ¶ 15, at 11 (citing Alaska Stat. § 18.13.010(a)(2); Fla. Stat. § 760.40(1)(c) (2024); Tex. Bus. & Com. Code § 503A.003).

[278] *See id*.

[279] *See* NAAG Motion ¶ 17, at 12 (citing Arizona's Genetic Information Privacy Act).

[280] *See* NAAG Motion ¶ 16, at 11; Alaska's Motion for Appointment of Consumer Privacy Ombudsman, at 3, *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. Apr. 15, 2025), Dkt. 246.

[281] Letter from California AG Rob Bonta to Professor Neil M. Richards, CPO, at 2 (June 2, 2025) [hereinafter California AG Letter]. The Texas Attorney General has also expressed skepticism towards the Debtors' "Change in Ownership" nomenclature. *See, e.g.*, Tex. Bus. & Com. Code Ann. § 503A.003; *see also* The State of Texas' Objection to Debtors Sale Transaction and Proposed Sale Order, at 16, *supra* n.161 ("Despite the parties' labels, there can be no reasonable dispute that the transactions contemplated under either APA will result in, at minimum, 'disclosure' of the Highly Sensitive Data to persons that are not the Debtors' vendors or service providers, including Regeneron or TTAM. There are no exemptions for 'change in control,' 'acquisitions,' 'equity transfers,' 'stock purchases,' or any other terminology the parties concoct to try and avoid the requirements under Texas law. The substance of the APAs also reflect a functional disclosure and transfer of control over the Highly Sensitive Data to a new, separate legal entity[.]" (footnote omitted)).

[282] *See id*.

76

requesting consumers' affirmative, express consent[283] and naming the winning bidder as the intended third party.[284]

The assertions made by the California Attorney General can similarly be adopted by state AGs across the country.  At least twenty-nine states have laws that require companies to obtain consumer consent before disclosing consumers' genetic data.[285]  More specifically, Texas' DTC Genetic Testing Act requires companies to obtain consumers' separate express consent before transferring or disclosing consumers' genetic data to a third party that is not a service provider.[286]  Similarly, Missouri's Genetic Information Privacy Law requires companies to obtain consumers' written authorization before disclosing consumers' genetic information.[287]  Under Alaska law, it is illegal for companies to transfer consumers' genetic data without informed, written consent.[288]  Notably, "a general authorization for the release of medical records or medical information" does not satisfy Alaska's consent requirements.[289]

### ii.   Unfair, Deceptive, or Abusive Acts and Practices ("UDAP") Laws

In addition to the FTC Act, every state (and the District of Columbia) has a law aimed at regulating unfair and deceptive business practices (sometimes called "UDAP" statutes).  These

---

[283] Cal. Civ. Code § 56.181(2).
[284] Cal. Civ. Code § 56.181(2)(D).
[285] *See* Alabama Genetic Data Privacy Act, Ala. Code § 8-43-1; Alaska Stat. § 18.13; Ariz. Rev. Stat. § 44-8001–8004; Genetic Information Privacy Act ("GIPA"), Cal. Civ. Code § 56.18; Del. Code Ann. tit. 16, §§ 1201 to 1208; Fla. Stat. Ann. § 817.5655; Ga. Code § 33-54-1; Genetic Information Privacy Act ("GIPA"), 410 Ill. Comp. Stat. 513; H.B. 1521, 124th Gen. Assemb., 1st Reg. Sess. (Ind. 2025) (effective July 1, 2025) (to be codified at Ind. Code § 22-9-14); Iowa Code § 729.6; Ky. Rev. Stat § 311.705; Genetic Information Privacy Act ("GIPA"), Md. Code Ann., Com. Law § 14-4404; Mass. Gen. Laws c. 111 § 70G; Minn. Stat. § 325F.995; Mo. Rev. Stat. § 375.1309; Montana Genetic Information and Privacy Act, Mont. Code § 30-23; Genetic Information Privacy Act, Neb. Rev. Stat. §§ 87-901 *et seq.*; Nev. Rev. Stat. § 629.101 *et seq.*; N.H. Rev. Stat. § 141-H:2; N.M. Stat. Ann.§§ 24-21-3 and 24-21-5; N.J. Stat. Ann. §§ 10:5-43 to 49; N.Y. Civ. Rights Law (CVR) § 79-L; S.C. Code Ann. § 38-93-40; Tenn. Code Ann. § 47-18-4902, 4904; Tex. Bus. & Com. Code § 503A; Utah Genetic Information Privacy Act, Utah Code § 13-60; Vt. Stat. tit. 18, § 9332; Va. Code § 59.1; Wyo. Stat. § 35-32.
[286] Tex. Bus. & Com. Code § 503A.006(a)(1)(A).
[287] Mo. Rev. Stat. § 375.1309.
[288] Alaska Stat. § 18.13.010(a)(1).
[289] Alaska Stat. § 18.13.010(c).

are broad consumer protection statutes akin to the FTC Act (though they may also apply to nonprofits).[290]  They are generally enforced by state attorneys general, though many of them also consumers with a private right of action.  Closely analogous to Section 5 claims, claims under state UDAP statutes often involve misleading statements, misrepresentations about a product, or the use of unclear language in a deceptive way.  These practices frequently lead to similar legal claims across different state UDAP statutes.

Some states believe that their UDAP laws are implicated in this bankruptcy proceeding. For example, in a motion filed by the Missouri Attorney General, the regulator argued that the Company's Privacy Statement, which purportedly permits the sale of consumers' personal information in bankruptcy, conflicts with the Company's Terms of Service, which states that "any information derived from your sample remains your information."[291]  According to the Missouri AG, these "conflicting representations to consumers could render the sale of such data illegal under Missouri's consumer protection laws."[292]  Citing the state's Unfair Trade Practices and Consumer Protection Law in a multistate letter sent by thirty-seven state AGs to the CPO (the "Multistate Letter," available at Appendix F), the Pennsylvania AG highlighted the fact the Company's "privacy policies have been more restrictive than [the Company's] privacy policy currently in effect," leaving a "vast number of consumers" with "the expectation that their [personally identifiable genetic information] would not be transferred or sold to an unrelated or unaffiliated third party, at least not without consumers' express consent."[293]  Finally, in the

---

[290] *See, e.g.,* Cal. Civ. Code § 1770; Fla. Stat. Ann. § 501.204; N.Y. Gen. Bus. L. § 349 (McKinney); Tex. Bus & Com. Code § 17.46; Wash. Rev. Code § 19.86.020.

[291] *See* Missouri AG's Motion for Appointment of a Consumer Privacy Ombudsman ¶¶ 23-24, at 7, *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. Apr. 15, 2025), Dkt. 248.

[292] *See id.* ¶ 26, at 7.

[293] Letter from the Offices of thirty-seven state AGs to Professor Neil M. Richards, CPO, at Appendix F (June 4, 2025) [hereinafter Multistate Letter] (p. 10 of PDF).

Multistate Letter, the Vermont AG concluded that the Company's sale of consumers' personal information "may amount to deceptive conduct to the extent that [the Company] made representations to consumers that their information would be protected, secured, and/or otherwise under consumers' control."[294]

### iii.  State "mini" HIPAA laws

Some states have "mini" HIPAA laws that largely mirror HIPAA's substantive requirements but can apply more broadly.  One such law is the California Confidentiality of Medical Information Act ("CMIA"), which applies to covered entities and business associates under HIPAA, as well as to certain entities that are not regulated under HIPAA.  For example, under the CMIA a "provider of health care" also includes a business that offers software or hardware that enables a consumer to manage their medical information or otherwise facilitates the diagnosis or treatment of a medical condition.[295]  Under the CMIA, companies are prohibited from disclosing or using the medical information of California residents for purposes which are not essential to providing the individual with health care services absent an exception.  The California Attorney General's office has authority to levy civil penalties for violations of the CMIA.

Based on the Company's representations and our understanding of the Company and Lemonaid Health, Lemonaid Health may be subject to the CMIA as a business that offers software or hardware that enables consumers to maintain their medical information for purposes such as diagnosis, treatment, or management of a medical condition.  Accordingly, Lemonaid Health may be regulated under the CMIA and could be subject to enforcement action under the

---

[294] *Id.*, Appendix F.
[295] *See* Cal. Civ. Code §§ 56.06(b), 56.10.

CMIA. Like many of the other laws in this section, the CMIA and other state "mini" HIPAA laws have informed the CPO's recommendations.

### iv. State "Comprehensive" Privacy Laws

At least 19 states have passed some form of a "comprehensive" privacy law that, while they vary in their specifics, generally creates data processing obligations for entities that operate in a particular state and process state residents' personal information or personal data. These laws generally apply to for-profit entities (though a few apply to certain nonprofits as well)[296] but include a number of exemptions for information and/or entities that are regulated under other federal laws (including HIPAA).[297] These laws are relevant to the Company's (including Lemonaid Health's) core business offerings in several ways, including through requirements related to:

- Posting an accurate and complete privacy notice;[298]

- Complying with data subject rights requests, including the right to access, delete, and opt-out of certain uses of personal information;[299]

- Data protection impact obligations;[300]

- Implementing reasonable security measures;[301] and

- Sensitive data.[302]

---

[296] *See, e.g.,* S.B. 619, 82nd Legis. Assemb., 2023 Reg. Sess. (Or. 2023) (codified at Or. Rev. Stat. § 180.095).
[297] *See* Cal. Civ. Code § 1798.145(c)(1)(A).
[298] *See e.g.,* Colo. Rev. Stat. § 6-1-1308 ("A controller shall provide consumers with a reasonably accessible, clear, and meaningful privacy notice that includes: …); *see also* Cal. Civ. Code § 1798.130.
[299] Cal. Civ. Code § 1798.100 *et seq.*; H.B. 4, 88th Leg., Reg. Sess. (Tex. 2023) (codified at Tex. Bus. & Com. Code § 541.001 *et seq.*).
[300] Tex. Bus. & Com. Code § 541.105; Colo. Rev. Stat. § 6-1-1309.
[301] Va. Code § 59.1-571–581; Tex. Bus. & Com. Code § 541.101.
[302] Colo. Rev. Stat. § 6-1-1308; Va. Code § 59.1-574.

On this last point, a number of these laws regulate "genetic data" as "sensitive data" that is subject to an affirmative consent requirement for processing.[303]  Separately, all of the state comprehensive privacy laws provide consumers with the right to opt out of the "sale" of their personal information.  The exact definitions vary, but a number of states define "sale" as "the exchange of personal data for monetary or other valuable consideration by a controller to a third party."[304]  There is, however, generally an exception within this definition for "the disclosure or transfer to a third party of personal data as an asset that is part of a proposed or actual merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets."[305]

These laws are generally enforced by state AGs, though the California Consumer Privacy Act is also enforced by the California Privacy Protection Agency.[306]  Most of these laws include statutory damages for potential violations.[307]

---

[303] *See* Colo. Rev. Stat. § 6-1-1308.

[304] *Id.* § 6-1-1303(23) ("(a) 'sale', 'sell', or 'sold' means the exchange of personal data for monetary or other valuable consideration by a controller to a third party. (b) 'sale', 'sell', or 'sold' does not include the following: (i) the disclosure of personal data to a processor that processes the personal data on behalf of a controller; (ii) the disclosure of personal data to a third party for purposes of providing a product or service requested by the consumer; (iii) the disclosure or transfer of personal data to an affiliate of the controller; (iv) the disclosure or transfer to a third party of personal data as an asset that is part of a proposed or actual merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets; or (v) the disclosure of personal data: (A) that a consumer directs the controller to disclose or intentionally discloses by using the controller to interact with a third party; or (B) intentionally made available by a consumer to the general public via a channel of mass media.").

[305] *See, e.g., id.*

[306] *See e.g.*, Code of Virginia § 59.1-584 ("The Attorney General shall have exclusive authority to enforce the provisions of this chapter."); *see also* Cal. Civ. Code § 1798.155.

[307] *See e.g.*, Tex. Bus. & Com. Code § 541.155.

### v. State Consumer Heath Data Laws

In 2023, Washington[308] and Nevada[309] passed laws imposing new requirements for the collection, use, and sale of consumer health data that falls outside the scope of HIPAA.  These laws apply to both for-profit and nonprofit entities.  Washington's My Health My Data Act ("MHMDA") is particularly broad in this regard.  It defines "consumer health data" to include categories of data such as genetic data, biometric data, measurements of bodily functions or vital signs, or any other health status identifying data.[310]  The MHMDA generally prohibits the collection and sharing of "consumer health data" except: 1) with consent from the consumer for such collection or sharing; or 2) to the extent necessary to provide a product or service that the consumer to whom the consumer health data relates to has requested from such regulated entity.[311]  It further prohibits the "sale" of consumer health data without an entity obtaining a very specific authorization from consumers.[312]  Importantly, both "sharing" and "sale" under the law are defined to exclude "the disclosure or transfer of personal data to a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the regulated entity's or the small business's assets and complies with the requirements and obligations in this [law]."[313]

As the Company (including through Lemonaid Health) processes information about Washington and Nevada residents that may be considered "consumer health data," it is likely

---

[308] *See* H.B. 1155, 68th Leg., 2023 Reg. Sess. (Wash. 2023) (codified at Wash. Rev. Code § 19.373 *et seq.*) ("Washington My Health My Data Act").
[309] S.B. 370, 2023 Leg., 98th Reg. Sess. (Nev. 2023) (codified at Nev. Rev. Stat. § 603A.400 *et seq.*).
[310] Wash. Rev. Code § 19.373.010(8).
[311] Wash. Rev. Code § 19.373.030(1).
[312] Wash. Rev. Code § 19.373.070(1).
[313] Wash. Rev. Code §§ 19.373.010(26)-(27).

subject to state consumer health data laws, including their requirements regarding the sharing and selling of such data.

### vi.   State Data Security Laws

At least twenty-five states require entities that process personal information or sensitive data to take proactive data security measures.[314]  Broadly speaking, data security laws typically fall into the following categories: (i) laws that require reasonable security measures;[315] (ii) laws with specific data security requirements;[316] (iii) laws that outline security requirements for certain internet-connected devices;[317] (iv) laws that provide affirmative defenses and cybersecurity-related safe harbors;[318] and (v) comprehensive consumer data privacy laws with specific data security obligations.[319]

---

[314] *See* Ala. Code § 8-38-3; Ark. Code Ann. § 4-110-104(b); Cal. Civ. Code § 1798.81.5; Colo. Rev. Stat. Ann. § 6-1-713.5; Conn. Gen. Stat. Ann. § 42-471(a); Del. Code Ann. tit. 6, § 12B-100; D.C. Code Ann. § 28-3852a; Fla. Stat. Ann. § 501.171(2); 815 Ill. Comp. Stat. Ann. 530/45; Ind. Code Ann. § 24-4.9-3-3.5; Iowa Consumer Data Protection Act, Iowa Code Ann. § 715D.4(1); Kan. Stat. Ann. § 50-6,139b; La. Stat. Ann. § 51:3074(A); Md. Code Ann., Com. Law § 14-3503; Mass. Gen. Laws Ann. ch. 93H, § 2; 201 Code Mass. Regs. 17.01-05; Neb. Rev. Stat. Ann. §§ 87-801 through 87-808; Nev. Rev. Stat. §§ 603A.210, 603A.215; N.M. Stat. Ann. §§ 57-12C-4, 57-12C-5; N.Y. Gen. Bus. Law § 899-bb(2); Ohio Rev. Code Ann. §§ 1354.01to 1354.05; Or. Rev. Stat. Ann. § 646A.622; 11 R.I. Gen. Laws § 11-49.3-2; Tenn. Code Ann. § 29-34-215 and Tennessee Information Protection Act, Tenn. Code Ann. §§ 47-18-3201-3217; Tex. Bus. & Com. Code Ann. § 521.052(a); Utah Code § 13-44-201(1)(a); Virginia Consumer Data Protection Act, Va. Code Ann. § 59.1-578(A)(3).

[315] *See* Ala. Code § 8-38-3; Ark. Code Ann. § 4-110-104(b); Cal. Civ. Code § 1798.81.5; Colo. Rev. Stat. Ann. § 6-1-713.5; Conn. Gen. Stat. Ann. § 42-471(a); Del. Code Ann. tit. 6, § 12B-100; D.C. Code Ann. § 28-3852a; Fla. Stat. Ann. § 501.171(2); 815 Ill. Comp. Stat. Ann. 530/45; Ind. Code Ann. § 24-4.9-3-3.5; Kan. Stat. Ann. § 50-6,139b; La. Stat. Ann. § 51:3074(A); Md. Code Ann., Com. Law § 14-3503; Neb. Rev. Stat. Ann. §§ 87-801 through 87-808; Nev. Rev. Stat. §§ 603A.210, 603A.215; N.M. Stat. Ann. §§ 57-12C-4, 57-12C-5; N.Y. Gen. Bus. Law § 899-bb(2); Or. Rev. Stat. Ann. § 646A.622; 11 R.I. Gen. Laws § 11-49.3-2; Tex. Bus. & Com. Code Ann. § 521.052(a); Utah Code § 13-44-201(1)(a).

[316] *See* Ala. Code §§ 8-38-2(2), (7) and § 8-38-3(a); Mass. Gen. Laws Ann. ch. 93H, § 2; 201 Code Mass. Regs. 17.01-05; Nev. Rev. Stat. § 603A.215; N.Y. Gen. Bus. Law § 899-bb(2)(b)(II) (McKinney); Or. Rev. Stat. Ann. § 646A.622(2); 11 R.I. Gen. Laws § 11-49.3-2.

[317] *See* Cal. Civ. Code § 1798.91.05(c) and Or. Rev. Stat. Ann. 646A.813(1)(a).

[318] *See* Conn. Gen. Stat. Ann. § 42-901(b); Iowa Code Ann. § 554G.2(1); Neb. Laws, L.B. 241, Nev. Rev. Stat. § 603A.215; Ohio Rev. Code Ann. §§ 1354.01 to 1354.05; Tenn. Code Ann. § 29-34-215 and Tennessee Information Protection Act, Tenn. Code Ann. §§ 47-18-3201-3217; Utah Code Ann. §§ 78B-4-702(2) and (3).

[319] *See* California Consumer Privacy Act (CCPA), as amended by the California Privacy Rights Act of 2020 (CPRA) (collectively CCPA), Cal. Civ. Code Ann. § 1798.100(e); Colorado Privacy Act (CPA), Colo. Rev. Stat. Ann. § 6-1-1308(5); Connecticut Personal Data Privacy and Online Monitoring Act, Conn. Gen. Stat. Ann. § 42-520(a)(3); Delaware Personal Data Privacy Act, Del. Code Ann. tit. 6, § 12D-106(a)(3); Florida Digital Bill of Rights, Fla.

New York's SHIELD Act is among the handful of state laws with specific data requirements.[320]  Under this state data security law, any entity that "owns or licenses computerized data which includes private information of a resident of New York" is required to "develop, implement and maintain reasonable safeguards" to protect consumers' personal information.[321]  Entities are considered to be in compliance with the New York SHIELD Act when the entity implements data security programs that include:

- Administrative safeguards (e.g., employee security training);

- Technical safeguards (e.g., regularly testing of systems and procedures); and

- Physical safeguards (e.g., risk assessment of information storage and disposal).[322]

Additionally, Massachusetts' data security law mandates heightened data security applicable to entities that "own or license personal information about a resident of the Commonwealth of Massachusetts."[323]  More specifically, Massachusetts requires certain entities to adopt comprehensive written information security plans (WISPs) that take into account the entity's "size, scope and type of business," "the amount of resources available" to the entity, "the

---

Stat. Ann. § 501.71; Indiana Consumer Data Protection Act, Ind. Code Ann. § 24-15-4-1(3) (eff. Jan. 1, 2026); Iowa Consumer Data Protection Act, Iowa Code Ann. § 715D.4(1); Kentucky Consumer Data Protection Act, Ky. Rev. Stat. Ann. § 367.3617(1)(c) (eff. Jan. 1, 2026); Maryland Online Data Privacy Act, Md. Code Ann., Com. Law § 14-4707(B)(1)(II) (eff. Oct. 1, 2025); Minnesota Consumer Data Privacy Act, Minn. Stat. Ann. 325M.16, subd. 2(c) (eff. July 31, 2025); Montana Consumer Data Privacy Act, Mont. Code Ann. § 30-14-2812(1)(b); Nebraska Data Privacy Act, Neb. Rev. Stat. Ann. § 87-1112(1)(b); New Hampshire Consumer Data Privacy Act, N.H. Rev. Stat. Ann. § 507-H:6(I)(c); New Jersey Consumer Data Privacy Act, N.J. Stat. Ann. § 56:8-166.12(a)(3); Oregon Consumer Privacy Act, Or. Rev. Stat. Ann. § 646A.578(1)(c); Rhode Island Data Transparency and Privacy Protection Act, 6 R.I. Gen. Laws § 6-48.1-4(b) (eff. Jan. 1, 2026); Tennessee Information Protection Act, Tenn. Code Ann. § 47-18-3305(a)(3) (eff. July 1, 2025); Texas Data Privacy and Security Act, Tex. Bus. & Com. Code Ann. § 541.101(a)(2); Utah Consumer Privacy Act, Utah Code Ann. § 13-61-302(2); Virginia Consumer Data Protection Act, Va. Code Ann. § 59.1-578(A)(3).

[320] *See* N.Y. Gen. Bus. L. § 899-bb(2) (McKinney).
[321] *See id.*
[322] *See id.*
[323] *See* 201 Mass. Code Regs. 17.01(1). *See also* Mass. Gen. Laws Ann. ch. 93H, § 2(a) (West).

amount of stored data," and "the need for security and confidentiality of both consumer and employee information."[324]  Furthermore, entities' WISPs should include:

- An assessment of "reasonably foreseeable internal and external risks to the security, confidentiality, and/or integrity of any electronic, paper or other records containing personal information" and evaluation of "current safeguards for limiting such risks";

- Employee security policies, including policies pertaining to the treatment of "records containing personal information outside of business premises";

- Disciplinary actions for violations of the entity's security program rules;

- Prevention measures protecting records containing personal information from terminated employees;

- Restrictions on physical access to records containing personal information; and

- Procedures for documenting responses to data breaches and cybersecurity incidents.[325]

Along with issues related to consent requirements and unfair and deceptive practices, the NAAG Motion highlighted concerns about the Company's data security posture.[326]  In particular, following the Company's October 2023 breach, Connecticut and Indiana organized a multistate investigation, with 44 states participating.[327]  As a result of the investigation, the multistate proposed settlement terms that required security enhancements.[328]  However, the settlement has

---

[324] *See* 201 Mass. Code Regs. 17.03(1).
[325] *See* 201 Mass. Code Regs. 17.03(2).
[326] *See* NAAG Mot. 8-9, ¶¶ 7-9. *See also* Tex. Mot. 8-9, ¶ 19; Cal. Mot. 3, ¶ 8.
[327] *See* NAAG Mot. 18, ¶ 45.
[328] *Id.*

not been finalized and, according to the NAAG Motion, "States have not received adequate assurances that such enhanced security measures have been implemented."[329]

Given that the Company and Lemonaid Health maintain records containing personal information in many of the states with state data security laws, both the Company and Lemonaid Health are likely subject to the various data security measures outlined under these relevant frameworks.  As such, all relevant parties are required to implement and maintain reasonable safeguards, including written information security plans, to protect consumers' personal information.

### vii.   State Data Breach Notification Laws

All fifty states and the U.S. territories have laws that require private organizations to notify individuals and (frequently) state attorneys general of data security breaches that impact their personal information.[330]  Security breach statutes all require notification to affected residents without unreasonable delay and specify who must comply with the law, the scope of personal information covered under the law, what qualifies as a data breach, notice requirements, and exceptions to the law.  However, the requirements of each particular state law vary substantially, with some states requiring notice to additional agencies or law enforcement, others requiring notification of credit reporting agencies when certain thresholds are met, and varying sets of obligations with regards to the contents of the notification and the time frame within which regulator notice must be delivered.  As such, compliance with state privacy laws requires discerning state-level requirements in connection with or in preparation for a data breach.

---

[329] *See* NAAG Mot. 18, ¶ 45.
[330] *See, e.g.*, Ariz. Rev. Stat. §§ 18-551, 552; Cal. Civ. Code § 1798.82; Colo. Rev. Stat. § 6-1-716; Conn. Gen. Stat. § 36a-701b; Fla. Stat. § 501.171; Mass. Gen. Laws ch. 93H; Mich. Comp. Laws § 445.72; Minn. Stat. § 325E.61; Mo. Rev. Stat. § 407.1500; Mont. Code Ann. § 30-14-1704. *See also Security Breach Notification Laws*, NCSL (Jan. 17, 2022), https://www.ncsl.org/technology-and-communication/security-breach-notification-laws.

The breach notification laws impose notice obligations on owners or licensors of computerized personal information. Based on the Company's representations and our understanding of the Company and Lemonaid Health's business operations, the Company and Lemonaid Health are subject to the breach notification laws across all states where its customers reside, as the two companies collect and are the data owner of customer personal information, including medical records and genetic information. Because the Company has customers in all fifty states, DC, and the U.S. territories,[331] it is potentially subject to all of these laws, and they are relevant to the CPO's recommendations.

### viii.  State Data Disposal Laws

At least thirty-six states require the safe disposal of paper and electronic records containing personal information.[332] While some state laws primarily focus on the disposal of records through methods like shredding or erasing, a few states like Nebraska go further and require businesses to "implement and maintain reasonable security procedures and practices that are appropriate to the nature and sensitivity of the personal information."[333] Further, other states like New York require businesses to "implement and maintain reasonable safeguards to protect the security, confidentiality and integrity of the private information including, but not limited to, disposal of data."[334] Businesses that dispose personal information "within a reasonable amount of time after it is no longer needed for business purposes" are deemed to be in compliance with New York law.[335]

---

[331] *See* Memorandum from Gretchen Ramos & John P. Carlin to Professor Neil Richards, *In re 23andMe Holding Co. – Responses to CPO* Questions, at 11-13 (June 4, 2025).

[332] *See* Practical Law Data Privacy & Cybersecurity, *State Data Disposal Laws Chart: Overview*, Westlaw, https://rb.gy/dd5trk (last visited June 5, 2025).

[333] Neb. Rev. Stat. Ann. § 87-808(1).

[334] N.Y. Gen. Bus. Law § 899-bb(2) (McKinney).

[335] N.Y. Gen. Bus. Law § 899-bb(2)(ii)(C)(4) (McKinney).

Given that the Company maintains records containing personal information for consumers in many of the states with state data disposal laws, the Company is likely subject to the disposal obligations outlined under these relevant frameworks.  These data disposal frameworks are also relevant to the CPO's recommendations.

### c.   International Laws

#### i.   GDPR/ UK GDPR

The General Data Protection Regulation (EU), and the UK GDPR (collectively, "GDPR") govern the protection of personal data including sensitive data categories or "special categories of personal data" which include health related data, genetic data, and biometric data, as well as the transfer of personal data outside of these regions.[336]  The GDPR has broad exterritoriality impact as it applies to all entities, including nonprofits, that process personal data of data subjects who are in the EU regardless of whether such processing takes place within the EU.[337]  Covered entities must meet distinct obligations based on their role in processing the relevant data.  Most relevant, a controller, or the entity that collects and determines the purpose and means of processing the impacted personal data, is accountable for the compliance with the strictest GDPR requirements, including assessing the purpose, scope, and risk associated with the processing activities, and implementing and ensuring that appropriate security is in place, among other requirements.[338] Further, controllers are prohibited from processing special categories of personal data unless heightened requirements are met including obtaining explicit consent from individuals for the processing of such data or under certain specified circumstances such as for

---

[336] Regulation (EU) 2016/679, 2016 O.J. (L 119) 1; Information Commissioner's Office, *The UK GDPR*, ICO, https://ico.org.uk/for-organisations/data-protection-and-the-eu/data-protection-and-the-eu-in-detail/the-uk-gdpr/ (last visited June 5, 2025); GDPR art. 9.
[337] GDPR art. 3.
[338] GDPR arts. 24, 28 & 29; GDPR EU, *Data Controllers and Processors*, https://www.gdpreu.org/the-regulation/key-concepts/data-controllers-and-processors/ (last visited June 5, 2025).

certain legal or public interest purposes.[339]  Entities subject to GDPR are also required to meet strict security breach notification reporting guidelines including notifying their lead supervisory authority of the breach within 72 hours after having become aware of the breach, and notifying impacted individuals where there is a risk to the rights and freedoms of natural persons.[340] Compliance violations under the GDPR are enforced by an entities' lead supervisory authority and the Information Commissioner's Office ("ICO") in the EU and UK respectively and violations can result in significant penalties, including fines of up to €20 million or 4% of global annual revenue, whichever is higher for serious violations.[341]

The Company collects, processes, and stores genetic data, among other data categories of millions of individuals, a meaningful number of which are located in the UK or across the EU including in the Netherlands, France, Sweden, Denmark, Ireland, and Spain.[342]  Accordingly, the data collected by the Company from individuals present within the UK and EU would be regulated under the GDPR.  Further, as a DTC service, the Company would be considered a controller, as it determines the purpose and means of processing the impacted data and therefore would be directly responsible for GDPR compliance in relation to the information it processes through its core services.

Notably, Lemonaid Health only offers services to U.S. residents.[343]  As such, in contrast to 23andMe, international laws do not apply to Lemonaid Health.

---

[339] GDPR art. 9.
[340] GDPR art. 33.
[341] GDPR EU, *What are the GDPR Fines?*, https://gdpr.eu/fines/ (last visited June 5, 2025).
[342] Responses to CPO Questions (Set 1), at 23andMe Response to Question 2.
[343] Responses to CPO Questions (Set 1), at Lemonaid Response to Question 2.

## ii.  Other Relevant International Considerations

In addition to information collected from residents in the UK and across the EU, the Company also collects data from residents of Canada and Australia which have their own set of federal, state, provincial, and genetic data related laws.  The Australia Federal Privacy Act 1988 ("Privacy Act") and the Privacy Principles contained in the Privacy Act are the primary Australian laws protecting the handling of consumer personal information including the collection, use, storage and disclosure of personal information.[344]  The Canadian Personal Information Protection and Electronic Documents Act ("PIPEDA"), Canada's federal privacy law, governs the collection, use, and disclosure of personal information for federally regulated entities.  There are also laws at the provincial level that may be relevant, such as Alberta's Personal Information Protection Act,[345] British Columbia's Personal Information Protection Act ("PIPA BC")[346] and, Quebec's Act Respecting the Protection of Personal Information in the Private Sector[347] (collectively, the "Provincial Statutes").[348]  Similar to previously discussed frameworks and regulatory guidance, entities regulated under these laws must meet heightened

---

[344] Attorney-General's Department, *Privacy*, https://www.ag.gov.au/rights-and-protections/privacy (last visited June 5, 2025).
[345] Personal Information Protection Act, SA 2003, ch. P-6.5, https://kings-printer.alberta.ca/documents/Acts/P06P5.pdf.
[346] Personal Information Protection Act, SBC 2003, ch. 63, https://www.bclaws.gov.bc.ca/civix/document/id/complete/statreg/00_03063_01.
[347] Act Respecting the Protection of Personal Information in the Private Sector, CQLR, ch. P-39.1, https://www.legisquebec.gouv.qc.ca/en/document/cs/P-39.1.
[348] Office of the Privacy Commissioner of Canada, *Policy statement on the collection, use and disclosure of genetic test results* (Dec. 4, 2017), https://www.priv.gc.ca/en/privacy-topics/health-genetic-and-other-body-information/s-d_140710/; Office of the Privacy Commissioner of Canada, *PIPEDA requirements in brief*, https://www.priv.gc.ca/en/privacy-topics/privacy-laws-in-canada/the-personal-information-protection-and-electronic-documents-act-pipeda/pipeda_brief/ (May 1, 2024).

obligations when handling sensitive data regarding consent and security, as emphasized by provincial regulators.[349]

For this case, a letter from the Alberta Privacy Commissioner (available at Appendix I) noted that "[g]enetic data constitutes highly sensitive personal information" which requires heightened safeguards including specified consent requirements related to the disclosure of such information such as requiring that disclosure is necessary, implementation of transaction purpose limitations, and the requirement that individuals be notified within a reasonable time that their personal information was transferred.[350]  Similarly, the Quebec Privacy Commissioner noted in a separate letter (available at Appendix H) that the disclosure of sensitive genetic data which could "reveal very intimate information not only about the private lives of the people who provided it, but also about those who are genetically linked to them" requires continued compliance with provincial regulation, including notification to individuals within a reasonable time of the transaction of the "context in which their sensitive information is held," or risk facing enforcement action.[351]

Genetic data is also regulated at the state and provincial level in Australia (similar to the way it is regulated in the United States and Canada).  For example, Australia regulates sensitive data in particular health data or genetic data under the Health Records and Information Privacy

---

[349] Australian Law Reform Commission, *Sensitive information*, Privacy Act § 6.91 (Aug. 16, 2010), https://www.alrc.gov.au/publication/for-your-information-australian-privacy-law-and-practice-alrc-report-108/6-the-privacy-act-some-important-definitions/sensitive-information/; Office of the Privacy Commissioner of Canada, *PIPEDA Interpretation Bulletin: Sensitive Information* (May 16, 2022), https://www.priv.gc.ca/en/privacy-topics/privacy-laws-in-canada/the-personal-information-protection-and-electronic-documents-act-pipeda/pipeda-compliance-help/pipeda-interpretation-bulletins/interpretations_10_sensible/.
[350] Letter from Diane McLeod, Information and Privacy Commissioner of Alberta to Jerry Jensen, Acting U.S. Trustee, et al., Office of the U.S. Trustee Region 13 South (May 20, 2025).
[351] Letter from Lise Girard, Chair of the Commission d'accès à l'information (Quebec) to Jerry Jensen, Acting U.S. Trustee, et al., Office of the U.S. Trustee Region 13 South (May 15, 2025).

Act 2002 in New South Wales ("NSW")[352] and the Health Records Act 2001 in Victoria

("VIC"),[353] while Canada regulates health information at the provincial level, in Ontario,[354]

Nova Scotia,[355] Newfoundland and Labrador,[356] and New Brunswick.[357]  Notably, only New

Brunswick defines health information broadly to include genetic information about an

individual.[358]

Lastly, similar to the U.S. regulatory landscape, entities regulated in these jurisdictions

must also comply with genetic related anti-discrimination provisions, which generally prohibit

discrimination using genetic information which could be used to predict health information such

as medical predispositions, for example, Canada's Genetic Non-Discrimination Act, which is

similar to GINA.[359]

Based on information provided by the Company, the Company is likely subject to

compliance with the obligations outlined for personal information (including genetic data)

collection across these international regions.  Similar concerns outlined above with regard to

U.S. data protection laws also likely apply to these international frameworks.  There may also be

unique considerations that apply across these laws as well, particularly given that regulators in

---

[352] NSW Government, *NSW Legislation*, https://legislation.nsw.gov.au/view/whole/html/inforce/current/act-2002-071 (last visited June 6, 2026).

[353] Victoria State Government, *Health Records Act 2001*, https://www.legislation.vic.gov.au/in-force/acts/health-records-act-2001 (last visited June 6, 2025).

[354] Ontario, *Personal Health Information Protection Act, 2004*, https://www.ontario.ca/laws/statute/04p03 (last visited June 6, 2025).

[355] Personal Health Information Act, SNS 2010, ch. 41, as amended, https://nslegislature.ca/sites/default/files/legc/statutes/personal%20health%20information.pdf.

[356] Personal Health Information Act, SNL 2008, ch. P-7.01, https://assembly.nl.ca/Legislation/sr/statutes/p07-01.htm#5_.

[357] New Brunswick, Acts and Regulations, *Personal Health Information Privacy and Access Act*, https://laws.gnb.ca/en/showfulldoc/cs/P-7.05/20121030 (last visited June 6, 2025).

[358] *Id.* sec. 1, Definitions.

[359] Office of the Privacy Commissioner of Canada, *Policy statement on the collection, use and disclosure of genetic test results* (Dec. 4, 2017), https://www.priv.gc.ca/en/privacy-topics/health-genetic-and-other-body-information/s-d_140710/; *see also* Australian Government, *Disability Discrimination Act 1992*, https://www.legislation.gov.au/C2004A04426/2018-04-12/text (last visited June 6, 2025).

international jurisdictions have historically been more active on data privacy issues compared to U.S. regulators.  This is evidenced by the Alberta and Quebec privacy commissioners' assertions of the applicability of provincial requirements for sensitive data in relation to this transaction, as well as their intent to ensure such requirements are enforced.[360]  While the CPO focused on applicable U.S. laws for the legal conclusions in this Report, these international frameworks inform his recommendations for safeguards.

## VII.    Whether the Proposed Sale Would Violate Applicable Non-Bankruptcy Law

One of the questions that the Court directly asked the CPO to analyze was whether the proposed sale would violate applicable non-bankruptcy laws.  Several of the laws detailed in the previous section are relevant as to the potential sale of the Company and/or the transfer of its data assets to the winning bidder (irrespective of who that may be).  Based on the CPO's reading of these laws (supported by counsel) and his experience in evaluating consumer privacy issues, the CPO cannot conclude that certain non-bankruptcy laws would not be violated if the Company and its data assets were sold as part of this current bankruptcy proceeding, unless the winning bidder obtained appropriate consent from the Company's customers prior to obtaining their genetic data and other personal information.

### a.  Genetic Privacy Laws

Arguably, the most relevant laws with regard to the sale itself are state laws that govern the disclosure, sale, and/or transfer of genetic data.  For example:

---

[360] Letter from Diane McLeod, Information and Privacy Commissioner of Alberta to Jerry Jensen, Acting U.S. Trustee, et al., Office of the U.S. Trustee Region 13 South (May 20, 2025); letter from Lise Girard, Chair of the Commission d'accès à l'information (Quebec) to Jerry Jensen, Acting U.S. Trustee, et al., Office of the U.S. Trustee Region 13 South (May 15, 2025).

- California's Genetic Information Privacy Act requires DTC genetic testing companies to "obtain a consumer's express consent for collection, use, and disclosure of the consumer's genetic data, including, at a minimum, separate and express consent for each of the following …. (D) Each transfer or disclosure of the consumer's genetic data or biological sample to a third party[361] other than to a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed."[362]

- Missouri prohibits any person that "creates, stores, receives, or furnishes genetic information" from disclosing "such genetic information except pursuant to written authorization of the person to whom such information pertains or to that person's authorized representative."[363]

- Arizona law requires DTC genetic testing companies to obtain separate express consent from the consumer before "[t]ransferring or disclosing the consumer's genetic data to any person other than the company's vendors and service providers."[364]

- South Carolina law prohibits the disclosure of genetic information to third parties "without first obtaining the written informed consent of that individual or a person legally authorized to consent on behalf of the individual."[365]

---

[361] The law does not define "third party" in this context.
[362] Cal. Civ. Code § 56.181(a)(2).
[363] Mo. Rev. Stat. § 375.1309.
[364] Ariz. Rev. Stat. § 44-8002(A)(2)(b)(i).
[365] S.C. Code § 38-93-40(A).

Notably, the laws referenced above include certain exceptions (for example, for entities that comply with other federal laws in relation to the underlying genetic information), but the exemptions under these laws generally do not specifically apply to data transferred as part of a bankruptcy proceeding[366] (or separately require entities to obtain consent for such a transfer).[367] Some of these laws do permit entities to disclose genetic data to "service providers" or "vendors" without the need for consent but, as further explained below, these terms are defined narrowly (or not at all) and are not necessarily intended to apply to the transfer or sale of assets as part of a bankruptcy proceeding.

The key question under these laws, then, is whether the purchase of the Company's genetic data assets constitutes a sale, transfer, or disclosure of genetic data from the Company to the successful bidder.  This is at least somewhat dependent on how the sale itself is construed under the applicable bankruptcy proceeding, a fact that is not lost on the Bidders.  In the May 17, 2025 Asset Purchase Agreement between the Company and Regeneron ("Regeneron APA"), the "Change in Ownership" provision stated that "the change of ownership of Customer Data included in the Acquired Assets from Sellers to Purchaser pursuant to this Agreement shall *not constitute a sale, transfer or disclosure* of Customer Data and shall solely constitute a change in ownership of such Acquired Assets."[368]  Furthermore, a Regeneron press release announcing that it entered into the Regeneron APA with the Company stated that "23andMe will be operated as a

---

[366] *See*, *e.g.*, Cal. Civ. Code § 56.184(c); Mo. Rev. Stat. § 375.1309.

[367] *See* Utah Code §§ 13-61-101(31)(b)(vii), 13-60-104(1)(c)(i)(A) (exempting disclosures of personal data to third parties as part of a bankruptcy from definition of "sale," but separately requiring express consumer consent for "the transfer or disclosure of the consumer's genetic data to any person other than the company's vendors and service providers").

[368] Notice of Successful and Backup Bidders with Respect to the Auction of the Debtors' Assets, at Exhibit A: Asset Purchase Agreement art. IV § 4.4, *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. May 19, 2025), Dkt. 420 [hereinafter APA Notice] (emphasis added) (p. 39 of PDF).

wholly owned direct or indirect subsidiary of Regeneron Pharmaceuticals, Inc. and continue operations as a personal genomics service."[369]

The CPO disagrees with this characterization.  Regeneron is seeking to purchase the Company in an asset sale under section 363(b) of the Bankruptcy Code,[370] which pertains to the "use, sale, or lease" of the estate's property.[371]  Furthermore, Regeneron is purchasing the Company "free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances) pursuant to Section 363."[372]  Moreover, the Regeneron APA states that the Company will "sell, transfer, convey, assign, deliver and set over" its "acquired assets" to Regeneron.[373]  Under the Regeneron APA, acquired assets are defined as "all customer data and all biological samples,"[374] excluding "stock, partnership interests or any other equity interest in any Person for U.S. federal income tax purposes."[375]

The APA between the Company and TTAM ("TTAM APA") adopts substantially the same framework.[376]  Similar to Regeneron, TTAM is seeking to purchase the Company in an asset sale under section 363(b) of the Bankruptcy Code,[377] "free and clear of any and all Liens, Liabilities and other Interests (other than Permitted Encumbrances and Assumed Liabilities)."[378]  Under the TTAM APA, acquired assets are defined as "the Company Genetic Database,"[379]

---

[369] Press Release, Regeneron, *Regeneron Enters into Asset Purchase Agreement to Acquire 23andMe® for $256 Million; Plans to Maintain Consumer Genetics Business and Advance Shared Goals of Improving Human Health and Wellness* (May 19, 2025), https://investor.regeneron.com/news-releases/news-release-details/regeneron-enters-asset-purchase-agreement-acquire-23andmer-256.
[370] APA Notice at 2 of PDF, Exhibit A: Asset Purchase Agreement.
[371] 11 U.S.C. § 363(b)(1).
[372] APA Notice at 77 of PDF, Exhibit A: Asset Purchase Agreement art. XI § 11.5.
[373] APA Notice at 131 of PDF, Exhibit B: Backup Bidder Asset Purchase Agreement art. II § 2.1.
[374] APA Notice at 12 of PDF, Exhibit A: Asset Purchase Agreement art. I §§ 1.1(a)-(b).
[375] APA Notice at 55 of PDF, Exhibit A: Asset Purchase Agreement art. V § 5.1(r)(vi).
[376] *See* APA Notice at 108 of PDF, Exhibit B: Backup Bidder Asset Purchase Agreement.
[377] *See id.*
[378] *See* APA Notice at 180 of PDF, Exhibit B: Backup Bidder Asset Purchase Agreement art. XI § 11.5.
[379] *See* APA Notice at 109 of PDF, Exhibit B: Backup Bidder Asset Purchase Agreement art. I § 1.1(a).

excluding "stock, partnership interests or any other equity interest in any Person for U.S. federal income tax purposes."[380]  Similar to Regeneron's APA, TTAM's APA also contains a "Change in Ownership" provision that states "the change of ownership of Personal Information included in the Acquired Assets from Sellers to Purchaser pursuant to this Agreement *shall not constitute a sale, transfer or disclosure* of Personal Information and shall solely constitute a change in ownership of such Acquired Assets."[381]

Because of this ambiguity, the CPO cannot conclude that the sale or transfer of the Company's assets to either bidder does not violate applicable non-bankruptcy laws, unless the Company first obtains affirmative consent from the Company's customers (that complies with applicable state law requirements) prior to the winning bidder obtaining control of the Company's genetic data assets, at least in those states where such consent is plausibly required. Additionally, and as the Court is aware, a number of state attorneys general have made clear that they believe that their genetic privacy laws are potentially implicated by the sale or transfer of the Company's genetic data assets to either bidder,[382] and the CPO has no reason to disagree with this interpretation.  And this is relevant because, as those same state attorneys general have argued, relevant provisions of the Bankruptcy Code stand for the propositions that "any limitations on transfer of property prepetition, remain intact once the bankruptcy is filed" and sales of property are only permitted only "if nonbankruptcy law would permit the sale."[383]

---

[380] *See* APA Notice at 152 of PDF, Exhibit B: Backup Bidder Asset Purchase Agreement art. V § 5.1(s)(v).
[381] *See* APA Notice at 140 of PDF, Exhibit B: Backup Bidder Asset Purchase Agreement art. IV § 4.4 (emphasis added).
[382] *See* States' Complaint, ¶ 22(C), *In re 23andMe Holding Co.*, No. 25-40976 (Bankr. E.D. Mo. June 9, 2025), Dkt. 686 [hereinafter State AG Complaint].
[383] *See* State AG Complaint ¶¶ 16-17.

The CPO understands that the Debtors do not agree with this conclusion. In a letter sent by their counsel regarding the potential acquisition of the Company by TTAM, the Debtors stated that:

> [Section 4.4 of the TTAM APA] provides that TTAM is merely stepping into the shoes of the Debtors—that the change in ownership of Debtors' Personal Information is not a sale, transfer or disclosure of that Personal Information, but instead TTAM is receiving ownership of the Personal Information pursuant to a sale of the business for the sole purpose of continuing to operate the Debtors' business, consistent with the privacy provisions contained in Section 7.12. Section 7.12 expressly provides that customers' data will remain subject to Debtors' Privacy Statement and consumer consents, and, if TTAM seeks to use the data for any new purpose, it must comply with applicable laws in relation to any notice, consent or other requirements.[384]

The Debtors used similar language in discussing the potential acquisition of the Company by Regeneron.[385]

The CPO, however, does not agree with this interpretation. The adoption of 23andMe's Privacy Statement does not necessarily mean that the underlying sale does not constitute a sale, transfer, or disclosure of genetic data, which is what triggers the consent obligation under these state laws. Additionally, and as is the case with some of the laws discussed later in this section, these laws often do not include exemptions for data that is transferred pursuant to bankruptcy proceedings. In some states (such as California), the state legislature specifically included such an exemption for their general comprehensive privacy law but did not include an exemption for the state law regulating genetic privacy. From the CPO's perspective, this suggests that state legislatures know when to include exemptions and when not to, and it is further evidence of the

---

[384] Memorandum from Gretchen Ramos & John P. Carlin to Professor Neil Richards, *In re 23andMe Holding Co. – Debtors' Supplemental Memorandum*, at 9-10 (June 6, 2025) (footnotes omitted).
[385] *See* Debtors' Memorandum to CPO, at 17.

legislature acknowledging the unique sensitivities associated with genetic data by providing

heightened protections for it.

The Debtors and their counsel have also tried to argue that the disclosure of genetic data

as part of this bankruptcy proceeding constitutes a disclosure to a "service provider" or vendor

that serves as an exception to state genetic privacy laws' consent requirements (in states where

such an exception is relevant, such as California).[386]  In a memo to the CPO, for example, they

argued, specifically in relation to California's GIPA, as follows:

> While GIPA does not define "third party," it defines "service provider" as an entity that
> "is involved in the collection …, and analysis of the consumer's biological sample or
> extracted genetic material on behalf of the direct-to-consumer genetic testing company."
> GIPA further provides that "[t]he contract between the company and the service provider
> shall prohibit the service provider from retaining, using, or disclosing [the data] … for
> any purpose other than for the specific purpose of performing the services specified in the
> contract for the business[.]"  This provision makes clear that if a party receiving the
> genetic data is subject to the same privacy policy as the Debtors, it is not a third party
> under GIPA.
>
> The Buyer in this bankruptcy, therefore, is more analogous to a service provider, to
> whom GIPA permits genetic data transfer without opt-in consent.  Pursuant to the
> covenants in the APA, the Buyer must continue to abide by the terms of the Privacy
> Statement, just as service providers must abide by the terms of disclosure in their
> contracts.  And just as service providers can only use the data for narrow purposes
> specified in a contract, the Buyer must continue to use the genetic data in the same
> manner and for the same purposes for which it has already obtained consent, unless the
> Buyer seeks and obtains new consent to use the data towards a different end.  Thus, like
> service providers and unlike a third party who would be allowed to process the genetic
> data for other purposes, the Buyer will obtain genetic data that is subject to the same
> strict privacy requirements and practices that currently exist.  And as suggested by the
> FTC in *1Health*, state genetic data privacy laws are not implicated in circumstances like
> here, where the Buyer is restricted to processing the data just as the seller has.[387]

In the CPO's opinion, Debtors' argument misreads GIPA (and similar state genetic

privacy laws). First, the CPO disagrees with the Debtors' conclusion that, under GIPA, "if a

---

[386] *See* Cal. Civ. Code § 56.184.
[387] Debtors' Memorandum to CPO, at 38-39.

party receiving the genetic data is subject to the same privacy policy as the Debtors, it is not a

third party under GIPA."  GIPA's provision that "[t]he contract between the company and the

service provider shall prohibit the service provider from retaining, using, or disclosing the

[genetic data] for any purpose other than for the specific purpose of performing the services

specified in the contract for the business"[388] is a *necessary* condition for the existence of a

service provider relationship, not a *sufficient* one.  Second, and more generally, it is not clear that

the Bidders acquiring 23andMe's genetic data would be "involved in the collection,

transportation, and analysis of the consumer's biological sample or extracted genetic material *on

behalf of* the direct-to-consumer genetic testing company," as required by GIPA (and other state

genetic privacy laws).[389]  The Bidders here do not seek to function as a processor of genetic data

ultimately controlled by 23andMe; rather, they seek to become the controller of that data.  Thus,

the argument that they are processing genetic data on behalf of 23andMe is unconvincing to the

CPO.

### b.  FTC Act/UDAP

The sale of the Company and its personal information potentially implicates the FTC Act

and state UDAP laws because of the representations made by the Company related to its

handling of such information.  It is unclear whether the sale of the Company's data (and

particularly its genetic data assets) in a bankruptcy proceeding would be consistent with these

promises.  Consequently, the CPO cannot conclude that such a sale would not violate the FTC

Act and state UDAP laws as a potential unfair or deceptive practice.

---

[388] Cal. Civ. Code § 56.18(b)(10).
[389] *See*, *e.g.*, Cal. Civ. Code § 56.18(b)(10) (emphasis added); Mont. Code Ann. § 30-23-102(10); Va. Code § 59.1-593.

The Company has made statements about its privacy and security practices in a range of forums that are arguably inconsistent with its proposed disposition of genetic information as part of this bankruptcy proceeding.  As noted previously, the Company states in its Privacy Statement that "Privacy is in our DNA"[390] and includes statements about its privacy practices in the advertising associated with its products.[391]  Meanwhile, the Company's "Privacy" webpage states that "You can be assured that your genetic data will not be shared with employers, insurance companies, or public databases without your explicit consent," which, as the state AGs have observed in their own recent filing, would provide customers with "a reasonable expectation that their genetic data would not be auctioned off and shared with the highest bidder without explicit consent."[392]  Additionally, the Company's product listings tout how, for example, "[y]our data is encrypted, protected, and under your control."[393]  The substance of the Company's various privacy-related documents, meanwhile, further emphasize its commitment to privacy.  For example, as observed by FTC Chair Ferguson, the Company's Medical Record Privacy Notice[394] pledges that "unless we have received your specific authorization, we will not disclose any of your genetic information as part of your Medical Record Information to third parties."[395]  Moreover, as discussed previously, the Company's Privacy Statement did not, prior to 2022, use the word "bankruptcy" in its fine print on "Business Transitions."  All of these

---

[390] *Privacy Statement*, 23andMe, https://www.23andme.com/legal/privacy/full-version/.
[391] *Id*.
[392] State AG Complaint ¶ 22(D).
[393] *Product Detail Page for 23and Me Ancestry Service*, Amazon, https://www.amazon.com/23andMe-DNA-Test-Ancestral-Opt/dp/B01LZ5K87Z/ (last visited May 23, 2025); *Product Detail Page for 23and Me Health + Ancestry Service*, Walmart, https://www.walmart.com/ip/23andMe-Health-Ancestry-Service-DNA-Test-before-You-Buy-See-Important-Test-Info-below/678846605 (last visited May 23, 2025); *Product Detail Page for 23and Me Health-only*, FSA Store, https://fsastore.com/23andme-health-only-genetic-testing-service/32162.html (last visited May 23, 2025); *Product Detail Page for 23and Me Health-only*, HSA Store, https://hsastore.com/23andme-health-only-genetic-testing-service/32162.html (last visited May 23, 2025).
[394] *Medical Record Privacy Notice*, 23andMe, https://www.23andme.com/legal/medical-record-privacy-notice/.
[395] Ferguson Letter, at 2.

statements — among many others — are arguably inconsistent with the Company's proposed disclosure of genetic information to the Bidders without customer consent as part of this bankruptcy proceeding, thus potentially constituting an unfair or deceptive act or practice (a view shared by many state AGs responsible for enforcing state UDAP laws).[396]

### c. State Comprehensive Privacy Laws

The state comprehensive privacy laws are also potentially relevant to the sale of the Company and its data assets as part of these bankruptcy proceedings.  However, in contrast to other legal frameworks examined in this Report, there is a more plausible claim that states' comprehensive privacy laws are not violated as the result of the Company's sale in the bankruptcy proceeding.  To be sure, as outlined earlier in this Report, some of the state comprehensive privacy laws regulate genetic data and certain categories of health data as sensitive data subject to an opt-in consent requirement for processing.[397]  And all of the state comprehensive privacy laws require that companies provide consumers with an ability to opt out of the "sale" of their personal information.[398]  However, these laws generally include exemptions within their definitions of "sale" for "the disclosure or transfer to a third party of personal data as an asset that is part of a proposed or actual merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets."[399]  Thus, there is a colorable argument that the genetic data transferred as part of this bankruptcy proceeding

---

[396] *See*, *e.g.*, State AG Complaint, Exhibit A, at 5, 7-8.
[397] *See*, *e.g.*, Colo. Rev. Stat. § 6-1-1308.
[398] *See*, *e.g.*, Cal. Civ. Code § 1798.120; Colo. Rev. Stat. § 6-1-1306(1)(a).
[399] *See*, *e.g.*, Colo. Rev. Stat. § 6-1-1303(23)(b)(IV).

would fall outside the scope of the state comprehensive privacy laws, though that it is not a view necessarily shared by state regulators.[400]

### d. State Consumer Health Data Laws

As with the state comprehensive privacy laws, there is also a plausible argument that the transfer of genetic data at issue in this bankruptcy proceeding would not run afoul of the state consumer health data laws in Washington and Nevada.  As noted above, the Company processes information about Washington and Nevada residents that may be considered "consumer health data" under those states' consumer health data laws, including those laws' requirements related to consent for sharing of such data, as well as authorizations for sale.  But those laws also exempt disclosures of information to third parties as part of bankruptcy proceedings from their definitions of "sale" (for both states) and "sharing" (in Washington only).[401]  Thus, there is a colorable argument that the disclosure of genetic data at issue in this case would not violate Washington's health data law or Nevada's law.

### e. Other Considerations

In addition to the considerations outlined above, there may be other legal theories under which the sale of the Company's genetic data in particular violates applicable non-bankruptcy laws, at least in the absence of express consent from the Company's customers.  Numerous state AGs, for example, have argued that 23andMe's customers "have inherent common law rights of ownership or control" in their biological material, genotype data, personal information, family tree data, and phenotype data.[402]  Some states have statutes that affirmatively confer such

---

[400] *See, e.g.,* State AG Complaint, Exhibit A, at 2 (Colorado Privacy Act identified as a statute implicated by the instant bankruptcy proceedings).

[401] Wash. Rev. Code §§ 19.373.010(26), (27); Nev. Rev. Stat. § 603A.333(2)(e).

[402] State AG Complaint ¶ 22(A); *see also* The State of Texas' Objection to Debtors Sale Transaction and Proposed Sale Order, at 2, *supra* n.161 ("Citizens have a basic, inherent right to their genetic data and biomaterials.").

rights.[403]  While the CPO is not necessarily in a position to evaluate this legal theory given its novelty, he also cannot reject it outright based on the information provided earlier about the unique sensitivities associated with genetic data, including the scientific reality that genetic data is not just sensitive data about people—in a very real sense, it *is* people.

There are also other data protection considerations that might not be relevant to the sale of the Company's data assets but which would certainly apply to how the winning bidder uses the Company's personal information (including genetic data) after acquisition.  For example, there are concerns related to whether the acquiring entity will comply with the Company's pre-existing privacy policy and other privacy promises (or potentially implicate violations of the FTC Act or state UDAP laws).  There are also issues regarding what permissions the winning bidder would have in relation to the underlying customer data (and whether the bidder can use the Company's pre-existing data for the same or additional purposes based on any consents or permissions originally obtained by the Company).  After all, even if post-acquisition data use is governed by the Privacy Statement, that document states by its own terms that it can change, as it has already changed *twenty-two times* since 2007.  There are further concerns related to whether consumers' genetic data will be subject to the same security protections as implemented by the Company (which were in place when the Company's customers agreed to provide their data to the Company).  The CPO analyzed all these considerations as part of his assessment, and they have informed his recommendations below.

---

[403] *See, e.g.*, Ram, *Investigative Genetic Genealogy and the Problem of Familial Forensic Identification*, *supra* n.173; s*ee also* Ram, *DNA by the Entirety*, *supra* n.173.

## VIII.    Recommendations of the CPO

Regardless of whether the sale or transfer of the Company's data assets is permitted under current applicable data privacy laws (which, as noted earlier, the CPO cannot conclude is the case), the CPO recommends that the Court should consider requiring certain best practices for either bidder due to the high volume and inherent sensitivity of the underlying data.  Based upon the examination of the facts and law relevant to the CPO's assignment, his experience and with the assistance of counsel, the CPO recommends as follows, given the serious privacy and security risks present in this matter, the complex web of over a hundred federal, state, and international privacy and security laws implicating the data at issue, and the consistent strong privacy and security promises made by the Company over the historical course of their business:

**Consent Safeguards.**  Putting aside the issue of whether consent is legally required, as a best practice and important safeguard, the optimal solution from a consumer privacy perspective would be to mandate the Company to obtain separate, affirmative consent by each of the Company customers in order to sell or transfer customers' data to the winning bidder.  Such consent would ideally be obtained by the Company prior to the transfer and would require the Company to request customers' consent either via email or through the Company's mobile application or website.  The consent mechanism would also be free of dark patterns or other uses of choice architecture or defaults to nudge the customers towards acceptance; in other words, it should be presented as a free and autonomous choice without attempts to influence the customer. Any customer who does not consent (within a reasonable time) should have their data deleted rather than transferred to the winning bidder.

An alternative solution would be to mandate the winning bidder to obtain separate, affirmative consent from Company customers prior to using customers' data (but after obtaining

control of such data).  This solution would require the winning bidder to notify consumers of the sale of their personal information (such as by email) and to obtain consumers to separately and affirmatively consent to the successful bidder's use and processing of consumers' personal information, consistent with the uses and processing outlined in the Company's current Privacy Statement.  The consent here should also be free of dark patterns and other uses of choice architecture as noted in the previous option.  If such consent could not be obtained for a consumer within a reasonable time (perhaps a year), the accounts should be deleted promptly from that point.  Requiring either the Company or the winning bidder to obtain consumers' separate, affirmative consent would be most consistent with 23andMe's promises that "privacy is in our DNA," "that each choice you make is an informed choice," that it empowered its customers by putting them "in control" of their sensitive genetic data, and telling them repeatedly that it remained "your data."

**Posthumous Use Safeguards.**  With regard to the Bidders, while individuals may have provided consent for the Company to use their genetic data anticipating that such a consent might last beyond their natural lives, it is unlikely that they expected that their data (including for many consumers their genome and biospecimens) would posthumously flow to a pharmaceutical company on one hand, or a new nonprofit organization on the other, potentially in perpetuity.[404] In addition to being a use by a different entity that the one to which the sensitive data was entrusted, posthumous use also creates additional security risks since data that continues to be stored rather than deleted can be accessed in a breach or security incident, as occurred in October

---

[404] *See, e.g.*, *Biobanking Consent Document*, 23andMe, https://www.23andme.com/about/biobanking (last visited May 23, 2025) (despite stating that absent a withdrawal of consent a customer's permission to keep samples at the 23andMe biobank "does not expire," the consent form makes no explicit references to posthumous use).

2023.  In the absence of a living data subject who can exercise control rights over the data,

posthumous uses of genetic data implicates to a greater level the rights and vulnerabilities of

family members, and other genetic relatives (including as-yet unborn ones) who, as noted above,

never have an opportunity to consent to the processing of sensitive data relating to them that can

be used to their detriment.[405]

      With respect to the inevitability of posthumous genetic data, the best practice from a

consumer privacy-protective standpoint for the Company or any successor in interest to the data

to take would proceed in three steps.  First, any holder of the sensitive genetic data moving

forward should put in place clear procedures by which the next of kin of a deceased customers

can take control of the accounts and delete the data if desired upon proof of death (perhaps by the

executor of a state presenting a valid state death certificate).  Second, when customers have not

logged into their accounts for a specified period (perhaps three years), the Company should

email those account holders to see if they are able to respond.  If the holders do not respond

within six months, the Company should presume those account holders to be deceased and delete

the accounts.  Third, the Company should clarify in its privacy policies and research consents

that its consents do not extend beyond the death of an account holder unless an account holder

manifests after informed consent (including notice of the consequences to living and unborn

relatives) a separate, clear (but revocable while alive) intention to donate the body of their data to

science.

      **Guarantee of Data Loyalty.**  An additional important safeguard from a consumer

privacy perspective would be to require either bidder to make an important substantive promise

---

[405] *See* Section IV.a. above.

not to use the genomic data in a way that is inconsistent with the best interests of the data

subject.  Such a safeguard would have the advantage, by ensuring loyal uses of personal data, of

both avoiding privacy harm and supporting company trust.  Duties of loyalty (like those of care

and confidentiality) are ancient common law duties that are frequently put in place in the context

of relationships of vulnerability, where there is an imbalance of power and often the disclosure of

sensitive information between a vulnerable person (like a client or a patient) and a powerful

entity (like a trustee, an attorney, a doctor, or a hospital).  There is robust and growing academic

literature discussing the applicability of loyalty duties to in privacy contexts, particularly where

sensitive information is shared in ways that create vulnerability for the person to whom the data

relates. [406]  For the many reasons given already in this Report demonstrating that such

---

[406] *See, e.g.*, Jack M. Balkin, *Information Fiduciaries and the First Amendment*, 49 U.C. Davis L. Rev. 1183, 1186
(2016); Jack M. Balkin, *The Fiduciary Model of Privacy*, 133 Harv. L. Rev. F. 11, 11 (2020); Jack M. Balkin &
Jonathan L. Zittrain, *A Grand Bargain to Make Tech Companies Trustworthy*, Atlantic (Oct. 3, 2016),
https://www.theatlantic.com/technology/archive/2016/10/information-fiduciary/502346; Ari Ezra Waldman, *Privacy
as Trust: Information Privacy for an Information Age* 8 (2018); Ari Ezra Waldman, *Privacy As Trust: Sharing
Personal Information in a Networked World*, 69 U. Miami L. Rev. 559, 591 (2015); Ari Ezra Waldman, *Privacy,
Sharing, and Trust: The Facebook Study*, 67 Case W. Rsrv. L. Rev. 193, 195-96 (2016); Neil Richards & Woodrow
Hartzog, *A Duty of Loyalty for Privacy Law*, 99 Wash. U. L. Rev. 961, 964 (2021); Neil Richards & Woodrow
Hartzog, *Taking Trust Seriously in Privacy Law*, 19 Stan. Tech. L. Rev. 431, 457 (2016); Neil Richards & Woodrow
Hartzog, *Privacy's Trust Gap: A Review*, 126 Yale L.J. 1180, 1198 (2017); Neil Richards & Woodrow Hartzog, *A
Relational Turn for Data Protection?*, 6 Eur. Data Prot. L. Rev. 492 (2020); Woodrow Hartzog & Neil Richards,
*The Surprising Virtues of Data Loyalty*, 71 Emory L.J. 985 (2022); Woodrow Hartzog & Neil Richards, *Legislating
Data Loyalty*, 97 Notre Dame L. Rev. Reflection 356 (2022); Christopher W. Savage, *Managing the Ambient Trust
Commons: The Economics of Online Consumer Information Privacy*, 22 Stan. Tech. L. Rev. 95, 113 (2019);
Lindsey Barrett, *Confiding in Con Men: U.S. Privacy Law, the GDPR, and Information Fiduciaries*, 42 Seattle U. L.
Rev. 1057, 1058 (2019); Ariel Dobkin, *Information Fiduciaries in Practice: Data Privacy and User Expectations*,
33 Berkeley Tech. L.J. 1, 1 (2018); *Cameron F. Kerry, Why Protecting Privacy Is a Losing Game Today — and
How to Change the Game*, Brookings (July 12, 2018), https://www.brookings.edu/articles/why-protecting-privacy-
is-a-losing-game-today-and-how-to-change-the-game/; Ian R. Kerr, *The Legal Relationship Between Online Service
Providers and Users*, 35 Canadian Bus. L.J. 419, 446-47 (2001); Daniel J. Solove, *The Digital Person: Technology
and Privacy in the Information Age*, at 102-04 (2006); Richard S. Whitt, *Old School Goes Online: Exploring
Fiduciary Obligations of Loyalty and Care in the Digital Platforms Era*, 36 Santa Clara High Tech. L.J. 75, 79
(2019); Kiel Brennan-Marquez, *Fourth Amendment Fiduciaries*, 84 Fordham L. Rev. 611, 613-14 (2015); Lauren
Henry Scholz, *Fiduciary Boilerplate: Locating Fiduciary Relationships in Information Age Consumer Transactions*,
46 J. Corp. L. 143, 144-45 (2020); Claudia E. Haupt, *Platforms As Trustees: Information Fiduciaries and the Value
of Analogy*, 134 Harv. L. Rev. F. 34, 35 (2020). For a criticism of information fiduciary proposals, see Lina M. Khan
& David E. Pozen, *A Skeptical View of Information Fiduciaries*, 133 Harv. L. Rev. 497, 499-501 (2019).

vulnerability is present in this matter,[407] the CPO suggests that requiring some binding commitment that the Company will not use the genetic data in ways contrary to its customers best interests would help alleviate some of that vulnerability moving forward.  This would also be consistent with letters received by the CPO from interested members of the public (available at Appendix L) suggesting that a fiduciary stewardship trust or other kind of data trust might provide more suitable safeguards for large volumes of genetic data than the privacy policy notice and consent model.[408]  A data loyalty requirement could serve as a supplement to or possibly a replacement for individual affirmative consent in some instances, should the Court determine that such consent is either (a) not practical in the totality of the circumstances in this Chapter 11 case or (b) not legally required in those jurisdictions that do not have a genetic privacy law mandating consent for the sale or transfer of genetic data.

**Actual Notice.**  Another alternative but—to be clear—*significantly less protective safeguard* from a consumer privacy perspective would be to provide meaningful, actual notice to all 23andMe customers of the sale and transfer of their information, as well as their deletion rights.  Ideally, such notice would be provided by the Company prior to the sale of consumers' data, providing consumers the opportunity to delete their data before it's transferred to the successful bidder.  This notice should be provided to consumers both through the application and web interfaces, as well as through individualized email and postal mail notice of the transfer.  Alternatively, the winning bidder should be required to provide meaningful, actual notice to all 23andMe customers via email and provide consumers with an opportunity to delete their data.  In

---

[407] *See*, *e.g.*, Section IV.a. above.
[408] *See* Letter from Richard Litman to CPO (June 2, 2025); Letter from Elizabeth Dreier, Global BioData Trust to CPO (June 6, 2025).

any event, this option would increase the importance of the presumption of death in the case of inactive accounts discussed above. The CPO offers this option in the spirit of completeness but notes that this is likely to be a highly ineffective form of notice in practice.

Nonetheless, while affirmative choice would be far superior from a privacy standpoint given the sensitivity of genetic data (and might be legally required in some jurisdictions), it remains the fact that actual notice would be better than nothing. The CPO notes that undoubtedly some 23andMe customers have received notice of data practices by the Company that they apparently do not like over the past two years, because 23andMe account deletions spiked (relative to past deletion rates) after the 2023 data breach was reported in the press, and they have spiked again by a larger amount after the Company declared bankruptcy earlier this year. This certainly suggests that some 23andMe customers both (1) learned about the potential sale in bankruptcy, perhaps from sources other than the Company and (2) were able to take action to successfully delete their accounts (and by extension their genetic data and any stored biospecimen).

Nevertheless, attempts at actual notice coupled with deletion mechanisms are less preferable from a privacy perspective than requiring affirmative consent prior to transfer and/or substantive data loyalty guarantees because (1) as previously discussed, safeguards that depend upon affirmative action by already overburdened consumers are structurally underprotective, particularly given the sensitivity of the data and the potentially unknown consequences due to the evolving scientific understandings of the human genome; (2) actual notice is impossible for dead customers or those who have changed their contact emails (perhaps by graduating from school or college or by changing jobs); (3) actual notice is difficult to guarantee given the already overburdened cognitive bandwidth of consumers with many competing demands and many

110

digital accounts and other businesses competing for their limited attention; and (4) the high sensitivity of genetic and genomic data creates vulnerabilities that warrant stronger safeguards than consumer self-help.  For this reason, the CPO strongly recommends that while actual notice is an option at an analytical level, it is insufficient and should not be deployed in this particular case.

**Publicly Available Privacy and Security Commitments.**  In addition to any consent and transparency obligation, the winning bidder should publicly commit to adhere to certain privacy and security standards with regard to the personal information they obtain from their acquisition of the Company's assets.  This type of public commitment would be akin to the requirements that are in consent decrees that companies regularly agree to with the FTC or state attorneys general.  For example, the winning bidder could be required to adhere to the requirements in one of FTC's recent settlement orders, which required a company to: (1) develop a timeline and plan to address information security gaps and deficiencies; (2) obtain initial and biennial third-party assessments; and (3) provide "a clear and conspicuous link on [the Company's] website and on their mobile applications directing U.S. consumers to an online process through which they can request the deletion of their Personal Information."[409]

Such a public and legally enforceable commitment is particularly warranted here given 23andMe's 2003 data breach.  The CPO notes that, as a functional matter, some elements of a such a program already seem to be in place given post-data breach remediation efforts by the Company's new security team, but particularly given the extraordinary sensitivity and volume of

---

[409] Agreement Containing Consent Order, at 7-8, 12, *In the Matter of Marriott International, Inc.*, FTC File No. 1923022, https://www.ftc.gov/system/files/ftc_gov/pdf/1923022marriottacco.pdf.

this data formalization of such a program is necessary to bring it within best privacy and security practices.

**Future Bankruptcy Issues.**  To avoid the level of complexity, uncertainty and expense that the privacy and security issues in this matter have produced, any bidder should be required to make a binding commitment that in the case of any future bankruptcy, it must acquire separate, explicit, informed, and easily revocable individual consent before it would seek to sell or transfer customer genomic data in a future bankruptcy.  This could take the form of a clearly stated promise in the Privacy Statement and Terms of Service, and preferably in the higher-level and more salient promises in the more consumer-accessible privacy summary page on the website.  In any event, such a clearly stated promise in the Privacy Statement would bring federal and state UDAP laws into play, though they could potentially also be enforced by customers of the company in a class action based upon a contract theory of relief.  It would certainly obviate the kind of unprecedentedly complex and expensive CPO process that has been necessary in this matter.

**Government Access Issues.**  As explained above in Section IV.a, consumer genetic data of the sort held by 23andMe is of great interest to law enforcement in the prosecution of crimes. However, individual consumers are unlikely to think of the remote possibility that their sensitive data might be made available to law enforcement.  As noted earlier in this section, they are certainly unable to consent to their genetic data being made available to companies by their genetic relatives.  Furthermore, consumers' lack of awareness of the possibility of government access is reinforced by 23andMe's privacy representations, such as its website statement that "[s]ince 2008, your individual data has **never been released to law enforcement** and will only

112

be shared if required by a valid legal process."[410]  For these reasons, the CPO recommends that the winning bidder commit in its Privacy Statement and consumer-facing representations to litigate any law enforcement requests for customer genetic data to the greatest extent possible under the law, such as, for example, demanding the presentation of a valid search warrant.

## IX.    Differences Between the Bidders

The Debtors specifically asked the CPO to evaluate whether one of the bids was preferable to the other from a data protection perspective.  While the CPO does not believe it to be his role to select the winning bidder, there are specific points that the Debtors should consider as they evaluate the impact and future consequences that the sale of the Company will have on consumer privacy concerns.

If Regeneron were to acquire the Company and its data assets, it is notable that Regeneron has never operated a DTC genetic testing business.  Instead, Regeneron's genetic data business has primarily focused on leveraging such information in the clinical trial context.[411]  If it is the winning bidder, Regeneron may have difficulties with adapting to the unique challenges faced by a DTC genetic company.  As outlined earlier, the legal framework governing consumer-facing genetic testing companies is evolving rapidly and has been an area of focus for both regulators and legislators.  The genetic data that Regeneron currently processes likely falls outside of the scope of many state privacy laws that create exemptions for data processed pursuant to certain research guidelines (including the Common Rule).[412]  These exemptions will not apply to Regeneron in its role as operating a DTC genetic company, and the company may

---

[410] *Your privacy comes first*, 23andMe, https://www.23andme.com/privacy/ (last visited May 23, 2025).
[411] *Genetics to Therapeutics, Designed for All*, Regeneron, https://www.regeneron.com/science/genetics-center (last visited May 23, 2025) ("At Regeneron Genetics Center, we are harnessing the power of human genetics to discover important new medicines, validate existing research programs and optimize clinical trials.").
[412] *See*, *e.g.*, Cal. Civ. Code § 56.184(c)(4).

113

face challenges, for example, in complying with data subject requests (among other potential

issues).  Since 2019, the Company has received tens of thousands of deletion requests annually

and, since 2024 (after the data breach became public), that number has jumped to the hundreds of

thousands (with another meaningful increase in such requests after the public announcement of

the Company's bankruptcy filing).  It is unclear whether Regeneron has a sufficient plan in place

to address this new role.

One other point to consider in relation to Regeneron specifically is that, it is the CPO's

understanding that, Regeneron plans on using the Company's existing consents for its own use

cases.[413]  This creates a unique concern for Regeneron because it is unclear that the Company's

customers would have reasonably anticipated that their consent would extend to the use of their

data for a completely different company in a completely different industry (this is in contrast to

TTAM, which has a more plausible claim that Company customers have a relationship with the

new entity, given the involvement by Anne Wojcicki, the Company's co-founder and former

CEO).  Indeed, none of the research consents disclose the possibility that they would also apply

to a successor entity in the event of a bankruptcy proceeding.  Thus, it is unlikely that

Regeneron's reliance on customer consents obtained by the Company would align with

consumers' reasonable expectations.

There are also potential concerns related to TTAM that the Debtors should evaluate as

part of this proceeding.  For one, many of the individuals associated with TTAM were also

---

[413] Memorandum from Regeneron Pharmaceuticals, Inc., *In re 23andMe Bankruptcy: List of Privacy Questions for the Successful Bidder*, at 1 (stating: "We intend to abide by the consents provided by 23andMe consumers and the approvals provided (and any conditions imposed) by the IRBs and Ethics Committees. To the extent Regeneron desires to use any of the 23andMe data (and associated biospecimens) beyond those uses currently carried out by 23andMe, Regeneron will obtain additional consumer consent and/or IRB or Ethics Committee approvals in accordance with applicable law.").

associated with the Company during the 2023 data breach, which led to the potential compromise of personal information of approximately 7 million individuals.  As outlined earlier, given the unique sensitivity associated with genetic data and its immutable nature, a data breach potentially compromising genetic data creates special risks.  While the Company has taken steps to improve its security program since the incident (including by mandating multi-factor authentication for all accounts),[414] its history in this regard is relevant for the CPO, particularly in comparison to Regeneron which, to the CPO's knowledge, has not had any major, public security incidents or data breaches.

If TTAM is the successful bidder, there is an additional wrinkle that potentially affects consumer privacy concerns.  Unlike Regeneron, TTAM is organized as a nonprofit medical research organization.[415]  Furthermore, Wojcicki has indicated plans to turn the Company into a nonprofit subsidiary of TTAM, if the purchase is approved by the Court.[416]  In a written response to the CPO's due diligence questions, TTAM concluded that "[h]ousing this data in a nonprofit allows a less commercially driven approach."[417]  However, and as detailed earlier, a number of applicable data protection laws that currently create data protection compliance obligations for the Company (e.g., state comprehensive privacy laws) and/or allow the Company to fall within certain regulatory frameworks (e.g., the FTC Act and most state comprehensive privacy laws) do not apply to certain nonprofits.  As such, the conversion of the Company into a nonprofit entity could prevent the FTC and state regulators from enforcing some of the privacy laws within their

---

[414] *Addressing Data Security Concerns – Action Plan*, 23andMe (updated Dec. 5, 2023), https://blog.23andme.com/articles/addressing-data-security-concerns.

[415] *Empowering Each of Us to Make a Difference*, TTAM Research Institute, https://ttamresearchinstitute.org/ (last visited June 5, 2025).

[416] Memorandum from TTAM, *In re 23andMe Bankruptcy: Responses to Privacy Questions from the Consumer Privacy Ombudsman*, at 6 (May 23, 2025).

[417] *Id.*

jurisdictions and could create an enforcement vacuum for the protection of consumers' privacy rights.  This is a meaningful distinction between the two bidders in terms of the impact of the sale on consumer privacy, both now and in the future.

There is also the Lemonaid Health piece of the puzzle, which is in play if TTAM is the winning bidder.  Should TTAM be declared the winning bidder, it will also acquire Lemonaid Health and all of the unique issues that come into play with maintaining and operating a personal health record (which, similar to DTC genetic testing companies, are increasingly subject to a complicated set of data protection rules and requirements).  In the alternative, if Regeneron were to be declared the winning bidder, based on the information provided to the CPO by Debtors' counsel, Lemonaid Health would either be sold to another party or unwound (and its data would be deleted subject to laws regulating data retention).  It is possible that there would be greater concerns from a consumer privacy perspective if another bidder acquired Lemonaid Health (depending on what this entity wished to do with Lemonaid Health's data).  The CPO cannot examine this issue fully without knowing all of the facts (particularly who, in the alternative, would purchase Lemonaid Health and its data) but is generally concerned about Lemonaid Health's data assets given the sensitivity associated with health data, and wishes to stress the importance of making sure that the serious concerns associated with the potential transfer of millions of genetic and genomic profiles do not lead to overlooking the important health privacy issues associated with any transfer or sale of Lemonaid Health.

## X.    Conclusion

This concludes the CPO's examination as required by the Court.  The Report takes into account the relevant legal framework, publicly available information and documents, stakeholder communications, and scholarship applicable to the proposed sale of 23andMe data, as well as the

information made available to the CPO at the time of submission by the Debtors and the Bidders.

The CPO remains available for any further analysis or recommendations requested by the Court.

**<u>Appendix A - Current Terms of Service</u>**

23andMe    lemonaid health

    Shop

Full Terms of Service

**Terms of Service Topics**

# Terms of Service

Last Updated: March 14, 2025

THESE TERMS OF SERVICE CONTAIN A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES IN CERTAIN CIRCUMSTANCES, RATHER THAN JURY TRIALS OR CLASS ACTION LAWSUITS. VIEW THESE TERMS HERE.

## Welcome to 23andMe Terms of Service

Like the As, Ts, Cs, and Gs that make up your DNA, our Terms of Service (what we call the "Terms") make up the agreement between 23andMe, Inc. ("23andMe") and you. These Terms govern your use and access to 23andMe's products, software, services, and website (including but not limited to text, graphics, images, and other material and information) as accessed from time to time by you, regardless if the use is in connection with an account or not (collectively, the "Services").

Please read the Terms carefully, and any policies, guidelines, or rules applicable to such Services, as they constitute a legal agreement between 23andMe and you. We also encourage you to review our Privacy Statement for additional information. Of course, if you do not agree with our Terms or any other policies, then do not use the Services. You can delete your account from your Account Settings at any time.

These Terms apply to you if you live in the United States or if you access our Services in the United States. If you live outside the United States, please review the Terms available in the respective region specific to the 23andMe Services you access.

# 1. Who Can Use the Services

We believe everyone should be able to access, understand, and benefit from their genome. That said, there are a few restrictions about who can use our Services. By using the Services or creating an account, you represent, warrant and agree that:

- You can form a binding contract with 23andMe;

- You are not a person barred from receiving the Services under the laws of the jurisdiction from which you use the Services;

- You are at least 18 years old;

- Any sample you provide to 23andMe is either your own, or the sample of a minor for whom you are a parent or legal guardian, or the sample of a person for whom you are a legally authorized representative;

- The sample you provide is not from a bone marrow or stem cell recipient (Why? Click here more information);

- You are not an insurance company or an employer; and

- You will not use the Services for any investigative forensic genealogy uses.

# Other Terms and Conditions

If you choose to use or purchase additional Services for a business or commercial purpose, or any purpose other than personal use, they may have their own terms and conditions. The specific terms and conditions associated with the use or purchase of additional Services

are made a part of these Terms by this reference, just like you agree to these Terms, you agree to abide by those additional terms and conditions too. In the event those additional terms may conflict with or be inconsistent with these Terms, including any arbitration provision or dispute resolution provision, these Terms will control.

The following terms also govern and apply to your use of the Services, and they are incorporated herein by this reference:

- Membership Terms

- Telehealth Terms

- Important Test Info

Each of these terms and conditions may be changed from time to time.

23andMe may make changes to the Terms at any time. If we make a material change to the Terms, we will notify you, such as by posting a notice on our website or sending a message to the email address associated with your account. By continuing to access or use the Services, you agree to be bound by the revised Terms.

# Risks and Considerations Regarding 23andMe Services

Once you obtain your Genetic Information, the knowledge is irrevocable. You should not assume that any information provided to you, whether now or as genetic research advances, will be welcome or positive. As research advances, you may need to obtain further Services from 23andMe, your physician, a genetic counselor, or other healthcare provider. We encourage you to talk to a genetic counselor to help you understand your results and testing options.

Some people feel a little anxious about getting genetic health results and you may learn information about yourself that you do not anticipate. This is normal. If you feel very anxious, you should speak to your physician or a genetic counselor prior to collecting your sample for testing. Additionally, you may discover things about yourself that trouble you and that you may not have the ability to control or change (e.g., your father is not

genetically your father, surprising facts related to your ancestry, or that someone with your genotype may have a higher than average chance of developing a specific condition or disease).

The laboratory may not be able to process your sample, and the laboratory process may result in errors. The laboratory may not be able to process your sample up to 5% of the time if your saliva does not contain a sufficient volume of DNA, you do not provide enough saliva, or the results from processing do not meet our standards for accuracy.*

Here's our policy on re-processing failed samples:

- If the initial processing fails for any of above reasons, we will reprocess the same sample at no charge to the user.

- If the second attempt to process the same sample fails, we will offer to send another sample collection kit to the user to collect a second sample at no charge.

- If the second attempt to process the sample is unsuccessful, (up to 0.65% of all samples fail the second attempt at testing according to 23andMe data obtained in 2019 for all genotype testing),* 23andMe will not send additional sample collection kits and the user will be entitled solely and exclusively to a complete refund of the amount paid to 23andMe, less shipping and handling, provided the user shall not resubmit another sample through a future purchase of the Service.

Note: If the user breaches this policy agreement and resubmits another sample through a future purchase of the Service and processing is not successful, 23andMe will not offer to reprocess the sample. Even for processing that meets our high standards, a small, unknown fraction of the data generated during the laboratory process may be un-interpretable or incorrect (referred to as "Errors").

**No Refunds.** Except as may be required by applicable law, payments are non-refundable and there are no refunds or credits for partially used services. Please refer to 23andMe's Return and Refund Policy.

You should not change your health behaviors solely on the basis of Genetic Information received from 23andMe.

23andMe's Services are not intended to diagnose any condition or disease.

- For most common diseases, the genes we know about are only responsible for a small fraction of the risk. Your ethnicity, environmental factors, and lifestyle choices are far

more important predictors and may affect the relevance of each report and how your results may be interpreted.

- The Services are not intended to tell you anything about your current state of health, or to be used to make medical decisions, including whether or not you should take a medication, how much of a medication you should take, or determine any treatment.

- If you have concerns or questions about what you learn through 23andMe, you should contact your physician or other healthcare provider before making any lifestyle changes. Please note that genetic risk assessment is not applicable to results of carrier screening tests.

23andMe Services are for research, informational, and educational use only. We do not provide medical advice. Please note, the Genetic Information provided by 23andMe is for research, informational, and educational use only. This means two things:

1. Many of the genetic discoveries that we report have not been clinically validated, and the technology we use, which is the same technology used by the research community, to date has not been widely used for clinical testing.

2. Talk to your Healthcare provider. 23andMe does not endorse, warrant or guarantee the effectiveness of any specific course of action, resources, tests, physician or other healthcare providers, drugs, biologics, medical devices or other products, procedures, opinions, or other information that may be mentioned on our website. If we provide any recommendations and/or potential ways to take action, this information is intended for informational purposes only and for discussion with your physician or other healthcare provider. The Services are not intended to be used by the customer for any diagnostic purpose and are not a substitute for professional medical advice. Reliance on any information provided by 23andMe, 23andMe employees, others appearing on our website at the invitation of 23andMe, or other visitors to our website is solely at your own risk.

While we are licensed in the State of California as a clinical laboratory, not all jurisdictions require our Services to be subject to license. Therefore, we are not universally licensed by all state, federal, or international authorities for genetic testing conducted for health and disease-related purposes. In addition, there are certain jurisdictions in which we do not offer our Services because we do not have the required licenses.

Furthermore, to expand and accelerate the understanding and practical application of genetic knowledge in healthcare, we invite all eligible genotyped users to participate in 23andMe Research. When we use the term "Product Development," it means research

performed for the purpose of new product development and new product development activities performed by 23andMe on De-identified Information. These activities may include, among other things, improving our Services and/or offering new products or services to you; performing quality control activities; or conducting data analysis that may lead to and/or include commercialization with a third party. Participation in such research is voluntary and based upon an Institutional Review Board-approved consent document.

*23andMe data on file.

2. Using the Services →

Last Updated: March 14, 2025.
Read the previous version


Home

**Services**

Health + Ancestry

Ancestry Service

23andme+ Premium

23andMe+ Total Health

Gifts

Merchandise

**Company**

Investors

Media Center

Blog

Careers

Refer a Friend

Return & Refund Policy

**Legal**

Bar Date Notice

Important Test Info

Terms of Service

Privacy Statement

Data Protection

Family Considerations

Research Consent

Individual Data Consent

Biobanking Consent

Cookie Policy

Cookie Choices

Patent Information

Report a Security Issue

Consumer Health Data Privacy Policy

## Appendix B - Current Privacy Statement



## Privacy Statement

Last Updated: March 14, 2025

# What you should know about privacy at 23andMe

At 23andMe, Privacy is in our DNA.

This Privacy Statement applies to all websites owned and operated by 23andMe, Inc., including www.23andme.com (https://www.23andme.com/), and any other websites, pages, features, or content we own or operate, and to your use of the 23andMe mobile app and any related Services. Should you choose to receive Telehealth Services coordinated through 23andMe, with clinical services provided through licensed healthcare providers, there is a separate Medical Record Privacy Notice (https://www.23andme.com/legal/medical-record-privacy-notice/) that describes how your medical information is used, disclosed, and maintained.

To keep things simple, we use the same terms here as in our Terms of Service (https://www.23andme.com/legal/terms-of-service/). We'll let you know in this Privacy Statement if we have a new or different definition for a term. You should read our entire Privacy Statement, but if you only have a few minutes you can take a look at this summary (https://www.23andme.com/privacy/).

# The information 23andMe collects

We try not to speak in legalese, but there are some useful definitions we use to describe data we collect in providing the Services to you.

When we say **Personal Information**, we use this as a general term to refer to the different data categories we describe in this section that either personally identify you or are about you. Your Personal Information can be either

- **Individual-level Information:** information about a single individual, such as their genotypes, diseases or other traits or characteristics.
- **De-identified Information:** information that has been stripped of identifying data, such as name and contact information, so that an individual cannot reasonably be identified.

**Here are the types of Personal Information we collect:**

- **Registration Information:** information you provide during account registration or when purchasing the Services, such as a name, user ID, password, date of birth, billing address, shipping address, payment information (e.g., credit card), account authentication information, or contact information (e.g., email, phone number).
- **Genetic Information:** information regarding your genotype (e.g., the As, Ts, Cs, and Gs at particular locations in your DNA). Genetic Information includes the 23andMe genetic data and reports provided to you as part of our Services.
- **Sample Information:** information regarding any sample, such as a saliva sample, that you submit for processing to be analyzed to provide you with Genetic Information, laboratory values or other data provided through our Services.
- **Self-Reported Information:** information you provide to 23andMe including your gender, disease conditions, health-related information, traits, ethnicity, family history, or anything else you provide to us within our Service(s).
- **Biometric information:** certain Self-Reported Information you provide to us or our service providers to verify your identity using biological characteristics.
- **User Content:** information, data, text, software, music, audio, photographs, graphics, video, messages, or other materials, other than Genetic Information and Self-Reported Information, generated by users of 23andMe Services and transmitted, whether publicly or privately, to or through 23andMe. For example, User Content includes comments posted on our Blog or messages you send through our Services.
- **Web-Behavior Information:** information on how you use our Services or about the way your devices use our Services is collected through log files, cookies, web beacons, and similar technologies (e.g., device information, device identifiers, IP address, browser type, location, domains, page views).

## Aggregate Information is different from Personal Information

**Aggregate Information** is not Personal Information because Aggregate Information does not contain information about, nor can it reasonably be linked to, a specific individual. Aggregate Information is information about a group of people, such as an analysis or evaluation of a group. Aggregate Information describes the group as a whole in such a way that no specific individual may be reasonably identified. For example, the number of 23andMe customers with a specific variant or health condition is Aggregate Information.

- **You:** We collect information you provide to us when you request or purchase Services or information from us (including authorizations to share data with us from another entity, like lab test results and other medical information), register with us (including when you link your account on a third-party site or platform with your 23andMe account, such as via Google or Apple), participate in forums or other activities on our sites, features, and applications, respond to surveys, visit our physical properties, call our Customer Care support line, or otherwise interact with us using one or more devices. You may provide information in a variety of ways, including by typing or using voice commands.
- **Service Providers:** We may collect information through service providers who use a variety of technologies and tools, such as cookies, analytics tools, software development kits, application program interfaces, web beacons, pixels, and tags when you visit, use or interact with our Services. For more detail on how we collect and use Web-Behavior Information, please see our Cookie Policy (https://www.23andme.com/about/cookies/).
- **Other Third Parties:** We may receive information about you from other users, individuals, our corporate affiliates, or other third parties. For example, if someone gifts you a testing kit or Subscription, invites you to view their 23andMe Report, or otherwise refers you to 23andMe, we may collect information about you.
- **23andMe:** We may infer new information from other data we collect, including using automated means to generate information about your likely preferences or other characteristics. For example, we use your Genetic Information to predict certain health predispositions, or we may infer your location (such as city, state, and country) based on your IP address.

## How we use your information

Now that we've covered the types of information we collect and how we collect it, let's review how we may use it. As a reminder, we will not use your Genetic Information for personalized or targeted marketing and/or advertising without your explicit consent. If you want to dig into the details of how we use your information, check out our How We Use Your Information page (https://www.23andme.com/legal/how-we-use-info/).

**We use your information to:**

- Provide our Services, including to develop, operate, improve, maintain, and safeguard our Services, including developing new product tools and features
- Analyze and measure trends and usage of the Services
- Communicate with you, including customer support, or to share information about our Services or other offers or information we think may be relevant to you
- Personalize, contextualize and market our Services to you
- Provide cross-context behavioral or targeted advertising (learn more in our Cookie Policy (https://www.23andme.com/about/cookies/) and Cookie Choices (https://www.23andme.com/about/cookie-choices/) page)
- Enhance the safety, integrity, and security of our Services, including prevention of fraud and other unauthorized or illegal activities on our Services
- Verify your identity and administer your User Account
- Enforce, investigate, and report conduct violating our Terms of Service or other policies
- Conduct surveys or polls, and obtain testimonials or stories about you
- Comply with our legal, licensing, and regulatory obligations
- Conduct 23andMe Research (https://customercare.23andme.com/hc/en-us/sections/200565350-Research-and-Surveys), if you choose to participate

## What 23andMe Research participation means for you

23andMe has an opt-in research program, meaning that for eligible customers, taking part in 23andMe Research is completely voluntary. Refer to the Main Research Consent (https://www.23andme.com/about/consent/) for information to help you make an informed choice about participating. Here are key points about 23andMe Research, how Research uses personal information, and other ways we safeguard your privacy.

Before explaining how Research uses Personal Information, let's cover a few basics:

### What is 23andMe Research?

The purpose of 23andMe Research is to make new discoveries about genetics and other factors behind diseases and traits. "23andMe Research" means research activities performed by 23andMe, either independently or jointly with third parties, and overseen by an independent ethics review board (also called an Institutional Review Board or "IRB"). 23andMe Research may be sponsored by, conducted on behalf of, or in collaboration with third parties, including non-profit foundations, academic institutions or pharmaceutical companies.

### What if I *do not* want to participate in Research?

If you are eligible to participate in Research, you choose whether to participate or not, and you can change your mind any time. Customers never need to participate in Research to use 23andMe. Nothing changes about your core 23andMe experience if you do not participate in Research. We do not use your information for Research unless you explicitly choose to participate in Research.

**How does 23andMe protect my information in Research?**

23andMe Research analyses are conducted with information that has been stripped of your identifying Registration Information. You can read more about protections for your data in the Main Research Consent (https://www.23andme.com/about/consent/).

**If you choose to consent to the Main Research Consent (https://www.23andme.com/about/consent/)...**

- Your de-identified Genetic Information and/or Self-Reported Information may be used for Research.
- We may use de-identified individual-level Genetic Information and Self-Reported Information internally at 23andMe for research purposes.
- We may share summaries of research results, which do not identify any particular individual, with qualified research collaborators and in scientific publications.
- We may inform you of research opportunities for which you may be eligible. We will not share individual-level Personal Information without your explicit consent. To change your preferences for these communications, go to your Account Settings (https://you.23andme.com/user/edit/preferences/).

Some participants choose to contribute in additional ways to Research. For example, you can choose to participate in Individual Level Data Sharing (https://www.23andme.com/about/individual-data-consent/), or additional study-specific agreement(s). Those consents are separate and, like the Main Research Consent, you can withdraw from them anytime. You should review those specific consents for the details. Take a look at your other Research consent documents (https://you.23andme.com/user/edit/research/).

## Data sharing

We appreciate the level of trust you put into us. Here's how we do, and do not share your information.

### Who we share with:

**Service providers:** Our service providers and contractors help us provide our Services and act on our behalf to get things done. We implement procedures and maintain contractual terms with each service provider and contractor to protect the confidentiality and security of your Personal Information. For example, some of the things we use service providers and contractors to help us with include: order fulfillment and shipping; processing and analyzing your samples (check out the How We Use Info page (https://www.23andme.com/legal/how-we-use-info/) to learn more!); sample storage (as we like to call it, "biobanking"); customer care support; cloud storage, IT, and security; marketing and analytics; and more. Learn more about cookies, analytics, and advertising partners we use on our Services in our Cookie Policy (https://www.23andme.com/about/cookies/).

**Your sharing choices:** You may direct us to share your Personal Information with friends, family members, doctors or other healthcare professionals, and/or any other individuals or entities who may or may not be using our Services, including through third party services such as social networks and third-party apps that connect to our Services. If you share your Personal Information with a third party, they may use your Personal Information differently than we do under this Privacy Statement. Please make such choices carefully and review the privacy policies of all other third parties involved.

**Commonly owned entities, affiliates and change of ownership:** If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity. We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services.

**Third parties related to law, harm, and the public interest:** We can't say it enough – 23andMe will not provide information to law enforcement unless required by law to comply with a valid court order, subpoena, or search warrant. We require all law enforcement inquiries to follow a valid legal process, such as a court order or search warrant, and are prepared to exhaust available legal remedies to protect customer privacy. If we are compelled to disclose your Personal Information to law enforcement, we will try our best to provide you with prior notice, unless we are prohibited from doing so under the law.

23andMe will preserve and disclose any and all information if required to do so by law or in the good faith belief that such preservation or disclosure is reasonably necessary to: (a) comply with legal or regulatory process (such as a judicial proceeding, court order, or government inquiry) or obligations that 23andMe may owe pursuant to ethical and other professional rules, laws, and regulations; (b) enforce the 23andMe Terms of Service (https://www.23andme.com/legal/terms-of-service/) and other policies; (c) respond to claims that any content violates the rights of third parties; or (d) protect the rights, property, or personal safety of 23andMe, its employees, officers, directors, contractors or other personnel, its users, and the public. Nothing in this Privacy Statement is intended to limit any legal defenses or objections that you may have to a third party's, including a government's, request to disclose your Personal Information.

### Who we *DO NOT* share with:

You can rest assured, *we will not* voluntarily share your Personal Information with:

- Public databases
- Insurance companies or employers
- Law enforcement, absent a valid court order, subpoena, or search warrant (Check out our track record on this promise in our Transparency Report (https://www.23andme.com/transparency-report/))

# Your privacy settings and controls

It's your data, and we make it easy to make decisions and certain choices about it. We do not make choices on your behalf for the privacy settings described below. Below are the types of controls you have in your Account Settings and we've listed what it means to opt-out or to opt-in:

### Storing your sample

- Opt-out: No, I do not want my sample stored. If you choose to discard your sample, it will be securely destroyed after the lab completes its analysis, subject to laboratory legal and regulatory requirements. Note, a discard choice cannot be reversed.
- Opt-in: Yes, I want my sample stored. Learn more about Biobanking (https://www.23andme.com/about/biobanking/).

### Viewing your health reports

- Opt-out: No, I do not want to receive my health reports.
- Opt-in: Yes, I do want to receive Genetic Health Risk and Carrier Status reports, as well as other reports (e.g., Pharmacogenetics reports) if available.

### Sharing features

- Opt-out: No, I do not want to share my information with genetic relatives or other users via features like DNA Relatives or My Connections.
- Opt-in: Yes, I want to be able to share my information so I can discover genetic relatives or connect with others.

### Personalized recommendations

- Opt-out: No, I do not want to receive Personalized Recommendations based on my sensitive data categories.
- Opt-in: Yes, I want to receive Personalized Recommendations to receive custom health and wellness recommendations, offers, and other information based on my sensitive data categories. Learn more about Personalized Recommendations (https://customercare.23andme.com/hc/en-us/articles/9295505340183).

### Communications preferences

- Opt-out: Please don't contact me for promotional purposes. In addition to changing your preferences via Account Settings or your device, you can also click the "unsubscribe" button at the bottom of promotional email communications.
- Opt-in: Yes, you can contact me (such as through email, in-product notifications, or push notifications) for product or promotional purposes.

### Research participation

- Opt-out: I don't want to participate in 23andMe Research. If you experience difficulties changing your consent status in Account Settings, contact the Human Protections Administrator at hpa@23andMe.com. You can change your mind any time about your participation, however any Research involving your data that has already been performed or published prior to your withdrawal from 23andMe Research will not be reversed, undone, or withdrawn.
- Opt-in: Yes, I'd like to participate in 23andMe Research. Learn more about Research (https://www.23andme.com/about/consent/).

### You can also:

**Access & Download:** You can access and download your Personal Information processed by 23andMe. Please note, if you lose access to your 23andMe Account, we require that you submit additional information to verify your identity before providing access or otherwise releasing information to you.

**Correct Information:** You can correct your Registration Information and modify Self-Reported Information entered into surveys.

**Delete your Account:** You can delete your 23andMe account within your Account Settings at any time. Upon account deletion, we will automatically opt you out of Research and discard your sample.

Keep in mind this process cannot be canceled, undone, withdrawn, or reversed, and your account deletion is subject to retention requirements and certain exceptions. For exact instructions, please read our Customer Care guidance (https://customercare.23andme.com/hc/en-us/articles/212170688-Requesting-23andMe-Account-Closure).

## Other things to know about privacy

### Security Measures

We implement physical, technical, and administrative measures aimed at preventing unauthorized access to or disclosure of your Personal Information. Our team regularly reviews and improves our security practices to help ensure the integrity of our systems and your Personal Information. To learn more about our practices, please visit our Customer Care guidance (https://customercare.23andme.com/hc/en-us/articles/202907840-How-Is-My-Personal-Information-Protected).

Please recognize that protecting your Personal Information is also your responsibility. Be mindful of keeping your password and other authentication information safe from third parties, and immediately notify 23andMe of any unauthorized use of your login credentials. Your password is not visible to 23andMe staff, and we encourage you not to share your password with 23andMe or any third parties. 23andMe cannot secure Personal Information that you release on your own or that you request us to release.

## Third Party Content and Integrations

Our Services may contain third party content, integrations or links to third party websites operated by organizations not affiliated with 23andMe. Through these integrations, you may be providing information to the third party as well as to 23andMe. Since we can only control our own Services, we are not responsible for how those third parties collect or use your information so please review the privacy policies of every third-party service that you visit or use, including those third parties you interact with through our Services.

## Federal, State, and Region-Specific Information

You may have specific privacy rights in your state or region. For example, in the United States, residents of California and other states (https://www.23andme.com/about/california-privacy/) have specific privacy rights, as well as 23andMe residents of the European Economic Area (EEA), the UK, Switzerland and other jurisdictions (https://www.23andme.com/legal/eu-privacy-notice/).

Federal and state laws (including the federal Genetic Information Non-discrimination Act or "GINA") provide some protection from employer and health insurance discrimination based on your genetics. Learn more (https://customercare.23andme.com/hc/en-us/articles/202907820-What-Is-GINA-).

## Retention of Personal Information

We retain Personal Information for as long as necessary to provide the Services and fulfill the transactions you have requested, comply with our legal obligations, resolve disputes, enforce our agreements, and other legitimate and lawful business purposes. Because these needs can vary for different data types in the context of different services, actual retention periods can vary significantly based on criteria such as user expectations or consent, the sensitivity of the data, the availability of automated controls that enable users to delete data, and our legal or contractual obligations.

23andMe and/or our contracted genotyping laboratory will retain your Genetic Information, date of birth, and sex as required for compliance with applicable legal obligations, including the federal Clinical Laboratory Improvement Amendments of 1988 (CLIA), California Business and Professions Code Section 1265 and College of American Pathologists (CAP) accreditation requirements, even if you chose to delete your account. 23andMe will also retain limited information related to your account and data deletion request, including but not limited to, your email address, account deletion request identifier, communications related to inquiries or complaints and legal agreements for a limited period of time as required by law, contractual obligations, and/or as necessary for the establishment, exercise or defense of legal claims and for audit and compliance purposes.

## Changes to this Privacy Statement

We may make changes to this Privacy Statement from time to time. We'll let you know about those changes here or by reaching out to you via email or some other contact method, such as through in-app notification, or on another website page or feature.

## Contact Information

If you have questions about this Privacy Statement, or have a complaint or inquiry, please email 23andMe's Privacy Administrator at privacy@23andme.com (mailto:privacy@23andme.com), call us at 1.800.239.5230, or send a letter to:

Privacy Administrator
23andMe, Inc.
870 Market Street, Room 415
San Francisco, CA 94102

Read the previous version of the document. (/legal/privacy/full-version/7.3/)



 (/)

**SERVICES**

Health + Ancestry (/dna-health-ancestry/)

Ancestry Service (/dna-ancestry/)

23andMe+ Premium (/membership/)

23andMe+ Total Health (/total-health/)

**LEGAL**

Important Test Info (/test-info/)

Terms of Service (/legal/terms-of-service/)

Privacy Statement (/legal/privacy/)

Data Protection (/gdpr/)

## Appendix C - Chart of Change in Control Language

| Effective Date/ Last Updated | Business Transaction Disclosures |
|---|---|
| Last Updated: 3/14/25 | "If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity. We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services." *Section on Data Sharing* |
| Last Updated: 9/24/24 | "If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity. We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services." *Section on Data Sharing* |
| Last Updated: 10/4/23 | - "If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity. We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services." *Section on Data Sharing* |
| Last Updated: 12/14/22 | - "If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity. We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services." *Section on Data Sharing* |
| Last Updated: 6/8/22 | - "If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity. We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services." *Section on Data Sharing* |
| Last Updated: 2/3/22 | "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 1/25/22 | "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 12/9/21 | "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 1/1/20 | -"In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your |

| Effective Date/ Last Updated | Business Transaction Disclosures |
|---|---|
| | Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 9/30/19 | -"In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre- existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 8/22/19 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 7/17/18 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 5/24/18 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 9/29/16 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transactions* |
| Last Updated: 12/7/15 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre- existing Privacy Statement." *Section on Business Transactions.* |
| Last Updated: 7/14/15 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre- existing Privacy Statement." *Section on Business Transactions.* |
| Last Updated: 11/13/14 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre- existing Privacy Statement." *Section on Business Transactions.* |
| Last Updated: 3/25/13 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your |

| Effective Date/ Last Updated | Business Transaction Disclosures |
|---|---|
| | |
| | Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transitions* |
| Last Updated: 11/1/12 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transitions.* |
| Last Updated: 12/1/11 | - "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transitions.* |
| Last Updated: 6/24/10 | -"In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement." *Section on Business Transitions* |
| Last Updated: 11/11/07 | -"In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your personal information and non-personal information will likely be among the assets transferred. You will be notified in advance via email and prominent notice on our website of any such change in ownership or control of your personal information. We will require an acquiring company or merger agreement to uphold the material terms of this privacy statement, including honoring requests for account deletion." *Section on Business Transitions* |

## Appendix D - Letter from Andrew Ferguson, Chairman of the FTC to the Office of the U.S. Trustee, dated March 31, 2025



**UNITED STATES OF AMERICA**
# Federal Trade Commission
WASHINGTON, D.C. 20580

Office of the Chairman

March 31, 2025

***VIA ELECTRONIC MAIL***
Jerry Jensen, Acting U.S. Trustee
Paul A. Randolph, Assistant U.S. Trustee
Carole J. Ryczek, Trial Attorney
Joseph Schlotzhauer, Trial Attorney
Office of the U.S. Trustee
Region 13
South 10th Street, Suite 6.353
St. Louis, MO 63102

Re:      *In re 23andMe Holding Co.*, *et al.*, Case No. 25-40976, United States Bankruptcy Court
for the Eastern District of Missouri (Eastern Division)

Dear Counsel,

It is my understanding that 23andMe user data may be an asset that is sold as part of the
above-referenced bankruptcy proceedings involving 23andMe Holding Company.[1] As Chairman
of the Federal Trade Commission, I write to express the FTC's interests and concerns relating to
the potential sale or transfer of millions of American consumers' sensitive personal information.

As you may know, 23andMe collects and holds sensitive, immutable, identifiable personal
information about millions of American consumers who have used the Company's genetic testing
and telehealth services. This includes genetic information, biological DNA samples, health
information, ancestry and genealogy information, personal contact information, payment and
billing information, and other information, such as messages that genetic relatives can send each
other through the platform.

23andMe recognizes the unique sensitivity of the information it collects and maintains and
has made direct representations to its users about how it uses, discloses, and protects their personal
information, including how personal information will be safeguarded in the event of bankruptcy.
The Company has promised, and continues to promise, that user privacy and choice are at the
forefront of its business model. 23andMe tells its users that "privacy comes first," and that, "since
day one, we've committed ourselves to protecting your privacy."[2] Further, the Company commits
to its users that they are in control of their data, and that users can decide how their information is
used and for what purposes—including honoring the right of users to delete their personal
information at any time.

---

[1] For purposes of this letter, 23andMe is defined to include all subsidiaries of 23andMe Holding Company, including
23andMe, Inc., which offers genetic testing services, and Lemonaid Health, which offers telehealth services.
[2] https://www.23andme.com/privacy/.

In its Privacy Statement,[3] 23andMe has represented that it does not share personal information with insurance companies, employers, public databases, or law enforcement, absent a valid court order, subpoena, or search warrant. The Company also tells users that it restricts the use and sharing of personal information to what is necessary to provide its services, and that it shares personal information with a limited number of service providers who are contractually bound to protect the confidentiality and security of user personal information.

Moreover, 23andMe's Medical Record Privacy Notice[4] promises that "unless we have received your specific authorization, we will not disclose any of your genetic information as part of your Medical Record Information to third parties," and that the Company discloses such information only if a user directs the Company to do so or with explicit consent. Lemonaid Health, 23andMe's telehealth service, has also promised users the same continuous protections through its privacy policy—which applies to personal information (including personal contact information and billing/payment information, health information, and users browsing information).[5]

Importantly, 23andMe promises users that these protections (and its entire Privacy Statement) shall apply continuously to their personal information, even if the data is sold or transferred in a bankruptcy proceeding:

> If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity.[6]

The Company's former CEO and current board member Anne Wojcicki recently re-affirmed that the Company is committed to its users' privacy and has pledged to keep the commitments made in 23andMe's privacy policy.[7] I am also pleased to see that the Company's public statements since the bankruptcy filing indicate that it will continue to prioritize honoring 23andMe's privacy representations in the process of securing a purchaser.[8]

The FTC believes that, consistent with Section 363(b)(1) of the Bankruptcy Code, these types of promises to consumers must be kept. This means that any bankruptcy-related sale or

---

[3] https://www.23andme.com/legal/privacy/full-version/.

[4] https://www.23andme.com/legal/medical-record-privacy-notice/.

[5] *See* Lemonaid Health's Privacy Policy ("We may disclose your Personal Information with other business entities in connection with the sale, assignment, merger or other transfer of all or a portion of Lemonaid's business to such business entity. This Privacy Policy will apply to your Personal Information as transferred to the new entity."), available at https://www.lemonaidhealth.com/legals/privacy-policy.

[6] https://www.23andme.com/legal/privacy/full-version/.

[7] *See, e.g.*, 23andMe Holding Co. SEC Form 13-D, Sept. 30, 2024, in which Wojcicki states, "I remain committed to our customers' privacy and pledge to maintain [23andMe's] current privacy policy in effect for the foreseeable future, including following completion of the acquisition I am currently pursuing.", available at https://investors.23andme.com/node/9961/html.

[8] *See* Questions Related to 23andMe's Chapter 11 Filing, available at: https://customercare.23andme.com/hc/en-us/articles/30805135934615-Questions-related-to-23andMe-s-Chapter-11-Filing.

2

transfer involving 23andMe users' personal information and biological samples will be subject to the representations the Company has made to users about both privacy and data security, and which users relied upon in providing their sensitive data to the Company. Moreover, as promised by 23andMe, any purchaser should expressly agree to be bound by and adhere to the terms of 23andMe's privacy policies and applicable law, including as to any changes it subsequently makes to those policies.

These conditions would help protect users' interests by ensuring that their data and personal information will be used consistent with 23andMe's promises.

Thank you for this opportunity to express these concerns on behalf of American consumers.

Sincerely,

Andrew N. Ferguson
Chairman, Federal Trade Commission

3

# Appendix E - NAAG Motion, dated April 15, 2025

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| 23ANDMEHOLDING CO., *et al.*, | § | Case No. 25-40976 |
| Debtors. | § | |
| | § | (Jointly Administered) |
| | § | |

The State of Arizona, ex rel. Kristin K. Mayes, the Attorney General; Office of the Attorney General, State of Colorado; State of Connecticut; District of Columbia, Office of the Attorney General; State of Florida, Office of the Attorney General, Department of Legal Affairs; Office of the Illinois Attorney General; The Commonwealth of Kentucky, ex rel. Russell Coleman, Attorney General; State of Louisiana; State of Maine; Michigan Attorney General, *ex rel.* the People of the State of Michigan; State of Minnesota, by its Attorney General, Keith Ellison; New Hampshire Office of the Attorney General, Consumer Protection Division; New Mexico Department of Justice; New York State Attorney General's Office; State of North Carolina; Ohio Attorney General; The State of Oregon, by and through its Attorney General Dan Rayfield; The State of South Carolina ex rel. Alan Wilson, in his official capacity as Attorney General of the State of South Carolina; State of Utah, Office of the Utah Attorney General; State of Vermont; Commonwealth of Virginia, *ex rel.* Jason S. Miyares, Attorney General; Washington Attorney General Nick Brown; Office of the West Virginia Attorney General; State of Wisconsin

                        Movants,

v.

23ANDME HOLDING CO., *et al.*,[1]

                    Respondents.

§ Hon. Brian C. Walsh
§ U.S. Bankruptcy Judge

§ **Response Deadline:** April 29, 2025
§ **Hearing Date:**      April 29, 2025
§ **Hearing Time:**     1:30 p.m. (CST)
§ **Hearing Location:**
§ Thomas F. Eagleton U.S. Courthouse
§ 111 S. 10th Street
§ Courtroom 5 North
§ St. Louis, MO 63102

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

---

**MOTION FOR THE APPOINTMENT OF A CONSUMER PRIVACY
OMBUDSMAN AND A SECURITY EXAMINER PURSUANT TO 11 U.S.C.
SECTIONS 105(a), 332, 363(b)(1) AND FEDERAL RULE OF BANKRUPTCY
PROCEDURE 6004(G) AND NOTICE OF HEARING**

**WARNING: THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT
YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT
THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING
PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO
THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE BY APRIL
29, 2025. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE
GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE
GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION
AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.
THE DATE IS SET OUT ABOVE. UNLESS THE PARTIES AGREE OTHERWISE, THE
COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE
MOTION AT THE HEARING.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

COMES NOW, The State of Arizona, ex rel. Kristin K. Mayes, the Attorney General;

Office of the Attorney General, State of Connecticut; District of Columbia, Office of the

Attorney General; State of Florida, Office of the Attorney General, Department of Legal Affairs;

Office of the Illinois Attorney General; State of Louisiana; State of Maine; Michigan Attorney

General, *ex rel.* the People of the State of Michigan; New Hampshire Office of the Attorney

General, Consumer Protection Division; New Mexico Department of Justice; New York State

Attorney General's Office; State of North Carolina; Ohio Attorney General; The State of South

Carolina *ex rel.* Alan Wilson, in his official capacity as Attorney General of the State of South

Carolina; State of Utah, Office of the Utah Attorney General; State of Vermont; Commonwealth

of Virginia, *ex rel.* Jason S. Miyares, Attorney General; Washington Attorney General Nick

Brown; Office of the West Virginia Attorney General; State of Wisconsin[2] by and through

---

[2] Hereinafter, the "States" or "NAAG Client States" and together with the State of Colorado, Commonwealth of

Abigail R. Ryan, Bankruptcy Counsel, National Association of Attorneys General, and by the

State of Colorado, by and through Senior Assistant Attorney General, Robert Padjen; by The

Commonwealth of Kentucky, ex rel. Russell Coleman, Attorney General, by and through

Assistant Attorney General, Christopher D. Hunt; by the State of Minnesota, by its Attorney

General, Keith Ellison; and by the State of Oregon, by and through Senior Assistant Attorney

General, Justin D. Leonard, and files this *Motion for the Appointment of a Consumer Privacy*

*Ombudsman and a Security Examiner pursuant to 11 U.S.C. Sections 105(a), 332, 363(b)(1) and*

*Federal Rule of Bankruptcy Procedure 6004(g)*,[3] and respectfully shows this Court the

following:

## I.  OVERVIEW

This is a watershed moment in bankruptcy—a moment when legal regulations have not

kept pace with science, leaving millions of Americans dependent upon the protections and

safeguards only this Court can enforce. Bankruptcy courts regularly oversee sales that include

personally identifiable information,[4] such as credit card numbers, email addresses, and phone

numbers.[5] Congress has determined that such PII requires special care and has established a

special provision in the Bankruptcy Code to protect it. However, such PII can be decoupled from

the person's identity; while inconvenient, addresses, phone numbers, and credit cards can be

changed.[6]

---

Kentucky, State of Minnesota, and the State of Oregon, by and through its Attorney General Dan Rayfield, "the
States."
[3] Hereinafter, "Motion" or "States' Motion."
[4] Hereinafter, "PII" or "personally identifiable information."
[5] *See e.g.*, *In re GMC*, 2009 Bankr. LEXIS 5565, *32 (Bankr. S.D.N.Y. 2009), *In re JK Harris & Co., LLC*, 475
B.R. 470, 472 (Bankr. D.S.C. 2012), *In re Golfsmith Int'l Holdings*, 16-12033, 2016 Bankr. LEXIS 4749 at *25
(Bankr. D. Del. Nov. 2, 2016), and *In re Celsius Network, LLC*, 2022 Bankr. LEXIS 3023 at *22-23 (October 24,
2022).
[6] The States do not intend to diminish the problems—sometimes life-altering problems---that the misuse of such
information can cause. The States have, in other bankruptcy cases, moved for an ombudsman to protect this type of

---

In this unprecedented case, the information this Debtor seeks to sell[7] is the person's immutable _genetic identity_: their genome. That information becomes exponentially more powerful – and more sensitive – when linked with that person's _PII_, and for all those who entrusted the Debtors for medical care, their _medical and pharmaceutical records_. Coupled together, the magnitude of the data within this Debtor's control is unprecedented – both in terms of the sheer amount, as well as its sensitivity: the fact is that an individual's genetic identity is immutable. The States are concerned not only about the protection of each and every consumer, but also every person who shares DNA with each consumer – along with their respective future generations. Each of these current and future people are intimately tied to this data, and most have no awareness that it has been entrusted with this Debtor, under the oversight of this bankruptcy court.

The Debtors are now seeking the Court's permission to auction off to the highest bidder millions[8] of Americans' Genetic Materials,[9] Genetic Data,[10] medical records containing individualized diagnoses and treatments based upon a consumer's Genetic Data, and other personally identifiable information with which the Debtors have been entrusted. The States urge the Court to rely on an independent ombudsman – someone who has the capability to address not

---

data in other sales. _See e.g. In re_ ToySmart, Case No. 00-13995, Bankr. Mass. at docket nos. 62 (Texas's obj to sale), 81 (New York's objection to sale), 83 (Commonwealth of Massachusetts's Memo in Support of dkt. 62), 86 (New York's Memorandum) and docket no 313 (50 States assenting to the complete destruction of Toysmart's PII); and _In re Radio Shack_, Case No. 15-10197, Bankr. Dist. Delaware at docket no. 1393 (Texas's Objection to Sale which was joined or supported by thirty-six States) docket no. 1822 (Second objection by the State of Texas to sale of PII), docket no. 1831 (The State of Oregon, by and through its Attorney General Dan Rayfield 's joinder to Texas's objection), docket no. 1851 (Objection and Joinder filed by the Commonwealth of Pennsylvania), docket no. 1852 (Joinder by the State of Tennessee).

[7] Despite the States' request for more information, the Debtors have not specifically articulated what exactly is being sold; however, due to the nature of the businesses, sensitive genetic materials and/or data may be part of the sale.
[8] _See_ docket no. 32 at paras. 2-3, 19. Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions. Hereinafter, "Kvarda Declaration," stating that the Debtors have over 15 million customers. How many million Americans are part of the 15 million consumers is not know at this time.
[9] "Genetic Materials" are actual, physical samples of genetic material sent in by consumers, typically spit samples.
[10] "Genetic Data" means personalized reports made based upon an individual's Genetic Materials or data derived or interpreted from the analysis of Genetic Materials.

---

only the typical consumer privacy issues, but also the security of the genomic and medical

records as well as the physical human material that has been entrusted with the Debtor.

The Debtors have repeatedly assured the States and the Court that it recognizes the

significance of the intimate records and material with which they have been entrusted and will

protect it through this process. However, good intention will not protect this data. The Court

surely recognizes the competing pressures inherent in any bankruptcy sale process, coupled with

the sensitivity of this particular data within a patchwork of state and federal regulations.

Compounding these concerns, the States – and their citizens who have been calling and writing

them with pleas for help – do not trust the Debtor's existing security, for good reason. The States

attorneys general have been investigating the Debtors' massive 2023 data breach, impacting

almost seven million consumers. It resulted in the targeted sales on the dark web of data of at

least one million individuals with Ashkenazi Jewish heritage, as well as hundreds of thousands

of individuals with Chinese ancestry. Unfortunately, the Debtors have failed to remedy the

States' concerns, this data is not sufficiently secure at present, and a Consumer Privacy

Ombudsman and Security Examiner is necessary.

The States urge the careful selection of an independent, proactive, and knowledgeable

ombuds for this extraordinary case. A standard pro forma analysis with a boilerplate report will

not suffice with this unique data set and its far-reaching impact – beyond the Debtors' consumers

themselves, including their extended families and future generations.  As now-Bankruptcy Judge

Christopher G. Bradley warned in his aptly-titled law review article "Privacy Theater in the

Bankruptcy Courts," the consumer privacy ombudsman system too often results in a "myth of

oversight" with ombuds submitting almost standardized reports with little original analysis.[11] The States hope to provide input in the selection process, to ensure a robust and meaningful review, analysis, and reporting – something that will guide the Court in its analysis of any potential sale while also providing transparency to the general public regarding the security of this data.

Therefore, the States request independent oversight of the data and its security through a special consumer ombudsman and security examiner who is appointed by and accountable to this Court – someone who is selected independently of the Debtor and with input from the States.

## II.    JURISDICTION AND VENUE

1.     The United States Bankruptcy Court for the Eastern District of Missouri[12] has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) and the Court has the authority to enter a final order with respect to the States' Motion.

2.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The relief requested herein is based upon sections 105(a), 332, and 363(b)(1) of the Bankruptcy Code; rules 6004(g), 7004, 9006(d); and 9014 of the Federal Rules of Bankruptcy Procedure, and this Court's Local Rules of Bankruptcy Procedure.

---

[11] Christopher G. Bradley, *Privacy Theater in the Bankruptcy Courts*, 74 Hastings Law J. 607, 645-55 (2023). After analyzing and assessing the work of 33 consumer privacy ombuds appointed in 141 bankruptcy cases from 2005 to mid-2020, then-Law Professor Bradley warns that the current consumer privacy ombudsman regime far too often projects what scholars have called "a myth of oversight." (In October 2023, the 5th Circuit Court of Appeals appointed now-Judge Bradley as a Bankruptcy Judge for the Western District of Texas.)
[12] Hereinafter, the "Court."

### III.    BACKGROUND FACTS

4.      23andMe is a California-based[13] biotechnology company that specializes in the

collection and monetization of human genetic data. 23andMe collects this data from consumers

through the sale of at-home genetic tests, that can be used to determine ancestry information,

lineal descent, and the presence of risk factors for certain diseases.[14] 23andMe also sells the

genetic information of consumers to pharmaceutical companies and has used this data for

pharmaceutical research and development.[15] 23andMe also has a telehealth arm, Lemonaid, that

offers remote healthcare services and prescription drugs through pharmacy subsidiaries.[16]

5.      23andMe collects and maintains a vast amount of sensitive personal information

about consumers. 23andMe solicits "profile information" from consumers, inviting them to input

their names, birthdays, and locations.[17] 23andMe also solicits "family tree" information, asking

users to input information about their relatives, who may or may not be 23andMe users.[18]

Through their Lemonaid telehealth subsidiary, 23andMe collects personal health information and

creates medical records.[19] Because Lemonaid does not take insurance or transmit health

information for payment, it does not perform any transactions that are covered by HIPAA.[20]  As

a result, the medical records collected and maintained by 23andMe are not subject to HIPAA's

protections.[21]

6.      Most importantly, 23andMe collects and analyzes biological samples in order to

---

[13] Dkt. No. 1 the Petition for 23andMe Holding Co. at number 4.
[14] Dkt. No. 32 at paras. 26-32.
[15] Dkt. No. 32 at paras. 38-41.
[16] Dkt. No. 32 at paras. 34-35.
[17] *See* https://customercare.23andme.com/hc/en-us/articles/360004944654-What-s-In-Your-Account-Settings
[18] *See* https://customercare.23andme.com/hc/en-us/articles/360036068393-The-23andMe-Family-Tree-Feature
[19] *See* https://www.lemonaidhealth.com/legals/privacy-policy
[20] *See* Dkt. No. 32 at para. 36.
[21] 45 CFR 160.103; *See* definitions of Covered Entity and Transaction.

sequence a person's entire genome.[22] This record of a human's entire raw genetic code is then

kept as a .csv file linked to the user's profile. 23andMe has collected this information about more

than 15 million people.[23] 23andMe analyzes this raw genetic information to provide insights

about an individual's ancestry, including the likely regions of origin of their forebears.[24]

23andMe also analyzes their customers' genomes to determine the presence of genetic risk

factors for diseases, deriving and retaining another trove of highly sensitive health information[25]

that is unprotected by HIPAA, but protected through a host and variety of state laws.

      7.      On October 6, 2023, 23andMe published a press release stating that "customer

profile information" shared through their "DNA Relatives" feature had been compiled and

exposed by a threat actor using 23andMe accounts without authorization.[26] This resulted in the

compilation and exposure of individuals' usernames, passwords, locations, genetic ancestry

information, and in some cases, health data and raw genotype data.[27] According to 23andMe, the

breach impacted over 6.4 million consumers nationwide.[28] Troublingly, the threat actor posted

data on the dark web, targeting account holders with specific genetic heritage.[29]

      8.      23andMe alleged the data was exposed as the result of a "credential stuffing"

attack, whereby the threat actors utilized email and password information already available from

unrelated past breaches to access 23andMe accounts.[30] Once the threat actor had this access,

---

[22] Dkt. No. 32 at paras. 26-32.
[23] Dkt. No. 32 at paras. 2-3, 19.
[24] Dkt. No. 32 at para. 26, 28. 31.
[25] Dkt. No. 32 at paras. 28-30.
[26] 23andMe's October 6, 2023, notice entitled "Addressing Data Security Concerns --- Action Plan" at
https://blog.23andme.com/articles/addressing-data-security-concerns
[27] *23andMe confirms hackers stole ancestry data on 6.9 million users*, TechCrunch (Dec. 4, 2023) at
https://techcrunch.com/2023/12/04/23andme-confirms-hackers-stole-ancestry-data-on-6-9-million-users/
[28] *Id*.
[29] *Id*.
[30] 23andMe's October 6, 2023, notice entitled "Addressing Data Security Concerns --- Action Plan" at
https://blog.23andme.com/articles/addressing-data-security-concerns

23andMe claimed that they were able to compile customer profile information based on user opt-ins for their "DNA Relatives" feature.[31] Reports also indicated that the threat actor was selling individual 23andMe user profiles that included raw, unedited genetic data.[32] 23andMe later admitted that the threat actor had begun breaking into user accounts beginning in April 2023, and maintained this access for five months, ostensibly undetected.[33]

9.      In the spring of 2024, Connecticut and Indiana organized a multistate investigation into the 23andMe breach, with 44 states participating.  Throughout 2024, the multistate collected documents and information through civil investigative demands. In September and October 2024, Indiana took sworn statements on behalf of the multistate from current and former 23andMe employees.  Based on the findings of its investigation, the multistate proposed settlement terms in early 2025, and to date there is no resolution of this investigation.

10.      On March 23, 2025, 23andMe Holding Co. and eleven affiliated debtors filed bankruptcy, and on March 24, 2025, the Debtors filed its *Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry Into Stalking Horse Agreement(s), if any, (V)Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims,*

---

[31] *Id.*
[32] *23andMe User Data Stolen in Targeted Attack on Ashkenazi Jews,* WIRED (Oct. 6, 2023), at https://www.wired.com/story/23andme-credential-stuffing-data-stolen/
[33] *23andMe admits it didn't detect cyberattacks for months*, TechCrunch (Jan. 25, 2024), at https://techcrunch.com/2024/01/25/23andme-admits-itdidnt-detect-cyberattacks-for-months/

*Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or*

*Abandonment of De Minimis Assets, and (VIII) Granting Related Relief*[34] in which, among other

things, the Debtors seek approval from this Court to auction off the Debtors' assets.

11.      The States have requested, among other things, that the Debtors provide the States

with a list of assets being sold, but, to date, that list has not been produced. It is assumed that the

Debtors' assets include the Genetic Materials, Genetic Data, and other personally identifiable

information of millions of Americans.

## IV.    ARGUMENT

A.  *The Debtors' Privacy Policy Violates State Laws, and, as such, a Consumer Privacy*
    *Ombudsman is Required.*

12.      Due to the illegality of the Debtors' privacy policy, the Debtors cannot sell any

personally identifiable information and other data covered by Debtors' privacy policy[35] outside

of the ordinary course of business without the appointment of a Consumer Privacy Ombudsman

under 11 U.S.C. § 363(b)(1)(B) and 11 U.S.C. § 332.

13.      It is axiomatic to say that company policies cannot violate state law, and 28

U.S.C. § 959(b) makes this axiom applicable to debtors in bankruptcy by requiring debtors to

operate in accordance with state laws. If a debtor's policy violates state or federal laws, the mere

act of filing bankruptcy does not relieve the debtor of its obligations to comply with applicable

non-bankruptcy laws.

14.      In the instant case, Debtors argue that under 11 U.S.C. § 363, the Debtors'

privacy policy in place at the time of the bankruptcy filings[36] allows for the proposed sale,

---

[34] Dkt. No. 30. Hereinafter "Debtors' Motion" or "Bidding Procedures Motion."
[35] Due to the bankruptcy code's definition of "Personally Identifiable Information," it is questionable as to whether
genetic materials (spit samples) would fall within this definition. The States reserve the right to fully brief this issue.
[36] *See* EX A - 23andMe's March 14, 2025, privacy policy. Also available at
https://www.23andme.com/legal/privacy/full-version/

notwithstanding the fact that the privacy policy does not comport with applicable state laws.  In

particular, a privacy policy allowing for sale or transfer of different types of Genetic Materials,

Genetic Data, and other personally identifiable information in the event of a bankruptcy violates

several state genetic laws, privacy laws, and other laws, and, therefore, is illegal.

15.     Many states have privacy laws covering Genetic Materials and Genetic Data,[37]

and some of these laws are specific as to transfer, use, and consent. For instance, some states

require that consumers give consent before the disclosure, transfer or sale of the consumers'

genetic data to a third party, with some states requiring that this express consent be separate from

any other consents previously provided.[38] Other states grant their citizens exclusive ownership

rights over their own Genetic Materials and Genetic Data, which raises the question of whether

some of the DNA materials and data belong to the Debtors at all.[39]

16.     Other state laws make it a crime to sell this type of information without express

consent. Under Florida law it is a second-degree felony to sell or transfer another person's DNA

sample without the person's express consent to the sale. Specifically, Section 817.5655(5) of the

Florida Statutes states: "It is unlawful for a person to willfully, and without express consent, sell

or otherwise transfer another person's DNA sample or results of another person's DNA analysis

---

[37] *See e.g.* ALA. CODE §§ 8-43-1 to 8-43-6; ALASKA STAT. ANN. §§ 18.13.010 to 18.13.100; ARIZ. REV. STAT. §§ 44-8001 to 44-8004; CAL. CIV. CODE §§ 56.18 to 56.186; Colorado Privacy Act, Colo. Rev. Stat. §§ 6-1-1301 to 1313; 4 CCR 904-3; DEL. CODE ANN. TIT. 16, §§ 1201 to 12078; FLA. STAT. ANN. §§ 760.40, 817.5655; GA. CODE ANN. § 33-54-1 to 33-54-8; KY. REV. STAT. ANN. § 311.705; MASS. GEN. LAWS ANN. CH. 111, § 70G; MD. CODE ANN., COM. LAW §§ 14-4401 to 14-4408; MINN. STAT. ANN. § 325F.995; MO. REV. STAT. § 375.1309; MONT. CODE. ANN. § 30-23-101 to 30-23-106; NEB. REV. STAT. ANN. §§ 87-901 to 87-904; N.H. Rev.Stat.Ann. 141:H-1, et. seq.; N.J. STAT. ANN. § 10:5-45; N.M. STAT. ANN. §§ 24-21-1 –- 24-21-7; NEV. REV. STAT. ANN. § 629.171; N.Y. CIV. RIGHTS LAW § 79-l; OR. REV. STAT. ANN. §§ 192.531 to 192.550; TENN. CODE ANN. §§ 47-18-4901 to 47-18-4906; UTAH CODE ANN. § 13-60-101 to 13-60-106; VA. CODE ANN. §§ 59.1-593 to 59.1-602; WASH. REV. CODE §§ 19.373.005 to 19.373.900; and WYO. STAT. ANN. §§ 35-32-101 to 35-32-105.

[38] *See e.g.* Ariz. Stat § 44-8002(A)(2)(b)(i), Colorado Privacy Act, Colo. Rev. Stat. § 6-1-1308(7); 4 CCR 904-3, Rules 6.10; 7.02-7.05, Fla. Stat. § 817.5655(5) (2024), N.H.Rev.Stat.Ann. 141:H:2, III, ORS § 192.539(1), Tex. Bus. & Comm. Code § 503A.001(5), Utah Code § 13-60-104(1)(c)(i)-(ii), Wash. Rev. Code Ann. § 19.373.070 (2024).

[39] *See* Alaska Stat. § 18.13.010(a)(2), Fla. Stat. § 760.40(1)(c) (2024), Tex. Bus. & Comm. Code § 503A.003.

---

to a third party, *regardless* of whether the DNA sample was originally collected, retained, or analyzed with express consent. A person who violates this subsection commits a felony of the second degree. . ..." (emphasis added). Under Florida law, a second-degree felony is punishable by a term of imprisonment not exceeding fifteen years and/or a fine of up to $10,000.[40]

17.     Arizona's Genetic Information Privacy Act, among other things, protects the genetic data of the deceased. Specifically, Arizona law requires that, following the death of a person who had genetic testing performed, the release of the testing information is limited to the deceased's next of kin.[41]

18.     A Consumer Privacy Ombudsman may review the Debtors' policies, the applicable states' laws, and any other relevant information and make recommendations as to the sale of the Debtors' assets for this Court's consideration.

19.     With the Ombudsman's report as guidance, the Court can only approve the sale after "giving due consideration to the facts, circumstances, and conditions of such sale . . . *and* finding that no showing was made that such sale. . . would violate applicable nonbankruptcy law."[42]

20.     Even if the Debtors' privacy policy were sufficient, the Court may still appoint a Consumer Privacy Ombudsman pursuant to 11 U.S.C. § 105(a), which authorizes the Court to "issues any order, process, or judgment that is necessary or appropriate" to administer the bankruptcy case.

21.     For example, in *In re Celsius*, despite the fact that the debtors' privacy policies provided for the sale, the Court appointed a Consumer Privacy Ombudsman to protect the

---

[40] Fla. Stat. §§775.082(d) and 775.083(1)(b) (2024).
[41] Ariz. Rev. Stat §§ 44-8002(6), 12-2802(F), and 12-2294(D).
[42] 11 U.S.C. §363(b).

consumers' personally identifiable information the debtors were seeking to sell.[43]

22.    In so doing, the Court recognized that "[e]ven if a sale will comply with the

Debtors' privacy policy, bankruptcy courts have the discretion 'to order the appointment of

officers or professionals at the expense of the estate when the court feels that it could benefit

from the additional information or assistance that a neutral third party might provide.' "[44]

B. ___Because the Debtors' Privacy Policy and Terms of Service are Vague and Ambiguous as
to the Ownership of Genetic Information, a Consumer Privacy Ombudsman Must be
Appointed.___

23.    The Debtors' privacy policy[45] and terms of service[46] create confusion as to

ownership of Genetic Materials and Genetic Data, and, as such, whether this information is or is

not property of the Debtors' estate that can be sold.[47]

24.    Under the privacy policy that the Debtors allege allow them to sell consumers'

Personal Information, the term "Personal Information" is defined as follows:

> When we say **Personal Information**, we use this as a general term to refer to the different data categories we describe in this section that either personally identify you or are about you. Your Personal Information can be either
>
> - **Individual-level Information:** information about a single individual, such as their genotypes, diseases or other traits or characteristics.
> - **De-identified Information:** information that has been stripped of identifying data, such as name and contact information, so that an individual cannot reasonably be identified.

25.    Under this definition,[48] Personal Information includes the information derived

from the sample submitted by consumers.

---

[43] *See In re Celsius Network, LLC*, 2022 Bankr. LEXIS 3023 at *22-23 (October 24, 2022).
[44] *Id*. at *23.
[45] https://www.23andme.com/legal/privacy/full-version/
[46] EX B – 23andMe's March 14, 2025, Terms of Service. Also available at https://www.23andme.com/legal/terms-of-service/full-version/
[47] The Texas Attorney General's Motion to Appoint a Consumer Privacy Ombudsman describes other serious issues with the Debtors' privacy policy, and, as such, they will not be repeated here but are incorporated by reference. *See* Dkt. No. 181.
[48] https://www.23andme.com/legal/privacy/full-version/

---

26.     The terms of use, however, state that "any information derived from your sample *remains your information*, subject to rights we retain as set forth in these Terms."[49]

27.     Nowhere in the terms of use does it state that Personal Information or information derived from a sample, can be sold.[50]

28.     Due to this apparent contradiction in the privacy policy and the terms of use, the appointment of a Consumer Privacy Ombudsman is mandatory,[51] necessary, and appropriate to assist in determining who owns the genetic information.[52]

---

[49] https://www.23andme.com/legal/terms-of-service/full-version/ (emphasis added), Section 2 Using the Services.

[50] https://www.23andme.com/legal/terms-of-service/full-version/

[51] *See* 11 U.S.C. §§ 363(b)(1) and 332.

[52] This contradiction might also be a violation of the States' Unfair Deceptive Acts/Practices statutes, which have varying equitable remedies that an Ombudsman can consider when making recommendations. *See* Unfair Trade Practices Act, Alaska Stat. 45.50.471, et seq.; Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, et seq.; Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, et seq.; Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, et seq.; California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.; California False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.; Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-101 et seq.; Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110b, et seq.; Consumer Protection Procedures Act, D.C. Code §§ 28-3901, et seq.; Consumer Fraud Act, 6 Del. C. §§ 2511 et seq.; Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, §501.201 et seq., Florida Statutes; Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390 through 408; Uniform Deceptive Trade Practice Act, Haw. Rev. Stat. ch. 481A and Haw. Rev. Stat. § 480-2; Iowa Consumer Fraud Act, Iowa Code § 714.16; Idaho Consumer Protection Act, Idaho Code §§ 48-601, et seq.; Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.; Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5 et seq.; Kansas Consumer Protection Act, K.S.A §§ 50-623 et seq.; Kentucky Consumer Protection Act, KRS §§ 367.110-367.300, 367.990; Unfair Trade Practices and Consumer Protection Law, La. R.S. §§ 51:1401, et seq.; Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A; Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, et seq.; Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-A, et seq.; Michigan Consumer Protection Act, MCL 445.901 et seq.; Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43 .48; Consumer Fraud Act, Minn. Stat. §§ 325F.68-.694; Mo. Rev. Stat. §§ 407.010, et seq.; Mississippi Consumer Protection Act, Miss. Code §§ 75-24-1, et seq.; Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code Ann. §§ 30-14-101 et seq.; North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, et seq.; Unlawful Sales or Advertising Practices, N.D.C.C. §§ 51-15-01 et seq.; Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601 et seq.; New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann § 358-A:1, et seq.; New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.; New Mexico Unfair Practices Act, NMSA 1978, §§ 57-12-1 et seq.; Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903 et seq.; Executive Law 63(12), General Business Law 349/350; Ohio Consumer Sales Practices Act, R.C. § 1345.01, et seq.; Oklahoma Consumer Protection Act, 15 O.S. Section 751, et seq.; Oregon Unlawful Trade Practices Act, ORS 646.605, et seq.; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, et seq.; Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws §§ 6-13.1-1, et seq.; South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, et seq.; SDCL Chapter 37-24; Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. §§ 47-18-101 to-135; Texas Deceptive Trade Practices Consumer Protection Act, Tex. Bus. & Com. Code Ann. §§ 17.41 17.63; Utah Consumer Sales Practices Act Utah Code §§ 13-11-1, et. seq.; Virginia Consumer Protection Act, Virginia Code §§ 59.1-196 through 59.1-207; Vermont Consumer Protection Act, 9 V.S.A. §§ 2451

---

C. _The Debtors' Current Privacy Policy should not Apply to All Consumers._

29.     As discussed in the United States Trustee's Motion to Appoint[53] and the State of

Texas's Motion to Appoint,[54] the Debtors' privacy policy at the time of filing should not apply to

all consumers.

30.     Prior to June 8, 2022,[55] the Debtor's privacy policy did not contain language

allowing for the sale of consumers' information in bankruptcy. Specifically, the February 3,

2022,[56] version of 23andMe's privacy statement regarding business transactions read as follows:

f.  **Business transactions**
    In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of
    all or a portion of its assets your Personal Information will likely be among the assets transferred. In such a case, your
    information would remain subject to the promises made in any pre-existing Privacy Statement.

31.     It is unclear how many times the Debtor has changed the privacy policy, but what

is clear is that any consumers that bought a 23andMe kit prior to June 8, 2022, they were not

subject to the language regarding selling consumers' personal information in a bankruptcy.

32.     As admitted by the Debtors, consumers generally buy this product only once,[57]

and, as such, it is unclear as to how the Debtors updated consumers as to these changes in the

privacy policy.

---

et seq.; Washington Consumer Protection Act, RCW 19.86.010 et seq.; Wis. Stat. § 100.18(1); W. Va. Code §§
46A-1-101, et seq.; and Wyoming Consumer Protection Act, W.S. §§ 40-12-101 et seq.
[53] Dkt. No. 195 "_United States Trustee's (I) Motion for Appointment of Consumer Privacy Ombudsman or, in the
Alternative, Appointment of an Examiner and (II) Objection to Debtors' Motion for Appointment of Independent
Customer Data Representative_" is incorporated by reference herein.
[54] Dkt. No. 181 "_Motion for Order Appointing a Consumer Privacy Ombudsman Under 11 U.S.C. §§ 105(a), 332,
and 363(b)(1) and Notice of Hearing._"
[55] https://web.archive.org/web/20220610073436/https://www.23andme.com/about/privacy/ (First inclusion of the
bankruptcy language in the privacy policy that is dated June 8, 2022.).
[56] EX C – 23andMe's Feb. 3, 2022, privacy policy. Also available at
https://web.archive.org/web/20220301024852/https://www.23andme.com/about/privacy/
[57] Dkt. No. 31-32 at para. 4 stating: ". . . the often 'one-time' nature of sales involving the Company's saliva
collection kits resulted in a shrinking customer base and declining topline revenues."

---

33.     This Court should appoint a Consumer Privacy Ombudsman to review the
Debtors' prior privacy policies and determine to whom the current policy might apply. To not do
so would set a bad precedent, that would allow future debtors to change their privacy policies on
the eve of bankruptcy with no notice to consumers.[58]

D.  *Lemonaid Health, Inc.'s Privacy Policy does not Clearly Disclose the Sale of Personally
Identifiable Information through Bankruptcy to Third Parties Unrelated to the Debtors,
and a Consumer Privacy Ombudsman Must be Appointed.*

34.     Lemonaid Health, Inc. has a different privacy policy from Debtors 23andMe, and
this privacy policy fails to properly inform consumers about a bankruptcy sale of their PII to an
unrelated third party, and, as such, the appointment of a Consumer Privacy Ombudsman is
mandatory.[59]

35.     Pursuant to 11 U.S.C. § 363(b)(1), a Consumer Privacy Ombudsman must be
appointed because Lemonaid Health, Inc.'s privacy policy at the time of filing did not clearly
disclose to consumers that their personally identifiable information could be sold in a bankruptcy
proceeding to third parties that are not related to the Debtor.[60]

36.     As of March 14, 2025, Lemonaid Health's privacy policy provided in pertinent
part:

> • **Business Transfers.** We may disclose your Personal Information with
> other business entities in connection with the sale, assignment, merger
> or other transfer of all or a portion of Lemonaid's business to such
> business entity. This Privacy Policy will apply to your Personal Information
> as transferred to the new entity.

---

[58] *The Sale of Personally Identifiable Information in Bankruptcy*, 27 Am. Bankr. Inst. L. Rev. 1, 10 (Winter 2019),
available at at https://www.abi.org/member-resources/law-review/the-sale-of-personally-identifiable-information-in-bankruptcy
[59] *See* 11 U.S.C. §§ 363(b)(1) and 332.
[60] EX D - Lemonaid Health, Inc.'s March 14, 2025, privacy policy also available at
https://www.lemonaidhealth.com/legals/privacy-policy

---

37.     As seen above, Lemonaid Health's privacy policy has no mention of a bankruptcy sale, and it does not clearly state that the "business entities" could be unrelated to the Lemonaid Health, Inc. as Debtor. In fact, sales, assignments, and mergers commonly occur between related companies.

38.     Due to the lack of clarity as to the sale of PII through bankruptcy to a third party not related to the Debtor, Lemonaid Health, a Consumer Privacy Ombudsman must be appointed.

39.     Further, to date, no privacy policy for Debtors Lemonaid Community Pharmacy, Inc. and Lemonaid Pharmacy Holdings have been found or disclosed. However, a reading of Lemonaid Health, Inc.'s privacy policy seems to indicate that Lemonaid Health's privacy policy may apply to these other Debtors.

40.     Specifically, Lemonaid Health's privacy policy states in pertinent part:[61]

> This Privacy Policy applies to Lemonaid Health, Inc., LMND Medical Group, Inc., a California Professional Corporation, LMND Medical Group, a Professional Association based in Kansas, LMND Medical Group, a Professional Corporation based in New Jersey, and LMND Medical Group, a Professional Association based in Texas (together, "Lemonaid"), products and services, including www.lemonaidhealth.com and any other websites, pages, features or content we own or operate, or that links to this Privacy Policy (collectively, the "Services"). When you use these Services, this Privacy Policy applies to your use.

41.     Because this privacy policy states that it applies to ". . .products and services, including www.lemonaidhealth.com and any other websites, pages, features or content we own

---

[61] EX D. Also available at https://www.lemonaidhealth.com/legals/privacy-policy

or operate, or that links to this Privacy Policy. . . ,"[62] and because the Lemonaid pharmacy

services are part and parcel to the website www.lemonaidhealth.com, it seems that this privacy

policy applies to Debtors Lemonaid Community Pharmacy, Inc. and Lemonaid Pharmacy

Holdings.

42.     To the extent that Lemonaid Health, Inc.'s privacy policy also applies to Debtors,

Lemonaid Community Pharmacy, Inc. and Lemonaid Pharmacy Holdings, Inc. or other Debtors,

the States raise this same objection and seek the appointment of a Consumer Privacy

Ombudsman for those Debtors as well.

E.  *Due to the Highly Sensitive Genetic Information held by the Debtors, and Because of the
    Unresolved Data Breach Investigation and Ongoing Security Concerns, a Security
    Examiner should be Appointed.*

43.     As discussed above, in October 2023, the Debtors disclosed that a serious data

breach occurred, resulting in the personally identifiable information and genetic information of

almost 7 million consumers being accessed and over 1 million consumers' information being put

up for sale on the dark web.

44.     Since that time, the States have been investigating the Debtors, and based upon

information disclosed in the investigation, the States learned of certain security deficiencies that

contributed to the October 2023, data breach.

45.     While the States have presented a proposed settlement to the Debtors that includes

terms requiring certain enhancements to security protections and processes, to date, this

settlement has not been finalized, and the States have not received adequate assurances that such

enhanced security measures have been implemented.  Further, given the financial condition of

23andMe any purported improvements in security may suffer due to lack of resources.  A robust

---

[62] EX D. Also available at https://www.lemonaidhealth.com/legals/privacy-policy

cybersecurity program requires strong governance, well trained personnel, and a host of

technical, administrative, and physical controls, all of which are expenditures.

46.     While a Consumer Privacy Ombudsman would report on and make

recommendations as to privacy policies and practices, compliance with applicable laws, and the

terms of potential sale of data, a Security Examiner would report on and make recommendations

as to reasonable data security measures commensurate with risk and employment of controls to

enable 23andMe to meet its commitments to keep the data safe and secure, which it previously

failed to do prior to the breach.

47.     The Security Examiner appointed would be able to review not only reasonable

data security standards and practices, but report on compliance with applicable state laws that

include reasonable data security or reporting of data breaches.[63]

---

[63] *See e.g.* Alaska Stat. 45.48.010, et seq.; Data Breach Notification Act of 2018, Ala. Code § 8-38-1, et seq.;
Arkansas Personal Information Protection Act, Ark. Code Ann. § 4-110-101, et seq.; Ariz. Rev. Stat. §§ 18-551 and
18-552; Cal. Civ. Code §§ 1798.81.5, 1798.82; Colorado Consumer Data Protection Laws, Colo. Rev. Stat. §§ 6-1-
713, 6-1-713.5, and 6-1-716; Breach of Security, Conn. Gen. Stat. § 36a- 701b; Safeguarding of Personal
Information, Conn. Gen. Stat. § 42-471; District of Columbia Consumer Security Breach Notification Act, D.C.
Code §§ 28-3851, et seq.; Delaware Data Breach Notification Law, 6 Del. C. § 12B-100 et seq.; Florida Information
Protection Act, Section 501.171, Florida Statutes; Georgia Personal Identity Protection Act, O.C.G.A §§ 10-1-910
through 915; Haw. Rev. Stat. ch. 487J and Haw. Rev. Stat. ch. 487N; Personal Information Security Breach
Protection Act, Iowa Code Chapter 715C; Idaho Code, Title 28, Chapter 51, , §28-51-103 et seq.; Illinois Personal
Information Protection Act, 815 ILCS 530/1 et seq.; Disclosure of Security Breach Act, Ind. Code §§ 24-4.9 et seq.;
Security Breach Notification Act, K.S.A. §§ 50- 7a01, et seq.; The Wayne Owen Act, K.S.A. § 50-6,139b; KRS
365.732; Database Security Breach Notification Law, La. R.S. §§ 51:3071, et seq.; Mass. Gen. Laws ch. 93H; 201
Code Mass. Regs. 17.00 et seq.; Maryland Personal Information Protection Act, Md. Code Ann., Com. Law §§ 14-
3501, et seq.; Maine Notice of Risk to Personal Data Act, 10 M.R.S.A. §§ 1346, et seq.; Identity Theft Protection
Act, MCL 445.61, et seq.; Minnesota Data Breach Notification Statute, Minn. Stat. § 325E.61 and Minnesota Health
Records Act, Minn. Stat. § 144.291-144.34; Mo. Rev. Stat. § 407.1500; Miss. Code Ann. § 75-24-29; Mont. Code
Ann. §§ 30-14-1701 et seq.; Identity Theft Protection Act, N.C.G.S. §§ 75- 60, et seq.; Notice of Security Breach for
Personal Information N.D.C.C. §§ 51-30-01 et seq.; Financial Data Protection and Consumer Notification of Data
Security Breach Act of 2006, Neb. Rev. Stat. § 87-801 et seq.; N.H. Rev. Stat. Ann § 359-C: 19-21; New Jersey
Identity Theft Prevention Act, N.J.S.A. 56:8-161 to -166; Data Breach Notifications Act, NMSA 1978, Sections 57-
12C-1 et seq.; Nev. Rev. Stat. §§ 603A.010-603A.290; General Business Law 899-aa and 899-bb; R.C. §§ 1349.19
to 1349.192; Oklahoma Security Breach Notification Act, 24 O.S. Section 161, et seq.; Oregon Consumer
Information Protection Act, ORS 646A.600, et seq.; Breach of Personal Information Notification Act, 73 P.S. §§
2301, et seq.; Rhode Island Identity Theft Protection Act R.I. Gen. Laws §§ 11-49.3-1, et seq.; South Carolina Data
Breach Notification Law, S.C. Code Ann. § 39-1-90; SDCL Chapter 22-40; Tennessee Identify Theft Deterrence
Act of 1999, Tenn. Code Ann. §§ 47-18-2101 to -2111;  Identity Theft Enforcement and Protection Act, Tex. Bus. &

---

48.     As such, the States request that this Court appoint a Security Examiner to review the Debtors' security measures currently in place, review the security measures utilized by any potential purchasers, and submit a report to this Court for consideration of informational safety in the event any sale occurs.

## V.    RESERVATION OF RIGHTS

49.     The States reserve the right to supplement this Motion or to raise additional arguments or objections to the Debtors' proposed sale. The States reserve the right to file a separate reply to the Debtors' *Motion for Entry of an Order (I) Appointing an Independent Customer Data Representative and (II) Granting Related Relief*.[64]

## VI.    NOTICE

50.     As required by docket 131 the *Interim Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures, and (II) Granting Related Relief*, notice is hereby given that copies of the proposed order granting the relief requested herein will be made available on the website of the Debtors' claims and noticing agent at

https://restructuring.ra.kroll.com/23andMe.


*(Remainder of Page Intentionally Left Blank)*

---

Com. Code Ann. § 521.001 - 521.152; Utah Protection of Personal Information Act, Utah Code §§ 13-44-101, et seq.; Virginia Breach of Personal Information Notification Law, Virginia Code § 18.2-186.6; 9 V.S.A §§ 2430, 2431, and 2435; Washington Data Breach Notification Law, RCW 19.255.005 et seq.; Wis. Stat. § 134.98; W. Va. Code §§ 46A-2A-101 et seq.; and W.S. §§ 40-12-501 *et seq*. (Note – some States combine data breach statutes and PII act, but others do not.).

[64] Dkt. No. 169.

---

## VII.    <u>PRAYER</u>

WHEREFORE, the States respectfully request that the Court direct the United States

Trustee to appoint a Consumer Privacy Ombudsman pursuant to section 332 of the Bankruptcy

Code, appoint a Security Examiner pursuant to 11 U.S.C. § 105(a), and enter any further relief to

which the Court finds is just.

Dated: April 15, 2025

*(Remainder of the Page Intentionally Left Blank
Signature Page Follows)*

RESPECTFULLY SUBMITTED,

**FOR MOVANT NAAG CLIENT STATES**

*/S/ ABIGAIL R. RYAN*
ABIGAIL R. RYAN, BANKRUPTCY COUNSEL
NATIONAL ASSOCIATION OF ATTORNEYS GENERAL
1850 M Street NW, 12th Floor
Washington, DC 20036
Telephone: (202) 326-6000, Ext. 258
Email: aryan@naag.org
COUNSEL FOR:

THE STATE OF ARIZONA, EX REL. KRISTIN K. MAYES,
THE ATTORNEY GENERAL

OFFICE OF THE ATTORNEY GENERAL, STATE OF
CONNECTICUT

DISTRICT OF COLUMBIA, OFFICE OF THE ATTORNEY
GENERAL

STATE OF FLORIDA, OFFICE OF THE ATTORNEY
GENERAL, DEPARTMENT OF LEGAL AFFAIRS

OFFICE OF THE ILLINOIS ATTORNEY GENERAL

STATE OF LOUISIANA

STATE OF MAINE

MICHIGAN ATTORNEY GENERAL, *EX REL.* THE PEOPLE
OF THE STATE OF MICHIGAN

NEW HAMPSHIRE OFFICE OF THE ATTORNEY GENERAL,
CONSUMER PROTECTION DIVISION

NEW MEXICO DEPARTMENT OF JUSTICE

NEW YORK STATE ATTORNEY GENERAL'S OFFICE

STATE OF NORTH CAROLINA

OHIO ATTORNEY GENERAL

THE STATE OF SOUTH CAROLINA EX REL. ALAN
WILSON

STATE OF UTAH, OFFICE OF THE UTAH ATTORNEY
GENERAL

STATE OF VERMONT

COMMONWEALTH OF VIRGINIA, EX REL. JASON S.
MIYARES, ATTORNEY GENERAL

WASHINGTON ATTORNEY GENERAL NICK BROWN

OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL

STATE OF WISCONSIN

**FOR MOVANT STATE OF COLORADO**

*/S/ ROBERT PADJEN*
ROBERT PADJEN, NO. 14678CO
SENIOR ASSISTANT ATTORNEY GENERAL COLORADO
DEPARTMENT OF LAW
RALPH L. CARR COLORADO JUDICIAL CENTER
1300 Broadway, 8th Floor
Denver, Colorado 80203
Direct dial: 720-508-6346
E-mail: robert.padjen@coag.gov

**FOR MOVANT THE COMMONWEALTH OF KENTUCKY, EX
REL. RUSSELL COLEMAN, ATTORNEY GENERAL**

*/S/ CHRISTOPHER D. HUNT*
CHRISTOPHER D. HUNT (KY BAR NO. 91775)
ASSISTANT ATTORNEY GENERAL
KENTUCKY OFFICE OF THE ATTORNEY GENERAL
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
Tel: (502) 696-5691
*ChrisD.Hunt@ky.gov*

**FOR MOVANT STATE OF MINNESOTA
KEITH ELLISON
ATTORNEY GENERAL OF MINNESOTA**

*/S/ DALILA Z. JORDAN*
DALILA Z. JORDAN, ATTORNEY REG # 0403120
ASSISTANT ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION
445 Minnesota Street, Suite 600
Saint Paul, Minnesota 55101
Telephone: (651) 300-7640
Email: Dalila.Jordan@ag.state.mn.us
COUNSEL FOR THE STATE OF MINNESOTA

**FOR MOVANT STATE OF OREGON
DAN RAYFIELD ATTORNEY GENERAL OF OREGON**

*/S/ JUSTIN D. LEONARD*
JUSTIN D. LEONARD, E.D. MO. D.C. # 033736OR
SENIOR ASSISTANT ATTORNEY GENERAL
OREGON DEPARTMENT OF JUSTICE
1162 Court Street NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4400
Email: Justin.Leonard@doj.oregon.gov

COUNSEL FOR THE STATE OF OREGON

---

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was filed electronically on April 15, 2025, with the United States Bankruptcy Court and has been served on the parties in interest via e-mail by the Court's CM/ECF System as listed on the Court's Electronic Mail Notice List.

I further certify that a true and correct copy of the foregoing document was served via email on April 15, 2025, on the parties listed in the Master Service List attached at Exhibit E and on April 16, 2025, a true and correct copy of the foregoing was served via United States Mail on those parties listed in the Master Service List that did not have an email address and are not a Movant herein.

*/s/Abigail R. Ryan*
Abigail R. Ryan

**Appendix F - Multistate Letter to CPO dated June 4, 2025**



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

PATRICK KANIA
ASSISTANT ATTORNEY GENERAL

Phone: +1 860-808-5440

June 4, 2025

Neil M. Richards
Koch Distinguished Professor in Law
Director of the Cordell Institute
Washington University School of Law
One Brookings Drive
St. Louis, MO 63130

Re:    State Attorneys General Seek Assurances and Express Concerns Regarding the Sale of
Customer Personal Information in 23andMe Bankruptcy Proceeding

Dear Professor Richards,

We write on behalf of the Office of the Attorneys General of Alaska, Arizona, California,
Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Iowa, Kansas,
Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Missouri, Montana, New
Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon,
Pennsylvania, South Carolina, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West
Virginia, and Wisconsin.

This letter is addressed to you by the above state attorneys general in your capacity as the
Consumer Privacy Ombudsman in *In re 23andMe Holding Co., et al.,* Case No. 25-40976 in the
U.S. Bankruptcy Court for the Eastern District of Missouri in St. Louis. We write to
communicate our concerns and to ask questions regarding the proposed sale of personally
identifiable information collected by 23andMe, Inc. and its subsidiaries (collectively, "23andMe"
or "Company"), including the genetic information of millions of our states' residents. We ask
that you consider this letter when drafting your CPO Report before final sale of the Company's
assets. We also ask that you enclose this letter with your report when it is finalized and submitted
to the Court.

23andMe sells consumer genetic testing kits, marketed to consumers as a means to learn detailed
information about their genetic ancestry, inherited traits, and the presence of risk factors for
certain diseases. 23andMe also offers remote healthcare services and prescription drugs through
its subsidiary Lemonaid. Through these offerings, 23andMe collects and maintains a vast amount



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

of sensitive personally identifiable information about consumers. 23andMe solicits "profile information" from consumers, inviting them to input their names, birthdays, and locations. 23andMe collects "family tree" information, asking users to input information about their relatives, who may or may not be 23andMe users. Through their Lemonaid telehealth subsidiary, 23andMe collects personal health information and creates medical records. Because Lemonaid does not take insurance, it does not perform any transactions that are covered by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  As a result, the medical records collected and maintained by 23andMe are not subject to HIPAA's protections.[1]

The proposed sale contemplates the transfer of the core of 23andMe's data hoard, the biological samples and the raw genetic code of more than fifteen million people. 23andMe analyzes this raw genetic information to generate detailed reports about an individual's ancestry, including the likely regions of origin of their forebears. 23andMe also analyzes their customers' genomes to determine the presence of genetic risk factors for diseases, deriving and retaining another trove of highly sensitive health information that is unprotected by HIPAA. All this genetic information is readily linked to an individual's profile in their 23andMe account and on 23andMe's website or app.

Genetic information is fundamentally different from other types of personal information. It is an indelible record of an individual's identity, ancestry, and biological composition. Once exposed to third parties, this information cannot be clawed back or truly deidentified. The potential for misuse of genetic information is legion. In one reported incident, 23andMe's genetic information was used to block access to websites based on users' racial or ethnic characteristics.[2] The well publicized 2023 data breach at 23andMe resulted in the compilation and targeted release of information about certain racial and ethnic groups, including individuals of Chinese and Ashkenazi Jewish descent.[3] The court should impose strong safeguards as part of the sale process to protect genetic data from the vast potential for misuse.

The states emphasize that *the Debtors and Buyers must follow all state laws relevant to the sale of the Company's assets*. Certain state laws expressly forbid the sale or transfer of genetic information collected by 23andMe. Other state laws forbid sale of genetic information collected by 23andMe without express consent. All states have unfair and deceptive trade practice laws that may be implicated by 23andMe's past public statements to consumers about the use, storage, and transfer of their personal information. An appendix is attached to this letter with selected

---

[1] 45 C.F.R. § 160.103

[2] Liat Clark, How one coder used 23andMe to create a race wall around the web, WIRED (July 23, 2015, 7:20 AM), https://www.wired.com/story/23andme-api-blocks-based-on-race-gender/.

[3] Jenny Kleeman, DNA testing: What happens if your genetic data is hacked?, BBC (Feb. 12, 2024), https://www.bbc.com/future/article/20240212-dna-testing-what-happens-if-your-genetic-data-is-hacked.



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

specific statements from individual Offices of Attorneys General regarding compliance with their state's laws.

In order to help guide your review, we believe the Debtor and Buyer should provide answers to the following questions regarding the sale of 23andMe customer data in the bankruptcy process:

1. How do the Debtor and Buyer intend to comply with state criminal laws that require affirmative consent from consumers prior to the sale or transfer of genetic data?[4]

2. How do the Debtor and Buyer intend to comply with state genetic data privacy laws that require express affirmative consent from consumers prior to the sale, transfer, or disclosure of genetic data?[5]

3. How do the Debtor and Buyer intend to adhere to the Debtor's representations to consumers as to the ownership, licensing, use, and deletion of personal information so as to not violate state consumer protection laws regarding unfair or deceptive practices?[6]

---

[4] *See, e.g.*, statements from Alaska and Florida in Appendix.

[5] *See, e.g.*, statements from Alaska, Arizona, Colorado, Kentucky, Delaware, Florida, Maryland, Minnesota, Montana, New Hampshire, New Jersey, New Mexico, New York, South Carolina, Tennessee, Texas, and Utah in Appendix; letter dated May 23, 2025, and supplemental letter dated June 2, 2025, from California to Prof. Richards (CPO).

[6] *See, e.g.*, statements from Pennsylvania and Vermont in Appendix. *See also,* state laws in Alaska (Alaska Unfair Trade Practices Act AS 45.50.471 – 45.50.561), Arizona (Ariz. Rev. Stat. § 44-1521 *et seq.*), California (Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Unfair Competition Law), 17500 *et seq.* (False Advertising Law)), Connecticut (Conn. Gen. Stat. § 42-110a, *et seq.*), District of Columbia (Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq.*), Florida (Florida Deceptive and Unfair Trade Practices Act, FS 501.204), Georgia (Georgia Fair Business Practices Act, O.C.G.A. §§ 10-1-390, *et seq.*), Iowa (Iowa Code § 714.16), Kansas (KSA 50-626), Louisiana (La. R.S. 51:1401, *et seq.*), Maine (5 M.R.S.A. § 205-A et seq.), Maryland (Md. Code Ann., Com. Law § 13-301 *et seq.*), Michigan (Michigan Consumer Protection Act, MCL 445.901, *et seq.*), Minnesota (Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-.48 and Consumer Fraud Act, Minn. Stat. §§ 325F.68-.694), Missouri (Missouri Merchandising Practices Act, Mo. Rev. Stat. 407.020 *et seq.*), New Hampshire (Consumer Protection Act, N.H. RSA 358-A, *et. seq.*), New Jersey (New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -229), New Mexico (NMSA 1978 § 57-12-1 *et seq.*), North Carolina (North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, *et seq.*), Oklahoma (Oklahoma Consumer Protection Act: 15 O.S. §§ 751 – 763), Oregon (ORS 646.607(12)), Tennessee (Tenn. Code Ann. § 47-18-101, *et seq.*), Texas (Texas Deceptive Trade Practices—Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–17.63), Utah (Utah Code § 13-11-1, *et. seq.*), Vermont (9 V.S.A. Chapter 63), Washington (RCW 19.86.020), West Virginia (W. Va. Code, § 46A-1-101, *et seq.*), and Wisconsin (Wis. Stat. § 100.18(1)).



4.  How do the Debtor and Buyer intend to comply with state genetic data privacy laws under which consumers (or their estates) have property rights in the genetic data?[7] How can the Debtor legally sell genetic data of consumers who have property rights in that data under state law?

5.  How do the Debtor and Buyer intend to comply with state comprehensive data protection laws regarding a consumer's data deletion rights?[8] How does the Debtor intend to ensure that consumers who have exercised their data deletion rights under state comprehensive data protection laws or pursuant to the Debtor's policies do not have their data transferred to the Buyer?

6.  How do the Debtor and Buyer intend to comply with state comprehensive data protection laws with respect to purpose limitation to ensure that consumers have consented to the potential uses of their data by the Buyer?[9] How does the Debtor intend to ensure that consumers who have not consented to the use of their data for medical research under state comprehensive data protection laws or pursuant to the Debtor's policies do not have their data provided to the Buyer?

7.  How do the Debtor and Buyer intend to comply with state consumer protection laws and related regulations[10] as well as personal information protection and/or data breach

---

[7] *See, e.g.*, statements from Alaska, Arizona, Florida, and Texas in Appendix.

[8] *See, e.g.*, state laws in California (Cal. Civ. Code § 1798.105), Connecticut (Conn. Gen. Stat. § 42-518(a)(3)), Delaware (DEL. CODE ANN. TIT. 12D, § 12D-104(a)(3)), Iowa (Iowa Code § 715D.3(1)(b)), New Jersey (New Jersey Data Privacy Law, N.J.S.A. 56:8-166.10(3)), Oregon (ORS 646A.574(1)(c)), Tennessee (Tenn. Code Ann. § 47-18-4904(a)(6)), Texas (Tex. Bus. Com. Code § 541.051(b)(3)) Utah (Utah Code § 13-61-201(2)). *See also* California (Genetic Information Privacy Act, Cal. Civ. Code § 56.181(c)(2), (d)(2)(B), (d)(2)(C).)

[9] *See, e.g.*, state laws in Connecticut (Conn. Gen. Stat. § 42-520(a)(2)), Delaware (DEL. CODE ANN. TIT. 12D, § 12D-104(a)(3)), New Jersey (New Jersey Data Privacy Law, N.J.S.A. 56:8-166.15(d)(1)-(2)), Oregon (ORS 646A.578(2)(a)), Tennessee (Tenn. Code Ann. § 47-18-4904(a)(3)(A)), Texas (Tex. Bus. & Com. Code §§ 503A.006, 503A.007, 541.101(b)). *See also* letter dated May 23, 2025, and supplemental letter dated June 2, 2025, from California to Prof. Richards (CPO).

[10] *See, e.g.*, statements from Pennsylvania and Vermont in Appendix. *See also,* state laws in Alaska (Alaska Unfair Trade Practices Act AS 45.50.471 – 45.50.561), Arizona (Ariz. Rev. Stat. § 44-1521 *et seq.*), California (Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Unfair Competition Law), 17500 *et seq.* (False Advertising Law)), Connecticut (Conn. Gen. Stat. § 42-110a, *et seq.*), District of Columbia (Consumer Protection Procedures Act, D.C. Code §§ 28-



<span style="color:#336699">OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT</span>

notification laws that require safeguarding, security, and/or protection of personal information?[11]

The aforementioned Offices of Attorneys General are closely monitoring the sale to ensure the Debtors and Buyers obey all applicable state laws. We stress the importance of protecting consumer privacy, especially where genetic data is concerned, and would like to reiterate that it is imperative that the Debtors and Buyers obey all state laws relevant to this transaction. We appreciate your consideration of this letter in your role as Consumer Privacy Ombudsman.

Very truly yours,

Patrick Kania
John Neumon
Assistant Attorneys General

---

3901, *et seq.*), Florida (Florida Deceptive and Unfair Trade Practices Act, FS 501.204), Georgia (Georgia Fair Business Practices Act,  O.C.G.A. §§ 10-1-390, *et seq.*), Iowa (Iowa Code § 714.16), Kansas (KSA 50-626), Louisiana (La. R.S. 51:1401, *et seq.*), Maine (5 M.R.S.A. § 205-A *et seq.*), Maryland (Md. Code Ann., Com. Law § § 13-301 *et seq.*), Michigan (Michigan Consumer Protection Act, MCL 445.901, *et seq.*), Minnesota (Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43-.48 and Consumer Fraud Act, Minn. Stat. §§ 325F.68-.694), Missouri (Missouri Merchandising Practices Act, Mo. Rev. Stat. 407.020 *et seq.*), New Hampshire (Consumer Protection Act, N.H. RSA 358-A, *et. seq.*), New Jersey (New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 to -229), New Mexico (NMSA 1978 § 57-12-1 *et seq.*), North Carolina (North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, *et seq.*), Oklahoma (Oklahoma Consumer Protection Act: 15 O.S. §§ 751 – 763), Oregon (ORS 646.607(12)), Tennessee (Tenn. Code Ann. § 47-18-101, *et seq.*),  Texas (Texas Deceptive Trade Practices— Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–17.63), Utah (Utah Code § 13-11-1, *et. seq.*), Vermont (9 V.S.A. Chapter 63), Washington (RCW 19.86.020), West Virginia (W. Va. Code, § 46A-1-101, *et seq.*), and Wisconsin (Wis. Stat. § 100.18(1)).

[11] *See, e.g.*, state laws in California (Cal. Civ. Code § 1798.81.5), Connecticut (Conn. Gen. Stat. § 42-471), Florida (Florida Information Protection Act, FS 501.171), Georgia (Georgia Personal Identity Protection Act, O.C.G.A. §§ 10-1-910, *et seq.*),  Iowa (Iowa Code § 715D.4(1)), (Kansas (KSA 50-7a02 and KSA 50-6,139b), Louisiana (La. R.S. 51:3071, *et seq.*), Maryland (Md. Code Ann., Com. Law §§ 14-3501 *et seq.*), Minnesota (Minn. Stat. § 325E.61),  New Jersey (New Jersey Identity Theft Prevention Act, N.J.S.A. 56:8-161 to -166), New Mexico (NMSA 1978, §§ 57-12C-1 to -12), Oregon (ORS 646A.600 to 646A.628), South Carolina (S.C. Code Ann. § 39-1-90), Tennessee (Tenn. Code Ann. § 47-18-4904(a)(5); Tenn. Code Ann. § 47-18-2107), Texas (Texas Identity Theft Enforcement and Protection Act, Tex. Bus. & Com. Code §§ 521.001-.152), Utah (Utah Code § 13-44-201).



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

# **Appendix**

### *Alaska*

Under Alaska law, "a DNA sample and the results of a DNA analysis performed on the sample are the *exclusive* property of the person sampled or analyzed." (AS 18.13.010(a)(2) (*emphasis added*)). 23andMe possesses no property rights in these samples or in these results. It therefore cannot sell them, because it has no property right to sell. 23andMe merely retains the samples and results on behalf of the Alaskans who actually own the samples, and who have the statutory right to revoke 23andMe's ability to retain the samples and results at any time. (AS 18.13.010(c)).

At most, Alaska law provides that the results of DNA testing can be "disclosed" (again, without transferring any property rights). However, it is illegal and, if done knowingly, a crime, for a person to analyze DNA samples, retain DNA samples, or disclose DNA test results without the informed written consent of the person whose genes the DNA reflects or their legal guardian or authorized representative. (AS 18.13.010(a); AS 18.13.030). "A general authorization for the release of medical records or medical information may not be construed as the informed and written consent" required by Alaska's genetic privacy law. (AS 18.13.010(c)).

In short, 23andMe cannot sell Alaskans' DNA samples or test results because it has no property interest to sell. It cannot disclose the results of an Alaskan's DNA test unless it has the informed, written consent of its Alaskan owner, and the person to whom 23andMe might disclose the results to cannot retain or disclose them without the informed, written consent of the Alaskan owner. Again, Alaskans retain the right to revoke their consents at any time. (AS 18.13.010(c)).

### *Arizona*

Arizona law requires direct-to-consumer genetic testing companies to obtain separate express consent from the consumer for the specific purpose of transferring or disclosing the consumer's genetic data to a buyer. Ariz. Rev. Stat. §§ 44-8001(5), 44-8002(A)(2)(b)(i). This separate consent requirement is backed by significant privacy protections for a consumer's genetic information. Ariz. Rev. Stat. § 44-8002(A)(6). The results of genetic testing are confidential and considered privileged to the consumer tested, and can only be released to: the consumer, anyone that the consumer authorizes in writing to receive it, or the consumer's healthcare decision maker. Ariz. Rev. Stat § 12-2082(A). In addition, separate express consent from the consumer must be provided for the direct-to-consumer genetic testing company to use the consumer's genetic data beyond the primary purpose of the genetic testing product and its inherent contextual uses. Ariz. Rev. Stat. § 44-8002(A)(2)(b)(iii). Notwithstanding any other consent obtained, a direct-to-consumer genetic testing company may never disclose consumer genetic data to any entity offering health insurance, life insurance, or long-term care insurance or to any employer of a consumer. Ariz. Rev. Stat. § 44-8002(B).

Further, under Arizona law the genetic testing information of a deceased consumer cannot be transferred at all based on consent provided by the consumer while still alive. *See* Ariz. Rev. Stat



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

§ 12-2082(F). Rather, it can *only* be released to the deceased consumer's last healthcare decisionmaker and the personal representative of the consumer's estate or next of kin. Ariz. Rev. Stat § 12-2294(D). And a deceased consumer's testamentary document may impose further limitations on the release of genetic testing information. Ariz. Rev. Stat § 12-2082(F).

### Colorado
Genetic data constitutes sensitive data under the Colorado Privacy Act. C.R.S. 6-1-1303(24)(b). Pursuant to C.R.S. 6-1-308(7), controllers are required to obtain a consumer's consent prior to selling their sensitive data.

### Delaware
Delaware law, DEL. CODE ANN. TIT. 16, §§ 1201 to 1208, prohibits the disclosure of genetic information about an individual in a manner that permits identification of the individual without obtaining informed consent of the tested individual describing the information to be disclosed and to whom the information will be disclosed.

### Florida
Florida's "Protecting DNA Privacy Act" was signed into law on June 29, 2021 and took effect on October 1, 2021as Florida Statute § 817.5655, Unlawful Use of DNA. The law enhances individual ownership over one's genetic information.  The law restricts the use and handling of DNA without express consent.
The law includes criminal penalties up to a second-degree felony in the State of Florida for violation of the statute.

Florida's law requires "**express consent**" to: 1) collect or retain another person's DNA sample with the intent to perform DNA analysis;
2) submit another person's DNA sample for DNA analysis or conduct or procure the conducting of another person's DNA analysis;
3)  disclose another person's DNA analysis results to a third party; and
4) sell or otherwise transfer another person's DNA sample or the results of another person's DNA analysis to a third party, regardless of whether the DNA sample was originally collected, retained or analyzed with express consent.

### Illinois
Under Illinois's *Genetic Information Privacy Act*, 410 ILCS 513/1, *et seq*. (Act), all medical and commercial genetic testing and information derived therefrom is confidential and privileged and may be released only to the individual tested and to persons specifically authorized by that individual in writing to receive the information. The Act forbids disclosure of testing results to another person except as authorized under the Act.

 The Act permits disclosures without express written consent in some circumstances for certain law enforcement and health care purposes.  However, the Act prohibits the solicitation of genetic



testing or genetic information as a condition of employment, preemployment application, labor organization membership, or licensure.

### Kentucky

Kentucky's genetic privacy statute, KRS 311.705, effective July 14, 2022, requires 23andMe to obtain "express consent" for "transferring or disclosing the consumer's genetic data to any person other than the company's vendors and service providers, or for using genetic data beyond the primary purpose of the genetic testing product or service and inherent contextual uses.

### Maryland

Maryland's Genetic Information Privacy Act ("Maryland's GIPA") regulates direct-to-consumer ("DTC") genetic testing companies like 23andMe, creating obligations for the collection, use, and disclosure of genetic data.  Among other things, Maryland's GIPA requires DTC companies to obtain "express consent for transferring or disclosing the consumer's genetic data to a person other than the company's vendors or service providers" and for "using genetic data beyond the primary purpose of the genetic testing product or service requested by the consumer."   Md. Com. Law §§ 14-4404(2) and (3).  Maryland's GIPA further states that express consent requires an "affirmative response by a consumer to a specific, discrete, freely given, and unambiguous notice regarding the *collection, use, or disclosure* of the consumer's genetic data *for a specific purpose. Id*. at § 14-4401(f) (emphasis added).  In order to sell or transfer genetic data, 23andMe must obtain express consent from the consumer in accordance with Maryland's GIPA.

Obtaining explicit, affirmative consent from consumers before transferring genetic data in bankruptcy is especially critical in light of Maryland's strict ban on sharing data collected by DTC companies, absent consent, with insurers or employers.  *Id*. at § 14-4405(d).  Without this consent, consumers who relied on this protection when providing their genetic data, could unexpectedly lose it, potentially facing serious negative consequences.

### Minnesota

Minnesota's Genetic Information Privacy Act forbids the sale or transfer of genetic information without the consumer's express consent.  The law specifies that a direct-to-consumer genetic testing company must obtain "separate express consent" before each transfer or disclosure of the consumer's genetic data or biological sample to any person other than the company's vendors and service providers.  Minn. Stat. § 325F.995, subd. 2(a)(2)(ii) (emphasis added). The law also requires "separate express consent" from the consumer for each use of genetic data or biological sample that is beyond the primary purpose of genetic testing services. Id. § 325F.995, subd. 2(a)(2)(iii). Because the sale of genetic data in this bankruptcy matter contemplates both the transfer and disclosure of genetic material to persons other than 23andMe, and is outside of the primary purpose and services provided by 23andMe, Minnesota law requires each consumer provide separate express consent before their genetic data or biological sample is sold or transferred to another company.  Under Minnesota's law, express consent means "a consumer's



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

affirmative written response to a clear, meaningful, and prominent written notice," which may be presented and captured electronically. *Id*. § 325F.995, subd. 1(f).

### Montana
Montana law requires express consent for the sale of consumer genetic data. Mont. Code Ann. § 30-23-104(3)(c)(iii). Montana law also requires express consent for the use of consumer genetic data "beyond the primary purpose of the entity's genetic testing product or service." Mont. Code Ann. § 30-23-104(3)(a)(ii). Finally, Montana law restricts where genetic data of Montana residents may be stored and imposes additional consent requirements on storing genetic data outside the United States. Mont. Code Ann. § 30-23-104(7).

### New Hampshire
New Hampshire has a genetic privacy statute (N.H. RSA § 141-H) and data privacy statute (N.H. RSA § 507-H) which prohibits the sale of genetic data without consent. The genetic privacy statute applies to genetic testing which is defined as any test that identifies the "presence, absence or alteration" of any gene or chromosome as well as any "report, interpretation or evaluation" of such a test. The statute prohibits both the disclosure that an individual has undergone genetic testing as well as the results of the test absent prior written and informed consent of the individual, or that of a guardian if the individual is a minor. In addition, under the data privacy statute, genetic testing data of the type collected by 23andMe would be considered Sensitive Data. Although the definition of "sale of personal data" does not include the transfer of personal data as a bankruptcy asset, Sensitive Data is held to a higher standard than general personal data under N.H. RSA 507-H. It is the State's position that the processing required to transfer Sensitive Data as a bankruptcy asset requires consumer consent under N.H. RSA 507-H:6, in addition to the parallel requirements of N.H. RSA 141-H.

### New Jersey
The New Jersey Genetic Privacy Act, N.J.S.A 10:5-43 to 49, requires informed consent prior to obtaining an individual's genetic information. The New Jersey Data Privacy Law, N.J.S.A. 56:8-166.4 to 166.19, covers genetic/biometric data and requires that a controller "clearly and conspicuously disclose such sale or processing, as well as the manner in which a consumer may exercise the right to opt out of such sale or processing.

### New Mexico
New Mexico law requires informed and written consent for the collection, analysis, retention, transmission, or use of genetic information. Therefore, any sale or transfer of such data by 23andMe must be preceded by obtaining express consent from the individual, in accordance with NMSA 1978, §§ 24-21-3 and 24-21-5.



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

*New York*
Under New York Civil Rights Law (CVR) § 79-L, any further disclosure of genetic test results to individuals or organizations not initially named in the informed consent requires the further informed consent of the subject of the test.

*North Carolina*
The North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1, prohibits unfair and deceptive acts in commerce. 23andMe's potential sale of consumers' personally identifiable information, including their genetic information, may be both deceptive and unfair under North Carolina law.

*Pennsylvania*
The Commonwealth of Pennsylvania, Office of Attorney General, Bureau of Consumer Protection ("Commonwealth of PA") generally objects to the sale of consumers' personally identifiable genetic information ("PIGI") collected by, and in the possession of, Debtors in this bankruptcy. It has been widely acknowledged, including by Debtors, that at different times during the course of the operation of Debtors' business, Debtors employed varying versions of a privacy policy. Notably, Debtors' historic privacy policies have been more restrictive than Debtors' privacy policy currently in effect. Therefore, a vast number of consumers agreed to purchase Debtors' services and provide their PIGI with the expectation that their PIGI would not be transferred or sold to an unrelated or unaffiliated third party, at least not without consumers' express consent.

Therefore, the Commonwealth of PA asserts that the proposed sale or transfer of consumers' PIGI is prohibited by, and unlawful under, the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PA Consumer Protection Law"), 73 P.S. § 201-1 *et seq*. The PA Consumer Protection Law declares unlawful certain unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce which is defined, in part, to include "engaging in any other fraudulent or deceptive conduct which creates the likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)(xxi). The Pennsylvania Supreme Court has long recognized that the PA Consumer Protection Law is to be construed liberally so that unfairness and deception in all consumer transactions be halted. *Commonwealth v. Monumental Properties*, 459 Pa. 450, 461, 329 A.2d 812, 817 (1988). The PA Consumer Protection Law was designed to promote full disclosure of information to consumers. *Gabriel v. O'Hara*, 368 Pa. Super. 383, 534 A.2d 488, 491, n.6 (1987).

Indeed, for many consumers the sale of their PIGI would violate the privacy policies to which they may have previously consented, and, therefore, violates the PA Consumer Protection Law.

*South Carolina*
South Carolina law forbids the sale or transfer of genetic information without express consent. See S.C. Code Ann. section 38-93-40.



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

***Tennessee***

Tennessee's Genetic Information Privacy Act ("GIPA") regulates direct-to-consumer genetic testing companies, such as 23andMe. *See* Tenn. Code Ann. § 47-18-4902, 4904. The GIPA requires direct-to-consumer genetic testing companies to obtain *express consent* before collecting, using, or disclosing a consumer's genetic data. *Id.* § 47-18-4904(a)(2). In obtaining such consent, the company must (1) clearly describe its use of the genetic data, (2) specify who has access to any test results, and (3) specify how the company may share the genetic data. *Id.* A company must also obtain *separate express consent* before, among other things, (1) transferring or otherwise disclosing a consumer's genetic data to a person other than the company's vendors or service providers or (2) using the genetic data beyond the primary purpose of the company's genetic testing product or service. *Id.* § 47-18-4904(a)(3)(A)(i)-(iii). Under the GIPA, express consent means a consumer's affirmative response to a "clear, meaningful, and prominent notice regarding the collection, use, or disclosure of genetic data for a specific purpose." *Id.* § 47-18-4902(6). The GIPA also requires companies to provide a process by which consumers can (1) access their genetic data, (2) delete their account and genetic data, and (3) destroy their biological sample. *Id.* § 47-18-4904(a)(6)(A)-(C).

On July 1, 2025, the Tennessee Information Protection Act ("TIPA") will become effective. The TIPA provides Tennessee consumers with certain personal information rights and places new obligations on controllers and processors of data, among other things. Under the TIPA, consumers have the right to access, correct, delete, and obtain a copy of their data, as well as a right to opt-out of the sale or processing of their personal information for certain purposes. Tenn. Code Ann. § 47-18-3304. The TIPA also imposes key requirements on data controllers, including a duty to: (1) provide a clear, meaningful privacy notice; (2) limit the collection of personal information to what is adequate, relevant, and reasonably necessary for the disclosed purposes; (3) not process personal information for purposes beyond what is reasonably necessary and compatible with the disclosed purposes, unless consent is obtained; (4) not process sensitive data without a consumer's express consent; (5) clearly disclose the sale of personal information to third parties; (6) establish and maintain reasonable data security practices to protect the confidentiality, integrity, and accessibility of personal information; and (7) provide a secure, reasonable means for consumers to exercise their rights under the statute, among other things. *Id.* § 47-18-3305. Under the TIPA, consent means "a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal information relating to the consumer." *Id.* § 47-18-3302(6)(A). Though the TIPA excludes bankruptcy acquisitions from the definition of a "sale", neither the TIPA nor the GIPA include blanket applicability exemptions for entities in bankruptcy.

***Texas***

The Texas Direct-to-Consumer Genetic Testing Act (the "DTC Genetic Testing Act") regulates companies like 23andMe and provides consumers with certain rights and protections over their biological samples and genetic data. *See* Tex. Bus. & Com. Code §§ 503A.001-.008. Under the



DTC Genetic Testing Act, Texans have an exclusive property right in, and right to exercise exclusive control over, their biological sample and genetic data. *Id*. § 503A.003. Debtors must obtain Texans' *separate* express consent to (a) transfer or disclose the individual's genetic data to any person other than the company's vendors and service providers; (b) use genetic data for a purpose other than the primary purpose of the company's genetic testing product or service; or (c) retain the biological sample following completion of the initial testing service. *Id*. § 503A.006(a)(1). Specifically, the Debtors must obtain a separate "affirmative response to a clear and meaningful notice regarding the collection, use, or disclosure of genetic data for a specific purpose." *Id*. § 503A.001(5). The consumer's click-through acceptance of 23andMe's Terms of Service and Privacy Statement upon signing up for services does not meet the *separate* express consent requirement as defined by the DTC Genetic Testing Act. 23andMe may not transfer or disclose Texans' genetic data and biological samples or deprive Texans of their property rights and rights to exercise exclusive control without their *separate* express consent.

Further, under the Texas Data Privacy and Security Act (the "TDPSA"), Debtors must obtain a Texan's consent to process their sensitive data. *See* Tex. Bus. & Com. Code §§ 541.101(b)(4). "Processing" includes the disclosure of personal information, including sensitive data such as a Texan's genetic or biometric data and mental or physical health diagnosis. *Id*. § 541.001(22) (defining "process" to include disclosure) and § 541.001(29) (defining "sensitive data"). Consent under the TDPSA "means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer." *Id*. § 541.001(6). A consumer's consent is not obtained through the "acceptance of a general or broad terms of use or similar document that contains descriptions of personal data processing along with other, unrelated information; hovering over, muting, pausing, or closing a given piece of content; or agreement obtained through the use of dark patterns." *Id*. The click-through acceptance of 23andMe's Terms of Service and Privacy Statement does not meet the consent requirement as defined under the TDPSA. 23andMe does not have the requisite consent of Texans to disclose their genetic data and medical information to a third-party buyer.

### *Utah*
Utah Code § 13-60-104(1)(c) ("Utah Genetic Information Privacy Act") requires 23andMe to obtain a consumer's separate express consent for the transfer or disclosure of the consumer's genetic data to any person other than the company's vendors and service providers. Utah's Genetic Information Privacy Act further states that express consent requires 23andMe to obtain a consumer's affirmative response to a clear, meaningful, and prominent notice regarding any transfer.

### *Vermont*
The Vermont Consumer Protection Act, 9 V.S.A. Chapter 63, prohibits unfair and deceptive acts in commerce. 23andMe's potential sale of consumers' personally identifiable information, including their genetic information, may be both deceptive and unfair under Vermont law. 23andMe's sale of consumers' personally identifiable information may amount to deceptive



OFFICE OF THE ATTORNEY GENERAL
CONNECTICUT

conduct to the extent that 23andMe made representations to consumers that their information would be protected, secured, and/or otherwise under consumers' control, whether those representations were made in 23andMe's advertisements or in the various versions of 23andMe's publicly available privacy policies at the time of consumers' purchases. 23andMe's sale of this information may also constitute unfair business practices to the extent such sale may cause a substantial injury to consumers. The Vermont Supreme Court has held that the Vermont Consumer Protection Act is a remedial statute that must be applied liberally to accomplish its purposes, meaning that Vermont courts will defer to broader interpretations of the statute when assessing whether any particular acts affecting consumers might implicate the act's prohibitions. *Carter v. Gugliuzzi,* 168 Vt. 48, 52, 716 A.2d 17, 21 (1998).

### *Virginia*

Virginia has a Genetic Data Privacy law which states that "[e]very direct-to-consumer genetic testing company shall obtain a consumer's express consent for the collection, use, and disclosure of the consumer's genetic data, including, at a minimum, separate and express consent for . . . [e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed." Va. Code § 59.1-596(B)(4). If a direct-to-genetic data testing company fails to comply with this requirement, the Attorney General may bring an enforcement action to obtain injunctive relief and seek civil penalties, attorney fees, and expenses. Va. Code. § 59.1-601. In addition, genetic data is defined as sensitive data under Virginia's Consumer Data Protection Act. Va. Code § 59.1-575. This Act requires that controllers "[n]ot process sensitive data concerning a consumer without obtaining the consumer's consent." Va. Code § 59.1-578(A)(5).

## Appendix G - Letter from CA AG to CPO, dated June 2, 2025



C A L I F O R N I A

**DEPARTMENT OF JUSTICE**

***Rob Bonta***
**Attorney General**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 510-4400
Telephone: (415) 510-3497
E-Mail: TiTi.Nguyen@doj.ca.gov

June 2, 2025

**VIA USPS and EMAIL**

Neil M. Richards
Koch Distinguished Professor in Law
Director of the Cordell Institute for Policy in Medicine & Law
Washington University School of Law
One Brookings Drive
St. Louis, MO 63130
nrichards@wustl.edu

RE:     California Law Uniquely Protects Genetic Data and Personal Information in the 23andMe
        Bankruptcy Proceeding – Supplemental Letter
        *In re 23andMe Holding Co., et al.*, Case No. 25-40976-357 (Bankr. E.D. Mo.)

Dear Professor Richards:

Further to our May 23, 2025 letter, we write to provide additional information and
citations regarding (1) 23andMe's proposed asset sale under Section 363 of the Bankruptcy
Code, and (2) California's Genetic Information Privacy Act (GIPA), including its legislative
history.

1.    The Proposed Sale to Regeneron Is a Transfer of Genetic Data

23andMe's proposed sale of genetic data has at times been (mis)characterized as going-
concern sale of 23andMe.  This appears to be an attempt to strategically avoid application of
various state laws that are triggered by transfers or disclosures of genetic information (e.g.,
GIPA).  *See, e.g.*, Regeneron Press Release, May 19, 2025 ("23andMe will be operated as a
wholly owned direct or indirect subsidiary of Regeneron Pharmaceuticals, Inc. and continue
operations as a personal genomics service.").[1]

These characterizations are misleading.  The proposed sale is not a sale of 23andMe as a
corporate entity, but unequivocally an asset sale of the genetic data that 23andMe possesses.
23andMe filed a motion to sell assets under 11 U.S.C. § 363 ("Use, sale, or lease of property")

---

[1] https://investor.regeneron.com/news-releases/news-release-details/regeneron-enters-asset-
purchase-agreement-acquire-23andmer-256.

June 2, 2025
CA AG Supp. Ltr. to Prof. Richards (CPO)
Page **2** of **6**

and provided public notice of auction for the sale of assets.  ECF No. 30 at pp. 25, 70.  The operative sale document confirms the asset-sale nature of the proposed transaction:

- The document itself is titled an Asset Purchase Agreement (APA).  ECF No. 420 at pp. 7, 11.

- The APA states that 23andMe will "sell, transfer, convey, assign, deliver and set over" to Regeneron the "Acquired Assets" (*id.* at p. 32 [Section 2.1])—defined to include "all customer data and all biological samples …, including genetic data, processed genetic data" (*id.* at p. 12 [Section 1.1, "Acquired Assets," subsection (b)].).

- The APA expressly excludes "all shares of capital stock or other equity interests" from the sale.  *Id.* at p. 20 [Section 1.1, "Excluded Assets," subsection (t)].

- The APA requires delivery of "any physical Acquired Assets" to Regeneron.  *Id.* at p. 36 [Section 4.2(a)(iii)].

- 23andMe and Regeneron further agreed that the "sale, transfer, conveyance, assignment and delivery of the Acquired Assets will be effected pursuant to the General Assignment" (*id.* at p. 32 [Section 2.1]), which itself tells "ALL MEN BY THESE PRESENTS" that 23andMe "sells, assigns, transfers, conveys, sets over, and delivers" the Acquired Assets to Regeneron. *Id.* at p. 91.

23andMe's current Proposed Order further confirms that 23andMe proposes to transfer assets to Regeneron and that transferring assets requires complying with applicable non-bankruptcy law:  "The transfer of the Acquired Assets (a) constitutes a legal, valid, enforceable, and effective transfer, and (b) complies with the Bankruptcy Code and applicable non-bankruptcy law."  5/28/2025 Draft at p. 6.

Likely aware that the proposed sale of genetic data would trigger various applicable state laws (e.g., GIPA), the APA includes a "Change in Ownership" provision that attempts to disclaim that any assets are being sold or transferred:  "[The parties] acknowledge and agree that the change of ownership of Customer Data included in the Acquired Assets … shall not constitute a sale, transfer or disclosure of Customer Data …."  (ECF No. 420 at p. 39 [Section 4.4].)  But this provision cannot undo reality.  The sale of genetic data contemplated by the APA is axiomatically a transfer to a third party.  *See* 11 U.S.C. § 101(54) ("The term 'transfer' means … each mode, direct or indirect … of disposing of or parting with … an interest in property."); *see also, e.g.*, *Jewett v. Comm'r*, 455 U.S. 305, 311 (1982) ("To a layman the word 'transfer' would normally describe a change in ownership of an existing interest ….").

June 2, 2025
CA AG Supp. Ltr. to Prof. Richards (CPO)
Page **3** of **6**

2. <u>California's Genetic Information Privacy Act (GIPA) Specifically Protects California Consumers When Their Genetic Data Is Sold</u>

In late 2021, the California Legislature passed the Genetic Information Privacy Act (GIPA) to specifically regulate direct-to-consumer genetic testing companies and provide consumers with robust protections for genetic data.[2]  GIPA accomplishes this in a number of ways, including by protecting consumers when a company sells, transfers, or otherwise discloses their genetic data to a third party:

- GIPA requires a "direct-to-consumer genetic testing company" to "[o]btain a consumer's express consent for collection, use, and disclosure of the consumer's genetic data, including at a minimum, <u>separate and express consent</u> for each of the following:

    (D) Each transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider, including <u>the name of the third party</u> to which the consumer's genetic data or biological sample will be transferred or disclosed."[3]  Cal. Civ. Code, § 56.181, subd. (a)(2)(D) (emphasis added).

- GIPA provides a thorough definition of "express consent":

    A consumer's affirmative authorization to grant permission in response to a clear, meaningful, and prominent notice regarding the collection, use, maintenance, or disclosure of genetic data for a specific purpose. The nature of the data collection, use, maintenance, or disclosure shall be conveyed in clear and prominent terms in such a manner that an ordinary consumer would notice and understand it. Express consent cannot be inferred from inaction. Agreement obtained through use of dark patterns does not constitute consent.  *Id.* § 56.18, subd. (b)(6).

---

[2] Thus, GIPA is later in time and more specific than the California Consumer Privacy Act (CCPA), which was passed by the legislature in 2018 and amended by the California Privacy Rights Act in 2020.

[3] GIPA does not define "third party" but does state that "'third party' does not include a public or private nonprofit postsecondary educational institution to the extent that the consumer's genetic data or biological sample is disclosed to a public or private nonprofit postsecondary educational institution for the purpose of scientific research or educational activities as described in paragraph (4) of subdivision (b) of Section 56.184."  Cal. Civ. Code, § 56.181, subd. (a)(2)(F).

June 2, 2025
CA AG Supp. Ltr. to Prof. Richards (CPO)
Page **4** of **6**

- GIPA adds further clarity to "express consent" by defining "affirmative authorization" as "an action that demonstrates an intentional decision by the consumer." *Id.* § 56.18, subd. (b)(1).

- GIPA also defines "dark patterns" as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." *Id.* § 56.18, subd. (b)(4).

GIPA's legislative history provides extensive discussion of the California Legislature's concerns regarding genetic data's sensitivity and the need for consumer control over their genetic data. The legislature recognized the "unique sensitivity of genetic data":

> Taken together, the fact that genetic data is immutable, specific to an individual, revealing of sensitive information about kin and kinship, of ever-increasing informational value, and capable of revealing sensitive health information, renders this data unique even among categories of PI in its sensitivity. Consequently, it is critical that privacy and consumer protection laws treat these data accordingly."[4]

The legislature sought to protect the privacy, security, and integrity of consumers' genetic data by requiring direct-to-consumer genetic testing companies to, among other things, "provide clear disclosures and more consumer control."[5]  The legislature discussed the need for and importance of obtaining separate and express consent to the named third party in a manner that avoids dark patterns:

- "[T]he bill requires DTC companies to obtain a consumer's *express* consent to the collection, use, and disclosure of the consumer's genetic data.  The bill includes a robust definition for 'express consent' that ensures meaningful consumer control. This is all the more significant because many companies deploy methods to undermine truly informed consent."[6]

---

[4] Assem. Com. on Privacy & Consumer Protection, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) as amended Jun. 17, 2021, pp. 5-6.
    The legislature's bill analysis for the Genetic Information Privacy Act's is at: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB41.  The Act's entire legislative history, including votes and amendments, can also be navigated to from that link.

[5] Sen. Rules Com., Office of Senate Floor Analysis, 3d reading analysis of Sen. Bill No. 41 (2021-2022 Reg. Sess.) as amended Jun. 11, 2021, p. 4.

[6] Sen. Com. on Judiciary, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) Dec. 7, 2020, p. 8 (emphasis original); Assem. Com. on Judiciary, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) as amended Jun. 17, 2021, p. 10 (emphasis original).

June 2, 2025
CA AG Supp. Ltr. to Prof. Richards (CPO)
Page **5** of **6**

- "In order to ensure more meaningful control and informed decision making, the bill requires a consumer's affirmative authorization in response to a 'clear, meaningful, and prominent notice' regarding the relevant actions taken with the genetic data and the specific purpose for it."[7]

- "Furthermore, to avoid another dark pattern involving a company securing consent in a single instance for a broad array of purposes, the obligation for security consent in the bill includes the requirement that these companies, at a minimum, secure *separate* and express consent for each of the following: … [¶] each transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed[.]"[8]

The Attorney General enforces the GIPA.  Cal. Civ. Code, § 56.182, subd. (c).  GIPA provides for civil penalties of up to $1,000 per negligent violation and up to $10,000 per willful violation.  *Id.* § 56.182, subd. (a), (b).[9]  A violation of GIPA is also an unlawful business act or practice that may serve as a predicate violation to a cause of action under California's Unfair Competition Law (UCL).  Cal. Bus. & Prof. Code § 17200 ("unfair competition shall mean and include any <u>unlawful</u>, unfair or fraudulent business act or practice") (emphasis added).[10]  Civil penalties under the California's UCL are up to $2,500 per violation, mandatory, and cumulative of penalties available under other state statutes.  *Id.* §§ 17205, 17206.

*      *      *

---

[7] Sen. Com. on Judiciary, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) Dec. 7, 2020, p. 8; Assem. Com. on Judiciary, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) as amended Jun. 17, 2021, p. 10.

[8] Sen. Com. on Judiciary, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) Dec. 7, 2020, p. 9 (emphasis original); Assem. Com. on Judiciary, com. on Sen. Bill No. 41 (2021-2022 Reg. Sess.) as amended Jun. 17, 2021, p. 10 (emphasis original).

[9] Penalties recovered under the Act are to be paid to the individual to whom the genetic data at issue pertains. Cal. Civ. Code, § 56.182, subd. (d).

[10] *Saunders v. Superior Court* 27 Cal. App. 4th 832, 838-39 (1994); see also *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.* 20 Cal. 4th 163, 180 (1999) (The "unlawful" prong of the unfair competition statute proscribes "'anything that can properly be called a business practice and that at the same time is forbidden by law.'").

June 2, 2025
CA AG Supp. Ltr. to Prof. Richards (CPO)
Page **6** of **6**


       Please reach out if you have any questions of if we can provide any further assistance. We can make ourselves available at your convenience.

                            Sincerely,

                            YEN P. (TiTi) NGUYEN
                            Deputy Attorney General

               For     ROB BONTA
                         Attorney General


Cc: Nicklas A. Akers, Senior Assistant Attorney General, Nicklas.Akers@doj.ca.gov
   Stacey D. Schesser, Supervising Deputy Attorney General, Stacey.Schesser@doj.ca.gov
   Bernard Eskandari, Supervising Deputy Attorney General, Bernard.Eskandari@doj.ca.gov
   Daniel Nadal, Deputy Attorney General, Daniel.Nadal@doj.ca.gov
   Kirk Nahra, Esq., Wilmer Cutler Pickering Hale & Dorr LLP, Kirk.Nahra@wilmerhale.com
   Ali A. Jessani, Esq., Wilmer Cutler Pickering Hale & Dorr LLP, Ali.Jessani@wilmerhale.com
   Ryan Durrie, Associate Director, Cordell Institute for Policy in Medicine & Law, Washington University in St. Louis, rdurrie@wustl.edu

**Appendix H -  Letter from Lise Girard, Chair of the Commission d'accès à l'information (Quebec) to the Office of the U.S. Trustee, dated May 15, 2025**

*TRANSLATION*

<u>BY EMAIL</u>

May 15, 2025

| | |
|---|---|
| Jerry Jensen, Acting U.S. Trustee | Carole J. Ryczek, Trial Attorney |
| Office of the U.S. Trustee Region 13 South | carole.ryczek@usdoj.gov |
| 10th Street, Suite 6.353 | |
| St. Louis, MO 63102 | |
| Paul A. Randolph, Assistant U.S. Trustee | |
| paul.a.randolph@usdoj.gov | |

**Reference: Reminder that 23andMe is subject to Québec's Act Respecting the Protection of Personal Information in the Private Sector**

Madam,
Sirs,

As Chair of the Commission d'accès à l'information du Québec (the Commission), I am deeply concerned about the recent bankruptcy of your enterprise, 23andMe, with regard to the protection of the personal information of Quebec clients. Having reviewed the bankruptcy judgment rendered by the Honourable Justice Brian C. Walsh and following the developments reported in the media, I would like to remind you that the enterprise is subject to the Québec's ***Act respecting the protection of personal information in the private sector***[1]. **This Act applies to any enterprise that collects, uses, or communicates the personal information of Quebecers.** The Commission is responsible for monitoring enterprises' compliance with the Private Sector Act in order to protect the privacy rights of Quebec citizens. It also has the power to impose penalties for any failure to comply with the Act.

In this context, I am writing to you to ensure that the personal information rights of 23andMe's Quebec clients are respected.

As you know, genetic data is some of the most sensitive information about an individual. It can reveal very intimate information not only about the private lives of the people who provided it, but also about those who are genetically linked to them.

---

[1] C.Q.L.R. chapter P-39.1; hereinafter the Private Sector Act.

While the Commission appreciates 23andMe's recent declaration that potential purchasers will be required to comply with its privacy policy and applicable laws, the Commission is concerned about a clause in 23andMe's privacy policy stating that the enterprise "may make changes to its privacy statement from time to time" and thereby potentially invalidate the enterprise's, or a potential purchaser's, commitment to protect its clients' personal information.

**23andMe's compliance with the Private Sector Act**

Quebec legislation contains several regulations relating to personal information and specific provisions concerning sensitive personal information, particularly with respect to consent. It also sets out specific obligations regarding commercial transactions that may apply during the bankruptcy process.

Consequently, the enterprise is affected by sections 6, 12, 13, and 18.4 of the Private Sector Act, among others.

Allow me to insist on the notion of consent in section 13, which stipulates the following:

> "**13.** No person may communicate to a third person the personal information he holds on another person, unless the person concerned consents to, or this Act provides for, such communication.
>
> Such consent must be given expressly when it concerns sensitive personal information."

I also think it is appropriate to quote section 18 with regard to the obligations of enterprises in commercial transactions:

> "**18.4.** Where the communication of personal information **is necessary for concluding a commercial transaction to which a person carrying on an enterprise intends to be a party, the person may communicate such information, without the consent of the person concerned, to the other party to the transaction.**
>
> **An agreement** must first be entered into with the other party that stipulates, among other things, that the latter undertakes
>
> 1° to use the information only for concluding the commercial transaction;
>
> 2° not to communicate the information without the consent of the person concerned, unless authorized to do so by this Act;
>
> 3° to take the measures required to protect the confidentiality of the information; and
>
> 4° to destroy the information if the commercial transaction is not concluded or if using the information is no longer necessary for concluding the commercial transaction.

2

> **Where the commercial transaction has been concluded and the other party wishes to continue using the information or to communicate it, that party may use or communicate it only in accordance with this Act. Within a reasonable time after the commercial transaction is concluded, that party must notify the person concerned that it now holds personal information concerning him because of the transaction.**
>
> For the purposes of this section, "commercial transaction" means the alienation or leasing of all or part of an enterprise or of its assets, a modification of its legal structure by merger or otherwise, the obtaining of a loan or any other form of financing by the enterprise or of a security taken to guarantee any of its obligations.**"**

Given that the enterprise 23andMe is subject to the Act, the Commission expects, amongst other things that Quebecers who are concerned by a commercial transaction involving 23andMe will be informed of the context in which their sensitive personal information is held. This will enable them to exercise their right to privacy, including the right to demand the destruction, correction, or withdrawal of consent to the use of their genetic data.

In this context, it is important that potential purchasers know that the Commission will not hesitate to use its supervisory powers, against 23andMe or any third party that acquires the personal information of 23andMe's clients, to ensure that the rights of Quebecers regarding their personal information are respected.

Moreover, upon reading the bankruptcy judgment handed down in the State of Missouri by the United States Bankruptcy Court, Eastern Division, we noted the existence of a "data room" containing confidential information held by 23andMe. Our understanding of this ruling is that any offer to purchase made to the enterprise will have to be accompanied by a prior confidentiality agreement in order to access the sensitive personal information in the "data room". Although this protection measure "echoes" to some extent the content of the aforementioned section 18.4, it does not, on its own, make it possible to comply with its prescriptions.

The Commission takes this opportunity to reiterate its support for the request to appoint a consumer privacy ombudsman to protect personal information in 23andMe's bankruptcy.

In connection with the enterprise's ongoing reorganization, please forward this letter to all members of the board of directors of 23andMe and the Special Committee of the Board of Directors of the company referred to in the order issued by the Honourable Judge Brian C. Walsh, as well as to any other person in charge of protecting personal information at 23andMe.

Remember also that, in the interests of transparency, this letter will be made public. The Commission has also issued a warning to 23andMe's Quebec customers.

3

In closing, should you require any additional information, please consult our our website or contact Madam Naomi Ayotte, Vice-President and member of the Commission's Oversight Section at 418 528-7741 or at Naomi.Ayotte@cai.gouv.qc.ca.

Thank you for your attention to this matter.

Lise Girard
Chair of the Commission d'accès à l'information

## **Appendix I - Letter from Diane McLeod, Information and Privacy Commissioner of Alberta to the Office of the U.S. Trustee, dated May 20, 2025**



Office of the Information and
Privacy Commissioner of Alberta

*Sent by email*

May 20, 2025

Jerry Jensen, Acting U.S. Trustee
Paul A. Randolph, Assistant U.S. Trustee
Carole J. Ryczek, Trial Attorney
Office of the U.S. Trustee Region 13 South

paul.a.randolph@usdoj.gov
carole.ryczek@usdoj.gov

Dear Counsels:

**RE: Reminder that 23andMe is subject to Alberta's *Personal Information Protection Act***

As Alberta's Information and Privacy Commissioner, I write in the context of the bankruptcy proceedings of 23andMe, Inc. ("23andMe"), to remind parties in the proceedings about legal requirements applicable to the personal information belonging to Albertans.

To the extent that 23andMe has collected, processed or retained genetic and other personal information of Albertans, it is subject to Alberta's *Personal Information Protection Act* (PIPA). PIPA governs the collection, use, disclosure, retention, and disposal of personal information by private sector organizations operating within, or having a real and substantial connection to, Alberta.

Genetic data constitutes highly sensitive personal information. It can reveal intimate details not only about individuals but also about their familial and ancestral connections. PIPA sets a high standard for the protection of such data, particularly regarding consent, reasonable purposes, access, safeguards, and the handling of personal information in business transactions.

In the context of a commercial transaction, personal information may be disclosed without consent only if certain conditions are met under section 22 of PIPA:

- The disclosure is necessary for evaluating or carrying out the transaction,
- The parties to the transaction must enter into an agreement that limits use to the transaction purpose, mandates protection of the information, and requires its return or destruction if the transaction does not proceed, and

410-9925 109 Street NW
Edmonton  Alberta  T5K 2J8

**Phone**    780 422 6860
**Toll-Free**  1 888 878 4044

generalinfo@oipc.ab.ca
www.oipc.ab.ca

- **Following the completion of the transaction, individuals <u>must be notified</u> within a reasonable time that their personal information has been transferred.**

Any failure to comply with these requirements constitutes a contravention of Alberta's privacy law and may result in investigation and enforcement action by my office.

An additional concern for me is the language in 23andMe's privacy policy[1] that allows unilateral changes, potentially undermining protections originally promised to individuals who sent their genetic information to 23andMe to use the company's services. Any attempt by a purchaser to rely on such a clause to broaden use or disclosure of Albertans' personal information post-transaction would contravene PIPA unless new, explicit consent is obtained.

Given these considerations, I expect that:

- All purchasers and parties involved in the potential acquisition of 23andMe's assets fully comply with Alberta's PIPA;
- Personal information continues to be protected by adequate administrative, technical, and physical safeguards, both during the transaction and following any change of control;
- No personal information is disclosed or used beyond what is strictly necessary to evaluate or complete the transaction without express consent.

My office will continue to monitor this situation closely and will not hesitate to exercise its investigative and enforcement powers under PIPA to ensure the protection of Albertans' privacy rights. Please forward this correspondence to all members of 23andMe's board of directors, the Special Committee overseeing the reorganization, and any officers responsible for privacy compliance.

Please note that this letter will be made public on my office's website. Like other information and privacy Commissioners in Canada, I have also issued a warning to 23andMe's customers in Alberta[2].

Sincerely,

Diane McLeod

Information and Privacy Commissioner

---

[1] https://www.23andme.com/en-ca/legal/privacy/full-version/
[2] https://oipc.ab.ca/information-and-privacy-commissioner-highlights-albertans-privacy-options-following-23andme-bankruptcy-filing/

**Appendix J - Letter from Legal Scholars to the CPO, dated June 6, 2025**

June 6, 2025

Neil Richards
Washington University School of Law
1 Brookings Dr.
St. Louis, MO 63130

Dear Professor Richards:

We are law professors with expertise in bioethics, privacy, and health law, and we write to express our concerns about the possible sale of certain assets currently held by 23andMe (including 23andMe Holding Co. and affiliated debtors) as part of the bankruptcy proceeding. It is our understanding that these assets are subject to a sale hearing before the Honorable Bankruptcy Judge Brian C. Walsh on June 17, 2025. As the court-appointed Consumer Privacy Ombudsman, we request that you consider these comments when drafting your report and that you attach this letter to your report when you submit it to the court.

### 23andMe's Business and Relevant Assets

23andMe operated a direct-to-consumer DNA analysis service. Consumers would buy a kit from 23andMe (or an affiliated seller), fill a testing device with saliva, and ship the kit back to 23andMe.[1] Once in possession of the saliva sample, 23andMe (or its laboratory partner) would extract DNA from cells in the sample, genotype or sequence significant portions of that DNA, analyze the resulting data, and make the results of that analysis available to the consumer who registered the kit on 23andMe's website.[2] Residual saliva would either be retained by the lab or destroyed.[3] Data developed through 23andMe could include estimates of geographic ancestry, health risks to the consumer or potential future children, and other traits.[4] Consumers were invited to opt in to the DNA Relatives feature, which "allows you to find and connect with genetic relatives and see specific DNA segments you share with them."[5] In addition, consumers were invited to opt in to allow their genetic data to be used in research.[6] As part of this research effort, consumers were asked to complete survey

---

[1] *Where to Buy 23andMe DNA Test Kit?*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/115014501108-Where-to-Buy-23andMe-DNA-Test-Kit.

[2] *How Does 23andMe Genotype My DNA?*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/202904610-How-Does-23andMe-Genotype-My-DNA; *Difference Between DNA Genotyping & Sequencing*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/202904600-Difference-Between-DNA-Genotyping-Sequencing.

[3] *Privacy*, 23ANDME, https://www.23andme.com/privacy/.

[4] *What You Can Learn*, 23ANDME, https://customercare.23andme.com/hc/en-us/sections/200565460-What-You-Can-Learn.

[5] *What Ancestry Information Can I Learn from 23andMe?*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/115013846688-What-Ancestry-Information-Can-I-Learn-from-23andMe.

[6] *Becoming Part of Something Bigger*, 23ANDME, https://www.23andme.com/research/.

questions online, which would be linked with their genetic data.[7] Finally, consumers had the option to allow 23andMe to store their samples, called biospecimens, into the future.[8]

23andMe's dataset for sale includes personal information from over 15 million consumers.[9] Importantly, this dataset includes genetic information as well as other personal details, such as samples, broad self-reported data related to health or other behavioral variables, and registration information, including consumers' addresses and credit card information.[10] A dataset of this magnitude requires heightened protection in terms of privacy and security, and 23andMe itself struggled to keep this data protected, suffering a data privacy breach in 2023.[11]

## Federal and State Privacy Laws Offer Insufficient Protection for Most 23andMe Consumers

23andMe promises consumers that "potential buyers must, among other requirements, agree to comply with 23andMe's consumer privacy policy and all applicable laws."[12] However, if the applicable laws provide insufficient protection for consumers, then consumers can only rely on a buyer's promises in the privacy policy, which can be changed after the sale (see more below). The Health Insurance Portability and Accountability Act (HIPAA) is a key federal law in the U.S. that protects the use and disclosure of certain health information. However, HIPAA is limited in its scope and applies to "covered entities" (e.g., most healthcare providers) and their "business associates," but it typically does *not* apply to direct-to-consumer genetic testing companies like 23andMe or biotechnology companies like Regeneron.[13] In contrast to other jurisdictions like the EU, the U.S. does *not* have a federal privacy law that comprehensively protects Americans' personal information and gives them numerous rights over their data, such as the right to erasure.[14]

---

[7] *Becoming Part of Something Bigger*, 23ANDME, https://www.23andme.com/research/.

[8] *Privacy Statement*, 23ANDME, https://www.23andme.com/legal/privacy/full-version/.

[9] *An Open Letter to 23andMe Customers*, 23ANDME, https://blog.23andme.com/articles/open-letter.

[10] *Privacy Statement*, 23ANDME, https://www.23andme.com/legal/privacy/full-version/

[11] Sara Gerke, Melissa B. Jacoby & I. Glenn Cohen, *Bankruptcy, Genetic Information, and Privacy— Selling Personal Information*, 392 NEW ENG. J. MED. 937 (2025), https://www.nejm.org/doi/abs/10.1056/NEJMp2415835.

[12] News Release, 23andMe, 23andMe Confirms All Potential Buyers Must Agree to Comply with Privacy Policy and Applicable Law (Mar. 26, 2025),https://www.globenewswire.com/news-release/2025/03/26/3050213/0/en/23andMe-Confirms-All-Potential-Buyers-Must-Agree-to-Comply-With-Privacy-Policy-and-Applicable-Law.html.

[13] Sara Gerke, Melissa B. Jacoby & I. Glenn Cohen, *Bankruptcy, Genetic Information, and Privacy— Selling Personal Information*, 392 NEW ENG. J. MED. 937 (2025) ; Sara Gerke, Melissa B. Jacoby & I. Glenn Cohen, 23andMe's *Bankruptcy Raises Concerns About Privacy in the Era of Big Data*, 389 BMJ r1071 (2025), https://www.bmj.com/content/389/bmj.r1071.full.pdf

[14] Sara Gerke, Melissa B. Jacoby & I. Glenn Cohen, *23andMe's Bankruptcy Raises Concerns About Privacy in the Era of Big Data*, 389 BMJ r1071 (2025), https://www.bmj.com/content/389/bmj.r1071.full.pdf.

2

Some protection exists for 23andMe consumers under U.S. state laws. A minority of states have adopted general data privacy laws in recent years, such as California, Colorado, and Delaware.[15] A number of states have also adopted a model Genetic Information Privacy Act, which regulates how direct-to-consumer genetic testing companies handle sensitive data.[16] These laws generally apply only to direct-to-consumer genetic testing companies, defined as "an entity that (a) offers consumer genetic testing products or services directly to consumers; or (b) collects, uses, or analyzes genetic data that a consumer provides to the entity."[17] If the buyer does not meet this definition, these privacy protections may no longer be applicable.

**After a Sale, a Buyer Could Change the Terms of Service and Privacy Policy**

In the absence of comprehensive privacy protections, a company's terms of service and privacy policy govern. Therefore, most Americans are dependent on what 23andMe and its future buyer promise.[18] 23andMe has stated that a buyer must comply with its consumer privacy policy,[19] but the privacy policy allows a buyer to change those terms following the sale. Generally, companies maintain the right to unilaterally change the terms.[20] In its terms of service, 23andMe "reserves the right at any time to modify or discontinue, temporarily or permanently, the Services (or any part thereof) with or without notice."[21] Moreover, 23andMe's terms of service state, "Notices to you may be made via either email or regular mail. 23andMe may also provide notices of changes to the Terms or other matters by displaying notices or links to notices to you generally on or through the Services."[22] Additionally, 23andMe's current privacy policy provides, "We may make changes to this Privacy Statement from time to time. We'll let you know about those changes here or by reaching out to you via email or some other contact method, such as through in-app

---

[15] *State Privacy Law Chart*, IAPP, https://iapp.org/resources/article/us-state-privacy-legislation-tracker/#state-privacy-law-chart.

[16] Anya E.R. Prince, *The Genetic Information Privacy Act: Drawbacks and Limitations*, 330 JAMA 2049 (2023), https://jamanetwork.com/journals/jama/fullarticle/2811606;

[17] Utah 2021    SB227   Genetic Information Privacy Act

[18] Sara Gerke, Melissa B. Jacoby & I. Glenn Cohen, *Bankruptcy, Genetic Information, and Privacy—Selling Personal Information*, 392 NEW ENG. J. MED. 937 (2025) ; Sara Gerke, Melissa B. Jacoby & I. Glenn Cohen, 23andMe's *Bankruptcy Raises Concerns About Privacy in the Era of Big Data*, 389 BMJ r1071 (2025), https://www.bmj.com/content/389/bmj.r1071.full.pdf

[19] News Release, 23andMe, 23andMe Confirms All Potential Buyers Must Agree to Comply with Privacy Policy and Applicable Law (Mar. 26, 2025), https://www.globenewswire.com/news-release/2025/03/26/3050213/0/en/23andMe-Confirms-All-Potential-Buyers-Must-Agree-to-Comply-With-Privacy-Policy-and-Applicable-Law.html.

[20] Jessica L. Roberts & Jim Hawkins**,** *When Health-Tech Companies Change Their Terms of Service*, Policy Forum, 367 SCIENCE 745 (2020); Leah R. Fowler, Jim Hawkins, & Jessica L. Roberts, *Uncertain Terms*, 97 NOTRE DAME L. REV. 1 (2021).

[21] *Other Things to Know: Modifications, Termination, and Survival*, 23ANDME, https://www.23andme.com/legal/terms-of-service/#other-things-to-know.

[22] *Other Things to Know: Modifications, Termination, and Survival*, 23ANDME, https://www.23andme.com/legal/terms-of-service/#other-things-to-know.

notification, or on another website page or feature."[23] Consumers, however, rarely read terms of service or privacy policies in full or check back for updates.[24]

## Genetic Data Is Private, Sensitive Data that Merits Protection

Genetic data is sensitive, personal, and presumptively private[25]—and using a service like 23andMe should not forfeit that privacy.[26] The data developed by direct-to-consumer genetic testing companies, like 23andMe, can inform assessments about an individual's identity, genetic relatedness, physical traits, and even potential health risks. While other data sources may be *about* people, genetic data, in a very real sense, *is* people. Given the unique nature of one's genetic code, there are risks of reidentifying individuals from their data, even after their names and other identifying information are removed.[27] Moreover, the family-tree building power of consumer genetics data means that a database of 15 million people makes hundreds of millions, if not billions, of people indirectly identifiable.[28] Robust privacy protection for genetic data is therefore even more essential, since it is only the consumers, and not their genetic relatives, who give consent.

## Genetic Data is Susceptible to Misuse and Discrimination

The privacy of genetic information is all the more important given gaps in U.S. discrimination law. The federal Genetic Information Nondiscrimination Act (GINA) prohibits discrimination in health insurance and employment but does not regulate the use of genetic information by other entities. One area of concern is how life, long-term care, and disability insurers can underwrite based on genetic information, potentially leaving individuals uninsurable based on their genetic predispositions. State law creates a patchwork of regulation, but only Florida bars all three insurers from considering genetic information in underwriting.[29] Thus, if a buyer decides to change the privacy policy after the sale, sharing genetic data with life, long-term care, and disability insurers would not be protected under GINA and could be legally permissible in most states.

Additionally , law enforcement access to or use of genetic data stored by 23andMe would be a betrayal of consumers' trust. Since the 2018 arrest of Joseph

---

[23] *Other Things to Know About Privacy*, 23andMe, https://www.23andme.com/legal/privacy/#other-things-to-know.

[24] *See* Natalie Ram, *Genetic Privacy After* Carpenter, 105 Va. L. Rev. 1357, 1397 (2019).

[25] Natalie Ram, *Genetic Privacy After* Carpenter, 105 Va. L. Rev. 1357, 1382-84 (2019); Natalie Ram, *DNA By The Entirety*, 115 Colum. L. Rev. 873, 891-98 (2015).

[26] Natalie Ram, *Genetic Privacy After* Carpenter, 105 Va. L. Rev. 1357, 1381-95 (2019); Natalie Ram, *DNA By The Entirety*, 115 Colum. L. Rev. 873, 891-98 (2015).

[27] Kayte Spector-Bagdady, *"The Google of Healthcare": Enabling the Privatization of Genetic Bio/Databanking*, 26 Ann. Epidemiol. 515 (2016).

[28] Natalie Ram, *Investigative Genetic Genealogy and the Problem of Familial Forensic Identification*, at 219, *in* Consumer Genetic Technologies: Ethical and Legal Considerations (I. Glenn Cohen, Nita Farahany, Henry T. Greely & Carmel Shachar, eds.) (Cambridge Univ. Press 2021).

[29] Jarrod O. Anderson, Anna C. Lewis & Anya E. Prince, *The Problems with Patchwork: State Approaches to Regulating Insurer Use of Genetic Information*, 22 DePaul J. Health Care L. (2021).

4

James DeAngelo as the Golden State Killer, who was identified as a suspect following uploading of crime scene DNA to several other consumer genetics platforms, 23andMe has assured consumers that "we will closely scrutinize all law enforcement requests and we will only comply with court orders, subpoenas, or search warrants that we determine are legally valid—we are prepared to exhaust available legal remedies to protect customer privacy."[30] 23andMe marketed itself, in part, based on its commitment to resist law enforcement access.[31] Yet, the scale of 23andMe's genetic data makes it a tempting target for law enforcement. Law enforcement could seek access to or use of 23andMe consumers' genetic data in a number of ways, including coordinating directly with the buyer of those assets or if the buyer permits consumers to upload genetic data developed elsewhere. Despite its own contrary guidance,[32] the FBI has uploaded casework DNA profiles to platforms that permit third-party uploads but do not authorize that pathway for law enforcement.[33]

**Biospecimens Merit at Least as Much Protection as Genetic Data**

As discussed above, the genetic data held by 23andMe is derived from the spit sample that consumers originally provided to the company. This means that 23andMe is in possession of not only the consumer's genomic and potentially survey data, but also potentially their saliva specimen. While 23andMe has an explicit consent for specimen storage,[34] it is unclear what share of consumers have requested 23andMe destroy their residual saliva specimen. 23andMe's privacy policy, terms of service, or biobanking consent document[35] do not speak to the sale of those biospecimens, even as these policies were amended to account for bankruptcy-related sale of related data. Specifically, 23andMe's terms of service provide, "If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity."[36] Personal Information, in turn, is defined to include the information stemming from the biospecimen.[37] But these policies do not address the residual spit

---

[30] *Transparency Report*, 23ANDME, https://www.23andme.com/transparency-report/

[31] Natalie Ram, *Genetic Privacy After* Carpenter, 105 VA. L. REV. 1357, 1406-11 (2019) (describing 23andMe's emphasis on refusing law enforcement use following the Golden State Killer case).

[32] U.S. DEP'T OF JUSTICE, INTERIM POLICY: FORENSIC GENETIC GENEALOGICAL DNA ANALYSIS AND SEARCHING (approved Sept. 2, 2019), https://www.justice.gov/olp/page/file/1204386/dl.

[33] Mike Baker, *To Identify Suspect in Idaho Killings, F.B.I. Used Restricted Consumer DNA Data*, N.Y. TIMES (Feb. 25, 2025), https://www.nytimes.com/2025/02/25/us/idaho-murders-bryan-kohberger-dna.html.

[34] *Your Privacy Settings and Controls*, 23ANDME, https://www.23andme.com/legal/privacy/#your-privacy-controls.

[35] *Biobanking Consent Document*, 23ANDME, https://www.23andme.com/about/biobanking/

[36] *Data Sharing*, 23ANDME, https://www.23andme.com/legal/privacy/#data-sharing.

[37] *The Information 23andMe Collects*, 23ANDME, https://www.23andme.com/legal/privacy/#information-we-collect (defining, among "Personal Information we collect," "Sample Information: information regarding any sample, such as a saliva sample, that you submit for processing to be analyzed to provide you with Genetic Information, laboratory values or other data provided through our Services").

5

sample itself. Nonetheless, in addition to genomic information, these saliva samples contain a wide range of biomolecules associated with health information such as infectious diseases (e.g., COVID-19) and other systemic diseases (e.g., Crohn's).[38]

If 23andMe consumers consent to research, the Research Consent form states that, in addition to its typical Single Nucleotide Polymorphism (SNP) analysis (which assesses variations at a predetermined set of locations in the genome),[39] it might conduct whole genome sequencing (WGS) on the sample.[40] WGS not only generates much more genomic information than SNP analyses, but can also make the data more identifiable.[41] 23andMe also states it may analyze microbiome data which can "provide a snapshot of the trillions of microbes found in a human body, which may influence health and wellness."[42]

23andMe consumers are asked if they would like to have their biospecimen destroyed after their genetic data is analyzed "subject to laboratory legal and regulatory requirements."[43] Its Biobanking Consent adds that "samples are stripped of personal identifiers (i.e. name and contact information)."[44] But, despite the fact that people report wanting to be clearly notified of commercial use of their specimens[45] and are often confused by disclosures regarding specimen commercialization,[46] they must read four different documents (Privacy Statement,[47] Biobanking Consent Document,[48] Research Consent Document,[49] and the Terms of Service[50]) to understand what may be done with their specimen, which can be confusing.[51]

The disposition of biospecimens for research caught the public eye with the publication of the 2010 *The Immortal Life of Henrietta Lacks* about an important cancer cell line derived from an impoverished, Black patient's sample without her

---

[38]Janice M. Yoshizawa et al., *Salivary Biomarkers: Toward Future Clinical and Diagnostic Utilities*, 26 CLIN. MICOBIOL. REV. 781 (2013).

[39] *How 23andMe Reports Genotypes*, 23ANDME, https://customercare.23andme.com/hc/en-us/articles/212883677-How-23andMe-Reports-Genotypes

[40] *Research Consent Document*, 23ANDME, https://www.23andme.com/about/consent/

[41] Mara Thomas et al., *Assessing Privacy Vulnerabilities in Genetic Data Sets: Scoping Review*, 5 JMIR BIOINFORM. BIOTECHNOL. e54332 (2024).

[42] *Research Consent Document*, 23ANDME, https://www.23andme.com/about/consent/

[43] *Privacy Statement*, 23ANDME, https://www.23andme.com/legal/privacy/full-version/

[44] *Biobanking Consent Document*, 23ANDME, https://www.23andme.com/about/biobanking/

[45] Kayte Spector-Bagdady et al., *Reported Interest in Notification Regarding Use of Health Information and Biospecimens*, 328 JAMA 474 (2022)

[46] Kayte Spector-Bagdady et al., *"My Research Is Their Business, but I'm Not Their Business": Patient and Clinician Perspectives on Commercialization of Precision Oncology Data*, 25 ONCOLOGIST 620 (2020).

[47] *Privacy Statement*, 23ANDME, https://www.23andme.com/legal/privacy/full-version/

[48] *Biobanking Consent Document*, 23ANDME, https://www.23andme.com/about/biobanking/

[49] *Research Consent Document*, 23ANDME, https://www.23andme.com/about/consent/

[50] *Terms of Service*, 23ANDME, https://www.23andme.com/legal/terms-of-service/

[51] Kayte Spector-Bagdady, *"The Google of Healthcare": Enabling the Privatization of Genetic Bio/Databanking*, 26 ANN. EPIDEMIOL. 515 (2016).

explicit consent.[52] Backlash over unconsented research use of specimens reached such a furor[53] that the federal government briefly considered offering more protections for specimens than data in federally funded work because of a "distinct autonomy interest in research using biospecimens."[54] In fact, many individuals express discomfort with commercial use of their specimens, even when they are de-identified.[55] They are particularly concerned when commercial interests share genomic information with additional parties for profit,[56] and have reported that they would like to be able to choose specifically *which* commercial companies to share with.[57] This has led major academic medical centers to change their specimen sharing policies to be more protective of patients.[58]

### Recommendations

In view of the foregoing concerns, we recommend (at least) the following conditions on the sale of 23andMe assets, including genetic data, biospecimens, and survey responses:

- The buyer agrees, at a minimum, to comply with the privacy and data security protections of the Genetic Information Privacy Act for all consumers;
- The buyer agrees that it will not share with or facilitate use by insurers or law enforcement of genetic or survey information in any manner;
- The buyer agrees not to re-identify any de-identified personal information, and to include a similar requirement in any third-party sharing agreement;
- The buyer agrees to obtain explicit, meaningful consent from consumers for any material changes to the terms of service or privacy policy that affect personal information or biospecimens collected under the 23andMe policies, including (but not limited to) changes to identifiability of data or procedures for deletion of accounts; and
- Prior to the transfer of any biospecimen to the buyer, explicit, meaningful consent to that transfer shall be obtained from consumers.

---

[52] REBECCA SKLOOT, THE IMMORTAL LIFE OF HENRIETTA LACKS (2010).

[53] Kayte Spector-Bagdady et al., *Biospecimens, Research Consent, and Distinguishing Cell Line Research*, 5 JAMA ONCOL. 406 (2019)

[54] Federal Policy for the Protection of Human Subjects, 80 Fed. Reg. 53,933, 53,942 (2015).

[55] Kayte Spector-Bagdady et al., *Reported Interest in Notification Regarding Use of Health Information and Biospecimens*, 328 JAMA 474 (2022); Kayte Bagdady et al., *Respecting Autonomy and Enabling Diversity: The Effect of Eligibility and Enrollment on Research Data Demographics*, 40 HEALTH AFFS. 1892 (2021).

[56] Kayte Spector-Bagdady et al., *"My Research Is Their Business, but I'm Not Their Business": Patient and Clinician Perspectives on Commercialization of Precision Oncology Data*, 25 ONCOLOGIST 620 (2020).

[57] Kayte Spector-Bagdady et al., *Lessons for a Learning Health System: Effectively Communicating to Patients About Research with Their Health Information and Biospecimens*, 13 LEARNING HEALTH SYS. e10450 (2024).

[58] Kayte Bagdady et al., *Sharing Health Data and Biospecimens with Industry—A Principle-Driven, Practical Approach*, 382 NEW ENG. J. MED. 2072 (2020).

7

Thank you for this opportunity to express our concerns. We appreciate your consideration of these comments.


Sincerely,


Natalie Ram
Professor of Law
University of Maryland Francis King Carey School of Law

Sara Gerke
Associate Professor of Law & Richard W. & Marie L. Corman Scholar
Associate Professor, European Union Center
University of Illinois Urbana-Champaign College of Law

Anya E.R. Prince
Joseph F. Rosenfield Fellow and Professor of Law
University of Iowa College of Law

Shawneequa L. Callier, JD, MA Bioethics
Associate Professor
Department of Clinical Research and Leadership
School of Medicine and Health Sciences
The George Washington University

Dov Fox
Herzog Research Professor of Law
Director, Center for Health Law Policy & Bioethics
University of San Diego School of Law

Leslie Francis
Distinguished Professor of Philosophy
Distinguished Alfred C. Emery Professor of Law
University of Utah

Henry T. Greely
Deane F. and Kate Edelman Johnson Professor of Law
Professor, by courtesy, of Genetics
Director, Center for Law and the Biosciences
Stanford University

8

Valerie Gutmann Koch
Associate Professor and Faculty Director
Mary and Michael Jaharis Health Law Institute
DePaul University College of Law

Yaniv Heled
Professor of Law
Center for Intellectual Property Law
Center for Law, Health & Society
Georgia State University College of Law

Seema Mohapatra
M.D. Anderson Foundation Endowed Professor in Health Law and
Professor of Law
SMU Dedman School of Law

Jessica L. Roberts
Professor of Law, Artificial Intelligence, Machine Learning, and Data Science
Emory University School of Law

Sonia M. Suter
Professor of Law and Kahan Family Research Professor
The Henry St. George Tucker III Dean's Research Professor of Law
Co-Director, Health Law & Policy Program
The George Washington University Law School

9

**<u>Appendix K - Letter from Elizabeth Dreier, Global BioData Trust to CPO, dated June 6, 2025</u>**

**Subject:**                    FW: TIME SENSITIVE re: 23andMe Data Ombudsman

**From:** Elizabeth Dreicer
**Date:** June 6, 2025 at 7:22:54 PM EDT
**To:** "Richards, Neil"
**Cc:** Lauren McEachran
**Subject: TIME SENSITIVE re: 23andMe Data Ombudsman**

Dear Neil - I hope this message finds you well. I'm reaching out on behalf of The Global BioData Trust (Trust), a nonprofit initiative formed in response to the 23andMe bankruptcy proceedings to advocate for the ethical stewardship of genetic and biometric data.

The Trust represents a coalition of philanthropic, academic, and patient advocacy organizations committed to upholding privacy, bioethics, and individual rights in the context of research data governance. You can find more on our work via our website and recent press release.

We believe your role as Consumer Privacy Ombudsman is central to protecting individual consumer's privacy in the disposition of 23andMe's biobank and associated data. In that context, I wanted to share several critical concerns that we hope may inform your review and reporting:

- **Deletion and Withdrawal**: Nearly 2 million individuals have requested deletion from the platform. How can we be confident that genetic data—including chip readouts and biospecimens—are fully removed from internal systems, backups, and third-party research databases?
- **Consent and Conversion**: In light of informed consent principles, is it legally and ethically sound for data originally given under research or service terms to be converted into a transferable bankruptcy asset without renewed consent or individual control?
- **Risk of Reidentification**: We are particularly concerned about post-sale aggregation scenarios—for example, Regeneron's investment in Truveta and the potential for data convergence enabling reidentification or new forms of targeting.
- **Customer Equity**: While beyond your direct scope, it's notable that customers contributed more than $2B in fees to 23andMe. Yet those seeking to exit the transaction receive neither refunds nor confirmation of data removal—raising public trust and fairness issues.

Additional detailed questions follow in an Appendix below my signature block for your review and consideration.

Further, we would welcome the opportunity to share further context, including a suggested ethical Trust framework for any data transfer that upholds individual dignity and privacy.

In closing, Lauren McEachran (cc'd) can assist in coordinating a call at your convenience. We understand the tight timeline and appreciate the gravity of your assignment. Please also feel free to reach me on my mobile line directly and impromptu, including this weekend.

Best, Elizabeth

**Elizabeth Dreicer**
Chair, On behalf of The Global BioData Trust
www.globalbiodatatrust.org

<mark>Appendix</mark>

Below are some **questions** tailored to highlight the privacy and consent gaps uniquely exposed by the 23andMe bankruptcy. These are all structured to resonate with the focus on bankruptcy oversight and privacy protections:

# IRB Oversight and Participant Protection in Bankruptcy Context

**1.** *What role did 23andMe's IRB play in overseeing the collection, storage, commercialization, and now proposed sale of genetic data and biospecimens?*

*2. Was the IRB ever asked to evaluate or approve the liquidation of participant biodata and biospecimens as a standalone asset?*

*3. Should IRBs have standing in bankruptcy court when participant data rights and biospecimens are subject to asset sale, particularly when informed consent was given under different conditions?*

*4. Does the transfer of biospecimens and associated data in an asset-only sale trigger distinct ethical or legal obligations under the Common Rule, compared to a full corporate acquisition?*

*5. Has 23andMe's IRB process upheld principles of ongoing consent, withdrawal rights, and participant notification in light of these organizational changes? Why does 23andMe's Independent IRB phone line loop back to 23andMe and not their Independent IRB?*

### Contact Information for IRB-Related Inquiries

**23andMe Human Protections Administrator**
**Email**: hpa@23andme.comcdn.lawreportgroup.com
**23andMe Customer Care**
**Phone**: 1-800-239-5230
**Hours**: Monday–Friday, 9 AM–12 PM and 1–4 PM PT
**Online Support**:

Submit a request23andme.com+223andme.com+2cdn.lawreportgroup.com+2cdn.lawreportgroup.comresearch.23andme.com+4customercare.23andme.com+4int.customercare.23andme.com+4

For matters you prefer not to discuss with 23andMe directly, you may contact **Salus IRB**, the independent review board overseeing 23andMe's research. While specific contact details are not provided in the available sources, you can reach out to Salus IRB through their official website or contact 23andMe's Human Protections Administrator for assistance in connecting with the IRB. research.23andme.com+5research.23andme.com+5int.customercare.23andme.com+5cdn.lawreportgroup.com

# Data Deletion and Audit-ability

6. *When a customer requests data deletion, what exactly is deleted?* Specifically:

- Is the **raw genotype file** deleted from internal systems and backups?

- Are **imputed and derivative datasets** removed from research environments and third-party contracts?
- Are **biospecimens** and their metadata delinked or destroyed?

*7. Can the company provide a **transparent audit trail** of deletion across its Illumina pipeline, cloud storage, research datasets, and licensing relationships? Or is deletion functionally symbolic?*

## Partial Deletion and User Confusion

*8. Given the current deletion options (account deletion, sample destruction, withdrawal from research), does 23andMe track how many users have only partially deleted their data?*

*9. Is there evidence that customers misunderstand or are unintentionally leaving behind residual data due to design complexity or poor interface clarity?*

## Data Download and Individual Control

*10. Why does 23andMe not offer a **single-button, one-time export** of all personal data—raw genotype, reports, surveys, and sharing logs—without requiring fragmented, multi-step workflows and 48-hour gaps?*

*11. What are the abandonment or non-completion rates for users trying to download their data? What prevents compliance with basic digital rights design standards?*

**Appendix L - Letter from Richard Litman to CPO, dated June 2, 2025**

**Subject:**                                    FW: Submission Request to the Consumer Privacy Ombudsman

To: Professor Neil M. Richards
Consumer Privacy Ombudsman
In re: 23andMe Holding Co., et al.
Case No.: 25-40976-357 (Jointly Administered)
U.S. Bankruptcy Court for the Eastern District of Missouri

Re: Submission of Proposal Regarding Stewardship Trust Model for data and biological samples submitted for testing by 23andMe

Dear Professor Richards,

I respectfully submit the attached proposal, A Stewardship Trust for Genomic Data and Biological Samples, in connection with my statement of concern as an interested party in the above-captioned proceeding. I am a customer of 23andMe who tested positive for BRCA-2.

Given your statutory role as Consumer Privacy Ombudsman under 11 U.S.C. § 332,  this proposal addresses the privacy implications surrounding the transfer, licensing and use of 23andMe assets.

As detailed in the proposal, a stewardship trust framework is proposed as an alternative governance model to address enduring privacy rights, ethical licensing, fiduciary obligations, and protections against misuse—particularly in light of growing risks to historically vulnerable populations.

Should the submission be accepted as part of the CPO's evaluative materials or advisory record, I am prepared to file a certificate of service and serve all required parties in accordance with applicable rules. Please let me know.

The Stewardship Trust will secure the genetic data and biological samples in perpetuity, and ensure its use for public benefit. I don't want my daughters, granddaughters and future descendants to die of BRCA-2  cancers. I don't want these assets weaponized. We can't lose control of this type of data or samples. We need to accelerate innovation to help people.

Regeneron, and any future biomedical actor, can and should be empowered to use 23andMe's data—but not to own it outright. A Trust structure ensures that these unique samples and datasets serve the public good, not private enrichment, and that the individuals—living and dead—whose DNA forms its foundation are respected as people, not products.

I would welcome the opportunity to provide further information or clarification, and would appreciate feedback.

Sincerely,
/s/ RCL
Richard C. Litman
Organizer, Stewardship Trust Initiative
BS Biology, JD (cum laude), LLM (Patent & Trade Regulation Law), Masters in Forensic Sciences
Admitted to Bar, 1979
Registered Patent Attorney
Former Bank Director and Chairman

# Stewardship Trust for Biological Samples and Related Data

A Stewardship Trust is a legal and ethical structure designed to hold, govern, and responsibly manage sensitive data or intangible assets on behalf of a defined group of beneficiaries - often in perpetuity. It ensures that data collected for research, public health, or cultural purposes remains protected, ethically managed, and used only in ways that reflect the values and rights of its contributors.

## What Is a Stewardship Trust?

A Stewardship Trust is typically a special-purpose, irrevocable entity that:

- Holds and manages assets such as genetic data, biological samples, intellectual property, or licensing rights
- Is governed by a fiduciary board acting solely in the interest of contributors and beneficiaries
- Emphasizes ethical use, transparency, and public accountability
- May generate revenue through licensing, which can be reinvested or shared with communities in mission-aligned ways

## Why Use a Stewardship Trust?

1. Trustworthiness - Ensures independence from commercial exploitation or unilateral government control.
2. Data Protection - Contributors retain representation and input over how their data is accessed, used, and protected.
3. Sustainable Monetization - Enables ethical licensing to researchers or public health institutions while funding the trust's ongoing work.
4. Regulatory Compliance - Can be structured to comply with HIPAA, GINA, GDPR, and New York State privacy laws - ensuring lawful and responsible data stewardship.

## Call to Action

The moment to protect the future of genetic privacy and public trust is now. As data from millions of individuals changes hands, we must ensure it is governed not by unchecked commercial interests, but by structures rooted in ethics, equity, and accountability. A Stewardship Trust offers that solution. I urge you to consider and support its establishment in this instance - before the window closes.