# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976-357 |
| Debtors. | (Jointly Administered) |
|  | Hearing Date: June 18, 2025<br>Hearing Time: 9:00 a.m. (Central Time)<br>Hearing Location:  Courtroom 5 North |

## DEBTORS' OMNIBUS REPLY IN SUPPORT OF ENTRY OF THE SALE ORDER

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this omnibus reply in support of entry of the proposed *Order (I) Approving (A) The Debtors' Entry Into The Sale Transaction Documents, (B) The Sale to The Purchaser of The Acquired Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (C) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (II) Authorizing The Debtors to Consummate Transactions in Connection Therewith; and (III) Granting Related Relief* (the "Sale Order," and the sale contemplated thereby, the "Proposed Sale").[2,3]  In further support of this reply, the Debtors incorporate by reference the

---

[1]  The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are:  23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]  The Debtors made copies available of the initial draft Sale Order on May 28, 2025 on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll/com/23andMe.  The Debtors are filing an updated draft Sale Order substantially contemporaneously with the filing of this reply.

[3]  "Proposed Sale" refers to the sale contemplated by the TTAM APA (as defined herein); nevertheless, many of the arguments described below justifying the Proposed Sale also apply to a sale under the Regeneron APA.

*Declaration of Andrew Swift in Support of Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. 30, Ex. 6] and the *Declaration of Andrew Swift in Support of the Regeneron Breakup Fee* [Docket No. 592], as well as the *Declaration of Thomas Walper in Support of Entry of the Sale Order* (the "Walper Declaration"), the *Declaration of Andrew Swift in Support of Entry of the Sale Order* (the "Swift Declaration"), and the *Declaration of Peter Lefkowitz in Support of Entry of the Sale Order* (the "Lefkowitz Declaration"), each filed contemporaneously herewith.

## Preliminary Statement[4]

1.      The Debtors filed these cases to effectuate a sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code with one primary objective:  maximize value for the benefit of the Debtors' estates and their stakeholders.  The Debtors also determined a fundamental component of any value-maximizing strategy was to honor their commitments to their customers and preserve their trust.

2.      From the outset of these cases, the Debtors have maintained strict adherence to their Privacy Policies while ensuring that their customers have ready access to information about these

---

[4]     Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this reply.

cases and the Proposed Sale. The Debtors' Privacy Policies provide important protections and rights to customers that go to the core of the Debtors' mission as a company. The Privacy Policies, specifically the Debtors' Privacy Statement, also permit—and have always permitted—the Debtors to transfer customers' Personal Information to a new owner in the context of a sale of the entire business, ***provided*** that such information remain subject to the terms of the Debtors' policy once in the hands of a buyer. That is exactly what our customers consented to and exactly what is happening here.

3. After a robust, multi-stage bidding process under the Court-approved Bidding Procedures and Final Proposal Procedures, the Debtors seek approval of a Proposed Sale that both maximizes value for the Debtors' stakeholders and honors their commitments to their customers. The Debtors have selected TTAM as the Winning Bidder at an aggregate purchase price of $305 million.[5] This is a phenomenal outcome for the Debtors' estates that will result in material stakeholder recoveries under the forthcoming chapter 11 plan. Importantly, TTAM has agreed not only to maintain the Debtor's Privacy Policies but to enhance them in many material respects.

4. It is hard to envision a better outcome in these cases, yet an obstacle remains. Notwithstanding the benefits of the Proposed Sale and the incremental benefits and protections the Debtors' customers will receive if the Proposed Sale is approved, over 30 state Attorneys General (the "Objecting States") oppose the transaction. Certain Objecting States argue that, as originally constructed, the asset sales contemplated under the TTAM APA and Regeneron APA (each as defined below) violate various state statutes governing the transfer of genetic data. Other Objecting States without specific state statutes argue this Court should create a common-law

---

[5]    As set forth in the Winning Bidder Notice, Regeneron has been designated as the Backup Bidder at an aggregate purchase price of $151 million.

3

prohibition on the transfer of genetic data. In each case, the Objecting States argue that the remedy for such perceived violations is to condition the transfer of customers' genetic data on the Debtors first obtaining new, opt-in consents from each of the Debtors more than 14 million customers. That outcome is neither legally required nor remotely practicable and, therefore, would destroy the benefits of the Proposed Sale currently available to the Debtors' stakeholders and customers.

5.     The Objecting States' interpretation of applicable nonbankruptcy law appears to be a new phenomenon born from the Debtors' chapter 11 cases. How many of the Objecting States objected to the acquisition of Ancestry.com in December 2020, which at the time had over 3 million customers' genetic data? None.[6] How many states objected to Invitae Corporation's ("Invitae") sale of over 4 million customers' genetic data to its purchaser in August 2024, which was effectuated through a section 363 sale in Invitae's chapter 11 cases? None. Did either transaction involve affirmative opt-in consent from all affected customers of the respective sellers? No. Contrary to the Objecting States' assertions, it is not the Proposed Sale that is "unprecedented" but instead the Objecting States' interpretation of their own laws that appears to be a first-of-its-kind in these chapter 11 cases.

6.     It is unclear why the Objecting States have determined to reinterpret their own laws to seek to block the Proposed Sale. Regardless, the Objecting States' objections lack merit and should be overruled for many reasons.

7.     *First*, the Bankruptcy Code expressly provides that personally identifiable information may be freely transferred in a section 363 sale—notwithstanding state law—so long

---

[6]     The acquisition of Ancestry.com predated enactment of certain—but not all—of the Objecting States' statutes governing transfers or disclosures of genetic information to third parties. However, to the extent customers possess "common law rights" to their genetic information—as certain of the Objecting States assert—such rights presumably did not come into existence after this acquisition. Tellingly, the Objecting States did not object to this acquisition on this (or any other) grounds.

as a debtor's privacy policies in effect as of the petition date did not prohibit such a transfer. Since its founding, the Debtors' Privacy Policies have **always** informed customers that their Personal Information may be transferred in connection with a sale of the business subject only to the requirement that the customer's Personal Information remains subject to the terms of Privacy Policies in the hands of the buyer. Every single customer of the Debtors consented to these terms when they signed up for the Debtors' services. And as the Cate Report makes clear, that is exactly what is happening here. The analysis here begins and ends with the plain text of section 363 and the Court should approve the sale on this basis alone.

8. *Second*, even if the Court looks beyond the policy and plain language of section 363—which it need not do—the Proposed Sale complies with applicable nonbankruptcy law. The Objecting States' primary argument—albeit with some variation depending on the specific language of a given state's privacy statute (if any)—is essentially that the Debtors may not "transfer" customers' genetic data to a third party without obtaining an entirely new, second express opt-in consent from customers. In making this argument, the Objecting States ignore the fundamental structure of the Proposed Sale and the text of their own laws (if they have one).

9. As a general matter, the "transfers" genetic privacy laws seek to restrict are those where genetic data is being transferred to a third party that will use or process the data in a different way and thus depart from the consumer's understanding and expectations as to the purposes for which the data would be used and the data protections the consumer was afforded by the seller. In contrast, the Proposed Sale contemplates a sale of the Debtors' entire business—a change in ownership only. Nothing changes from the customer's perspective: the Debtors' Privacy Policies remain in effect, customers' Personal Information may only be used and processed in the same manner—and subject to the same restrictions—that the Debtors use and process the data today,

5

and customers maintain the right to delete their Personal Information or revoke consents as to specific uses as they always have under those policies.

10.     In TTAM's case, the Objecting States' arguments are even more strained where (a) TTAM has committed to multiple privacy-related *enhancements* for customers (*e.g.*, perpetual right to delete data/revoke consents, incremental notice of the sale, establishment of a Consumer Privacy Advisory Board, etc.) that leave customers objectively better off post-transaction and (b) TTAM is owned and controlled by Ms. Anne Wojcicki, the Debtors' founder and—until immediately before the Petition Date—board chairman, Chief Executive Officer, and controlling shareholder.  The Objecting States argue, in effect, that reverting ownership of customers' Personal Information to the person who had it in the first place while simultaneously enhancing the protections and rights customers have with respect to that information violates state privacy laws.

11.     To the extent any Objecting State has a genetic privacy statute that requires customer consent to certain types of transfers of genetic data, such restrictions do not apply to the Proposed Sale for the reasons mentioned above or because the Debtors already have the requisite consent under their policies.  For all these reasons, the Debtors submit that the asset sales contemplated under the TTAM APA and Regeneron APA (each as defined below) comply with applicable nonbankruptcy law.

12.     Underscoring the inconsistency of the Objecting States' efforts to block a Proposed Sale that objectively enhances customers' rights and protections with respect to their information, a critical mass of Objecting States claim that it is the implementation methodology (*i.e.*, an asset sale) that violates certain transfer restrictions under various states' privacy laws as opposed to the end result of the Proposed Sale.  They say that a "change in ownership" of customers' genetic data "is legally possible" without requiring affirmative customer opt-in consent if structured as a

purchase of the Debtors' stock. *See* NAAG States Obj. ¶ 38. Although the Debtors believe that a change of ownership effectuated through an asset sale or equity sale that results in the same outcome—a change in ownership of the entire business—cannot be the basis on which state law prohibits or permits such a transaction, the Debtors have nonetheless taken steps to meet these Objecting States where they stand.

13.     Specifically, the Debtors and TTAM have agreed to implement the Proposed Sale as an equity sale of a wholly-owned subsidiary of the Debtors. Under this revised construct, the Proposed Sale will be implemented in two steps. *First*, the Debtors will sell the Acquired Assets, including customers' Personal Information, and transfer the Assumed Liabilities under TTAM's APA (as defined below) to a new, wholly-owned non-Debtor subsidiary of the Debtors pursuant to section 363 of the Bankruptcy Code. Pro forma for this initial step, the Debtors will own 100% of the equity interests in a wholly-owned subsidiary that, in turn, owns the Acquired Assets and Assumed Liabilities contemplated to be transferred to TTAM under the existing APA.

14.     *Second*, TTAM will acquire the Debtors' equity interests in this "NewCo" pursuant to a second sale transaction under section 363 of the Bankruptcy Code. The detailed steps required to implement this equity sale structure are described below, but the net result is that the Debtors will bring about the same result contemplated by the TTAM APA (as defined below) using a different transactional form. Based on certain of the Objecting States' own admissions, this structure should resolve their objections that the Proposed Sale runs afoul of their laws. And it is clear why. A sale of the equity of a new wholly-owned subsidiary of the Debtors to TTAM does not involve the transfer of Personal Information at all, it is merely a transfer of the equity interests of that subsidiary (*i.e.*, identical to the acquisition of Ancestry.com to which none of the Objecting States objected). Nor could any state meaningfully challenge the transfer of assets by the Debtors

to a wholly-owned subsidiary of the Debtors controlled and operated by the same directors, officers, and employees of the Debtors as a transfer to a third party or "person."

15.     It is worth noting that if the Objecting States have their way in blocking a value-maximizing sale that benefits customers, there will still likely be a "transfer" of the Debtors' Personal Information.  Instead of a value-maximizing sale transaction, however, it will likely be through foreclosure by the Debtors' DIP Lender or into the control of a chapter 7 trustee.  Absent a viable sale, the Debtors will exhaust their liquidity and the prospect of *any*—let alone meaningful—stakeholder recoveries will evaporate.  The largest creditor constituency harmed by that result is likely the approximately 6.4 million customers comprising the conditionally approved settlement class in the Debtors' prepetition U.S. class action litigation arising from the 2023 Cyber Security Incident—the very people the Objecting States purport to seek to protect in blocking the sale.

16.     In short, the Debtors and TTAM believe the Court has multiple paths to approve the Proposed Sale notwithstanding the "unprecedented" position taken by the Objecting States in these cases.  *First*, the Court can agree with the Debtors that the only relevant inquiry under section 363 is whether the Debtors' Privacy Policies do not prohibit the transfer of Personal Information or the Proposed Sale is otherwise consistent with the Debtors' Privacy Policies.  The Privacy Policies always provided that customers' Personal Information may be transferred in connection with a sale of the business and all customers consented to those terms when signing up for the Debtors' services.  It is that simple and the Court may approve the Proposed Sale on that basis.  Moreover, section 363 reflects a Congressional determination as to the specific requirements to effect a sale in bankruptcy involving personally identifiable information, including genetic data, and any state law that would otherwise prohibit such a sale on the ground that it

involves the transfer of personally identifiable information that would otherwise satisfy the terms of section 363 is preempted.

17.     Should the Court nevertheless examine whether the Proposed Sale complies with applicable nonbankruptcy law, it does.  The Debtors, with TTAM's cooperation and support, have structured the Proposed Sale such that (a) the transaction will proceed as an equity sale of a wholly-owned subsidiary of the Debtors—no Personal Information is being transferred to any third party and the only transfer to a third party is shares of stock in a wholly-owned subsidiary the Debtors will own; (b) the Debtors' existing Privacy Policies will remain in place, as modified by the multiple enhancements and additional benefits TTAM has agreed to provide customers with respect to their data; (c) customers will receive prior notice of the sale and preserve the ability to delete their accounts and Personal Information at any time at their option in perpetuity; and (d) the ultimate purchaser is an entity controlled by the original founder and person who, until the Petition Date, served as the CEO and board chairman of the Company.  Structured in this way, the Proposed Sale complies with all applicable privacy laws and should be approved.

18.     The Cate Report, filed substantially contemporaneously herewith, incisively describes why Congress meant exactly what it said in section 363(b).  The carefully crafted statutory regime of 363(b) reflects an intentional decision to "respect[] the choices that consumers have already made and recognize[] the importance of bringing bankruptcies to a successful conclusion that protects the interests of all of the parties involved."  Cate Report ¶ 3.  And the Cate Report further explains why Congress's "clear path" in section 363 warrants approval of the Proposed Sale:  Because "[u]nder the Bankruptcy Code, in the absence of any promise not to sell personal data to third parties, no additional protections are required.  Should there be such a promise, and there is not here, then the [TTAM APA] not only meets the requirements in the

Bankruptcy Code, but goes substantially further." Cate Report ¶ 33. Moreover, the Cate Report insightfully describes why the CPO's opinions predominantly reflect policy preferences untethered to the statutory framework, and should not be credited. *See, e.g.*, Cate Report ¶¶ 7, 19, 30, 34–39, 43–45.

19.    For these reasons and all those set forth below, the Debtors respectfully request that the Court overrule the Objections (as defined below) and approve the Proposed Sale.

**Relevant Background**

**A.    The Marketing and Auction Process**

20.    The Debtors commenced these chapter 11 cases to conduct an orderly and value maximizing sale of all or substantially all of their assets. To accomplish this objective, the Debtors sought and obtained Court approval of bidding procedures [Docket No. 125, Ex. 1] (the "Bidding Procedures"),[7] which were carefully crafted to meet the Debtors' goals.

21.    As described in further detail in the Swift Declaration, prior to the Petition Date, the Debtors, under the direction of the special committee of the board of directors of 23andMe Holding Co. (the "Special Committee") and with the assistance of their investment bank Moelis & Company LLC ("Moelis"), conducted a robust marketing process that spanned several months and involved outreach to 103 potential counterparties. Following the Petition Date and the Court's entry of the Bidding Procedures Order, Moelis continued its efforts to market all or a portion of the Debtors' assets on a postpetition basis for an additional 40 days prior to the bid deadline. As part of the postpetition marketing process, Moelis engaged with approximately 57 potential

---

[7]    On March 28, 2025, the Court entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), if Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VII) Granting Related Relief* [Docket No. 125] (the "Bidding Procedures Order").

purchasers and the Debtors received 32 indications of interested by the April 13, 2025, IOI Deadline (as defined in the Bidding Procedures).

22.     Ultimately, the Debtors received several bids for their assets that contemplated an acquisition of the entire company or the entire company excluding the Lemonaid telehealth business, and multiple other bids that contemplated different asset packages. Accordingly, from May 14, 2025, through May 16, 2025, the Debtors conducted an auction with respect to their assets (the "Auction"). The opening bid at the Auction was $52 million. At the conclusion of the Auction, the Debtors, in consultation with their advisors and the Consultation Parties (as defined in the Bidding Procedures) and in their business judgment, selected (a) Regeneron Pharmaceuticals, Inc. ("Regeneron") as the successful bidder, with a bid of $256 million, and (b) TTAM Research Institute ("TTAM" and, together with Regeneron, the "Bidders") as the backup bidder, with a bid of $146 million. On May 17, 2025, the Debtors and Regeneron executed an asset purchase agreement (the "Regeneron APA").

23.     Following the Auction, TTAM submitted revised proposals to acquire substantially all of the Debtors' assets at a higher purchase price than contemplated under the Regeneron APA. Subsequently, the Debtors, TTAM, and Regeneron agreed to the terms of certain "final proposal" procedures to govern a final round of bidding, which the Court approved on June 6, 2025, through entry of the *Order (I) Establishing Procedures for the Submission of Final Proposals From the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [Docket No. 657] (the "Final Procedures Order"). Among other things, the Final Procedures Order provided that (i) the starting bid in the Final Bidding Round[8] would be TTAM's bid of $305 million,

---

[8]     Capitalized terms used but not otherwise defined in this reply shall have the meanings ascribed to them in the Bidding Procedures Order or the Final Procedures Order, as applicable.

(ii) Regeneron would have an opportunity to increase its bid to at least $315 million, (iii) if Regeneron increased its bid to $315 million, TTAM would have the opportunity to submit its Final Proposal, and (iv) if TTAM submitted a Final Proposal, Regeneron would have the opportunity to submit its own Final Proposal.

24.     On June 13, 2025, the Debtors conducted the Final Bidding Round in accordance with the Final Procedures Order.  At the conclusion of the Final Bidding Round, the Debtors selected (i) TTAM as the Winning Bidder, with a bid of $305 million, and (ii) Regeneron as the Backup Bidder, with a bid of $151 million.  That same day, the Debtors filed the *Notice of Winning Bidder with Respect to the Final Proposal Procedures to Acquire the Debtors' Assets* [Docket No. 739] (the "Winning Bidder Notice").

25.     On June 14, 2025, the Debtors filed the *Notice of (I) Adjournment of Sale Hearing and (II) Election of NewCo Drop Down and NewCo Equity Transfer Pursuant to TTAM Asset Purchase Agreement* [Docket No. 746] (the "Notice of Equity Sale Election"), noticing the Debtors' election to structure the Proposed Sale to TTAM through the TTAM Equity Sale (as defined below).

**B.     The Sale and APAs**

26.     On June 13, 2025, the Debtors terminated the Regeneron APA and executed an asset purchase agreement with TTAM, subject to Court approval (the "TTAM APA" and, together with the Regeneron APA, the "APAs").[9]  Certain key terms of the APAs are highlighted below.[10]

        a.     Purchase Price.

---

[9]     The APAs are included as exhibits to the Winning Bidder Notice.  For the avoidance of doubt, the Debtors still seek approval of the Regeneron APA as the Backup Bid despite the termination described herein.

[10]    This summary is qualified in its entirety by the terms of the applicable APA.  To the extent of any inconsistencies between the APAs and this summary, the applicable APA shall control.

       i.    *TTAM*. The total cash purchase price to be paid by TTAM, as the Winning Bidder, is $302.5 million[11] plus the payment of certain assumed liabilities and certain cure amounts in respect of the assumed executory contracts and leases.

       ii.    *Regeneron*. If the Sale to the Winning Bidder is not consummated, the Debtors may consummate a Sale with the Backup Bidder for a total cash purchase price of $151 million plus the payment of certain assumed liabilities and certain cure amounts in respect of the assumed executory contracts.

b.    <u>Data Privacy and Security</u>. Each APA contains an identical covenant requiring the Purchaser, following the closing of the Sale, to "comply with [the] Seller's privacy policies and statements, consent documents and all applicable Privacy Laws," and to "process all Customer Data in accordance with user consents, privacy policies and statements, terms of service, and notices" in effect upon signing of the APA. *See* TTAM APA § 7.11; Regeneron APA § 7.11. Further, under this covenant, the Purchaser is required to "employ appropriate security controls and procedures . . . designed to protect Customer Data that comply with applicable Privacy Laws." *See* TTAM APA § 7.11; Regeneron APA § 7.11.

c.    <u>Enhanced Consumer Protection and Privacy Safeguards</u>. TTAM has also made binding commitments to adopt additional consumer protections and privacy safeguards to enhance protections for customer data and privacy memorialized in Exhibit D to the TTAM APA (the "Enhanced Consumer Safeguards"), which include:

       i.    *Customer Data Rights*. TTAM will honor the Debtors' existing policies that allow customers to delete their account and genetic data and opt-out of research in perpetuity;

       ii.    *Customer Notification*. With the Debtors' cooperation, all customers will be emailed at least two business days before closing with details on TTAM's role, TTAM's commitment to privacy choices, and instructions on how to delete data or opt out of research;

       iii.    *Data Transfer Restrictions*. TTAM will not sell or transfer genetic data in connection with a subsequent bankruptcy or change of control unless the recipient is a qualified domestic entity that adopts TTAM's privacy policies and complies with all laws;

---

[11]   The TTAM APA provides that the sale of the Debtors' Lemonaid health telehealth business will be separately sold pursuant to a chapter 11 plan for a purchase price of at least $2.5 million (subject to Court approval), which structure is being utilized to account for the transfer of certain regulatory licenses under applicable law.

iv.  *Privacy Advisory Board*. Within 90 days of the closing, TTAM will establish a Consumer Privacy Advisory Board;

v.  *Privacy Procedures and Reporting*. TTAM will implement privacy procedures, notify customers of material changes, mitigate data breaches, and prepare annual reports to be made available to state Attorneys General upon request;

vi.  *Identity Theft Monitoring*. TTAM will offer customers two years of free Experian identity theft monitoring; and

vii.  *Research and Donations*. TTAM will continue the Debtors' policy of allowing de-identified data to be used for scientific and biomedical research to research scholars at academic universities and other nonprofits and refuse donations from individuals or companies in specified countries.

d.  <u>Change in Ownership</u>. TTAM has also acknowledged and agreed that the change of ownership of customer data under the applicable APA "solely constitute a change in ownership of such Acquired Assets in connection with Purchaser's operation of the Acquired Assets from and after the Closing." *See* TTAM APA § 4.4. Regeneron has similarly acknowledged and agreed that the change in ownership of customer data "shall solely constitute a change in ownership of such Acquired Assets, and shall be made for the sole purpose of enabling Purchaser to continue operating the Business." Regeneron APA § 4.4.

e.  <u>Transferability of Personal Information</u>. The Debtors made representations and warranties under each APA regarding their ability to transfer personal information as of the closing, which, if not true at the closing of the Sale, would provide the Purchaser with the ability to terminate the APA.[12]

27.  Finally, section 2.8(a) of the TTAM APA permits the Debtors to elect to modify

the structure of the TTAM APA that effectuates the change in ownership of the Acquired Assets

---

[12]  Specifically, each of the TTAM APA and Regeneron APA contain representations and warranties by the Debtors regarding the transferability of Industry Data (as defined in the applicable APA) and Personal Information (as defined in the applicable APA) included in acquired assets, and that the Purchaser will be able to use the Industry Data in substantially the same manner as used by the Debtors prior to closing. *See* TTAM APA § 5.1; Regeneron APA § 5.1. Under sections 10.1(e) and 10.1(c) of the TTAM APA and the Regeneron APA, respectively, TTAM or Regeneron, as applicable, has the ability to terminate the APA if such applicable representations and warranties are not true and correct in all material respects as of the closing date, such that (i) the conditions to closing are not satisfied before the outside date, (ii) one of the conditions is not capable of being satisfied or (iii) there is a material uncured breach by the Sellers. See TTAM APA §§ 9.1(a), 10.1(a), (e); Regeneron APA §§ 9.1(a), 10.1(a), (c).

14

and Assumed Liabilities (each as defined in the TTAM APA) through an equity sale instead of an asset sale (the "Equity Sale Toggle").  As set forth in the objection of the NAAG States (as defined below), certain states have argued that the transaction would not implicate state laws if the Purchaser could effectuate a change in ownership through the purchaser of the Debtors' stock.  Although the Debtors disagree with that position and believe the original structure of the TTAM APA complies with the Bankruptcy Code and applicable law, in an effort to address the NAAG States' concerns the Debtors requested—and TTAM agreed—to include the Equity Sale Toggle in the TTAM APA.  On June 14, 2025, the Debtors informed TTAM of their election to exercise the Equity Sale Toggle and filed the Notice of Equity Sale Election on the docket.

28.    Pursuant to the Equity Sale Toggle, the Debtors will form a new wholly-owned, non-debtor subsidiary ("NewCo" and, the Debtor entity that owns 100% of the equity interests of NewCo, the "Debtor HoldCo").  The Debtors will then effectuate the Equity Sale Toggle in two steps.  *First*, the Debtors will sell the Acquired Assets and transfer the Assumed Liabilities to NewCo pursuant to section 363 of the Bankruptcy Code (the "NewCo Sale").  *Second*, Debtor HoldCo will sell 100% of its equity interests in NewCo to TTAM pursuant to a separate sale transaction under section 363 of the Bankruptcy Code (the "TTAM Equity Sale").  The specific steps to effectuate the Equity Sale Toggle are further set forth below (the "Equity Sale Steps Plan"):

a.    Formation of NewCo.  The Debtor HoldCo will form a new wholly-owned, non-Debtor subsidiary that will be a Delaware limited liability company. The organizational documents of NewCo will provide that NewCo cannot take any corporate action without Debtor HoldCo's consent in its capacity as controlling (and sole) member of NewCo.  NewCo will not involve any individual that is not a current director, officer, or employee of the Debtors in its governance structure or otherwise.

b.    Intercompany Transactions.  The Debtors may effectuate intercompany transfers of Acquired Assets or Assumed Liabilities solely as among Debtor entities to facilitate subsequent steps of the Equity Sale Steps Plan.  Any such transfers shall not involve any third-party other than the Debtors and no third-party will obtain access to any Acquired Asset, including Customer

Data, as a result of such transfers.  The primary purpose of such transfers, if any, will be to minimize any delay in effectuating the Equity Sale Toggle at closing.

c.    <u>NewCo Sale</u>.  Each applicable Debtor will sell the Acquired Assets and transfer the Assumed Liabilities[13] to NewCo pursuant to section 363 of the Bankruptcy Code in accordance with the terms set forth in the Sale Order. As consideration for such sale and transfer, NewCo will issue a note to the Debtors in an aggregate principal amount sufficient to provide the Debtors with cash consideration on the Closing Date equal to the Purchase Price under the TTAM APA (the "NewCo Note").  The NewCo Note will provide that such NewCo Note will become immediately due and payable in cash upon a change of control of NewCo.

d.    <u>TTAM Equity Sale</u>.  Immediately following consummation of the NewCo Sale, (i) Debtor HoldCo will effectuate the TTAM Equity Sale by selling 100% of its equity interests in NewCo to TTAM pursuant to section 363 of the Bankruptcy Code in accordance with the terms of the Sale Order, (ii) the applicable Debtors will sell or transfer, as applicable, the Direct Transfer Assets and Liabilities (if any) to TTAM pursuant to sections 105, 363, 365 of the Bankruptcy Code in accordance with the terms of the Sale Order.  In connection with the TTAM Equity Sale, TTAM will transfer aggregate cash consideration in an amount equal to $302.5 million to satisfy (a) the outstanding principal amount of the NewCo Note and (b) the portion of the Purchase Price, if any, allocable to any Acquired Assets included in the Direct Transfer Assets and Liabilities.

e.    <u>No Impairment of Substantive Rights</u>.  As set forth in the Sale Order, each component of the Equity Sale Steps Plan will not impair, modify, or otherwise affect any rights or legal entitlements of each of the Debtors and their respective creditors and equityholders with respect to any such parties' rights to the proceeds of the TTAM Equity Sale and all such rights and legal entitlements shall remain in full force in effect notwithstanding any transfers or other steps taken by the Debtors in connection with the Equity Sale Steps Plan; *provided* that nothing herein shall impact the "free and clear" component of the NewCo Sale or TTAM Equity Sale as set forth in the Sale Order.

f.    <u>Customer Protections</u>.  Notwithstanding any action taken or authorized to be taken pursuant to the Equity Sale Steps Plan, the Customer Data shall at all times remain subject to the Debtors' Privacy Statement (as defined below) and nothing in the Equity Sale Steps Plan or the Sale Order abrogates or otherwise adversely impacts the Debtors' customers' rights with respect

---

[13]    The Debtors and TTAM may elect to sell or transfer, as applicable, certain Acquired Assets and Assumed Liabilities directly from the Debtors to TTAM (the "<u>Direct Transfer Assets and Liabilities</u>"); *provided* that all Customer Data included in the Acquired Assets are subject to the NewCo Sale.

to their respective Customer Data under the Privacy Statement or applicable law, including any provision of the Equity Sale Steps Plan or the Sale Order that provides for the change of ownership of Acquired Assets pursuant to the NewCo Sale or the TTAM Equity Sale on a "free and clear" basis under section 363(f) of the Bankruptcy Code or otherwise; *provided* that any customer's claim for monetary damages arising on or before the closing may only be asserted against the Debtors in accordance with the Bar Date Order (as defined below) and such claim is subject to the "free and clear" provisions of the Sale Order.

### C. The Debtors Provided Notice in Accordance with the Bidding Procedures Order and the Privacy Statement.

29. The Debtors have provided notice of the Sale Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Assumption and Assignment Procedures, the proposed cure amounts thereunder, the Final Proposal Procedures, and the selection of TTAM as the Winning Bidder and Regeneron as the Backup Bidder, all in accordance with the Bidding Procedures Order.[14]

30. Moreover, prior to the Sale Hearing, the Debtors notified all of their current and former customers of the potential change of ownership of their Personal Information to either Regeneron or TTAM through distribution of the notice attached as <u>Exhibit A</u> to the *Notice of*

---

[14]   Specifically, the Debtors have filed and served notice of the following documents:

(i)   the Bidding Procedures Order [Docket No. 125], for which a certificate of service was filed at [Docket No. 150];

(ii)   the *Notice of Auction for the Sale of the Debtors' Assets*, for which a certificate of service was filed at [Docket No. 162], a copy of the same was published in the national edition of *The Wall Street Journal* on April 2, 2025, and an affidavit of such publication was filed at [Docket No. 155];

(iii)   the *Notice of Successful and Backup Bidders with Respect to the Auction of the Debtors' Assets* [Docket No. 420], for which a certificate of service was filed at [Docket No. 513];

(iv)   the *Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 591], for which a certificate of service was filed at [Docket No. 630];

(v)   the Final Procedures Order [Docket No. 657], for which a certificate of service was filed at [Docket No. 689];

(vi)   the *Notice of (I) Procedures for the Submission of Final Proposals from the Backup Bidder and Successful Bidder and (II) Sale Objection Deadline* [Docket No. 668], for which a certificate of service was filed at [Docket No. 708]; and

(vii)   the Winning Bidder Notice [Docket No. 739].

*Change of Ownership of Personal Information* [Docket No. 752] (the "Customer Notice").[15]  In addition, immediately following the Court's approval of the Proposed Sale, the Debtors will place a banner on their website notifying customers of the approved sale, which banner will remain on the website through closing of the transaction.

### D.      Appointment of Mr. Neil Richards, the Consumer Privacy Ombudsman and the Cate Report

31.      On April 7, 2025, the Debtors filed their *Motion for Entry of an Order (I) Appointing an Independent Customer Data Representative and (II) Granting Related Relief* [Docket No. 169], seeking appointment of an independent and disinterested Customer Data Representative to analyze the Company's data policies and cybersecurity infrastructure and serve as a Consultation Party to advise on any data-related issues arising out of potential transactions arising from these chapter 11 cases.  In response, the United States Trustee and various states filed objections to the Debtors' motion and instead moved for the appointment of a Consumer Privacy Ombudsman ("CPO") pursuant to 11 U.S.C. §§ 332 and 336(b)(1) [Docket Nos. 181, 195, 239, 244, 246, 248, 254, 282, 284].

32.      The Debtors maintained that the appointment of a CPO was not required under the Bankruptcy Code for these chapter 11 cases, where the Company's Privacy Policies remained in place, Qualified Bidders were required to comply with those prepetition policies under the Bidding Procedures, and the policies expressly permit transfer of Personal Information in connection with

---

[15]    In addition to the Customer Notice, the Debtors also provided all of their current and former customers, at the applicable time, with (a) the *Order and Notice of Chapter 11 Bankruptcy Case* [Docket No. 157], for which a certificate of service was filed at [Docket No. 168], a copy of the same was published in the national edition of *The Wall Street Journal* on April 7, 2025, and an affidavit of such publication was filed at [Docket No. 175]; and (b) the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof and (II) Granting Related Relief* [Docket No. 349], for which a certificate of service was filed at [Docket No. 372] (the "Bar Date Order") and the *Notice of Deadlines Requiring Filing Proofs of Claim On or Before the Applicable Bar Date*, which was published in the national edition of *The Wall Street Journal* on May 5, 2025, and for which an affidavit of such publication was filed at [Docket No. 387].

bankruptcy or asset sales. Nonetheless, recognizing the importance of the treatment of consumer data to consumers, regulators, and other stakeholders, on April 28, 2025, the Debtors joined in filing the *Joint Stipulation and Agreed Order Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman* [Docket No. 340] (the "CPO Stipulation"), seeking approval of an order directing the U.S. Trustee to appoint a disinterested person to serve as CPO in conducting an examination and presenting a report related to any proposed sale of personally identifiable information. The CPO Stipulation specified topics the CPO should consider and report on, encompassing topics well beyond those enumerated in Sections 332 and 363(b) of the Bankruptcy Code. By entering into the CPO Stipulation, the Debtors expressly preserved their right to argue that a CPO in these cases is unnecessary under the Bankruptcy Code. CPO Stipulation ¶ 7 (stating that nothing in the CPO Stipulation constituted an admission of "(i) any failure to comply with applicable privacy policies in effect on the date of the commencement of this bankruptcy case and (ii) whether any proposed sale or lease of PII complies with such policies"). The CPO Stipulation reserved the parties' rights, including the right to object to the CPO's report. CPO Stipulation ¶ 10.

33. The Court approved the CPO Stipulation on April 29, 2025 [Docket No. 346]. On May 6, 2025, the U.S. Trustee filed the Notice of Appointment of Consumer Privacy Ombudsman [Docket No. 388] announcing the appointment of Professor Neil M. Richards as the CPO. On June 11, 2025 the CPO filed the *Report of Consumer Privacy Ombudsman* (the "CPO Report").

34. Following the filing of the CPO Report, the Debtors engaged Professor Fred H. Cate, a Distinguished Professor, C. Ben Dutton Professor of Law, and Adjunct Professor of Informatics and Computing at Indiana University, among other things, as an expert witness to provide an additional, independent report regarding the Debtors' Privacy Policies, the proposed

sale of any personally identifiable information, application of applicable law, and the statements made in the CPO Report related to the foregoing (the "Cate Report").  The Cate Report was filed substantially contemporaneously herewith and, as noted below, (a) contradicts many of the conclusions outlined in the CPO Report and the arguments raised by the Objecting States and (b) provides a critical, fulsome second opinion on the Debtors' privacy policy and application of applicable law to the Proposed Sale, among other things.

### E.    The Debtors' Privacy Policies

35.    The Debtors operate two consumer-facing businesses:  (i) the Personal Genome Service through 23and Me Inc. ("23andMe" or the "Company") and (ii) Lemonaid Health telehealth services through Lemonaid Health, Inc. ("Lemonaid").

36.    Every customer of 23andMe's services is required to consent to 23andMe's Terms of Service.  Lefkowitz Decl. ¶ 18.  The Terms of Service, in turn, specify that customers' use of 23andMe's services is governed by a single privacy statement (the "Privacy Statement," and together with the Terms of Service and any other additional privacy-related policies, the "Privacy Policies").  Lefkowitz Decl. ¶ 11 & Ex M ("Your use of the Services is governed by our Privacy Statement.  We encourage you to review our Privacy Statement to learn about how we handle data.").  At all relevant times the Privacy Statement has expressly provided that customers' personal information ("Personal Information") may change ownership and be transferred in connection with an acquisition or sale of assets involving 23andMe, and that the Privacy Statement will follow the customers' personal information to the new entity.

37.    In order to use the 23andMe services, every customer must accept the 23andMe Terms of Service and Privacy Statement.  Lefkowitz Decl. ¶¶ 7, 10.  Customers agree to the Terms of Service, which incorporate the Privacy Statement by reference, when registering their 23andMe kit before sending their saliva for processing.  As shown below, this registration process requires

every customer to set up an account by providing their first name, last name, email address, and date of birth; creating a password; confirming a password; and then checking a box confirming, "I have read and agree to the Terms of Service and the Privacy Statement."  Lefkowitz Decl. ¶ 8.  Customers can access and review the Privacy Statement by clicking on the words "Privacy Statement" when creating an account.  Lefkowitz Decl. ¶ 8.



38.     After customers check the box confirming that "I have read and agree to the Terms of Service and Privacy Statement" and click on "Create Account," customers are directed to a page containing a summary of key provisions of the Privacy Statement and Terms of Service, which also includes hyperlinks to those documents.  Lefkowitz Decl. ¶ 19 & Ex Q.  To proceed from this page, customers must click "Accept and Continue" and acknowledge that they "accept the Terms of Service and acknowledge the Privacy Policy."  Lefkowitz Decl. ¶ 19 & Ex Q.

39.     As noted above, 23andMe's Privacy Statement—accepted by all customers as a condition of setting up their account—has at all times included language informing customers that their Personal Information could be transferred in connection with an asset sale or change in control transaction.  The Privacy Statement has always provided that the Privacy Statement will follow the customer's Personal Information to the acquiring entity.  Lefkowitz Decl. ¶¶ 13–17.

40.     From November 11, 2007 through June 23, 2010, the Privacy Statement had the following change of ownership language:

> "**Business Transitions.**  In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your personal information and non-personal information will likely be among the assets transferred.  You will be notified in advance via email and prominent notice on our website of any such change in ownership or control of your personal information.  We will require an acquiring company or merger agreement to uphold the material terms of this privacy statement, including honoring requests for account deletion."  Lefkowitz Decl. ¶ 14 & Ex. A.

41.     From June 24, 2010 until June 7, 2022, the Privacy Statement included the following change of ownership language:

> "**Business Transitions.**  In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred.  In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement."  Lefkowitz Decl. ¶ 15 & Exs. B–J.

42.     Beginning on June 8, 2022, through the present, the Privacy Statement has included the following change of ownership language:

> "**Commonly owned entities, affiliates and change of ownership**.  If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity.  We may also disclose Personal Information about you to our corporate affiliates to help operate our services and our affiliates' services."  Lefkowitz Decl. ¶ 16 & Ex. K.

43.     The Privacy Statement thus at all times has captured "business transitions," and included among its non-exclusive list of transactions "sale[s] of assets" and "acquisition[s]."

While the term "bankruptcy" was added to the list of business transitions in June 2022, the prior language already encompassed all "business transformations" as well as "sales" and "acquisitions," and thus by their plain terms captured sales such as those under section 363 of the Bankruptcy Code.

44.    While 23andMe's Privacy Statement made clear that customers' data could be transferred in a sale of change-of-control transaction, it further provided that the significant customer protections afforded by the Privacy Statement would continue in the hands of any buyer. The customer protections in the Privacy Statement include that customers may request the deletion of their data any time.  Customers also are afforded the option to consent to particular uses of their data, including participation in 23andMe Research, Individual Data Sharing, and Biobanking. Lefkowitz Decl. ¶ 21 & Exs. S–U.  23andMe allows customers to modify or revoke these consents at any time.  Lefkowitz Decl. ¶ 22.

45.    Similar to 23andMe, each customer of Lemonaid must check a box confirming that they "understand and agree" to the Lemonaid Privacy Policy in order to use Lemonaid's services. Customers must also agree that they have reviewed and accept the Lemonaid Sensitive Data Processing Consent.  Lefkowitz Decl. ¶ 30.

46.    At all times since 23andMe acquired Lemonaid, the Lemonaid Privacy Policy has expressly informed customers that ownership of their data may be transferred through a sale. Lefkowitz Decl.  ¶¶ 31–34.  The Lemonaid Privacy Policy in place from 2021 (when 23andMe acquired Lemonaid) to April 17, 2022, contained the following language about change in ownership:

> "We may share your PHI with a third party if we merge, are acquired or undergo an asset sale.  Wherever possible we strive to make sure that any third parties with whom we share

23

your PHI are legally bound by the restrictions of this Privacy Policy."  Lefkowitz Decl.
¶¶ 32–33.[16]

The Lemonaid Privacy Policy during this period also provided that:

> "We may share personal information about you as follows: . . . In connection with, or
> during the negotiation of, any merger, sale of company stock or assets, financing,
> acquisition, divestiture or dissolution of all or a portion of our business (but only under
> non-disclosure and confidentiality agreements and protections)[.]"  Lefkowitz Decl. ¶ 33
> & Ex. O.

47.    The Lemonaid Privacy Policy in place from April 18, 2022, to the present, has the

following language relevant to a change of ownership:

> "Business Transfers.  We may disclose your Personal Information with other business
> entities in connection with the sale, assignment, merger or other transfer of all or a portion
> of Lemonaid's business to such business entity.  This Privacy Policy will apply to your
> Personal Information as transferred to the new entity."  Lefkowitz Decl. ¶ 34 & Exs. P,
> Y.[17]

48.    Since April 18, 2022 Lemonaid's Privacy Policy has expressly disclosed that

Lemonaid customers may request deletion of their data at any time.  Lefkowitz Decl. ¶ 36 & Exs.

P, Y.  For example, Lemonaid's current Privacy Policy specifically provides that:

> "You may request deletion of your Personal Information that we collect or maintain about
> you at any time.  To make a Deletion request, email us at privacy@lemonaid.com with the
> subject line "Deletion Request."  In some cases, we are required to maintain certain
> information as required by law (for example, to maintain medical records)."  Lefkowitz
> Decl. ¶ 36 & Exs. P, Y.

## OBJECTIONS AND THE CPO REPORT

49.    Several parties have filed objections to the Proposed Sale and the Sale Order

(collectively, the "Objections").  The Debtors were able to consensually resolve many of the

Objections prior to filing this reply.  As discussed below, certain states have objected, 24 of which

---

[16]   PHI was defined in this version of the Lemonaid Privacy Policy as information that "generally includes
information that we create or receive that identified you and your past, present, or future health status or case, or
the provision of or payment for that health care."  Lefkowitz Decl. ¶ 33.

[17]   Lefkowitz Decl. ¶ 35; Personal Information is defined by the Lemonaid Privacy Policy as "information that
identifies you personally, and . . . a general term to refer to the different categories we describe in this section."

(the "NAAG States") filed the *States' Objection to the Debtors' Proposed Sale of Customers' Assets* [Docket No. 687].  A reply to certain Objections is set forth in **Sections A** through **E** below. The Debtors continue to work with all objectors and hope to resolve any remaining objections consensually prior to the Sale Hearing.  As noted previously, on June 11, 2025 the CPO filed the CPO Report and issues raised in the CPO Report are also addressed here.

50.    On June 9, 2025, the NAAG States filed a *Complaint for Declaratory Judgment* [Docket No. 686] and the State of Texas filed a *Complaint for Declaratory Judgment* [Docket No. 688] (together, the "Adversary Complaints"), both seeking a determination from this Court that consumers have property interests in their genetic data that prevents Debtors from transferring such genetic data without their consent.  On June 13, 2025, the State of Texas also filed a *Motion and Application for an Order (I) Preliminarily Enjoining the Proposed Sale Transaction and (II) Granting Temporary Restraining Order Pending a Further Hearing and Brief in Support* [Case No. 25-04036, Docket No. 4] (the "TRO Motion"), seeking (a) an order preliminarily enjoining the Debtors from executing the Proposed Sale while the adversary proceeding remains pending and (b) an order temporarily restraining Debtors from executing the Proposed Sale until the Court determines whether separate and express consent of consumers is necessary to effectuate the transaction.

### Omnibus Reply to Objections and CPO Report

**A.    The Debtors Have Satisfied Their Burden For Approval of the Proposed Sale Under Section 363 of the Bankruptcy Code**

51.    The Debtors have satisfied their burden for approval of the Proposed Sale under section 363(b).  Following vigorous bidding, the Debtors selected TTAM as the Winning Bidder because TTAM's offer represents the highest cash purchase price for the assets, affords the Debtors' customers with enhanced privacy protections, allows the Debtors to consummate the

25

Proposed Sale through an equity sale, and is superior to other bids in all key respects.  As more fully set forth below, the Debtors have a sound business justification for the Proposed Sale and it was negotiated in good faith.  And to the extent TTAM constitutes an insider of the Debtors, the Proposed Sale satisfies heighted scrutiny required for such transactions because, among other things, the Debtors' sale process was led by the Special Committee whose decision-making remained independent and completely divorced from Ms. Wojcicki's interests at all times and in all respects related to the Proposed Sale or otherwise.

### (i)        The Proposed Sale Satisfies the Requirements Under Section 363(b) of the Bankruptcy Code.

52.        Under section 363(b)(1), a debtor is permitted to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  To approve a sale under section 363(b)(1), courts consider "if the debtor has established some articulated business justification for the proposed transaction." *In re Trilogy Dev. Co., LLC*, 2012 WL 13330680, at *1 (Bankr. W.D. Mo. June 14, 2012).  "Once a court determines that a sound business justification exists, the court must further determine whether (i) the debtor has provided all interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith." *In re MF Glob. Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012); *see also In re Summit Glob. Logistics, Inc.*, 2008 WL 819934, at *9 (Bankr. D.N.J. Mar. 26, 2008).  For the reasons discussed below, the Proposed Sale satisfies the requirements under section 363(b)(1).

### (a)        There Is a Sound Business Purpose for the Proposed Sale.

53.        Transactions under section 363 of the Bankruptcy Code must be based on the "sound business judgment of the debtor." *In re MF Glob.*, 467 B.R. at 730.  "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily

or capriciously), courts will generally not entertain objections to the debtor's conduct." *Id.* In light of the liquidity challenges facing the Debtors, the Debtors commenced these chapter 11 cases to conduct an orderly and value-maximizing sale of all or substantially all of their assets on a "free and clear" basis through a sale under section 363 of the Bankruptcy Code. In the business judgment of the Debtors, conducting such a sale provided the best path to maximize value for the benefit of the Company's stakeholders.

54.    As set forth in the Swift Declaration, the Debtors vigorously marketed their assets for several months both before and after commencing these chapter 11 cases. Swift Decl. ¶¶ 8-13. The Debtors engaged in a due diligence process for potential bidders, and a transparent, robust, and efficient marketing process. Swift Decl. ¶¶ 8-13. As part of that process, the Debtors conducted the Auction in accordance with the Bidding Procedures as well as the Final Bidding Round pursuant to the Final Proposal Procedures, the terms of which were consensually agreed to by the Debtors and the Bidders participating in the Final Bidding Round. Swift Decl. ¶¶ 14-33.

55.    Following this process, the Debtors, with the assistance of their advisors, determined that TTAM's Final Bid was the highest or otherwise best bid for the Debtors' assets. Walper Decl. ¶ 22. In making this determination, the Debtors considered several factors. *First*, TTAM's bid had the highest cash purchase of $305 million—$49 million higher than Regeneron's Successful Bid at the Auction.[18] *Second*, the TTAM APA provides for greater privacy protections for consumer data held by the Company, which is an important consideration for the Debtors and a primary concern of several stakeholders including the governmental entities who have filed objections to the Sale Order. *Third*, the TTAM APA provides for greater flexibility in transaction

---

[18]    Regeneron elected not to submit an overbid above TTAM's starting bid of $305M pursuant to the Final Proposal Procedures.

structure, allowing the Debtors to adopt a transaction structure that should resolve the objections of certain Objecting States which objected to an asset purchase but acknowledged that an equity sale would not implicate state privacy laws. *Finally*, the Proposed Sale contemplated by the TTAM APA does not require approval pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, which will likely permit the Debtors and TTAM to close the transaction more quickly and diminishes the risks associated with closing the Proposed Sale. Taken together, these factors demonstrated that TTAM's bid was the highest and best and counseled in favor of selecting TTAM as the Winning Bidder. Walper Decl. ¶ 22.

56.    Because, the Proposed Sale reflects the highest and best offer for the Debtors' assets, Walper Decl. ¶ 22, it represents a sound exercise of the Debtors' business judgment. *See In re Trilogy Dev.*, 2012 WL 13330680, at *2 (finding that the debtor's decision to sell certain assets was "based upon the reasonable exercise of its sound business judgment" because, among other things, "[t]he bidding process and the subsequent Auction appear to have been well designed to elicit the maximum sale price for the Project."); *see also In re Yuska*, 2017 WL 6506326 at *1 (Bankr. N.D. Iowa 2017) ("The goal of a [section] 363 sale is to 'maximiz[e] the value of the bankruptcy estate.'") (quoting *In re Farmland Indus., Inc.*, 289 B.R. 122, 126 (B.A.P. 8th Cir. 2003)). Absent approval of the Proposed Sale, the Debtors face a real risk of liquidation, which further supports a finding of the Debtors' sound business judgment in effectuating the Proposed Sale. *See In re Summit Glob.*, 2008 WL 819934, at *10 (finding that the debtors exercised sound business judgment in effectuating a sale under section 363 of the Bankruptcy Code because "[t]he Debtor has no real alternative but to complete a sale as a going concern" and "failure to consummate a sale at this juncture will result in a complete shut down of the Debtors' operations.").

(b)    The Debtors Provided Adequate and Reasonable Notice

57.    The Debtors have provided adequate and reasonable notice of the Proposed Sale. From the inception of these cases, and in particular by requesting approval of the Bidding Procedures on the Petition Date, the Debtors made clear their intention to effectuate a sale of all or substantially all their assets pursuant to section 363 of the Bankruptcy Code as early as possible in these cases.  The Debtors filed the Sale Motion and sought approval of their Bidding Procedures at the first day hearing.  After the Court approved the Bidding Procedures, the Debtors broadly distributed on March 28, 2025 a notice of the Bidding Procedures, related deadlines, Auction, and sale (the "Sale Notice").   The Sale Hearing is scheduled to take place on June 18, 2025, approximately 12 weeks after publication of the Sale Notice and 33 days after the conclusion of the Auction, which timing is far from "accelerated."  *Compare, e.g.*, *In re Summit Glob.*, 2008 WL 819934, at *11 (holding that the debtors provided adequate and reasonable notice where the debtors "filed the instant motion for bidding procedures and approval of its [s]ection 363 sale on January 30, 2008," and the "sale approval hearings occurred . . . approximately six weeks later."). Critically, as of June 18, 2025, the Debtors will have notified substantially all of their current and former customers of the potential change of ownership of their personal information to either TTAM or Regeneron.  Thus, the requirement for adequate and reasonable notice is satisfied.

(c)    The Proposed Sale Price Is Fair.

58.    For a sale to be approved pursuant to section 363 of the Bankruptcy Code, a debtor must also prove that the proposed sale price is fair.  A debtor must demonstrate that "the proposed purchase price is not only the highest offer, but the highest and best offer."  *In re Fam. Christian, LLC*, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015); *see also In re Summit Glob.*, 2008 WL 819934, at *10 (finding that the purchaser's bid represented a "fair valuation of the [debtors'] assets" because it was the "highest and best economic offer received").

29

59.     The Debtors conducted an extensive marketing process and highly competitive Auction involving multiple bidders and a Final Bidding Round that resulted in a purchase price of $305 million—a $253 million dollar increase from the starting bid at the Auction and a substantially better outcome for stakeholders than the best prepetition offer.  The process ensured competitive tension between the two leading bidders at all times, including, notably, through Regeneron's ability to have the final opportunity to submit a Final Proposal and top TTAM's Final Proposal during the Final Bidding Round.  The Debtors did not receive any proposals to acquire their assets at a purchase price higher than (or even close to) TTAM's Winning Bid.

60.     In addition, TTAM's Winning Bid is also the best offer when considering other factors, including (a) Enhanced Consumer Safeguards, (b) the right to exercise the Equity Sale Toggle, (c) economic terms of the bids, including the cash purchase price, (d) liabilities assumed by each bidder, and (e) timing and certainty of achieving necessary regulatory approvals and satisfying other closing conditions in connection with each sale.  Walper Decl. ¶ 22.  Thus, the Proposed Sale satisfies the "fair price" requirement under section 363 of the Bankruptcy Code.[19]

(d)     TTAM Is a Good Faith Purchaser.

61.     A sale pursuant to section 363 of the Bankruptcy Code requires a showing of the proposed purchaser's good faith.  A good faith finding establishes the "integrity of [a purchaser's] conduct in the course of the sale proceedings."  *In re Summit Glob.*, 2008 WL 819934, at *11.  A court may not find good faith if "fraud, collusion or unfair advantages are determined."  *Id.*  As discussed below, the record supports a finding that TTAM is a good faith purchaser.

---

[19]     For the same reasons, the Proposed Sale also provides "fair value" for the Debtors' assets as required under the heightened scrutiny standard applied to insider transactions.

### (ii)   The Proposed Sale Satisfies Heightened Scrutiny for Insider Transactions, to the Extent it Applies

62.     TTAM is led by the Debtors' co-founder, former CEO and current director, Ms. Anne Wojcicki.  To the extent the Winning Bidder constitutes an "insider" of the Debtors, the Proposed Sale easily satisfies the standard for heightened scrutiny for insider transactions. *See* 11 U.S.C. 101(31) ("The term 'insider' includes─ . . . (B) if the debtor is a corporation─(i) a director of the debtor").  As a threshold matter, "[t]here is no per se prohibition on a sale of a debtor's assets to an insider."  *In re AIG Fin. Prods. Corp*, 651 B.R. 463, 476 (Bankr. D. Del. 2023), *aff'd sub nom. In re AIG Fin. Prods. Corp.*, 2024 WL 3967465 (D. Del. Aug. 28, 2024); *see also In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo. 1988) (holding that "it is well established that, even when the purchaser is an insider, 'the Bankruptcy Court should have wide latitude in approving . . . a private sale of all or substantially all of the estate assets not in the ordinary course of business under § 363(b)'") (internal citations omitted).  Instead, where a proposed sale would benefit an insider of a debtor, "a court is required to give heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." *In re Fam. Christian*, 533 B.R. at 622; *see also In re Summit Glob.*, 2008 WL 819934, at *11.

63.     "The consideration of the good faith of the buyer is particularly relevant in a sale to an insider."  *In re Flour City Bagels, LLC*, 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016).  Here, a good faith finding is amply supported. *First*, in connection with marketing their assets, the Debtors established the Special Committee, which since the Petition Date has been comprised of four independent and disinterested directors.  The Special Committee was afforded exclusive authority to review, evaluate, negotiate and approve any proposed transaction to sell the Debtors' assets.  At all relevant times, the Special Committee had its own independent advisors and conducted its work

without input or influence from Ms. Wojcicki.  Neither TTAM nor Ms. Wojcicki has participated in any way in the decision-making process related to the Sale, including the ultimate selection of TTAM as the Winning Bidder.[20]  The Special Committee's independence from Ms. Wojcicki is amply demonstrated by the fact that it declined to accept a pre-petition offer for approximately $50 million from Ms. Wojcicki and determined, instead, to commence these cases for purposes of effectuating a sale under section 363 of the Bankruptcy Code (which sale process resulted in a substantially higher offer for the Debtors' assets).  Moreover, the Special Committee implemented extensive guardrails to restrict communications between the Debtors' management and Ms. Wojcicki on any matters related to the sale process to avoid the possibility of advantaging TTAM in the sale process given Ms. Wojcicki's role as a director of the Company.  Walper Decl. ¶ 9, 20.

64.    *Second*, the Special Committee elected to pursue a sale pursuant to a publicly-noticed bankruptcy auction subject to the approval of the Bankruptcy Court, which ensures "[a] fair and open sale process [that] is crucial to a bankruptcy court's good faith finding."  *In re Summit Glob.*, 2008 WL 819934, at *12.  The Debtors, through their advisors, contacted more than 100 strategic and financial institutions, pre- and post-petition, as potential purchasers of the Debtors' assets and provided the same diligence information to all interested parties subject to confidentiality agreements (including TTAM) to ensure information parity.  Swift Decl. ¶¶ 7-8.  In fact, a finding of a fair and open sale process, and one that lacks any favorable treatment afforded

---

[20]    The independent oversight of the Special Committee also would warrant application of business judgment review standard rather than heightened scrutiny.  Courts in Delaware, the state of incorporation of the Debtors' publicly-held parent company as well as several other Debtors whose assets are being sold as part of the Sale, have held that "business judgment is the standard of review that should govern mergers between a controlling stockholder and its corporate subsidiary, where the merger is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders."  *Kahn* v. *M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014) *overruled on other grounds by Flood* v. *Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

to TTAM and/or Ms. Wojcicki, to the extent TTAM or Ms. Wojcicki are "insiders" of the Debtors, is supported by the fact that shortly after the Auction, TTAM filed an objection to the Debtors' Sale Motion alleging that, among other things, the Debtors' sale process "tilt[ed] the sale process away from TTAM and in favor of its preferred bidder, Regeneron Pharmaceuticals, Inc." *See TTAM Parties' Preliminary Objection to the Sale Motion* [Docket No. 573] ¶ 2.

65.     *Third*, when evaluating the good faith requirement with respect to an insider sale, courts consider whether the transaction insulates and provides releases to such insiders. *In re Summit Glob.*, 2008 WL 819934 at *12; *see also In re Exaeris, Inc.*, 380 B.R. 741, 747 (Bankr. D. Del. January 15, 2008) ("What is clear is that a court can and should consider whether an insider is receiving a release when evaluating the "good faith" criterion."); *In re Fam. Christian*, 533 B.R. at 629.  Here, the Debtors negotiated to ensure that the TTAM APA does not effectuate any release of potential estate causes of action or claims.  Such claims and actions are expressly carved out of the "Acquired Assets" and will remain with the Debtors' estates after closing of the Proposed Sale. The absence of a release or acquisition of estate claims or cause of action further supports a finding that TTAM is a good-faith purchaser of the Debtors' assets.

66.     *Finally*, TTAM disclosed to the Debtors throughout the bidding process and in its Qualified Bid documents all information required by the Bidding Procedures concerning the identity of TTAM and its affiliates.  Such disclosures provided the Debtors and the Consultation Parties complete and accurate information concerning all material connections between TTAM and its affiliates, on the one hand, and the Debtors and their respective affiliates, on the other hand.

67.     For the reasons set forth above, to the extent it applies, the Proposed Sale satisfies the heightened scrutiny standard for insider transactions and the Proposed Sale of the Debtors' assets to TTAM should be approved.  Indeed, no stakeholders have objected to the sale on any

grounds related to the consideration being paid to the estate, the terms of the sale, or any insider status of the Winning Bidder.

### (iii)    The Proposed Sale Satisfies Section 363(f) of the Bankruptcy Code

68.    Certain of the Objecting States misconstrue the Debtors' request for approval of the Proposed Sale "free and clear" under section 363(f) of the Bankruptcy Code as an attempt to impair or abrogate customer's rights with respect to their data under the Debtors' Privacy Policies and applicable law.  This argument ignores two critical facts.  *First*, nothing in the APAs seeks to convey an interest in customer's Personal Information greater than what the Debtors maintain under the Terms of Service and Privacy Statement and applicable law.  *Second*, it is an objective fact that the Debtors' customers will have **greater** rights and protections with respect to their data should the Proposed Sale to TTAM close.  The Debtors do not seek to effect a change of ownership of the Personal Information "free and clear" of customers' rights.  Customers would retain the same—and, indeed, greater—rights in their data.

69.    Section 363(f) of the Bankruptcy Code allows a debtor to sell property under sections 363(b) or (c) "free and clear of any interest in such property of an entity" if one of five requirements is met, including (among others) if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."[21]  Section 363(f) is "one of the most powerful provisions in the Bankruptcy Code in that it can authorize a sale of estate property free and clear of interests, with such interests to attach to the sale proceeds" and thus preclude any party from asserting successor or other liability arising out of the Debtors' use of the purchased assets prior to closing.  *See In re Sugarloaf Holdings, LLC*, 640 B.R. 270 (Bankr. D.

---

[21]    The conditions of section 363(f)(1)–(5) are disjunctive (meaning only one needs to apply for section 363(f) to be satisfied), *see infra* ¶ 106, contrary to the position of the NAAG States that each condition must be satisfied. NAAG States Obj. ¶ 20 ("Section 363(f)(1) only allows the sale of property if nonbankruptcy law would permit the sale.").

Utah 2022) ("[W]hile § 363(f) has the power to sell property free and clear, it does not alter or extinguish the value of a party's property interests but 'preserves all parties' rights by simply transferring interests from property to dollars that represent its value.").

70.     The Debtors only seek to sell the interests in their property that they hold today. They are not, as the Objectors suggest, using section 363(f) to somehow expand those interests. Presently, the Debtors have an interest in the Personal Information under their Terms of Service, which provide, with respect to customers, that "[a]ny information derived from your sample remains your information, subject to the rights [the Debtors] retain as set forth in these Terms." Lefkowitz Decl. ¶ 10.  For example, a customer that registers a test kit with the Debtors and elects to have its information used for research purposes expressly grants the Debtors an interest in that information to effectuate such research.  Because both Bidders have agreed to comply with the Debtors' Privacy Policies, either purchaser will hold those exact same rights after the sale closes. Nothing more.  Nothing in the APAs suggests otherwise, nor does the Sale Order contemplate any diminishment in customers' rights.

71.     The Debtors' interest in customer data is, of course, an asset that can be part of a section 363 sale.  Section 363(b)(1) expressly contemplates the transfer of a debtor's interest in such information by imposing a statutory framework governing the "transfer of personally identifiable information about individuals," which includes "individual names," "addresses," and "any other information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically."  11 U.S.C. §§ 363(b)(1); 101(41A).  Such personally identifiable information includes, as discussed below, genetic information. *See infra* ⁋ 80.

72.     While it is true that section 363(f) permits the sale of assets "free and clear of any interest in such property," nothing in section 363(f) operates to strip customers of their rights as to their own personal information.  Even if it did, the APAs confirm that such rights will be *preserved*.  The Debtors operate a direct-to-consumer business that TTAM intends to continue.  TTAM has agreed to adopt and comply with the Debtors' Privacy Policies, including honoring customers' rights thereunder, and provide the Enhanced Consumer Safeguards that guarantee perpetual deletion rights, provide increased notice and reporting controls, preclude a sale or transfer of genetic data in a subsequent bankruptcy or change of control unless the recipient is a qualified domestic entity that adopts TTAM's privacy policies and complies with all laws (among other things).  TTAM APA, Ex. D.  Customers are guaranteed in perpetuity their existing right to delete their Personal Information.  Put differently, customers have the absolute right to control their data by directing its deletion and terminating any interest the Debtors—or TTAM once the Proposed Sale closes—has in that data.  That is true today and will remain true if the Proposed Sale is consummated.

73.     With respect to customers, the only "interest" that will remain with the Debtors' estates if the Court authorizes the sale under section 363(f) are *claims* that could be asserted against the Debtors' estates through the bar date process, such as those arising from the Debtors' Cyber Security Incident.[22]  *See In re Stelluti*, 167 B.R. 29, 33 (Bankr. S.D.N.Y. 1994), *subsequently aff'd*, 94 F.3d 84 (2d Cir. 1996) ("A creditor, even one that is unsecured, has an intangible, legally protected interest in its debtor's property.").  Section 363(f)(5) expressly contemplates this type of discharge as it provides for the ability to sell assets free and clear of such claims if the holder

---

[22] As defined in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 32].

"could be compelled, in a legal or equitable proceeding" to accept a money satisfaction of such interest.  In that case, a customer who submits a timely proof of claim would have its claim, if allowed, reduced to a money judgment and receive a distribution from the sale proceeds as part of the claims reconciliation process (a much more favorable outcome than the alternative, where the Debtors' postpetition DIP lender could foreclose on the assets and the customer would receive nothing).  The customer would then, by virtue of section 363(f), be precluded from asserting the same claim against the purchaser.  But a customer's rights in his or her information remain unaffected.  As such, the Proposed Sale satisfies section 363(f) and the Objections on these grounds should be overruled.

## B.   The Proposed Sale Complies with Section 363(b)(1)'s Requirements Governing Transfers of Personally Identifiable Information

74.   The Objecting States simply ignore the controlling statute when urging that the Proposed Sale should be rejected on the ground that it supposedly violates myriad data-privacy-related state laws.  The Objecting States' state-law arguments are wrong on the merits and should be rejected, but the Court need not reach them where, as here, the Debtors' Privacy Policies expressly authorize the transfer in connection with a sale.  In that circumstance, the express terms of section 363 make clear that approval should be granted and that the Court should not reach whether or not the Proposed Sale violates applicable nonbankruptcy law.  *See* Cate Report ¶¶ 16–18.  And as discussed below, *see infra* at ¶¶100-105, the Bankruptcy Code preempts any state law that would prohibit a sale that is expressly authorized under section 363.

75.   Section 363(b)(1) of the Bankruptcy Code—not state law—supplies the governing framework for evaluating whether the Proposed Sale constitutes an impermissible sale of customers' genetic data.  As explained in the Cate Report, this statutory framework was intentionally and carefully crafted to "respect[] the choices that consumers have already made and

recognize[] the importance of bringing bankruptcies to a successful conclusion that protects the rights of all of the parties involved," *see* Cate Report ⫟ 3.   The Proposed Sale complies with section 363(b)(1) for at least three reasons, each of which is independently sufficient to warrant overruling the Objections.

76.    *First,* section 363(b)(1) permits a sale of estate property, including "personally identifiable information," without any unique limitations or restrictions except in one particular circumstance, which, as explained in the Cate Report, is not present here.  *see* Cate Report ¶ 16 ("If the Debtors had a policy, which is not the case here, 'prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor' that 'is in effect on the date of the commencement of the case,' then Congress has two additional routes for the privacy process to follow."). ***Only where*** the debtor's policies "prohibit[] the transfer of personally identifiable information" does section 363(b)(1) apply additional limitations—set forth in (b)(1)(A) and (b)(1)(B)—on a sale involving the transfer of personally identifiable information. Here, the Debtors' Privacy Policies expressly permit such transfer, and accordingly the restrictions in subsection (b)(1)(A) or (b)(1)(B) are not applicable.  *Second*, the Proposed Sale nevertheless also plainly satisfies section 363(b)(1)(A), the first of the two disjunctive tests, because the Proposed Sale is "consistent with" the Debtors' Privacy Policies.  *Third*, the Proposed Sale also satisfies section 363(b)(1)(B) because there has not been, and cannot be, any showing that the Proposed Sale would violate applicable nonbankruptcy law.

(i)    **The Proposed Sale Complies with Section 363(b)(1) Because the Debtors'
Privacy Policies Do Not "Prohibit[] the Transfer of Personally Identifiable
Information"**

77.    *First*, because the Debtors' Privacy Policies do not prohibit the transfers[23]
contemplated by the Proposed Sale, the sale should be approved.  Neither subsection 363(b)(1)(A)
nor 363(b)(1)(B) apply here.  By their terms, subsection 363(b)(1)(A) and (B)'s provisions
regarding the sale of "personally identifiable information" are implicated only where the
"debtor . . . discloses to an individual a ***policy prohibiting*** the transfer of personally identifiable
information" and "such policy is in effect on the date of the commencement of the case."
(emphasis added).

78.    Here, the 23andMe Privacy Statement in effect on the Petition Date does not
"prohibit"—indeed, it expressly permits—the sale of "Personal Information" to a "new entity."
Lefkowitz Decl. ¶¶ 16–17 ("If we are involved in a bankruptcy, merger, acquisition,
reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred
as part of that transaction and this Privacy Statement will apply to your Personal Information as
transferred to the new entity.").[24]  All prior versions of the Privacy Statement equally expressly
authorize such a sale.

79.    The genetic data subject to the APAs—described by the NAAG States as "highly
sensitive and immutable personal data"—is personally identifiable information under
section 363(b)(1).  *See* NAAG States Obj. ¶ 11.  The Bankruptcy Code defines "personally
identifiable information" to include "information concerning an identified individual that, if

---

[23]    Certain Personal Information being sold under the TTAM APA, for example, deidentified data, is not "personally
identifiable information."  To the extent the Debtors are seeking to sell such data, additional analysis under
363(b)(1) is not required for the additional reason that the sale does not involve "personally identifiable
information."

[24]    The Lemonaid Privacy Policy in effect on the Petition Date contains substantially similar language.  Lefkowitz
Decl. ¶¶ 31–35.

disclosed, will result in contacting or identifying such individual physically or electronically" when such information is identified in connection with one or more types of information enumerated in the Code, including contact information such as names and email addresses. *See* 11 U.S.C. § 101(41A).

80.     The customer data, which includes customers' genetic data, satisfies this definition. *First*, as the Objecting States acknowledge, it is information that is "exclusively personal and unique in representing that customer's identity." NAAG States Obj. ¶ 12. *Second*, the various types of personal information that the Debtors process about customers, including genetic data, can be linked to a specific individual. Lefkowitz Decl. ¶ 9. All customers are required to create an account by providing certain identification information, such as their first name, last name, email, and date birth, and 23andMe associates this identification information with the customer's genetic information for certain purposes, including managing data access and data deletion requests. Lefkowitz Decl. ¶ 9. The Objecting States recognize the genetic data is "conjoined with [customers'] phenotype data . . . and other sensitive personal information, including the individual's family tree and ***contact information***." NAAG States Compl. ¶ 10 (emphasis added). The CPO Stipulation likewise acknowledges that "genetic data as well as health and personal information" falls within section 101(41A)'s definition of "personally identifiable information." CPO Stipulation at 6 n.2.[25]

81.     Here, 23andMe's Privacy Statement—which was "in effect on the date of the commencement of [this] case"—expressly permits a transfer of data in connection with a sale or

---

[25]     Other statutes and regulations likewise consider genetic data to be "personally identifiable information." *See In the Matter of TerraCom, Inc. & YourTel Am., Inc.*, 29 F.C.C. Rcd. 13325 (2014) (stating personally identifiable information includes "biometric records" under telecommunications regulations); *Lei Ke* v. *Drexel Univ.*, 2014 WL 1100179, at *4 (E.D. Pa. Mar. 20, 2014) (noting "personally identifiable information" includes "biometric record" in education regulations).

other change of control transaction.  *See* 11 U.S.C. § 363(b)(1).  23andMe's Privacy Statement

provides that if the Company is involved in a "bankruptcy, merger, acquisition, reorganization, or

sale of assets," then customers' "Personal Information may be accessed, sold or transferred as part

of that transaction and this Privacy Statement will apply to [their] Personal Information as

transferred to the new entity."[26]

82.     The Objecting States do not (and could not) argue that the Debtors' Privacy Policies

in effect on the Petition Date "prohibits" the transfer of genetic information in a sale under section

363 of the Bankruptcy Code.  Nor does the CPO.  Instead, the CPO states that he "***cannot conclude***

***with certainty*** that the sale of the Company's data in bankruptcy is otherwise consistent with its

privacy policies, particularly for those customers who created their accounts before the 23andMe

Privacy Statement was amended in June 2022 to expressly note the potential for a sale of customer

data in bankruptcy."  CPO Report at 7 (emphasis added).

83.     The CPO disregards the relevant legal standard.  Section 363(b)(1) is limited to

whether the Debtors had disclosed a policy "***prohibiting the transfer*** of personally identifiable

information."  The CPO does not identify any statement in any of the Debtors' Privacy Policies or

elsewhere that ***prohibits*** the transfer of Personal Information in connection with a sale or change

of control.  To the contrary, the CPO appears to ***acknowledge*** that the Privacy Statement in effect

on the Petition Date permitted such transfers by referencing bankruptcies among the types of

change of control transactions in which Personal Information may be transferred.  CPO Report at

34.  As a matter of law, this is the only relevant policy, because it was the one in effect at the

commencement of the case.  *See In re Borders Grp., Inc.*, 2011 WL 5520261, at *5.

---

[26]    Previous versions of the Privacy Statement were in accord, and at all times authorized the sale or acquisition of
assets including Personal Information in a change of control transaction.  *See* Lefkowitz Decl. ¶¶ 7, 14-17.

84.     Nor does it make any difference to the analysis that the word "bankruptcy" was added to the Privacy Statement in 2022.  As discussed in the Cate Report, nothing in pre-2022 Privacy Staatement "prohibited" the transfer of Personal Information.  Cate Report ¶ 17.  ("The Policy in place on the Petition Date, and for almost 20 years before that, explicitly recognized that data could be transferred in connection with a sale of the business.")  And neither the Objecting States nor the CPO offer any argument to the contrary.  That presumably is because each pre-2022 privacy statement expressly allowed the transfer of information in connection with sales and other business transitions:  "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred."  The objecting parties and the CPO fail even to attempt to explain how a bankruptcy proceeding would not be "business transition" or how a section 363 sale is anything other than a "sale of all or a portion of [the Debtors'] assets."  Surely, nothing in this text can be read to *prohibit* the transfer of Personal Information in a sale under section 363 of the Bankruptcy Code.

85.     Perhaps the CPO's difficulty in finding "certainty" arises from his decision to "interpret 'the Debtors' Privacy Policies' broadly, to include not just the revisions of the 23andMe Privacy Statement and 23andMe's Terms of Service, but also the frequent representations and promises 23andMe made about privacy, most of which were far more visible . . . than technical language about change in control deep in the Privacy Statement."  CPO Report at 7.  This approach, as Professor Cate explains, is incorrect.  Cate Report ¶ 20.  23andMe has one privacy policy, reflected in its Privacy Statement, and the language at issue has been updated only three times. *See* Lefkowitz Decl. ¶¶ 11, 14–16.  It always has expressly allowed transfers in connection with business transitions such as acquisitions and asset sales.  There is no legal basis cited by the CPO,

nor any of the Objecting States, to support a conclusion that the "privacy policy" under section 363 is broader than what customers are asked to acknowledge and accept as the operative policy governing the use of their data when they sign up to be customers of 23andMe. The CPO implicitly concedes as much, asserting that his approach instead is supposedly supported by "the academic literature on how consumers reasonably understand privacy terms." CPO Report at 36-37. Moreover, as explained in the Cate Report, "[t]here are numerous law review articles and reports examining privacy practices that limit themselves to privacy policies themselves, starting with the FTC's own 1998 and 2000 reports to Congress on the state of online privacy" Cate Report ¶ 20.

86.    Not only would the CPO's "broad" interpretation of the Debtors' Privacy Policies be practically inadministrable as a practical matter and have no basis in applicable law, the CPO fails to identify any supposed "representations and promises" that "prohibit" the transfer of Personal Information in connection with a sale or change in control.[27]

87.    There is, therefore, no basis in the record anywhere to support a conclusion that 23andMe ever had a privacy policy prohibiting the transfers at issue in the Proposed Sale. But it bears repeating that the CPO Report and the Objecting States have substantially overcomplicated what Professor Cate makes clear is a very straightforward analysis. Under the Bankruptcy Code, only the privacy policy in place on the date of the commencement of the case is relevant. All parties concede that the Privacy Policies in effect when these cases were commenced on March 23, 2025, expressly permits changes in ownership during a bankruptcy. *See* Cate Report ¶ 47 ("There is no role for these nonbankruptcy laws if a debtor does not have a policy 'prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the

---

[27]    Moreover, the CPO overlooks the purchasers' ability to terminate under the terms of the APAs if the Personal Information cannot be transferred without the second, separate affirmative consent process the CPO would like, *see supra* ¶ 26, a worse outcome for all customers and stakeholders.

debtor' that 'is in effect on the date of the commencement of the case.'  There is no conclusion in the CPO report that the Debtors do, so further consideration of other laws seems unnecessary.").

88.    *In re Borders Grp., Inc.* is particularly instructive, and underscores the fact that earlier versions of the Privacy Statement are irrelevant under section 363.  Borders Group, Inc. and its subsidiaries (collectively "Borders") filed for chapter 11 on February 16, 2011 and sought to sell its consumers' personally identifiable information to Barnes & Noble, Inc. (the "Buyer"). The United States Trustee appointed a consumer privacy ombudsman (the "Borders CPO") to review Borders' proposed sale.  Borders' privacy policy in effect at the petition date permitted the transfer of personal transfer as part of a sale, but, unlike here, Borders had at least three historical policies that required customer consent before personal information could be disclosed.  Borders CPO Report ¶ 42.[28]  The Borders CPO explained that "[a]lthough there are small variations among the [earlier] Privacy Policies, none of the policies contains a provision that is similar to the provision in the [current] Privacy Policy concerning the treatment of 'personal information' and other information in a sale or reorganization." The earlier policies instead required Borders to obtain consumers' express consent to disclosure to third parties of their "email addresses or other personal information."  Borders CPO Report ¶ 43.  Specifically, the Privacy Policy in place on the commencement date contained the following provision regarding the sharing of "personal information" with third parties in connection with the sale of the company:

> "Circumstances may arise where for strategic or other business reasons Borders decides to sell, buy, merge or otherwise reorganize its own or other businesses.  Such a transaction may involve the disclosure of personal and other information to prospective or actual purchasers, or receiving it from sellers.  It is Borders' practice to seek appropriate protection for information in these types of transactions.  In the

---

[28]    The "Borders CPO Report" refers to the *Report of Michael St. Patrick Baxter Consumer Privacy Ombudsman* [Docket No. 1830] filed in *In re Borders Group, Inc., et al.,* Case No. 11-10614 (Bankr. S.D.N.Y.).

event that Borders or all of its assets are acquired in such a transaction, customer information would be one of the transferred assets."

Borders CPO Report ¶ 41.  Because the earlier privacy statements "did not contain a 'sale' provision," the Borders CPO opined that "the Sale is not consistent with the [earlier] Privacy Policies and is permitted only if there is no showing that the Sale would violate applicable nobankruptcy law."  Borders CPO Report ¶ 49.

89.    In approving the sale, the court rejected the CPO's recommendation, recognizing that "[a]s contemplated in the Transaction, and subject to the terms of this Order, the sale to the Purchaser of personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code, "PII") about individuals is consistent *with the privacy policy of the Debtors in effect on the date of commencement of the Cases*."  *In re Borders Grp., Inc.*, 2011 WL 5520261, at *5 (emphasis added).  The same result should obtain here.  Indeed, the analysis is even more straightforward because each version of 23andMe's Privacy Statement expressly authorized the transfer contemplated here.

90.    Certain Objectors point to irrelevant statements in superseded versions of the Privacy Statement that 23andMe does "not sell information, and we will not use your Genetic Information for marketing or personalized advertising without your explicit consent," and that 23andMe "will not sell, lease, or rent your individual-level information (*i.e.*, information about a single individual's genotypes, diseases or other traits/characteristics) to any third party or to a third party for research purposes without your explicit consent."  Texas Obj. ¶ 29; *see also* NAAG States Obj. ¶¶ 28–29; Alaska Obj. at 4; CPO Report at 37–40.  But these statements address limitations on information transfer as part of 23andMe's ordinary-course commercial relationships.  The

transfer of data in connection with a ***sale or business transformation*** was specifically addressed in the same Privacy Statement and expressly permitted.  Lefkowitz Decl. ¶ 15.[29]

91.    Similarly unavailing are the claims that the Privacy Statement's provisions stating that customers' Personal Information may be sold in a business transition are "tucked away," and therefore not binding.  NAAG States Obj. ¶ 27; *see also* CPO Report at 37–38.  These claims are factually false:  customers expressly acknowledge that they have read and accept the Privacy Statement and Terms of Service and are presented with multiple avenues to review the Privacy Statement and Terms of Service, along with summaries of the key provisions in those documents. *See supra* 38.

92.    Accordingly, because the Debtors' Privacy Policies as of the Petition Date did not "prohibit[]" (in fact, it specifically authorized) a sale of personally identifiable information (*i.e.*, genetic data), the additional provisions of section 363(b)(1)—which as described below, are satisfied in any event—are not applicable.  *See* Cate Report ¶ 29 ("As a result, in all of the bankruptcy cases with which I am familiar as a scholar or having served in the CPO role myself, in the absence of an express commitment in a privacy policy not to sell data to a third party, there is no requirement for a CPO or further privacy-related inquiry.")  The Court may approve the Proposed Sale on this basis alone.  *See* Cate Report ¶ 24 ("So if there is no policy in effect on the date the bankruptcy commences prohibiting the sale of personal data to unaffiliated third policies, there is no need for a CPO or further privacy inquiry.").

---

[29]    Specifically, the 23andMe Privacy Statement included the following change of ownership language between June 24, 2010 and June 7, 2022: "In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred.  In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement."  Lefkowitz Decl. ¶ 15.

(ii)     **The Proposed Sale Can Be Approved Under Either Sections 363(b)(1)(A) or 363(b)(1)(B), Either of Which Is Independently Sufficient**

93.      Even if further analysis under section 363(b)(1) were warranted—it is not—the Proposed Sale satisfies ***both*** of the independently sufficient tests under which a bankruptcy sale of personally identifiable information is permitted.

94.      Section 363(b)(1) supplies two, alternative grounds by which a debtor that "discloses to an individual a policy prohibiting the transfer of personally identifiable information" may sell such personally identifiable information: *first*, if "such sale . . . is consistent with such policy," 11 U.S.C. § 363(b)(1)(A), "***or***" *second*, if "after [the] appointment of a consumer privacy ombudsman," the court "approves such sale . . . (i) giving due consideration to the facts, circumstances, and conditions of such sale . . . and (ii) finding that no showing was made that such sale . . . would violate applicable nonbankruptcy law."   11 U.S.C. § 363(b)(1)(B) (emphasis added).

95.      Critically, section 363(b)(1) is disjunctive: ***either*** the sale must satisfy section 363(b)(1)(A) ***or*** it must satisfy 363(b)(1)(B).  *See Campos-Chaves* v. *Garland,* 602 U.S. 447, 457 (2024) ("The word 'or' is 'almost always disjunctive,' and is generally used 'to indicate . . . an alternative.'") (quoting *Encino Motorcars, LLC* v. *Navarro*, 584 U.S. 79, 87 (2019); Webster's Third New International Dictionary 1585 (1993)); *see also Lamie* v. *U.S. Trustee,* 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (quoting *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  That a sale may comply with section 363(b)(1) by satisfying one of its two alternative tests is consistent with the statute's legislative history: when enacting the statute, Congress explained that personally

identifiable information subject to section 363 may be sold if "*either of [its] conditions [are] satisfied*." H.R. REP. 109-31(I), 67-68, 2005 U.S.C.C.A.N. 88, 136 (emphasis added).

96.     Here, (a) the Proposed Sale is consistent with the Debtors' Privacy Policies in effect as of the Petition Date, and (b) there has not been any showing that the Proposed Sale would "violate nonbankruptcy law." Each of these conclusions are independently sufficient to comply with section 363(b)(1).

(a)     <u>The Proposed Sale Complies with Section 363(b)(1)(A) of the Bankruptcy Code, Independently Warranting Its Approval</u>

97.     The Proposed Sale is entirely consistent with the Debtors' privacy policies in effect on the Petition Date, which expressly contemplates sales like the Proposed Sale. Accordingly, the Proposed Sale satisfies section 363(b)(1)(A) of the Bankruptcy Code, a sufficient basis on which the Court may find the Proposed Sale complies with section 363(b)(1). Moreover, because section 363(b) reflects a Congressional determination as to the specific requirements to effect a sale in bankruptcy involving personally identifiable information, including genetic data, any state law that would otherwise prohibit such a sale on the ground that it involves the transfer of personally identifiable information that would otherwise satisfy the terms of section 363 is preempted.

1.     <u>The Proposed Sale is Consistent With the Debtors' Privacy Policies in Effect on the Petition Date</u>

98.     Section 363(b)(1)(A) provides that a debtor may sell personally identifiable information if "such sale . . . is consistent with" the debtor's "policy prohibiting the transfer of personally identifiable information . . . in effect on the date of the commencement of the case." As described above, the Debtors' Privacy Policies have never "prohibit[ed] the transfer of personally identifiable information." Even if they had, however, the Proposed Sale is entirely "consistent with" Debtors' Privacy Policies in effect on the Petition Date.

48

99.     As described above, the Privacy Statement in effect on the Petition Date states that if the company is involved in a "bankruptcy, merger, acquisition, reorganization, or sale of assets," then customers' "Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to [their] Personal Information as transferred to the new entity." Each prior version of the Privacy Statement, while irrelevant, also expressly stated "[i]n the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred," and likewise required the buyer to honor the Privacy Statement. Because 23andMe's customers each consented to a policy that allows transfer of their genetic data in the event of an "acquisition" or "sale of assets"—*e.g.*, the Proposed Sale—and because TTAM or Regeneron are acquiring such assets subject to the same Privacy Statement, the Proposed Sale is consistent with the Debtors' Privacy Policies and thus complies with Section 363(b)(1)(A).[30]

> 2.     The Bankruptcy Code Preempts State Laws That Would Otherwise Preclude a Sale Involving the Transfer of Personally Identifiable Information

100.     If a sale satisfies Section 363(b)(1) or 363(b)(1)(A), nonbankruptcy law is irrelevant under section 363, and application of state law to preclude such a sale would be preempted by the Bankruptcy Code. In 2005, with the BAPCPA, section 363(b)(1) of the Bankruptcy Code was modified to provide precisely how assets involving personally identifiable information could be sold by a debtor under section 363. These amendments accordingly reflected

---

[30]    Moreover, this result is consistent with the caselaw: bankruptcy courts approve sales involving personal information when it is consistent with a debtor's privacy policy. *See, e.g.*, *In re S & K Famous Brands, Inc.*, 2009 WL 8189297, at *3 (Bankr. E.D. Va. Feb. 9, 2009) ("The Court previously determined that the Sale is consistent with the Privacy Policy, as provided in section 5.4 of the Agreement, and, therefore, the PII may be sold pursuant to § 363 without the necessity of the appointment of a consumer privacy ombudsman."); *In re Borders Grp., Inc.*, 2011 WL 5520261, at *5 (Bankr. S.D.N.Y. Sept. 27, 2011) (approving a sale including personally identifiable information consistent with the debtors' privacy policy).

49

Congress's judgment as to the circumstances in which nonbankruptcy law may—and importantly, may not—preclude a section 363 sale.

101.    That judgment is clear from the text of the statute:  the **only** circumstance in which applicable nonbankruptcy law can potentially apply to a section 363 sale is when a debtor's privacy policy prohibits transfers **and** the proposed sale is not otherwise consistent with the debtor's policy. This result especially makes sense here, where in the case giving rise to the applicable statutory framework—*Toysmart*—the debtor had a privacy policy "that promised 'never' to share the information with third parties."  Cate Report ¶ 25.  As the statutory text makes clear, applicable nonbankruptcy law otherwise has no application.  Because the Privacy Policies authorize the transfer of Personal Information in connection with the Proposed Sale, the Proposed Sale satisfies section 363 and any state law that nevertheless precludes the Proposed Sale is preempted.

102.    To read section 363(b) as requiring compliance with state privacy laws—which could only apply where approval is necessary under section 363(b)(1)(B)—despite the fact that the Proposed Sale satisfies independently sufficient statutory grounds would be contrary to the plain language of section 363 and Congressional intent.  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same [statute], it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello* v. *U.S.*, 464 U.S. 16, 23 (1983) (internal citations omitted).  Requiring in all circumstances a "finding that no showing was made that [a] sale . . . would violate applicable nonbankruptcy law" thus would conflict with a clear Congressional command that such a finding is unnecessary where other provisions of section 363 are satisfied.  *See* Cate Report ¶ 4 ("Congress permits [a sale of personally identifiable information] if it is nevertheless 'consistent with [a debtor's privacy policy] in effect on the date of the commencement of the case.'").

50

103.    Section 363(b)(1)(A) of the Bankruptcy Code expressly authorizes the Proposed Sale because section 363(b)(1)(A) does not condition a transfer of personally identifiable information on compliance with nonbankruptcy (*e.g.*, state) law.  Because federal law permits the Proposed Sale, implied conflict preemption precludes application of any state law that would prohibit what the federal statute expressly allows.  *See, e.g.*, *In re Old Carco LLC*, 442 B.R. 196, 210 (S.D.N.Y. 2010) ("The principles of conflict preemption preclude application of the challenged state dealer amendments to deny the debtor and the purchaser the benefits of a judicially approved rejection of certain dealer franchise agreements in accordance with the Bankruptcy Code. Based on the record before me, the ***plaintiffs have established that compliance with the state dealer amendments would frustrate and undermine lawful actions taken pursuant to the Bankruptcy Code.***" (emphasis added)); *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287 (1995) ("We have found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") (internal citation and quotation marks omitted); *In re Rancourt*, 153 B.R. 380, 383 (Bankr. D.N.H. 1993) (holding that the right of first refusal provided under certain state laws was preempted by provision of the Bankruptcy Code requiring liquidation of estates by bidding process or other processes that would extract the highest realizable value of property because otherwise, enforcing the right under state law would "destroy[] the federal statute and the auction bidding process."); *In re Congoleum Corp.*, No. 03-51524, 2008 WL 4186899, at *5 (Bankr. D.N.J. Sept. 2, 2008) (finding that state law "must give way to federal law" where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

104.    Bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See, e.g.*, *In re Shenango Grp., Inc.*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997); *In re Protarga*, 329 B.R. 451, 480 (Bankr. D. Del. 2005) ("[T]he task—as in all preemption analysis—is to determine whether state regulation is consistent with the structure and purpose of the federal statute as a whole.") (quoting *40235 Wash. St. Corp.* v. *Lusardi*, 177 F.Supp.2d 1090, 1103 (S.D. Cal. 2001)); *Lusardi*, 177 F. Supp.2d at 1103 ("A sufficient conflict occurs when the state law has a direct and substantial impact on the federal scheme.") (citing *Gade* v. *Nat'l Solid Wastes Mgmt. Ass'n.*, 505 U.S. 88, 107 (1992)).

105.    Section 363(b) of the Bankruptcy Code evinces a clear Congressional intent to facilitate sale of estate property outside of the ordinary course of business—subject to clearly delineated restrictions.  Through section 363(b), Congress has expressly legislated the standard for sales involving the transfers of personally identifiable information, and has placed at the center of that statute consumer expectations reflected in prepetition privacy policies.  Only in circumstances where a sale would violate a prepetition policy does section 363 call for courts to look to nonbankruptcy law.  Requiring compliance with state privacy laws as a condition to every sale under by section 363 would directly undermine the Bankruptcy Code.  *See, e.g.*, *In re Baker & Drake, Inc.*, 35 F.3d 1348, 1354-55 (9th Cir. 1994) (holding that preemption may be properly invoked where a state law "directly conflict[s] with the purposes of the Bankruptcy Code in [a] way which could be generalized beyond the particular facts of [a specific] case."); *see also* Cate

Report ¶ 4 ("Congress' preference for allowing personal data to be included responsibly in bankruptcy proceedings thus is so great that it permits that information be transferred to a third party, even if there was a promise not to, solely on the authority of the Bankruptcy Code and without consideration of other federal or state laws, if the sale is otherwise consistent with the privacy policy.").

106.    The NAAG States assert that "[s]ection 363(f)(1) only allows the sale of property if nonbankruptcy law would permit the sale." NAAG States Obj. ¶ 20. But section 363(f) is disjunctive, and the Debtors do not seek a finding under section 363(f)(1). The two cases they cite are in any event inapposite. Each case predates the enactment of BAPCPA and neither involves transfer of personally identifiable information—where Congress has clearly spoken on the requirements necessary to effect such a transfer through a section 363 sale. *See In re Schauer*, 835 F.2d 1222 (8th Cir. 1987) (involving the transfer of patronage margin certificates issued by a farm cooperative to a debtor) and *In re Paul*, 355 B.R. 64, 68 (Bankr. N.D. Ill. 2001) (involving a sale or assignment of a debtor's right to receive payments under an annuity).

107.    The NAAG states further assert that 28 U.S.C. § 959(b) "requires that debtors operate in accordance with state law, including the statutory and common law rights of consumers." NAAG States Obj. ¶ 21. Section 959, however, merely governs the debtors' obligation to "operate his business in accordance with state law." *Matter of Investors Development Co.*, 7 B.R. 772, 776 (Bankr. D. N.J. 1980) (citing 28 U.S.C. Section 959(b)); *see also Matter of Borne Chemical Co., Inc.*, 54 B.R. 126, 135 (Bankr. D. N.J. 1984) ("The purpose of the statute is to negate the idea that a trustee or debtor in possession 'could ignore the rules of law of the state of operation affecting the conduct of the business committed to his charge.'"). Section 959 does not purport to govern the sale or lease of debtor property outside of the ordinary course, which is

instead governed by section 363. The NAAG states' contrary interpretation would create an unwarranted statutory conflict.

> (b) In the Alternative, the Proposed Sale Complies with Section 363(b)(1)(B), a Further, Sufficient Basis for Its Approval

108. The Proposed Sale also complies with section 363(b)(1)(B), which permits a sale involving personally identifiable information, even if inconsistent with privacy policies, where (a) a consumer privacy ombudsman has been appointed, (b) the court has given "due consideration to the facts, circumstances, and conditions of such sale," and (c) the court finds "no showing was made that such sale . . . would violate applicable nonbankruptcy law."

109. The Objecting States' data privacy laws are therefore relevant for purposes of section 363(b)(1)(B) only, and as relevant to the Objections, fall into two broad categories. *First*, nine states (the "Express Consent States")[31] have laws requiring consent for a "disclosure" or "transfer" of genetic data. *Second,* eleven states (the "Separate Consent States")[32] have laws requiring each user's "separate and express consent" because the Sale Order contemplates a sale to a separate "person" or "third party"—*i.e.*, the Winning Bidder.

---

[31] *See* ALASKA STAT. § 18.13.010(A)(1-2) ("informed and written consent"); DEL. CODE ANN. TIT. 16, § 1202 ("informed consent"); FLA. STAT. ANN. § 817.5655 ("express consent"); 410 ILL. COMP. STAT. ANN. 513/30 ("legal authorization"); MD. CODE ANN. COM. L. § 14-4404 ("express consent"); N.H. REV. STAT. ANN. § 141-H:2, III ("written and informed consent"); N.J. STAT. ANN. § 10:5–47 ("signed consent"); N.M. STAT. ANN. § 24-21-3 ("informed written consent or authorized representative"); N.Y. CIV. RTS. L. § 79-L ("written informed consent"); S.C. CODE ANN. § 38-93-40 ("written and informed consent").

[32] *See* ARIZ. REV. STAT. §§ 44-8002(A)(2)(b)(i); CAL. CIV. CODE § 56.181; KY. REV. STAT. § 311.705; MINN. STAT. § 325F.995; MONT. CODE ANN. § 30-23-104; TENN. CODE ANN. § 47-18-4904; TEX. BUS. & COM. CODE ANN. § 503A.006(a)(1); UTAH CODE § 13-60-104; VA. CODE § 59.1-596; WASH. REV. CODE ANN. § 19.373.070 (2024). Note also that, under Washington State law, "'Sell' or 'sale' does not include the exchange of consumer health data for monetary or other valuable consideration: (i) To a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the regulated entity's or the small business's assets that complies with the requirements and obligations in this chapter[.]" *Id.* § 19.373.010(26)(b). Thus, Washington law does not restrict this transaction for the additional reason that the transaction does not qualify as a "sale."

110.    The CPO did not to determine whether or not the Proposed Sale was consistent with states' genetic privacy laws.  Instead, the CPO was unable to reach any conclusion, stating that he "cannot conclude that the sale or transfer of the Company's assets to either bidder does not violate" states' genetic data privacy laws.  CPO Report at 97.

111.    None of the Objecting States make the requisite showing that a transfer of genetic information as part of the Proposed Sale violates applicable nonbankruptcy law.

      1.    <u>The Objecting States Have Failed to Show that the Proposed Sale Is a "Transfer or Disclosure" to a "Third Party" Under State Genetic Privacy Law</u>

112.    All of the Objecting States' and CPO's arguments fail for the simple reason that genetic information laws apply ***only where*** there is a "transfer or disclosure" of "genetic data" (or equivalent) to a "third party." *See, e.g.*, Cal. Civ. Code § 56.181(a)(2)(D) (requiring "separate and express consent" for "[e]ach transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider.").  Because the Proposed Sale—an equity sale—is neither a "transfer or disclosure," nor does it contemplate a "third party" purchasing the genetic information, these states' laws are inapplicable.

      *a.    An Equity Sale Is Not a "Transfer or Disclosure"*

113.    The Debtors believe that a section 363 sale—whether structured as an asset purchase or an equity purchase—complies with applicable nonbankruptcy law.  Certain of the Objecting States made clear, however, their belief that a revised transaction structure in which an equity interest were sold to the Winning Bidder—even if the ultimate outcome remained the same—could moot their objections.  As the NAAG States explained, "[a] 'change in ownership' without a sale and transfer of the Customer Data is legally possible," noting that the Debtors "could effectuate a change in ownership" "[t]hrough the purchase of Debtors' stock."  NAAG States Obj. ¶ 38.  The CPO similarly acknowledged that the "key question" of

55

"whether the purchase of the Company's genetic data assets constitutes a sale, transfer, or disclosure of genetic data" is "at least somewhat dependent on how the sale itself is construed under the applicable bankruptcy proceeding." CPO Report at 95. The Debtors negotiated for— and obtained—the right from TTAM to proceed via equity sale in light of the Objecting States' acknowledgment that such a structure would be consistent with their laws, and the Debtors have since elected to consummate the Proposed Sale, if approved, as an equity sale.

114. An equity sale does not constitute a "transfer or disclosure of the ***consumer's genetic data***" within the meaning of the Objecting States' statutes, because the buyer is purchasing and obtaining only ***equity***. Accordingly, the Debtors' interest in users' genetic data does not "transfer" to any entity; it remains within the same corporate entity at all times during the equity sale transaction.

115. Any contrary interpretation by the Objecting States would be inconsistent with the Objecting States' failure to take any action against equity sale transactions in similar circumstances. In 2021, 23andMe engaged in a SPAC transaction in connection with going public whereby it was purchased by VG Acquisition Corporation.[33] As here, although VG Acquisition Corp. is a separate legal entity, it purchased 23andMe subject to the terms in the Privacy Statement. No state argued that the purchase of 23andMe violated state genetic data privacy laws.[34]

116. Nor are the Debtors aware of any state or regulatory authority challenging the acquisition of Ancestry.com. In that case, as the Seventh Circuit recognized in considering a

---

[33] Combined Company to Trade on Nasdaq Under Ticker "ME" Commencing June 17, 23andMe (Jun. 16, 2021), https://investors.23andme.com/news-releases/news-release-details/23andme-successfully-closes-its-business-combination-vg.

[34] Like the acquisition of Ancestry.com, *see supra* ¶ 5 n.6, 23andMe's SPAC transaction predated certain of the Objecting States' data privacy statutes. But again, according to the Objecting States' theory that customers possess "common law rights" to their genetic data, such Objecting States could have—but did not—object to the SPAC transaction.

putative consumer class action, the structure of the acquisition as an equity sale powerfully counseled against the application of state genetic privacy laws. The Seventh Circuit reviewed and affirmed an order dismissing a putative consumer class action against a private equity acquirer alleging the violation of the Illinois Genetic Information Privacy Act in connection with the acquisition of Ancestry.com, "the largest genealogy company in the world." *Bridges* v. *Blackstone,* 66 F.4th 687, 688 (7th Cir. 2023). The Seventh Circuit affirmed the dismissal of plaintiffs' genetic privacy claims, finding that "[a]ll we can say with certainty about [the] all-stock acquisition of Ancestry is that a change in ownership occurred—nothing more." *Id.* at 689. It thus concluded that no genetic privacy claims plausibly alleged "from an acquisition alone—at least one structured as a stock transaction." *Id.*

117.    Because an equity sale is not a "transfer or disclosure of genetic information" the Court should conclude that the proposed equity sale does not implicate state genetic privacy laws.[35]

### b.    TTAM Is Not a "Third Party"

118.    The Objecting States' arguments that the Proposed Sale violates state genetic privacy laws fails for the independent reason that TTAM is not a "third party" under these states' statutes and any contrary interpretation would lead to absurd results. TTAM is proposing to process the customer's Personal Information in **precisely the same way**, under the **same management team**, and in **full compliance** with the Company's existing privacy policies.

---

[35]    The NAAG States argue that Arizona's law that prohibits the transfer of genetic data of a deceased individual applies here to limit the transaction. NAAG States Obj., Ex. A, at 1. Under Arizona law, "[f]ollowing the death of a person who had genetic testing performed, the release of the testing information is governed by section 12-2294, subsection D, except that the person may deny, release or limit release of the genetic testing results by adopting a provision in a testamentary document." ARIZ. REV. STAT. SEC. 12-2082(F). That subsection states that a decedent's genetic data may be released, but only to his or her health care provider or next of kin. *See id.* Sec. 12-2294(D). Because after the transfer in ownership to NewCo (which is not properly considered a separate person, *see supra* ¶ 128) this is an equity sale where the data remains in the control of the same entity, there is no "release" of the data to a separate person. Thus, this statute does not restrict the equity sale.

Although nearly every Objecting States' statute does not define "third party," no "third party" could be deemed to be involved in the Proposed Sale in any meaningful sense.

119.     *First*, the result urged by the Objecting States—to interpret "third party" as encompassing ***any*** person or entity afforded access to genetic information—regardless of the circumstances—would be absurd.  That interpretation would preclude any purely internal corporate reorganization (even where genetic information is maintained and accessed in exactly the same way as before) and preclude genetic services or testing companies from bringing on new employees, executives, or board members without first obtaining express consent from all of their customers in the applicable states.

120.     A statute should not be construed to create an absurd result.  *See, e.g.*, *In re K.H.*, 84 Cal. App. 5th 566, 603 (2022) (rejecting "expansive" reading of statute where "[s]uch an extreme approach would be both absurd and unnecessary, as generally, '[u]nless the intent of a statute can only be served by demanding strict compliance with its terms, substantial compliance is the governing test.'"); *Wedemeyer* v. *Safeco Ins. Co. of Am.,* 160 Cal. App. 4th 1297, 1305 (2008) ("We must give the statute a reasonable interpretation, avoiding, if possible, a literal interpretation which will lead to an absurd result.").

121.     *Second*, "[i]n construing a statute, courts begin by ascertaining the legislative intent so as to effectuate the purpose of the law."  *Lubner* v. *City of Los Angeles*, 45 Cal. App. 4th 525, 529 (1996); *see also Kenai Peninsula Borough* v. *Andrus*, 436 F. Supp. 288, 291 (D. Alaska 1977), *aff'd sub nom. Watt* v. *Alaska*, 451 U.S. 259 (1981) ("All statutes must be interpreted in light of their statutory purpose, and a literal reading which would be contrary to the legislative purpose is to be avoided if the statute can be read in a manner consistent with the words and purpose.").

122.    The Separate Consent States agree that the purpose of their data privacy statutes is to protect consumer's genetic data. *See, e.g.*, CA Obj. ¶ 2.  For many states, this is clear from the very face of the statute. *See, e.g.*, Cal. Civ. Code § 56.181(a) (providing that the "separate and express consent" requirement is "[t]o safeguard the privacy, confidentiality, security, and integrity of a consumer's genetic data . . ."). The legislative history reveals that these consumer protection interests were motivated by legislative concerns that genetic data could be transferred to individuals or entities who may put that information to different, and potentially sinister, uses to which consumers never consented.  For example, when passing its data privacy statute in 2021, California legislators explained that they were troubled by the possibility of genetic data testing companies that may "share [] data with law enforcement, [or] sell your DNA data to third parties, after which it can become difficult to track," as well as the "use of genetic data for potential discrimination in insurance contexts."[36]

123.    "Third party" thus should be construed in accordance with the statutory purpose of the Separate Consent States' laws.  The Proposed Sale changes nothing from a customer's perspective.  The Proposed Sale contemplates a continuation of the exact same business under the same prepetition leadership, where customers will be offered the same services under the same (and enhanced) privacy terms, and in which their genetic data will be used and stored in precisely the same way, and be accessible by precisely the same individuals.  No customers will be deprived of any existing rights in respect of their genetic data—including the ability to direct the deletion of their genetic data. Lefkowitz Decl. ¶¶ 23–26, 36–37; *see also* Cate Report ¶ 51 ("The new entity

---

[36]    California Assembly Committee on Privacy and Consumer Protection analysis of SB 41 on July 1, 2021 (GIPA), Comments, at 8, https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202120220SB41.  It was concerned about companies that "deploy methods to undermine truly informed consent" to disclosure of sensitive genetic information, including by "securing consent through an easily accessible method but then hiding the process for revocation of that consent or limiting it to an entirely different medium."

includes the founder of the Debtors and is seeking to retain many of the same employees, performing the same type of work, using the same equipment and data. The transfer seems far removed from the Bankruptcy Code's focus in its consideration of privacy protections on sales to "persons that are not affiliated with the debtor" or from the textbook definition of third party and far more akin to transfers routinely permitted under Gramm-Leach-Bliley without notice or consent among affiliates or service providers or even under Texas law for transfers of genetic information to 'vendors and service providers.'").

124.    Prohibiting a transfer of genetic data to a party where the consumer's expectations as to the uses of that data are not undermined—for example, where identical parties will have access to the data, and the user's rights in respect of such data remain exactly the same—does not "fulfill the purpose of the . . . statutory scheme." *See Ajaxo, Inc.* v. *E\*Trade Fin. Corp.*, 48 Cal. App. 5th 129, 200 (2020) (rejecting "inclusive[]" definition of words within statutory text where such interpretation does not fulfill the statute's "basic purpose" given the "unique" facts at issue in that case).

125.    The Court should not prohibit conduct that these legislatures did not clearly intend to prohibit, and that are wholly consistent with the statute's purpose. *See, e.g.*, *Neal* v. *Fairfax Cnty. Police Dep't*, 299 Va. 253, 269 (2020) (rejecting argument that the Court "should construe [the statute] broadly" because it is "not at liberty to stretch the meaning of a statute in a manner that would contravene the legislature's intent"); *State* v. *Hall*, 969 N.W.2d 299, 310–11 (Iowa 2022) ("We are not at liberty to read the statute to prohibit conduct not plainly encompassed by its terms.").

126.    This result is also consistent with the limited authority interpreting "third party" in the data privacy context. In 2023, the FTC issued a consent order to 1Health.io on the grounds

that the genetic testing company's retroactive changes to privacy policy terms governing the sharing of its user's genetic information were made without notice and consent.  *1Health.io Inc.*, No. C-4798 (F.T.C. Sept. 7, 2023).  In this order, the FTC defined "third party" to exclude entities receiving customer data under a contract "agree[ing] to be bound by [the seller's] privacy policy" and agreeing to obtain affirmative, express consent "before applying . . . any polices or practices that are material changes" from the existing privacy policy.  *Id.*  The FTC's interpretation also supports the conclusion that the Winning Bidder is not a "third party" within the meaning of these states' data privacy laws, which is entirely consistent with the FTC's position **in this case**:  on March 31, 2025, the FTC Chair, Andrew Ferguson, sent a letter to the Acting U.S. Trustee related to this matter,[37] stating that the Debtors could "protect users' interests" if a purchaser "expressly agree[s] to be bound by and adhere to the terms of 23andMe's privacy policies and applicable law, including as to any changes it subsequently makes to those policies."[38]

127.    The CPO Report offers nothing to change the conclusion that the Bidders are not "third parties."  The CPO Report does not mention—let alone analyze—whether an entity such as the Winning Bidder or Backup Bidder is a "third party" under the Separate Consent States' statutes, outside of simply observing that "the law does not define 'third party' in this context."  CPO Report at 94 n.361.

        *c.*      *Any "Transfer" to Newco Does Not Trigger the Objecting States' Genetic Information Laws Because Newco Is Not a "Third Party"*

---

[37] This letter is available at https://www.ftc.gov/system/files/ftc_gov/pdf/23andme-letter-ferguson.pdf.

[38] In a similar context, the FTC has permitted the transfer of customer information to "an entity that was essentially operating as a new owner of the business, as opposed to a 'third party', who was merely the highest bidder in a winner-take-all auction[.]"  *See In re RadioShack Corp., et al.*, No. 15-10197, at 5 (BLS) (Bankr. D. Del. May. 16, 2015).

128.     Nor could the Objecting States argue that the Debtors' sale of Personal Information to NewCo as part of the NewCo Sale implicates state genetic privacy laws.  The NewCo Sale does not actually involve the movement or disclosure of genetic information to anyone that does not have the same access to the information today.  It is an internal modification of the Company's corporate structure in which NewCo, a wholly-owned subsidiary and affiliate of the Debtors under the Debtors' exclusive control, will hold the Acquired Assets.  Sale Order ¶ F.  A movement of legal title to a debtor affiliate that becomes a holding company for operating assets the debtor always owned and continues to control cannot constitute a transfer to a "third party."  Construing "third party" to exclude "affiliate" is entirely consistent with existing law:  "In common legal writings, the term 'third party' is uniformly used in a manner that excludes 'affiliates.'"  *In re Wesco Aircraft Holdings, Inc.*, 2025 WL 354858, at *21 (Bankr. S.D. Tex. Jan. 15, 2025) (collecting cases holding that the undefined term "third party" does not include "affiliates").  That Newco is not a "third party" makes perfect sense here, where the Sale Order will *require* that the Personal Information subject to the TTAM APA will be held in a wholly-owned subsidiary controlled by the Debtors and where the Debtors will be prohibited, by Court order, from allowing anyone that does not currently have access to subsequently gain access to this genetic information.  Sale Order ¶ 7.

2.     The Proposed Sale Complies with the Express Consent States' Data
       Privacy Laws

129.     The Express Consent States have genetic privacy laws that require prior consent to the transfer or disclosure of genetic information to a third party.  While, as discussed above, the Proposed Sale does not involve the transfer or disclosure of genetic information to a third party, the Express Consent states' laws are not implicated in any event because the Debtors have already obtained any consent required under their genetic data privacy laws.

130.    As further detailed in **Exhibit A**, the Express Consent States impose different formulations of a "consent" requirement, and range from "consent" (*e.g.*, Colorado), to "legally effective authorization" (*e.g.*, Illinois) to "express consent" (*e.g.*, Florida), to "written informed consent" (*e.g.,* New York), to "informed and written consent" (*e.g.*, Alaska).

131.    Customers provided the consent required by each Express Consent State when they agreed to 23andMe's Terms of Use and Privacy Statement.  The Privacy Statement expressly contemplates 23andMe's ability to transfer Personal Information in connection with a sale or acquisition.[39]

132.    Alaska's "informed and written consent" standard arguably poses the most stringent consent threshold of any state law, and 23andMe readily meets it.[40]  "[T]he ordinary meaning of the phrase 'informed consent' is 'a person's agreement to allow something to happen, made with full knowledge of the risks involved and the alternatives,'" and "[t]o be 'written' means the consent must be in writing."  *Cole* v. *Gene by Gene, Ltd.*, 2017 WL 5992467, at *6 (D. Alaska

---

[39]    23andMe offers multiple ways for customers to re-access the Privacy Statement after providing their consent to its terms. On the website, customers can re-access the Privacy Statement by clicking "Privacy Statement" in the persistent footer of the website.  Lefkowitz Decl. ¶ 12.  On the mobile app, a customer can access the Privacy Statement by clicking on the account symbol in the upper right hand corner which opens a Settings screen, and, under the "Legal" section, there is a link to the Privacy Statement.  Lefkowitz Decl. ¶ 12.  And on the mobile web site, a site visitor can access the Privacy Summary and Privacy Statement by clicking on the choices symbol in the upper left hand corner, which opens a choices screen, and then clicking "Privacy."  Lefkowitz Decl. ¶ 12.

[40]    *See, e.g. University Medical Center, Inc.* v. *Schwab*, 628 S.W.3d 112, 129 (Ky. 2021) ("[O]ur informed consent law does not require a determination of how the [plaintiff] claims to have understood the consent form, procedure and risks but rather how a reasonable person would have understood the information.  Consequently, the [relevant] standard . . . is not met by a [plaintiff], after the fact, simply claiming they were not properly informed or that, had they known of the specific risk that resulted in actual harm, they would not have consented to the treatment or procedure."); FLA. STAT. ANN. § 760.40 (defining express consent as "authorization by the person whose DNA is to be extracted or analyzed, … evidenced by an affirmative action demonstrating an intentional decision, after the person receives a clear and prominent disclosure regarding the manner of collection, use, retention, maintenance, or disclosure of a DNA sample or results of a DNA analysis for specified purposes.  A single express consent may authorize every instance of a specified purpose or use"); *see also* MD. COM. LAW § 14-4401(f) (defining "express consent" as "an affirmative response by a consumer to a specific, discrete, freely given, and unambiguous notice regarding the collection, use, or disclosure of the consumer's genetic data for a specific purpose"); MINN. STAT. § 325F.995, subd. 1(f) (defining "express consent" as "a consumer's affirmative written response to a clear, meaningful, and prominent written notice regarding the collection, use, or disclosure of genetic data for a specific purpose").

63

July 28, 2017) (quoting Black's Law Dictionary (10th ed. 2014)).  As discussed above, 23andMe customers acknowledged they understood "the risks involved and the alternatives," and affirmatively indicated their consent.  *See supra* ¶¶ 35-48.[41]  23andMe's consent process likewise meets the standards in other state laws—ranging from "consent" to "written authorization"—for the same reasons.

133.    Alaska argues that 23andMe has not obtained its customers' "informed and written consent" because 23andMe only included a reference to a potential transfer of data during bankruptcy beginning in 2022.  *See* Alaska Obj. at Section II; *see also* NAAG States Obj., Ex. A, at 1.  But that ignores the Privacy Statement's language that existed before that change.  As explained above, the Debtors ***have always*** advised their customers that their data could change ownership in a sale of assets, and before 2022, the Debtors' Privacy Policies were, with respect to the sale of assets, ***broader*** than after the cited changes.  *See supra* ¶¶ 35-48.  Nor is Alaska's observation that a "general authorization for the release of medical records or medical information may not be construed as informed and written consent" on point because the genetic information at issue does not constitute medical records or medical information.  *See, e.g.*, *Noffke* v. *Perez*, 178 P.3d 1141, 1146 (Alaska 2008) (discussing types of documents that may constitute medical records "including doctors' chart notes, opinions, and diagnoses") (citation omitted).[42]

---

[41]   Alaska's proposed standard—that consumers be provided with facts sufficient to "make an informed and intelligent decision"—has no application here.  Alaska Obj. at 3 n.9 (quoting *Korman* v. *Mallin*, 858 P.2d 1145, 1149 (Alaska 1993)).  Based on Alaska's own authority, that standard applies in contexts such as medical procedures or breaches of fiduciary duty, where the relevant facts may be asymmetrical or unknown.  *See Korman*, 858 P.2d at 1149.  Here, by contrast, there is no fiduciary or other asymmetrical relationship.  In any event, 23andMe satisfies Alaska's standard as all relevant facts are disclosed within the Privacy Statement itself.

[42]   Alaska also complains that "[b]inding an entity to a privacy policy they can change at any time provides little protection to consumers,"  *See* Alaska Obj. at 4 n.12, but at least here, the clause to which consumers agreed before June 2022 was *broader* with respect to asset sales than after June 2022, meaning that 23andMe only made its Privacy Statement more privacy protective.  Because all customers agreed to a change of ownership of their data in an equity sale or sale of assets, Alaska's argument has no legal relevance.

64

134.    Citing only academic literature, the CPO suggests that 23andMe's customers may not have given their consent because U.S. privacy law's "notice and choice" framework, under which companies notify consumers of privacy policies and then consumers choose how their information is processed, may not effectively "put consumers in control of their data."  CPO Report at 46–52.  The Court should decline to credit a policy position by the CPO that bears no resemblance to governing law.  *See supra* ¶¶ 83-87.  Courts have repeatedly affirmed the validity of the U.S. "notice and choice" framework.  When a customer accepts the 23andMe Privacy Statement and Terms of Service, they have "received notice of the terms being offered and . . . 'know[] or [have] reason to know that the other party may infer from [their] conduct that [they] assent[] to those terms."  *Berman* v. *Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (quoting Restatement (Second) of Contracts § 19(2)); *see also Meyer* v. *Uber Techs., Inc*., 868 F.3d 66, 75 (2d Cir. 2017).  Thus, based on the "notice and choice" framework of U.S. privacy law, when consumers agree to Debtors' Privacy Policies, they consent to the Privacy Statement's term informing them that their data may be transferred in a bankruptcy.  Cate Report ¶ 20.

135.    For all of these reasons, the Debtors obtained consent that satisfies the statutes of the Express Consent States.

3.    The Objectors Have Failed to Show that the Proposed Sale Violates Any Other Applicable State Law

136.    The NAAG States argue that consumers have "inherent common law rights of ownership or control" and that those supposed "common law rights" preclude the Debtors' from transferring their data.  NAAG States Obj. ¶¶ 22–23.  Texas similarly argues that several of its laws "provide Texas customers exclusive property, ownership, and control rights" as well as "privacy rights" in their genetic data.  Texas Obj. ¶¶ 15, 23.  These arguments miss the point. Debtors are transferring whatever existing interest they hold in the genetic data to the Buyer—no

more and no less. *See Mission Prod. Holdings, Inc.* v. *Tempnology, LLC*, 587 U.S. 370, 381 (2019) ("The estate cannot possess anything more than the debtor itself did outside bankruptcy."); *In re Schauer* 835 F.2d 1222, 1225 (8th Cir. 1987) (explaining a debtor can only sell "rights that the debtor had" before the transaction); *Integrated Sols., Inc.* v. *Serv. Support Specialties, Inc.*, 124 F.3d 487, 491 (3d Cir. 1997) (holding "state laws restricting the transfer of property . . . do not preclude the property from passing to the bankrupt[cy] estate"). Whether consumers have some type of property right in their genetic data is therefore irrelevant to whether their data can be transferred, and the Court need not resolve whether a nebulous common law property right exists in genetic data.[43]

137.    The NAAG States' argument also fails because they do not establish any common-law right of ownership in their genetic data that would require opt-in consent (which consent 23andMe has already obtained as discussed above). They cite only one case in support of their argument—*Hecht* v. *Superior Ct.,* 20 Cal. Rptr. 2d 275 (1993)—that has no relevance here. *See* NAAG ¶ 23 n.29. *Hecht* involved a probate court order about whether a decedent had the ability to bequeath sperm that was stored in a sperm bank. *Hecht*, 20 Cal. Rptr. at 280-85. Whether a decedent has the type of property right in his sperm that would allow him to control its post-mortem disposition has no bearing on whether there is a recognized "common law" right in genetic data held by 23andMe, let alone a "common law" right that would require opt-in consent.

138.    The NAAG States also reference a handful of general consumer protection statutes, *see* NAAG States Obj. ¶ 25 n.34 (incorporating Exhibit A), but those statutes also do not specifically reference genetic information at all, let alone codify a common law right that would

---

[43]    The CPO declined to analyze these arguments based on their "novelty." CPO Report at 104.

restrict the transfer of genetic information absent opt-in consent.[44] *See, e.g.*, NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT, N.C. GEN. STAT. § 75-1 (providing that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal"); PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 Pa. Cons. Stat. § 201-3 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . are hereby declared unlawful."); VERMONT CONSUMER PROTECTION ACT, 9 VT. STAT. ANN. TIT. 9, § 2453(a) ("Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are hereby declared unlawful."). [45]

139.    Finally, the NAAG States argue that 23andMe's representations on its website—specifically, its "Privacy" webpage and its privacy policies prior to June 8, 2022—gave consumers "a reasonable expectation" that their genetic data would not be transferred without opt-in consent. NAAG States Obj. ¶¶ 26–29.  For the reasons previously explained, *see supra* at ¶¶ 35-48, 23andMe's former privacy policies expressly authorize the transfer of data as part of an asset sale or business transformation.  The generalized statements to which the Objecting States and CPO also point—such as "Your privacy comes first" and "You can be assured that your genetic data will not be shared with employers, insurance companies, or public databases without your explicit

---

[44]    The CPO Report also references consumer protection laws, stating that "[i]t is unclear whether the sale of the Company's data . . . would be consistent with" the "representations made by the Company related to its handling of such information." CPO Report at 100.

[45]    And on the merits, there is nothing "unfair or deceptive" about transferring data ownership consistent with the terms of the policies to which all 23andMe customers consented. *See supra*, ¶¶ 78-84.  The Proposed Sale would transfer data ownership consistent with the terms of Debtors' Privacy Policies, and so Debtors have not engaged in any unfair or deceptive act or practice.

consent"—are hardly inconsistent with the express authorization in the Privacy Statement that such information may be transferred in connection with a change of control.  Lefkowitz Decl. ¶ 27.[46]

## C.    The Objecting States' Remaining Objections Lack Merit

140.    The Objecting States raise several other meritless objections to the Proposed Sale. Each is discussed in turn.

141.    *First*, California objects to the sale on the grounds that the state's comprehensive data privacy law, the California Consumer Privacy Act ("CCPA") "restricts businesses from using or disclosing sensitive personal information without first providing notice to consumers" about "the right to limit the use or disclosure of their sensitive personal information."  CA Obj. ¶ 19 (quoting Cal Civ. Code § 1798.121(a)) (cleaned up).[47]  As discussed above, *see supra* ¶¶ 42, 78,

---

[46]    The NAAG States and Texas also raise a number of comprehensive data privacy laws—*i.e.*. laws that regulate the disclosure of a wider array of data than just genetic data—to argue that they restrict the sale of data here.  *See* NAAG States Obj. ¶ 25 n.34, Ex. A; Tex. Obj. ¶¶ 19–23.  These laws do not restrict this transaction because, for all of the reasons above, 23andMe has either obtained any requisite consent, or this transaction does not qualify as a transfer of data to a third party to whom that transfer is restricted.  Nor do these statutes codify a common law right that would restrict the transfer of genetic information absent opt-in consent.  *See* COLO. REV. STAT. § 6-1-1308(7) ("A controller shall not process or sell a consumer's sensitive data without first obtaining the consumer's consent . . . ."); N.H. REV. STAT. ANN. § 507-H:6(I)(d) ("A controller shall: [n]ot process sensitive data concerning a consumer without obtaining the consumer's consent . . . ."); N.J. STAT. ANN. § 56:8-166.12 ("A controller shall [n]ot process sensitive data concerning a consumer without first obtaining the consumer's consent . . . ."); VA. CODE ANN. § 59.1-578(A)(5) ("A controller shall: . . . Not process sensitive data concerning a consumer without obtaining the consumer's consent . . . ."); TEX. BUS. & COM. CODE § 541.101(b)(4) ("A controller may not: . . . process the sensitive data of a consumer without obtaining the consumer's consent . . . ."); WASH. REV. CODE ANN. § 19.373.070 ("[I]t is unlawful for any person to sell or offer to sell consumer health data concerning a consumer without first obtaining valid authorization from the consumer.  The sale of consumer health data must be consistent with the valid authorization signed by the consumer.  This authorization must be separate and distinct from the consent obtained to collect or share consumer health data[.]").  Note also that, under Washington State law, "'Sell' or 'sale' does not include the exchange of consumer health data for monetary or other valuable consideration: (i) To a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the regulated entity's or the small business's assets that complies with the requirements and obligations in this chapter[.]"  *Id.* § 19.373.010(26)(b).  Thus, Washington law does not restrict this transaction for the additional reason that the transaction does not qualify as a "sale."

[47]    Notably all the state comprehensive privacy laws, including the CCPA, expressly exclude from the definition of "sale" changes of data ownership that are part of a bankruptcy.  *See*, *e.g.*, CAL. CIV. CODE § 1798.140(t)(2)(D) (" For purposes of this title, a business does not sell personal information when: . . . [t]he business transfers to a third party the personal information of a consumer as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the business[.]"); COLO. REV. STAT. § 6-1-1303(23)(b)(IV) ("'Sale', 'sell', or 'sold' does not include . . . [t]he disclosure or transfer to a third party of personal data as an asset that is part of a proposed or actual merger, acquisition, bankruptcy, or other transaction

81, 99, the 23andMe Privacy Statement notifies customers that their "Personal Information may be accessed, sold or transferred" in the event "the company is involved in a bankruptcy." Lefkowitz Decl. ¶ 16 & Ex. K.  This same Privacy Statement also provides customers with information about their privacy settings and controls, including clear instructions about customers' data rights, including the right to access, correct, or delete their Personal Information.[48]  Additionally, the full 23andMe Privacy Statement also provides a link for "residents of California" that takes them to the 23andMe Privacy Notice for U.S. State Residents, which describes "your privacy rights" including the specific right to "[l]imit the use and sharing of your sensitive Personal Information."[49]  Accordingly, customers have been provided adequate notice of their right to limit the use or disclosure of their Personal Information, including sensitive personal information governed by the CCPA.[50]

---

in which the third party assumes."); N.H. REV. STAT. ANN. § 507-H:1(XXVII)(f) ( "'Sale of personal data' does not include: . . . [t]he disclosure or transfer of personal data to a third party as an asset that is part of a merger, acquisition, bankruptcy or other transaction, or a proposed merger, acquisition, bankruptcy or other transaction, in which the third party assumes control of all or part of the controller's assets[.]"); N.J. REV. STAT. § 56:8-166.4 ("'Sale' shall not include: . . . [t]he disclosure or transfer of personal data to a third party as an asset that is part of a proposed or actual merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets."); TEX. BUS. & COM. CODE § 541.001(28)(E) ( "'Sale of personal data' . . . . does not include: . . . the disclosure or transfer of personal data to a third party as an asset that is part of a merger or acquisition."); VA. CODE ANN. § 59.1-575 ( "'Sale of personal data' does not include: . . . [t]he disclosure or transfer of personal data to a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets."); WASH. REV. CODE ANN. §19.373.010(26)(b)(i) ( "'Sell' or 'sale' does not include the exchange of consumer health data for monetary or other valuable consideration: . . . [t]o a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the regulated entity's or the small business's assets that complies with the requirements and obligations in this chapter[.]")

[48]   *See* Lefkowitz Decl. ¶¶ 23–24 & Ex. K, at Your Privacy Settings and Controls.

[49]   *See* Lefkowitz Decl. ¶ 11 & Ex. N.

[50]   Confusingly, California also notes that the "CCPA [] imposes alternate restrictions on nonprofit organizations," CA Obj. ¶ 19, but California only cites the *exclusion* of nonprofits from the definition of "business."  *Id.* (citing Cal Civ. Code § 1798.140(d)).  As noted above, the CCPA "restricts *businesses* from using or disclosing sensitive personal information without first providing notice to consumers[.]"  *See id.* § 1798.121(a).  Thus, when it comes to TTAM (which is a nonprofit) California does not highlight an alternate restriction, but instead, just the lack of one.

69

142.    *Second*, Alaska also objects to the sale on the grounds that customers are unaware "what entity would be receiving [their genetic] data," Alaska Obj. at 4–5, and the NAAG states suggest that "[c]onsumers are not necessarily aware of the continued current use of their data . . . that they even have the option of deletion . . . [or] that the Debtors are auctioning off their data . . ." NAAG States Obj. ¶ 24 n.31.  Both bidders were announced publicly, with multiple news releases and formal announcements from 23andMe, Kroll, and Regeneron.[51]  A notice will be sent out to all 23andMe consumers via email to notify them of a potential change of ownership of their personal information.  Moreover, this bankruptcy sale has been the subject of extensive public reporting,[52] causing, as discussed by the CPO, *millions* of customers to delete their data.  *See* CPO Report at 18–19.

143.    *Third*, the NAAG States object to a sale to TTAM because TTAM is a non-profit entity that "would be able to evade some of the regulatory scrutiny that 23andMe faced prior to the bankruptcy filing" due to the exemptions in some state comprehensive data privacy laws for nonprofit entities.  NAAG States Obj. ¶¶ 49–50.  But TTAM has "agree[d]" to "remain subject to all state privacy and cybersecurity laws and regulations notwithstanding its nonprofit status."  Winning Bidder Notice.  Accordingly, the Objecting Sates' Objections to TTAM as Winning Bidding on this ground are moot.[53]

---

[51]    Press Release, 23andMe, *Regeneron, A Leading U.S. Biotechnology Company, to Acquire 23andMe in Court-Supervised Sale*, (May 19, 2025), https://investors.23andme.com/news-releases/news-release-details/regeneron-leading-us-biotechnology-company-acquire-23andme-court Press Release, Regeneron, *Regeneron Enters into Asset Purchase Agreement to Acquire 23andMe® for $256 Million; Plans to Maintain Consumer Genetics Business and Advance Shared Goals of Improving Human Health and Wellness* (May 19, 2025), https://investor.regeneron.com/news-releases/news-release-details/regeneron-enters-asset-purchase-agreement-acquire-23andmer-256.

[52]    *See, e.g.* Ron Leuty, *What's not included in the 23andMe deal, and who else was bidding*, Silicon Valley Bus. J. (May 20, 2025), https://www.bizjournals.com/sanjose/bizwomen/news/latest-news/2025/05/genetic-data-23andme-lemonaid-health-regeneron.html?page=all.

[53]    The NAAG States also appear to object to a sale for violating the Tennessee Information Protection Act ("TIPA"), while acknowledging that it both exempts bankruptcy proceedings from its definition of "sale" and moreover,

**D.      The Remaining Objections Should Be Overruled**

144.    <u>Equityholder and customer objections</u>.  Various pro se equityholders and customers filed objections or similar pleadings challenging the sale (i) to the extent it implicates a transfer or sale of customer data, (ii) as violating the Constitution, and/or (iii) unless the Debtors provide notice of the sale to customers with an opportunity to object or opt out.  These objections and the status thereof are summarized in the *Notice of Pro Se Objections Status Report* [Docket No. 740].  These objections should be overruled because the Debtors continue to honor and process requests from customers to delete their accounts (and related customer data) and notified all current and former customers of the potential change in ownership of their data and the Purchaser's commitment to continue the Privacy Policies via the Customer Notice.  To the extent these measures do not resolve the objections, the objections should be overruled for the same reasons set forth in this reply.

145.    <u>Scholars</u>.  Certain U.S.-based scholars (the "<u>Scholars</u>") filed the *Limited Objection of Intellectual Property, Health Law, and Bioethics Scholars to Debtors' Proposed Asset Sale* [Docket No. 701], arguing, among other things, that the Court should condition any sale on the Purchaser's commitment to (i) continue royalty-free licensing of deidentified data to researchers for scientific and biomedical research purposes and (ii) offer to license such data on a non-exclusive basis to any commercial entity engaged in biomedical or pharmaceutical research on terms that are fair, reasonable, and non-discriminatory.  As an initial matter, the Scholars are not parties in interest in these cases and lack standing to object to the sale because they fail to allege any pecuniary interest that may be affected by the outcome of the sale.  *See, e.g., In re Las Cruces*

---

will not be in effect until July 1, 2025.  NAAG States Obj. Ex. A, at 6 (citing Tenn. Code Ann. § 47-18-3302 *et seq.*).  That TIPA is not yet effective begins and ends this analysis—it plainly does not apply to this transaction.

*Country Club, Inc.*, 585 B.R. 239, 246 (Bankr. D. N.M. 2018) ("Generally, an entity that is a stranger to the bankruptcy case except for its interest in purchasing an estate asset lacks standing to object to a motion to sell."); *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 210 (3d Cir. 2011) (parties in interest under section 1109 of the Bankruptcy Code are limited to those with a "legally protected interest that could be affected by a bankruptcy proceeding"). However, even if the Scholars had standing, the Winning Bidder has committed through the Enhanced Consumer Safeguards to continue the Debtors' policies of licensing identified data for research purposes. The Backup Bidder has no legal obligation to do so, nor have the Scholars identified one beyond personal preference. For these reasons, the Scholars' objection should be overruled.

### E.   Certain Objecting States' Adversary Proceedings and TRO Requests Are Unnecessary and Improper

146.   The Adversary Complaints and TRO Motion ask this Court to make a finding concerning the scope of the property interest consumers have in their genetic data, but as described, the Court need not make this finding in deciding whether the Proposed Sale complies with applicable law. These last-minute pleadings are merely attempts by the Objecting States to inject procedural complexity and uncertainty into the sale in order to unjustifiably delay the sale process, which was adopted by this Court at the first day hearing.

147.   *First*, the Court need not make any findings about the extent of consumers' interests in their data, if any, because such interests have no bearing on the Court's evaluation of the Proposed Sale under applicable law. The Proposed Sale only entails a transfer of whatever existing interests the Debtors' currently hold in its consumers' genetic data. The Proposed Sale would neither expand any of these existing interests, which are subject to the Debtors' privacy policy that all consumers must read and agree to in order to receive the services, nor threaten the interests consumers hold in their data.

148.    To the contrary—the Proposed Sale would actually *expand* consumers' privacy protections with respect to their data.  In fact, TTAM has agreed pro forma to provide consumers with enhanced privacy protections, including, among other things, a perpetual ability to revoke their consent and delete their data, notice of any material changes to TTAM's privacy policies, and the establishment of a Consumer Privacy Advisory Board.  Thus, whatever interest consumers may currently hold in their data is either preserved or enhanced by the Proposed Sale.

149.    *Second*, the Objecting States provide no sound basis for delaying the Sale Hearing and approval of the Proposed Sale.  The Objecting States have already submitted objections on the topic of whether state laws require additional customer opt-in consent to approve the Proposed Sale, so this issue will already be before the Court at the Sale Hearing.  The Objecting States should not be afforded multiple opportunities to litigate the same issue.

150.    The Objecting States' contention that they require more time to evaluate and respond to the Proposed Sale falls flat.  The Bidding Procedures approved by this Court in March 2025 expressly contemplated a sale of all or substantially all of the Company Assets.[54]  And on May 19, 2025, the Debtors filed the *Notice of Successful Bidder and Backup Bidder With Respect to the Auction of the Debtors' Assets* [Docket No. 420] announcing that TTAM and Regeneron were the two potential purchasers remaining in the sale process and providing their respective APAs, which both clearly defined the scope of the Acquired Assets to include the consumer data at issue in the states' objections.

---

[54]    Even prior to this time, consumers and the Objecting States were on notice that the Company may pursue a sale of all or substantially all of the Company Assets.  For example, on January 28, 2025, the Special Committee issued a press release announcing that it had undertaken a process to explore strategic alternatives, including among other alternatives, a possible sale of the Company, business combination, sale of all or part of the Company Assets, licensing of assets, restructuring, or other strategic action.  Swift Decl. ¶ 7.

151.    Three weeks later, on June 9, 2025, the Objecting States filed their adversary complaints, after failing to seek discovery or take any other action to investigate or resolve their concerns before this date.  Nonetheless, the Debtors informed the Objecting States, and hereby reiterate, that they will not take the position that the Adversary Complaints are barred by any procedural impediments[55] at the Sale Hearing, to the extent the Objecting States seek to object on the basis of any consumer property interest in the data subject to the Proposed Sale.

152.    Because the Court will have the opportunity to address the exact claims raised by the Objecting States at the Sale Hearing, and because these claims are meritless in any event, the TRO Motion should be denied.[56]

## **CONCLUSION**

153.    The Debtors respectfully request that the Court (i) overrule the Objections, (ii) enter the Sale Order, and (iii) grant such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

---

[55]    Specifically, the Debtors agreed not to advance any arguments that the issues raised in these states' objections to the Debtors' section 363 sale should have been brought as an adversary proceeding under Federal Rule of Bankruptcy Procedure 7001(b).

[56]    Denial of the TRO Motion will not prejudice the Objecting States, whose rights to seek a stay pending appeal or other relief will be preserved.

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed Order

and grant such other relief as the Court deems appropriate under the circumstances.

Dated: June 16, 2025
St. Louis, Missouri

Respectfully submitted,

**Carmody MacDonald P.C.**
*/s/ Thomas H. Riske*
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:     (314) 854-8600
Facsimile:      (314) 854-8660
Email:            thr@carmodymacdonald.com
                      nrw@carmodymacdonald.com
                      jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Jessica I. Choi (admitted *pro hac vice*)
Grace C. Hotz (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:     (212) 373-3000
Facsimile:      (212) 757-3990
Email:            pbasta@paulweiss.com
                      chopkins@paulweiss.com
                      jchoi@paulweiss.com
                      ghotz@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Genetic Data Privacy Laws Raised in State Objections**[1]

| State | Legal Standard | General Response |
|---|---|---|
| Alaska | **Alaska Stat. § 18.13.010(a)**: "Except as provided in (b) of this section; (1) a person may not . . . disclose the results of a DNA analysis unless the person has first obtained the informed and written consent of the person, or the person's legal guardian or authorized representative, for the collection, analysis, retention, or disclosure . . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| Arizona | **Ariz. Rev. Stat § 44-8002(A)(2)(b)(i)**: "A direct-to-consumer genetic testing company shall: . . . Obtain a consumer's consent for collecting, using or disclosing the consumer's genetic data, including: . . . Separate express consent for any of the following: . . . Transferring or disclosing the consumer's genetic data to any person other than the company's vendors and service providers." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128 |
| California | **Cal. Civ. Code § 56.181(a)(2)(D)**: "a direct-to-consumer genetic testing company shall do both of the following: . . . (2) Obtain a consumer's express consent for collection, use, and disclosure of the consumer's genetic data, including, at a minimum, separate and express consent for each of the following: . . . (D) Each transfer or disclosure of the consumer's genetic data or biological sample to a third party other than to a service provider, including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128 |

---

[1] Note that Connecticut, the District of Columbia, Kansas, Louisiana, Maine, Michigan, Missouri, Oklahoma, Ohio, Oregon, South Dakota, West Virginia and Wisconsin are signatories to the NAAG Objection, but do not raise arguments specific to any of their states' statutes.

| State | Legal Standard | General Response |
|-------|---------------|------------------|
| Delaware[2] | **Del. Code Ann. Tit. 16, § 1205(a)**: "a person shall not . . . disclose genetic information about the individual in a manner that permits identification of the individual, unless: . . . (5) Disclosure is authorized by obtaining informed consent of the tested individual describing the information to be disclosed and to whom . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| Florida | **Fla. Stat. § 817.5655(5)**: "It is unlawful for a person to willfully, and without express consent, sell or otherwise transfer another person's DNA sample or the results of another person's DNA analysis to a third party, regardless of whether the DNA sample was originally collected, retained, or analyzed with express consent …." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| Illinois | **410 Ill. Comp. Stat. 513/15(a)**: "Except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| Kentucky | **Ky. Rev. Stat. Ann. 311.705**: "a direct-to-consumer genetic testing company shall: . . . [obtain a consumer's] (c) Separate express consent for transferring or disclosing the consumer's genetic data to any person other than the company's vendors and service providers, or for using | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117 |

---

[2] State did not file or otherwise join an objection to the Sale.

| State | Legal Standard | General Response |
|---|---|---|
| | genetic data beyond the primary purpose of the genetic testing product or service and inherent contextual uses. . .” | • The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| Maryland[3] | **Md. Code Ann., Com. Law § 14-4404(2)**: “A direct–to–consumer genetic testing company, at a minimum, shall obtain the following consents from a consumer before collecting, using, or disclosing the consumer's genetic data: . . . (2) Express consent for transferring or disclosing the consumer's genetic data to a person other than the company's vendors and service providers . . . ” | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| Minnesota | **Minn. Stat. § 325F.995, subd. 2(a)(2)(ii)**: “a direct-to-consumer genetic testing company must: . . . (2) obtain a consumer's express consent to collect, use, and disclose the consumer's genetic data, including at a minimum: . . . (ii) separate express consent, which must include the name of the person receiving the information, for each transfer or disclosure of the consumer's genetic data or biological sample to any person other than the company's vendors and service providers . . . .” | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128 |
| Montana[4] | **Mont. Code Ann. § 30-23-104(3)(a)(i), (c)(iii)**: “an entity shall: . . . (3) if the entity engages in any of the following, obtain a consumer's: (a) separate express consent for: . . . (i) the transfer or disclosure of the consumer's genetic data or biological sample to any third party other than the entity's processors . . . .” | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128 |

---

[3] State did not file or otherwise join an objection to the Sale.
[4] State did not file or otherwise join an objection to the Sale.

| State | Legal Standard | General Response |
|-------|----------------|------------------|
| | | |
| New Hampshire | **N.H. Rev. Stat. Ann. 141-H:2, III**: "no person shall disclose the results of such [genetic] testing to any other person, without the prior written and informed consent of the individual, the parent, guardian, or custodian if the individual is a minor under the age of 18, or the legal guardian or conservator if the individual is an incompetent person." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| New Jersey | **N.J. Rev. Stat. § 10:5-47**: "a person may not disclose or be compelled, by subpoena or any other means, to disclose the identity of an individual upon whom a genetic test has been performed or to disclose genetic information about the individual in a manner that permits identification of the individual, unless: (5) Disclosure is authorized by the tested individual or the tested individual's representative by signing a consent which complies with the requirements of the Department of Health and Senior Services . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| New Mexico | **N.M. Stat. Ann. 1978, § 24-21-3**: "Except as provided in Subsection C of this section, genetic analysis of an individual or collection, retention, transmission or use of genetic information without the informed and written consent of the individual or the individual's authorized representative is prohibited." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135 |
| New York | **N.Y. Civ. Rights Law § 79-L**: "Any further disclosure of genetic test results to persons or organizations not named on the informed consent shall require the further informed consent of the subject of the test. . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128 |

| State | Legal Standard | General Response |
|---|---|---|
| | | |
| South Carolina | **S.C. Code Ann. § 38-93-40**:  "All genetic information obtained before or after the effective date of this chapter must be confidential and must not be disclosed to a third party in a manner that allows identification of the individual tested without first obtaining the written informed consent of that individual or a person legally authorized to consent on behalf of the individual . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party.  *See* Reply ¶¶ 118-128<br>• The Debtors have already obtained the consent contemplated by the statute.  *See* Reply at ¶¶ 129-135 |
| Tennessee | **Tenn. Code Ann. § 47-18-4904(a)(3)(A)(i)-(iii)**:  "A direct-to-consumer genetic testing company shall: . . .  obtain a consumer's: (A) Separate express consent for:  (i) The transfer or disclosure of the consumer's genetic data to a person other than the company's vendors and service providers . . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party.  *See* Reply ¶¶ 118-128 |
| Texas | **Tex. Bus. & Com. Code § 503A.006(a)(1)**:  "A direct-to-consumer genetic testing company engaging in any of the following activities must obtain: (1) an individual's separate express consent for: (A) the transfer or disclosure of the individual's genetic data to any person other than the company's vendors and service providers   . . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party.  *See* Reply ¶¶ 118-128 |
| Utah | **Utah Code Ann. § 13-60-104(1)(c)(i)**:  "A direct-to-consumer genetic testing company shall: if the company engages in any of the following, obtain a consumer's: (i) separate express consent for: (A) The transfer or disclosure of the consumer's genetic data to any person other than the company's vendors and service providers   . . . ." | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party.  *See* Reply ¶¶ 118-128 |
| Virginia | **Va. Code Ann. § 59.1-596(B)(4)**:  "Every direct-to-consumer genetic testing company shall obtain a consumer's express consent for the collection, use, and disclosure of the consumer's genetic data, including, at a minimum, separate and express consent for each of the following: . . . 4. Each transfer or disclosure of the consumer's genetic data or biological sample to a third party other than a service provider, | • The statute does not cover an equity sale. *See* Reply ¶¶ 113-117<br>• The Proposed Sale does not involve a transfer to a third party.  *See* Reply ¶¶ 118-128 |

| State | Legal Standard | General Response |
|---|---|---|
| | including the name of the third party to which the consumer's genetic data or biological sample will be transferred or disclosed." | |
| Washington | **Wash. Rev. Code Ann. § 19.373.070**: "Except as provided in subsection (6) of this section, beginning March 31, 2024, it is unlawful for any person to sell or offer to sell consumer health data concerning a consumer without first obtaining valid authorization from the consumer. The sale of consumer health data must be consistent with the valid authorization signed by the consumer. This authorization must be separate and distinct from the consent obtained to collect or share consumer health data, as required under RCW 19.373.030." | <ul><li>The statute does not cover an equity sale. *See* Reply ¶¶ 113-117</li><li>The Proposed Sale does not involve a transfer to a third party. *See* Reply ¶¶ 118-128</li><li>The Debtors have already obtained the consent contemplated by the statute. *See* Reply at ¶¶ 129-135</li></ul> |