UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **23ANDME HOLDING CO.,** *et al.*,[1] | Case No. 25-40976-357 |
| Debtors. | (Jointly Administered) |

DECLARATION OF ANDREW SWIFT
IN SUPPORT OF ENTRY OF THE SALE ORDER

I, Andrew Swift, hereby declare under penalty of perjury:

1.  I am a Managing Director at Moelis & Company LLC ("Moelis") an investment banking firm with principal offices located at 399 Park Avenue, New York, New York 10022. Moelis is the investment banker for the debtors and debtors-in-possession (collectively, the "Debtors" or the "Company") in the above-captioned chapter 11 cases. I submit this declaration (the "Declaration") in support of entry of the proposed *Order (I) Approving (A) The Debtors' Entry Into The Sale Transaction Documents, (B) The Sale to The Purchaser of The Acquired Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (C) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (II) Authorizing The Debtors*

---

[1] The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are: 23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595). The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

*to Consummate Transactions in Connection Therewith; and (III) Granting Related Relief* (the "Sale Order," and the sale contemplated thereby, the "Proposed Sale").[2]

2. Although Moelis is expected to be compensated for its work as the Debtors' investment banker in these chapter 11 cases, I am not being compensated separately for this Declaration or testimony. Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by Moelis professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors and their advisors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am over the age of 18 years, and I am authorized to submit this Declaration.

## Professional Qualifications

3. I have more than 12 years of investment banking experience. I have led engagement teams in complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities. In particular, I have provided services to debtors and other constituencies in numerous restructurings, including: *In re Blink Holdings, Inc., et al.*, No. 24-11686 (JKS) (Bankr. D. Del. 2024); *In re Invitae Corp., et al.*, No. 24-11362 (MBK) (Bankr. D.N.J. 2024); *In re Diamond Sports Group LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. 2023); *In re Cyxtera Technologies, Inc.*, No. 23-14853 (JKS) (Bankr. D.N.J. 2023); *In re Genesis Global Holdco, LLC*, No. 23-10063 (SHL) (Bankr. S.D.N.Y. 2023); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. 2019); *In re Mattress Firm, Inc.*, No. 18-12241 (CSS) (Bankr. D. Del.

---

[2] Capitalized terms used herein but not defined shall have the meanings ascribed to such terms in: (a) the Debtors' *Omnibus Reply in Support of Entry of the Sale Order* (the "Reply"), (b) the Bidding Procedures (as defined in the Reply), (c) the Final Procedures Order (as defined in the Reply), or (d) the Sale Order.

2

2018); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. 2016); and *In re Trinity Coal Corp.*, No. 13-50364 (TNW) (Bankr. E.D. Ky. 2013).

4. I have been employed at Moelis since 2012. I hold a Bachelor of Arts in history from the University of Michigan. I am authorized to execute this declaration on behalf of Moelis.

5. Since its engagement began in late 2024, Moelis has rendered investment banking advisory services to the Special Committee of the Board of Directors of Debtor 23andMe Holding Co. (the "Special Committee") in connection with its evaluation of financing and strategic alternatives, including the Proposed Sale. Additionally, Moelis has worked extensively with the Debtors' management and other professionals retained by the Debtors throughout these chapter 11 cases, including with respect to the Sale and Auction process, and has become familiar with the Debtors' capital structure, financial condition, liquidity needs, and business operations.

**The Debtors' Marketing Process**

6. Prior to Moelis' involvement, I understand from the Debtors' advisors that in March 2024, the Special Committee engaged Wells Fargo Securities, LLC ("Wells Fargo") as its independent financial advisor to assist the Special Committee in evaluating a potential strategic transaction for the Company. I understand that as part of this process, Wells Fargo, at the discretion of the Special Committee, contacted 15 potential counterparties to assess potential third-party interest in the Company (the "Initial Outreach"). I also understand that such efforts did not result in an out-of-court transaction.

7. Following the Initial Outreach, the Special Committee was repopulated in November 2024 with three new independent and disinterested directors, and shortly thereafter, the Special Committee selected Moelis to aid in its evaluation of strategic alternatives for the

3

Company.[3]  In January 2025, at the direction of the Special Committee, Moelis began soliciting potential third-party interest in the acquisition of the Debtors for all or a portion of the Company's Assets or the Company's business segments, as well as potential financing sources for new financing for the Debtors (the "Prepetition Marketing Process") after completing work with the Special Committee and the Debtors to assist in the preparation of materials for the Prepetition Marketing Process.  As part of this process, the Debtors dedicated substantial time and effort to conduct outreach to strategic and financial investors and, in consultation with Moelis, determined which parties to contact based on the parties' involvement in the healthcare sector, potential capacity to consummate a transaction, and industry knowledge and experience (among other criteria). In furtherance of the Prepetition Marketing Process, the Debtors, under the direction of the Special Committee and with Moelis' assistance, prepared a confidential information memorandum with extensive information on the Company Assets, populated a data room containing significant diligence documentation (the "Data Room"), and began outreach to potential buyers and financing parties.  On January 28, 2025, the Special Committee issued a press release announcing that it had undertaken a process to explore strategic alternatives, including among other alternatives, a possible sale of the Company, business combination, sale of all or part of the Company Assets, licensing of assets, restructuring, or other strategic action,[4] which resulted in additional inbound interest from third parties.

8.      The Debtors, under the direction of the Special Committee with the assistance of its advisors, engaged with 103 potential counterparties (including the 15 counterparties I

---

[3] In March 2025, Moelis's engagement was subsequently modified to account for its role as investment banker to both the Special Committee and the Debtors in connection with these chapter 11 cases.  On April 23, 2025, the Court approved Moelis's retention application on a final basis.  *See Final Order Authorizing the Retention of Moelis & Company LLC as Investment Banker for the Debtors and Debtors in Possession Effective as of the Petition Date* [Docket No. 299].

[4] *See* 23andMe Holding Co. press release dated January 28, 2025 (https://investors.23andme.com/newsreleases/news-release-details/23andme-special-committee-announces-exploration-strategic).

4

understand were contacted by Wells Fargo), including 51 potential strategic investors and 52 potential financial investors or financing counterparties (the "Contact Parties"), to evaluate a potential purchase of all or part of the Company Assets or an alternative potential investment in the Company. These efforts resulted in 90 introductory calls and the execution of 42 confidentiality agreements with the applicable counterparties receiving access to a comprehensive Data Room. Beginning January 30, 2025, and continuing throughout the Prepetition Marketing Process, Moelis distributed the confidential information memorandum and a preliminary financial model to the Contact Parties that had executed a confidentiality agreement. In the aggregate, the Debtors, with the assistance of Moelis, published over 180 diligence documents to the Data Room throughout the Prepetition Marketing Process covering financial, operational, legal, and other key items, and facilitated several diligence calls among the Debtors' management team, certain Contact Parties, and the Special Committee's and/or the Debtors' advisors.

9. In early February 2025, Moelis distributed a formal process letter requesting that the Contact Parties remaining in the process submit initial indications of interest no later than February 20, 2025 (the "Initial IOI Deadline"). This process letter provided to the Contact Parties included optionality for the Contact Parties to present indications of interest for the Company's equity, an acquisition of all or part of the Debtors' assets on a cash-free, debt-free basis, or a financing transaction. In connection with the Initial IOI Deadline, Moelis, on behalf of the Special Committee, received multiple preliminary non-binding indications of interest from Contact Parties with various structures. Subsequent to the Initial IOI Deadline, Moelis continued to engage in discussions with Contact Parties about a potential transaction involving the Company, and received preliminary non-binding indications of interest from a few additional Contact Parties with respect to potential financing or asset acquisition transactions. None of the non-binding indications of

5

interest received in the Prepetition Marketing Process, other than an indication of interest from the Debtors' former Chief Executive Officer, co-founder, controlling stockholder, and Chair of the Debtors' board of directors, provided for an out-of-court acquisition for 100% of the equity of the Company. Ultimately, the Special Committee determined that the indications of interest received during the Prepetition Marketing Process were either (a) preliminary in nature and not currently actionable, (b) not actionable on an out-of-court basis, or (c) otherwise not in the best interest of the Debtors and their stakeholders. In addition, given the Debtors' financial condition and liquidity position, among other relevant factors, the Special Committee determined that it was in the best interests of the Debtors' stakeholders to pivot to an in-court sale process.

10. The Debtors filed these chapter 11 cases with the goal of continuing their prepetition marketing efforts to attempt to enter into a transaction (or transactions) with the highest or otherwise best offer (or offers) for the benefit of all stakeholders. Accordingly, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines with Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), if any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. 30], which established parameters for the continuation of the Prepetition Marketing Process on a postpetition basis.

11. Accordingly, upon entry of the Bidding Procedures Order on March 28, 2025, the Debtors and Moelis continued their efforts to market all or a portion of the Company Assets in

6

accordance with the Bidding Procedures Order for an additional forty (40) days prior to the Bid Deadline (the "Postpetition Marketing Process" and, together with the Prepetition Marketing Process, the "Marketing Process").  On April 2, 2025, Moelis distributed an additional formal process letter (the "April Process Letter") requesting that parties interested in purchasing the Company Assets submit non-binding indications of interest no later than April 13, 2025 (the "Final IOI Deadline").  Among other things, the April Process Letter informed potential bidders that they must include in their proposal (a) a detailed description of their intended use of any purchased customer data, (b) whether such use would require any modification of the Debtors' existing privacy policies, and (c) the privacy programs and security controls that the potential bidder would implement to protect any purchased customer data.  The April Process Letter also reiterated the requirement under the Bidding Procedures that any bid must comply with the Debtors' existing privacy policies.

12. As part of the Postpetition Marketing Process, Moelis engaged with approximately 57 potential purchasers and the Debtors received 32 indications of interest.  Throughout this process, the Debtors also from time to time consulted with and apprised certain key stakeholders and parties-in-interest (including the Consultation Parties) of the status and key developments in the Marketing Process.  The Debtors explored the possibility of designating a Stalking Horse Bidder based on indications of interest received by the Final IOI Deadline, but ultimately did not designate a Stalking Horse.  Based on indications of interest and ongoing diligence by other potential bidders, the Debtors determined that the best path forward was to allow parties to continue to develop their diligence and submit fulsome bids in advance of the Bid Deadline.

13. I believe that the Marketing Process was comprehensive and transparent, and was conducted in good faith in accordance with the Court-approved Bidding Procedures.

7

**The Auction**

14. Ultimately, the Debtors generated several potential actionable transaction proposals from Potential Bidders. By the Bid Deadline, the Debtors received several bids for the Company Assets that contemplated an acquisition of the whole company or the whole company excluding the Lemonaid telehealth business, as well as multiple other bids that contemplated different asset packages.

15. In accordance with the Bidding Procedures, on May 14, 2025, the Debtors commenced an auction (the "Auction") with respect to the Company Assets, which included participation by seven Qualified Bidders for the Company Assets.[5] The bidding at the Auction proceeded without a stalking horse bid and opened with a starting bid of $52 million. At the end of the day on May 14, the Debtors had received bids from three separate bidders, each of $64 million.

16. Two bidders, Regeneron Pharmaceuticals, Inc. ("Regeneron") and TTAM Research Institute ("TTAM" and, together with Regeneron, the "Bidders") participated in the second day of the Auction, on May 15, 2025. At the end of the day on May 15, TTAM had submitted the then-leading bid for $146 million.

17. At the start of the third day of the Auction on May 16, the Debtors announced on the record that the backup bids would be capped at $146 million for TTAM and $151 million for Regeneron, respectively, based on an agreement reached with TTAM and Regeneron before the commencement of the Auction.[6] The Debtors conducted the Auction until Regeneron submitted

---

[5] The Debtors also qualified one Qualified Bidder for the Lemonaid telehealth business only (for a total of eight Qualified Bidders), who did not participate in the Auction.

[6] Under the terms of the Regeneron APA and TTAM's Asset Purchase Agreement, TTAM agreed to assume certain unpaid postpetition accounts payable at the time of closing that the Debtors estimate to be $5 million. The Regeneron APA does not contemplate the assumption of such liabilities, but Regeneron agreed to increase its cash purchase price by $5 million to offset the net value differential.

a bid of $256 million, as at that time, the Debtors determined that TTAM had not submitted satisfactory evidence of financial wherewithal to support a bid in excess of this amount. At such time, the Debtors, in consultation with their advisors and the Consultation Parties and in their business judgment, selected Regeneron as the Successful Bidder with a bid of $256 million for the whole company except the Lemonaid business, and TTAM as the Backup Bidder with a bid of $146 million for the whole company and concluded the Auction. Regeneron's bid was selected because the Debtors and their advisors determined that it was the highest or otherwise best bid submitted at the Auction.

18.   In evaluating these bids, the Debtors considered the Bidders' ability to both close a transaction and fund the going concern operations of the business on a go-forward basis. Prior to the Auction, the Debtors and their advisors assessed that the Company was expected to incur approximately $84 million in operating costs over the next 12 months, which factored into the Debtors' selection of a Successful Bidder.

### Post-Auction Events

19.   On May 17, 2025, the Debtors and Regeneron entered into that certain Asset Purchase Agreement by and among 23andMe Holding Co., the other Debtors party thereto, and Regeneron (as amended, modified, or supplemented from time to time, the "Regeneron APA"), which, among other things, (a) provided the Debtors a right to terminate the Regeneron APA if they determined that proceeding with the transactions contemplated by the Regeneron APA or failing to terminate the Regeneron APA would be inconsistent with their fiduciary duties (the "Fiduciary Out") and (b) preserved the Debtors' right to pursue any transaction or restructuring strategy that, in the Debtors' business judgment, would maximize the value of their estates notwithstanding any other provision in the Regeneron APA or other document related to the transactions contemplated by the Regeneron APA. On May 19, 2025, the Debtors filed the *Notice*

9

*of Successful and Backup Bidders With Respect to the Auction of the Debtors' Assets* [Docket No. 420] announcing the outcome of the Auction.

20. Following the Debtors' and Regeneron's entry into the Regeneron APA, on May 17, TTAM's advisors circulated a letter to the Debtors' advisors setting forth the terms of a revised proposal from TTAM to acquire substantially all of the Company Assets at a higher purchase price than contemplated under the Regeneron APA (the "May 17 Proposal").

21. On May 21, 2025, TTAM's advisors circulated a second letter to the Debtors' advisors setting forth the terms of a further revised proposal from TTAM for substantially all of the Company Assets at a higher purchase price than contemplated in the May 17 Proposal (the "May 21 Proposal" and, together with the May 17 Proposal, the "TTAM Post-Auction Proposals") that included additional evidence of financial wherewithal that TTAM did not provide before the conclusion of the Auction.

22. Given the negotiated Fiduciary Out in the Regeneron APA, the Special Committee evaluated the TTAM Post-Auction Proposals in good faith and engaged in dialogue with TTAM, Regeneron, their respective advisors, and other stakeholders. Through this process, TTAM provided the Debtors with additional diligence information and evidence of financial support to fund the purchase price associated with its bid, continue operating the Company after closing, and fulfill any other obligations contemplated under the TTAM APA. Such evidence includes TTAM's balance sheet, binding and irrevocable grant commitments from entities who committed to fund TTAM's obligations under the TTAM APA (the "Commitment Parties"), and additional documentation evidencing funds available to those Commitment Parties.

23. On May 27, 2025, TTAM filed the *TTAM Parties' Motion for Leave to File Under Seal Preliminary Objection to the Sale Motion* [Docket No. 480] and the *TTAM Parties' Motion*

10

*for Entry of an Order (I) Shortening the Objection Period and, if Necessary, Scheduling an Expedited In Camera Hearing on the TTAM Parties' Motion for Leave to File Under Seal Preliminary Objection to the Sale Motion; (II) Setting A Scheduling Conference with Respect to the Sale Motion* [Docket No. 481] (together, the "TTAM Pleadings") requesting, among other things, (a) Court approval to file a "preliminary" objection to the Debtors' Bidding Procedures, forthcoming Sale Motion, and the Auction process (the "TTAM Preliminary Objection") under seal and (b) a scheduling conference to address related discovery procedures, briefing schedules, and deadlines, among other things.

24.     The Debtors perceived litigation and business risks presented by the TTAM Pleadings and the TTAM Preliminary Objection, as well as Regeneron's positions concerning the propriety of the TTAM Post-Auction Proposals and Regeneron's ability to terminate the Regeneron APA.  The Debtors consulted with their advisors and believed these risks had the potential to threaten their ability to conduct a value-maximizing sale process.

25.     Accordingly, following receipt of the TTAM Post-Auction Proposals and after discussions among the Debtors, their advisors, the Special Committee, and the Consultation Parties, the Debtors engaged with both Regeneron and TTAM in negotiations regarding a framework for soliciting and evaluating further proposals for a sale of the Company Assets.  The Debtors ultimately filed the *Debtors' Motion for Entry of an Order (I) Establishing Procedures for the Submission of Final Proposals from the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [Docket No. 574] (the "Final Bidding Procedures Motion") with a proposed framework.  Regeneron consented to the framework proposed by the Final Bidding Procedures Motion, subject to inclusion of certain provisions reflected therein.

11

26. TTAM filed an objection to the Final Bidding Procedures Motion (the "TTAM Final Procedures Objection," and, together with the TTAM Preliminary Objection, the "TTAM Objections"), agreeing with the Debtors that bidding for the Company Assets should resume but disagreeing with certain procedures proposed in the Final Bidding Procedures Motion.

27. The Court held a hearing on the Final Bidding Procedures Motion and related matters on June 4, 2025. During a recess at the June 4 hearing, the Debtors, TTAM, and Regeneron agreed to terms of certain "final proposal" procedures to govern a final round of bidding. This consensual resolution resolved the TTAM Objections and included an agreement to cease and not commence or initiate any further discovery or litigation with respect to the Auction.

28. On June 6, 2025, the Court approved the agreed-upon final proposal procedures through entry of the *Order (I) Establishing Procedures for the Submission of Final Proposals From the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [Docket No. 657] (the "Final Procedures Order"). The Final Procedures Order made binding both Regeneron's existing bid of $256 million and TTAM's bid of $305 million on the terms set forth in the May 21 Proposal.

**The Final Bidding Round**

29. In accordance with the Final Procedures Order, on June 13, 2025, the Debtors conducted the Final Bidding Round (as defined in the Final Procedures Order).

30. The Final Bidding Round opened with TTAM's bid of $305 million. Regeneron declined to increase its bid beyond $256 million.

31. Following the Final Bidding Round, the Debtors, in consultation with their advisors and the Consultation Parties and in their business judgment, selected (i) TTAM as the Winning Bidder (as defined in the Final Procedures Order), with a bid of $305 million, and (ii) Regeneron as a backup bidder, with a bid of $151 million. That same day, the Debtors filed the *Notice of*

*Winning Bidder with Respect to the Final Proposal Procedures to Acquire the Debtors' Assets* [Docket No. 739] (the "Winning Bidder Notice").

32. TTAM's Final Proposal contemplates a going concern transaction that preserves the vast majority of employees' jobs and provides greater cash consideration than any other bid or proposal received by the Debtors. I understand that both TTAM and the Debtors have represented that they are willing and able to consummate the transactions contemplated by the TTAM APA on the terms set forth therein.

33. I believe, based on my involvement in the Marketing Process and my experience as an investment banker, that the Marketing Process, Bidding Procedures, and final procedures provided the Debtors with a reasonable amount of time to solicit and potentially identify and select a higher or otherwise better bid for the Company Assets than the Proposed Sale contemplated to be effected pursuant to the TTAM APA, and, similarly, afforded interested parties a reasonable opportunity to conduct due diligence prior to submitting their proposals or bids. Based on my experience in and review of marketing and sale processes, the timeline between the Auction and the Final Bidding Round, on the one hand, and the Sale Hearing, on the other, is reasonable and comparable to timelines utilized by other chapter 11 debtors pursuing sales of their assets.[7] The foregoing view is informed by the duration and scope of the Marketing Process described above, the due diligence conducted by potential interested parties, the feedback obtained from the parties solicited, as well as from the parties who submitted proposals and/or with whom the Debtors engaged in related negotiations. Given the foregoing, I believe that the Proposed Sale

---

[7] In an analysis of approximately 15 chapter 11 cases filed in the last 12 months of similar size involving sales under section 363, the mean and median of the days between the auction and the sale hearing were 13 days and 9 days, respectively.

contemplated to be effectuated pursuant to the TTAM APA is the highest or otherwise best bid presently available to the Debtors under the circumstances.

### The Proposed Sale

34. On June 13, 2025, the Company and certain of its subsidiaries and affiliates named therein (the "Sellers"), as sellers, executed a revised asset purchase agreement with TTAM, as purchaser (the "Purchaser"), subject to Court approval (the "TTAM APA"). Following the Final Bidding Round, the Debtors and Regeneron, as the Backup Bidder, also finalized a revised Regeneron APA, updated to reflect the Backup Bid purchase price.

35. On May 28, 2025, the Debtors posted a draft of the Sale Order on the website of its claims and noticing agent. Through the Sale Order, the Debtors seek (a) authority to enter into, and approval of, the TTAM APA, and (b) authorization and approval of the sale of the Company Assets free and clear of all liens, claims, liabilities, rights, encumbrances, and other interests (other than Assumed Liabilities).[8]

36. Pursuant to the TTAM APA, the Sellers and the Purchaser have agreed to a sale of the Acquired Assets, on terms set forth in the TTAM APA. The TTAM APA provides for a purchase price of $305 million in cash, plus additional non-cash consideration, such as the payment of certain cure costs and the assumption of liabilities arising out of ownership of the Acquired Assets, subject to certain terms and conditions.

37. The TTAM APA contemplates the purchase of the Acquired Assets, free and clear of any liens or encumbrances, and the assumption of certain liabilities associated with the Acquired Assets. The TTAM APA also contemplates the assumption and assignment to the Purchaser of

---

[8] Through the Sale Order, the Debtors also seek authority to enter into, and approval of, the Regeneron APA in the event that the Debtors and TTAM are unable to consummate the Proposed Sale.

Executory Contracts and Unexpired Leases as set forth in the *Notice of (I) Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [Docket No. 591], with certain cure costs to be borne by the Purchaser pursuant to the terms of the TTAM APA.

38.     On June 14, 2025, the Debtors made an election to consummate the Proposed Sale via the Equity Sale Toggle (as defined in the Reply). Pursuant to this structure, I understand that the Acquired Assets and Assumed Liabilities will be transferred to a newly formed and wholly-owned, non-debtor subsidiary of the Company ("NewCo"), in exchange for a note in the amount of $305 million. The Company will then sell 100% of the equity interests in NewCo to TTAM in exchange for $305 million. Based on my review of the applicable documents and discussions with the Debtors' advisors, I believe that the Equity Sale Toggle does not modify the economics, or the scope of Acquired Assets and Assumed Liabilities, that are ultimately included within the Proposed Sale with TTAM.

39.     Based upon my observations during the Marketing Process, I believe that the Debtors selected the Purchaser as the Winning Bidder in good faith and without collusion or fraud. Based on my observations, knowledge and interactions during the Marketing Process, I believe that the Purchaser has transacted with the Debtors in good faith in connection with this proceeding. Although the Company's former CEO, director, founder, and controlling shareholder, Anne Wojcicki, is also the founder of Purchaser, the purchase price and terms of the TTAM APA are the result of a competitive auction process and arm's-length negotiations conducted under the supervision of the disinterested and independent Special Committee. Moreover, the Debtors have successfully preserved estate claims through this sales process, including claims against Ms. Wojcicki that are not being sold or released pursuant to the TTAM APA.

## Conclusion

40. Accordingly, I believe that the Debtors engaged in a robust Marketing Process, and that the Proposed Sale and the terms of the TTAM APA reflect the highest or otherwise best bid for the Company Assets currently available under the circumstances of these chapter 11 cases

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 16, 2025

                                                        By:  */s/ Andrew Swift*
                                                               Andrew Swift
                                                               Managing Director
                                                              Moelis & Company LLC