**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976-357 |
| Debtors. | (Jointly Administered) |

**DECLARATION OF THOMAS WALPER
IN SUPPORT OF ENTRY OF THE SALE ORDER**

I, Thomas Walper, hereby declare under penalty of perjury:

1.     I am an independent director serving on the board (the "Board") of 23andMe Holding Co. (together with the other above-captioned debtors, the "Debtors" or the "Company") and on the Board's special committee of independent and disinterested directors (the "Special Committee"). I submit this declaration (the "Declaration") in support of entry of the proposed *Order (I) Approving (A) The Debtors' Entry Into The Sale Transaction Documents, (B) The Sale to The Purchaser of The Acquired Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (C) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (II) Authorizing The Debtors to Consummate Transactions in Connection*

---

[1]     The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are: 23andMe Holding Co. (0344), 23andMe, Inc. (7371), 23andMe Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595). The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

*Therewith; and (III) Granting Related Relief* (the "Sale Order," and the sale contemplated thereby, the "Proposed Sale").[2]

2.      Although I am being compensated for my role as a Board member, I am not being compensated separately for this Declaration or testimony.  Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, the information provided to me by professionals involved in advising the Debtors in these chapter 11 cases, or information provided to me by the Debtors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.  I am over the age of 18 years, and I am authorized to submit this Declaration.

## Background and Professional Qualifications

3.      I have served as a member of the Board and the Special Committee since I was appointed, effective March 24, 2025.  Until March 22, 2025, I was a partner at the law firm of Munger, Tolles & Olson LLP.  I have advised clients on restructuring and bankruptcy matters for more than 40 years.  I graduated from the University of Southern California with a Bachelor of Science in 1977 and a Masters of Business Administration in 1977.  I graduated from Loyola Law School with a Juris Doctor in 1980.

## The Special Committee's Formation, Independence, and Scope of Authority

4.      The Special Committee, of which I am a member, was formed prior to my involvement with the Company on March 28, 2024.  I understand that the Special Committee was formed at that time in response to a public announcement by Anne Wojcicki, the Company's then-Chief Executive Officer ("CEO"), director, founder, and controlling shareholder, that she intended

---

[2]   Capitalized terms used in this Declaration but not defined shall have the meanings ascribed to them in: (a) the Debtors' *Omnibus Reply in Support of Entry of the Sale Order* (the "Reply"), (b) the Bidding Procedures (as defined in the Reply), (c) the Final Procedures Order (as defined in the Reply), or (d) the Sale Order.

to make a bid to take the Company private. The Board delegated to the Special Committee the authority to review and evaluate strategic alternatives that might be available to the Company, including sale proposals from Ms. Wojcicki.[3] The Board authorized the Special Committee to retain independent legal counsel, financial advisors, and other advisors in connection with its duties and to negotiate the terms and conditions of any potential transaction.[4] The Special Committee retained Dechert LLP as legal counsel and Wells Fargo Securities, LLC to serve as its financial advisor.

5.    Following the September 17, 2024 resignation of the then-serving independent directors of the Board—including the directors then-serving on the Special Committee—three new independent and disinterested directors, Jim Frankola, Andre Fernandez, and Mark Jensen, were appointed to the Board on October 28, 2024.[5] On November 2, 2024, the Board appointed Messrs. Frankola, Fernandez, and Jensen to the Special Committee.[6] The Special Committee subsequently retained new, independent counsel at Goodwin Procter LLP, and Moelis & Co. as its financial advisor, and conducted a prepetition marketing to solicit bids and interest from third parties, as well as Ms. Wojcicki.

6.    On March 7, 2025, the Board authorized resolutions that expanded the Special Committee's delegation of authority to include all matters related to a potential restructuring of the Company, including the authority to direct the Company to file and commence chapter 11 proceedings.[7]

---

[3]    *See* Ex. 1, Board Resolution Appointing Special Committee (Mar. 28, 2024).

[4]    *Id.* at 2.

[5]    *See* Ex. 2, Action by Written Consent of the Board of Directors at 2–3 (Oct. 28, 2024).

[6]    *See* Ex. 3, Resolutions of the Board of Directors at 2 (Nov. 2, 2024).

[7]    *See* Ex. 10, Resolutions of the Board of Directors (Mar. 7, 2025).

7.      On March 21, 2025, the Board approved resolutions appointing me as an additional independent director and a Special Committee member, effective upon the filing of these chapter 11 cases.[8]  On March 23, 2025, I was delegated the power and authority to conduct audits, reviews, and investigations concerning, among other things, the Company's transactions and relationships with insiders of the Company.[9]

8.      On the same day, Ms. Wojcicki, by mutual agreement between Ms. Wojcicki and the Special Committee, tendered her resignation as an officer of the Company to the Board, with such resignation effective at 5:00 p.m., Eastern Time, on March 23, 2025.  Ms. Wojcicki also stepped down as Chair of the Board (while continuing to serve as a director on the Board) and further resigned as director and/or officer, as applicable, from various other Company subsidiaries.

9.      On March 23, 2025, the Special Committee approved specific guidelines governing, among other things, communications between Ms. Wojcicki and the Company's management, subject to appropriate oversight by the Special Committee and senior members of the Company's management team (the "March 23, 2025 Guidelines").[10]  The March 23, 2025 Guidelines served as supplemental guidance to earlier guidelines adopted for the same purpose.[11]

10.      Mr. Frankola, Mr. Fernandez, Mr. Jensen, and I are fully independent, are not affiliated with Ms. Wojcicki, her affiliates (other than in connection with our service as directors of the Company), or any other bidder, had no prior relationships with Ms. Wojcicki, her affiliates,

---

[8]      *See* Ex. 11, Resolutions of the Board of Directors at 1 (Mar. 21, 2025).

[9]      *See* Ex. 4, Omnibus Resolution of the Special Committee at 2 (Mar. 23, 2025).

[10]      *See* Ex. 5, Third Supplemental Guidance for Management in Connection with the Strategic Alternatives Review Process (Mar. 23, 2025).

[11]      *See* Ex. 6, Second Supplemental Guidance for Management in Connection with the Strategic Alternatives Review Process (Jan. 23, 2025); Ex. 7, Supplemental Guidance for Management in Connection with the Strategic Alternatives Review Process (Apr. 4, 2024); Ex. 8, Addendum to Rules and Guidelines for Management in Connection with the Strategic Alternatives Review Process (Sept. 27, 2024); Ex. 9, Rules and Guidelines for Management in Connection with the Strategic Alternatives Review Process (Apr. 2, 2024).

or any other bidder, and have no material financial or other interest in a potential transaction distinct from the interests of the Company's stockholders generally (excluding Ms. Wojcicki and her affiliates). Following Ms. Wojcicki's resignation from her role as CEO of the Company, she has played no role in the management of the Company, and has had no input into any corporate decision-making during these chapter 11 cases.

### The Auction and Sale Processes

11.    On March 24, 2025, each Debtor filed a voluntary petition for relief in this Court under chapter 11 of title 11 of the United States Code, thereby commencing the chapter 11 cases. The Court thereafter entered the *Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry Into Stalking Horse Agreement(s), If Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, And (VII) Granting Related Relief* [Docket No. 125] (the "Bidding Procedures Order"), which established procedures by which the Debtors were authorized to conduct an auction for the sale of all or substantially all of their assets or some combination thereof (the "Auction").

12.    Together with the other members of the Special Committee, and in accordance with the Bidding Procedures Order, I have overseen the Debtors' postpetition marketing and sale process. Since the Debtors' filing of these chapter 11 cases, the Special Committee met as a committee more than twenty-five times and met with the Debtors' advisors on at least a weekly basis to discuss the marketing and sale processes, among other matters.

13.    On May 14 through May 16, 2025, in accordance with the Bidding Procedures, the Debtors conducted the Auction with respect to the Company Assets. The Auction opened with a

highest or overall best bid of $52 million, and included seven Qualified Bidders during the first day of the Auction. After the first day, the only remaining bidders were Regeneron Pharmaceuticals, Inc. ("Regeneron"), and TTAM Research Institute ("TTAM"), who engaged in active, competitive bidding for the next two days. TTAM was founded by Ms. Wojcicki. Regeneron has no affiliation with Ms. Wojcicki and is an unaffiliated third party.

14. On May 16, 2025, the Special Committee, in consultation with the Debtors' advisors and the Consultation Parties and in its business judgement, evaluated the submitted bids, selected Regeneron as the Successful Bidder with a bid of $256 million, selected TTAM as the Backup Bidder with a bid of $146 million, and concluded the Auction.

15. At the Auction, the Debtors successfully negotiated with all bidders to preserve substantially all estate claims and causes of action, which will not be sold or released as part of the Sale Transaction contemplated by the Sale Order.

16. Following the Auction, the Debtors received two revised bid proposals from TTAM, the second of which was a proposal to acquire the Company Assets at a purchase price of $305 million. TTAM also provided additional evidence of financial wherewithal, not available at the Auction. At the direction of the Special Committee, the Debtors' advisors conducted due diligence on such evidence and concluded that TTAM's bid was fully financed, and that TTAM had sufficient financial wherewithal to continue operating the Company after closing and fulfill any other obligations contemplated under the TTAM APA. As a result, the Debtors engaged both Regeneron and TTAM in an active dialogue regarding a framework for soliciting and evaluating further proposals for a sale of the Company Assets. The Debtors ultimately filed the *Debtors' Motion for Entry of an Order (I) Establishing Procedures for the Submission of Final Proposals*

*from the Backup Bidder and Successful Bidder and (II) Granting Related Relief* [Docket No. 574]
(the "Final Bidding Procedures Motion") with a proposed framework.

17.　　The Court held a hearing on the Final Bidding Procedures Motion and related
matters on June 4, 2025.  During a recess at the June 4 hearing, the Debtors, TTAM, and Regeneron
agreed to terms of certain "final proposal" procedures to govern a final round of bidding.  On
June 6, 2025, the Court approved the agreed upon final proposal procedures through entry of the
*Order (I) Establishing Procedures for the Submission of Final Proposals From the Backup Bidder
and Successful Bidder and (II) Granting Related Relief* [Docket No. 657] (the "Final Procedures
Order").

18.　　Accordingly, and in accordance with the Final Procedures Order, on June 13, 2025,
the Debtors conducted the Final Bidding Round.  The Final Bidding Round opened with TTAM's
bid of $305 million.  Regeneron declined to increase its bid beyond $256 million.

19.　　Following the Final Bidding Round, the Special Committee, in consultation with
the Debtors' advisors and the Consultation Parties, applying their business judgement, selected
TTAM as the Winning Bidder (as defined in the Final Procedures Order) with a bid of $305 million
and Regeneron as the Backup Bidder with a bid of $151 million.[12]

20.　　At all times during the chapter 11 cases, the Special Committee has rigorously
performed their obligations, and maintained complete independence.  The Special Committee's
objective has been, and will continue to be, to achieve the best, value-maximizing outcome for the
Debtors and their stakeholders.  In pursuing that objective, TTAM—like all other bidders—has
been dealt with at arm's-length, and has been represented by separate counsel (at Skadden, Arps,

---

[12]　During the Auction, the Special Committee determined, with the participating bidders' agreement, that backup
bids would be frozen at levels reflecting the bidding at the conclusion of the second day of the Auction.

Slate, Meagher & Flom LLP; Quinn Emanuel Urquhart & Sullivan, LLP; and Kirkland & Ellis LLP) and separate financial advisors (at TD Cowen). The treatment of TTAM and Ms. Wojcicki has been on equal footing with other bidders. Although Ms. Wojcicki is a member of the Board, she remained subject to the guidelines governing her communications with Company management, has not been involved in any meetings of the Special Committee (there have been no full meetings of the Board since the Petition Date, given the full delegation of all matters in the chapter 11 cases to the Special Committee), and was afforded no opportunities to provide input into any decisions related to the Special Committee's evaluation of strategic alternatives during, leading up to, and between the Petition Date and the Final Bidding Round.

21.     The Company's advisors negotiated vigorously with TTAM to obtain the best possible terms for the Debtors' estate, customers, and stakeholders. Initial drafts of TTAM's proposed APA sought to acquire claims and causes of action against insiders, which the Special Committee rejected, both to preserve value for the estate and avoid potentially complex valuation questions that can accompany the acquisition of such claims (other bidders, for example, did not seek to obtain such claims). The Debtors also negotiated for and obtained increased flexibility in the transaction structure, allowing the Debtors to "toggle" to an equity purchase structure in an effort to accommodate certain objections to the original APA raised by certain state attorneys general. Finally, the Debtors negotiated to include numerous privacy-enhancing measures, intended to provide privacy protections beyond what the Debtors' prepetition policies provide. Given TTAM's commitment to customer privacy and choice, TTAM agreed to substantially all of the Debtors' proposed privacy-related modifications.

**The Winning Bid Is the Highest or Otherwise Best Bid**

22.     With the benefit of detailed input and advice from its legal, financial, and investment banking teams as well as from management, the Special Committee determined that

the TTAM proposed transaction and bid was highest or otherwise best, and selected it as the Winning Bid. That determination was based on several factors, including (i) most significantly, that TTAM's bid had the highest cash purchase price of $305 million—$49 million higher than Regeneron's bid; (ii) the TTAM APA provides for greater privacy protections for consumer data held by the Company, which is a primary concern of several parties-in-interest, including the governmental entities who have filed objections to the proposed Sale Order; (iii) the TTAM APA provides for greater flexibility in transaction structure, allowing for the Sale Transaction to be consummated as an asset purchase, as originally conceived, or as an equity sale; (iv) the TTAM APA provides the Debtors with the ability to effectuate the transactions contemplated in the TTAM APA pursuant to a chapter 11 plan; (v) TTAM is assuming certain liabilities, including outstanding payables that arise and become due after bankruptcy but are outstanding as of closing; and (vi) the Sale Transaction contemplated by the TTAM APA does not require approval pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, which will likely permit the Debtors and TTAM to close the transaction more quickly and diminishes the risks associated with closing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 16, 2025

By:  _/s/ Thomas Walper_____
Thomas Walper

**Exhibit 1**

DocuSign Envelope ID: CD32A4F8-9D8D-49EC-8A08-32B7023C8ADD

DECHERT LLP 3/28/24
PRIVILEGED & CONFIDENTIAL

# 23ANDME HOLDING CO.
## SPECIAL COMMITTEE APPOINTMENT

WHEREAS, the Board of Directors (the "Board") of 23andMe Holding Co., a Delaware corporation (the "Corporation") has determined that because the Corporation's Chief Executive Officer Anne Wojcicki and her affiliates (other than the Corporation) own as of the date hereof approximately 49% of the total voting power of all of the Corporation's outstanding voting securities and may have an interest in a Potential Transaction (as defined below) that is different from, or in addition to, the interests of the Corporation's stockholders generally (the "Unaffiliated Stockholders"), it is advisable and in the best interests of the Corporation and its stockholders to establish a special committee of the Board consisting of independent and disinterested directors  (the "Special Committee"), to review and evaluate potential strategic transactions with potential acquirors and the Corporation's other strategic alternatives (a "Potential Transaction"), as well as maintaining the status quo as a standalone company, and to take such other action with respect thereto as shall be authorized in the following resolutions.

NOW, THEREFORE, BE IT RESOLVED, that pursuant to Section 141(c) of the General Corporation Law of the State of Delaware and Article V of the Second Amended and Restated Bylaws of the Corporation (the "Bylaws"), the Board hereby establishes the Special Committee;

FURTHER RESOLVED, that the Board hereby determines that each of Sandra Hernández, M.D., Valerie Montgomery Rice, M.D. and Peter J. Taylor is independent, is not affiliated with Anne Wojcicki or her affiliates (other than the Corporation) and, based on facts known to the Board as of the date of these resolutions, does not have a material financial or other interest in a Potential Transaction that is different from, or in addition to, the interests of the Unaffiliated Stockholders;

FURTHER RESOLVED, that Sandra Hernández, M.D., Valerie Montgomery Rice, M.D. and Peter J. Taylor are hereby designated to serve as the members of the Special Committee, with the duties and powers granted to the Special Committee as hereinafter described, and Peter J. Taylor is hereby appointed as the chair of the Special Committee;

FURTHER RESOLVED, that the Board hereby delegates to the Special Committee the power and authority of the Board, to the fullest extent permitted by law, to take actions with respect to any Potential Transaction or alternative thereto (an "Alternative Transaction") and any review, discussion, consideration, deliberation, examination, investigation, analysis, assessment, evaluation, exploration, response, negotiation, termination, rejection, approval and/or authorization on behalf of the Corporation in connection therewith; provided, however, that the Special Committee shall not have authority to approve any agreement required under applicable law to be approved by the Board;

FURTHER RESOLVED, that, without limiting the foregoing resolutions, the Board hereby delegates to the Special Committee, to the fullest extent permitted by law, the full power and authority of the Board: (i) to formulate, establish, oversee, control and direct the strategic alternatives review process, (ii) to review and evaluate the terms and conditions, and determine the advisability of any Potential Transaction any Alternative Transaction and any documents, agreements or other instruments to be or proposed to be entered into by the Corporation in connection with any Potential Transaction or any Alternative Transaction, (iii) to negotiate with any potential counterparty or any other person or entity the terms and conditions of any Potential Transaction, any Alternative Transaction and any documents,

agreements or other instruments to be or proposed to be entered into by the Corporation in connection with any Potential Transaction or any Alternative Transaction, and if the Special Committee deems appropriate and in its sole discretion, to approve and authorize, or to reject, any Potential Transaction or any Alternative Transaction and the execution, delivery and performance of any documents, agreements or instruments relating thereto or to be or proposed to be entered into in connection therewith (and, for avoidance of doubt, the Special Committee is hereby authorized in its discretion to terminate any and all negotiations concerning any Potential Transaction or any Alternative Transaction at any time), (iv) to review and evaluate, and negotiate the terms and conditions of, any Alternative Transaction and any documents, agreements or other instruments following the execution of a definitive agreement with respect to a Potential Transaction, (v) to review and evaluate, and negotiate the terms and conditions of, any voting or support agreement to which the Corporation is a party whereby a stockholder of the Corporation agrees to support any Potential Transaction, (vi) to determine whether any Potential Transaction or any Alternative Transaction, and any documents, agreements or other instruments to be or proposed to be entered into by the Corporation in connection with any Potential Transaction or any Alternative Transaction, are fair to, and in the best interests of, the Corporation and its stockholders, (vii) to approve any Potential Transaction or any  Alternative Transaction (including, without limitation, any transaction resulting in a person becoming an "interested stockholder") for purposes of Article IX of the Corporation's Certificate of Incorporation and (viii) to take any and all other actions as the Special Committee in its sole discretion deems necessary, advisable or appropriate in connection with its consideration of any Potential Transaction or any Alternative Transaction; provided, however, that the Special Committee shall not have authority to approve any agreement required under applicable law to be approved by the Board;

FURTHER RESOLVED, that the Board shall not approve any Potential Transaction or any Alternative Transaction, or recommend any Potential Transaction or any modification, variation, supplement or waiver thereof or any Alternative Transaction for approval by the Corporation's stockholders, without a prior favorable recommendation of such Potential Transaction or any such Alternative Transaction by the Special Committee;

FURTHER RESOLVED, that the Special Committee is hereby authorized and empowered to retain legal counsel to advise it and assist it in connection with fulfilling its duties;

FURTHER RESOLVED, that the Special Committee is hereby authorized and empowered to retain such other consultants and agents, including, without limitation, financial advisors or other valuation experts and consultants, as the Special Committee may deem necessary or appropriate to advise it and assist it in connection with fulfilling its duties as delegated by the Board and to perform such services and render such opinions or reports as may be necessary or appropriate in order for the Special Committee to discharge such duties;

FURTHER RESOLVED, that the Special Committee is hereby authorized and empowered to enter into such contracts providing for the retention, compensation, reimbursement of expenses and indemnification of such legal counsel, financial advisors or valuation consultants, other consultants and agents as the Special Committee may in its sole discretion deem necessary or appropriate, and that the Corporation is hereby authorized and directed to pay all fees, expenses and disbursements of such legal counsel, financial advisors or valuation consultants, other consultants and agents on presentation of statements approved by the Special Committee, and that the Corporation shall pay all fees, expenses, and disbursements of such legal counsel, financial advisors or valuation consultants, other consultants and agents and shall honor all other obligations of the Corporation under such contracts; and any such contract entered into by the Special Committee is hereby approved, adopted, confirmed and ratified, and, to the extent necessary or advisable, the officers of the Corporation are hereby authorized and directed to execute any such contract, for and on behalf of the Corporation, and the execution thereby by any such

2

officer shall constitute approval thereof by the Board and shall represent the Corporation's acknowledgment and acceptance of the terms and conditions thereof;

FURTHER RESOLVED, that the Special Committee, after consultation with management and the Corporation's legal counsel, is hereby authorized to issue news releases and other public disclosures documents on behalf of the Corporation as it may deem appropriate in connection with any Potential Transaction and any Alternative Transaction;

FURTHER RESOLVED, that the officers, employees and agents of the Corporation are hereby directed to cooperate fully with the Special Committee, each member thereof, and any of their advisers, agents, counsel and designees, and to provide such information and materials, including, without limitation, the books, records and financial statements of the Corporation, and any other documents, reports or studies pertaining to any Potential Transaction or any Alternative Transaction (including any forecasts or projections or similar materials) as may be useful or helpful in the discharge of the Special Committee's duties or as may be determined by the Special Committee, or any member thereof on behalf of the Special Committee, to be appropriate or advisable in connection with the discharge of the duties of the Special Committee and each of its members;

FURTHER RESOLVED, that the Special Committee is authorized to solicit the views of the Corporation's executive, financial and other officers regarding the terms and conditions of any Potential Transaction or any Alternative Transaction to assist the Special Committee in its review and evaluation of such terms and conditions, including the views of such officers on any reports, studies or similar information pertaining to any Potential Transaction or any Alternative Transaction prepared or submitted to the Special Committee by its advisors, consultants and other agents;

FURTHER RESOLVED, that the Special Committee, and each member thereof, is hereby authorized and empowered to do all acts as may be necessary or appropriate in its or his or her judgment to carry out the duties of the Special Committee contemplated by these resolutions;

FURTHER RESOLVED, that the officers of the Corporation are hereby authorized and directed to take all such further action and to prepare, execute, acknowledge, file, deliver and record all such further documents and instruments by and on behalf of the Corporation, and in its name, or otherwise, as in the judgment of any such officer shall be necessary, appropriate or advisable in order fully to carry out the intent and to accomplish the execution of the purposes of the foregoing resolutions;

FURTHER RESOLVED, that, in addition to (and without limitation of) any rights provided under the Certificate of Incorporation or Bylaws, any agreement or applicable law, the Corporation, to the fullest extent permitted by law, shall indemnify, hold harmless and advance expenses to each member of the Special Committee in connection with any threatened, pending or completed action, suit or proceeding (whether criminal, administrative or investigative) in which the Special Committee, or any member thereof, is or is threatened to be made a participant (including as a witness) arising from or relating to any such member's appointment to or service on the Special Committee, any Potential Transaction or any Alternative Transaction, or the discharge of the powers or duties of the Special Committee or any member thereof pursuant to or in furtherance of these resolutions, and provided further, that such indemnification, hold harmless and advance of expenses as set forth herein is in addition to, and not in lieu of, all other such rights available to each member of the Special Committee under the Bylaws and the Certificate of Incorporation of the Corporation, or under any agreements between any such members and the Corporation, or under applicable law;

FURTHER RESOLVED, that, solely in recognition of the additional time and effort required of the members of the Special Committee to discharge their duties as contemplated hereby, each member of

3

the Special Committee shall earn $7,500 per month (payable quarterly in arrears in fully vested restricted stock units), beginning on April 1, 2024; provided, that (a) payment of such fees shall continue for the duration of the Special Committee's existence, (b) with respect to any partial month, members shall be paid a pro rata amount of the monthly fee, (c) members of the Special Committee shall have reasonable expenses related to service on the Special Committee reimbursed in accordance with Section 3.4 of the Bylaws, and (d) the payment of such fees and reimbursement of such expenses shall not be conditioned on the approval or completion of any Potential Transaction;

FURTHER RESOLVED, that, to the fullest extent permitted by law, the deliberations and records of the Special Committee shall be confidential, and all statutory and common law privileges shall be available with respect to legal advice rendered to, and documents prepared by counsel to assist, the Special Committee;

FURTHER RESOLVED, that any and all actions heretofore taken by the officers and directors of the Corporation, or any of them, with respect to and in contemplation of, the transactions authorized by any of the foregoing resolutions, are hereby authorized, approved, ratified and confirmed; and

FURTHER RESOLVED, that all actions heretofore taken by the members of the Special Committee, with respect to and in contemplation of, the transactions authorized by any of the foregoing resolutions, are hereby authorized, approved, ratified and confirmed.

**<u>Exhibit 2</u>**

**23ANDME HOLDING CO.**
**ACTION BY WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS**

**October 28, 2024**

In accordance with Section 141(f) of the Delaware General Corporation Law and the Second Amended and Restated Bylaws (the "Bylaws") of 23andMe Holding Co., a Delaware corporation (the "Company"), the undersigned, being the sole member of the Board of Directors of the Company (the "Board"), hereby takes the following actions and adopts the following resolutions by written consent without a meeting:

**WHEREAS**: Section 3.2 of the Bylaws provides that the Board shall consist of not less than one nor more than fifteen members, the exact number of which shall be fixed from time to time by the Board;

**WHEREAS**: Section 3.2 of the Bylaws provides that the Board shall be divided into three classes of directors, and each class of directors will serve for such terms, as are set forth in the Company's Certificate of Incorporation (as amended, the "Charter");

**WHEREAS**: Section 5.2(a) of the Charter provides that the number of directors of the Company shall be fixed from time to time exclusively by the Board pursuant to a resolution adopted by a majority of the Board;

**WHEREAS**: Section 5.2(b) of the Charter provides that the Board shall be divided into three classes, Class I, Class II, and Class III, and in case of any increase or decrease, from time to time, such classes shall be as nearly equal in number of directors as possible;

**WHEREAS**: Section 5.2(b) of the Charter provides that each director shall serve for a term ending on the third annual meeting of stockholders following the annual meeting of stockholders at which such director was elected;

**WHEREAS**: Section 5.3 of the Charter provides that newly created directorships resulting from an increase in the number of directors may be filled solely and exclusively by a majority vote of the remaining directors then in office, even if less than a quorum, or by a sole remaining director (and not by stockholders), and any director so chosen shall hold office for the remainder of the full term of the director to which the new directorship was added;

**WHEREAS**: On September 17, 2024, all seven of the non-employee directors of the Board resigned from the Board (the "Resignations");

**WHEREAS**: In connection with the Resignations, the size of the Board was decreased to one member, with Anne Wojcicki, the Company's Chief Executive Officer, serving as the sole Board member, having been elected by the Company's stockholders to serve as a Class III director with a term expiring at the Company's 2027 Annual Meeting of Stockholders;

**WHEREAS**: As a result of the Resignations, on September 18, 2024, the Company received a deficiency letter from the Nasdaq Listing Qualifications Department, notifying the Company that the Company was not in compliance with Nasdaq Listing Rule 5605, which requires, among other things, that a majority of the Board be comprised of Independent Directors (as defined in Nasdaq Listing Rule 5605(a)(2));

**WHEREAS**: At the direction of Ms. Wojcicki, the Company engaged an independent nationally recognized search firm (the "Search Firm") to assist the Company in identifying and vetting qualified Independent Directors to serve on the Board in order to regain compliance with Nasdaq Listing Rule 5605;

**WHEREAS**: Ms. Wojcicki and the Company, with the assistance of the Search Firm and other external advisors and independent legal counsel, evaluated, among other factors, the independence, experience, background, and business judgment and acumen of multiple candidates (the "Candidate Evaluation Process");

**WHEREAS**: Following the Candidate Evaluation Process, the Board has determined that it is in the best interests of the Company and its stockholders to appoint to the Board three of the multiple candidates identified, interviewed, and evaluated (the "Appointments");

**WHEREAS**: In connection with the Appointments, the Board has determined that it is in the best interests of the Company and its stockholders to increase the size of the Board to four members, consisting of three classes, with one director serving in Class I, two directors serving in Class II, and one director serving in Class III;

**WHEREAS**: In connection with the Appointments, the Board has determined that it is in the best interests of the Company and its stockholders to designate a Lead Independent Director and to set forth certain responsibilities and duties applicable to such position; and

**WHEREAS:** In connection with the Appointments, the Board has determined that it is in the best interests of the Company and its stockholders to terminate, effective as of the Resignations, the 23andMe Holding Co. Amended and Restated Outside Director Compensation Policy (Effective as of September 6, 2023) (the "Prior Director Compensation Policy") and approve the payment of certain cash compensation to non-employee directors.

*Board Size and Director Appointments*

**NOW, THEREFORE, BE IT RESOLVED**: That, effective as of October 28, 2024 (the "Effective Date"), the authorized number of directors be, and hereby is, increased from one to four; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, the Board shall consist of three classes, with one director serving in Class I, two directors serving in Class II, and one director serving in Class III; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Jim Frankola be, and hereby is, appointed to serve as a Class I director, with a term expiring at the 2025 Annual Meeting of Stockholders (the "2025 Annual Meeting"); and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, each of Andre Fernandez and Mark Jensen be, and hereby is, appointed to serve as a Class II director, with a term expiring at the Company's 2026 Annual Meeting of Stockholders; and be it

*Director Independence*

**FURTHER RESOLVED**: That the Board has reviewed the respective relationships of each of Mr. Fernandez, Mr. Jensen, and Mr. Frankola (collectively, the "New Directors" and each, a "New Director") with the Company in accordance with the applicable listing rules of Nasdaq (the "Listing Rules") and the Company's Corporate Governance Guidelines; and be it

**FURTHER RESOLVED**: That, pursuant to such review, the Board determines that each of the New Directors meets the independence requirements set forth in Nasdaq Listing Rule 5605 and the Company's Corporate Governance Guidelines; and be it

**FURTHER RESOLVED**: That the Board determines, based on its review, that none of the New Directors have a relationship with the Company that, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director; and be it

**FURTHER RESOLVED**: That the Board has reviewed with the Company's independent legal counsel the respective relationships of each of the New Directors with Ms. Wojcicki, and that the Board, upon the recommendation of the Company's independent legal counsel, determines that none of the New Directors have a relationship with Ms. Wojcicki which would interfere with the exercise of independent judgement in carrying out the responsibilities of a director; and be it

*Audit Committee Appointments*

**FURTHER RESOLVED**: That the Board has reviewed the respective relationships of each of the New Directors with the Company in accordance with (a) Nasdaq Listing Rule 5605(c)(2)(A) and the Company's Corporate Governance Guidelines and (b) Section 10A-3 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and be it

**FURTHER RESOLVED**: That the Board determines, based on its review, that each of the New Directors meets (a) the independence requirements set forth in Nasdaq Listing Rule 5605(c)(2)(A) and the Company's Corporate Governance Guidelines and (b) the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") with respect to independence of audit committees of board of directors; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, each of the New Directors be, and hereby is, appointed to serve on the Board's Audit Committee (the "Audit Committee"); and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Mr. Fernandez be, and hereby is, appointed as the Chair of the Audit Committee; and be it

*Audit Committee Financial Expert*

**FURTHER RESOLVED**: That the Sarbanes-Oxley Act of 2002 (the "SOX Act") requires a public company to disclose in its annual reports filed with the SEC whether it has at least one director on its audit committee who qualifies as an "audit committee financial expert" pursuant to the criteria set forth in the SOX Act, and, if so, the name of such expert and whether such expert is independent of the company's management; and be it

**FURTHER RESOLVED**: That based on each of his experience, business acumen, and independence (in accordance with the requirements specified by the Listing Rules), the Board believes that Mr. Jensen is qualified under the criteria set forth in the applicable rules and regulations of the SEC to be an "audit committee financial expert"; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Mr. Fernandez be, and hereby is, designated as the Audit Committee's "audit committee financial expert" as defined under the SEC's rules and regulations by virtue of his business background and experience; and be it

*Compensation Committee*

**FURTHER RESOLVED**: That the Board has reviewed the respective relationships of each of the New Directors with the Company (a) in accordance with Rule 5605(d)(2)(A) of the Listing Rules, the Company's Corporate Governance Guidelines, and Section 10C-1 of the Exchange Act and (b) for "non-employee director" status for purposes of Rule 16b-3 under Section 16 of the Exchange Act; and be it

**FURTHER RESOLVED**: That the Board determines, based on such review, that each of the New Directors (a) meets the independence requirements of Nasdaq Listing Rule 5605(d)(2)(A), the Company's Corporate Governance Guidelines, and the applicable rules and regulations of the SEC with respect to independence of compensation committees of board of directors and (b) is a "non-employee director" for purposes of Rule 16b-3 under Section 16 of the Exchange Act; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, each of the New Directors be, and hereby is, appointed to serve on the Board's Compensation Committee (the "Compensation Committee"); and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Mr. Jensen be, and hereby is, appointed as the Chair of the Compensation Committee; and be it

*Lead Independent Director*

**FURTHER RESOLVED**: That, effective as of the Effective Date, the Board shall have a Lead Independent Director, who shall have the following responsibilities and duties:

- Reviewing and advising the Chair of the Board (the "Chair") on Board meeting agendas;

- Reviewing and advising the Chair on Board meeting materials and informational needs;

- Reviewing and advising the Chair on the Board meeting schedule;

- Calling and presiding over executive sessions of the Board;

- Acting as the liaison between the independent directors and Ms. Wojcicki, who currently serves as the Company's Chief Executive Officer and the Chair;

- Presiding at Board meetings in the absence of the Chair;

- Facilitating discussion among the independent directors on key issues and concerns outside of Board meetings; and

- Performing such other duties as specified or as needed by the Board from time to time; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Mr. Jensen be, and hereby is, appointed as the Lead Independent Director of the Board; and be it

*Designation of Section 16 Reporting Persons*

**FURTHER RESOLVED**: That, effective as of the Effective Date, each of the New Directors be, and hereby is, designated by the Company as a person subject to the reporting requirements of Section 16(a) of the Exchange Act for the fiscal year ending March 31, 2025; and be it

*Indemnification Agreements*

**FURTHER RESOLVED**: That Company be, and hereby is, authorized to enter into an Indemnification Agreement with each of the New Directors, which such Indemnification Agreement shall be in substantially the form previously approved by the Board; and be it

*Director Compensation*

**FURTHER RESOLVED**: That the Prior Director Compensation Policy be, and hereby is, terminated, with such termination to be deemed effective as of the Resignations; and be it

**FURTHER RESOLVED:** That the New Directors shall each be entitled to receive $1 million in cash compensation (the "New Director Compensation") for their respective services on the Board, the Audit Committee, and the Compensation Committee for the period beginning on the Effective Date and ending on the date of the 2025 Annual Meeting (the "Director Service Period"), which such New Director Compensation shall be paid as follows: $800,000 on or promptly following the Effective Date, and $20,000 per month thereafter (the "Monthly Payment"), payable on the last business day of each month beginning in November 2024 and ending with the final Monthly Payment to be made on the date of the 2025 Annual Meeting; and be it

**FURTHER RESOLVED:** That, for the avoidance of doubt, a New Director shall only be entitled to receive the full Monthly Payment for a given month if such New Director is serving on the Board on the date of payment; if a New Director ceases to serve on the Board prior to the date of the 2025 Annual Meeting, such New Director will only be entitled to receive a pro-rated amount of the Monthly Payment for the month in which such New Director ceased to serve on the Board; and be it

**FURTHER RESOLVED:** That, for the avoidance of doubt, the New Directors shall not be entitled to any compensation other than the New Director Compensation, whether cash or equity, for their respective Board and committee service during the Director Service Period; and be it

*General*

**FURTHER RESOLVED**: The officers of the Company (acting singly or jointly) are hereby authorized and directed, on behalf and in the name of the Company, to make all such arrangements, to do and perform all such acts and things, including, without limitation, executing and delivering all such instruments, certificates, and other documents, as they may deem necessary or appropriate in order to effectuate fully the purpose of each and all of the foregoing resolutions and the transactions contemplated thereby and the undersigned hereby ratify and confirm any and all actions taken heretofore and hereafter by such officers to accomplish such purposes.

**IN WITNESS WHEREOF**, the undersigned has caused this Written Consent of the Board of Directors to be duly executed as of the day and year set forth above.

_____

Anne Wojcicki

*[Written Consent of the Board of Directors of 23andMe Holding Co.]*

**Exhibit 3**

# 23ANDME HOLDING CO.
## RESOLUTIONS OF
## THE BOARD OF DIRECTORS

WHEREAS, on March 28, 2024, the Board of Directors (the "Board") of 23andMe Holding Co., a Delaware corporation (the "Corporation"), established a special committee of the Board (the "Special Committee") consisting of independent and disinterested directors to review and evaluate potential strategic transactions with potential acquirors and the Corporation's other strategic alternatives (a "Potential Transaction"), as well as maintaining the status quo as a standalone company, and to take such other action with respect thereto as authorized in the resolutions establishing the Special Committee (the "March 28th Resolutions");

WHEREAS, the March 28th Resolutions provided, among other things, (i) for the delegation of authority by the Board to the Special Committee, to the fullest extent permitted by law, to review and evaluate any Potential Transaction or Alternative Transaction (as defined in the March 28th Resolutions) and, if the Special Committee deems appropriate and in its sole discretion, to approve and authorize, or to reject, any Potential Transaction or Alternative Transaction and (ii) that the Board shall not approve any Potential Transaction or Alternative Transaction, or recommend any Potential Transaction, or any modification, variation, supplement or waiver thereof, or any Alternative Transaction for approval by the Corporation's stockholders, without a prior favorable recommendation of such Potential Transaction or any such Alternative Transaction by the Special Committee;

WHEREAS, the Company's Chief Executive Officer, Anne Wojcicki, disclosed her desire to take the Company private by acquiring all of the outstanding shares of the Company that she and her affiliates do not own and, in light of the foregoing and to ensure proper processes with respect to the review and consideration of any Potential Transaction or Alternative Transaction, the Special Committee previously established the Rules and Guidelines for Management in connection with the Strategic Alternatives Review Process of 23andMe Holding Co. (together with the supplements thereto, the "Rules and Guidelines");

WHEREAS, on July 29, 2024, Ms. Wojcicki delivered a preliminary, non-binding proposal to the Special Committee to acquire all of the Corporation's outstanding shares of common stock not owned by her or her affiliates or any other stockholders she invites to roll over their current shares (the "Proposal"), which Proposal was rejected by the Special Committee on August 2, 2024;

WHEREAS, Ms. Wojcicki confirmed in the Proposal that, as stated when she previously informed the Special Committee that she was considering making a proposal to acquire the Company, she would only engage in a Potential Transaction or any other corporate acts related to a Potential Transaction if (i) the Special Committee is empowered to consider (including the ability to reject) any such proposal by Ms. Wojcicki with the assistance of its own legal and financial advisors, and the Special Committee approves such proposal, and (ii) in addition to any other vote required, such transaction is subject to a non-waivable condition requiring approval of a majority of the shares of common stock of the Company not owned by Ms. Wojcicki and her affiliates or any other stockholders who she may invite to roll over their shares, and their affiliates, and such approval is in fact obtained prior to the consummation of such transaction;

WHEREAS, on September 17, 2024, all of the non-employee directors of the Company, including the members of the Special Committee, resigned from the Board (the "Resignations");

WHEREAS, in light of the Resignations and in order to ensure the continuation of the proposed processes with respect to the review of Potential Transactions and Alternative Transactions, on September 27, 2024, Ms. Wojcicki, in her capacity as the then-sole director of the Corporation, approved and adopted an Addendum to the Rules and Guidelines, which Addendum has been and will remain in effect until the Special Committee has been re-populated; and

WHEREAS, on October 28, 2024, each of Andre Fernandez, Jim Frankola and Mark Jensen were appointed as independent directors of the Board.

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby determines that each of Andre Fernandez, Jim Frankola and Mark Jensen is independent, is not affiliated with Anne Wojcicki or her affiliates (other than the Corporation), had no prior relationship with Anne Wojcicki or her affiliates, and, based on facts known to the Board as of the date of these resolutions, does not have a material financial or other interest in a Potential Transaction or Alternative Transaction that is different from, or in addition to, the interests of the Corporation's stockholders generally (excluding Ms. Wojcicki and her affiliates);

FURTHER RESOLVED, that (i) the total number of members of the Special Committee is hereby fixed at three (3) members, (ii) each of Andre Fernandez, Jim Frankola and Mark Jensen is hereby appointed to the Special Committee, and (iii) Jim Frankola is hereby appointed as the chair of the Special Committee;

FURTHER RESOLVED, that, except as otherwise expressly provided in these resolutions, the Board hereby confirms that the Special Committee has and shall continue to have the authority, duties and powers delegated to it in the March 28th Resolutions;

FURTHER RESOLVED, that the members of the Special Committee shall not be entitled to any additional fees from the Corporation solely for their service as members of the Special Committee; provided, for the avoidance of doubt, that members of the Special Committee shall be entitled to the reimbursement of reasonable expenses related to their service on the Special Committee in accordance with Section 3.4 of the Bylaws of the Corporation and such reimbursement of expenses shall not be conditioned on the approval or completion of any Potential Transaction;

FURTHER RESOLVED, that, in addition to (and without limitation of) any rights provided under the Corporation's Certificate of Incorporation or Bylaws, any agreement or applicable law, the Corporation, to the fullest extent permitted by law, shall indemnify, hold harmless and advance expenses to each member of the Special Committee in connection with any threatened, pending or completed action, suit or proceeding (whether criminal, administrative or investigative) in which the Special Committee, or any member thereof, is or is threatened to be made a participant (including as a witness) arising from or relating to any such member's appointment to or service on the Special Committee, any Potential Transaction or any Alternative Transaction, or the discharge of the powers or duties of the Special Committee or any member thereof pursuant to or in furtherance of the March 28th Resolutions and these resolutions; and

FURTHER RESOLVED, that, except as expressly modified hereby, the March 28th Resolutions remain in full force and effect, and the Special Committee, and each member thereof, is hereby authorized and empowered to do all acts as may be necessary or appropriate in his judgment to carry out the duties of the Special Committee contemplated thereby.

**Exhibit 4**

**OMNIBUS RESOLUTION OF THE SPECIAL COMMITTEE (THE "SPECIAL COMMITTEE") OF THE BOARD OF DIRECTORS (THE "BOARD") OF 23ANDME HOLDING CO. (THE "COMPANY")**

**March 23, 2025**

WHEREAS, on March 28, 2024, the Board adopted resolutions (the "Special Committee Resolutions") establishing a special committee of the Board (the "Special Committee") and designating three independent and disinterested directors of the Board to serve as the members of the Special Committee (the "Initial Special Committee Members");

WHEREAS, on September 17, 2024, all of the non-employee directors of the Board, including the Initial Special Committee Members, resigned from the Board;

WHEREAS, on October 28, 2024, each of Andre Fernandez, Jim Frankola, and Mark Jensen were appointed as independent directors of the Board;

WHEREAS, on November 2, 2024, the Board adopted resolutions designating each of Andre Fernandez, Jim Frankola, and Mark Jensen as members of the Special Committee and confirming that the Special Committee has and shall continue to have the authority, duties, and power delegated to it in the Special Committee Resolutions;

WHEREAS, pursuant to the Board's Resolutions, dated March 7, 2025 (the "March Resolutions"), the Board delegated to the Special Committee, to the fullest extent permitted by law, among other things, the power and authority of the Board to (i) authorize the commencement of a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on behalf of the Company, (ii) take actions with respect to any Restructuring Matter (as defined in the March Resolutions), (iii) engage professionals for the Company and/or the Special Committee in connection with any Restructuring Matter, and (iv) take actions as the Special Committee in its sole discretion deems necessary, advisable, or appropriate in connection therewith;

WHEREAS, on March 21, 2025, the Board adopted resolutions appointing Thomas Walper to the Board and designating Thomas Walper as an additional member of the Special Committee, in each case, subject to the commencement of a chapter 11 case by the Company;

WHEREAS, the Special Committee has determined that the matters the Special Committee is approving and authorizing herein in each case constitute a Restructuring Matter;

WHEREAS, the Special Committee has previously discussed and determined that it is desirable and in the best interests of the Company and its stakeholders to conduct a special review (the "Investigation") of the Company's governance, financial transactions, and business operations to assess the potential viability of legal claims that may be brought by various parties against any third party or any of the Company's directors, officers, managers, members, equity holders, principals, employees, and any other individual that is an insider of the Company (the "Potential Causes of Action");

**WHEREAS**, the Special Committee has determined that it is desirable and in the best interests of the Company and its stakeholders to grant to Thomas Walper the power and authority of the Special Committee to, in connection with the Investigation, (a) perform any and all internal audits, reviews, and investigations of the Company and its subsidiaries including, but not limited to, audits, reviews, and investigations of (i) the Company's material transactions and strategic decisions within the generally recognized statutory limitations periods, (ii) contemporaneous evidence of the Company's financial condition, and (iii) the Company's transactions and relationships with insiders of the Company, if any, (b) determine what actions, if any, should be taken on account of the Potential Causes of Action under or pursuant to any potential plan of reorganization in the Company's forthcoming chapter 11 cases, and (c) take any and all other actions incident or ancillary to the foregoing or otherwise as Thomas Walper may determine to be advisable, appropriate, convenient, or necessary to the performance of its duties and the discharge of its responsibilities (the powers and authority described in this recital, the "Investigation Powers");

**WHEREAS**, the Special Committee has determined that it is desirable and in the best interests of the Company and its stakeholders (a) for all of the managers, directors, officers, and employees of the Company and its subsidiaries to fully cooperate and comply in connection with any investigations, audits, reviews, and requests made by Thomas Walper (the "Investigation Reviews") and (b) that no manager, director, officer, or employee who so cooperates or complies with the Investigation Reviews be subject to any penalty, punishment, or retribution therefor; and

**WHEREAS**, the Special Committee has determined that the foregoing resolutions should take effect immediately upon the Company commencing a chapter 11 case under the Bankruptcy Code.

**NOW, THEREFORE, BE IT:**

1. **Delegation of Investigation Powers**

**RESOLVED**, that Thomas Walper be, and hereby is, designated and empowered to exercise all of the power and authority of the Special Committee with respect to the Investigation Powers; and be it further

**RESOLVED**, that Thomas Walper be, and hereby is, designated and empowered to retain such legal counsel and any other professionals as he may deem necessary to assist him in exercising the power and authority of the Special Committee with respect to the Investigation Powers; and be it further

**RESOLVED**, that all managers, directors, officers, and employees of the Company and its subsidiaries be, and hereby are, directed to fully cooperate and comply with any and all Investigation Committee Reviews and that no manager, director, officer, or employee shall be subject to any penalty, punishment, or retribution in connection with the foregoing; and be it further

2.    **General Authorization**

  **RESOLVED**, that each of the officers of the Company (each, an "<u>Authorized Person</u>") be, and each of them hereby is, authorized, empowered, and directed to take all such further actions, to do and perform (or cause to be done and performed), and to execute and deliver all such instruments, documents, filings, agreements, and the like, in the name of and on behalf of the Company and to pay all such costs, fees, expenses, and taxes, in each case as shall be necessary or advisable in order to carry out fully the intent and accomplish the purposes of the foregoing resolutions and the actions, transactions, and agreements contemplated thereby and that the authority of such Authorized Person to execute and deliver any of such instruments and documents, including without limitation any modification, extension, or expansion, and to take any such other action, shall be conclusively evidenced by their execution and delivery thereof or their taking thereof; and be it further

  **RESOLVED**, that the actions of any individual authorized by the foregoing resolutions or which would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, be, and they hereby are, ratified, confirmed, approved, authorized, and adopted in all respects as the acts and deeds of the Company.

**Exhibit 5**

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Third Supplemental Guidance for Management
in Connection with the
Strategic Alternatives Review Process of
23andMe Holding Co.**

This memorandum (the "**Third Supplemental Memo**") is a supplement to (i) the memoranda titled Rules and Guidelines for Management in connection with the Strategic Alternatives Review Process of 23andMe Holding Co. (referred to herein as the "**Strategic Review Process**"), (ii) Supplemental Guidance for Management in Connection with the Strategic Alternatives Review Process of 23andMe Holding Co., and (iii) Second Supplemental Guidance for Management in Connection with the Strategic Alternatives Review Process of 23andMe Holding Co. (the "**Second Supplemental Memo**," and together with the documents referenced in clauses (i) and (ii), the "**Memos**").  Defined terms not otherwise defined herein shall have the meanings ascribed to them in the Memos.

As discussed in the Second Supplemental Memo, the Company has worked with its restructuring counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul Weiss**"), and other advisors to consider restructuring options and contingency planning for a potential filing of chapter 11 cases for the Company and its subsidiaries (collectively, the "**Company Entities**").  As of the date hereof, the Special Committee has authorized the Company Entities to file for chapter 11 protection in the Eastern District of Missouri.

As part of the chapter 11 cases, Management will continue to play a key role in gathering and providing information to Paul Weiss, the Company's other advisors, and the advisors to the Special Committee, Moelis & Company LLC ("**Moelis**") and Goodwin Procter LLP ("**Goodwin**") (referred to herein as "**Chapter 11 Diligence**"), as well as making recommendations to the Special Committee and the Board of Directors regarding certain decisions during the pendency of the chapter 11 cases ("**Chapter 11 Decisions**" and together with Chapter 11 Diligence, the "**Chapter 11 Process**").  As with actions that Management has taken in connection with the Strategic Review Process and Contingency Process generally, actions that Management takes in connection with the Chapter 11 Process may be subject to intense stockholder, employee and public scrutiny as well as judicial scrutiny by the bankruptcy court in the Company Entities' chapter 11 cases.  Litigation in this context may involve allegations of conflicting interests of Anne Wojcicki, a director of the Company and the Company's largest stockholder (the "**Stockholder**"), in particular.  Accordingly, in taking any actions in connection with the Chapter 11 Process, Management must pay attention to any interests that could conflict or appear to conflict with the interests of the Company Entities and the maximization of their value.

Consequently, Management should follow the same instructions in the Memos in connection with the Chapter 11 Process that it follows in connection with the Strategic Review Process and Contingency Process.  Additionally, Management should follow these guidelines with respect to the Chapter 11 Process:

1.  The Special Committee has directed the formation of an "Executive Committee" comprised of senior members of the Company's management team that includes: Joe Selsavage (Interim Chief Executive Officer, Chief Financial and Accounting Officer), Guy Chayoun

(Vice President, Interim General Counsel and Corporate Secretary) and Matthew Kvarda (Chief Restructuring Officer).  The Special Committee may change the membership of the Executive Committee from time to time.

2.  At the direction of the Special Committee, the Executive Committee will lead the Chapter 11 Process and shall be responsible for the following: (a) analyzing, reviewing, and evaluating all material issues and considerations for the Company Entities that relate to the Chapter 11 Process; (b) supervising and utilizing other employees of the Company Entities to assist in Chapter 11 Diligence; (c) coordinating with the Company's advisors, including Paul Weiss, as well as the advisors to the Special Committee, including Moelis and Goodwin; (d) providing regular updates to the Special Committee; and (e) making formal recommendations to the Board or Special Committee, as appropriate, with respect to Chapter 11 Decisions.  The Stockholder should not be consulted by the Executive Committee with respect to any matter without the prior written authorization of the Special Committee (which may be delivered by the Special Committee's legal advisors).

3.  No information regarding the Chapter 11 Process should be shared with the Stockholder or any of her advisors without the prior written authorization of the Special Committee (which may be delivered by the Special Committee's legal advisors).

4.  If the Executive Committee determines that it is in the best interest of the Company Entities to consult or discuss with the Stockholder regarding any aspect of the Chapter 11 Process, including any process involving postpetition financing or a sale of any or all of the Company's assets, or negotiations concerning a chapter 11 plan in the Company Entities' chapter 11 cases, the Executive Committee will seek authorization from the Special Committee prior to any such consultation or discussion and will not consult or discuss with the Stockholder unless the Special Committee provides prior written authorization of such consultation  (which may be delivered by the Special Committee's legal advisors).

5.  If the Special Committee authorizes consultation or discussion with the Stockholder, the Special Committee and/or its legal and financial advisors should have reasonable advance notice of, and the opportunity to participate in, the consultation or discussion.

6.  The Executive Committee should share information regarding the Chapter 11 Process *only* on a need-to-know basis with fellow members of Management or other employees, consultants, or advisors of the Company (other than the Stockholder) known to be "under the tent" with respect to such Chapter 11 Process, and not to any other person.

7.  As the Chapter 11 Process progresses, additional rules and guidelines may be established by the Special Committee to facilitate a clear and effective process for Chapter 11 Diligence and Chapter 11 Decisions.

For any matters that require notifying the Special Committee or any questions with respect to the foregoing, Management should contact Lisa Haddad (617-570-8311 or lhaddad@goodwinlaw.com).

**Exhibit 6**

GOODWIN PROCTER LLP 1/23/25
PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Second Supplemental Guidance for Management
in Connection with the
Strategic Alternatives Review Process of
23andMe Holding Co.**

This memorandum (the "**Second Supplemental Memo**") is a supplement to the memoranda titled Rules and Guidelines for Management in connection with the Strategic Alternatives Review Process of 23andMe Holding Co. (referred to herein as the "**Strategic Review Process**") and Supplemental Guidance for Management in Connection with the Strategic Alternatives Review Process of 23andMe Holding Co. (the "**Memos**"). Defined terms not otherwise defined herein shall have the meanings ascribed to them in the Memos.

As the Company works with its restructuring counsel, Paul, Weiss, Rifkin, Wharton & Garrison LLP ("**Paul Weiss**"), and other advisors to consider restructuring options and contingency planning for potential chapter 11 cases for the Company and its subsidiaries (the "**Company Entities**"), Management will play a key role in gathering and providing information to Paul Weiss, the Company's other advisors, and the advisors to the Special Committee, Moelis & Company LLC ("**Moelis**") and Goodwin Procter LLP ("**Goodwin**") (referred to herein as "**Contingency Preparation**"), as well as making recommendations to the Special Committee and Board of Directors regarding decisions such as whether to commence chapter 11 cases and/or other strategic decisions relevant to the Contingency Preparation ("**Contingency Decisions**" and together with Contingency Preparation, the "**Contingency Process**"). As with actions that Management takes in connection with the Strategic Review Process generally, actions that Management takes in connection with the Contingency Process may be subject to intense stockholder, employee and public scrutiny and, in the event litigation is filed or any of the Company Entities commence chapter 11 cases, judicial scrutiny. Any litigation in this context could involve allegations of conflicting interests of Anne Wojcicki, the Company's CEO and largest stockholder (the "**Stockholder**"), in particular. Accordingly, in taking any actions in connection with the Contingency Process, Management must pay attention to any interests that could conflict or appear to conflict with the interests of the Company Entities and the maximization of their value.

Consequently, Management should follow the same instructions in the Memos in connection with the Contingency Process that it follows in connection with the Strategic Review Process. Additionally, Management should follow these guidelines with respect to the Contingency Process:

1.  The Special Committee has directed the formation of an "Executive Committee" comprised of senior members of the Company's management team that initially includes: [——]. The Special Committee may change the membership of the Executive Committee from time to time, but the Executive Committee shall not include the Stockholder.

2.  At the direction of the Special Committee, the Executive Committee will lead the Contingency Process and shall be responsible for the following: (a) analyzing, reviewing, and evaluating all material issues and considerations for the Company Entities that relate to the Contingency Process; (b) supervising and utilizing other employees of the Company Entities (excluding the Stockholder) to assist in Contingency Preparation; (c) coordinating

with the Company's advisors, including Paul Weiss, as well as the advisors to the Special Committee, including Moelis and Goodwin; (d) providing regular updates to the Board and the Special Committee; and (e) making formal recommendations to the Board or Special Committee, as appropriate, with respect to Contingency Decisions.

3. If the Executive Committee determines that it is in the best interest of the Company Entities to consult with the Stockholder regarding any aspect of the Contingency Process, the Executive Committee will seek authorization from the Special Committee prior to any such consultation and will not consult with the Stockholder unless the Special Committee provides prior written authorization of such consultation  (which may be delivered by the Special Committee's legal advisors).

4. If the Special Committee authorizes consultation with the Stockholder, the Special Committee and/or its legal and financial advisors should have reasonable advance notice of, and the opportunity to participate in, the consultation.

5. The Executive Committee should share information regarding the Contingency Process *only* on a need-to-know basis with fellow members of Management (other than the Stockholder) or other employees, consultants, or advisors of the Company known to be "under the tent" with respect to such Contingency Process, and not to any other person.

6. As the Contingency Process progresses, additional rules and guidelines may be established by the Special Committee to facilitate a clear and effective process for Contingency Preparations and Contingency Decisions.

For any matters that require notifying the Special Committee or any questions with respect to the foregoing, Management should contact Lisa Haddad (617-570-8311 or lhaddad@goodwinlaw.com).

2

**Exhibit 7**

DECHERT LLP 4/4/24
PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Supplemental Guidance for Management
in connection with the
Strategic Alternatives Review Process of
23andMe Holding Co.**

This memorandum is a supplement to the memorandum titled Rules and Guidelines for Management in connection with the Strategic Alternatives Review Process of 23andMe Holding Co. (the "**Memo**").

As explained in the Memo, the Board of Director has delegated to the Special Committee certain powers in connection with the Strategic Alternatives Review Process (the "**Process**").  In order to preserve the Special Committee's function, and to adhere to applicable legal requirements, it is important to follow the instructions set forth in the Memo.  For that reason, we are providing the following guidelines to assist you in adhering to the instructions in the Memo:

1. The Special Committee is responsible for evaluating any proposed transaction with potential counterparties, including without limitation the following types of transactions:

   - a sale of the Company or some or all of the assets or business lines of the Company

   - a license of data or other property or grant of exclusivity

   - equity or debt financing arrangements

   - a strategic partnership, alliance or joint venture

2. All activity with third parties (e.g., discussions, negotiations, provision of information) with respect to a potential transaction should cease unless and until the Special Committee or its counsel, Dechert LLP, specifically authorizes you in writing to resume such activity, and then you shall resume only in the manner authorized.

3. You shall consult with the Special Committee or Dechert on any proposed transaction with potential counterparties.

4. You shall take direction from the Special Committee on whether to pursue or to refrain from a proposed transaction.  You shall not pursue a proposed transaction without prior written approval from the Special Committee.

5. You shall not disclose the existence of the Process to anyone at the Company or to third-parties without the prior written approval of the Special Committee or Dechert.

6. If you receive an indication of interest from another party about a proposed transaction, you must (1) inform the Special Committee or Dechert of that indication of interest and (2) receive the written approval of the Special Committee to proceed before engaging in discussions with the other party.

7. Similarly, if you identify a potential transaction, you should promptly report such transaction to the Special Committee and receive the Special Committee's written approval before proceeding in any discussions with third parties.

8. You shall not engage investment bankers or other advisors related to any proposed transaction without prior written approval from the Special Committee.

9. Unless the Special Committee directs you in writing to do so, you should not discuss potential transactions or related matters with investment bankers or other advisors.

10. The Special Committee may give additional instructions to you in connection with any proposed transaction, such as submitting a term sheet to the Special Committee for approval before transmitting it to the counterparty.

11. You should not discuss any expectations regarding timing, process, valuation or other transaction terms with any potential counterparty without prior written approval from the Special Committee's approval.

12. You may be asked to collect diligence materials for the Special Committee in connection with the Process.  You must be discrete in collecting such information and take care not to disclose the existence of the Process as part of that collection unless otherwise directed.

13. If you are asked to prepare any projections requested by the Special Committee, the projections should reflect your good faith estimate of the projected financial performance of the Company.

14. You cannot provide any projections to third parties unless authorized to do so by the Special Committee in writing. If you prepare projections for internal purposes in the ordinary course of business, please inform the Special Committee or Dechert.

15. If you are asked if the Company is for sale or engaged in a strategic alternatives review process, you should reply that "it is the policy of the Company not to comment on such matters" or such other reply as is expressly authorized by the General Counsel.

16. If so instructed, you may be prohibited from disclosing certain information about the Process to others in the Company, including the CEO.

**Exhibit 8**

**Addendum to Rules and Guidelines for Management in Connection
with the Strategic Alternatives Review Process of
23andMe Holding Co.**

This Addendum (the "**Addendum**") supplements and modifies, during the "**Gap Period**"
as hereinafter defined, the Rules and Guidelines for Management and the two Supplements
thereto (collectively, the "**Rules**") previously established by the Special Committee (the "**Special
Committee**") of the Board of Directors (the "**Board**") of 23andMe Holding Co. (the
"**Company**"), in light of the resignation on September 17, 2024 of all of the members of the
Board other than Anne Wojcicki, the Chief Executive Officer and holder of approximately 49%
of the voting power of the Company. The Addendum shall be effective from the date it is
adopted by the Board until new independent members have been duly appointed to the Board
and a Special Committee consisting solely of independent members of the Board has been
reestablished (such period, the "**Gap Period**"). Other than as modified hereby, the Rules will
remain in full force and effect during the Gap Period. For the avoidance of doubt, if the Rules
require the approval of the Special Committee with respect to any action, neither Ms. Wojcicki
nor any member of management shall take such action during the Gap Period, unless specifically
authorized in accordance with this Addendum.

1.     **Financial Advisor**.  The Special Committee engaged Wells Fargo as its
independent financial advisor (the "**Financial Advisor**"). Ms. Wojcicki, her affiliates and
advisors, and members of management shall not interact with the Financial Advisor during the
Gap Period.

2.     **Information Sharing**.  Any new non-disclosure agreement ("**NDA**") or
modification to an existing NDA with a potential financing source or other partner of Ms.
Wojcicki ("**Third Parties"**) with respect to a potential transaction shall be (i) consistent with the
template approved by the Special Committee, with the sole changes to such template being those
set forth in the proposed NDA that was under negotiation and circulated by counsel to the
Special Committee in a draft dated September 17, 2024 prior to the resignation of the members
of the Special Committee; and (ii) reviewed and approved by the Company's Interim General
Counsel ("**Company GC**"), after consultation with outside counsel for the Company, before
being executed, with no involvement by Ms. Wojcicki or her affiliates or advisors.

3.     **Data Requests**.  Requests for data room access by any party to an existing or new
NDA authorized in accordance with this Addendum shall be directed to the Company GC, who
shall arrange access to the virtual data room ("**VDR**") that was established by the Financial
Advisor. No new non-public information will be added to the VDR or provided to Third Parties
by Ms. Wojcicki or her affiliates or advisors, or members of management, during the Gap
Period.

4.     **Projections**.  Ms. Wojcicki, her affiliates and advisors and members of
management shall not share with Third Parties any projections other than those previously
authorized by the Special Committee. Ms. Wojcicki and her affiliates and advisors shall not
prepare any new projections. Nothing herein shall impair the ability of management to prepare
new projections in the ordinary course of operating the Company, but any such new projections
shall not be shared with any Third Parties during the Gap Period.

5.      **<u>Licensing and Normal Course Agreements</u>**.  The Special Committee previously authorized management to engage in specified discussions and negotiations involving matters including potential licenses of data or other intellectual property, collaborations with respect to designated therapeutics assets or programs, and commercial partnerships of various types. These discussions and negotiations may continue during the Gap Period. No contract involving material commitments or the license or sale of material assets of the Company shall be signed during the Gap Period. The Company GC, after consultation with outside counsel for the Company, shall determine the materiality of any commitment or license in advance of any such commitment or license being executed.

6.      **<u>Inbound from Third Party</u>**. If a member of management receives an indication of interest from any party concerning a proposed transaction, such member of management shall promptly report and transmit that indication of interest to the Company GC, and shall not respond thereto or otherwise engage in any discussions with such party, unless instructed in writing to do so by the Company GC, after consultation with outside counsel for the Company (and without influence by Ms. Wojcicki or her affiliates or advisors).

7.      **<u>Questions</u>**. If there are any questions concerning the Rules or the Addendum, please direct them to the Company GC, who shall respond after consultation with outside counsel for the Company.

**Exhibit 9**

DECHERT LLP 4/2/24
PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Rules and Guidelines for Management
in connection with the
Strategic Alternatives Review Process of
23andMe Holding Co.**

This memorandum seeks to establish certain "rules of the road" with respect to potential conflicts of interest that could arise during the strategic alternatives review process of 23andMe Holding Co. (the "**Company**"). While this memorandum focuses on guidelines governing management's involvement in the strategic review process, the same guidelines apply to the independent directors, particularly insofar as they may have direct contact with counterparties or their advisors. The term "**Management**" as used below refers to employee-directors and all other members of the senior management team, including Anne Wojcicki, the Company's CEO and largest stockholder (the "**Stockholder**").

In our experience, management plays an important role in assisting a special committee in conducting a strategic alternatives review process. Nonetheless, the actions that management takes in connection with a strategic review process may be subject to intense stockholder, employee and public scrutiny and, in the event litigation is filed, close judicial scrutiny. Any litigation in this context would likely involve allegations of conflicting interests of the Stockholder, officers and directors.

In taking any action in connection with the process, Management must pay attention to any interests that could conflict or appear to conflict with the interests of the Company or the public stockholders. Failure to disclose and address any such conflicts in a timely and appropriate manner may result in challenges to actions taken by the board of directors of the Company (the "**Board**") or the committee of the Board formed in connection with the process (the "**Special Committee**"), and could result in potential liability.

In general, a conflict of interest exists where an officer, director or controlling stockholder has a material interest in a proposed transaction that is different than or in addition to the interests of the Company or its public stockholders, including through the receipt of a benefit from the transaction that is not shared by the public stockholders generally. Potential conflicts of interest could relate to or arise from, among other things, relationships with or interests in potential counterparties, or the form, structure, timing or effect of a transaction. Examples of potential conflicts of interest include, but are not limited to:

- a management or controller buy-out of the other stockholders;

- the right to receive payments not shared equally with the public stockholders (*i.e.*, on a *pro rata* basis);

- opportunities to invest or obtain options in, or "roll-over" existing equity to, the surviving or acquiring company, or affiliates thereof, and which are not available to the stockholders generally; or

- employment or consulting opportunities in the surviving or acquiring company, or affiliates thereof.

To the extent that potential conflicts of interest exist or arise, they must be disclosed as promptly as possible to the Special Committee. Prompt disclosure is critically important to ensure that the Special Committee is aware of and can properly address potential conflicts of interest. Members of Management should feel free to discuss potential conflicts of interest, if any, with us, by contacting Michael Darby as indicated below.

Given the spotlight that is often on the conduct of members of Management in a significant corporate transaction, and to avoid legal and tactical issues, we have developed the following practical guidelines for Management for the strategic alternatives review process:

1. The Special Committee will oversee the process of evaluating indications of interest and any proposed transaction with potential counterparties, taking a lead role by managing the process as it develops, directing any negotiations with counterparties, and recommending a transaction (if any) that the Special Committee determines to be in the best interests of the Company and its stockholders. The Special Committee will consult with members of Management and other members of the Board in this process to assist the Special Committee in discharging its duties. Management should be sensitive to the role and function of the Special Committee throughout the process and act only at the direction of the Special Committee in connection with the process.

2. Management should cooperate fully with the Special Committee and its advisors, including by attending meetings and engaging in discussions with the Special Committee or its advisors at their request, and providing them with any and all information and materials requested, including books, records, projections and financial statements of the Company. Management should not discuss potential transactions or related matters with investment bankers or other advisors, other than at the direction of the Special Committee.

3. The Special Committee's outside legal and financial advisors, along with the Special Committee, will oversee the due diligence process with the support of Management. Management should provide due diligence information to the Special Committee's advisors, and act under the oversight of the Special Committee throughout the diligence process.

4. In preparing any projections requested by the Special Committee, the projections should reflect Management's good faith estimate of the projected financial performance of the Company. Until and unless expressly authorized to do so by the Special Committee by email, Management should not provide any such projections to third parties.

5. If a member of Management receives outreach regarding a potential transaction from a third party, that member should promptly report the outreach to the Special Committee. Similarly, if a member of Management develops its own interest in pursuing a potential transaction with the Company, that member should promptly report such interest to the Special Committee. The Special Committee will then determine how to respond to the

outreach or interest, including implementing additional guidelines regarding the interested-member's further participation in the strategic alternatives review process.

6.  Unless and until Management obtains express authorization to do so from the Special Committee by email, Management should not discuss the strategic alternatives review process, any potential transaction or any expectations regarding timing, process, valuation or other transaction terms with any potential counterparty.

7.  Unless and until expressly authorized by the Special Committee by email, members of Management should not enter into discussions or negotiations with any potential counterparty regarding their equity participation if a transaction were to occur.  Such discussions taking place prior to the negotiation of deal price, as well as other material terms, may create the appearance of a conflict of interest.  In particular, no member of Management should:

    a.  commit to work with (or only with) a particular counterparty;

    b.  commit to or discuss specific opportunities to invest in a "buy out" or similar transaction; or

    c.  take other actions that favor any potential counterparty.

8.  Likewise, absent prior express approval by the Special Committee by email, members of Management should not discuss specific future compensation, benefits or similar employment arrangements with a potential counterparty.  For instance, we would not expect the Special Committee to permit members of Management to discuss or negotiate terms of employment or consulting agreements with a potential counterparty until the very end of the process after the principal business terms of an agreement between the counterparty and the Company have been agreed upon.

9.  If the Special Committee authorizes the discussions covered by Paragraphs 7 and 8 above, the Special Committee and/or its legal and financial advisors should have reasonable advance notice of, and the opportunity to participate in, the discussions.

10. Management should refrain from trading in the stock of any potential counterparties to avoid any appearance of insider trading.  Management also should refrain from trading in the stock of the Company while in possession of material non-public information, including as it relates to any potential transaction, and continuously be aware of any blackout periods that may be applicable as a result of the strategic alternatives review process.  Any questions regarding trading should be directed to the General Counsel.

11. Strictly keep in confidence all discussions and information regarding the strategic alternatives review process and the identity of any potential counterparty, and promptly report all rumors or potential leaks to the General Counsel.  Management should not talk with the press regarding the Company's evaluation of any strategic alternatives, and inform the General Counsel of any press inquiries related to any such alternatives.  If a member of Management is participating in a press interview and is asked if the Company is for sale or engaged in a strategic alternatives review process, Management should reply that "it is the

policy of the Company not to comment on such matters" or such other reply as is expressly authorized by the General Counsel in light of any related disclosure the Company has already made at the time such situation arises.

12. Management should also share information regarding any transaction *only* on a need-to-know basis with fellow members of Management or other employees, consultants or advisors known to be "under the tent" with respect to such transaction, and not to any other person.  Preserving confidentiality is especially important given that the Company is publicly traded and any leak may have an unpredictable impact on the Company's stock price and/or trading volumes and may pose insider trading risks to the disclosing party, including tipper-tippee liability.

13. The Special Committee anticipates frequently soliciting the input and expertise of the Stockholder with respect to key elements of the process, but will do so in consultation with its outside counsel so as to minimize risk in case a transaction emerges in which the Stockholder may have a conflict.  For example, when appropriate, the Special Committee will work with its outside counsel to solicit the Stockholder's views on a range of potential transaction types, counterparties and terms without revealing information with enough specificity that it would prejudice the Company if the Stockholder indicated an interest in pursuing a transaction that could pose a conflict.  Accordingly, notwithstanding any of the above, unless otherwise expressly consented to by the Special Committee or its advisors by email, Management should not share confidential information developed or being used or considered by the Special Committee with the Stockholder or any of her representatives or affiliated entities.  Any such information would include information regarding the terms or conditions of a transaction received by the Special Committee from counterparties in the Company's strategic alternatives review process, including any compensation matters that are impacted by a potential transaction (e.g., change of control severance).  For clarity, the restrictions in this paragraph do not necessarily apply to communications with the Stockholder to the extent in the ordinary course and consistent with past practice and not related to the strategic alternatives review process.

14. Once a financial advisor has been engaged by the Special Committee, additional rules and guidelines may be established to facilitate a clear and effective process for interacting with potential counter-parties in a unified and consistent fashion.

Please feel free to contact Mark Thierfelder (212-698-3804 or mark.thierfelder@dechert.com) or Eric Siegel (215-994-2757 or eric.siegel@dechert.com) if you have any questions or would like to discuss these matters further.  For any matters that require notifying the Special Committee, Management should contact Mike Darby (215-994-2088 or michael.darby@dechert.com).

**Exhibit 10**

## Resolutions of the Board of Directors
## of 23andMe Holding Co.

WHEREAS, on March 28, 2024, the Board of Directors (the "Board") of 23andMe Holding Co., a Delaware corporation (the "Corporation"), established a special committee of the Board (the "Special Committee") consisting of independent and disinterested directors to review and evaluate potential strategic transactions with potential acquirors and the Corporation's other strategic alternatives, as well as maintaining the status quo as a standalone company, and to take such other action with respect thereto as authorized in the resolutions establishing the Special Committee; and

WHEREAS, the Board desires to expand the delegation of authority to the Special Committee to include the commencement of a case under chapter 11 of title 11 of the United States Code for the Corporation (a "Chapter 11 Case") if and to the extent the Special Committee determines to pursue a Chapter 11 Case and to oversee any and all matters arising in connection with or otherwise with respect to Restructuring Matters, as defined below.

NOW, THEREFORE, BE IT RESOLVED, that the Board hereby delegates to the Special Committee the power and authority of the Board, to the fullest extent permitted by law, (i) to authorize the commencement of a Chapter 11 Case and the approval of and filing on behalf of the Corporation of any motions, pleadings, and other documents in connection with the filing or prosecution of a Chapter 11 Case, (ii) to take any actions in a Chapter 11 Case, including, without limitation, to approve and pursue transactions for the financing of a Chapter 11 Case, the sale or sales, or other disposition of any kind, of some or all of the assets of the Corporation, the confirmation and effectiveness of any Chapter 11 plan and its attendant disclosure statement for the Corporation, any other motions, pleadings, or decisions for the Corporation in or outside the ordinary course of business, and any actions or approvals with respect to any direct or indirect subsidiaries or affiliates of the Corporation in connection with any financing, restructuring, sale or recapitalization transactions or other matters that arise, whether in or outside the ordinary course of business with respect thereto (collectively, "Restructuring Matters"), (iii) to engage professionals for the Corporation and/or the Special Committee in connection with any Restructuring Matter, including, without limitation, seeking and obtaining court approval of the engagement of any such professionals in a Chapter 11 Case, and (iv) to take any and all other actions as the Special Committee in its sole discretion deems necessary, advisable or appropriate in connection with a Chapter 11 Case or any Restructuring Matter; and

FURTHER RESOLVED, that, in addition to the delegation of authority set forth in the preceding resolution, the Board hereby confirms that the Special Committee has and shall continue to have the authority, duties and powers previously delegated to the Special Committee by the Board, and the Special Committee, and each member thereof, is hereby authorized and empowered to do all acts as may be necessary or appropriate in his judgment to carry out the duties of the Special Committee contemplated hereby and thereby; and

FURTHER RESOLVED, that all actions heretofore taken by the members of the Special Committee, with respect to and in contemplation of, the transactions authorized by any of the foregoing resolutions, are hereby authorized, approved, ratified and confirmed.

DB1/ 156799759.2

**<u>Exhibit 11</u>**

# RESOLUTIONS
## OF
## THE BOARD OF DIRECTORS

### March 21, 2025

### *Board Size and Director Appointment*

**WHEREAS**: Section 3.2 of the Second Amended and Restated Bylaws (the "Bylaws") of 23andMe Holding Co., a Delaware corporation (the "Company"), provides that the Board of Directors of the Company (the "Board") shall consist of not less than one nor more than fifteen members, the exact number of which shall be fixed from time to time by the Board;

**WHEREAS**: Section 3.2 of the Bylaws provides that the Board shall be divided into three classes of directors, and each class of directors will serve for such terms, as are set forth in the Company's Certificate of Incorporation (as amended, the "Charter");

**WHEREAS**: Section 5.2(a) of the Charter provides that the number of directors of the Company shall be fixed from time to time exclusively by the Board pursuant to a resolution adopted by a majority of the Board;

**WHEREAS**: Section 5.3 of the Charter provides that newly created directorships resulting from an increase in the number of directors may be filled solely and exclusively by a majority vote of the remaining directors then in office, even if less than a quorum, or by a sole remaining director (and not by stockholders), and any director so chosen shall hold office for the remainder of the full term of the director to which the new directorship was added;

**WHEREAS**: The Board has determined that it is in the best interests of the Company and its stockholders to increase the size of the Board from four members to five members and appoint Thomas Walper to the Board as a Class III director and as a member of the Board's Special Committee (the "Appointment"); and

**WHEREAS**: In connection with the Appointment, the Board has determined that it is in the best interests of the Company and its stockholders for the Company to enter into that certain Agreement for Service of Independent Director, in substantially the form attached hereto as Exhibit A (the "Director Agreement"), to set forth the terms of Mr. Walper's service as a director, including, without limitation, the compensation that Mr. Walper will be entitled to for such service as a director.

**NOW, THEREFORE, BE IT RESOLVED**: That, subject to the Company's filing of voluntary petitions seeking relief under Chapter 11 of Title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Petition Filing") and effective upon the date of such Bankruptcy Petition Filing (the "Bankruptcy Petition Date"), the authorized number of directors be, and hereby is, increased from four to five; and be it

**FURTHER RESOLVED**: That, subject to the Bankruptcy Petition Filing and effective as of the Bankruptcy Petition Date, Mr. Walper be, and hereby is, appointed to serve as a Class III director, with a term expiring at the 2027 Annual Meeting of Stockholders; and be it

**FURTHER RESOLVED**: That, subject to the Bankruptcy Petition Filing and effective as of the Bankruptcy Petition Date, Mr. Walper be, and hereby is, appointed to serve on the Special Committee of the Board (the "Special Committee"); and be it

1

**FURTHER RESOLVED**: That the Board has reviewed Mr. Walper's relationship with the Company in accordance with the applicable listing rules of Nasdaq (the "Listing Rules") and the Company's Corporate Governance Guidelines; and be it

**FURTHER RESOLVED**: That, pursuant to such review, the Board determines that Mr. Walper meets the independence requirements set forth in Nasdaq Listing Rule 5605 and the Company's Corporate Governance Guidelines; and be it

**FURTHER RESOLVED**: That the Board determines, based on its review, that Mr. Walper does not have a relationship with the Company that, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director; and be it

**FURTHER RESOLVED**: That the Board has reviewed with the Company's independent legal counsel Mr. Walper's relationship, if any, with Anne Wojcicki, and that the Board, upon the recommendation of the Company's independent legal counsel, determines that Mr. Walper does not have any such relationship with Ms. Wojcicki that would interfere with the exercise of independent judgement in carrying out the responsibilities of a director; and be it

**FURTHER RESOLVED**: That, subject to the Bankruptcy Petition Filing and effective as of the Bankruptcy Petition Date, Mr. Walper be, and hereby is, designated by the Company as a person subject to the reporting requirements of Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"); and be it

**FURTHER RESOLVED**: That Company be, and hereby is, authorized to enter into an Indemnification Agreement with Mr. Walper, which such Indemnification Agreement shall be in substantially the form previously approved by the Board; and be it

**FURTHER RESOLVED**: That the Director Agreement, including, without limitation, the compensation terms set forth therein, be, and hereby is approved, and the Company be and hereby is, authorized to enter into the Director Agreement with Mr. Walper.

### *Appointment of Interim Chief Executive Officer*

**WHEREAS**: Pursuant to Section 6.2 of the Bylaws, officers of the Company shall be appointed by the Board;

**WHEREAS**: On March 21, 2025, Anne Wojcicki, the Company's Chief Executive Officer and President, tendered her resignation as an officer of the Company to the Board (the "Resignation"), with such Resignation to be effective at 5:00 p.m., Eastern Time, on March 23, 2025 (the "Resignation Effective Time"); and

**WHEREAS**: The Board has determined that it is in the best interests of the Company and its stockholders to accept Ms. Wojcicki's resignation, and to appoint Joseph Selsavage, the Company's current Chief Financial and Accounting Officer, as Interim Chief Executive Officer and Interim President.

**NOW, THEREFORE, BE IT RESOLVED**: That, effective as of the Resignation Effective Time, the Resignation be, and hereby is, accepted; and be it

**FURTHER RESOLVED**: That, effective as of the Resignation Effective Time, Mr. Selsavage be, and hereby is, appointed as Interim Chief Executive Officer and Interim President of the Company; and be it

2

**FURTHER RESOLVED**: That, for the avoidance of doubt, following the Resignation Effective Time, Mr. Selsavage will continue to serve as the Company's Chief Financial and Accounting Officer and Ms. Wojcicki will continue to serve as a Class III director of the Board.

### *Appointment of Chief Restructuring Officer*

**WHEREAS**: Pursuant to Section 6.2 of the Bylaws, officers of the Company shall be appointed by the Board;

**WHEREAS**: The Special Committee has recommended to the Board that Matthew Kvarda be appointed as Chief Restructuring Officer of the Company and that, in connection with Mr. Kvarda's appointment, the Company enter into that certain Engagement Letter (the "CRO Agreement") with Alvarez & Marsal North America, LLC ("A&M"), to set forth the terms of A&M's engagement and Mr. Kvarda's service as the Company's Chief Restructuring Officer, including, without limitation, the compensation to which A&M will be entitled; and

**WHEREAS**: Based upon the recommendation of the Special Committee, the Board has determined that it is in the best interests of the Company and its stockholders to appoint Mr. Kvarda as the Company's Chief Restructuring Officer and to approve the Company's entry into the CRO Agreement.

**NOW, THEREFORE, BE IT RESOLVED**: That, subject to the Bankruptcy Petition Filing and effective as of the Bankruptcy Petition Date, Mr. Kvarda be, and hereby is, appointed as Chief Restructuring Officer of the Company; and be it

**FURTHER RESOLVED**: That, subject to the Bankruptcy Petition Filing and effective as of the Bankruptcy Petition Date, Mr. Kvarda be, and hereby is, designated by the Company as a person subject to the reporting requirements of Section 16(a) of the Exchange Act; and be it

**FURTHER RESOLVED**: That, subject to the Bankruptcy Petition Filing and effective as of the Bankruptcy Petition Date, Mr. Kvarda be, and hereby is, designated as an "executive officer" of the Company as that term is defined in Rule 3b-7 under the Exchange Act; and be it

**FURTHER RESOLVED**: That the CRO Agreement, in substantially the form presented to the Special Committee, including, without limitation, the compensation terms set forth therein and the form of Indemnification and Limitation on Liability Agreement attached thereto (the "CRO Indemnification Agreement"), be, and hereby is approved, and the Company be and hereby is, authorized to enter into the CRO Agreement with A&M; and be it

**FURTHER RESOLVED**: That Company be, and hereby is, authorized to enter into the CRO Indemnification Agreement with A&M.

### *Appointment of Chair of the Board*

**WHEREAS**: Ms. Wojcicki is currently serving as the Chair of the Board and Mark Jensen, an independent member of the Board, is currently serving as the Lead Independent Director; and

**WHEREAS**: The Board has determined that it is in the best interests of the Company and its stockholders for Ms. Wojcicki to cease to serve as the Chair of the Board and for Mr. Jensen to be appointed as Chair of the Board.

**NOW, THEREFORE, BE IT RESOLVED**: That, effective as of the date hereof (the "Effective Date"), Ms. Wojcicki shall cease to serve as the Chair of the Board; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Mr. Jensen be, and hereby is, appointed as Chair of the Board; and be it

**FURTHER RESOLVED**: That, effective as of the Effective Date, Board will no longer have a Lead Independent Director.

### *General*

**FURTHER RESOLVED**: The officers of the Company (acting singly or jointly) are hereby authorized and directed, on behalf and in the name of the Company, to make all such arrangements, to do and perform all such acts and things, including, without limitation, executing and delivering all such instruments, certificates, and other documents, as they may deem necessary or appropriate in order to effectuate fully the purpose of each and all of the foregoing resolutions and the transactions contemplated thereby and the undersigned hereby ratify and confirm any and all actions taken heretofore and hereafter by such officers to accomplish such purposes.