## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| *In re*: <br><br> **23ANDME HOLDING CO.**, *et al.* <br><br> Debtors[1] | **Chapter 11** <br><br> **Case No. 25040976** <br><br> **(Jointly Administered)** <br><br> Related Docket Nos. 30, 125, 574, 657, 739 |

## OMNIBUS REPLY OF TTAM RESEARCH
## INSTITUTE IN SUPPORT OF ENTRY OF THE SALE ORDER

TTAM Research Institute, a California nonprofit public benefit corporation ("**TTAM**"), as proposed buyer of substantially all of the assets of 23andMe Holding Co. ("**23andMe**" or the "**Company**") and its debtors affiliates (collectively, and together with 23andMe, the "**Debtors**"), files this reply (this "**Reply**") in support of entry of the proposed Sale Order, as requested pursuant to the Debtors' Sale Motion,[2] and in reply to objections

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870- market Street, Room 415, San Francisco, CA 94102.

[2] "**Sale Motion**" refers to the proposed *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry into Stalking Horse Agreement(s), if any, (V) Establishing Notice and Procedures for the Assumption and assignment of Contracts and Leases, (VI) Authorizing the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (VII) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VIII) Granting Related Relief* [Docket No. 30]. "**Sale Order**" refers to the proposed *Order (I) Approving (A) the Debtors' Entry into the Sale Transaction Documents, (B) the Sale to the Purchaser of the Acquired Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (II) Authorizing the Debtors to Consummate Transactions in Connection Therewith; and (III) Granting Related Relief*, in the form made available on the website of the Debtors' claims and noticing agent. Capitalized terms used but not defined herein shall have the respective meanings ascribed to them in the Sale Motion.

thereto.  Upon the declarations of Anne Wojcicki (the "**Wojcicki Declaration**") and Jami Mills Vibbert (the "**Vibbert Declaration**"), each filed contemporaneously herewith, TTAM respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The proposed sale of 23andMe's business to TTAM (the "**TTAM Transaction**") represents a truly value-maximizing result for the estates.  It is anticipated to *satisfy all of the Debtors' creditors in full and generate meaningful distributions to stockholders*—a rare and remarkable outcome in a large, "free fall" chapter 11 case.  Key terms of the sale transaction include a $305 million cash purchase price, employment offers to all of the Debtors' employees related to the Acquired Assets subject to the upcoming Sale Hearing, and binding agreements to uphold *in perpetuity* the Debtors' core privacy commitments to customers.  Importantly, the TTAM Transaction preserves 23andMe's mission to empower consumers with genetic knowledge and advance health science research, ensuring its continuation through a nonprofit entity led by the co-founder and former CEO of 23andMe, Anne Wojcicki.

2.      As this Court is aware, the proposed TTAM Transaction is the culmination of an intense, highly competitive and, at times, contentious bidding process that unfolded over a period of nearly a month.  The auction began on May 14, 2025 with an opening bid of $52 million and the final bidding round concluded this past Friday with TTAM's winning bid of $305 million—nearly six times the initial baseline bid.

3.      TTAM's winning bid is not only the highest and best offer in terms of economic value but also for its commitments to consumer protection and privacy—

principles of utmost importance to TTAM. As part of its bid, TTAM made numerous binding commitments in furtherance of this goal, including:

- *Customer Data Rights*: TTAM will honor in perpetuity 23andMe's existing policies on account and genetic data deletions and research opt-out;

- *Customer Notification*: With the Debtors' cooperation, all customers will be emailed at least two business days before the closing of the TTAM Transaction with details on TTAM's role, privacy adherence, and instructions for data deletion or opting out of research;

- *Data Transfer Restrictions*: Genetic data cannot be sold or transferred in connection with a subsequent bankruptcy or change of control unless the recipient is a qualified domestic entity that adopts TTAM's privacy policies and complies with all laws;

- *Privacy Advisory Board*: Within 90 days of the closing of the TTAM Transaction, TTAM will establish a Consumer Privacy Advisory Board;

- *Privacy Procedures and Reporting*: TTAM will implement privacy procedures, notify customers of material changes, mitigate data breaches, and prepare annual reports to be made available to Attorneys Generals upon request;

- *Identity Theft Monitoring*: TTAM will offer two years of free Experian identity theft monitoring; and

- *Research and Donations*: TTAM will continue 23andMe's policy of licensing aggregate data for scientific and biomedical research to research scholars at academic universities and other nonprofits, and refuse donations from individuals or companies in specified countries.

4. Collectively, these voluntary good-faith agreements demonstrate TTAM's commitment to go above and beyond in protecting customers and ensuring their data is used strictly in accordance with their consent.

5. Certain states (the "**Objecting States**")[3] have objected to the TTAM Transaction. The gist of their arguments is that the sale of 23andMe customers' genetic

---

[3]   States' objections were filed at: ECF 683 (California); ECF 687 (Arizona, Connecticut, District of Columbia, Florida, Illinois, Kansas, Louisiana, Maine, Michigan, New Hampshire, New Mexico, New York, North Carolina, Oklahoma, South Carolina, South Dakota, Utah, Vermont, Virginia, Washington, Wisconsin, Colorado, Kentucky, Minnesota, Missouri, Oregon, Pennsylvania); ECF 693 (Tennessee); ECF 696 (Alaska); ECF 703 (Texas). Additional objections were filed at: ECF 690 (Class Action Plaintiffs); ECF 712 (GlaxoSmithKline); ECF 738 (U.S. Trustee). *See also* ECF 686 (declaratory judgment filed by Arizona, Colorado, Connecticut, District of Colombia, Florida, Illinois, Kansas, *(cont'd)*

data and biological samples would violate their respective consumer privacy laws.  They are wrong for at least two reasons.

6.    First, the Bankruptcy Code preempts state law on this point. Section 363(b)(1)(A) of the Bankruptcy Code expressly permits a debtor to sell personally identifiable information ("**PII**") if the sale is consistent with the debtor's privacy policy in effect as of the commencement of the case.  23andMe's current privacy policy, in place well before the Petition Date, explicitly disclosed that customer PII could be transferred in the event of a sale of the company or its assets, including in bankruptcy.[4]

7.    Second, even if the Bankruptcy Code does not preempt state law on this issue, the state laws invoked by the Objecting States do not apply to the TTAM Transaction. The TTAM Transaction involves a two-step structure: (i) the transfer of customer PII to a new, wholly owned non-debtor subsidiary and (ii) the subsequent sale of that subsidiary's equity interests to TTAM.  This is a sale of equity, not an asset sale of customer PII; it therefore falls outside the scope of the state privacy laws cited by the Objecting States. Moreover, even if such state privacy laws did apply, the TTAM Transaction complies with those laws.

8.    For these reasons, the Court should overrule the objections and approve the sale of 23andMe's business to TTAM.

---

Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, New Hampshire, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin); ECF 688 (declaratory judgment filed by Texas).

[4]    *See*    23andMe    Privacy    Statement    (updated    March    14,    2025), https://www.23andme.com/legal/privacy/full-version/ (stating that if the company is "involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction").

## ADDITIONAL FACTUAL BACKGROUND

I.     **TTAM and Its Mission**

9.     TTAM is a non-profit medical research organization dedicated to helping scientists and non-scientists join together to unravel the mysteries of DNA and for the medical research that will hopefully facilitate medical advances to cure diseases.  TTAM's goals include democratizing access to data and empowering individuals to contribute their own genetic data to scientific research.  The organization was founded by Anne Wojcicki, 23andMe's co-founder and former Chief Executive Officer, on May 2, 2025, for the purpose of bidding on the Debtors' assets in bankruptcy.  TTAM is currently managed by Ms. Wojcicki, the President of TTAM.

10.     Ms. Wojcicki's mission in co-founding 23andMe was to help people access, understand and benefit from the human genome.  If the sale to TTAM is approved, TTAM will continue to carry out that same mission as a not-for-profit entity under the continued leadership of Ms. Wojcicki.  TTAM has the same objectives and the same leadership that over 15 million 23andMe customers entrusted with their genetic data pre-petition.  Thus, customers can take comfort that, should the sale to TTAM be approved, their data will remain in experienced and capable hands and will not be used for purposes that they did not authorize.

11.     Moreover, TTAM's bid is indisputably the best option to maximize value for the estates.  The benefits of the proposed sale are clear: TTAM's $305 million bid will provide substantial value for the Debtors' stakeholders (including equityholders).  The Debtors' business will be preserved as a going concern, and because TTAM's bid includes job offers for all of 23andMe's employees, hundreds of jobs will be saved.  As discussed in the preliminary statement and as described in more detail below, TTAM's bid also

includes a numbers of binding commitments designed to enhance customer privacy, choice, and protections.

## II.     TTAM's Good-Faith Participation in the Debtors' Sale Process

12.     Ms. Wojcicki is a co-founder, director, and stockholder of 23andMe, and its former CEO.  Prior to the chapter 11 filing, the board of directors of 23andMe (the "**Board**") formed a special committee comprised of independent and disinterested directors (the "**Special Committee**") to review and evaluate strategic alternatives available to the Company.  This included, with the assistance of its investment banker, Moelis & Company LLC, exploring and evaluating potential third-party interest in a sale of all or a portion of the Company.  Ms. Wojcicki was not and has never been a part of the Special Committee.  Prior to the chapter 11 filing, Ms. Wojcicki voluntarily resigned (at her own suggestion) from her role as CEO and stepped down from her role as chair of the Board to participate in the sale process as an independent bidder.  To that end and for that reason, she established TTAM. TTAM did not exist prior to these chapter 11 cases.

13.     Although Ms. Wojcicki has remained a stockholder and a Board member, these chapter 11 proceedings have been directed exclusively by the Special Committee (and management).   Ms. Wojcicki has not attended any Special Committee meetings or participated in the Special Committee's decision-making throughout the proceedings or the Auction.  Since her resignation, Ms. Wojcicki has not participated in the Debtors' decision-making in any manner, including the decision to commence these chapter 11 cases, to pursue the Sale Transaction, to establish the Bidding Procedures, or to agree to the Final Proposal Procedures.  Moreover, all interactions related to the sale process and these chapter 11 cases have been at arms-length.

14. Likewise, TTAM has not participated in any of the Debtors' decision-making in any manner throughout these chapter 11 proceedings, including with respect to the commencement of these chapter 11 cases, the Sale Transaction, the Bidding Procedures, or the Final Proposal Procedures. TTAM has no relationship with the Debtors other than as an arm's-length participant in the Debtors' Auction on May 14, 2025 through May 16, 2025, and a Final Bidding Round on June 13, 2025. Following multiple rounds of competitive bidding against several other bidders, the Debtors selected TTAM as the Winning Bidder with its bid of $305 million—approximately $50 million more than the next best bid.

## III.   TTAM's Capabilities and Commitments

15. TTAM is deeply committed to honoring and protecting customer privacy. 23andMe requires customers to give explicit consent before their anonymized data is used for any research purpose. In fact, 23andMe maintains a strict policy that customer data is never provided to any third party without the customer's explicit consent (and even then, the Company removes any personally identifiable information before sharing it). Customers are regularly reminded of their consent status and are able to quickly change that status at any time. 23andMe never shares customer data (genetic or non-genetic) with insurance companies or employers under any circumstance. Most significantly, customers have the option to cancel their account at any time, for any reason. If the sale is approved, TTAM will continue 23andMe's policies aimed at safeguarding customers' genetic data.

16. In addition to numerous policies and safeguards designed to ensure customer consent is central to the Company's systems and controls, TTAM will continue 23andMe's commitment to data security and national security. TTAM is acutely aware of

the threat that foreign adversaries pose to the American biotechnology sector, and TTAM is committed to doing all that it can to protect individuals' data and national security.

17.     To demonstrate its continued commitment to customer privacy and choice, data security and national security, TTAM has voluntarily agreed to abide by a variety of consumer protection and privacy safeguards if the sale is approved.  First and foremost, despite being a non-profit that is not required to comply with the same privacy laws as a for-profit entity, TTAM has agreed to voluntarily comply with all applicable state privacy laws (including those governing genetic privacy and consumer health privacy) as if it were a for-profit entity.  With respect to customer data, TTAM has agreed to, among other things, (1) uphold 23andMe's current policies regarding customers' rights to delete their accounts and genetic data and/or opt out of research in perpetuity, (2) create a Consumer Privacy Advisory Board responsible for reviewing TTAM's policies and procedures to ensure compliance with laws and mitigate privacy risks for customers, and (3) in line with 23andMe's existing practices, not sell or share customer accounts or data with any insurance company (except with the explicit authorization of the customer).  To assuage concerns about any future change of control, TTAM has also agreed that it will not sell or transfer customers' genetic data to any entity that does not agree to adopt TTAM's privacy statements.

18.     As part of its continued commitment to national security, TTAM will not share genetic data with any companies or individuals in specified countries, nor will TTAM accept donations from such companies or individuals.

19.     Finally, in line with its continued commitment to research and democratizing access to data, TTAM has committed to continuing 23andMe's policy of

licensing de-identified data for scientific and biomedical research to research scholars at academic universities and other nonprofits.

20.    In conclusion, TTAM brings with it a wealth of experience operating a direct-to-consumer genetic testing company, a mission and plan for genetic data usage that aligns with customer expectations, and continuity of leadership and policies and procedures consistent with those that have long been in place at 23andMe.  TTAM is committed to upholding 23andMe's mission and dedication to customer privacy and consent as a not-for-profit entity.

**REPLY**

## I.    The Court Should Approve the Selection of TTAM as the Winning Bidder as a Reasonable Exercise of the Debtors' Business Judgment.

21.    At least one objector has taken the position that Ms. Wojcicki is an insider of the Debtors and therefore, any sale to TTAM should be subject to heightened scrutiny. *See* Dkt. 703 at ¶¶ 42-44. This is wrong.  The appropriate standard of review to apply to the proposed sale transaction is the business judgment standard.

22.    As an initial matter, TTAM, not Ms. Wojcicki, is purchasing substantially all of the Debtors' assets.  The fact that Ms. Wojcicki is affiliated with TTAM does not make TTAM an insider of the Debtors.  Ms. Wojcicki is not the controlling stockholder of 23andMe, as she now holds less than 19% of the total equity and 11% of the total voting power.  She also resigned from her position as CEO on the eve of bankruptcy to pursue a sale of 23andMe.  Ms. Wojcicki subsequently formed TTAM as a vehicle to pursue an acquisition of 23andMe.  TTAM does not currently own any stock or interest in 23andMe.  TTAM is not an insider of 23andMe.  Although Ms. Wojcicki may be considered an insider of 23andMe under the bankruptcy code, that does not render TTAM an insider

of 23andMe.  Nor does Ms. Wojcicki's position at TTAM render TTAM an insider of 23andMe.  Accordingly, no objector has presented any evidence to support the applicability of a heightened standard of review to the proposed sale transaction.

## II.     The Court Should Overrule the States' Objections.

23.     The Objecting States argue that the Court should deny approval of the sale of 23andMe customers' genetic data and biological samples because such a sale would not comply with their respective consumer privacy laws.[5]  The objections should be overruled for at least two independent reasons.  *First*, section 363(b)(1)(A) of the Bankruptcy Code expressly provides that a debtor may sell PII provided that such sale is consistent with the debtor's privacy policy in effect as of the commencement of the case.  The Debtors' privacy policy as of the Petition Date (and indeed long before) unequivocally stated that customers' PII may be transferred if the company or its assets are sold, including in a bankruptcy, and thus the TTAM Transaction is plainly consistent with that policy and hence permitted under section 363(b)(1)(A), which ends the analysis as a matter of federal preemption.  *Second*, even if section 363(b)(1)(A) did not preempt state law, the TTAM Transaction complies with the state laws at issue and accordingly may be approved under section 363(b)(1)(B).  As set forth above, the TTAM Transaction contemplates (i) a sale of customers' PII to a new wholly owned non-debtor subsidiary and (ii) a subsequent sale of that subsidiary's equity interests to TTAM.  None of the state laws at issue regulate a company's ability to

---

[5]     *See The People of the State of California's Objection to the Debtors' Proposed Asset Sale* [ECF 683] ("**Cal. Obj.**") ¶¶ 15-20; *The States' Objection to the Debtors' Proposed Sale Of Customers' Assets* [ECF 687] ("**NAAG Obj.**") ¶¶ 16-21; *State of Tennessee's Limited Objection to the Debtors' Motion Approving Sale of Assets* [ECF 693] ("**Tenn. Obj.**") ¶¶ 3-13; *Notice of Joinder in the People of the State of California's Objection to Debtors' Proposed Asset Sale* [ECF 696] ("**Alaska Obj.**") at 2-5; *The State of Texas' Objection to Debtors' Sale Transaction and Proposed Sale Order* [ECF 703] ("**Tex. Obj.**") ¶¶ 15-23.

transfer PII to a wholly owned subsidiary, nor do they regulate the issuance or sale of equity

interests in an entity that holds PII.

### A. The TTAM Transaction Complies With Section 363(b)(l)(A), Which Preempts State Law.

24.    Even if the TTAM Transaction were to implicate the Objecting States'

consumer and genetic privacy statutes, which it does not, the objections should

nevertheless be overruled because the transaction plainly complies with

section 363(b)(l)(A) of the Bankruptcy Code.    Section 363(b)(l) sets forth two

circumstances under which a debtor can lawfully sell PII:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—
>
> (A)    such sale or such lease is consistent with such policy; or
>
> (B)    after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—
>
>> (i)  giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and
>>
>> (ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

ll U.S.C. § 363(b)(l).  Thus, under section 363(b)(l)(A), a debtor may lawfully sell PII if

"such sale . . . is consistent with [its] policy" "prohibiting the transfer of personally

identifiable information about individuals to persons that are not affiliated with the debtors"

that is "in effect on the date of the commencement of the case."  The inquiry can end here

because the TTAM Transaction is consistent with the Debtors' privacy policy in place on the Petition Date.

25.     Indeed, bankruptcy courts across the country routinely approve sales of PII under section 363(b)(1)(A) when the sale is consistent with the debtor's existing privacy policy or when the debtor never disclosed a policy against transferring PII to unaffiliated persons in the first place.[6]

26.     The sale order entered by Judge Kaplan of the U.S. Bankruptcy Court for the District of New Jersey in the bankruptcy case of Invitae Corporation—a genetic testing company in the same industry as 23andMe—is illustrative and mirrors the approach taken by a wide chorus of bankruptcy courts in approving transfers of PII under section 363(b)(1)(A):

> The sale, conveyance, assignment, and transfer of any personally identifiable information pursuant to the terms of the Labcorp APA and this Sale Order complies with the terms of the Debtors' privacy policy regarding the transfer of such personally identifiable information as of the Petition Date and, as a result, consummation of the sale transaction is permitted pursuant to section 363(b)(1)(A) of the Bankruptcy Code.   Accordingly, appointment of a consumer privacy ombudsman in accordance with section 363(b)(1) or 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.[7]

---

[6]   *See, e.g., In re FL 6801 Spirits LLC*, 2014 WL 3891435, at *3 (Bankr. S.D.N.Y. July 1, 2014); *In re Advanced Living Techs., Inc.*, 2014 WL 13071944, at *6 (Bankr. W.D. Tex. Mar. 28, 2014); *In re Simply Wheelz LLC*, 2014 WL 983764, at *1 (Bankr. S.D. Miss. Jan. 24, 2014); *In re W. 380 Fam.  Care Fac.*, 2013 WL 1285674, at *7 (Bankr. N.D. Tex. May 16, 2013); *In re Metro Fuel Oil Corp.*, 2012 WL 5427528, at *2 (Bankr. E.D.N.Y. Sept. 28, 2012); *In re Ambassadors Int'l, Inc.*, 2011 WL 6370906, at *4 (Bankr. D. Del. Dec. 12, 2011); *In re Brown Publ'g Co.*, 2011 WL 13498454, at *6 (Bankr. E.D.N.Y. June 13, 2011); *In re BI-LO, LLC*, 2011 WL 13506135, at *2 (Bankr. D. S.C. May 2, 2011); *In re Stant Parent Corp.*, 2011 WL 13502837, at *4 (Bankr. D. Del. Apr. 29, 2011); *In re Crucible Materials Corp.*, 2010 WL 11821899, at *5 (Bankr. D. Del. Oct. 14, 2010); *In re Hedwin Corp.*, 2010 WL 11813031, at *6 (Bankr. D. Md. July 9, 2010); *In re United Retail Grp., Inc.*, 2010 WL 11828770, at *3 (Bankr. S.D.N.Y. June 4, 2010); *In re Escada (USA) Inc.*, 2010 WL 4916435, at *4 (Bankr. S.D.N.Y. Jan. 7, 2010); *In re Drug Fair Grp., Inc.*, 2009 WL 10796793, at *2 (Bankr. D. Del. June 23, 2009).

[7]   *Order (I) Approving the Sale of the Acquired Assets Free and Clear of All Liens, Claims, and Encumbrances and (II) Authorizing the Debtors to Enter into and Perform Their Obligations under the LabCorp Asset Purchase Agreement* ¶ S, *In re Invitae Corp.*, Ch. 11 Case No. 24-11362 (Bankr. D.N.J. May 7, 2014), ECF 463.

27.     The same result should obtain here.  There can be no question that the biological samples and the genetic and other data derived from those samples constitute PII under the Bankruptcy Code.[8]  Nor can there be any genuine dispute that a transfer of such PII in the context of a sale or change in ownership of 23andMe comports with the Debtors' privacy policy in effect as of the Petition Date.  Specifically, the Debtors' privacy policy in effect on the Petition Date provides "[i]f we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity."[9]  The Debtors' privacy policy in effect on the Petition Date thus expressly provides that consumers' PII may be "accessed, sold or transferred" under the exact circumstances contemplated by the TTAM Transaction.

---

[8]    Section 101(41A) of the Bankruptcy Code defines PII.  Part A of the definition enumerates certain categories of information that can be used to identify or contact an individual (such as their name, address, and phone number) and provides that such information is PII if it is "provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes."  11 U.S.C. § 101(41A)(A).  Part B of the definition includes a catch-all provision which states that "any other information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically" is PII if it is "identified in connection with 1 or more of the items of information specified in subparagraph (A)."  *Id.* § 101(41A)(B)(ii).  Because biological samples and the genetic data derived from it identified in connection with an individual's name or other categories of information set forth in section 101(41A)(A) "will result in … identifying such individual physically or electronically," it is PII under the catch-all provision.  None of the Objecting States argues otherwise, and indeed they have so stipulated.  *See Joint Stipulation and Agreed Order Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman* [Dkt. No. 346] ¶ 3 n.2 (defining "PII" as "Personally Identifiable Information as defined in 11 U.S.C. § 101(41A), including genetic data as well as health and personal information").

[9]    *See Declaration of Jami Mills Vibbert in Support of TTAM's Omnibus Reply In Support Of Entry Of the Sale Order* ("**Vibbert Decl.**") ¶ 2; *id.* Ex. 1.  The Vibbert Declaration and supporting exhibits are filed contemporaneously herewith.  "Personal Information" is defined in the 23andMe "Privacy Statement" to include consumers' genetic information, biological samples, biometric information, and various other data that 23andMe collects from its customers.  *See* 23andMe Privacy Statement (updated March 14, 2025), https://www.23andme.com/legal/privacy/full-version/.

28.     Nothing more is required to comply with section 363(b)(1)(A), and the Court's analysis should end there.  "The rules of statutory construction mandate [that] when a 'statute's language is plain, the sole function of the court is to enforce it according to its terms.'"  *Carton v. Gen. Motor Acceptance Corp.*, 611 F.3d 451, 458 (8th Cir. 2010) (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989)).  Here, the statutory text could not be more clear.  Section 363(b)(1) provides that a debtor may sell or transfer PII if "such sale … is consistent with" the debtor's privacy policy "in effect on the date of the commencement of the case,"  11 U.S.C. § 363(b)(1)(A), or, alternatively, after appointment of a consumer privacy ombudsman if the court "find[s] that no showing was made that such sale . . . would violate applicable nonbankruptcy law," *id.* § 363(b)(1)(B).  Because section 363(b)(1)(B) expressly requires compliance with "applicable nonbankruptcy law," while section 363(b)(1)(A) makes no mention of "applicable nonbankruptcy law" and instead only requires compliance with the debtor's existing privacy policy, the only plausible construction of the statutory text—and the one the Court should adopt—is that section 363(b)(1)(A) preempts state-law restrictions on the transfer of PII.  *See United States v. Palmer*, 643 F.3d 1060, 1066 (8th Cir. 2011) ("When we are able to ascertain the plain meaning of statutory text, we apply that meaning . . . 'The Supreme Court has stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says.'"); *see also Salinas v. U.S. R.R. Ret. Bd.*, 592 U.S. 188, 196 (2021) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or omission.").

29.    In arguing that any transfer of PII must comply with state law, the Objecting States rely heavily on in *In re Schauer*, in which the Eighth Circuit concluded that section 363(b)(1) does not authorize a debtor to sell property contrary to restrictions imposed by state law.[10]  835 F.2d 1222, 1225 (8th Cir. 1987).  The *Schauer* decision is of little relevance, if any, to this dispute, as it was decided nearly two decades before Congress amended the Bankruptcy Code to provide that a court may approve a debtor's transfer of PII (a) if the transfer comports with the debtor's existing privacy policy (section 363(b)(1)(A)) *or* (b) upon finding that no showing was made that the transfer would violate applicable nonbankruptcy law (section 363(b)(1)(B)).[11]  The Objecting States cite no case—and TTAM has not found any—holding that notwithstanding this disjunctive structure and the glaring distinction between these two subsections, section 363(b)(1) does not mean what it says and that when proceeding under section 363(b)(1)(A) the court must nevertheless delve into section 363(b)(1)(B).

30.    The Objecting States further argue that because state law defines the extent of the Debtors' property rights, the TTAM Transaction cannot be consummated because it is supposedly violative of the "inherent common law rights of ownership or control" that individuals have over their DNA and associated data, as well as state laws that purportedly make such rights "exclusive."[12]  This is a red herring, because the TTAM Transaction does

---

[10]    *See* Cal. Obj. ¶¶ 1, 15, 20, 22, 25; NAAG Obj. ¶ 20 & n.26; Tex. Obj. ¶¶ 14 n.25, 40 n.63-64.

[11]    Section 363(b)(1)(A) and (B) were added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109–8, 119 Stat. 23 ("**BAPCPA**").  Prior to the enactment of BAPCA, as relevant to the 1987 case cited by the Objecting States, section 363(b)(1) merely provided that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

[12]    *See* NAAG Obj. ¶ 23 (arguing that "human beings have inherent common law rights of ownership or control" in their biological material, DNA, and related data); Tex. Obj. ¶ 15 ("Texas law provides Texas
*(cont'd)*

not deprive the Debtors' customers of their ownership interests in or right to control their property. The sale to TTAM is not "free and clear" of customers' rights; it is expressly **subject to them**. Indeed, as set forth in the TTAM APA, TTAM has agreed "to retain **in perpetuity** 23andMe's current policies as in existence on the Petition Date regarding customers' rights to delete their accounts and genetic data and/or opt out of research."[13] In other words, the TTAM Transaction does not alter in any way individuals' ownership and control of their genetic PII, which they retain the right to remove from TTAM by submitting a deletion request at any time.[14]

31.    Nor does the fact that the Debtors may only have a qualified interest in such property mean that the Debtors cannot lawfully alienate whatever interest they have.[15] It is undisputed that the Debtors have a possessory interest in any PII that the Debtors' customers transferred to them or that the Debtors developed with their customers' permission and consent. *See ACI Constr., LLC v. United States*, 2022 WL 3999907, at *4 (D. Utah Aug. 31, 2022) ("[I]n the context of the Bankruptcy Code, a possessory interest [ ] exists when 'the debtor has some right to possess the property, for example, by virtue of

---

customers exclusive property, ownership, and control rights in and over their biological samples, genetic and personal data, and the results or analysis thereof.").

[13]    TTAM Research Institute Voluntary Consumer Protection and Privacy Safeguards Term Sheet, ECF 739 at l14 (emphasis added).

[14]    The NAAG Objection filed on behalf of 26 of the 30 Objecting States and the District of Columbia (collectively, the "**NAAG Client States**") acknowledges that "an individual's interest in these items is not absolute and remains subject to various exceptions as recognized in common law and statutes." NAAG Obj. ¶ 23 n.30. TTAM agrees and respectfully submits that the Court's authority under section 363(b)(1)(A) to approve a transfer of such property in accordance with the debtor's existing privacy policies is exactly the kind of "exception[ ] as recognized in common law and statutes" that an individual's "interest in these items" may be "subject to."

[15]    *See* NAAG Obj. ¶ 23 (arguing that "human beings have inherent common law rights of ownership or control" in their biological material, DNA, and related data); Tex. Obj. ¶ 15 ("Texas law provides Texas customers exclusive property, ownership, and control rights in and over their biological samples, genetic and personal data, and the results or analysis thereof.").

the title holder's consent or permission."). Whatever the full extent of the Debtors' interest in such property, that possessory interest is property of the estate. *See, e.g.*, *In re Kappa Dev. & Gen. Contracting*, 589 B.R. 302, 307 (Bankr. S.D. Miss. 2017) ("Under the Bankruptcy Code, property of the estate includes a debtor's 'mere possessory interest.'"); *see also In re Gull Air, Inc.*, 890 F.2d 1255, 1259 (1st Cir. 1989) ("[A] possessory interest must constitute property of the estate."); *In re Heien*, 528 B.R. 901, 904 (E.D. Mo. 2015) ("If [the debtor] had some sort of possessory interest . . . it would be property of the estate."). State-law transfer restrictions did not and cannot prevent that possessory interest from coming into the estate. *See* 11 U.S.C. § 541(c)(1)(A) ("[A]n interest of the debtor in property becomes property of the estate . . . notwithstanding any . . . applicable nonbankruptcy law . . . that restricts or conditions transfer of such interest by the debtor."); *In re Envision Healthcare Corp.*, 655 B.R. 701, 710 (Bankr. S.D. Tex. 2023) ("[S]tates cannot legislate estate property away."). And because the Debtors seek at most only to transfer that possessory interest, the fact that the Debtors' customers retain rights in such property under state law has no bearing on (and in fact supports) the lawfulness of the transaction.

32.    The Objecting States' invocation of 28 U.S.C. § 959(b) does not change the analysis.[16] That statute merely provides, as a general matter, that a debtor in possession "shall manage and operate the property in his possession" in compliance with state law. 28 U.S.C. § 959(b). But it is "a basic canon of statutory construction" that "the specific governs the general." *Cont'l Res., Inc. v. N.D. Bd. of Univ. & Sch. Lands*, 136 F.4th 778, 785 (8th Cir. 2025). Because section 363(b)(1)(A) governs the transfer of PII in bankruptcy,

---

[16]    *See* Cal. Obj. ¶ 22; NAAG Obj. ¶ 21; Tenn. Obj. ¶ 7.

it trumps 28 U.S.C. § 959(b).  *See Hughes v. Can.  Nat'l Ry. Co.*, 105 F.4th 1060, 1067 (8th Cir. 2024) ("[A] specific provision applying with particularity to a matter should govern over a more general provision encompassing that same matter.") (citing *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 21 (2012)).  Simply put, a generic provision of Title 28 providing generally that a debtor in possession must "manage" and "operate" its property in conformity with state law cannot override the Bankruptcy Code provision that expressly permits the sale or transfer of the property at issue in this dispute.

33.     The State of Texas argues that section 363(b) does not preempt state law because there is no "actual conflict" between state statutes restricting the transfer of PII and "a specific provision of the Bankruptcy Code."[17]  But the "actual conflict" between section 363(b)(1)(A) and the state laws at issue here is manifest:  one allows a debtor to transfer PII if doing so comports with its existing privacy policy, while the others prohibit a transfer unless additional requirements are also satisfied.  "[A] state law [] is invalid to the extent that it 'actually conflicts with a . . . federal statute."  *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 491 (1987).  Such a conflict exists where "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.*

34.     Moreover, "preemption arguments[ ] must be grounded 'in the text and structure of the statute at issue.'"  *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).  The text and structure of section 363(b)(1) weigh decisively in favor of finding preemption, and the

---

[17]     Tex. Obj. ¶ 40.  The State of California also argues that the Bankruptcy Code does not "preempt[ ] applicable state-law transfer restrictions," citing *In re Schauer* and the Third Circuit's decision in *Integrated Solutions, Inc. v. Service Support Specialties*, 124 F.3d 487, 492-43 (3rd Cir. 1997).  *See* Cal. Obj. ¶ 25.  The NAAG Client States cite *Integrated Solutions* and lower-court decisions applying it in support of the same proposition.  *See* NAAG Obj. ¶ 47 n.45.  Both *In re Schauer* and *Integrated Solutions*, however, predate the 2005 amendments that added section 363(b)(1)(A) and (B) to the Bankruptcy Code and accordingly do not address (much less decide) whether section 363(b)(1)(A) preempts state law with respect to the transfer of PII.

Objecting States barely attempt to argue otherwise. "The interpretive canon that Congress acts intentionally when it omits language included elsewhere applies with particular force" when the relevant statutory provisions are "in close proximity." *DHS v. MacLean*, 574 U.S. 383, 392 (2015). Here, not only is section 363(b)(1)(B)'s reference to "applicable nonbankruptcy law" in "close proximity" with section 363(b)(1)(A), they are "in the same sentence." *Id.* It would be "simply contrary to any reasonable interpretation of the text" to conclude that Congress's omission of any mention of "applicable nonbankruptcy law" in section 363(b)(1)(A) was not intentional. *Id.*; *see also IRS v. Fed. Lab. Rels. Auth.*, 494 U.S. 922, 932 (1990) ("A statute that in one section refers to 'law, rule or regulation,' and in another section to only 'laws' cannot, unless we abandon all pretense at precise communication, be deemed to mean the same thing in both places.").

35. Unable to overcome the clear import of section 363(b)(1)(A), the Objecting States strain to argue that the sale or transfer of their residents' PII somehow does not comport with the Debtors' privacy policies. None of their arguments are persuasive. The State of Texas, for example, notes that "[m]any versions [of the Debtors' 'Privacy Statement'] did not include any reference to sales in the context of 'bankruptcy' or 'reorganization.'"[18] But whether *prior versions* of the Debtors' privacy policy contained this disclosure is irrelevant for purposes of section 363(b)(1)(A), which looks to the "policy [ ] in effect on the date of the commencement of the case." Moreover, ***every*** version of the Debtors' "Privacy Statement" going back its first iteration in November 2007 disclosed to customers that if the Debtors were subject to a merger, acquisition, or asset sale, their

---

[18]    Tex. Obj. ¶ 29; *see also* NAAG Obj. ¶¶ 27-28.

personal information would be transferred as part of that transaction.[19]  Accordingly, even

if the Debtors' prior privacy policies were relevant—which they are not—those policies

indisputably authorized the Debtors to transfer PII in the event of an acquisition or asset

sale, whether the acquisition or sale was consummated in bankruptcy or not.[20]  And because

the Debtors' privacy statement stated that consumers' PII could be transferred under these

specific circumstances, the policies' more general disclaimers that the company would not

transfer customers' PII without their consent does not negate that authorization.  *See, e.g.*,

*In re Armstrong Energy Inc.*, 613 B.R. 529, 536 (B.A.P. 8th Cir. 2020) ("[L]anguage which

deals with a specific situation prevails over more general provisions if there is ambiguity

or inconsistency between them."); *see also Corso v. Creighton Univ.*, 731 F.2d 529, 533 (8th

Cir. 1984) ("It is [ ] axiomatic that where general and specific terms in a contract may relate

to the same thing, the more specific provision should control.").

36.     In sum, section 363(b)(1)(A) provides that the Court may approve a debtor's

sale or transfer of its PII if such transfer is consistent with the debtor's disclosed privacy

policies as they existed at the time of entering bankruptcy.  It does not require any finding

that such transfer comports with state law, as is the case if the fallback statute governing

the sale of PII is relied upon.  The only tenable construction of section 363(b)(1)(A) is that

---

[19]  *See* Vibbert Decl. ¶¶ 2-23; *id.*  Exs. 1-22.

[20]  The Court-appointed CPO likewise dwells on the fact that the Debtors' privacy policy did not include a
reference to "bankruptcy" until June 8, 2022.  *See* Report of Consumer Privacy Ombudsman, D.I. 718
("**CPO Report**") at 36-41.  But nowhere does the CPO explain why whether a sale occurs inside or
outside of a bankruptcy proceeding matters from a privacy standpoint or for informed consumer consent.
In light of the Company's longstanding disclosure that customers' PII could be sold in the event of a
"merger, acquisition by another company, or sale of all or a portion of its assets," Vibbert Decl. ¶ 7, it
would be contrary to the Bankruptcy Code's general anti-forfeiture policy to suggest that a company
could sell PII as part of a merger, acquisition, or asset sale but would lose that valuable right if it filed
for chapter 11 and tried to do so under section 363.  *See* 11 U.S.C. § 541(c).

it preempts state law with respect to any sale or transfer of PII, provided that the transfer comports with the debtor's privacy policies as of the petition date. Because the TTAM Transaction complies with the Privacy Statement in effect on the Petition Date—which explicitly states that if the company is "involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction"—the Court should overrule the Objecting States' objections and approve the transaction pursuant to section 363(b)(1)(A).[21]

**B.    Even If Section 363(b)(1)(A) Does Not Preempt State Law, The TTAM Transaction Complies With Section 363(b)(1)(B).**

37.    Should the Court determine notwithstanding the above that it must examine applicable nonbankruptcy law, the Court should approve the sale under section 363(b)(1)(B) because the Objecting States cannot meet their burden to show that the TTAM Transaction violates state laws.

38.    Several of the Objecting States have comprehensive consumer privacy laws or consumer health privacy laws (the "**Consumer Privacy Laws**") that regulate the use and disclosure of personal information and sensitive personal information, which is

---

[21]    The CPO did not reach a conclusion one way or the other as to whether the TTAM Transaction complies with the Debtors' prepetition privacy policies. *See* CPO Report at 7 ("Based upon his examination, the CPO cannot conclude with certainty that the sale of the Company's data in bankruptcy is otherwise consistent with its privacy policies."). Nor should he have because it is the ultimate question of law and fact for the Court. The CPO's approach to this issue, as far as it went, strayed far from discussing whether the proposed transaction is consistent with the Debtors' prepetition privacy policies. Instead, the CPO offered a wide-ranging analysis of the "the interdisciplinary academic literature on privacy," delving into topics such as "the practical limits of notice and choice frameworks," how many clicks it takes to reach the full 23andMe privacy statement, whether customers have the time and mental capacity to read and understand the Debtors' privacy policies, and speculating as to whether consumers would have been aware of any changes to the Privacy Statement over time. *See* CPO Report at 36-41, 46-52. These considerations as to the efficacy of the notice and consent model simply do not inform the legal question of whether the TTAM Transaction is consistent with the Debtors' prepetition privacy policies which, as explained above, it clearly is.

generally defined to include genetic data.[22] Separately, many of the Objecting States have enacted genetic privacy laws,[23] which regulate genetic data and biological samples ("**Genetic Privacy Laws**," and together with the Consumer Privacy Laws, the "**State Privacy Laws**").

39. As structured, the TTAM Transaction would satisfy section 363(b)(1)(B) (if it applied) because neither a transfer of the Debtors' assets to a wholly owned subsidiary nor the issuance of equity implicate the State Privacy Laws. Moreover, even if the TTAM Transaction were to implicate the State Privacy Laws, the transaction complies with those laws in any event.

      (i)    ***The TTAM Transaction Does Not Implicate the State Privacy Laws Because It Is a Transfer to a Wholly Owned Subsidiary Followed By a Sale of that Subsidiary's Equity Interests to a Third Party.***

---

[22] *See, e.g.*, California Consumer Privacy Act ("**CCPA**"), Cal. Civ. Code § 1798.100 *et seq.*; Colorado Privacy Act ("**CPA**"), Colo. Rev. Stat. Ann. § 6-1-1301 *et seq.*; Connecticut Data Privacy Act ("**CTDPA**"), Conn. Gen. Stat. Ann. § 42-515 *et seq.*; Indiana Consumer Data Protection Act ("**ICDPA**"), Ind. Code Ann. § 24-15-1-1 *et seq.* (effective Jan. 1, 2026); Kentucky Consumer Data Privacy Act ("**KCDPA**"), Ky. Rev. Stat. § 367 *et seq.* (effective Jan. 1, 2026); Minnesota Consumer Data Privacy Act ("**MCDPA**"), SF 2915 § 325O *et seq.* (effective July 31, 2025); New Hampshire Data Privacy Act ("**NHDPA**"), N.H. Rev. Stat. Ann. §507-H:1 *et seq.*; Oregon Consumer Privacy Act ("**OCPA**"), Or. Rev. Stat. Ann. § 646A.570 *et seq.*; Texas Data Privacy and Security Act ("**TDPSA**"), Tex. Bus. & Com. Code Ann. § 541 *et seq.*; Utah Consumer Privacy Act ("**UCPA**"), Utah Code Ann. §13-61-101 *et seq.*; Virginia Consumer Data Protection Act ("**VCDPA**"), Va. Code Ann. § 59.1-575 *et seq.*; Washington My Health My Data Act ("**MHMDA**"), Wash. Rev. Code Ann. § 19.373.010 *et seq.*

[23] *See, e.g.*, Alaska's Act Relating to Genetic Privacy, Alaska Stat. Ann. § 18.13.010 *et seq.*; California's Genetic Information Privacy Act ("**GIPA**"), Cal. Civ. Code § 56.18 *et seq.*; Florida's Protecting DNA Privacy Act, Fla. Stat. Ann. § 760.40 *et seq.*; Illinois Genetic Information Protection Act, 410 Ill. Comp. Stat. Ann. 513/1 *et seq.*; Kentucky Genetic Data Privacy Law, Ky. Rev. Stat. Ann. § 311.705 *et seq.*; Minnesota's Genetic Information Privacy Act, Minn. Stat. Ann. § 325F.995; Montana Genetic Information Privacy Act, Mont. Code Ann. § 30-23-101 *et seq.*; Tennessee Genetic Information Privacy Act, Tenn. Code Ann. § 47-18-4901 *et seq.*; Texas Direct-to-Consumer Genetic Testing Act, Tex. Bus. & Com. Code Ann. § 541.001 *et seq.*; Utah Genetic Information Privacy Act, Utah Code Ann. § 13-60-101 *et seq.*; Virginia Genetic Data Privacy Law, Va. Code Ann. § 59.1-593 *et seq.*; Wyoming Genetic Data Privacy Law, Wyo. Stat. Ann. § 35-32-101 *et seq.*

40.     The State Privacy Laws do not apply to the TTAM Transaction because the State Privacy Laws, to the extent of any applicable transfer restrictions, only impose requirements on certain types of transfers of PII to third parties, not transfers to wholly owned subsidiaries or affiliates.  In addition, State Privacy Laws do not preclude a change in control of an entity that owns PII (indeed, the Debtors are a publicly traded company which could be involved in a change of control at any time).  The TTAM Transaction's Equity Transfer flexibility consists of the Debtors transferring assets to a newly formed wholly owned subsidiary and then selling the equity interests in that subsidiary to TTAM (a change of ownership / control).[24]  By their plain terms, the State Privacy Laws are only triggered by transfers of PII to a "third party," which cannot fairly be read as a restriction on transferring assets to entities within the corporate family.  The State Privacy Laws also do not contemplate—and therefore do not govern—a transfer of equity interests in an entity that houses PII, nor do the State Privacy Laws require customers' affirmative consent before such an equity sale occurs.  The TTAM Transaction accordingly does not implicate—much less violate—the State Privacy Laws.

41.     While the Consumer Privacy Laws impose certain requirements on the "sale"[25] of personal information,[26] the TTAM Transaction is not a sale for purposes of those

---

[24]   Section 2.8 of the TTAM APA has always given the Debtors the option to transfer assets to a wholly owned subsidiary before selling the equity interests in that subsidiary to TTAM.

[25]   Some Consumer Privacy Laws impose requirements on the "sharing" of certain personal information for cross-context behavioral advertising.  *See, e.g.*, Cal. Civ. Code § 1798.100 *et seq.*  Cross-contextual behavioral or targeted advertising are not at issue in this case.  Even if they were, the definition of "sharing" under the Consumer Privacy Laws similarly exempts transfers of personal information as part of mergers, acquisitions, bankruptcies, and other transactions where the third party assumes control of all or part of the business.  *Id.* § 1798.140(ah)(2)(C).

[26]   *See, e.g.*, Cal. Civ. Code § 1798.120; Colo. Rev. Stat. § 6-1-1306(1)(a).

laws because the definitions of "sale" in the Consumer Privacy Laws exempt "the disclosure or transfer of personal data to an affiliate."[27]  Rather, a sale under the Consumer Privacy Laws must be to a "third party" for those laws to be implicated.[28]  An affiliate (such as a wholly owned subsidiary) is not a "third party" for purposes of these laws.[29]

42.     An "affiliate" is "a legal entity that controls, is controlled by, or is under common control with another legal entity."[30]  Although the definitions of "control" in the Consumer Privacy Laws differ slightly from one another, it is generally defined as (i) the ownership, or the power to vote, more than a certain percent of the outstanding shares of any class of voting security of a company; (ii) control in any manner over the election of a majority of the directors or of individuals exercising similar functions; or (iii) the power to

---

[27]   TDPSA § 541.001(28)(C) (The term "sale of personal data" does not include "the disclosure or transfer of personal data to an affiliate."); VCDPA § 59.1-575 ("'Sale of personal data' does not include … [t]he disclosure or transfer of personal data to an affiliate."); KCDPA§ 367.3611(27) (same); MCDPA § 325O.02(u) (same); ICDPA § 24-15-2-27 (The term "sale of personal data" does not include "the disclosure of personal data to an affiliate."); CTDPA § 42-515(37) (same); NHDPA §507-H:l(XXVII)(c) (same); UCPA §13-61-101(31)(b)(ii) ("'Sale,' 'sell,' or 'sold' does not include … a controller's disclosure of personal data to an affiliate."); CPA § 6-1-1303(23)(b)(III) (same).

[28]   *See, e.g.*, CCPA § 1798.140(ad)(1) ("Sale," "selling," or "sold," means "selling, renting, releasing, disclosing, disseminating, making available, transferring, or otherwise communicating orally, in writing, or by electronic or other means, a consumer's personal information by the business to a third party for monetary or other valuable consideration."); CPA § 6-1-1303(23)(a) ("'Sale,' 'sell,' or 'sold' means the exchange of personal data for monetary or other valuable consideration by a controller to a third party."); TDPSA § 541.001(28) ("'Sale of personal data' means the sharing, disclosing, or transferring of personal data for monetary or other valuable consideration by the controller to a third party."); VCDPA § 59.1-575 ("'Sale of personal data' means the exchange of personal data for monetary consideration by the controller to a third party.").

[29]   The Texas Data Privacy and Security Act, for example, defines a "third party" as "a person, other than . . . an affiliate."  TDPSA § 541.001(32); *see also, e.g.*, CPA § 6-1-1303(26); VCDPA § 59.1-575; KCDPA § 367.3611(31); MCDPA § 325O.02(y); ICDPA § 24-15-2-31; CTDPA § 42-515(40); NHDPA § 507-H:l(XXX); UCPA § 13-61-101(36).

[30]   CPA § 6-1-1303(1); *see also* TDPSA § 541.001(1); VCDPA § 59.1-575; KCDPA§ 367.3611(1); MCDPA § 325O.02(b); ICDPA § 24-15-2-1; CTDPA § l(1); NHDPA § 507-H:l(I); UCPA §13-61-101(2).

exercise controlling influence over the management or policies of a company."[31]  By virtue of being owned and controlled by the Debtors, any wholly owned subsidiary formed by the Debtors pursuant to the TTAM Transaction would be an "affiliate" of the Debtors under the Consumer Privacy Laws and not a "third party."  In light of that status, the transfer of the Debtors' assets to that entity would not implicate the Consumer Privacy Laws.

43.    The Consumer Privacy Laws also do not proscribe such an entity from issuing equity.  The laws prescribe rules for a "sale" or certain information but simply do not address—and therefore do not prohibit—transfers of an equity ownership interest in companies.  Construing the statutes to reach those circumstances would produce an absurd result: each sale of a share of a public company in possession of PII would be halted by an inquisition into whether the equity sale violates the Consumer Privacy Laws and, under the logic of several of the Objecting States, would require the affirmative consent of all consumers affected.  The Court should not adopt this erroneous construction, which has no basis in the text of the Consumer Privacy Laws.  *See, e.g.*, *Chapman v. Hiland Partners GP Holdings, LLC*, 862 F.3d 1103, 1108 n.3 (8th Cir. 2017) ("Statutes must be construed to avoid absurd results.").

44.    Indeed, the NAAG Client States appropriately recognize that a change in ownership via an equity sale does not implicate the Consumer Privacy Laws (or, for that matter, the Genetic Privacy Laws).  As they explain in their brief:

> A "change in ownership" without a sale and transfer of the Customer Data is legally possible.  The Debtors are corporations, and their shareholders are the owners.  Through the purchase of the Debtors' stock, the proposed

---

[31]    *See, e.g.,* CPA § 6-1-1303(1); VCDPA § 59.1-575; TDPSA § 541.001(1); KCDPA§ 367.3611(1); MCDPA § 3250.02(b); ICDPA § 24-15-2-1; CTDPA § 42-515(1); NHDPA § 507-H:1(II); UCPA §13-61-101(11).

buyers could effectuate a change in ownership outside of bankruptcy – arguably without causing a sale, transfer, or disclosure of the assets.[32]

The NAAG Client States' concession that changing ownership of the entity that holds PII is "legally possible" applies with equal force to the TTAM Transaction. The State Privacy Laws do not regulate transfers of equity interests, and hence the sale of equity and change in ownership of a wholly owned subsidiary by the Debtors' sale to TTAM neither implicates nor violates these laws.

45.      Finally, even if the TTAM Transaction were viewed merely as an asset sale, the Consumer Privacy Laws do not apply to asset sales that occur in the context of mergers and acquisitions. The California Consumer Privacy Act is illustrative:

> [A] business does not sell personal information when . . . [t]he business transfers to a third party the personal information of a consumer as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the business, provided that information is used or shared consistently with this title.[33]

46.      The CPO agrees. The CPO Report notes the above exemption for bankruptcies in the definition of "sale" in the Consumer Privacy Laws and concludes that "there is a colorable argument that the genetic data transferred as part of this bankruptcy proceeding would fall outside the scope of the state comprehensive privacy laws."[34]

---

[32]   NAAG Obj. ¶ 38.

[33]   CCPA § 1798.140(ad)(2)(C); *see also* CPA § 6-1-1303(23)(a)(IV); TDSPA § 541.001(28); VCDPA § 59.1-575; KCDPA § 367.3611(27); MCDPA § 325O.02(u)(5); OCPA § 646A.570(17); ICDPA § 24-15-3-27; CTDPA § 42-515(37)(F); NHDPA §507-H:1(XXVII)(f); UCPA § 13-61-101(31)(b)(vii); MHMDA § 19.373.010; Florida Digital Bill of Rights ("FDBR") Fla. Stat. Ann. § 501.716(1)(k).

[34]   CPO Report at 102-03.

47.    Because the Consumer Privacy Laws exempt transfers to affiliates, do not govern equity sales, and do not apply to mergers or acquisitions, the TTAM Transaction is not subject to, and therefore does not violate, the Consumer Privacy Laws.

    **(ii)**    ***The Genetic Privacy Laws Similarly Only Govern Transfers of Genetic Information To Third Parties and Do Not Prohibit Transfers to Affiliates or Changes in Control.***

48.    The Genetic Privacy Laws also only contemplate and apply to the transfer or disclosure of a consumer's genetic information to a third party, not to an affiliate such as a wholly owned subsidiary, and similarly do not address changes in control.  By way of example, California's Genetic Information Privacy Act (the "**CA GIPA**") governs transfers or disclosures of genetic data to "a third party other than to a service provider."[35]  A wholly owned subsidiary is not a "third party," but rather is an affiliate and hence part of the company as that term is used in these statutes.  *See In re Wesco Aircraft Holdings*, 2025 WL 354858, at *21 (Bankr. S.D. Tex. Jan. 15, 2025) ("In common legal writings, the term 'third party' is uniformly used in a manner that excludes 'affiliates.'").[36]  This is obvious from how the words "a third party" are used next to "other than to a service provider" in

---

[35]    Cal. Civ. Code § 56.18l(2)(D).

[36]    *See also, e.g., Oppenheimer v. Harriman Nat'l Bank & Tr. Co. of City of New York*, 301 U.S. 206, 211 (1937) ("The bank had power to sell the stock in question whether acquired by it in accordance with or contrary to section 83, and whether the stock belonged to it, the affiliate or a third party."); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 328 (1988) (Scalia, J., dissenting) ("That same phenomenon renders inexplicable Justice BRENNAN's perception that all affiliated trademark holders are less in need of, or less deserving of, § 526(a) protection against the products of their foreign affiliates. It is not the affiliates who are doing the damage but third parties."); *United States v. Brown*, 459 F.3d 509, 513 (5th Cir. 2006) ("The Government contended, however, that the sale was a sham because Enron executives orally promised Merrill a flat fee of $250,000 and a guaranteed 15% annual rate of return over the six-month period of Merrill's investment; Enron executives allegedly promised that Enron or an affiliate would buyback Merrill's interest in the barges if no third party could be found."); *Inland Waters Pollution Control, Inc. v. Jigawon, Inc.*, 2008 WL 205209, at *12 ("[A]ffiliated companies with common economic interests are not third-parties.") (citing *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 801 (6th Cir. 2007)).

the CA GIPA.  The use of the term "third party" refers to entities that are external to the company.  That also comports with common sense because California's contrary contention would mean their Genetic Privacy Laws allow transfers to companies over which 23andMe has no control, but not to 23andMe's own controlled subsidiaries.  Such an interpretation is not supported by the text or by reason.  Companies routinely house different assets in direct and indirect subsidiaries, whether for organizational purposes, tax purposes, bookkeeping purposes, or financing purposes.

49.     The same conclusion holds with respect to laws that, like the Texas Direct-to-Consumer Genetic Testing Act ("**TX DTC Act**"), prohibit disclosures of genetic data to "any person other than the company's vendors and service providers."[37]  To be sure, the TX DTC Act defines "person" broadly to include "an individual, partnership, corporation, association, business, or business trust or the legal representative of an organization."[38]  But the very breadth of the definition underscores that the term "person," as used in the statute, cannot plausibly mean persons affiliated with the direct-to-consumer genetic testing company itself.  Were it otherwise, even the company's own employees could not process a customer's genetic data without first obtaining the customer's express consent.  And as noted above, this would also mean that data could be lawfully transferred to *external* vendors and service providers, but not to entities within the same corporate family and under common control.  The statute also broadly defines a "direct-to-consumer genetic testing company" as "an entity that … offers genetic testing products or services directly to individuals as consumers of those products or services" or one that "collects, uses, or

---

[37]   Tex. DTC Act § 503A.006(a)(1)(A).

[38]   *Id.* § 503A.001(8).

28

analyzes genetic data that … results from a direct-to-consumer genetic testing product or service; and [ ] an individual rather than a health care provider provides to the entity."[39] In referring to "an entity" (which is not defined) that engages in various aspects of the regulated activity, the statute clearly intended to capture to the corporate enterprise as a whole (including its employees and subsidiaries, each of which would be a separate "person" under the text), rather than to conflate "entity" with "person."  This would be in line with the idea that other entities subject to contractual control can receive genetic data (such as external vendors and service providers).

50.    The Genetic Privacy Laws also do not address or prohibit issuing or selling equity in an entity that holds the type of information covered by the statutes.  As noted above, reading the statutes to require consent for every change in equity ownership would substantially interfere with the functioning of the market and in effect would make trading in companies that own information covered by the statutes impossible.  While the Objecting States could take the position that obtaining consent is required in the context of a change of control, that position would lack any support in the text of the Genetic Privacy Laws, which simply do not regulate changes in ownership.  And, as noted above, the NAAG Client States appropriately concede that a transfer of ownership does not implicate their Genetic Privacy Laws.

51.    For these reasons, neither the transfer of the Debtors' assets to a wholly owned subsidiary nor the sale of that subsidiary's equity to TTAM implicates the State Privacy Laws.

---

[39]    *Id.* § 503A.001(3).

(iii)   *To the Extent the TTAM Transaction Is Covered by the State Privacy Laws, the Transaction Complies With Those Statutes.*

52.     Even if the TTAM Transaction does implicate the State Privacy Laws, the Debtors have satisfied the requirements of the laws because the Debtors obtained consent for the processing and transfer of their customers' genetic data.

53.     The Consumer Privacy Laws generally require consent for the processing of sensitive information, including genetic information.[40]   And, although the Genetic Privacy Laws all differ slightly from one another, they generally require consent for a transfer or disclosure of genetic information.[41]

54.     The Debtors received affirmative consent for the collection, use, and sharing of genetic information.  As noted above, when consumers consented to the Debtors' privacy policy, they consented to the following terms that disclosed that a consumer's personal information may be shared with "corporate affiliates" or to other parties as part of a "bankruptcy, merger, acquisition, reorganization, or sale of assets":

> **Commonly owned entities, affiliates and change of ownership:** If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity.  We may also disclose

---

[40]   *See, e.g.*, CPA § 6-1-1308(7); CTDPA § 42-520(a)(4); ICDPA § 24-15-4-1(5); MCDPA § 325O.07(2)(d); OCPA § 646A.578(2)(b); TDPSA § 541.101(b)(4); VCDPA § 59.1-578(5).  As described above, the Consumer Privacy Laws generally also require consent to or opt-out from a sale, but specifically exempt the TTAM Transaction from the definition of sale.  *See* CPA § 6-1-1306(1); CTDPA § 42-518(a)(5); ICDPA § 24-15-3-1(b)(5); MCDPA § 325O.05(1)(f); OCPA § 646A.574(1)(d); TDPSA § 541.051(b)(5); VCDPA § 59.1-577(5); *see also* CPA § 6-1-1303(23)(a)(III); TDPSA § 541.001(28)(C); VCDPA § 59.1-575; MCDPA § 325O.02(u); ICDPA § 24-15-2-27; CTDPA § 42-515(37).

[41]   *See, e.g.*, Alaska Stat. Ann. § 18.13.010(a)(1); Cal. Civ. Code § 56.181(a)(2)(D); Va. Code Ann. § 59.1-596(B); Minn. Stat. 325F.995, Subd. 2(2); Mo. Rev. Stat. § 375.1309(1); Fla. Stat. Ann. § 760.40(2); Vt. Stat. Ann. tit. 18, § 9332(e); S.C. Code Ann. § 38-93-40(A); N.H. Rev. Stat. § 141-H:2(III); Ky. Rev. Stat. Ann. § 311.705(2)(b); N.Y. Civ. Rights Law § 79-1(2)(d); N.M. Stat. Ann. § 24-21-3(B); Tex. Bus. & Com. Code Ann. § 503A.003.

> Personal Information about you to our corporate affiliates to help operate
> our services and our affiliates' services.[42]

55.    Furthermore, as discussed above, the 23andMe privacy statement has, since

its inception, had a similar statement that personal data may be disclosed in the event of an

acquisition:

> In the event that 23andMe goes through a business transition such as a
> merger, acquisition by another company, or sale of all or a portion of its
> assets, your personal information and non-personal information will likely
> be among the assets transferred.  You will be notified in advance via email
> and prominent notice on our website of any such change in ownership or
> control of your personal information.  We will require an acquiring company
> or merger agreement to uphold the material terms of this privacy statement,
> including honoring requests for account deletion.[43]

56.    Further, the Debtors required a consumer's permission for specific optional

disclosures, including sharing aggregate genetic information with third parties for research

purposes,[44] sharing de-identified individual-level information with certain third parties for

research purposes,[45] and for storing a consumer's biological sample for research.[46]  TTAM

plans to ensure consumers' personal and genetic data be used only as permitted in their

---

[42]    Privacy Statement, 23AndMe (available at https://www.23andme.com/legal/privacy/full-version/) (last updated March 14, 2025).

[43]    Vibbert Decl. ¶¶ 7-23.  The CPO Report asserts that the absence of the word "bankruptcy" from this disclosure in the privacy statements from February 2022 and earlier makes a material difference in consumers' understanding of how their data may be transferred.  But as noted above, there is no reason why the failure to explicitly mention "bankruptcy" matters so far as consumer consent is concerned.  Bankruptcy is just one mechanism through which an acquisition or change of ownership can occur—a more protective mechanism, in fact, because such acquisition or change of ownership needs to be approved by a court.

[44]    Research Consent Document, 23AndMe (available at https://www.23andme.com/about/consent/) (last accessed June 12, 2025).

[45]    Individual Data Sharing Consent, 23AndMe, (available at https://www.23andme.com/about/individual-data-consent/) (last accessed June 12, 2025).

[46]    Biobanking Consent Document, 23AndMe (available at https://www.23andme.com/about/individual-data-consent/) (last accessed June 12, 2025).

consents. Of course, TTAM also will abide by consumer's subsequent preferences—including opting out of any personal data sharing, deletion of data and samples, and other indications of privacy preferences.[47]

57. Because the Debtors received consent as required by the State Privacy Laws, the TTAM Transaction is in compliance with the State Privacy Laws. Accordingly, if the State Privacy Laws are even implicated by the TTAM Transaction, the Court should approve the transaction pursuant to section 363(b)(1)(B) of the Bankruptcy Code.

---

[47] Texas has objected based on individual's property right in their genetic data and the concomitant right to control the use and disclosure of their genetic data. Tex. Obj. at 7-10. But as noted, the TTAM Transaction does not change their property right—Texas consumers will continue to own the right to control the use and disclosure of their data.

## CONCLUSION

WHEREFORE, TTAM respectfully requests that the Court (a) overrule the objections, (b) enter the Sale Order, and (c) grant such other and further relief as may be just and proper.

Dated: St. Louis, Missouri
June 17, 2025

BRYAN CAVE LEIGHTON PAISNER LLP

*/s/* David M. Unseth
David M. Unseth, #48086MO
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102-2750
Telephone: (314) 259-2000
Fax: (314) 259-2020
Email: david.unseth@bclplaw.com

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Joseph O. Larkin (admitted *pro hac vice*)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001
Email: Joseph.Larkin@skadden.com

– and –

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Kenneth Hershey (admitted *pro hac vice*)
Emma McCabe (admitted *pro hac vice*)
295 Fifth Avenue
New York, NY 10016
Telephone: (212) 849-7000

Fax: (212) 849-7100
Email: susheelkirpalani@quinnemanuel.com
       kenhershey@quinnemanuel.com
       emmamccabe@quinnemanuel.com

– and –

Cameron Kelly (admitted *pro hac vice*)
700 Louisiana Street, Suite 3900
Houston, TX 77002
Telephone: (713) 221-7000
Fax: (713) 221-7100
Email: cameronkelly@quinnemanuel.com

*Counsel for TTAM*