IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| 23ANDME HOLDING CO., *et al.*,[1] | Case No. 25-40976 (BCW) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF ANNE E. WOJCICKI IN SUPPORT OF
THE OMNIBUS REPLY OF TTAM RESEARCH INSTITUTE
IN SUPPORT OF THE ENTRY OF THE SALE ORDER**[2]

---

[1] A complete list of Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe. The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2] *See Omnibus Reply of TTAM Research Institute in Support of the Entry of the Sale Order* (hereinafter, the "**TTAM Reply**").

I, Anne E. Wojcicki, hereby declare the following facts to the best of my knowledge, information, and belief:

### Background About Me And 23andMe[3]

1. I am the co-founder, former Chief Executive Officer ("**CEO**"), and an existing equity owner of 23andMe Holding Co. (collectively with its subsidiaries, "**23andMe**" or the "**Debtors**"). I submit this declaration as my proposed direct testimony in support of the Response filed by TTAM Research Institute ("**TTAM**") and the Court's consideration of TTAM as the Winning Bidder and Purchaser of the Acquired Assets.

2. My interest in health sciences and the human body began when I was a child. I was raised in California by my parents with my two sisters. My father was a physics professor at Stanford University and my mother was an educator and journalist. My parents instilled in me the value of being an advocate, and I developed a passion for healthcare and biology. Over the years, this passion grew as I grew, all while furthering my education and eventually earning a Bachelor of Science degree in biology from Yale University in 1996. I conducted molecular biology research at the National Institutes of Health, University of California, San Diego, and Yale. These institutions gave me transformative opportunities to learn about groundbreaking science, including the exploration of genetics. My work experiences, plus my lab experiences, ultimately led me to co-found 23andMe, the Debtors in these chapter 11 proceedings.

3. As co-founder and CEO of 23andMe from its inception in 2006, I saw 23andMe as an opportunity to transform how healthcare research is conducted and to empower individuals by giving them meaningful access to information and real choice into how their information is used

---

[3] Capitalized terms not defined herein have the meaning ascribed to search terms in the TTAM Reply or the Sale Order, as applicable.

to contribute to scientific advances. I wanted to democratize data and research—and, by doing so, accelerate the pace of discoveries in the world.

4. As 23andMe grew, it became clear that our research program was truly groundbreaking. We built the world's largest re-contactable genetic research community by developing one of the most diverse genetic datasets in existence, in partnership with our customers who voluntarily completed surveys that pioneered this effort and enabled a robust, anonymized (or deidentified) research dataset.

5. With this scale of data collection, I was (and remain) cognizant of the importance of privacy and a fierce advocate of the same. Consumers' rights to direct the use of their genetic data is one of the most foundational aspects of the 23andMe business model. It was with a commitment to transparency and choice that we were able to build the relationships with our consumers that enabled data collection of this scale. This is a commitment to our users that TTAM will continue to keep following the acquisition of 23andMe.[4]

6. 23andMe's privacy statements and practices have always provided consumers the ability to choose whether to participate in 23andMe's research by opting in or out at any time.[5] The privacy policies further allow consumers to choose to participate in either an aggregated or deidentified way, and to withdraw such consent at any time. By the time the Debtors' entered these chapter 11 proceedings, over 80 percent of customers had chosen to participate in research and contributed by completing online surveys. As a result of this level of participation and the scale of our work, 23andMe has been cited in almost *three hundred* peer-reviewed scientific

---

[4] *See generally TTAM Purchase Agreement* (hereinafter, and as defined in the Sale Order, the "**Purchase Agreement**") at Exhibit D (Voluntary Consumer Protection and Privacy Safeguards Term Sheet).

[5] *See* ECF 718, *Report of Consumer Privacy Ombudsman* (June 11, 2025) (hereinafter, the "**CPO Report**") at 132 (Appendix B: Current Privacy Statement) (reflecting a number of "opt-in" or "opt-out" choices available for consumers).

3

publications.[6]  Access to this breadth of data is profound in its ability to support previously unimaginable research investigations, and the trailblazing results of our collaborations with research partners confirm this time and time again.

7. I served as CEO of 23andMe until March 23, 2025, two days after the Special Committee of 23andMe's Board of Directors indicated its plan to pursue a sale of the Debtors through this chapter 11 bankruptcy process.  I resigned with the intention of pursuing an acquisition of 23andMe during the Debtors' Auction process as an independent bidder.  My participation in the Auction through TTAM has been a hard-fought effort to retain the company that I have built and to continue supporting the values that have underpinned the company since I co-founded it in 2006, namely:  (1) enabling consumers' access to their own genetic data in a manner that is transformative to ensuring they receive effective healthcare and preventative care, and (2) facilitating health sciences research by maintaining the democratization of 23andMe's deidentified dataset for all qualified scientists to utilize.

### TTAM's Participation In The Chapter 11 Auction Process

8. Following my resignation and the initiation of these chapter 11 proceedings, I founded TTAM Research Institute, a California nonprofit public benefit corporation with the goal that it will be qualified as a "medical research organization" public charity under Section 501(c)(3) of the Internal Revenue Code to serve as a bidder in the Debtors' chapter 11 auction process.  Until

---

[6] *See* 23andMe, *Publications* (last accessed June 12, 2025) (reporting that "[s]ince 2010, 23andMe has published 293 papers" and linking each publication), https://www.23andme.com/publications/.  By way of example, these research contributions include: Austeja Ciulkinyte, et. al, *Genetic Neurodevelopmental Clustering and Dyslexia*, 30 MOLECULAR PSYCHIATRY 140 (2025), https://www.nature.com/articles/s41380-024-02649-8; Matthew J Kmiecik, *Genetic Analysis and Natural History of Parkinson's Disease Due to the LRRK2 G2019S Variant*, 147 BRAIN 1996 (2024), https://academic.oup.com/brain/article/147/6/1996/7676517?login=false; Nora Strom, et al, *Genome-Wide Association Study Identifies 15 Common Risk Variants Associated With Obsessive-Compulsive Disorder*, 91 BIOLOGIC PSYCHIATRY 462 (2022), https://www.biologicalpsychiatryjournal.com/article/S0006-3223(22)00785-5/abstract#relatedArticles

4

I founded TTAM with the express purpose of bidding in the Debtors' auction, TTAM did not exist. As it did not exist prior to these chapter 11 proceedings, TTAM is not and was never affiliated with the Debtors.  TTAM has never been associated with the Debtors in any way other than as a third-party bidder in the Auction and the Final Bidding Round for the Debtors' assets.

9. As noted above, I resigned from my role as CEO of the Debtors prior to the commencement of their bankruptcy cases.  I am also a shareholder, currently with less than 20 percent of the total equity and 11 percent of the voting power, and a board member—but the Debtors' chapter 11 proceedings have been directed exclusively by the Special Committee (and management), and I have not attended any board meetings, including Special Committee meetings, or participated in the Special Committee's deliberations or decision-making throughout the proceedings, the Auction, or the Final Bidding Round.  In fact, since resigning as CEO, I have not participated in the Debtors' decision-making process in any manner, including regarding whether to commence these chapter 11 cases, whether to pursue the Sale Transaction, how to establish the Bidding Procedures, or whether to agree to the Final Proposal Procedures.[7]

10. Likewise, TTAM has not participated in any of the Debtors' decision-making process in any manner throughout these chapter 11 proceedings, including with respect to the commencement of these chapter 11 cases, the Sale Transaction, the Bidding Procedures, or the Final Proposal Procedures.  TTAM is not affiliated with the Debtors, and TTAM has no relationship with the Debtors other than as an arm's-length participant in the Debtors' Auction on May 14, 2025, through May 16, 2025, and Final Bidding Round on June 13, 2025.  After multiple

---

[7] Through counsel, I had objected to the Debtors' initial decision to select another bidder as the Successful Bidder and asked the Court to reopen the bidding.  The Final Proposal Procedures represented an arm's-length settlement of those issues negotiated by and among the Debtors, TTAM, and the other bidder.

5

rounds of competitive bidding against several other bidders, TTAM was selected by the Debtors as the Winning Bidder with its bid of $305 million. By virtue of becoming the Winning Bidder, TTAM is the proposed Purchaser of the Acquired Assets pursuant to the Purchase Agreement and the proposed Sale Order.[8]

11. While TTAM itself is not an affiliate of the Debtors, I am the CEO and President of TTAM and a member of its board of directors. The other members of the board are my sister, Janet Wojcicki, and the CEO of my family office, Stephen Magowan (who also serves as Treasurer and Secretary of TTAM as of the date hereof). The entirety of TTAM's purchase price is funded by charitable contributions from me personally (including through investment vehicles that I own) and through grants from my private foundation (The Anne Wojcicki Foundation). As noted above, I founded TTAM expressly for the purpose of acquiring 23andMe, and if the proposed sale to TTAM is approved, I will resume direct involvement in 23andMe's strategic planning and day-to-day operations. Moreover, as discussed below, TTAM will continue to employ 23andMe's employees and subcontractors, and 23andMe's robust data privacy protections will remain in place and will even be enhanced.

### The TTAM Research Institute Sale Transaction

12. Pursuant to TTAM's Winning Bid on June 13, 2025, if approved by the Court, TTAM will acquire the Debtors' Acquired Assets in the manner set forth in the Purchase Agreement and the Sale Order (as more specifically defined in the Sale Order, the "**Sale Transaction**"). Through the purchase of the Acquired Assets of 23andMe in the Sale Transaction, TTAM will continue the Debtors' mission (and my own) to empower consumers with the

---

[8] *See generally* Purchase Agreement.

knowledge of their genetic material and to contribute to more groundbreaking health science research for the benefit of *all* humans, through a nonprofit entity.

13. At the time of the chapter 11 filing, 23andMe had robust privacy policies and statements in place to protect consumers and their data.[9] These policies, which I played a significant role in fashioning, remain in place today and reflect the commitment to consumers that 23andMe will not share consumers' Personal Information (defined by the policy to include both identifying data and deidentified data) with public databases, insurance companies, employers, or law enforcement absent a valid court order, subpoena, or search warrant.[10] Now and as of the date the Debtors' entered chapter 11, 23andMe's privacy policies also provide that consumers can choose whether to (i) have 23andMe store their sample and/or (ii) participate in 23andMe's research.[11] Importantly, consumers also have the right to delete their account, delete their data, destroy their samples, and opt out of 23andMe's research, at any time.[12] These are just some of the core ways that 23andMe's policies were designed to respect consumers' interests in their own genetic data—including the right to decide whether their data will support 23andMe's research.

14. After the closing of the Sale Transaction, our privacy policy at TTAM will be the same as 23andMe's privacy statements in effect as of the commencement of these chapter 11 proceedings, plus certain additional privacy-forward enhancements contained in TTAM's Voluntary Consumer Protection and Privacy Safeguards Term Sheet.[13] TTAM has committed to

---

[9] *See, e.g.,* CPO Report at 129 (Appendix B: Current Privacy Statement) (reflecting that it was last updated on March 13, 2025). *See also* Privacy Policy (last accessed June 12, 2025), *https://www.23andme.com/legal/privacy/full-version/*

[10] CPO Report at 130.

[11] CPO Report at 132.

[12] CPO Report at 132.

[13] Purchase Agreement, Exhibit D.

7

maintain *in perpetuity* 23andMe's current policies with respect to allowing consumers to (i) delete their accounts and genetic material and (ii) opt out of participating in 23andMe's research.[14] In other words, consumers can change their minds at any time, and TTAM will honor that decision, just as the Debtors have always done. In addition, in an effort to comply with all regulatory standards that are in place to protect consumers, TTAM will also establish a Consumer Privacy Advisory Board to advise TTAM on an ongoing basis regarding applicable state and federal privacy laws.[15] TTAM appreciates the importance of this Sale Transaction for all stakeholders—especially 23andMe's customers. With that in mind, TTAM has also committed to a robust notice campaign in advance of the Closing Date, which will apprise customers of the Sale Transaction (along with the identity and mission of the Purchaser), inform customers that their data will continue to be protected according to the same principles that governed their data at 23andMe, and remind them of their privacy rights, including their rights to opt-out of research and to delete their data.[16]

15. Although TTAM, as a nonprofit, is not subject to all of the same privacy laws as for-profit entities, following the Closing, TTAM will comply with all obligations under applicable state privacy laws, including those governing genetic privacy and consumer health privacy, as if it were a for-profit entity. Furthermore, TTAM has agreed to limit the types of institutions that could

---

[14] *See* Purchase Agreement, Exhibit D (TTAM "agrees to uphold in perpetuity 23andMe's current policies as in existence on the Petition Date regarding customers' rights to delete their accounts and genetic data and/or opt out of research.").

[15] *See* Purchase Agreement, Exhibit D.

[16] *See* Purchase Agreement, Exhibit D (This notice will include: "1. The identity of TTAM as the expected purchaser of the Debtors' assets; 2. A high-level summary of TTAM's proposed post-closing business operations, which will align with 23andMe's business operations, with the exception of certain nonprofit-related limitations for more narrow research; 3. The anticipated Closing Date; 4. A statement confirming that TTAM will adhere to 23andMe's existing privacy policies; and 5. A reminder that customers may delete their data, delete any samples, and/or opt out of research, along with clear instructions on how to do so.").

8

acquire TTAM by restricting any sale associated with any merger or restructuring to prospective buyers that agree to comply with all of TTAM's privacy policies and applicable privacy laws.[17] In addition, TTAM will not sell or share individual customer accounts or genetic data with any insurance company or any entity controlled by an insurance company, except with the explicit authorization of the applicable customer. Consistent with its mission, TTAM does plan to collaborate with qualified researchers to advance scientific discoveries through the sharing of deidentified data provided either in aggregate form or, where individual-level, deidentified data is shared, only with customer consent. All data sharing will adhere to TTAM's privacy policy and to the commitments outlined above as more fully described in the Voluntary Consumer Protection and Privacy Safeguards Term Sheet.[18]

16. In addition to maintaining data privacy, TTAM is also committed to ensuring that customers' data is secured. For example, TTAM will have "best practice" security measures in place—including two-step authentication measures for all customers and employees—and TTAM plans to offer customers two years of complimentary identity theft protection for all customers.[19] Internally, TTAM plans to undergo hypothetical security breach exercises designed to ensure that TTAM is prepared to respond swiftly and effectively in the event of a breach.

17. With these privacy and security measures in place, TTAM will continue 23andMe's mission to participate in medical and health science research with the incomparable benefit of the

---

[17] *See* Purchase Agreement, Exhibit D ("TTAM will not sell or transfer customers' genetic data in connection with any, merger, acquisition, bankruptcy, reorganization or asset sale unless the transferee (i) is another domestic non-profit research institution or a domestic for-profit entity that satisfies all CFIUS and other applicable regulatory requirements and (ii) agrees to adopt TTAM's privacy statements and comply with all applicable state and federal laws.").

[18] Purchase Agreement, Exhibit D.

[19] Purchase Agreement, Exhibit D ("TTAM will offer individuals two (2) years of complimentary identity theft monitoring, which monitors individuals credit files and detects threats with a Dark Web surveillance report, from Experian.").

9

world's largest dataset of genetic material. In my role as CEO and President of TTAM, my customer-first, research-driven approach will be the same as it has always been—and I will assure customers that TTAM will continue to uphold the values and commitments that 23andMe made to them when they signed up. Now, though, TTAM will have the benefit of operating the 23andMe direct-to-consumer business as a private, nonprofit research institution—rather than as a public company with numerous third-party shareholders. Furthermore, as an independent nonprofit, TTAM will have the capacity to partner with worthy third-party researchers, including hospitals, universities, pharmaceutical companies, and other research institutions—meaning the data will not be inherently monopolized by one entity only for the benefit (and profitability) of that entity. Such an outcome would be antithetical to the approach of 23andMe, which sought to democratize access to data for researchers, and asynchronous with the type of direct-to-consumer company that customers contracted with.

18. I also note that the CPO Report recognized this important distinction between the TTAM bid and the Regeneron bid. The CPO Report explained:

> One other point to consider in relation to Regeneron specifically is that, it is the CPO's understanding that, Regeneron plans on using the Company's existing consents for its own use cases. This creates a unique concern for Regeneron because it is unclear that the Company's customers would have reasonably anticipated that their consent would extend to the use of their data for a completely different company in a completely different industry (this is in contrast to TTAM, which has a more plausible claim that Company customers have a relationship with the new entity, given the involvement by Anne Wojcicki, the Company's co-founder and former CEO).[20]

19. TTAM, as a nonprofit medical research organization, intends to use the privilege of safeguarding the genetic and sensitive personal data to accelerate discovery and research by enabling qualified researchers to analyze data. TTAM also expects this approach will continue to

---

[20] CPO Report at 114.

10

foster competition and generate progress in data analysis. All data sharing will be on a deidentified basis, whether through aggregate research results or, in certain cases, individual-level deidentified data sharing with customer consent. TTAM will continue providing consumers with 23andMe products and services in the same manner as 23andMe and in accordance with the consents individuals have provided.

### TTAM Is Fully Funded And Well Positioned To Lead The Post-Transaction 23andMe

20. Following the Sale Transaction, TTAM will lead the 23andMe business (as defined by the Acquired Assets) with the benefit of (i) adequate capital and (ii) an experienced executive team.

21. *First,* TTAM has cash and/or grant commitments that will provide, in addition to capital sufficient to satisfy the proposed purchase price, no less than $84.0 million of working capital, an amount which based on the Debtors' estimates will be sufficient to cover cure amounts and operating costs for the first twelve months following closing. This funding is also in addition to the resources TTAM has available to provide incentive compensation to key employees during the same period. As a result, TTAM will have substantial capital and liquidity to operate the business prudently after closing and meet its future performance requirements under the Transferred Contracts.

22. *Second*, TTAM has a highly skilled team to lead the business post-closing. There are only a handful of people in the world who have experience in running a direct-to-consumer genetic testing company—and I am one of them. I will bring my unique expertise from co-founding and running 23andMe for nearly two decades to TTAM. With me at the helm, TTAM also expects to retain key executives and employees of the Debtors who possess deep knowledge of the business and the expertise to drive success within TTAM's platform. I believe strongly in

11

the 23andMe workforce, so much so, that with respect to the Acquired Assets that are the subject of the Sale Hearing, TTAM is seeking to maintain the 23andMe workforce and will make offers to all employees.[21] TTAM also plans to keep in place 23andMe's subcontractors, thereby minimizing disruptions for the business and for users, and avoiding unnecessary sharing of sensitive data with new service providers. In fact, with the continuation of 23andMe's workforce (including the executive team) and subcontractor relationships, TTAM does not anticipate having to disclose genetic data to *any* new parties as a result of the transaction.

23. With the foregoing principles in mind, TTAM looks forward to operating the Acquired Assets in a manner that is consistent with the values that have always underpinned my vision for 23andMe—and I look forward to the innovative and transformative contributions we will undoubtedly make through TTAM.

---

[21] *See* Purchase Agreement § 8.1.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 16, 2025  /s/ _____

Anne E. Wojcicki
*President and CEO of TTAM Research Institute*