# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>23ANDME HOLDING CO., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  25-40976-357<br><br>(Jointly Administered) |

## STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF SALE

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this statement (the "Statement") in support of the proposed sale of substantially all of the Debtors' assets as set forth in the June 13, 2025 asset purchase agreement (the "APA") with TTAM Research Institute ("TTAM").[2]  In support of this Statement, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Modern-day bankruptcy emanated from the Bankruptcy Reform Act of 1978, codifying a new chapter 11, which remains the template for corporate reorganizations today.[3]  In adopting the 1978 Act, Congress believed that "[t]he purpose of a business reorganization case

---

[1]      The Debtors in each of these cases are: 23andMe Holding Co., 23andMe, Inc., 23andMe Pharmacy Holdings, Inc., Lemonaid Community Pharmacy, Inc., Lemonaid Health, Inc., Lemonaid Pharmacy Holdings Inc., LPharm CS LLC, LPharm INS LLC, LPharm RX LLC, LPRXOne LLC, LPRXThree LLC, and LPRXTwo LLC.  The Debtors' service address for purposes of these Chapter 11 Cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]      Docket No. 739.

[3]      Pub. L. No. 95-598, 92 Stat. 2549 (1978) (effective Oct. 1, 1979) (codified, as amended, at 11 U.S.C. §§ 101 *et seq.*).

[under Chapter 11]…is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders."[4]  To achieve these goals, the Supreme Court has recognized the need for flexibility to facilitate reorganization.[5]

2.      Facing unsustainable losses, dwindling liquidity, and litigation overhang from a 2023 data breach, the Debtors availed themselves of the protections of chapter 11.  Following a robust marketing and auction process, the Debtors now seek approval of a sale to TTAM, a non-profit entity controlled by Anne Wojcicki, the Debtors' co-founder, former CEO, board member, and equity holder.

3.      The sale of the Debtors' businesses is a substantial achievement in these cases that exemplifies the core goals of bankruptcy espoused by Congress in adopting the 1978 Act.  The sale will ensure that the Debtors' business continues with fresh liquidity to sustain operations and provide customers the same services and benefits they receive today.  Employees will retain their jobs.  Vendors will have a continuing business partner.  And, with a $305 million purchase price, creditors, including customers harmed by the 2023 data breach, will realize a meaningful recovery on their claims.

4.      The Committee believes that the sale should be approved as a sound exercise of the Debtors' business judgment.  The sale will pave the way for a plan that delivers meaningful value to stakeholders and an orderly wind down of these cases.  The Committee is comprised of a diverse set of interests, including creditors that speak for more than 7 million current and former customers asserting substantial claims against the Debtors.  These creditors have, through hard-fought

---

[4]      H.R. Rep. No. 95-595, at 220 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6179.

[5]      *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203 (1983).

litigation, advocated for the rights of customers who stand to lose substantial value and benefits if the sale is not approved.

5.      As the Court knows, the sale includes the Debtors' interest in customers' PII, including genetic data, which has been the center of much attention in these cases.  The Debtors and TTAM have taken affirmative steps to address the concerns raised by various State Attorneys General, the National Association of Attorneys General, and the Consumer Privacy Ombudsman. The APA ensures that TTAM will continue to honor the Debtors' commitment to privacy and security policies and comply with applicable privacy laws.  TTAM has also agreed to enhanced privacy protections which, among other things, commit TTAM to (i) provide actual notice of the sale and a reminder that customers can delete their data and genetic sample and opt-out of research; (ii) not sell or share PII with insurance companies without explicit customer consent; (iii) establish a consumer privacy advisory board; and (iv) provide annual reporting to state attorneys general or regulatory agencies for at least three years regarding account deletion issues, material changes to TTAM's privacy policy, and notifiable data breaches.

6.      The Debtors and TTAM have further agreed to structure the transaction through an equity sale such that PII, including genetic information, is not sold to an unaffiliated third party. However, even if the Court finds that the sale constitutes a transfer of the Debtors' interest in PII to an unaffiliated entity, the sale complies with sections 363(b)(1) and (f) of the Bankruptcy Code.[6] With respect to section 363(b)(1)(A), the sale is consistent with the Debtors' current and historic privacy policies.  Since at least 2007, these policies have permitted the transfer of PII as part of a disposition of all or a portion of the Debtors' assets.  Alternatively, the sale should be approved

---

[6]      The States' argument that the Debtors have no interest in PII is baseless given the nature of the Debtors' business.  *See id.* at 204 ("[b]oth the congressional goal of encouraging reorganizations and Congress' choice of methods to protect secured creditors suggest that Congress intended a broad range of property to be included in the estate.").

under section 363(b)(1)(B), giving due consideration to the facts, circumstances, and conditions of these cases and the absence of a showing that the sale violates applicable nonbankruptcy law. Specifically, the sale balances consumers' privacy interests with the goals of chapter 11 given TTAM's commitment to the Debtors' privacy and security policies and agreement to provide enhanced privacy protections.

7.      Any argument that 363(f) is a bar to the proposed sale is meritless.  Consumers' interests in PII, including the right to control their own genetic information will continue unabated through the sale process and thereafter following the sale of the business to TTAM.  As such, PII is being transferred subject to, not free and clear of, any consumer rights or  interests.

8.      Lastly, failure to approve the sale will lead to disastrous results for all stakeholders. Beyond the obvious loss of the $305 million purchase price, there is a significant risk that creditors will receive no recovery, the estates will be administratively insolvent, and these cases will convert to chapter 7.  Business operations will cease, jobs will be lost, and creditors and customers will receive no recovery and lose access to the Debtors' services.  A chapter 7 trustee will be appointed which, as the CPO concedes, will implicate far more serious privacy issues.

9.      In short, the sale accomplishes the goals Congress envisioned when it enacted chapter 11 and harmonizes the interests of all stakeholders while protecting important consumer privacy rights.  The sale satisfies the requirements of the Bankruptcy Code and should be approved.

## BACKGROUND

I.      **Background**

   A.      **General Background**

   10.      On March 23, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Missouri (the "Court").

   11.      Since the Petition Date, the Debtors have remained in possession of their assets and continue to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

   12.      On April 3, 2025, the Office of the United States Trustee for Region 13 appointed a seven-member Committee consisting of: (i) Laboratory Corporation of America Holdings; (ii) Workday, Inc.; (iii) Telus International Services Limited; (iv) Jellyfish US Limited; (v) Whitney S. Grubb; (vi) Pamela Zager-Maya; and (vii) Michelle Igoe.[7]

   B.      **Events Leading to the Petition Date**

   13.      The Debtors are a human genetics and telehealth company offering direct-to-consumer genetic testing and telehealth services.  Anne Wojcicki co-founded the Debtors in 2006 and, from time to time thereafter, has served as the chief executive officer, director and the controlling shareholder of the Debtors.[8]  In the course of their business, the Debtors own, control, and maintain customer data and biological samples, including genetic data, genotyped data,

---

[7]      Docket No. 159.

[8]      *See Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions*, Docket No. 32 (the "First Day Declaration"), at ¶¶ 7, 19.

phenotype data, related health data, and other personally identifiable information (collectively, the "PII") of over 15 million customers.[9]

14.    In October 2023, the Debtors announced that they had suffered a data breach that compromised the personal information of approximately seven million customers.[10]  As a result, over 40 putative class actions were filed against the Debtors and various regulators initiated investigations.[11]

15.    In March 2024, Ms. Wojcicki advised the Debtors that she was interested in taking the Debtors private in light of the litigation overhang and declining sales.[12]  The Debtors formed a Special Committee of independent members of the Debtors' board of directors (the "Special Committee") to analyze Ms. Wojcicki's proposal given her status as CEO and controlling shareholder.  On September 17, 2024, the board of directors resigned citing, among other things, strategic differences with Ms. Wojcicki.[13]  On November 2, 2024, the Debtors reconstituted the Special Committee with three new directors.[14]

16.    The reconstituted Special Committee engaged Moelis & Company LLC ("Moelis") to pursue options, which began in January 2025.[15]  From February 20 through March 10, 2025, Ms. Wojcicki submitted numerous bids to acquire the Debtors.  The Special Committee rejected these bids and ultimately chose to commence these Chapter 11 Cases.[16]

---

[9]    *See id.* at ¶ 2.

[10]    *See id.* at ¶ 64.

[11]    *See id.* at ¶¶ 65, 70–72.

[12]    *See id.* at ¶ 7.

[13]    *See id.* at ¶¶ 7, 87.

[14]    *See id* at ¶ 89.

[15]    *See id.*

[16]    *See id.* at ¶¶ 96–99.

6

###### C.      The Sale Process

17.      On March 28, the Court approved bid procedures for the sale of the Debtors' assets.[17]  Following a robust marketing process, the Debtors conducted a three-day auction from May 14 through May 16.  Bidding commenced with a $52 million bid.  The auction concluded on May 16, when the Debtors selected Regeneron Pharmaceuticals, Inc.'s ("Regeneron") $256 million bid as the winning bid and TTAM's $146 million bid as the backup bid.

18.      After the auction closed, TTAM submitted a revised $305 million bid.  Following discussions with Regeneron and TTAM, the Debtors sought and obtained approval of a "last look" bid process to take place on June 13.[18]  Regeneron declined to bid further and the Debtors announced TTAM's $305 million bid as the winning bid and Regeneron's $151 million bid as the backup bid.

19.      The National Association of Attorneys General ("NAAG") on behalf of 28 states, as well as the states of Texas, California, Tennessee, and Alaska (collectively, the "States") have objected to the sale as inconsistent with sections 363(b) and (f) of the Bankruptcy Code.  The States generally contend that the Debtors cannot transfer PII unless the Debtors obtain express, affirmative consent from customers in certain States.[19]  They further argue that (i) customers'

---

[17]      *See Order (I) Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling Certain Dates and Deadlines With Respect Thereto, (III) Approving the Form and Manner of the Notice Thereof, (IV) Approving Procedures Regarding Entry Into Stalking Horse Agreement(s), if Any, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Approving Procedures for the Sale, Transfer, or Abandonment of De Minimis Assets, and (VII) Granting Related Relief.*  Docket No. 125.

[18]      *Order (I) Establishing Procedures for the Submission of Final Proposals from the Backup Bidder and Successful Bidder and (II) Granting Related Relief.*  Docket No. 657.

[19]      *See The States' Objection to the Debtors' Proposed Sale of Customers' Assets* (the "NAAG Objection") [Docket No. 687]; *The People of the State of California's Objection to Debtors' Proposed Asset Sale* [Docket No. 683]; *The State of Texas' Objection to Debtors' Sale Transaction and Proposed Sale Order* (the "Texas Objection") [Docket No. 703]; *State of Tennessee's Limited Objection to the Debtors' Motion Approving Sale of Assets* [Docket No. 693]; and *Notice of Joinder in the People of the State of California's Objection to Debtors' Proposed Asset Sale* [Docket No. 696].

existing agreement to the Privacy Statement is insufficient to constitute affirmative consent; and (ii) customers have exclusive property rights in their genetic data under state privacy laws that, absent consent, cannot be sold free and clear of the customers' interests.[20]

## II.    The Debtors' Privacy Statement and Security Protections

20.    From their inception, the Debtors have placed privacy and security at the forefront of their business. The Debtors have revised their privacy statement (the "Privacy Statement") 22 times to ensure compliance with the evolving privacy and legal landscape.[21] Since 2007, the Privacy Statement is conspicuously available to all customers, including through prominently displaying the hyperlinked word "Privacy" at the top of the 23andMe homepage and in the homepage footer.

21.    To access the Debtors' services, every customer must agree to the Privacy Statement and consent to the Debtors' use of sensitive data.[22] Further consents are obtained for additional use such as research, biobanking and individual data sharing.[23] Customers are also able to withdraw their consent at any time.[24]

22.    The Privacy Statement uses simple and clear language to describe the broad protections. The Debtors provide customers the unilateral right to modify and limit the right of a purchaser of the Debtors' business to use their data and genetic sample, as well as the right to delete it entirely. The Debtors commit not to share PII with public databases, insurance companies,

---

[20]    NAAG and Texas also filed adversary proceedings seeking a declaratory judgment that the Debtors do not have sufficient property rights in the PII to sell the data without customers' express, affirmative consent. *See* Docket Nos. 686 and 688.

[21]    *See, e.g.*, Privacy Statement, 23ANDME, (Mar. 14, 2025), https://www.23andme.com/legal/privacy/full-version/ [https://perma.cc/ https://www.23andme.com/about/consent/TB7E-L9H8].

[22]    *Id.*

[23]    *Id.*; *see also* Research Consent Document ("Research Consent"), 23ANDME, https://www.23andme.com/about/consent/ (last visited June 16, 2025).

[24]    *See* Privacy Statement; Research Consent.

employers, and law enforcement absent court order.[25] The Debtors also promise not to use sensitive PII for personalized marketing or advertising without explicit consent.[26] If customers elect to share their data for research purposes, the analyses are performed using de-identified data.[27] Any individual-level data sharing is subject to separate, explicit consent that can also be revoked.[28]

23.     The Debtors have implemented numerous security controls to protect PII.[29] As the CPO acknowledges, among other things, the Debtors maintain or conduct:

- an "Information Security Management System" to identify, assess, prioritize and mitigate risks;

- routine audits by an independent third party to detect weaknesses, which have earned the Debtors numerous certifications from the International Organization for Standardization;

- security measures for authentication, encryption, data segregation and access, including the ability to use multi-factor authentication;

- processes for assessing cybersecurity controls of new vendors;

- both internal and third-party security assessments; and

- required security training related to the handling of genetic information.

---

[25]     *See* Privacy Statement (Data Sharing Section).

[26]     *Id.* at "How We Use Your information" Section (https://www.23andme.com/legal/how-we-use-info/); *see also id. (*Data Sharing Section), in addition, PII may be shared with the Debtors' service providers (*e.g.*, IT, customer support, analytics) solely to operate the business, and these providers are bound by strict confidentiality obligations.

[27]     *Id.*

[28]     *See* Privacy Statement; Research Consent.

[29]     *See* 23andMe Holding Co., Form 10-K, at 69-70 (May 30, 2024) (https://www.sec.gov/ix?doc=/Archives/edgar/data/1804591/000180459124000038/me-20240331.htm). The CPO acknowledges the Debtors' policies and procedures addressing data security issues at pages 23 – 24 in his report.

24.     The Debtors also made updates to their security policies and procedures following the 2023 data breach incident, including by requiring multi-factor authentication for all new and existing customers.[30]

25.     Since at least 2007, the Privacy Statement has provided customers notice that PII could be transferred as part of a larger transaction, such as a sale, merger or acquisition of the business.  Between 2007 and 2010, the Privacy Statement specifically provided:

> In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your personal information and non-personal information will likely be among the assets transferred. You will be notified in advance via email and prominent notice on our website of any such change in ownership or control of your personal information. We will require an acquiring company or merger agreement to uphold the material terms of this privacy statement, including honoring requests for account deletion.[31]

26.     In 2010 the Privacy Statement was modified to read:

> In the event that 23andMe goes through a business transition such as a merger, acquisition by another company, or sale of all or a portion of its assets, your Personal Information will likely be among the assets transferred. In such a case, your information would remain subject to the promises made in any pre-existing Privacy Statement.[32]

---

[30]    *Enhanced Customer Security at 23andMe with 2-Step Verification*, 23ANDME, (Nov. 6, 2023), https://blog.23andme.com/articles/enhanced-customer-security-at-23andme-with-2-step-verification.

[31]    *See*, 23andMe Privacy Statement, 23ANDME, (Nov. 13, 2008), https://web.archive.org/web/20081113224231/https://www.23andme.com/about/privacy/ [https://perma.cc/4TWC-27P6] (last visited June 12, 2025).

[32]    *See*, 23andMe Privacy Statement, 23ANDME, (Oct. 4, 2011), https://web.archive.org/web/20111004041050/https://www.23andme.com/about/privacy/ [https://perma.cc/RC5Y-QYX2] (last visited June 12, 2025).

27.    In June 2022, the Privacy Statement was updated to its current form to include specific references to bankruptcy and reorganization, providing:

> If we are involved in a bankruptcy, merger, acquisition, reorganization, or sale of assets, your Personal Information may be accessed, sold or transferred as part of that transaction and this Privacy Statement will apply to your Personal Information as transferred to the new entity.[33]

## III.    The APA, Value and Privacy Commitments

28.    The APA delivers meaningful value to the estates in addition to the $305 million purchase price.[34]  Through the APA, TTAM has unequivocally committed to complying with the Debtors' privacy policies and all applicable privacy laws.[35]  Specifically, TTAM has agreed (i) to process all PII in accordance with existing user consents, policies and statements, terms of service, and notices as if TTAM was the Debtors; (ii) to employ appropriate security controls; and (iii) for any use not currently contemplated to inform customers of the new purpose and obtain consent of such customers, as required by applicable privacy laws (the "TTAM Privacy Commitment").[36] Given her history with the Debtors, Ms. Wojcicki is intimately familiar with the Debtors' operations and handling of PII.

29.    To address concerns raised by NAAG and certain States, including with respect to TTAM's non-profit status, TTAM has added a 4-page "Voluntary Consumer Protection and Privacy Safeguards Term Sheet" to the APA.  The document provides TTAM's explicit agreement to comply with all applicable state privacy laws as if it were a for-profit entity.  It also provides

---

[33]    *See* Privacy Statement (Data Sharing section).

[34]    The Committee notes that at the auction, TTAM agreed to exclude claims against Ms. Wojcicki and other insiders from the acquired assets, as well as all directors and officers and cyber insurance policies to ensure such assets were preserved for the benefit of the Debtors' stakeholders.  APA, Art I., Acquired Assets.

[35]    APA at § 7.11 ("Following the Closing, in connection with any and all processing of Customer Data in the operation of the Business and owned or controlled by, licensed to or otherwise in the possession of any Seller, Purchaser and its Affiliates shall (a) comply with such Seller's privacy policies and statements . . . .").

[36]    *Id.*

for TTAM's commitment to: (i) uphold in perpetuity the policy allowing customers to delete their accounts and data and/or opt out of research and to advise all customers of same before closing of the sale; (ii) revise the Privacy Statement to limit the identity of future transferees; (iii) prevent sharing of customer accounts or genetic data with any insurer or certain foreign entities; (iv) form a consumer privacy advisory board with persons knowledgeable about state and federal privacy laws; (v) develop privacy procedures to mitigate risk of security incidents and give notice to customers of changes to the privacy policies or applicable law; (vi) prepare reports for any requesting attorney general or state agency explaining customer deletions and material changes to the privacy policies; and (vii) provide individuals with 2 years of complimentary theft monitoring (together with the TTAM Privacy Commitment, the "Enhanced Privacy Protections").[37]

30.    To address the States' objections to the sale of PII to an unaffiliated third party, the Debtors and TTAM have agreed to modify the sale structure to provide for the sale of the Debtors' assets, including PII, to a newly formed, wholly-owned, affiliate ("NewCo"). The equity of NewCo will in turn be sold to TTAM (the "NewCo Equity Transfer").[38]   Accordingly, the equity of NewCo, not the Debtors' assets or PII, will be sold to TTAM.

---

[37]    *Id.* at Exhibit D.

[38]    *Id.*, at § 2.8(a). Pursuant to section 2.8(b) of the APA, TTAM may acquire all of the equity interests in the applicable Debtors rather than the directly purchasing the PII and other acquired assets.  The APA also authorizes the Debtors to pivot to a plan process if the Court denies the sale in whole or in part due to continued concerns surrounding the transfer of PII.

## ARGUMENT

### I.    The Sale Satisfies the Business Judgement Standard and Should Be Approved

31.    Courts defer to the debtor's business judgment when assessing the propriety of a proposed sale under section 363 of the Bankruptcy Code.[39]  This standard simply requires "a determination that the transaction is in the best interest of the estate."[40]  It does not require that the court substitute its judgment for that of the debtor.[41]  Business judgment is demonstrated when "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[42]  Courts in this and other jurisdictions do not interfere with directors' business decisions absent a showing of bad faith, self-interest, or gross-negligence.[43]

32.    It is uncontroverted that the sale process was not only successful, but informed, conducted in good faith, and in the best interest of the estates.  The Debtors, through the Special Committee and experienced advisors, conducted a fulsome sale process to maximize value for all

---

[39]    *See, e.g.*, *In re Trilogy Dev. Co., LLC*, No. 09-42219-DRD-11, 2012 WL 13330680, at *1 (Bankr. W.D. Mo. June 14, 2012) ("The decision to enter into [a sale] agreement out of the ordinary course of a debtor's business is to be based on the reasonable business judgment of the debtor."); *In re Borders Grp., Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011) ("In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment."); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("In determining whether to authorize use, sale or lease of property of the estate under [section 363], courts require the [debtor] to show that a sound business purpose justifies such actions. If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale.").

[40]    *In re Noranda Aluminum, Inc.*, 549 B.R. 725, 727–28 (Bankr. E.D. Mo. 2016).

[41]    *Id.* at 728.

[42]    *Borders Grp.*, 453 B.R. at 482 (citing *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

[43]    *See Borders Grp.*, 453 B.R. at 482–83 (citing *Integrated Res.*, 147 B.R. at 656; *In re Crystalin, L.L.C.*, 293 455, 464 (B.A.P. 8th Cir. 2003)) ("[T]he bankruptcy court should not interfere with the trustee or debtor-in-possession's business judgment 'except upon a finding of bad faith or gross abuse of their 'business discretion'."); *Noranda*, 549 B.R. at 728 ("The bankruptcy court should not interfere with the trustee or debtor-in-possession's business judgment except on a finding of bad faith or gross abuse of their business discretion. Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval as long as the proposed action appears to enhance the debtor's estate.") (internal citations and quotations omitted).

stakeholders. Over a three-day auction and subsequent final bidding round, the purchase price increased by more than 500% from $52 million to $305 million. The sale will result in the continuation of the Debtors' business, save jobs, and provide a go-forward business partner for vendors.

33.     The TTAM sale will also pave the way to confirmation of a chapter 11 plan that will provide a significant recovery for unsecured creditors and orderly wind down of these cases. While the full universe of claims will not be known until after the July 14 general bar date and September 19 governmental bar date, the Committee is hopeful the sale proceeds will be sufficient to pay unsecured creditors in full. Even if the Debtors revert to the $151 million Regeneron back up bid, unsecured creditors likely will receive a meaningful recovery.

34.     Importantly, the APA incorporates the Enhanced Privacy Protections and estate litigation claims against insiders—including Ms. Wojcicki—are expressly preserved. Approval of the TTAM bid as the winning bid and the Regeneron bid as the back-up bid is unquestionably an exercise of sound business judgment.

## II.     The Sale Complies with Section 363(b) of the Bankruptcy Code

35.     Section 363(b)(1) imposes certain requirements on a debtor seeking to transfer PII to unaffiliated entities. The Debtors are currently a publicly traded corporation. As such, equity in the Debtors is traded freely on the open market without running afoul of the privacy statement or applicable state privacy laws. Under the current sale structure, the Debtors will transfer PII to NewCo—a newly formed non-debtor affiliate. Following the transfer, the Debtors' will sell the equity of NewCo to TTAM. The transfer of the equity of NewCo to TTAM through the sale is functionally indistinguishable from the equity transfers that currently take place on a daily basis. This structure, therefore, eliminates concerns regarding the transfer of PII to a non-affiliated third party. A contrary finding would effectively elevate form over substance.

36.     Even if the Court were to consider the sale a direct transfer of PII to TTAM, an unaffiliated entity, the Debtors easily satisfy sections 363(b)(1)(A) or (B).  Those sections provide that PII that is subject to a privacy policy may be sold to an unaffiliated third party if:

(A)     such sale or such lease is consistent with such policy; or

(B)     after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

        i.     giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

        ii.     finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

### A.     The Sale Should Be Approved Under 363(b)(1)(A)

37.     Section 363(b)(1)(A) expressly permits the sale of PII where the sale is consistent with a debtor's privacy policies.  Courts have routinely approved the transfer of PII when consistent with a debtor's privacy policy under section 363(b)(1)(A) without the need for appointment of a consumer privacy ombudsman.[44]

38.     Since 2007, the Debtors' Privacy Statement has provided explicit and express notice to each and every customer that PII may be transferred as part of a "merger, acquisition by another company, or sale of all or a portion of its assets" so long as the purchaser adheres to the material terms of the Primacy Statement.  Customers were on notice and affirmatively agreed to

---

[44]     *See, e.g., In re Crucible Materials Corp.*, 2009 WL 8189019, at *5 (Bankr. D. Del., 2009) ("The sale of the assets is consistent with section 363(b)(1)(A) . . .  and the Debtors' privacy policy and no consumer privacy ombudsman is required in connection with the sale."), *In re Penn Traffic Co.*, 2011 WL 13499535, at *5 (Bankr. D. Del. 2011) ("The [s]ale of the [assets] is consistent with Bankruptcy Code section 363(b)(1)(A) and the [d]ebtors' privacy policy, and no consumer privacy ombudsman is necessary in connection with the [s]ale."), *In re Stant Parent Corp.*, 2011 WL 13502837, at *4 (Bankr. D. Del., 2011) ("The [s]ale of the [assets] is consistent with section 363(b)(1)(A) of the Bankruptcy Code and the [d]ebtors' privacy policy, and no consumer privacy ombudsman is necessary in connection with the [s]ale."), *In re FL 6801 Spirits LLC*, 2014 WL 3891435, at *3 (Bankr. S.D.N.Y. 2014) ("The proposed sale of the [a]ssets is consistent with section 363(b)(1)(A) of the Bankruptcy Code and the [d]ebtors' existing privacy policy, and no consumer privacy ombudsman is necessary in connection with the sale . . . .").

the transfer of PII as part of a sale of the business by accepting the Terms of Service and the Privacy Statement. While the wording may have changed over the years, the meaning, intent, and purpose has remained steadfast.

39. Notwithstanding the clear and unambiguous language of the Privacy Statement, certain States argue that the sale is inconsistent with the Privacy Statement because pre-2022 versions failed to include the words "bankruptcy" or "reorganization."[45] Such arguments are meritless and should be rejected.

40. First, these arguments run contrary to basic cannons of contractual interpretation. Unless a contrary intent appears, courts will give words their ordinary meaning and refuse to impose limitations.[46] The Privacy Statement has historically permitted the transfer of PII in connection with a sale of the Debtors' assets without qualification or limitation on the particular type of sale transaction. The addition of the word "bankruptcy" in 2022 does not mean that the previous versions precluded a sale in bankruptcy, and the Court should not countenance such a tortured reading.[47] The Court should not countenance a tortured reading of a straightforward, simple and broad term. A contrary result would create the need for extensive disclosures of the wide range of language used to describe corporate transactions involving transfers of substantially all assets and create confusion. As discussed below, this is particularly true given the legal mandate to use plain, understandable language to disclose privacy practices to consumers.

---

[45]    *See* Texas Objection, at ¶ 29; NAAG Objection, at ¶ 27.

[46]    *See, e.g.*, *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992) (noting that the broad ordinary meaning of "defend" required the defendant to indemnify costs incurred with plaintiff's assertion of affirmative defenses based on agreement to cover costs incurred "in defending" that suit); *see also Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it.").

[47]    *SeaWorld Ent., Inc. v. Andrews*, 2023 WL 3563047, at *5 (Del. Ch. May 19, 2023) (noting that "[a] particular [] phrase cannot be read to pollute the larger linguistic sea in which it swims.").

41.     Second, the States fail to cite a single authority for the proposition that a bankruptcy sale falls outside the general understanding of the word "sale."[48]   As the Court is aware, a bankruptcy sale is functionally equivalent to a sale outside of bankruptcy, albeit more restrictive in that they are court supervised, and provide parties in interest with the added protections of section 363.[49]  Indeed a sale outside of bankruptcy invites greater risk to the consumer that private parties contracting may not agree to privacy policies and state privacy laws.  The States present no plausible argument as to how one would read the pre-2022 Privacy Statements to somehow exclude a sale of substantially all of the Debtors assets in a more restrictive bankruptcy sale subject to court oversight and approval.[50]

42.     Third, the States' argument that the failure to specifically reference "bankruptcy" in the Privacy Statement amounts to a prohibition on a bankruptcy sale runs contrary to the very purpose of privacy policies.   Privacy policies are intended to set consumers' reasonable expectations about what, how, and for what purpose their PII will be processed.[51]  To achieve that goal, businesses are required to describe their privacy and security practices using plain,

---

[48]     *See Iowa v. McFarland*, 110 U.S. 471, 478 (1884) ("A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent."); *Camacho v. Ford Motor Co.*, 993 F.3d 308, 312 (5th Cir.  2021) (stating that when faced with an undefined statutory term, courts should apply common meaning unless a more precise definition is clear from context, and that the dictionary definition of "sale" is "the action or an act of selling or making over to another for a price"); *Sale*, BLACK'S LAW DICTIONARY (12th ed.  2024) ("The transfer of property or title for a price") (citing UCC § 2-106).

[49]     *See Daumit Stores, Inc. v. Brown*, 249 Miss. 528, 536, 163 So. 2d 466, 469 (1964) ("A sale by a trustee in bankruptcy is like any other sale and must meet the requirement that there must be something to sell, that is to say, an asset of the bankruptcy property, and there must be a consideration paid for such property.").

[50]     *See Elhouty v. Lincoln Ben. Life Co.*, 121 F. Supp. 3d 989, 995 (E.D. Cal. 2015) ("[A] word with a broad meaning . . . may be used for that very reason — its breadth — to achieve a broad purpose."); *see also USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 535 (7th Cir. 2022) (recognizing same).

[51]     *See, e.g.*, Cal. Code Regs. § 7011(a) ("The purpose of the privacy policy is to provide consumers with a comprehensive description of a business's online and offline information practices . . . .").

understandable language, and at a level sufficient that a reasonable consumer would not be taken by surprise.[52]

43.    The Debtors' disclosures concerning the transfer of PII as part of a "sale" in their Privacy Statement are consistent with this standard.  Taken to an illogical conclusion, the States' argument would seemingly require the Privacy Statement to be even more descriptive than simply using the word "sale."[53] To be able to effect a transaction the Privacy Statement would need to describe the countless subcategories of sales and mergers, such as a foreclosure sale, public sale, private sale, asset sale, or stock sale. As for mergers, the statement would need to reference a reverse merger, horizontal merger, or a vertical merger.  Consistent with applicable law, the Privacy Statement does not use "highly technical or legal jargon."  Rather, it uses straightforward, easy-to-understand language, which explains to customers that PII may be transferred as part of a "sale," regardless of the type or form. Consistent with these principles, courts routinely approve the transfer of PII in bankruptcy sales both where the word "bankruptcy" was not specified as a potential mode of sale, and where the policy explicitly prohibited a transfer of PII or other sensitive data.[54]

---

[52]    *See, e.g.*, 4 CO ADC 904-3:6.02(F) ("The level of specificity in a privacy notice should enable a Consumer to understand, in advance or at the time of the Processing, the scope of the Controller's Processing operations, such that a Consumer should not be taken by surprise at a later point about Personal Data that has been collected and the ways in which Personal Data has been Processed."); s*ee also* California Attorney General's Office*, Guidance: Making Your Privacy Practices Public: Recommendations on Developing a Meaningful Privacy Policy* (2014) ("A meaningful privacy policy statement addresses significant data collection and use practices, uses plain language, and is presented in a format that enhances its readability."); Virginia Consumer Data Protection Act (VCDPA) § 59.1-578 ("Controllers shall provide consumers with a reasonably accessible, clear, and meaningful privacy notice . . . .").

[53]    This is also true of the words "sale", "merger" and "acquisition", which can take a variety of forms.

[54]    *See* Exhibit A; CPOs have recommended, and courts have ordered, the transfer of PII in cases in which the privacy policy permitted the transfer of PII in a sale, but did not specify a sale in bankruptcy. *See, e.g.*, *In re Nasty Gal Inc.,* Case No. 16-24862 (Bankr. C.D. Cal. Feb. 7, 2017), *see also In re Family Christian, LLC*, Case No. 15-00643 (Bankr. W.D. Mich. Jun. 8, 2015).

44.    Fourth, the States argue that the Court should ignore the unambiguous language in the Privacy Statement because certain words limit transfers of PII to third parties in specific, limited circumstances.  For example, the States point to language in previous Privacy Statements that prohibited the transfer of PII to "third parties for research purposes" without "explicit consent" as evidence that PII cannot be sold under any circumstances.[55]

45.    This argument fails because such provisions clearly delineate particular transfers that are completely different than a sale of the business.  Even to the extent one could read conflict in the language, every attempt should be made to harmonize the provisions so that both can be given effect.[56]  The States' reading would moot provisions that explicitly permit the transfer of PII as part of a sale permitted by the Debtors' privacy policies for almost 20 years.  A more reasonable interpretation is that the Privacy Statement permits transfers in defined contexts, such as a sale or merger of the business, while requiring consent for other uses, such as discrete transfers to third parties for research purposes.  This reading comports with the plain language and gives meaning to all parts of the Privacy Statement.

**B.    The Sale Should Be Approved Under Section 363(b)(1)(B)**

46.    Even if the Court were to determine that the sale to TTAM included a transfer of PII that was not in strict compliance with the Privacy Statement, the sale should still be approved under section 363(b)(1)(B). That section allows a court, after the appointment of a CPO, to approve a sale when two conditions have been met.  First, where the sale is found to be appropriate after

---

[55]    *See* NAAG Objection, at ¶ 28; Texas Objection, at ¶ 29.

[56]    See *Nat'l Nurses Org. Comm.-Missouri & Kansas/Nat'l Nurses United v. Midwest Div.-RMC, LLC*, 25 F.4th 1073, 1076 (8th Cir. 2022) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect") (quoting Restatement (Second) of Contracts § 203(a) (1981)); *Hudson v. ConAgra Poultry Co.*, 484 F.3d 496, 503 (8th Cir. 2007) ("[a] common-law rule of construction . . . 'a document should be read to give effect to all its provisions and to render them consistent with each other.'")

due consideration of the facts, circumstances, and conditions of such sale.[57]  And second, where
no showing has been made that the sale would violate applicable nonbankruptcy law.[58]  Where
these conditions are satisfied, a sale of PII can be approved notwithstanding any real or perceived
limitations in a debtor's privacy policy.[59]  In fact, courts and CPOs routinely support and approve
sales of PII in circumstances where such sales were inconsistent with a debtor's privacy policy.[60]

(i)    The Facts, Circumstances, and Conditions Support Sale Approval

47.  Approval of the sale of PII to TTAM under the APA is warranted by the applicable
"facts, circumstances, and conditions."[61]  Factors relevant to this inquiry include: "(1) the debtor's
privacy policy; (2) the potential losses or gains of privacy to consumers if such sale or such lease
is approved by the court; and (3) the potential costs or benefits to consumers if such sale or such
lease is approved by the court."[62]  Applied to the facts of this case, each of these factors weigh in
favor of the sale.

---

[57]  11 U.S.C. § 363(b)(1)(B)(i).

[58]  11 U.S.C. § 363(b)(1)(B)(ii).

[59]  *See* Report of Warren E. Agin, *In re Aeropostale, Inc. et al.*, 555 B.R. 369 (Bankr. S.D.N.Y. 2016), at p. 20 ("If the Court finds that the proposed sale is 'consistent' with the privacy policy, the Court should allow the sale.  At the other end of the analysis, if the Court finds that the proposed sale violates Section 5 of the FTC Act, the Court may not allow the sale.  Thus, [section] 363(b)(1)(B)(i) applies to those situations where the proposed sale is inconsistent with the privacy policy, but still does not rise to the level of an unfair or deceptive business act or practice").

[60]  *See e.g., In re Northwest Family Dentistry*, Case No. 16-41750 (Bankr. W.D. Wash. Apr. 1, 2016) (approving transfer of PII where the debtor had no existing privacy policy, and the data included PHI; *In re Great Atlantic & Pacific Tea Co., Inc.*, Case No. 15-23007 (Bankr. S.D.N.Y. Sep. 11, 2015) (approving transfer of PII where the debtor's privacy policy explicitly prohibited such a transfer and the data included PHI; *In re Haggen Holdings LLC, et al.*, Case No. 15-11874, (Bankr. D. Del. Sep. 23, 2015) (same); *In re Hancock Fabrics*, Case No. 16-10296 (Bankr. D. Del. July 31, 2016) (approving transfer of PII where the debtor's privacy policy explicitly prohibited such a transfer); *In re ODI Oldco Inc.*, Case No. 24-05385 (Bankr. N.D. Ill. June 3, 2024) (same); *In re Fresh Produce Holdings, LLC, et al.*, Case No. No. 15-13485 (Bankr. D. Colo. May 21, 2015) (same).

[61]  Under section 363(b)(1)(B), the court shall consider these details after appointment of a CPO and a noticed hearing.  However, it is still the responsibility of the court to determine if the sale is warranted and to approve it.  The CPO is only to provide "information to assist the court *in its* consideration of the facts, circumstances, and conditions of the proposed sale . . ."  11 U.S.C. § 332(b) (emphasis added).

[62]  11 U.S.C. § 332.

48.    <u>The Debtors' privacy policy</u>:  As explained above, the Privacy Statement broadly protects customers and expressly permits the transfer of PII in connection with a sale.  CPOs routinely recommend, and courts approve, the sale of PII in cases with far less privacy safeguards than those agree to by TTAM through the Enhanced Privacy Protections.[63]  That includes cases in which the debtor (a) did not have an existing privacy policy,[64] (b) the privacy policy explicitly prohibited such a transfer,[65] and (c) where the policy permitted such transfer in a sale, but did not specify a sale in bankruptcy.[66]

49.    <u>The potential losses or gains of privacy to consumers</u>:  TTAM has agreed to the Enhanced Privacy Protections.  These protections, which go far beyond the protections in the Privacy Statement, increase consumer privacy protections, and eliminate any reasonable risk of privacy losses.

50.    <u>The potential costs or benefits to consumers</u>:  The sale to TTAM directly benefits consumers while giving them the benefit of their bargain. The $305 million purchase price will provide substantial value to past and current customers who have claims and were affected by the 2023 data breach incident.  Moreover, those who choose not to delete their accounts and/or information will benefit from the ongoing services by TTAM.  These services include continued access to data, health reports, ancestry features, and genetics-informed clinical care.  Past purchases by existing customers represent personal investments in their health and self-discovery,

---

[63]    *See, e.g.*, Report of Elise Frejka, *In re Great Atlantic & Pacific Tea Company, Inc.*, Case No. 15-23007 (Bankr. S.D.N.Y. Sep. 11, 2015), Dkt. No. 872.

[64]    *See, e.g.*, Report of Wesley Avery, at p. 5, *In re Northwest Family Dentistry*, Case No. 16-41750 (Bankr. W.D. Wash. Apr. 1, 2016), Dkt. No. 69 (finding that because "[t]here is no evidence before the court that the [d]ebtor ever had a privacy policy" there would be "no loss of privacy to consumers").

[65]    *See, e.g.*, Report of Lucy Thomson, *In re Hancock Fabrics*, Case No. 16-10296 (Bankr. D. Del. Jul. 31, 2016), Dkt. No. 948.

[66]    *See, e.g.*, Report of Wesley Avery, *In re Nasty Gal Inc.*, Case No. 16-24862 (Bankr. C.D. Cal. Jan. 6, 2017), Dkt. No. 357.

and a continuation of these services preserves that investment.   The alternative, a liquidation under chapter 7 by a third-party trustee would deprive consumers of these benefits.

(ii)    <u>The Transfer of PII Complies With Nonbankruptcy Law</u>

51.    In assessing whether a sale complies with nonbankruptcy law, the Court need not consider laws across all jurisdictions.  A court must only find that no showing has been made that a law likely to apply to the sale would be violated.[67]  Here, no such showing has been made, including with respect to the myriad of potentially applicable state privacy laws and state genetic privacy laws.

52.    Twenty-one comprehensive state privacy laws are now or will be in effect.[68]  These laws generally contain material requirements related to the disclosure of PII.  Businesses seeking to "sell," "share" or otherwise make PII available to a third party must provide notice to consumers,

---

[67]    *See In re S & K Famous Brands, Inc.,* 2009 WL 8189297, at *3 (Bkrtcy. E.D. Va., 2009) (finding where "there has been no showing that the transfer of the PII provided for herein violates any federal, state, international, and any other applicable nonbankruptcy laws… the sale satisfies the requirements of bankruptcy code section 363(b)(1)(B)(ii) if applicable.").

[68]    California Consumer Privacy Act (CCPA) Cal. Civ. Code §§ 1798.100 to 1798.199.100, Cal. Code Regs. tit. 11, §§ 7000 to 7304; Colorado Privacy Act (CPA), Colo. Rev. Stat. Ann. §§ 6-1-1301 to 6-1-1313, 4 Colo. Code Regs. §§ 904-3:1.01 to 904-3:11.02; Connecticut Act Concerning Personal Data Privacy and Online Monitoring (CTDPA), Conn. Gen. Stat. Ann. §§ 42-515 to 42-529e; Delaware Personal Data Privacy Act (DPDPA), 6 Del. C. §§ 12D-101 to 12D-111; Florida Digital Bill of Rights (FDBR), §§ 501.701 to 501.721, Fla. Stat., Fla. Admin. Code R. 2-3.001 to 2-3.004; Indiana Consumer Data Protection Act (INCDPA), Ind. Code §§ 24-15-1-1 to 24-15-11-2; Iowa Consumer Data Protection Act (ICDPA), Iowa Code Ann. §§ 715D.1 to 715D.9; Kentucky Consumer Data Privacy Act (KCDPA), KRS 367.3611 to 367.3629; Maryland Online Data Privacy Act (MODPA), Md. Code Ann., Com. Law § 14-4701 to 14-4714; Minnesota Consumer Data Privacy Act (MNCDPA), Minn. Stat. Ann. §§ 325M.10 to 325M.21; Montana Consumer Data Privacy Act (MCDPA), Mont. Code Ann. § 30-14-2801 to 30-14-2817; Nebraska Data Privacy Act (NEDPA), Neb. Rev. St. §§ 87-1101 to 87-1130; Nevada's online privacy law (OPL), NRS 603A.300 to 603A.360; New Hampshire Consumer Data Privacy Act (NHCDPA), N.H. RSA §§ 507-H:1 to 507-H:12; New Jersey's consumer data privacy law (NJDPA), N.J.S.A. 6:8-166.4 to N.J.S.A. 56:8-166.19; Oregon Consumer Privacy Act (OCPA), ORS 646A.570 to ORS 646A.589; Rhode Island Data Transparency and Privacy Protection Act (RIDPA), R.I. Gen. Laws § 6-48.1-1 to 6-48.1-10; Tennessee Information Protection Act (TIPA), T.C.A. §§ 47-18-3301 to 47-18-3315; Texas Data Privacy and Security Act (TDPSA), Tex. Bus. & Com. Code Ann. §§ 541.001 to 541.205; Utah Consumer Privacy Act (UCPA), Utah Code §§ 13-61-101 to 13-61-404; Virginia Consumer Data Protection Act (VCDPA), Va. Code Ann. §§ 59.1-575 to 59.1-584.

obtain their consent under specified circumstances, align their use to the consumer's reasonable expectations, and grant them rights with respect to such disclosures (e.g., the ability to opt out).[69]

53.    However, certain transactions are expressly exempt from these requirements. Similar to the express terms of the Debtors' Privacy Statement, transactions such as mergers, acquisitions or other sales of substantially all assets generally do not require separate express customer consent.  Certain of these statutes further expressly provide that sales in bankruptcy are exempt from the state law disclosure limitations.[70]  For example, the California Consumer Protection Act ("CCPA") specifies that "a business does not share personal information when "[t]he business transfers to a third party the personal information of a consumer as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the business, provided that information is used or shared consistently with [the CCPA]."[71]

54.    In addition to comprehensive state privacy laws, the Debtors are subject to compliance with a number of state genetic privacy laws that do not contain an express bankruptcy exemption. However, a reasonable interpretation of these statutes leads to a conclusion that separate consent requirements would not apply to a bankruptcy sale of substantially all assets. While, these laws include explicit notice and consent requirements related to the "disclosure" or

---

[69]    *See, e.g.*, Colo. Rev. Stat. Ann. § 6-1-1308 (Colorado Privacy Act's placement upon data controllers the duties of transparency, purpose specification, care, and avoidance of secondary use).

[70]    *See, e.g.*, Va. Code Ann. §§ 59.1-575 (excluding from the definition of "sale" of personal data "[t]he disclosure or transfer of personal data to a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's asset").

[71]    *See, e.g.*, Cal. Civil. § 1798.140(ah)(2)(C).  Similarly, businesses subject to the Health Insurance Portability Act (in the healthcare space) and Gramm-Leech-Bliley Act (in the financial sector) receive disclosure exemptions to avoid unnecessary interference into these heavily-regulated areas.

"transfer" of genetic data,[72] they do not, however, define the type of "disclosure" or "transfer" that would trigger such obligations.[73]

55.     When a statute does not define a term, courts generally employ common interpretative methods to discern its meaning. As with contractual interpretation, the starting place is a term's plain and ordinary meaning.[74] Where there is no accepted meaning, a court will consider other evidence that may assist in understanding the term. Such evidence includes how other, related statutes may define or interpret the same or similar terms and the legislative history behind the law that contains the term.[75]

56.     Based on the applicable privacy laws, which expressly exempt bankruptcy from their restrictions on the disclosure of PII, a bankruptcy sale does not amount to a "disclosure" or "transfer" under state genetic privacy laws. To interpret these terms in the context of genetic privacy laws to include a sale of a business creates an illogical inconsistency between comprehensive privacy and genetic privacy laws.

---

[72]    *See, e.g.*, KY ST § 311.705 ("[A] direct-to-consumer genetic testing company shall… [o]btain a consumer's consent for collection, use, or disclosure of the consumer's genetic data including… [s]eparate express consent for transferring or disclosing the consumer's genetic data to any person other than the company's vendors and service providers.").

[73]    Where applicable privacy laws do not specifically address the transfer of information in bankruptcy proceedings, at least one CPO has determined those state laws do not apply to the proposed sale. *See* Report of Alan Chappell, *In re HH Liquidation, LLC*, 590 B.R. 211 (Bankr. D. Del. Sept. 23, 2015) ("Neither Arizona, California, nor Oregon's medical privacy law specifically address the transfer of patient information pursuant to a bankruptcy proceeding. Accordingly, the laws of those states do not apply to the proposed transfer of Debtors' customer PHI.").

[74]    *See Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 806–07 (8th Cir. 2021) ("Where a statute . . . does not define a word, we generally give that word its ordinary meaning at the time Congress enacted the statute."); *In re Thurmon*, 625 B.R. 417, 422 (Bankr. W.D. Mo. 2020) (interpreting statute using "plain meaning" of operative, but undefined, word).

[75]    *See DeBough v. Shulman*, 799 F.3d 1210, 1212 (8th Cir. 2015) (stating that courts rely on rules of statutory interpretation, and applying rule that court must give every word of statute effect); Bryan A. Garner & Antonin Scalia, *A Dozen Canons of Statutory and Constitutional Text Construction*, JUDICATURE (2015), https://judicature.duke.edu/articles/a-dozen-canons-of-statutory-and-constitutional-text-construction/ (listing canons of construction, including, *inter alia*, *expressio unius*, Ordinary-Meaning Canon, and General Terms Canon).

57.    Harmonizing privacy and genetic laws is further supported by the only genetic privacy law that does explicitly define "disclosure."  The Illinois Genetic Information Privacy Act defines "disclosure" as having the meaning "ascribed to it under HIPAA."[76]  HIPPA expressly excludes sales like the one here from the definition of "disclose."   Under HIPAA, a sale of protected health information in the context of a "transfer, merger, or consolidation of all or part of the covered entity" is not a "disclosure."[77]

58.    Notably, state genetic privacy laws[78] were enacted to prevent the use of genetic data to discriminate against persons in employment, insurance, and other contexts.[79]  The foundation of such laws is the federal Genetic Information Nondiscrimination Act ("GINA"), which is also aimed at addressing potential discrimination and related risks stemming from the use and sharing of genetic data.[80] An unnecessary expansion of the terms transfer or disclosure to include a prohibition against the sale of substantially all of a company's assets would not assist in preventing

---

[76]    IL ST CH 410 § 513/10 ("'Disclosure" has the meaning ascribed to it under HIPAA, as specified in 45 CFR 160.103.").

[77]    See 45 C.F.R. § 164.502 (a)(5)(ii)(B)(2)(iv). HIPAA has been in effect for over a quarter century and the treatment on how to treat such sensitive information in the bankruptcy context is well-established. Similarly, Missouri's genetic privacy law instructs that the information be held as "confidential medical records" (Mo. Rev. Stat. §375.1309.1) and Arizona's direct-to-consumer genetic testing law requires that the testing results of the deceased be treated as a medical record (Ariz. Rev. Stat §12-2294(D)).  The confidentiality of medical records are governed by HIPAA, which again, allows for transfer in bankruptcy.

[78]    See, e.g., Alabama Genetic Data Privacy Act, AL ST § 8-43-1 et seq.; Kentucky's Genetic Information Privacy Act, Ky. Rev. Stat. Ann. § 311.705; Maryland's Genetic Information Privacy Act, Md. Code Ann., Com. Law §§ 14-4401 to 4408; Nebraska Genetic Information Privacy Act (87–901 to 87–904); Texas Bus. & Comm. Code § 503A.001(5).

[79]    See, e.g., California's Genetic Information Nondiscrimination Act ("CalGina"), Cal. Gov't Code §§ 12920 et seq. (prohibiting genetic discrimination in sectors such as housing, employment, education, mortgage lending and public accommodations).

[80]    Pub. L. No. 110-233, 122 Stat. 881 (2008).

genetic discrimination and is therefore unsupported by legislative history and policy underlying genetic privacy law.[81]

### III.    The Sale Complies With Section 363(f)

59.    Section 363(f) provides that a debtor may sell property "free and clear of any interest in such property of an entity other than the estate" if certain conditions are met.[82]  Certain States argue the sale of customers' PII to TTAM is free and clear of their interests in such PII and should be denied under.  For example, NAAG asserts that "[s]ection 363(f)(1) only allows the sale of property if nonbankruptcy law would permit the sale."[83]  The Debtors do not seek to transfer PII free and clear of consumers' interest in their PII.  Here, TTAM has committed to the Enhanced Privacy Protections, which exceed consumers' existing privacy and security protections under the Privacy Statement.  As such, consumers will have equal or greater rights to their PII after the sale closes and section 363(f) does not apply.

60.    Relatedly, the States argue that the Debtors have no rights to the PII under applicable state law.  For example, Texas argues that consumers that have voluntarily signed up for the Debtors' services have "exclusive ownership" of the PII and that the Debtors have not shown interest in PII beyond mere possession.[84]  Such argument ignores the fundamental nature of the Debtor's business and the relationship between the parties.  The Debtors consensually use customer PII in numerous ways, including to assess ancestry composition analysis, for research

---

[81]    *See, e.g.*, New Mexico Fiscal Impact Report for House Bill 369 (Feb. 23, 2015) ("The AG discusses the significant privacy concerns with genetic testing and such testing being used for improper purposes, such as discrimination on the basis of a genetic analysis for purposes of denying insurance coverage.").

[82]    *See* 11 U.S.C. § 363(f).

[83]    NAAG Objection, at ¶ 20.

[84]    Texas Objection, at ¶¶ 16, 23.

purposes, for biobanking and genetic health risk analysis, and general health studies.[85]  If the Debtors' sole right was merely to possess PII, they could not provide customers the bargained for services.

## IV.   The CPO Report Supports Sale Approval

61.     Following lengthy negotiations, the Debtors, the U.S. Trustee, the Committee, and the States entered into a stipulation (the "Stipulation") directing the U.S. Trustee to appoint a consumer privacy ombudsman (a "CPO").[86]  Pursuant to the Stipulation, the CPO was tasked with analyzing, among other things, (i) whether the sale is consistent with the privacy policies in effect on the Petition Date, (ii) whether the sale violates nonbankruptcy law, and (iii) TTAM's security controls and any changes necessary to mitigate privacy losses or costs to customers.[87]  The Stipulation required the CPO to present a report to assist the Court in considering the facts, circumstances, and conditions of the sale.

62.     On May 6, 2025, the UST filed the *Notice of Appointment of Consumer Privacy Ombudsman*, appointing Professor Neil M. Richards as the CPO in these Chapter 11 Cases.[88]

63.     On June 11, 2025, the CPO filed his report.[89]  The report provides that the CPO "cannot conclude" (i) whether any proposed transfer of PII is consistent with the Debtors' privacy policies, particularly for customers who created accounts before the June 2022 changes to the privacy policies (*i.e.*, the addition of the word "bankruptcy"); and (ii) if applicable nonbankruptcy

---

[85]     *See* Health + Ancestry Service, 23ANDME, https://www.23andme.com/dna-health-ancestry/ (last visited June 16, 2025); How We Use Your Information, 23ANDME, https://www.23andme.com/legal/how-we-use-info/ (last visited June 16, 2025).

[86]     *See Joint Stipulation and Agreed Order Directing the United States Trustee to Appoint a Consumer Privacy Ombudsman*.  Docket No. 346.

[87]     *Id.* at pp. 5–6.

[88]     Docket No. 388.

[89]     Docket No. 718, *Report of the Consumer Privacy Ombudsman* (the "CPO Report").

law would not be violated by the sale of the Debtors' assets.[90] *A fortiori*, the CPO does not conclude that the transfer of PII is inconsistent with the Debtors' privacy policies or that the sale violates appliable nonbankruptcy law.

64.     Against this backdrop, when distilled to its core, the report supports approval of the sale in accordance with section 363(b)(1)(A) or (B).  Specifically, the report confirms the existence of the exhaustive privacy policies, restrictions and security measures the Debtors adopted and refined over almost 20 years.[91]   In particular, the Debtors mandatory sign-up procedures implemented through their Terms of Service provide expansive disclosures regarding the Debtors' Privacy Statement.  These Terms and Conditions require numerous consents with respect to the Debtors' use of PII.  The report does not contend that any of these policies or procedures fail to comply with the privacy laws, genetic privacy laws, or any other laws, applicable to the Debtors.

65.     Interestingly, the report does not question the adequacy or propriety of the Privacy Statement, but opines that consumers cannot comprehend it based on academic studies.[92]  Query whether consumers would better comprehend disclosure of the litany of terms used to describe the multitude of forms the sale of a large publicly traded company could take.  This is precisely the outcome sought to be avoided by requiring businesses to describe their privacy and security practices using plan understandable language.  A goal that would be eviscerated were the Court to decline to approve the sale based on the omission of the single word "bankruptcy" from the Debtors' Privacy Statement.

---

[90]     CPO Report, at p. 7.

[91]     *Id.* at pp. 31-39.

[92]     *Id.* at p. 39.

Dated: June 17, 2025

Respectfully submitted,

**STINSON LLP**

By: */s/ Nicholas J. Zluticky*
Nicholas J. Zluticky (MO # 61203)
Zachary H. Hemenway (MO # 59670)
Miranda S. Swift (MO # 75782)
1201 Walnut, St. 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
Facsimile: (816) 691-3495
Email: nicholas.zluticky@stinson.com
        zachary.hemenway@stinson.com
        miranda.swift@stinson.com

-and-

**KELLEY DRYE & WARREN LLP**
Eric R. Wilson (admitted *pro hac vice*)
Alysa Z. Hutnik (admitted *pro hac vice*)
Jason R. Adams (admitted *pro hac vice*)
Maeghan J. McLoughlin (admitted *pro hac vice*)
Steven Yachik (admitted *pro hac vice*)
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Telephone: (212) 808-7800
Facsimile: (212) 808-7897
Email: ewilson@kelleydrye.com
        ahutnik@kelleydrye.com
        jadams@kelleydrye.com
        mmcloughlin@kelleydrye.com
        syachik@kelleydrye.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

## EXHIBIT A

| Case | CPO | Summary |
|------|-----|---------|
| *In re ODI Oldco Inc* , No. 1:24‑BK‑ 05385, June 3, 2024 (Bankr. N.D. Ill.) | Elise Frejka | Sale recommended where the debtor's privacy policy explicitly prohibited such a transfer. |
| *In re  Nasty Gal Inc.* , No. 2:16‑bk‑ 24862‑BB, Feb. 7, 2017 (Bankr. C.D. Cal. 2017) | Wesley Avery | Sale recommended where the privacy policy permitted transfer of PII in a sale, but did not specify a sale in bankruptcy. |
| *In re  Hancock Fabrics* , No. 16‑10296, Jul. 31, 2016 (Bkrtcy.D.Del., 2016) | Lucy Thomson | Sale recommended where the debtor's privacy policy explicitly prohibited such a transfer. |
| *In re  Great Atlantic & Pacific Tea Company, Inc.* , No. 15‑23007, Sep. 11, 2015 (Bkrtcy.S.D.N.Y., 2015) | Elise Frejka | Sale recommended where the debtor's privacy policy explicitly prohibited such a transfer and the data included personal health information ("PHI") |
| *In re Haggen Holdings LLC, et al.* , No. 15‑11874, Sep. 23, 2015 (Bkrtcy.D.Del., 2015) | Alan Chappell | Sale recommended where the debtor's privacy policy explicitly prohibited such a transfer and the data included PHI. |
| *In re Family Christian, LLC* , No. 15‑ 00643, Jun. 8, 2015 (Bankr. W.D. Mich.) | Luis Salazar | Sale recommended where the privacy policy permitted transfer of PII in a sale, but did not specify a sale in bankruptcy. |
| *In re Fresh Produce Holdings, LLC* , et al., No. 15‑13485, May 21, 2015 (Bankr. Colo.) | Bonnie Glantz Fatell | Sale recommended where the debtor's privacy policy explicitly prohibited such a transfer. |