UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In re:
23ANDME HOLDING CO., et al.,

Debtors.

Case No. 25-40976
Chapter 11
(Jointly Administered)

# MOTION TO FILE AMICI CURIAE BRIEF IN SUPPORT OF ESTABLISHING THE GLOBAL BIODATA TRUST

Come now Amici Curiae listed in Exhibit A (attached) and for their Motion, state:

1. Pursuant to Federal Rule of Bankruptcy Procedure 2018(a) and Local Rule 2018-1, the undersigned respectfully requests leave to file the attached Amici Curiae Brief in Support of Establishing the Global BioData Trust for 23andMe's Genetic Database.

**Interest of Proposed Amici Curiae**

2. The proposed amici include lawyers, physicians, bioethicists, and other professionals who have researched and written about the operation of genetic databases and the protection of human genetic information respectfully submit this brief to address the novel and significant legal questions regarding the proper treatment of genetic data in bankruptcy proceedings. The disposition of the 23andMe genetic database presents unprecedented challenges at the intersection of bankruptcy law, property theory, constitutional rights, and bioethics that will establish a critical precedent for the digital age.

**Assistance to the Court**

3.    This amici brief addresses novel and significant legal questions regarding the proper treatment of genetic data in bankruptcy proceedings that have not been previously addressed by any court. The brief:

a. Proposes application of the quasi-property doctrine from *Pierce v. Proprietors of Swan Point Cemetery* to genetic data

b. Demonstrates how genetic data requires special fiduciary protections based on extensive legal and academic analysis

c. Shows alignment with the Consumer Privacy Ombudsman's independent findings and recommendations

d. Provides a concrete legal framework for protecting the rights of over 15 million data subjects while respecting creditor interests

**Compliance with Local Rules**

4.    This brief complies with all applicable local rules and will be served on all parties in interest. The proposed amici have no financial interest in the outcome of this proceeding beyond their institutional missions to protect consumer privacy and genetic data rights.

**Timeliness**

5.    Given the expedited nature of this proceeding and the significant public interest in genetic data protection, this motion is submitted as soon as practicable after the parties became aware of the legal issues requiring amici participation.

Wherefore, the proposed amici respectfully request that this Court grant leave to file the attached amici brief.

Respectfully submitted,

/s/John Talbot Sant, Jr.
John Talbot Sant, Jr.
BECK & SANT , LLC
11775 Borman Drive, Suite 216
Maryland Heights, MO  63146
Phone: 636-240-3632/Fax:  636-240-6803
tal@beckandsantlaw.com
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of this document was filed electronically with the United States Bankruptcy Court and has been served on the parties in interest via email by the Court's CM/ECF system as listed on the Court's Electronic Mail Notice List on this 18th day of June, 2025.

/s/ John Talbot Sant, Jr.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | |
| 23ANDME HOLDING CO., et al., | Case No. 25-40976 |
| | Chapter 11 |
| | (Jointly Administered) |
| Debtors. | |

## **AMICI CURIAE BRIEF**

Come now those parties listed in Exhibit A ("Amici Curiae") and for their brief, state:

Amici Curiae respectfully submit this brief to address the novel and significant legal questions regarding the proper treatment of genetic data in bankruptcy proceedings. The disposition of 23andMe's genetic database presents unprecedented challenges at the intersection of bankruptcy law, property theory, constitutional rights, and bioethics that will establish critical precedent for the digital age.

The amici include lawyers, physicians, bioethicists, and other professionals who have researched and written about the operation of genetic databases and the protection of human genetic information respectfully submit this brief to address the novel and significant legal questions regarding the proper treatment of genetic data in bankruptcy proceedings. The disposition of the 23andMe genetic database presents

unprecedented challenges at the intersection of bankruptcy law, property theory, constitutional rights, and bioethics that will establish a critical precedent for the digital age. These amici have unique expertise and institutional interests in ensuring that genetic data receives appropriate legal protection and ethical stewardship.

## SUMMARY OF ARGUMENT

This Court should recognize 23andMe's genetic database as "quasi-property" held in sacred trust rather than as an ordinary commercial asset subject to standard bankruptcy sale procedures. The genetic data at issue occupies a unique legal position between traditional property and personhood, warranting specialized treatment through the bankruptcy court's equitable powers under 11 U.S.C. § 105(a).

The quasi-property doctrine established in *Pierce v. Proprietors of Swan Point Cemetery* provides the appropriate legal framework for protecting genetic information that contains the immutable biological essence of over 15 million individuals. This framework finds powerful support in the Consumer Privacy Ombudsman's ("CPO") comprehensive analysis, which concluded that genetic data is "perhaps the most sensitive data about humans that exists" and requires "heightened protections." (CPO Report at 42) This brief supports The Global BioData Trust as the mechanism to honor both creditors' legitimate interests and the profound dignity, privacy, and autonomy rights inherent in genetic information.

## ARGUMENT

# I. The *Pierce* Doctrine Establishes the Legal Framework for Treating Genetic Data as Quasi-Property

### A. Historical Foundation and Core Principles

In *Pierce v. Proprietors of Swan Point Cemetery*, 10 R.I. 227 (1872), the Rhode Island Supreme Court established the foundational principle that certain subjects exist in a legal liminal space between property and personhood. The Court held that while human remains are not property "in the strict sense of the common law," they constitute "quasi-property" over which relatives have rights that courts will protect through equitable powers.

The *Pierce* court identified several defining characteristics of quasi-property that distinguish it from ordinary commercial assets:

- **Inalienability**: Quasi-property cannot be freely bought, sold, or transferred like ordinary property
- **Dignity Interests**: The subject matter involves fundamental human dignity requiring special protection
- **Relational Rights**: Rights extend beyond the immediate holder to family and community
- **Perpetual Nature**: Obligations persist beyond ordinary commercial relationships
- **Public Interest**: Society maintains an independent stake in proper treatment

Most significantly, Pierce established that persons having charge of quasi-property hold it as a "sacred trust" that courts of equity will regulate and may "change the custody if improperly managed."

*Note bene:* Recognition of quasi-property in this context serves solely to prevent third-party commodification and unauthorized transfer. It does not, and must not, imply that genetic data is alienable from individuals. The Global BioData Trust ensures that the future of genomic data governance must rest on recognition of inalienable rights, participatory control, and consent-based stewardship.

### B. Application to Genetic Data

Genetic data shares every defining characteristic of quasi-property identified in Pierce, as powerfully confirmed by the CPO's independent analysis:

### 1. Immutability and Permanence

Like human remains, DNA cannot be changed or replaced. As the CPO noted, "genetic data is not just data about people—in a very real sense, it is people. Our genome is our unique individual source code. It cannot be changed, and thus it is immutable." (CPO Report at 43-44) The CPO emphasized that "unlike passwords or even addresses or Social Security numbers, people cannot change their DNA," creating perpetual vulnerability requiring ongoing protection that transcends ordinary commercial relationships. (CPO Report at 17)

### 2. Dignity and Privacy Interests

The CPO's examination confirmed that genetic information reveals the most intimate details about identity, ancestry, health predispositions, and biological relationships. The

CPO concluded that genetic data "implicates fundamental human dignity in ways directly analogous to the treatment of human remains, touching on core aspects of selfhood and human essence." (CPO Report at 42-43) The CPO further noted that genetic data possesses characteristics that make it "arguably the most sensitive personal data that exists." (CPO Report at 43)

### 3. Familial and Intergenerational Impact

The CPO's analysis substantiated that genetic data inherently reveals information about biological relatives across generations. As the CPO explained, "one person's consent has direct and permanent ramifications for others" because "a person who shares their genetic data with another is also sharing a significant fraction of the genetic data of their mother, father, siblings, and children, and of other blood relatives." (CPO Report at 45) The CPO noted that "a database of multiple millions of people makes hundreds of millions, if not billions, of people indirectly identifiable." (CPO Report at 45)

### 4. Sacred Trust Relationship

The CPO's investigation revealed that individuals provide genetic samples for specific purposes—health insights, ancestry research, medical advancement—creating what the CPO characterized as a fiduciary-like relationship based on profound trust and vulnerability. The CPO recommended requiring "a Guarantee of Data Loyalty" whereby the winning bidder would "make an important substantive promise not to use Company customer data in a way that is inconsistent with the best interests of the data subject." (CPO Report at 107-108) This recommendation explicitly recognizes the sacred trust nature of the relationship.

### 5. Public Interest Considerations

The CPO documented compelling public interests in preventing genetic discrimination, protecting public health research integrity, and preventing the commodification of human biological material. The CPO noted receiving correspondence from "a number of eminent legal scholars with expertise in bioethics, privacy, and health law" and from advocacy organizations committed to "the ethical stewardship of genetic and biometric data." (CPO Report at 6)

## II. The CPO Report Validates Academic Support for Quasi-Property Analysis

The CPO's analysis provides powerful validation for extending quasi-property protection to genetic information, documenting extensive academic and expert support for treating genetic data as requiring special fiduciary protections.

The CPO noted receiving a letter from "a number of eminent legal scholars with expertise in bioethics, privacy, and health law" supporting enhanced protections. (CPO Report at 6) These scholars emphasized that genetic data is "sensitive, personal, and presumptively private" and that "using a service like 23andMe should not forfeit that privacy." (See CPO Report, Appendix J at 196)

The CPO also documented the "robust and growing academic literature discussing the applicability of loyalty duties to privacy contexts, particularly where sensitive information is shared in ways that create vulnerability for the person to whom the data relates." (CPO Report at 108) This literature supports the application of traditional fiduciary principles—duties of loyalty, care, and confidentiality—to genetic data relationships.

## III. The CPO's Analysis Confirms the Inadequacy of Standard Notice-and-Choice Frameworks

The CPO's examination provided detailed documentation that traditional property law frameworks are inadequate for genetic data protection. The CPO concluded that "relying on 'notice and choice' models that purport to put consumers in control of how their data is processed is likely to be ineffective or otherwise misleading." (CPO Report at 46-47)

The CPO found that "few, if any, consumers of digital services read those dense and vague privacy policies" and that "the claim that consumers do—or can—meaningfully read and understand the terms of service and privacy policies is (as one experimental study memorably called it) 'the biggest lie on the Internet.'" (CPO Report at 48)

Critically, the CPO's analysis revealed systemic problems with 23andMe's own privacy policies. The CPO could not "conclude with certainty that the sale of the Company's data in bankruptcy is otherwise consistent with its privacy policies, particularly for those customers who created their accounts before the 23andMe Privacy Statement was amended in June 2022 to expressly note the potential for a sale of customer data in bankruptcy." (CPO Report at 7)

## IV. State and Federal Legal Support for Special Protection

The amici state attorneys general have direct experience with the inadequacy of ordinary commercial frameworks for genetic data protection. The CPO documented extensive state law support for special genetic data protections, finding that "at least twenty-nine states have laws that require companies to obtain consumer consent before disclosing consumers' genetic data." (CPO Report at 77)

The CPO concluded that because of "the repeated, clear promises made by the Company" and "the plausible claim that the sale or transfer of the Company's genetic information data assets would constitute a disclosure, transfer, or sale of such information under the genetic privacy laws of many states," the CPO could not "conclude that applicable non-bankruptcy law would not be violated as a result of the sale." (CPO Report at 7-8)

## V. The Global BioData Trust Implements the CPO's Framework Through Independent Governance

The establishment of The Global BioData Trust represents the practical implementation of both the quasi-property principles articulated in *Pierce* and the safeguards recommended by the CPO. The Trust's structural independence addresses the fundamental need for truly independent genetic data stewardship.

### A. Fulfills Sacred Trust Requirements

The Global BioData Trust would serve as the fiduciary custodian recommended by the CPO, maintaining genetic data for the benefit of data subjects and their genetic relatives while honoring the purposes for which it was entrusted. The Trust's governance ensures:

- **Undivided Loyalty**: No commercial incentives competing with data subject interests
- **Long-term Stewardship**: Governance structure designed for perpetual operation
- **Stakeholder Representation**: Direct voice for affected communities

### B. Protects Multiple Stakeholder Interests

As the CPO noted, a trust structure can serve multiple interests:

- **Individual Dignity**: Safeguards privacy and autonomy as emphasized throughout the CPO Report

- **Creditor Recovery**: Provides fair compensation through ethical licensing arrangements

- **Research Integrity**: Preserves valuable medical research under appropriate governance

- **Public Interest**: Prevents discrimination and commodification while advancing scientific knowledge

### C. Provides Ongoing Judicial Supervision

The Trust structure provides ongoing oversight consistent with Pierce's recognition of continuing equitable supervision of quasi-property. The CPO recommended ongoing accountability measures that the Trust framework enables through its transparent governance structure.

# CONCLUSION

The CPO's independent and comprehensive analysis provides powerful validation for the quasi-property framework proposed in this brief. The CPO's findings that genetic data is the most sensitive form of human information, that traditional notice-and-choice frameworks are inadequate, and that trust-based fiduciary protections are necessary, all support treating 23andMe's genetic database as quasi-property held in sacred trust.

The amici respectfully urge this Court to exercise its equitable powers under Section 105(a) to recognize genetic data as quasi-property and order the establishment of The Global BioData Trust to serve as perpetual custodian of this most sensitive form of human information.

This framework protects the genetic privacy rights that the amici are charged with enforcing while providing a sustainable path forward that respects creditor interests and preserves valuable research capabilities under ethical governance.

Respectfully submitted,

/s/John Talbot Sant, Jr.
John Talbot Sant, Jr.
BECK & SANT , LLC
11775 Borman Drive, Suite 216
Maryland Heights, MO  63146
Phone: 636-240-3632/Fax:  636-240-6803
tal@beckandsantlaw.com
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of this document was filed electronically with the United States Bankruptcy Court and has been served on the parties in interest via email by the Court's CM/ECF system as listed on the Court's Electronic Mail Notice List on this 18th day of June, 2025.

/s/ John Talbot Sant, Jr.

# Exhibit A

<u>Linda MacDonald Glenn /s/</u>
**Linda MacDonald Glenn, JD, LLM**
Ethicist, Futurist & Attorney-at-law
Faculty | CSU Monterey Bay
Faculty | UC Santa Cruz
Founding Director | Center for Applied Values and Ethics in Advanced Technologies (*CAVEAT*)



---

<u>Alexander M. Capron /s/</u>
**Alexander M. Capron**
University Professor Emeritus,
Scott H. Bice Chair Emeritus in Healthcare Law, Policy, and Ethics (Gould School of Law)
Professor Emeritus of Law and Medicine (Keck School of Medicine), and
Founding Co-Director of the Pacific Center for Health Policy and Ethics
University of Southern California
Los Angeles, California

---

<u>Camille Nebeker /s/</u>
**Camille Nebeker, EdD, MS**
Professor, Herbert Wertheim School of Public Health and Human Longevity Science, UC San Diego
Director, ReCODE Health, UC San Diego
Director, Research Ethics Program, UC San Diego

Campus Location: Atkinson Hall | 9500 Gilman Drive | La Jolla, CA 92093 MC 0811

---

*Nanette Elster /s/*
_____
**Nanette Elster, JD, MPH**
Professor of Bioethics
Neiswanger Institute for Bioethics

Loyola University Chicago Stritch School of Medicine
2160 S. First Avenue
Maywood, IL 60153

<u>Arthur L. Caplan /s/</u>

**Arthur L. Caplan**
Drs. William F. and Virginia Connolly Mitty Professor
Founding Head of the Division of Medical Ethics
NYU Grossman School of Medicine
Department of Population Health
New York, NY 10016

<u>PaulRoot Wolpe /s/</u>

**Paul Root Wolpe, Ph.D.**
Raymond F. Schinazi Distinguished Research Chair of Jewish Bioethics Professor of Medicine, Pediatrics, Psychiatry, Neuroscience and Biological Behavior, and Sociology
Emory University
Atlanta, Georgia

Kayte Spector-Bagdady /s/
_____
**Kayte Spector-Bagdady, JD, MBioethics, HEC-C**
Director, Michigan Bioethics
Associate Professor, Obstetrics & Gynecology
Associate Editor, American Journal of Bioethics
734.764.9886 (office)  x31922 (pager)
kaytesb@med.umich.edu

Robert Cook-Deegan /s/
_____
**Robert Cook-Deegan, MD**

Professor, Arizona State University
Barrett & O'Connor Washington Center
1800 I (Eye) Street, NW
Washington, DC  20006

---

*Andrea Downing /s/*
**Andrea Downing**
Co-Founder & Board President, The Light Collective
1711 Willamette St. Suite 301
Eugene Oregon 97401

---

Lisa A. Berkley  /s/
**Lisa A. Berkley, PhD**
Founder + Director, Crown College, UCSC, Resiliency Program
Founding Executive Director
Center for Applied Values and Ethics in Advancing Technologies (CAVEAT)
UCSC Crown College Faculty