**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

In re:

23ANDME HOLDING CO., et al.,

Case No. 25-40976
Chapter 11
(Jointly Administered)

Debtors.

---

## MOTION FOR LEAVE TO FILE AMENDED SUPPLEMENTAL AMICI CURIAE BRIEF

Come now, certain and former customers of  Debtor andAmici Curiae listed in Exhibit A (attached), including The University of California, Santa Cruz Center for Applied Ethics in Advancing Technologies ("CAVEAT"), members of the Global BioData Trust Bioethics Committee, Linda MacDonald Glenn, JD, LLM, Lisa A. Berkley, PhD, Alexander M. Capron, LLB, Camille Nebeker, EdD, MS, Nanette Elster, JD, MPH, Arthur L. Caplan, PhD, Paul Root Wolpe, PhD, Kayte Spector-Bagdady, JD, MBe, Robert Cook-Deegan, MD, Andrea Downing, and Elizabeth Dreicer,[1] and for their Motion for Leave to File Amended Supplemental Amici Curiae Brief, respectfully state:

---

[1] **Linda MacDonald Glenn, JD, LLM:** Ethicist, Futurist and Attorney-at-law, Faculty, California State University Monterey Bay, Faculty, University of California Santa Cruz, Founding Director, Center for Applied Values and Ethics in Advanced Technologies (CAVEAT)

**Lisa A. Berkley, PhD:** Founder and Director, Crown College, University of California Santa Cruz, Resiliency Program, Founding Executive Director, Center for Applied Values and Ethics in Advancing Technologies (CAVEAT), Crown College, University of California Santa Cruz, Professor, Crown College, University of California, Santa Cruz

**Alexander M. Capron, LLB:** University Professor Emeritus, Scott H. Bice Chair Emeritus in Healthcare Law, Policy, and Ethics, Gould School of Law, Professor Emeritus of Law and Medicine, Keck School of Medicine, Founding Co-Director of the Pacific Center for Health Policy and Ethics, University of Southern California

**Camille Nebeker, EdD, MS:** Professor, Herbert Wertheim School of Public Health and Human Longevity Science, University of California San Diego, Director, ReCODE Health and Director, Research Ethics Program, University of California San Diego

**Nanette Elster, JD, MPH:** Professor of Bioethics Neiswanger Institute for Bioethics, Loyola University Chicago Stritch School of Medicine

**Arthur L. Caplan, PhD:** Drs. William F. and Virginia Connolly Mitty Professor, Founding Head of the Division of Medical Ethics, NYU Grossman School of Medicine, Department of Population Health

**Paul Root Wolpe, PhD:** Raymond F. Schinazi Distinguished Research Chair of Jewish Bioethics, Professor of Medicine, Pediatrics, Psychiatry, Neuroscience and Biological Behavior, and Sociology Emory University Atlanta, Georgia

**Kayte Spector-Bagdady, JD, MBe:** MBioethics, HEC-C Director, Michigan Bioethics Associate, Professor, Obstetrics & Gynecology Associate Editor, American Journal of Bioethics

**Robert Cook-Deegan, MD:** Professor, Arizona State University Barrett & O'Connor Washington Center

**Andrea Downing:** Co-Founder & Board President, The Light Collective

**Elizabeth Dreicer:** Founding Chairperson and Trustee, The Global BioData Trust

# I. INTRODUCTION AND PROCEDURAL HISTORY

1.    **Previous Filing:** On June 18, 2025, Amici filed their initial Amici Curiae Brief [Doc. 807] addressing the novel legal questions regarding the proper treatment of genetic data in bankruptcy proceedings.

2.    **Need for Amendment:** Amici now seek leave to file an Amended Supplemental Amici Curiae Brief to address material changes to the sale structure that occurred after the initial filing deadline and to respond to critical questions raised by the Court during the hearings on the Sale Motion.

## II. BASIS FOR AMENDMENT

3.     Federal Rule of Bankruptcy Procedure 8017 provides in relevant part:

4.    In addition, or in the alternative, this Court has  discretion to grant this Motion pursuant to:

### A. Material Post-Filing of Sale motion and original Amici brief  Structural Changes

5.    Since  filing of the Sale Motion and the Amici Curie Brief, fundamental changes to the proposed sale occurred, including:

a.    Purchaser **Substitution:** TTAM (formed on May 2, 2025)[2] the principal of which is Anne Wojcicki, a board member and insider of the Debtor, replaced Regeneron as the proposed purchaser (June 13, 2025) with inadequate notice.

b.    **Introduction of Intermediary Entities:** the  creation of TTMC/TTAM as shell entities designed to effectuate control while avoiding technical "transfer" of data (introduced June 18-20, 2025, during the Juneteenth holiday)

c.    **Elimination of Consent Mechanisms:** The revised structure eliminates meaningful consumer consent protections that were present in the original proposal replacing them with a broad reliance on existing privacy policy language. This change

---

[2] https://www.bizprofile.net/ca/los-altos/ttam-research-institute

allows the transfer of genetic data and biospecimens without explicit, informed consent from each individual.[3],[4],[5],[6],[7],[8]

## B. Significant New Developments Requiring Analysis

6.   Critical information has emerged that was unavailable at the time of initial filing, including :

**a.      Financial Analysis:**  that consumers paid an estimated $2.9 billion for *23andMe* services;[9]

**b.      Consumer Harm Metrics:** Approximately 1.9 million customers as of early June requested data deletion without receiving refunds that **would equate to approximately $380 million**[10]**, a figure in excess of the proposed purchase price;**

**c.      Evidence of Legal Circumvention:** entity restructuring designed to bypass state genetic data and PII privacy laws, through an equity acquisition, in part, rather than asset sale.

## C. Additional Legal Precedents and Analysis

7.     The amended brief incorporates critical legal analysis beyond that contained in  in the original brief, including:

**Relevant Case Law:**

a.      *FTC v. Toysmart* establishing restrictions on bankruptcy sales of consumer data

b.      that pursuant to  *Henrietta Lacks*  biodata ownership is restricted to the individual donor and consent to transfer must be informed, explicit, and

---

[3] 23andMe. (2025, June 13). 23andMe enters into agreement to sell assets to TTAM Research Institute. [Press release]. https://investors.23andme.com/news-releases/news-release-details/23andme-enters-agreement-sell-assets-ttam-research-institute

[4] California Secretary of State. (2025). TTAM Research Institute registration record. https://bizfileonline.sos.ca.gov/search/business

In re: 23andMe, Inc., Case No. 25-30123 (Bankr. E.D. Mo. 2025). (2025). Notice of successful bidder and backup bidder [Court filing]. https://ecf.moeb.uscourts.gov/

[5] Muoio, D. (2025, June 14). Anne Wojcicki's nonprofit outbids Regeneron for 23andMe assets. Fierce Biotech. https://www.fiercebiotech.com/biotech/anne-wojcickis-nonprofit-outbids-regeneron-23andme-assets

[6] Office of the Attorney General for the District of Columbia. (2025, June 14). Multistate coalition moves to block sale of 23andMe genetic data. https://oag.dc.gov/release/multistate-coalition-moves-block-sale-23andme-genetic-data

[7] Rosenbaum, L. (2025, June 14). 23andMe's bankruptcy sale raises privacy alarm. Forbes. https://www.forbes.com/sites/leahrosenbaum/2025/06/14/23andmes-bankruptcy-sale-raises-privacy-alarm/

[8] U.S. Federal Trade Commission. (2025, June 15). FTC statement on 23andMe bankruptcy and consumer privacy. https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-statement-23andme-bankruptcy-consumer-privacy

[9] Assuming an average of $200 per customer @ 14.5 million customers

[10] Assuming an average of $200 per customer

voluntary[11],[12],[13]Furthermore, biodata ownership is restricted to the individual donor in certain U.S. states that have enacted statutes recognizing genetic information as the property of the person from whom it was derived, and consent to transfer must be informed and explicit, as reviewed and enforced by Institutional Review Boards (IRBs) in accordance with federal regulations and ethical standards[14],[15],[16];

c.     That the legislatures in Texas and California recently enacted

d.     the proposed transaction's failure to comply with the requirements of  11 U.S.C. § 363(b)(1)

e.     impermissible circumvention of state law through formation and transfers through intermediary entities _____;

f.     Additional evidence (in bankruptcy hearings, and in congressional hearings) of insider self-dealing given Ms. Wojcicki's dual roles

### D. Response to Court's Inquiries

8.     During the hearing on approval of the proposed sale, the Court repeatedly asked "what's the harm?" The amended/supplemental  brief  provides:

a.     Specific examples of genetic data misuse risks;

b.     Quantification of the harm (an estimated $2.9 billion paid by Debtor's customers)

c.     further details concerning the irreversible harm that would be caused by genetic data exposure as proposed in the transaction.

d.     the national security threat inherent in the proposed transaction; and ;

e.     the precedential dangers of permitting sales in Bankruptcy that attempt to circumvent laws and regulations concerning treatment of genetically sensitive bio data and information.

f.     Essential analysis of how Debtor's assets could be transferred in a manner that obviates the deficiencies in the proposed transaction but still yields a return to

---

[11] Rothstein, M. A. (2013). Ethical issues in the use of human biospecimens. *Journal of Law, Medicine & Ethics, 41*(1), 143–146.

[12] Caulfield, T., & Murdoch, B. (2017). Genetic privacy and the law: An end to genetics exceptionalism. *Nature Reviews Genetics, 18*(6), 302–303.

[13] Skloot, R. (2010). *The Immortal Life of Henrietta Lacks.* New York: Crown.

As referenced in Khan F. A. (2011). The Immortal Life of Henrietta Lacks. *The Journal of IMA, 43*(2), 93–94. https://doi.org/10.5915/43-2-8609

[14] Dove, E. S., & Knoppers, B. M. (2024). Data ownership in genomic research consortia. *Journal of Law and the Biosciences, 11*(2), lsac024. https://doi.org/10.1093/jlb/lsae024

[15] Achieving genetic data privacy through enforcement of property rights. (2024). *UC Davis Law Review, 57*(1). https://lawreview.law.ucdavis.edu/archives/57/1/achieving-genetic-data-privacy-through-enforcement-property-rights

[16] McGuire, A. L., & Beskow, L. M. (2010). Broad data sharing in genetic research: Views of institutional review board professionals. *Journal of Law, Medicine & Ethics, 38*(3), 513–522. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3394177/

creditors, including the many customers of Debtor, such as by transfer of assets and right to an entity with truly independent governance (such as The Global BioData Trust);

### III. GOOD CAUSE AND PROCEDURAL FAIRNESS

**9. Timeliness:** This motion was drafted and filed promptly after Amici became aware of the material structural changes and before any final determination by the Court.

**10. Due Process Concerns:** Amici were not afforded a sufficient opportunity to fully address the Court regarding the Debtor's last-minute structural changes presented immediately before the hearing.

**11.   Narrowly Tailored:** The amended brief will focus solely on:

a.   Issues arising from the post-filing structural changes;
b.   The Court's unanswered questions;
c.   Legal arguments that were unknown prior to having knowledge of the final transaction structure.

### IV. NO PREJUDICE TO ANY PARTY

12.   This Court's granting leave will not prejudice any party because:

a.   Matters remain under consideration by the Court;
b.   All parties could be afforded the opportunity to respond further;
c.   Full and complete briefing serves the paramount public interest in this unprecedented matter that affects 15.5 million individuals' genetic data.

### V. RELEVANCE TO DISPOSITION

13.   Consideration of the arguments made in the Amended/Supplemental Brief is essential to the Court's ruling, as the Amended/Supplemental Brief :

a.   Demonstrates potential violations of state and federal law under the revised structure;
b.   Reveals the inadequacy of the proposed TTMC/TTAM structure and proposal,
c.   Provides concrete evidence of consumer harm as requested by the Court
d.   Offers practical solutions that protect all stakeholder interests while preserving estate value.

WHEREFORE, Amici respectfully request that this Court grant leave to file the attached Amended Supplemental Amici Curiae Brief, which provides critical information necessary for the Court's determination of these unprecedented issues affecting the genetic privacy rights of approximately 15.5 million individuals.

Respectfully submitted,

/s/John Talbot Sant, Jr.
**John Talbot Sant, Jr.MoBar#35324**
BECK & SANT, LLC
11775 Borman Drive, Suite 216
Maryland Heights, MO 63146
Phone: 636-240-3632
Fax: 636-240-6803
tal@beckandsantlaw.com
*Counsel for Amici Curiae*

---

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of this document was filed electronically with the United States Bankruptcy Court and has been served on the parties in interest via email by the Court's CM/ECF system as listed on the Court's Electronic Mail Notice List on this 24th day of June, 2025.

/s/ John Talbot Sant, Jr.

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

In re:

 23ANDME HOLDING CO., et al.,                 Case No. 25-40976

                                                  Chapter 11

                                                  (Jointly Administered)

Debtors.

# AMENDED SUPPLEMENTAL AMICI CURIAE BRIEF

PARTIES: The parties filing this Amended Suplemental Brief are the University of California, Santa Cruz Center for Applied Ethics in Advancing Technologies ("CAVEAT"), members of the Global BioData Trust Ethics Committee,  and the additional parties listed in Exhibit A, certain members of which are current and former customers of Debtor.

POSITION: This Amended Supplemental Brief requests this Court to deny approval of Debtor's proposed sale of assets to TTAM.

# TABLE OF AUTHORITIES

**Cases**

- *FTC v. Toysmart.com, LLC*, No. 00-11341-RGS (D. Mass. July 21, 2000)
- *Henrietta Lacks Estate* (various proceedings and settlements)
- *Pierce v. Proprietors of Swan Point Cemetery*, 10 R.I. 227 (1872)

**Statutes**

- 11 U.S.C. § 105(a)
- 11 U.S.C. § 363
- 45 CFR 46 (Common Rule)
- 21 CFR 50 & 56
- Cal. Civ. Code § 1798.100 et seq. (CPRA)
- Tex. Bus. & Com. Code § 503.001

**Rules**

- Federal Rule of Bankruptcy Procedure 2018(a)
- Federal Rule of Bankruptcy Procedure 8017
- Local Rule 2018-1

**Other Authorities**

- Consumer Privacy Ombudsman Report ("CPO Report")

---

# STATEMENT OF INTEREST

1.      The University of California, Santa Cruz Center for Applied Ethics in Advancing Technologies ("CAVEAT"), members of the Global BioData Trust Bioethics Committee, and the additional parties listed in Exhibit A ("Amici Curiae")[1] which includes customers/former customers of Debtor respectfully submit this Amended Supplemental Brief to directly address the Court's specific inquiries regarding the harm to Debtor's customers and the general public and national security that would be suffered if the proposed transaction were to be approved and

---

[1] Amici include lawyers, physicians, bioethicists, consumer advocates, and academic institutions with decades of experience protecting genetic privacy and human research participants. These amici have unique expertise in genetic data governance, research ethics, and the protection of populations whose most intimate biological information is at stake in this proceeding.

to address the material changes in the transaction structure that occurred after the original briefing deadline.

# SUMMARY OF ARGUMENT

### The Substantial "Harm?"

2.     Debtor's proposed sale of 15.5 million people's genetic data through a two-step asset sale and then equity transfer (an evasion of applicable state laws and federal regulations) would cause massive, irreversible harm that spans every dimension of human dignity and constitutional protection. The Court stands at a constitutional moment where it must decide whether human DNA can be commodified and transferred without consent through legal fiction designed to evade consumer protection laws.

3.     The harms are concrete, documented, and irreversible across individual, familial, legal, scientific, geopolitical, consumer, and constitutional dimensions and affect more than 2 million customers who explicitly requested data destruction but whose genetic data is proposed to be sold with scant and late notice

4.     The proposed sale is contrary to established precedent, See *FTC v. Toysmart* ( *FTC v. Toysmart.com, LLC, No. 00-11341-RGS (D. Mass. filed July 10, 2000)*) and *Pierce v. Proprietors of Swan Point Cemetery, (Pierce v. Proprietors of Swan Point Cemetery, 10 R.I. 227, 229 (1872)*

5.     15.5 million people have been provided cursory and limited (less than the 21days as required by Federal Rule of Bankruptcy Procedure 2002(a)(2) and Federal Rule of Bankruptcy Procedure 2002(c)(1)) notice of the proposed transfer of their genetic data, and therefore, have been denied a meaningful opportunity to protect their genetic privacy rights.

6.     Establishment of, and Debtor's transfer into **The Global BioData Trust** of genetic information would provide a viable alternative that protects rights while facilitating legitimate research.

# I. DIRECT ANSWER TO THE COURT'S HARM INQUIRIES: THE DAMAGE IS MASSIVE AND IRREVERSIBLE

## A. Individual Harms: Loss of Fundamental Human Dignity

7.     **Permanent Loss of Privacy.** DNA is the most intimate identifier. Unlike passwords or financial information, **DNA cannot be changed once exposed**.

8.     **Loss of Bodily Autonomy.** Selling genetic data strips individuals of control over their own bodies' blueprints and medical potential. The 15.5 million customers and former customers of Debtor may never know how their genetic essence will be used, by whom, or for what purposes. This represents a fundamental violation of human autonomy and self-determination.

9.     **Psychological Trauma.** As documented in research literature[2],[3],[4], realization that one's genetic data was commodified without consent provokes anxiety, betrayal, and loss of trust in medicine, science, and legal institutions. This psychological harm is particularly acute because genetic data represents core identity (including ethnic and racial identity).

## B. Familial and Hereditary Harms: Genetic Surveillance Without Consent

10.     **Involuntary Family Exposure.** Genetic data also exposes an individual's parents, children, siblings, and cousins—**without their consent**. When a person's DNA is revealed, it reveals significant genetic information about his/her entire family, creating a ripple effect of privacy violations across generations.

11.     **Disrupted Family Privacy.** Genetic data sales can expose private family truths including non-paternity, adoption secrets, sperm donor relationships, or children of incest. These revelations can harm families and cause trauma when disclosed without preparation or consent.

12.     **Unwanted Medical Revelations.** Genetic data may reveal predispositions to diseases (BRCA1, Huntington's, Alzheimer's) that individuals and families are not prepared to learn.

## C. Discriminatory and Social Harms: Permanent Second-Class Status

13.     **Genetic Discrimination** Despite laws like Genetic Information Nondiscrimination Act (GINA, 42 U.S.C. § 2000ff et seq. (2008), enforcement is limited and gaps remain. Employers, insurers, lenders, and other entities may gain access to genetic data and deny services based on DNA markers. Health, life, long-term care, and disability insurance are particularly vulnerable to genetic discrimination.

14.     **Racial, Ethnic, and Population Profiling** Selling genetic data enables systematic profiling of ethnic populations, indigenous communities, and other groups for exploitative,

---

[2] Walshe, J., Elphinstone, B., Nicol, D., & Taylor, M. (2024). A systematic literature review of the 'commercialisation effect' on public attitudes towards biobank and genomic data repositories. *Public Understanding of Science*, 33(5), 548–567.

[3] Genetic Data and the Right to Privacy: Towards a Relational Theory. *Human Rights Law Review*, 22(1), 2022.

[4] Roth, W. D., & Ivemark, B. (2018). Genetic Options: The Impact of Genetic Ancestry Testing on Consumers' Racial and Ethnic Identities. *American Journal of Sociology*, 124(1).

surveillance, or eugenic purposes. This creates particular harm for historically marginalized communities.

15. **Digital Redlining and Algorithmic Scoring.** DNA data can be incorporated into algorithms that score individuals for employment, loans, housing, fertility treatments, or even criminality predictions. This creates a genetic caste system where individuals face discrimination based on biological characteristics.

## D. Legal and Constitutional Harms: Rights Without Remedies

16. **Lack of Legal Protections.** In the U.S., there is no comprehensive law protecting DNA as personal property. Once genetic data is sold or breached, consumers have few meaningful remedies. The irreversible nature of genetic information makes this lack of protection particularly harmful.

17. **Dark Pattern Consent Deception** Many of Debtor's customers and former customers "agreed" to data use under buried terms and conditions, misleading interfaces, or while under duress (medical need). This negates the claimed  consent for what amounts to permanent alienation of genetic identity.

`

## E. Scientific and Research Harms: Corrupting the Foundation of Genetic Research

19. **Data Pollution and Research Bias** When genetic data is collected under coercive, unethical, or non-transparent terms, it undermines public trust in genetic research. Future studies risk being biased, incomplete, or lacking legitimate consent-based inclusion, corrupting the scientific foundation.[5],[6],[7]

20. **Commercial Lock-In of Scientific Progress** When datasets are sold to private corporations, they can become proprietary and walled off from independent researchers. This hinders open science, slows medical discoveries, and prioritizes profit over public health.

---

[5] Milne, R., et al. (2021). Demonstrating trustworthiness when collecting and sharing genomic data: public views across 22 countries. *European Journal of Human Genetics*, 29(9), 1332–1345. (PubMed ID: 34034801)

[6] Grady, C., & Eckstein, L. (2015). Trust, vulnerable populations, and genetic data sharing. *Journal of Law and the Biosciences*, 2(3), 747–753. doi: 10.1093/jlb/lsv044

[7] Haga, S. B., & O'Daniel, J. (2021). The Ethics of Consent in a Shifting Genomic Ecosystem. *Frontiers in Genetics*, 12, 664633. (Published in PMC: PMC8683157)

21.    **Increased  Healthcare Inequality Exploited communities may refuse to participate** in future genetic research, reducing diversity in datasets and worsening healthcare disparities. This particularly harms communities of color and other marginalized populations.

## F. Geopolitical and National Security Harms: Genetic Sovereignty at Risk

22.     **Foreign Exploitation Risks** Genetic data could be accessed by foreign entities, including adversarial governments, for:

    **a.**    **Loss of National Genetic Sovereignty** privatization or  or control by offshore entities of genetic heritage of Americans without public awareness, consent, or benefit, which is  a fundamental threat to national biological security.

    **b.**    **Strategic National Asset at Risk** The 23andMe genetic database represents critical infrastructure containing biological blueprints of millions of Americans requiring federal protection rather than commercial sale.

    **c.**    **Population-Specific Biological Weapons** hostile actors development of biological weapons targeting specific American ethnic populations.

    **d.**    **Individual Precision Targeting**  development of  biological weapons targeting specific American leaders, military personnel, or intelligence operatives.

    **e.**    **Foreign Intelligence Exploitation** identification of  American operatives, mapping of  family networks for coercion, and conduct counterintelligence operations.

    **f.**    **AI-Enhanced Genetic Surveillance through**  use of AI, for mass population monitoring, predictive targeting, and systematic genetic discrimination against Americans.

    **g.**    **Multi-Generational Threats**  biological attacks threats affecting future generations through inherited vulnerabilities and long-term population health degradation.

    **h.**    **Undetectable Attacks** Genetic-based attacks that could appear as natural disease outbreaks with delayed activation, providing hostile actors plausible deniability.

23.    **Loss of National Genetic Sovereignty** The genetic heritage of the American population may be privatized or controlled by offshore entities without public awareness, consent, or benefit. This represents a fundamental threat to national biological security.

## G. Consumer Fraud and Economic Harms: Billions Paid, Nothing Received

24.    **Uncompensated Commercialization.** Customers collectively paid approximately $2.9 billion to 23andMe for genetic testing services[8].  Now their genetic data is being sold for an

---

[8] This assumes an average of $200/customer

additional $305 million, yet they receive no compensation, refunds, or share of proceeds despite being the source of all value.

25.     **Bankruptcy Shell Games** The TTAM/TTMC structure allows *23andMe* to sell consumer genetic data without re-consent by claiming it's not technically a "transfer." This represents sophisticated consumer fraud using bankruptcy law as a vehicle for rights laundering.

### H. Ethical and Philosophical Harms: The Commodification of Human Essence

26.     **Dehumanization Through Commodification** Treating DNA as a tradable bankruptcy asset reduces human biological identity to commercial property. This fundamentally violates human dignity and treats people's genetic essence as corporate inventory.

27.     **Intergenerational Injustice** Decisions made today about genetic data sales will affect future generations who cannot consent. Children, grandchildren, and great-grandchildren of current customers will live with the consequences of today's genetic data transfers.

# II. DEBTOR'S  CONSTITUTIONAL VIOLATIONS

28.     The due process violations baked into this transaction include:

>   a.     **15.5 million affected individuals received no meaningful notice** of this bankruptcy or that their genetic data was being sold and therefore, no meaningful opportunity to be heard;
>   b.     **2 million "deleted" account holders** had no opportunity to object to inclusion of their genetic data in the proposed sale of assets;

29.     The proposed transaction is a violation of  Customers' rights of privacy as confirmed by the CPO, noting the Supreme Court has recognized constitutional protection for medical and genetic information." (CPO Report at 20)

### C. Equal Protection Violations

30.     The proposed asset sale would allow systematic discrimination against vulnerable populations whose genetic data is being commodified without recourse, while wealthy individuals have means to protect their genetic privacy through greater financial and legal accessibility.

# III. THE "DELETION DECEPTION" REPRESENTS CONSUMER FRAUD AT SCALE

## A. The Scope of Deception

**31.**    Approximately 2 million customers "deleted" their *23andMe* accounts believing their genetic data and biospecimens would be permanently destroyed. Congressional Investigation[9] and the Consumer Privacy Ombudsman (CPO) Report reveals:

    a.    "Deletion" only removes customer access while retaining all underlying genetic data indefinitely;

    b.    Physical biospecimens (saliva samples, DNA extractions) remain in company custody;

    c.    All research derivatives and analytical results are preserved;

    d.    No verification mechanism exists to confirm actual destruction versus access removal;

## B. Consumer Expectations vs. Reality

32.    When customers click "delete account," they reasonably expect:

    a.    Permanent destruction of their genetic data;

    b.    Removal of physical biospecimens;

    c.    Termination of their relationship with *23andMe*; and

    d.    Protection from future commercial exploitation.

**33.**    The reality is the opposite occurred. All genetic materials remain and are now being sold for $305 million.

## C. Legal and Ethical Implications

34.    This deception violates:

    a.    Consumer protection laws in dozens of states;

    b.    Fundamental principles of informed consent;

    c.    Basic commercial fairness and good faith dealing; and

    d.    Constitutional due process requirements.

# IV. THE TTAM/TTMC STRUCTURE IS TRANSPARENT LEGAL LAUNDERING

## A. The Shell Game Structure

---

[9] https://oversight.house.gov/release/wrap-up-congress-taking-action-to-ensure-the-safety-of-americans-personal-dna-data/

35.    The proposed transaction doesn't technically "move" genetic data—it transfers control through corporate shells while claiming data "stays put", as:

  a.    **TTAM/TTMC** are newly created Delaware entities with no consumer relationships
  b.    **Liabilities remain with "OldCo"** while "NewCo" takes control of genetic assets
  c.    **Legal obligations are laundered** through entity transfers
  d.    **State privacy laws are circumvented** by claiming no "transfer" occurred

## B. Clear Violations of State Privacy Laws

36.    **Texas Law:** Business & Commerce Code § 503.001 requires separate, express consent before genetic data can be disclosed or sold. The proposed structure provides no mechanism for obtaining such consent.

37.    **California CPRA:** Requires affirmative opt-in before any sale of sensitive personal information, explicitly including genetic data. Millions of California customers have no opportunity to opt-out.

38.    **Multi-State Violations:** The CPO documented that "at least twenty-nine states have laws that require companies to obtain consumer consent before disclosing consumers' genetic data." (CPO Report at 77)

# V. ESTABLISHED PRECEDENT PROHIBITS THIS SALE

## A. The Toysmart Doctrine

39.    *FTC v. Toysmart.com, LLC* established that consumer data collected under specific privacy promises cannot be sold in bankruptcy if doing so contradicts those promises. The FTC required that any buyer:

  a.    Be in a similar business
  b.    Agree to be bound by original privacy promises
  c.    Obtain affirmative consent for material changes

40.    The TTAM structure fails every requirement:

  a.    TTAM is a newly created shell, not an established genetic testing business
  b.    The structure is designed to evade, not honor, original privacy promises
  c.    No affirmative consent is being obtained from 15.5 million affected individuals

## B. The Pierce Quasi-Property Doctrine

41.    *Pierce v. Proprietors of Swan Point Cemetery* established that certain subjects exist between property and personhood as "quasi-property" held in "sacred trust." Genetic data shares every defining characteristic:

    a.    **Inalienability**: Cannot be freely bought, sold, or transferred
    b.    **Dignity Interests**: Involves fundamental human dignity
    c.    **Relational Rights**: Affects family and community members
    d.    **Perpetual Nature**: Obligations transcend commercial relationships
    e.    **Public Interest**: Society maintains independent stake in proper treatment

# VI. THE HENRIETTA LACKS LEGACY: WE MUST NOT REPEAT HISTORY

42.    The Henrietta Lacks case stands as a cautionary tale of biological materials taken in trust and exploited without consent. The parallels are stark:

    a.    Biological materials provided for one purpose (medical treatment/genetic testing)
    b.    Commercial exploitation without consent or compensation
    c.    Perpetual use affecting family members across generations
    d.    Profit to companies while individuals bear all risks

This Court must not sanction a 21st-century repetition of this injustice.

# VII. THE GLOBAL BIODATA TRUST: TRUE INDEPENDENCE VS. COMMERCIAL CAPTURE

## A. Why the TTAM Structure Fails

43.    The financial facts demonstrate why TTAM cannot provide independent stewardship:

    a.    *23andMe* has never been profitable
    b.    The company loses over $10 million monthly
    c.    TTAM depends on the same failed business model
    d.    Same leadership that created this crisis retains control

## B. Comparing True Independence

As set forth in the table below the proposed transaction lacks "true independence governance" components as compared to transfer of assets to the Global BioData Trust

| Factor | Global BioData Trust | TTAM/Wojcicki Entity |
|---|---|---|
| **Governance** | Multi-stakeholder board with patient advocates, ethicists, academics | Corporate board controlled by founder |
| **Financial Model** | Nonprofit with no data monetization pressure | Dependent on commercializing genetic data |
| **Transparency** | Public meetings and decisions | Corporate confidentiality |
| **Track Record** | Backed by 100+ year old patient advocacy organizations | Same leadership that created crisis |
| **Accountability** | To data subjects and public interest | To commercial stakeholders |
| **IRB Oversight** | Established bioethics governance | No mention of independent review |

## C. Institutional Support for GBDT

44.    The Global BioData Trust is backed by:

    a.    The National Health Council (100+ years of patient advocacy, 140+ member organizations)

    b.    Major research universities including UC San Diego and UC Santa Cruz

    c.    CAVEAT (The Center for Applied Values and Ethics in Advanced Technologies)

    d.    Established IRB oversight and bioethics governance frameworks

# VIII. REMEDIES: PROTECTING RIGHTS WHILE PRESERVING VALUE

45.    We ask the Court to establish one fundamental principle: **No one should be allowed to sell someone else's DNA without their consent.** This can be achieved through:

    **a.    Staying the proposed sale** pending proper notice and consent procedures

    **b.    Requiring a comprehensive inventory** of all "deleted" account data included in sale assets

   c.  **Mandating disclosure to all 15.5 million affected individuals that their genetic data is being sold**

   d.  **Affirmative opt-in consent** from each affected individual, not silence or inaction

   e.  **Real choice with meaningful alternatives** including deletion and refunds

   f.  **Clear disclosure of all intended uses and recipients of genetic data**

   g.  **Transfer to truly independent governance** through the Global BioData Trust

   h.  **Court supervision** ensuring compliance with state and federal privacy laws

   i.  **Ongoing oversight** with regular reporting to the Court

   j.  **Exclusion of all "deleted" customer data** from sale assets until proper consent obtained

   k.  **Full refunds** for the 2 million customers who requested deletion

   l.  **Independent verification** of actual data destruction capabilities

# IX. THE CONSTITUTIONAL DIMENSION DEMANDS INTERVENTION

46.    The CPO confirmed that this sale implicates fundamental constitutional rights. Approving the TTAM structure without consent would violate:

   a.  **Due process rights** to notice and opportunity to be heard on genetic data transfers
   b.  **Privacy rights** in the most intimate personal information imaginable
   c.  **Property rights** in biological materials provided for specific limited purposes
   d.  **Equal protection** for vulnerable populations whose genetic data is being commodified

# CONCLUSION

47.    Your Honor asked what harm would result from this sale. The answer is clear: irreversible, massive, and permanent harm to 15.5 million people whose genetic essence would be transferred without consent through corporate shell games designed to evade legal protections. In addition, the sale of this data as currently proposed presents a national security risk The harms span every dimension of human dignity and collective national security:

   a.  **Individual**: Permanent loss of genetic privacy and bodily autonomy
   b.  **Familial**: Involuntary exposure of relatives across generations
   c.  **Social**: Genetic discrimination and algorithmic scoring
   d.  **Legal**: Rights without remedies in an unprotected legal landscape
   e.  **Scientific**: Corruption of research ethics and public trust

    f.    **National**: Loss of genetic sovereignty to foreign interests proposes overall national security threat

    g.    **Economic**: Uncompensated commercialization of $2.9 billion in consumer payments

    h.    **Constitutional**: Violation of due process and privacy rights

48.    The proposed sale of *23andMe*'s genetic assets, as currently structured, would inflict irreversible, massive, and permanent harm on 15.5 million individuals whose most sensitive biological information—including that of at least 2 million customers who explicitly deleted their accounts—would be transferred without notice, consent, or any meaningful legal remedy. This "deletion deception" not only strips individuals of their genetic privacy and bodily autonomy, but also involuntarily exposes their relatives across generations, enabling genetic discrimination, algorithmic profiling, and the uncompensated commercialization of $2.9 billion in consumer payments.

49.    The transaction's lack of IRB review, absence of consumer notice, and use of complex intermediary structures to evade legal protections further undermine fundamental research ethics, public trust, and constitutional due process. Legally, it leaves consumers with rights but no remedies, and scientifically, it corrupts the standards that underpin ethical research.

50.    Most alarmingly, transferring one of the world's largest genetic databases outside federal security oversight poses a profound national security threat. This dataset—containing the genetic blueprints of millions of Americans—could be exploited for AI-driven surveillance, population-specific biological weapons, and precision-targeted attacks, representing a loss of genetic sovereignty and a dangerous precedent that human biological essence can be traded like corporate property.

51.    The quasi-property doctrine from *Pierce*, the consumer protection principles from *Toysmart*, the bioethics lessons from Henrietta Lacks, and the constitutional protections recognized by the CPO all point to one conclusion: genetic data requires independent fiduciary protection, not commercial exploitation through shell games.

**52.**    We respectfully urge this Court to:

    a.    Recognize genetic data as quasi-property held in sacred trust

    b.    Reject the proposed TTAM structure as violating state and federal law

    c.    Require transfer to truly independent governance through The Global BioData Trust

    d.    Protect the constitutional and human rights of millions whose genetic essence hangs in the balance

53.     This is our generation's Henrietta Lacks moment. Let us choose dignity over dollars, trust over betrayal, and justice over expedience.

54.     The genetic information revolution promises tremendous benefits, but these benefits cannot come at the cost of fundamental consumer trust, human autonomy, and constitutional protection. When 15.5 million people trusted 23andMe with their genetic essence, they deserved better than corporate shell games designed to evade their legal rights.

55.     The Court has the power under 11 U.S.C. § 105(a) to fashion equitable relief that protects genetic privacy while preserving legitimate research interests. The Global BioData Trust provides that path forward.

---

**Respectfully submitted,**

/s/ John Talbot Sant, Jr.
John Talbot Sant, Jr., MO35324
BECK & SANT, LLC
11775 Borman Drive, Suite 216
Maryland Heights, MO 63146
Phone: 636-240-3632
tal@beckandsantlaw.com
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document was filed electronically with the United States Bankruptcy Court and has been served on the parties in interest via email by the Court's CM/ECF system as listed on the Court's Electronic Mail Notice List on this 24th day of June, 2025.

/s/ John Talbot Sant, Jr.

---

# EXHIBIT A - AMICI CURIAE SIGNATURES

**Linda MacDonald Glenn /s/**
Linda MacDonald Glenn, JD, LLM
Ethicist, Futurist and Attorney-at-law
Faculty, California State University Monterey Bay
Faculty, University of California Santa Cruz
Founding Director, Center for Applied Values and Ethics in Advanced Technologies (CAVEAT)

**Lisa A. Berkley /s/**
Lisa A. Berkley, PhD
Founder and Director, Crown College, University of California Santa Cruz, Resiliency Program
Founding Executive Director, Center for Applied Values and Ethics in Advancing Technologies
(CAVEAT), Crown College, University of California Santa Cruz
Professor, Crown College, University of California, Santa Cruz

**Alexander M. Capron /s/**
Alexander M. Capron, LLB
University Professor Emeritus, Scott H. Bice Chair Emeritus in Healthcare Law, Policy, and
Ethics, Gould School of Law
Professor Emeritus of Law and Medicine, Keck School of Medicine
Founding Co-Director of the Pacific Center for Health Policy and Ethics, University of Southern
California

**Camille Nebeker /s/**
Camille Nebeker, EdD, MS
Professor, Herbert Wertheim School of Public Health and Human Longevity Science, University
of California San Diego, Director, ReCODE Health and Director, Research Ethics Program,
University of California San Diego

**Nanette Elster /s/**
Nanette Elster, JD, MPH
Professor of Bioethics Neiswanger Institute for Bioethics, Loyola University Chicago Stritch
School of Medicine

**Arthur L. Caplan /s/**
Arthur L. Caplan, PhD
Drs. William F. and Virginia Connolly Mitty Professor, Founding Head of the Division of
Medical Ethics, NYU Grossman School of Medicine, Department of Population Health

**Paul Root Wolpe /s/**
Paul Root Wolpe, Ph.D.
Raymond F. Schinazi Distinguished Research Chair of Jewish Bioethics Professor of Medicine,
Pediatrics, Psychiatry, Neuroscience and Biological Behavior, and Sociology Emory University
Atlanta, Georgia

**<u>Kayte Spector-Bagdady /s/</u>**
Kayte Spector-Bagdady, JD, MBe
MBioethics, HEC-C Director, Michigan Bioethics Associate Professor, Obstetrics & Gynecology
Associate Editor, American Journal of Bioethics

**<u>Robert Cook-Deegan /s/</u>**
Robert Cook-Deegan, MD
Professor, Arizona State University Barrett & O'Connor Washington Center

**<u>Andrea Downing /s/</u>**
Andrea Downing
Co-Founder & Board President, The Light Collective

**<u>Elizabeth Dreicer /s/</u>**
**Elizabeth Dreicer**
Founding Chairperson and Trustee, The Global BioData Trust