UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

In re:

*23ANDME* HOLDING CO., et al.,                          Case No. 25-40976

                                                        Chapter 11

                                                        (Jointly Administered)

Debtors.

## MOTION TO REOPEN SALE HEARING DUE TO MATERIAL CHANGES IN TRANSACTION STRUCTURE, NEW INFORMATION, AND MISSING INFORMATION WITHOUT PROPER NOTICE AND DISCOVERY OF FUNDAMENTAL ASSET MISREPRESENTATIONS

**INTRODUCTION**

The University of California Santa Cruz, **Center for Applied Ethics in Advancing Technologies ("CAVEAT")**, members of **The Global BioData Trust** *Bioethics Committee*, Linda MacDonald Glenn, JD, LLM, Lisa A. Berkley, PhD, Alexander M. Capron, LLB, Camille Nebeker, EdD, MS, Nanette Elster, JD, MPH, Arthur L. Caplan, PhD, Paul Root Wolpe, PhD, Kayte Spector-Bagdady, JD, MBe, Robert Cook-Deegan, MD, Andrea Downing, and Elizabeth Dreicer,[1] some of whom are **23andMe Customers and Data Breach Creditors,** (collectively

---

[1] **Linda MacDonald Glenn, JD, LLM:** Ethicist, Futurist and Attorney-at-law, Faculty, California State University Monterey Bay, Faculty, University of California Santa Cruz, Founding Director, Center for Applied Values and Ethics in Advanced Technologies (CAVEAT)

"Movants") together, respectfully move this Court to reopen the sale hearing held on June 20,

2025, pursuant to **Federal** Rule of Bankruptcy Procedure 9024, Federal Rule of Civil Procedure

60(b), and the Court's inherent authority to ensure due process and prevent manifest injustice.

1.      This motion addresses extraordinary procedural defects and material

misrepresentations that fundamentally compromise the integrity of the sale process:

>    a.      the Debtors materially altered the structure of the proposed sale without
>    providing adequate notice to affected parties;
>    b.       approximately 2 million customers who believed they had permanently
>    deleted their accounts are now discovering that their genetic data and
>    biospecimens were retained by *23andMe* and are included in the assets being
>    sold—despite their reasonable expectation that such sensitive information would
>    be fully destroyed; and
>    c.      there has been inadequate disclosure regarding the research cohort, which
>    comprises the vast majority of *23andMe*'s customers who consented to participate

**Lisa A. Berkley, PhD:** Founder and Director, Crown College, University of California Santa Cruz, Resiliency Program, Founding Executive Director, Center for Applied Values and Ethics in Advancing Technologies (CAVEAT), Crown College, University of California Santa Cruz**,** Professor, Crown College, University of California, Santa Cruz

**Alexander M. Capron, LLB:** University Professor Emeritus, Scott H. Bice Chair Emeritus in Healthcare Law, Policy, and Ethics, Gould School of Law**,** Professor Emeritus of Law and Medicine, Keck School of Medicine**,** Founding Co-Director of the Pacific Center for Health Policy and Ethics, University of Southern California

**Camille Nebeker, EdD, MS:** Professor, Herbert Wertheim School of Public Health and Human Longevity Science, University of California San Diego, Director, ReCODE Health and Director, Research Ethics Program, University of California San Diego

**Nanette Elster, JD, MPH:** Professor of Bioethics Neiswanger Institute for Bioethics, Loyola University Chicago Stritch School of Medicine

**Arthur L. Caplan, PhD:** Drs. William F. and Virginia Connolly Mitty Professor, Founding Head of the Division of Medical Ethics**,** NYU Grossman School of Medicine**,** Department of Population Health

**Paul Root Wolpe, PhD:** Raymond F. Schinazi Distinguished Research Chair of Jewish Bioethics, Professor of Medicine, Pediatrics, Psychiatry, Neuroscience and Biological Behavior, and Sociology Emory University Atlanta, Georgia

**Kayte Spector-Bagdady, JD, MBe:** MBioethics, HEC-C Director, Michigan Bioethics Associate, Professor, Obstetrics & Gynecology Associate Editor, American Journal of Bioethics

**Robert Cook-Deegan, MD:** Professor, Arizona State University Barrett & O'Connor Washington Center

**Andrea Downing:** Co-Founder & Board President, The Light Collective

**Elizabeth Dreicer:** Founding Chairperson and Trustee, The Global BioData Trust

in scientific research under IRB oversight—yet no information has been provided
as to whether the Institutional Review Board has reviewed or approved the
transfer or continued use of these research-consented data and biospecimens in
the context of a commercial asset sale.

## STATEMENT OF FACTS

### Material Changes in Transaction Structure

2.      The original sale proceedings contemplated a transaction with Regeneron

Pharmaceuticals as the winning bidder with a $256 million offer. However, the transaction was

fundamentally restructured as a result of being challenged by TTAM Research Institute in the

final days before the hearing, as the following transpired:

a) **June 4, 2025**: The Court reopened the auction

b) **June 11, 2025**: The privacy ombudsman—**Neil M. Richards**, appointed in the case—
   concluded in his report that:

   i. He **could not determine with certainty** whether selling millions of users' genetic
      data aligns with *23andMe's* own evolving stated privacy policy and public
      assurances (CPO Report, I(d), p. 7).

   ii. The data trove is "**one of the most — if not the most — sensitive collections** of
       personal information ever put up for sale in a bankruptcy"(CPO Report, II(c), p.
       19).

   iii. He **strongly recommended**, before any sale is approved, that users must be given
        the chance to provide **"separate, affirmative consent"** for their data to be sold—
        rather than relying solely on general terms buried in the privacy policy (CPO
        Report, I(e), pgs 8-9; VIII, pgs. 105-107.)

c) **June 11, 2025: U.S.** Congressional Hearings revealed that *23andMe's* "delete account"
   function was materially deceptive. While marketed as a tool to erase sensitive genetic
   data, it in fact merely *restricted user access*, allowing the company to retain—and now
   potentially sell—the underlying data and biospecimens. (CPO Report, Pgs 6, 8-9, 19)

d) **June 13, 2025**: TTAM Research Institute, controlled by insider and board member of *23andMe,* Anne Wojcicki, replaced Regeneron as the winning bidder with a $305 million bid with a new Asset Purchase Agreement.

e) **June 18-20, 2025**: The Debtors and TTAM introduce an altered transaction structure designed to avoid the appearance of transferring genetic data and biomaterials while *transferring control* to circumvent federal and state privacy laws.

**Failure to Provide Proper Notice of Material Changes**

3.      The changes outlined above constitute *material modifications* that required *additional notice* under Federal Rule of Bankruptcy Procedure 2002(a)(2) (notice of sale of property), Federal Rule of Bankruptcy Procedure 2002(c)(1) (notice to creditors and equity security holders), and due process requirements for affected stakeholders:

a.      The 6.9 million data breach victims who are creditors in these proceedings;

b.      The 15.5 million customers whose genetic data constitutes the primary asset being transferred; and

c.      Other stakeholders who relied on the original sale structure

4.      As was revealed in the late filings and the Sale Hearing, even sophisticated parties like state Attorneys General *struggled* to address these changes with late and inadequate notice. Consumers had no opportunity whatsoever for meaningful participation.

**Discovery of the "Deletion Deception"**

5.      As revealed in the June 10, 2025, U.S. Congressional Senate hearing[2], the proposed asset inventory included genetic data and *biospecimens* from approximately 2 million

---

[2] https://oversight.house.gov/hearing/securing-americans-genetic-information-privacy-and-national-security-concerns-surrounding-23andmes-bankruptcy-sale/

customers who expressly sought to "delete" their data and discontinue a relationship with

*23andMe*; however:

>    a.      *23andMe's* "delete account" function was materially deceptive. While
>    marketed as a tool to erase sensitive genetic data, it in fact merely restricted user
>    access, allowing the company to retain—and now potentially sell—the underlying
>    data and biospecimens.

>    b.      Senator Josh Hawley underscored the seriousness of this conduct,
>    describing it as a profound violation of consumer trust and a betrayal of
>    Americans who believed their most intimate information was protected;
>    including:

>    >    i.      "I hope [consumers] will rush to the courthouse, even as we are here
>    >    today, to sue you into oblivion," Senator Hawley said to *23andMe's* CEO
>    >    Mr. Selsavage, who failed to provide an adequate explanation for
>    >    *23andMe's* byzantine privacy policy. The CEO ultimately admitted that
>    >    *23andMe's* privacy policy does, in fact, allow the retention of customers'
>    >    personal information—even after consumers opt to delete it.

>    >    ii.      Senator Hawley went on to say, "What you're doing here has all kinds of
>    >    implications—national security implications, all of it—but nothing is
>    >    worse than taking the personal, identifiable information of American
>    >    consumers and keeping it, and lying to them about it."

**Material Misrepresentation of Assets:**

6.      The sale now before the Court includes disputed assets belonging to individuals

who had *explicitly* terminated their relationship with *23andMe*. These consumers received no

notice that their genetic data and biospecimens were still retained—let alone that they were being

sold. To date:

>    a.      Physical biospecimens (e.g., saliva samples and DNA extractions) may
>    remain in *23andMe's* custody despite deletion requests.

b.    There is no independent verification mechanism to confirm whether such data has actually been destroyed rather than merely having user access revoked.

c.    As reported in CPO Report and Congressional Testimony, the company's current privacy policy provides vague and conflicting terms that fail to clearly disclose ongoing retention post-deletion, contributing to this misrepresentation.

**Unclear Role of the Institutional Review Board (IRB) in Sale Authorization**

7.    In addition to privacy policy concerns, the proposed asset sale implicates data covered by human subjects research consent. *23andMe* has repeatedly stated that over 80% of its customers *historically* opted into research participation governed by an independent Institutional Review Board (IRB). However, no disclosure has been made regarding the IRB's review, findings, or authorization concerning the inclusion of such research-consented data and biospecimens in the commercial asset sale. This raises critical ethical and legal concerns, as IRB consent and privacy policy consent are distinct in scope, governance, and purpose. Research participation governed by IRB protocols does not inherently authorize the transfer of research biospecimens or de-identified data to third parties in a bankruptcy asset sale. There is no evidence that the IRB has evaluated the permissibility of such a transfer under applicable federal regulations or ethical standards for human subjects research.

8.    Movants respectfully submit that this missing review represents a major unresolved issue as to the *legitimacy* of transferring research-derived data and further underscores the necessity of reopening the sale hearing to fully evaluate this critical omission; sale should be denied unless and until IRB approves transfer of such data, assuming it is being transferred in the proposed sale.

**Consumer Deception and Financial Harm**

9.    *Consumers* reasonably understood "deletion" to mean permanent destruction of their genetic material and data. In light of the uniquely sensitive nature of genetic information—being immutable, predictive, familial, and perpetual—this misrepresentation is not a minor technical oversight but a core breach of informed consent.

10.    Moreover, consumers collectively paid an estimated **$2.9 billion** for services premised on privacy, *autonomy*, and data control. Of that, approximately **$380 million** came from the 1.9 million customers who specifically requested deletion. These individuals have not received refunds, even though their data remains in the company's possession and is now positioned as a transferable asset in bankruptcy.

**National Security Harm**

11. The following harm would occur if the sale, as structured, were approved**:**

a.    **Strategic National Asset at Ris**k The 23andMe genetic database represents a strategic national asset containing the biological blueprints of millions of Americans. This database constitutes critical infrastructure requiring federal protection rather than treatment as ordinary commercial property subject to bankruptcy liquidation. (See Appendix A for detailed analysis)

b.    **Population-Specific Biological Weapons Development**
1Scientific research has documented the theoretical possibility of developing biological weapons that target specific ethnic or genetic populations. The 23andMe database contains the precise genetic diversity and population markers that could enable hostile actors to develop such weapons targeting American populations. (See Appendix A, Section II.A)

c.    **Individual Precision Targeting Capabilities**
Advances in genetic engineering and synthetic biology raise concerns about biological agents designed to target specific individuals based on their genetic profiles. The database could enable foreign adversaries to develop precision biological weapons targeting American political leaders, military personnel, or intelligence operatives while appearing as natural illness. (See Appendix A,

Section II.A.2)

**d.    Foreign Intelligence Exploitation and Counterintelligence Operations**

Security experts have identified potential capabilities for hostile intelligence services to exploit genetic databases to identify American intelligence operatives, map family networks for coercion, and conduct counterintelligence operations. This database could provide foreign adversaries with identification capabilities exceeding those of U.S. law enforcement. (See Appendix A, Section III.A)

**e.    AI-Enhanced Genetic Surveillance Systems**

Advanced artificial intelligence systems could analyze the 23andMe database to create unprecedented genetic surveillance and targeting capabilities. Foreign adversaries with sophisticated AI capabilities could develop mass population monitoring systems, predictive targeting algorithms, and systematic genetic discrimination tools against American citizens. (See Appendix A, Section III.C)

**f.    Multi-Generational Security Threats**

The genetic information in this database could enable biological threats designed to affect future generations of Americans through inherited vulnerabilities, long-term population health degradation, and epigenetic warfare targeting the genetic health of American families across generations. (See Appendix A, Section VII)

**g.    Detection and Attribution Challenges**

Genetic-based biological attacks could be designed to appear as natural disease outbreaks, use delayed-activation mechanisms, and employ multiple attack vectors that would complicate detection and attribution, providing hostile actors with plausible deniability for attacks on American populations. (See Appendix A, Section VIII)

## LEGAL STANDARD

12.    Federal Rule of Bankruptcy Procedure 9024 incorporates Federal Rule of Civil

Procedure 60(b), which permits reopening proceedings for:

**(1) Mistake, inadvertence, surprise, or excusable neglect**
**(2) Newly discovered evidence that, with reasonable diligence, could not have been discovered in time**
**(3) Fraud, misrepresentation, or misconduct by an opposing party**
**(6) Any other reason that justifies relief**

13.     Additionally, courts possess inherent authority to reconsider their rulings to correct manifest errors of law or fact, prevent manifest injustice, or address material changes in circumstances. *See* In re Continental Airlines, 279 B.R. 784, 788 (Bankr. D. Del. 2002).

14.     Due process requires meaningful notice and opportunity to be heard, particularly when material terms change after initial notice. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

**ARGUMENT**

**I. Material Changes to Transaction Structure During Federal Holiday Violated Due Process**:

   **A.  Fundamental Change in Transaction Type**

   **15.**     The last-minute restructuring deprived affected parties of constitutional due process by:

      a.     Shift from for-profit pharmaceutical company acquisition to nonprofit research institute acquisition through complex intermediary structures

      b.     Introduction of corporate shells (TTAM, NewCo) never contemplated in original sale notices

      c.     Different regulatory frameworks and oversight mechanisms

      d.     Fundamentally altered consumer protection implications and legal compliance obligations

      e.     Changed governance and control structures designed to circumvent state privacy laws (See Exhibit A)

**B. Inadequate Notice and Timing**

    **16.** Pursuant to Fed. R. Bankr. P. 2002(a)(2), parties in interest must be given at least 21 days' notice by mail of the hearing to consider approval of a compromise or settlement. Material changes introduced during a federal holiday when legal and advocacy organizations have limited capacity to respond fail to comply with this requirement. Further:

a.      No opportunity for meaningful objection to the new intermediary structure was provided;

b.      Interested parties could not receive proper notice of the fundamental transaction restructuring:

c.      The materiality of changes is evidenced by the Court's decision to delay sale hearings and the complexity evident in the hearing transcript

**C. Designed to Circumvent Legal Protections** The new intermediary structure appears specifically engineered to evade:

**17.** Texas Bus. & Com. Code § 503.001 (requiring express consent for genetic data transfers)

a.      California's Consumer Privacy Rights Act (CPRA) (mandating opt-in consent for sensitive personal information sales)

b.      Similar consumer protection statutes in other jurisdictions

c.      Federal and state data breach notification requirements

18.      This Court should not permit parties to use bankruptcy as a vehicle for "legal laundering" of consumer protection obligations through complex corporate shell structures.

## II. The "Deletion Deception" Constitutes Grounds for Reopening Under Multiple Standards

### A. Newly Discovered Evidence (Rule 60(b)(2))

19.      The scope of "deleted" account data included in sale assets was not disclosed during proceedings. This evidence:

a.      Could not have been discovered through reasonable diligence during the original proceedings

b.      Materially affects the validity and scope of assets being sold

c.      Impacts approximately 2 million supposed former customers who believed they had terminated their relationship with 23andMe

d.      Represents a substantial portion of the customer base and asset value

### B. Misrepresentation (Rule 60(b)(3))

20.     *23andMe's* failure to disclose that "deleted" customer data and biospecimens remained in sale assets constitutes material misrepresentation:

>      a.      The asset inventory implied only active customer data was included in the sale;

>      b.      There was no disclosure that customers who "deleted" accounts still had genetic data and physical biospecimens being sold;

>      c.      There was misrepresentation of what "deletion" actually accomplished (the customer no longer had access to their data but their biodata remained in *23&Me's* biobank) versus customer expectations (the biodata was destroyed and no longer in the *23&Me* biobank).

>      d.      *23&Me* exhibited deceptive practices that undermine the integrity of the entire sale process.

## C. Other Reasons Justifying Relief (Rule 60(b)(6))

21.     The unique nature of genetic data, as refenced in the sub-paragraphs below, and the scale of affected customers justifies reopening:

>      a.      Genetic data is immutable, familial, and perpetually identifying—it cannot be changed if misused

>      b.      2 million customers are unknowingly having their genetic identity and physical biospecimens sold

>      c.      Consumer protection and privacy rights are at stake for 15.5 million total affected individuals

>      d.      The harm is irreversible and substantial, unlike financial data that can be modified or corrected

## III. Due Process Violations Require Immediate Intervention

## A. Lack of Notice to "Deleted" Account Holders

22.     Customers who "deleted" their accounts:

>      a.      Received no notice of the bankruptcy proceedings or that their data still existed

b.      Had no opportunity to object to inclusion of their genetic data and biospecimens in sale assets

c.      Cannot verify whether actual deletion occurred versus mere access removal

d.      Have no mechanism to protect their genetic privacy rights or seek exclusion from the sale

## B. Fundamental Fairness and Consumer Protection

23.      Allowing the sale of genetic data and biospecimens from customers who explicitly sought to terminate their relationship with 23andMe violates basic principles of fairness and consumer protection. These customers:

a.      Paid for services with explicit privacy promises

b.      Took affirmative steps to delete their accounts and data

c.      Reasonably relied on representations that deletion would be permanent

d.      Are now having their information sold without their knowledge or consent

## IV. Immediate Relief Required to Prevent Irreparable Harm

24.      Given the immutable, predictive, and deeply personal nature of genetic information—and the vast number of individuals affected—the Court must intervene immediately to prevent irreparable harm. The following relief is necessary to restore procedural integrity and protect consumer rights:

## A. Immediate Injunctive Relief

**25.**      Movants respectfully request:

a.      Deny sale until status of "deleted" accounts is verified and properly addressed;

b.      That the Court order a comprehensive inventory of all customer data and biospecimens from deleted accounts currently included in the sale assets;

c.      That the Court require direct notice to affected customers informing them that their genetic data and biospecimens remain in 23andMe's custody and are being offered for sale.

**B. Ongoing Procedural Requirements**

26.    Movants further request:

a.  That the court deny sale unless and until certain actions by IRB, Debtors and others referenced herein are undertaken;

b.    That the Court require Debtor to provide  new notice to all 15.5 million affected consumers outlining the material changes in transaction structure and legal implications;

c.    That  stakeholders be provided additional time to analyze, evaluate, and object to the intermediary sale arrangement;

d.    That the Court add to the duties of the consumer privacy ombudsman under 11 U.S.C. § 332 to safeguard the interests of affected individuals and ensure compliance with federal and state privacy laws.

**C. Asset and Transaction Modifications**

27.    Movants further request:

a.    That  all customer data and biospecimens associated with unverified "deleted" accounts be excluded from the sale asset pool;

b.    That the purchase price be adjusted as necessary to reflect the exclusion of these disputed assets;

c.    That the Court mandate the implementation of independent, auditable deletion verification protocols to confirm compliance with consumer expectations and representations;

d.    That the Court prohibit the use of intermediary entities or legal structures designed to evade statutory privacy protections and regulatory oversight.

**CONCLUSION**

28. The combination of material transaction restructuring without proper notice, the

discovery that millions of customers who "deleted" their accounts still have their

genetic data and biospecimens included in the sale, and the complete absence of

Institutional Review Board (IRB) review or disclosure regarding the research-

consented data, present compelling and extraordinary grounds for reopening these

proceedings.

29. This Court should not permit the transfer of genetic assets from customers who

explicitly chose to terminate their relationship with 23andMe, received no notice of

this sale, and have no mechanism to protect their genetic privacy rights. Nor should it

allow complex intermediary structures designed to circumvent consumer protection

laws—or the misuse of human subjects research consent—to proceed without

appropriate oversight and analysis.

30. Moreover, the proposed transfer of one of the most sensitive genetic databases in the

world raises profound national security implications. As detailed in Appendix A, the

*23andMe* dataset contains the genetic blueprints of millions of Americans. It

represents a strategic national asset vulnerable to exploitation for population-specific

biological weapons, precision-targeted attacks against individuals, and foreign

intelligence operations. Its transfer to entities outside federal security oversight—

especially in the absence of safeguards, transparency, and control—creates

unacceptable risk vectors for AI-enhanced surveillance, intergenerational biological

harm, and untraceable genetic-based assaults against American citizens.

31. The integrity of the bankruptcy process, protection of consumer rights, adherence to

federal research ethics standards, safeguarding of national security interests, and

fundamental constitutional due process all require that these proceedings be reopened,

thoroughly examined, and carefully resolved before any sale may proceed.

**WHEREFORE**, Movants respectfully request that this Court:

A. **Grant this Motion to Reopen the Sale Hearing** and permit full briefing and evidentiary review of the material changes, newly discovered facts, unresolved ethical issues, and national security implications;

B. **Stay any sale or transfer of assets** pending resolution of these matters, including verification of "deleted" account data inclusion and IRB considerations;

C. **Order comprehensive disclosure** of all customer data and biospecimens associated with deleted accounts currently included in the proposed sale;

D. **Mandate direct notice** to all affected consumers—including deleted account holders and those who consented to research use—informing them of the transaction's material changes and their rights;

E. **Appoint a consumer privacy ombudsman** under 11 U.S.C. § 332 to independently represent and protect the privacy and security interests of millions of impacted individuals;

F. Any sale should be expressly conditioned upon the implementation of the aforementioned measures, and should proceed only if the results of Institutional Review Board (IRB) review and further evaluation by the Consumer Privacy Ombudsman (CPO) are deemed satisfactory.

G. **Grant such other and further relief** as this Court deems just, proper, and necessary to protect consumer rights, national security, and the integrity of the judicial process.

---

**Respectfully submitted,**

/s/John Talbot Sant, Jr., **MoBar#35324**
**John Talbot Sant, Jr.**
BECK & SANT, LLC
11775 Borman Drive, Suite 216
Maryland Heights, MO 63146
Phone: 636-240-3632
Fax: 636-240-6803
tal@beckandsantlaw.com
*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

     The undersigned hereby certifies that a true and correct copy of this document was filed electronically with the United States Bankruptcy Court and has been served on the parties in interest via email by the Court's CM/ECF system as listed on the Court's Electronic Mail Notice List on this 24th day of June, 2025.

/s/ John Talbot Sant, Jr.

**Exhibit A**



APPENDIX A

**ANALYSIS: NATIONAL SECURITY THREATS FROM 23ANDME GENETIC DATABASE EXPLOITATION**

I. EXECUTIVE SUMMARY

The genetic database of 23andMe, containing biological information from 15.5 million individuals, represents one of the largest civilian genetic repositories in existence. If acquired by hostile actors, this database poses unprecedented national security risks, enabling new forms of biological warfare, genetic surveillance, and precision targeting capabilities. This analysis details the potential threats posed by genetic data weaponization based on documented scientific research, published intelligence assessments, and established biotechnology capabilities.

II. BIOLOGICAL WEAPONS DEVELOPMENT CAPABILITIES

A. Population-Specific Bioweapons

    1.   Scientific Foundation and Current Capabilities

Research in biotechnology and genetic engineering has documented the theoretical possibility of developing biological weapons that could target specific ethnic or genetic populations.[1] The 23andMe database contains genetic diversity information that could potentially be exploited for such purposes:

a) Population-Specific Genetic Analysis: The database contains ancestry information and genetic markers that could theoretically be analyzed to identify population-specific characteristics.

b) Genetic Homogeneity Vulnerabilities: Published studies indicate that populations with similar genetic backgrounds may share common vulnerabilities to certain biological agents.

c) Reproductive System Targeting: Scientific literature has explored the theoretical possibility of biological agents designed to affect reproductive capabilities in specific populations.

    2.   Individual Precision Targeting

Advances in genetic engineering and synthetic biology have raised concerns about the theoretical development of biological agents designed to target specific genetic profiles.

Potential capabilities include: a) Personalized Biological Agents: The theoretical development of biological weapons tailored to individual genetic signatures. b) Covert Attack Methods:

Biological agents designed to appear as naturally occurring illness. c) Delayed-Activation Systems: Time-delayed biological effects to complicate detection and attribution.

3. Synthetic Biology and Gene-Editing Threats

CRISPR-Cas9 and other gene-editing technologies have expanded the theoretical possibilities for biological weapons development.[2]

Current scientific capabilities that raise concerns include: a) Artificial Pathogen Creation: Documented scientific achievements in synthesizing viruses from genetic sequence data. b) Multi-Component Weapon Systems: Theoretical development of biological agents with multiple activation requirements. c) Immune System Targeting: Research into biological agents that could interfere with human immune, nervous, or endocrine systems.

III. GENETIC SURVEILLANCE AND INTELLIGENCE EXPLOITATION

A. Foreign Intelligence Operations

Security researchers and intelligence experts have identified potential capabilities for hostile foreign intelligence services to exploit genetic databases for counterintelligence purposes.[3]

1. National Security Implications: a) Intelligence Personnel Identification: Genetic databases could potentially be used to identify intelligence operatives through familial DNA analysis. b) Family Network Mapping: Genetic information could reveal family relationships useful for targeting or coercion. c) Enhanced Counterintelligence Capabilities: Foreign adversaries could develop superior identification capabilities using large genetic datasets.

B. Mass Population Surveillance

Various nations have implemented large-scale genetic collection programs, demonstrating the surveillance potential of genetic databases.[4]

1. Surveillance Applications: a) Location and Movement Analysis: DNA evidence could theoretically track individual presence at specific locations. b) Social Network Mapping: Genetic genealogy could expose family and social relationships. c) Predictive Analysis: Genetic information could be used for targeting decisions. d) Population Monitoring Infrastructure: Large genetic databases enable systematic population surveillance capabilities.

C. Artificial Intelligence-Enhanced Analysis

Advanced computational systems could potentially analyze genetic data to identify vulnerabilities or develop targeting strategies.

1. AI-Enhanced Capabilities: a) Pattern Recognition: Machine learning could identify genetic patterns relevant to biological targeting. b) Predictive Modeling: AI systems could optimize biological agent design for specific genetic profiles. c) Population Analysis: Computational systems could analyze population-level genetic vulnerabilities.

## IV. DOMESTIC SECURITY THREATS

### A. Terrorist and Criminal Organization Exploitation

The increasing accessibility of biotechnology raises concerns about non-state actors acquiring biological weapons capabilities.

1. Potential Terrorist Applications: a) Agricultural System Targeting: Biological agents designed to affect food production systems. b) Infrastructure Attacks: Genetic information used to target critical infrastructure personnel. c) Population-Specific Attacks: Terrorist groups potentially targeting specific communities or populations.

### B. Criminal Enterprise Applications

1. Genetic Exploitation Schemes: a) Extortion Operations: Using genetic information for blackmail or coercion. b) Identity-Related Crimes: Sophisticated fraud schemes using genetic data. c) Targeting Schemes: Using genetic profiles to identify vulnerable individuals.

## V. HEALTH SYSTEM AND CRITICAL INFRASTRUCTURE VULNERABILITIES

### A. Medical System Exploitation

Genetic information could potentially be used to exploit vulnerabilities in medical treatment systems.

1. Medical System Attack Vectors: a) Drug Interaction Exploitation: Using genetic data to identify dangerous pharmaceutical combinations. b) Treatment Sabotage: Exploiting genetic predispositions during medical care. c) Vaccine and Treatment Interference: Identifying genetic factors that affect medical treatment efficacy.

### B. Critical Infrastructure Personnel Targeting

1. Essential Services Disruption: a) Healthcare Personnel: Targeting medical professionals during health emergencies. b) Military and Security Personnel: Biological agents

designed for specific occupational populations. c) Government Personnel: Precision targeting of political and administrative leadership.

## VI. EMERGING TECHNOLOGICAL THREATS

### A. Advanced Computing Integration

Future technological developments could amplify genetic data exploitation capabilities.

1. Enhanced Technological Capabilities: a) Quantum Computing Applications: Advanced computational power for genetic analysis and biological design. b) Pattern Analysis Enhancement: Superior capability to identify genetic vulnerabilities. c) Predictive Modeling Advancement: Enhanced ability to design targeted biological agents.

### B. Nanotechnology and Delivery Systems

1. Advanced Delivery Mechanisms: a) Precision Targeting Systems: Nanotechnology-enhanced biological agent delivery. b) Stealth Deployment Capabilities: Advanced methods for covert biological agent deployment. c) Environmental Persistence: Self-sustaining biological systems with extended operational periods.

## VII. MULTI-GENERATIONAL SECURITY IMPLICATIONS

### A. Long-Term Genetic Vulnerabilities

1. Generational Security Concerns: a) Inherited Vulnerability Exploitation: Biological effects designed to manifest across generations. b) Population-Level Health Degradation: Long-term reduction of population disease resistance. c) Epigenetic Effects: Environmental factors that could activate harmful genetic expressions.

## VIII. DETECTION AND ATTRIBUTION CHALLENGES

### A. Covert Operation Characteristics

1. Investigation and Detection Difficulties: a) Natural Disease Simulation: Biological attacks designed to appear as natural outbreaks. b) Delayed Effects: Time-delayed activation complicating threat detection. c) Attribution Complexity: Multiple attack vectors making source identification difficult.

## IX. LEGAL AND POLICY IMPLICATIONS

Current U.S. intelligence and security assessments have identified genetic weapons as an emerging threat requiring policy attention. The transfer of large genetic databases without

appropriate national security review could potentially compromise American strategic interests and population security.

The genetic information contained in the 23andMe database represents sensitive data that requires protection under national security frameworks rather than treatment as routine commercial property subject to bankruptcy liquidation.

X. CONCLUSION

The 23andMe genetic database represents a potential national security vulnerability that, if acquired by hostile actors, could enable:

1. Advanced biological weapons development targeting American populations;
2. Enhanced genetic surveillance capabilities exceeding current U.S. government capabilities;
3. Long-term biological threats affecting future generations;
4. AI-enhanced targeting with unprecedented precision; and
5. Covert biological operations difficult to detect or attribute.

The implications extend beyond individual privacy concerns to fundamental questions of national security, population protection, and genetic sovereignty. Protection of this genetic information requires government intervention to prevent acquisition by hostile actors and ensure appropriate safeguards for this sensitive national security-related data.

---

FOOTNOTES

[1] See generally academic literature on ethnic bioweapons and population-specific biological agents, including documented research in biotechnology journals and security studies publications.

[2] See scientific literature on CRISPR-Cas9 applications and synthetic biology capabilities, including peer-reviewed research on artificial pathogen creation.

[3] See cybersecurity and intelligence analysis literature on genetic database vulnerabilities and foreign intelligence exploitation methods.

[4] See documented reports of national genetic collection programs and their surveillance applications in various countries.