**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re: | Case No. 25-40976-357 |
| **23ANDME HOLDING CO.**, *et al.*, | **Chapter 11** |
|  | **Jointly Administered** |
| Debtors. |  |
|  | **Related to Doc. 30** |

## MEMORANDUM OPINION

The Debtors in these cases operate businesses centered around highly sensitive personal information. Their largest business unit involves the analysis of consumers' DNA, and they currently have approximately 13 million customers. More than 80% of the Debtors' customers also have elected to participate in the Debtors' medical-research programs.[1] Following an extensive marketing and sale process, the Debtors propose to sell substantially all of their assets to TTAM Research Institute (TTAM), a non-profit corporation headed by the Debtors' co-founder and former chief executive officer. The transaction as currently structured involves the transfer of the Debtors' assets, including genetic and other personally identifiable information (PII), from the Debtors to a newly formed subsidiary, which will then be sold to TTAM in an equity transaction.

More than 30 States and the District of Columbia initially objected to the proposed sale, largely on privacy-related grounds.[2] Before the sale hearing and while it was underway, many of these States resolved their objections or otherwise acknowledged that they would not actively oppose the sale.[3] California, Kentucky, Tennessee, Texas, and Utah remain actively

---

[1] A third business unit provides telehealth services. It is not clear whether this business will ultimately be included in the proposed sale, and the objecting parties have not presented evidence or arguments specific to it. I will not discuss it further here.

[2] In the interest of simplicity, I refer to these objecting parties as States or by the name of a particular State, even if they formally appear through a state agency or official.

[3] This high-level summary is not intended to override the specific language of and conditions imposed by any particular State's arrangement with the Debtors and TTAM.

(footnote continued)

opposed to the sale. This opinion addresses their objections, as well as certain related recommendations made by Professor Neil Richards of Washington University in St. Louis, who has served as the Consumer Privacy Ombudsman in these cases (Ombudsman).

For the reasons discussed below, I will grant the Debtors' sale motion and approve the proposed transaction.

## I.    Jurisdiction

The Court has subject-matter jurisdiction under 28 U.S.C. § 1334(b) because the Debtors' sale motion arises under Title 11. This is a core proceeding under 28 U.S.C. § 157(b)(2)(N).

## II.    Background

I conducted a two-day evidentiary hearing to consider whether to approve the proposed sale. The Debtors and the States presented witness testimony, generally offering direct testimony in the form of declarations with attached exhibits. Other declarations were admitted into the record in earlier stages of these cases, including the bid-procedures hearing, and discussed undisputed background matters.

### A.    The Debtors' Business and History

The Debtors operate a direct-to-consumer genetic-testing business. After creating an account, a customer sends a saliva sample to the company to be tested (Am. Lefkowitz Decl. ¶ 5). Customers can then learn about their personal genome, including their ancestry and susceptibility to certain illnesses (*Id.*). At the time of the sale hearing, the Debtors had approximately 13 million customers (Tr. 2:146).[4]

The Debtors also offer customers the opportunity to participate in medical research, and more than 80% of them have chosen to do so (Wojcicki Decl. ¶ 6). Data provided to researchers is deidentified, meaning that it is not associated with individual customers (Tr. 1:163). Customers may opt out of medical research at any time (Wojcicki Decl. ¶ 13). They

---

These include reservations of the right to prosecute their objections to a sale of the Debtors' assets to the proposed backup bidder, Regeneron Pharmaceuticals, Inc. The Debtors and others agree that it is not necessary for me to resolve objections to the contingent sale to Regeneron now.

[4] Tr. 1 refers to the amended transcript of proceedings held on June 18; Tr. 2 is the transcript for June 20.

also have the rights to delete their accounts and to direct the Debtors to dispose of their saliva samples (*Id.*). In fact, approximately 1.9 million customers have deleted their accounts since the Debtors commenced these Chapter 11 cases (Tr. 2:152).

The Debtors maintain consumer-related assets in physical form—saliva samples housed in biobanks—and in electronic form—DNA testing results and other customer account information such as names and email addresses. The electronic data certainly qualifies as PII, and no party has suggested that the physical samples should be treated differently.

The Debtors cited several causes for their Chapter 11 filings, such as inflation and rising competition (Kvarda Decl. ¶ 4). Perhaps the biggest strain on the Debtors' resources comes from legal actions commenced or threatened against them related to a 2023 data breach (Kvarda Decl. ¶ 64). During this incident, hackers obtained access to personal data of approximately 7 million of the Debtors' customers (*Id.*).

Before turning to restructuring, the Debtors considered several alternative solutions to resolve their financial struggles (Am. Swift Decl. ¶ 7). Then-CEO and co-founder Anne Wojcicki considered taking the Debtors private (Walper Decl. ¶ 4). A special committee of the board of directors (Special Committee) was formed in March 2024 to consider Ms. Wojcicki's proposals and other options (*Id.*). The members of this committee resigned from the Debtors' board in September 2024 (Walper Decl. ¶ 5). The Debtors reconstituted the Special Committee in October 2024 with new independent directors (*Id.*). Ms. Wojcicki is not a member of the Special Committee (Kvarda Decl. ¶ 89). The Special Committee sought out and received several proposals to purchase either the entire company or some of its assets, but it determined that none of these proposals were actionable (Am. Swift Decl. ¶¶ 8-9).

Having not received any adequate proposals to purchase the company and facing a worsening financial condition, the Special Committee sought to sell the Debtors' assets in bankruptcy (Am. Swift Decl. ¶¶ 9-10). The Special Committee has authority over all matters related to restructuring, including these Chapter 11 cases (Walper Decl. ¶ 6).

### B.    The Debtors' Privacy Policies

A customer must create an account before using the Debtors' services. (Am. Lefkowitz Decl. ¶ 8). As part of the sign-up process, the customer must check a box stating that she has read and agrees to the Debtors' Terms of Service and Privacy Statement. (Am. Lefkowitz Decl. Exh. V). The text of these documents is available via a hyperlink, but the Debtors do not require customers to actually read them. (*Id.*; Omb. Rep. 31).

The Debtors' privacy policies have changed throughout the nearly twenty years that the Debtors have been operating (Omb. Rep. 32). But one aspect of the Privacy Statement has been consistent: since 2007, every version of the statement has contained language alerting customers that their personal information may be sold in connection with a merger, acquisition, or sale of the Debtors' assets and that the requirements of the Privacy Statement would apply to the successor or purchaser (Omb. Rep. App. C). In 2022, the Debtors added a reference to bankruptcy in this discussion of transactions that might include a sale of data (*Id.*). Although the Debtors later published several more versions of the Privacy Statement, they did not change this language (*Id.*). As of the commencement of these cases, it stated that personal data may be "accessed, sold or transferred" in the event of "a bankruptcy, merger, acquisition, reorganization, or sale of assets" (Am. Lefkowitz Decl. ¶ 16.).

Other areas of the Debtors' website emphasize their commitment to protecting consumer data and the importance of privacy (Omb. Rep. 33). Consumers are repeatedly assured that they are in control of their genetic information (*Id.*). Earlier versions of the Privacy Statement also explicitly told customers in a summary section that the company "does not sell, lease, or rent your individual-level Personal Information without explicit consent" (Am. Lefkowitz Decl. Exhs. B, C, D). But they also contained the above-mentioned language about the possibility that information would be sold in connection with a sale of assets (Am. Lefkowitz Decl. Exhs. B, C, D).

In addition to the Privacy Statement, the Debtors have a supplemental Privacy Notice that applies to residents of some states (Vibbert Decl. Exh. 23). The most recent version applies to residents of California, Colorado, Connecticut, Utah, Virginia, and Washington (*Id.*). It informs these customers that they have the right to "opt-out of a sale or sharing of your Personal Information with a third party" (*Id.*). A more detailed section of the Notice suggests that this language may be intended to refer to website cookies and other tracking technologies, to the extent that their operations might constitute a sale or sharing under the law, rather than to a more straightforward sale of data, as is proposed here.

Earlier versions of this Privacy Notice, which applied only to California residents at the time, addressed sales more directly, stating that "**we do not sell your Personal Information**" in bold text (Vibbert Decl. Exh. 27). This language was eliminated in December 2022 when an amendment broadened the Notice to apply in additional states (Vibbert Decl. Exh. 26).

### C. The Proposed Transaction

On March 24, 2025, the Debtors filed a motion to establish bidding procedures and to set certain hearing dates and deadlines for the sale process. I granted that motion after a

hearing, authorizing the Debtors to conduct an auction for the sale of all or substantially all of their assets, although I did not approve the Debtors' request to determine that no consumer privacy ombudsman would be required in these cases. The Debtors held a three-day auction beginning on May 14, with seven bidders participating and an opening bid of $52 million (Walper Decl. ¶ 13). At the conclusion of the auction, the Special Committee selected Regeneron as the successful bidder, with a bid of $256 million, and TTAM as the backup bidder, with a bid of $146 million (Walper Decl. ¶ 14). After the auction had closed, TTAM submitted additional proposals, one of which included a purchase price of $305 million (Walper Decl. ¶ 16).

In recognition of the incremental value offered by TTAM, the Debtors filed a motion seeking to establish procedures for a final round of bidding. Although Regeneron had objected to the Debtors' consideration of additional bids from TTAM, it supported the procedures proposed in the Debtors' motion. Conversely, although TTAM wanted to submit an overbid, it objected to the details of the Debtors' proposal. The parties resolved their differences during a recess in the hearing, and I entered an order that established procedures for a final round of bidding in which TTAM's bid of $305 million would be the starting bid (Walper Decl. ¶¶ 17-18). The Debtors conducted this final round on June 13, 2025 (Walper Decl. ¶ 18). Regeneron did not submit an additional bid (*Id.*). The Special Committee thus selected TTAM's $305 million bid as the winning bid (Walper Decl. ¶ 19). And the Debtors filed a notice of the selection of TTAM as the winning bidder and Regeneron as the backup bidder, together with copies of their respective asset purchase agreements, later on June 13.

Ms. Wojcicki created TTAM soon after the Debtors filed their voluntary petitions, with the goal of using TTAM to purchase the Debtors' assets (Wojcicki Decl. ¶ 8). TTAM is a non-profit public-benefit corporation that is fully funded by Ms. Wojcicki and her affiliates (Wojcicki Decl. ¶¶ 8, 11). Ms. Wojcicki is the chief executive officer and president of TTAM and one of three members of its board of directors (Wojcicki Decl. ¶ 11).

The form of Asset Purchase Agreement between the Debtors and TTAM (APA), filed on June 13, contemplates a sale of assets by the Debtors directly to TTAM or its designee. But it also includes two alternative structures. Under Section 2.8, the Debtors may elect to implement an equity transfer, which the parties have referred to as the Equity Toggle. And under Section 11.8, in certain circumstances, the Debtors may choose to complete the transaction through confirmation of a Chapter 11 plan of reorganization, which the parties have referred to as the Plan Toggle.

The Debtors elected to proceed under the Equity Toggle on June 14 and filed a notice of the election on the docket. The Equity Toggle involves two separate transactions. First, the Debtors will form a new, wholly owned limited-liability company, which the parties have

referred to as Newco. Newco will purchase the Debtors' assets, including customer data, in exchange for a promissory note due and payable upon a change in control of Newco. This sale would be free and clear of liens, claims, and encumbrances under Section 363(f) of the Bankruptcy Code. In the second step, the Debtors would sell all of their equity interests in Newco to TTAM, also free and clear of liens, claims, and encumbrances. Following the closing, TTAM would be the sole owner of Newco, which would house all customers' genetic data and other assets.

If the sale is approved and consummated, TTAM will essentially operate in the same manner and serve the same functions as the Debtors do currently (Wojcicki Decl. ¶¶ 12, 22). TTAM has agreed to make employment offers to all of the Debtors' employees (Wojcicki Decl. ¶ 22). The same limited number of people that currently have access to customer data would continue to have access (Tr. 1:135). The transaction process contemplates that genetic data will not be disclosed to any new parties (Wojcicki Decl. ¶ 22).

Following the closing, TTAM's privacy policy will be the same as the Debtors' policy in effect on the petition date (Wojcicki Decl. ¶ 14). This includes customers' continuing deletion rights and the ability to opt out of research in perpetuity (*Id.*). TTAM has also agreed to certain privacy enhancements, listed in Exhibit D of the APA. These include TTAM's agreement to comply with applicable laws, even if it might otherwise be excused from complying because of its status as a non-profit, and limitations on future mergers, acquisitions, bankruptcy transactions, and asset sales. TTAM also has agreed not to share personal information with insurance companies. Within ninety days of the closing, TTAM intends to form an independent consumer privacy advisory board that will ensure compliance with relevant privacy laws. And TTAM has agreed to provide customers with two years of identity-theft monitoring. These privacy enhancements would not apply under the Plan Toggle (APA Exh. D).

The Debtors have not yet elected the Plan Toggle, but an assessment of the States' objections requires an understanding of that alternative. If exercised, it would result in the completion of the proposed transaction through a Chapter 11 plan, rather than through a Section 363 sale. Under that plan, TTAM would become the sole owner of the reorganized Debtors, resulting in exactly the same structure as under the Equity Toggle. Because no assets would move out of the Debtors—not even to affiliates—the state statutes that may complicate the Equity Toggle would not apply to the Plan Toggle.

In additional to formal notices filed on the docket of these cases, the Debtors published notice of the proposed sale in the Wall Street Journal on April 2, 2025. They also distributed a notice to all current and former customers of a potential change of ownership of their personal information beginning on June 11, 2025. The Debtors and TTAM have agreed to

send another notice by email to current customers, at least two days prior to closing, informing them about TTAM's privacy practices, customers' right to delete their accounts and data, and related matters.

### D.    The Ombudsman's Principal Conclusions and Recommendations

Following some initial disagreement, the parties agreed to the appointment of a consumer privacy ombudsman in these cases. On April 29, 2025, I entered a joint stipulation and agreed order that directed the United States Trustee to appoint an ombudsman. The Ombudsman was asked to address, among other considerations, whether the proposed sale of personally identifiable information complied with Debtors' privacy policies and whether the sale would violate applicable non-bankruptcy law. Professor Richards filed his report on June 11, 2025, before the final round of bidding.[5]

In his report, the Ombudsman states that he considers the Debtors' privacy policies to be broader than the formal Privacy Statement, Privacy Notice, and Terms of Service (Omb. Rep. 28). He cites multiple representations the Debtors made about the importance of privacy and their repeated assurances to customers that their personal data would be protected (Omb. Rep. 29). He also discusses statements by the Debtors that customers are in control of their own genetic data (*Id.*). The Privacy Statement has always included language about the possibility of customer data being sold as part of a larger change in ownership of the company (Omb. Rep. Exh. C). But the Ombudsman notes that other pages of the company's website promise not to share the genetic data of consumers (Omb. Rep. 33). Ultimately, the Ombudsman was not able to conclude with certainty whether the proposed sale is consistent with the Debtors' privacy policies (Omb. Rep. 41).

Similarly, the Ombudsman analyzed a variety of federal, state, and foreign non-bankruptcy laws that may apply to the proposed sale (Omb. Rep. 60-105). Among these are state genetic-privacy laws that apply to direct-to-consumer genetic-testing companies such as the Debtors (Omb. Rep. 93-100). Many of these statutes require the express consent of a consumer before certain transfers or disclosures of the consumer's genetic data (*Id.*). The Ombudsman states that these state genetic-privacy laws are likely the most relevant non-bankruptcy laws (Omb. Rep. 93), and indeed they are at the heart of the States' objections to

---

[5] The Ombudsman's report is thorough and detailed. Some of his recommendations have been mooted by TTAM's agreement to certain deal terms; some do not apply in light of subsequent developments; and still others would have required a party to develop a factual record before I could realistically act on them. I address here only the Ombudsman's main recommendations that remain matters of contention.

the transaction. The Ombudsman was unable to conclude that the sale would not violate the state genetic-privacy laws or other applicable non-bankruptcy laws (Omb. Rep. 97).

The Ombudsman also proposed privacy safeguards in his report that he believed a winning bidder should be required to follow (Omb. Rep. 105). The most significant is that the Debtors should be required to obtain separate and express consent from each customer before transferring the customer's data, even if the law does not require that consent (*Id.*). As an alternative, he suggested that the purchaser be permitted to take control of the data, but not to use it until the purchaser obtains affirmative consent (Omb. Rep. 105-06). As a third alternative, he recommended that the Debtors be required to provide their customers with actual notice of the sale that includes a statement about the ability of customers to delete their data, but he notes that this alternative would be significantly less protective of consumers' privacy interests (Omb. Rep. 109-11).

The Ombudsman also recommended that the purchaser make a binding commitment that it will not use genetic data in a manner that is inconsistent with the best interests of consumers (Omb. Rep. 107-08). And he suggested policies to reduce the likelihood that the purchaser would retain genetic data after a customer's death, including allowing a next of kin to delete data, deleting the accounts of customers who do not log into the service for years or respond to email prompts, and providing that research consents will terminate upon the death of the customer unless the customer affirmatively agrees to donate genetic information to science (Omb. Rep. 106-07).

## III.    Analysis

I discuss below the States' objections to the proposed sale. Many of the objections turn on state legislation that governs direct-to-consumer genetic-testing companies such as the Debtors. Before reaching those issues, however, I address a preemption theory advanced by the Debtors and TTAM, which appears to be an issue of first impression.

### A.    Preemption of State-Law Restrictions on Transfer

A threshold question is whether the Debtors must comply with the States' laws in the first place. If the Bankruptcy Code preempts state law in this context, as the Debtors and TTAM contend, then the finer details of state law are irrelevant.

#### 1.    Preemption of transfer restrictions generally

The Bankruptcy Code does not state directly whether a debtor must comply with non-bankruptcy law in the sale of PII, but it provides some clues. Section 541(c), for example, states that property of the debtor becomes property of the bankruptcy estate "notwithstanding

any provision in … applicable nonbankruptcy law … that restricts or conditions transfer of such interest by the debtor." 11 U.S.C. § 541(c)(1)(A). This is a clear statement of preemption of state law, with exceptions that are not relevant here, but in a different context: as property moves *into* the bankruptcy estate.

When a debtor seeks to transfer an asset *out* of the bankruptcy estate, two Bankruptcy Code provisions are relevant. Section 363(*l*) authorizes a debtor to sell property "notwithstanding any provision in … applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor … and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property." 11 U.S.C. § 363(*l*). This also is language of express preemption, but its scope is limited to laws that operate to deprive financially struggling owners of the very assets they seek to sell. Meanwhile, if the debtor is "a corporation or trust that is not a moneyed business, commercial corporation, or trust," the debtor may sell property "only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust." 11 U.S.C. § 363(d)(1). This is the antithesis of preemption, but it applies only to a non-profit debtor.

For a sale by a for-profit debtor, then, there is neither a broad preemption of state-law transfer restrictions, as in Section 541(c), nor a broad requirement that the debtor comply with those restrictions, as in Section 363(d)(1).

The case law resolves this gap in favor of compliance. In *In re Schauer*, 835 F.2d 1222 (8th Cir. 1987), a bankruptcy trustee sought to sell patronage certificates issued to the debtors by a farm cooperative even though the trustee had not obtained the consent of the cooperative's board of directors, as its bylaws required. The trustee argued that the Bankruptcy Code preempted state law, but the Eighth Circuit rejected that contention, stating that "Sections 363(b)(1) and 704 do not expressly authorize the trustee to sell property contrary to the restrictions imposed by state and contract law." *Id.* at 1225.[6]

---

[6] The Fourth Circuit held in a similar case that a Minnesota cooperative could be compelled to turn over patronage certificates. *See In re FCX, Inc.*, 853 F.2d 1149, 1155 (4th Cir. 1988). But that dispute arose under a plan of reorganization, and the court concluded that the introductory language of Section 1123(a) ("Notwithstanding any otherwise applicable nonbankruptcy law…") provided the preemption that was lacking in *Schauer. See id. See also In re Federal-Mogul Global, Inc.*, 684 F.3d 355, 369 (3d Cir. 2012) (construing § 1123(a) similarly).

*Schauer* is consistent with the Supreme Court's earlier decision in *Board of Trade v. Johnson*, 264 U.S. 1 (1924). The Court's opinion in that case is dense, but it is generally understood as establishing that the trustee could not sell a seat on a commodities exchange without complying with the exchange's rules governing sales. *See id.* at 10 ("Of course, where the Bankrupt Law deals with property rights which are regulated by the state law, the federal courts in bankruptcy will follow the state courts."); *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019) (describing *Board of Trade* as establishing the principle that "[t]he estate cannot possess anything more than the debtor itself did outside bankruptcy."); Kenneth N. Klee, *Bankruptcy and the Supreme Court* 190 (2008).

The courts have since applied this principle to restrictions imposed directly by state law, as opposed to the contract-based restrictions in *Board of Trade* and *Schauer*. Thus, if a state's champerty law prohibits the assignment of a cause of action, the Bankruptcy Code does not override it. *See Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 493 (3d Cir. 1997); *Crabtree v. Allstate Property & Casualty Ins. Co.*, No. 23-60537, 2025 WL 1662279, at *2 (5th Cir. June 12, 2025). The same is true of a law restricting the assignment of payments under a structured settlement. *See In re Crossman*, 259 B.R. 301, 307 (Bankr. N.D. Ill. 2001); *In re Jackus*, 442 B.R. 365, 370 (Bankr. D.N.J. 2011). *See also In re Rosa Dairy Farm, Inc.*, 622 B.R. 806, 817 (B.A.P. 1st Cir. 2020) (§ 363 does not preempt requirement to obtain regulatory body's approval of lease); *In re Borne Chemical Co.*, 54 B.R. 126, 132 (Bankr. D.N.J. 1984) (§ 363 does not preempt state environmental cleanup law).

Exempting debtors and trustees from transfer restrictions in non-bankruptcy laws would present significant public-policy challenges. Generally applicable laws regulate or prohibit the transfer of items as diverse as firearms, endangered species, controlled substances, securities, human organs, and goods manufactured in violation of the wage-and-hour laws. *See, e.g.*, 26 U.S.C. § 5861 (firearms); 16 U.S.C. § 668 (bald eagles); 21 U.S.C. § 841 (controlled substances); 15 U.S.C. § 77e (unregistered securities); Mich. Comp. Laws § 333.10204 (organs); 29 U.S.C. § 215(a) ("hot goods"). Nothing in the Bankruptcy Code suggests that Congress intended that these salutary laws should be unenforceable merely because a debtor or a trustee is the seller.

## 2. Preemption of PII transfer restrictions

The Debtors do not dispute the general principle established by these precedents. They contend that only sales of PII are exempt from non-bankruptcy restrictions, and only if a debtor's privacy policy authorizes a sale of the information. Their argument depends on language added to Section 363(b)(1) after *Schauer* was decided. It reads, in relevant part, as follows:

… except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

> (A)    such sale or lease is consistent with such policy; or

> (B)    after appointment of a consumer privacy ombudsman … the court approves such sale or lease—

>> (i)    giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

>> (ii)    finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

11 U.S.C. § 363(b)(1).

The Debtors reason that compliance with applicable law appears only in subparagraph (B), and so there is no need for them to comply with applicable law if I approve their proposed sale under subparagraph (A). In other words, they say, if they demonstrate that the sale is consistent with their privacy policy, they do not need to show anything else.

The Debtors have not identified any precedent supporting their preemption theory.[7] I find their argument unpersuasive for several reasons.

First, the structure of the statute suggests a different meaning. The language quoted above begins with "except that" and specifies when a debtor "may not sell" property. 11 U.S.C. § 363(b)(1). It is thus a limitation on the power to sell, applicable to debtors with restrictions in their privacy policies. Compliance with subparagraphs (A) or (B) satisfies that limitation, but it does not mean that the debtor has met all other requirements of the statute. In other words, (A) and (B) include necessary but not sufficient conditions for approval of a

---

[7] As far as I am aware, the Chapter 11 case of Invitae Corporation in the District of New Jersey is the only other instance in which genetic data has been sold in a Section 363 sale. The court in that case had no occasion to address preemption because no party objected to the sale on privacy grounds or even requested the appointment of a consumer privacy ombudsman. *See In re Invitae Corp.*, No. 24-11362 (Bankr. D.N.J. May 7, 2024) (Doc. 463).

sale of PII by a debtor with a privacy policy that includes restrictions; the rest of Section 363 (and the rest of the Bankruptcy Code) remain relevant.[8]

Second, both the exception language for PII sales in Section 363(b)(1) and the restrictions on sales by non-profit debtors in Section 363(d)(1) were included in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). If Congress intended to exempt for-profit debtors selling PII from compliance with state law, it would have been a simple matter to add language to Section 363(d), or perhaps 363(*l*), saying that expressly.

Third, the PII exception comes from Section 231 of BAPCPA. *See* Pub. L. No. 109-8, § 231(a) (2005). The report of the House Committee on the Judiciary on the bill stated that Section 231 "does not preempt applicable nonbankruptcy law." H.R. Rep. No. 109-31, pt. 1, at 67 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 136. Legislative history can be an unreliable guide, and perhaps this was an imprecise reference to the "no showing was made" language in Section 363(b)(1)(B)(ii). Nevertheless, it is a blanket statement; it does not distinguish between debtors with permissive and restrictive privacy policies.

Fourth, the implications of the Debtors' preemption theory are concerning.[9] Consider a hypothetical state statute that bars any business from selling its customer information to any person who has been convicted of a felony involving identity theft. Or another that prohibits a video streaming service from disclosing a subscriber's viewing history. Under the Debtors' theory, a debtor or a trustee could sell the information regardless of the restrictions, exposing consumers to harm and, depending on who the purchaser is, embarrassment. These would be

---

[8] One way of testing the Debtors' preemption theory is to compare the rights of two hypothetical debtors, one with no privacy policy at all and the other with a typical policy that prohibits some transactions but has exceptions for others. Logically, the first debtor should have the greatest freedom to sell its assets, because it is not subject to the Section 363(b)(1) exception at all. But the Debtors' theory would give only the debtor with a partially restrictive policy the ability to ignore state law.

[9] The Debtors clarified at the sale hearing that because their preemption argument is grounded in the Supremacy Clause, federal non-bankruptcy laws are not preempted. I question whether a preemption theory that is based on the location of the phrase "applicable nonbankruptcy law" within a statute can be confined to only some non-bankruptcy law, but I will accept the premise for purposes of this discussion. This narrower interpretation steers clear of problems such as sales of PII in violation of international trade sanctions. But rather than eliminating the parade of horribles that follows, it just means that that parade has fewer floats.

remarkable consequences of a legislative proviso consisting of less than a full sentence. As Justice Scalia memorably stated, "Congress … does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

The Debtors' argument is based on so-called obstacle preemption, which requires a showing that "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (cleaned up). Courts have applied obstacle preemption in bankruptcy cases in which the purposes and objectives of Congress are clear. *See, e.g., In re Old Carco LLC*, 442 B.R. 196, 210 (S.D.N.Y. 2010) (state statutes seeking to undermine the benefit of rejection of contracts under § 365 were preempted); *In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 385 (Bankr. D. Del. 2022) (state statute of repose was preempted by Bankruptcy Code's statutory limitation period). That clarity is lacking here.

Adoption of the Debtors' preemption theory would require me to conclude that Congress intended debtors in bankruptcy to be able to sell PII without any restrictions, so long as they published a sufficiently loose privacy policy. For the reasons described above, I conclude that Congress's purpose was somewhat more modest: to permit debtors and trustees to address and possibly to contravene privacy policies that prove inconvenient in light of the transactions they would like to pursue in bankruptcy. Section 363(a)(1)(A), rather than displacing state law, determines whether an ombudsman is required in a particular case. If the proposed sale is consistent with the debtor's privacy policy, the parties and the court may move on to other issues without the expense and delay that an ombudsman would require. Subparagraph (B) then identifies the issues for an ombudsman and the court to consider, including the requirements of the law.

But if all sales under Section 363(b) are subject to generally applicable restrictions under non-bankruptcy law, why is non-bankruptcy law mentioned specifically in Section 363(b)(1)(B)(ii)? One answer is that not every amendment to the Bankruptcy Code makes perfect sense. *See Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) (describing language as "awkward, and even ungrammatical"). A more charitable conclusion is that Congress intentionally emphasized two important considerations when an ombudsman and a court consider a sale that appears to violate a debtor's privacy policy: the circumstances of the case and the requirements of the law. But this does not require a conclusion that non-bankruptcy

law is irrelevant in other contexts. *See Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) ("Sometimes the better overall reading of the statute contains some redundancy.").[10]

The preceding discussion does not mean that every restriction in non-bankruptcy law is enforceable in a sale of PII. In the circumstances of a particular transaction, a non-bankruptcy restriction may directly frustrate a clear congressional objective, or be impossible for a debtor to comply with, or fall within the scope of Section 363(*l*), or otherwise satisfy the requirements of a preemption doctrine. But I disagree with the Debtors' argument that all such restrictions must give way under Section 363(b)(1) to a permissive privacy policy.

### B.    The Debtors' Privacy Policy and Section 363(b)(1)

#### 1.    What policy was in effect on the petition date?

As the preceding discussion makes clear, whether a debtor's privacy "policy is in effect on the date of the commencement of the case" and whether a proposed sale of property "is consistent with such policy" may be important in a court's consideration of the sale. 11 U.S.C. § 363(b)(1)(A).

The parties in this case have distinctly different positions on how to determine whether a privacy policy is in effect at the commencement of the case. The Debtors and others supporting the sale suggest that a court should look only to the publicly available privacy policy or policies as they exist on that date. This interpretation has the benefit of simplicity, but it also may permit a debtor to bring a transaction within Section 363(b)(1)(A) by merely amending or superseding earlier, restrictive versions of the policy, even on the eve of bankruptcy. *See* Christopher G. Bradley, *Privacy Theater in the Bankruptcy Courts*, 74 Hastings L.J. 607, 625 (2023) (describing this as "an invitation for mischief").

---

[10] At the sale hearing, the Debtors cited *Heart of America Grain Inspection Service, Inc. v. Missouri Department of Agriculture*, 123 F.3d 1098 (8th Cir. 1997), as additional authority. But *Heart of America* is a field-preemption case. *See id.* at 1104. There are several possible ways to define the relevant field here, but no tenable argument that federal law pervasively occupies any of them and "leav[es] no room for state action." *Pharmaceutical Research & Manufacturers v. McClain*, 95 F.4th 1136, 1143 (8th Cir. 2024). Federal regulation of bankruptcy is pervasive, but it frequently implements, rather than displaces, state law. *See generally Butner v. United States*, 440 U.S. 48, 55 (1979); 11 U.S.C. §§ 363(f)(1), 522(b)(2). Federal regulation of the sale of genetic information is minimal, and regulation of the sale of personal property generally is even less comprehensive.

The Ombudsman favors a different approach. Backed by several objecting parties, he argues that that the "policy … in effect" may vary from customer to customer, depending on the terms that were in force when a particular customer signed up for the Debtors' services.[11] *See* Bradley, 74 Hastings L.J. at 626 (describing this as "a minority position"). The Ombudsman also argues that the "policy" for purposes of Section 363(b)(1) should include not only formal statements about privacy but the full body of representations and promises that the Debtors made about privacy issues over the years on their website, blogs, and elsewhere.

On this point, the Debtors have the more persuasive argument. The principal function of the "policy … in effect" language is to determine whether the court must appoint a consumer privacy ombudsman in a particular case. A court usually must make that decision quickly and with limited information. Even in a case that is much less complicated than this one, it is highly implausible that Congress intended the parties and the court to spend the time and effort necessary to evaluate multiple versions of a privacy policy, statements that may have appeared on a website at some point during the debtor's history, and the effect of a debtor's reservation of the right to change the policy, all for the purpose of deciding whether someone else should be appointed to investigate the same issues.

I thus conclude that the "policy" relevant to Section 363(b)(1) is the formal privacy policy, as a lawyer would understand that term, and it is "in effect" if it is the current version of the policy as of the petition date, without regard to what might have occurred earlier. Judge Bradley is right to describe Section 363(b)(1) as an "invitation for mischief," but the scope of that mischief is somewhat confined. If Section 363(b)(1) preempted non-bankruptcy law, that would present a serious problem, for an eve-of-bankruptcy amendment might enable a debtor to sell assets in a way that was otherwise unlawful. But in light of my conclusion above that the statute does not preempt other law, the most mischievous outcome is likely to be that appointment of an ombudsman is not required when it otherwise would be. And even this problem is mitigated by the court's power to appoint an ombudsman anyway, which probably is more likely in a case in which the parties point out a material last-minute modification to a privacy policy.

As discussed above, the Debtors' primary privacy policy (the Privacy Statement) has, since 2007, authorized them to include personal information in a "sale of all or a portion of

---

[11] It is not clear from the Ombudsman's report what sort of notice or consent might be sufficient to cause a customer to be governed by a later version of a company's privacy policy. But he notes that a meaningful number of customers do not log into their accounts with the Debtors regularly, and thus they would not have affirmatively consented to any changes.

its assets" or a "sale of assets." The Ombudsman and objecting States argue that it is significant that the policy did not mention "bankruptcy" until 2022. I disagree. What is proposed here is a sale of substantially all of the Debtor's assets. The fact that it will occur in a Chapter 11 bankruptcy case does not change the essential nature of the transaction. Neither a reasonable lawyer nor a reasonable consumer reviewing the pre- and post-amendment versions of the Privacy Statement would conclude that the addition of the word "bankruptcy" materially enhanced the Debtors' rights or impaired customers' rights. Thus, even if I agreed that it were appropriate to consider prior versions of a privacy policy, I would conclude that the Privacy Statement authorizes the transaction proposed in this case.

The privacy policy specific to California and certain other states (the Privacy Notice) is different. Before December 2022, it stated in bold print that "**we do not sell your Personal Information**." In that month, the Debtors reformatted this policy, removed the bold statement, and modified the language to refer to a right to "opt out of a sale or sharing of your Personal Information with a third party." As discussed above, this language may be limited to the operation of website cookies and other tracking technologies. If that is correct, then it is fair to interpret the revised policy as silent on a sale of the business, as is proposed here. In any event, the privacy policy applicable to California residents that was in effect on the petition date did not prohibit the sale of personal information in connection with a sale of assets.

California responds that the most recent versions of the Policy Notice violate its laws and are thus void. As I understand the argument, this would mean that the pre-2022 prohibition on the sale of personal information would remain in effect because it never was validly superseded. But however challenging it might be to enforce an unlawful policy over the objection of an affected party, that does not mean it is not a policy. If a construction firm has a policy that it will hire only men, or a lender has a policy that it will charge interest at a usurious rate, these businesses are violating the law, but they nevertheless have policies. And there is an enormous body of law involving the liability of local governments that are alleged to have policies that are unconstitutional. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978) (cited by more than 93,000 other cases).

I therefore conclude that the Debtors' privacy policies that were in effect as of the commencement of this case either authorized or did not prohibit the sale of PII as part of a transaction involving the other assets that constitute the Debtors' business, subject to the right of customers to opt out of the sale.

2.      Facts, circumstances, and conditions of the sale

The preceding discussion suggests that the appointment of a consumer privacy ombudsman in this case may not have been required. Nevertheless, the parties agreed to the appointment of an ombudsman, and if the parties had litigated the matter, I may well have appointed an ombudsman over the Debtors' objection in light of the high profile of this case and the sensitivity of the information held by the Debtors.

It is not clear from the statute whether Section 363(b)(1)(B) applies in a case in which the court appoints an ombudsman when it is not otherwise required. But it is difficult to imagine a case in which I would approve a sale, particularly over objections, without "giving due consideration to the facts, circumstances, and conditions of such sale." 11 U.S.C. § 363(b)(1)(B)(i). At the risk of repeating analysis that appears elsewhere in this opinion, I summarize here some of the facts, circumstances, and conditions that favor approval of the sale.

- The transaction will yield $305 million, including $302.5 million in cash, for the payment of creditors' claims and, likely, a return to shareholders. This represents a nearly six-fold increase from the opening auction bid of $52 million (Am. Swift Decl. ¶ 15).

- A typical customer's relationship with TTAM after closing will be essentially the same as the customer's relationship with the Debtors today. TTAM will have the same business lines, employees, trade name, security practices, and privacy policies as the Debtors have now, except for certain privacy enhancements discussed below. Ms. Wojcicki, who co-founded the Debtors, will be the principal of TTAM.

- The primary creditors of the Debtors' estates are customers or former customers who were affected by the 2023 cybersecurity incident. Except for some insurance coverage, there is no other obvious source of recovery for these creditors.

- TTAM has agreed to a series of privacy enhancements. Although there is disagreement about how effective some of these enhancements may be and whether some are already required by the laws of certain states, there does not appear to be any dispute that the enhancements will result in greater privacy protections than many customers enjoy today. The enhancements include the adoption in perpetuity of the Debtors' policies permitting customers to delete their accounts, delete their data, and opt out of research.

- The Debtors and TTAM could produce exactly the same structure that will result from the Equity Toggle—that is, TTAM as the sole member of a limited-liability company

that owns and operates the 23andme business and controls its data—by pursuing the Plan Toggle instead. Because the Plan Toggle would not result in a transfer or disclosure of any PII, which would remain with the Debtors at all times, the States' objections to the Equity Toggle would not apply.[12] A plan of reorganization likely would have overwhelming support from creditors and shareholders, and there is no obvious reason why it would not be confirmable. But preparing and confirming a plan would require several months, during which the Debtors would continue to run operating deficits, accrue interest on their post-petition financing facility, and incur substantial professional fees. The Debtors estimate that they would lose $20 million or more while preparing and confirming a plan. There is no direct support for that number in the evidentiary record, but it is plausible, and it would present a significant concern even if it were halved. Proceeding under the Plan Toggle would not generate any incremental privacy benefits. In fact, the privacy enhancements discussed in the preceding paragraph would not apply in a Plan Toggle transaction.

Of course, there are factors weighing against approval of the sale as well. I summarize several of them here as well.

- Some subset of customers probably would prefer not to do business with TTAM but are not in a position to opt out by deleting their accounts. This may be because they no longer have access to their login credentials, because they are deceased, because they ignore email messages, or for some other reason.

- TTAM could decide to take the business in a different direction that conflicts with customers' expectations. To some degree, customers have been subject to the same risk during their relationship with the Debtors thus far, but this remains a valid concern. The risk is mitigated somewhat by certain state statutes that limit the right of genetic-testing companies to use data beyond the scope of their primary businesses. Nothing in the proposed transaction will immunize TTAM from the requirements of these statutes and others that may be enacted.

---

[12] Although the States have not pursued objections under federal or state laws governing deceptive trade practices, Judge Bradley has made a similar observation in that context: "Sale of data as part of a 'qualified buyer' transaction can be analogized in its privacy impact to the sale of a company's equity to a new owner, which would not generally violate a privacy policy (even a strict one that prohibits transfer of data to a third party)." Christopher G. Bradley, *Privacy for Sale: The Law of Transactions in Consumers' Private Data*, 40 Yale J. on Reg. 127, 149 (2023).

- Something could go wrong at TTAM that exposes or significantly increases the risk of exposure of customer data. There is nothing a court can do to ensure that customer data will be protected after a transaction closes. TTAM would, however, be subject to legislation, regulation, and litigation with regard to its post-closing actions and omissions.

On balance, the facts and circumstances strongly favor approval of the transaction. If it proceeds, customers are likely to have the same or better experiences (with respect to privacy and otherwise) with TTAM as they have with the Debtors today. There are alternatives that would provide stronger privacy protection, but they are essentially theoretical. In particular, non-bankruptcy law might require, or I might impose unilaterally, a requirement that customers expressly opt in to the transaction as it is presently structured before their data may be transferred or used. But there is no reason to believe that the Debtors or TTAM will follow through with the opt-in requirement. Because of the out-of-pocket costs, delays, and loss of transaction value associated with an opt-in campaign, it is quite likely that the parties would instead exercise the Plan Toggle and proceed under a structure that requires no consent at all. As discussed above, that would result in fewer privacy protections while costing the bankruptcy estates approximately $20 million. The States have not articulated any persuasive reason why this outcome would be preferable.

For these reasons, I am inclined to approve the proposed sale notwithstanding the privacy objections raised by the States, unless non-bankruptcy law precludes that result. I turn to that issue next.

## C. The States' Statutes Governing Genetic Information

### 1. Disclosure and transfer consent statutes

California, Kentucky, Tennessee, Texas, and Utah assert that the proposed transaction with TTAM would violate their respective genetic-privacy statutes because the Debtors do not propose to seek affirmative, opt-in consent of every customer residing in their states. Although the exact language of these statutes varies, they generally require direct-to-consumer genetic-testing companies to obtain consumers' separate express consent when the company transfers or discloses a consumer's genetic data. *See* Cal. Civ. Code § 56.181(a)(2)(D); Ky. Rev. Stat. Ann. § 311.705(2)(b)(2); Tenn. Code Ann. § 47-18-4904(a)(3)(A); Tex. Bus. & Com. Code Ann. § 503A.006(a)(1)(A); Utah Code Ann. § 13-60-104(1)(c)(i)(A). To satisfy the express-consent requirement, the consumer must affirmatively indicate their consent in response to notice of the possible disclosure of their genetic data. *See* Cal. Civ. Code § 56.18(6); Ky. Rev. Stat. Ann. § 311.705(1)(d); Tenn. Code Ann. § 47-18-4902(6); Tex. Bus. & Com. Code Ann. § 503A.001(5); Utah Code Ann. § 13-60-102(6). It appears to be common

ground that if and to the extent that these statutes apply, the consent provided by a consumer at the outset of the relationship is not sufficient to authorize a later disclosure or transfer.

By way of example, the relevant portion of the Texas statute reads as follows:

(a)    A direct-to-consumer genetic testing company … must obtain:

(1)    an individual's separate express consent for:

(A)    the transfer or disclosure of the individual's genetic data to any person other than the company's vendors and service providers.

Tex. Bus. & Com. Code Ann. § 503A.006(a)(1)(A).

### a.    Persons and third parties

The statutes of Kentucky, Tennessee, Texas, and Utah regulate the transfer or disclosure of genetic data to any "person," while California's statute regulates transfers to a "third party." *See* Cal. Civ. Code § 56.181(a)(2)(D); Ky. Rev. Stat. Ann. § 311.705(2)(b)(2); Tenn. Code Ann. § 47-18-4904(a)(3)(A)(i); Tex. Bus. & Com. Code Ann. § 503A.006(a)(1); Utah Code Ann. § 13-60-104(1)(c)(i)(A). Each state's statute also contains one or more exceptions, under which express consent is not required prior to transfer or disclosure. California's statute contains an exception for service providers, while those of Kentucky, Tennessee, Texas, and Utah contain exceptions for vendors and service providers. *See* Cal. Civ. Code § 56.181(a)(2)(D); Ky. Rev. Stat. Ann. § 311.705(2)(b)(2); Tenn. Code Ann. § 47-18-4904(a)(3)(A); Tex. Bus. & Com. Code Ann. § 503A.006(a)(1)(A); Utah Code Ann. § 13-60-104(1)(c)(i)(A).

For the States' genetic-privacy statutes to apply, there must first be a disclosure or transfer of genetic data. None of the statutes define "disclosure" or "transfer." "In the absence of an indication to the contrary, words in a statute are assumed to bear their ordinary, contemporary, common meaning." *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 207 (1997) (cleaned up). "Disclose" means "[t]o make (something) known or public." *Disclose*, *Black's Law Dictionary* (12th ed. 2024). In this transaction, TTAM plans to retain the Debtors' current employees and subcontractors, and the genetic data is not anticipated to be made known to anyone who does not already have access (Wojcicki Decl. ¶ 22). Thus, unless every transfer is also a disclosure, the transaction with TTAM will not result in any disclosure of any genetic data.

Nevertheless, although the genetic data will not be disclosed, the first step of the Equity Toggle will result in the transfer of genetic data from the Debtors to Newco. "Transfer" means "[a]ny mode of disposing of or parting with an asset or an interest in an asset." *Transfer*, *Black's Law Dictionary* (12th ed. 2024). The Debtors propose to sell their assets, including the genetic data, to Newco. Even if there is no physical movement of the genetic data to Newco, nor the involvement of new personnel, the Debtors will still be disposing of their interest in the assets. A transfer, in form, will occur.

The next issue is whether this transfer is to a "person," as used in the genetic-privacy statutes of Kentucky, Tennessee, Texas, and Utah, or a "third party," as used in California's genetic-privacy statute.[13] "Person" is not uniformly defined in these laws, but it often includes individuals and various forms of business organizations. *See* Ky. Rev. Stat. Ann. §§ 311.705(1)(g), 446.010(33); Tenn. Code Ann. § 47-18-4902(10); Tex. Bus. & Com. Code Ann. § 503A.001(8). Utah does not define "person" in its genetic privacy law. Similarly, California's genetic privacy law does not define "third party."

But whatever "person" or "third party" is or is not defined to mean in the States' statutes, those terms cannot be interpreted such that the transfer or disclosure of genetic data to any conceivable individual or organization would require a genetic-testing company to seek express consent from all its customers. Courts avoid interpreting statutes in ways that would create absurd results. *See Marion Energy, Inc. v. KFJ Ranch Partnership*, 267 P.3d 863, 869 (Utah 2011) ("Generally, when interpreting statutes we seek to avoid interpretations which render some part of a provision nonsensical or absurd.") (cleaned up); *National Shooting Sports Foundation, Inc. v. California*, 420 P.3d 870, 873 (Cal. 2018) (noting that the absurdity canon counsels against interpreting statutes in ways that would result in absurd consequences); *Norton Hospitals, Inc. v. Peyton*, 381 S.W.3d 286, 292 (Ky. 2012) ("[A]ny interpretation that

---

[13] The Debtors also attack the States' argument from the other end. To come within the statutory prohibition, a transfer must be made by a direct-to-consumer genetic-testing company, which is defined in the statutes as an "entity." *E.g.*, Cal. Civ. Code § 56.18(b)(5). But if the entity includes the entire corporate family, transfers between affiliates are not prohibited. *See generally Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 81 Cal. Rptr. 2d 425, 439 (Ct. App. 1999) (quoting ABA ethics opinion stating that "whole ownership may well entail not merely a shared legal department but a management so intertwined that all members of the corporate family effectively operate as a single entity"); *Texas Liquor Control Board v. Continental Distilling Sales Co.*, 199 S.W.2d 1009, 1014-15 (Tex. Civ. App. 1947) (describing affiliates as "one entity or corporate family"). Although I will not pursue the entity argument further, the hypotheticals below demonstrate flaws in the States' position on this issue as well.

leads to an absurdity must be rejected."); *Parveen v. ACG South Insurance Agency, LLC*, 613 S.W.3d 113, 118 (Tenn. 2020) ("Tennessee law provides that courts are to avoid a construction that leads to absurd results.") (cleaned up); *Jaster v. Comet II Construction, Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) ("We limit our analysis to the words of the statute and apply the plain meaning of those words unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.") (cleaned up).

Although the genetic-privacy statutes provide explicit exceptions for vendors or service providers, there must also be some implicit exceptions. The "notion that some things go without saying applies to legislation just as it does to everyday life." *Morath v. Lampasas Independent School District*, 686 S.W.3d 725, 738 (Tex. 2024) (cleaned up) (discussing a statute's implicit time period for school board action). For example, the Debtors' Privacy Statement states that data will be shared with service providers, but it also contemplates that consumers' information will be used by the Debtors themselves to provide the services that they offer (Vibbert Decl. Exh. 1). Even if a privacy policy does not say that information will be disclosed to a company's employees, a reasonable consumer would understand that disclosure to be necessary.

Similarly, the statutes at issue here must be understood to permit a genetic-testing company to disclose information to its own employees in the furtherance of their responsibilities. A couple of examples make this clear.

- Consider a genetic-testing company that does not contract with any vendors or service providers and instead performs all services in-house. The individuals that are employed by the company will naturally change over time. If the company needs to hire a new employee whose job requires access to genetic data, would the company be required to obtain all of its customers' express consent before the employee could start working? As a practical matter, must a genetic-testing company outsource all of its operations to vendors or service providers?

- Or suppose that a company that uses a mix of in-house and outsourced services experiences a data breach. The company could retain a vendor to help remediate the breach and investigate what went wrong. But does the statute prelude the company's own privacy and information-technology employees from assisting these efforts, or even from receiving a detailed report from the vendor?

The answer to all of these questions is "no; of course the statute doesn't require that." A genetic-testing company's employees, though technically distinct "persons" from the company, are part of the company for purposes of its statutory restrictions on disclosure and transfers.

The next issue is whether there is also an implicit exception for subsidiaries or affiliates of the company. The statutes include indications that there is. For example, the statutes of Kentucky, Tennessee, Texas, and Utah all contain language requiring express consent for marketing to a consumer based on that consumer's genetic data (presumably referring to marketing from the testing company itself), as well as express consent for marketing by a "third party" or "third party person" based on the consumer's ordering or purchasing a genetic testing product or service. Ky. Rev. Stat. Ann. § 311.705(2)(b)(5); Tenn. Code. Ann. § 47-18-4904(a)(3)(C); Tex. Bus. & Com. Code Ann. § 503A.006(a)(3); Utah Code Ann. § 13-60-104(1)(c)(iii). California's statute contains a similar provision. *See* Cal. Civ. Code § 56.181(a)(2)(E)(i). These provisions treat third parties as somehow different from the company.

It is also worth noting that the Debtors' Privacy Statement alerts consumers that their information may be shared with the Debtors' corporate affiliates (Vibbert Decl. Exh. 1). The privacy policy also distinguishes between third-party content and organizations affiliated with the Debtors (*Id.*). As with the issue of disclosures to employees, a privacy policy does not determine the meaning of the statutory language, but it helps to provide context.

So is a subsidiary or affiliate a person or third party for purposes of disclosure and transfer? Examples again help to illuminate the issue.

- Suppose that California passes legislation requiring sophisticated encryption of all genetic data. This particular type of encryption is patented and available only from a single vendor, and so it is expensive. Rather than license the encryption product for all 4 million of its customers, a genetic-testing company decides to create a new subsidiary for its California business, move customer data for Californians into the new subsidiary, and have the new subsidiary enter into a license for the new product. Is this a transfer to a third party that requires separate and express consent under Section 56.181(a)(2)?

- Now suppose that the company just discussed decides that California's approach to encryption policy is better after all, and the price of a license has come down. May the company merge its California subsidiary back into its main operating company without violating the law? Does it matter which of the two merged companies is technically the surviving company?

- Next consider a genetic-testing company that contracts with an unaffiliated vendor to provide cybersecurity advice and, in the event of a security incident, response and remediation services. In the course of its work, the vendor periodically accesses customers' information. During the term of the contract, the testing company

purchases the stock of the vendor, which becomes a subsidiary of the testing company and is then covered by its privacy policies. There are a few months left in the term of the contract, but the parties allow it to expire. The cybersecurity subsidiary continues to provide the same services to the rest of the corporate family as it did when it was a vendor. Has a prohibited transfer or disclosure occurred? When did it occur? If no transfer or disclosure has occurred yet, what happens if there is a cyber incident? Can employees of the cyber subsidiary access the data of the affected customers without obtaining separate express consent? Would the result be any different if the testing company had founded the cybersecurity company and housed it in a subsidiary all along?

- Continuing with this theme, imagine a corporate family that includes a genetic-testing company. For tax or other reasons, the parent company organizes matters so that all workers who provide services to the corporate family are employed and paid by a single subsidiary that has no operations beyond managing payroll and benefits. Can the testing company make use of these employees when it is necessary to access customer data, or is that an impermissible disclosure or transfer?

As these examples demonstrate, there is a meaningful difference between what happens within the confines of a corporate enterprise, where a privacy policy governs, and what happens outside the corporate family.

As discussed above, courts avoid interpreting statutes in ways that produce absurd results. *See, e.g.*, *National Shooting Sports Foundation, Inc.,* 420 P.3d at 873. To interpret these statutes to require separate express consent for every transfer to an affiliate would hamper a genetic-testing company's ability to organize itself, to operate, and, in important respects, to protect the interests of customers. A court's "role in statutory interpretation is to give a statute the full effect of the [legislature's] intent without unduly restricting or expanding the statute's intended scope." *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010). *See also Lungren v. Deukmejian*, 755 P.2d 299, 304 (Cal. 1988) ("The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.").

These statutes regulate the disclosure and transfer of genetic data. *See* Cal. Civ. Code § 56.181(a)(2)(D); Ky. Rev. Stat. Ann. § 311.705(2)(b)(2); Tenn. Code Ann. § 47-18-4904(a)(3)(A); Tex. Bus. & Com. Code Ann. § 503A.006(a)(1)(A); Utah Code Ann. § 13-60-104(1)(c)(i)(A). They do not purport to regulate the form that a testing company's business takes, nor to require a company to refrain from actions designed to enhance customer security. To construe these statutes to prohibit all transfers of genetic data to subsidiaries of a testing company would lock the company into whatever structure it happened to have on the effective date of a statute, greatly expanding the reach of the law.

The analysis above does not mean that the statutes permit *every* disclosure or transfer of data to an employee or affiliate. It is not absurd or beyond the intent of the legislature to apply the statutory prohibition to an employee's effort to transfer data to himself as the first step in a plan to steal it, or to a company's movement of data into an affiliate that markets pharmaceuticals. And no customer consents to that sort of transfer, explicitly or implicitly, at the outset of the customer relationship. But the States' rigid interpretation of these statutes breaks down when it is applied to disclosures or transfers intended to continue the operations of a testing company as a going concern, to improve operations in some respect, or to enhance customer privacy, with no adverse effect on customers. In these situations, the requirement of separate express consent must give way.

And the proposed transaction fits within the exception. Consumers are already on notice that the Debtors may share information with their affiliates. The transfer to Newco, along with substantially all of the Debtors' other assets, is not for purposes of marketing, or monetizing the data to the detriment of customers, or criminal behavior, or other evils targeted by the States' statutes. It is instead to enable the Debtors' business to continue under new ownership and with enhanced privacy protections.

b.    Particular California issues

California argues that a genetic-testing company's affiliates are not excepted from the application of its genetic-privacy statute. It points to a provision in its general privacy legislation which includes affiliates in the definition of "business," and argues that the absence of a similar provision in its genetic-privacy act means that the California legislature did not intend to create such an exception in the latter. *See* Cal. Civ. Code § 1798.140(d)(2). Thus, California argues, Newco should be considered a third party under Section 56.181(a)(2)(D).

California's genetic privacy statute does not define "third party." California courts "giv[e] the words their usual, ordinary meaning." *People v. Canty*, 90 P.3d 1168, 1172 (Cal. 2004). "Third party" is commonly understood to exclude affiliates. *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611, 2025 WL 354858, at *21 (Bankr. S.D. Tex. Jan. 15, 2025); *see also MCI Communications Services, Inc. v. California Department of Tax and Fee Administration*, 28 Cal. App. 5th 635, 640 (Cal. Ct. App. 2018) (describing purchase of materials from "third party vendors and intercompany affiliates").

Furthermore, construing an affiliate to be a "third party" would cause problems elsewhere in California's genetic-privacy statute. The term "third party" also appears in Section 56.181(a)(2)(E)(iii), which requires an "advertisement of a third-party product or service . . . [to] be prominently labeled as advertising content and be accompanied by the name of any third party that has contributed to the placement of the advertising." Consider a

corporate structure in which a genetic-testing company's test kits are produced by a subsidiary. It would not make sense for the company to label advertisements for those genetic testing kits as third-party content. The same provision further requires that, "[i]f applicable, the advertisement also shall clearly indicate that the advertised product or service, and any associated claims, have not been vetted or endorsed by the direct-to-consumer genetic testing company." Cal. Civ. Code § 56.181(a)(2)(E)(iii). If California is correct that affiliates are third parties, the company could set up an affiliate to produce products and then offer them to customers while disclaiming any responsibility for vetting those same products.

California also argues that "provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." Cal. Civ. Code § 56.184(b). But that standard governs conflicts between the genetic-privacy statute and other California laws. *Id.* It does not require me to overlook absurdity and other relevant canons of construction when determining the meaning of the privacy statute in the first instance.

In summary, Newco, a wholly owned subsidiary of the Debtors, would not be considered a "third party" under California's genetic-privacy statute, nor a "person" under the statutes of Kentucky, Tennessee, Texas, and Utah for purposes of the proposed transaction. I conclude that the transfer of the genetic data, along with the rest of the business, to a wholly owned subsidiary of the Debtors does not require separate consent under these genetic-privacy statutes.

c.    On form and substance

The second step of the Equity Toggle—the sale of the Debtors' equity in Newco to TTAM—does not require separate consent either, because nothing in the statutes purports to prohibit or condition a change of ownership of or sale of equity in a direct-to-consumer testing company. I cannot say for sure why the States' legislatures decided not to regulate ownership changes, but a likely reason is that it could deprive emerging and growing companies of access to equity capital.

The States argue, in essence, that I should collapse the two steps of the Equity Toggle for purposes of my analysis and examine the result of the transaction, which is that TTAM will be the new owner of the genetic data and biological samples. This is not quite right, because Newco will be the new owner of those assets, and the genetic-privacy statutes have nothing to say about who owns Newco. Nevertheless, bankruptcy courts sometimes deploy the collapsing doctrine to more accurately assess a complex series of transactions that are alleged to constitute a fraudulent transfer. *See, e.g., In re Maxxus Energy Corp.*, 641 B.R. 467, 531-32 (Bankr. D. Del. 2022).

The collapsing doctrine is not particularly helpful in the present situation. If I collapse the proposed transaction, I see that a business now operated by the Debtors, which control the genetic data and biological samples at issue, and beneficially owned in part by Ms. Wojcicki and in part by public shareholders, will be owned and operated after the closing by Newco, which will control the data and samples, and Newco will be owned by TTAM. The difficulty is that although I can tell from these starting and ending positions that TTAM has purchased a valuable going concern, I cannot determine whether the States' statutes were violated in the process. As discussed above, the APA includes three possible transactions structures, any of which could lead to the same endpoint. The Debtors could sell assets directly to a subsidiary designee of TTAM, which would most directly implicate the genetic-transfer statutes. They could elect the Plan Toggle, which would not implicate the statutes at all. Or they could implement the Equity Toggle, the first step of which might implicate the statutes (though I have concluded that it does not) and the second step of which does not.

Each side in this dispute argues that the other side is elevating form over substance. The Debtors and their supporters point out that the States are interposing technical objections to a transaction that will benefit the bankruptcy estates, and in particular benefit consumers harmed by the 2023 data breach. The States counter that the Debtors have replaced a structure that would require them to obtain opt-in consent from customers with a structure that does not require that consent (though the States disagree), even though there is no difference in the substance of the two structures. Neither of these arguments is preposterous, but neither resolves the standoff.

2.    Texas's definition of property rights in DNA

Texas's genetic-privacy statute includes a second relevant provision. It reads as follows:

> Sec. 503A.003. EXCLUSIVE PROPERTY RIGHT IN DNA; CONFIDENTIALITY. An individual has a property right in, and retains the right to exercise exclusive control over, the individual's biological sample that is provided to or used by a direct-to-consumer genetic testing company and the results of genetic testing or analysis conducted on the individual's DNA by a direct-to-consumer testing company, including to the collection, use, retention, maintenance, disclosure, or destruction of the sample or results. The results of the genetic testing of an individual's DNA are confidential and may not be disclosed to another person without the individual's express consent.

Tex. Bus. & Com. Code Ann. § 503A.003. As the title and structure of this section indicate, it covers two topics: a customer's property rights and the confidentiality of testing results.

Texas advances several arguments based on the first issue, the nature of a customer's property interest in a biological sample and genetic analysis. Initially, it complains that the Debtors seek to sell property of Texas residents free and clear of their property interests. The record does not support this claim. The Debtors have been clear that they will not sell anything beyond their own property interests. In other words, to the extent that a Texas customer owns a biological sample or testing results today, she will have that same ownership interest in those items when they are in the possession of TTAM.

Texas also notes that the property right created by its statute includes "the right to exercise exclusive control over … disclosure … of the sample or results." *Id.* The State argues that this property right is part of the "bundle of sticks" often used to conceptualize interests in property, such that any disclosure without a customer's opt-in consent is a violation of the customer's property rights. Although I have concluded above that the proposed transaction does not involve a disclosure, I will accept Texas's point for purposes of this discussion. I nevertheless disagree with this broad interpretation of Section 503A.003 for two reasons.

First, as we have seen, Section 503A.006(a)(1) includes a requirement of "separate express consent" for certain disclosures, with an exception for disclosures to vendors and service providers. Neither of these provisions in Section 503A.006 makes sense if Section 503A.003 already imposes a blanket prohibition on disclosures without opt-in consent: the requirement of separate express consent for most disclosures would be unnecessary, and the exception for vendors and service providers would be inconsistent with Section 503A.003. Statutory coherence requires that Section 503A.003 have a narrower scope. *See Watkins v. State*, 619 S.W.3d 265, 272 (Tex. Crim. App. 2021) (court must "harmonize provisions and avoid conflicts").

Second, Section 503A.003 grants the *right* to *exercise control* over disclosures. A person does not exercise control over something by inaction; the person must take some affirmative step to control another individual or object. *See generally Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997) (distinguishing between right of control and exercise of control for purposes of liability of general contractor). For example, a trademark owner has the right (and obligation) to control the use of its trademark by a licensee. *See Lawn Managers, Inc. v. Progressive Lawn Mangers, Inc.*, 959 F.3d 903, 908-09 (8th Cir. 2020). But there are consequences if the owner fails to exercise control, including abandonment and forfeiture of the mark. *See id.* The President has the power to control which legislation becomes law. But he must exercise that power by affirmatively disapproving a bill presented to him by Congress, except in the unusual situation when a "pocket veto" is available. *See* U.S. Const. art. I, § 7. And an air-traffic controller has the right to direct a plane to change its altitude or heading, but the controller must use the radio to give affirmative direction to the pilot of that plane,

which will otherwise continue on its current path. Texas's argument here—that doing nothing is a form of exercising control, such that a disclosure may occur only after the customer affirmatively approves it—does not comport with ordinary usage or common sense. *See Watkins*, 619 S.W.3d at 272 (court construes words and phrases "according to rules of grammar and common usage"); *Morath*, 686 S.W.3d at 738 ("Context also includes common sense.") (cleaned up).

A much more straightforward reading of the first sentence of Section 503A.003 is that the customer retains the rights to consent or to refuse to consent to the collection, use, retention, maintenance, disclosure, or destruction of a test sample or results at the outset of the parties' relationship—at which point the testing company can decide whether or not to accept the customer—and the rights to opt out of use, retention, maintenance, or disclosure, and to require destruction, later in the relationship. The most straightforward way for a customer to exercise these rights after the initial encounter is to delete the customer's account.[14] And that right is preserved here, both before and after the sale closes. I thus conclude that the Debtors' proposed transaction does not deprive Texans of any property interest recognized by Section 503A.003.

The second sentence of Section 503A.003 concerns confidentiality of genetic-testing results. This right to confidentiality is not defined as a property interest. Instead, it is a matter requiring "express consent," but not the "separate express consent" discussed in Section 503A.006(a)(1). Like the first sentence of Section 503A.003, the second sentence must be harmonized with the more specific Section 503A.006(a)(1). I thus conclude that a testing company may obtain the "express consent" required by Section 503A.003 at the beginning of the customer relationship, but transfers or disclosures to persons other than vendors or service providers fall under Section 503A.006(a)(1). As discussed above, that section does not prohibit the proposed sale transaction either.

---

[14] I do not suggest, and do not need to conclude, that deletion is the only way in which a customer may exercise the control provided by the statute. Imagining how a customer might actively control his sample or testing results leads quickly to interpretive problems. May a customer direct a testing company to move his saliva sample to a facility located within one mile of his home? May he direct a testing company to accept and store in its database a genetic analysis prepared by the company's competitor? Nevertheless, to the extent that a customer has these control rights, they are preserved. I conclude only that the customer does not exercise control by doing nothing, forcing the company to request and obtain his express permission before undertaking or modifying any of the activities mentioned in the statute.

3.    Utah's scope objection

At the very end of the sale hearing, Utah suggested that TTAM's use of the genetic data would be for a purpose that is outside the scope of the Debtors' genetic-testing service. This assertion is not in Utah's written objection, but I understand it to relate to Utah Code Ann. § 13-60-104(1)(c)(i)(B), which requires separate express consent for "the use of genetic data beyond the primary purpose of the company's genetic testing product or service." The record does not support Utah's assertion. As discussed above, TTAM would operate the genetic-testing service in the same manner as the Debtors do now.

### D.    Other Objections by the States

Some of the objecting States also have advanced arguments unrelated to their genetic-privacy statutes. I discuss these below.

1.    Compliance with other Section 363 requirements

a.    Business judgment / good business reason

In general, a bankruptcy court considers a proposed sale of assets outside of the ordinary course of business under the deferential business-judgment standard. *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012). California takes issue with the Debtors' business judgment in one respect. It argues that because the State can pursue a civil penalty for each transfer of genetic information without opt-in consent, the bankruptcy estates may be largely devoted to paying civil penalties rather than to compensating creditors and shareholders. *See* Cal. Civ. Code §§ 56.181(a)(2), 56.182. But, as discussed above, I have concluded that the sale does not violate California law.

Texas questions the appropriateness of a Section 363 sale more directly, though its arguments are blended with those suggesting that the sale is a *sub rosa* plan, which I address below. Under local precedent, a sale of substantially all of a debtor's assets may warrant additional scrutiny to ensure the sale is not an effort to evade the protections of a reorganization plan. *See In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 101 (Bankr. E.D. Mo. 1990). Such analysis "include[s] a showing that there is a sound business purpose for the sale without a disclosure statement and plan; that there has been accurate and reasonable notice; that the price to be paid is fair and reasonable; and that the sale does not unfairly benefit insiders or the prospective purchasers, or unfairly favor a creditor or class of creditors." *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990). The Debtors' sound business purpose for proceeding by a Section 363 sale is straightforward: their liquidity is challenged, and it will cost tens of millions of dollars to confirm a plan, with no apparent

benefit to anyone. *See id.* (approving § 363 sale because debtor did not generate sufficient revenue to continue operations). Notice has been ample; parties have litigated the issues thoroughly, and nearly 2 million customers have deleted their accounts. The price was determined by a competitive auction run by independent directors, and it exceeds the highest price at the original auction by nearly $50 million. And assuming for the sake of analysis that Ms. Wojcicki is an insider, she will not unfairly benefit here. She is investing more than $300 million of her own funds and will end up as the owner of a non-profit corporation, which will limit her ability to recover her investment.

b.    *Sub rosa* plan

California and Texas argue that the proposed sale is an impermissible *sub rosa* plan. A debtor may not "short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). But nothing in the APA, the sale order, or other aspects of the transaction establishes any terms of a forthcoming plan of liquidation for the Debtors. Upon closing, the Debtors will have a pot of cash and will be free to propose a plan that distributes that cash as the Debtors believe is appropriate, subject to the requirements of the Bankruptcy Code and the votes and objections of parties in interest.

c.    Section 363(m)

At the sale hearing, California argued that the protection against appellate modification provided by Section 363(m) should not apply to the first step of the Equity Toggle, the sale of assets from the Debtors to Newco, because Newco will not be providing value to the estate in exchange for the transfer of the assets. No party has suggested that the second step, the sale of equity interests to TTAM, is not eligible for Section 363(m) protection.

"Section 363(m) moots any challenge to an order approving the sale of assets to a good faith purchaser where (1) no party obtained a stay of the sale pending appeal, and (2) reversing or modifying the authorization to sell would affect the validity of the sale or lease." *In re Polaroid Corp.*, 611 F.3d 438, 440-41 (8th Cir. 2010). The goal of Section 363(m) is to "provid[e] reliability and finality." *In re Trism, Inc.*, 328 F.3d 1003, 1006 (8th Cir. 2003). Section 363(m) protects a transaction only if the purchaser acted in good faith. The test for good faith "is twofold: a good faith purchaser is one who buys in good faith and for value." *In re Burgess*, 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000).

The short answer to this argument is that the Debtors' sale of assets to Newco is a necessary part of the larger transaction. Section 363(m) moots challenges that "would affect the validity of a sale." 11 U.S.C. § 363(m). The Eighth Circuit has held that related provisions

of a transaction may receive Section 363(m) protection when they are "integral" to the sale. *Trism*, 328 F.3d at 1007. "A provision is integral if the provision is so closely linked to the agreement governing the sale that modifying or reversing the provision would adversely alter the parties' bargained-for exchange." *Id.* at 1007. *See also In re AFY*, 734 F.3d 810, 817 (8th Cir. 2013) (§ 363(m) applies to assignment of an executory contract under § 365).

But the argument also is unsound on the merits. California contends that the note to be issued by Newco to the Debtors is of no value because Newco has no assets. But this ignores the instantaneous exchange of assets and the note. When Newco delivers the note to the Debtors, the Debtors will deliver assets worth hundreds of millions of dollars to Newco. These presence of these assets means that Newco's note will not be worthless.

Whether and how Section 363(m) applies to this transaction ultimately will be an issue for an appellate tribunal to decide. I conclude only that California's argument is insufficient to deprive Newco and TTAM of the good-faith finding that underlies the appellate protection.

    2.    Section 959(b)

California, Tennessee, and Texas assert that the proposed sale would violate 28 U.S.C. § 959(b). This statute requires a debtor in possession to "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated." 28 U.S.C. § 959(b). According to the States, the Debtors may not sell customers' genetic information because doing so would violate state law, which is prohibited by Section 959(b).

I have already rejected the state-law premise of this argument. But in any event, there is a distinction between management and operation of property, governed by Section 959(b), and the sale of assets outside the ordinary course of business, which is governed by Section 363. *See In re Valley Steel Products Co.,* 157 B.R. 442, 447 (Bankr. E.D. Mo. 1993) (§ 959(b) does not apply to a debtor liquidating its business); *In re White Crane Trading Co.,* 170 B.R. 694, 702 (Bankr. E.D. Cal. 1994) ("The constraints of section 959 limit the debtor's authority to conduct business in the ordinary course.").

    3.    Fraudulent transfer

California and Texas argue that I cannot approve the Debtors' sale of assets to a subsidiary because it is an avoidable fraudulent transfer. They cite no authority for this argument in the context of a Section 363 sale.

The argument is easily refuted. The Debtors are not seeking to hinder, delay, or defraud any of their creditors. *See* Cal. Civ. Code § 3439.04(a)(1); Tex. Bus. & Comm. Code

Ann. § 24.005(a)(1). To the contrary, they are pursuing a transaction that will produce more than $300 million for their creditors, and it may allow them to pay all creditors in full. Nor are the Debtors transferring assets without receiving a reasonably equivalent value in return. *See* Cal. Civ. Code § 3439.04(a)(2), 3439.05(a); Tex. Bus. & Comm. Code Ann. §§ 24.005(a)(2), 24.006(a). As discussed above, the Debtors will receive a promissory note from Newco, but that is not necessary for purposes of a fraudulent-transfer claim. The increase in the value of the Debtors' equity interest in Newco is sufficient. "Courts recognize that a transfer to a solvent, wholly-owned subsidiary does not amount to a fraudulent transfer." *In re HH Liquidation, LLC*, 590 B.R. 211, 266 (Bankr. D. Del. 2018).

### 4.    Jurisdiction

Texas also argues that this Court lacks jurisdiction to approve the transaction under the Equity Toggle structure. That is not correct. The Debtors' operating assets are property of their bankruptcy estates, and the equity interests in Newco will be property of the bankruptcy estates when that company is formed. *See* 11 U.S.C. § 541(a)(1), (7).[15] The district court, and thus the bankruptcy court on referral of a case, has exclusive jurisdiction of all property of the estate. *See* 28 U.S.C. § 1334(e)(1). The transaction involves two sales: first, the sale of the operating assets to Newco, and second, the sale of the Newco equity interests to TTAM. Because all of the assets to be sold will be property of the estates when they are sold, the assets fall within the Court's exclusive jurisdiction. To the extent that Texas disputes subject-matter jurisdiction rather than *in rem* jurisdiction, that is not an obstacle either. The sale of the operating assets to Newco and the equity interests in Newco to TTAM will have more than a conceivable effect on the Debtors' bankruptcy estates; they will have a direct and quantifiable effect on the estates. *See In re Dogpatch U.S.A., Inc.*, 810 F.2d 78, 786 (8th Cir. 1987) (adopting conceivable-effect test).

I agree with Texas's implicit suggestion that the Court will not have jurisdiction of the operating assets after they are transferred from the Debtors to Newco. This would be an obstacle if the parties asked me to approve further transfers of those assets. But no such transfers are contemplated; those assets will remain owned by Newco.

---

[15] Although it is not a jurisdictional issue, California argues that the Debtors do not have the authority to create a new subsidiary. But a debtor may enter into transactions and use property in the ordinary course of business without obtaining court approval. *See* 11 U.S.C. § 363(c)(1). Creating an empty subsidiary is well within this authority.

5.    Due process

Texas argues that parties have received insufficient notice of the proposed sale, in violation of their due process rights. The Debtors counter that, in their view, the sale process has moved relatively slowly compared to other large Chapter 11 cases.

The Debtors have the better of this argument. Through a combination of formal notice and general publicity, these cases have a high profile. The Debtors have made no secret of their plan to sell their assets in a formal sale process. Many States appeared at the first-day hearing in these cases, and more have been actively involved as the cases proceeded. The attorneys general have ably represented the interests of their citizens.

Chapter 11 cases move quickly. There are different reasons for the pace of each case, but they often involve a lack of cash or constraints imposed by the only lender willing to provide more cash. In some cases, only a few days elapse between the announcement of the high bidder at an auction and the beginning of the sale hearing. That gap in these cases was nearly a month, and it was mostly intentional. (As I informed the parties at the first-day hearing, my travel plans were a factor as well.) Because objections to the sale were due only seven days before the hearing, creditors, governmental units, and the Ombudsman had more than three weeks to absorb and respond to the results of the auction and the draft documentation.

To be sure, the reopening of the bidding process presented a twist. But TTAM was not a new bidder, and its earlier agreement was disclosed on May 19 when TTAM was in the position of backup bidder. The order authorizing additional bidding also permitted objectors to address new developments in supplemental objections, and the States used that opportunity to buttress their arguments.

At some level, Texas's argument appears to be that it did not have sufficient notice that the Debtors might implement the Equity Toggle. But the Equity Toggle also appeared in Section 2.8 of TTAM's May 19 agreement. Texas was thus sufficiently alerted that if it presented a show-stopping objection to the proposed sale, the Debtors and TTAM were prepared to implement a different structure that would render the objection inapplicable.

In short, I conclude that Texas and other parties received notice and an opportunity to be heard that are consistent with the requirements of due process.

6.    Stay under Rules 6004(h) and 6006(d)

Several of the States object to the Debtors' request that I waive the fourteen-day stay of sale and assignment orders under Federal Rules of Bankruptcy Procedure 6004(h) and

6006(d). Rule 6004(h) stays an order authorizing a sale for 14 days absent a court order waiving or shortening the stay. Similarly, Rule 6006(d) stays an order authorizing a debtor to "assign an executory contract or unexpired lease under § 365(f) . . . for 14 days" unless the court orders otherwise. The rules do not limit a court's power to shorten or waive these stays. *See* Fed. R. Bank. P. 6004(h), 6006(d).

> According to a leading treatise,
>
> if an objection has been filed and is overruled, the court should eliminate or reduce the 14-day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14-day period and the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected. The reasons are almost always monetary.

9A *Collier on Bankruptcy* ¶ 6004.11 (16th ed. 2025). The reasons favoring a waiver in this case are, as *Collier* suggests, monetary. The Debtors lose money daily, without taking into consideration the interest accruing at 14% per annum on their post-petition financing or the charges of their professionals. Delay in closing translates directly to reduced recovery for stakeholders.

On the other hand, the States have filed and pursued objections, and they are likely to pursue appeals. It is not clear that they have the right to appeal, *see* Fed. R. Bankr. P. 2018(b), but that is a matter for the appellate court to determine, and the rule does not limit other parties. The Debtors have acknowledged that they will require some time to consummate the transaction and will not be in a position to close the day after receiving court approval. And the upcoming Independence Day holiday may present an obstacle to the parties' efforts to be heard by an appellate court and to the movement of the funds needed for the closing.

Taking these factors into consideration, I believe that it is appropriate to reduce the 14-day stays to 10 days. This will allow any appellants sufficient time to seek a stay but will not unduly delay the closing or impair stakeholders' recoveries. Closing of the transaction will thus be stayed through Monday, July 7, 2025, but I will permit the Debtors and TTAM to take preliminary actions, such as forming Newco and giving notice to customers, in the interim.

### E.    Other Recommendations of the Ombudsman

#### 1.    Opt-in consent

The Ombudsman has recommended that I require the Debtors to obtain opt-in consent to the proposed transaction even if I conclude that it is not required by the law. He describes

this as "the optimal solution from a consumer privacy perspective" (Omb. Rep. 105). Alternatively, he suggests that I permit TTAM to obtain possession of customer data but not permit TTAM to use the data of a particular customer until it obtains affirmative opt-in consent from that customer. I agree that either of these requirements would provide robust protections for consumers. Nevertheless, assuming that I have the authority to impose conditions such as these,[16] there are three reasons why it is not appropriate to do so in the particular circumstances of this transaction.

First, the effect of the proposed transaction on consumer privacy is not so significant as to justify court intervention. As discussed above, after the closing, customers will deal with the same business, the same employees, familiar leaders, and the same privacy policies (plus some additional privacy protections). Consumers are not likely to even understand why their consent has been requested in this scenario. I see no need to impose obstacles to the ongoing operations of this enterprise.

Second, there is a significant risk that the sale will not close if I impose an opt-in requirement. The APA includes representations by the Debtors that TTAM will be able to use personal information without undue restriction or delay and that no court has imposed any material restriction on the transfer or use of data (APA §§ 5.1(*l*)(iv), 5.1(w)(iv)). I am confident that the Debtors would present the strongest possible arguments against the application of these representations, but their counsel described this at the sale hearing as a litigation alternative. That assessment seems accurate. It also is consistent with Ms. Wojcicki's testimony that the number of customers in California and Texas alone is equivalent to about three years of growth for the Debtors. I cannot readily conclude that TTAM would agree to close the transaction at the current price if it were required to obtain opt-in consent from those customers, much less from all customers.

Third, the Plan Toggle materially affects the analysis. Despite the discussion of transaction failure just above, the Debtors' fallback option is to confirm a plan that results in the issuance of new equity to TTAM. That mitigates the downside considerably, but not entirely. More to the point, the Debtors would not be required to obtain any type of consent from customers before confirming a plan, and I see no reason why I would impose an opt-in

---

[16] At some point, of course, a debtor's refusal to account for privacy interests betrays a lack of sound business judgment. Even in less egregious situations, I am confident that a bankruptcy court has the power to prevent a miscarriage of justice. But it is not necessary to explore the boundaries of that power here.

requirement under a plan that leaves customers and the Debtors in exactly the same legal and practical positions that they occupy currently.

Thus, if I were to impose an opt-in requirement, it is highly unlikely that it would ever be fulfilled, or even attempted. The Debtors probably would exercise the Plan Toggle and consummate a restructuring, with no customer consent required and probably tens of millions of dollars lost to administrative expenses and professional fees. Or, if their estates could not bear that expense, they would convert these cases to Chapter 7.

### 2. Protections for deceased customers

The Ombudsman has suggested a detailed protocol for protection of, and potential deletion of, genetic information of customers who are no longer living. The proposal is creative and may well be in the best interests of TTAM and the heirs of deceased customers.

Nevertheless, there is little information in the record about the Debtors' current policies and protocols on this subject, and none of the objecting parties pursued the issue in any depth. I am reluctant to tinker with the parties' transaction without that foundation. Although I commend the Ombudsman's recommendations to the leadership of TTAM, I will not impose any particular requirements on the purchaser in this regard.

### 3. Fiduciary duty

The Ombudsman also recommends that I require TTAM "not to use Company customer data in a way that is inconsistent with the best interests of the data subject" (Omb. Rep. 9). This is essentially, if not exactly, a fiduciary duty to customers.

This recommendation also is creative and would provide strong protections for consumers. But it is not practical for me to impose it, because it would require an infrastructure beyond the leadership of TTAM itself. Who would determine what the duty requires in a particular situation? Who would have standing to enforce the duty? What tribunal would resolve disputes? I do not have the power to establish all that would be necessary for this fiduciary duty to be meaningful. But the Ombudsman and others may want to address the proposal to Congress and state legislatures, which are able to evaluate its costs and benefits and to appropriate the resources necessary to make it meaningful.

## V.    Conclusion

These cases present challenging issues involving sensitive information. In the abstract, a company's sale of genetic data is a scary proposition, and reasonable people might conclude

that it should not be permitted in any circumstances. In our society, legislators are empowered to make decisions of that sort, and they have not taken such a firm stance.

The proposed sale by the Debtors to TTAM suggests that an absolute prohibition on sales could result in missed opportunities. If we cut through the formalities, this transaction will result in Ms. Wojcicki's repurchase of a business that she co-founded and ran for years. To make that happen, she will pay a very large sum of money that may be sufficient to compensate all of the company's creditors, including customers who were harmed by a data breach. And she will improve privacy practices while honoring customers' rights to delete their accounts and data.

As currently structured, the transaction involves a sale of customer data only in a technical sense: the Debtors will transfer the data, along with the rest of the business, to a subsidiary. And, as discussed above, the parties could avoid even that technical sale by exercising the Plan Toggle, though the process would cost perhaps $20 million. If the law required the parties to obtain opt-in consent to implement the Equity Toggle, then they would need to obtain that consent or else bear the cost of the Plan Toggle. But I have concluded above that there is no such requirement.

For these reasons, I will enter a separate order that grants the Debtors' sale motion, includes appropriate findings of fact and conclusions of law, and shortens the stays under Rules 6004(h) and 6006(d) to 10 days.

Dated:  June 27, 2025
St. Louis, Missouri
cjs

Brian C. Walsh
United States Bankruptcy Judge