**UNITED STATE BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

In re:

*23ANDME HOLDING CO.*, et al.,            Case No. 25-40976

                                                                         Chapter 11

                                                                         (Jointly Administered)

Debtors.

---

**<u>MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR STAY PENDING APPEAL OF ORDER APPROVING SALE OF DEBTORS' ASSETS AND RELATED ORDER AND SALE TRANSACTION</u>**

NOW COME the Amici/Appellants/Movants, ("Movants" or "Appellants") through undersigned counsel, and for this Memorandum, in Support of Emergency Motion for Stay Pending Appeal of Order Approving Sale of Debtors' Assets and Related Order and Sale Transaction of the Bankruptcy Court's order dated June 27, 2025, authorizing the sale of 23andMe Holding Co.'s assets to TTAM Research Institute (the "Sale Order") and related order entered June 27, 2025, state:

**INTRODUCTION**

Appellants appeal the Bankruptcy Court's approval of the sale of 23andMe's assets—including the irrevocable transfer of genetic and biometric data belonging to 15 million Americans—to a newly formed, insider-controlled entity, TTAM Research Institute. The facts are largely undisputed and are set forth in the Memorandum Opinion entered June 27, 2025 (doc 908). Movants assert that the legal conclusions concerning the applicability of state laws and the ability of the court to condition sale on necessary protections are in error. As a result, the Sale Order must be stayed to prevent irreparable harm to consumers, ensure proper adjudication of

constitutional and statutory issues, and maintain public trust in the integrity of both the bankruptcy system and genetic privacy protections.

Equitable estoppel precludes the parties from benefiting from prior representations or omissions that induced reasonable reliance by consumers, only to now effectuate a transfer that is fundamentally inconsistent with those assurances. The Sale Order contains errors of law that have resulted in people losing control over their DNA and genetic information, being forced to cede their personal genetic resources to an entity led by the same person at the helm when *23andMe* was forced to seek relief under the Bankruptcy Code and suffered a breach that affected half of its customers.

This case is of great public interest because if people cannot trust institutions to sufficiently protect their DNA and test results, they will be less likely to participate in genetics research to the detriment of all our health, casting a pall over personal genomics companies in the same way that the failure of Theranos set back low-cost diagnostics. The public importance is underscored by the fact that 30 states and the District of Columbia intervened in the case to object to the proposed sale on privacy grounds.

**LEGAL STANDARD**

*23and Me* is a direct-to-consumer genetic testing company. *23andMe*'s main assets are people's physical DNA (such as saliva or other samples), people's genetic information (their sequence data, the A, T, C, and Gs that have been revealed through genetic tests), and their medical information which includes what potential future illnesses they might encounter based on their sequence data and what family relationships and ancestry those sequences suggest or reveal.

In April 2023, a hacker entered *23andMe*'s system and gained access to over 7 million users' accounts. In response to the hack, 23andMe users filed over 30 legal cases against the company. The cases were consolidated as *In re: 23andMe, Inc., Customer Data Security Breach Litigation* on April 16, 2024. *In Re 23andme, Inc.,* 2024 WL 4982986, at *3. A settlement was agreed upon, but implementation of the settlement was delayed when *23andMe* filed for bankruptcy of the company. Def.'s Notice of Suggestion of Pendency of Bankr. & Automatic Stay of Proceedings, ECF No. 175 (filed Mar. 26, 2025); *Questions Related to 23andMe's Chapter 11 Filing*, 23ANDME (Mar. 26, 2025), https://customercare.23andme.com/hc/en-us/articles/30805135934615-Questions-related-to-23andMe-s-Chapter-11-Filing. The stay of proceedings under Chapter 11 took effect automatically pursuant to 11 U.S.C. § 362(a)-(c).

During the course of the bankruptcy proceedings, this Court appointed an Ombudsman who investigated and concluded, among other things, that state laws giving *23andMe* users rights to control their DNA and genetic information should apply to the bankruptcy proceedings. See CPO report, 718, p. 72-88. Multiple parties objected to the sale on various grounds, including 30 states and the District of Columbia, as well as movants who include the founder and board members of the Global BioData Trust. Some of Movants are also *23andMe* users. Doc 902 at 1. The Sale Order is effective in an expedited 10 days instead of the usual 14.

A stay pending appeal requires showing of: (1) likelihood of success on the merits; (2) irreparable harm absent a stay; (3) absence of substantial injury to other parties; and (4) public interest favors the stay. See *In re Revel AC, Inc.,* 802 F.3d 558 (3d Cir. 2015); *Hilton v.*

*Braunskill,* 481 U.S. 770 (1987). All four factors strongly support a stay here. See *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th Cir. 1981).

**ARGUMENT**

**I. APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS**

**A. The Bankruptcy Court Erred in Treating Genetic Data as Ordinary Commercial Property**

**1. DNA Remains Customer Property "On Loan" to *23andMe***

The Sale Order improperly classified sensitive genetic and biometric data as fungible commercial property owned by 23andMe*23andMe* and as personally identifiable information (PII) under section 363(b)(1) of the Bankruptcy Code. The law recognizes genetic data as quasi-property, implicating constitutional privacy rights, bodily autonomy, and public policy considerations. *See Pierce v. Swan Point Cemetery,* 10 R.I. 227 (1872); *FTC v. Toysmart.com,* No. 00-11341 (D. Mass. 2000).

Even while in *23andMe*'s care, customers retained ownership of their physical DNA and sequence information under contract terms and various state laws. *See* CPO report, (doc.718), p. 72-88. The contractual deletion provision proves customers owned their DNA—they could remove it at any time, demonstrating the material was "on loan" for specific services, not sold to *23andMe.* O*wnership remained with the 23andMe customers.*  Any language in the customer privacy agreements and/or policies and the Asset Purchase Agreement that purports to be a recognition that customers' DNA and its sequence data might be sold as assets does not give *23andMe* a property right to the DNA and sequence. The customers still hold the property right

because they could remove the DNA and sequence data at any time.  The customers' property interest gives them a right to be told of an impending sale and not have their biomaterials and data sold unless they specifically opt in.

This bankruptcy sale is analogous to selling a parking garage—the buyer gets the garage but not the parked cars. Similarly, in a dry cleaner bankruptcy, the buyer doesn't acquire customers' clothing left for cleaning services. The concept of "DNA on loan" is well-established in scientific literature. *See* Laura Arbour & Doris Cook, *DNA on Loan: Issues to Consider When Carrying out Genetic Research with Aboriginal Families and Communities, 9* Community Genetics 153-60 (2006), *doi:10.1159/000092651*; Krystal S. Tsosie, K. S., Joseph M. Yracheta, J. M., Jessica A. Kolopenuk, J. A., & Janis Geary, *We Have "Gifted"' Enough: Indigenous Genomic Data Sovereignty in Precision Medicine,* 21(4) American Journal of Bioethics 72–75 (2021), *https://doi.org/10.1080/15265161.2021.1891347cs*. 23andMe functioned as a bank, not a department store.

**2. De-identification Cannot Eliminate Property Rights or Privacy Concerns**

DNA cannot  be "de-identified" in order to  "not be associated with an individual customer." Opinion( doc 908) p. 2. Unlike erasing a VIN from a car, the connection between a person and their DNA cannot be severed. DNA samples and sequences can always be linked back to individuals—this is the foundation of forensic DNA testing.

Under the Nuremberg Code and federal research regulations, people have an absolute right to choose what research they participate in. The voluntary consent of the human subject in the Nuremberg Code is absolutely essential. The Code further specifies that the person involved should have legal capacity to give consent and should be situated as to be able to exercise free

power of choice, without the intervention of any element of force, fraud, deceit, duress, overreaching, or other ulterior form of constraint or coercion. See Nuremberg Code (1947). The sale transaction and supporting rationale create risks for individuals and take away rights they currently possess, such as the right to refuse to participate in research because it allows their DNA to be used in research if it is "de-identified," even though it is still possible to link that DNA back to a particular individual.

**B. The Recommendations in the Consumer Privacy Ombudsman Report Are Properly Followed**

Per 11 U.S.C. § 363(b)(1) (as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005), when a debtor proposes to sell or lease PII in violation of its privacy policy, the court must order appointment of a consumer privacy ombudsman (CPO). The ombudsman's duty is to advise the court on privacy implications of the proposed sale and recommend measures to protect consumer privacy. This statute significantly changes bankruptcy law in that it is no longer enough to just get money to creditors; where genetic information is involved, new requirements must be taken into account. The CPO report states that Consumers were repeatedly assured that they were in control of their genetic information. Ombudsman Report (doc 718), p.33. Earlier versions of the Privacy Statement also explicitly told customers in a summary section that the company "does not sell, lease, or rent your individual-level Personal Information without explicit consent. Opinion (doc 908), p. 20.

In his report, CPO Neil Richards articulated that this sale was not compliant with the privacy policies. Ombudsman Report (doc 718) , p.108), despite this, the Court elected to approve the proposed sale finding the policy in effect at the time of filing controlled and it stated that genetic information may be transferred.

The Court's finding that privacy policies permit the proposed transfer ignores explicit statements throughout Debtor's privacy policies that "we do not sell your Personal Information." Privacy Policy § 3.2. The Sale Order is reversable for this reason. See *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). Additionally, , lumping all 15 million users under a single analysis despite evidence of multiple policy versions is contrary to holdings by Circuit Courts . See *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016) (requiring particularized analysis of contract terms).

The Ombudsman's recommendation for opt-in consent is properly required as a condition of the sale of assets in this Case. 11 U.S.C. § 332(b). Potential adverse consequences from opt-in requirements are speculative and exceeded by the benefits of opt-in. See *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 315 (3d Cir. 2010).

**C. The Sale Structure Violates State Genetic Privacy Laws**

**1. Federal Courts Lack Jurisdiction to Authorize State Law Violations**

Some states explicitly provide that the DNA and genetic information of an individual is their property. See, e.g., Alaska Stat. Ann. § 18.13.010(a)(2). Particularly in those states that view DNA and genetic information as property, there are no grounds for allowing such property to be sold in bankruptcy because the DNA and genetic information were never the exclusive property of 2*3andMe*. If *23andMe* were to be found to have some form of property right, it is a shared one with its customers, not an exclusive right.

"Disclosure" is not properly interpreted to require public dissemination, notwithstanding the dictionary definition, as case law recognizes that any unauthorized sharing—even to a single

party—constitutes disclosure under privacy statutes. Opinion( doc 908), p. 20.  See *Pilon v. U.S. Department of Justice,* 73 F.3d 1111(D.C. Cir. 1996); *Hollis v. Army,* 856 F. 2d 1541 (D.C. Cir. 1988).

**2. Plain Language Violations**

Implicit exceptions to state genetic privacy statutes are improper. California (Cal. Civ. Code § 56.18(b)), Kentucky (Ky. Rev. Stat. § 367.991(3)), Tennessee (Tenn. Code Ann. § 47-18-4303(a)), Texas (*T*ex. Bus. & Com. Code § 503.001(b)), and Utah (Utah Code § 13-54-202(1)) require express written consent for ANY transfer of genetic data to a "person" or "third party."

Reliance on plain meaning of statutes and their intent is required, over the "absurdity doctrine" . See *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) ("[W]here... the statute's language is plain, the sole function of the courts is to enforce it according to its terms"). The plain language of these statutes admits no exception for transfers to subsidiaries or affiliates.

**D. There are Inherent Risks to Customers in TTAM's Ownership of their Genetic Data and Materials.**

**1. TTAM's Fundamental Inadequacies**

TTAM lacks basic qualifications to handle genetic materials —it has no laboratories, no track record, no employees. Most critically, it will be controlled by Ann Wojcicki, whose management failures contributed to *23andMe's* collapse and prompted her entire independent board's resignation. Press Release, *Independent Directors of 23andMe Resign from Board*,

23andMe Holding Co. (Sept. 17, 2024), https://investors.23andme.com/news-releases/news-release-details/independent-directors-23andme-resign-board. *23AndMe's* cybersecurity failures under her guidance —including the absence of basic protections like two-factor authentication and monitoring of suspicious activity—make TTAM an unsuitable custodian for sensitive genetic information. Lori Andrews & Richard Warner, *Data Breaches, Self-Realization, and Non-Economic Damages,* (forthcoming, 2025). While a CPO was appointed, there was no cybersecurity assessment of TTAM's capabilities.

**2. Improper Extension of Section 363(m) Good Faith Protection**

The Court's analysis contains a fatal inconsistency that undermines the entire transaction. For privacy law purposes, the Court treats TTAM and 23andMe as "basically the same entity" to avoid state law requirements that would apply to transfers to third parties like Regeneron. Opinion, 908 p. 26. Yet for transaction purposes, the Court recognizes TTAM as a separate entity entitled to Section 363(m) protection.[1] This selective recognition ignores that TTAM—a single-member LLC controlled by Wojcicki—differs vastly from 23andMe, a public company with independent board oversight and shareholders. The critical error lies in the Court's failure to recognize that **TTAM Holdco, LLC is a separate legal entity from both the Debtors and NewCo**, making this a three-party transaction that cannot qualify for good-faith-purchaser protection under established precedent. The Court's finding that there was no collusion ignores that the CEO's dual role as debtor's fiduciary and ultimate controller of the purchaser creates inherent conflict, which precludes good faith findings.

This inconsistency is legally untenable. As recognized in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) (2010), corporations possess separate legal

personhood. Courts pierce this fiction only to prevent injustice, as in *DBDC Spadina Ltd. v. Walton (Ontario Court of Appeal, 2018)* and *Dewberry Group, Inc. v. Dewberry Engineers Inc.*, 604 U.S. \_\_\_ (2025)*,* where control by the same individual justified treating separate entities as one. Here, the Court did the opposite—collapsed entities to avoid regulatory requirements while maintaining separateness to grant statutory protections.

*In re Gucci*, 126 F.3d 380, 387 (2d Cir. 1997), requires "integrity in the conduct of the sale proceedings" and absence of "collusion between the purchaser and other bidders or the trustee." This manipulation of corporate form to achieve desired outcomes warrants avoidance under 11 U.S.C. § 548.

**3. Inconsistent Entity Treatment Regarding Consent**

The Court's finding that state laws don't apply because the same people at TTAM will have access as at 23andMe is flawed. TTAM has no employees—there is no guarantee that Ms. Wojcicki will be able to rehire Debtor's employees. More critically, TTAM may pursue the same research deals that led to Debtor's bankruptcy. Basic corporate law recognizes separate legal entities, suggesting that a disclosure occurs when two different entities are involved. See *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003) ("[A] corporation is a legal entity distinct from its shareholders"). The finding that TTAM's 100% ownership of NewCo means there is no transfer to TTAM is contrary to precedent regarding beneficial ownership. See T*SC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976) (control includes ability to direct management and policies)*.* Because the customers were initially willing to have *23andMe* do certain things with their DNA information (some of which they may not have understood and did not explicitly consent to) does not mean they would still allow TTAM to do it now following the 2023 cyber

breach. Opinion (doc 908) p. 3. Despite the proposed enhanced privacy protections TTAM agreed to provide, the record contains no evidence that TTAM has any experience or expertise in privacy protection.

Customers who previously had no reason to anticipate *23andMe's* fragility when they initially consented to certain policies are now wary. Customer trust has evaporated—more than 30 class actions were filed after the October 2023 data breach, and, since news of the potential sale of their DNA broke, over 2 million people requested that their DNA and genetic information be deleted Opinion (doc 908) p.3.

*23andMe* failed to appropriately and timely process customer deletion requests. Originally, customers could delete samples and genetic information using simple login credentials. Recognizing DNA's sensitivity, *23andMe* offered anonymous testing to prevent genetic discrimination—paralleling anonymous HIV testing during the AIDS epidemic to prevent discrimination against people with HIV. Recently, however, *23andM*e instituted burdensome new deletion requirements. Customers must now provide birth dates, which often fail to process, and subsequently submit driver's licenses and additional personal information to delete their genetic data. See *Declaration of interested party (doc* 901) p. *27-28,Response Brief of Debtor citing and Transcript testimony of 23andMe user at hearing)*. These escalating barriers serve an obvious purpose: customer data access and licensing constitute *23andMe'*s (and prospectively TTAM's) core business asset. Fewer customers in the database directly reduces revenue generation, creating perverse incentives to trap genetic information through procedural obstacles.

*23andMe's* customers whose genetic and personal information is the company's foundation are entitled to greater protections. If customers had known that state genetic privacy protections would be found inapplicable to the TTAM transfer, they—who are also creditors due to the data breach class action—might have preferred Regeneron as purchaser. The speculative financial harm is exceeded by the damage caused by concrete privacy violations affecting fundamental rights. See *Riley v. California,* 573 U.S. 373, 393 (2014) (privacy rights require special protection). In reality, customers might have preferred more privacy over their valuable genetic essence, even if it meant less money (note that the current accepted bid of $302.5M equates to a payout of $20-$30/person based upon the current 13 million customers).

## II. IRREPARABLE HARM WILL RESULT ABSENT A STAY

*23andMe'*s primary assets consist of customers' physical DNA samples, genetic sequence information (the A, T, C, and G data revealed through testing), and related medical information revealing potential future illnesses, family relationships, and ancestry. These assets enable pharmaceutical partnerships, service development, customer reidentification through database linking, and marketing of additional genetic tests or health products to consumers.

DNA is inherently an identifier that cannot be truly de-identified. Even when names and addresses are removed, genomic information remains embedded in databases and can be reidentified. The harms from this permanent vulnerability are concrete and severe. Genetic sequence information can trigger mortgage denials based on cancer predisposition despite current health, disqualify individuals from inheritances through unexpected parentage revelations, and enable law enforcement searches without probable cause. When police find partial DNA matches, they disrupt innocent relatives' lives by subjecting them to testing. These

risks explain why DNA and genetic sequences receive broad state law protection and why some users established anonymous 23andMe accounts.

Although TTAM's voluntarily agreed to privacy protections, Opinion 908, p. 6; (Doc 910), Exhibit D, pgs. 160-163, they are insufficient and lack clarity. TTAM's commitment to retain "in perpetuity *23andMe's* current policies regarding customers' rights to delete their accounts and genetic data and/or opt out of research" provides inadequate protection for multiple reasons. The provision can be evaded through deletion obstacles already implemented by *23andMe*. More critically, TTAM could gut deletion rights entirely by claiming de-identification before selling DNA to biotech companies, directly contravening customers' express deletion requests. Having their DNA or sequence information put into research without consent through the ruse of "de-identification" would violate customers' personal and religious beliefs about permissible research uses, such as opposition to embryonic stem cell research, regardless of whether identifiers are removed.

Another voluntary safeguard allows TTAM to change privacy guidelines with notice of "material" changes, but materiality remains TTAM's determination. Without explicit email notification requirements and opt-in consent for changes, consumers may never learn of modifications that materially affect their interests. These deficiencies render TTAM's voluntary protections illusory rather than meaningful safeguards against irreparable genetic privacy violations.

### III. A STAY WILL NOT SUBSTANTIALLY INJURE OTHER PARTIES

TTAM has not yet implemented the transaction. A brief stay will preserve the status quo without prejudicing the estate or materially disrupting estate value. It merely provides time for

judicial review of unresolved constitutional and statutory questions. Should the transaction fail to close, and the Purchase Price not be paid, that would amount to less than $40 per cyber breach customer or $20 per customer for all customers that would not be received-a small price to adequately protect use of genetic information and data.

**IV. THE PUBLIC INTEREST STRONGLY SUPPORTS A STAY**

This transaction affects the genetic rights of 15 million Americans and sets an undesirable precedent allowing insiders to commodify human biology without transparency or customer re-consent. National security experts have warned of potential data misuse. The public interest demands scrutiny and independent oversight, not rubber-stamped insider transfers.

If people cannot trust institutions to protect their DNA and test results, participation in genetics research will decline to the detriment of public health—casting a pall over personal genomics companies similar to how Theranos set back low-cost diagnostics.

**V. GROUNDS FOR STAY**

**A. Likelihood of Success on Appeal**

The lack of sufficient and required protections of customers genetic material built into the transaction expose it to reversal on appeal.

**B. Irreparable Harm**

Once genetic data is transferred, the privacy violation cannot be undone. Genetic information is immutable and its disclosure permanent. The 13 million remaining consumers, and even the 2 million former customers some of whose genomic data remain in 23andMe's

database, face irreparable harm to their most fundamental privacy interests. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

### C. Balance of Hardships

A brief delay in closing or even failure of the sale to proceed and the resulting loss of $20 per cyber breach customer creditors weighs negligibly against the permanent loss of genetic privacy for millions.

### D. Public Interest

The public interest strongly favors enforcing democratically enacted privacy protections for genetic information. This case will set precedent for every future bankruptcy involving sensitive genetic data. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

### E. BRIEF

This Brief was drafted by Movants/Appellants.

### CONCLUSION

For the foregoing reasons, the State Objectors respectfully request that this Court stay the effectiveness of its Sale Order pending expedited appeal. The Bankruptcy Court's decision contains numerous reversible errors that threaten irreparable harm to millions of consumers' genetic privacy rights. Time is of the essence to prevent this unprecedented violation of state privacy laws through an improperly structured insider transaction masquerading as a good faith purchase.

Appellants respectfully request this Court to:

1. **Issue immediate stay** of the Sale Order pending appeal resolution;

2. **Alternatively, condition any sale** upon independent oversight, consumer re-consent, and deletion of all data from previously "deleted" accounts;

3. **Grant such other relief** as the Court deems just and proper.

**DATED:** July 3, 2025

**Respectfully submitted,**

/s/ John Talbot Sant, Jr.
John Talbot Sant, Jr., MO #35324
BECK & SANT, LLC
11775 Borman Drive, Suite 216
Maryland Heights, MO 63146
Phone: 636-240-3632
Email: tal@beckandsantlaw.com

*Counsel for Amici/Appellants/Movants*

---

[1] Section 363(m) protects only arms-length transactions with truly independent third parties. See *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). The circular structure—Debtors create NewCo, transfer assets to NewCo, then transfer NewCo to TTAM (controlled by Debtors' CEO), with TTAM using CEO's money to pay Debtors—exemplifies insider dealing that precludes good faith. See *In re Tempo Technology Corp.*, 202 B.R. 363, 367 (D. Del. 1996) *(insider transactions subject to heightened scrutiny); In re Pursued Capital, LLC* 2014 WL 4384808, at 5 (Bankr. S.D.N.Y. Sept. 4, 2014) ("transactions between insiders and the estate are not entitled to the presumptions of good faith").