UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>**CHROME HOLDING CO. (f/k/a 23ANDME HOLDING CO.),** *et al.,*<br><br>Debtors. | Case No. 25-40976-357<br><br>Chapter 11<br>Jointly Administered |

## **MEMORANDUM OPINION**

Debtor ChromeCo, Inc., formerly known as 23andMe, Inc., sold its assets under Section 363 of the Bankruptcy Code earlier in this case. It then rejected its lease of a building in San Francisco owned by KR OP Tech, LLC (the "Landlord"). The Landlord filed a proof of claim for rejection damages of approximately $9.7 million.

The Landlord has now objected to the Fourth Amended Joint Plan of Chrome Holding Co. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"). Its objections raise several issues, but all derive from a single fact: if Section 502(b)(6) of the Bankruptcy Code applies here, the Landlord's allowed claim in this case will be limited to about $5.6 million.[1]

For the reasons discussed below, I will overrule the Landlord's objections to confirmation of the Plan, but I will include language in the confirmation order protecting the Landlord's rights against what may remain of the Debtor after confirmation.

**I.     Jurisdiction**

The Court has subject-matter jurisdiction of the Debtor's case and the plan-confirmation proceedings under 28 U.S.C. § 1334(a)-(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

---

[1] The Debtor has not agreed to either of these calculations, but it has not disputed them for purposes of the legal issues raised by the Landlord. I will take the same approach.

## II.     Background

### A.     The Debtors' Business and History

Before filing for bankruptcy relief, the Debtors in these cases operated a direct-to-consumer genetic-testing business.[2] Customers could send the company saliva samples in exchange for extensive information about their personal genomes, including ancestry and susceptibility to certain illnesses. In operating this business, the Debtors stored highly sensitive personal information, including saliva samples, DNA testing results, and other customer information such as names and email addresses.

In 2023, the company announced that it had suffered a data breach, during which hackers accessed the personal data of approximately seven million customers. Extensive litigation and threats of legal action ensued after the data breach. The fallout from the data breach strained the Debtors' resources and, along with other economic factors, led the Debtors to file for Chapter 11 relief.

In March 2025, the Debtors filed a motion to establish bidding procedures and to set certain deadlines for the sale of their assets, and I granted that motion. A lengthy sale process followed, culminating in a two-day evidentiary hearing on the Debtors' motion to sell substantially all of their assets, except the Lemonaid telehealth business, for a purchase price of $302.5 million. I entered an order approving the sale on June 27, 2025, and the sale closed on July 14, 2025. *See In re 23andMe Holding Co.*, --- B.R. ----, 2025 WL 1791166 (Bankr. E.D. Mo. June 27, 2025).

The Debtors filed their original Chapter 11 plan and disclosure statement on August 15, 2025. I entered an order approving the adequacy of the disclosure statement and the confirmation procedures on October 1, 2025. The Debtors have since filed various supplements and amended plans, with the most recent being the Plan.

On September 11, 2025, the Debtors filed a Notice of Lemonaid Stock Purchase Agreement, which indicated an intent to consummate the sale of the Lemonaid telehealth business through the Plan. Pursuant to this agreement, Bambumeta Ventures, LLC will acquire 100% of the outstanding capital stock of Debtors Lemonaid Health, Inc. and Chrome Pharmacy Holdings, and thus obtain indirect ownership of several other subsidiaries (collectively, the "Lemonaid Debtors") for $10 million. No party objected to the related plan

---

[2] Although the dispute with the Landlord involves only Debtor ChromeCo, Inc., I discuss that company and its affiliated debtors collectively in this background section.

provisions. With the sale of the Lemonaid Debtors, the Debtors will no longer have any business operations.

### B. Key Terms of the Plan

Classes 3, 4, 5, and 14 under the Plan address three class actions that have been preliminarily certified for settlement purposes, as well as a large group of claimants with pending arbitration claims. Claimants who opt out of the class actions or do not participate in the arbitration settlement will join other general unsecured creditors of the genomics business in Class 7 or general unsecured creditors of the Lemonaid business in Class 9. Creditors in these classes will receive pro rata distributions from a liquidating trust known as the Plan Administration Trust. If the trust has sufficient assets, allowed claims of general unsecured creditors will be paid in full.

Classes 6 and 8 include commercial creditors of the genomics and Lemonaid businesses, respectively. These creditors also will be paid pro rata from the Plan Administration Trust. If sufficient assets are available in the trust, they will have their allowed claims paid in full and will receive post-petition interest.

Class 12 consists of holders of stock in the Debtors' publicly traded parent company. If there are funds remaining in the trust after all allowed claims are paid in full, the equity holders will receive a pro rata share of the remaining proceeds.

The liquidation analysis attached to the disclosure statement suggests that the Debtors are solvent and that there may be a substantial distribution to equity holders. As the Debtors noted at the confirmation hearing, however, it is too soon to know whether the Debtors are solvent. Creditors have filed proofs of claim with an aggregate face value in the trillions of dollars against the Debtors, but they have only approximately $200 million to distribute. Whether and to what extent equity holders will receive a distribution will be uncertain until the Debtors complete the claims reconciliation process.

All eligible classes voted to accept the plan except for Classes 6, 7, and 12.

As discussed previously, the Debtors will sell the stock of the Lemonaid Debtors through the Plan. The Debtors intend to close that sale on the effective date of the Plan. The Debtors intend to wind-down their remaining entities (the "Wind-Down Debtors"). The Wind-Down Debtors will not "engage in business after consummation of the plan" and therefore are ineligible to receive discharges. 11 U.S.C. § 1141(d)(3)(B). The Lemonaid Debtors, however, will receive discharges.

### III. Analysis

The Landlord objects to confirmation of the Plan on three principal grounds. First, it argues that Section 502(b)(6) should not operate to cap a landlord's claim for rejection damages if the debtor is solvent.[3] Second, the Landlord argues that the Plan violates the best-interests-of-creditors test of 11 U.S.C. § 1129(a)(7) because the Landlord would recover more in a hypothetical Chapter 7 liquidation than it will under the Plan. And third, the Landlord argues that the Plan indirectly discharges its debt even though the Debtor is not eligible for a discharge.

I will address each of these arguments, along with two related ones, in turn.

#### A. Section 502(b)(6) and Solvent Debtors

Courts have been nearly unanimous in their rejection of the Landlord's argument that Section 502(b)(6) does not apply to a solvent debtor. *See, e.g.*, *In re Federated Department Stores, Inc.*, 131 B.R. 808, 817 (S.D. Ohio 1991) ("There is simply nothing in the plain language of § 502(b)(6) to suggest that a bankruptcy court may depart from the application of the cap on a lessor's claim any time the debtor is solvent or the court otherwise believes the equities of the case might warrant such a departure."); *1500 Mineral Spring Associates, LP v. Gencarelli*, 353 B.R. 771, 785 (D.R.I. 2006) (discussing "overwhelming weight of authority" favoring debtors); *In re Farley, Inc.*, 146 B.R. 739, 748 (Bankr. N.D. Ill. 1992) ("[T]he solvency question is not a material issue of fact which would have any effect on determination of the statutory cap under § 502(b)(6)."); *In re PPI Enterprises (U.S.), Inc.*, 228 B.R. 339, 346 (Bankr. D. Del. 1998) ("The Code allows for no such distinction between value for creditors involving the application of § 502(b)(6) and value for equity holders excluding the application of § 502(b)(6)."), *aff'd*, 324 F.3d 197 (3d Cir. 2003).[4]

---

[3] Section 502(b)(6) provides that "the claim of a lessor for damages resulting from the termination of a lease of real property" is disallowed to the extent that it exceeds "the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease," plus accrued unpaid rent. 11 U.S.C. § 502(b)(6).

[4] The Landlord argues that the debtor in *PPI* was not solvent. That is arguably correct, because the plan in that case included a large class of insider claims that would not be paid in full. *See* 324 F.3d at 201 n.6. But the landlord in *PPI* presented his argument that the cap should not apply on the premise that the debtor was solvent, and the bankruptcy court rejected that argument. *See* 228 B.R. at 346. As discussed above, it is not clear whether the Debtor in

(footnote continued)

In the leading case to the contrary, the court relied on equitable principles because it concluded that Section 502(b)(6) did not clearly include or exclude a landlord's claim against a debtor-guarantor, as opposed to a debtor-tenant. *See In re Danrik, Ltd.*, 92 B.R. 964, 967 (Bankr. N.D. Ga. 1988). Many courts have disagreed with this initial premise of *Danrik*, concluding that the plain language of the statute covers guarantors as well. *See, e.g.*, *In re Interco Inc.*, 137 B.R. 1003, 1006 (Bankr. E.D. Mo. 1992) (§ 502(b)(6) "is applicable whether the debtor is the tenant or the guarantor"); *In re Arden*, 176 F.3d 1226, 1229 (9th Cir. 1999) (criticizing bankruptcy court for relying on *Danrik* in case of solvent debtor-guarantor). *See also In re Wigley*, 951 F.3d 967, 971 (8th Cir. 2020) (cap applies to landlord's claim against debtor that received fraudulent transfer). And there is no ambiguity in this case; the Debtor was a tenant, not a guarantor. Because Congress has clearly specified that the Section 502(b)(6) cap applies in the situation before me, I cannot deploy equitable principles to reach the opposite conclusion. *See, e.g.*, *United States v. Noland*, 517 U.S. 535, 543 (1996) (bankruptcy court cannot make equitable "categorical determination" about priority of claims).

But even if I had a completely free hand in the matter, I would not adopt the Landlord's preferred construction of Section 502(b)(6). The statute has its roots in a 1934 amendment to the Bankruptcy Act of 1898. *See* Act of June 7, 1934, ch. 424, § 1, 48 Stat. 911, 915 (enacting § 77B(b) of Bankruptcy Act). The Second Circuit described the provisions of this legislation relating to landlords as "an obvious compromise . . . reached only after serious research and study on the part of the legislators." *Oldden v. Tonto Realty Corp.*, 143 F.2d 916, 920 (2d Cir. 1944). *See also* S. Rep. No. 95-989, at 63-64 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849-50 (citing *Oldden* and describing compromises in similar 1978 legislation); *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 453 (1937) (describing "the diverse views entertained in Congress as to the amount for which a claim should be allowed"). The amendment provided a limited remedy to landlords, whose claims for rejection damages had not previously been considered provable. *See City Bank Farmers Trust Co. v. Irving Trust Co.*, 299 U.S. 433, 437 (1937). And it was promptly challenged, on both statutory and constitutional grounds, as it applied to solvent debtors and their shareholders. The Second Circuit rejected such a challenge in *Kuhner v. Irving Trust Co.*, 85 F.2d 35 (2d Cir. 1936), *aff'd sub nom. Kuehner v. Irving Trust Co.*, 299 U.S. 445 (1937). Judge Learned Hand explained:

> The appraisal of realty at a distant time is the merest guess; nobody can possibly know anything about it, and one man's guess is nearly as good as another's. For this reason Congress might circumscribe its use to the near future, not only

---

this case is solvent, but that does not preclude the Landlord from raising objections to confirmation because of how the Plan would work should the Debtor turn out to be solvent.

> as against creditors, but against the lessee itself. That would be no more drastic or unfair than the common law had been again and again.

*Kuhner*, 85 F.2d at 38. The Supreme Court agreed that the statute disallowed claims in excess of the limit that it set forth; it did not merely subordinate the excess for payment before distributions to shareholders. *See Kuehner*, 299 U.S. at 449-50. It rejected the constitutional challenge as well:

> Whatever courts, in the absence of a statutory formula, might feel compelled to adopt as the measure of damage in such a case, we cannot hold that Congress could not reasonably find that an award of the full difference between rental value and rent reserved for the remainder of the term smacks too much of speculation and that a uniform limit upon landlords' claims will, in the long run, be fairer to them, to other creditors, and to the debtor.

*Id.* at 454.

The Landlord points out that an important consequence of the 1934 legislation allowing landlords' claims for rejection damages was that debtors could, for the first time, discharge those debts. *See id.* at 453 ("Congress obviously attempted to award landlords an equitable share in the debtor's assets . . . since the purpose was to discharge the debtor from liability to future suits based upon the lease."). Although that is correct, nothing in the statute or the *Kuehner* opinion limits the application of the cap to situations in which the debtor receives a discharge of its debts generally or of the landlord's claim in particular. The statute and the case concern "the creditor's remedy for [contract] enforcement against the debtor's assets, or the measure of the creditor's participation therein," not what might happen after the assets have been distributed, or if the debtor is reconstituted as a going concern, or when the landlord pursues a non-debtor. *Id.* at 452. *See also In re Wigley*, 15 F.4th 1208, 1212 (8th Cir. 2021) (§ 502(b)(6) "established the amount allowed to be paid from the bankruptcy estate," as distinguished from what creditor might recover if debt were excepted from discharge).

The Landlord also argues that two changes in the law in 1978 render *Kuehner* inapplicable today. The first is that liquidating corporations were eligible to receive discharges under the Bankruptcy Act of 1898 but are not under the Bankruptcy Code. *See* 11 U.S.C. § 1141(d)(3). And the second is that the 1934 statute stated that a landlord's claim "shall be limited," while Section 502(b)(6) says that a landlord's claim is allowed "except to the extent that" it "exceeds" the cap. *Compare* 48 Stat. at 915 *with* 11 U.S.C. § 502(b)(6). I do not agree that either of these changes is meaningful. As just discussed, the statute, and its interpretation in *Kuehner*, concern what happens during the distribution of the debtor's assets among

creditors and shareholders, not what may happen afterwards. And the distinction between limiting a claim and disallowing the portion of a claim above a threshold is not material.[5]

Against this historical backdrop, there is no room for me to decide that it would be preferable for the Landlord to recover in full before shareholders may receive distributions. Congress has made its decision—in 1934 and again in 1978—about what a landlord may recover in the bankruptcy case of its tenant, and the Supreme Court has determined that Congress may do so, even if the tenant is solvent.[6]

The Landlord also relies on 21st-century cases interpreting a different disallowance statute, Section 502(b)(2) of the Bankruptcy Code. That subsection generally disallows claims for unmatured interest, but under what is known as the "solvent-debtor exception," a debtor must nevertheless pay interest to creditors before making distributions to shareholders. *See, e.g.*, *In re Ultra Petroleum Corp.*, 51 F.4th 138, 150 (5th Cir. 2022); *In re PG&E Corp.*, 46 F.4th 1047, 1057 (9th Cir. 2022). But these cases depend significantly on the longstanding, pre-Code practice of requiring solvent debtors to pay interest. *See Ultra*, 51 F.4th at 150 (noting that the solvent-debtor exception has existed for "some three centuries of bankruptcy law"); *PG&E*, 46 F.4th at 1059 (noting that "the equitable solvent-debtor exception was widely applied"); *American Iron & Steel Manufacturing Co. v. Seaboard Air Line Ry.*, 233 U.S. 261, 267 (1914) (discussing exception); *United States v. Kalishman*, 346 F.2d 514, 518 (8th Cir. 1965) (same). *See also* 11 U.S.C. § 726(a)(5) (requiring Chapter 7 trustee to pay interest if all allowed claims have been paid).

The Landlord's claim to compensation above the Section 502(b)(6) cap has no such pedigree. As discussed above, before 1934, landlords could not recover rejection damages at all, and the cap imposed at that time applied to both solvent and insolvent debtors. Thus, to

---

[5] Another provision of the 1934 legislation amended Section 63(a) of the Bankruptcy Act to include a similar limit on landlords' claims. It provided that the claim "shall in no event be allowed in an amount exceeding" the cap. 48 Stat. at 924. This formulation is similar to Section 502(b)(6), and Section 63(a) was cross-referenced in Section 77B(b). *See id.* at 915. The use of both phrases to describe the same concept in a single piece of legislation suggests that they are fundamentally equivalent.

[6] The Landlord insists in its supplemental brief that *Kuehner* is "devoid of any reference to [the debtor's] solvency." But the first question presented to the Court was whether the landlord's claim in excess of the statutory cap had "priority over the interests of stockholders." *Kuehner*, 299 U.S. at 447. It is irrelevant whether the debtor in that case had been determined to be solvent or whether, as in this case, the parties were disputing what would happen if the debtor should turn out to be solvent.

the extent that there is a role here for the principle that courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure," it favors the Debtors' position, not the Landlord's. *Cohen v. de la Cruz*, 523 U.S. 213, 221 (1998) (cleaned up).

### B.   Best-Interests-of-Creditors Objection

The Landlord's second argument is more complicated. It involves six steps.

One: Section 1129(a)(7) of the Bankruptcy Code, known as the best-interests-of-creditors test, requires that each holder of a claim in an impaired class either accept the plan or "receive or retain under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Code] on such date." 11 U.S.C. § 1129(a)(7)(A)(ii).

Two: although the Section 502(b)(6) cap limits the amount that a landlord may recover from the bankruptcy estate, it does not extinguish liability for the excess. *See, e.g.*, *In re Modern Textile, Inc.*, 900 F.2d 1184, 1191 (8th Cir. 1990) (landlord may pursue non-debtor guarantor); *Wigley*, 15 F.4th at 1212 (landlord may pursue full claim if it is excepted from discharge).

Three: when a solvent debtor liquidates in Chapter 7, the trustee makes distributions to creditors and returns the excess to the debtor. *See* 11 U.S.C. § 726(a).

Four: a corporate debtor does not receive a discharge in Chapter 7. *See* 11 U.S.C. § 727(a)(1). When a solvent corporate debtor receives the surplus of the bankruptcy estate from the trustee under Section 726(a)(6), it remains liable for any debts the trustee has not satisfied.

Five: under general principles of corporate law, and in particular in Delaware, where the Debtor is incorporated, a company must pay its creditors before its shareholders. *See* 8 Del. Code § 281 (requiring dissolved corporation to pay or make provision for debts before distributing assets to shareholders). If the Debtor received assets that remained after a hypothetical Chapter 7 liquidation, it would need to pay the balance of the Landlord's claim before making distributions to its shareholders.

Six: because the Landlord would recover the full, uncapped amount of its claim in a hypothetical Chapter 7 liquidation, it must recover the full, uncapped amount under the Plan as well.

The Landlord has not cited any decisions adopting its interpretation of Section 1129(a)(7).[7] Assuming for the sake of analysis that the preliminary points above are sound, I nevertheless disagree with the conclusions the Landlord draws, for two principal reasons.

First, the plain language of Section 1129(a)(7) requires a comparison of apples to apples. The question is whether a creditor will "receive or retain under the plan on account of such claim . . . property of a value" that at least equals "the amount that [the creditor] would *so* receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7)(A)(ii) (emphasis added). The word "so" calls for a parallel structure here: it initially suggests that we must compare what the creditor recovers "under the plan on account of such claim" in Chapter 11 to what the creditor would recover "under the plan on account of such claim" in Chapter 7. The comparison cannot be quite so literal, because there is no plan in a Chapter 7 case, but it is just as straightforward to interpret the statute to require an analysis of what the creditor would recover *from the bankruptcy estate* in each chapter. *See Dow Corning*, 237 B.R. at 411 ("[C]ourts look at the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan."). And by the Landlord's own analysis, it would receive only the capped amount from the estate in either scenario.

---

[7] The Landlord argues that the case most favorable to its position is *In re Liberate Technologies*, 314 B.R. 206 (Bankr. N.D. Cal. 2004), but it acknowledges that the context is different. *Liberate* involved a landlord's motion to dismiss the Chapter 11 case of a solvent debtor as a bad-faith filing. *See id.* at 209. Although much of the court's opinion discussed the Section 502(b)(6) cap as though it would be enforceable if the case proceeded, the court stated in a footnote near the end that if the debtor did not continue in business, it would not receive a discharge, and the debtor "would then remain liable to [the landlord] for the full amount due under state law." *Id.* at 218 n.9. The *Liberate* court did not hold that the cap does not apply to a solvent debtor or that the best-interests test requires payment of a landlord's claim in full.

A closer case, though not cited by the Landlord, is *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999). The court in *Dow Corning* contemplated but rejected a "decidedly novel" argument that echoes the Landlord's: the best-interests test "should account for the value of any cause of action that a creditor would *retain* against a chapter 7 corporate debtor." *Id.* at 411. It recognized that no court had ever discussed or decided the question and that the Collier treatise did not support it. *See id.* at 411 n.20. Twenty-six years later, the situation appears to be much the same. *See* 7 Collier on Bankruptcy ¶ 1129.02[7][b] & n.84a (16th ed. 2025) (stating that test measures creditor's "hypothetical chapter 7 distribution" and not "potential receipt of recoveries from those co-liable with the debtor").

Second, Section 1129(a)(7) applies only to a class of impaired claims. *See* 11 U.S.C. § 1129(a)(7). The Debtor has classified the Landlord's class as impaired, apparently because of uncertainty about whether and when the claims of unsecured creditors may be paid in full. But in a case involving fewer creditors and a debtor that is unquestionably solvent, the debtor might classify a landlord separately, commit to paying its capped claim in full upon plan confirmation, and thus treat the landlord as unimpaired.[8] The landlord in that hypothetical case, with an obviously solvent debtor, would not be able to invoke the best-interests test, while the Landlord in this case, with a potentially solvent debtor, claims that the best-interests test requires payment of its claim in full, without regard to the cap. That is an absurd result.

### C.　De Facto Discharge and Related Arguments

Although the Debtor is not entitled to a discharge, and the Plan states as much in Article VIII, Section A, the Landlord argues that a number of provisions in the Plan have the effect of awarding the Debtor a discharge anyway.

#### 1.　Section 1141 arguments

The Landlord first takes issue with language providing that all creditors are bound by the Plan and that the Debtor's assets will vest in the Plan Administration Trust free and clear of creditors' claims. This language does not enjoin the Landlord from commencing or continuing an action to recover from the Debtor, which is what a discharge would do. *See* 11 U.S.C. § 524(a)(2). But the Landlord contends that it has the same effect and, moreover, that it is inconsistent with Sections 1141(a) and (c) of the Bankruptcy Code.

These statutes describe the effect of plan confirmation, and their general substance is consistent with the Plan. Section 1141(a), for example, states that "the provisions of a confirmed plan bind … any creditor." And Section 1141(c) says that "the property dealt with by the plan is free and clear of all claims and interests of creditors," unless the plan or the confirmation order states otherwise. But each section also includes this introductory language: "Except as provided in subsections (d)(2) and (d)(3) of this section." 11 U.S.C. §§ 1141(a), (c). Because Section 1141(d)(3) is the Code provision that denies a discharge to a liquidating

---

[8] Courts generally conclude that a claim is not impaired if it receives the treatment provided by the Bankruptcy Code, such as the Section 502(b)(6) cap. *See, e.g.*, *PPI*, 228 B.R. at 353 (distinguishing between "plan impairment" and "statutory impairment"); *In re K Lunde, LLC*, 513 B.R. 587, 597 (Bankr. D. Colo. 2014); *In re American Solar King Corp.*, 90 B.R. 808, 820 (Bankr. W.D. Tex. 1988).

corporate debtor, the Landlord argues that such a debtor cannot bind creditors to the terms of a plan or have its assets emerge from Chapter 11 free and clear of claims.

Some courts have used sweeping language when describing the binding effect of a plan on a debt excepted from discharge, which is the subject of the related cross-reference to Section 1141(d)(2). For example, the Tenth Circuit stated, "Although a confirmed plan generally binds any creditor regardless of whether the creditor's claim is impaired by the plan or whether the creditor accepted the plan, the same is not true of a creditor whose claim is nondischargeable." *In re DePaolo*, 45 F.3d 373, 375 (10th Cir. 1995) (cleaned up). The question in that case, however, was not whether the creditor was free to ignore every aspect of the confirmed plan; it was whether the creditor was bound by language generally discharging all of the debtor's debts when its claim was not dischargeable as a matter of law. *See id.* at 374. Similarly, another court stated boldly that "the holders of the nondischargeable claims are not bound by the provisions of a confirmed plan." *In re Adelman*, 90 B.R. 1012, 1018 (Bankr. D.S.D. 1988). But two sentences later, the court reached a conclusion pertinent to the more limited dispute before it: "[A] holder of a nondischargeable claim may execute or collect on his nondischargeable debt without regard to the discharge provisions of the plan." *Id.*

More recently, the Ninth Circuit Bankruptcy Appellate Panel adopted a narrower interpretation of Sections 1141(a) and (c). *See In re Brotby*, 303 B.R. 177 (B.A.P. 9th Cir. 2003). It concluded that "while all creditors are bound by the provisions of a confirmed plan, this binding effect cannot operate to discharge an otherwise nondischargeable debt." *Id.* at 189. Similarly, "while confirmation of a plan releases all property dealt with by the plan from the claims of creditors, the plan cannot release property from § 523 claims." *Id.* And thus, in appropriate circumstances, a Chapter 11 plan may include an injunction limiting the collection rights of holders of non-dischargeable debts while the debtor makes payments to all creditors. *See id.* at 190.

This narrow interpretation is consistent with the plain language, structure, and context of Section 1141, as well as common sense. The introductory phrase "except as provided in" suggests that there may be conflicts between two statutes, and if there are, the statute identified as exceptional should control. As applied to the statutes here, a plan that contains a discharge is not enforceable to the extent that the discharge is inappropriate, either as to a single debt or as to all debts of a liquidating corporation. But that does not mean that no aspect of the plan is enforceable. Chapter 11 plans often contain provisions having little to do with the discharge of debts—such as approval of the sale of remaining assets and the appointment of persons to conduct the liquidation—and nothing in the statute suggests that Congress believed that creditors with non-dischargeable debts should be able to ignore them.

For example, the Plan contemplates the sale of the stock of the Lemonaid Debtors to a third party for cash. There is no reason why the Landlord or any other creditor should be permitted to ignore the validity of the sale and pursue the stock in the hands of the purchaser, nor should the cash proceeds be distributed to whichever creditor obtains an execution warrant first. Even though the Debtor is not receiving a discharge, the Plan provides for the orderly distribution of its assets, and creditors must comply with its requirements. *See In re AB Liquidation Corp.*, No. 06-1024, 2006 WL 6810956, at *6 (B.A.P. 9th Cir. Dec. 22, 2006) (lack of discharge "does not . . . allow [creditor] to pursue its claim against the plan proceeds"). The holder of a claim that is not discharged must find another path to payment in full.

Congress clearly contemplated that corporate debtors could confirm liquidating plans in Chapter 11. *See, e.g.*, 11 U.S.C. §§ 1123(b)(4) (authorizing sale of all debtor's property and distribution of proceeds among creditors and shareholders); 1129(a)(11) (recognizing that liquidation may be proposed in a plan); 1141(d)(3)(A) (same). But if the Landlord's interpretation of Section 1141 were correct, there would be little—perhaps nothing—for a liquidating debtor to gain from confirmation of a plan, because creditors could ignore the plan and pick the debtor's assets apart at will. If this were the result that Congress intended, it would have been simpler for it to preclude liquidating corporations from confirming Chapter 11 plans in the first place.[9]

2.   Other arguments

The Landlord also objects to eight provisions of the plan that, in its view, attempt to deem its rejection-damages claim to be fully satisfied, purport to impose on the Landlord a settlement to which it has not agreed, or otherwise are inconsistent with the lack of a discharge for a liquidating corporate debtor.

Two of the challenged provisions include the word "discharge." For example, Article III, Section D of the Plan states that the treatment provided in the Plan is "in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for [a creditor's] Allowed Claim." Article IV, Section I provides that "all agreements . . . evidencing Claims or Interests . . . shall automatically be deemed discharged, cancelled, and of no further force and effect, and the obligations of the Debtors . . . shall be deemed satisfied in full,

---

[9] A liquidating corporation is denied a discharge to prevent "trafficking in corporate shells and bankrupt partnerships." H.R. Rep. No. 95-595, at 384 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6340; *see also In re Fairchild Aircraft Corp.*, 128 B.R. 976, 982 (Bankr. W.D. Tex. 1991) (same). For the reasons discussed here, the Landlord will have the right to pursue the Debtor if, for some reason, it is reanimated and holds assets.

cancelled, discharged, release, and of no force and effect." In context, it is clear that both of these excerpts use the term "discharged" in the sense of "satisfied" rather than the Bankruptcy Code's sense of "not collectible as a personal liability." *See* 11 U.S.C. § 524(a). Nevertheless, it is possible to construe these phrases broadly to mean that the Landlord retains no recourse after confirmation against the Debtor or any other person who may be liable for the Debtor's obligations, such as a guarantor. That would be inconsistent with a discharge under Section 524(a), even if the Debtor were entitled to receive one. *See Zavelo v. Reeves*, 227 U.S. 625, 629 (1913) ("[T]he discharge destroys the remedy, but not the indebtedness."); 11 U.S.C. § 524(e).

Another provision in Article IV, Section E does not use the word "discharge," but it comes even closer to the bankruptcy-law meaning of that term. It says that "Holders of Claims or Interests are enjoined from asserting against any Debtor or any Wind-Down Debtor any Claims or Interests and may not proceed in any manner against any Debtor or Wind-Down Debtor on account of any Claim or Interests in any other forum whatsoever." Although this language can be read as a sensible warning to creditors that they should not waste their time and money suing entities that have no remaining assets, it also can be construed as essentially a discharge injunction.

By contrast, another challenged provision is not a problem at all. Located in Article III, Section F, it states that "in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed the amount of the Allowed Claim." No creditor is entitled to more under the Plan than full satisfaction of its allowed claim, even if that claim is capped under Section 502(b)(6), as discussed above.

The remainder of the Landlord's objections to what it contends are discharge-like elements of the Plan are generally similar to those discussed above. I will therefore address all of these objections *en masse* by including language in the confirmation order clarifying (1) that the Landlord's claim is not discharged; (2) that nothing in the Plan extinguishes any liability of the Debtor (including in its capacity as a Wind-Down Debtor) to the Landlord under the terms of the parties' lease, nor any related or derivative liability of any non-debtor to the Landlord; and (3) that the Landlord nevertheless is not entitled to any greater recovery under the Plan or from the Plan Administration Trust than that set forth in the Plan. *See In re Midway Gold US, Inc.*, 575 B.R. 475, 515 (Bankr. D. Colo. 2017) (noting that similar language in plan was sufficient to overcome other plan provisions that might have been impermissible in liquidating corporate Chapter 11 case).

### D.    Absolute Priority

At the confirmation hearing, the Landlord argued that the Plan does not comply with the absolute-priority rule of Section 1129(b)(2)(B) of the Bankruptcy Code because it does not

specifically adopt one of the two options set forth there: payment in full of allowed claims of unsecured creditors or elimination of the interests of shareholders. The Landlord did not include this argument in its written objection to confirmation, but it argues—correctly—that the ballot report showing that the Landlord's class of creditors voted to reject the Plan was not filed until after the objection deadline. Because only a rejecting class may invoke the absolute-priority rule, *see* 11 U.S.C. § 1129(b)(1), I will treat the Landlord's argument as timely.[10]

Nevertheless, the objection is not sound. The absolute-priority rule requires one of two outcomes in this case, and the Plan will yield one or the other. Many Chapter 11 debtors know at the time of confirmation that they are insolvent, and an occasional debtor is confident of its solvency. These debtors typically propose plans, respectively, that eliminate equity or guarantee payment in full of allowed claims. But nothing requires a debtor with assets or liabilities of uncertain value to commit preemptively to one of the two absolute-priority outcomes before it administers its assets and reconciles its liabilities. *See In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 585 (Bankr. W.D. Tex. 2010) (rejecting absolute-priority objection because "[t]he only way Class 4 [equity] will receive anything is if Class 3 in fact gets paid *in full*").

The waterfall built into the Plan ensures that shareholders will not be paid before allowed claims of creditors are satisfied. Section 1129(b)(2)(B) requires no more than that.

### E. Third-Party Releases

The Landlord's written objection to confirmation includes a short objection to the third-party releases in the Plan. The Landlord did not press this objection at the confirmation hearing after other parties announced a consensual resolution of their similar objections. But, in any event, the Landlord opted out of the third-party releases and lacks standing to challenge

---

[10] In its supplemental brief, the Landlord expands its absolute-priority argument to include other, uncodified aspects of the requirement that a plan be "fair and equitable" to an impaired, non-accepting class of creditors. 11 U.S.C. § 1129(b)(1). This argument is not timely. But in any event, for the reasons explained above, Congress has determined how a debtor's assets should be distributed, and there is no basis for me to determine that some other result would be more fair.

them. *See Mercy Health Network, Inc. v. Mercy Hospital*, 671 B.R. 499, 507 (N.D. Iowa 2025); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013).

## IV.      Conclusion

For these reasons, I will enter a separate order that confirms the Plan, makes appropriate findings of fact and conclusions of law, and includes language addressing the discharge-related issues discussed above.

Dated:  November 26, 2025
St. Louis, Missouri
cjs

                                                 Brian C. Walsh
                                                 United States Bankruptcy Judge