**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |
|---|---|
| In re: | Case No. 25-40976-357 |
|  | Chapter 11 |
| CHROME HOLDING CO. (f/k/a 23ANDME HOLDING CO.), *et al.*,[1] | (Jointly Administered) |
| Debtors |  |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING THE CYBER INSURER SETTLEMENT AND POLICY BUYBACK
AGREEMENT UNDER RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE AND (II) GRANTING REATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion (the "Motion"):

**Relief Requested[2]**

1.      The Debtors seek entry of an order (the "Proposed Order")[3] (a) approving and

authorizing the Debtors to enter into and perform under a settlement (the "Settlement") with

Various Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR

B1510CY2300014 ("Various Underwriters"), HCC Global ("HCC"), Allied World Specialty

Insurance Company ("Allowed World"), Landmark American Insurance Company ("Landmark,"

and collectively with Various Underwriters, HCC and Allied World, the "Cyber Insurers")

---

[1]      The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Chrome Holding Co. (0344), ChromeCo, Inc. (7371), Chrome Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]      Capitalized terms used but not defined in this section have the meanings ascribed to such terms elsewhere in this motion.

[3]      A copy of the Proposed Order will be made available on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/23andMe.

1

(together with the Debtors, the "Parties" and each a "Party"), on the terms and conditions set forth in that certain Cyber Insurance Settlement and Policy Buyback Agreement and Release attached hereto as **Exhibit A** (the "Settlement Agreement"); and (b) granting related.

2.       In support of this Motion, the Debtors submit the *Declaration of Matthew Kvarda in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Cyber Insurer Settlement and Policy Buyback Agreement Under Rule 9019 of the Federal Rules of Bankruptcy Procedure and (II) Granting Related Relief,* filed contemporaneously herewith.

## Jurisdiction

3.       The United States Bankruptcy Court for the Eastern District of Missouri (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and rule 9.01(B) of the Local Rules of the United States District Court for the Eastern District of Missouri.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors consent to a final order with respect to this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.       Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.       The bases for the relief requested herein are sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and rules 6004 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Relevant Background

### I.       The Chapter 11 Cases

6.       On March 23, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2

7.      The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  On April 3, 2025, the Office of the United States Trustee for the Eastern District of Missouri (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On July 15, 2025, the U.S. Trustee appointed an official committee of equity security holders (the "Official Equity Committee" and together with the Creditors' Committee, the "Committees").

8.      A detailed description of the Debtors and their business, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Matthew Kvarda in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 32] (the "First Day Declaration").

## II.     The Cyber Insurance Policies

9.      Certain cyber and technology liability and excess liability policies (the "Policies") were issued by, or novated to or assumed by, the Cyber Insurers to Chrome Holding Co. (formerly known as 23andMe Holding Co.) and its subsidiaries.  The Policies provide coverage during the May 1, 2023 through May 1, 2024 time frame (the "Policy Period").

10.     The Policies contemplate an aggregate limit of liability of $25 million on account of certain cyber and technology related events, including but not limited to, cyber extortion losses incurred as a result of a cyber extortion event (*i.e.*, any threat directed to steal, disseminate, compromise or use data as a result of unauthorized access or use of the Chrome Releasing Parties' computer system) that is first discovered during the Policy Period and expenses for claims and damages that the Chrome Releasing Parties become legally obligated to pay as a result of a claim for actual or alleged network security and privacy insured events, and breach event management

3

costs, including attorneys' fees, directly incurred as a result of an actual or suspected privacy breach or security breach first discovered during the Policy Period.

11.　　The Policies are "wasting" or "eroding" policies; thus, the total coverage available under the Policies is reduced on a dollar-for-dollar basis on account of, among other things, defense costs (including attorneys' fees) incurred in connection with lawsuits or claims arising from or related to events covered by the Policies.

### III.　　The Pixel Litigation and the Cyber Security Incident

12.　　On June 30, 2023, certain plaintiffs the ("Pixel Plaintiffs"), on behalf of putative class members who visited the website (the "Website") of Debtor Lemonaid Health, Inc. and non-Debtor LMND Medical Group, Inc. A Professional Corporation (California) between June 30, 2019 and July 14, 2025 (the "Pixel Putative Class Members"), commenced the currently pending action titled *A.J., et al.* v. *Lemonaid Health Inc. and LMND Medical Group, Inc. d/b/a Lemonaid Health*, No. 3:23-cv-03288 in the United States District Court for the Northern District of California (the "Pixel Action"). Pursuant to the Pixel Action, the Pixel Plaintiffs are alleging damages and seeking injunctive relief from the Pixel Defendants related to the Pixel Defendants' use of certain "pixels" or tracking technologies on the Website.

13.　　In October 2023, the Debtors identified and disclosed an incident (the "Cyber Security Incident") whereby a threat actor was able to access a small percentage (0.1%) of user accounts in instances where usernames and passwords that were used on the Debtors' website were the same as those used on other websites that had been previously compromised or were otherwise available (the "Credential Stuffed Accounts"). The information accessed by the threat actor in the Credential Stuffed Accounts varied by user account, and generally included ancestry information, and, for a subset of those accounts, health-related information based upon the user's genetics. Using this access to the Credential Stuffed Accounts, the threat actor accessed files containing

4

information that other users consented to share when opting in to either 23andMe's DNA Relatives, Family Tree or Connections features.[4]  The Debtors determined that as a result of the Cyber Security Incident, the threat actor accessed, without authorization, personal information relating to approximately seven million 23andMe customers worldwide.

14.     Following the Debtors' announcement of the Cyber Security Incident, over 40 putative class action lawsuits were filed in the U.S. and Canada against ChromeCo, Inc. and Chrome Holding Co. asserting claims for various common law torts and various statutory claims. In the U.S., the putative class action lawsuits were consolidated and centralized before the Honorable Edward M. Chen of the Norther District of California (the "MDL Proceeding").  In Canada, there are two class action proceedings pending in the Supreme Court of British Columbia (the "BC Class Actions") and a class action proceeding pending in the Ontario Superior Court (the "Ontario Action," and together with the BC Class Actions, the "Canadian Proceedings"). Moreover, prior to the commencement of these chapter 11 cases, more than 32,000 claimants in the U.S. represented by three law firms—Labaton Keller Sucharow LLP ("Labaton"), Levi & Korsinsky LLP ("Levi"), and Milberg Coleman Bryson Phillips Grossman PLLC ("Milberg")— asserted or threatened arbitration claims against the Debtors arising from the Cyber Security Incident.

15.     To date, Various Underwriters have approved payments of approximately $8,474,240.37 of defense costs incurred in connection with the MDL Proceeding, Canadian Proceedings and the U.S. Data Breach Arbitration Claims.  As of the date hereof, the Parties

---

[4]     23andMe's "DNA Relatives" feature allows customers to find and connect with their genetic relatives, while the "Family Tree" feature automatically predicts a family tree based on the DNA shared by a customer with its relatives in 23andMe.  23andMe's "Connections" feature allows users to share information with another 23andMe user. Connections are established based on mutual agreement of the users—one user sends a Connection invitation and the other user accepts it to initiate the sharing of data between the users.

estimate that approximately $16,525,759.63 in cyber insurance limits remain available under the Policies.

16.     During the pendency of the chapter 11 cases, the Debtors executed settlement agreements with (a) the settlement class representatives in the MDL Proceeding (the "U.S. Data Breach Class Settlement Agreement"), (b) the Canadian plaintiffs in the BC Actions (the "Canadian Data Breach Class Settlement Agreement"), (c) the plaintiffs in the Pixel Action (the "Pixel Class Settlement Agreement" and together with the U.S. Data Breach Class Settlement Agreement and Canadian Data Breach Class Settlement Agreement, the "Class Settlement Agreements"), and subsequently filed motions seeking preliminarily approval of the Settlement Agreements.

17.     On October 2, 2025, the Court entered orders preliminarily approving the Class Settlement Agreements. *See Order (I) Preliminarily Approving the Canadian Data Breach Settlement Agreement Between the Debtors and the Canadian Plaintiffs; (II) Preliminarily Certifying a Class for Settlement Purposes Only; (III) Approving the Form and Manner of Notice to Class Members of the Class Certification and Settlement; (IV) Scheduling a Fairness Hearing to Consider Final Approval of the Pixel Settlement Agreement; and (V) Granting Related Relief* [Docket No. 1449]; (b) *Order (I) Preliminarily Approving the U.S. Data Breach Settlement Agreement Between the Debtors and the Settlement Class Representatives; (II) Preliminarily Certifying a Class for Settlement Purposes Only; (III) Approving the Form and Manner of Notice to Class Members of the Class Certification and Settlement; (IV) Scheduling a Fairness Hearing to Consider Final Approval of the Pixel Settlement Agreement and (V) Granting Related Relief* [Docket No. 1450]; and (c) *Order (I) Preliminarily Approving the Pixel Class Settlement Agreement Between the Debtors and the Pixel Plaintiffs; (II) Preliminarily Certifying a Class for*

*Settlement Purposes Only; (III) Approving the Form and Manner of Notice to Class Members of the Class Certification and Settlement; (IV) Scheduling a Fairness Hearing to Consider Final Approval of the Pixel Settlement Agreement; and (V) Granting Related Relief* [Docket No. 1451].

18.     On November 17, 2025, the Debtors and certain claimants represented by Labaton, Levi, Milberg and Tycko & Zavareei LLP executed a settlement agreement (the "U.S. Data Breach Arbitration Agreement") to resolve approximately 32,000 arbitration claims arising from the Cyber Security Incident.  The Debtors' entry into the U.S. Data Breach Arbitration Agreement was approved by the Court on November 19, 2025.  *See Order (I) Authorizing and Approving the U.S. Data Breach Arbitration Settlement Agreement under Rule 9019 of the Federal Rules of Bankruptcy Procedure and (II) Granting Related Relief* [Docket No. 1638].

## IV.     Proposed Settlement of Claims

19.     The Debtors engaged in post-petition discussions with the Cyber Insurers regarding the disposition of the Policies in these chapter 11 cases.  Those discussions resulted in an agreement between the Debtors and the Cyber Insurers pursuant to which the Cyber Insurers would "buy back" the Policies for a purchase price equal to the remaining coverage limits.  Subject to this Court's approval, the Settlement will allow the Debtors to receive the remaining proceeds of the Policies for distribution and allocation in accordance with the terms of the Settlement and the Plan without any further involvement from the Cyber Insurers.  The Debtors believe that the Settlement is in the best interests of the estates by securing the remaining pecuniary value of the Policies for the benefit of the applicable stakeholders and expediting distribution of those proceeds in accordance with the Plan.

20.     The material terms of the Settlement Agreement are set forth below:[5]

---

[5]     The summary set forth herein is qualified in its entirety by the terms of the Settlement Agreement, and the terms of the Settlement Agreement shall control in the event of a conflict.

A.  **Settlement Terms**.  Subject to the conditions set forth in the Settlement Agreement, the Chrome Releasing Parties[6] and the Cyber Insurers agree as follows:

1.  <u>Settlement Payment</u>:  The Cyber Insurers will pay to the Debtors or the Plan Administration Trust, as applicable, the total lump sum of $16,525,759.63 (the "<u>Settlement Payment</u>") on or before 15 days following the date on which all of the following conditions precedent have occurred: (a) each of the Parties has executed the Settlement Agreement and delivered its signature page to the other Parties; (b) the Proposed Order becomes a Final Order (as defined in the Settlement Agreement); and (c) the Settlement Agreement has not been terminated under Section 4.7 thereof or otherwise.

2.  <u>Sale/Buyback of the Policies</u>:  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Debtors or the Plan Administration Trust, as applicable, shall sell, convey, transfer, assign, and deliver Debtors' Interest in the Policies to the Cyber Insurers in accordance with an order approving the Settlement, free and clear of any and all Interests of any other Persons, in full and final settlement of all of the Interests relating to the Policies.  Subject to the terms of the Settlement Agreement and the entry of the Proposed Order, (a) the Settlement Payment is the total amount that the Cyber Insurers are obligated to pay on account of any and all Interests of any kind relating to the Policies; (b) the Settlement Payment represents the full purchase price of the Policies, and, upon its payment, the Cyber Insurers shall own their respective Policies free and clear of all Interests of any Person; and (c) the Settlement Payment is reasonable and fair consideration for the buyback of the Policies regardless of whether there are any unpaid defense expenses or other costs that were incurred but unpaid at the time of the making of the Settlement Payment.

3.  <u>Payment Is Final</u>:  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Policies).

4.  <u>Allocation of the Settlement Payment</u>:  The Parties acknowledge that the Settlement Payment is to be used solely to fund Claims that would otherwise be deemed covered claims under the Policies, including but not limited to, settlement amounts contemplated in the Class Settlement Agreements, the U.S. Data Breach Arbitration Settlement Agreement, as well as any other Claims filed in the chapter 11 cases relating to or arising from the Cyber

---

[6]  "Chrome Releasing Parties" is defined in the Settlement Agreement as collectively referring to the Debtors and each of their respective past, present, and future parents, subsidiaries, affiliates, divisions, officers, directors, employees, representatives, agents, claims representatives, reinsurers, administrators, attorneys, and members, as well as each of their respective legal or personal representatives, successors, and assigns.  The Chrome Releasing Parties are sometimes referred to individually as a "Chrome Releasing Party."

Security Incident or the Pixel Action, including the U.S. Data Breach Class Opt-Out Claims (as defined in the Plan), Canadian Data Breach Class Opt-Out Claims (as defined in the Plan), and Pixel Settlement Class Opt-Out Claims (as defined in the Plan). The Debtors agree that the Settlement Payment shall be deposited into a segregated account and shall be used for the exclusive purpose of funding only such Claims that would otherwise be deemed covered claims under the Policies and in accordance with the Plan.

5.  <u>Several, and Not Joint, Obligations of Payment</u>: The Debtors acknowledge that the obligations of the Cyber Insurers are several, and not joint. The Debtors agree that no Cyber Insurer shall be liable for any settlement amount allocable to any other Insurer. Accordingly, each Insurer listed in **Exhibit B** to the Settlement Agreement agrees to pay only its individual, respective, allocated share of the Settlement Amount, which amount is set forth in **Exhibit C** to the Settlement Agreement. The Chrome Releasing Parties shall not seek to recover from any individual Cyber Insurer an amount in excess of its stated, respective, allocated share, as set forth in **Exhibit C** to the Settlement Agreement. Upon receipt of payment of each paying Cyber Insurer's respective, allocated share of the Settlement Payment, the Chrome Releasing Parties shall be deemed to have released such Cyber Insurer pursuant to the terms of Section 3 of the Settlement Agreement.

6.  <u>Indemnification</u>

(a)  **Defense and Indemnification**: The Debtors (or an affiliated entity established to maintain the following obligation) will defend and indemnify the Cyber Insurers for Claims[7] against them by any Person relating to the Policies, including but not limited to: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Policies; (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of the Chrome Releasing Parties, and (iii) Claims directly against the Cyber Insurers by any other Person who does not qualify as an insured under any of the Policies.

---

[7]  "Claims" is defined in the Settlement Agreement as (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

(b)    **Limitations on the Debtors' Indemnification Obligations**:

(i)    The indemnification and defense obligations enumerated in Section 5.1 of the Settlement Agreement will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment; *provided* that, for the avoidance of doubt, nothing in the Settlement Agreement shall require the Debtors or the Plan Administration Trust, as applicable, to fund any indemnification and defense obligations from proceeds of the Settlement Payment.

(ii)    Any obligation on the part of the Debtors or the Plan Administration Trust, as applicable, to pay for the Cyber Insurers' defense and indemnity under the Settlement Agreement shall immediately terminate upon the earlier of (A) the exhaustion of the amounts set forth in Section 5.2(a) of the Settlement Agreement by payments of defense or indemnity to the Cyber Insurers (or the Plan Administrator's reasonable determination that funds sufficient to satisfy the defense and indemnification obligations contemplated in Section 5.1 of the Settlement Agreement are no longer available in the Plan Administration Trust) and (B) the closing of all of the chapter 11 cases.

(c)    **Defense of the Cyber Insurers**:  Subject to Section 5.2 of the Settlement Agreement, the defense of the Cyber Insurers for an indemnified Claim under Section 5.1 of the Settlement Agreement will proceed as follows:

(i)    The Debtors, through their own counsel, will use commercially reasonable efforts to obtain a dismissal of the Cyber Insurers and the substitution of an appropriate Chrome Releasing Party on the basis that the Cyber Insurers' obligations with respect thereto were finally resolved by a reasonable, good faith settlement.

(ii)    Should the claimant refuse to dismiss the Cyber Insurers, the Cyber Insurers will have the right to select defense counsel, subject to the Debtors or the Plan Administration Trust's, as applicable, consent, which consent shall not be unreasonably withheld, to defend the Cyber Insurers at the Debtors' expense ("<u>Retained Counsel</u>").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Cyber Insurers, at rates not to exceed those routinely paid by the Cyber Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

10

(iii)     The Cyber Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Policies.

B.     <u>Insurer Injunction and Bar Order</u>: The Settlement Agreement contemplates that the Proposed Order include, among other things, an injunction, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code (the "<u>Insurer Injunction/Bar Order</u>"), providing that all Persons who hold or assert, or may in the future hold or assert, a Claim or other debt or liability, or an Interest or any right against, in, arising out of, related to or in any way interrelated with any of the Debtors, or the Policies, or against any Cyber Insurer based on, arising out of, related to or in any way interrelated with the Insurer's relationship to any of the Debtors and the Policies, whether that Person or entity filed a proof of claim in the chapter 11 cases or otherwise, and any other Person who may claim to be an insured, additional insured, or otherwise entitled to any benefit under any of the Policies, are permanently barred, enjoined and restrained from:

1.     Commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, any and all suits, actions, causes of action, direct actions, Claims, cross-claims, counterclaims, defenses, suits, amounts, reckonings, liens, security interests, or other demand against the Cyber Insurers;

2.     Seeking to recover any loss, liability, cost, damage, expense, contribution, indemnification or reimbursement from the Cyber Insurers; and

3.     Bringing any other cause of action or Claim, under federal law, state law, or any other applicable law or regulation, in any federal court, state court or any other judicial or non-judicial proceeding (including, without limitation, any proceeding in any judicial, arbitral, mediation, administrative, governmental or other forum) against or affecting the Insurers, or any of them, or their respective successors or assigns:

(a)     arising out of or in connection with any conduct, injury, or damage allegedly covered by the Policies, or any of them; and

(b)     arising out of or in connection with the activities of the Debtors, or any of them, giving rise to Claims made or that could be made under the Policies, or any of them.

4.     The protections of the Insurer Injunction/Bar Order include, but are not limited to:

(a)     any and all Claims that are based in whole or in part on the insurance relationship between the Insurers and the Debtors (or the Debtors' successors in interest), or any of them, under any of the Policies, whether arising from statute, common law, or otherwise; and

11

    (b)    any and all Claims that are based in whole or in part on any alleged breach by an Insurer of the duty of good faith and fair dealing, unfair claims practices, unfair trade practices, bad faith, violations of any statute, regulation or code (except violations of any criminal law that has resulted in a criminal charge), or any other type of extra-contractual liability based on, arising from, or attributable to, in any way, any of the Policies.

## C.    **Mutual Releases**

    1.    <u>Release of the Cyber Insurers and Termination of the Policies</u>

    (a)    Effective upon receipt by the Debtors or the Plan Administration Trust (as representative of /successor to the Debtors) of each Cyber Insurer's portion of the Settlement Payment, and in consideration thereof, the Debtors shall waive, release, and forever discharge each and every Cyber Insurer that pays its pro rata portion of the Settlement Payment from any and all past, present, and future Claims, liabilities, duties to defend or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations, of every kind, nature and description whatsoever, whether arising in law or in equity under or relating solely to the Policies set forth in Exhibit A of the Settlement Agreement for the Chrome Releasing Parties to the maximum extent they are capable at law.

    (b)    As to the Chrome Releasing Parties, the Policies will have no further force or effect whatsoever, and the Chrome Releasing Parties are released from any obligations to the Cyber Insurers thereunder (including the obligation to give cooperation and information). The Chrome Releasing Parties' releases include, without limitation, any liability for past, present, or future claims, known and unknown arising out of or relating to the Cyber Security Incident and the Pixel Action, including but not limited to (a) Class Claims (as defined in the Settlement Agreement), (b) any Contribution Claims (as defined in the Settlement Agreement), or (c) any Extra Contractual Claims (as defined in the Settlement Agreement), in each case that arise under the Policies.

    2.    <u>Limitations on Scope of Release</u>: The Debtors do not release any claim under insurance policies other than those under the Policies as listed on Exhibit A of the Settlement Agreement. For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies covering the Chrome Releasing Parties with policy periods that have not yet lapsed.

3.    Release in All Capacities:  The releases provided in Sections 3.1 of the Settlement Agreement are provided by the Debtors in all of their actual or alleged capacities, including, without limitation, as to 23andMe Holding Co., 23andMe, Inc. and 23andMe Pharmacy Holdings, Inc., and their past and present parents, subsidiaries, and affiliates as the alleged insureds, additional insureds, successors to an insured, assignors, assignees, subrogors, subrogees, indemnitors, indemnitees, creditors, judgment creditors of the Chrome Releasing Parties or any other Person asserting Claims on behalf of the Chrome Releasing Parties.

## Basis for Relief Requested

## I.    The Sale and Buyback of the Policies Should Be Approved as an Exercise of the Debtors' Sound Business Judgment

21.    Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See, e.g., In re Channel One Comm., Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. Aug. 9, 1990) (citing *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. July 1, 1993) (citing *In re George Walsh Chevrolet*, 118 B.R. 99, 102 (Bankr. E.D. Mo. Aug. 21, 1990)); *Meyers* v. *Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc.* v. *McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3-4 (Bankr. W.D. Mo. Aug. 31, 2010).

22.    Moreover, courts have recognized that insurance policies are property of a debtor's estate, which may be sold with court approval under section 363 of the Bankruptcy Code.  *See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 9, 93-93 (2d

Cir. 1988) (affirming bankruptcy court's approval of insurance settlement and related channeling injunction pursuant to section 363(f) and observing that "[n]umerous courts have determined that a debtor's insurance policies are property of the estate"); *In re Roman Catholic Diocese of Rockville Ctr.*, 665 B.R. 71 (Bankr. S.D.N.Y. 2024); *Estate of Lellock* v. *Prudential Ins. Co.*, 811 F.2d 186,189 (3d Cir. 1987); *In re Boy Scouts of Am. & Del. BSA, LLC*, 642 B.R. 504, 568-69 (Bankr. D. Del. 2022).

23.     The business judgment rule shields a debtor's decisions from judicial second-guessing.  Once a debtor articulates a valid business justification, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. Aug. 31, 1995) (internal citations omitted); *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at *40 (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *see also Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. May 5, 1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.

24.     Here, the Debtors are acting within their sound business judgment in seeking to sell the Policies to the Cyber Insurers free and clear pursuant to the Settlement Agreement.  *First*, the Cyber Insurers will pay significant consideration in exchange for the Policies in an amount equal to the remaining coverage limits under the Policies to the Debtors' estates.  *Second*, the Settlement

Payment was arrived at through good-faith and arms' length negotiations and represents fair and reasonable consideration for the Policies.  *Third*, the monies will be available to pay creditors whose claims are covered by the Policies, including claims arising from or related to the Cyber Security Incident and the Pixel Action.  *Fourth*, the sale of the Policies and the associated compromises will also remove the delays and uncertainties associated with any potential coverage litigation against the Cyber Insurers.  Lastly, the Committees support the sale of the Policies in accordance with the terms of the Settlement Agreement.

25.     Accordingly, the Debtors submit that the sale of the Policies to the Cyber Insurers represents a sound exercise of the Debtors' business judgment.

## II.     The Sale and Buyback of the Policies Should Be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code

26.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interests; (2) such entity consents; (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Since section 363(f) of the Bankruptcy Code is written in the disjunctive, any of the five conditions provides authority to sell free and clear of claims, liens, and encumbrances. *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. Aug. 20, 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *The Mutual Life Inc. Co. of New York* v. *Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R. 856, 857–858 (Bankr. W.D. Mo. 1984) (same); *Citicorp Homeowners Servs., Inc.* v. *Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

27.     Here, the Debtors intend to implement the proposed Settlement by selling the Policies back to the Cyber Insurers free and clear of any claims or other interests—for several independent reasons, including: (a) nonbankruptcy law permits a negotiated settlement "of an insured's cause of action against its insurer free and clear of any interest of an injured party whose tort claim would trigger the insurer's duty to defend and indemnify the insured," *see In re Dow Corning Corp.*, 198 B. R. 214, 245 (Bankr. E.D. Mich. 1996); and (b) to the extent any third party asserts that they have an interest in the Policies as the holder of a Claim arising from or related to the Cyber Security Incident or the Pixel Action, (i) such interest, as well as the underlying Claim, is subject to a bona fide dispute and (ii) any such third party could be compelled to accept a money satisfaction of their Claims arising from or related to the Cyber Security Incident or the Pixel Action and their interests (if any) in the Policies. *See In re WBQ P'ship*, 189 B.R. 97, 106-07 (Bankr. E.D. Va. 1995) (finding section 363(f)(5) to be applicable to claims which can be reduced to money judgment for complete relief).  Thus, the sale of the Policies to the Cyber Insurers satisfies the disjunctive requirements of sections 363(f)(1), (4), and (5) of the Bankruptcy Code, and the Debtors should be authorized to sell the Policies to the Cyber Insurers free and clear of any claims and/or other interests.

### III.    The Cyber Insurers Are Entitled to the Protections of Section 363(m) of the Bankruptcy Code

28.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

29.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," courts have held that a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993); *In re Congoleum Corp.*, 2007 WL 1428477, at *2 (Bankr. D.N.J. May 11, 2007); *U.S.* v. *Whitney Design, Inc. (In re Whitney Design, Inc.)*, 2011 WL 13254299, at *2 (E.D. Mo. Jan. 11, 2011) (noting that the purpose of section 363(m) is to protect the reasonable expectations of good faith third-party purchasers in good faith and "by providing reliability and finality, § 363 enhances the value of the debtor's assets sold in bankruptcy").

30.    The proposed settlement is the culmination of good-faith, arm's-length negotiations between the Debtors and the Cyber Insurers.  As a result of those negotiations, the Debtors request the Court find that the Cyber Insurers are good faith purchasers for value and are entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of Policies.

## IV.    Injunctive Relief Is Necessary to Implement the Sale of the Policies Free and Clear of Interests.

31.    To effectuate and supplement the "free and clear" nature of the sale of the Policies to the Cyber Insurers pursuant to section 363(f) of the Bankruptcy Code, the Cyber Insurers have conditioned consummation of the Settlement Agreement upon the issuance of an order containing the Insurer Injunction / Bar Order.

32.     Consistent with the policy buyback contemplated in the Settlement Agreement, the Insurer Injunction / Bar Order would operate to prevent all persons who hold or assert, or may in the future hold or assert, any claim against the Debtor or the Cyber Insurers arising out of or in connection with the activities covered by the Policies, or in connection with the Debtors' activities giving rise to claims made or to be made under the Policies, or any other person who may claim to be an insured, additional insured, or otherwise entitled to any benefit under the Policies, from asserting any claim or right to entitlement, or taking any other action against the Cyber Insurers, for the purpose of obtaining any recovery or other relief from the Cyber Insurers in connection with the Debtors' activities giving rise to Claims made or to be made under the Policies or under or in connection with the Policies.

33.     The Court has authority to issue the Insurer Injunction / Bar Order pursuant to section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105.  Issuance of an order containing the Insurer Injunction / Bar Order is necessary and appropriate to carry out and enforce the "free and clear" nature of the sale of the Policies to the Cyber Insurers under the Settlement Agreement pursuant to section 363(f) of the Bankruptcy Code

34.     The basis of the Insurer Injunction / Bar Order in connection with a policy buyback under section 363(f) of the Bankruptcy Code is well-established.  As the court in *In re Dow Corning Corp.* observed:

> Courts have long recognized that inherent within the authority to sell estate property free and clear of liens is the power to enjoin creditors from pursuing the purchaser of such property.  Nevertheless, more explicit protection is often needed to effectuate this important aspect of a § 363 sale. In other words, an actual injunction barring creditors from suing a purchaser of estate assets is sometimes necessary and appropriate to give the "free and clear" aspect of § 363(f) meaning.  When this is the case, a court has the

> power to "issue an [] order . . . necessary or appropriate to carry out [§363(f),
> one of] the provisions of the [Bankruptcy Code]."

*In re Dow Corning Corp.*, 198 B.R. 214, 245 (Bankr. E.D. Mich. 1996) (certain internal citations omitted). Courts frequently issue injunctions to effectuate sales of estate property under section 363 of the Bankruptcy Code. *See In re Johns-Manville Corp.*, 837 F.2d at 90 (holding that the court has the power to issue injunctive relief "pursuant to its power to dispose of a debtor's property free and clear of third-party interests and to channel such interests to the proceeds of the disposition"). Supplemental injunctions are routinely granted where insurance policies are sold back to insurers under sections 105(a) and 363(b) and (f) of the Bankruptcy Code. *See In re Bird Global, Inc.*, No. 23-20514-CLC, [Docket No. 1214], at 37 (Bankr. S.D. Fla. Aug. 2, 2024) (citing *In re Roman Catholic Bishop of Stockton*, No. 14-20371, 2017 WL 118013, at *8-9 (Bankr. E.D. Cal. Jan. 10, 2017)); *In re Sunland, Inc.*, 2014 WL 7011747 (Bankr. D.N.M. Dec. 11, 2014) ("Such 'channeling,' 'supplemental,' or 'clarifying' injunctions are relatively common with § 363(f) sale orders.").

36. Here, the Insurer Injunction / Bar Order is an integral part of the Debtors' resolution with the Cyber Insurers. Without the Settlement Agreement and the Insurer Injunction / Bar Order, the sizeable sale proceeds made available pursuant to the Settlement could not be realized or could not be realized within any reasonable period of time. Therefore, the Insurer Injunction / Bar Order should be approved.

**V.    The Court Should Approve the Settlement Agreement Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure**

36. Bankruptcy Rule 9019 grants the Court authority to approve the settlement of claims and controversies after notice and a hearing. Specifically, Bankruptcy Rule 9019(a) provides the following:

> On the [debtor in possession's] motion and after notice and a hearing, the court may approve a compromise or settlement.  Notice must be given to:  all creditors; the United States trustee; . . . and any other entity the court designates.

Fed. R. Bankr. P. 9019(a).

37.    Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement so long as the proposed settlement is "fair and equitable and in the best interests of the estate."  *TooBaRoo, LLC* v. *W. Robidoux, Inc.*, 135 F.4th 1133, 1138 (8th Cir. 2025); *see also In re Apex Oil Co.*, 92 B.R. 847, 866-67 (Bankr. E.D. Mo. 1988) (quoting *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson*, 390 U.S. 414, 424 (1968) ("*TMT Trailer Ferry*") and *In re Cockhren*, 468 B.R. 838, 845-46 (8th Cir. 2012)).  The proposed settlement need not result in the best possible outcome for the debtor, but must not "fall below the lowest point in the range of reasonableness." *Tri-State Financial, LLC* v. *Lovald*, 525 F.3d 649, 654 (8th Cir. 2008) (citing *TMT Trailer Ferry*, 390 U.S. at 424).

38.    Relying on the guiding language of *TMT Trailer Ferry*, courts in this circuit have set forth the following factors regarding the reasonableness of settlements (the "*TMT* Factors"):

a.    the probability of success in the litigation;

b.    the difficulties, if any, to be encountered in the matter of collection;

c.    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

d.    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Tri-State Financial*, 525 F.3d at 654; *see also TooBaRoo, LLC* v. *W. Robidoux, Inc.*, 135 F.4th at 1138-1139.  Ultimately, approval of a compromise is within the sound discretion of the bankruptcy court.  *See Tri-State Financial*, 525 F.3d at 654 (citing *In re New Concept Housing, Inc.*, 951 F.2d 932, 939 (8th Cir. 1991) ("A bankruptcy court's approval of a settlement will not be set aside

unless there is plain error or abuse of discretion")).  It is the responsibility of the bankruptcy court to examine a settlement and determine whether it "fall[s] below the lowest point in the range of reasonableness." *Tri-State Financial*, 525 F.3d at 654.

39.     In assessing whether a settlement is in the best interests of the estate, "[i]t is not necessary for the court to conduct a 'mini-trial' of the facts or the merits underlying [each] dispute." *In re Adelphia Commc'ns, Inc.*, 327 B.R. 143, 166–67 (Bankr. S.D.N.Y. 2005).  Rather, the court must be "apprised of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment." *In re NII Holdings, Inc.*, 536 B.R. 61, 99 (Bankr. S.D.N.Y. 2015).  In conducting its analysis of a settlement, "a court may rely on the opinions of the debtor, the parties to the settlement, and professionals in evaluating the necessary facts, and it should factor in the debtor's exercise of its business judgment in recommending the settlement." *Id.*

40.     In the Debtors' business judgment, the resolution embodied in the Settlement Agreement is in the best interest of the Debtors, their estates and other parties in interest, and falls well within the range of reasonableness.  The Settlement is the result of months of good-faith, arm's-length negotiation between the Debtors and the Cyber Insurers.  The Debtors believe that the Settlement allows the Parties to avoid administrative costs and delays associated coverage litigation that may be commenced by the Debtors or other parties in interest against the Cyber Insurers.

41.     The Settlement also satisfies the relevant *TMT* Factors.  As a threshold matter, there is no litigation or dispute currently pending as between the Debtors and the Cyber Insurers arising from or related to the Policies or the Cyber Insurers' obligations arising therefrom.  Thus, the Debtors maintain that the first and third *TMT* Factors—the probability of success in the litigation

and the complexity of the litigation involved—are not relevant to the analysis.  As it relates to the second *TMT* Factor (*i.e.*, the difficulties, if any, to be encountered in the matter of collection), apart from the expense and potential delays associated with the process for filing and receiving reimbursement for Claims covered under the Policies, the Debtors are not aware of other inherent issues with collection and thus, this factor is neutral with respect to the proposed Settlement.

42.     The last *TMT* Factor—the paramount interest of the creditors and a proper deference to their reasonable views in the premises—weighs strongly in favor of approving the Settlement.  The Cyber Insurers will pay the Settlement Payment in exchange for the Policies, which amount was arrived at through good-faith and at arm's-length negotiations.  The Settlement Payment can be made available to compensate Claims that are covered under the Policies, including any payments contemplated pursuant to the Class Settlement Agreements as well as the U.S. Data Breach Arbitration Settlement Agreement.  The sale of the Policies and the associated compromises will also remove any delays and uncertainties in the chapter 11 cases associated with coverage litigation that may be commenced by the Debtors or other parties in interest against the Cyber Insurers.  For these reasons, the Settlement represents a sound exercise of the Debtors' business judgment and should be approved under Rule 9019 of the Bankruptcy Rules.

## **Reservation of Rights**

43.     Except as expressly set forth herein, nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion

or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## **Bankruptcy Notice**

44.     The Debtors will provide notice of this Motion to the following parties: (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) counsel to the Official Equity Committee; (d) U.S. Data Breach Class Counsel (as defined in the Settlement Agreement); (e) Canadian Data Breach Class Counsel (as defined in the Settlement Agreement); (f) Pixel Class Counsel (as defined in the Settlement Agreement); (g) the law firms representing claimants who have filed or asserted claims arising out of the Cyber Security Incident as of the Petition Date; (h) claimants who timely filed proofs of claim on account of their Claims arising from the Cyber Security Incident or related to the Pixel Action; (i) the United States Attorney's Office for the Eastern

District of Missouri; (j) the Internal Revenue Service; (k) the state attorneys general in all 50 states; (l) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (m) any other person designated by the Court as requiring notice (collectively, the "Notice Parties").  Notice of this motion and any order entered hereon will be served in accordance with Local Rule 9013-3(E)(1). The Parties submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Parties respectfully request that the Court enter the Proposed Order and grant the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: December 1, 2025

Respectfully Submitted,

By: */s/ Thomas H. Riske*
**Carmody MacDonald P.C.**
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
Becky R. Eggmann #37302MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 854-8600
Facsimile: (314) 854-8660
Email: thr@carmodymacdonald.com
nrw@carmodymacdonald.com
jjg@carmodymacdonald.com
bre@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Jessica I. Choi (admitted *pro hac vice*)
Grace C. Hotz (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
chopkins@paulweiss.com
jchoi@paulweiss.com
ghotz@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

## __Exhibit A__

**The Settlement Agreement**

*Executed Version*

## <u>SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE</u>

THIS SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE ("Agreement") is entered into by and between Chrome Holding Co. (formerly known as 23andMe Holding Co.); ChromeCo, Inc. (formerly known as 23andMe, Inc.); Lemonaid Health, Inc. and its wholly owned subsidiaries; Chrome Pharmacy Holdings, Inc. and its wholly owned subsidiaries (formerly known as 23andMe Pharmacy Holdings, Inc.) on the one hand; and Various Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014 ("Various Underwriters"); Houston Casualty Company ("HCC"); Allied World Specialty Insurance Company ("Allied World"); Landmark American Insurance Company ("Landmark") (collectively the "Insurers") on the other hand.  The parties are sometimes referred to herein collectively as the "Parties," and individually as "Party."

## <u>RECITALS</u>

**WHEREAS**, Insurers (as hereinafter defined) issued or allegedly issued certain Cyber and Technology Liability or excess liability insurance policies to 23andMe Holding Co. and its affiliated and subsidiary companies ("23andMe"), as referenced below in the definition of "Policies"; and

**WHEREAS**, in June 2023, certain plaintiffs commenced a class action lawsuit titled *A.J., et al.* v. *Lemonaid Health Inc. and LMND Medical Group, Inc. d/b/a Lemonaid Health*, No. 3:23-cv-03288, which is currently pending in the United States District Court for the Northern District of California (the "Pixel Action") alleging damages and seeking injunctive relief arising from the named defendants' use of certain "pixels" or tracking technologies on the https://www.lemonaidhealth.com website, and the operative complaint in the Pixel Action asserts various theories of tort liability and violations of state privacy and consumer protection laws; and

**WHEREAS**, in early October 2023, 23andMe announced it had become aware that certain customer profile information was accessed from certain individual 23andMe.com user accounts without authorization (the "Security Incident"); and

**WHEREAS**, after the announcement of the Security Incident, numerous putative class action lawsuits were filed against 23andMe alleging that 23andMe had failed to properly protect personal information in accordance with its responsibilities, had inadequate data security protocols, was unjustly enriched by the use of personal information of the impacted individuals, violated various state genetic information privacy statutes and other state consumer statutes, failed to provide adequate notice pursuant to various breach notification statutes or common law duty, and had engaged in invasion of privacy and other claims related to the Security Incident; and

**WHEREAS**, 23andMe's investigation determined the threat actor downloaded information without authorization relating to approximately 6.4 million natural persons in the United States; and

**WHEREAS**, on April 11, 2024, the Judicial Panel on Multidistrict Litigation centralized the litigation before the Honorable Edward M. Chen of the Northern District of California for coordinated or consolidated pretrial proceedings, where nearly 40 putative class action lawsuits were pending (the "US Data Breach Class"); and

**WHEREAS**, on or about February 14, 2024, 100 arbitration demands were made against 23andMe, on or about July 10, 2024, approximately 4,766 arbitration demands were made against 23andMe, on or about September 13, 2024, approximately 881 arbitration demands were made against 23andMe, and numerous other arbitration demands were threatened or made, all as a result of the Security Incident; and

**WHEREAS**, 23andMe tendered the various lawsuits, arbitration demands, and regulatory claims under the Policies (as hereinafter defined) to date as a result of the significant Security Incident litigation; and

**WHEREAS**, on March 23, 2025, each of the Debtors filed petitions for relief under Chapter 11 of the United States Bankruptcy Code commencing chapter 11 cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Eastern District of Missouri (the "Bankruptcy Court"), which are being jointly administered under Case No. 25-40976; and

**WHEREAS**, on and effective as of August 14, 2025, 23andMe Holding Co. filed a certificate of amendment amending its Certificate of Incorporation with the Secretary of State of the State of Delaware to change its name from "23andMe Holding Co." to "Chrome Holding Co."; and

**WHEREAS**, on and effective as of August 7, 2025, 23andMe, Inc. filed a certificate of amendment amending its Certificate of Incorporation with the Secretary of State of the State of Delaware to change its name from "23andMe, Inc." to "ChromeCo, Inc."; and

**WHEREAS**, on and effective as of August 7, 2025, 23andMe Pharmacy Holdings, Inc. filed a certificate of amendment amending its Certificate of Incorporation with the Secretary of State of the State of Delaware to change its name from "23andMe Pharmacy Holdings, Inc." to "Chrome Pharmacy Holdings, Inc."; and

**WHEREAS**, for purposes of this Agreement the Parties acknowledge and agree that the Chrome Releasing Parties share the same corporate form to 23andMe Holding Co., 23andMe, Inc., and 23andMe Pharmacy Holdings, Inc., but merely have adopted new names, and as such, the Chrome Releasing Parties have the same rights and obligations under the insurance policies issued by the Insurers for purposes of this Settlement Agreement; and

**WHEREAS**, the Debtors have entered into putative class settlements to resolve certain class action lawsuits related to the Security Incident as well as the Pixel Action as part of the ongoing Bankruptcy Cases (collectively, the "Class Settlements"), which have been preliminarily approved by the Bankruptcy Court[1]; and

**WHEREAS,** the Parties now desire finally and completely to resolve, compromise, and settle to the fullest extent possible under applicable law: (i) any and all Claims (as hereinafter defined) tendered under the Policies relating to the Security Incident, the Pixel Action and other matters addressed herein, and (ii) any disputes arising out of or related to the Bankruptcy Cases, without any admission of liability or concession of the validity of the positions or arguments advanced by each other; and

**WHEREAS**, as part of this compromise and resolution, the Insurers wish to repurchase all of the Debtors' rights, title and interests in the Policies, free and clear of all Interests of any Person, except as expressly set forth in this Agreement; and

**WHEREAS**, by and through this Agreement, the Debtors seek to provide the Insurers with the broadest possible release permissible under law, as set forth herein including without limitation the Insurer Injunction and Bar Order, as herein defined, with respect to the Policies and to provide

---

[1]    *See Order (I) Preliminarily Approving the Canadian Data Breach Settlement Agreement Between the Debtors and the Canadian Plaintiffs; (II) Preliminarily Certifying a Class for Settlement Purposes Only; (III) Approving the Form and Manner of Notice to Class Members of the Class Certification and Settlement; (IV) Scheduling a Fairness Hearing to Consider Final Approval of the Pixel Settlement Agreement; and (V) Granting Related Relief* [Docket No. 1449]; *Order (I) Preliminarily Approving the U.S. Data Breach Settlement Agreement Between the Debtors and the Settlement Class Representatives; (II) Preliminarily Certifying a Class for Settlement Purposes Only; (III) Approving the Form and Manner of Notice to Class Members of the Class Certification and Settlement; (IV) Scheduling a Fairness Hearing to Consider Final Approval of the Pixel Settlement Agreement and (V) Granting Related Relief* [Docket No. 1450]; and *Order (I) Preliminarily Approving the Pixel Class Settlement Agreement Between the Debtors and the Pixel Plaintiffs; (II) Preliminarily Certifying a Class for Settlement Purposes Only; (III) Approving the Form and Manner of Notice to Class Members of the Class Certification and Settlement; (IV) Scheduling a Fairness Hearing to Consider Final Approval of the Pixel Settlement Agreement; and (V) Granting Related Relief* [Docket No. 1451].

that the Insurers shall have no further obligations to the Debtors, the Debtors' creditors or other parties-in-interest, except as expressly set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the foregoing and the mutual promises and covenants contained herein, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

1.    **DEFINITIONS**

Capitalized terms used, but not otherwise defined, in this Agreement will have the meaning scribed to such terms in the *Modified Fifth Amended Joint Plan of Chrome Holding Co. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1655].

As used in this Agreement, the following terms have the following meanings:

1.1    "Chrome Releasing Parties"  collectively refers to the Debtors and each of their respective past, present, and future parents, subsidiaries, affiliates, divisions, officers, directors, employees, representatives, agents, claims representatives, reinsurers, administrators, attorneys, and members, as well as each of their respective legal or personal representatives, successors, and assigns.  The Chrome Releasing Parties are sometimes referred to individually as a "Chrome Releasing Party."

1.2    "Insurers" means Various Underwriters; HCC; Allied World; and Landmark, and, in their capacity as such, their reinsurers, predecessors, successors, parents, divisions, subsidiaries, directors, officers, agents, and assigns in their capacities in those roles.  The Insurers are sometimes referred to individually as "Insurer."

1.3    "Policies" means the cyber and technology liability insurance and excess liability policies listed in **Exhibit A** hereto that were issued or allegedly issued by, or novated to or assumed by, any Insurer to 23andMe Holding Co., and its affiliated and subsidiary companies.

-5-

1.4    "Allied World" means Allied World Specialty Insurance Company and each of its respective past, present, and future parents, subsidiaries, divisions, officers, directors, employees, representatives, agents, claims representatives, reinsurers, administrators, attorneys, and members, as well as each of their respective legal or personal representatives, successors, and assigns.[2]

1.5    "Approval Motion" means the motion to be filed seeking approval of the terms of this Agreement, including the sale of the Policies provided for herein, and entry of the Approval Order, as provided in Section 4.1 hereof.

1.6    "Approval Order" means an order approving this Agreement and entered by the Bankruptcy Court, upon a hearing following proper notice, containing all of the provisions set out in Section 4.1 hereof, or modifications thereto that are reasonably acceptable to the Parties, which becomes a Final Order.

1.7    "Bankruptcy Cases" means the chapter 11 bankruptcy cases of the Debtors, jointly administered and captioned *In re: Chrome Holding Co. (f/k/a 23andMe Holding Co.),* Case No. 25-40976, presently pending before the Bankruptcy Court, Judge Brian C. Walsh, presiding.

1.8    "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as amended from time to time.

1.9    "Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Missouri.

1.10    "Bankruptcy Notice Parties" means the following

> (i)    the Office of the United States Trustee for the Eastern District of Missouri;

---

[2]    Allied World only makes and enters into this Agreement on behalf of any companies controlled by Allied World Assurance Company Holdings, Ltd. For the avoidance of doubt, as applied to Allied World, the terms "related entities," "affiliates," "sister corporations," "related companies," "predecessors," "subsidiaries," "parents," and "successors" shall include only entities controlled by Allied World Assurance Company Holdings, Ltd.

(ii)     the Creditors' Committee (through its counsel);

(iii)    the Official Equity Committee (through its counsel);

(iv)    U.S. Data Breach Class Counsel;

(v)     Canadian Data Breach Class Counsel;

(vi)    Pixel Class Counsel;

(vii)   Counsel representing holders of Claims arising from the Security Incident as reflected in the Cyber Claimants Counsel List filed at docket number 101 in the Bankruptcy Cases;

(viii)  Claimants that timely filed proofs of claim on account of their Claims arising from the Security Incident or related to the Pixel Action;

(ix)    the United States Attorney's Office for the Eastern District of Missouri;

(x)     the United States Internal Revenue Service;

(xi)    the state attorneys general in all 50 states;

(xii)   any party that has requested notice pursuant to Bankruptcy Rule 2002; and

(xiii)  any other Person designated by the Bankruptcy Court as requiring notice.

1.11    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

1.12    "Canadian Data Breach Class Counsel" means KND Complex Litigation.

1.13    "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any actual, potential, threatened, or alleged past, present, or future claim, complaint, cross-complaint, counterclaim, third-party claim, right, demand, order, directive, cross-claim, arbitration or mediation demand, request, suit, lawsuit, administrative proceeding, action, cause of action, statutory or regulatory obligation or directive, and any other assertion of liability of any kind, whether at law or in equity, whether sounding in tort, contract, equity, nuisance, trespass, negligence, strict liability, or any other statutory, regulatory, administrative, or common law cause

of action of any sort, whether currently known or unknown, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct or consequential, foreseen or unforeseen, asserted or unasserted.

1.14    "Class Claim" means a Claim of any kind, including for bodily injury, property damage, personal injury, advertising injury, or economic loss that arises from or is related to the Security Incident or the Pixel Action.

1.15    "Class Settlements" means the U.S. Data Breach Class Settlement, Pixel Class Settlement, and Canadian Class Settlement that have been filed with the Bankruptcy Court and preliminarily approved.

1.16    "Contribution Claim" means any Claim, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, by one insurer against another insurer for the reimbursement of money paid by the first insurer for having paid a Claim of its insured in a situation where two or more policies issued by different insurers cover the same insured for the same loss, and the first insurer contends it has paid more than its proper or proportionate share.

1.17    "Creditors' Committee" means the statutory committee of unsecured creditors appointed in the Bankruptcy Cases, as may be further reconstituted from time to time.

1.18    "Debtors" means Chrome Holding Co. (formerly known as 23andMe Holding Co.), ChromeCo, Inc. (formerly known as 23andMe, Inc.), Lemonaid Health, Inc.,  Chrome Pharmacy Holdings, Inc. (formerly known as 23andMe Pharmacy Holdings, Inc.), and each of their respective and each of their respective, subsidiaries and affiliates, which are deemed to be the insured entities under the Policies at issue in this Agreement.

1.19    "Effective Date" means the date on which all of the following conditions precedent have occurred: (a) each of the Parties has executed this Agreement and delivered its signature page to the other Parties; (b) the Approval Order becomes a Final Order; and (c) this Agreement has not been terminated under Section 4.7 hereof or otherwise.

1.20    "Extra-Contractual Claim" means any Claim against an Insurer with respect to the Policies, seeking any type of relief, including compensatory, exemplary or punitive damages, on account of alleged bad faith; failure to act in good faith; violation of any duty of good faith and fair dealing; violation of any unfair claims practices act or similar statute, regulation or code; any type of alleged misconduct; or any other act or omission of the insurer of any type for which the claimant seeks relief other than coverage or benefits under an insurance policy.

1.21    "Final Order" means an order, ruling or judgment of the Bankruptcy Court which has not been stayed or the time to move for a stay has expired and as to which no motion for a stay has been timely taken or is pending.

1.22    "HCC" means Houston Casualty Company and each of its respective past, present, and future parents, subsidiaries, divisions, officers, directors, employees, representatives, agents, claims representatives, reinsurers, administrators, attorneys, and members, as well as each of their respective legal or personal representatives, successors, and assigns.

1.23    "Interests" means all liens, Claims, encumbrances, interests, defenses and other rights of any nature, whether at law or in equity, including all Class Claims and Extra-Contractual Claims.

1.24    "Landmark" means Landmark American Insurance Company and RSUI Group, Inc. and each of their respective past, present, and future parents, subsidiaries, divisions, officers, directors, employees, representatives, agents, claims representatives, reinsurers, administrators,

attorneys, and members, as well as each of their respective legal or personal representatives, successors, and assigns.

1.25    "Official Equity Committee" means the official committee of equity security holders appointed in the Bankruptcy Case, as may be further reconstituted from time to time.

1.26    "Person" means and includes a natural person or persons, a group of natural persons acting as individuals, a group of natural individuals acting in a collegial capacity (e.g., as a committee, board of directors, etc.), a corporation, partnership, limited liability company or partnership joint venture, trust or any other unincorporated association, business organization or enterprise, any government entity and any successor in interest, heir, executor, administrator, trustee, trustee in bankruptcy, or receiver of any person or entity.

1.27    "Pixel Class Counsel" means Almeida Law Group LLC and Migliaccio & Rathod, LLP, in their capacity as counsel representing plaintiffs and putative class members in the Pixel Action.

1.28    "Plan" means the *Modified Fifth Amended Joint Plan of Chrome Holding Co. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1655] (as amended).

1.29    "Plan Administrator" means an individual with the rights and duties as described in the Plan.

1.30    "Plan Administration Trust" means the trust established in accordance with the Plan.

1.31    "Settlements" means the Class Settlements and the U.S. Data Breach Arbitration Settlement.

1.32   "U.S. Data Breach Arbitration Settlement" means that certain settlement agreement made and entered into on November 17, 2025 by and among the Debtors, U.S. Data Breach Arbitration Counsel and arbitration claimants represented by U.S. Data Breach Arbitration Counsel.

1.33   "U.S. Data Breach Arbitration Counsel" means Labaton Keller Sucharow LLP, Levi & Korsinsky LLP, Milberg Coleman Bryson Phillips Grossman PLLC and Tycko & Zavareei LLP.

1.34   "U.S. Data Breach Class Counsel" means Casey Gerry Francavilla Blatt LLP, Keller Rohrback L.L.P., and Stueve Siegel Hanson LLP.

1.35   "Various Underwriters" means Various Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014, which includes Munich Re Syndicate 0457; Nephila Syndicate 2358, and RenRe Syndicate 1458, along with each of their respective past, present, and future parents, subsidiaries, divisions, officers, directors, employees, representatives, agents, claims representatives, reinsurers, administrators, attorneys, and members, as well as each of their respective legal or personal representatives, successors, and assigns.

As used in this Agreement, the singular and masculine gender shall mean also the plural and feminine or neuter, as may be appropriate; "it" shall include "he" and "she"; and "each" and "all" includes "each" and "every".

## 2.   SALE/BUYBACK OF THE POLICIES AND THE SETTLEMENT PAYMENT

2.1   **Settlement Payment**.  On or before fifteen (15) days following the Effective Date, the Insurers will pay into a segregated account controlled by the Plan Administration Trust, as applicable, the total lump sum of $16,525,759.63 (hereinafter referred to as the "Settlement Payment").  The allocated share of the Settlement Payment owed by each of the Insurers is stated in **Exhibit C** hereto.  Payment of the Settlement Payment will be made by wire transfer or check

or other immediately available funds to the wire information or address set forth in **Schedule 1** attached hereto by each Insurer solely for its allocated share of the Settlement Payment as stated in **Exhibit C** of this Agreement.

      2.2    **Sale/Buyback of the Policies.**  Upon receipt of the Settlement Payment and in consideration thereof, and without any further action of the Parties, the Debtors or the Plan Administration Trust, as applicable, shall sell, convey, transfer, assign, and deliver the Debtors' Interest in the Policies, to the Insurers in accordance with the Approval Order, free and clear of any and all Interests of any other Persons, in full and final settlement of all of the Interests relating to the Policies.  Subject to the terms of this Agreement and the entry of the Approval Order, (i) the Settlement Payment is the total amount that the Insurers are obligated to pay on account of any and all Interests of any kind relating to the Policies; (ii) the Settlement Payment represents the full purchase price of the Policies, and, upon its payment, the Insurers shall own their respective Policies free and clear of all Interests of any Person; and (iii) the Settlement Payment is reasonable and fair consideration for the buyback of the Policies regardless of whether there are any unpaid defense expenses or other costs that were incurred but unpaid at the time of the making of the Settlement Payment.

      2.3    **Payment is Final**.  The Settlement Payment will be final and irrevocable, and will not be subject to any claims for set-off, contribution, or charge-backs (including, without limitation, any claims for additional premiums, retrospective premiums, self-insured retentions, deductibles or recoupment of prior payments to any insured under the Policies).

      2.4    **Allocation of the Settlement Payment**.  The Parties acknowledge that the Settlement Payment is to be used solely to fund Claims that would otherwise be deemed covered claims under the Policies, including but not limited to, settlement amounts contemplated in the

Settlements as well as any other Claims filed in the Bankruptcy Cases relating to or arising from the Security Incident or the Pixel Action, including the U.S. Data Breach Class Opt-Out Claims (as defined in the Plan), Canadian Data Breach Class Opt-Out Claims (as defined in the Plan), and Pixel Settlement Class Opt-Out Claims (as defined in the Plan). The Debtors agree that the Settlement Payment shall be deposited into a segregated account and shall be used for the exclusive purpose of funding only such Claims that would otherwise be deemed covered claims under the Policies and in accordance with the Plan.

2.5 **Several, and Not Joint, Obligations of Payment**. The Debtors acknowledge that the obligations of the Insurers are several, and not joint. The Debtors agree that no Insurer shall be liable for any settlement amount allocable to any other Insurer. Accordingly, each Insurer listed in **Exhibit B** agrees to pay only its individual, respective allocated share of the Settlement Amount, which amount is set forth in **Exhibit C** hereto. The Chrome Releasing Parties shall not seek to recover from any individual Insurer an amount in excess of its stated, respective, allocated share, as set forth in **Exhibit C** hereto. Upon receipt of payment of each paying Insurer's respective, allocated share of the Settlement Payment, the Chrome Releasing Parties shall be deemed to have released such Insurer pursuant to the terms of Section 3 below.

Nothing in this Agreement shall preclude the Insurers from pursuing reinsurance recoveries for the Settlement Payment from their reinsurers.

3. **RELEASE**

3.1 **Release of the Insurers and Termination of the Policies.** Effective upon receipt by the Debtors or the Plan Administration Trust (as representative of /successor to the Debtors) of each Insurer's portion of the Settlement Payment, and in consideration thereof, the Debtors shall waive, release, and forever discharge each and every Insurer that pays its pro rata portion of the Settlement Payment from any and all past, present, and future Claims, liabilities, duties to defend

-13-

or indemnify, causes of action, demands, rights, damages (including, but not limited to, all compensatory, extra-contractual, bad faith, punitive or exemplary damages that were or could have been alleged), or any other obligations, of every kind, nature and description whatsoever, whether arising in law or in equity under or relating solely to the Policies set forth in Exhibit A for the Chrome Releasing Parties to the maximum extent they are capable at law.  As to the Chrome Releasing  Parties, the Policies will have no further force or effect whatsoever, and the Chrome Releasing Parties are released from any obligations to the Insurers thereunder (including the obligation to give cooperation and information).  The Chrome Releasing Parties' releases include, without limitation, any liability for past, present, or future claims, known and unknown arising out of or relating to the Security Incident and the Pixel Action, including but not limited to (a) Class Claims, (b) any Contribution Claims, or (c) any Extra Contractual Claims, in each case that arise under the Policies.

3.2    **Limitations on Scope of Release**.  The Debtors do not release any claim under insurance policies other than those under the Policies as listed on Exhibit A of this Agreement. For the avoidance of doubt, it is not the Parties' intent to release any obligations in connection with currently effective policies covering the Chrome Releasing Parties with policy periods that have not yet lapsed.

3.3    **Release in All Capacities.**  The releases provided in Sections 3.1 are provided by the Debtors in all of their actual or alleged capacities, including, without limitation, as to 23andMe Holding Co., 23andMe, Inc. and 23andMe Pharmacy Holdings, Inc., and their past and present parents, subsidiaries, and affiliates as the alleged insureds, additional insureds, successors to an insured, assignors, assignees, subrogors, subrogees, indemnitors, indemnitees, creditors, judgment

-14-

creditors of the Chrome Releasing Parties or any other Person asserting Claims on behalf of the Chrome Releasing Parties.

3.4    **Released Party Within the Plan.** The Debtors represent and warrant that the Plan (as modified, amended, or supplemented from time to time) confirmed by the Bankruptcy Court shall include in the definition of "Released Parties" the following entities: Various Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014 ("Various Underwriters"); Houston Casualty Company ("HCC"); Allied World Specialty Insurance Company ("Allied World"); and Landmark American Insurance Company ("Landmark"), solely to the extent that (a) this Agreement is executed by the Parties, (b) the Bankruptcy Court enters an order approving the Agreement, and (c) the Insurers perform their obligations under the Agreement (the "Released Party Provision").  Notwithstanding anything else in this Agreement to the contrary, a failure to incorporate the Released Party Provision in the Plan that is confirmed by the Bankruptcy Court shall constitute a breach of a condition precedent to the obligation to make the Settlement Payment and shall excuse any further performance of this Agreement by the Insurers, at their sole discretion.

3.5    **Release of Unknown and Unsuspected Claims.**  The Parties acknowledge that they have read and understand Section 1542 of the California Civil Code which reads as follows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or her, would have materially affected his or her settlement with the debtor or released party."  All Parties hereby expressly waive and relinquish all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to any claims that they have between and/or

-15-

among them regardless of whether they know or suspect them to exist as of the time of the execution of this Agreement.

3.6    **Warranty Regarding Known Claims.**    Each of the Debtors represents and warrants that as of the date it has executed this Agreement and delivered its signature page to the other Parties, the Chrome Releasing Parties are not "on notice" of any Claims for which the Chrome Releasing Parties are alleged to be liable other than the Claims arising out of the Security Incident and Claims related to the Pixel Action.  For purposes of this Agreement, "on notice" means that the Persons responsible for handling the insurance affairs of the Chrome Releasing Parties have received notification from any source of the assertion or filing of a claim.

3.7    **Changes in Fact or Law.**  The Parties acknowledge that there may be changes in the law with respect to interpretation of coverage under the Policies or otherwise and/or the Parties may hereafter discover facts different from, or in addition to, those which they now believe to be true with respect to any and all of the Claims released in this Agreement.  Nevertheless, the Parties hereby agree that the releases set forth above shall be and remain effective in all respects, notwithstanding any changes in the law and/or the discovery of such additional or different facts.

3.8    **No Other Assignment.**    The Debtors represent and warrant that they are not currently aware of any prior assignments of their rights under the Policies and that they will not assign or transfer, in whole or in part, to any Person any of their rights under the Policies with respect to Claims released under this Agreement.  Moreover, the Debtors represent, warrant, and agree that, except as provided for in this Agreement, they will not in any way assist any Person in the establishment of any Claim against the Insurers relating to any Claim released under this Agreement.

4.  **THE DEBTORS' BANKRUPTCY-RELATED OBLIGATIONS**

4.1    As soon as reasonably practicable after the date on which this Agreement has been executed by all Parties, the Debtors, through their counsel, shall file the appropriate motion or motions seeking approval of the terms of this Agreement, including the sale of the Policies, and entry of the Approval Order together with appropriate findings of fact and conclusions of law, in the form attached as **Exhibit D** hereto.  The Approval Order shall include, or have alternative protections reasonably acceptable to Insurers to:

(a)    Approve this Agreement in its entirety pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 105(a), and Bankruptcy Rules 6004 and 9019;

(b)    Find that due and adequate notice of (1) the terms and conditions of this Agreement, (2) the sale and buyback of the Policies, (3) the terms of the Insurer Injunction/Bar Order, and (4) the hearing to approve this Agreement, was provided in accordance with Bankruptcy Rules 2002 and 6004 and published in accordance with Section 4.3 of this Agreement;

(c)    Find that this Agreement was negotiated in good faith, the product of arms-length bargaining, free from fraud or collusion;

(d)    Find that the settlements and compromises embodied in this Agreement, including, without limitation, the sale of the Policies, the release of Claims with respect thereto, and the Insurer Injunction/Bar Order, are within the reasonable range of litigation outcomes if the Debtors were to litigate the matters resolved pursuant to this Agreement and the Approval Order, represent fair and reasonable consideration, and are reasonable, fair and equitable, and in the best interest of the Debtors' estates and their creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors;

(e)     Find that neither this Agreement nor the transactions contemplated thereby are subject to avoidance under Section 363(n) of the Bankruptcy Code, and that none of the Parties have engaged in any conduct that would (1) cause or permit this Agreement, or the sale of the Policies, to be avoided under Section 363(n) or (2) prevent the application of Section 363(m). Furthermore, in the absence of a stay pending appeal, if any, the Insurers will be acting in good faith within the meaning of Section 363(m) in consummating the contemplated transactions at any time after entry of the Approval Order;

(f)     Find that (1) Claims against the Debtors; and (2) Claims and Interests in, to or under the Policies are subject to bona fide dispute; hence, the Policies may be sold free and clear of such Claims pursuant to Section 363(f)(4) of the Bankruptcy Code;

(g)     Find that all holders of Claims against the Policies could be compelled in a legal or equitable proceeding to accept a money satisfaction of such Claims; therefore, the Policies may be sold free and clear of such Claims pursuant to Section 363(f)(5) of the Bankruptcy Code;

(h)     Authorize the Parties to undertake the settlement, perform the obligations and the transactions contemplated by this Agreement;

(i)     Authorize the sale of the Chrome Releasing Parties' Interests in the Policies to the Insurers free and clear of any and all Interests of any Person, with all Interests in and to, and Claims against, the Chrome Releasing Parties' Interests in the Policies being fully extinguished without reservation as to the Insurers;

(j)     Provide that the Insurers are good-faith purchasers of the Policies for value and without knowledge of adverse claims and, as such, are entitled to all protections provided to a good faith purchaser under Bankruptcy Code § 363(m);

-18-

(k)        Provide that the consummation of this Agreement releases the Insurers from

liability to the Chrome Releasing Parties under the Policies and/or applicable law;

(l)        Provide that the sale of the Policies outside the ordinary course of business,

free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and

§ 363(f);

(m)        Enter an injunction, pursuant to Sections 105(a) and 363(f) of the

Bankruptcy Code, 28 U.S.C. § 1651, and Bankruptcy Rule 7016 (the "Insurer Injunction/Bar

Order"), providing that all Persons who hold or assert, or may in the future hold or assert, a Claim

or other debt or liability, or an Interest or any right against, in, arising out of, related to or in any

way interrelated with any of the Debtors, or the Policies, or against any Insurer based on, arising

out of, related to or in any way interrelated with the Insurer's relationship to any of the Debtors

and the Policies, whether that Person or entity filed a proof of claim in the Bankruptcy Cases or

otherwise, and any other Person who may claim to be an insured, additional insured, or otherwise

entitled to any benefit under any of the Policies, are permanently barred, enjoined and restrained

from:

(a)  commencing, prosecuting, continuing or asserting, either derivatively
or on behalf of themselves, any and all suits, actions, causes of action, direct
actions, Claims, cross-claims, counterclaims, defenses, suits, amounts,
reckonings, liens, security interests, or other demand against the Insurers;

(b)  seeking to recover any loss, liability, cost, damage, expense,
contribution, indemnification or reimbursement from the Insurers; and

(c)  bringing any other cause of action or Claim, under federal law, state
law, or any other applicable law or regulation, in any federal court, state
court or any other judicial or non-judicial proceeding (including, without
limitation, any proceeding in any judicial, arbitral, mediation,
administrative, governmental or other forum) against or affecting the
Insurers, or any of them, or their respective successors or assigns:

(1)  arising out of or in connection with any conduct, injury, or
damage allegedly covered by the Policies, or any of them; and

-19-

(2) arising out of or in connection with the activities of the Debtors, or any of them, giving rise to Claims made or that could be made under the Policies, or any of them.

(n)    The protections of the Insurer Injunction/Bar Order include, but are not limited to:

(a) any and all Claims that are based in whole or in part on the insurance relationship between the Insurers and the Debtors (or the Debtors' successors in interest), or any of them, under any of the Policies, whether arising from statute, common law, or otherwise; and

(b) any and all Claims that are based in whole or in part on any alleged breach by an Insurer of the duty of good faith and fair dealing, unfair claims practices, unfair trade practices, bad faith, violations of any statute, regulation or code (except violations of any criminal law that has resulted in a criminal charge), or any other type of extra-contractual liability based on, arising from, or attributable to, in any way, any of the Policies.

4.2    The Debtors shall serve notice of the Approval Motion and of the hearing thereon. Such notice shall be accomplished through electronic means or by mail on each of the Bankruptcy Notice Parties by United States mail, postage pre-paid. The mailing expense for notice of the Approval Motion and of the hearing shall be borne by the Debtors. The Insurers will not object to the use of any Settlement Proceeds to cover the mailing expense for notice of the Approval Motion and of the hearing.

4.3    To ensure the broadest notice possible, Debtors shall also publish notice of the sale of the Policies to the Insurers pursuant to §§ 363(b), (f) and (m) and Bankruptcy Rules 6004 and 9019 and notice of the hearing on the Approval Motion in *The Wall Street Journal* within seven (7) days after the filing of the Approval Motion. Publication of the notice of the sale of the Policies shall be borne by the Debtors. The Insurers will not object to the use of any Settlement Proceeds to cover the mailing expense for notice of the Approval Motion and of the hearing.

4.4    If the Approval Order is appealed by any Person (or a petition for *certiorari* or motion for rehearing or reargument shall be filed with respect thereto), then subject to the Parties'

-20-

termination rights set forth below, the Parties shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion; *provided, however*, that nothing herein shall preclude the Parties from mutually consummating the transactions contemplated herein if the Approval Order shall have been entered and is not stayed.

4.5     The Parties shall not take any appeal from, or seek to reopen, reargue or obtain reconsideration of, or otherwise contest or challenge in any way, directly or indirectly, either the Approval Order or any other order provided for by, or executed or entered pursuant to, or in implementation of, this Agreement, except to the extent that any such order shall be materially inconsistent with the terms hereof.

4.6     The Debtors shall cooperate with the Insurers and their representatives in connection with efforts to obtain entry of the Approval Order and on other matters directly related to entry of the Approval Order in the Bankruptcy Cases.  The Debtors shall not submit to the Bankruptcy Court for approval any motion, plan of reorganization, adversary proceeding, filing or other request, the approval of which would conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement or the rights of the Insurers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Approval Order.

4.7     The Insurers shall have no obligation to remit the Settlement Payment until the Approval Order is entered and the Effective Date occurs.  If (a) the Approval Order is vacated or modified, or otherwise entered in a form that is not reasonably acceptable to the Insurers, or (b) the Approval Order is reversed on appeal, then each Party may terminate this Agreement by delivering written notice to the other Parties within ten (10) business days of such event.  In the event this

Agreement is terminated, (i) the Agreement shall be void; (ii) the Insurers shall not be obligated to pay the Settlement Payment; and (iii) the Parties shall have all of the rights, defenses, and obligations under or with respect to the Policies that they would have had absent this Agreement.

**5.     INDEMNIFICATION**

5.1     **Defense and Indemnification.**  The Debtors(or an affiliated entity established to maintain the following obligation) will defend and indemnify the Insurers for Claims against them by any Person relating to the Policies, including but not limited to: (i) Claims by any Person claiming to be an insured, named insured, additional insured, or otherwise entitled to any benefits under any of the Policies; (ii) Claims for contribution, indemnification, apportionment or subrogation by any other insurers or alleged insurers of the Chrome Releasing Parties, and (iii) Claims directly against the Insurers by any other Person who does not qualify as an insured under any of the Policies.

5.2     **Limitations on the Debtors' Indemnification Obligations.**

(a)     The indemnification and defense obligations enumerated in Section 5.1 will incept upon the receipt of the Settlement Payment and will be capped at the amount of the Settlement Payment; *provided* that, for the avoidance of doubt, nothing in this Agreement shall require the Debtors or the Plan Administration Trust, as applicable, to fund any indemnification and defense obligations from proceeds of the Settlement Payment.

(b)     Any obligation on the part of the Debtors or the Plan Administration Trust, as applicable, to pay for the Insurers' defense and indemnity under this Agreement shall immediately terminate upon the earlier of (1) the exhaustion of the amounts set forth in Section 5.2(a) by payments of defense or indemnity to the Insurers (or the Plan Administrator's reasonable determination that funds sufficient to satisfy the defense and indemnification obligations

-22-

contemplated in Section 5.1 of this Agreement are no longer available in the Plan Administration Trust) and (2) the closing of all of the Bankruptcy Cases.

5.3     **Defense of the Insurers**.  Subject to Section 5.2, the defense of the Insurers for an indemnified Claim under Section 5.1 will proceed as follows:

(a)     The Debtors, through their own counsel, will use reasonable efforts to obtain a dismissal of the Insurers and the substitution of an appropriate Chrome Insured Entity on the basis that the Insurers' obligations with respect thereto were finally resolved by a reasonable, good faith settlement.

(b)     Should the claimant refuse to dismiss the Insurers, the Insurers will have the right to select defense counsel, subject to the Debtors' or the Plan Administration Trust's, as applicable, consent, which consent shall not be unreasonably withheld, to defend the Insurers at the Debtors' expense ("Retained Counsel").  Any such Retained Counsel will be chosen from among insurance coverage counsel used by the Insurers, at rates not to exceed those routinely paid by the Insurers for similar insurance coverage legal representation in the jurisdiction at issue and for the matters involved.

(c)     The Insurers will have the right to control all positions taken on their behalf whether procedural or substantive, including without limitation all positions taken in connection with interpretation of the Policies.

6.     **ADDITIONAL RELEASES**

6.1     Effective upon receipt by the Debtors or the Plan Administration Trust of the Settlement Payment, in the event any of the Chrome Releasing Parties settles any Claim related to or arising out of a Claim released under this Agreement with any Person other than the Insurers without the Insurers' consent, the settling Chrome Insured Entity agrees that it will not seek from the Insurers any sums allocated to the Insurers by such settlement.

6.2     Each of the Debtors further warrants and agrees that the Insurers shall be included as "released parties" in the U.S. Data Breach Class Settlement Agreement, the U.S. Data Breach Arbitration Settlement Agreement, the Canadian Data Breach Class Settlement Agreement, and the Pixel Class Settlement Agreement.  With respect to the Class Settlements, which have already been preliminarily approved by the Bankruptcy Court, the Debtors further warrant and agree that the Class Settlements will be modified to include the Insurers within the definition of "Released Party" and included as released parties in the final order approving each of the settlement agreements.

6.3     The Debtors agree that they shall further use reasonable efforts to obtain a release in favor of the Insurers from any Person who, as part of their Claim against the Chrome Releasing Parties, has also asserted a Claim against the Insurers and which Claim is being released under this Agreement.

## 7.     **ADDITIONAL PROVISIONS**

7.1     **Restrictions on Disclosure of Agreement.**  It is a material inducement for the Parties to enter into this compromise and settlement of their disputes and differences that the terms and provisions of this Agreement, shall be, and remain, strictly confidential, until the Agreement is filed in the Bankruptcy Cases for purposes of obtaining the Approval Order.  Prior to such public filing, neither this Agreement, nor any of its terms, may be disclosed to any Person, except that this Agreement and its terms may be disclosed; (a) as required by law or court order; (b) to any reinsurer, reinsurance intermediary, or retrocessionaire of the Parties, if any, in connection with insurance or reinsurance obligations or to any reinsurance arbitrator(s); (c) to the officers, directors, employees, representatives, counsel, accountants, agents and auditors of any of the Parties; (d) in any action or proceeding between the Parties where the existence or terms of the Agreement are at issue; (e) to the advisors for the Creditors' Committee and the Official Equity

-24-

Committee on a professional eyes only basis; or (f) by written agreement of the Parties.  If this Agreement or its terms are disclosed pursuant to subparagraphs (a) or (d) above, the Party disclosing such information shall give prior written notice thereof to each of the other Parties. If this Agreement or its terms are disclosed pursuant to subparagraphs (b), (c), (e) or (f) above, the Party disclosing such information shall advise the recipient of the provisions of this paragraph.

7.2  **Reinsurance**.  Notwithstanding anything in this Settlement Agreement, nothing in this Settlement Agreement is intended to or shall be construed to apply to, or have any effect on, the Insurers' right to reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Policies or any other binder certificate, or policy of insurance issued by the Insurers.

7.3  **Amendments.**  Subject to the provisions of Section 7.2 hereof, neither this Agreement nor any term set forth herein may be changed, waived, discharged, or terminated except by a writing signed by the Parties.

7.4  **No Precedential Value.**  This Agreement shall be without precedential value, and it is not intended to be, nor shall it be construed as, an interpretation of any insurance policies.  It shall not be used as evidence, or in any other manner, in any court or other dispute resolution proceeding, to create, prove, or interpret the obligations of the Parties under any insurance policies issued to the Chrome Releasing Parties or to any other Person.

7.5  **Agreement Voluntarily Entered Into by Each of the Parties.**  This Agreement is executed voluntarily by each of the Parties, without any duress or undue influence on the part, or on behalf, of any of them.  The Parties represent and warrant to each other that they have read and fully understand each of the provisions of this Agreement and have relied on the advice and representations of competent legal counsel of their own choosing.

-25-

7.6    **Interpretation.**  This Agreement has been negotiated at arm's length and between and among Persons sophisticated and knowledgeable in the matters dealt with in this Agreement. In addition, this Agreement was drafted by experienced and knowledgeable legal counsel for each of the Parties.  Accordingly, none of the Parties shall be presumptively entitled to have any provisions of the Agreement construed against any of the other Parties in accordance with any rule of law, legal decision, or doctrine.

7.7    **No Admission.**  This Agreement is the result of a compromise of disputed issues. This Agreement does not constitute and may not be construed as an admission of any liability, fact, course of performance, or wrongdoing by any Party.  This Agreement is not, and cannot be construed as, any admission by any Party that any defense, indemnity, contribution, or other obligation exists under the Policies for the Claims released herein.

7.8    **Entire And Integrated Agreement.**  This Agreement is intended by the Parties as a final expression of their agreement and is intended to be a complete and exclusive statement of the agreement and understanding of the Parties with respect to the subject matters contained herein. This Agreement supersedes any and all prior promises, representations, warranties, agreements, understandings, and undertakings between or among the Parties with respect to such subject matters and there are no promises, representations warranties, agreements, understandings, or undertakings with respect to such subject matters other than those set forth or referred to herein.

7.9    **No Third-Party Beneficiaries.**  Nothing in this Agreement is intended or shall be construed to give any Person, other than the Insurers, the Chrome Releasing Parties, and the Plan Administration Trust, and their respective successors and permitted assigns, any legal or equitable right, remedy, or claim under or in respect to this Agreement or any provisions contained herein; this Agreement and any conditions and provisions hereof being and intended to be for the sole and

-26-

exclusive benefit of the Insurers, and the Chrome Releasing Parties as well as each of their respective successors and permitted assigns, and for the benefit of no other Person.

       7.10    **Notice.**  Any notice or request required or desired to be given pursuant to this Agreement shall be sufficient if made in writing and sent by first class mail, postage prepaid or by overnight mail or by electronic mail, addressed as follows or as the Parties subsequently may direct in writing:

              As to the Insurers:

                  Munich Re Specialty
                  Attn: Carolyn Thomas (cathomas@munichre.com)

                  Allied World Specialty Insurance Company
                  Attn: Brenda Hamilton (brenda.hamilton@awac.com)

                  Houston Casualty Company
                  Attn: Aaron Samples (asamples@tmhcc.com)

                  With a copy to:

                  Meghan Dalton
                  Clyde & Co US LLP
                  30 S. Wacker Drive, Ste. 2600
                  Chicago, IL 60606
                  (Meghan.Dalton@clydeco.us)

                  Landmark American Insurance Company

                  Attn: Cindy Gutierrez (cgutierrez@rsui.com)

                  With a copy to:

                  Brian C. Bassett
                  Danielle K. Kegley
                  Traub Lieberman Straus & Shrewsberry LLP
                  71 S. Wacker Dr., Ste. 2110
                  Chicago, Illinois 60606
                  bbassett@tlsslaw.com
                  dkegley@tlsslaw.com

As to the Chrome Releasing Parties:

> Chrome Holding Co.
> (formerly 23andMe)
>
> Attn:
> Guy Chayoun (guy@chromeholding.com)
> Jennie Feldman (jennie@chromeholding.com))
>
> With a copy to:
>
> Christopher Hopkins
> Jessica I. Choi
> PAUL, WEISS, RIFKIND, WHARTON &
> GARRISON LLP
> 1285 Avenue of the Americas
> New York, New York 10019
> chopkins@paulweiss.com
> jchoi@paulweiss.com

As to the Plan Administration Trust:

> Thomas B. Walper
> thomas.b.walper@pm.me

7.11   **Headings.**   The section titles, captions, and headings contained in the Agreement are inserted as a matter of convenience and for reference, and shall in no way be construed to define, limit, or extend the scope of this Agreement or the effect of any of its provisions.

7.12   **Recitals.**   The recitals set forth at the beginning of this Agreement shall not be admissible to prove the truth of the matters asserted therein in any action or proceeding involving any of the Parties (other than an action or proceeding brought to enforce the terms of this Agreement), nor do any of the Parties intend such recitals to constitute admissions of fact by any of them.

7.13   **Additional Representations and Warranties.**   The Debtors and the Insurers each represents and warrants that it is fully authorized to enter into this Agreement on its own behalf and on behalf of the Chrome Releasing Parties and the Insurers respectively, as those terms are

defined herein.  In addition, each of the Debtors and Insurers represents and warrants that (i) it is duly organized and existing in good standing under the laws of the United States, (ii) it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or internal approval is necessary, and (iii) the making and performance of this Agreement will not violate any provision of the law or the Party's articles of incorporation, charter, or by-laws.  In addition, each of the individuals signing this Agreement represents and warrants that they are authorized to execute this Agreement on behalf of the Party(ies) whom they represent.

7.14    **Execution in Counterparts.**    This Agreement may be signed in multiple counterparts and the separate signature pages executed by the Parties may be combined to create a document binding on all of the Parties and together shall constitute one and the same instrument.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _December 1, 2025_

CHROME HOLDING CO., CHROME CO, INC., LEMONAID HEALTH, INC., CHROME PHARMACY HOLDINGS, INC.

(Debtors)

By: _/s/ Matthew Kvarda_

Name: _Matthew Kvarda_

Title: _Chief Restructuring Officer_

Dated: _____

VARIOUS UNDERWRITERS subscribing to Cyber and Liability Policy UMR B1510CY2300014

By: _____

Name: _____

Title: _____

Dated: _____

ALLIED WORLD SPECIALTY INSURANCE COMPANY

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____     CHROME HOLDING CO., CHROME CO, INC., LEMONAID HEALTH, INC., CHROME PHARMACY HOLDINGS, INC.

(Debtors)

By: _____

Name: _____

Title: _____

Dated: __11/28/2025__     VARIOUS UNDERWRITERS
subscribing to Cyber and Liability Policy
UMR B1510CY2300014

By: Carolyn Thomas  Digitally signed by Carolyn Thomas
_____  Date: 2025.11.28 20:23:33 Z

Name: _Carolyn Thomas___
Head of Cyber, Casualty and Financial Lines Claims
Munich Re Specialty - Global Markets (MRS 457)
Title: _____

Dated: _____     ALLIED WORLD SPECIALTY
INSURANCE COMPANY

By: _____

Name: _____

Title: _____

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date set forth opposite the respective signatures below.

Dated: _____      CHROME HOLDING CO., CHROME CO, INC., LEMONAID HEALTH, INC., CHROME PHARMACY HOLDINGS, INC.

(Debtors)

By: _____

Name: _____

Title: _____

Dated: _____      VARIOUS UNDERWRITERS
subscribing to Cyber and Liability Policy
UMR B1510CY2300014

By: _____

Name: _____

Title: _____

Dated: ___12/1/2025_____      ALLIED WORLD SPECIALTY INSURANCE COMPANY

By: _____

Name: ___Andrew Baldwin_____

Title: ___Vice President_____

Dated: 11/25/2025

LANDMARK AMERICAN
INSURANCE COMPANY

By: *Cindy L. Gutierrez*

Name: Cindy L. Gutierrez

Title: Vice President, Team Leader

Dated: _____

HOUSTON CASUALTY COMPANY

By: _____

Name: _____

Title: _____

Dated: _____

LANDMARK AMERICAN
INSURANCE COMPANY

By: _____

Name: _____

Title: _____

Dated: __11/26/25____

HOUSTON CASUALTY COMPANY

By: _____

Name: Aaron Samples_____

Title: Claims Counsel_____

**Exhibit A**
**Policies**

| Policy Number | Insurer | Policy Start Date | Policy End Date |
|---|---|---|---|
| B1510CY2300014 | Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014 | 5/1/2023 | 5/1/2024 |
| 0313-8200 | Allied World Specialty Insurance Company | 5/1/2023 | 5/1/2024 |
| 14-MG-23-A16005 | Houston Casualty Company | 5/1/2023 | 5/1/2024 |
| LQS803239 | Landmark American Insurance Company | 5/1/2023 | 5/1/2024 |

[Exhibit A]

**Exhibit B**
**Insurers**

| Insurers | Limits of Liability |
|---|---|
| Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014 | $15,000,000 |
| Allied World Specialty Insurance Company | $5,000,000 |
| Houston Casualty Company | $2,500,000 |
| Landmark American Insurance Company | $2,500,000 |

[Exhibit B]

**Exhibit C**
**Insurers and Their Several Settlement Shares**

| Insurer | Allocated Share of Settlement Amount (USD) |
|---|---|
| Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014:<br>• Syndicate 457 at Lloyds (Munich Re Syndicate)<br>• Syndicate 2358 (Nephila Syndicate)<br>• RenaissanceRe Syndicate 1458 | $6,525,759.63 |
| Allied World Specialty Insurance Company | $5,000,000 |
| Houston Casualty Company | $2,500,000 |
| Landmark American Insurance Company | $2,500,000 |

[Exhibit C]

**Exhibit D**
**Proposed Order**

[Exhibit D]

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CHROME HOLDING CO. (f/k/a 23ANDME HOLDING CO.), *et al.*,[1]<br>          Debtors. | Case No. 25-40976-357<br>Chapter 11<br><br><br>(Jointly Administered)<br><br>Related Doc. 1226 |

**ORDER (I) AUTHORIZING AND APPROVING THE CYBER INSURER SETTLEMENT AND POLICY BUYBACK AGREEMENT AND RELEASE UNDER RULE 9019 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for entry of an order (this "Order") (a) approving and authorizing the Debtors to enter into and perform under a settlement (the "Settlement") with Various Underwriters at Lloyds subscribing to Cyber and Liability Policy UMR B1510CY2300014 ("Various Underwriters"), HCC Global ("HCC"), Allied World Specialty Insurance Company ("Allowed World"), Landmark American Insurance Company ("Landmark," and collectively with Various Underwriters, HCC and Allied World, the "Cyber Insurers") (together with the Debtors, the "Parties" and each a "Party"), on the terms and conditions set forth in that certain Cyber Insurance Settlement and Policy Buyback Agreement and Release attached hereto as **Exhibit A** (the "Settlement Agreement"); and (b) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter

---

[1]    The Debtors in each of these cases, along with the last four digits of each Debtor's federal tax identification number, are: Chrome Holding Co. (0344), ChromeCo, Inc. (7371), Chrome Pharmacy Holdings, Inc. (4690), Lemonaid Community Pharmacy, Inc. (7330), Lemonaid Health, Inc. (6739), Lemonaid Pharmacy Holdings Inc. (6500), LPharm CS LLC (1125), LPharm INS LLC (9800), LPharm RX LLC (7746), LPRXOne LLC (3447), LPRXThree LLC (3852), and LPRXTwo LLC (1595).  The Debtors' service address for purposes of these chapter 11 cases is: 870 Market Street, Room 415, San Francisco, CA 94102.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing, if any, on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND, DETERMINED, AND CONCLUDED THAT:

1.    The Settlement was proposed, negotiated, and entered into by the Parties and each of their applicable members, officers, directors, employees, agents, attorneys, advisors, and representatives at arm's length, in good faith, and without collusion or fraud.

2.    The settlements and compromises embodied in the Settlement Agreement, including, without limitation, the sale of the Policies, the release of Claims with respect thereto, and the Insurer Injunction/Bar Order (as defined below), are within the reasonable range of litigation outcomes if the Debtors were to litigate the matters resolved pursuant to the Settlement Agreement, represent fair and reasonable consideration, and are reasonable, fair and equitable, and in the best interest of the estate and its creditors after consideration of (a) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (b) the likely

difficulties in collection; (c) the complexity and likely duration of litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of creditors.

3.      Neither the Settlement Agreement nor the transactions contemplated thereby are subject to avoidance under Section 363(n) of the Bankruptcy Code, and none of the Parties have engaged in any conduct that would (a) cause or permit the Settlement Agreement, or the sale of the Policies, to be avoided under Section 363(n) of the Bankruptcy Code, or (b) prevent the application of Section 363(m) of the Bankruptcy Code.  Furthermore, in the absence of a stay pending appeal, if any, the Cyber Insurers will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in consummating the contemplated transactions at any time after entry of this Order.

4.      Claims against the Debtors and Claims and Interests in, to or under the Policies, are subject to bona fide dispute; hence, the Policies may be sold free and clear of such Claims and Interests pursuant to Section 363(f)(4) of the Bankruptcy Code.  Holders of Claims against the Policies may be compelled in a legal or equitable proceeding to accept a money satisfaction of such Claims; therefore, the Policies may be sold free and clear of such Claims pursuant to Section 363(f)(5) of the Bankruptcy Code.

5.      The sale of the Policies outside the ordinary course of business, free and clear of the Interests of all Persons, satisfies the requirements respectively of § 363(b) and § 363(f) of the Bankruptcy Code.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

6.      Pursuant to sections 105 and 363 of the Bankruptcy Code, Bankruptcy Rules 6004 and 9019, and all applicable law, the Settlement Agreement is hereby authorized and approved on the terms set forth herein.

7.     The Settlement (a) satisfies the standards applied by bankruptcy courts for the approval of a compromise and settlement pursuant to Bankruptcy Rule 9019, and (b) is fair, equitable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  Performance under the Settlement represents a sound exercise of the Debtors' business judgment.

8.     The Debtors execution of, and performance under, the Settlement Agreement is authorized and approved in all respects, and the Debtors are authorized to execute, deliver and perform under the Settlement Agreement and any additional instruments, documents and/or agreements that may be necessary or desirable to implement the Settlement Agreement without further order of the Court.  The Debtors have the power and authority, and are hereby authorized, to take any and all actions necessary to consummate the Settlement Agreement and to perform any and all obligations contemplated by the Settlement Agreement and this Order, including, without limitation, the granting of the releases set forth in the Settlement Agreement.

9.     The sale of the Chrome Releasing Parties' Interests in the Policies to the Cyber Insurers free and clear of any and all Interests of any Person is hereby approved, with all Interests in and to, and Claims against, the Chrome Releasing Parties' Interests in the Policies being fully extinguished without reservation as to the Cyber Insurers.

10.     The Cyber Insurers are good-faith purchasers of the Policies for value and without knowledge of adverse claims and, as such, as hereby entitled to all protections provided to a good-faith purchaser under Section 363(m) of the Bankruptcy Code.

11.     Upon the Settlement Agreement going effective in accordance with its terms, the Cyber Insurers shall be released from liability to the Chrome Releasing Parties under the Policies and/or applicable law.

12.     Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, 28 U.S.C. § 1651, and Bankruptcy Rule 7016 (the "Insurer Injunction/Bar Order"), all Persons who hold or assert, or may in the future hold or assert, a Claim or other debt or liability, or an Interest or any right against, in, arising out of, related to or in any way interrelated with any of the Debtors, or the Policies, or against any Cyber Insurer based on, arising out of, related to or in any way interrelated with the Cyber Insurers' relationship to any of the Debtors and the Policies, whether that Person or entity filed a proof of claim in the chapter 11 cases or otherwise, and any other Person who may claim to be an insured, additional insured, or otherwise entitled to any benefit under any of the Policies, are permanently barred, enjoined and restrained from:

a.      commencing, prosecuting, continuing or asserting, either derivatively or on behalf of themselves, any and all suits, actions, causes of action, direct actions, Claims, cross-claims, counterclaims, defenses, suits, amounts, reckonings, liens, security interests, or other demand against the Cyber Insurers;

b.      seeking to recover any loss, liability, cost, damage, expense, contribution, indemnification or reimbursement from the Cyber Insurers; and

c.      bringing any other cause of action or Claim, under federal law, state law, or any other applicable law or regulation, in any federal court, state court or any other judicial or non-judicial proceeding (including, without limitation, any proceeding in any judicial, arbitral, mediation, administrative, governmental or other forum) against or affecting the Cyber Insurers, or any of them, or their respective successors or assigns:

i.      arising out of or in connection with any conduct, injury, or damage allegedly covered by the Policies, or any of them; and

ii.     arising out of or in connection with the activities of the Debtors, or any of them, giving rise to Claims made or that could be made under the Policies, or any of them.

13.     The protections of the Insurer Injunction/Bar Order include, but are not limited to:

a.      any and all Claims that are based in whole or in part on the insurance relationship between the Cyber Insurers and the Debtors (or the Debtors' successors in interest), or any of them, under any of the Policies, whether arising from statute, common law, or otherwise; and

b.   any and all Claims that are based in whole or in part on any alleged breach by an Insurer of the duty of good faith and fair dealing, unfair claims practices, unfair trade practices, bad faith, violations of any statute, regulation or code (except violations of any criminal law that has resulted in a criminal charge), or any other type of extra-contractual liability based on, arising from, or attributable to, in any way, any of the Policies.

14.   The failure to mention any provision of the Settlement in this Order shall not impair its efficacy, it being the intent and effect of this Order that the Settlement and the compromises and agreements contained therein are approved in all respects and all relief contemplated by the Settlement is hereby granted.

15.   Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or any order granting the relief requested by the Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in the Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection

6

or seek avoidance of all such liens.

16.     Notice of the Motion, including the terms and conditions of the Settlement Agreement, the Sale/Buyback of the Cyber Insurance Policies, the terms of the Cyber Insurer Injunction/Bar Order and the hearing to approve the Motion, as provided therein is hereby deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

17.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

18.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

19.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

20.     No later than two business days after the date of this Order, the Debtors shall serve on the Notice Parties a copy of the Order and shall file a certificate of service no later than 24 hours after service.

Dated: _____, 2025
St. Louis, Missouri

_____
Brian C. Walsh
United States Bankruptcy Judge

**Order Prepared By:**

**Carmody MacDonald P.C.**
Thomas H. Riske #61838MO
Nathan R. Wallace #74890MO
Jackson J. Gilkey #73716MO
120 S. Central Avenue, Suite 1800
St. Louis, Missouri 63105
Telephone:      (314) 854-8600
Facsimile:      (314) 854-8660
Email:
              thr@carmodymacdonald.com
              nrw@carmodymacdonald.com
              jjg@carmodymacdonald.com

- and -

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Paul M. Basta (admitted *pro hac vice*)
Christopher Hopkins (admitted *pro hac vice*)
Jessica I. Choi (admitted *pro hac vice*)
Grace C. Hotz (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019
Telephone:      (212) 373-3000
Facsimile:      (212) 757-3990
Email:      pbasta@paulweiss.com
              chopkins@paulweiss.com
              jchoi@paulweiss.com
              ghotz@paulweiss.com

*Counsel to the Debtors and Debtors in
Possession*

**Schedule I**

Provided separately to Insurers.