**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF MISSOURI**

**EASTERN DIVISION**

| | |
|---|---|
| In re:<br>**CHROME HOLDING CO. (f/k/a 23ANDME HOLDING CO.),**<br>*Wind-Down Debtor.* | Case No. 25-40976-357<br>Chapter 11<br>Relates to Docket No. 2485<br>Response Deadline: September 8, 2026, at 4:00 p.m. (Central)<br>Hearing Date: September 15, 2026<br>Hearing Time: 1:00 p.m. (Central) |

**OBJECTION OF COURTNEY J. NAGLE, HOLDER OF DISPUTED CLAIM NO. 88157, TO THE PLAN ADMINISTRATION TRUST'S MOTION FOR ENTRY OF AN ORDER (I) ESTABLISHING THE DISPUTED CLAIMS RESERVES, (II) APPROVING THE RESERVE AND DISTRIBUTION PROCEDURES, AND (III) GRANTING RELATED RELIEF**

Courtney J. Nagle ("Claimant" or "Objector"), the holder of Disputed Claim No. 88157 (the "Claim") asserted against the above-captioned Wind-Down Debtor arising out of the 2023 Cyber Security Incident, appearing pro se, hereby objects (this "Objection") to the Plan Administration Trust's Motion for Entry of an Order (I) Establishing the Disputed Claims Reserves, (II) Approving the Reserve and Distribution Procedures, and (III) Granting Related Relief [Docket No. 2485] (the "Motion"), filed by the Plan Administration Trust (the "Trust") on August 14, 2026. In support of this Objection, Claimant respectfully states as follows. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

**PRELIMINARY STATEMENT**

1. This Motion asks the Court to sanction a reserve and distribution scheme that treats the victims of the Debtors' own data breach as an afterthought while insiders are made whole in

full and on negotiated terms. The Trust proposes to reserve $8.8 million — negotiated, consented-to, dollar-for-dollar — for the Former CEO's attorneys' fees, TTAM's contract claims, and a former employee's severance. In the very same breath, the Trust's own Reserve Calculation Notice, served on Claimant on August 14, 2026, fixes the reserve against Claimant's own documented $5,000,000 claim at $281.25 — a figure produced by the same formulaic, non-individualized methodology the Trust applied across all 1,182 Twenty-Second Objection claimants, each a person whose personal genetic and health data the Debtors lost in a breach the Debtors themselves caused, disclosed, and have never disputed occurred. No negotiation. No individualized review of Claimant's asserted damages. A number generated by the very fiduciary whose job is to shrink the pool available to pay the people the Debtors harmed.

2. That is not claims administration. That is triage in which the people who caused no harm to the estate and suffered the actual injury are placed last, and the insiders who ran the company into bankruptcy are placed first, paid in full, and paid on their own negotiated terms. The Trust calls this "reasonable business judgment." It is neither reasonable nor is it the exercise of the good faith the Bankruptcy Code and this Court require of a fiduciary administering a trust for the benefit of creditors — including, first and foremost, the creditors whose data was stolen because the Debtors failed to protect it.

3. The Trust compounds the unfairness with timing. The Trust scheduled the hearing on the omnibus objections that will decide whether these very claims survive — the Twenty-Second and Twenty-Third Objections — for August 25, 2026, and then set the deadline to object to this Motion, which fixes how much (if anything) those claimants can ever recover, for September 8, 2026 — two weeks after the merits of their claims will already have been

decided. Claimants are being asked to respond to a reserve for claims the Trust will already have moved to extinguish. That sequencing did not happen by accident. It denies over a thousand claimants, most of them unrepresented, any realistic opportunity to be heard on the amount reserved for them before the pool of money potentially available to them is effectively fixed.

4. For the reasons set forth below, the Court should deny the Motion as to the General Reserve and the Twenty-Second and Twenty-Third Objection Claims, or, at minimum, condition any approval on the relief requested in the Conclusion below.

**BACKGROUND**

5. On October 6, 2023, the Debtors disclosed that unauthorized third parties had accessed the personal genetic, health, and ancestry data of substantially all of their customers (the “Cyber Security Incident”). That breach is the origin of the overwhelming majority of the 1,351 Disputed Claims now before the Court, including the Twenty-Second Objection Claims (1,182 claims, which include Claimant's) and a substantial portion of the Twenty-Third Objection Claims (125 claims). Motion ¶¶ 25–28, 51–58.

6. The Trust proposes three reserves: (a) $3.2 million for the State of California's claims; (b) $8.8 million for the “TTAM Parties” — the former CEO, TTAM Research Institute, and a former employee; and (c) a General Reserve of approximately $5.2–$6.7 million for all 1,309 remaining Disputed Claims, the overwhelming majority of which are individual data breach victims, including Claimant. Motion ¶¶ 8–10, 28.

7. The TTAM Parties Reserve was reached through direct negotiation between Trust counsel and counsel for the Former CEO and the other TTAM Parties, all of whom “consented to

the amounts and allocation." Motion ¶ 49; Walper Decl. ¶ 23. No such negotiation was offered, or was possible, for the 1,182 individual claimants — including Claimant — subject to the Twenty-Second Objection, or the 125 claimants subject to the Twenty-Third Objection. The Trust set those reserve amounts unilaterally. Motion ¶¶ 53–58.

8. The Trust's own papers acknowledge that the Twenty-Second Objection Claims were filed by individual claimants across approximately 54 countries and 12 states who "appear likely to have been impacted by the Cyber Security Incident based on the Debtors' books and records," and who are excluded from the Cyber Claims Settlements only "because of their location or their decision to opt out." Motion ¶ 52. Claimant is one of these individuals: Claimant timely filed Claim No. 88157 on June 26, 2025, asserting $5,000,000.00 in documented damages arising from the Cyber Security Incident. Notwithstanding the Trust's acknowledgment of probable impact, the Trust's Reserve Calculation Notice fixes the reserve against Claimant's claim at $281.25 — a fraction of one percent of the amount asserted, and a figure the Trust's own notice shows was generated by formula rather than by any review of the amount asserted or the documentation supporting it. Motion ¶¶ 53–54.

## ARGUMENT

### *I. The Motion's Timeline Denies Claimants a Meaningful Opportunity to Be Heard*

9. Due process requires notice and a meaningful opportunity to be heard before a right is finally adjudicated. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The Trust's own scheduling makes that opportunity illusory here. The Twenty-Second and Twenty-Third Objections — which determine whether the claims covered by the General Reserve survive at all — are set for hearing on August 25, 2026. The deadline to object to this Motion, which fixes the dollars available to satisfy those very claims, is

September 8, 2026. By the response deadline, the claims will already have been Allowed at the Trust's calculated reserve amount, or Disallowed outright, at a hearing most of the 1,182 affected claimants — spread across 54 countries, most appearing pro se — had no practical ability to attend or oppose.

10. The Motion then asks each claimant who wishes to challenge the reserve amount to do so by filing a response "identifying … the amount requested to be reserved … together with documentation sufficient to support both (i) the requested amount and (ii) the legal basis on which the Debtors would be liable to such claimant for that amount." Motion ¶ 67. That is not a reserve-amount objection procedure. It is a demand that unrepresented individuals across four continents fully brief the merits of their claims, unassisted, inside a three-week window, against a fiduciary represented by two law firms — while the TTAM Parties' claims were resolved through direct attorney-to-attorney negotiation with no comparable burden. The disparity in process alone warrants denial or, at minimum, an extension and bifurcation of the response deadline until after the Twenty-Second and Twenty-Third Objections are finally resolved.

## *II. The Reserve Figure Assigned to Claimant's Twenty-Second Objection Claim Is Arbitrary and Cannot Satisfy Section 502(c)*

11. Section 502(c) estimation is not a license to pick a number that is administratively convenient for the estate; it requires a reasoned method suited to the claims being estimated. See Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982). The Trust's method here is circular: it benchmarks its per-claimant figure against a "weighted average implied per-claimant recovery" of $125.94 drawn entirely from settlements the Twenty-Second Objection claimants, including Claimant, were excluded from. Walper Decl. ¶ 28.

A claimant cannot be bound to a number derived from a deal he or she was never permitted to accept. Using an excluded class's non-participation to justify a below-that-class recovery is not reasoned estimation — it is bootstrapping a low number into legitimacy by reference to a benchmark manufactured from claims the Trust itself kept these claimants out of.

12. The reserve fixed for Claimant's claim is also facially inconsistent with the Trust's own factual admissions. The Trust does not contend Claimant, or the other Twenty-Second Objection claimants, were unaffected by the breach — to the contrary, it states they "appear likely to have been impacted … based on the Debtors' books and records." Motion ¶ 52. Having conceded probable impact, the Trust cannot simultaneously fix a $281.25 reserve against Claimant's documented $5,000,000 claim, or any comparably formula-driven figure against any other Twenty-Second Objection claim, without regard to the amount asserted, the degree of harm alleged, or the documentation submitted in support. A reserve calculated without any reference to the individual claim amount, degree of asserted harm, or supporting documentation is not an estimate — it is a ceiling imposed to protect estate assets from the very people the estate harmed.

### *III. The Twenty-Third Objection's $150,000 Cutoff Illustrates the Same Result-Oriented Methodology Applied to Claimant's Claim*

13. The Trust reserves the full asserted amount for any Twenty-Third Objection claim of $150,000 or less but caps every claim above that threshold — the "Excessive and Undetermined Claims" — at the same "Per Claimant Reserve Amount" of approximately $10,366.90, derived exclusively from the smaller claims. Motion ¶¶ 57–58; Walper Decl. ¶¶ 30–32. That methodology has no relationship to claim merit, and it is the same result-oriented approach applied to Claimant's own claim in the Twenty-Second Objection: a

formula is selected, and whatever number it produces is treated as "reasonable" regardless of what any individual claimant actually asserted or documented. A reserve methodology that reserves less, proportionally, the larger and more substantiated a claim becomes — whether applied to a Twenty-Third Objection claim capped above $150,000 or to Claimant's own $5,000,000 claim reduced to $281.25 — is result-oriented, not principled, and should not be approved without a claim-specific justification the Motion does not provide.

### *IV. The Trust's Disparate Treatment of Insiders and Data Breach Victims Is Inequitable and Inconsistent With the Fiduciary Duties the Trust Owes Its Beneficiaries*

14. A bankruptcy estate's fiduciary must administer the estate honestly, evenhandedly, and in the interest of the creditors as a whole — not in a manner that privileges insiders over the ordinary people harmed by the Debtors' own conduct. See In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994) (a fiduciary "must treat all parties … fairly" and may not favor one class of claimant over another absent a legitimate basis). The Plan Administrator, Thomas B. Walper, previously served on the Debtors' own Board and its Special Committee before assuming his current role. Walper Decl. ¶ 2. He now sets, in his own words, the reserve amounts "in his reasonable business judgment" for the very claimants harmed by conduct that occurred, in part, on his watch — while the TTAM Parties, plainly the more sophisticated and represented constituency, received a negotiated outcome that fully protects their claims.

15. Set aside the legal doctrine for a moment and look at what this Motion actually proposes. The Debtors collected the most sensitive personal data a person can give a company — their genetic code — and lost it to a data breach. Claimant's own reserve, fixed by the Trust

at $281.25 against a documented $5,000,000 claim, illustrates what that means in practice: the people whose DNA, ancestry, and health information were exposed are, under this Motion, worth pennies on the dollar. The former Chief Executive Officer whose company lost that data is worth $5 million, guaranteed, negotiated, consented-to. That is not a business judgment call. It is a moral inversion of who this estate exists to make whole, and no amount of "conservative methodology" language in the Motion changes the plain arithmetic of it. The Court sits in equity as well as law, and equity does not require rubber-stamping a distribution scheme that pays the executives first and the victims last, in that order of magnitude.

16. Basic decency, not just the Bankruptcy Code, counsels against approving a scheme where a company's own leadership walks away insured and indemnified in full while the people whose trust that leadership violated are handed a reserve calculated to be just large enough to survive a motion to dismiss for lack of adequate protection. The Trust had the ability to negotiate individually with the TTAM Parties because it chose to. It had the same ability, as a matter of process design, to provide Claimant and the other Twenty-Second Objection claimants — who did nothing wrong and bear no responsibility for the breach — a claims process proportionate to what they actually lost. It chose not to. The Court should not ratify that choice by approving the Motion as submitted.

### *V. The Incremental Reserve Amount Is an Admission That the Trust's Own Estimates Are Not Reliable*

17. The Trust asks the Court to find its Reserve Amounts "reasonable" — including the $281.25 fixed against Claimant's claim — while simultaneously adding a $5 million "Incremental Reserve Amount" because the Trust is not confident those very amounts are

sufficient. Motion ¶¶ 8, 62–63; Walper Decl. ¶ 36. The Trust cannot have it both ways: either the underlying estimates are adequate, in which case the cushion is unnecessary, or they are not, in which case the Court should not approve them as “reasonable determinations” without independent scrutiny of the gap the Trust itself flagged.

**CONCLUSION**

18. For the foregoing reasons, Claimant respectfully requests that the Court (a) deny the Motion as to the General Reserve, the Twenty-Second Objection Claims (including Claimant's Claim No. 88157), and the Twenty-Third Objection Claims; (b) in the alternative, continue the response deadline on this Motion until after final resolution of the Twenty-Second and Twenty-Third Objections, so that affected claimants are not forced to respond to a reserve for claims whose merits have not yet been decided; (c) direct the Trust to recalculate the General Reserve, including the reserve for Claimant's own claim, using an individualized, claim-specific methodology rather than a formula benchmarked against settlements the claimants were excluded from; and (d) grant such other and further relief as is just and proper.

Dated: August 19, 2026

Ronkonkoma, New York

Respectfully submitted,

Courtney J. Nagle
500 Peconic Street, Apt. 253B
Ronkonkoma, NY 11779
*(Note to the Court and the Trust: the address of record for Claim No. 88157 on file with Kroll Restructuring Administration is 211 Terry Road, Apt. 18B, Smithtown, NY 11787-5111.*

*Claimant has since relocated and provides the address above as the correct and current address for all further notices, service, and correspondence in this matter.)*

Phone: (631) 897-6578
Email: cjnagle@gmail.com
*Claimant, Pro Se — Class 7*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2026, or such later date as this Objection is actually filed, a true and correct copy of the foregoing Objection was served via the Court's CM/ECF electronic filing system on all parties registered to receive electronic notice in this case, and via electronic mail and/or first-class mail upon the following:

Counsel for the Plan Administration Trust:
Jessica I. Choi, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas, New York, NY 10019

Co-Counsel:
Thomas H. Riske, Esq.
Carmody MacDonald P.C.
120 S. Central Avenue, Suite 1800, St. Louis, MO 63105

Office of the United States Trustee:
Carole J. Ryczek / Joseph Schlotzhauer
111 South 10th Street, Suite 6.353, St. Louis, MO 63102

Courtney J. Nagle